UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELYSE MCKENNA,

     Plaintiff,                   Case No. 24-cv-12347

v.

                                      Hon. Brandy R. McMillion

ROBERT F. RILEY,            Magistrate Elizabeth A. Stafford

and

RILEY & HURLEY, PC,

and

OLSMAN MACKENZIE PEACOCK, PC,

     Defendants.

_____/

| | |
|---|---|
| Kathleen Kalahar (P60301) | Elizabeth Hardy (P37426) |
| Goodman Kalahar | Thomas J. Davis (P78626) |
| Attorneys for Plaintiff | Kienbaum Hardy Viviano |
| 1394 East Jefferson Avenue | Pelton & Forrest, P.L.C. |
| Detroit, MI 48207 | Attorneys for Defendants |
| (313) 567-6165 | Robert F. Riley and Riley & Hurley, PC |
| (248) 310-0133 (mobile) | 280 N. Old Woodward Avenue, Suite 400 |
| kkalahar@goodmankalahar.com | Birmingham, MI 48009 |
| | (248) 645-0000 |
| Randi McGinn | ehardy@khvpf.com |
| McGinn Montoya Love Curry & | tdavis@khvpf.com |
| Sievers PA, | |
| Attorneys for Plaintiff | Deborah L. Gordon (P27058) |
| 201 Broadway Blvd SE | Elizabeth Marzotto Taylor (P82061) |
| Albuquerque, NM 87102 | Sarah Gordon Thomas (P83935) |
| randi@mcginnlaw.com | DEBORAH GORDON LAW |
| | Attorneys for Defendant Olsman |
| | MacKenzie Peacock, P.C. |
| | 33 Bloomfield Hills Parkway, Suite 220 |

Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com

## SECOND AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, Elyse McKenna, through her attorneys, Goodman Kalahar PC, and McGinn Montoya Love Curry & Sievers PA, for her Complaint and Jury Demand against the Defendants, Robert Riley, Riley & Hurley, PC, and Olsman MacKenzie Peacock, PC, alleges as follows:

### INTRODUCTION

1.      During the time she worked for his law firm, Robert F. Riley ("Riley") treated Elyse McKenna ("McKenna") differently than other attorneys in his office because of her gender, creating a hostile work environment for this young lawyer. For the past five years Riley continued to sexually harass and stalk attorney McKenna. For more than two of those years, Riley's harassment of McKenna occurred with the knowledge and constructive approval of McKenna's then-employer, the law firm of Olsman MacKenzie Peacock, which has a close and mutually beneficial business relationship with Riley and allowed Riley to influence and control McKenna's employment conditions.

2.      Riley is the foremost mediator in Michigan for front-page sex abuse/harassment lawsuits and complex personal injury lawsuits. On the pretense of

2

being McKenna's professional "mentor" and, later, as her employer, Riley – who first met McKenna when she was a twenty-one year-old law clerk – lured McKenna away from her job as an attorney to hire her at his firm, Riley & Hurley ("RH"). Riley then subjected McKenna to intense sexual grooming and a sexually hostile work environment, in which her tolerance of Riley's inappropriate sexual behavior and obsession with her were conditions of her employment.

3.    McKenna's life was taken over by Riley. From day one, Riley bombarded her with unwanted handwritten notes, text messages, phone calls, time spent in her office throughout the workday, lavish gifts, and mandatory monthly dinners with just him at expensive restaurants. He interrogated McKenna about her personal life and insisted on being part of it, attempted to kiss her when he was alone with her, wrote McKenna a romantic note saying he saw "no reason to be tentative" about his "love" and "affection" for her "no matter its implications," and wrote her another note saying, "I have already thought of you 662,112 times today."

4.    When McKenna rebuffed Riley or attempted to distance herself from him, as she did often, he questioned her loyalty, intimidated her, and reminded her that her professional success depended on him.

5.    After McKenna discovered Riley had been secretly photographing her at the office and stockpiling hundreds of other photographs of her on his iPad, she quit her job and went to work for her new employer, Olsman MacKenzie Peacock

3

("Olsman").

6.     With the knowledge, fostering and constructive approval of Olsman, Riley's sexual harassment of McKenna continued and escalated, including crying to her about her setting boundaries; duping her into being alone with him so he could discuss his feelings for her; threatening suicide; persistently contacting her; meddling in her personal and professional life; showing up uninvited; interfering with and sabotaging her work; and stalking McKenna and putting her in great fear for her physical safety.

7.     Throughout McKenna's employment at Olsman, Olsman and Riley regularly communicated with each other about McKenna, and Riley influenced Olsman's decisions regarding McKenna's employment.

8.     McKenna repeatedly told Riley to leave her alone, but Riley was a man who would not take "no" for an answer.

9.     The partners of Olsman disregarded McKenna's numerous reports of Riley's unwanted, inappropriate behavior and rejected her requests for help and to not be required to interact with Riley. Olsman warned McKenna that "we keep Bob Riley happy in this office," laughed at her for expressing her fear for her safety as Riley's behavior escalated, told McKenna not to "make a big stink" about it, allowed Riley's gossip to negatively influence McKenna's work conditions, told McKenna to stop talking about Riley, and, ultimately, fired McKenna, in retaliation, two days

after she confronted Riley, through counsel, to try and get him to stop.

10.    Riley and Olsman launched an ongoing concerted effort to ruin McKenna's reputation and destroy her livelihood. They disparaged her to clients and to her colleagues in the legal community, telling them she was "incompetent," having an "emotional breakdown" and "dishonest." They spread rumors about her.

11.    All the while, Olsman and Riley have continued to mutually benefit from their close and longstanding relationship.

12.    As a result of standing up to  Riley and Olsman, McKenna was forced to leave the state and had to start her legal career over. Because of  Riley's prominent position in the community, McKenna was unable to find legal support in the metro-Detroit legal community that was the center of her once vibrant and promising professional life, and she was ostracized by Riley's network of loyalists for revealing his misconduct. McKenna now lives in Maryland, in the home of her law partner, where she is trying to rebuild the nine-year career that Riley and Olsman took away from her and put the pieces of her shattered life back together.

13.    This action is brought by Plaintiff Elyse McKenna for discrimination, sexual harassment, hostile work environment, disparate treatment, retaliation, and other violations of Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e, et seq. ("Title VII"); the Elliott-Larsen Civil Rights Act, as codified, M.C.L. § 37.2101 et seq. ("ELCRA"); and Michigan statutory and common law.

## PARTIES, JURISDICTION AND VENUE

14.     Plaintiff Elyse McKenna, formerly known as Elyse Heid ("McKenna") is a 31 year-old attorney and is now a resident and citizen of the State of Maryland.

15.     Defendant Riley & Hurley, PC, ("RH") is a general civil practice law firm and is incorporated in and has its principal place of business in Michigan.

16.     Defendant Robert Riley ("Riley") is a 70 year-old attorney,  the named and managing partner of RH and  a resident and citizen of the State of Michigan.

17.     William Hurley ("Hurley") is an attorney and a named partner of RH and is a resident and citizen of the State of Michigan.

18.     Defendant Olsman MacKenzie Peacock, PC ("Olsman") is a metro-Detroit personal injury law firm which  is incorporated in and has its principal place of business in Michigan.

19.     Jules Olsman ("Jules Olsman") is a 71 year-old attorney and named partner at Olsman and is a resident and citizen of the State of Michigan.

20.     Donna MacKenzie ("MacKenzie") is a 44 year-old attorney and named partner at Olsman and is a resident and citizen of the State of Michigan.

21.     Emily Peacock ("Peacock") is a 45 year-old attorney and named partner at Olsman and is a resident and citizen of the State of Michigan.

22.     This Court has personal jurisdiction over the parties to this Complaint.

23.     Pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, this Court has

subject matter jurisdiction over this matter, because Plaintiff's claims arise under federal law.

24.    Pursuant to 28 U.S.C. §1332(a)(1), this Court also has subject matter jurisdiction over this action, based on diversity of citizenship and an amount in controversy in excess of $75,000.00.

25.    Pursuant to 28 U.S.C. §1367, this Court should exercise supplemental jurisdiction over Plaintiff's state law claims because those claims arise out of the same set of operative facts as Plaintiff's federal claims, such that all claims form part of the same case and controversy.

26.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action occurred in the Eastern District of Michigan.

## PROCEDURAL BACKGROUND

27.    McKenna exhausted her administrative remedies at the U.S. Equal Employment Opportunity Commission ("EEOC").

28.    The EEOC found reasonable cause to believe violations of Title VII occurred. The EEOC issued McKenna a Notice of Right to Sue, which McKenna received on or about October 15, 2024. A true and correct copy of that notification is attached as **Exhibit A**.

## FACTUAL ALLEGATIONS

**Riley's Knowledge of the Elements of Sexual Harassment, Discrimination, Stalking.**

29.     Riley has served as a mediator, facilitator, and arbitrator in hundreds of civil matters in various areas of law, including complex medical malpractice and personal injury litigation and sex abuse/sex harassment litigation. Of note, Riley served as independent mediator in:

      a.  the UM/Anderson lawsuit involving 1,050 University of Michigan athletes and patients alleging they were sexually abused by Dr. Robert Anderson, a physician at the school;

      b.  the Northwestern University hazing lawsuits by numerous former football players alleging sexualized hazing, racial discrimination, and abuse within the football program; and

      c.  the Eastern Michigan University rape lawsuits by 24 current and former Eastern Michigan students alleging the university and several of its officials covered up students' reports of rape near campus.

30.     Based on his experience as a lawyer and a mediator, Riley knew or should have known what was inappropriate conduct in the workplace, including conduct that constitutes sexual harassment, sexual discrimination, hostile work environment, disparate treatment in the workplace, retaliation, and stalking.

**July – October 2019: Riley Begins Sexually Grooming McKenna and Lures Her to Quit her Job and Work for Him**.

31.     Riley met McKenna in 2014 at a mediation. McKenna was a 21 year-old law student working as a law clerk at a Troy, Michigan medical malpractice law firm.

32.    At the time, McKenna, who graduated as valedictorian of her Marine City, Michigan high school at age 17, was on track to graduate from Case Western Law School in 2015 at age 22, as the youngest person in her class.

33.    While in law school, McKenna was a finalist in the school's moot court competition and won the awards for "best student in trial tactics" and "best litigator." She also was inducted into the Order of the Barristers, a national honor society with membership limited to graduating law students and practicing lawyers who demonstrate exceptional skill in trial advocacy, oral advocacy, and brief writing.

34.    Between 2014 and the summer of 2019, while working as a law clerk and then as a lawyer, McKenna attended various facilitations that were mediated by Riley.

35.    In the summer of 2019, Riley commenced an elaborate scheme to sexually groom and acquire control over McKenna's career. He 1) lured McKenna away from her job as medical malpractice lawyer, 2) worked behind the scenes (and without McKenna's knowledge) to get McKenna several job offers, 3) became McKenna's "mentor" to guide her in her career choices, 4) misrepresented problems in the law firms she was considering to convince McKenna to reject the very job offers he had cultivated, and 5) presented McKenna with an attractive offer to work for his firm, RH, which she ultimately accepted.

36.    In July or August of 2019, an attorney from a respected Southfield,

Michigan law firm contacted McKenna and asked if she was interested in a position with the firm. The attorney said she was reaching out based on the recommendation of a well-known attorney.

37.     Around the same time, Riley prompted a mutual professional acquaintance (a hospital claims representative) to contact McKenna and encourage her to leave her current firm. The claims representative told McKenna that Riley had asked her to share his contact information with McKenna. She said Riley had told her he did not want McKenna's current employer to think Riley was trying to "poach" McKenna, but that he would be happy to be a sounding board for McKenna as she made career decisions, and, furthermore, that he had specific career advice for McKenna.

38.     Shortly thereafter, McKenna was approached by other law firms, which resulted in job offers for medical malpractice associate positions from four prominent metro-Detroit firms, including the Southfield firm that had reached out to McKenna first, at Riley's suggestion.

39.     Upon information and belief (but unknown to McKenna at the time), Riley recommended McKenna as a promising young attorney to these and many metro-Detroit law firms in the area.

40.     Subsequently, Riley reached out to McKenna and invited her to his annual end-of-summer barbeque. The event is regarded as a party for the "who's

who" of medical malpractice attorneys in Michigan.

41.     On September 7, 2019, McKenna attended Riley's barbeque, after which they had numerous conversations regarding McKenna's job offers and career prospects.

42.     Riley's first piece of advice for McKenna was that she should leave her current employer. He falsely told her  the partners of the firm were subverting medical malpractice cases from being directly assigned to her.

43.     Riley discouraged McKenna from taking any of the job offers that she had received (and, upon information and belief, that he had cultivated), stating that McKenna would not be afforded the opportunities she deserved at these other firms.

44.     Throughout these early discussions about McKenna's job opportunities, Riley praised McKenna's legal skills and spoke very favorably of her potential, which he often described as being unlimited.

45.     Riley also implored McKenna to tell him about her upbringing, telling her that he could only determine where she would be a good fit, whether she would make a good attorney, and how much promise she had if she was willing to share intimate details about her childhood and family.

46.     After discouraging her from taking a job with any of the other firms, Riley offered McKenna a job with his firm, RH, and coordinated an interview of McKenna by his law partner, Hurley.

47.     After much consideration, McKenna declined Riley's offer and accepted a position with the Southfield firm that had first contacted her. She tendered her notice of resignation to her employer.

48.     When McKenna told Riley of her decision, Riley became very upset with McKenna and cried throughout the meeting. He expressed concern for McKenna's legal career and told her she was making the wrong decision, but he refused to articulate why.

49.     Later that week, Riley asked McKenna and McKenna's then-husband to dinner, during which Riley falsely told them that female attorneys who had worked for the Southfield firm had been raped and sexually assaulted by colleagues. Riley warned McKenna that going to work for that firm would ruin her career.

50.     Riley also discussed the all-male board of directors at the Southfield firm and said he had a female attorney friend around his age who was a partner at the firm, and she was consistently mistreated and disparately compensated. Riley also discussed that female attorney's female associate, who he stated also was not fairly treated by the firm.

51.     Riley explained that he had been hesitant to tell McKenna all this upfront, but that he felt he had to tell her once he knew she was making a mistake with her career.

52.     On September 27, 2019, Riley sent McKenna an unsolicited term sheet

detailing, *inter alia*, her potential to become a full owner of his RH law firm at no cost to her, other than recognition of outstanding accounts receivables to RH and existing stock reimbursement.

53.     Alarmed at what Riley had shared about the Southfield firm, having already put in her notice at her current employer, recognizing Riley's reputation in the legal field in Michigan, and excited about the opportunity to become a partner in a well-respected law firm in the metro-Detroit area, McKenna changed her mind and accepted Riley's offer of employment.

54.     What should have been the start of a long and promising career at RH turned into a decision that McKenna will look back on and regret for the foreseeable future.

**October – December 2019: McKenna Begins Work at RH, Riley's Sexual Grooming Continues, and his Sexual Harassment of McKenna Commences.**

55.     On October 21, 2019, McKenna began working at RH.

56.     RH had no human resources department, and Riley was its majority shareholder and McKenna' only supervisor.

57.     Over the course of the next several months, Riley sexually groomed McKenna and insinuated himself into every part of her life. Unlike the way he treated other lawyers in the office, he began a barrage of relentless and unwanted notes, text messages, and phone calls; spent lots of time in her office; left her lavish gifts; required her to attend mandatory monthly dinners with just him at expensive,

romantic restaurants; isolated her from her friends and family; shared intimate details about his personal life; tried to kiss her; interrogated her about her personal life; asked her to treat him as her closest confidante; demanded that she be available to him at all times; told her to be happy that he thought about her hundreds of thousands of times per day; told her he loved her and tried to normalize it; sexualized the office environment and tried to normalize it; told her "E & B" was his "dream;" and got angry or intimidating when she failed or refused to reciprocate his affection or otherwise to do as he wanted.

58.     Riley's behavior eventually escalated to secretly taking photographs of McKenna, secretly researching and collecting information about her online, and secretly saving hundreds of photographs of her on his iPad.

59.     Riley also gave McKenna numerous gifts, including a pair of roundtrip plane tickets to anywhere in the world, expensive bottles of wine and earrings.

60.     McKenna did not know how to respond to Riley's unwanted gifts besides emphasizing to him that they were unnecessary. McKenna never used the plane tickets.

61.     Sometime in November or December of 2019, Riley insisted on taking McKenna and her mother out to dinner. Following the dinner, McKenna's mother expressed concern regarding Riley's infatuation with McKenna.

62.     Riley then sent McKenna's mother a card detailing how impressed he

was with McKenna and how much he admired her. McKenna's mother again expressed concern that Riley was enamored with McKenna.

63.    McKenna told her mother that she did not know how to make Riley stop.

**2020: Riley's Behavior Escalates.**

64.    In 2020, the sexual grooming continued, including more romantic hand-written cards and mandatory dinners. There were at least five such dinners with Riley from January - March of 2020. Riley attempted to kiss McKenna at more than one of these dinners; McKenna physically recoiled from all attempts.

65.    Beginning February 10, 2020, Riley initiated a two-week long scavenger hunt to celebrate McKenna's birthday. Each day, McKenna found a new birthday card on her desk from Riley with clues for where to find that day's gift. They were typically hidden in Riley's office.

66.    The COVID-19 pandemic enabled McKenna to work from home, providing a reprieve from Riley's sexual grooming and advances and increasingly threatening behaviors and demands for attention.

67.    However, a few months into the pandemic, Riley began complaining that he was not seeing enough of McKenna and insisted that she return to the office, which required McKenna to be alone with Riley due to the COVID lockdown.

68.    Riley also required McKenna to eat dinner with him via Zoom and

attend an alone and in-person dinner at his house during the pandemic, at which Riley tried to kiss McKenna when she was leaving, which she again resisted. Riley claimed the dinners would ensure that McKenna was still progressing according to Riley's expectations and  "ensure McKenna's success."

69.     As the pandemic drew on, Riley became increasingly possessive of McKenna's time, often requiring after-hours Zoom meetings lasting until midnight "to discuss work."

70.     When McKenna attempted to end these Zoom meetings at reasonable hours, Riley would threaten McKenna that she wasn't taking the work seriously.

71.     The work that Riley was requiring be worked on until the early hours of the morning was not pressing or urgent, and Riley would often veer off-topic, sharing personal details with McKenna about his life and his discussions with his therapist, and inquiring about the personal details of McKenna's life and her relationship with her husband at the time.

72.     On June 16, 2020, Riley sent McKenna the following message:

> Good morning ELMH! It is the 16th day of the 6th month of 2020 AD. **I have already thought of you 662,112 times today.** I think I miss you.
>
> Actually, I know I do.
>
> Now that you know too, it can be a great day for both of us. (emphasis added).

73.     In the summer of 2020, Riley discussed partnership prospects with

McKenna and asked her to personally guarantee a new lease for the RH office building.

74.    McKenna declined and said she was uncomfortable with that level of financial commitment.

75.    In furtherance of his sexual grooming, Riley became frustrated at McKenna, questioning her loyalty to him, and the work environment grew increasingly hostile.

76.    In December of 2020, Riley again gave McKenna numerous additional cards, expensive gifts, and roundtrip plane tickets to anywhere for Christmas. Again, McKenna never used the tickets.

**January - June 2021: Riley Continues to Monopolize McKenna's Personal Time, Again Hints at the Possibility of McKenna's RH Partnership, Then Watches Pornography on His Computer in McKenna's Presence.**

77.    In 2021, Riley required mandatory dinners with just him and McKenna on January 17, January 24, March 30, April 22, June 7. At least some of these dinners, Riley again tried to kiss McKenna when departing, which McKenna physically recoiled from.

78.    At the April 22, 2021 dinner, Riley again spoke with McKenna about becoming a partner in the firm.

79.    The sexual grooming continued to escalate. In May of 2021, Riley invited McKenna to his office under the guise of needing McKenna's help with

technology issues. When McKenna arrived, Riley was watching pornography on his computer. He made no effort to remove it from view and it was clear he wanted McKenna to see it. This made McKenna feel uncomfortable. She averted her eyes and left the office as soon as she could.

80.     Also in May of 2021, McKenna learned that the other RH partner, Hurley, would be slowing down his work. McKenna became concerned she would be working solely with Riley. She did not like being alone with Riley because he would be more likely to try to kiss her and have intimate conversations with her.

**June 2021 – Mid-August 2021: McKenna Discovers Riley is Taking Surreptitious Photographs of Her and Decides to Leave RH; Riley Choreographs McKenna Getting Hired by Olsman.**

81.     In June of 2021, McKenna became increasingly suspicious that Riley was surreptitiously taking photographs of her with his iPad while she was sitting in his office, because she could see a reflection of herself on the iPad screen in the window behind his desk and he always instructed McKenna to sit in the chair that his iPad was facing.

82.     Because of Riley's increasingly possessive and disparate behavior toward her, McKenna felt extremely threatened and unsafe and knew she could not continue working at RH. She decided to search for employment elsewhere, without informing Riley.

83.     When McKenna interviewed prospective employers, she was

18

confronted repeatedly with the question of why she wanted to stop working for such a high profile mediator and lawyer. The attorneys were hesitant to hire McKenna away from Riley and expressed concern that doing so might affect their ability to resolve cases with Riley as their mediator. They wanted Riley's consent.

84.     McKenna was left with no choice but to inform Riley that she would be leaving his firm. Because she needed Riley's blessing to get hired by other firms, McKenna premised her departure on Hurley's likely retirement and her desire to work for the plaintiff's bar.

85.     Riley discouraged McKenna from leaving. He insisted RH could continue to pay McKenna's salary while she started her career as a plaintiff's lawyer at RH, even if her only source of revenue came from the hourly rate she was paid by an RH organizational client that Riley and McKenna both represented. Riley also told McKenna that he would return to working as a trial lawyer so that the two of them could be a team and try cases together.

86.     McKenna felt unsafe and was extremely uncomfortable at the thought of continuing to work with Riley and stressed to him that she wanted to work for a well-established plaintiff's medical malpractice firm where she could learn and grow.

87.     Reluctantly, Riley encouraged McKenna to explore an opportunity to work for Olsman.

88.     Riley also assured McKenna that he would not object to her continuing to represent the organizational client after she left RH.

89.     Recognizing she needed Riley's consent before a prospective employer would hire her, and aware that Olsman was a reputable plaintiff's medical malpractice firm, McKenna agreed to explore the opportunity at Olsman.

90.     Riley facilitated a meeting between MacKenzie and McKenna, after which McKenna met Jules Olsman, and Olsman offered McKenna a job at $75,000 a year, a significant pay cut for McKenna.

91.     When McKenna tried to negotiate a higher salary than offered, MacKenzie told McKenna every lawyer in the office was paid the exact same salary, regardless of experience or contribution, and that increases were made through year-end bonuses in recognition of the attorney's yearly contribution.

92.     Shortly after this conversation, MacKenzie offered McKenna five thousand dollars more in salary. Riley later told McKenna that he had negotiated this on McKenna's behalf. McKenna did not know about or want this interference by Riley.

93.     McKenna accepted Olsman's offer. She was hopeful that because Olsman represented victims of Larry Nassar and had female partners, they would be in a position to understand the sexual harassment and grooming that McKenna had endured and be in a position to shield her from more of the same.

94.     McKenna put in her two weeks' notice at RH at the beginning of August

of 2021.

**August 18, 2021: McKenna Discovers Riley Has a Large Collection of Photographs of Her Saved on His iPad.**

95.     On August 18, 2021, McKenna accessed Riley's iPad and found what

appeared to be hundreds of photographs of herself - including photographs

downloaded off of the internet, taken of her during Zoom calls, taken of her while

she was sitting in his office, taken of her walking down the hallway, downloaded

from other people's social media accounts, downloaded from McKenna's social

media accounts from at least seven years earlier when McKenna was younger, and

in countless other situations when McKenna did not know Riley was photographing

her.

**August 20, 2021: Riley Uses His Relationship with the RH Organizational Client to Try to Keep Control Over McKenna at Olsman.**

96.     McKenna's last day at RH was on August 20, 2021, two days after she

found the photos on Riley's iPad. Riley gave McKenna yet another handwritten card

to memorialize the occasion.

97.     Just before leaving, McKenna received a letter drafted by Riley and

signed by the organizational client's Executive Director. The letter stated that, in

order for McKenna to continue representing the organizational client at Olsman, as

Riley had promised, McKenna would be required to become Riley's independent

contractor. The letter was designed to intimidate and force McKenna to continue to be subjected to Riley's sexual harassment, and required that she:

    a.  recognize  her "continued association with Bob Riley is important;"

    b.  "work fully and completely under Bob's guidance and direction;"

    c.  work for the organizational client "outside" of her employment with Olsman and only "through Riley & Hurley, P.C.;"

    d.  agree that "Bob will serve as your supervisor for all [organizational client] activities, including assignments, projects, meetings, negotiations, etc.;"

    e.  prepare all invoices for the client "through Riley & Hurley, P.C.;" and

    f.  have all invoices "reviewed and approved by Bob."

98.    The organizational client was and is an extremely male-dominated organization. McKenna viewed Riley's letter (and his ability to get the Executive Director to sign it) as a clear sign of his disparate treatment of her and hostility toward her because of her rejection of his sexual advances.

**August 20-22, 2021: McKenna Contacts Attorneys to Request Help.**

99.    McKenna felt unsafe and threatened by Riley's secret surveillance of her, his sexual grooming, his attempt to intimidate and control her through the organizational client, and his other conduct.

100.    McKenna contacted numerous attorneys in Michigan for help. They all told her she had viable sex discrimination claims against Riley and his firm but that they would not represent her because of Riley's prominent status in the legal

community.

101.   One of the attorneys assured McKenna that their communications and the information disclosed to her by McKenna would be kept confidential but said she could not represent McKenna, because she "would not touch Bob Riley with a ten-foot pole." This attorney further advised McKenna not to file a lawsuit and warned her that if she did file a lawsuit, it would ruin her career. She informed McKenna that, at the very least, McKenna would have to leave the state of Michigan.

**August 22, 2021: McKenna Confronts Riley; Riley Accepts Responsibility for his Conduct and Actions and Promises to Leave McKenna Alone.**

102.   On August 22, 2021 (two days after leaving RH), McKenna confronted Riley about his behavior and actions. She told Riley she would not work in any capacity in which he was her "supervisor" and she would therefore step aside as counsel for the organizational client. She also expressed concern that Riley would retaliate against her for speaking up. McKenna's email to Riley stated as follows:

> Bob,
>
> I received the draft agreement regarding my proposed independent contractor status with Riley & Hurley, PC. I cannot agree to this arrangement.
>
> I am aware that you took photographs of me surreptitiously while I was in your office. This is extremely upsetting and inappropriate. This, in conjunction with your other behaviors and actions, including your romantic text messages, letters, and comments, has caused me to feel very uncomfortable and scared. I will not be working in any capacity in which you

23

<u>are my supervisor</u>.

I have attached a memo with the information necessary to transition my current [organizational client] projects and I will reasonably cooperate in transitioning these projects so as to protect the client's interests. Under the circumstances, I felt it better to not record a [organization client] annual meeting video and I leave preparation of such a video to you.

I received the $10,000 personal check from you. In light of this situation, I do not feel comfortable cashing this check.

I want you to know that I feared speaking up for fear of retaliation due to your status and prominence in the legal field.

I trust that this fear will not be realized.

I have removed the rest of my personal items from the office. I left the laptop on my desk and the keys to the building and the office suite are located in the drawer on the right-hand side of my desk. I trust that we will move on without further complication.

Elyse Heid

103.   In his response that same day, August 22, 2021, Riley promised to "step aside as attorney" for the organizational client, rather than continue working for the client without controlling McKenna.

104.   Riley also promised to "end any and all personal contacts" with McKenna and "make certain" he and McKenna would "have no personal dealings" going forward. He also assured McKenna she would have "nothing to fear" going

forward.

105.   Riley did not keep any of the above promises.

106.   Riley sent a second message  later that day, with a "final personal note" of "wrongdoing." This time, Riley stated that he was "very sorry" but that "sorry" was "not enough." He conveyed his "unequivocal acknowledgment" of his "mistakes" and admitted his "mistakes" were "clear" and "unambiguous," and that they could not be "explained away." He admitted, "I am guilty" and that he had "let down" McKenna, and he further acknowledged, "I have frightened you." Riley further "absolutely assure[d]" Mckenna there would be "no retaliation in any manner of form" but said he recognized why his retaliation was a "concern" for McKenna. Riley further stated that he did "not merit forgiveness" and that he would "accept whatever consequences may follow."

107.   In the days, months and years that followed, Riley did not act in accordance with the above note of alleged contrition.

108.   Riley's second email to McKenna of August 22, 2021, was not, as he stated, his "final personal note." Still later on August 22, 2021, Riley sent McKenna a third email.

109.   In the third email, Riley made an emotional plea devoted to his "intentions," his "goals," his "dreams," his expectations, and his desires. He insisted he "never intended" to hurt or harm McKenna and that he "always wanted"  the best

for McKenna. He claimed that "E&B" (i.e., Elyse & Bob) was his "dream" and that he had been "counting on" a "terrific friendship" with McKenna that would have lasted through his (age 67) and McKenna's (age 26) "remaining lives." Riley used the words, "I failed" six times. He then stated that, "however," what he had done to McKenna (his failure), and indeed, "no failure" could compare to his feelings of "regret." He ended with a perfunctory, "I remain very sorry Elyse."

**September 2021: McKenna Starts Work at Olsman, and Olsman Refuses McKenna's Request Not to Have to Work with Riley.**

110.   McKenna began working at Olsman in September of 2021. She mistakenly believed she was escaping Riley's harassment and control and would be able to move on with her life and career.

111.   McKenna told MacKenzie of the email exchange she had with Riley upon departing RH and the history of sexually harassing conduct that preceded it, and that she wanted to continue to represent the organizational client only because Riley had promised to step aside as that client's attorney.

112.   During this conversation, McKenna told MacKenzie that she had confronted Riley in writing and that he had acknowledged his inappropriate behavior in writing. MacKenzie told McKenna that she had "balls of steel." She said she wished McKenna had not told her about this, that McKenna was not to tell Jules Olsman (the senior partner in the firm) about it, and that she, MacKenzie, had endured far worse during her legal career.

113.   McKenna offered to send MacKenzie the emails and the evidence of the photographs, but MacKenzie did not want to see any of it.

114.   In speaking with MacKenzie, McKenna also asked that she not be forced to mediate cases with Riley.

115.   McKenna quickly discovered Riley was Olsman's preferred mediator and that she was expected to have a close relationship with him despite informing Olsman of his harassment of her.

116.   From September 2021 to February 2024, McKenna attempted to appease Olsman while simultaneously keeping her distance from Riley.

117.   Riley did not keep his promise to step aside as an attorney for the organizational client following a "transition." Accordingly, RH and Olsman decided that the representation of the organizational client would be shared by Olsman and RH, with McKenna assigned to the client on behalf of Olsman.

118.   This sharing arrangement required McKenna to talk with Riley multiple times per week.

119.   At Olsman's direction, McKenna's invoices to the organizational client were on Olsman letterhead, and all payments for McKenna's work were deposited in Olsman's bank account.

120.   At first, Riley kept his promise not to have any personal contacts or in-person dealings with McKenna.

121.   In December of 2021, when Riley learned that McKenna had contracted COVID-19, he broke those promises – sending McKenna a personal email with a New York Times article specifying what to do.

122.   In May of 2022, Riley broke those promises again.

**May 2022: Riley's Behavior Escalates, and Olsman Again Deliberately Disregards McKenna's Concerns.**

123.   In May of 2022, McKenna attended the State Bar of Michigan Negligence Section meeting in Nashville with her then-husband Brandon Heid ("Heid").

124.   MacKenzie and her husband, Brandon MacKenzie, were also in attendance.

125.   Riley also attended the meeting.

126.   Riley and Olsman are past chairs of the Michigan State Bar Negligence Section, and MacKenzie is the current chair.

127.   During the meeting, Riley repeatedly tried to have personal and private conversations with McKenna, which McKenna avoided and was threatened by.

128.   One night at the meeting, the MacKenzies and McKenna and Heid got together in MacKenzie's hotel room to socialize. McKenna and Heid discussed Riley's inappropriate behavior with the MacKenzies, including Riley's refusal to step down from working for the organizational client that Olsman and RH shared, and Riley's continued interest in McKenna despite her many attempts to redirect

28

him.

129.   MacKenzie chose to downplay and do nothing about McKenna's concerns.

130.   In June of 2022, while trying a case together in Clare County, McKenna informed Emily Peacock about Riley's harassment and refusal to step aside as attorney for the RH/ Olsman organizational client.

131.   Peacock chose to do nothing about McKenna's concerns.

132.   In December of 2022, McKenna and Heid went to MacKenzie's home for dinner with MacKenzie and her husband. MacKenzie congratulated McKenna for her successful year and informed her she would receive a $30,000 end-of-year bonus for 2022.

133.   Riley later told McKenna that he advocated for and was responsible for McKenna receiving this bonus.

**January – Spring 2023: Riley's Behavior Continues to Escalate. Olsman Chooses to Disregard McKenna's Concerns and Condones Riley's Behavior.**

134.   In January of 2023, McKenna and Heid decided to get divorced.

135.   McKenna informed Peacock of this decision.

136.   In February of 2023, MacKenzie publicly praised McKenna for her work for the firm during MacKenzie's presentation to the 2022-2023 Michigan Association of Justice (MAJ) Leadership Academy Class. MacKenzie showcased a 5-star review that McKenna had received from a client.

137.   Around this time, McKenna herself graduated from the MAJ Leadership Academy, an intensive, six-session program designed to prepare young MAJ members to assume leadership positions within MAJ or become members of the state legislature or judiciary.

138.   In March of 2023, McKenna, at Peacock's urging, informed MacKenzie and Olsman of her decision to get divorced.

139.   Someone at the firm told Riley about McKenna's divorce.

140.   As a result, Riley attempted again, and more aggressively, to insert himself into McKenna's personal life and sexually groom and harass her, inviting McKenna to Easter at his home. Riley told McKenna he was aware that in previous years she had spent the holiday with Heid's family, suggesting he was doing her a favor by inviting her to spend the holiday with him. Riley also explained that he wanted to apologize for everything he had done. He reiterated his desire to apologize to McKenna in person, face-to-face, and he said he wanted to be McKenna's friend. McKenna felt threatened and promptly declined Riley's invitation.

141.   Riley became very upset that McKenna declined his invitation and retaliated.

142.   Shortly thereafter, Riley sent McKenna a racy photograph of a scantily clad brunette woman from ultrafilms.com.

143.   Appalled and frightened by Riley's actions, McKenna again attempted

30

to enforce boundaries with Riley and tried to mediate her personal injury cases with other facilitators.

144.   Because of her efforts to enlist Olsman to rebuff Riley's sexual harassment and stalking, McKenna's employment conditions at Olsman grew increasingly hostile.

145.   McKenna told Peacock about Riley's Easter invitation and his reaction to her saying no, and that she felt threatened by Riley contacting her. Peacock advised McKenna to "forgive and forget."

146.   Shortly after declining Riley's Easter invitation, McKenna learned that Riley and Olsman had been talking about McKenna, her divorce, and the alleged effects it had on her.

147.   Olsman informed McKenna that she was no longer permitted to work from home because Riley had told him that McKenna was spending all of her time crying about her divorce. This was not true and was more retaliation by Riley.

148.   Throughout McKenna's employment at Olsman, other attorneys were regularly granted special accommodations, for the stated reason of stress management, including working from home and taking weeks off at a time. Because of Riley's influence over her job at Olsman, McKenna was treated differently and also was required to take on work that was the responsibility of the attorney who was off work for stress management.

31

149.   In the spring of 2023, McKenna was invited to the RH/Olsman organizational client's June 2023 Annual Conference in Orlando, Florida. The conference was mandatory and a requirement of her job to keep and service the organizational client.

150.   Around this time, in further retaliation and to intimidate McKenna, Riley contacted McKenna and informed her that MacKenzie and Olsman had been talking negatively about McKenna and that Riley allegedly was preserving her reputation with them. McKenna felt oppressed by Riley's pervasive influence over job.

151.   When McKenna pressed Riley on what negative comments were supposedly being made and what McKenna had allegedly done wrong, Riley would not say.

152.   In further effort to intimidate McKenna, Riley encouraged McKenna to reach out to Peacock to seek resolution of negative statements Peacock also allegedly had made about McKenna to Riley.

153.   In further effort to sexually groom McKenna and remind her of his power over her, Riley informed McKenna that she and he would share a conference room suite at the Annual Conference. Riley assured McKenna that the privacy of their separate hotel rooms would not be compromised by the adjoining conference room. McKenna did not make the hotel arrangements and did not have authority to

change them.

154.   Concerned about this arrangement, when McKenna and Peacock had breakfast together, McKenna informed Peacock of the shared conference room suite and adjoining hotel rooms.

155.   McKenna expressed her discomfort with the hotel room arrangement and asked for Peacock's help and advice. Peacock again dismissed McKenna's concerns.

156.   Immediately following that breakfast, Peacock set up an in-person facilitation with Riley on one of McKenna's cases, to be conducted on April 19, 2023, despite knowing that McKenna felt threatened by this arrangement, and then attended the facilitation with McKenna in an attempt to achieve early resolution.

157.   In the months after Easter, Jules Olsman routinely came into McKenna's office and made intimidating comments regarding Riley such as, "I was talking to Riley about you" and "we keep Bob Riley happy in this office."

158.   McKenna continued to repel Riley's advances and tried to navigate his control over her job, but treaded carefully, given that Riley and Olsman had been talking about her; Olsman had acted on Riley's false reports about her; and Olsman had refused to do anything to help her and had urged her to forget what Riley had done, forgive him, move on, and keep him happy.

**June 2023: McKenna and Riley Attend the Annual Conference in Orlando, and Olsman Again Dismisses McKenna's Concerns About Riley's Behavior.**

33

159.   In June of 2023, in the course of her employment, McKenna flew to Orlando to attend the organizational client's mandatory Annual Conference.

160.   When McKenna discovered that she and Riley were scheduled to be on the same flight, McKenna changed her reservation to avoid contact with Riley.

161.   On June 14, 2023, in advance of the trip, McKenna and Peacock went to breakfast again. McKenna again expressed concern that she would be sharing a conference room suite with Riley. Peacock told McKenna not to make a big stink about it.

162.   Upon arriving in Orlando on June 18, 2023, McKenna checked into her hotel room (part of the adjoining conference room suite arranged by Riley) and confirmed with the hotel receptionist that the door of each hotel room adjoining the conference room could be locked, and that, if locked, the hotel room could not be accessed from the adjoining conference room. Because she was assured she could lock her room from the inside and was worried about the consequences of making a stink about the room arrangement, McKenna did not ask the client to change her assigned room.

**June 2023: Riley Uses the Adjoining Conference Room to Get McKenna Alone, Cries, Accuses McKenna of Ruining His Life, Suggests He Will Commit Suicide, Repeatedly Tries to Have Personal Contact with McKenna, and Eavesdrops on McKenna's Phone Calls.**

163.   On June 19, 2023, Riley told McKenna that he had set up a meeting for

himself, McKenna, and the Executive Director of the organizational client, to take place at 8 pm in the conference room connecting Riley and McKenna's hotel rooms.

164.   McKenna attended the meeting with Riley. While waiting for the Executive Director to arrive, Riley spoke tearfully about the photographs and McKenna confronting him, accused McKenna of ruining his life, told her that he no longer had the will to live, and requested McKenna's forgiveness.

165.   McKenna repeatedly told Riley that his behavior made her feel uncomfortable and that it was not fair to blame her for "ruining his life," because all she wanted was for him to stop.

166.   After an hour of waiting for the Executive Director and listening to Riley, McKenna concluded Riley had lied about there being a meeting scheduled with the Executive Director. She told Riley the Executive Director clearly was not showing up and returned to her room.

167.   Upon information and belief, the Executive Director was not invited to or expected to attend the meeting.

168.   The next day, the Annual Conference held a session regarding suicide.

169.   During this presentation, Riley wrote a note to McKenna insinuating he was threatening suicide; he indicated that he related to the presentation more than she could ever guess and then told her that she would likely never see him again.

170.   Riley then left the room, and McKenna became concerned he was going

35

to kill himself.

171.   Following the presentation, Riley and McKenna were to conduct a meeting with the organizational client's executive committee. McKenna attended the meeting. Riley showed up late.

172.   Riley asked McKenna to dinner numerous times during the Annual Meeting. Each time, McKenna declined and made sure she had dinner plans with other people to ensure her safety.

173.   McKenna became aware that Riley was listening to her phone calls through the adjoining conference room door. Some of the conversations Riley was eavesdropping on were about his behavior.

**June 2023: McKenna Reports Riley's Behavior to Olsman; Olsman Again Rejects McKenna's Concerns.**

174.   While the Annual Meeting was still ongoing, McKenna called MacKenzie to give her an update on a case McKenna was handling. During this conversation, McKenna informed MacKenzie of Riley's behavior and her discomfort. MacKenzie laughed it off and encouraged McKenna to get through the trip.

175.   MacKenzie told McKenna that she did not want to hear any more about Riley.

**June 2023: Riley Stalks McKenna All Night.**

176.   On the final night of the Annual Meeting, McKenna and Riley attended

the closing dinner with the other meeting attendees.

177.   McKenna left the banquet hall following dinner.

178.   Riley called McKenna's cell phone repeatedly, accusing her of scaring him because she had left.

179.   McKenna informed Riley that she was fine and asked him to leave her alone.

180.   Over the next several hours, Riley continued to call and text McKenna, insisting that he needed to talk to her.

181.   McKenna returned to her hotel room and locked the door.

182.   Riley then showed up outside of McKenna's hotel room, knocking on the door and calling her cell phone repeatedly. He insisted that he wanted to speak to her.

183.   McKenna told Riley, via text message from the other side of her door, that she wanted him to leave her alone.

184.   Riley continued to try and force a confrontation, texting and calling McKenna repeatedly while standing outside of McKenna's hotel room door, where he remained for hours.

185.   When McKenna looked out of the peephole on the hotel room door, she saw Riley remaining outside of her door. She felt trapped and threatened and became fearful for her safety and desperate that Riley would not leave her alone.

186.   McKenna called a mental health hotline to ask for help with handling Riley.

187.   McKenna was scheduled to share a car with Riley to the airport the following morning. Instead, she changed her schedule to depart earlier, avoiding further interaction with Riley. The new flight required her to depart the hotel at approximately 5:00 am.

188.   In order to access the elevators or staircase to get to the lobby entrance, where her Uber was picking her up to bring her to the airport, McKenna had to walk past Riley's hotel room.

189.   Riley's hotel room door was propped open with a shoe, and she could clearly see Riley asleep in an armchair that he had positioned to face the hallway.

190.   McKenna walked quickly and quietly by Riley's room, trying not to wake him, and took the elevator to the lobby where she met her Uber.

**June – July 2023: McKenna Again Informs Olsman of Riley's Behavior and That It Makes Her Uncomfortable;  Olsman  Chooses to Do Nothing About Her Concerns.**

191.   Following the Annual Meeting in Orlando, McKenna had a conversation with MacKenzie. McKenna explained the terrifying stalking incident and again expressed that she did not feel comfortable mediating cases with Riley due to his sexually harassing behavior. MacKenzie again dismissed McKenna's concerns; it was clear to McKenna that MacKenzie was annoyed at McKenna for

making this report.

192.   Approximately a month after the Annual Meeting, McKenna had a facilitation scheduled with Riley, which McKenna attended via phone because she was uncomfortable attending via Zoom, given that Riley had previously secretly captured photographs of her via Zoom.

193.   McKenna spoke with MacKenzie about the facilitation beforehand and expressed her continued discomfort in having any contact with Riley. MacKenzie again dismissed her concerns.

194.   Around this time, McKenna, sensing MacKenzie's growing hostility towards McKenna for her continuing complaints about Riley, set up a lunch with Olsman and suggested that McKenna stop working for the organizational client so that she could devote her entire time to medical malpractice and nursing home abuse cases. Olsman told McKenna that it was a terrible idea to give up a client that lauded her and that Olsman was enjoying McKenna's success with Riley.

195.   McKenna came to the realization that her work environment would continue to become increasingly hostile if she kept asking Olsman to help her, and that she would need an attorney to confront Riley and/or explain her legal rights to MacKenzie and Olsman to get anything to change and again consulted numerous attorneys.

196.   The attorneys McKenna consulted would not take her case due to

Riley's prominent status in the legal field.

197.   In August of 2023, Michigan SuperLawyers announced that McKenna had been selected to its "Rising Stars" list. No more than 2.5 percent of attorneys in Michigan are selected to receive this honor.

**September 2023: Riley Again Refuses to Respect McKenna's Boundaries and Cries About McKenna Hurting His Feelings; McKenna Again Asks Riley to Leave Her Alone.**

198.   McKenna and Riley were required by the RH/Olsman organizational client to attend a workers' compensation conference in Niagara-on-the-Lake in early September of 2023.

199.   Riley changed his flight itinerary to be on the same flight as McKenna (Detroit to Buffalo).

200.   Riley orchestrated for McKenna and him to drive together in a rented car for a two-and-a-half-hour trip from Buffalo to Niagara-on-the-Lake. This was done without McKenna's consent.

201.   During this drive, Riley again became tearful and insisted that McKenna's behavior hurt his feelings. McKenna told Riley she needed to be left alone and again reiterated that their relationship is a professional one. McKenna also told Riley that he made her feel uncomfortable with his behavior during the Orlando conference and the photographs and romantic overtures, and that he had told her that he was stepping down from representing the shared organizational client back in

2021, yet he still had not done so.

202.   Riley specifically asked McKenna what she wanted from him, and McKenna stated that she would either stop working for the RH/Olsman organizational client or he needed to stop working for the client because he would not leave her alone and his feelings for her were not reciprocal.

203.   During the conference, Riley retaliated against McKenna for insisting that Riley keep his promise and respect her boundaries and stop harassing her. McKenna and Riley gave a presentation. Despite an agreement as to how the portions of the presentation would be handled, Riley presented McKenna's portions and then disparaged her to the Executive Director following the presentation.

204.   At the end of the Niagara-on-the-Lake conference, Riley again agreed to step down from working for the shared organizational client and told McKenna she would never hear from him again.

205.   Instead of stepping down, Riley again interfered with McKenna's employment. McKenna was identified as the point of contact to meet with workers' compensation lawyers from each state. On a call shortly after the conference, McKenna was questioned by the client's Executive Director about the meetings she had conducted related to this task. He asked why she was doing this work. She indicated that she had set up the meetings at Riley's direction. Riley, who was also on the call, lied and said he had not directed McKenna to set up the meetings. Riley

then suggested that another attorney take on the task, a male, despite the fact that the other attorney billed a higher hourly rate than McKenna and had no experience doing this type of work for the organizational client.

206.   Riley's efforts to sabotage McKenna were effective. The Executive Director later called McKenna to discuss lightening her workload after being told by Riley that she was having an "emotional breakdown" because of her divorce, which was false. The Executive Director also questioned McKenna about her dating life in light of information provided to him by Riley.

207.   McKenna became increasingly concerned that instead of stepping down, Riley was using his power and influence to have her fired from representing the organizational client. A significant portion of the income McKenna (now divorced) generated for Olsman came from the organizational client, which affected McKenna's year end bonus on her $80,000 salary.

208.   McKenna again reached out to additional attorneys to ask if they would be willing to help her in her case, but upon learning the case was against Riley, those attorneys, like the others, refused to help given his status and prominence in the legal field.

**October 25, 2023: McKenna Continues to Ask Riley to Leave Her Alone; Riley Responds with Veiled Threats About his Power Over McKenna.**

209.   McKenna had a meeting with Riley on October 25, 2023 in another attempt to confront him regarding his sexually harassing behavior and with the hope

of getting him to stop.

210.   At the meeting, McKenna again explained to Riley that his inappropriate behavior made her feel uncomfortable and she could not continue to work with him.

211.   McKenna told Riley she could not trust his word because he had agreed to step down from representing the RH/Olsman organizational client on numerous occasions but still had not done so.

212.   Riley responded with veiled threats, mentioning numerous facets of McKenna's employment and life that Riley could control or influence, including:

   a.   whether McKenna would receive a year-end bonuses from Olsman (Riley told her he was responsible for McKenna receiving the $30,000 bonus in 2022);

   b.   whether McKenna would get a raise in her hourly billing rate with the organizational client (Riley told her he was responsible for McKenna getting a previous raise);

   c.   whether Riley would continue representing the organizational client (Riley told her he would not step down after all and would continue to represent the client);

   d.   what Riley could do with the photographs he had secretly taken of McKenna (Riley told her had destroyed them);

   e.   Riley's conversations with Olsman and MacKenzie about her (Riley told McKenna he had tried to have "positive" conversations with them about her);

   f.   Riley's general position of power over McKenna and his ability to interfere with her career;

213.   Following the conversation, McKenna realized she would have to

43

continue to work with Riley if she continued to work at Olsman or continued to represent the organizational client.

214.   During this time, the partners at Olsman increasingly alienated McKenna.

215.   McKenna began exploring potential career opportunities with other law firms and businesses, so as to get herself away from Riley and her hostile work environment.

216.   All of the in-state opportunities McKenna found had ties to Riley and some made it clear that mediating cases with Riley would be a condition of McKenna's employment.

217.   McKenna did not want to walk away from nine years of practicing and learning medical malpractice law in Michigan. Her passion is representing clients in medical malpractice cases and standing up for those who need representation.

218.   McKenna began seriously contemplating how she was going to continue to represent medical malpractice clients in Michigan. McKenna also understood that practicing medical malpractice law or any type of law in another state would not only require getting licensed in that state but also learning the legal technicalities of that particular state.

**December of 2023: Olsman Retaliates Against McKenna for Voicing Her Concerns About Riley's Behavior and Revokes Her Earned Year-End Bonus.**

219.   Conditions at Olsman became more hostile. It became clear to

McKenna that Riley and partners of Olsman were routinely discussing her. MacKenzie, in particular, was openly hostile toward and easily angered by McKenna.

220. In December of 2023, McKenna learned from the accountant at Olsman that she would not receive an annual bonus.

221. Bonuses were earned when an attorney had accrued enough fees to cover their base salary.

222. Earlier in 2023, McKenna received an accounting report that showed she was on track to earn an end-of-year bonus based on case settlements alone. In December 2023, McKenna received an updated accounting that looked completely different from prior accountings, and which reflected that she would not receive a bonus.

223. This came as a shock to McKenna in light of the end-of-year bonuses paid to her in 2021 and 2022. In December of 2021, she received a $5,000 bonus despite having started working for Olsman in September 2021 and having only two cases in litigation and no settlements. In December of 2022 she received a $30,000 bonus based on her share of settlements in cases she personally managed, settlements in cases which she provided support to Olsman, and the money she brought into the firm from her hourly billings to the organizational client.

224. In 2023, McKenna more than doubled her settlements as well as her

hourly billings, yet she did not receive a bonus.

225.   McKenna also did not receive a raise at any time during her employment at Olsman.

226.   With the lack of a bonus from Olsman and the increasingly hostile work environment, McKenna became increasingly anxious to find employment that would not require her to work with or appease Riley.

227.   Concerned about her future with Olsman, and scared about how she would navigate stepping down from the RH/Olsman organizational client without further upsetting Olsman, coupled with fear and concern about how she would get Riley to leave her alone, McKenna finally found two attorneys to help her confront Riley.

**January of 2024: Olsman Changes the Rules on Bonuses After McKenna's Increased Complaints about Riley**

228.   On or around January 22, 2024, McKenna attended a scheduled meeting with partners MacKenzie and Peacock. McKenna presented them with her caseloads and annual bonuses over the prior two years. MacKenzie and Peacock said they were changing the bonus rules, that her work for the RH/Olsman organizational client that McKenna brought to the firm would no longer contribute to her bonus calculation the way it had the year prior.

229.   MacKenzie and Peacock gave no business reason for this sudden change in how bonuses were calculated. Upon information and belief, the change

was a result of McKenna's complaints that she was continuing to have to work with the man who had been sexually harassing and stalking her.

230.   McKenna expressed concern that her complaints about Riley's sexual harassment were negatively affecting how she was being treated at Olsman. McKenna also expressed her fear of confronting Riley because of the ramifications it may have on her with Olsman.

231.   MacKenzie got angry and insisted McKenna's treatment had nothing to do with Riley and that she, MacKenzie, had never stood in the way of McKenna confronting him. MacKenzie further encouraged McKenna to do what she felt she had to do.

232.   On or around January 29, 2024, McKenna and MacKenzie met to discuss McKenna's caseload. MacKenzie assigned new cases to McKenna. She also instructed McKenna to start learning about nursing home audit trails and begin drafting templates that could be used to request records in future cases.

**January 31, 2023 – February 16, 2024: McKenna's Attorneys Confront Riley, Olsman Fires McKenna In Retaliation, and Olsman and Riley Tell Clients that McKenna is "Incompetent."**

233.   On January 31, 2024, McKenna's attorneys confronted Riley about his behavior and conduct toward McKenna.

234.   On or around February 3, 2024, although she feared termination, McKenna informed Olsman's partners in writing that she had confronted Riley,

47

through counsel, about his sexual harassment of her.

235.   On Sunday, February 4, 2024, MacKenzie, on behalf of Olsman, immediately terminated McKenna's employment.

236.   Olsman's termination letter stated that its decision to fire McKenna was made due to "grave concerns" about McKenna's "honesty, integrity and judgment." Olsman defended Riley and made statements (intended to justify McKenna's termination) regarding McKenna's personal life, an alleged "romantic" relationship, and her divorce. Olsman acknowledged McKenna's reporting of the sexual harassment that she had endured at the hands of Riley.

237.   McKenna made a decision to start a firm with a friend, attorney Amanda Fox Perry. Fox McKenna, PLLC is based in the District of Columbia, with an office in Michigan.

238.   McKenna subsequently contacted her clients to inform them of her departure from Olsman and her plan to start a firm in the near future. She informed them of their right to either stay with Olsman, discharge Olsman and retain her new firm, or discharge Olsman and retain any other attorney.

239.   Numerous clients elected to transition with McKenna, including the organizational client.

240.   Olsman then contacted a number of the clients that had chosen to move with McKenna and informed them that McKenna had been terminated from Olsman

because she was "incompetent," and that McKenna did not have a firm or the resources with which to continue their representation, causing some of the clients to change their minds and go back to Olsman.

241.   On information and belief, Olsman made similar statements to other clients.

242.   Many of the cases McKenna was handling at the time of her termination and stayed with Olsman have since been settled. Had McKenna not been terminated or subjected to a hostile work environment, she would have received bonus pay based on these and other matters and continued to increase her annual income.

243.   On or around February 16, 2024, the organizational client contacted McKenna and threatened to terminate her, citing false comments Riley had made regarding McKenna's competence and emotional well-being. McKenna defended herself and was essentially placed on probation.

**April 2024: McKenna Moves to Maryland**

244.   In late April of 2024, her career as a plaintiff's medical malpractice attorney ruined and her reputation tarnished in her home state of Michigan, McKenna moved to Maryland, away from her family, friends, professional ties, and connections.

245.   McKenna's has no choice but to remain in Maryland.

246.   Riley has reached out to McKenna on numerous occasions, asking

where she is living and where she intends to live.

247.   Riley's questioning regarding McKenna's whereabouts, in light of her many requests to Riley that he leave her alone, is threatening, inappropriate, wrong, and a continuation of his stalking and sexually harassing behavior.

**June 2024: McKenna and Riley Attend the RH/Olsman Organizational Client's Annual Meeting in Orlando.**

248.   In June of 2024, the organizational client required Riley and McKenna's attendance at the Annual Meeting in Orlando, Florida.

249.   McKenna's new law partner attended the conference with her as McKenna did not feel safe attending the conference alone, given Riley's behavior.

250.   During the conference, Riley repeatedly tried to speak with McKenna in private.

251.   Riley expressed remorse regarding his prior conduct and promised McKenna that he would act differently going forward, including that he would not make negative representations and comments regarding McKenna to the RH/Olsman organizational client.

252.   McKenna maintained repeatedly that she needed Riley to leave her alone.

253.   No matter, Riley continued to contact McKenna and shower her with compliments regarding her work performance and her legal knowledge, while simultaneously disparaging her to her colleagues and client behind her back.

254.   Following this meeting, Riley also offered to mediate McKenna's fee disputes with Olsman MacKenzie Peacock.

**Ongoing: Olsman and Riley Continue to Act in Concert to Disparage McKenna.**

255.   Since this action was filed, Olsman continues to routinely facilitate cases with Riley.

256.   Since this action was filed, Olsman continues to support and speak highly of Riley in the legal community.

257.   Since this action was filed, Olsman and Riley continue to mutually benefit from their close and longstanding relationship.

258.   Since this action was filed, Riley has finally stepped down as counsel for the organizational client.

259.   Riley and Olsman have an ongoing concerted effort to destroy McKenna's reputation and livelihood. They routinely disparage her to her colleagues in the legal community with falsehoods, telling them, for example, that McKenna had an "emotional breakdown" and is "dishonest." Gordon has told the media McKenna's lawsuit is a "sham," and has called McKenna "looney tunes."

260.   Olsman also is engaged in retaliatory, harassing, bad faith litigation against McKenna in several state court "lien" actions for attorney fees earned in the few cases McKenna kept after Olsman terminated her. Riley's counsel has attended at least one of the state court hearings and also has threatened retaliatory litigation

against McKenna.

261.   Olsman recently retained the President of the State Bar of Michigan to sign and publish a document, written by Olsman, that falsely accuses McKenna of dishonesty. The document alleges McKenna "resigned" from Olsman and that "McKenna's claim that she was somehow improperly dismissed by Olsman is false and should be regarded by this Court as violative of MRPC 3.3, which prohibits an attorney from either making a false statement of material fact or law to a Court. MRPC 3.3(a)(3) specifically prohibits an attorney from offering evidence that he or she knows is false."

**COUNT I**
**Elliott-Larsen Civil Rights Act**
**Sexual Harassment/Hostile Work Environment**
*Riley Defendants*

Plaintiff incorporates by reference all preceding paragraphs.

262.   Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at Defendant RH.

263.   From September of 2019 to September of 2021, Plaintiff was an employee, and Riley Defendants were employers covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*.

264.   From September of 2021 to February 4, 2024, Plaintiff was an individual and an employee, and Riley Defendants were employers covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*., and Riley Defendants affected or controlled a term, condition, or privilege of Plaintiff's employment at Defendant Olsman, including but not limited to compensation, evaluation, terms and conditions of client relationships, work from home privileges, travel, and/or termination, covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act.

265.   During the course of McKenna's employment with Defendants, Defendants Riley subjected Plaintiff to unwanted comments, speech, touching, grooming, and other actions of an offensive and sexual nature, and by his words and conduct, explicitly or implicitly made Plaintiff's submission to the same a term or condition of her employment.

266.   Defendant Riley's treatment of Plaintiff was different than the treatment of other attorneys in the office.

267.   Plaintiff was highly qualified for her jobs with Defendants and was a member of a protected class.

268.   Defendant Riley's treatment of Plaintiff was severe and/or pervasive and created an intimidating, hostile, abusive and offensive work environment.

269.   Defendant Riley's unwanted conduct and communications were on the

basis of and because of Plaintiff's sex.

270.    Defendant Riley's unwelcome comments and conduct were intentional and willful, in deliberate disregard of, and with reckless indifference to the rights and sensibilities of Plaintiff.

271.    As a direct and proximate result of Riley Defendants' unlawful conduct described above, the terms, conditions, and privileges of Plaintiff employment were adversely affected.

272.    As a further direct and proximate result of Riley Defendants' unlawful actions against Plaintiff as described, she has suffered and will continue to suffer in the future, injuries and damages, including, but not limited to, loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal reputation, physical distress, loss of the ordinary pleasures of everyday life.

### COUNT II
### Elliott-Larsen Civil Rights Act
### Sexual Harassment/Hostile Work Environment
### *Defendant Olsman*

Plaintiff incorporates by reference all preceding paragraphs.

273.    Defendant Olsman is vicariously liable for the negligent or intentional acts of all of its partners, including but not limited to MacKenzie, Jules Olsman, and Peacock.

274.    From September of 2021 to February of 2024, Plaintiff was an

employee and Defendant Olsman was an employer covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*.

275.   Plaintiff was highly qualified for her job and a member of a protected class.

276.   During the course of her employment, Plaintiff informed MacKenzie and Peacock of the sexually harassing and grooming conduct by Defendant Riley and requested relief from his conduct and presence, but Defendant Olsman explicitly or implicitly made continued contact and dealing with Defendant Riley's sexually harassing and grooming conduct a condition of  Plaintiff's employment with Defendant Olsman.

277.   Based on its knowledge, Defendant Olsman could choose to protect its employee, Plaintiff, or use that knowledge to its advantage. Rather than protect its employee, Defendant Olsman chose the latter.

278.   Upon information and belief, Defendant Olsman was aware of Defendant Riley's sexual infatuation with Plaintiff and hoped to use that to gain an advantage in mediating cases and otherwise.

279.   Defendant Riley's unlawful mistreatment of Plaintiff was severe and/or pervasive and requiring Plaintiff to continue to work with Defendant Riley created an intimidating, hostile or offensive work environment while she was at Defendant Olsman.

280.    Defendant Olsman's requirement that Plaintiff continue to work with, take out of town trips with and even stay in the same hotel with the man who it knew was sexually grooming, harassing and stalking her constituted an adverse action under circumstances that give rise to an inference of unlawful discrimination.

281.    Defendant Olsman's conduct was on the basis of and because of Plaintiff's sex.

282.    Defendant Olsman's actions and inactions were intentional, willful, in deliberate disregard of, and with reckless indifference to, the rights and sensibilities of Plaintiff.

283.    As a direct and proximate result of Defendants Olsman's unlawful conduct described above, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

284.    As a further direct and proximate result of Defendants' unlawful actions against Plaintiff as described, she has suffered and will continue to suffer in the future, injuries and damages, including, but not limited to, loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal reputation, physical distress, loss of the ordinary pleasures of everyday life, reasonable attorney's fees and costs incurred in this litigation, and any other compensatory and equitable damages that the Court deems appropriate.

## COUNT III
## Elliott-Larsen Civil Rights Act
## Retaliation and Retaliatory Harassment
### *All Defendants*

Plaintiff incorporates by reference all preceding paragraphs.

285.   Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at RH.

286.   Defendant Olsman is vicariously liable for the negligent or intentional acts of all of its partners, including but not limited to MacKenzie, Jules Olsman, and Peacock.

287.   The Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.*, prohibits retaliation against an employee for engaging in activity protected under the Elliott-Larsen Civil Rights Act.

288.   Plaintiff engaged in activity protected under the Elliott-Larsen Civil Rights Act, including but not limited to the reporting of, opposition to and confronting of the unlawful sexual harassment and grooming committed by Defendant Riley and repeatedly requesting that Defendant Riley stop or be stopped and/or the Plaintiff be protected from his conduct.

289.   Defendants were aware of and constantly updated on Plaintiff's concerns and opposition to Defendant Riley's sexual harassment and failed to act to

stop the harassment.

290.   Plaintiff's rejection and confrontation of Defendant Riley about his harassing and discriminatory behavior did not make it stop, but resulted in retaliation, during and after Plaintiff's employment, which adversely affected her career and ability to make a living.

291.   Defendants have continued to retaliate against and disparage Plaintiff and her abilities as a result of her opposing harassment and confronting Defendant Riley and asserting her rights to legal redress in this lawsuit.

292.   Defendants are liable under the ELCRA for retaliation based on sex and retaliatory harassment.

293.   Plaintiff's rejection of and opposition to the unlawful sexual harassment and discriminatory behavior of Defendant Riley resulted in adverse employment action and including having to leave her employment and then, years of continued severe and pervasive retaliation and retaliatory harassment.

294.   Defendants' failure to stop the offensive conduct and retaliation actions were willful, deliberate, and intentional.

295.   The injuries to Plaintiff that arose as a consequence of Defendant Riley's conduct were foreseeable and intentionally caused by the Defendant.

296.   Plaintiff's protected activity was a significant factor in Defendants' retaliation and retaliatory harassment.

297.    As a further direct and proximate result of Riley Defendants' unlawful actions against Plaintiff as described, she has suffered and will continue to suffer in the future, injuries and damages, including, but not limited to, loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal reputation, physical distress, loss of the ordinary pleasures of everyday life, reasonable attorney's fees and costs incurred in this litigation, and any other compensatory and equitable damages that the Court deems appropriate.

**COUNT IV**
**Elliott-Larsen Civil Rights Act**
**Discrimination**
*All Defendants*

298.    Plaintiff incorporates by reference all preceding paragraphs.

299.    Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at Defendant RH.

300.    Defendant Olsman is vicariously liable for the negligent or intentional acts of all of its partners, including but not limited to MacKenzie, Jules Olsman, and Peacock.

301.    From September of 2019 to September of 2021, Plaintiff was an

employee, and Riley Defendants were employers covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*.

302.   From September of 2021 to February of 2024,  Plaintiff was an employee and Defendant Olsman was an employer covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*.

303.   From September of 2021 to February 4, 2024, Plaintiff was an individual and an employee, and Riley Defendants were employers covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*., and  Riley Defendants affected or controlled a term, condition, or privilege of Plaintiff's employment at Defendant Olsman, including but not limited to compensation, evaluation, terms and conditions of client relationships, work from home privileges, travel, and/or termination, covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act.

304.   Plaintiff was well qualified for her job and a member of a protected class.

305.   Plaintiff was discriminated against and harassed because of her sex.

306.   Defendants' above-described conduct was on the basis of and because of Plaintiff's sex.

307.   Defendants' treatment of Plaintiff was different or disparate from the treatment of other attorneys in the law firm, who were not required to deal with

persons who had threatened, stalked and sexually harassed them.

308.   The conduct of Defendant Riley in sexually grooming and harassing Plaintiff constitutes sex discrimination and disparate treatment in violation of the Act.

309.   The intentional and reckless dismissal and disregard of Plaintiff's complaints related to Defendant Riley's misconduct reflects gender hostility toward Plaintiff and is an adverse action under circumstances that give rise to an inference of unlawful discrimination.

310.   Defendant Olsman's actions of promoting and condoning Defendant Riley and its attempt to secure negative information about Plaintiff following her repeated complaints regarding Defendant Riley's sexually harassing conduct reflect gender hostility toward Plaintiff.

311.   The actions of Defendants were intentional, willful, in deliberate disregard of, and with reckless indifference to, the rights and sensibilities of Plaintiff.

312.   As a direct and proximate result of those actions and failures to act, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

313.   As a further direct and proximate result of Defendants' unlawful actions against Plaintiff as described, Plaintiff has suffered past and future injuries and damages including, but not limited to, the loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish,

humiliation and embarrassment, loss of professional and personal reputation, physical distress, loss of the ordinary pleasures of everyday life, reasonable attorney's fees and costs incurred in this litigation, and any other compensatory and equitable damages that the Court deems appropriate.

## COUNT V
### Title VII—Discrimination and Retaliation on the Basis of Sex, Retaliatory Harassment
### *Defendant Olsman*

Plaintiff incorporates by reference all preceding paragraphs.

314.   Defendant Olsman is vicariously liable for the negligent or intentional acts of all of its partners, including but not limited to MacKenzie, Jules Olsman, and Peacock.

315.   Plaintiff is a member of a protected class on the basis of sex.

316.   Plaintiff, in all respects, was performing her job in a manner that was consistent with Defendant Olsman's legitimate business expectations.

317.   During the course of Plaintiff's employment at Defendant Olsman, Defendant Olsman discriminated against Plaintiff as described above, including but not limited to subjecting her to harassment or disparate treatment on the basis of sex and subjecting her to a hostile work environment.

318.   Defendant Olsman also retaliated and engaged in retaliatory harassment against Plaintiff for engaging in activity protected under Title VII with Defendant Olsman's knowledge, including but not limited to reporting and opposing unlawful

sexual harassment committed by Defendant Riley.

319.   As a direct and proximate result of having engaged in the above protected activity regarding Defendant Olsman's favored mediator, Plaintiff was retaliated against by Defendant Olsman, including, but not limited to, the following materially adverse actions and severe and pervasive retaliatory harassment by Defendant Olsman:

    a.  Denial of bonuses;

    b.  Termination;

    c.  Blacklisting Plaintiff in the legal community;

    d.  Subjecting Plaintiff to disparate treatment and a hostile work environment;

    e.  Revocation or denial of normal employment accommodations enjoyed by other similarly situated employees, such as working from home, work-related travel,

    f.  Announcing a "change" in annual financial performance requirements at the end of the year without notice and then falsely claiming Plaintiff failed to meet financial performance requirements;

    g.  Intimidation by MacKenzie and Jules Olsman;

    h.  Falsification of performance evaluations;

    i.  Fabrication of performance evaluations;

    j.  Fabrication of claims of insubordination;

    k.  Fabrication of claims of character issues;

    l.  Intentional exposure of Plaintiff to further and worsening sexual harassment by Defendant Riley;

    m. Defamation and disparagement of Plaintiff with clients and throughout the legal community both inside and outside Michigan;

    n.  Intrusive investigation of Plaintiff's private "romantic" life without cause.

    o.  Filing of retaliatory claims against Plaintiff;

    p.  Intentional interference with this court's authority over this action;

    q.  Post-termination harassment and efforts to deprive Plaintiff of her ability to make a living;

    r.  Other acts of discrimination and retaliation to be determined.

320.  Defendant Olsman's actions were taken with a willful and wanton disregard of Plaintiff's rights under Title VII.

321.  As a direct and proximate result of those actions, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

322.  As a further direct and proximate result of Defendants' unlawful actions against Plaintiff as described, she has suffered and will continue to suffer in the future, injuries and damages, including, but not limited to, loss of earnings and

earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal reputation, physical distress, loss of the ordinary pleasures of everyday life, reasonable attorney's fees and costs incurred in this litigation, and any other compensatory and equitable damages that the Court deems appropriate.

**COUNT VI**
**Breach of Contract (Express)**
*Defendants Riley and RH*

Plaintiff incorporates by reference all preceding paragraphs.

323.   Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at Defendant RH.

324.   Plaintiff was employed by Defendant RH pursuant to an express employment contract, executed in writing in September of 2019.

325.   Defendant Riley violated the terms of the employment contract between Plaintiff and Defendant RH.

326.   Defendant Riley engaged in conduct that violated the employment contract.

327.   Defendant Riley's sexual harassment, unwanted attention and stalking

was severe, offensive, and abusive;  was ongoing and pervasive;  prohibited Plaintiff from doing her job, and in doing so breached the employment contract by creating a workplace that was intimidating, hostile, offensive, and ultimately, intolerable, to Plaintiff.

328.   Defendant Riley's repeated and pervasive harassment of Plaintiff constituted a breach of the contract.

329.   A reasonable person in Plaintiff's circumstances would have considered the work environment to be hostile, offensive, and/or abusive, as Plaintiff came to realize.

330.   As a direct and proximate result of Defendants' breach, Plaintiff suffered damages including but not limited to loss of earnings and earning capacity, loss of the promised partnership opportunity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal reputation, physical distress, loss of the ordinary pleasures of everyday life, and any other compensatory and equitable damages that the Court deems appropriate.

## COUNT VII
## MCL § 600.2954 Stalking
### *Defendants Riley and RH*

Plaintiff incorporates by reference all preceding paragraphs.

331.   Defendant Riley is liable for his negligent or intentional acts, and, as

Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at Defendant RH.

332.   Defendant Riley's actions described in the factual statements set forth in the above paragraphs amount to conduct prohibited under section 411h and/or 411i of the Michigan Penal Code, Act No. 328 of the Public Acts of 1931, being sections 750.411h and 750.411i of the Michigan Compiled Laws.

333.   More specifically, Defendant Riley's conduct constitutes harassment under section 750.411h of the Michigan Compiled Laws, in that his conduct included repeated or continuing unconsented conduct that would cause a reasonable individual to suffer emotional distress and that Defendant Riley's conduct actually caused Plaintiff to suffer emotional distress.

334.   Defendant Riley's conduct, including, but not limited to photographing and collecting photos of Plaintiff and obsessively stalking her, also constitutes stalking under section 750.411h of the Michigan Compiled Laws, in that Defendant Riley engaged in a willful course of conduct involving repeated or continuing harassment of Plaintiff that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, or harassed, and that Defendant Riley's conduct actually caused Plaintiff to feel terrorized, frightened, intimidated, threatened, or

harassed.

335.   Damages incurred by a victim as a result of conduct prohibited in sections 750.411h or 750.411i may be recovered, together with exemplary damages, costs of the action, and reasonable attorney fees. MCL § 600.2954.

336.   As a direct and proximate result of Defendant Riley's prohibited conduct, Plaintiff has suffered lost earnings and earning capacity, humiliation, mortification, embarrassment, sleeplessness, and anxiety, among other damages that may arise during the course of discovery, and any other compensatory and equitable damages that the Court deems appropriate.

## COUNT VIII
### Intentional Inflection of Emotional Distress
*All Defendants*

Plaintiff incorporates by reference all preceding paragraphs.

337.   Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at RH.

338.   Defendant Olsman is vicariously liable for the negligent or intentional acts of all of its partners, including but not limited to MacKenzie, Jules Olsman, and Peacock.

339.   Upon information and belief, the Defendants conspired together to

68

intentionally inflict emotional distress upon the Plaintiff.

340.   The above-described conduct of Defendants was extreme, outrageous, and beyond all possible bounds of decency, and of such character as to be intolerable in a civilized society.

341.   Defendants promoted and fostered the continued misconduct and contact between Defendant Riley and Plaintiff while knowing the contact was unwanted by Plaintiff and placed Plaintiff at risk of serious injury.

342.   The above-described conduct of Defendants was reckless and/or intentional.

343.   Defendants' conduct was not for any proper purpose, nor was it within the scope of Defendants' authority.

344.   The above-described conduct of Defendants caused Plaintiff severe emotional distress.

345.   Defendants are liable to Plaintiff for intentional infliction of emotional distress.

346.   Defendants' conduct in this matter, which proximately caused Plaintiff's injuries and damages, was grossly negligent because it was so reckless that it demonstrated a substantial lack of concern for Plaintiff's physical and emotional wellbeing.

347.   As a direct and proximate result of Defendants' prohibited conduct,

Plaintiff has suffered lost earnings and earning capacity, humiliation, mortification, embarrassment, sleeplessness, and anxiety, among other damages that may arise during the course of discovery, and any other compensatory and equitable damages that the Court deems appropriate.

348.    Defendants' conduct deliberately and intentionally injured Plaintiff; their acts were willful and malicious and are not dischargeable in bankruptcy.

**COUNT IX**
**Intrusion Into Seclusion**
*Riley Defendants*

Plaintiff incorporates by reference all preceding paragraphs.

349.    Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at RH.

350.    Plaintiff maintained privacy concerning details of her personal professional life.

351.    Plaintiff had a right to keep those intimate details and matters private.

352.    Defendant Riley invaded Plaintiff privacy, including but not limited to surreptitiously photographing her, secretly maintaining a cache of photographs of her; stalking her outside of her hotel room in Orlando; refusing to listen to her many requests to be left alone; and listening to her phone calls, some of which were about

Defendant Riley's behavior, while she was in her hotel room.

353.   Defendant Riley's conduct was objectionable and would be objectionable to a reasonable person.

354.   Defendant Riley's conduct as outlined above was objectionable, extreme, outrageous, and beyond all possible bounds of decency, and of such character as to be intolerable in a civilized society.

355.   Defendant Riley's conduct was not for any proper purpose, nor was it within the scope of Defendant's authority or otherwise immune or privileged.

356.   As a direct and proximate result of Defendant Riley's conduct, Plaintiff has suffered lost earnings and earning capacity, humiliation, mortification, embarrassment, sleeplessness, and anxiety, among other damages that may arise during the course of discovery, and any other compensatory and equitable damages that the Court deems appropriate.

357.   Defendant Riley's conduct deliberately and intentionally injured Plaintiff; his acts were willful and malicious and are not dischargeable in bankruptcy.

## COUNT X
**Conspiracy to Permit Stalking and to Violate the ELCRA**
*All Defendants*

Plaintiff incorporates by reference all preceding paragraphs.

358.   Defendant Riley is liable for his negligent or intentional acts, and, as

Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at RH.

359.   Defendant Olsman is vicariously liable for the negligent or intentional acts of all of its partners, including but not limited to MacKenzie, Jules Olsman, and Peacock.

360.   Defendant Riley and Co-Conspirator Defendant Olsman agreed and conspired together to allow Defendant Riley to continue to sexually harass and stalk Plaintiff, to subject Plaintiff to a hostile work environment at Defendant Olsman, and to retaliate against Plaintiff for exercising her right to oppose the harassment and hostile work environment that she was subjected to at Defendant Olsman, in violation of the ELCRA.

361.   Despite Plaintiff's repeated requests that she not be forced to use Defendant Riley as a mediator or have professional contact with the man because of his inappropriate sexual conduct, stalking, and obsession with her, Defendant Olsman had conversations with and conspired with Defendant Riley to continue to allow Defendant Riley to have contact with, harass and stalk Plaintiff, including but not limited to conspiring to warn Plaintiff that Defendant Olsman had been "talking to Bob [Riley] about"  her and that Plaintiff was to "keep Bob [Riley] happy" and conspiring to reject and disregard Plaintiff's reasonable fear of Defendant Riley with

knowledge that her fear was reasonable and well-founded. This conspiracy permitted Defendant Riley's stalking and sexual harassment and Defendant Olsman's hostile work environment to continue.

362. Because Plaintiff resisted, reported and confronted the unlawful misconduct of Defendant Riley, Defendants Riley and Olsman agreed to conspire to fire Plaintiff from her position at Defendant Olsman in further violation of the ELCRA, including but not limited to conspiring to threaten Plaintiff based on false information that she was "spending all of her time crying about her divorce" rather than doing her work; conspiring to rescind Plaintiff's 2023 year-end bonus; conspiring to concoct pretextual reasons to fire Plaintiff; and conspiring to retaliate against Plaintiff.

363. As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages including but not limited to loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal reputation, physical distress, loss of the ordinary pleasures of everyday life, and any other compensatory and equitable damages that the Court deems appropriate.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

**Legal Relief:**

1. Compensatory damages from Defendants in whatever amount Plaintiff is found to be entitled;

2. Exemplary and/or punitive damages from Defendants in whatever amount Plaintiff is found to be entitled;

3. Consequential damages from Defendants in whatever amount Plaintiff is found to be entitled;

4. Trial by jury on all issues so triable; and

5. An award of interest, costs and reasonable attorney fees.

**Prospective Injunctive (Equitable) Relief**

1. An injunction out of this Court requiring Defendant Riley immediately stop contacting Plaintiff and to maintain a safe distance from her;

2. An injunction out of this Court requiring all Defendants to stop disparaging and retaliating against Plaintiff, including but not limited to throughout the Michigan legal community;

3. An injunction out of this Court enjoining state court proceedings in aid of its jurisdiction and as expressly authorized by Title VI of the Civil Rights Act of 1964.

4. An award of interest, costs and reasonable attorney fees; and

5. Whatever other equitable relief appears appropriate at the time of final

judgment.

Respectfully submitted,


/s/ Kathleen Kalahar
Kathleen Kalahar (P60301)
Goodman Kalahar
Attorneys for Plaintiff
1394 East Jefferson Avenue
Detroit, MI 48207
(313) 567-6165
(248) 310-0133 (mobile)
kkalahar@goodmankalahar.com


/s/ Randi McGinn
Randi McGinn
McGinn Montoya Love Curry &
Sievers PA
Attorneys for Plaintiff
201 Broadway Blvd SE
Albuquerque, NM 87102
randi@mcginnlaw.com

Dated: January 31, 2025

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELYSE MCKENNA,

     Plaintiff,               Case No. 24-cv-12347

v.

                                   Hon. Brandy R. McMillion

ROBERT F. RILEY,           Magistrate Elizabeth A. Stafford

and

RILEY & HURLEY, PC,

and

OLSMAN MACKENZIE PEACOCK, PC,

     Defendants.

_____/

Kathleen Kalahar (P60301)
Goodman Kalahar
Attorneys for Plaintiff
1394 East Jefferson Avenue
Detroit, MI 48207
(313) 567-6165
(248) 310-0133 (mobile)
kkalahar@goodmankalahar.com

Randi McGinn
McGinn Montoya Love Curry &
Sievers PA,
Attorneys for Plaintiff
201 Broadway Blvd SE
Albuquerque, NM 87102
randi@mcginnlaw.com

Elizabeth Hardy (P37426)
Thomas J. Davis (P78626)
Kienbaum Hardy Viviano
Pelton & Forrest, P.L.C.
Attorneys for Defendants
Robert F. Riley and Riley & Hurley, PC
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com
tdavis@khvpf.com

Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
DEBORAH GORDON LAW
Attorneys for Defendant Olsman
MacKenzie Peacock, P.C.
33 Bloomfield Hills Parkway, Suite 220

Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com

## JURY DEMAND

Plaintiff requests a trial by jury on all issues triable by a jury.

Respectfully submitted,

*/s/ Kathleen Kalahar*
Kathleen Kalahar (P60301)
Goodman Kalahar
Attorneys for Plaintiff
1394 East Jefferson Avenue
Detroit, MI 48207
(313) 567-6165
(248) 310-0133 (mobile)
kkalahar@goodmankalahar.com

*/s/ Randi McGinn*
Randi McGinn
McGinn Montoya Love Curry &
Sievers PA
Attorneys for Plaintiff
201 Broadway Blvd SE
Albuquerque, NM 87102
randi@mcginnlaw.com

Dated: January 31, 2025