**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

ELYSE MCKENNA,

Plaintiff,

v.

ROBERT F. RILEY, et al.,

Defendants.

Case No. 2:24-cv-12347

Hon. Brandy R. McMillion

Magistrate Judge Elizabeth A. Stafford

---

**DEFENDANTS RILEY AND RILEY & HURLEY, PC'S ANSWER TO SECOND AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

Defendants Robert F. Riley and Riley & Hurley, PC (collectively, "Riley Defendants"), through their undersigned counsel, answer Plaintiff's Second Amended Complaint as follows:

**PLAINTIFF'S INTRODUCTION**

1. During the time she worked for his law firm, Robert F. Riley ("Riley") treated Elyse McKenna ("McKenna") differently than other attorneys in his office because of her gender, creating a hostile work environment for this young lawyer. For the past five years Riley continued to sexually harass and stalk attorney McKenna. For more than two of those years, Riley's harassment of McKenna occurred with the knowledge and constructive approval of McKenna's then-

employer, the law firm of Olsman MacKenzie Peacock, which has a close and mutually beneficial business relationship with Riley and allowed Riley to influence and control McKenna's employment conditions.

**Answer:** Denied.

2. Riley is the foremost mediator in Michigan for front-page sex abuse/harassment lawsuits and complex personal injury lawsuits. On the pretense of being McKenna's professional "mentor" and, later, as her employer, Riley – who first met McKenna when she was a twenty-one year-old law clerk – lured McKenna away from her job as an attorney to hire her at his firm, Riley & Hurley ("RH"). Riley then subjected McKenna to intense sexual grooming and a sexually hostile work environment, in which her tolerance of Riley's inappropriate sexual behavior and obsession with her were conditions of her employment.

**Answer:** Admitted that Riley is a well-regarded mediator in Michigan and that Riley has mediated cases of the type indicated. Otherwise denied.

3. McKenna's life was taken over by Riley. From day one, Riley bombarded her with unwanted handwritten notes, text messages, phone calls, time spent in her office throughout the workday, lavish gifts, and mandatory monthly dinners with just him at expensive restaurants. He interrogated McKenna about her

personal life and insisted on being part of it, attempted to kiss her when he was alone with her, wrote McKenna a romantic note saying he saw "no reason to be tentative" about his "love" and "affection" for her "no matter its implications," and wrote her another note saying, "I have already thought of you 662,112 times today."

**Answer:** Admitted only that Riley communicated via notes, text messages, phone calls and office visits—and had dinners with and provided gifts to—multiple Riley & Hurley employees, including but not limited to Plaintiff, but denies Plaintiff's false implications of impropriety regarding the same or that any notes were of a "romantic" nature. Otherwise, the allegations of this paragraph are denied.

4. When McKenna rebuffed Riley or attempted to distance herself from him, as she did often, he questioned her loyalty, intimidated her, and reminded her that her professional success depended on him.

**Answer:** Denied.

5. After McKenna discovered Riley had been secretly photographing her at the office and stockpiling hundreds of other photographs of her on his iPad, she quit her job and went to work for her new employer, Olsman MacKenzie Peacock ("Olsman").

**Answer:** Denied.

6. With the knowledge, fostering and constructive approval of Olsman, Riley's sexual harassment of McKenna continued and escalated, including crying to her about her setting boundaries; duping her into being alone with him so he could discuss his feelings for her; threatening suicide; persistently contacting her; meddling in her personal and professional life; showing up uninvited; interfering with and sabotaging her work; and stalking McKenna and putting her in great fear for her physical safety.

**Answer:** Denied.

7. Throughout McKenna's employment at Olsman, Olsman and Riley regularly communicated with each other about McKenna, and Riley influenced Olsman's decisions regarding McKenna's employment.

**Answer:** Denied.

8. McKenna repeatedly told Riley to leave her alone, but Riley was a man who would not take "no" for an answer.

**Answer:** Denied.

9. The partners of Olsman disregarded McKenna's numerous reports of Riley's unwanted, inappropriate behavior and rejected her requests for help and to not be required to interact with Riley. Olsman warned McKenna that "we keep Bob Riley happy in this office," laughed at her for expressing her fear for her safety as Riley's behavior escalated, told McKenna not to "make a big stink" about it, allowed Riley's gossip to negatively influence McKenna's work conditions, told McKenna to stop talking about Riley, and, ultimately, fired McKenna, in retaliation, two days after she confronted Riley, through counsel, to try and get him to stop.

**Answer:** Denied.

10. Riley and Olsman launched an ongoing concerted effort to ruin McKenna's reputation and destroy her livelihood. They disparaged her to clients and to her colleagues in the legal community, telling them she was "incompetent," having an "emotional breakdown" and "dishonest." They spread rumors about her.

**Answer:** Denied.

11. All the while, Olsman and Riley have continued to mutually benefit from their close and longstanding relationship.

**Answer:** Denied.

12. As a result of standing up to Riley and Olsman, McKenna was forced to leave the state and had to start her legal career over. Because of Riley's prominent position in the community, McKenna was unable to find legal support in the metro-Detroit legal community that was the center of her once vibrant and promising professional life, and she was ostracized by Riley's network of loyalists for revealing his misconduct. McKenna now lives in Maryland, in the home of her law partner, where she is trying to rebuild the nine-year career that Riley and Olsman took away from her and put the pieces of her shattered life back together.

**Answer:** Denied.

13. This action is brought by Plaintiff Elyse McKenna for discrimination, sexual harassment, hostile work environment, disparate treatment, retaliation, and other violations of Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e, et seq. ("Title VII"); the Elliott-Larsen Civil Rights Act, as codified, M.C.L. § 37.2101 et seq. ("ELCRA"); and Michigan statutory and common law.

**Answer:** Admitted only that the second amended complaint purports to bring such claims. Denied that the claims have any merit.

**PARTIES, JURISDICTION AND VENUE**

14. Plaintiff Elyse McKenna, formerly known as Elyse Heid ("McKenna") is a 31-year-old attorney and is now a resident and citizen of the State of Maryland.

**Answer:** Admitted only that Plaintiff's name is Elyse McKenna, was formerly known as Elyse Heid, is an attorney. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

15. Defendant Riley & Hurley, PC, ("RH") is a general civil practice law firm and is incorporated in and has its principal place of business in Michigan.

**Answer:** Admitted.

16. Defendant Robert Riley ("Riley") is a 70-year-old attorney, the named and managing partner of RH and a resident and citizen of the State of Michigan.

**Answer:** Admitted.

17. William Hurley ("Hurley") is an attorney and a named partner of RH and is a resident and citizen of the State of Michigan.

**Answer:** Admitted.

18. Defendant Olsman MacKenzie Peacock, PC ("Olsman") is a metro-Detroit personal injury law firm which is incorporated in and has its principal place of business in Michigan.

**Answer:** Admitted.

19. Jules Olsman ("Jules Olsman") is a 71-year-old attorney and named partner at Olsman and is a resident and citizen of the State of Michigan.

**Answer:** Admitted.

20. Donna MacKenzie ("MacKenzie") is a 44-year-old attorney and named partner at Olsman and is a resident and citizen of the State of Michigan.

**Answer:** Admitted.

21. Emily Peacock ("Peacock") is a 45-year-old attorney and named partner at Olsman and is a resident and citizen of the State of Michigan.

**Answer:** Admitted.

22. This Court has personal jurisdiction over the parties to this Complaint.

**Answer:** Admitted; however, to the extent that there is no subject-matter jurisdiction, personal jurisdiction is irrelevant.

23. Pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, this Court has subject matter jurisdiction over this matter, because Plaintiff's claims arise under federal law.

**Answer:** Denied that any claims against the Riley Defendants arise under federal law.

24. Pursuant to 28 U.S.C. §1332(a)(1), this Court also has subject matter jurisdiction over this action, based on diversity of citizenship and an amount in controversy in excess of $75,000.00.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of McKenna's allegations that she is a citizen of Maryland, and on that basis deny that the Court has diversity jurisdiction.

25. Pursuant to 28 U.S.C. §1367, this Court should exercise supplemental jurisdiction over Plaintiff's state law claims because those claims arise out of the same set of operative facts as Plaintiff's federal claims, such that all claims form part of the same case and controversy.

**Answer:** Denied that a Court may exercise supplemental jurisdiction over a party when there are no claims for which that party is subject to either federal-question or diversity jurisdiction, simply because a separate party has claims that

are properly before the Court.

26. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action occurred in the Eastern District of Michigan.

**Answer:** Admitted only that events or omissions alleged herein occurred in Michigan; however, to the extent there is no subject-matter jurisdiction the question of venue is irrelevant.

## PROCEDURAL BACKGROUND

27. McKenna exhausted her administrative remedies at the U.S. Equal Employment Opportunity Commission ("EEOC").

**Answer:** Denied as to the Riley Defendants. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

28. The EEOC found reasonable cause to believe violations of Title VII occurred. The EEOC issued McKenna a Notice of Right to Sue, which McKenna received on or about October 15, 2024. A true and correct copy of that notification is attached as **Exhibit A**.

**Answer:** Denied.

## FACTUAL ALLEGATIONS

29. Riley has served as a mediator, facilitator, and arbitrator in hundreds of civil matters in various areas of law, including complex medical malpractice and personal injury litigation and sex abuse/sex harassment litigation. Of note, Riley served as independent mediator in:

a. the UM/Anderson lawsuit involving 1,050 University of Michigan athletes and patients alleging they were sexually abused by Dr. Robert Anderson, a physician at the school;

b. the Northwestern University hazing lawsuits by numerous former football players alleging sexualized hazing, racial discrimination, and abuse within the football program; and

c. the Eastern Michigan University rape lawsuits by 24 current and former Eastern Michigan students alleging the university and several of its officials covered up students' reports of rape near campus.

**Answer:** Admitted that Riley mediated the case identified in Paragraph 29.a, as that information has been publicly disclosed. The Riley Defendants are unaware if there has been any public disclosure regarding details of mediation (if any) by Riley for the cases identified in Paragraphs 29.b and 29.c, and Plaintiff would be breaching ethical obligations by disclosing private, undisclosed mediation information. The Riley Defendants would likewise breach ethical obligations by

disclosing details of mediations that have not been publicly disclosed. On that basis, the Riley Defendants indicate that they will neither confirm nor deny those allegations and, on that basis, request that the Court consider this a denial for pleading purposes.

30. Based on his experience as a lawyer and a mediator, Riley knew or should have known what was inappropriate conduct in the workplace, including conduct that constitutes sexual harassment, sexual discrimination, hostile work environment, disparate treatment in the workplace, retaliation, and stalking.

**Answer:** Admitted that Riley is aware of what is inappropriate conduct in the workplace. Denied that there was any such inappropriate conduct.

31. Riley met McKenna in 2014 at a mediation. McKenna was a 21-year-old law student working as a law clerk at a Troy, Michigan medical malpractice law firm.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

32. At the time, McKenna, who graduated as valedictorian of her Marine City, Michigan high school at age 17, was on track to graduate from Case Western

Law School in 2015 at age 22, as the youngest person in her class.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

33. While in law school, McKenna was a finalist in the school's moot court competition and won the awards for "best student in trial tactics" and "best litigator." She also was inducted into the Order of the Barristers, a national honor society with membership limited to graduating law students and practicing lawyers who demonstrate exceptional skill in trial advocacy, oral advocacy, and brief writing.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

34. Between 2014 and the summer of 2019, while working as a law clerk and then as a lawyer, McKenna attended various facilitations that were mediated by Riley.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

35. In the summer of 2019, Riley commenced an elaborate scheme to sexually groom and acquire control over McKenna's career. He 1) lured McKenna

away from her job as medical malpractice lawyer, 2) worked behind the scenes (and without McKenna's knowledge) to get McKenna several job offers, 3) became McKenna's "mentor" to guide her in her career choices, 4) misrepresented problems in the law firms she was considering to convince McKenna to reject the very job offers he had cultivated, and 5) presented McKenna with an attractive offer to work for his firm, RH, which she ultimately accepted.

**Answer:** Denied.

36. In July or August of 2019, an attorney from a respected Southfield, Michigan law firm contacted McKenna and asked if she was interested in a position with the firm. The attorney said she was reaching out based on the recommendation of a well-known attorney.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

37. Around the same time, Riley prompted a mutual professional acquaintance (a hospital claims representative) to contact McKenna and encourage her to leave her current firm. The claims representative told McKenna that Riley had asked her to share his contact information with McKenna. She said Riley had told her he did not want McKenna's current employer to think Riley was trying to

"poach" McKenna, but that he would be happy to be a sounding board for McKenna as she made career decisions, and, furthermore, that he had specific career advice for McKenna.

**Answer:** Denied that Riley made the statements alleged to the adjuster. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

38. Shortly thereafter, McKenna was approached by other law firms, which resulted in job offers for medical malpractice associate positions from four prominent metro-Detroit firms, including the Southfield firm that had reached out to McKenna first, at Riley's suggestion.

**Answer:** Denied that Riley made the statements alleged to the Southfield firm. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

39. Upon information and belief (but unknown to McKenna at the time), Riley recommended McKenna as a promising young attorney to these and many metro-Detroit law firms in the area.

**Answer:** Denied.

40. Subsequently, Riley reached out to McKenna and invited her to his annual end-of-summer barbeque. The event is regarded as a party for the "who's who" of medical malpractice attorneys in Michigan.

**Answer:** Admitted that Riley has an annual barbecue but denied that only medical malpractice attorneys are invited. Further admitted that McKenna and her husband were invited to the barbecue. Otherwise denied.

41. On September 7, 2019, McKenna attended Riley's barbeque, after which they had numerous conversations regarding McKenna's job offers and career prospects.

**Answer:** Admitted that McKenna and her husband attended the barbecue, and that she had a conversation with Riley regarding various matters legal matters and at least one conversation with Riley and his wife. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations that any conversions occurred, and on that basis deny.

42. Riley's first piece of advice for McKenna was that she should leave her current employer. He falsely told her the partners of the firm were subverting medical malpractice cases from being directly assigned to her.

**Answer:** Denied.

43. Riley discouraged McKenna from taking any of the job offers that she had received (and, upon information and belief, that he had cultivated), stating that McKenna would not be afforded the opportunities she deserved at these other firms.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations that any conversions occurred, and on that basis deny. Denied that Riley "cultivated" offers and denied that Riley ever discouraged Plaintiff from taking specific offers.

44. Throughout these early discussions about McKenna's job opportunities, Riley praised McKenna's legal skills and spoke very favorably of her potential, which he often described as being unlimited.

**Answer:** Admitted only that Riley spoke positively about McKenna's potential. Otherwise denied.

45. Riley also implored McKenna to tell him about her upbringing, telling her that he could only determine where she would be a good fit, whether she would make a good attorney, and how much promise she had if she was willing to share intimate details about her childhood and family.

**Answer:** Denied.

46. After discouraging her from taking a job with any of the other firms, Riley offered McKenna a job with his firm, RH, and coordinated an interview of McKenna by his law partner, Hurley.

**Answer:** Denied that Riley discouraged McKenna from taking jobs with other firms. Denied that Riley offered Plaintiff a job prior to any interviews with Riley's law partner. Admitted that after an interview with Riley's law partner, Riley & Hurley offered Plaintiff a job.

47. After much consideration, McKenna declined Riley's offer and accepted a position with the Southfield firm that had first contacted her. She tendered her notice of resignation to her employer.

**Answer:** Admitted that Plaintiff declined the job offer. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations and on that basis deny.

48. When McKenna told Riley of her decision, Riley became very upset with McKenna and cried throughout the meeting. He expressed concern for McKenna's legal career and told her she was making the wrong decision, but he refused to articulate why.

**Answer:** Denied.

49. Later that week, Riley asked McKenna and McKenna's then-husband to dinner, during which Riley falsely told them that female attorneys who had worked for the Southfield firm had been raped and sexually assaulted by colleagues. Riley warned McKenna that going to work for that firm would ruin her career.

**Answer:** Admitted that Riley had a dinner with McKenna and her husband. Otherwise denied.

50. Riley also discussed the all-male board of directors at the Southfield firm and said he had a female attorney friend around his age who was a partner at the firm, and she was consistently mistreated and disparately compensated. Riley also discussed that female attorney's female associate, who he stated also was not fairly treated by the firm.

**Answer:** Admitted only that during the dinner, McKenna raised concerns about a Southfield firm and its male leadership, and that Riley encouraged her to have discussions with the firm including its female attorneys. Otherwise denied.

51. Riley explained that he had been hesitant to tell McKenna all this upfront, but that he felt he had to tell her once he knew she was making a mistake with her career.

**Answer:** Denied.

52. On September 27, 2019, Riley sent McKenna an unsolicited term sheet detailing, *inter alia*, her potential to become a full owner of his RH law firm at no cost to her, other than recognition of outstanding accounts receivables to RH and existing stock reimbursement.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of whether any such document existed or was sent to Plaintiff—or, if genuine, who sent it and whether it was solicited or unsolicited—and on that basis deny.

53. Alarmed at what Riley had shared about the Southfield firm, having already put in her notice at her current employer, recognizing Riley's reputation in the legal field in Michigan, and excited about the opportunity to become a partner in a well-respected law firm in the metro-Detroit area, McKenna changed her mind and accepted Riley's offer of employment.

**Answer:** Admitted only that Plaintiff accepted an offer with Riley & Hurley. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

54. What should have been the start of a long and promising career at RH turned into a decision that McKenna will look back on and regret for the foreseeable

future.

**Answer:** Denied to the extent this paragraph implies any wrongdoing by the Riley Defendants. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

55. On October 21, 2019, McKenna began working at RH.

**Answer:** Admitted.

56. RH had no human resources department, and Riley was its majority shareholder and McKenna's only supervisor.

**Answer:** Admitted that Riley was the majority shareholder. Admitted that there is no human resources "department" at Riley & Hurley PC but denied insofar as this is intended to give the false implication that there was no one at the firm besides Riley who would have involvement in human resources issues. Otherwise denied.

57. Over the course of the next several months, Riley sexually groomed McKenna and insinuated himself into every part of her life. Unlike the way he treated other lawyers in the office, he began a barrage of relentless and unwanted notes, text messages, and phone calls; spent lots of time in her office; left her lavish gifts;

required her to attend mandatory monthly dinners with just him at expensive, romantic restaurants; isolated her from her friends and family; shared intimate details about his personal life; tried to kiss her; interrogated her about her personal life; asked her to treat him as her closest confidante; demanded that she be available to him at all times; told her to be happy that he thought about her hundreds of thousands of times per day; told her he loved her and tried to normalize it; sexualized the office environment and tried to normalize it; told her "E & B" was his "dream;" and got angry or intimidating when she failed or refused to reciprocate his affection or otherwise to do as he wanted.

**Answer:** Denied.

58. Riley's behavior eventually escalated to secretly taking photographs of McKenna, secretly researching and collecting information about her online, and secretly saving hundreds of photographs of her on his iPad.

**Answer:** Admitted only that Riley—who Plaintiff knows is legally blind and can only see the faces of attorneys and other people he works with by using his iPad to magnify and increase the resolution of photographs—had photos of Plaintiff and others on his iPad, all of which were either publicly-available or taken in non-private settings. Admitted that Riley has seen publicly-available material about Plaintiff that she or others have placed on the internet, but denied to the

extent that the utterly commonplace act of viewing publicly-available information (something her and her counsel unquestionably do on a routine basis themselves) constitutes "secretly researching and collecting information." Otherwise denied.

59. Riley also gave McKenna numerous gifts, including a pair of roundtrip plane tickets to anywhere in the world, expensive bottles of wine and earrings.

**Answer:** Admitted only that all employees of Riley & Hurley P.C.—including McKenna—received numerous generous gifts of this nature, particularly at Christmas. The gifts given to all employees would include things such as high-dollar-figure airline gift cards, jewelry, wine, and the like. Denied otherwise, including McKenna's knowingly false implication that she alone received such gifts or that such gifts were given with improper motivations.

60. McKenna did not know how to respond to Riley's unwanted gifts besides emphasizing to him that they were unnecessary. McKenna never used the plane tickets.

**Answer:** Denied as to the implication that McKenna refused gifts of a nature provided to all employees because they were somehow inappropriate. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations and on that basis deny.

61. Sometime in November or December of 2019, Riley insisted on taking McKenna and her mother out to dinner. Following the dinner, McKenna's mother expressed concern regarding Riley's infatuation with McKenna.

**Answer:** Admitted only that Riley has gone to dinner with McKenna and her mother. The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations in regard to when the dinner was and what McKenna's mother believed, and on that basis deny. Otherwise denied, including the implication that the dinner was for romantic or other improper purposes.

62. Riley then sent McKenna's mother a card detailing how impressed he was with McKenna and how much he admired her. McKenna's mother again expressed concern that Riley was enamored with McKenna.

**Answer:** Admitted only that Riley has sent a card to McKenna's mother, but denied to the extent that Plaintiff is implying that this action was based on romantic or other improper motivations. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations in regard to the specific contents of the card and what McKenna's mother believed, and on that basis deny.

63. McKenna told her mother that she did not know how to make Riley stop.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations about what Plaintiff allegedly said, and on that basis deny. Denied to the extent this paragraph implies there was improper conduct.

64. In 2020, the sexual grooming continued, including more romantic hand-written cards and mandatory dinners. There were at least five such dinners with Riley from January - March of 2020. Riley attempted to kiss McKenna at more than one of these dinners; McKenna physically recoiled from all attempts.

**Answer:** Denied that there was "sexual grooming," "romantic" cards, "mandatory" dinners, or any attempts to kiss McKenna at any dinners whatsoever. Admitted that, as with other attorneys at Riley & Hurley, there were occasional dinners where Riley and McKenna were present, but the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of the number of such dinners, if any, between January and March 2020 and on that basis deny.

65. Beginning February 10, 2020, Riley initiated a two-week long scavenger hunt to celebrate McKenna's birthday. Each day, McKenna found a new

birthday card on her desk from Riley with clues for where to find that day's gift. They were typically hidden in Riley's office.

**Answer:** Admitted only that all employees of Riley & Hurley P.C.—including McKenna—received birthday gifts, including occasionally more than one gift. Denied otherwise, including McKenna's false implication that she alone received such gifts or that such gifts were given with improper motivations.

66. The COVID-19 pandemic enabled McKenna to work from home, providing a reprieve from Riley's sexual grooming and advances and increasingly threatening behaviors and demands for attention.

**Answer:** Admitted that at the outset of the COVID-19 pandemic, Riley & Hurley staff worked from home. Otherwise denied, including specifically denied that there was "sexual grooming," "advances," or inappropriate "behaviors" or "demands for attention."

67. However, a few months into the pandemic, Riley began complaining that he was not seeing enough of McKenna and insisted that she return to the office, which required McKenna to be alone with Riley due to the COVID lockdown.

**Answer:** Denied.

68. Riley also required McKenna to eat dinner with him via Zoom and attend an alone and in-person dinner at his house during the pandemic, at which Riley tried to kiss McKenna when she was leaving, which she again resisted. Riley claimed the dinners would ensure that McKenna was still progressing according to Riley's expectations and "ensure McKenna's success."

**Answer:** Admitted only that Plaintiff, Plaintiff's husband, and Riley had dinner at Riley's home during the pandemic, and that work-related matters were discussed at the dinner. Otherwise denied.

69. As the pandemic drew on, Riley became increasingly possessive of McKenna's time, often requiring after-hours Zoom meetings lasting until midnight "to discuss work."

**Answer:** Admitted only that Plaintiff and Riley often had communications via Zoom regarding work matters, and that such meetings occasionally occurred "after hours" to the extent that means after 5 o'clock pm, which is customary in the legal profession. Otherwise denied, including the implication that any such meetings were unrelated to work.

70. When McKenna attempted to end these Zoom meetings at reasonable hours, Riley would threaten McKenna that she wasn't taking the work seriously.

**Answer:** Denied.

71. The work that Riley was requiring be worked on until the early hours of the morning was not pressing or urgent, and Riley would often veer off-topic, sharing personal details with McKenna about his life and his discussions with his therapist, and inquiring about the personal details of McKenna's life and her relationship with her husband at the time.

**Answer:** Admitted only that—as with any work-related interaction with any colleague—occasional discussions of non-work-related matters might occur during a work meeting. Otherwise denied.

72. On June 16, 2020, Riley sent McKenna the following message:

> Good morning ELMH! It is the 16th day of the 6th month of 2020 AD. **I have already thought of you 662,112 times today.** I think I miss you.
>
> Actually, I know I do.
>
> Now that you know too, it can be a great day for both of us. (emphasis added).

**Answer:** Admitted that Riley sent the text message in question, but denied to the extent this paragraph implies that there was anything sexual or otherwise improper about this text—a text that McKenna responded to by "liking" it and then texting back "Bob! I miss you too!"

73. In the summer of 2020, Riley discussed partnership prospects with McKenna and asked her to personally guarantee a new lease for the RH office building.

**Answer:** Admitted only that Plaintiff was hired with the expectation that she would be on a track to partnership, but denied to the extent Plaintiff is implying that she was anywhere near partnership at this time or that Riley indicated that she was near partnership. Otherwise denied.

74. McKenna declined and said she was uncomfortable with that level of financial commitment.

**Answer:** Denied.

75. In furtherance of his sexual grooming, Riley became frustrated at McKenna, questioning her loyalty to him, and the work environment grew increasingly hostile.

**Answer:** Denied.

76. In December of 2020, Riley again gave McKenna numerous additional cards, expensive gifts, and roundtrip plane tickets to anywhere for Christmas. Again, McKenna never used the tickets.

**Answer:** Admitted only that all employees of Riley & Hurley P.C.—including McKenna—received numerous generous gifts of this nature, particularly at Christmas. The gifts given to all employees would include things such as high-dollar-figure airline gift cards, jewelry, wine, and the like.

77. Riley required mandatory dinners with just him and McKenna on January 17, January 24, March 30, April 22, June 7. At least some of these dinners, Riley again tried to kiss McKenna when departing, which McKenna physically recoiled from.

**Answer:** Denied that there were "mandatory" dinners. Denied that Riley tried to kiss McKenna. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations with respect to specific dates on which firm dinners with Plaintiff or other employees occurred, and on that basis deny.

78. At the April 22, 2021 dinner, Riley again spoke with McKenna about becoming a partner in the firm.

**Answer:** Denied that there were "mandatory" dinners. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations with respect to specific dates on which firm dinners with

Plaintiff or other employees occurred, and on that basis deny. Admitted that Plaintiff was hired with the expectation that she was on a potential partnership track, but the Riley Defendants lack knowledge or information sufficient to form a belief about whether this topic was discussed at any particular dinner. Denied to the extent that Plaintiff suggests that she was told that she was close to becoming a partner.

79. The sexual grooming continued to escalate. In May of 2021, Riley invited McKenna to his office under the guise of needing McKenna's help with technology issues. When McKenna arrived, Riley was watching pornography on his computer. He made no effort to remove it from view and it was clear he wanted McKenna to see it. This made McKenna feel uncomfortable. She averted her eyes and left the office as soon as she could.

**Answer:** Denied.

80. Also in May of 2021, McKenna learned that the other RH partner, Hurley, would be slowing down his work. McKenna became concerned she would be working solely with Riley. She did not like being alone with Riley because he would be more likely to try to kiss her and have intimate conversations with her.

**Answer:** Admitted that in or about this timeframe, Mr. Hurley indicated that

he might be slowing down his work. Denied that Riley ever tried to kiss McKenna or have "intimate" conversations with her. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations and on that basis deny.

81. In June of 2021, McKenna became increasingly suspicious that Riley was surreptitiously taking photographs of her with his iPad while she was sitting in his office, because she could see a reflection of herself on the iPad screen in the window behind his desk and he always instructed McKenna to sit in the chair that his iPad was facing.

**Answer:** Denied that McKenna was "instructed" to sit in any particular chair. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

82. Because of Riley's increasingly possessive and disparate behavior toward her, McKenna felt extremely threatened and unsafe and knew she could not continue working at RH. She decided to search for employment elsewhere, without informing Riley.

**Answer:** Admitted that McKenna sought other employment. Denied that she did not inform Riley. Otherwise denied.

83. When McKenna interviewed prospective employers, she was confronted repeatedly with the question of why she wanted to stop working for such a high-profile mediator and lawyer. The attorneys were hesitant to hire McKenna away from Riley and expressed concern that doing so might affect their ability to resolve cases with Riley as their mediator. They wanted Riley's consent.

**Answer:** Denied that any employer has ever sought Riley's "consent" to hire employees, or that Riley has ever required prospective employers to seek consent before hiring anyone. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

84. McKenna was left with no choice but to inform Riley that she would be leaving his firm. Because she needed Riley's blessing to get hired by other firms, McKenna premised her departure on Hurley's likely retirement and her desire to work for the plaintiff's bar.

**Answer:** Denied that McKenna needed Riley's "blessing" to be hired anywhere. Admitted that McKenna indicated she was leaving due to Hurley's likely retirement and her desire to work for the Plaintiff's bar. Otherwise denied.

85. Riley discouraged McKenna from leaving. He insisted RH could continue to pay McKenna's salary while she started her career as a plaintiff's lawyer at RH, even if her only source of revenue came from the hourly rate she was paid by an RH organizational client that Riley and McKenna both represented. Riley also told McKenna that he would return to working as a trial lawyer so that the two of them could be a team and try cases together.

**Answer:** Denied.

86. McKenna felt unsafe and was extremely uncomfortable at the thought of continuing to work with Riley and stressed to him that she wanted to work for a well-established plaintiff's medical malpractice firm where she could learn and grow.

**Answer:** Denied.

87. Reluctantly, Riley encouraged McKenna to explore an opportunity to work for Olsman.

**Answer:** Denied.

88. Riley also assured McKenna that he would not object to her continuing to represent the organizational client after she left RH.

**Answer:** Admitted that Riley supported Plaintiff's wish to keep working with Riley's organizational client after her departure. Denied otherwise.

89. Recognizing she needed Riley's consent before a prospective employer would hire her, and aware that Olsman was a reputable plaintiff's medical malpractice firm, McKenna agreed to explore the opportunity at Olsman.

**Answer:** Denied that McKenna needed Riley's consent for her to obtain employment. Admitted that Olsman is a reputable plaintiff's firm. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

90. Riley facilitated a meeting between MacKenzie and McKenna, after which McKenna met Jules Olsman, and Olsman offered McKenna a job at $75,000 a year, a significant pay cut for McKenna.

**Answer:** Denied that Riley facilitated such a meeting. Admitted that Plaintiff became employed by Olsman. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

91. When McKenna tried to negotiate a higher salary than offered, MacKenzie told McKenna every lawyer in the office was paid the exact same salary, regardless of experience or contribution, and that increases were made through year-end bonuses in recognition of the attorney's yearly contribution.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

92. Shortly after this conversation, MacKenzie offered McKenna five thousand dollars more in salary. Riley later told McKenna that he had negotiated this on McKenna's behalf. McKenna did not know about or want this interference by Riley.

**Answer:** Denied.

93. McKenna accepted Olsman's offer. She was hopeful that because Olsman represented victims of Larry Nassar and had female partners, they would be in a position to understand the sexual harassment and grooming that McKenna had endured and be in a position to shield her from more of the same.

**Answer:** Denied there was any "sexual harassment" or "grooming." Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

94. McKenna put in her two weeks' notice at RH at the beginning of August of 2021.

**Answer:** Admitted.

95. On August 18, 2021, McKenna accessed Riley's iPad and found what appeared to be hundreds of photographs of herself - including photographs downloaded off of the internet, taken of her during Zoom calls, taken of her while she was sitting in his office, taken of her walking down the hallway, downloaded from other people's social media accounts, downloaded from McKenna's social media accounts from at least seven years earlier when McKenna was younger, and in countless other situations when McKenna did not know Riley was photographing her.

**Answer:** Admitted that McKenna illegally and without authorization accessed Riley's iPad, which she knew he relied upon due to his disability and which contains his most sensitive and personal information, including financial and medical information. Further admitted that Riley—who Plaintiff knew to be legally blind, and who she knew can only see the faces of attorneys and other people he works with by using his iPad to magnify and increase the resolution of photographs—had photos of Plaintiff and others on his iPad, all of which were either publicly-available or taken in non-private settings. Otherwise, the Riley

Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

96. McKenna's last day at RH was on August 20, 2021, two days after she found the photos on Riley's iPad. Riley gave McKenna yet another handwritten card to memorialize the occasion.

**Answer:** Admitted that Plaintiff's last day was August 20, 2021. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

97. Just before leaving, McKenna received a letter drafted by Riley and signed by the organizational client's Executive Director. The letter stated that, in order for McKenna to continue representing the organizational client at Olsman, as Riley had promised, McKenna would be required to become Riley's independent contractor. The letter was designed to intimidate and force McKenna to continue to be subjected to Riley's sexual harassment, and required that she:

a. recognize her "continued association with Bob Riley is important;"

b. "work fully and completely under Bob's guidance and direction;"

c. work for the organizational client "outside" of her employment with Olsman and only "through Riley & Hurley, P.C.;"

d. agree that "Bob will serve as your supervisor for all [organizational client] activities, including assignments, projects, meetings, negotiations, etc.;"

e. prepare all invoices for the client "through Riley & Hurley, P.C.;" and

f. have all invoices "reviewed and approved by Bob."

**Answer:** Admitted that Riley drafted a letter was sent to McKenna in light of her desire to continue working to represent Riley's organizational client. Denied that there was sexual harassment. Denied that Plaintiff ever became Riley's "independent contractor." Denied that McKenna had any obligation to continue representing Riley's client or that she had any obligation to Riley of any kind.

98. The organizational client was and is an extremely male-dominated organization. McKenna viewed Riley's letter (and his ability to get the Executive Director to sign it) as a clear sign of his disparate treatment of her and hostility toward her because of her rejection of his sexual advances.

**Answer:** Denied.

99. McKenna felt unsafe and threatened by Riley's secret surveillance of her, his sexual grooming, his attempt to intimidate and control her through the organizational client, and his other conduct.

**Answer:** Denied.

100. McKenna contacted numerous attorneys in Michigan for help. They all told her she had viable sex discrimination claims against Riley and his firm but that they would not represent her because of Riley's prominent status in the legal community.

**Answer:** Denied to the extent this paragraph implies there was any legitimate basis to seek "help" as no improper conduct occurred. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

101. One of the attorneys assured McKenna that their communications and the information disclosed to her by McKenna would be kept confidential but said she could not represent McKenna, because she "would not touch Bob Riley with a ten-foot pole." This attorney further advised McKenna not to file a lawsuit and warned her that if she did file a lawsuit, it would ruin her career. She informed McKenna that, at the very least, McKenna would have to leave the state of Michigan.

**Answer:** Denied to the extent this paragraph implies there was any improper conduct. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

102. On August 22, 2021 (two days after leaving RH), McKenna confronted Riley about his behavior and actions. She told Riley she would not work in any capacity in which he was her "supervisor" and she would therefore step aside as counsel for the organizational client. She also expressed concern that Riley would retaliate against her for speaking up. McKenna's email to Riley stated as follows:

> Bob,
>
> I received the draft agreement regarding my proposed independent contractor status with Riley & Hurley, PC. I cannot agree to this arrangement.
>
> <u>I am aware that you took photographs of me surreptitiously while I was in your office. This is extremely upsetting and inappropriate. This, in conjunction with your other behaviors and actions, including your romantic text messages, letters, and comments, has caused me to feel very uncomfortable and scared. I will not be working in any capacity in which you are my supervisor</u>.
>
> I have attached a memo with the information necessary to transition my current [organizational client] projects and I will reasonably cooperate in transitioning these projects so as to protect the client's interests. Under the circumstances, I felt it better to not record a [organization client] annual meeting video and I leave preparation of such a video to you.
>
> I received the $10,000 personal check from you. In light of this situation, I do not feel comfortable cashing this check.
>
> I want you to know that I feared speaking up for fear of retaliation due to your status and prominence in the legal field.
>
> I trust that this fear will not be realized.

> I have removed the rest of my personal items from the office. I left the laptop on my desk and the keys to the building and the office suite are located in the drawer on the right-hand side of my desk. I trust that we will move on without further complication.
>
> Elyse Heid

**Answer:** Admitted only that McKenna sent the email, which contained numerous false and misleading allegations of fact. Otherwise denied.

103. In his response that same day, August 22, 2021, Riley promised to "step aside as attorney" for the organizational client, rather than continue working for the client without controlling McKenna.

**Answer:** Denied that this four-word snippet of a multiple-paragraph email response constitutes "promises" to step aside from his long-standing representation of the organizational client. Instead, Riley indicated (because of his disability) he required assistance to continue serving his client and that he proposed that—if the client accepted—McKenna could represent the client allowing Riley to step aside entirely after a transition period, if that would be consistent with ethical obligations to the client, but that regardless he would not be her "supervisor" and that she would have an independent billing relationship with the client, if the client approved.

104. Riley also promised to "end any and all personal contacts" with McKenna and "make certain" he and McKenna would "have no personal dealings" going forward. He also assured McKenna she would have "nothing to fear" going forward.

**Answer:** Denied for the reasons stated in the response to Paragraph 103, above, which selectively and misleadingly quotes a multi-paragraph email. undefined point in time in the future in the event the organizational client decided, after a transition period, to retain Plaintiff as its sole counsel.

105. Riley did not keep any of the above promises.

**Answer:** The inferences and allegations are denied. Plaintiff misstates the contents and meaning of the email in question as discussed in the preceding two paragraphs.

106. Riley sent a second message later that day, with a "final personal note" of "wrongdoing." This time, Riley stated that he was "very sorry" but that "sorry" was "not enough." He conveyed his "unequivocal acknowledgment" of his "mistakes" and admitted his "mistakes" were "clear" and "unambiguous," and that they could not be "explained away." He admitted, "I am guilty" and that he had "let down" McKenna, and he further acknowledged, "I have frightened you." Riley

further "absolutely assure[d]" McKenna there would be "no retaliation in any manner of form" but said he recognized why his retaliation was a "concern" for McKenna. Riley further stated that he did "not merit forgiveness" and that he would "accept whatever consequences may follow."

**Answer:** Denied that this paragraph accurately transcribes all of the portions it purports to quote, and denied that it is a complete and accurate recounting of the email. Further denied to the extent that Plaintiff is being grossly misleading regarding the contents of this email which—when read in full—shows that Riley believed that Plaintiff and he had been good friends, and that he was unreservedly apologizing because he believed he had hurt a good friend. Thus, denied insofar as Plaintiff is attempting to suggest that this email reflects an "admission" of sexual harassment or any other legal wrongdoing.

107. In the days, months and years that followed, Riley did not act in accordance with the above note of alleged contrition.

**Answer:** Denied.

108. Riley's second email to McKenna of August 22, 2021, was not, as he stated, his "final personal note." Still later on August 22, 2021, Riley sent McKenna a third email.

**Answer:** No such email appears in Riley's records; thus, the Riley

Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

109. In the third email, Riley made an emotional plea devoted to his "intentions," his "goals," his "dreams," his expectations, and his desires. He insisted he "never intended" to hurt or harm McKenna and that he "always wanted" the best for McKenna. He claimed that "E&B" (i.e., Elyse & Bob) was his "dream" and that he had been "counting on" a "terrific friendship" with McKenna that would have lasted through his (age 67) and McKenna's (age 26) "remaining lives." Riley used the words, "I failed" six times. He then stated that, "however," what he had done to McKenna (his failure), and indeed, "no failure" could compare to his feelings of "regret." He ended with a perfunctory, "I remain very sorry Elyse."

**Answer:** No such email appears in Riley's records; thus, the Riley Defendants lack knowledge or information sufficient to form a belief about whether this purported email even exists, let alone that any of the quoted language is accurate, and on that basis deny. Denied, however, to this extent this paragraph is intended to suggest that Riley ever "admitted" sexual harassment or other legal wrongdoing in any context.

110. McKenna began working at Olsman in September of 2021. She mistakenly believed she was escaping Riley's harassment and control and would be able to move on with her life and career.

**Answer:** Denied that there was "harassment" or "control." Admitted that Plaintiff started work at Olsman in September 2021.

111. McKenna told MacKenzie of the email exchange she had with Riley upon departing RH and the history of sexually harassing conduct that preceded it, and that she wanted to continue to represent the organizational client only because Riley had promised to step aside as that client's attorney.

**Answer:** Denied that there was "sexually harassing conduct." Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

112. During this conversation, McKenna told MacKenzie that she had confronted Riley in writing and that he had acknowledged his inappropriate behavior in writing. MacKenzie told McKenna that she had "balls of steel." She said she wished McKenna had not told her about this, that McKenna was not to tell Jules Olsman (the senior partner in the firm) about it, and that she, MacKenzie, had endured far worse during her legal career.

**Answer:** Denied there was "inappropriate behavior." Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

113. McKenna offered to send MacKenzie the emails and the evidence of the photographs, but MacKenzie did not want to see any of it.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

114. In speaking with MacKenzie, McKenna also asked that she not be forced to mediate cases with Riley.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

115. McKenna quickly discovered Riley was Olsman's preferred mediator and that she was expected to have a close relationship with him despite informing Olsman of his harassment of her.

**Answer:** Denied that there was harassment. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

116. From September 2021 to February 2024, McKenna attempted to appease Olsman while simultaneously keeping her distance from Riley.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

117. Riley did not keep his promise to step aside as an attorney for the organizational client following a "transition." Accordingly, RH and Olsman decided that the representation of the organizational client would be shared by Olsman and RH, with McKenna assigned to the client on behalf of Olsman.

**Answer:** Denied that there was any such promise, as discussed in the preceding paragraphs. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

118. This sharing arrangement required McKenna to talk with Riley multiple times per week.

**Answer:** Denied.

119. At Olsman's direction, McKenna's invoices to the organizational client were on Olsman letterhead, and all payments for McKenna's work were

deposited in Olsman's bank account.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny

120. At first, Riley kept his promise not to have any personal contacts or in-person dealings with McKenna.

**Answer:** Denied that there was any promise as implied by Plaintiff here, for the reasons discussed in preceding paragraphs.

121. In December of 2021, when Riley learned that McKenna had contracted COVID-19, he broke those promises – sending McKenna a personal email with a New York Times article specifying what to do.

**Answer:** Denied that there was any promise as implied by Plaintiff here, for the reasons discussed in preceding paragraphs. Further denied insofar as Plaintiff's paragraph misleadingly omits that to the extent there was any "personal contact" at issue, Riley did not merely "learn that McKenna had contracted COVID-19," but rather, *McKenna told Riley* that "personal information" via text message. Admitted only that Riley texted McKenna after she told him that she contracted COVID-19, but denied to the extent that Plaintiff misleadingly omits that the text indicated that Riley was concerned because "Covid is frightening," preemptively apologized for

asking, and told McKenna not to respond if she didn't want to—to which McKenna responded with a lengthy text regarding her symptoms and personal matters. The Riley Defendants have no records indicating that a New York Times article was sent, and on that basis the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of that allegations, and on that basis deny.

122. In May of 2022, Riley broke those promises again.

**Answer:** Denied.

123. In May of 2022, McKenna attended the State Bar of Michigan Negligence Section meeting in Nashville with her then-husband Brandon Heid ("Heid").

**Answer:** Denied that McKenna attended a State Bar of Michigan meeting in Nashville in May 2022. Admitted that there was such a meeting in April.

124. MacKenzie and her husband, Brandon MacKenzie, were also in attendance.

**Answer:** Admitted that these individuals were in attendance in April 2022.

125. Riley also attended the meeting.

**Answer:** Admitted that Riley attended the meeting in April 2022.

126. Riley and Olsman are past chairs of the Michigan State Bar Negligence Section, and MacKenzie is the current chair.

**Answer:** Admitted that Riley and Olsman are past chairs. Denied that MacKenzie was a chair or past chair in April 2022.

127. During the meeting, Riley repeatedly tried to have personal and private conversations with McKenna, which McKenna avoided and was threatened by.

**Answer:** Denied.

128. One night at the meeting, the MacKenzies and McKenna and Heid got together in MacKenzie's hotel room to socialize. McKenna and Heid discussed Riley's inappropriate behavior with the MacKenzies, including Riley's refusal to step down from working for the organizational client that Olsman and RH shared, and Riley's continued interest in McKenna despite her many attempts to redirect him.

**Answer:** Denied that there was inappropriate behavior. Otherwise, the Riley

Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

129. MacKenzie chose to downplay and do nothing about McKenna's concerns.

**Answer:** Denied that there would have been legitimate concerns regarding Riley. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

130. In June of 2022, while trying a case together in Clare County, McKenna informed Emily Peacock about Riley's harassment and refusal to step aside as attorney for the RH/ Olsman organizational client.

**Answer:** Denied there was harassment and denied that there was a "refusal" to step aside, an allegation based on Plaintiff's misleading and incomplete allegations as discussed in the answer to Paragraph 103, above. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

131. Peacock chose to do nothing about McKenna's concerns.

**Answer:** Denied that there would have been any legitimate concerns

regarding Riley. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

132. In December of 2022, McKenna and Heid went to MacKenzie's home for dinner with MacKenzie and her husband. MacKenzie congratulated McKenna for her successful year and informed her she would receive a $30,000 end-of-year bonus for 2022.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

133. Riley later told McKenna that he advocated for and was responsible for McKenna receiving this bonus.

**Answer:** Denied.

134. In January of 2023, McKenna and Heid decided to get divorced.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

135. McKenna informed Peacock of this decision.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

136. In February of 2023, MacKenzie publicly praised McKenna for her work for the firm during MacKenzie's presentation to the 2022-2023 Michigan Association of Justice (MAJ) Leadership Academy Class. MacKenzie showcased a 5-star review that McKenna had received from a client.

**Answer**: The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

137. Around this time, McKenna herself graduated from the MAJ Leadership Academy, an intensive, six-session program designed to prepare young MAJ members to assume leadership positions within MAJ or become members of the state legislature or judiciary.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

138. In March of 2023, McKenna, at Peacock's urging, informed MacKenzie and Olsman of her decision to get divorced.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

139. Someone at the firm told Riley about McKenna's divorce.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

140. As a result, Riley attempted again, and more aggressively, to insert himself into McKenna's personal life and sexually groom and harass her, inviting McKenna to Easter at his home. Riley told McKenna he was aware that in previous years she had spent the holiday with Heid's family, suggesting he was doing her a favor by inviting her to spend the holiday with him. Riley also explained that he wanted to apologize for everything he had done. He reiterated his desire to apologize to McKenna in person, face-to-face, and he said he wanted to be McKenna's friend. McKenna felt threatened and promptly declined Riley's invitation.

**Answer:** Admitted only that Riley invited McKenna to have Easter dinner with Riley and Riley's wife. Otherwise denied.

141. Riley became very upset that McKenna declined his invitation and retaliated.

**Answer:** Denied.

142. Shortly thereafter, Riley sent McKenna a racy photograph of a scantily clad brunette woman from ultrafilms.com.

**Answer:** Admitted only that a photo was sent. Denied that it was sexually motivated or retaliatory insofar as McKenna misleadingly omits that (1) the image in question had been inappropriately sent to a shared contact of Riley in response to that person's advocacy work; (2) the shared contact forwarded it to Riley explaining the context; and (3) Riley clearly identified that context when relaying the same to McKenna, along with the shared contact's advocacy work in question.

143. Appalled and frightened by Riley's actions, McKenna again attempted to enforce boundaries with Riley and tried to mediate her personal injury cases with other facilitators.

**Answer:** Denied that McKenna was "appalled and frightened" by the communication above. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

144. Because of her efforts to enlist Olsman to rebuff Riley's sexual harassment and stalking, McKenna's employment conditions at Olsman grew increasingly hostile.

**Answer:** Denied that there was "sexual harassment" and "stalking." Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

145. McKenna told Peacock about Riley's Easter invitation and his reaction to her saying no, and that she felt threatened by Riley contacting her. Peacock advised McKenna to "forgive and forget."

**Answer:** Denied to the extent this implies there was an inappropriate reaction by Riley; otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

146. Shortly after declining Riley's Easter invitation, McKenna learned that Riley and Olsman had been talking about McKenna, her divorce, and the alleged effects it had on her.

**Answer:** Denied.

147. Olsman informed McKenna that she was no longer permitted to work from home because Riley had told him that McKenna was spending all of her time crying about her divorce. This was not true and was more retaliation by Riley.

**Answer:** Denied that Riley made the alleged comment. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

148. Throughout McKenna's employment at Olsman, other attorneys were regularly granted special accommodations, for the stated reason of stress management, including working from home and taking weeks off at a time. Because of Riley's influence over her job at Olsman, McKenna was treated differently and also was required to take on work that was the responsibility of the attorney who was off work for stress management.

**Answer:** Denied that Riley had "influence" over Plaintiff's job at Olsman. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

149. In the spring of 2023, McKenna was invited to the RH/Olsman organizational client's June 2023 Annual Conference in Orlando, Florida. The

conference was mandatory and a requirement of her job to keep and service the organizational client.

**Answer:** Admitted that McKenna was invited to the organizational client's June 2023 Annual Conference. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

150. Around this time, in further retaliation and to intimidate McKenna, Riley contacted McKenna and informed her that MacKenzie and Olsman had been talking negatively about McKenna and that Riley allegedly was preserving her reputation with them. McKenna felt oppressed by Riley's pervasive influence over job.

**Answer:** Denied.

151. When McKenna pressed Riley on what negative comments were supposedly being made and what McKenna had allegedly done wrong, Riley would not say.

**Answer:** Denied, including that there were negative comments.

152. In further effort to intimidate McKenna, Riley encouraged McKenna to reach out to Peacock to seek resolution of negative statements Peacock also allegedly had made about McKenna to Riley.

**Answer:** Denied.

153. In further effort to sexually groom McKenna and remind her of his power over her, Riley informed McKenna that she and he would share a conference room suite at the Annual Conference. Riley assured McKenna that the privacy of their separate hotel rooms would not be compromised by the adjoining conference room. McKenna did not make the hotel arrangements and did not have authority to change them.

**Answer:** Denied, including the implication that Riley made the hotel arrangements, which he did not.

154. Concerned about this arrangement, when McKenna and Peacock had breakfast together, McKenna informed Peacock of the shared conference room suite and adjoining hotel rooms.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

155. McKenna expressed her discomfort with the hotel room arrangement and asked for Peacock's help and advice. Peacock again dismissed McKenna's concerns.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

156. Immediately following that breakfast, Peacock set up an in-person facilitation with Riley on one of McKenna's cases, to be conducted on April 19, 2023, despite knowing that McKenna felt threatened by this arrangement, and then attended the facilitation with McKenna in an attempt to achieve early resolution.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

157. In the months after Easter, Jules Olsman routinely came into McKenna's office and made intimidating comments regarding Riley such as, "I was talking to Riley about you" and "we keep Bob Riley happy in this office."

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

158. McKenna continued to repel Riley's advances and tried to navigate his control over her job, but treaded carefully, given that Riley and Olsman had been talking about her; Olsman had acted on Riley's false reports about her; and Olsman had refused to do anything to help her and had urged her to forget what Riley had done, forgive him, move on, and keep him happy.

**Answer:** Denied that there were advances, that Riley and Olsman were "talking about" or making "false reports" about McKenna. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

159. In June of 2023, in the course of her employment, McKenna flew to Orlando to attend the organizational client's mandatory Annual Conference.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

160. When McKenna discovered that she and Riley were scheduled to be on the same flight, McKenna changed her reservation to avoid contact with Riley.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

161. On June 14, 2023, in advance of the trip, McKenna and Peacock went to breakfast again. McKenna again expressed concern that she would be sharing a conference room suite with Riley. Peacock told McKenna not to make a big stink about it.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

162. Upon arriving in Orlando on June 18, 2023, McKenna checked into her hotel room (part of the adjoining conference room suite arranged by Riley) and confirmed with the hotel receptionist that the door of each hotel room adjoining the conference room could be locked, and that, if locked, the hotel room could not be accessed from the adjoining conference room. Because she was assured she could lock her room from the inside and was worried about the consequences of making a stink about the room arrangement, McKenna did not ask the client to change her assigned room.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

163. On June 19, 2023, Riley told McKenna that he had set up a meeting for himself, McKenna, and the Executive Director of the organizational client, to take

place at 8 pm in the conference room connecting Riley and McKenna's hotel rooms.

**Answer:** Admitted that Riley *and* the Executive Director together set up the meeting in question.

164. McKenna attended the meeting with Riley. While waiting for the Executive Director to arrive, Riley spoke tearfully about the photographs and McKenna confronting him, accused McKenna of ruining his life, told her that he no longer had the will to live, and requested McKenna's forgiveness.

**Answer:** Denied.

165. McKenna repeatedly told Riley that his behavior made her feel uncomfortable and that it was not fair to blame her for "ruining his life," because all she wanted was for him to stop.

**Answer:** Denied.

166. After an hour of waiting for the Executive Director and listening to Riley, McKenna concluded Riley had lied about there being a meeting scheduled with the Executive Director. She told Riley the Executive Director clearly was not showing up and returned to her room.

**Answer:** Denied that Riley had lied, as the meeting had been arranged by

Riley and the Executive Director. Otherwise admitted, as the Executive Director did not attend the meeting that he and Riley had arranged.

167. Upon information and belief, the Executive Director was not invited to or expected to attend the meeting.

**Answer:** Denied.

168. The next day, the Annual Conference held a session regarding suicide.

**Answer:** Admitted.

169. During this presentation, Riley wrote a note to McKenna insinuating he was threatening suicide; he indicated that he related to the presentation more than she could ever guess and then told her that she would likely never see him again.

**Answer:** Denied.

170. Riley then left the room, and McKenna became concerned he was going to kill himself.

**Answer:** Denied.

171. Following the presentation, Riley and McKenna were to conduct a meeting with the organizational client's executive committee. McKenna attended the meeting. Riley showed up late.

**Answer:** Admitted that there was a meeting and that McKenna attended, and that Riley was late due to work matters he was attending to.

172. Riley asked McKenna to dinner numerous times during the Annual Meeting. Each time, McKenna declined and made sure she had dinner plans with other people to ensure her safety.

**Answer:** Denied.

173. McKenna became aware that Riley was listening to her phone calls through the adjoining conference room door. Some of the conversations Riley was eavesdropping on were about his behavior.

**Answer:** Denied.

174. While the Annual Meeting was still ongoing, McKenna called MacKenzie to give her an update on a case McKenna was handling. During this conversation, McKenna informed MacKenzie of Riley's behavior and her discomfort. MacKenzie laughed it off and encouraged McKenna to get through the trip.

**Answer:** Denied that there was any "behavior" that legitimately could have caused discomfort. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

175. MacKenzie told McKenna that she did not want to hear any more about Riley.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

176. On the final night of the Annual Meeting, McKenna and Riley attended the closing dinner with the other meeting attendees.

**Answer:** Admitted.

177. McKenna left the banquet hall following dinner.

**Answer:** Admitted.

178. Riley called McKenna's cell phone repeatedly, accusing her of scaring him because she had left.

**Answer:** Denied that Riley called McKenna's cell phone repeatedly. Admitted that Riley indicated that he was concerned, as McKenna had previously that week told Riley that she had been assaulted by a conference attendee, asked Riley for assistance multiple times (which was provided), and then indicated that she feared retaliation, after which time she went incommunicado. Otherwise denied, including the false implication that such a communication is "stalking" or otherwise improper.

179. McKenna informed Riley that she was fine and asked him to leave her alone.

**Answer:** Admitted that McKenna said she was fine. Denied that she asked him to "leave her alone."

180. Over the next several hours, Riley continued to call and text McKenna, insisting that he needed to talk to her.

**Answer:** Denied.

181. McKenna returned to her hotel room and locked the door.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

182. Riley then showed up outside of McKenna's hotel room, knocking on the door and calling her cell phone repeatedly. He insisted that he wanted to speak to her.

**Answer:** Admitted that Riley contacted McKenna regarding her well-being after the incident that she requested Riley's assistance with, as described above. Otherwise denied.

183. McKenna told Riley, via text message from the other side of her door, that she wanted him to leave her alone.

**Answer:** Denied.

184. Riley continued to try and force a confrontation, texting and calling McKenna repeatedly while standing outside of McKenna's hotel room door, where he remained for hours.

**Answer:** Denied.

185. When McKenna looked out of the peephole on the hotel room door, she saw Riley remaining outside of her door. She felt trapped and threatened and became fearful for her safety and desperate that Riley would not leave her alone.

**Answer:** Denied.

186. McKenna called a mental health hotline to ask for help with handling Riley.

**Answer:** Denied that there was any basis to seek "help with handling Riley," but the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

187. McKenna was scheduled to share a car with Riley to the airport the following morning. Instead, she changed her schedule to depart earlier, avoiding further interaction with Riley. The new flight required her to depart the hotel at approximately 5:00 am.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

188. In order to access the elevators or staircase to get to the lobby entrance, where her Uber was picking her up to bring her to the airport, McKenna had to walk past Riley's hotel room.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

189. Riley's hotel room door was propped open with a shoe, and she could clearly see Riley asleep in an armchair that he had positioned to face the hallway.

**Answer:** Denied to the extent that this paragraph suggests that Riley was asleep in an armchair with the door propped open with the hopes of seeing McKenna. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

190. McKenna walked quickly and quietly by Riley's room, trying not to wake him, and took the elevator to the lobby where she met her Uber.

**Answer:** Denied to the extent this paragraph suggests that Riley was asleep in an armchair with the door open with the hopes of seeing McKenna pass by. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

191. Following the Annual Meeting in Orlando, McKenna had a conversation with MacKenzie. McKenna explained the terrifying stalking incident and again expressed that she did not feel comfortable mediating cases with Riley due to his sexually harassing behavior. MacKenzie again dismissed McKenna's concerns; it was clear to McKenna that MacKenzie was annoyed at McKenna for making this report.

**Answer:** Denied that there was a "terrifying stalking incident" or "sexually harassing behavior." Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

192. Approximately a month after the Annual Meeting, McKenna had a facilitation scheduled with Riley, which McKenna attended via phone because she was uncomfortable attending via Zoom, given that Riley had previously secretly captured photographs of her via Zoom.

**Answer:** Denied to the extent that McKenna alleges improper "secretly captured photographs of her via Zoom." Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

193. McKenna spoke with MacKenzie about the facilitation beforehand and expressed her continued discomfort in having any contact with Riley. MacKenzie again dismissed her concerns.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

194. Around this time, McKenna, sensing MacKenzie's growing hostility towards McKenna for her continuing complaints about Riley, set up a lunch with Olsman and suggested that McKenna stop working for the organizational client so that she could devote her entire time to medical malpractice and nursing home abuse cases. Olsman told McKenna that it was a terrible idea to give up a client that lauded her and that Olsman was enjoying McKenna's success with Riley.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

195. McKenna came to the realization that her work environment would continue to become increasingly hostile if she kept asking Olsman to help her, and that she would need an attorney to confront Riley and/or explain her legal rights to MacKenzie and Olsman to get anything to change and again consulted numerous attorneys.

**Answer:** Denied that there was any reason to "confront" Riley. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

196. The attorneys McKenna consulted would not take her case due to Riley's prominent status in the legal field.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

197. In August of 2023, Michigan SuperLawyers announced that McKenna had been selected to its "Rising Stars" list. No more than 2.5 percent of attorneys in Michigan are selected to receive this honor.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

198. McKenna and Riley were required by the RH/Olsman organizational client to attend a workers' compensation conference in Niagara-on-the-Lake in early September of 2023.

**Answer:** Admitted that McKenna and Riley were asked to attend the organizational client's conference. Denied otherwise, including the implication that

McKenna was required by Riley to attend this client conference.

199. Riley changed his flight itinerary to be on the same flight as McKenna (Detroit to Buffalo).

**Answer:** Denied.

200. Riley orchestrated for McKenna and him to drive together in a rented car for a two-and-a-half-hour trip from Buffalo to Niagara-on-the-Lake. This was done without McKenna's consent.

**Answer:** Denied that Riley "orchestrated" anything or that McKenna did not consent to the arrangements. Admitted that the client made the travel arrangements, and that Riley himself cannot drive due to his disability.

201. During this drive, Riley again became tearful and insisted that McKenna's behavior hurt his feelings. McKenna told Riley she needed to be left alone and again reiterated that their relationship is a professional one. McKenna also told Riley that he made her feel uncomfortable with his behavior during the Orlando conference and the photographs and romantic overtures, and that he had told her that he was stepping down from representing the shared organizational client back in 2021, yet he still had not done so.

**Answer:** Denied.

202. Riley specifically asked McKenna what she wanted from him, and McKenna stated that she would either stop working for the RH/Olsman organizational client or he needed to stop working for the client because he would not leave her alone and his feelings for her were not reciprocal.

**Answer:** Denied.

203. During the conference, Riley retaliated against McKenna for insisting that Riley keep his promise and respect her boundaries and stop harassing her. McKenna and Riley gave a presentation. Despite an agreement as to how the portions of the presentation would be handled, Riley presented McKenna's portions and then disparaged her to the Executive Director following the presentation.

**Answer:** Denied.

204. At the end of the Niagara-on-the-Lake conference, Riley again agreed to step down from working for the shared organizational client and told McKenna she would never hear from him again.

**Answer:** Denied.

205. Instead of stepping down, Riley again interfered with McKenna's employment. McKenna was identified as the point of contact to meet with workers' compensation lawyers from each state. On a call shortly after the conference, McKenna was questioned by the client's Executive Director about the meetings she had conducted related to this task. He asked why she was doing this work. She indicated that she had set up the meetings at Riley's direction. Riley, who was also on the call, lied and said he had not directed McKenna to set up the meetings. Riley then suggested that another attorney take on the task, a male, despite the fact that the other attorney billed a higher hourly rate than McKenna and had no experience doing this type of work for the organizational client.

**Answer:** Denied.

206. Riley's efforts to sabotage McKenna were effective. The Executive Director later called McKenna to discuss lightening her workload after being told by Riley that she was having an "emotional breakdown" because of her divorce, which was false. The Executive Director also questioned McKenna about her dating life in light of information provided to him by Riley.

**Answer:** Denied.

207. McKenna became increasingly concerned that instead of stepping down, Riley was using his power and influence to have her fired from representing the organizational client. A significant portion of the income McKenna (now divorced) generated for Olsman came from the organizational client, which affected McKenna's year-end bonus on her $80,000 salary.

**Answer:** Denied that Riley was attempting to have McKenna fired. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

208. McKenna again reached out to additional attorneys to ask if they would be willing to help her in her case, but upon learning the case was against Riley, those attorneys, like the others, refused to help given his status and prominence in the legal field.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

209. McKenna had a meeting with Riley on October 25, 2023 in another attempt to confront him regarding his sexually harassing behavior and with the hope of getting him to stop.

**Answer:** Admitted that there was a scheduled meeting on this date for

review and editing of the client's bylaws, and that instead of doing that work, McKenna reiterated prior complaints to Riley in a brief discussion. Otherwise denied, including denied that McKenna ever mentioned sexual harassment or that there had ever been sexual harassment.

210. At the meeting, McKenna again explained to Riley that his inappropriate behavior made her feel uncomfortable and she could not continue to work with him.

**Answer:** Admitted that McKenna stated that she wanted Riley to stop working for the organizational client. Otherwise denied, including that there was ever inappropriate behavior.

211. McKenna told Riley she could not trust his word because he had agreed to step down from representing the RH/Olsman organizational client on numerous occasions but still had not done so.

**Answer:** Denied.

212. Riley responded with veiled threats, mentioning numerous facets of McKenna's employment and life that Riley could control or influence, including:

a. whether McKenna would receive a year-end bonus from Olsman (Riley told her he was responsible for

McKenna receiving the $30,000 bonus in 2022);

b. whether McKenna would get a raise in her hourly billing rate with the organizational client (Riley told her he was responsible for McKenna getting a previous raise);

c. whether Riley would continue representing the organizational client (Riley told her he would not step down after all and would continue to represent the client);

d. what Riley could do with the photographs he had secretly taken of McKenna (Riley told her had destroyed them);

e. Riley's conversations with Olsman and MacKenzie about her (Riley told McKenna he had tried to have "positive" conversations with them about her);

f. Riley's general position of power over McKenna and his ability to interfere with her career;

**Answer:** Denied that Riley made any threats, veiled or otherwise. Denied that Riley could control or influence McKenna's employment or life. Admitted that the topic of Riley no longer having the photographs came up at the meeting, and that Riley did not make negative comments about McKenna to the Olsman firm. The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations that the topics of bonuses or billing rates came up. Denied that Riley was responsible for getting McKenna a bonus. Admitted only that Riley obtained billing rate increases for the organizational client but denied

that this was unusual or improper. Denied that there was ever a promise to step away for the reasons discussed previously. Denied that Riley at any time had (or discussed having) a "general position of power" over McKenna or could interfere with her career.

213. Following the conversation, McKenna realized she would have to continue to work with Riley if she continued to work at Olsman or continued to represent the organizational client.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

214. During this time, the partners at Olsman increasingly alienated McKenna.

**Answer:** Denied.

215. McKenna began exploring potential career opportunities with other law firms and businesses, so as to get herself away from Riley and her hostile work environment.

**Answer:** Denied that there was a "hostile work environment" related to contact McKenna had with Riley. Otherwise, the Riley Defendants lack knowledge

or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

216. All of the in-state opportunities McKenna found had ties to Riley and some made it clear that mediating cases with Riley would be a condition of McKenna's employment.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

217. McKenna did not want to walk away from nine years of practicing and learning medical malpractice law in Michigan. Her passion is representing clients in medical malpractice cases and standing up for those who need representation.

**Answer:** Denied that there was any reason for McKenna to stop practicing in Michigan. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

218. McKenna began seriously contemplating how she was going to continue to represent medical malpractice clients in Michigan. McKenna also understood that practicing medical malpractice law or any type of law in another

state would not only require getting licensed in that state but also learning the legal technicalities of that particular state.

**Answer:** Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

219. Conditions at Olsman became more hostile. It became clear to McKenna that Riley and partners of Olsman were routinely discussing her. MacKenzie, in particular, was openly hostile toward and easily angered by McKenna.

**Answer:** Denied that Riley routinely discussed McKenna. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

220. In December of 2023, McKenna learned from the accountant at Olsman that she would not receive an annual bonus.

**Answer**: The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

221. Bonuses were earned when an attorney had accrued enough fees to cover their base salary.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

222. Earlier in 2023, McKenna received an accounting report that showed she was on track to earn an end-of-year bonus based on case settlements alone. In December 2023, McKenna received an updated accounting that looked completely different from prior accountings, and which reflected that she would not receive a bonus.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

223. This came as a shock to McKenna in light of the end-of-year bonuses paid to her in 2021 and 2022. In December of 2021, she received a $5,000 bonus despite having started working for Olsman in September 2021 and having only two cases in litigation and no settlements. In December of 2022 she received a $30,000 bonus based on her share of settlements in cases she personally managed, settlements in cases which she provided support to Olsman, and the money she brought into the firm from her hourly billings to the organizational client.

**Answer:** The Riley Defendants lack knowledge or information sufficient to

form a belief about the truth of these allegations, and on that basis deny.

224. In 2023, McKenna more than doubled her settlements as well as her hourly billings, yet she did not receive a bonus.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

225. McKenna also did not receive a raise at any time during her employment at Olsman.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

226. With the lack of a bonus from Olsman and the increasingly hostile work environment, McKenna became increasingly anxious to find employment that would not require her to work with or appease Riley.

**Answer:** Denied that McKenna was required to "work with" or "appease" Riley. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

227. Concerned about her future with Olsman, and scared about how she would navigate stepping down from the RH/Olsman organizational client without further upsetting Olsman, coupled with fear and concern about how she would get Riley to leave her alone, McKenna finally found two attorneys to help her confront Riley.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

228. On or around January 22, 2024, McKenna attended a scheduled meeting with partners MacKenzie and Peacock. McKenna presented them with her caseloads and annual bonuses over the prior two years. MacKenzie and Peacock said they were changing the bonus rules, that her work for the RH/Olsman organizational client that McKenna brought to the firm would no longer contribute to her bonus calculation the way it had the year prior.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

229. MacKenzie and Peacock gave no business reason for this sudden change in how bonuses were calculated. Upon information and belief, the change was a result of McKenna's complaints that she was continuing to have to work with

the man who had been sexually harassing and stalking her.

**Answer:** Denied there was "sexual harassment" or "stalking." Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

230. McKenna expressed concern that her complaints about Riley's sexual harassment were negatively affecting how she was being treated at Olsman. McKenna also expressed her fear of confronting Riley because of the ramifications it may have on her with Olsman.

**Answer:** Denied that there was sexual harassment, or that anything related to the Riley Defendants impacted her "treatment" at Olsman. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

231. MacKenzie got angry and insisted McKenna's treatment had nothing to do with Riley and that she, MacKenzie, had never stood in the way of McKenna confronting him. MacKenzie further encouraged McKenna to do what she felt she had to do.

**Answer:** The Riley Defendants lack knowledge or information sufficient to

form a belief about the truth of these allegations, and on that basis deny.

232. On or around January 29, 2024, McKenna and MacKenzie met to discuss McKenna's caseload. MacKenzie assigned new cases to McKenna. She also instructed McKenna to start learning about nursing home audit trails and begin drafting templates that could be used to request records in future cases.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

233. On January 31, 2024, McKenna's attorneys confronted Riley about his behavior and conduct toward McKenna.

**Answer:** Admitted only that McKenna's attorneys met with Riley on that date regarding McKenna's allegations. Denied that Riley engaged in any inappropriate behavior or conduct towards McKenna as previously set forth in this Answer.

234. On or around February 3, 2024, although she feared termination, McKenna informed Olsman's partners in writing that she had confronted Riley, through counsel, about his sexual harassment of her.

**Answer:** Denied that there was "sexual harassment." Otherwise, the Riley

Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

235. On Sunday, February 4, 2024, MacKenzie, on behalf of Olsman, immediately terminated McKenna's employment.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

236. Olsman's termination letter stated that its decision to fire McKenna was made due to "grave concerns" about McKenna's "honesty, integrity and judgment." Olsman defended Riley and made statements (intended to justify McKenna's termination) regarding McKenna's personal life, an alleged "romantic" relationship, and her divorce. Olsman acknowledged McKenna's reporting of the sexual harassment that she had endured at the hands of Riley.

**Answer:** Denied that there was "sexual harassment" or other improper conduct by the Riley Defendants. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

237. McKenna made a decision to start a firm with a friend, attorney Amanda Fox Perry. Fox McKenna, PLLC is based in the District of Columbia, with an office in Michigan.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

238. McKenna subsequently contacted her clients to inform them of her departure from Olsman and her plan to start a firm in the near future. She informed them of their right to either stay with Olsman, discharge Olsman and retain her new firm, or discharge Olsman and retain any other attorney.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

239. Numerous clients elected to transition with McKenna, including the organizational client.

**Answer:** Admitted that McKenna kept working for the organizational client after leaving Olsman. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

240. Olsman then contacted a number of the clients that had chosen to move with McKenna and informed them that McKenna had been terminated from Olsman because she was "incompetent," and that McKenna did not have a firm or the resources with which to continue their representation, causing some of the clients to change their minds and go back to Olsman.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

241. On information and belief, Olsman made similar statements to other clients.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

242. Many of the cases McKenna was handling at the time of her termination and stayed with Olsman have since been settled. Had McKenna not been terminated or subjected to a hostile work environment, she would have received bonus pay based on these and other matters and continued to increase her annual income.

**Answer:** Denied that there was a hostile work environment. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about

the truth of these allegations, and on that basis deny.

243. On or around February 16, 2024, the organizational client contacted McKenna and threatened to terminate her, citing false comments Riley had made regarding McKenna's competence and emotional well-being. McKenna defended herself and was essentially placed on probation.

**Answer:** Denied that Riley made false comments. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

244. In late April of 2024, her career as a plaintiff's medical malpractice attorney ruined and her reputation tarnished in her home state of Michigan, McKenna moved to Maryland, away from her family, friends, professional ties, and connections.

**Answer:** Denied insofar as McKenna alleges that her career as an attorney in Michigan was ruined and her reputation tarnished by Riley, thereby necessitating a move to Maryland. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

245. McKenna's has no choice but to remain in Maryland.

**Answer:** Denied that anything done by the Riley Defendants required her to remain in Maryland. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

246. Riley has reached out to McKenna on numerous occasions, asking where she is living and where she intends to live.

**Answer:** Admitted only that at some point (date unknown) McKenna raised the issue of her potential career path, and that she had mutual discussion with Riley about the same.

247. Riley's questioning regarding McKenna's whereabouts, in light of her many requests to Riley that he leave her alone, is threatening, inappropriate, wrong, and a continuation of his stalking and sexually harassing behavior.

**Answer:** Denied.

248. In June of 2024, the organizational client required Riley and McKenna's attendance at the Annual Meeting in Orlando, Florida.

**Answer:** Admitted only that the organizational client had an annual meeting.

Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

249. McKenna's new law partner attended the conference with her as McKenna did not feel safe attending the conference alone, given Riley's behavior.

**Answer:** Denied that there was any "behavior" by Riley. Admitted that McKenna's law partner attended. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

250. During the conference, Riley repeatedly tried to speak with McKenna in private.

**Answer:** Admitted only that there were private, attorney-client privileged conversations with McKenna regarding client issues. Otherwise denied.

251. Riley expressed remorse regarding his prior conduct and promised McKenna that he would act differently going forward, including that he would not make negative representations and comments regarding McKenna to the RH/Olsman organizational client.

**Answer:** Denied.

252. McKenna maintained repeatedly that she needed Riley to leave her alone.

**Answer:** Denied.

253. No matter, Riley continued to contact McKenna and shower her with compliments regarding her work performance and her legal knowledge, while simultaneously disparaging her to her colleagues and client behind her back.

**Answer:** Denied.

254. Following this meeting, Riley also offered to mediate McKenna's fee disputes with Olsman MacKenzie Peacock.

**Answer:** Denied.

255. Since this action was filed, Olsman continues to routinely facilitate cases with Riley.

**Answer:** Denied.

256. Since this action was filed, Olsman continues to support and speak highly of Riley in the legal community.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

257. Since this action was filed, Olsman and Riley continue to mutually benefit from their close and longstanding relationship.

**Answer:** Denied.

258. Since this action was filed, Riley has finally stepped down as counsel for the organizational client.

**Answer:** Denied.

259. Riley and Olsman have an ongoing concerted effort to destroy McKenna's reputation and livelihood. They routinely disparage her to her colleagues in the legal community with falsehoods, telling them, for example, that McKenna had an "emotional breakdown" and is "dishonest." Gordon has told the media McKenna's lawsuit is a "sham," and has called McKenna "looney tunes."

**Answer:** Denied, except as to allegations made regarding comments by Olsman and Gordon; as to those allegations, otherwise, the Riley Defendants lack

knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

260. Olsman also is engaged in retaliatory, harassing, bad faith litigation against McKenna in several state court "lien" actions for attorney fees earned in the few cases McKenna kept after Olsman terminated her. Riley's counsel has attended at least one of the state court hearings and also has threatened retaliatory litigation against McKenna.

**Answer:** Admitted that one of Riley's counsel attended a public hearing in the Oakland County Circuit Court, which took place months after this litigation was filed, after learning that McKenna had made negative, non-germane statements about Riley to that Court and appeared ready to make further statements in that litigation regarding Riley, who had nothing to do with the events of that hearing otherwise. Denied to the extent that McKenna suggests that Riley's attempts to defend himself against her false and defamatory claims in civil litigation is "retaliation." Admitted that Riley is bringing counterclaims against McKenna for her misconduct, as set forth later in this document. Denied that a party's exercise of its right to file counterclaims is retaliation. With respect to the allegations about the merits of the Olsman claims against McKenna, the Riley Defendants lack knowledge or information sufficient to form a belief about the

truth of these allegations, and on that basis deny.

261. Olsman recently retained the President of the State Bar of Michigan to sign and publish a document, written by Olsman, that falsely accuses McKenna of dishonesty. The document alleges McKenna "resigned" from Olsman and that "McKenna's claim that she was somehow improperly dismissed by Olsman is false and should be regarded by this Court as violative of MRPC 3.3, which prohibits an attorney from either making a false statement of material fact or law to a Court. MRPC 3.3(a)(3) specifically prohibits an attorney from offering evidence that he or she knows is false."

**Answer:** Admitted that McKenna has been dishonest with respect to her false and defamatory allegations about Riley. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

**COUNT I**
**(Alleged) Elliott-Larsen Civil Rights Act**
**Sexual Harassment/Hostile Work Environment**
***Riley Defendants***

Defendants incorporate by reference all preceding paragraphs

262. Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at

all times material hereto was an agent, partner and majority shareholder at Defendant RH.

**Answer:** Denied.

263. From September of 2019 to September of 2021, Plaintiff was an employee, and Riley Defendants were employers covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*.

**Answer:** Admitted only that Riley & Hurley was an employer of Plaintiff between October 2019 and August 2021. Otherwise denied.

264. From September of 2021 to February 4, 2024, Plaintiff was an individual and an employee, and Riley Defendants were employers covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*., and Riley Defendants affected or controlled a term, condition, or privilege of Plaintiff's employment at Defendant Olsman, including but not limited to compensation, evaluation, terms and conditions of client relationships, work from home privileges, travel, and/or termination, covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act.

**Answer:** Denied.

265. During the course of McKenna's employment with Defendants, Defendants Riley subjected Plaintiff to unwanted comments, speech, touching, grooming, and other actions of an offensive and sexual nature, and by his words and conduct, explicitly or implicitly made Plaintiff's submission to the same a term or condition of her employment.

**Answer:** Denied.

266. Defendant Riley's treatment of Plaintiff was different than the treatment of other attorneys in the office.

**Answer:** Denied.

267. Plaintiff was highly qualified for her jobs with Defendants and was a member of a protected class.

**Answer:** Denied.

268. Defendant Riley's treatment of Plaintiff was severe and/or pervasive and created an intimidating, hostile, abusive and offensive work environment.

**Answer:** Denied.

269. Defendant Riley's unwanted conduct and communications were on the basis of and because of Plaintiff's sex.

**Answer:** Denied.

270. Defendant Riley's unwelcome comments and conduct were intentional and willful, in deliberate disregard of, and with reckless indifference to the rights and sensibilities of Plaintiff.

**Answer:** Denied.

271. As a direct and proximate result of Riley Defendants' unlawful conduct described above, the terms, conditions, and privileges of Plaintiff employment were adversely affected.

**Answer:** Denied.

272. As a further direct and proximate result of Riley Defendants' unlawful actions against Plaintiff as described, she has suffered and will continue to suffer in the future, injuries and damages, including, but not limited to, loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal

reputation, physical distress, loss of the ordinary pleasures of everyday life.

**Answer:** Denied.

**COUNT II**
**(Alleged) Elliott-Larsen Civil Rights Act**
**Sexual Harassment/Hostile Work Environment**
***Defendant Olsman***

Defendants incorporate by reference all preceding paragraphs.

273. Defendant Olsman is vicariously liable for the negligent or intentional acts of all of its partners, including but not limited to MacKenzie, Jules Olsman, and Peacock.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

274. From September of 2021 to February of 2024, Plaintiff was an employee and Defendant Olsman was an employer covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

275. Plaintiff was highly qualified for her job and a member of a protected class.

**Answer:** The Riley Defendants lack knowledge or information sufficient to

form a belief about the truth of these allegations, and on that basis deny.

276. During the course of her employment, Plaintiff informed MacKenzie and Peacock of the sexually harassing and grooming conduct by Defendant Riley and requested relief from his conduct and presence, but Defendant Olsman explicitly or implicitly made continued contact and dealing with Defendant Riley's sexually harassing and grooming conduct a condition of Plaintiff's employment with Defendant Olsman.

**Answer:** Denied that there was sexual harassment or "grooming." Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

277. Based on its knowledge, Defendant Olsman could choose to protect its employee, Plaintiff, or use that knowledge to its advantage. Rather than protect its employee, Defendant Olsman chose the latter.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

278. Upon information and belief, Defendant Olsman was aware of Defendant Riley's sexual infatuation with Plaintiff and hoped to use that to gain an

advantage in mediating cases and otherwise.

**Answer:** Denied there was a sexual infatuation. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

279. Defendant Riley's unlawful mistreatment of Plaintiff was severe and/or pervasive and requiring Plaintiff to continue to work with Defendant Riley created an intimidating, hostile or offensive work environment while she was at Defendant Olsman.

**Answer:** Denied.

280. Defendant Olsman's requirement that Plaintiff continue to work with, take out of town trips with and even stay in the same hotel with the man who it knew was sexually grooming, harassing and stalking her constituted an adverse action under circumstances that give rise to an inference of unlawful discrimination.

**Answer:** Denied that there was "sexual grooming," "harassing," or "stalking." Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

281. Defendant Olsman's conduct was on the basis of and because of Plaintiff's sex.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

282. Defendant Olsman's actions and inactions were intentional, willful, in deliberate disregard of, and with reckless indifference to, the rights and sensibilities of Plaintiff.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

283. As a direct and proximate result of Defendants Olsman's unlawful conduct described above, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

284. As a further direct and proximate result of Defendants' unlawful actions against Plaintiff as described, she has suffered and will continue to suffer in the future, injuries and damages, including, but not limited to, loss of earnings and

earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal reputation, physical distress, loss of the ordinary pleasures of everyday life, reasonable attorney's fees and costs incurred in this litigation, and any other compensatory and equitable damages that the Court deems appropriate.

**Answer:** Denied.

**COUNT III**
**(Alleged) Elliott-Larsen Civil Rights Act Retaliation and Retaliatory Harassment**
*All Defendants*

Defendants incorporate by reference all preceding paragraphs

285. Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at RH.

**Answer:** Denied.

286. Defendant Olsman is vicariously liable for the negligent or intentional acts of all of its partners, including but not limited to MacKenzie, Jules Olsman, and Peacock.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

287. The Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.*, prohibits retaliation against an employee for engaging in activity protected under the Elliott-Larsen Civil Rights Act.

**Answer:** Admitted.

288. Plaintiff engaged in activity protected under the Elliott-Larsen Civil Rights Act, including but not limited to the reporting of, opposition to and confronting of the unlawful sexual harassment and grooming committed by Defendant Riley and repeatedly requesting that Defendant Riley stop or be stopped and/or the Plaintiff be protected from his conduct.

**Answer:** Denied.

289. Defendants were aware of and constantly updated on Plaintiff's concerns and opposition to Defendant Riley's sexual harassment and failed to act to stop the harassment.

**Answer:** Denied.

290. Plaintiff's rejection and confrontation of Defendant Riley about his harassing and discriminatory behavior did not make it stop, but resulted in retaliation, during and after Plaintiff's employment, which adversely affected her career and ability to make a living.

**Answer:** Denied.

291. Defendants have continued to retaliate against and disparage Plaintiff and her abilities as a result of her opposing harassment and confronting Defendant Riley and asserting her rights to legal redress in this lawsuit.

**Answer:** Denied.

292. Defendants are liable under the ELCRA for retaliation based on sex and retaliatory harassment.

**Answer:** Denied.

293. Plaintiff's rejection of and opposition to the unlawful sexual harassment and discriminatory behavior of Defendant Riley resulted in adverse employment action and including having to leave her employment and then, years of continued severe and pervasive retaliation and retaliatory harassment.

**Answer:** Denied.

294. Defendants' failure to stop the offensive conduct and retaliation actions were willful, deliberate, and intentional.

**Answer:** Denied.

295. The injuries to Plaintiff that arose as a consequence of Defendant Riley's conduct were foreseeable and intentionally caused by the Defendant.

**Answer:** Denied.

296. Plaintiff's protected activity was a significant factor in Defendants' retaliation and retaliatory harassment.

**Answer:** Denied.

297. As a further direct and proximate result of Riley Defendants' unlawful actions against Plaintiff as described, she has suffered and will continue to suffer in the future, injuries and damages, including, but not limited to, loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal reputation, physical distress, loss of the ordinary pleasures of everyday life, reasonable attorney's fees and costs incurred in this litigation, and any other

compensatory and equitable damages that the Court deems appropriate.

**Answer:** Denied.

**COUNT IV**
**(Alleged) Elliott-Larsen Civil Rights Act Discrimination**
***All Defendants***

298. Plaintiff incorporates by reference all preceding paragraphs.

**Answer:** Defendants incorporate by reference all preceding paragraphs.

299. Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at Defendant RH.

**Answer:** Denied.

300. Defendant Olsman is vicariously liable for the negligent or intentional acts of all of its partners, including but not limited to MacKenzie, Jules Olsman, and Peacock.

**Answer:** The Riley Defendants lack knowledge or information sufficient to

form a belief about the truth of these allegations, and on that basis deny.

301. From September of 2019 to September of 2021, Plaintiff was an employee, and Riley Defendants were employers covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*.

**Answer:** Denied.

302. From September of 2021 to February of 2024, Plaintiff was an employee and Defendant Olsman was an employer covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

303. From September of 2021 to February 4, 2024, Plaintiff was an individual and an employee, and Riley Defendants were employers covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*., and Riley Defendants affected or controlled a term, condition, or privilege of Plaintiff's employment at Defendant Olsman, including but not limited to compensation, evaluation, terms and conditions of client relationships, work from home privileges, travel, and/or termination, covered by and within the meaning of

Michigan's Elliott-Larsen Civil Rights Act.

**Answer:** Denied.

304. Plaintiff was well qualified for her job and a member of a protected class.

**Answer:** Denied.

305. Plaintiff was discriminated against and harassed because of her sex.

**Answer:** Denied.

306. Defendants' above-described conduct was on the basis of and because of Plaintiff's sex.

**Answer:** Denied.

307. Defendants' treatment of Plaintiff was different or disparate from the treatment of other attorneys in the law firm, who were not required to deal with persons who had threatened, stalked and sexually harassed them.

**Answer:** Denied.

308. The conduct of Defendant Riley in sexually grooming and harassing Plaintiff constitutes sex discrimination and disparate treatment in violation of the Act.

**Answer:** Denied.

309. The intentional and reckless dismissal and disregard of Plaintiff's complaints related to Defendant Riley's misconduct reflects gender hostility toward Plaintiff and is an adverse action under circumstances that give rise to an inference of unlawful discrimination.

**Answer:** Denied.

310. Defendant Olsman's actions of promoting and condoning Defendant Riley and its attempt to secure negative information about Plaintiff following her repeated complaints regarding Defendant Riley's sexually harassing conduct reflect gender hostility toward Plaintiff.

**Answer:** Denied that there was sexually harassing conduct. Otherwise, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

311. The actions of Defendants were intentional, willful, in deliberate disregard of, and with reckless indifference to, the rights and sensibilities of Plaintiff.

**Answer:** Denied.

312. As a direct and proximate result of those actions and failures to act, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

**Answer:** Denied.

313. As a further direct and proximate result of Defendants' unlawful actions against Plaintiff as described, Plaintiff has suffered past and future injuries and damages including, but not limited to, the loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal reputation, physical distress, loss of the ordinary pleasures of everyday life, reasonable attorney's fees and costs incurred in this litigation, and any other compensatory and equitable damages that the Court deems appropriate.

**Answer:** Denied.

**COUNT V**
**(Alleged) Title VII—Discrimination and Retaliation on the Basis of Sex, Retaliatory Harassment**
***Defendant Olsman***

Defendants incorporate by reference all preceding paragraphs.

314. Defendant Olsman is vicariously liable for the negligent or intentional acts of all of its partners, including but not limited to MacKenzie, Jules Olsman, and Peacock.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

315. Plaintiff is a member of a protected class on the basis of sex.

**Answer:** Admitted.

316. Plaintiff, in all respects, was performing her job in a manner that was consistent with Defendant Olsman's legitimate business expectations.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

317. During the course of Plaintiff's employment at Defendant Olsman, Defendant Olsman discriminated against Plaintiff as described above, including but

not limited to subjecting her to harassment or disparate treatment on the basis of sex and subjecting her to a hostile work environment.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

318. Defendant Olsman also retaliated and engaged in retaliatory harassment against Plaintiff for engaging in activity protected under Title VII with Defendant Olsman's knowledge, including but not limited to reporting and opposing unlawful sexual harassment committed by Defendant Riley.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

319. As a direct and proximate result of having engaged in the above protected activity regarding Defendant Olsman's favored mediator, Plaintiff was retaliated against by Defendant Olsman, including, but not limited to, the following materially adverse actions and severe and pervasive retaliatory harassment by Defendant Olsman:

a. Denial of bonuses;

b. Termination;

c. Blacklisting Plaintiff in the legal community;

d. Subjecting Plaintiff to disparate treatment and a hostile work environment;

e. Revocation or denial of normal employment accommodations enjoyed by other similarly situated employees, such as working from home, work-related travel,

f. Announcing a "change" in annual financial performance requirements at the end of the year without notice and then falsely claiming Plaintiff failed to meet financial performance requirements;

g. Intimidation by MacKenzie and Jules Olsman;

h. Falsification of performance evaluations;

i. Fabrication of performance evaluations;

j. Fabrication of claims of insubordination;

k. Fabrication of claims of character issues;

l. Intentional exposure of Plaintiff to further and worsening sexual harassment by Defendant Riley;

m. Defamation and disparagement of Plaintiff with clients and throughout the legal community both inside and outside Michigan;

n. Intrusive investigation of Plaintiff's private "romantic" life without cause.

o. Filing of retaliatory claims against Plaintiff;

p. Intentional interference with this court's authority over this action;

q. Post-termination harassment and efforts to deprive Plaintiff of her ability to make a living;

r. Other acts of discrimination and retaliation to be determined.

**Answer:** Denied that there was sexual harassment or other alleged misconduct by the Riley Defendants. Otherwise, The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

320. Defendant Olsman's actions were taken with a willful and wanton disregard of Plaintiff's rights under Title VII.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

321. As a direct and proximate result of those actions, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

**Answer:** Denied as to the Riley Defendants. As to Olsman, the Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny

322. As a further direct and proximate result of Defendants' unlawful actions against Plaintiff as described, she has suffered and will continue to suffer in the

future, injuries and damages, including, but not limited to, loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal reputation, physical distress, loss of the ordinary pleasures of everyday life, reasonable attorney's fees and costs incurred in this litigation, and any other compensatory and equitable damages that the Court deems appropriate.

**Answer:** Denied.

**COUNT VI**
**(Alleged) Breach of Contract (Express)**
***Defendants Riley and RH***

Defendants incorporate by reference all preceding paragraphs.

323. Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at Defendant RH.

**Answer:** Denied.

324. Plaintiff was employed by Defendant RH pursuant to an express employment contract, executed in writing in September of 2019.

**Answer:** Denied.

325. Defendant Riley violated the terms of the employment contract between Plaintiff and Defendant RH.

**Answer:** Denied.

326. Defendant Riley engaged in conduct that violated the employment contract.

**Answer:** Denied.

327. Defendant Riley's sexual harassment, unwanted attention and stalking was severe, offensive, and abusive; was ongoing and pervasive; prohibited Plaintiff from doing her job, and in doing so breached the employment contract by creating a workplace that was intimidating, hostile, offensive, and ultimately, intolerable, to Plaintiff.

**Answer:** Denied.

328. Defendant Riley's repeated and pervasive harassment of Plaintiff constituted a breach of the contract.

**Answer:** Denied.

329. A reasonable person in Plaintiff's circumstances would have considered the work environment to be hostile, offensive, and/or abusive, as Plaintiff came to realize.

**Answer:** Denied.

330. As a direct and proximate result of Defendants' breach, Plaintiff suffered damages including but not limited to loss of earnings and earning capacity, loss of the promised partnership opportunity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal reputation, physical distress, loss of the ordinary pleasures of everyday life, and any other compensatory and equitable damages that the Court deems appropriate.

**Answer:** Denied.

**COUNT VII**
**(Alleged) MCL § 600.2954 Stalking**
***Defendants Riley and RH***

Defendants incorporate by reference all preceding paragraphs.

331. Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at Defendant RH.

**Answer:** Denied.

332. Defendant Riley's actions described in the factual statements set forth in the above paragraphs amount to conduct prohibited under section 411h and/or 411i of the Michigan Penal Code, Act No. 328 of the Public Acts of 1931, being sections 750.411h and 750.411i of the Michigan Compiled Laws.

**Answer:** Denied.

333. More specifically, Defendant Riley's conduct constitutes harassment under section 750.411h of the Michigan Compiled Laws, in that his conduct included repeated or continuing unconsented conduct that would cause a reasonable

individual to suffer emotional distress and that Defendant Riley's conduct actually caused Plaintiff to suffer emotional distress.

**Answer:** Denied.

334. Defendant Riley's conduct, including, but not limited to photographing and collecting photos of Plaintiff and obsessively stalking her, also constitutes stalking under section 750.411h of the Michigan Compiled Laws, in that Defendant Riley engaged in a willful course of conduct involving repeated or continuing harassment of Plaintiff that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, or harassed, and that Defendant Riley's conduct actually caused Plaintiff to feel terrorized, frightened, intimidated, threatened, or harassed.

**Answer:** Denied.

335. Damages incurred by a victim as a result of conduct prohibited in sections 750.411h or 750.411i may be recovered, together with exemplary damages, costs of the action, and reasonable attorney fees. MCL § 600.2954.

**Answer:** Denied.

336. As a direct and proximate result of Defendant Riley's prohibited conduct, Plaintiff has suffered lost earnings and earning capacity, humiliation, mortification, embarrassment, sleeplessness, and anxiety, among other damages that may arise during the course of discovery, and any other compensatory and equitable damages that the Court deems appropriate.

**Answer:** Denied.

**COUNT VIII**
**(Alleged) Intentional Inflection of Emotional Distress**
***All Defendants***

Defendants incorporate by reference all preceding paragraphs.

337. Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at RH.

**Answer:** Denied.

338. Defendant Olsman is vicariously liable for the negligent or intentional acts of all of its partners, including but not limited to MacKenzie, Jules Olsman, and Peacock.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

339. Upon information and belief, the Defendants conspired together to intentionally inflict emotional distress upon the Plaintiff.

**Answer:** Denied.

340. The above-described conduct of Defendants was extreme, outrageous, and beyond all possible bounds of decency, and of such character as to be intolerable in a civilized society.

**Answer:** Denied.

341. Defendants promoted and fostered the continued misconduct and contact between Defendant Riley and Plaintiff while knowing the contact was unwanted by Plaintiff and placed Plaintiff at risk of serious injury.

**Answer:** Denied.

342. The above-described conduct of Defendants was reckless and/or intentional.

**Answer:** Denied.

343. Defendants' conduct was not for any proper purpose, nor was it within the scope of Defendants' authority.

**Answer:** Denied.

344. The above-described conduct of Defendants caused Plaintiff severe emotional distress.

**Answer:** Denied.

345. Defendants are liable to Plaintiff for intentional infliction of emotional distress.

**Answer:** Denied.

346. Defendants' conduct in this matter, which proximately caused Plaintiff's injuries and damages, was grossly negligent because it was so reckless that it demonstrated a substantial lack of concern for Plaintiff's physical and emotional wellbeing.

**Answer:** Denied.

347. As a direct and proximate result of Defendants' prohibited conduct, Plaintiff has suffered lost earnings and earning capacity, humiliation, mortification, embarrassment, sleeplessness, and anxiety, among other damages that may arise during the course of discovery, and any other compensatory and equitable damages that the Court deems appropriate.

**Answer:** Denied.

348. Defendants' conduct deliberately and intentionally injured Plaintiff; their acts were willful and malicious and are not dischargeable in bankruptcy.

**Answer:** Denied.

**COUNT IX**
**(Alleged) Intrusion Into Seclusion**
***Riley Defendants***

Defendants incorporate by reference all preceding paragraphs.

349. Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at RH.

**Answer:** Denied.

350. Plaintiff maintained privacy concerning details of her personal professional life.

**Answer:** Denied.

351. Plaintiff had a right to keep those intimate details and matters private.

**Answer:** Denied that there were relevant "intimate details and matters."

352. Defendant Riley invaded Plaintiff privacy, including but not limited to surreptitiously photographing her, secretly maintaining a cache of photographs of her; stalking her outside of her hotel room in Orlando; refusing to listen to her many requests to be left alone; and listening to her phone calls, some of which were about Defendant Riley's behavior, while she was in her hotel room.

**Answer:** Denied.

353. Defendant Riley's conduct was objectionable and would be objectionable to a reasonable person.

**Answer:** Denied.

354. Defendant Riley's conduct as outlined above was objectionable, extreme, outrageous, and beyond all possible bounds of decency, and of such character as to be intolerable in a civilized society.

**Answer:** Denied.

355. Defendant Riley's conduct was not for any proper purpose, nor was it within the scope of Defendant's authority or otherwise immune or privileged.

**Answer:** Denied.

356. As a direct and proximate result of Defendant Riley's conduct, Plaintiff has suffered lost earnings and earning capacity, humiliation, mortification, embarrassment, sleeplessness, and anxiety, among other damages that may arise during the course of discovery, and any other compensatory and equitable damages that the Court deems appropriate.

**Answer:** Denied.

357. Defendant Riley's conduct deliberately and intentionally injured Plaintiff; his acts were willful and malicious and are not dischargeable in bankruptcy.

**Answer:** Denied.

**COUNT X**
**(Alleged) Conspiracy to Permit Stalking and to Violate the ELCRA**
***All Defendants***

Defendants incorporate by reference all preceding paragraphs.

358. Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at RH.

**Answer:** Denied.

359. Defendant Olsman is vicariously liable for the negligent or intentional acts of all of its partners, including but not limited to MacKenzie, Jules Olsman, and Peacock.

**Answer:** The Riley Defendants lack knowledge or information sufficient to form a belief about the truth of these allegations, and on that basis deny.

360. Defendant Riley and Co-Conspirator Defendant Olsman agreed and conspired together to allow Defendant Riley to continue to sexually harass and stalk Plaintiff, to subject Plaintiff to a hostile work environment at Defendant Olsman, and to retaliate against Plaintiff for exercising her right to oppose the harassment and

hostile work environment that she was subjected to at Defendant Olsman, in violation of the ELCRA.

**Answer:** Denied.

361. Despite Plaintiff's repeated requests that she not be forced to use Defendant Riley as a mediator or have professional contact with the man because of his inappropriate sexual conduct, stalking, and obsession with her, Defendant Olsman had conversations with and conspired with Defendant Riley to continue to allow Defendant Riley to have contact with, harass and stalk Plaintiff, including but not limited to conspiring to warn Plaintiff that Defendant Olsman had been "talking to Bob [Riley] about" her and that Plaintiff was to "keep Bob [Riley] happy" and conspiring to reject and disregard Plaintiff's reasonable fear of Defendant Riley with knowledge that her fear was reasonable and well-founded. This conspiracy permitted Defendant Riley's stalking and sexual harassment and Defendant Olsman's hostile work environment to continue.

**Answer:** Denied.

362. Because Plaintiff resisted, reported and confronted the unlawful misconduct of Defendant Riley, Defendants Riley and Olsman agreed to conspire to fire Plaintiff from her position at Defendant Olsman in further violation of the

ELCRA, including but not limited to conspiring to threaten Plaintiff based on false information that she was "spending all of her time crying about her divorce" rather than doing her work; conspiring to rescind Plaintiff's 2023 year-end bonus; conspiring to concoct pretextual reasons to fire Plaintiff; and conspiring to retaliate against Plaintiff.

**Answer:** Denied.

363. As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages including but not limited to loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal reputation, physical distress, loss of the ordinary pleasures of everyday life, and any other compensatory and equitable damages that the Court deems appropriate.

**Answer:** Denied.

## RELIEF REQUESTED

WHEREFORE, the Riley Defendants deny that Plaintiff is entitled to any of the relief she requests, and the Riley Defendants request that judgment be entered for a no cause of action with costs and attorney fees to the Riley Defendants.

**AFFIRMATIVE DEFENSES**

Defendants Robert F. Riley and Riley & Hurley, PC (collectively, "Riley Defendants"), through their undersigned counsel, for their affirmative defenses, states as follows:

1. Some or all of McKenna's claims are barred by the statute of limitations.

2. McKenna has failed to exhaust remedies.

3. McKenna has failed to mitigate damages.

4. The after-acquired evidence defense bars Plaintiff's damages claims in whole or in part.

5. Plaintiff's claims are barred, in whole or in part, by the equitable doctrines of waiver, estoppel, and unclean hands.

6. Some of Plaintiff's claims rely on alleged conduct occurring outside the state of Michigan, but the relevant laws on which Plaintiff's claims rely do not apply to extraterritorial conduct.

7. Plaintiff's claims for punitive or exemplary damages are not allowed under Michigan law.

## COUNTERCLAIMS

Counterclaim Plaintiffs Robert F. Riley and Riley & Hurley, PC (collectively, "Riley Plaintiffs"), through their undersigned counsel, state for their Counterclaims against Counterclaim Defendant Elyse McKenna ("McKenna") as follows:

### Jurisdiction and Venue

1. Counterclaim Plaintiff Riley is a resident and citizen of the State of Michigan.

2. Counterclaim Plaintiff Riley & Hurley, P.C. is a professional corporation that is incorporated in, and has its principal place of business in, Michigan.

3. Counterclaim Defendant Elyse McKenna purports to be a citizen and resident of the State of Maryland which, if true, renders this action between citizens of different states.

4. This action is between citizens of different states and the amount in controversy is in excess of $75,000.

5. Venue is proper under 28 U.S.C. § 1391.

### Allegations

6. In October 2019, Elyse McKenna joined the Riley & Hurley law firm as a promising new associate attorney. She had only been practicing a few years,

and had minimal litigation experience, but she presented as bright and ambitious thus leading Riley & Hurley to believe she had significant potential once she gained meaningful experience.

7. At the time McKenna joined Riley & Hurley, the firm was looking for a litigator with the potential to develop into a future firm leader.

8. As with any associate attorney, Riley & Hurley expected that McKenna would acquire the experience over time to become a seasoned litigator and would cultivate relationships with the firm's longstanding clients, all with the hope that—at some point with client consent—she would have the opportunity to continue servicing those clients after the firm's founders had retired.

9. During her time at Riley & Hurley, McKenna became particularly attached to Counterclaim Plaintiff Robert Riley, leading Riley to believe that the two of them had developed a meaningful mentor/mentee relationship and a good friendship.

10. For instance, in December 2019, Riley gave McKenna a Christmas card alluding to their close friendship and personal bond, which McKenna has asserted used the terms "love" and "affection" in a sexually-charged manner.

11. McKenna's response to that card, sent via text messages, included the following statements:

- "the card made my day and I want to make sure I do right by it."

- "Your card really meant the world to me. I've read it over a number of times. It brought me a lot of happiness yesterday and today. I am very lucky to have you in my life."

- "I've decided on a reciprocal card to really detail my thoughts. I'm happy."

12. In late December 2020, McKenna also sent the following text message to Riley:

> Hi Bob! It was a terrific day and you know, I thought about the fact that it was your lucky number day multiple times throughout it.
>
> I am so glad that we have been able to achieve the special personal and professional relationship that we both hoped for. It is a very important one that I regularly cherish.
>
> You have contributed so much to this relationship and I am very grateful for you. I have learned a lot and grown along the way. I appreciate your friendship more than you can know.

13. These texts avowing friendship continued well after the time McKenna falsely alleges that Riley attempted to kiss her or engage in other allegedly inappropriate behavior.

14. For instance, on June 12, 2021—just five weeks prior to McKenna's resignation from Riley & Hurley—McKenna sent the following unsolicited text to Riley:

> Bob Riley!!!! Happy birthday! I hope you have the best day today doing all of the things that you love most. Please let me know what you are up to! I trust you've enjoyed a walk with Hank? What about some peace and quiet? Is

> there a fire planned tonight? What about a homemade pizza or something else for dinner that you love?
>
> I want to let you know that I am very grateful for you. I believe that things happen for a reason and I am glad we got to know each other when we did.

15. Unfortunately, this "friendship" appears to have been a ruse. McKenna's true intention was that she would use her "special relationship" with Riley to get existing Riley & Hurley clients handed to her without putting in the work and time necessary to earn a clients' trust and respect.

16. Not surprisingly, McKenna's career at Riley & Hurley did not unfold in the unrealistic way she had hoped. As of May 2021—after a mere 19 months with the firm—McKenna had not acquired, to her significant disappointment, enough experience as a litigator to be viewed by the firm clients as "first chair" or "lead" material. Further, she failed to cultivate a close working relationship with the firm principal who was the key contact for the firm's litigation clients. Instead, she leaned on Robert Riley to shepherd her career and help her obtain the firm's medical malpractice clients. While Riley committed a lot of time to helping McKenna develop and mature as a lawyer during her tenure at the firm, he was a mediator at that point in time and not directly involved in firm litigation matters.

17. When Riley & Hurley's litigation principal decided in May 2021 to slow down his work and eventually retire, McKenna decided that she would leave the firm. Before departing, she put in place a plan to take with her certain firm

clients and to set up a litigation claim at the Firm's expense for her own personal financial benefit.

18. McKenna knew that Riley was legally blind and used the high-resolution screen of his iPad and its magnification capabilities to be able to read documents or view images. He also used his iPad to be able to magnify and read emails and other documentation. The device contained significant private, sensitive information including financial records, medical records, personal and work emails, and family photographs and other personal information of a private nature.

19. McKenna was aware that, in the course of mediations, he would obtain photographs of all of the participants in the mediations from the Internet and have them placed on his iPad. This allowed Riley to put a face to the voices of the people he would hear during mediations.

20. McKenna correctly suspected that Riley would have similar photographs of McKenna; he could not see her face any more than he could see the faces of other staff members or attorneys of the firm.

21. Thus, McKenna—knowing she was already leaving the firm anyway—spent several days badgering a Riley & Hurley employee into giving her the password to Riley's iPad. The employee ultimately relented under McKenna's ongoing pressure and gave McKenna the password.

22. The employee was not Riley's assistant, and was not authorized to access Riley's iPad without permission. Indeed, Riley had not provided this employee with his password.

23. McKenna was likewise not authorized to access Riley's iPad and did not have the password until she obtained it from the employee.

24. McKenna accessed the iPad and accessed emails and other messages, files, and folders on the device that she was not authorized to access.

25. The Counterclaim Plaintiffs did not learn that McKenna had badgered an employee into providing Riley's password, or that McKenna personally accessed the device herself until late last year, when McKenna stated in her *pro se* Complaint that she had actually accessed the device personally.

26. Upon information and belief, McKenna used her smartphone to take photos of Riley's iPad screen and its contents.

27. There were no inappropriate photos of McKenna on the iPad—something McKenna does not even attempt to allege despite numerous other falsehoods and misleading accusations in her various complaints. All the photos were either taken from the Internet or were taken in the office setting.

28. Nonetheless, Riley admittedly did not ask permission before taking photos of people in a non-private setting, or off the Internet.

29. McKenna left Riley & Hurley without saying anything to Riley about her accessing his iPad and viewing information on that device.

**McKenna and Riley Share Joint Client for Years Without Incident**

30. Despite McKenna's leaving, Riley still believed that they had a good professional relationship.

31. Prior to McKenna's departure, she expressed a desire to keep working for Riley's major organizational client even though her new firm did not handle that sort of work.

32. The organizational client was a client relationship that Riley had developed long prior to McKenna's joining Riley & Hurley.

33. McKenna had no obligation to continue representing that client.

34. McKenna, however, wanted to take Riley's significant client for herself, without Riley's continued involvement.

35. Riley—still believing, albeit naively, that McKenna was a good friend and a promising lawyer, and not realizing that McKenna's plan was to supplant him entirely from representing this client—was supportive of her request.

36. The client wished for the existing relationship to continue, with Riley as the lead counsel and the far less experienced McKenna as associate.

37. Only after McKenna learned that she would not be given the client relationship for herself, did she decide to "confront" Riley about the photographs.

38. McKenna sent an email to Riley, accusing him of sending "romantic" notes, stating that she was aware of his taking photographs (without disclosing that she had illegally accessed the iPad) and stating that she would not work with Riley for the shared client.

39. Riley was taken aback by McKenna's accusations of "romantic" notes, which was not true. However, because he had taken photos (albeit in a non-private setting) without disclosing it, he deeply regretted the fact that his actions—while legal—violated McKenna's view of their friendship. Because Riley continued to believe that McKenna was a good friend and that she was genuinely hurt, he profusely apologized for taking the photos.

40. McKenna responded to Riley's apology email by stating "Thank you for apologizing. I really appreciate it."

41. Contrary to the narrative McKenna now weaves, Riley did not attempt to "retaliate." His first concern, despite McKenna's accusations, was to continue to help her career development in the small way he could.

42. He suggested that they would work together with the client through a transition period (of an undefined duration) and that if and when the client agreed she was ready to assume responsibility for the client account, he would voluntarily step away.

43. That client had a long-time relationship with Riley and was not ready as of August 2021 to end its association with Riley. McKenna was still given the opportunity to work with that client so that she could gain the experience and earn the trust necessary to eventually take over the account.

44. Over the course of the next several years, McKenna never told Riley that she construed his actions to be "stalking," "harassing," or anything of the sort.

45. Instead, both worked together on the shared client's matters. Over time, and as one would expect if actual friends had a fallout, their normal working relationship resumed.

46. McKenna and Riley resumed text communications on various matters, with McKenna herself initiating several of those communications. Among other things, she discussed personal matters with Riley and sought career advice unrelated to the organizational client.

47. For instance, in April 2023 she reached out to Riley about career advice unrelated to the organizational client, and—in response—she texted "I appreciate the words of wisdom, Bob" and continued to vent about the issue.

48. In June 2023, while at the organizational client's Orlando conference, McKenna expressly reached out to Riley to obtain his assistance.

49. Specifically, McKenna came to Riley and claimed that a conference attendee had assaulted her.

50. McKenna requested Riley's assistance in resolving a concern she had with potentially having to work with that conference attendee.

51. Riley assisted McKenna as requested. When Riley told McKenna that the issue had been resolved favorably to her, and that she would no longer face having to work with that attendee, the following texts ensued:

**McKenna**: Really?

Swear?

??????

**Riley**: Yes. I don't lie

**McKenna**: I know you don't lie. Just cannot believe it

**Riley**: I'm sorry this was so stressful

52. McKenna then told Riley that she feared retaliation from the conference attendee. After telling Riley that, McKenna went incommunicado for a lengthy period of time; Riley attempted to ensure that McKenna was all right.

53. The professional working relationship between McKenna and Riley resumed as normal after the June conference.

**McKenna Devises a Scheme to Injure Riley**

54. After several years, Riley's client contact at the organizational client remained in his position and McKenna feared that she would not be able to take over entirely for Riley unless she forced it to happen.

55. At the same time, upon information and belief, McKenna was having employment problems at her new firm, Olsman MacKenzie.

56. McKenna set about on a course of action to resolve both of her perceived problems simultaneously.

57. In or around January 22, 2024, Riley received a communication from attorney Ken Mogill that he and attorney Sarah Prescott wanted to discuss a "confidential matter" with Riley.

58. The matter in question was McKenna's demand that Riley pay her a significant amount of money or else she would publicly accuse Riley of sexual harassment based on nearly three-year old events.

59. McKenna was aware—as was Riley—that a mere accusation of such wrongdoing can destroy a person's career, legacy, and personal life, even if that person is subsequently vindicated in legal proceedings.

60. Riley ultimately refused to submit to McKenna's threats to make accusations against him that she knew to be false, if he did not pay her money. This was conveyed to McKenna's counsel—one of whom indicated that acquiescence to McKenna's demands was "in everyone's best interest" because absent that, McKenna would sue Riley and have him "served in public."

61. Upon information and belief, McKenna then either fired both Mogill and Prescott, or both of them resigned. She filed a *pro se* lawsuit.

62. In addition to filing the lawsuit, McKenna began a campaign to defame and otherwise punish Riley for not paying her hush money.

63. McKenna maliciously planted a false story with the Detroit News (see Counterclaim Ex. A). While that article contained some quotes from her *pro se* lawsuit, McKenna directly spoke to at least one Detroit News reporter, who then included McKenna's extrajudicial statements in the article. Those included false and defamatory statements accusing Riley of (a) sexually harassing and stalking McKenna at multiple conferences and events after her employment ended; and (b) using his "influence" to prevent her from working in Michigan.

64. In the article, when asked how she accessed Riley's iPad, McKenna "declined to comment because she said she's defending herself and can't discuss certain aspects of the case." In fact, McKenna did not comment because she knew she would have been admitting to tortious (and potentially criminal) activity for unauthorized access to a computer system. McKenna's willingness to discuss multiple details of her case in the media, but not the issue of her accessing the iPad, reflects her consciousness of guilt.

65. The article also contained the false statement by McKenna that no lawyers would "take the case" against Riley, when in fact she had *two* seasoned attorneys "representing" her immediately prior to her lawsuit.

66. McKenna likewise directly spoke with the organizational client and made false and defamatory accusations that Riley had stalked and harassed her, and told the organizational client that she would no longer work with Riley as a result. Based on McKenna's statements, the organizational client ended its relationship with Riley and hired McKenna to take over Riley's role in addition to her own pre-existing work for that client.

67. McKenna's initial plan—a desire to obtain Riley's organizational client entirely for herself—was thus fulfilled.

68. McKenna also spread false and misleading accusations throughout the Detroit legal community, causing several other clients of Riley's to immediately cease working with him and his firm—again, based merely on her accusations.

69. Remarkably, McKenna has now taken the position that Riley's very attempts to defend himself in court—including filing an initial motion to dismiss disclosing her abuse of the litigation process by identifying demonstrably false and misleading allegations in her complaint—is "retaliation." This is a blatant effort to misuse the civil rights laws to shield her misconduct from the light of day. Riley will not be intimidated by such threats.

70. McKenna's conduct as set forth above has caused the Counterclaim Plaintiffs actual damages and loss of earnings or earning capacity, and has caused Riley severe harm in his personal and professional relationships, causing him

mental anguish; fright and shock; denial of social pleasure and enjoyments; and embarrassment, humiliation, or mortification. The damages exceed $75,000.

**COUNT I: Tortious Interference with Business Relationships and Expectancies**

71. The Counterclaim Plaintiffs incorporate the foregoing allegations.

72. The Counterclaim Plaintiffs have contractual and business relationships and expectancies, including with the organizational client and other clients.

73. McKenna has knowledge of the business relationship and expectancies that the Counterclaim Plaintiffs have with the organizational customer and other clients.

74. McKenna has intentionally and wrongfully interfered with the Counterclaim Plaintiffs' business relationships and expectancies by making false, misleading, and defamatory accusations to the organizational client and other clients about Riley.

75. The Counterclaim Plaintiffs have suffered damages as a result of the interference.

WHEREFORE, Counterclaim Plaintiffs request that the Court enter judgment in their favor and against Counterclaim Defendant McKenna and award actual damages, exemplary damages, emotional distress damages, and any other

damages allowable per law, plus interest, costs, attorneys' fees, and such further relief as the Court deems just and equitable.

**COUNT II: Defamation**
**Common Law and MCL 600.2911**

76. The Counterclaim Plaintiffs incorporate the foregoing allegations.

77. McKenna published false and defamatory statements concerning the Counterclaim Plaintiffs.

78. McKenna's statements were unprivileged and made with malice.

79. McKenna was at least negligent with respect to the defamatory statements she uttered; indeed, they were made with knowledge of their falsity or reckless disregard of the truth.

80. McKenna's false statements are defamatory *per se*.

81. The Counterclaim Plaintiffs were also specially harmed by McKenna's false and defamatory statements, which led to the immediate and direct loss of income from clients who ceased their relationship with the Counterclaim Plaintiffs as a result of the false and defamatory statements.

82. As a result of the defamation, the Counterclaim Plaintiffs have been damaged.

WHEREFORE, Counterclaim Plaintiffs request that the Court enter judgment in their favor and against Counterclaim Defendant McKenna and award actual damages, exemplary damages, punitive damages, emotional distress

damages, and any other sort of damages awardable by law, plus interest, costs, attorneys' fees as specifically permitted by MCL 600.2911, and such further relief as the Court deems just and equitable.

**COUNT III: Trespass To Chattels**

83. The Counterclaim Plaintiffs incorporate the foregoing allegations.

84. Counterclaim Plaintiff Riley's iPad is, for legal purposes, a chattel (*i.e.*, an item of property other than real estate) which he used both for personal matters and professional matters on behalf of Riley & Hurley P.C.

85. Counterclaim Plaintiff Riley is the owner of the iPad, and was thus in possession of the chattel.

86. Counterclaim Defendant McKenna intentionally used or intermeddled with the chattel without permission of Riley, by taking physical possession of the device, defeating its password protection, and reading and copying messages from the device.

87. The Counterclaim Plaintiffs were damaged and are continuing to be damaged as a result of McKenna's unauthorized use of Riley's iPad and her reading and copying messages from that device, including her past and ongoing attempts to use that improperly-obtained evidence in furtherance of a scheme to obtain money from the Counterclaim Plaintiffs.

WHEREFORE, Counterclaim Plaintiffs request that the Court enter judgment in their favor and against Counterclaim Defendant McKenna and award actual damages, exemplary damages, emotional distress damages, and any other damages allowable per law, plus interest, costs, attorneys' fees, and such further relief as the Court deems just and equitable.

The Counterclaim Plaintiffs also seek preliminary and permanent injunctive relief against Counterclaim Defendant's attempts to use information that she illegally and/or tortiously obtained from being used as evidence in this or any other proceeding, and to destroy copies of any information that she obtained from the devices.

**COUNT IV: Intrusion Upon Seclusion**

88. The Counterclaim Plaintiffs repeat the foregoing allegations.

89. Riley's iPad—which he relies upon due to a disability that Defendant McKenna was aware of—contains secret and private subject matter, including but not limited to personal files stored therein that he uses as an accommodation of his disability, and emails, documents, and other communications of a personal, private, sensitive and/or privileged nature (including work-related emails and documents belonging to Riley & Hurley P.C.).

90. The Counterclaim Plaintiffs have a right to keep the subject matter private.

91. Counterclaim Defendant McKenna obtained the information through methods objectionable to a reasonable person; *i.e.*, by relentlessly badgering a legal assistant over several days until that assistant provided access to the password to McKenna without authorization, and then using that wrongfully-obtained password to obtain unauthorized access to Riley's iPad and review and copy information she found in the device.

92. The Counterclaim Plaintiffs have been injured by McKenna's misconduct.

WHEREFORE, Counterclaim Plaintiffs request that the Court enter judgment in their favor and against Counterclaim Defendant McKenna and award actual damages, exemplary damages, emotional distress damages, and any other damages allowable per law, plus interest, costs, attorneys' fees, and such further relief as the Court deems just and equitable.

The Counterclaim Plaintiffs also seek preliminary and permanent injunctive relief against Counterclaim Defendant's attempts to use information that she illegally and/or tortiously obtained from being used as evidence in this or any other proceeding, and to destroy copies of any information that she obtained from the devices.

Respectfully submitted,

KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.

By: */s/Elizabeth P. Hardy*
Elizabeth Hardy (P37426)
Thomas J. Davis (P78626)
Attorneys for Defendants
Robert F. Riley and Riley & Hurley, PC
280 N. Old Woodward Avenue,
Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com
tdavis@khvpf.com

Dated: March 5, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on March 5, 2025, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF participants.

*/s/Elizabeth Hardy*

Elizabeth Hardy (P37426)
Kienbaum Hardy Viviano Pelton
& Forrest, P.L.C.
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ELYSE MCKENNA,<br><br>Plaintiff,<br>v.<br><br>ROBERT F. RILEY, et al.,<br><br>Defendants. | Case No. 24-cv-12347<br><br>Hon. Brandy R. McMillion<br><br>Magistrate Judge Elizabeth A. Stafford |

---

**Index of Exhibits to**
**Defendants Riley and Riley & Hurley, PC's Answer to**
**Second Amended Complaint, Affirmative Defenses, and Counterclaims**

| | |
|---|---|
| **Exhibit A (to Counterclaim)** | 9.14.24 Detroit News article |

561323

# EXHIBIT A
# (to Counterclaim)




MICHIGAN

# UM Anderson case mediator accused of sex harassment in lawsuit



George Hunter
The Detroit News

Published 11:00 p.m. ET Sept. 14, 2024

*Detroit* — An attorney has filed a federal lawsuit accusing a fellow lawyer of sexually harassing her during the time he was mediating the case against the late University of Michigan athletic physician Dr. Robert Anderson that resulted in a multimillion-dollar settlement for more than 1,000 alleged sexual assault victims.

Elyse McKenna filed a lawsuit Monday in the U.S. District Court for the Eastern District of Michigan accusing fellow attorney Robert F. Riley of "surreptitiously taking photographs" of her, and allegedly engaging in a pattern of harassment while she worked for Riley and his firm and afterward, from 2019-February 2024.

The lawsuit names as defendants Riley, his Southfield firm, Riley & Hurley, and Berkley law firm Olsman, MacKenzie, Peacock & Wallace, which McKenna claims "terminated and disparaged" her after she confronted Riley about his alleged harassment.

McKenna said she had already given her notice to quit when she found the photographs on Riley's iPad. McKenna said she went to several attorneys trying to file a lawsuit against her former boss, although because nobody would take the case, she filed the suit herself.

"The attorneys that McKenna contacted informed her that although she had a viable legal claim, they were not comfortable with pursuing a case against him given his prominent status in the legal community," the 60-page filing said.

Riley did not return a phone call seeking comment.

Deborah Gordon, attorney for Olsman, MacKenzie, Peacock & Wallace, called McKenna's lawsuit "a sham."

"There's absolutely no legal basis to it whatsoever," Gordon said.

## Attorney outlines complaint

Riley in 2020 was appointed as the mediator to handle the hundreds of lawsuits that were filed in U.S. District Court alleging the University of Michigan had ignored complaints about sexual assaults by Anderson and allowed him to work with patients for decades. In 2022, about 1,050 plaintiffs shared the $490 million settlement that was mediated by Riley.

"I considered him my mentor," McKenna said of her former boss.

McKenna said she started working at Riley & Hurley in October 2019.

"He started requiring these dinners to encourage me to become a better attorney," she told The Detroit News. "That's how he framed it. It gradually started to concern me, and I started asking myself, 'Am I making a big deal out of nothing?' But then it dawned on me that this is not OK."

According to the lawsuit, "In June of 2021, McKenna became increasingly suspicious that Riley was taking photographs of her with his iPad while she was sitting in his office because McKenna could see a reflection of herself on the iPad screen in the window behind his desk. McKenna would deliberately sit in different parts of Riley's office out of view of his iPad. Riley always instructed McKenna to sit in the chair that the iPad was facing.

"Upon it becoming clear to McKenna that Riley was regularly taking photographs of her, McKenna felt extremely unsafe and knew she could no longer tolerate working for RH, therefore she decided to search for employment elsewhere," the lawsuit said.

## Plaintiff moves to new firm

McKenna said she told Riley she wanted to quit, and that her boss tried to talk her out of leaving the firm. When she refused, she said Riley helped her get her job at Olsman, MacKenzie, Peacock & Wallace. The two firms shared a client.

"Riley facilitated a meeting between (partner Donna) MacKenzie and McKenna, and OMPW ultimately offered McKenna employment as an attorney with their firm," the lawsuit said. "McKenna was hopeful that because OMPW represented victims of Larry Nassar and had female partners, they would be in a position to understand the harassment and grooming that McKenna had endured and be in a position to shield her from more of the same."

McKenna said she put in her two weeks' notice at the beginning of August 2021.

A few weeks later, McKenna said she found hundreds of pictures of herself on Riley's iPad. When asked how she accessed the device, McKenna declined to comment because she said she's defending herself and can't discuss certain aspects of the case.

"On August 18, 2021, McKenna went on Riley's iPad and found hundreds of photographs of herself — including photographs downloaded off of the internet, taken of her during Zoom calls, taken of her while she was sitting in his office, taken of her walking down the hallway, downloaded from other people's social media accounts, downloaded from McKenna's social media accounts from at least seven years prior when McKenna was younger, and in countless other situations when McKenna did not know Riley was photographing her," according to the lawsuit.

"Following her finding the photographs, McKenna immediately blocked Riley from all of her social media accounts and changed the privacy settings on her social media accounts with the hope of precluding others from being able to tag McKenna in photographs that Riley could then obtain," the lawsuit said. "McKenna also immediately went on Amazon and purchased a device that purported to be able to detect hidden cameras, audio bugs and GPS tracking devices."

McKenna told The News she felt violated after discovering Riley was allegedly photographing her.

"It was like time stopped," she said. "It was an out-of-body experience."

McKenna said the incident has left her feeling paranoid whenever she sees someone holding a cellphone.

"There was a time in the grocery store, when a man had his cellphone out, and he was probably only looking at a grocery list, but I left a cartful of groceries in the aisle and got out of there," she said. "Since this happened, it's made me realize how many people have their cellphones out, and I always wonder if they're taking my picture."

McKenna claims in the lawsuit that Riley continued to stalk her at conferences and other events after she'd stopped working for him. She also alleges her bosses at OMPW became increasingly hostile to her because she complained about Riley's alleged ongoing harassment.

"When Riley was confronted regarding his continued harassment of McKenna and asked to stop, McKenna was immediately terminated and disparaged by her then employer Olsman, MacKenzie, Peacock & Wallace," the lawsuit said.

McKenna was fired Feb. 4, 2024, because the firm's partner "questioned McKenna's honesty, integrity, and judgment," the lawsuit said.

McKenna told The News she moved to Maryland to resume her legal career. She claimed Riley's influence made it difficult for her to work in Michigan.

"I'm not barred here in Maryland yet," McKenna said. "I did a lot of gymnastics to attempt to stay in the legal field in Michigan. I know Michigan laws, that's where my family is. But now I'm in Maryland, trying to put everything back together."

*ghunter@detroitnews.com*

*(313) 222-2134*

*@GeorgeHunter_DN*