UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELYSE MCKENNA,

      Plaintiff,                    Case No. 24-cv-12347

v.

                                    Hon. Brandy R. McMillion

ROBERT F. RILEY and
RILEY & HURLEY, PC and           Magistrate Judge Elizabeth
OLSMAN MACKENZIE PEACOCK, PC    Stafford

         Defendants.
_____/

## PLAINTIFF'S ANSWER TO DEFENDANTS RILEY AND RILEY & HURLEY, P.C.'S COUNTERCLAIMS AND AFFIRMATIVE DEFENSES

Plaintiff Elyse McKenna ("McKenna"), through her counsel, answers Defendants Robert F. Riley ("Riley") and Riley & Hurley, PC's ("RH") (collectively, "Riley Defendants") Counterclaims as follows:

1.    Counterclaim Plaintiff Riley is a resident and citizen of the State of Michigan.

**Answer**:  Admitted.

2.    Plaintiff Riley & Hurley, P.C. is a professional corporation that is incorporated in, and has its principal place of business in, Michigan.

**Answer**:  Admitted that Riley & Hurley is a professional corporation that is

1

incorporated in, and has its principal place of business in, Michigan. Denied that Riley & Hurley, P.C. is the Plaintiff. McKenna is the Plaintiff.

3.      Counterclaim Defendant Elyse McKenna purports to be a citizen and resident of the State of Maryland which, if true, renders this action between citizens of different states.

**Answer**:  Admitted that McKenna is a citizen and resident of the State of Maryland and that this action is between citizens of different states. Denied to the extent this paragraph implies McKenna is not a citizen and resident of the State of Maryland.

4.      This action is between citizens of different states and the amount in controversy is in excess of $75,000.

**Answer**:  Admitted that this action is between citizens of different states. McKenna is without knowledge or information sufficient to form a belief as to the truth of the allegation that the amount in controversy as to the Counterclaims is in excess of $75,000.

5.      Venue is proper under 28 U.S.C. § 1391.

**Answer**: Admitted.

2

6.      In October 2019, Elyse McKenna joined the Riley & Hurley law firm as a promising new associate attorney. She had only been practicing a few years, and had minimal litigation experience, but she presented as bright and ambitious thus leading Riley & Hurley to believe she had significant potential once she gained meaningful experience.

**Answer**:  Admitted that McKenna began working at RH in October of 2019 as a promising new associate attorney. Admitted that McKenna had been practicing law since 2015 and that she was bright and ambitious. Admitted that McKenna had significant potential when she began working at RH and that RH believed the same. Denied that McKenna had minimal litigation experience and lacked meaningful experience. Denied to the extent the Riley Defendants are attempting to imply that McKenna was not in fact bright and ambitious or that McKenna misled them.

7.      At the time McKenna joined Riley & Hurley, the firm was looking for a litigator with the potential to develop into a future firm leader.

**Answer**: Admitted that, at the time McKenna began working at RH, she had been told by Riley that she was hired because she was a litigator with the potential to develop into a future firm leader and owner.

8.     As with any associate attorney, Riley & Hurley expected that McKenna would acquire the experience over time to become a seasoned litigator and would cultivate relationships with the firm's longstanding clients, all with the hope that—at some point with client consent—she would have the opportunity to continue servicing those clients after the firm's founders had retired.

**Answer**:  Admitted that the Riley Defendants agreed to provide McKenna with opportunities to cultivate client relationships, further develop her litigation skills, and continue servicing RH clients after Riley and Hurley retired. Denied that Riley expected that McKenna would become seasoned litigator while working at RH or hoped that McKenna would continue servicing clients after the firm's founders had retired. Denied that the Riley Defendants treated McKenna the same as "any associate attorney."

9.     During her time at Riley & Hurley, McKenna became particularly attached to Counterclaim Plaintiff Robert Riley, leading Riley to believe that the two of them had developed a meaningful mentor/mentee relationship and a good friendship.

**Answer**: Denied

10.     For instance, in December 2019, Riley gave McKenna a Christmas card

alluding to their close friendship and personal bond, which McKenna has asserted used the terms "love" and "affection" in a sexually-charged manner.

**Answer**:  Admitted that Riley gave McKenna the card and that he used the terms "love" and "affection" in a sexually charged manner. Denied to the extent the Riley Defendants are attempting to imply that the card did not use additional language in a sexually charged manner.

11.     McKenna's response to that card, sent via text messages, included the following statements:

- "the card made my day and I want to make sure I do right by it."

- "Your card really meant the world to me. I've read it over a number of times. It brought me a lot of happiness yesterday and today. I am very lucky to have you in my life."

- "I've decided on a reciprocal card to really detail my thoughts. I'm happy."

**Answer**: Denied.

12.     In late December 2020, McKenna also sent the following text message to Riley:

Hi Bob! It was a terrific day and you know, I thought about the fact that it was your lucky number day multiple times throughout it.

I am so glad that we have been able to achieve the special personal and professional relationship that we both hoped for. It is a very important one that

I regularly cherish.

You have contributed so much to this relationship and I am very grateful for you. I have learned a lot and grown along the way. I appreciate your friendship more than you can know.

**Answer**:  Admitted.

13.     These texts avowing friendship continued well after the time McKenna falsely alleges that Riley attempted to kiss her or engage in other allegedly inappropriate behavior.

**Answer**:  Denied.

14.     For instance, on June 12, 2021—just five weeks prior to McKenna's resignation from Riley & Hurley—McKenna sent the following unsolicited text to Riley:

Bob Riley!!!! Happy birthday! I hope you have the best day today doing all of the things that you love most. Please let me know what you are up to! I trust you've enjoyed a walk with Hank? What about some peace and quiet? Is there a fire planned tonight? What about a homemade pizza or something else for dinner that you love?

I want to let you know that I am very grateful for you. I believe that things happen for a reason and I am glad we got to know each other when we did.

**Answer**: Admitted that the McKenna sent the text to Riley. Denied that the text was unsolicited.

6

15.     Unfortunately, this "friendship" appears to have been a ruse. McKenna's true intention was that she would use her "special relationship" with Riley to get existing Riley & Hurley clients handed to her without putting in the work and time necessary to earn a clients' trust and respect.

**Answer**: Denied to the extent the Riley Defendants are attempting to imply that any "ruse" is attributable to McKenna. McKenna denies the remaining allegations in Paragraph 15.

16.     Not surprisingly, McKenna's career at Riley & Hurley did not unfold in the unrealistic way she had hoped. As of May 2021—after a mere 19 months with the firm—McKenna had not acquired, to her significant disappointment, enough experience as a litigator to be viewed by the firm clients as "first chair" or "lead" material. Further, she failed to cultivate a close working relationship with the firm principal who was the key contact for the firm's litigation clients. Instead, she leaned on Robert Riley to shepherd her career and help her obtain the firm's medical malpractice clients. While Riley committed a lot of time to helping McKenna develop and mature as a lawyer during her tenure at the firm, he was a mediator at that point in time and not directly involved in firm litigation matters.

**Answer**: Admitted that McKenna's career at RH did not unfold in the way

she had hoped. Denied that the way McKenna had hoped her career at RH would have unfolded – a career without Riley sexually harassing her – was unrealistic. Admitted that Riley's demands on McKenna prevented her from working closely with Hurley and that McKenna was disappointed that she was not obtaining more experience as a litigator because of it. Denied that McKenna "leaned on Riley." Admitted that Riley committed a lot of time to McKenna but denied that his motivation for doing so was to help her develop and mature as a lawyer or that this commitment was wanted by McKenna. Admitted Riley was a mediator as of May 2021. McKenna lacks knowledge or information sufficient to form a belief about the truth of the allegation that Riley was "not directly involved in firm litigation matters" and on that basis denies the allegation.

17.     When Riley & Hurley's litigation principal decided in May 2021 to slow down his work and eventually retire, McKenna decided that she would leave the firm. Before departing, she put in place a plan to take with her certain firm clients and to set up a litigation claim at the Firm's expense for her own personal financial benefit.

**Answer**:  Denied.

18.     McKenna knew that Riley was legally blind and used the high-

8

resolution screen of his iPad and its magnification capabilities to be able to read documents or view images. He also used his iPad to be able to magnify and read emails and other documentation. The device contained significant private, sensitive information including financial records, medical records, personal and work emails, and family photographs and other personal information of a private nature.

**Answer**: Denied that McKenna knew Riley was legally blind and used the high-resolution screen of his iPad and its magnification capabilities to be able to read documents and view images. McKenna lacks knowledge or information sufficient to form a belief about the truth of the allegations that Riley used his iPad to be able to magnify and read emails and other documentation and that his iPad contained financial records, medical records, personal and work emails, or family photographs and on that basis denies the allegation. To the extent the Riley Defendants are referring to photographs of McKenna as being "significantly private," "sensitive" and "personal" information contained on Riley's iPad, McKenna admits such photographs are significantly private sensitive, and personal to McKenna and that they were obtained by Riley without McKenna's knowledge or consent.

19.     McKenna was aware that, in the course of mediations, he would obtain photographs of all of the participants in the mediations from the Internet and have them placed on his iPad. This allowed Riley to put a face to the voices of the people

he would hear during mediations.

**Answer**: McKenna denies that she was aware that Riley obtained photographs of mediation participants from the Internet and had them placed on his iPad and lacks knowledge or information sufficient to form a belief about the truth of the allegation that Riley did so and on that basis denies the allegation. McKenna lacks knowledge or information sufficient to form a belief about the truth of the allegation as to the what the photographs allowed Riley to do and on that basis denies the allegation.

20. McKenna correctly suspected that Riley would have similar photographs of McKenna; he could not see her face any more than he could see the faces of other staff members or attorneys of the firm.

**Answer**: Admitted that McKenna's suspicion that Riley had photographs of her on his iPad was confirmed. Denied that all of the photographs Riley had of McKenna were obtained from the Internet and on that basis denies that the photographs of McKenna were "similar" to the photographs Riley allegedly obtained of mediation participants from the Internet. McKenna lacks knowledge or information sufficient to form a belief about the truth of the allegation that Riley's photographs of Mckenna were otherwise "similar" to photographs of mediation participants that Riley allegedly obtained from the Internet and on that basis denies

the allegation. McKenna lacks knowledge or information sufficient to form a belief about the truth of the allegation that Riley could not see McKenna's face any more than he could see the faces of other staff members or attorneys of the firm and on that basis denies the allegation.

21.     Thus, McKenna—knowing she was already leaving the firm anyway—spent several days badgering a Riley & Hurley employee into giving her the password to Riley's iPad. The employee ultimately relented under McKenna's ongoing pressure and gave McKenna the password.

**Answer**: Denied.

22.     The employee was not Riley's assistant, and was not authorized to access Riley's iPad without permission. Indeed, Riley had not provided this employee with his password.

**Answer**: McKenna lacks knowledge or information sufficient to form a belief about the truth of these allegations about an unidentified RH employee and on that basis denies these allegations.

23.     McKenna was likewise not authorized to access Riley's iPad and did not have the password until she obtained it from the employee.

**Answer**: Denied.

24.     McKenna accessed the iPad and accessed emails and other messages, files, and folders on the device that she was not authorized to access.

**Answer**: Admitted that McKenna accessed the iPad. Denied that McKenna accessed emails and other messages, files and folders on the device.

25.     The Counterclaim Plaintiffs did not learn that McKenna had badgered an employee into providing Riley's password, or that McKenna personally accessed the device herself until late last year, when McKenna stated in her *pro se* Complaint that she had actually accessed the device personally.

**Answer**: Denied.

26.     Upon information and belief, McKenna used her smartphone to take photos of Riley's iPad screen and its contents.

**Answer**: Admitted only that McKenna used her smartphone to take photographs of images of McKenna that Riley had obtained and stored on his iPad without McKenna's knowledge or consent. Otherwise denied.

27.     There were no inappropriate photos of McKenna on the iPad—

something McKenna does not even attempt to allege despite numerous other falsehoods and misleading accusations in her various complaints. All the photos were either taken from the Internet or were taken in the office setting.

**Answer**: Denied.

28.     Nonetheless, Riley admittedly did not ask permission before taking photos of people in a non-private setting, or off the Internet.

**Answer**: Admitted that Riley did not ask permission or have McKenna's consent to take, obtain or store photographs of her in any setting or from any source. McKenna accepts Riley's admission that he also did not ask permission before taking or obtaining photos of other people.

29.     McKenna left Riley & Hurley without saying anything to Riley about her accessing his iPad and viewing information on that device.

**Answer**: Denied.

30.     Despite McKenna's leaving, Riley still believed that they had a good professional relationship.

**Answer**:  Denied.

31.    Prior to McKenna's departure, she expressed a desire to keep working for Riley's major organizational client even though her new firm did not handle that sort of work.

**Answer**: Denied that prior to her departure from RH, McKenna expressed a desire to keep working for Riley's major organizational client at her new firm, Defendant Olsman MacKenzie Peacock. McKenna lacks knowledge or information sufficient to form a belief about the truth of the allegation that her new firm did not handle that sort of work and on that basis denies the allegation.

32.    The organizational client was a client relationship that Riley had developed long prior to McKenna's joining Riley & Hurley.

**Answer**: McKenna lacks knowledge or information sufficient to form a belief about the truth of this allegation and on that basis denies the allegation.

33.    McKenna had no obligation to continue representing that client.

**Answer**: McKenna admits that she had no obligation to continue representing that client before she started working at Defendant Olsman MacKenzie Peacock.

34.    McKenna, however, wanted to take Riley's significant client for herself, without Riley's continued involvement.

**Answer**: Denied that McKenna wanted to take Riley's client "for herself." Admitted that McKenna did not want Riley's continued control over her work, continued involvement in her personal life and continued sexual harassment. McKenna denies the remaining allegations of Paragraph 34. Upon learning that Riley had a large collection of photographs of McKenna and wanted to control her work after her departure from RH, McKenna emailed Riley indicating she would be stepping down from representing the organizational client, because of Riley's involvement.

35.     Riley—still believing, albeit naively, that McKenna was a good friend and a promising lawyer, and not realizing that McKenna's plan was to supplant him entirely from representing this client—was supportive of her request.

**Answer**: Admitted that Riley knew McKenna was a promising lawyer. Denied that Riley still believed, naively or otherwise, that McKenna was a good friend. Denied that McKenna had any plan to supplant Riley entirely from representing the organizational client. Denied that Riley was supportive of an unspecified "request."

36.     The client wished for the existing relationship to continue, with Riley as the lead counsel and the far less experienced McKenna as associate.

**Answer**: McKenna lacks knowledge or information sufficient to form a belief about the truth of these allegations and on that basis denies the allegation.

37.    Only after McKenna learned that she would not be given the client relationship for herself, did she decide to "confront" Riley about the photographs.

**Answer**: McKenna denies that she expected or demanded to be given the organizational client relationship "for herself" at any time before she confronted Riley about the photographs. Upon learning that Riley had a large collection of photographs of McKenna and wanted to control her work after her departure from RH, McKenna emailed Riley indicating she would be stepping down from representing the organizational client, because of Riley's involvement.

38.    McKenna sent an email to Riley, accusing him of sending "romantic" notes, stating that she was aware of his taking photographs (without disclosing that she had illegally accessed the iPad) and stating that she would not work with Riley for the shared client.

**Answer**: Admitted that McKenna sent an email to Riley. Admitted that McKenna stated in the email, among other things, "I am aware that you took photographs of me surreptitiously while I was in your office. This is extremely upsetting and inappropriate. This, in conjunction with your other behaviors and

16

actions, including your romantic text messages, letters, and comments, has caused me to feel very uncomfortable and scared." Denied that McKenna "illegally accessed" Riley's iPad. Denied that McKenna did not disclose to Riley that she had accessed the photographs. Admitted that McKenna further stated in the email, "I will not be working in any capacity in which you [Riley] are my supervisor" and further stated that she would therefore no longer be representing the organizational client. Denied to the extent the Riley Defendants are insinuating that McKenna demanded in the email that Riley relinquish his relationship with the client or that McKenna be "given" the client relationship "for herself."

39.    Riley was taken aback by McKenna's accusations of "romantic" notes, which was not true. However, because he had taken photos (albeit in a non-private setting) without disclosing it, he deeply regretted the fact that his actions— while legal—violated McKenna's view of their friendship. Because Riley continued to believe that McKenna was a good friend and that she was genuinely hurt, he profusely apologized for taking the photos.

**Answer**: Denied.

40.    McKenna responded to Riley's apology email by stating "Thank you for apologizing. I really appreciate it."

**Answer**:  Admitted.


41.     Contrary to the narrative McKenna now weaves, Riley did not attempt to "retaliate." His first concern, despite McKenna's accusations, was to continue to help her career development in the small way he could.

**Answer**: Denied.


42.     He suggested that they would work together with the client through a transition period (of an undefined duration) and that if and when the client agreed she was ready to assume responsibility for the client account, he would voluntarily step away.

**Answer**: Denied.


43.     That client had a long-time relationship with Riley and was not ready as of August 2021 to end its association with Riley. McKenna was still given the opportunity to work with that client so that she could gain the experience and earn the trust necessary to eventually take over the account.

**Answer**:  McKenna lacks knowledge or information sufficient to form a belief about the truth of the allegation regarding the client's "readiness" to end its association with Riley and on that basis denies the allegation. McKenna denies the

remaining allegations of Paragraph 43.

44.     Over the course of the next several years, McKenna never told Riley that she construed his actions to be "stalking," "harassing," or anything of the sort.

**Answer**:  Denied.

45.     Instead, both worked together on the shared client's matters. Over time, and as one would expect if actual friends had a fallout, their normal working relationship resumed.

**Answer**: Denied.

46.     McKenna and Riley resumed text communications on various matters, with McKenna herself initiating several of those communications. Among other things, she discussed personal matters with Riley and sought career advice unrelated to the organizational client.

**Answer**: Admitted only that any "resumption" of text communications initiated by McKenna was on professional matters. McKenna denies the remaining allegations of Paragraph 46.

47.     For instance, in April 2023 she reached out to Riley about career advice

unrelated to the organizational client, and—in response—she texted "I appreciate the words of wisdom, Bob" and continued to vent about the issue.

**Answer**: Admitted only that McKenna asked Riley to substantiate his unsolicited statements to her that the partners at Olsman MacKenzie had been talking negatively about McKenna to Riley.

48.     In June 2023, while at the organizational client's Orlando conference, McKenna expressly reached out to Riley to obtain his assistance.

**Answer**:  Denied.

49.     Specifically, McKenna came to Riley and claimed that a conference attendee had assaulted her.

**Answer**: Denied that McKenna was assaulted by a conference attendee or that she came to Riley and claimed she was assaulted for a conference attendee.

50.     McKenna requested Riley's assistance in resolving a concern she had with potentially having to work with that conference attendee.

**Answer**: Denied.

51.     Riley assisted McKenna as requested. When Riley told McKenna that

the issue had been resolved favorably to her, and that she would no longer face having to work with that attendee, the following texts ensued:

**McKenna**:   Really?
Swear?
??????

**Riley**:   Yes. I don't lie

**McKenna**:   I know you don't lie. Just cannot believe it

**Riley**:   I'm sorry this was so stressful

**Answer**:  Denied.

52.   McKenna then told Riley that she feared retaliation from the conference attendee. After telling Riley that, McKenna went incommunicado for a lengthy period of time; Riley attempted to ensure that McKenna was all right.

**Answer**: Denied.

53.   The professional working relationship between McKenna and Riley resumed as normal after the June conference.

**Answer**: Denied.

54.   After several years, Riley's client contact at the organizational client remained in his position and McKenna feared that she would not be able to take over

entirely for Riley unless she forced it to happen.

**Answer**: Admitted that Riley's "client contact" at the organizational client remained in his position for several years, to the extent that the Riley Defendants are referring to the now-former executive director of the organizational client. McKenna denies the remaining allegations of Paragraph 54.

55.    At the same time, upon information and belief, McKenna was having employment problems at her new firm, Olsman MacKenzie.

**Answer**: Admitted that Olsman MacKenzie's refusal to address McKenna's numerous reports of Riley's conduct toward her created employment problems for McKenna at Olsman MacKenzie and that Riley and partners of Olsman MacKenzie regularly spoke negatively about McKenna amongst themselves.

56.    McKenna set about on a course of action to resolve both of her perceived problems simultaneously.

**Answer**:  Denied.

57.    In or around January 22, 2024, Riley received a communication from attorney Ken Mogill that he and attorney Sarah Prescott wanted to discuss a "confidential matter" with Riley.

**Answer**: McKenna admits Mogill and Prescott communicated with Riley to make a pre-litigation settlement demand on McKenna's behalf.

58.     The matter in question was McKenna's demand that Riley pay her a significant amount of money or else she would publicly accuse Riley of sexual harassment based on nearly three-year old events.

**Answer**: Denied.

59.     McKenna was aware—as was Riley—that a mere accusation of such wrongdoing can destroy a person's career, legacy, and personal life, even if that person is subsequently vindicated in legal proceedings.

**Answer**:  Denied.

60.     Riley ultimately refused to submit to McKenna's threats to make accusations against him that she knew to be false, if he did not pay her money. This was conveyed to McKenna's counsel—one of whom indicated that acquiescence to McKenna's demands was "in everyone's best interest" because absent that, McKenna would sue Riley and have him "served in public."

**Answer**: Denied. Riley agreed to settle, then added onerous terms to the settlement that caused McKenna to reject his terms.

61.     Upon information and belief, McKenna then either fired both Mogill and Prescott, or both of them resigned. She filed a *pro se* lawsuit.

**Answer**: Denied that McKenna fired Mogill or Prescott. Denied that Mogill or Prescott resigned. Admitted that McKenna filed a *pro se* lawsuit.

62.     In addition to filing the lawsuit, McKenna began a campaign to defame and otherwise punish Riley for not paying her hush money.

**Answer**:  Denied.

63.     McKenna maliciously planted a false story with the Detroit News (see Counterclaim Ex. A). While that article contained some quotes from her *pro se* lawsuit, McKenna directly spoke to at least one Detroit News reporter, who then included McKenna's extrajudicial statements in the article. Those included false and defamatory statements accusing Riley of (a) sexually harassing and stalking McKenna at multiple conferences and events after her employment ended; and (b) using his "influence" to prevent her from working in Michigan.

**Answer**: Admitted only that McKenna spoke with a Detroit New Reporter about the contents of her Complaint. McKenna denies the remaining allegations of Paragraph 63.

64.     In the article, when asked how she accessed Riley's iPad, McKenna "declined to comment because she said she's defending herself and can't discuss certain aspects of the case." In fact, McKenna did not comment because she knew she would have been admitting to tortious (and potentially criminal) activity for unauthorized access to a computer system. McKenna's willingness to discuss multiple details of her case in the media, but not the issue of her accessing the iPad, reflects her consciousness of guilt.

**Answer**:  Admitted that McKenna declined to comment. McKenna denies the remaining allegations of Paragraph 64.

65.     The article also contained the false statement by McKenna that no lawyers would "take the case" against Riley, when in fact she had *two* seasoned attorneys "representing" her immediately prior to her lawsuit.

**Answer**:  Denied that the statement was false. Admitted McKenna had two seasoned attorneys representing her before she filed this action.

66.     McKenna likewise directly spoke with the organizational client and made false and defamatory accusations that Riley had stalked and harassed her, and told the organizational client that she would no longer work with Riley as a result.

25

Based on McKenna's statements, the organizational client ended its relationship with Riley and hired McKenna to take over Riley's role in addition to her own pre-existing work for that client.

**Answer**:  Admitted that McKenna spoke directly with the organizational client about Riley and advised that she would no longer work with Riley. Denied that McKenna made false and defamatory accusations. She told the truth. McKenna lacks knowledge or information sufficient to form a belief about the truth of the allegation that the organizational client ended its relationship with Riley based on McKenna's statements and on that basis denies the allegation. McKenna admits that she has continued to represent the organizational client but denies that she "took over Riley's role in addition to her own pre-existing work for that client."

67.    McKenna's initial plan—a desire to obtain Riley's organizational client entirely for herself—was thus fulfilled.

**Answer**: Denied.

68.    McKenna also spread false and misleading accusations throughout the Detroit legal community, causing several other clients of Riley's to immediately cease working with him and his firm—again, based merely on her accusations.

**Answer**: Denied.

69.     Remarkably, McKenna has now taken the position that Riley's very attempts to defend himself in court—including filing an initial motion to dismiss disclosing her abuse of the litigation process by identifying demonstrably false and misleading allegations in her complaint—is "retaliation." This is a blatant effort to misuse the civil rights laws to shield her misconduct from the light of day. Riley will not be intimidated by such threats.

**Answer**: Denied that McKenna has taken the position that Riley filing a motion to dismiss is retaliation. Admitted that McKenna has taken the position that Riley has retaliated against McKenna including since the filing of this action. Denied that McKenna has made any effort, blatant or otherwise, to misuse the civil rights laws for any purpose. Denied that McKenna has made any threats or otherwise attempted to intimidate Riley.

70.     McKenna's conduct as set forth above has caused the Counterclaim Plaintiffs actual damages and loss of earnings or earning capacity, and has caused Riley severe harm in his personal and professional relationships, causing him mental anguish; fright and shock; denial of social pleasure and enjoyments; and embarrassment, humiliation, or mortification. The damages exceed $75,000.

**Answer**: Denied.

<u>COUNT I: Tortious Interference with</u>
<u>Business Relationships and Expectancies</u>

71.     The Counterclaim Plaintiffs incorporate the foregoing allegations.

**<u>Answer</u>**: McKenna incorporates by reference all preceding paragraphs.


72.     The Counterclaim Plaintiffs have contractual and business relationships and expectancies, including with the organizational client and other clients.

**<u>Answer</u>**:  McKenna lacks knowledge or information sufficient to form a belief about the truth of this allegation and on that basis denies the allegation.


73.     McKenna has knowledge of the business relationship and expectancies that the Counterclaim Plaintiffs have with the organizational customer and other clients.

**<u>Answer</u>**:  Denied.


74.     McKenna has intentionally and wrongfully interfered with the Counterclaim Plaintiffs' business relationships and expectancies by making false, misleading, and defamatory accusations to the organizational client and other clients about Riley.

**<u>Answer</u>**:  Denied.

75.     The Counterclaim Plaintiffs have suffered damages as a result of the interference.

**Answer**:  Denied.

WHEREFORE, McKenna denies the Riley Defendants are entitled to any of the relief they request, and McKenna requests that judgment be entered for a no cause of action with costs and attorney fees to McKenna.

<u>COUNT II: Defamation</u>
<u>Common Law and MCL 600.2911</u>

76.     The Counterclaim Plaintiffs incorporate the foregoing allegations.

**Answer**: McKenna incorporates by reference all preceding paragraphs.

77.     McKenna published false and defamatory statements concerning the Counterclaim Plaintiffs.

**Answer**: Denied.

78.     McKenna's statements were unprivileged and made with malice.

**Answer**: Denied.

79.     McKenna was at least negligent with respect to the defamatory statements she uttered; indeed, they were made with knowledge of their falsity or reckless disregard of the truth.

**Answer**: Denied.

80.     McKenna's false statements are defamatory *per se*.

**Answer**: Denied.

81.     The Counterclaim Plaintiffs were also specially harmed by McKenna's false and defamatory statements, which led to the immediate and direct loss of income from clients who ceased their relationship with the Counterclaim Plaintiffs as a result of the false and defamatory statements.

**Answer**: Denied.

82.     As a result of the defamation, the Counterclaim Plaintiffs have been damaged.

**Answer**: Denied.

WHEREFORE, McKenna denies the Riley Defendants are entitled to any of the relief they request, and McKenna requests that judgment be entered for a no cause

of action with costs and attorney fees to McKenna.

<u>COUNT III: Trespass To Chattels</u>

83.     The Counterclaim Plaintiffs incorporate the foregoing allegations.

**Answer**: McKenna incorporates by reference all preceding paragraphs.

84.     Counterclaim Plaintiff Riley's iPad is, for legal purposes, a chattel (*i.e.*, an item of property other than real estate) which he used both for personal matters and professional matters on behalf of Riley & Hurley P.C.

**Answer**: McKenna lacks knowledge or information sufficient to form a belief about the truth of this allegation and on that basis denies the allegation.

85.     Counterclaim Plaintiff Riley is the owner of the iPad, and was thus in possession of the chattel.

**Answer**:  McKenna lacks knowledge or information sufficient to form a belief about the truth of this allegation and on that basis denies the allegation.

86.     Counterclaim Defendant McKenna intentionally used or intermeddled with the chattel without permission of Riley, by taking physical possession of the device, defeating its password protection, and reading and copying messages from the device.

**Answer**: Denied.


87.     The Counterclaim Plaintiffs were damaged and are continuing to be damaged as a result of McKenna's unauthorized use of Riley's iPad and her reading and copying messages from that device, including her past and ongoing attempts to use that improperly-obtained evidence in furtherance of a scheme to obtain money from the Counterclaim Plaintiffs.

**Answer**:  Denied.


WHEREFORE, McKenna denies the Riley Defendants are entitled to any of the relief they request, and McKenna requests that judgment be entered for a no cause of action with costs and attorney fees to McKenna.


COUNT IV: Intrusion Upon Seclusion

88.     The Counterclaim Plaintiffs repeat the foregoing allegations.

**Answer**: McKenna incorporates by reference all preceding paragraphs.


89.     Riley's iPad—which he relies upon due to a disability that Defendant McKenna was aware of—contains secret and private subject matter, including but not limited to personal files stored therein that he uses as an accommodation of his

disability, and emails, documents, and other communications of a personal, private, sensitive and/or privileged nature (including work-related emails and documents belonging to Riley & Hurley P.C.).

**Answer**: McKenna lacks knowledge or information sufficient to form a belief about the truth of these allegations and on that basis denies the allegations except to the extent that the Riley Defendants are referring to images of McKenna that Riley secretly obtained without McKenna's knowledge or consent, which McKenna admits were contained on the iPad in question.

90.     The Counterclaim Plaintiffs have a right to keep the subject matter private.

**Answer**: McKenna lacks knowledge or information sufficient to form a belief about the truth of these allegations and on that basis denies the allegations, except to the extent that the Riley Defendants are referring to images of McKenna that Riley secretly obtained without McKenna's knowledge or consent, which McKenna denies the Riley Defendants had a right to keep private from McKenna.

91.     Counterclaim Defendant McKenna obtained the information through methods objectionable to a reasonable person; *i.e.*, by relentlessly badgering a legal assistant over several days until that assistant provided access to the password to

McKenna without authorization, and then using that wrongfully-obtained password to obtain unauthorized access to Riley's iPad and review and copy information she found in the device.

**Answer**: Denied.

92. The Counterclaim Plaintiffs have been injured by McKenna's misconduct.

**Answer**: Denied.

WHEREFORE, McKenna denies the Riley Defendants are entitled to any of the relief they request, and McKenna requests that judgment be entered for a no cause of action with costs and attorney fees to McKenna.

AFFIRMATIVE DEFENSES

Plaintiff Elyse McKenna ("McKenna"), through her counsel, for her affirmative defenses to the Counterclaims of Defendants Robert F. Riley ("Riley") and Riley & Hurley, P.C. ("RH") (collectively, "Riley Defendants"), states as follows:

1. Some or all of the counterclaims are barred by the statute of limitations.

2. The counterclaims are barred because of the Riley Defendants'

spoliation of evidence.

3.      McKenna's statements about the Riley Defendants are true.

4.      McKenna did not make a false statement of fact about the Riley Defendants.

5.      McKenna's statements about the Riley Defendants are privileged.

6.      McKenna's statements about the Riley Defendants are fair comments.

7.      McKenna's actions were in defense of and to recapture her personal property.

8.      The Riley Defendants permitted, consented to, or approved of McKenna's actions and statements.

9.      The Riley Defendants ratified McKenna's actions and statements.

10.     McKenna had a good faith and reasonable belief that she was entitled to locate, see and/or retake the images of herself that were wrongfully taken, obtained, and/or stored by Riley on the iPad without McKenna's consent.

11.     McKenna had a privilege to peacefully locate, see and/or retake the images of herself that the Riley wrongfully took, obtained and/or stored without McKenna's consent.

12.     McKenna had a legal right to interfere with the iPad in question where Riley stored the images of McKenna that he wrongfully took and/or obtained.

13.     The Riley Defendants failed to preserve the claimed confidentiality of

the images of McKenna that were stored on the iPad.

14.     McKenna's statements and actions did not cause harm to the Riley Defendants' business relationship.

15.     McKenna's statements and actions were properly taken in good faith to protect and act in her own legitimate business interests to safeguard or promote her financial or economic interest and are privileged.

16.     Any interference by McKenna with the Riley Defendants' business relationship was with a non-exclusive right and is privileged.

17.     The Riley Defendants' business relationship would have been damaged regardless of McKenna's actions.

18.     The Riley Defendants had no business relationship under which they had legal rights.

19.     McKenna did not use improper means to interfere with the Riley Defendants' business relationship.

20.     The Riley Defendants failed to act in a commercially reasonable manner.

21.     McKenna's actions were legally justified.

22.     McKenna's actions were taken out of necessity to prevent a more significant harm or danger.

23.     McKenna acted in good faith.

24.    McKenna acted based on the advice of counsel.

25.    The counterclaims are barred, in whole or in part, by the equitable doctrines of waiver, estoppel, and unclean hands.

26.    The counterclaims are barred under the doctrine of unconscionability.

27.    The counterclaims are contrary to public policy.

28.    The Riley Defendants' alleged damages were the result of unrelated, pre-existing, or subsequent conditions unrelated to McKenna's conduct.

29.    The Riley Defendants' alleged damages were the result of the conduct of others.

30.    The Riley Defendants' own actions caused or contributed to their alleged injuries.

31.    The Riley Defendants' alleged damages were not foreseeable.

32.    The Riley Defendants seek an impermissible injunction.

33.    RH lacks standing.

34.    The Riley Defendants have failed to mitigate damages.

35.    The Riley Defendants' claims for punitive or exemplary damages are not allowed under Michigan law.


Respectfully submitted,


*/s/ Kathleen Kalahar*                    */s/ Randi McGinn*

Kathleen Kalahar (P60301)
Goodman Kalahar
Attorneys for Plaintiff
1394 East Jefferson Avenue
Detroit, MI 48207
(313) 567-6165
(248) 310-0133 (mobile)
kkalahar@goodmankalahar.com

Randi McGinn
McGinn Montoya Love Curry &
Sievers PA
Attorneys for Plaintiff
201 Broadway Blvd SE
Albuquerque, NM 87102
randi@mcginnlaw.com

Dated: March 26, 2025