# EXHIBIT 5

Ancient Brands, LLC v. Planet Stuff, LLC, Not Reported in Fed. Supp. (2018)

2018 WL 5885502

2018 WL 5885502
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

ANCIENT BRANDS, LLC, Plaintiff,

v.

PLANET STUFF, LLC, and
Howard B. Goldman, Defendants

Case No: 18-11647
|
Signed 11/09/2018

**Attorneys and Law Firms**

Mary Hyde, Honigman Miller Schwartz and Cohn LLP,
Chicago, IL, Leigh C. Taggart, Honigman Miller Schwartz
and Cohn LLP, Bloomfield Hills, MI, for Plaintiff.

Ethan R. Holtz, Jaffe Raitt Heuer & Weiss, Southfield, MI,
for Defendants.

**ORDER DENYING DEFENDANT
GOLDMAN'S AMENDED MOTION TO
DISQUALIFY HONIGMAN, MILLER,
SCHWARTZ, AND COHN, LLP (ECF No. 15)**

Sean F. Cox, United States District Judge

*1  Plaintiff's attorney is from Honigman. Before Plaintiff
filed its Complaint, Defendant Howard B. Goldman met
with other Honigman attorneys to discuss hiring them for
a different litigation and to sell some of his businesses.
Goldman alleges that, during these discussions, he disclosed
confidential information about his business model, and that
this information is relevant to this action. Now, Goldman
seeks to disqualify Honigman because it has a conflict of
interest with him, either as a former client or as a prospective
client. The Court heard oral arguments on this motion on
October 18, 2018.

For the reasons below, the Court will DENY Goldman's
motion to disqualify.

**BACKGROUND**

**I. Generally**

Plaintiff Ancient Brands sells dietary supplements that adhere
to the "foundational nutritional principles" that have "best
served human health and wellness needs throughout history."
Compl. ¶ 19, 21. Ancient Brands has established trademarks
and trade dress for these supplements, which "are associated
with a single source in the minds of the consuming public,
and Ancient Brands has developed substantial and valuable
goodwill in its [trademarks and trade dress]." *Id.* at ¶ 33.

Ancient Brands requires its authorized distributors to sign
a Non-Diversion Agreement, which prohibits distributors
from intentionally diverting Ancient Brands products to
unauthorized retailers. *Id.* at ¶ 37, 39. T he Agreement also
prohibits distributors from selling Ancient Brands products
on any e-commerce platform, including Amazon.com. *Id.* at
¶ 39.

This non-diversion policy is significant because Ancient
Brands offers a 100% customer-satisfaction guarantee for
its products when they are sold by authorized retailers or
through Ancient Brands's online store. *Id.* at ¶ 42. After
purchasing an Ancient Brands product from an authorized
source, an unsatisfied customer has 60 days to return the
product for a full refund. *Id.* at ¶ 42-43. This guarantee does
not attach to Ancient Brands products sold by unauthorized
sources because Ancient Brands has "no way to ascertain the
authenticity, genuineness, or quality of such products." *Id.* at
¶ 44.

Sometime in 2017, Ancient Brands discovered that Defendant
Planet Stuff, LLC, was selling products marked with Ancient
Brands trademarks and trade dress on its Amazon store.
Neither Planet Stuff nor its principal, Defendant Howard
Goldman, [1] is an authorized distributor of Ancient Brands
products. *Id.* at ¶ 48. As such, Defendants' products are not
covered by the satisfaction guarantee and, therefore, are not
authentic Ancient Brands products. *Id.* at ¶ 49.

Ancient Brands's counsel, Honigman, Miller, Schwartz, and
Cohn LLP ("Honigman") sent a cease-and-desist letter to
Defendants on November 26, 2017. *Id.* at ¶ 53. Defendants
did not respond. *Id.* at ¶ 54. Honigman sent a second letter
on February 15, 2018. *Id.* at ¶ 55. Again, Defendants did
not respond. *Id.* Both of these letters were on Honigman's
letterhead. (ECF No. 1-4, PageID 40; ECF No. 1-5, PageID
46)

Case 2:24-cv-12347-BRM-EAS   ECF No. 46-6, PageID.1942   Filed 04/11/25   Page 3 of 24

Ancient Brands, LLC v. Planet Stuff, LLC, Not Reported in Fed. Supp. (2018)

2018 WL 5885502

**\*2** On May 24, 2018, Ancient Brands filed its Complaint, alleging violations of the Lanham Act and tortious inference with a contractual relationship. Compl. ¶ 1. The parties are currently in discovery, which is set close on December 12, 2018.

### II. The Current Motion

On September 4, 2018, Defendant Goldman filed this motion to disqualify Honigman from representing Ancient Brands. (ECF No. 15). Goldman argues that Honigman has a conflict of interest because he previously met with Honigman attorneys to discuss his other businesses and other pending litigation.

Goldman states that, in or about January 2017, he repeatedly met with Honigman attorney Joshua Opperer to discuss selling certain companies. Goldman Aff. ¶ 5-6. At the hearing on this motion, defense counsel stated that Planet Stuff was not a subject of these conversations. Instead, Goldman was interested in selling one of his other businesses, H&H Wholesale Services, Inc. During these meetings, and in several e-mails and telephone conversations, Goldman says he "provided Opperer with extensive confidential information about how [he] conduct[s his] reselling business," so that Opperer could help market his companies. *Id.* at ¶ 7. Goldman does not say that these conversations led to a formal attorney-client relationship.

Goldman also states that, in 2017, he was sued by Abbott Laboratories ("the Abbott action"), and considered hiring Honigman attorney Jeffrey Lamb to file an indemnification suit against an upstream distributer. *Id.* at ¶ 12. To this end, Goldman "sent numerous emails to Lamb containing confidential information, including but not limited to attorney-client privileged communications with [his] New York counsel" for the purpose of obtaining legal advice for the Abbot action and the possible indemnification suit. *Id.* at ¶ 13. He also had extensive phone calls with Lamb, during which he disclosed confidential information about how he conducts his reselling business. *Id.* at ¶ 14. Ultimately, Goldman "chose not to engage" Lamb for the indemnification suit. *Id.* at ¶ 15.[2]

### ANALYSIS

#### I. Motions to Disqualify

A motion to disqualify counsel is the proper method for a party to bring to the court's attention an alleged conflict of interest or breach of ethical duty by opposing counsel. *DeBiasi v. Charter County of Wayne*, 284 F. Supp. 2d. 760, 770 (E.D. Mich. 2003). However, "motions to disqualify are viewed with disfavor and disqualification is considered a drastic measure which courts should hesitate to impose except when absolutely necessary." *Valley-Vulcan Mold Co. v. Ampco-Pittsburgh Corp.*, 237 B.R. 322, 337 (B.A.P. 6th Cir. 1999), *aff'd*, 5 F. App'x 396 (6th Cir. 2001) (citation and internal quotation marks omitted).

Disqualification should only be utilized when there is a "reasonable possibility that some specifically identifiable impropriety" actually occurred. *Moses v. Sterling Commerce (America), Inc.*, 122 F. App'x 177, 183-184 (6th Cir. 2005) (quoting *Kitchen v. Aristech Chem.*, 769 F. Supp. 254, 257 (S.D. Ohio 1991) ). "The party seeking disqualification bears the burden of demonstrating specifically how and as to what issues in the case the likelihood of a prejudice will result." *Rymal v. Baergen*, 262 Mich. App. 274, 319; 686 N.W.2d 241 (2004). When confronted with a motion to disqualify, the court "must be sensitive to the competing public policy interests of preserving client confidences and of permitting a party to retain counsel of his choice." *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988).

**\*3** The Michigan Rules of Professional Conduct (MRPC) are the proper guidelines against which to measure the appropriateness of an attorney's conduct for the purpose of determining whether he should be disqualified. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania v. Alticor, Inc.*, 466 F.3d 456, 457-58 (6th Cir. 2006), *vacated on other grounds*, 472 F.3d 436 (6th Cir. 2007).

#### II. The Standard for Conflicts Arising from Former Clients

MRPC 1.9 governs conflicts of interest arising from a former client:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interest are materially adverse to the interests of the former client unless the former client consents after consultation.

Ancient Brands, LLC v. Planet Stuff, LLC, Not Reported in Fed. Supp. (2018)

2018 WL 5885502

The Sixth Circuit applies a three-part test for disqualification pursuant to MRPC 1.9: (1) a past attorney-client relationship; (2) the subject matter of the prior attorney-client relationship is substantially related to the subject matter of the present action; and (3) the attorney acquired confidential information from the party seeking disqualification. *Dana Corp. v. Blue Cross & Blue Shield Mutual of Northern Ohio*, 900 F.2d 882, 889 (1990).

### A. A Past Attorney-Client Relationship

Goldman does not argue that he ever had an express attorney-client relationship with Honigman. Rather, he argues that he had an implied attorney-client relationship. (ECF 21, PageID 456-457). To determine whether an implied attorney-client relationship existed, the Court must focus on "the putative client's subjective belief that he is consulting a lawyer in his professional capacity, and on his intent to seek professional legal advice." *MJK Family, LLC v. Corporate Eagle Management Services, Inc.*, 676 F.Supp.2d 584, 592 (E.D. Mich. 2009) (citations omitted). The Court must also determine "whether the purported client reasonably believes an attorney-client relationship has been created." *Id.*

#### i. Selling H&H Wholesale (Opperer)

Based on Goldman's affidavit, he did not intend to seek legal advice when he supposedly provided confidential information about his other businesses to Opperer. Rather, he provided this information so that "Opperer could assist with marketing these companies." Goldman Aff. ¶ 7. Thus, Goldman has failed to establish that he reasonably believed he had an attorney-client relationship with Honigman at that time. [3]

#### ii. The Indemnification Action (Lamb)

For the indemnification action, Goldman acknowledges that "[u]ltimately, [he] chose not to engage [Honigman]...." *Id. at* ¶ 15. This statement shows that, during Goldman's conversations with Lamb, he understood that Lamb was not his attorney. [4] Goldman was, admittedly, in the process of deciding whether or not to hire Lamb. Thus, Goldman has also failed to establish that he believed he had an attorney-client relationship with Honigman at that time.

**\*4** For these reasons, the Court concludes that Goldman has not met *Dana*'s first prong.

### B. Substantially Related Subject Matter & Confidential Information

Moreover, Goldman has failed to show that he meets either the second or third prong of the *Dana* test. The Sixth Circuit has articulated a test for whether matters are substantially related that also incorporates the use of confidential information. As such, the Court will address the second and third *Dana* prongs together.

To determine whether the purported attorney-client relationships are substantially related, the Court "must look to the general type of information that the potentially conflicted lawyer would have been exposed to in a normal or typical representation of the type that occurred with the now adverse client." *Bowers v. Ophthalmology Group*, 733 F.3d 647, 652 (6th Cir. 2013); *See also U.S. ex rel. Guzall v. City of Romulus*, 2014 WL 5090856 at \* 6 (E.D. Mich. 2014) (applying *Bowers*'s "substantial relationship" test to the MRPC). Thus, the Court "must examine whether there is a substantial risk that confidential information as would normally or typically have been obtained in [the attorney]'s prior representation [of the former client] would materially advance [the opposing party]'s position in the present case." *Bowers*, 733 F.3d at 653.

Although a former client has no obligation to specifically identify the confidential information he seeks to protect, *Atmosphere Hospitality Mgmt. Serv., LLC v. Royal Realties, LLC*, 28 F.Supp.3d 692, 698 (E.D. Mich. 2014), general information about business practices does not raise confidentiality concerns that mandate disqualification. *Marks One Car Rental, Inc. v. Auto Club Group Ins.*, 2014 WL 12721922 at \*3 (E.D. Mich. 2014); *See also Quicken Loans v. Jolly*, 2008 WL 2566373 \*5 (E.D. Mich. 2008); *Haworth, Inc. v. Wickes Mfg. Co.*, 1994 WL 16099352 (W.D. Mich. 1994) (finding, after an *in camera* review, that the information acquired by the law firm was much more akin to general information than to specific knowledge of facts pertaining to the current lawsuit); *Int'l Paper Co. V. Lloyd Mfg. Co.*, 555 F.Supp. 125, 136 (N.D. Ill. 1982) (general knowledge of a company's inner workings acquired during another representation is not sufficient to warrant disqualification).

2018 WL 5885502

Here, Goldman has not given any details about what kind confidential information he provided to Honigman or how this information could be used against him. Although Goldman is not obligated to do so, he still bears the "burden of demonstrating specifically how and as to what issues in the case the likelihood of a prejudice will result." *Rymal,* 262 Mich. App. at 319. The only evidence offered by Goldman is his affidavit, wherein he states that he provided Opperer and Lamb with confidential information about how he "conducts his re-selling business." Goldman Aff. ¶ 6, 14. This disclosure appears to be general information about business practices, which does not amount to confidential information for the purposes of disqualification. For these reasons, the Court concludes that Goldman has not satisfied the second or third prong of *Dana*.

### III. Standard for Conflicts Arising from Prospective Clients

**\*5** In the alternative, Goldman argues that, even if he does not satisfy *Dana*'s first prong by establishing a past attorney-client relationship, Honigman is still conflicted because he was a prospective client. (ECF No. 21, PageID 457 n.1).

This argument implicates the recently promulgated MRPC 1.18, which became effective on September 1, 2018. In full, MRPC 1.18 reads

(a) A person who consults with a lawyer about the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.

(b) Even when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client shall not use or reveal that information, except as Rule 1.9 would permit with respect to information of a former client.

(c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be **significantly harmful** to that person in the matter, except as provided in paragraph (d). If a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d).

(d) When the lawyer has received disqualifying information as defined in paragraph (c), representation is permissible if:

(1) both the affected client and the prospective client have given informed consent, confirmed in writing, or:

(2) the lawyer who received the information took reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary to determine whether to represent the prospective client; and

(i) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and

(ii) written notice is promptly given to the prospective client.

(emphasis added)

MRPC 1.18 tracks Sixth Circuit precedent, which recognizes that "[w]hen a potential client consults with an attorney, the consultation establishes a relationship akin to that of an attorney and existing client." *Banner v. City of Flint,* 99 Fed. App'x 29, 36 (6th Cir. 2004). Courts in this district have found that a "motion to disqualify an attorney who has met with, but was not retained by, a prospective client 'should be analyzed the same as a motion to disqualify pursuant to a former client relationship, with the additional requirement that the lawyer receive information that could be 'significantly harmful,' rather than merely confidential as required by the Sixth Circuit's three-prong *Dana Corp.* test.' " *Glenn v. Nasscond, Inc.* 2016 WL 409409 at \*3 (E.D. Mich. Feb. 3, 2016).

Goldman has not satisfied the high bar of showing that the information he disclosed would be significantly harmful. As explained above, Goldman only provided information about how he "conducts his re-selling business," Goldman Aff. ¶ 6, 14, which appears to be general business information. The Court does not see how general knowledge of Goldman's business model could be significantly harmful.

Second, it appears that Honigman has adequately screened Opperer and Lamb from this matter, pursuant to MRPC 1.18(d). Lamb was screened, and Goldman was notified of this screen, on August 31, 2018—the day before MRPC 1.18(d) actually imposed a screening obligation. (ECF No. 18-7, PageID 451). Opperer was screened on September 5,

Ancient Brands, LLC v. Planet Stuff, LLC, Not Reported in Fed. Supp. (2018)

2018 WL 5885502

2018, the day after Goldman filed the current motion and first notified Honigman of that potential conflict. (ECF No. 18-7, PageID 450). Given that MRPC 1.18 just went into effect, the Court concludes that Honigman complied with its ethical obligations.

## CONCLUSION

 **\*6** Goldman has failed to establish that he had an attorney-client relationship with Honigman or that he provided information that would raise confidentiality concerns.

Goldman has also failed to show that, as a former prospective client, he would be significantly harmed by information he provided during his consultations with Honigman. For these reasons, the Court DENIES Goldman's Motion to Disqualify Honigman (ECF No. 15).

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 5885502

---

### Footnotes

1    Although the pleadings do not clearly establish the relationship between Goldman and Planet Stuff, at the hearing on this motion, defense counsel stated that Goldman is Planet Stuff's "principal."

2    Goldman also notes that he has "a long history with [Honigman], who has served as his counsel and/or counsel for companies he is involved with dating back many years, including in trademark related/re-selling matters in 2009, 2005, and earlier." Def.'s Mem. 2 (ECF No. 15, PageID 160). Goldman does not provide any more detail, and, at the hearing, defense counsel stated that these matters were not material to this motion.

3    Moreover, given Goldman's "long history" with Honigman, the Court doubts that Goldman subjectively believed an attorney-client relationship existed when, apparently, no engagement letter was signed, no fee structure was formally discussed, and no fees were actually billed.

4    This statement also shows that, as described in Footnote 3, Goldman *actually knows* how hiring a lawyer works.

---

**End of Document**      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:24-cv-12347-BRM-EAS ECF No. 46-6, PageID.1946 Filed 04/11/25 Page 7 of 24
Courser v. Allard, Not Reported in Fed. Supp. (2016)
2016 WL 10520134

2016 WL 10520134
Only the Westlaw citation is currently available.
United States District Court, W.D.
Michigan, Southern Division.

Todd COURSER, Plaintiff,
v.
Keith ALLARD, et al., Defendants.

Case No. 1:16-CV-1108
|
Signed 11/28/2016

**Attorneys and Law Firms**

Matthew S. Deperno, Deperno Law Office PLLC, Kalamazoo, MI, for Plaintiff.

Sarah Riley Howard, H. Rhett Pinsky, Pinsky Smith Fayette & Kennedy LLP, Grand Rapids, MI, Douglas E. Mains, Gary P. Gordon, Jason Thomas Hanselman, Kyle Michael Asher, Dykema Gossett PLLC, Lisa M. Geminick, MI Dept. Attorney General Civil Litigation, Employment & Elections, Mark E. Donnelly, MI Dept. Attorney General (Employ, Elect, Torts), Rock A. Wood, Michigan Department of Attorney General, Lansing, MI, Cameron Jezewski Evans, Evans Law Group, P.C., Rochester, MI, Andrew Michael Pauwels, James E. Stewart, Honigman Miller Schwartz and Cohn LLP, Detroit, MI, Leonard M. Niehoff, Butzel Long PC, Ann Arbor, MI, for Defendants.

**MEMORANDUM ORDER DENYING PLAINTIFF'S MOTION TO DISQUALIFY ATTORNEYS DONNELLY, GEMINICK AND WOOD**

GORDON J. QUIST, UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff, Todd Courser, has filed a motion to disqualify attorneys Mark Donnelly, Lisa Geminick and Rock Wood, all of whom are employed by the Michigan Department of Attorney General and represent Defendants William Schuette, the Michigan State Police (MSP), Jeremy Brewer, Kraig Britvec, and David Dwyer (collectively the non-legislative State Defendants). Courser argues that disqualification is required pursuant to Michigan Rule of Professional Conduct (MRPC) 1.7 and possibly Rules 1.6 1.8, 1.9, 1.10, 1.11, 3.3, and 3.4 because: (1) the same attorneys cannot represent all of the non-legislative State Defendants; (2) an attorney from the

law firm of Dickinson Wright, PLLC cannot represent those Defendants; and (3) employees of the Michigan Attorney General's Office cannot represent Defendant Schuette in his individual capacity.

The motion will be denied.

Motions to disqualify are "viewed with disfavor," and a party seeking to disqualify opposing counsel carries a heavy burden and must satisfy a high standard of proof. *In re Valley-Vulcan Mold Co.*, 237 B.R. 322, 337 (B.A.P. 6th Cir. 1999) (internal quotation marks omitted). Courts have recognized that, while motions to disqualify can serve a legitimate purpose in maintaining the integrity of both the legal profession and the judicial process, *see, e.g.*, *Lee v. Todd*, 555 F. Supp. 628, 630 (W.D. Tenn. 1982) ("In dealing with a Motion to Disqualify, this Court is charged with the responsibility of supervising the members of its bar ... [,] the duty to maintain pubic confidence in the legal profession, and the duty to insure [sic] the integrity of the judicial proceeding."), it is also true that such motions are closely scrutinized because the "ability to deny one's opponent the services of capable counsel is a potent weapon." *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988); *see also Freeman v. Chi. Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir. 1982) (noting that motions to disqualify "should be viewed with extreme caution for they can be misused as techniques of harassment"); *Bowman v. Bank of Del.*, No. 87-44-CMW, 1988 WL 54669, at \*3 (D. Del. May 24, 1988) ("The Court must be wary so as to prevent motions to disqualify from being used as just another weapon in the litigation arsenal."). "[A] party's right to have counsel of choice is a fundamental tenet of American jurisprudence, and therefore a court may not lightly deprive a party of its chosen counsel." *Am. Special Risk Ins. Co. ex rel. S. Macomb Disposal Auth. v. City of Centerline*, 69 F. Supp. 2d 944, 953 (E.D. Mich. 1999) (internal quotation marks omitted). Thus, in deciding a motion to disqualify, a court must balance the public interest of upholding the integrity of the legal profession against the litigant's right to choose its own counsel. *Manning*, 849 F.2d at 225.

### *Standing*

Citing cases from the Sixth Circuit, this district, and other courts, the non-legislative State Defendants argue that Courser lacks standing to seek disqualification because Courser never had an attorney-client relationship with their counsel. In fact, courts generally require the moving party

Case 2:24-cv-12347-BRM-EAS  ECF No. 46-6, PageID.1947  Filed 04/11/25  Page 8 of 24

Courser v. Allard, Not Reported in Fed. Supp. (2016)
2016 WL 10520134

to have had an attorney-client relationship with the attorney it seeks to disqualify. *See Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 889 ( 6th Cir. 1990) (listing "a past attorney-client relationship ... between the party seeking disqualification and the attorney it seeks to disqualify" as the first part of a three-part test for disqualification); *Bialik v. Raddatz*, No. 1:12-CV-522, 2012 WL 2913201, at *2 (W.D. Mich. June 6, 2012) ("Generally, a party does not have standing to bring a motion to disqualify on the ground of a conflict of interest unless an attorney-client relationship existed between the moving party and the attorney."); *Factory Mut. Ins. Co. v. APComPower, Inc.*, 662 F. Supp. 2d 896, 898 (W.D. Mich. 2009) (citing *Dana Corp.*). In his reply, Courser cites *Health Alliance Plan of Michigan v. Blue Cross Blue Shield of Michigan Mutual Insurance Co.*, No. 14-13788, 2015 WL 5697682 (E.D. Mich. Set. 29, 2015)—a case the non-legislative State Defendants cited in their response—for the proposition that Courser has standing to move for disqualification, even though he did not have an attorney-client relationship with the non-legislative State Defendants' attorneys. Although the *Health Alliance Plan* court cited the three-part test from *Dana Corp.*, it also concluded, based on the comments to MRPC 1.7 and a statement by the Sixth Circuit in *Gordon v. Norman*, 788 F.2d 194 (6th Cir. 1986), that a party without an attorney-client relationship may raise a conflict of interest issue. However, this is not a universal view. For example, in *Winchester v. Education Management Corp.*, No. 5:10-CV-12-TBR, 2010 WL 2521465 (W.D. Ky. June 18, 2010), the court held that the plaintiff lacked standing to disqualify opposing counsel. *Id.* at *2. The *Winchester* court noted that while the Sixth Circuit has not expressly decided the issue, it found the Sixth Circuit's statement in *Willis v. First Bank National Association*, Nos. 89-3834, 89-3838, 1990 WL 155366, at *2 (6th Cir. Oct. 15, 1990), that the "plaintiff's standing to assert opposing counsel's alleged conflict of interest is questionable at best," an indication that the Sixth Circuit would follow the majority rule that requires an attorney-client relationship for standing. *See* 2010 WL 2521465, at *2. The *Willis* court noted what while a minority of courts have permitted a non-client to raise opposing counsel's conflicts, such courts have required the moving party to have a personal stake in the motion in order to satisfy Article III's standing requirements. *Id.* (citing *Colyer v. Smith*, 50 F. Supp. 2d 966, 969 (C.D. Cal. 1999)).

**\*2** The Court need not decide whether a non-client can ever have standing to bring a motion to disqualify because, as set forth below, Courser's arguments lack merit.

### Grounds

Although Courser cites a number of Rules, he primarily relies upon MRPC 1.7, which provides:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

MRPC 1.7.[1]

Courser first argues that attorneys Donnelly, Geminick, and Wood cannot represent the non-legislative State Defendants because Courser alleges a broad ranging conspiracy in which Defendant Schuette is failing to perform his duty to prosecute Defendants Brewer and Dwyer for perjury, and perhaps other Defendants for certain unidentified crimes. Courser explains that: (1) Defendants Brewer and Dwyer swore in state district court that a violation of house Rule 41 is a crime; (2) Defendant Schuette is prosecuting the crime; (3) Defendant Britvec said a violation of House Rule 41 is not a crime; (4) Defendant Britvec sent the police report to the Attorney General; and (5) the Michigan House stated that violating Rule 41 is not a crime. (ECF no. 26 at PageID.291.) Courser points out that in his complaint he requests a writ of mandamus compelling the non-legislative State Defendants to perform their duty and investigate and prosecute the crimes charged in the complaint, including the possible perjury committed by Defendants Brewer and Dwyer in stating that violating House Rule 41 is a crime. There is no conflict in this

case. Courser's argument is specious because this Court will not be issuing writs of mandamus to compel state officials to perform their duties. "[F]ederal courts have no authority to issue writs of mandamus to direct state courts or their judicial officers in the performance of their duties." *Haggard v. Tenn.*, 421 F.2d 1384, 1386 (6th Cir. 1970) (citing *Clark v. Washington*, 366 F.2d 678 (9th Cir. 1966); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 104 S. Ct. 900, 911 (1984) (stating that "it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law"); *Noble v. Cain*, 123 Fed.Appx. 151, 152 (6th Cir. 2005) (per curiam) ("[T]he remedy sought by Noble is in the nature of mandamus relief, which is not available to federal courts to direct state officials in the performance of their duties and functions."). [2] Courser fails to offer any other specific basis for concluding that a conflict of interest exists that could conceivably affect Courser or the integrity of these proceedings based on the joint representation of the non-legislative State Defendants.

**\*3** Courser's second ground—that an attorney from the Dickinson Wright law firm cannot represent the non-legislative State Defendants—is, as Courser admits, based on an incorrect assumption that attorney Rock Wood is employed by that Dickinson Wright firm. There is no question that attorney Wood is employed by the Michigan Department of Attorney General. [3]

Courser's final argument is that attorneys from the Michigan Department of Attorney General cannot represent Defendant Schuette in his individual capacity because the MSP—a state agency—is also a party. Courser cites *Attorney General v. Michigan Public Service Commission (MPSC)*, 243 Mich. App. 487, 625 N.W.2d 16 (2000), in support of his argument. However, *MPSC* does not support Courser's argument. In *MPSC*, the conflict at issue was the attorney general acting on both sides of the dispute. The Attorney General was a party, and attorneys from the Attorney General's office were representing the state agency. *See id.* at 490, 500–02, 625 N.W.2d 19–20, 25. Such is not the case here. While Defendant Schuette is a party, attorneys from the Michigan Department of Attorney General are representing other Defendants, both individuals and the MSP, on the same side of the dispute. When State agencies and individual employees are sued by a plaintiff, there is no real conflict of interest—for example, the State could be held liable only for the actions of its employees, so they are on the same side. Indeed, the Court sees none in this case. [4]

Therefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion to Disqualify Attorneys Donnelly, Geminick, and Wood (ECF No. 25) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to file a reply brief (ECF No. 64) is **GRANTED**.

### All Citations

Not Reported in Fed. Supp., 2016 WL 10520134

---

## Footnotes

1 Courser raises no specific arguments regarding Rules 1.6, 1.8, 1.9, 1.10, 1.11, 3.3, and 3.4, and thus fails to satisfy his heavy burden of showing that disqualification is required under those Rules.

2 Courser's contention that testimony about whether violation of a House Rule constitutes a crime can be the basis for a perjury charge lacks merit. Whether something is a crime is an issue of law for the court, not an issue of fact. Any such testimony was a pure legal opinion that is not subject to a charge of perjury. *See* 66 A.L.R. 2d 791 *Statement of belief or opinion as perjury* (1959).

3 It appears that the information on the docket report showing that attorney Wood is still with the Dickinson Wright firm was the result of out-of-date information in this Court's database.

**Courser v. Allard, Not Reported in Fed. Supp. (2016)**

2016 WL 10520134

4    The non-legislative State Defendants state in their opposition to Plaintiff's motion to file a reply that they have signed consent forms, which they are willing to submit to the Court for *in camera* review. (ECF No. 70 at PageID.567.) The Court finds no need to review such consents in light of its rejection of Plaintiff's arguments.

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 5921207

2011 WL 5921207
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan,
Southern Division.

A. Gregory EATON, and Lansing Farms, LLC, Plaintiffs,
v.
Cullan F. MEATHE, Defendant.

No. 1:11–CV–178.
|
Nov. 27, 2011.

**Attorneys and Law Firms**

C. William Garratt, Garratt & Bachand P.C., Bloomfield Hills, MI, for Plaintiffs.

Marc E. Thomas, Bendure & Thomas (Bingham Farms), Bingham Farms, MI, for Defendant.

***OPINION***

ROBERT HOLMES BELL, District Judge.

**\*1** This fraud action between two members of a limited liability company comes before the Court on Defendant's motion to disqualify Plaintiffs' counsel. (Dkt. No. 24.) For the reasons that follow, the motion will be denied.

**I.**

Plaintiff A. Gregory Eaton and Defendant Cullan F. Meathe each own a 50% interest in Lansing Farms Properties, LLC (identified by Plaintiffs as Lansing Farms, LLC) ("Lansing Farms"). Plaintiff Eaton and Lansing Farms filed this action, alleging that Meathe engaged in fraudulent or oppressive conduct, breach of the parties' operating agreement, and conversion by embezzling and/or converting the property of Lansing Farms for his personal benefit. Defendant Meathe and Lansing Farms have filed a counterclaim against Eaton, alleging that Eaton breached his fiduciary duties to Meathe when he took over the management of Lansing Farms in 2009. [1]

Defendant Meathe has moved to disqualify Plaintiff's counsel, C. William Garratt, based on discussions between Meathe and Garratt on January 28–29, 2010. In 2009, Garratt obtained a judgment of over $1 million against Meathe and his co-defendant in *TGINN Jets, LLC v. Hampton Ridge Properties, LLC,* Case No. 07–082312–CK (Oakland County Cir. Ct.) (Dkt. No. 33, Pls.' Resp., Ex. C, Am. J.) Garratt conducted a post-judgment creditor's examination of Meathe on January 28, 2010, pursuant to a court order directing Meathe to appear at Garratt's office for examination as a judgment debtor. (Dkt. No. 33, Pl.Ex.E.) Meathe was represented at the creditor's examination by James M. O'Reilly, his counsel in the *TGINN* litigation. During the examination, Meathe testified that he had a potential claim against Eaton and others regarding the formation of Great Lakes Transportation Holdings, LLC ("GLT") and its acquisition of the assets of Metro Cars without the knowledge or consent of Meathe. (Dkt. No. 24, Def.'s Br. Ex. B, Meathe Dep. 26–33). When the issue of the potential claim against Eaton was raised, they went off the record. Meathe's motion to disqualify Garratt is based on his off-the-record discussions with Garratt on January 28–29, 2010. The parties have presented conflicting evidence on what occurred during those discussions.

Meathe contends that they spent approximately two hours on January 28 and an additional three hours on January 29 exploring the possibility of Garratt pursuing Meathe's cause of action against Eaton regarding Great Lakes' purchase of Metro Cars on a contingent fee basis, with the goal of crediting any recovery, after Garratt's fee, against the judgment that had been entered in the *TGINN* litigation. Meathe contends that the conversation included a discussion of potential counter-claims that Eaton might raise against Meathe, including claims based on the distributions Meathe received from Lansing Farms, which are the same claims that have been asserted in this case. Meathe contends that in the course of the discussions, Garratt obtained substantial privileged, confidential, and secret information about strategy and tactics in handling the Lansing Farms claims from Meathe and his attorneys. (*See generally* Dkt. No. 24, Def.'s Mot., Exs. C–F, O'Reilly, Meathe, Shanaman and Obeid Affidavits.) According to Meathe, Garratt is unfairly and unethically using that information against Meathe in this litigation. Meathe requested Garratt to withdraw as Eaton's attorney in this litigation, and Garratt refused.

**\*2** Garratt contends that he did not learn anything on January 28 or 29, 2010, that warrants his disqualification. He denies ever representing that he would represent Meathe against

2011 WL 5921207

Eaton; he denies that there was any discussion about any potential counterclaim Eaton might have against Meathe for money Meathe had taken from Lansing Farms; and he denies learning any confidences, strategy or tactics in handling the Lansing Farms claims. Garratt contends that the focus of the discussion was on Metro Cars rather than on Lansing Farms, and that his only purpose was to ascertain whether there were legal claims or other valuable rights that TGINN could obtain to satisfy its judgment against Meathe. (*See generally* Dkt. No. 34, Pls.' Affs. in Opp'n, Garratt Aff.; Tritt Aff.)

## II.

Meathe contends that Garratt's representation of Eaton in this action violates Rules 1.6 and 1.9 of the Michigan Rules of Professional Conduct ("MRPC")[2] relating to client confidences and conflicts of interest. Rule 1.6 provides that a lawyer shall not knowingly "use a confidence or secret of a client to the disadvantage of the client." MRPC 1.6(b) (2). Rule 1.9(a) provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation."

Motions to disqualify opposing counsel raise two competing public policy interests: preserving client confidences, and permitting a party to retain counsel of his choice. *Manning v. Waring, Cox., Jame, Sklar and Allen,* 849 F.2d 222, 224 (6th Cir.1988). "[D]isqualification is a "drastic" remedy and should not be employed lightly." *Factory Mut. Ins. Co. v. APComPower, Inc.,* 662 F.Supp.2d 896, 898 (W.D.Mich.2009) (Quist, J.) "A court should only disqualify an attorney when there is a reasonable possibility that some specifically identifiable impropriety actually occurred." *Moses v. Sterling Commerce (America), Inc.,* 122 F. App'x 177, 183–84 (6th Cir.2005) (internal quotations omitted). The Sixth Circuit has articulated a three-part test for determining whether disqualification is warranted:

> 1) the party seeking disqualification had a past attorney-client relationship with the attorney it seeks to disqualify; 2) the subject matter of that relationship is substantially related to the instant case; and 3)

the attorney acquired confidential information from the party seeking disqualification.

*Factory Mut.,* 662 F.Supp.2d at 898 (citing *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio,* 900 F.2d 882, 889 (6th Cir.1990)). The burden is on the party seeking disqualification to prove that opposing counsel should be disqualified. *S.D. Warren Co. v. Duff–Norton,* 302 F.Supp.2d 762, 767 (W.D.Mich.2004) (Quist, J.).

### 1. Attorney/Client Relationship

**\*3** The first *Dana* test asks whether the party seeking disqualification had a past attorney-client relationship with the attorney it seeks to disqualify. Meathe acknowledges that he never entered into a written retainer agreement with Garratt. However, Meathe contends that he disclosed confidences to Garratt while consulting about potential future representation.

"When a potential client consults with an attorney, the consultation establishes a relationship akin to that of an attorney and existing client." *Banner v. City of Flint,* 99 F. App'x 29, 36 (6th Cir.2004). Accordingly, prospective clients who meet with an attorney but do not retain the attorney are entitled to "at least some of the protections afforded former clients." *Factory Mut.,* 662 F.Supp.2d at 899. A motion to disqualify an attorney who has met with, but was not retained by, a prospective client "should be analyzed the same as a motion to disqualify pursuant to a former client relationship, with the additional requirement that the lawyer receive information that could be 'significantly harmful,' rather than merely confidential as required by the Sixth Circuit's three-prong *Dana Corp.* test." *Id.* at 900.

The parties have filed conflicting affidavits as to the nature of these discussions. The Court cannot weigh the credibility of these conflicting affidavits. However, the Court does find relevant the undisputed evidence that can be gleaned from the evidence provided. The discussions occurred in the context of a creditor's examination where Garratt represented the opposing party, where Meathe was obligated to respond to inquiries about his assets, where Meathe was represented by his own counsel, and where third parties were present during at least some of the discussions. In addition, no one asserts that Garratt offered to represent Meathe in an action against Eaton. At most, Meathe's affidavits indicate that

Eaton v. Meathe, Not Reported in F.Supp.2d (2011)

2011 WL 5921207

Garratt showed an interest in representing Meathe, subject to his need to check with his current client, TGINN, or his law partner. (O'Reilly Aff. ¶ 10; Shanaman Aff. ¶ 9; Obeid ¶ 6.) Meathe stated that because he was "anticipating" that Garratt would accept the case, he and his attorneys were "very candid, forthcoming, and thorough" in providing him with "all of the facts, opinions, and tactical impressions of the case." (Meathe Aff. ¶ 20.) Under Michigan law, "a putative client's subjective belief is insufficient to establish an attorney-client relationship where none exists." *Jackson v. Pollick,* No. 90–2271, 991 WL 157247, 2 (6th Cir. Aug. 16, 1991) (citing *Scott v. Green,* 140 Mich.App. 384, 400, 364 N.W.2d 709 (1985) (Kirwan, J., concurring in part), and noting that the majority explicitly adopted the concurring opinion on this issue). Under the circumstances, the creation of an attorney-client relationship is questionable at best.

**2. Substantially Related?**

Assuming there was a qualifying attorney-client consultation, the second *Dana* test asks whether the subject matter of that consultation is substantially related to the instant case; "[A] substantial relationship is measured by the allegations in the complaint, and by the nature of the evidence that would be helpful in establishing those allegations." *Anchor Packing Co. v. Pro–Seal, Inc.,* 688 F.Supp. 1215, 1220 (E.D.Mich.1998) (quoting *Trone v. Smith* 621 F.2d 994, 1000 (9th Cir.1980)).

*4 Meathe contends that he made disclosures to Garratt concerning Eaton's potential claim against Meathe concerning distributions from Lansing Farm and how such a claim could be defended. (O'Reilly Aff. ¶ 15.) If such disclosures were made, there can be no doubt that they were substantially related to the issues in this lawsuit.

Garratt, however, contends that this lawsuit is not substantially related to Meathe's disclosures because Meathe's disclosures related to Metro Cars. Eaton's complaint in this action does not refer to Metro Cars, or to the sale of Metro Cars' assets to Great Lakes. Garratt denies having any discussions on January 28–29 relating to any potential counterclaim of Eaton against Meathe for money Meathe had taken from Lansing Farms. (Garratt Aff. p. 8.)

The Court cannot judge the credibility of the parties on the basis of the affidavits presented, nor can it speculate on the content of the parties' discussions. For purposes of evaluating this motion, the Court will assume that the parties discussed the Lansing Farm distributions.

**3. Confidential and Significantly Harmful?**

The third *Dana* test asks whether the attorney acquired confidential information from the party seeking disqualification. Because Meathe is only asserting that he consulted with, not that he retained, Garratt, the Court must also consider whether any information Garratt received could be "significantly harmful" to Meathe. *Factory Mut.,* 662 F.Supp.2d at 900.

Eaton contends that Meathe did not impart any "confidential" information to Garratt because Garratt was entitled to information about Meathe's potential claims during the creditor examination, and, in any event, Garratt already knew about the large distributions from Lansing Farms to Meathe through post-judgment collection proceedings before the January 28–29 meeting. (Garratt Aff. ¶ 6.) Garratt avers that he has not told Eaton what was said in that discussion, and "nothing was said that I did not already know that might benefit Mr. Eaton or Lansing Farms in this action." (Garratt Aff. p. 7.)

Meathe contends that Garratt was not only told facts about the Lansing Farms distributions, but also privileged and confidential information about strategy and tactics in handling Eaton's potential Lansing Farms claims. (O'Reilly Aff. ¶ 16; Shanaman Aff. ¶¶ 10, 11.) Although Meathe has not specified what confidential information was divulged to Garratt, Meathe contends that because he provided Garratt information that was substantially related to the claims in this case, a presumption arose that confidential, secret or privileged information was divulged. *See Gen. Elec. Co. v. Valeron Corp.,* 608 F.2d 265, 267–68 (6th Cir.1979). *See also Quicken Loans v. Jolly,* 2008 WL 2566373 (E.D.Mich.2008) (noting that Rule 1.9 implies that former counsel acquired confidential information in the prior representation when the subject matter of the two suits is substantially similar).

*5 Because the issue of disqualification has been submitted on affidavits, and because the affidavits contain directly conflicting information, the Court cannot make any definitive findings regarding the content of the January 28–29 discussions. Nevertheless, certain facts are clear from the record. The January 28–29 discussions arose in the middle of a creditor's examination where Garratt was aggressively pursuing collection on the judgment against Meathe. Meathe was required to make disclosures about his assets to Garratt under oath. Meathe was represented by counsel. There is no suggestion that Meathe or his counsel ever discussed or

2011 WL 5921207

entered into a confidentiality or protective order with Garratt regarding the use of any information discussed off the record. Garratt already had substantial information about Lansing Farms from other sources. Given this context, the Court is reluctant to presume that Meathe disclosed any confidential information to Garratt that he was not required to disclose. Moreover, even if the Court were to presume that confidential information was disclosed, Meathe has made no showing that any of the information disclosed could be significantly harmful to him in this action. *See In re Modanlo,* 342 B.R. 230, 237 (D.Md.2006) (denying motion for disqualification in part because debtor failed to show that any information shared with creditor's attorney was significantly harmful).

Because the creation of an attorney-client relationship is questionable, and because Meathe has not identified the specific confidences disclosed or how they might significantly harm him in this litigation, the Court concludes that Meathe has not met his burden of showing that there is a reasonable possibility that Garratt engaged in some specifically identifiable impropriety that warrants his disqualification from representing Eaton in this action. The Court will accordingly deny Meathe's motion to disqualify. In making this determination, the Court has confined itself to the present record. Should additional information be disclosed during the course of this litigation that suggests a violation of the rules of professional conduct, the Court will not hesitate to revisit this issue.

An order consistent with this opinion will be entered.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5921207

---

## Footnotes

1    Lansing Farms is both a Plaintiff and a Counter–Plaintiff in this action. For purposes simplicity and clarity in this opinion, the Court will refer to Plaintiff and Defendant in the singular.

2    Attorneys practicing before this Court are "subject to the Rules of Professional Conduct adopted by the Michigan Supreme Court," i.e., the Michigan Rules of Professional Conduct ("MRPC"). W.D. Mich. LCivR 83.1(j).

---

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

In re S.D. Benner III, L.L.C., Not Reported in B.R. (2014)

2014 WL 4536645

2014 WL 4536645
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
W.D. Michigan.

In re S.D. BENNER III, L.L.C., Debtor.
In re S.D. Benner, L.L.C., Debtor.

Nos. DG 11–08112, DG 11–08113.
|
Signed Sept. 9, 2014.

**Attorneys and Law Firms**

Michael E. Baum, Brendan G. Best, Joseph K. Grekin, Leon N. Mayer, John J. Stockdale, Jr., Schafer and Weiner, PLLC, BloomfieldHills, MI, for Debtor.

*ORDER REGARDING EX PARTE COMMUNICATIONS*

SCOTT W. DALES, Chief Bankruptcy Judge.

**\*1** This morning, Steven D. Benner, evidently without or against the advice of counsel, sent three e-mail messages (and numerous attachments) directly to the court regarding a proposed refinancing of certain obligations of chapter 11 debtors S.D. Benner, L.L.C. and S.D. Benner III, L.L.C (the "Debtors"), and related matters. [1] The court regards the emails as unauthorized *ex parte* communications, and will take curative measures immediately. *See* Fed. R. Bankr.P. 9003 (prohibiting *ex parte* communications generally); *see also* Code of Conduct for United States Judges, ("Code of Conduct"), at Canon 3(A)(4).

The applicable ethical canon provides in relevant part as follows:

A judge should accord to every person who has a legal interest in a proceeding, and that person's lawyer, the full right to be heard according to law. Except as set out below, a judge should not initiate, permit, or consider *ex parte* communications or consider other communications concerning a pending or impending matter that are made outside the presence of the parties or their lawyers. If a judge receives an unauthorized *ex parte* communication bearing on the substance of a matter, the judge should promptly notify the parties of the subject matter of the communication and allow the parties an opportunity to respond, if requested.

Code of Conduct, at Canon 3(A)(4). Mindful of these restrictions, the court reviewed the emails in order to determine a proper course of action, but has not opened or otherwise reviewed or considered the attachments.

Obviously, the emails put the court and all parties, including Mr. Benner, in a difficult position. Communicating directly with the court, especially using a judge's personal email address, is patently unorthodox, if not simply improper. Under the circumstances, the court has refrained from viewing the attachments in order to mitigate the adverse effect of the *ex parte* communication, and to protect whatever privileges the attachments might reveal or compromise, if fully disclosed. Nothing in this Order, however, is intended to resolve any such privilege or other similar issue.

The court will direct the Clerk to print each email, but not the attachments, scan, and enter each email on the docket of the above-captioned cases. This will give interested parties ample notice of the substance of the communications and an opportunity to review them to the same extent the court has reviewed them. It will also give the parties an opportunity to respond, if any of them so requests.

The court will also enjoin Mr. Benner from sending additional emails or other correspondence directly to the court. Parties copied on the offending emails should take care not to hit "Reply All" or otherwise include the court in additional electronic communications.

Finally, the court reminds Mr. Benner that the Debtors are distinct legal entities who may appear in federal court only through counsel. Mr. Benner's membership interests in the Debtors, or even his management of them, does not authorize him to speak on their behalf in federal court: "[i]t has been the law for the better part of two centuries ... that a corporation may appear in the federal courts only through licensed counsel." *Rowland v. California Men's Colony, Unit II Men's Advisory Council,* 506 U.S. 194, 201–02 (1993);

2014 WL 4536645

*see also* LBR 9010–2(b). Consequently, the court does not regard the emails as satisfying the Debtors' obligations under the Order Directing Debtors to File Status Report, entered on September 4, 2014.

**\*2**  The court will take no further action regarding the emails unless and until an interested party properly moves for relief.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Clerk shall forthwith: (1) enter a copy of this Order in each of the above-captioned cases; and (2) print each *ex parte* email described herein (but not the attachments), scan each printed email to produce a pdf image, and enter each scanned image separately on the docket of the above-captioned cases.

IT IS FURTHER ORDERED that Steven D. Benner is HEREBY ENJOINED from sending further email communications to the court.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order pursuant to Fed. R. Bankr.P. 9022 and LBR 5005–4 upon: Michael Baum, Esq., Brendan G. Best, Esq., Ryan Matthew Felber, Esq., Joseph K. Grekin, Esq., Leon N. Mayer, Esq., John J. Stockdale, Jr., Esq., Steven Roach, Esq., Melissa Brown, Esq., Michael V. Maggio, Esq., and other persons requesting notice of these proceedings.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order by electronic mail upon Steven D. Benner at the address indicated on the *ex parte* email communications described herein.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in B.R., 2014 WL 4536645

---

### Footnotes

1   The court assumes Mr. Benner sent these communications in response to the court's Order Directing Debtors to File Status Report, entered on September 4, 2014 in the above-captioned cases.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 635797
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan.

Jack McCOOL, Plaintiff,
v.
OPERATIVE PLASTERERS' & CEMENT
MASONS' INT'L ASS'N OF the UNITED
STATES & CANADA, AFL–CIO, Defendant.

No. 13–13614.
|
Feb. 18, 2014.

**Attorneys and Law Firms**

Eric I. Frankie, Law Office of Eric I. Frankie, Detroit, MI, for Plaintiff.

Keith R. Bolek, O'Donoghue & O'Donoghue LLP, Washington, DC, Richard G. Mack, Miller, Cohen, Detroit, MI, for Defendant.

*ORDER ON PLAINTIFF'S MOTION
FOR PROTECTIVE ORDER [17] AND
MOTION TO DISQUALIFY COUNSEL [31]*

LAURIE J. MICHELSON, United States Magistrate Judge.

**\*1** This is an employment discrimination case. Plaintiff Jack McCool ("Plaintiff") formerly worked for local affiliates of Defendant Operative Plasterers and Cement Masons International Association of the United States and Canada, AFL–CIO ("Defendant" or "Union"). He alleges that he was demoted and ultimately terminated from his position due to his age. Prior to his termination, Plaintiff spoke with a lawyer for the Union's local affiliate. Plaintiff advised the lawyer that he was going to be replaced with someone younger who "would last longer" and that he was considering filing a lawsuit. Plaintiff did sue, and the lawyer's law firm, Miller Cohen, PLC ("Miller Cohen"), appeared as local counsel for Defendant. Four months later, and only after the parties encountered difficulties in scheduling depositions and filed discovery motions against one other, Plaintiff moved to preclude Miller Cohen from participating in his deposition (Dkt.17) and, further, to disqualify the firm on the basis of a conflict of interest (Dkt.31). These two motions were referred

to this Court for hearing and determination. (Dkts.18, 32.) The Court conducted oral argument and heard testimony from Plaintiff on February 12, 2014.[1] For the reasons set forth below, the motions are **DENIED.**

**I. BACKGROUND**

On March 5, 2001, Plaintiff was hired by Defendant as a Business Agent for its affiliated Local 67. (Dkt.1, Compl., ¶ 5.) Plaintiff was subsequently promoted to Business Manager. (*Id.*) In the summer of 2012, Local 67 merged with Defendant's affiliated Local 514. At that time, Plaintiff was 59 years old. On June 27, 2012, Plaintiff was allegedly advised by Defendant's Vice President, Dan Rauch, that a younger, less experienced individual (Joel Santos) would become the Business Manager of the merged entity effective November 1, 2012. (*Id.* at ¶¶ 6, 7.) According to Plaintiff, Rauch believed Plaintiff was too old for the job and wanted to replace him with someone younger who "would last longer." (*Id.* at ¶¶ 7, 9; Mot. to Disqualify at 4–5.)

Plaintiff contends that, following his discussion with Rauch, he immediately contacted labor lawyer Robert Fetter ("Fetter"), a partner with the Michigan law firm of Miller Cohen. The law firm is counsel to the Union's affiliated Local 514 and also represented Local 67 prior to the merger.

Plaintiff testified that, in his capacity as Business Manager for Local 67, he had occasion to interact with Fetter. The two also went golfing and had other interactions. Thus, Plaintiff expressed that he had a "relationship" with Fetter. Plaintiff further testified, however, that he was aware Fetter was counsel for Local 67 and that he never thought Fetter was his personal lawyer. During a short telephone call, Plaintiff informed Fetter about Rauch's statements and advised Fetter that he was thinking about filing a lawsuit against the Union. Plaintiff does not know what Fetter did with the information, but believes it is "reasonable to assume Fetter told Rauch and other members of Miller Cohen...." (Dkt. 31, Pl. Mot. to Disqualify at 4.)

**\*2** A few months later, on October 25, 2012, Mr. Eric Frankie, Plaintiff's counsel in this matter, sent a letter to Rauch and Union President Patrick Finley that stated, "Please be advised that I represent Mr. Jack McCool concerning his age discrimination claims against your Union. For your ease of reference, I have enclosed herewith, a copy of Mr. McCool's [October 16, 2012] EEOC charge of discrimination. By this letter, I am notifying you and your union that no

Case 2:24-cv-12347-BRM-EAS   ECF No. 46-6, PageID.1957   Filed 04/11/25   Page 18 of 24
McCool v. Operative Plasterers' & Cement Masons Intern...., Not Reported in...
2014 WL 635797

further actions of discrimination should be taken against Mr. McCool." (Dkt. 35, Pl. Resp. to Mot. to Compel, Ex. A.)

On November 1, 2012, Plaintiff was demoted from Business Manager to Business Agent for the merged Local 514. (Dkt. 1, Compl. at ¶¶ 5, 6, 12.) Plaintiff was ultimately terminated on July 22, 2013. (*Id.* at ¶ 13.) He brought this age discrimination lawsuit on August 21, 2013. The Complaint discloses the information that Plaintiff discussed with Fetter—i.e., that, according to Rauch, Plaintiff was not going to be the Business Manager of the post-merger Local 514 "because of his age and because he was too old, or words to that effect." (Dkt. 1, Compl. at ¶ 9.) The Union answered the complaint on September 23, 2013. (Dkt.5.) The Union is represented by Fetter's partner, Mr. Richard Mack of Miller Cohen, as well as a firm in Washington D.C.

Defendant acknowledges that Plaintiff and Fetter had two communications regarding the subject matter of this litigation. As explained by Defendant in its December 2013 interrogatory answers:

> a. The first communication occurred around the time of the merger of Local 67 and Local 16 into Local 514. Plaintiff mentioned that the merger was going to take place and Plaintiff further stated that Vice President Daniel Rauch stated that Plaintiff would not be the [B]usiness [M]anager. Plaintiff also stated that Vice President Rauch told the Plaintiff that Joel Santos would be the Business Manager because he would be around longer. McCool indicated that he believed that age may have been a factor. Fetter replied that he was not getting involved in the matter.

> b. The second communication took place a month or two ago [October or November 2013]. Plaintiff called Fetter and asked if they were still friends. Plaintiff further asked how Fetter's law firm could be representing "Danny," i.e., Vice President Daniel Rauch. Fetter responded that his firm represents the Local Union, i .e., Local 514. Plaintiff stated to Fetter something to the effect of "I talked to you about this" and Fetter replied that is why he is not handling the matter. Fetter then told McCool that he could not talk about the matter.

(Dkt. 11, Def. Mot. to Quash at 4, Ex. J.)

The parties conducted their Rule 16 Scheduling Conference on October 8, 2013, and Plaintiff did not raise any conflict of interest issue based upon Miller Cohen's (September 23, 2013) appearance and representation of the Union. The parties

then began discovery. After initiating written discovery, they encountered difficulties in scheduling depositions. This resulted in Defendant's Motion to Quash and for Protective Order seeking to preclude Plaintiff from taking certain depositions of Defendant's representatives that he had noticed (Dkt.11), and Plaintiff's Motion to Compel, which sought to compel those depositions (Dkt.13). On January 5, 2014, Plaintiff's counsel wrote to Defendant's counsel that "in preparing Plaintiff's response to Defendant's Motion to Quash and for Protective Order, it has become clear to me that Miller Cohen PLC has a conflict of interest under the [Michigan Rules of Professional Conduct] and should be disqualified from representing Defendant in this case." (Mot. to Disqualify at 7, Ex. A.) As a result, Plaintiff's counsel did not think it was appropriate for his client to be deposed by any lawyer from Miller Cohen. He initially filed a Motion for Protective Order to preclude Miller Cohen from participating in his deposition on the sole ground that they have a conflict of interest under several provisions of the Michigan Rules of Professional Conduct ("MRPC") and then filed a Motion to Disqualify asserting the same reasons. (Dkts.17, 31.) [2]

**\*3** On the same day that Plaintiff filed the Motion to Disqualify, January 23, 2014, he also submitted the following complaint to the Attorney Grievance Commission:

> My name is Jack McCool.... I have a pending discrimination suit that was filed on August 21, 2013 against the Operative Plasterers and Cement Masons International Association (OPCMIA) in the U.S. District Court for [the] Eastern District of Michigan....

> I was the Business Manager of OPCMIA Local 67 and Business Agent of Local 514 of this organization.

> The defendant of this case has hired the law firm of Miller/Cohen 600 W. Lafayette Blvd 4th floor Detroit, Michigan 48226. Which I had a business relationship with this firm for over 10 years as the senior officer of Local 67, and had direct contact with senior partner Bruce Miller and attorney Robert Fetter of this firm.

> I had a conversation about this case with Robert Fetter before Miller/Cohen was hired by the defendant and I think that conversation is being discussed with the defendant and other attorneys from this firm, therefore I think this a conflict of interest and this law firm should not be a part of this case.

(Mot. to Disqualify, Ex. C.)

McCool v. Operative Plasterers' & Cement Masons Intern...; Not Reported in...

Case 2:24-cv-12347-BRM-EAS   ECF No. 46-6, PageID.1958   Filed 04/11/25   Page 19 of 24

2014 WL 635797

Miller Cohen contends that there is no conflict of interest because Fetter, as attorney for Local 67, did not have an attorney-client relationship with Plaintiff and because Plaintiff did not reveal any confidences to Fetter. (Dkts.30, 36, Def.Resp.)[3]

## II. ANALYSIS

### A. Legal Standard

A motion to disqualify counsel is the proper method for a party to bring to the court's attention an alleged conflict of interest or breach of ethical duty by opposing counsel. *See DeBiasi v. Charter County of Wayne,* 284 F.Supp.2d 760, 770 (E.D.Mich.2003) (citing *Musicus v. Westinghouse Elec. Corp.,* 621 F.2d 742 (5th Cir.1980)). The court, however, must be vigilant in reviewing such a motion, as the "ability to deny one's opponent the services of capable counsel is a potent weapon." *Manning v. Waring, Cox, James, Sklar & Allen,* 849 F.2d 222, 224 (6th Cir.1988). Indeed, "[m]otions to disqualify are viewed with disfavor and disqualification is considered a drastic measure which courts should hesitate to impose except when absolutely necessary." *Valley–Vulcan Mold Co. v. Ampco–Pittsburgh Corp.,* 237 B.R. 322, 337 (B.A.P. 6th Cir.1999), *aff'd,* 5 F. App'x 396 (6th Cir.2001) (citation and internal quotation marks omitted). The court must balance the interest of the court and the public in upholding the integrity of the legal profession against the right of a party to retain counsel of its choice. *Manning,* 849 F.2d at 225. A party seeking disqualification carries a heavy burden and must meet a high standard of proof. *Valley–Vulcan,* 237 B.R. at 337, (citation omitted); *see also MJK Family LLC v. Corporate Eagle Mgmt. Servs.,* 676 F.Supp.2d 584, 592 (E.D.Mich.2009) ("The movant bears the burden of proving that opposing counsel should be disqualified."). A court should only disqualify an attorney "when there is a reasonable possibility that some specifically identifiable impropriety actually occurred." *Moses v. Sterling Commerce (America) Inc.,* 122 F. App'x 177, 184 (6th Cir.2005) (citations omitted).

**\*4** A state's ethics rules are appropriate standards against which to measure the propriety of an attorney's conduct for the purpose of determining whether he or she should be disqualified. *Nat'lUnion Fire Ins. Co. of Pittsburgh, Pennsylvania v. Alticor, Inc.,* 466 F.3d 456, 457–58 (6th Cir.2006), *vacated on other grounds,* 472 F.3d 436 (6th Cir.2007); *see also Nissan N. Am., Inc. v. Johnson Elec. N. Am., Inc.,* No. 09–11783, 2011 U.S. Dist. LEXIS 51115, at \*18, 2011 WL 1812505 (E.D.Mich. May 12, 2011)

("In finding that a 'reasonable probability' exists that some "specifically identifiable impropriety" occurred, it is appropriate for this Court to look to the applicable rules of professional conduct."). The "Rules of Professional Conduct adopted by the Michigan Supreme Court ... apply to members of the bar of this court and attorneys who practice in this court." E.D. Mich. L.R 83.22.

Here, Plaintiff relies upon the following Michigan Rules of Professional Conduct to support his motions:

Rule 1.7 Conflict of Interest: General Rule

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

Rule 1.8 Conflict of Interest: Prohibited Transactions

(b) A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client consents after consultation, except as permitted or required by Rule 1.6 or Rule 3.3.

Rule 1.9 Conflict of Interest: Former Client

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

(b) Unless the former client consents after consultation, a lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated has previously represented a client

(1) whose interests are materially adverse to that person, and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

Case 2:24-cv-12837-BRM-EAS ECF No. 46-6, PageID.1959 Filed 04/11/25 Page 20 of 24

McCool v. Operative Plasterers' & Cement Masons Intern...., Not Reported in...

2014 WL 635797

(1) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.

MRPC 1.10 Imputed Disqualification: General Rule

**\*5** (a) While lawyers are associated in a firm none of them shall knowingly represent a client when anyone of them practicing alone would be prohibited from doing so by Rule[ ] ... 1.9(a).

(Mot. to Disqualify at 5–6.) Plaintiff contends that "[w]hile it is not fully known at the present time how these rules are implicated by Fetter and Miller Cohen's conduct, it is clear that Miller Cohen P.LC should not be representing Defendant in the claims brought by Plaintiff because Fetter, due to Plaintiff's consultation with him about Defendant's discriminatory behavior and the actions he should take, individually could not represent Defendant in this case." (*Id.* at 6.)

At oral argument, Plaintiff continued to argue that McCool was a "former client" of Fetter, thereby precluding Fetter's law firm from representing Defendant in this matter. As to former clients, the Sixth Circuit applies the following three-part test for attorney disqualification: (1) a past attorney-client relationship existed between the party seeking disqualification and the attorney it seeks to disqualify; (2) the subject matter of that relationship is substantially related to the subject matter of the present case; and (3) the attorney acquired confidential information from the party seeking disqualification. *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio,* 900 F.2d 882, 889 (6th Cir.1990). At issue here are the first and third prongs of the *Dana* test. [4]

**B. Disqualification is Not Warranted**

As the senior officer (Business Manager) of Local 67, Plaintiff had a business relationship with Local 67's law firm, Miller Cohen, and he had direct contact with senior partner Bruce Miller as well as attorney Fetter. (Mot. to Disqualify, Ex. C, Grievance Compl.) With knowledge of this relationship, Plaintiff called Fetter after his June 2012 meeting with Rauch. The discussion lasted approximately four (4) minutes. Plaintiff clearly knew Fetter was counsel for Local 67. Indeed,

Plaintiff testified that he never thought Fetter was his personal lawyer and was not going to ask Fetter to represent him. Plaintiff further testified that he was just looking for some insight. Plaintiff testified that he advised Fetter that he was going to be demoted because of his age and that he was thinking about filing a lawsuit. According to Plaintiff, Fetter told him that litigation was a long, hard road. Recognizing that Fetter represented Local 67 (and not wanting to involve him in a conflict of interest), Plaintiff says he told Fetter, "I won't involve you in this," and Fetter said, "thank you." According to Defendant's interrogatory response, Fetter simply told Plaintiff he was not getting involved.

Of course, Plaintiff's relationship with Fetter in Plaintiff's capacity as a representative of Local 67 was not personal to Plaintiff and therefore cannot create a conflict of interest. Thus, the dispositive question is whether, through their four-minute conversation where Plaintiff recounted what Rauch had said, Plaintiff formed a personal attorney-client relationship with Fetter.

**\*6** Unfortunately, there does not appear to be a definitive test for when a preliminary consultation creates an attorney-client relationship. Defendant relies on a Michigan ethics opinion that analyzed a somewhat analogous situation. In Mich. Bar Ass'n, Ethics Op. No. RI–154 (Feb. 1, 1993), a lawyer had been approached by a company to pursue the recovery of money from a former employee pursuant to a tax reimbursement policy. Three years earlier, however, the former employee had been referred to another lawyer at the same law firm. The former employee had a half-hour conversation with this lawyer about the tax reimbursement issue. The former employee told the lawyer that the company had asserted a claim against him and that he disagreed with the claim. The lawyer responded that the issues were involved and complex and required a more detailed development of the facts. The two discussed the costs, fees, and other terms of the law firm's potential representation, but the former employee decided not to retain the law firm. In analyzing Rule 1. 10, the ethics opinion advised that

no client-lawyer relationship was established in connection with the lawyer colleague's bar association referral contact with the former employee. No agreement was reached between the lawyer colleague and the former employee whereby the

Case 2:24-cv-12347-BRM-EAS   ECF No. 46-6, PageID.1960   Filed 04/11/25   Page 21 of 24
McCool v. Operative Plasterers' & Cement Masons Intern...; Not Reported in...

2014 WL 635797

lawyer colleague expressly undertook to provide legal services to the former employee on the tax reimbursement issue. Nor was the content of the consultation sufficiently specific to imply a client-lawyer relationship [.] While the subject of a tax reimbursement claim was raised, in a very general manner, there was no legal advice imparted to the former employee regarding the tax reimbursement issue; instead, the former employee was told that no advice could be provided without further information and study.

(*Id.*) The advisory opinion further concluded that "the law firm's adherence to its duties under MRPC 1.6 and 1.9(c) would not have any impact on the law firm's representation of the company on the tax reimbursement issue." (*Id.*)

*MJK Family LLC v. Corporate Eagle Mgmt. Servs.,* 676 F.Supp.2d 584 (E.D.Mich.2009), provides another possibly-applicable test for determining the existence of an attorney-client relationship in this case. There, District Judge John Feikens analyzed whether, as a result of their consultation with the corporation's lawyer, individual members of a corporate entity had established an independent attorney-client relationship with the corporation's law firm. Judge Feikens found instructive the law governing claims of attorney-client privilege asserted by corporate employees. He reasoned, "Generally, there is no individual attorney-client privilege between a corporation's attorney and an individual within the corporation unless there is a clear showing that he consulted the corporate counsel in his individual capacity." (*Id.* at 594); *see also* MRPC 1.13 (providing that "[a] lawyer employed or retained to represent an organization represents the organization as distinct from its directors, officers, employees, members, shareholders, or other constituents."). He then identified the following factors that should be considered in making that determination:

**\*7** 1. Whether the employee approached counsel for the purpose of seeking legal advice;

2. When he approached counsel, did he make it clear that he was seeking legal advice in his individual rather than representative capacity;

3. Counsel saw fit to communicate with him in his individual capacity, knowing that a possible conflict could arise;

4. His conversations with counsel were confidential; and

5. The substance of the conversations with counsel did not concern matters within the company or the general affairs of the company.

*Id.* (citing *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 805 F.2d 120, 123 (3d Cir.1986); *Ross v. City of Memphis,* 423 F.3d 596, 605 (6th Cir.2005)); *see also Ross,* 423 F.3d at 605 (recognizing that the Bevill test, which "has been adopted by many circuits," requires an individual to show that he "made it clear" that he was seeking individual advice).

Additionally, the Sixth Circuit recognizes that "[w]hen a potential client consults with an attorney, the consultation establishes a relationship akin to that of an attorney and existing client." *Banner v. City of Flint,* 99 F. App'x 29, 36 (6th Cir.2004). Thus, federal district courts in Michigan have found that a "motion to disqualify an attorney who has met with, but was not retained by, a prospective client 'should be analyzed the same as a motion to disqualify pursuant to a former client relationship, with the additional requirement that the lawyer receive information that could be 'significantly harmful,' rather than merely confidential as required by the Sixth Circuit's three-prong *Dana Corp.* test." *Eaton v. Meathe,* No. 11–178, 2011 U.S. Dist. LEXIS 135838, at \*7–8, 2011 WL 5921207 (W.D.Mich. Nov. 27, 2011) (citing *Factory Mut. Ins. Co. v. APComPower, Inc.,* 662 F.Supp.2d 896, 900 (W.D.Mich.2009)). [5]

The Court finds that, utilizing any of these tests, Plaintiff has failed to demonstrate a disqualifying conflict of interest on the part of Miller Cohen. Plaintiff acknowledges that Fetter was counsel for Local 67 and that he contacted Fetter in that capacity. This resulted in one short phone conversation. They did not discuss any terms of individual representation, no legal advice was given, and there was no agreement Fetter would render legal services to Plaintiff. Indeed, Plaintiff did not believe Fetter was his personal counsel. Plaintiff told Fetter he was not going to involve him and Fetter agreed that he was not getting involved. Plaintiff subsequently retained Mr. Frankie who sent a letter to the Union disclosing the EEOC charge and ultimately filed this lawsuit. There

Case 2:24-cv-12347-BRM-EAS   ECF No. 46-6, PageID.1961   Filed 04/11/25   Page 22 of 24

McCool v. Operative Plasterers' & Cement Masons Intern...., Not Reported in...

2014 WL 635797

is simply no objective manifestation of an attorney-client relationship between Plaintiff and Fetter.

Additionally, Plaintiff has not established that Fetter has revealed any confidential information from their conversation or, even assuming otherwise, that the disclosures have been or will be "significantly harmful" to Plaintiff. *See Eaton,* 2011 U.S. Dist. LEXIS 135838 at *10–11, 2011 WL 5921207 (explaining that "[t]he third *Dana* test asks whether the attorney acquired confidential information from the party seeking disqualification" and where the party seeking disqualification is "only asserting that he consulted with, not that he retained" the opposing lawyer, "the Court must also consider whether any information [Defendant] received could be 'significantly harmful' to [Plaintiff]."). Plaintiff testified that the confidential information he disclosed to Fetter includes the alleged statements by Rauch that Plaintiff was going to be replaced as the Business Manager because Mr. Santos would be around longer (i.e., because of his age), and that Plaintiff was thinking of filing a lawsuit. Rauch's statements are not confidential information. Rauch, as a Union officer, was certainly free to share this information with Fetter, counsel for the Union's local affiliate. Within days of Plaintiff filing an EEOC complaint, his lawyer sent a copy directly to Defendant. That complaint, and the Complaint that was ultimately filed in this lawsuit, disclose the very information that Plaintiff conveyed during his conversation with Fetter. Moreover, counsel for the Union represented that Fetter did not disclose to the Union any of the content of his communication with Plaintiff. They have further represented that any inability to use this information has not materially impacted their representation of the Union, especially since the information all became public in the litigation.

**\*8** Because it appears that no attorney-client relationship was created and the information disclosed was not confidential, and because Plaintiff has not identified how the disclosures that occurred might significantly harm him in this litigation, the Court finds that, on the present record, Plaintiff has not met his burden of showing that there is a "reasonable possibility that some specifically identifiable impropriety actually occurred." *Moses,* 122 F. App'x at 184; *see also Eaton,* 2011 U.S. Dist. LEXIS 135838 at *13, 2011 WL 5921207.

Plaintiff's arguments do not alter the Court's conclusion. According to Plaintiff, Defendant admitted the existence of an attorney-client relationship between Fetter and Plaintiff in one of its interrogatory responses. (Mot. to Disqualify at 8.) In particular, Defendant objected to the interrogatory "on the grounds that it is not tailored to lead to the discovery of admissible evidence. Mr. Fetter is a partner in the law firm of opposing counsel. Further, Mr. Fetter cannot disclose any attorney-client privileged communication, and objects to the extent the question involves legal advice from Mr. Fetter to Mr. McCool, Defendant will keep the information confidential and will not broadcast it further." (*Id.*)

Defendant counters that Plaintiff is misreading its response. Defendant explains that in objecting to the disclosure of attorney-client privileged communications, it was not referring to legal advice Fetter gave to Plaintiff for his personal legal issues—because there was none. (Resp. at 13.) Instead, it was referring to the disclosure of communications from Fetter to Local 67. (*Id.*) As Business Manager, Plaintiff was the principal officer of Local 67. Thus, if Fetter provided legal advice about the merger of the local unions to Plaintiff, that would have been advice to the local union.

Defendant's interrogatory objection is suspect, but it does not create an attorney-client relationship. Plaintiff's Interrogatory No. 20 asked for the substance of any communication between Plaintiff and Fetter regarding Plaintiff's claims of age discrimination. It had nothing to do with legal advice to the local union about the merger. However, the fact that Defendant interposed an unwarranted objection, an all-too-common occurrence in discovery responses, cannot create an attorney-client relationship between Fetter and Plaintiff (in his individual capacity). And here, Plaintiff's testimony makes clear that there was no such relationship.

Plaintiff also contends that this case is indistinguishable from *DeBiasi v. Charter County of Wayne,* 284 F.Supp.2d 760 (E.D.Mich.2003), in which the plaintiff's counsel was found to have a disqualifying conflict of interest. The Court disagrees. In *DeBiasi,* the plaintiff was a white male lieutenant who claimed reverse discrimination when the defendant county promoted a black female lieutenant, Pamela McClain, over him. The plaintiff believed that McClain should not have received the promotion. The potential conflict arose because the plaintiff's counsel was also general counsel to the union that both the plaintiff and McClain were members of. In that role, the plaintiff's counsel had served as McClain's union representative and had thereby obtained information about her fitness for the promotion that the plaintiff could use against the defendant county. In issuing an advisory opinion as to the lawyer's potential conflict of interest, the State Bar stated:

2014 WL 635797

**\*9** Even though the labor union [and not individual union member McClain] is and was your client, it is possible that you could have received some confidential communications from an agent of your client ... during your representation as general counsel during labor negotiations.

\* \* \*

Therefore, the test is whether or not you obtained any privileged and confidential information from the agent of your client during a former representation that could be used against her in this matter. If the answer is "yes", the conflict of interest rules could prevent your current representation. If the answer is "no", the ethics rules would permit your current representation.

*Id.* at 762. The court adopted this test and found "Plaintiff's counsel's knowledge of matters confided to him in the course of his service as general counsel for the Union-particularly with regard to the qualifications of Pamela McClain ...—are central to the defense of this case." *Id.* at 771. Significantly, the Court found that the conflict of interest rules prevented the attorney's concurrent representation of the plaintiff and the local union. Indeed, the court noted that "when an attorney concurrently represents two clients with adverse positions, impropriety is presumed." *Id.* at 771 n. 8.

This case is not like *DeBiasi.* First, Fetter's position is different from the plaintiff's counsel in *DeBiasi.* This is not a case of concurrent representation. As discussed, Fetter has never represented McCool individually. Second, unlike the information that the plaintiff's counsel in *DeBiasi* obtained about McClain, Plaintiff has not adequately demonstrated that the information he disclosed to Fetter was not otherwise available to Defendant. Plaintiff arguably made public the fact that he was thinking of filing a lawsuit when he filed the EEOC charge or when his lawyer sent the letter to the Union. At a minimum he made it public when he filed this suit. Plaintiff offers no explanation for how his intent to file a lawsuit against the Union was used or is now being used against him in this litigation. Likewise, Plaintiff does not explain how disqualifying Miller Cohen at this point in the litigation would prevent any harm to his case.

In sum, Plaintiff falls short of meeting the demanding standard for disqualification. He has failed to establish the requirements of the *Dana* test or a violation of the similar requirements set forth in MRPC 1.7, 1.8, 1.9, or 1.10.

**C. MRPC 3.7 Does Not Require Disqualification**
Lastly, Plaintiff contends that "MRPC 3.7(a) mandates that Fetter and Miller Cohen PLC not act as attorneys for Defendant because Fetter is also a necessary witness to Plaintiff and none of the listed exceptions to MRPC 3.7(a) apply." (Mot. to Disqualify at 13.)

Rule 3.7(a) is inapplicable. It provides:

(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:

**\*10** (1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

Fetter is not involved in the defense of the Union. He is not and will not be trial counsel. Thus, this rule does not support disqualification of Miller Cohen.

**III. CONCLUSION**
Accordingly, Plaintiff's Motion for Protective Order to preclude Miller Cohen from taking Plaintiff's deposition and Plaintiff's Motion to Disqualify Miller Cohen as counsel for Defendant are **DENIED.**

**IT IS SO ORDERED.**
The attention of the parties is drawn to Fed.R.Civ.P. 72(a), which provides a period of fourteen days from the date of receipt of a copy of this order to file objections for consideration by the district judge under 28 U.S.C. § 636(b) (1).

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 635797

Case 2:24-cv-12347-BRM-EAS ECF No. 46-6, PageID.1963 Filed 04/11/25 Page 24 of 24

McCool v. Operative Plasterers' & Cement Masons Intern...., Not Reported in...

2014 WL 635797

---

### Footnotes

1   The Court's Notice of Hearing advised the parties that "[t]he Court is prepared to conduct an evidentiary hearing on the Motion to Disqualify Counsel if that is how the parties wish to proceed." (Dkt.33.) Mr. McCool was the only witness presented. At the hearing, Defendant requested a continuance because they did not bring Mr. Fetter to testify. The request was denied.

2   Courts have disallowed disqualification on the basis of waiver or estoppel where the moving party has failed to move for disqualification in a timely manner. *In re Valley–Vulcan Mold Co.,* 237 B.R. at 337 ("It is well settled that a former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right." (citing *Trust Corp. of Montana v. Piper Aircraft Corp.,* 701 F.2d 85, 87 (9th Cir.1983)* (denying motion for disqualification where it was asserted just prior to the scheduled trial date))). Here, because of the parties' discovery disputes, they have not yet conducted any depositions, no dispositive motions have been filed, and the Court has granted Defendant's motion to extend the scheduling order. Thus, while Plaintiff certainly could have raised the disqualification issue sooner, the court cannot say it is untimely given the current posture of the case.

3   Because of the overlap in the motions, the Court indicated that it would treat Defendant's Response to the Motion for Protective Order as its Response to the Motion to Disqualify. (Dkt.32.)

4   At the hearing, Plaintiff's counsel argued that the only issue in determining disqualification is whether Plaintiff expected Fetter to keep the disclosed information confidential. This is not a correct recitation of the law. Michigan Rule of Professional Conduct 1.6, which is Plaintiff's primary support, defines "confidence" as "information protected by the client-lawyer privilege under applicable law" and states that "a lawyer shall not knowingly reveal a confidence or secret of a client" or "use a confidence or secret of a client to the disadvantage of the client." MRPC 1.6(a), (b)(1) and (2). In other words, Rule 1.6 applies only where a lawyer-client relationship exists.

5   This is based upon Model Rule of Professional Conduct 1.18 which has not yet been adopted in Michigan. That Rule provides, in part:

> (a) A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.

> (b) Even when no client-lawyer relationship ensues, a lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation, except as Rule 1.9 would permit with respect to information of a former client.

> (c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d)....

ABA Mod. Rules Prof. Cond. Rule 1.18.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.