# EXHIBIT U

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4
 5   ELYSE MCKENNA,
 6          Plaintiff,
 7
                                 Case No. 24-cv-12347
 8   -vs-                        Hon. Brandy R. McMillion
 9
10   ROBERT F. RILEY, an individual,
11   RILEY & HURLEY, PC, a domestic professional
12   corporation, and OLSMAN, MACKENZIE,
13   PEACOCK, PC, a domestic professional
14   corporation,
15          Defendants.
16   _____/
17
18        VIDEO DEPOSITION of ELYSE MCKENNA
19
20     Taken by the Defendant on the 17th day of November,
21     2025 at Deborah Gordon Law, 33 Bloomfield Hills
22     Parkway, Suite 220, Bloomfield Hills, Michigan 48304
23     commencing at 10:08 a.m.
24
25
```

| | Page 134 |
|---|---|
| 1 Q | What record do you have? |
| 2 A | I have text messages. |
| 3 Q | With who? I've got every one of your text messages. |
| 4 | MS. RUSSELL: Allow her to answer the question. |
| 5 | BY MS. GORDON: |
| 6 Q | So you tell me who you texted with, Elyse. |
| 7 A | I'm not sure how you have all of my text messages. |
| 8 Q | They were all produced. |
| 9 A | They're supposed to be produced by November 20 |
| 10 | something, I believe. |
| 11 Q | Well, who did you text with that I don't have? |
| 12 A | I'm confused that all the text messages that you |
| 13 | have so I don't – |
| 14 Q | Guess what, when you text, there's two parties, |
| 15 | okay? |
| 16 A | Okay. |
| 17 Q | So I have all the Olsman parties texts with you. |
| 18 | Whether you produced them to me or you did not, I |
| 19 | have them. |
| 20 A | Okay. |
| 21 Q | There's nothing in those text messages whatsoever |
| 22 | from you saying one single negative word about Bob |
| 23 | Riley before you were hired by the Olsman office. |
| 24 | Do you disagree? |
| 25 | MS. RUSSELL: Counsel, what is your question? |

| | Page 135 |
|---|---|
| 1 | BY MS. GORDON: |
| 2 Q | Do you disagree? |
| 3 A | You asked me if I had a record of telling someone |
| 4 | and I said I have text messages. I didn't say those |
| 5 | text messages were with the Olsman parties. You |
| 6 | assumed that. |
| 7 Q | Well, the only thing I'm focused on here, Elyse, is |
| 8 | the Olsman office and what you put them on notice |
| 9 | of. I don't care who you told anything to other |
| 10 | than Olsman. You know why, they're about to put you |
| 11 | on their payroll. And you haven't told them that |
| 12 | you can't facilitate with Bob Riley and, oh, he |
| 13 | sexually harassed you. So you have no record that |
| 14 | you told anybody at Olsman this, am I correct? |
| 15 | MS. RUSSELL: Objection. She's answered. |
| 16 | BY MS. GORDON: |
| 17 Q | A minute ago you tried to say I have texts. You |
| 18 | don't have any texts where you said that. |
| 19 | MS. RUSSELL: Objection. |
| 20 | THE WITNESS: I texted other people about the |
| 21 | conversation that I had with Donna in which I told |
| 22 | her that before I was on her payroll. |
| 23 | BY MS. GORDON: |
| 24 Q | Who did you text that to? |
| 25 A | I believe there are multiple people but the one |

| | Page 136 |
|---|---|
| 1 | person - |
| 2 Q | Who are they? |
| 3 A | I'm going to - I would love to finish my answer. |
| 4 Q | Please do. |
| 5 A | I think it would make things easier for both of us. |
| 6 Q | Go ahead. What are the names. |
| 7 A | Thank you. Lauren Studley is one person that I know |
| 8 | I texted about the conversation. |
| 9 Q | Who is Lauren – |
| 10 A | And I also – |
| 11 Q | Go ahead. |
| 12 A | - told you that I was going to talk to Olsman |
| 13 | because you knew that I was going to go there to |
| 14 | work there. |
| 15 Q | You've already lied about me so many times. And |
| 16 | you've been proven to lie about me. |
| 17 | MS. RUSSELL: Objection. |
| 18 | BY MS. GORDON: |
| 19 Q | So anything you tell me - so you're telling me - |
| 20 A | You asked me where I was going to go work. And I |
| 21 | told you I was going to work at Olsman. |
| 22 Q | When you called me, you already had a job offer. |
| 23 | That's literally what you told me. |
| 24 | MS. RUSSELL: Counsel, are you testifying or |
| 25 | are you going to ask questions? You don't have to |

| | Page 137 |
|---|---|
| 1 | answer her questions. |
| 2 | BY MS. GORDON: |
| 3 Q | So I'm one of the people that you told that to. And |
| 4 | who else - |
| 5 | MS. RUSSELL: You can answer these questions |
| 6 | when you sit for your deposition. |
| 7 | BY MS. GORDON: |
| 8 Q | She just gave me her names, I'm been one of them. |
| 9 | So you told me and you told - what was the other |
| 10 | gentleman's name? |
| 11 A | I have text messages with Lauren Studley. |
| 12 Q | Who was he? |
| 13 A | She's a woman. |
| 14 Q | Who is she? |
| 15 A | She's an attorney that works for Giamarco Mullins |
| 16 | and Horton. |
| 17 Q | And what does she do there? |
| 18 A | Med mal defense. |
| 19 Q | She's still at the firm today? |
| 20 A | The last I knew she was, yes. |
| 21 Q | When was the last time you talked to her? |
| 22 A | When was - pardon me? |
| 23 Q | Last time you spoke with her, connected with her? |
| 24 A | A few weeks ago. A month ago. |
| 25 Q | Do you stay in touch with her? |

Page 138
1  A   I stay in touch with her. I've moved now and I
2      don't see her as frequently.
3  Q   So on our upcoming date I'm going to be getting
4      this text from you and Lauren Studler, is that what
5      you're telling me?
6  A   Her last name is Studley.
7  Q   Thank you. I'm sorry. I'm going to be getting that
8      text between you and Lauren Studley that's going to
9      be before July 27, 2021?
10 A   I don't know the date of when the text is. It was
11     before I started working at Olsman that I had the
12     conversation with Donna. So I don't have a date.
13 Q   You accepted the job offer quite a bit before you
14     started.
15 A   I don't have the dates.
16 Q   Well, I do.
17 A   Okay.
18 Q   You made a deal with them on July 7, 2021 and you
19     did not start until - you were supposed to start
20     September 7. You didn't start, I don't think, till
21     the 8th or 9th but we'll get to all this. Let's
22     keep going.
23     MS. RUSSELL: Is there a question there,
24     Counsel? There's an objection anytime that she
25     testifies on the record, standing. I'm putting it

Page 139
1      on from now on. Did you have a question you want to
2      ask, Deb?
3      MS. GORDON: If I do, I'll ask it.
4      MS. RUSSELL: Are we at a point to break for
5      lunch? I know we've been going close to an hour.
6      MS. GORDON: Is the lunch here? Is it here?
7      MS. RUSSELL: Yes.
8      (Whereupon a luncheon recess was taken.)
9  BY MS. GORDON:
10 Q   So it appears that on July 23rd, you accepted a job
11     offer, a verbal job offer from Olsman's firm. Does
12     that sound correct to you?
13 A   I don't know what document you're referring to. It
14     was in the summer of 2021.
15 Q   You know, I have my notes here. I'm not necessarily
16     - just so FYI. I'm not necessarily referring to a
17     document. I have read everything, of course. But
18     I'm just asking you whether you agree. I'll help
19     you. I have an email, a text here to you from Donna
20     where you're confirming that she's now told Emily.
21     Emily was apparently waiting, she was waiting to
22     tell Emily that you were coming on board. And Donna
23     tells you that, you know, everybody's now approved.
24     She's talking about Emily. We've texted. She's very
25     excited, too. She's on vacay. You're apparently at

Page 140
1      dinner with Bob. You say, ah, good, I'm glad. We're
2      all celebrating and I'm so happy.
3      Does that sound accurate to you?
4      MS. RUSSELL: What's the Bates on this?
5  Q   11. Does that sound accurate? You don't dispute it?
6      MS. RUSSELL: For Plaintiffs?
7      THE WITNESS: I would like to read the messages
8      that we're referring to.
9  BY MS. GORDON:
10 Q   Pardon me?
11 A   I would like to read the messages you're
12     referencing.
13 Q   I'm not going to read everything because I don't
14     have time. Because I'm under seven hours. Do you
15     disagree that you learned on July 23rd that you
16     guys had a deal and you were coming on board?
17 A   I don't recall the exact date.
18 Q   It was around then?
19 A   It was in the summer of 2021, yes.
20 Q   So that's the best you can do sitting here today as
21     to when you got your job offer?
22 A   Yes. I do not have the exact date in my head.
23 Q   That's fine. And then on the 24th, Donna texted you
24     and invited you to a MHA Women's Caucus party. Do
25     you remember that?

Page 141
1  A   Yes, I remember.
2  Q   And she was excited to get you involved and there
3      were going to be judges there and the like. Do you
4      recall that?
5  A   Yes.
6  Q   Did you go to that?
7  A   I believe I did.
8  Q   And then on August 3rd you put in your two-weeks
9      notice with the Riley firm, correct?
10 A   I don't know that exact date.
11 Q   It sounds likely or around then, is that correct?
12 A   I don't know because it sounds like Bob knew I was
13     involved in the negotiations before. So I'm not
14     sure when I put in my formal two-weeks notice. I
15     don't have that date.
16 Q   Well, he was involved in negotiations but I don't
17     think a start date had been set. And in fact, you
18     put in your notice on August 3rd but apparently you
19     wanted to take some time off because the start date
20     wasn't until end of September. So I'm going to go
21     with my date of 8/3 that you put in the notice. And
22     you intended to start with Donna on or around
23     September - Donna and the office on or around
24     September 7th.
25     Now, after you've already accepted the offer

Page 146
1  Q   Okay. On the 18, Elyse –
2      MR. ALTMAN: We're stepping out.
3      MS. GORDON: At your peril.
4  BY MS. GORDON:
5  Q   On the 18, Elyse, you accessed Bob's photos.
6      (Brief pause.)
7      MR. ALTMAN: I'm making it very clear to you,
8   Deb, that if you interrupt this witness again while
9   she is answering your questions, we are suspending
10  the depo and moving for a protective order that you
11  are harassing the witness by not allowing her to
12  answer your questions.
13     MS. GORDON: My response to that is that the
14  witness is not being responsive to the questions.
15     MR. ALTMAN: Then you have the ability to
16  object as non-responsive. But what you don't have
17  the ability to do is to cut her off and interrupt
18  her.
19     MS. GORDON: You know, deps are - people talk
20  over at deps all the time and they don't do it on
21  purpose. Let's get back on the record.
22     MR. ALTMAN: You are absolutely doing it on
23  purpose.
24     MS. RUSSELL: We're already on the record, Deb.
25     MS. GORDON: You are incorrect.

Page 147
1      MR. ALTMAN: We'll let the judge decide that.
2      MS. RUSSELL: So for the record you are not
3   confirming whether or not you are communicating ex
4   parte with the court right now through an email?
5      MS. GORDON: I don't tell you what I do. I
6   don't tell you what I do.
7      MS. RUSSELL: Shall we call the court?
8  BY MS. GORDON:
9  Q   On August 18 you accessed Bob Riley's iPad and you
10  took photos off of it. Now, at this time, you were
11  starting a new job with Olsman, Mackenzie. Why were
12  you accessing Bob Riley's iPad? You were leaving
13  the law firm.
14     MS. RUSSELL: Objection.
15     THE WITNESS: I don't know what date. You've
16  added a lot to the question. I don't know about the
17  date. And I did access the iPad at some point in
18  August around that time frame. And what was your
19  question? Why?
20 BY MS. GORDON:
21 Q   Why did you do it? You had accepted another job and
22  you had given Riley notice. Why were you taking
23  your time to access his iPad?
24     MS. RUSSELL: Objection.
25     THE WITNESS: Because he had been taking

Page 148
1   photographs again of me that day and it was
2   upsetting. And I wanted to know what was going on.
3  BY MS. GORDON:
4  Q   What was the date that he was taking photos of you?
5  A   If you're telling me that –
6      MS. RUSSELL: Objection.
7      THE WITNESS: - on August 18 I accessed the
8   iPad I know for certain it happened that date. But
9   I don't know if that's what you're telling me or
10  not.
11 BY MS. GORDON:
12 Q   Well, do you know the date?
13 A   I just have said that I don't recall the exact date
14  but that that was around the time frame that I
15  accessed the iPad.
16 Q   And were you in the office on the 18th?
17 A   I do not know what date I was in the office. And if
18  you would like to refer me to a document or show me
19  a calendar.
20 Q   Again, I'm not going to.
21 A   I'm going to finish answering my question.
22 Q   So my question to you is, you were trying to get
23  evidence of some kind? Is that what it was?
24     MS. RUSSELL: Objection.
25     THE WITNESS: That's not what I said.

Page 149
1  BY MS. GORDON:
2  Q   Why did you get the photos off on the 18th and that
3   you were leaving the firm? You had accepted a job
4   somewhere else and you had given notice. Why did
5   you do that? What was your goal?
6  A   I've answered that question.
7  Q   Tell me the answer again.
8  A   Because Bob had just been taking photographs again
9   of me and it made me extremely uncomfortable.
10 Q   Well, were you planning to sue him? Is that why you
11  wanted the photos?
12     MS. RUSSELL: Objection.
13     THE WITNESS: My intention at that time was not
14  to sue him, no.
15 BY MS. GORDON:
16 Q   A few days later, after the 18th, you started
17  calling lawyers, is that correct?
18 A   I believe the first lawyer I had called was before
19  the 18th but I don't have a specific date.
20 Q   And who was the first lawyer you called?
21 A   Matt Besser.
22 Q   And what does he do? What's his expertise?
23 A   Employment law in Ohio.
24     MS. RUSSELL: I'm going to place an objection
25  on the record. I know that the court has ruled that

Page 150

1 attorney-client privilege has been waived in a
2 limited capacity but I'm just putting everybody on
3 notice.
4 Q  So what did you ask him about there?
5 A  I talked to him about the situation.
6 Q  And what did he say? Was he willing to bring a
7 lawsuit for you?
8      MS. RUSSELL: Objection.
9      THE WITNESS: He was willing to bring a lawsuit
10 for me.
11 BY MS. GORDON:
12 Q  So why didn't you have him do that? Why did you
13 keep calling people?
14      MS. RUSSELL: Objection.
15      THE WITNESS: He is not an attorney barred in
16 Michigan. And he thought that I should find an
17 attorney barred in Michigan, and that's when I
18 reached out to you at your office. And I also
19 didn't want to sue Bob because I knew of his
20 prominence in the legal field. And you advised me
21 that I'd have to leave the state of Michigan if I
22 wanted –
23 BY MS. GORDON:
24 Q  Okay. That's a false -
25 A  I'm still continuing.

Page 151

1 Q  Go ahead.
2 A  I'm continuing my answer. And I didn't want to sue
3 Bob. I wanted him to leave me alone. And I wanted
4 to move on with my career and stay in the medical
5 malpractice community. And I understood his
6 position in the community as the facilitator and I
7 wanted to know how to navigate that situation.
8 Q  Well, did the attorney you talked to from Ohio give
9 you some tips on how to navigate the situation?
10 A  Yes.
11      MS. RUSSELL: Objection.
12      THE WITNESS: And one of the things that he
13 told me to do is call you, and I did.
14 BY MS. GORDON:
15 Q  He knew who I was?
16 A  He looked up employment attorneys in Michigan and
17 you come up.
18 Q  And I told you, you didn't have enough for a case.
19 It wasn't a case.
20 A  That's not true.
21      MS. RUSSELL: Objection, testifying.
22 BY MS. GORDON:
23 Q  Who else did you call as an attorney in Michigan?
24 A  I don't recall as I sit here today.
25 Q  Well, is there a way you can refresh your

Page 152

1 recollection? Because we've been to court on this,
2 trying to get the names. And your counsel has said
3 they're privileged and you cannot give the names.
4 Nobody has ever said you don't have the names.
5      So are you telling me you have no recollection
6 of who you called?
7      MS. RUSSELL: For the record, that's prior
8 counsel and you've not renewed your request for the
9 names. We can get that to you by what - is that
10 part of the supplemental request which is due 12 –
11      MS. GORDON: No. No, it's not.
12 BY MS. GORDON:
13 Q  So you do have names? Have you given names to your
14 counsel? You just said you didn't know. Now she
15 says she has names.
16 A  Are we talking about in August of 2021?
17 Q  Yes, we are.
18 A  Or are we talking about all the way up until -
19 Q  August 2021. Do you have names of individuals you
20 contacted?
21 A  I contacted Matt Besser and I contacted your
22 office. And I believe there was one other attorney
23 that I contacted in that time frame and I do not
24 recall her name right as I sit here today. She's a
25 Michigan attorney.

Page 153

1 Q  Are you aware that your complaint states that you
2 contacted numerous people and that nobody would
3 touch Bob Riley with a 10-foot pole?
4      MS. RUSSELL: What paragraph are you referring
5 to, Counsel?
6      MS. GORDON: 10.
7      MS. RUSSELL: In the Second Amended?
8      MS. GORDON: That's the only complaint that I
9 know that's viable, so that's what I'm referring to
10 all day today.
11 BY MS. GORDON:
12 Q  Who was the third attorney you contacted?
13 A  I have now stated multiple times that I don't
14 recall at this moment.
15 Q  So when you filed your complaint originally, your
16 original complaint, did you know who these
17 attorneys were? Because you have this in your
18 original complaint as well.
19 A  Yes. And you asked - I asked you specifically what
20 time frame you were talking about. And you said
21 August of 2021. And there is a lot of time between
22 August of 2021 and when the complaint was filed.
23 And in August of 2021, I recall three attorneys.
24 Maybe – there could - there is a fourth attorney
25 but he doesn't do that type of law.

Page 158

1  A   I have now stated multiple times that I don't
2      recall as I sit here today.
3  Q   Do you recall who the office was?
4  A   I'm going to finish my answer.
5  Q   I thought you were finished.
6  A   I was still talking so I'm not sure how you could
7      think that I was finished.
8  Q   You're talking very low. Could you raise your voice
9      a little bit?
10 A   Sure.
11 Q   Go ahead.
12 A   As I sit here today, I do not recall the name of
13     the other female attorney.
14 Q   What did she tell you?
15 A   That she didn't want to get involved due to the
16     people involved.
17 Q   And who was the office you talked to? What was the
18     office?
19 A   I don't recall the office.
20 Q   Do you remember the city?
21 A   It was Metro Detroit.
22 Q   Was she an employment lawyer?
23 A   It was my understanding that her expertise included
24     employment.
25 Q   And was there a fourth attorney?

Page 159

1  A   The attorney that referred me to Matt Besser.
2  Q   Who's that?
3  A   His name is Joe Medici. He does not do employment
4      law.
5  Q   And did you call him for legal advice on this?
6  A   Yes.
7  Q   What did he say?
8  A   He connected me with Matt Besser who does do this
9      type of law.
10 Q   Your complaint states that you started work at the
11     Olsman Firm – excuse me, at the Riley Firm in
12     September 2021. It's Olsman, I'm sorry. In 2021,
13     and that you mistakenly believed you were escaping
14     Riley's harassment and control.
15     MS. RUSSELL: What paragraph are you referring
16     to?
17     MS. GORDON: 110.
18 BY MS. GORDON:
19 Q   Do you remember taking that position in your
20     complaint?
21 A   My former attorneys wrote my complaint.
22 Q   No, actually, you wrote the first complaint and
23     this has been in there.
24 A   That would not be my wording in the first
25     complaint.

Page 160

1      MS. RUSSELL: If we're going to move to other
2      than the operative complaint, I want the paragraph
3      that we're referring to.
4  BY MS. GORDON:
5  Q   So you were going to a firm where you knew they
6      used Bob Riley for a facilitator, and you were
7      going to a firm where you knew that the owners of
8      the firm were friendly with Bob Riley. But you
9      believed you were going to escape Bob Riley.
10 A   Yes. I had talked to Donna Mackenzie and she had
11     told me I wouldn't need to facilitate cases with
12     Bob Riley so, yes.
13 Q   We will get to that in a minute. In addition to
14     what I just said, that you knew that they used
15     Jules as a facilitator and that they were friends,
16     you also had made a decision that you were going to
17     continue to work with the hockey client that you
18     had worked on with Bob. And that this was very
19     important to you, correct?
20     MS. RUSSELL: Objection.
21     THE WITNESS: That's incorrect.
22 BY MS. GORDON:
23 Q   Was it important for you to stay on with the hockey
24     client?
25 A   I don't know what you mean by that.

Page 161

1  Q   It was important to you. You made a request to the
2      Olsman firm that you be allowed to continue working
3      on the PHA hockey client, correct?
4  A   I sent an email to Bob Riley stepping down from
5      working on the hockey client.
6  Q   You pursued working on the hockey client, correct?
7  A   I disagree with that statement.
8  Q   Once you got to the Olsman office – one you got to
9      the Olsman office, you made a request that you be
10     able to work for the hockey client, correct?
11 A   Bob had advised that he was stepping down from the
12     hockey client.
13 Q   I didn't ask you that. I asked you, once you got to
14     the Olsman Firm, you made a request that you
15     continue to work with the hockey client, correct?
16 A   Because Bob had advised he was stepping down.
17 Q   But at the time you made that request, Bob had not
18     stepped down, had he?
19 A   That's incorrect.
20 Q   Bob did not step down from the hockey organization
21     as of September 2021, had he?
22 A   Ultimately, Bob never stepped down until September
23     of 2024.
24 Q   Exactly.
25 A   So he had represented that he would step down and

Page 178

1  Q   I didn't ask you about a client.
2  A   Well, you're trying to -
3         MS. RUSSELL: You did.
4         THE WITNESS: You're asking me what I did
5     during the day about my work and I'm trying to
6     answer the questions. I'm trying to tell you where
7     I would have taken notes about my work. I don't
8     understand the question.
9  BY MS. GORDON:
10 Q   Sitting here today, you cannot think of anything
11    you have ever put in writing where you would have
12    said to Donna anything about your dissatisfaction
13    with Bob and the hockey client. You can't identify
14    anything here today in writing from you, correct?
15 A   A writing between me and Donna directly?
16 Q   You just said it was Donna you were -
17 A   I'm asking for clarification on the question.
18 Q   Well, I'll start with Donna, sure. Can you think of
19    anything you have in writing with Donna whatsoever
20    about hockey client?
21 A   I don't have all of the emails with Donna. I don't
22    have access to those. They're in the Olsman
23    Mackenzie email server.
24 Q   I didn't ask you -
25 A   I'm not done with my answer. So I don't know -

Page 179

1  Q   It's not responsive.
2  A   I don't know if those emails.
3         MS. RUSSELL: How do you know it's not
4     responsive if she isn't finished answering.
5     hasn't finished answering.
6  BY MS. GORDON:
7  Q   It's not responsive to my question, which is
8     there's nothing you can identify or think of today
9     that you put in writing to Donna, anything
10    specific?
11        MS. RUSSELL: Objection.
12        THE WITNESS: I don't recall.
13 BY MS. GORDON:
14 Q   Did you have a journal or notebook where you wrote
15    down your feelings?
16 A   As I stated before, I write poetry.
17 Q   I didn't ask you if you wrote poetry. I asked you
18    whether you kept a journal or notebook where you
19    wrote down your feelings. It's a yes or no.
20 A   I've written down feelings sometimes on a piece of
21    paper. I don't keep a journal of that nature.
22 Q   But you do make notes or write down your feelings.
23    Do you keep those?
24 A   I typically, when I write down my feelings then
25    turn it into a poem. So I know that that's not, you

Page 180

1     don't, that's not the answer that you're looking
2     for but I'm just -
3  Q   That's fine. You read one of your poems to Emily. I
4     mean, I know you wrote poems. I know you read them
5     to people. And I think it was from your diary that
6     you were reading it but it was some booklet of some
7     kind. So I want to know whether or not you have
8     anything in writing in a diary or a notebook or a
9     poem about the hockey client.
10        MS. RUSSELL: Objection.
11        THE WITNESS: I write poems in a book. So
12    that's like there - it's in a journal-type book,
13    but it doesn't mean that it's a journal. But would
14    I have written a poem about the hockey client? Is
15    that your question?
16 BY MS. GORDON:
17 Q   Any reference about the hockey client and your
18    concerns and you talking to Donna or anyone from
19    OMP about it?
20 A   I have written poetry about this situation.
21 Q   And where is that right now?
22        MS. RUSSELL: Objection.
23 BY MS. GORDON:
24 Q   Where is that kept? How do you keep that? Is it on
25    a laptop or what is that?

Page 181

1  A   It's written in a book of poetry.
2  Q   Like a journal?
3  A   Like a journal that's poetry, yep.
4  Q   So you do journaling then?
5  A   It's not really journaling because it's poems. But
6     like I don't write a journal, it's not a journal
7     entry. I'm trying to answer your question. I
8     don't -
9  Q   Yeah. I saw you wrote a poem to one of your
10    employers as to you were asked to make comments
11    about your performance and you wrote a poem.
12 A   I don't know what –
13 Q   I saw that.
14        MS. RUSSELL: Is there a question there,
15    Counsel?
16        THE WITNESS: Is there a question?
17        MS. GORDON: No, I was getting to one.
18        MS. RUSSELL: I object to that testimony.
19        MS. GORDON: Can I just get my question out?
20 BY MS. GORDON:
21 Q   I've seen that you wrote a poem to one of your
22    earlier employers with regard to a performance
23    review. So it appeared to me that you do write
24    poetry about things that are happening. And I'm
25    asking you whether you keep these.

46 (Pages 178 - 181)

Page 362
1 asking me a few different questions. One, you asked
2 me the attorneys that I consulted while I was
3 employed with Riley and Hurley and with Olsman,
4 Mackenzie, Peacock. And then there are - now you're
5 asking me in general for any attorney that I've
6 consulted. Those are two different - one timeframe
7 is a limited timeframe and the other is broader. So
8 what timeframe do you want?
9 BY MS. GORDON:
10 Q During the time you worked for Bob Riley, did you
11 contact attorneys?
12 A Yes. And I've answered that question already.
13 Q And did any of the attorneys you contacted say they
14 would not take your case because it was Bob Riley?
15 A You did.
16 Q What year was that?
17 A In August of 2021. We've already talked about that.
18 Q You contacted me after you already had a new job
19 offer from Olsman.
20 MS. RUSSELL: Objection.
21 BY MS. GORDON:
22 Q You contacted me and you told me you had a job
23 offer from Olsman and you were taking it. And I
24 said, well, that's good. You got a job, you don't
25 need damages.

Page 363
1 MS. RUSSELL: Objection. Counsel's testifying.
2 BY MS. GORDON:
3 Q So when you contacted me, you were already at that
4 stage. But leaving that aside, who told you that?
5 A When are we talking?
6 MS. RUSSELL: Can you clarify the question.
7 THE WITNESS: Are we talking about August of
8 2021? We've already talked about that.
9 BY MS. GORDON:
10 Q We're talking about any other timeframe. Any other
11 - strike that.
12 A timeframe I've given you and all of the
13 people who you talked to. Have you now given us the
14 name of every attorney you reached out to with
15 regard to a claim against Riley or a claim against
16 the Olsman Firm? Are there any others?
17 MS. RUSSELL: Objection. Asked and answered.
18 THE WITNESS: No. You have asked me about who I
19 contacted while I was employed at Riley and Hurley
20 and while I was employed at Olsman, Mackenzie. And
21 I contacted attorneys after that timeframe. So we
22 have not talked about that timeframe. I've asked
23 you what timeframes you want talk about.
24 BY MS. GORDON:
25 Q So does that mean when you were trying to find

Page 364
1 lawyers to represent you on this case that was
2 filed? Is that what you're talking about?
3 A Is that what you're trying to ask me about?
4 Q No. You just offered up a new timeframe.
5 A I don't - you're referring to a paragraph in the
6 complaint. If you show it to me, then - I've asked
7 what timeframe you want.
8 Q I'm not just referring to the paragraph. I was
9 using it as an example.
10 A What timeframe do you want?
11 Q You got to stop interrupting.
12 A I don't know what timeframe you want.
13 Q I've given you the timeframe multiple times. Are
14 there any other attorneys you've ever spoken to
15 about Bob Riley other than the names you've given
16 today, about any topic about Bob Riley?
17 MS. RUSSELL: Objection. Asked and answered.
18 BY MS. GORDON:
19 Q I know you must have talked to Katie Kalahar about
20 Bob Riley.
21 A Yes. You've asked me the timeframe of while I was
22 employed at Riley and Hurley and Olsman, Mackenzie,
23 Peacock. So what timeframe do you want?
24 Q I gave you the timeframe about five times.
25 A Can you give it to me again?

Page 365
1 Q During - throughout the time you worked for Riley
2 and throughout the time you worked for Olsman.
3 A I don't - as I sit here today, I do not recall
4 anyone else during that timeframe that you're
5 talking about. So Katie Kalahar would not be during
6 that timeframe.
7 Q Were there other lawyers outside of that timeframe?
8 A Yes.
9 Q That you talked to? And what would that timeframe
10 be when you contacted them?
11 A Following - being terminated by Olsman, Mackenzie
12 to present. If you want to take it as a big block.
13 Q Did Sarah Prescott say she would not sue Bob Riley
14 because of who he was or Jules Olsman because of
15 who he was?
16 MS. RUSSELL: Objection.
17 THE WITNESS: That is - Sarah Prescott could
18 not sue Bob Riley or Jules Olsman.
19 BY MS. GORDON:
20 Q Did she explain why?
21 A I believe she - well, I know there were a couple
22 different factors for her.
23 Q What were they?
24 A One being that her daughter has maybe a close
25 relationship with one of Donna's children. Or I'm

| | Page 366 | | Page 368 |
|---|---|---|---|
| 1 | sorry. Not her daughter, her partner's daughter. | 1 A | We talked about Ray Sterling. |
| 2 | Some sort of closeness there. And another being, I | 2 Q | Who's we? |
| 3 | know she had some staffing issues due to people | 3 A | You asked me if someone I talked to earlier was Ray |
| 4 | going out on maternity leave and having the | 4 | Sterling. So that was - |
| 5 | bandwidth. | 5 Q | Somebody recommended Ray Sterling to you? Or you |
| 6 Q | Why couldn't she sue Olsman? | 6 | did call Ray? |
| 7 A | I just indicated the answer to that question. | 7 A | I did call Ray. I would have to look at his, the |
| 8 Q | I thought you said Riley. She had some connection | 8 | firm website to tell you who I talked to from his |
| 9 | with Riley. Why couldn't she sue Jules Olsman? | 9 | office because I don't think I talked to Ray |
| 10 A | Because as I understood it, one of her law partners | 10 | specifically. I talked to Paladin Employment Law. |
| 11 | has a close relationship. Their children have a | 11 | That's not his last name. That's just the name of |
| 12 | close relationship with Donna's children. And the | 12 | the firm. I don't know his name. I could – I - I'll |
| 13 | same thing about the bandwidth and the staff and | 13 | have to think through the list of names that I - |
| 14 | her maternity leave. | 14 | I've put together a list so that can - |
| 15 Q | And what about Ken Mogill? Why was he not willing | 15 Q | When did you do that? |
| 16 | to take it on? | 16 A | I provided it to my former attorneys. |
| 17 A | He described himself as no longer - he wasn't ever | 17 Q | Ms. Kalahar? |
| 18 | going to litigate a case like that. He had brought | 18 A | Yes. |
| 19 | Sarah in. | 19 | MS. GORDON: Are you having questions for your |
| 20 Q | You went to him first and then he brought Sarah in? | 20 | witness today? |
| 21 A | Yes. | 21 | MS. RUSSELL: Not today. |
| 22 Q | Did you, I'll use the word fire them but I'm not, | 22 | BY MS. GORDON: |
| 23 | you know, did you remove them from the case or stop | 23 Q | I have some questions about the complaint that you |
| 24 | working with them for some reason? Was it your | 24 | filed. |
| 25 | decision to stop working with them or their | 25 | MS. RUSSELL: I think we have about 30 minutes |

| | Page 367 | | Page 369 |
|---|---|---|---|
| 1 | decision? | 1 | left. I don't know if you want to reserve time for |
| 2 A | I knew that they were not going to file suit. That | 2 | after I ask questions but that's - I'm not going to |
| 3 | wasn't in the scope of their representation. So | 3 | tell you how to prosecute your case so. |
| 4 | there was no firing that occurred. | 4 | MS. GORDON: Well, if you have a cross notice, |
| 5 Q | Did they recommend you to somebody when they said, | 5 | I'm just going to do whatever I would normally do. |
| 6 | we're not going to be able to do this? Why don't | 6 | I'm not going to reserve time. You're not – I mean, |
| 7 | you call so-and-so? Did they give you some names? | 7 | you're doing it a different date and a different |
| 8 A | They gave me some names, yes. | 8 | time. It's not a part of this dep. You have a cross |
| 9 Q | Who did they give you? | 9 | dep notice, you said. |
| 10 A | I don't recall the list of names off the top of my | 10 | MS. RUSSELL: No. We'll do our questions of her |
| 11 | head. | 11 | after the Riley party's deposition. |
| 12 Q | Do you recall anybody? How many did they give you, | 12 | MS. GORDON: You can show me some law on that |
| 13 | roughly? I mean, they know a lot of people | 13 | but I don't agree. |
| 14 | obviously. | 14 | MS. RUSSELL: Everything's going to come up in |
| 15 A | I called a lot of people. And I don't know how | 15 | y'all's dep. There's no reason for us to do it |
| 16 | many. They maybe gave me three names. I can get | 16 | twice. |
| 17 | that information for you. | 17 | MR. DAVIS: You're not superseding our |
| 18 Q | So you called a lot of people? | 18 | Deposition, Ms. Russell. I don't know what you're |
| 19 A | Yes. | 19 | talking about. |
| 20 Q | Roughly, how many? | 20 | MS. RUSSELL: I'm not. |
| 21 A | More than 10. | 21 | MR. DAVIS: Yeah, you're right. We're taking |
| 22 Q | Do you remember those names? | 22 | our full seven hours and you're not - you don't |
| 23 A | I remember some names but I don't remember all of | 23 | actually get to take two depositions. You get to |
| 24 | the names. | 24 | take one. You cross noticed your witness for today. |
| 25 Q | Who are the names you remember that you called? | 25 | So you will not be noticing them for a deposition |