# EXHIBIT 7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN

ELYSE McKENNA,

      Plaintiff/Counterclaim Defendant,


     -vs-                  Case No. 2:24-CV-12347

ROBERT F. RILEY, et al,

    Defendants/Counterclaim Plaintiffs.

_____/


VIDEOTAPED DEPOSITION


| | |
|---|---|
| DEPONENT: | ELYSE McKENNA |
| DATE: | Wednesday, December 10, 2025 |
| TIME: | 9:18 a.m. |
| LOCATION: | KIENBAUM HARDY VIVIANO |
| | PELTON & FORREST PLC |
| | 280 North Old Woodward Avenue, Suite 400 |
| | Birmingham, Michigan |
| REPORTER: | Karen Fortna, CRR/RMR/RPR/CSR-5067 |
| VIDEO: | Bailey Wellman |
| JOB NO: | 48239 |

Fortz Legal Support

www.FortzLegal.com

844.730.4066



1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF MICHIGAN

3

4    ELYSE McKENNA,

5          Plaintiff/Counterclaim Defendant,

6

7          -vs-                          Case No. 2:24-CV-12347

8

9    ROBERT F. RILEY, et al,

10         Defendants/Counterclaim Plaintiffs.

11    _____/

12

13                    VIDEOTAPED DEPOSITION

14

15         DEPONENT:   ELYSE McKENNA

16         DATE:       Wednesday, December 10, 2025

17         TIME:       9:18 a.m.

18         LOCATION:   KIENBAUM HARDY VIVIANO

19                     PELTON & FORREST PLC

20                     280 North Old Woodward Avenue, Suite 400

21                     Birmingham, Michigan

22         REPORTER:   Karen Fortna, CRR/RMR/RPR/CSR-5067

23         VIDEO:      Bailey Wellman

24         JOB NO:     48239

25

ELYSE McKENNA v ROBERT F. RILEY                                    Job 48239
MCKENNA, ELYSE 12/10/2025                                            2..5

Page 2

```
 1  APPEARANCES:
 2        THE RUSSELL LAW FIRM PLLC
          By:  Ms. Kimberly Russell
 3        1140 Third Street NE
          Washington, DC  20002
 4        202.430.5085
          kimberly@russellatlaw.com
 5            Appearing on behalf of the Plaintiff
 6        BROWN LEGAL GROUP PLLC
          By:  Mr. Sammy L. Brown, Jr.  (VIA ZOOM)
 7        175 North Union Street
          Canton, Mississippi  39046
 8        601.407.4887
          slb@brownlegalgrouppllc.com
 9            Appearing on behalf of the Plaintiff
10        KIENBAUM HARDY VIVIANO
          PELTON & FORREST PLC
11        By:  Ms. Elizabeth Hardy
               Mr. Thomas J. Davis
12             Mr. Thomas G. Kienbaum
          280 North Old Woodward Avenue, Suite 400
13        Birmingham, Michigan  48009
          248.645.0000
14        ehardy@khvpf.com
          tdavis@khvpf.com
15        tkienbaum@khvpf.com
              Appearing on behalf of
16            Defendants/Counterclaim Plaintiffs
17        DEBORAH L. GORDON PLC
          By:  Ms. Deborah L. Gordon
18             Ms. Elizabeth A. Marzotto Taylor  (VIA PHONE)
          33 Bloomfield Hills Parkway, Suite 220
19        Birmingham, Michigan  48304
          248.258.2500
20        dgordon@deborahgordonlaw.com
          emarzottotaylor@deborahgordonlaw.com
21            Appearing on behalf of
              Defendants/Counterclaim-Plaintiffs
22
    ALSO PRESENT:  Mr. Robert F. Riley, Esquire
23                 Mr. Robert P. Hurley, Esquire
                   Ms. Donna M. MacKenzie, Esquire
24
25
```

Page 4

```
 1              E X H I B I T S
 2
 3  EXHIBIT              DESCRIPTION           PAGE
 4  Exhibit 1    Google calendar excerpt, Bates  . .70
 5               Nos. PL00599-600
 6  Exhibit 2    10-1-19 Sommers Schwartz letter . 111
 7  Exhibit 3    Employment term sheet, Bates Nos. 161
 8               PL23238-23239
 9  Exhibit 4    Text string, Bates Nos. RH00017-20 58
10  Exhibit 5    Text string, Bates No. RH00033  . 178
11  Exhibit 6    Christmas cards, Bates Nos. . . . 182
12               PL00486-505
13  Exhibit 7    Text string, Bates No. RH00295  . 183
14  Exhibit 8    Text string, Bates Nos. . . . . . 185
15               RH00331-333
16  Exhibit 31   Photographs, Bates Nos. . . . . . 276
17               PL00569-570
18  Exhibit 36   Text string, Bates Nos. PL22340,  213
19               22341, 22343
20  Exhibit 37   Text string, Bates Nos. . . . . . 266
21               RH01924-1926
22
23
24
25
```

Page 3

```
 1                  I N D E X
 2
 3  W I T N E S S
 4
 5      ELYSE MCKENNA                       PAGE
 6
 7  Examination by Ms. Hardy                 10
 8
 9
10  COUNSEL-REQUESTED MARKED LOCATION:  Page 52, line 25
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1            Wednesday, December 10, 2025
 2            Birmingham, Michigan
 3            9:18 a.m.
 4               *    *    *
 5        VIDEOGRAPHER:  Good morning.  We are
 6  now on the record at 9:18 a.m. on Wednesday,
 7  December 10, 2025.  This begins the videotaped
 8  deposition of Elyse McKenna, taken in the matter of
 9  Elyse McKenna versus Robert F. Riley, et al, Case
10  No. 2:24-CV-12347.  We are taking this deposition
11  at the offices of Kienbaum Hardy Viviano Pelton &
12  Forrest in Birmingham, Michigan.
13        My name is Bailey Wellman, your legal
14  videographer, representing Fortz Legal Support.
15        Counsel, will you please state your name
16  and whom you represent after which our court
17  reporter will swear the witness.
18        MS. RUSSELL:  This is Kimberly Russell,
19  representing Elyse McKenna, the plaintiff.  And on
20  Zoom we also have Sammy Brown, who is representing
21  the plaintiff as well.
22        MS. HARDY:  Elizabeth Hardy on behalf of
23  the Riley parties.
24        MS. GORDON:  Deborah Gordon on behalf of
25  the Olsman parties.
```

ELYSE McKENNA v ROBERT F. RILEY

Job 48239

MCKENNA, ELYSE 12/10/2025

6..9

Page 6

1      MR. DAVIS:  Thomas Davis on behalf of the
2 Riley parties.
3      MS. HARDY:  And we have Liz Marzotto
4 Taylor, who is hooked up by phone, on behalf of
5 OMP.
6      *    *    *    *
7          ELYSE MCKENNA,
8 having first been duly sworn, was examined and
9 testified as follows:
10      MS. HARDY:  Good morning, Ms. McKenna.
11      THE WITNESS:  Good morning.
12      MS. HARDY:  We've met before, but I'll
13 reintroduce myself.  I'm Elizabeth Hardy and I
14 represent the Riley parties and we are here to ask
15 you questions about what facts you have that
16 support your claims that have been pled against the
17 Riley parties.
18      I am not going to be showing you
19 documents to refresh your memory throughout the
20 course of this deposition unless I'm specifically
21 asking you about the wording of a document, so just
22 bear that in mind.  There's no reason for you to
23 continually ask me, as you did Ms. Gordon, to show
24 you a document before you can answer.
25      I'm finding out what your recall is

Page 7

1 sitting here as the party bringing the claim and as
2 a lawyer bringing the claim and as a lawyer who
3 brought this claim on her own behalf initially.  So
4 the questions are going to be directed to you; I
5 need your answers, not your lawyer's, and I don't
6 need you regurgitating what's in a document.
7      MS. RUSSELL:  I'm going to go ahead and
8 object to the statement on the record.  Last time
9 when we had these documents, one of them were
10 third-party subpoenas that are still not produced
11 that plaintiff had no opportunity to review
12 beforehand.  If you're going to mischaracterize
13 documents, she has every right to ask to review
14 them.
15      MS. HARDY:  With respect to breaks, I
16 will provide appropriate breaks for restroom use,
17 for you to stretch your legs, but when there's a
18 question pending on the table, you are expected to
19 answer that question before going on a break.  So
20 if you're getting at a point where you think you
21 might need a break, might need to go to the
22 restroom, let me know.  I understand you're
23 pregnant and you have a need to go to the bathroom
24 every hour on the hour.  If that is truly the case,
25 I will accommodate that, but with some limitations.

Page 8

1 I don't expect like a 30-second notice that you
2 need to run to the bathroom.  I assume that you can
3 predict when you're getting to a point where you
4 need to use the restroom and we can plan
5 accordingly so that we can finish a line of
6 questioning and wrap it up before you get up and
7 leave the room.
8      One other request:  When you do leave the
9 room for a restroom break, if you have to indeed go
10 every hour on the hour, I don't expect it to become
11 a 15-minute break.  The restroom is right outside
12 the door, so there's no reason you can't be to the
13 restroom and back within five minutes.  Understood?
14      THE WITNESS:  I'm not sure what you're
15 asking me if I understand, how long the restroom
16 should take me?
17      MS. RUSSELL:  You understand her request?
18      THE WITNESS:  There were a lot of
19 requests in that.  I'm trying to ask what -- all of
20 the requests?
21      MS. HARDY:  I'm going to assume you
22 understood, and if you don't understand me at any
23 point during this deposition, ask me for an
24 explanation.
25      THE WITNESS:  Okay.

Page 9

1      MS. HARDY:  You're a lawyer, you're
2 presumably an intelligent woman, you're presumably
3 capable of listening to questions and answering
4 them, and if you don't understand something, the
5 burden is on you to ask me to explain.
6      Okay.  Do you have something you need to
7 say, Ms. Russell?
8      MS. RUSSELL:  A couple of things that I
9 want to address as her counsel.  I understand your
10 request; we will do what is needed for our
11 plaintiff.
12      I want to read into the record a note
13 from plaintiff's doctor and I am happy to produce
14 this as an exhibit.
15      It says -- it's dated 12-9-2025.  "To
16 whom it may concern" -- for the record, she had a
17 GYN appointment scheduled yesterday already.
18      So here is the note.  It says, "To whom
19 it may concern:  Elyse McKenna is an obstetrical
20 patient in my office.  It is my medical opinion
21 that she takes frequent hourly breaks to use the
22 restroom and also breaks for breakfast, lunch and
23 dinner.  It is also recommended that she be allowed
24 to take additional breaks in the event she
25 experiences elevated heart rate or increased

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
10..13

Page 10

1    anxiety, as this can be harmful on the fetus.  If
2    you have any questions or concerns, please contact
3    my office at 859.278.0396.  Thank you, Karen
4    Schell."
5            And I will give this to you to review.
6    We will produce a copy as an exhibit.
7            MS. HARDY:  Ms. Gordon, do you have
8    anything you would like to say before we start?
9            MS. GORDON:  No.
10           MS. RUSSELL:  Would you like to review
11   the note?
12           MS. GORDON:  Who's the doctor that's on
13   the note?
14           MS. RUSSELL:  Karen Schell.
15           MS. GORDON:  And what's the location?
16           MS. RUSSELL:  Kentucky.  She's new.  We
17   can get you a HIPAA authorization.  She's recently
18   retained.
19           MS. GORDON:  Retained?
20           MS. RUSSELL:  Hired, whatever the medical
21   term is.  You know I'm a lawyer; I live in lawyer
22   land.
23              EXAMINATION
24   BY MS. HARDY:
25   Q.   All right.  Ms. McKenna, have you taken any

Page 11

1    prescription medications this morning?
2    A.   No.
3    Q.   Do you take any prescription medications on a
4    regular basis?
5    A.   I -- not since I've been pregnant, I do not.
6    Q.   Okay.  Have you taken any prescription medications
7    since you've been pregnant?
8    A.   I think before I knew that I was pregnant, I took
9    Flagyl.
10   Q.   And what was that for?
11   A.   A UTI.
12   Q.   Okay.  Do you know of any reason you are not able
13   today to provide truthful and accurate sworn
14   testimony?
15   A.   No, I do not know of any reason.  I know being
16   pregnant has made me a little more forgetful, but I
17   don't think that should prevent me from providing
18   truthful and accurate testimony.  If I don't
19   remember something, I would say that.
20   Q.   Have you ever been a party in litigation outside of
21   this case and your divorce proceeding?
22   A.   In my divorce proceeding, I was.
23   Q.   Outside of --
24   A.   So outside of it?  No, just the divorce proceeding.
25   Q.   And you were the plaintiff in the divorce

Page 12

1    proceeding?
2    A.   Yes.
3    Q.   Prior to employment with the Riley & Hurley law
4    firm, how would you describe your emotional and
5    mental health?
6    A.   Can you explain what you mean by that?  I don't
7    understand your question.
8    Q.   Sure.  What was, in your assessment and the
9    assessment of your treaters, the state of your
10   emotional and mental health prior to working for
11   the Riley & Hurley law firm; was it healthy?
12   A.   I don't -- if you're asking me what my treater's
13   impression was, I don't know what my treater's
14   impression was.  I don't know the answer to your
15   question.
16   Q.   Well, were you seeing treaters prior to becoming
17   employed by the Riley & Hurley law firm for your
18   mental or emotional health?
19   A.   I was -- I saw doctors, and if something
20   anxiety-producing came up, like I saw a primary
21   care provider -- I'm sure I mentioned -- I think
22   they have to ask you for their own records, "Are
23   you depressed?  Are you anxious?"  I don't know
24   what those say, so...
25   Q.   What primary care providers did you see in the five

Page 13

1    years preceding your employment with Riley &
2    Hurley?
3    A.   I have produced authorizations for those people.  I
4    went into my MyChart and listed all of them.  I
5    don't remember those names off the top of my head.
6    It would have been while I was still in Michigan.
7    Q.   Were they all located in Michigan?
8    A.   Yes, I was located in Michigan and my primary care
9    providers were located in Michigan.
10   Q.   Did you raise with any of them that you had some
11   type of emotional or mental health challenge that
12   you needed to discuss?
13   A.   I don't recall.
14   Q.   You have no recall?
15   A.   I have not -- I know you don't want me to ask to
16   look at records and I don't have those records and
17   I don't recall.  I would have brought up -- if
18   there was something concerning to me, I would have
19   brought that up with my provider.
20   Q.   So sitting here today, you can't characterize in
21   any fashion what the state was of your emotional
22   and mental health before you worked for the Riley &
23   Hurley law firm; was it a healthy one, was it one
24   with stress, were there occasional problems?  Can
25   you give any descriptor of what the state was of

Page 14

1  your emotional and mental health prior to
2  employment with Riley & Hurley?
3  A.  I would say, just like anyone has occasional
4     problems, I had occasional problems and that would
5     be my descriptor. I don't have --
6  Q.  Anything that required prescription medication?
7  A.  I think on perhaps one occasion I was given a
8     prescription of Xanax.
9  Q.  When was that?
10 A.  I could not give you any -- I did not take the
11    Xanax; it was for some acute -- "If you're anxious,
12    take your Xanax," and I couldn't tell you when it
13    was or...
14 Q.  Can you tell me who prescribed it?
15 A.  I'm sure it's in the records of who prescribed it.
16 Q.  No, can you tell me?
17 A.  I cannot tell you who prescribed it.
18 Q.  So you have one prescription in the five-year
19    period preceding working for the Riley & Hurley law
20    firm in which Xanax was prescribed; you don't know
21    who prescribed it or when; is that your testimony?
22 A.  That's my testimony and it's also -- it could have
23    been while I was at Riley & Hurley. It's in that
24    timeframe. I mean, we're at six years ago now.
25 Q.  My question is focused on prior to working for

Page 15

1     Riley & Hurley, did you have any problems with your
2     emotional and mental health?
3  A.  And my answer is that I had occasional problems
4     just like anyone has life problems and at some
5     point I got a prescription for Xanax, but I do not
6     know if that was prior to Riley & Hurley or not.
7     Riley & Hurley was six years ago and prior to
8     Riley & Hurley would be more than six years ago.
9     I'm doing my best to give you an estimate.
10    MS. RUSSELL: Object to the last
11    question.
12 BY MS. HARDY:
13 Q.  Did you seek treatment for emotional and mental
14    health problems with either a primary care
15    physician or any other professional prior to
16    working for Riley & Hurley?
17 A.  No, I would have talked to my primary care
18    physician about it. I've listed all the therapists
19    and counselors, but you have those records, you
20    have those authorizations.
21 Q.  All right. So it's your testimony that prior to
22    employment with the Riley & Hurley law firm, the
23    only time you discussed emotional or mental health
24    issues with any kind of professional was a primary
25    care physician, name unknown at the moment, and

Page 16

1     that physician prescribed Xanax in the event you
2     had an anxiety issue; is that correct?
3     MS. RUSSELL: Counsel, when she finishes
4     this question, I would like to say something on the
5     record, but I just want to say that.
6     THE WITNESS: My testimony is that I
7     don't recall everyone that I would have spoken to.
8     I do recall that primary care providers in their
9     general practice, they ask you, and if they would
10    have asked me if I was anxious, I believe I would
11    have told them at times that I had occasional
12    problems. I do not know when a -- I do not recall
13    when a prescription for Xanax was -- I don't know
14    when that was prescribed. I think it was in the
15    timeframe that you've stated, but I don't recall
16    exactly and I don't recall other people that I
17    would have talked to.
18    MS. RUSSELL: Is your answer finished?
19    THE WITNESS: Yes.
20    MS. RUSSELL: Okay. Ms. Hardy, prior to
21    this deposition, it was represented to the Court
22    and to plaintiff that HIPAA authorizations and
23    medical records were necessary to prepare for this
24    dep. There was exactly one notice of intent to
25    serve a subpoena on Ms. Gemma Haynes, even though

Page 17

1     we served -- we produced HIPAA authorizations for
2     14 providers.
3     If you all have served subpoenas and not
4     produced -- first of all, not given us your notice
5     of intent to serve subpoenas and not produced the
6     information that you received, that's a problem.
7     MS. HARDY: Are you --
8     MS. RUSSELL: I just want that on the
9     record as a standing objection to this line of
10    questioning.
11    MS. HARDY: First, let me speak to this.
12    This is the first issue I'm going to warn you
13    about. That did not -- statement did not belong in
14    this deposition. You are wasting time in a
15    seven-hour deposition trying to raise your
16    discovery disputes and somehow prompt an argument.
17    That is inappropriate.
18    MS. RUSSELL: I'm stating it on the
19    record.
20    MS. HARDY: That is issue No. 1 that's
21    going on my list for issues to raise with the
22    Court.
23    MS. RUSSELL: Go ahead.
24    MS. HARDY: It will be in our sanctions
25    motion.

Page 18

1      MS. RUSSELL:  What I just stated on the
2  record will be in our sanctions motion as well.
3      MS. HARDY:  It's interfering
4  inappropriately with this deposition to start
5  debating discovery disputes.  That will not be
6  acceptable here or else you'll see it in a motion.
7      MS. RUSSELL:  It was simply a statement
8  on the record about --
9      MR. DAVIS:  A false statement.  Check
10  your emails because it was served, Ms. Russell.
11  Your statement is false and incorrect and we have
12  the evidence of it, so let's move on.
13      MS. HARDY:  Tom, let's move on because I
14  don't want to spend time on this record --
15      MR. DAVIS:  Yeah.
16      MS. HARDY:  -- debating discovery
17  disputes.
18      MR. DAVIS:  Correct.
19  BY MS. HARDY:
20  Q.   All right.  Did you seek in-patient treatment for
21      mental health services or emotional problems prior
22      to your employment with the Riley & Hurley law
23      firm?
24  A.   In-patient, meaning going to a hospital to seek --
25  Q.   A treatment center, a hospital where you would

Page 19

1  spend the night.
2  A.   I do not recall that prior to working at Riley &
3      Hurley.
4  Q.   You're not saying no, correct?
5      MS. RUSSELL:  Objection.
6      THE WITNESS:  I know you don't want
7  to show me anything.  I don't recall that
8  happening.
9  BY MS. HARDY:
10  Q.   Would I have to show you something for you to
11      remember if you've been an in-patient client for
12      emotional and mental health services; would you
13      have to actually see something in writing to recall
14      that?
15      MS. RUSSELL:  Object to form.
16      THE WITNESS:  Well, I know that I've been
17  an in-patient -- I have tried to go to a treatment
18  center post the filing of this complaint, but no, I
19  don't recall ever going to an in-patient prior to
20  Riley & Hurley.
21  BY MS. HARDY:
22  Q.   But your answer is not, "No, I did not have
23      hospitalization or in-patient treatment,"
24      correct?
25      MS. RUSSELL:  Objection.

Page 20

1  BY MS. HARDY:
2  Q.   You can't say no to that question; all you can say
3      is "I don't recall"?
4      MS. RUSSELL:  Objection.
5      THE WITNESS:  I'm saying I don't recall.
6  BY MS. HARDY:
7  Q.   If there were witnesses who testified that you told
8      them you had received in-patient treatment for
9      mental health problems and that you had had a lot
10      of mental health challenges prior to Riley &
11      Hurley, would you dispute that?
12      THE WITNESS:  Sorry, can you repeat the
13      question?
14      MS. HARDY:  Read it back, please.
15      (Whereupon the question was read
16      back by the court reporter.)
17      THE WITNESS:  I don't recall in-patient
18      services prior to Riley & Hurley, so I would
19      dispute that.  I don't recall that.
20  BY MS. HARDY:
21  Q.   You're not saying it didn't happen, you're just
22      saying you don't recall?
23      MS. RUSSELL:  Objection.
24      THE WITNESS:  I know -- I understand you
25      want me to get trapped in it didn't happen or I

Page 21

1  don't recall.  I don't recall.  You've asked me
2  to -- you set forth rules at the beginning of this
3  deposition.  I don't recall that.
4  BY MS. HARDY:
5  Q.   You understand there's a difference between, "No,
6      it didn't happen," "Yes, it did happen," and "I
7      don't recall"?
8  A.   Yes, I understand there's a difference.
9  Q.   Okay.  And you're selecting "I don't recall" as
10      your answer?
11  A.   Yes.  You seem to be -- you seem to be -- and I
12      understand this is -- because I'm a lawyer, I
13      understand this is how lawyers do it.  You seem to
14      be implying that I had in-patient services and that
15      would be shocking to me because I don't recall
16      that, so that's my answer.  I don't recall that.
17  Q.   When did you seek in-patient services after working
18      for Riley & Hurley?
19  A.   I want to make sure that we're talking about the
20      same thing.  In-patient services, meaning going to
21      a hospital?
22  Q.   It could be going to a hospital, it could be a
23      clinic, it could be any number of different types
24      of facilities.
25  A.   Well, an out-patient -- out-patient and in-patient

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
22..25

Page 22

1    being different things here --
2  Q.   Correct.
3  A.   -- I just am trying to make sure that we're --
4  Q.   In-patient being where you are there to spend some
5       extended period of time, two days, three days,
6       three weeks, three months; out-patient where you go
7       for a specific visit and you depart.
8  A.   Sure.
9  Q.   So let's stay with in-patient.
10 A.   In-patient.  Okay.
11 Q.   You don't recall in-patient prior to Riley &
12      Hurley, but you mentioned in one of your answers
13      that you sought in-patient while you were working
14      for Riley & Hurley or after you worked for Riley &
15      Hurley?
16 A.   Okay.  And I want to clarify something just so that
17      we're all clear for everything.  I have not -- like
18      my answer for the in-patient, I have never been --
19      prior to Riley & Hurley, I was never admitted
20      in-patient.  I'm saying I was never.  That did not
21      happen.
22           Whether I presented to someplace to an
23      in-patient -- to a hospital or something on an
24      acute basis, that is what I am saying I don't
25      recall to, but I was never admitted in-patient.

Page 23

1  Q.   Okay.  Thank you.
2  A.   I just want to be clear that we have
3       in-patient/out-patient going on.  I don't recall
4       any situation in which I appeared or presented for
5       in-patient prior to Riley & Hurley; I don't recall
6       that.  Post -- sorry, post-Riley & Hurley, or
7       post-complaint now?  What timeframe?
8  Q.   No.
9            Since working for Riley & Hurley, which
10      would be during the time you worked there or
11      after --
12 A.   Or OMP -- okay.  We're on in-patient -- sorry, I'm
13      trying to -- we're on in-patient, we're on
14      presentation or on admission or on both?
15 Q.   Let's take it in steps.
16 A.   Okay.
17 Q.   Did you present yourself for in-patient treatment
18      after you started with Riley & Hurley up through
19      today's date?
20 A.   I went to -- I recall going to a mental health
21      clinic on a more emergent basis after the filing of
22      the complaint.
23 Q.   What clinic was that?
24 A.   I would have to recall it.  I would look for a name
25      for you and be happy to provide it.

Page 24

1  Q.   Did you disclose that name?
2  A.   No, I didn't think about it.  It was like a
3       Maryland Public Services, like emergency-type
4       center.  I can probably find it on a break.
5  Q.   Why did you present for treatment at that clinic at
6       that time?
7  A.   Because I was deeply stressed about the filing of
8       the complaint and I was in distress.
9  Q.   Did you receive treatment?
10 A.   I talked to someone and I don't know if she was --
11      I couldn't tell you if she was a psychologist or
12      MSW or -- I don't know what her title was, but I
13      spoke with her about --
14 Q.   How long?
15 A.   I think I waited in the facility for a couple of
16      hours before I was seen and then I spoke with her
17      for --
18 Q.   Did she do an intake procedure?
19           MS. RUSSELL:  Counsel, you were
20      interrupting the witness two times in a row now.
21      Allow the witness to answer.
22           THE WITNESS:  I believe she took notes.
23      I don't know what -- when you say intake procedure,
24      I was not admitted.  I don't know that that
25      facility admits anyone, but I was --

Page 25

1  BY MS. HARDY:
2  Q.   Did you return for treatment at any subsequent
3       point?
4  A.   No, the followup for that was to go to my regularly
5       scheduled therapy session with my therapist at the
6       time, which was Anne Gialanella.
7  Q.   Gialanella.
8            Why did you go to the clinic as opposed to
9       directly to Gialanella?
10 A.   Because I did not have a scheduled therapy
11      appointment and I was in a crisis.  I could not
12      wait for a therapy appointment.
13 Q.   Prior to your employment at Riley & Hurley, did you
14      ever take medication to help regulate your
15      emotional or mental health?
16 A.   As I stated before, I might have been prescribed
17      Xanax prior to Riley & Hurley.  I don't know what
18      date that was and I didn't end up taking it on any
19      regular basis.  I had a small prescription for
20      Xanax.
21 Q.   So you took it occasionally?
22 A.   I didn't end up taking -- I took it one time and I
23      didn't take it again.
24 Q.   Other than the Xanax that you took one time, did
25      you ever take, prior to Riley & Hurley, any

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
26..29

---

Page 26

1   medication to regulate emotional or mental health?
2   A.   I don't recall taking any other medication to
3        regulate my emotional or mental health prior to
4        Riley & Hurley.
5   Q.   Prior to Riley & Hurley, was there ever a clinical
6        diagnosis regarding your mental health?
7   A.   I don't believe that there was.
8   Q.   How would you describe your personality?
9   A.   I have no -- what kind of description, I guess, are
10       you looking for?
11  Q.   I can give you descriptions and you can tell me
12       whether they fit your personality.  Would that
13       help?
14            MS. RUSSELL:  Objection.
15            THE WITNESS:  I can tell you that on the
16       Myers-Briggs assessment for personality, I'm an
17       INFJ.
18  BY MS. HARDY:
19  Q.   What does that mean?
20  A.    It means -- I would have to think about that.
21       Introverted and then intuitive, feeling and
22       judgmental.  There's like -- you can be an I or an
23       E, you can be an N or an S maybe, an F or a -- I
24       don't know.  There's eight options and four
25       combinations.

---

Page 27

1   Q.   Okay.  Did you take a Myers-Briggs test at some
2        point?
3   A.   I took it for a leadership class, yeah.
4   Q.   When was that?
5   A.   Last year.
6   Q.   Would you describe yourself as timid?
7   A.   I think at times I can be timid, just like anybody,
8        but I would say I try not to be timid.  I don't
9        know.
10  Q.   How would you describe your self-esteem?
11  A.   I think it's changed over time.
12  Q.   How?
13  A.   Sometimes it's not great and sometimes it's better.
14       I guess I don't -- I think it depends on factors in
15       life.
16  Q.    Are there any kind of prevailing characteristics
17       that you have of your own personality, but aside
18       from what Meyers-Briggs has to say, that you would
19       use to describe it?
20  A.   I try to be authentic.
21  Q.   Are you optimistic?
22  A.   I try to be optimistic.
23  Q.   Self-confident?
24  A.   I think that depends on the fact of things going on
25       in life.

---

Page 28

1   Q.   Some days you are, some days you're not; you can't
2        generally describe yourself as a self-confident
3        person?
4            MS. RUSSELL:  Objection.
5            THE WITNESS:  I think this situation hurt
6        my confidence.  I work on building up to have it
7        back.
8   BY MS. HARDY:
9   Q.   Were you a self-confident person in 2019?
10  A.   I think so.
11  Q.    Did you have a healthy self-esteem in 2019?
12  A.   I think -- as I said before, I think self-esteem on
13       all those things are dictated by factors that
14       are -- the factors that you're going through and
15       it's up and down.  I don't know that you can pick
16       one point in time and be like that was a great
17       self-esteem time or not.
18  Q.   Well, you seem to have a theory in this lawsuit
19       that you were one person before Riley & Hurley and
20       you became somebody different later.  I'm trying to
21       figure out, who were you before and who have you
22       become?
23            MS. RUSSELL:  Is there a question there?
24            MS. HARDY:  Yeah, I just posed it.
25            THE WITNESS:  What is the question?

---

Page 29

1   BY MS. HARDY:
2   Q.   Let's focus on the time in 2019.  You start working
3        for Riley & Hurley.  Would you describe yourself as
4        somebody who was a motivated person?
5   A.   Yes.
6   Q.   All right.  Would you describe yourself as somebody
7        who generally had good self-esteem?  Of course
8        everyone can have a day where you're feeling low or
9        whatever, but were you generally somebody who felt
10       good about yourself?
11  A.   I would say generally.
12  Q.   Okay.  And you're optimistic?
13  A.   I would say I tried to maintain being optimistic,
14       but I would say yes, prior to Riley & Hurley, I was
15       more optimistic than post Riley & Hurley.
16  Q.   The first year you joined, were you self-confident?
17  A.   The first year I joined Riley & Hurley?
18  Q.   Yeah.
19  A.   I think I was -- self-confident compared to what?
20       I guess like more self-confident?
21  Q.   You know, if you really can't answer, just say you
22       can't answer.
23  A.   Well, you're asking --
24  Q.   If you have no idea what kind of person you were at
25       that point, what your kind of general frame of mind

---

ELYSE McKENNA v ROBERT F. RILEY

Job 48239

MCKENNA, ELYSE 12/10/2025

30..33

Page 30

1     and personality was, just say you can't answer.
2          MS. RUSSELL:  Objection.  Counsel, she's
3     asking for clarification.
4  BY MS. HARDY:
5  Q.   Were you generally a self-confident person in 2019
6     when you joined Riley & Hurley?
7  A.   I was more self-confident then than when I left
8     Riley & Hurley.
9  Q.   Were you somebody who was able to speak up when you
10    disagreed and assert yourself?
11 A.   Prior to Riley & Hurley, I would say that was
12    easier than post Riley & Hurley, yes.
13 Q.   As of the time you joined Riley & Hurley, were you
14    able to do that, were you able to voice a contrary
15    opinion; did you have that capacity?
16 A.   Yes, I would say I did.
17 Q.   Okay.  Were you somebody, when you joined Riley &
18    Hurley, who was intimidated by men?
19 A.   I don't think I could say that as a blanket rule
20    that I was intimidated by men.
21 Q.   Okay.  So then the answer is no, but for perhaps
22    occasional people; is that correct?
23 A.   Yes, I would say that's correct.
24 Q.   Okay.  Did you have a problem working with men at
25    the time you joined Riley & Hurley?

Page 31

1  A.   In general?
2  Q.   Yeah.
3  A.   Did I have -- no, I did not have an in general
4     problem.
5  Q.   Did you have an aversion to working with men?
6  A.   No.
7  Q.   Did you feel as comfortable voicing a contrary
8     opinion with men as women at the time you joined
9     Riley & Hurley?
10 A.   In general, no.
11 Q.   In general, no?
12 A.   I did not have a hard time voicing a contrary
13    opinion to men versus women in general; yes,
14    correct.
15 Q.   All right.  Let's talk for a moment about your
16    legal career prior to Riley & Hurley.  You were
17    with the Mellon firm from October 2015 to June 2018
18    as an associate attorney, correct?
19          MS. RUSSELL:  Objection.
20          THE WITNESS:  Correct.  And before that I
21    was a law clerk at Mellon Pries.
22 BY MS. HARDY:
23 Q.   But you started your practice as a lawyer in
24    October 2015?
25 A.   That's when I passed the bar, yes.

Page 32

1  Q.   Okay.  And you then went to the Foley Baron firm
2     from June 2018 through October 2019?
3  A.   Correct.
4  Q.   Okay.  So between those two firms, you had four
5     years of experience as an associate -- first as an
6     associate attorney and then as a senior associate;
7     is that correct?
8  A.   Yes.
9  Q.   And during that time, you were a litigator,
10    correct?
11 A.   Yes.
12          MS. RUSSELL:  I'm going to place a
13    standing objection to everything that's already
14    been asked in OMP so that way I don't have to say
15    objection over and over again.
16 BY MS. HARDY:
17 Q.   And you focused on medical malpractice defense,
18    correct?
19 A.   Yes, although at Mellon Pries, I also -- we did
20    some insurance defense for the Michigan Municipal
21    Risk Management Authority, so I would say the time
22    at Mellon Pries was not -- it might have been more
23    50/50.
24 Q.   Insurance defense and then 50 percent medical
25    malpractice?

Page 33

1  A.   Yeah, or maybe 60/40; 60 medical malpractice,
2     40 insurance defense, but it was --
3  Q.   Insurance defense is litigation though, correct?
4  A.   Yes, and I just want to clarify the medical
5     malpractice versus not, but I'm not saying I wasn't
6     doing litigation.
7          And then there was -- I guess at Mellon
8     Pries, there was also -- Renee Pries had worker's
9     compensation cases and so I maybe spent 10
10    percent -- so we've got to change this ratio up,
11    but maybe 50/40/10, 50 med mal, 40 insurance
12    defense, 10 percent worker's comp.
13 Q.   Were you satisfied with your first four years in
14    terms of your professional development by the time
15    you left Foley Baron?
16 A.   Yes, as far as my professional development.
17 Q.   Okay.  Did you feel you developed strong litigation
18    skills during that time?
19 A.   Yes, I did.
20 Q.   And were you self-confident that you, as an
21    attorney of four years, had been successful and had
22    a bright future ahead of you?
23 A.   Yes.
24 Q.   Did you have any clients of your own at Foley
25    Baron?

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
34..37

Page 34

1  A.   No, I did not.
2  Q.   Did you have any first-chair responsibilities for
3        any case that you handled?
4  A.   So I went up -- during the time I was at Foley
5        Baron, there were not cases that went to trial, but
6        there were cases that I was taking the lead on in
7        the discovery process. So when you say first-chair
8        responsibilities, I want to make sure that -- I
9        understand first chair in a trial term only so --
10 Q.   Let me explain it in a broader sense. Were you
11       ever the person, whether it's discovery, just
12       discovery or not, who the client looked to to be
13       the new person handling the case?
14 A.   I would say no at Mellon Pries for sure. At Foley
15       Baron, there was always a partner above me, but
16       there were cases that I was the primary person
17       that was talking to the client, but the partner
18       was always the backstop, but if they were -- I
19       mean, if they were not -- if they were a small
20       case, there were cases that the partner wasn't
21       involved in.
22 Q.   Did you ever take a plaintiff's deposition?
23 A.   Yes.
24 Q.   How many?
25 A.   I do not know that number.

Page 35

1  Q.   More than ten?
2  A.   I would think more than ten, yes.
3  Q.   Okay. Did you feel when you left Foley Baron that
4        you were ready to graduate from being the second
5        chair reporting to a partner in charge to the first
6        chair?
7  A.   In certain cases, I felt that way. I mean -- I'm
8        sorry, I want to clarify something on an old
9        question, but in certain cases, yes. I'm
10       certainly -- sorry.
11            MS. RUSSELL: I want to put an objection
12       on the record about Foley Baron. This goes back to
13       the subpoena issue.
14            MS. HARDY: Objection noted. It's not a
15       place to have that discussion. Please continue.
16            THE WITNESS: When you asked me about the
17       ten depositions, how many plaintiff depositions,
18       did you mean at Foley Baron or did you mean at
19       Mellon Pries or --
20            MS. HARDY: I meant in general.
21            THE WITNESS: In general? Yes.
22            MS. HARDY: In your first four years.
23            THE WITNESS: Yes, I believe I -- I don't
24       recall an exact number, but yes, I believe I would
25       have.

Page 36

1  BY MS. HARDY:
2  Q.   By the time you concluded your first four years and
3        left Foley Baron, did you feel from a professional
4        standpoint that your litigation skills were mature
5        enough for you to assume first chair
6        responsibility?
7  A.   In certain cases, yes.
8  Q.   What kinds of cases?
9  A.   Smaller cases. I mean, I wouldn't think I could
10       have assumed first chair responsibility for a
11       multi-million-dollar birth trauma case certainly,
12       but I think that there are cases that are smaller
13       cases that I could have assumed first chair
14       responsibility for.
15 Q.   Could you have stayed at Foley Baron in 2019 as
16       opposed to leaving?
17 A.   I could have.
18 Q.   What was your compensation in 2019 at Foley Baron;
19       what was your annual salary?
20 A.   I don't recall. I know that that's in -- I believe
21       it's in discovery responses somewhere, but I don't
22       -- I looked at those numbers to provide you
23       answers, so...
24 Q.   Did you leave because you were looking for greater
25       compensation, a bigger role in litigation, or what

Page 37

1        was the reason?
2  A.   I didn't leave because I was looking for more
3        compensation. Obviously more compensation is
4        something that people try to get when they move
5        places, but that was not a primary reason for why I
6        left.
7  Q.   What was the reason you left?
8  A.   Well, I was sought out by -- first I was contacted
9        by Lisa Esser-Weidenfeller, and that was the first
10       time I was thinking -- I'm sure I thought prior to
11       that, "Oh, I could leave this place," so I'm not
12       going to say I never thought about that, but that
13       was the first time I thought more seriously about
14       it.
15            And I know I already testified as to the
16       Brian Whitelaw situation. That, in addition to, I
17       learned that there was a client that was trying to
18       more directly assign me cases or directly assign me
19       cases and then I had this opportunity and that
20       caused me to think about it.
21 Q.   What client was that?
22 A.   Henry Ford, specifically the adjuster for the
23       Allegiance.
24 Q.   So that was Diane Gallagher?
25 A.   Yes.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
38..41

Page 38

1  Q.   And she was trying to assign you cases and it was
2       your understanding that someone at Foley Baron
3       interfered with that?
4  A.   I think was circumventing that or putting -- yes.
5  Q.   And when did you learn that?
6  A.   Sometime that summer of 2019.
7  Q.   Before you gave your notice at Foley Baron?
8  A.   I believe, yes, before I gave my notice.
9  Q.   Did Diane Gallagher confirm that for you?
10 A.   She discussed it with me.  She -- but I first -- I
11      believe I first -- yeah, I don't --
12 Q.   Who did you first -- who first tipped you off to
13      that being a possible issue?
14 A.   I knew that it had happened with other -- I guess
15      being tipped off in general, I knew that it had
16      happened with other Foley Baron associates based on
17      what they had said, but it -- I then -- it was a
18      discussion with Bob at one point and it was a
19      discussion with Diane Gallagher and I tried to
20      raise it with Clyde Metzger after I learned about
21      it.
22 Q.   Okay.  But Diane Gallagher confirmed what you had
23      heard from Bob, which was that there were instances
24      when she wanted you to take a case directly and
25      somebody prevented that from happening at Foley

Page 39

1       Baron?
2  A.   I'm trying to recall exactly what Diane told me
3       about that situation.  I don't -- yeah, I'm not
4       sure I'm -- I should say I did confirm that, but I
5       just am not -- I don't recall the sequence, so when
6       you said she confirmed it, I don't recall if Bob
7       came -- Bob said it first or Diane said it first;
8       as I sit here today, I don't recall.
9  Q.   Is there anything you learned from Bob about that
10      situation that you believe was not truthful?
11 A.   I don't know if it was truthful.  As I sit here
12      today, I don't know -- I don't know how I would be
13      able to --
14 Q.   Based on what Diane Gallagher told you.
15 A.   Right, but when Bob talked to me about it, he was
16      saying it about -- it was broader than just Diane,
17      so I don't know that I can say whether -- I can
18      tell you what Diane said to me and then I don't
19      know about other clients.
20 Q.   All right.  So you believe it's truthful as to
21      Diane; you don't know the circumstances concerning
22      the other clients?
23 A.   Yeah, I don't, but when I had a conversation with
24      Clyde Metzger, I was talking to him about it in
25      general beyond just Diane.

Page 40

1  Q.   Okay.  At the time you left Foley Baron, did you
2       feel optimistic about your future as a lawyer?
3  A.   Yes.
4  Q.   Okay.  And did you feel you were capable of holding
5       your own as a female in the profession?
6  A.   Yes.
7  Q.   And did you leave feeling that you could, if
8       necessary, deal with male attorneys and represent
9       your client and hold your own?
10 A.   Yes.
11 Q.   And that you could voice a contrary opinion if
12      someone was telling you something that you didn't
13      think was correct or in your best interests?
14 A.   Depending on the circumstances, yes.
15 Q.   What circumstances would prevent you from doing
16      that?
17 A.   Obviously, I mean, I think there's -- I mean, I
18      feel like you're asking me to agree to a general --
19      like if you're asking a general principle, then the
20      answer is yes, but I'm saying there's obviously
21      always extenuating circumstances in anything, so...
22 Q.   Of course there can always be extenuating
23      circumstances --
24 A.   Sure.
25 Q.   -- but can you think of any reason why, in 2019 as

Page 41

1       you're departing Foley Baron, you were not fully
2       capable of making your own judgments, determining
3       what's good for you, voicing opposition when you
4       had opposition, basically being self-confident
5       enough in yourself and in your lawyering skills to
6       speak for yourself and defend yourself; was that a
7       description of you at that time?
8  A.   Is your question whether that's a description of me
9       or --
10 Q.   Yes.  Is that an accurate description of you?
11 A.   I think we've already tried to describe me.
12 Q.   Is that an accurate description of you; and if not,
13      what's not accurate?
14           MS. RUSSELL:  Objection.
15           THE WITNESS:  I believe in general that
16      yes, I could tell people if I had a contrary
17      opinion.
18 BY MS. HARDY:
19 Q.   Who did you have offers from, concrete offers from
20      in the way of law firms, when you left Foley Baron
21      and before you started with Riley & Hurley?
22 A.   I know I had one from Sommers Schwartz, I had one
23      from Riley & Hurley obviously.  I know I put -- I
24      know I've put this list together for discovery
25      responses.  There are people that -- there are

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
42..45

Page 42

1    offers at this time and then there are offers post
2    Riley & Hurley time and so I'm trying to give you
3    the best answer that I --
4  Q.  I'm focused on --
5  A.  Pre Riley --
6  Q.  -- prior to starting at Riley & Hurley.
7  A.  Yeah, and I definitely know that I put these in
8    discovery responses and I would --
9  Q.  I don't want to refer to discovery responses.
10  A.  Okay.  Well, I don't -- I went and looked through
11    things to find those.
12  Q.  Can you recall any other law firm that you had an
13    offer from prior to starting with Riley & Hurley
14    and following your decision to start looking for
15    other law firm opportunities?
16        MS. RUSSELL:  Objection.
17        MS. HARDY:  Post --
18        THE WITNESS:  I believe Brian McKeen's
19    office is in that first.
20  BY MS. HARDY:
21  Q.  You got an offer from them in either August,
22    September or October 2019?
23  A.  I believe that they're in that.
24  Q.  Did you get a written offer from them?
25  A.  No, but that wasn't --

Page 43

1  Q.  Who made you --
2  A.  I haven't gotten a lot -- like there hasn't been a
3    lot of written offers that I've received.  Like I
4    didn't --
5  Q.  You had a written one from Sommers Schwartz and a
6    written one from Riley & Hurley.
7  A.  Sure.
8  Q.  You didn't get a written one from McKeen?
9  A.  No.  And I don't think I got a written one from
10    FBMJ until after I had accepted it as like a,
11    "Here, you can sign something," if I even did.  And
12    I didn't get a written one from Mellon Pries.
13  Q.  Did you go back to them when you were thinking of
14    leaving Foley Baron and interviewing for a job
15    there?
16  A.  Mellon Pries?
17  Q.  Yes.
18  A.  No.
19  Q.  Okay.  Well, I'm focused on this timeframe of when
20    you're contemplating leaving Foley Baron in the
21    summer, early fall 2019, and when you start working
22    at Riley & Hurley.  Who did you have firm offers
23    from?
24  A.  I had a conversation with Kerr Russell that did
25    not -- I ended the conversation and it did not

Page 44

1    result in a firm offer, so I'm not adding that --
2  Q.  That's not responsive.
3  A.  -- to your list.  I don't recall if I had
4    a conversation -- I don't have anymore written
5    offers.  I just want to be clear about --
6  Q.  I'm not focused on just written.  I said a firm
7    offer.
8  A.  Sure, I understand.
9  Q.  "We are offering you a job."
10  A.  I get it.  At some point I talked to Cullen
11    McKinney, who was at Tanoury Nauts at the time.
12  Q.  I'm sorry, where?
13  A.  Tanoury Nauts McKinney & Garbarino, but I know for
14    sure I talked to him in 2021 and I believe I talked
15    to him in 2019 as well, but I don't know that
16    that's going to rise to your firm offer.  I mean,
17    it wasn't written.  I believe we had that
18    conversation then.  I don't recall more than that
19    at this moment.
20  Q.  But all I've heard thus far with any certainty is
21    Sommers Schwartz and Riley & Hurley and maybe
22    McKeen?
23  A.  I feel pretty good about McKeen as I sit here.
24  Q.  Who made the verbal offer?
25  A.  From McKeen?

Page 45

1  Q.  Yes.
2  A.  McKeen.
3        MS. RUSSELL:  Counsel, we're coming up on
4    15 minutes to the hour.
5        MS. HARDY:  Okay.  Thank you.
6  BY MS. HARDY:
7  Q.  When did you first consult legal counsel about
8    work-related issues that pertain to Riley & Hurley?
9  A.  August of 2021, I believe.
10  Q.  When in August of 2021?
11  A.  I guess, you want me to try to find a specific
12    date?
13  Q.  Before or after your final day at Riley & Hurley?
14  A.  Before my final day.
15  Q.  So before August 20th?
16  A.  Yes.  So I guess it could -- I would have to try to
17    find something with a specific date.  I believe it
18    was -- I believe it was August, I guess it could
19    have been the end of July, but it was very close to
20    the end.
21  Q.  Okay.  And who did you consult at that point; who
22    did you reach out to?
23  A.  I reached out to my former mock trial coach whose
24    name is Joseph Medici that there's been a subpoena
25    for, who connected me with Matthew Besser.

ELYSE McKENNA v ROBERT F. RILEY

Job 48239

MCKENNA, ELYSE 12/10/2025

46..49

Page 46

1  Q.   And that's the lawyer from Ohio?
2  A.   Yes.
3  Q.   And who else did you reach out to for advice?
4  A.   After that, I reached out to Deb Gordon at some
5       point in August.
6  Q.   Okay.
7  A.   And there was one other female attorney who I
8       talked about who I've testified about previously
9       who I don't remember her name, but she is in the
10      Metro Detroit area and I don't know -- I don't
11      recall her name.
12 Q.   Did you retain any attorney to represent you in
13      August 2021?
14 A.   With a formal retainer or...
15 Q.   Where they were your counsel, whether or not it's
16      committed to writing or not, where they agreed to
17      represent you.
18 A.   Matt Besser agreed to give me legal advice.  I
19      would not say he -- it was a consultation.
20 Q.   Okay.  He agreed to represent you, perhaps not in
21      litigation itself, but for counseling purposes?
22 A.   Yeah, he was not -- he is not a Michigan barred
23      attorney and does not have a license here and was
24      not going to agree to represent me, but he was
25      willing to give advice; that's my understanding.

Page 47

1       There was no signed agreement to that effect,
2       but...
3  Q.   Did you retain anyone else in August 2021 to either
4       provide counseling advice or to represent you for
5       potential litigation?
6  A.   Counseling advice, you mean like legal counsel?
7  Q.   Yes.
8  A.   Okay.  No, I -- no, I did not, no.
9  Q.   How did you connect with Joe Medici?
10 A.   I called him.
11 Q.   Did you ever email with him or text?
12 A.   I might have texted him and said, "Hey, do you have
13      a couple minutes to talk?"  I don't know if I did
14      or didn't, but --
15 Q.   Did you connect with him on social media?
16 A.   No, I don't know that -- I don't think he has
17      social media and I wasn't his friend on social
18      media, but no -- and I wouldn't have emailed him
19      because I didn't know his email.
20 Q.   How did you connect with Matthew Besser?
21 A.   Joe gave me his phone number and I would have --
22      Joe, I believe, reached out to Matt and said,
23      "There's a former mock trial student of mine that
24      I'm going to connect with you," or something -- I'm
25      sure he said something to that effect to make him

Page 48

1       know that I would be contacting him.
2  Q.   Did you email or text with Matthew Besser about
3       representation for you?
4  A.   I would have called; I would have had a phone
5       conversation with Matthew Besser.  I might have
6       said "Hi" -- I don't know if Joe put the three of
7       us on a text chain and said, "Hey, Matt, here's
8       Elyse," but then I got on the phone and talked to
9       Matt.
10 Q.   All right.  Who did you next retain in the way of
11      legal counsel to represent your interests in
12      connection with issues that you had with Riley &
13      Hurley?
14      MS. RUSSELL:  I'm sorry, I want to object
15      here.  I know that we have -- I know you want to
16      keep my time speaking brief; I understand.
17      The judge's order on attorney-client
18      privilege is limited.  We think that it's limited
19      in a specific way, you think it's broader.  I want
20      an objection on the record that we object to all
21      questions about attorney-client privilege that are
22      broader than what the scope of the judge's order is
23      and that if she testifies outside of it because of
24      how vague the judge's order is that that -- that
25      she's not waiving privilege.  Understood?

Page 49

1       MS. HARDY:  Asking a question about who
2       she retained is not privileged.  Privilege applies
3       to the substance of communication --
4       MS. RUSSELL:  I understand that, but my
5       objection stands.
6       MS. HARDY:  -- and what --
7       MS. RUSSELL:  You can continue your
8       questioning.
9       MS. HARDY:  All right.  Let's go.
10 BY MS. HARDY:
11 Q.   Who did you next retain after Matthew Besser to
12      represent your interests in connection with the
13      issues you had with the Riley & Hurley law firm?
14 A.   Ken Mogill, who -- I reached out to Ken Mogill
15      first and he brought in Sarah Prescott.
16 Q.   And did you have a retainer agreement with Ken
17      Mogill?
18 A.   I had a retainer agreement with Ken and Sarah; I
19      did not have one separately with Ken.
20 Q.   Okay.  You had a written retainer agreement with
21      the two of them jointly?
22 A.   I have a -- yes.
23 Q.   Did you have a written retainer agreement with
24      Matthew Besser?
25 A.   No.

Page 50

1  Q.   You did not have a written retainer agreement with
2       Deb Gordon, correct?
3  A.   Correct.
4  Q.   She never agreed to represent you, correct?
5  A.   Correct.
6  Q.   Did you have a written retainer agreement with
7       Kalahar & McGinn?
8  A.   Yes, yes, a contingency agreement.
9  Q.   And you have a written retainer agreement with your
10      current counsel, Kimberly Russell, Keith Altman and
11      Sammy Brown?
12 A.   Yes, I have a current retainer agreement with
13      Kimberly Russell, yes.
14 Q.   Okay.  Are there any other attorneys who have
15      represented you in connection with your
16      disputes with the Riley & Hurley law firm or OMP?
17 A.   I would say there are other attorneys that I've
18      consulted with, but I wouldn't say they represented
19      me with respect to those.
20 Q.   Who else did you consult with?
21 A.   So as I have testified before, I -- in the drafting
22      of the complaint, I consulted with Amanda Fox Perry
23      and Jared Smith and we worked on the complaint
24      together.
25 Q.   They never represented you though, did they?

Page 51

1  A.   In a formal way, no, they did not --
2  Q.   Even in -- I mean, I don't know what an informal
3       representation is.  There's a representation or
4       there's not a representation.
5           MS. RUSSELL:  An informal representation
6       might be what Ms. Gordon represented in her
7       affidavit about OMP.
8  BY MS. HARDY:
9  Q.   Did they represent -- did either Amanda Fox or
10      Jared Smith represent you as attorneys in
11      connection with your disputes with Riley & Hurley
12      or OMP?
13          MS. RUSSELL:  Objection.  I'm going to
14      assert that that's attorney-client privilege and
15      direct the client not to answer.
16          MS. HARDY:  That's another thing that's
17      going to be added to the list.
18          MS. RUSSELL:  Go ahead.  We have plenty
19      of lists on our own.
20          MS. HARDY:  So it's another warning about
21      inappropriate instructions.
22          MS. RUSSELL:  I appreciate that, teacher.
23      Go ahead.
24          MS. HARDY:  So you're instructing her not
25      to answer whether Jared Smith and Amanda Fox

Page 52

1       represented her in connection with these claims?
2           MS. RUSSELL:  They're attorneys, she has
3       work product with them on this litigation, it's
4       attorney-client privilege.
5           MS. HARDY:  Well, work product and
6       attorney-client privilege are different; and two,
7       whether she has work product has nothing to do
8       with whether or not they provided privileged
9       attorney-client advice.
10 BY MS. HARDY:
11 Q.   Okay.  What advice did Jared Smith give in
12      connection --
13          MS. RUSSELL:  Same objection.  I'm
14      directing you not to answer.  Go ahead.
15          MS. HARDY:  Is that because you're
16      claiming he was counsel?  I mean, why else would
17      you be asserting that objection?
18          MS. RUSSELL:  My objection is what it is.
19 BY MS. HARDY:
20 Q.   All right.  What advice did Amanda Fox give you in
21      connection with your legal claims?
22          MS. RUSSELL:  Same objection, same
23      instruction.
24          MS. HARDY:  All right.  Add it to the
25      list.  Can you mark that, please?

Page 53

1           MS. RUSSELL:  To be clear, since you're
2       adding it to the list, these attorneys were not
3       contemplated or listed in the complaint, which is
4       what the judge's order is narrowed to.
5           MS. HARDY:  Again, that's an
6       inappropriate statement on this record in the
7       context of this deposition.
8           MS. RUSSELL:  Your questions are
9       inappropriate, so go ahead.
10 BY MS. HARDY:
11 Q.   Let's go to your journal.  Where is this journal of
12      yours; where is the physical copy of it?
13          MS. RUSSELL:  We're coming up to
14      four minutes on the hour, by the way, counsel.
15 BY MS. HARDY:
16 Q.   Where is your journal?
17 A.   I think there's a misunderstanding of what the
18      journal is.  I have things that I write down --
19      like similarly to you have legal pads and you write
20      down notes on legal pads, I write poems places.
21      There's no, like, kept journal that like that's
22      where all the good stuff is or anything like that.
23      There are different places that I write poetry.
24          I don't want to not answer the question of
25      where is the journal, but there's probably multiple

Page 54

1    journals and multiple legal pads in multiple places
2    where I've written poetry, including on my computer
3    in a Word document.
4  Q.   Where are all those multiple different writings
5    that you've described as part of your journal?
6    Even if they're not all collected in one bound
7    volume, where are the discrete pieces that, when
8    pulled together, constitute your journal?
9        MS. RUSSELL:  Objection.
10        THE WITNESS:  Okay, but I'm not calling
11    it my journal.  I feel like -- you guys are calling
12    it my journal and so when you're saying like what I
13    call my journal, I don't call it that.  I just --
14  BY MS. HARDY:
15  Q.   You've never called it your journal?  In the last
16    deposition, you never referred to it as a journal?
17        MS. RUSSELL:  Objection.
18        THE WITNESS:  Ms. Gordon asked me
19    questions about a journal of keeping poetry and I
20    am doing my best to answer your guys' questions,
21    but there's not some concrete -- it's not like
22    there's some -- like the Bible and then everything
23    is in the Bible.  It doesn't exist.
24  BY MS. HARDY:
25  Q.   All right.  Irrespective of whether it's in one

Page 55

1    place or in multiple places, where are the
2    component parts of your poetry that have been
3    described previously as a journal?
4        MS. RUSSELL:  Objection.  Asked and
5    answered.
6        THE WITNESS:  Various different places.
7  BY MS. HARDY:
8  Q.   Where are those various places?  Describe them.
9  A.   I'm sure --
10        MS. RUSSELL:  Objection.  Asked and
11    answered.
12        THE WITNESS:  I have poetry on legal
13    pads, I have poetry in random notebooks, I have --
14  BY MS. HARDY:
15  Q.   Where are the documents themselves, the legal pads,
16    the notebooks?
17  A.   In my house.
18  Q.   All in your house?
19  A.   Yes, I believe they're in my house.
20  Q.   And where is that currently?  Are you in Kentucky
21    now or are you still in Maryland?
22  A.   Yes, I'm in Kentucky.
23  Q.   And all of them are with you in Kentucky?
24  A.   Yes, I have -- I used to have a storage unit in
25    Michigan and the things in the storage unit are now

Page 56

1    in Kentucky, so everything I own should be in
2    Kentucky, so yes.
3  Q.   All right.  So whether they're in five places or
4    ten places or one place, they're all currently in
5    your Kentucky residence, correct?
6  A.   Yes, I have -- I don't know where, like -- I
7    believe they're all --
8  Q.   Have you searched for them and tried to pull them
9    together because of the request from the defendants
10    for you to produce them?
11        MS. RUSSELL:  Objection.  There's been no
12    formal request.
13        THE WITNESS:  When I became aware, which
14    was at my last deposition, that these might be
15    something that are wanted, I began -- as I'm
16    unpacking to move into my Kentucky house, I look
17    for them as I unpack.  I have many boxes that are
18    not unpacked.  I will -- as I find them, I will
19    sequester them.
20        MS. HARDY:  I will let you take your
21    restroom break now, but before you go, you are
22    being put on notice, which shouldn't have to be
23    said and hopefully it does not have to be said --
24        MS. RUSSELL:  You can give us a formal
25    discovery request.

Page 57

1        MS. HARDY:  -- that they are not to be
2    tampered with, destroyed, disappear.  You have an
3    obligation to keep them in a safe place so they can
4    be produced in this litigation.
5        THE WITNESS:  I understand that.
6        MS. HARDY:  All right.  Thank you very
7    much.  Why don't you take your break.
8        MS. RUSSELL:  Before we go off the
9    record, your clients have the same obligation for
10    everything, including ESI.  We have a custodian of
11    her official records, we have it with a forensic
12    digital, whatever it's called; we've received
13    nothing from you all that you all have done the
14    same.
15        MS. HARDY:  I'm not responding to
16    discovery disputes, so take my silence as --
17        MS. RUSSELL:  You're bringing up
18    discovery disputes live on the record and I'm going
19    to bring them up live and on the record too, so we
20    can go ahead and do it.
21        MS. HARDY:  No inference should be drawn
22    from my lack of response to whatever statement
23    Ms. Russell said.
24        MS. RUSSELL:  And as I said earlier, if
25    you all want this stuff, you can send us a formal

Page 58

1    discovery request.  All right.
2         VIDEOGRAPHER:  Off the record at 10:19.
3    (Whereupon a break was taken
4    from 10:19 a.m. to 10:37 a.m.)
5         VIDEOGRAPHER:  We are back on the record
6    at 10:37 a.m.
7    BY MS. HARDY:
8    Q.   Do you have an electronic copy of the various poems
9    that you have in your Kentucky home; as opposed to
10   just a hard copy, have you made electronic copies
11   of them?
12   A.   Like scans?
13   Q.   A photograph, a scan.
14   A.   At some point I wrote a bunch of poems into a Word
15   document.  They wouldn't have been all the poems,
16   but they would have been like a bunch of poems, but
17   I wouldn't have updated that for -- since prior to
18   the complaint -- when I lived in Michigan, I know
19   that's when I wrote up the document.  I don't know
20   if I have that.  I probably can look for that.  It
21   would have been on an old computer.  I don't think
22   I have any scans of any poems.  I would have taken
23   some pictures of my poems like that would be
24   photographs on my phone.  I think that would be the
25   extent of electronic copies.

Page 59

1         I mean, if there's a scan of a poem, I
2    can't think of purposely scanning a poem in like
3    that, but I know that like a picture is like a scan
4    now, so I'm not trying to...
5    Q.   Sure.  How many of the poems have you taken photos
6    of and stored in your phone?
7    A.   I don't know, I really don't know the answer, but
8    the only other thing I want to add to that is poems
9    I would have written in my notes app on my phone
10   are also electronic, to answer your question.
11   Q.   I'm sorry, repeat that?
12   A.   Like if I had written a poem in my notes app on my
13   phone, that would also be electronic.
14   Q.   Okay.
15   A.   So I think there's some categories of electronic
16   ones that I retyped in a Word document, ones that I
17   would have written in a notes app on my phone, ones
18   that I would have taken a picture of.  I don't
19   recall a situation in which I put a poem into a
20   scanner.
21   Q.   Okay.  I've got it.
22        The Word document that you created, do you
23   know how you labeled that when you saved it?
24   A.   Probably something about poems in there, like --
25   Q.   How long ago was that?  You said it was --

Page 60

1    A.   I definitely know that I wrote it up sometime when
2    I lived in Michigan; that's in my head.  I couldn't
3    give you -- I mean, not post Riley & Hurley, I can
4    give you that timeframe.  Sometime --
5    Q.   During OMP, during your tenure there?
6    A.   I don't know if I would have written it there, but
7    I think I would have already had it by the time I
8    got there, so it could have been in the start of
9    OMP or prior to OMP.
10   Q.   Were any of the poems that, when you created them,
11   done so electronically other than the ones that you
12   said you created in your notes app?
13   A.   When I created them electronically?
14   Q.   Yeah.  Were there -- I mean, the first form was in
15   an electronic format as opposed to handwritten.
16   A.   Very unlikely other than the notes app.  I would
17   have retyped them, but that wasn't when they were
18   created, so...
19   Q.   So they're all either originally done in
20   handwriting or done in your notes app?
21   A.   Yeah, I don't think I've written any -- I'm trying
22   to scan my brain for other electronic means that I
23   would have written.  I don't think there's anything
24   other than that, correct.
25   Q.   Let's put aside the poems.

Page 61

1    A.   Okay.
2    Q.   At any point in time since you've been with Riley &
3    Hurley or with OMP, have you created, either in
4    handwriting or through some kind of electronic
5    product, notes that reflect things that happened
6    that were of concern, things that are at issue in
7    this litigation?
8    A.   At times before I write a poem, I write down notes
9    about what I'm feeling, but it's not been -- it
10   goes through a process before it becomes a poem, so
11   it would have -- I wouldn't consider those notes a
12   poem, but they would go into creating the poem, so
13   I would think they would be responsive to what
14   you're saying.
15   Q.   Yes.
16   A.   I would have written like the subset -- sure, like
17   some notes, but also I would like to say those
18   don't always exist for each poem either; it's kind
19   of hit or miss.
20   Q.   Okay.  So did you have a habit of trying to record
21   for yourself so that you would have some kind of
22   record to jog your memory of events that occurred
23   in the workplace either with Riley & Hurley or with
24   OMP that were troubling to you concerning something
25   you thought was worth preserving?

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
62..65

Page 62

1        MS. RUSSELL:  Objection.
2        THE WITNESS:  I would not say it was a
3    habit.  If it came up and I wanted to write about
4    it, I would write about it, but it wasn't something
5    that I was doing with any frequency or every week;
6    writing something down.  I wouldn't articulate it
7    like that.
8    BY MS. HARDY:
9    Q.   To the extent you did create such notes, where are
10       they stored today?
11   A.   They would be -- so like in the event it is in a
12       random journal, the notes before the poem are on
13       the page before the poem.
14   Q.   Okay.
15   A.   And to the extent it's in a notes app, it's
16       probably in the same note, but up top is some
17       random notes and down bottom is a poem, so it's
18       very close to wherever the other thing is.
19   Q.   Okay.  Fair enough.
20       You've talked about legal pads being one
21       place --
22   A.   Sure.
23   Q.   -- you would start the notes that then led to the
24       poem.  What other kinds of devices or pads did you
25       use; did you use some bound journals?  Just

Page 63

1    describe them.
2    A.   Sure, I think there's some bound journals.  I'm
3        guilty of being someone that, like, buys a planner
4        and then abandons the planner after a couple weeks,
5        I buy a bound journal and then I abandon it and I'm
6        like, it's easier to write on your notes app
7        because you always have that.  So there are some
8        bound journals like that that aren't ones that I
9        wrote in to completion.  I wanted to be a journal
10       person and I'm not.
11   Q.   Okay.
12   A.   But --
13   Q.   I understand.
14   Q.   Okay.  So those exist.  I don't -- that is what I'm
15       looking for when I'm unpacking.  They are on my
16       list of pull them out, yep.
17   Q.   Okay.  Have you given any of them yet to your
18       attorneys?
19   A.   I don't -- which attorneys?
20   Q.   Well, any of the attorneys.
21   A.   Okay.  I believe Ms. Kalahar and Ms. McGinn had
22       some poems, but no journals, so no.  I hadn't found
23       any journals because they had not moved with me
24       from the storage unit in Michigan.
25   Q.   We've moved --

Page 64

1    A.   Sure.
2    Q.   -- based on your testimony, beyond just the word
3        journal to this broader collection of documents
4        that could be legal pads, could be journals, could
5        be spiral binders.  Have you physically given any
6        of those to any of your various attorneys?
7    A.   I believe I sent two electronic poems that were
8        from the notes app to Ms. Kalahar.
9    Q.   Okay.  You think that's it?
10   A.   I don't recall there being more than two.  I
11       wouldn't -- one or two.
12   Q.   But none of the hard copies have been given to
13       attorneys?
14   A.   Correct.
15   Q.   You have all those?
16   A.   In a box, yes, yes.
17   Q.   All right.
18   A.   Many boxes, I should say.
19   Q.   So when you were at Riley & Hurley or OMP, did you
20       keep a calendar on which you recorded like work
21       events and just kind of who you were meeting with,
22       things -- you know, just the typical business thing
23       that people usually put on their calendar?
24   A.   Sure, yes.  And at Riley & Hurley, we had a program
25       called Lotus and so events were in Lotus.  And at

Page 65

1        OMP, the program was Outlook, Outlook calendar.
2    Q.   Okay.  And did you regularly keep it up to date as
3        to how often you were meeting with -- at Riley &
4        Hurley is my question -- meeting with Allison, Bill
5        Hurley, Bob Riley, the three attorneys who work
6        there?
7    A.   I don't know because at that point everyone was --
8        I mean, at a certain point during the Riley &
9        Hurley time, everyone was in the office and
10       impromptu meetings happened all the time, so I
11       don't know that those are something that were
12       really captured unless there was a specific reason
13       to say, "We have to spend two hours on X case."
14   Q.   So would you have copies of your Lotus calendar at Riley
15       & Hurley?
16   A.   I do not.
17   Q.   Did you keep any portion of it?
18   A.   I did not.
19   Q.   Did you have anyplace other than the Lotus software
20       program that you recorded events that occurred in
21       the workplace, important meetings, something
22       important that happened that was concerning,
23       anyplace that you recorded such information?
24   A.   We're talking about business meetings or any
25       important events?

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
66..69

Page 66

1  Q.   Any important events.
2  A.   If I had written a poem about it, obviously it
3       would have been captured there, but we've talked
4       about those.
5  Q.   Yeah.
6  A.   I had a Google calendar that I don't believe had --
7       I know there was some production of it which
8       involved dinners with Bob, but I don't believe I
9       would put any work events on there, but you're
10      saying any important events, so I'm trying to
11      broaden my --
12 Q.   Broader than --
13 A.   Broader than that.
14 Q.   Yeah.  Was the Google calendar something you
15      maintained; was that a personal calendar?
16 A.   I had a personal calendar and then I also had a
17      shared calendar with my husband at the time so that
18      he would know if I had an event.  So it's personal
19      and shared.
20 Q.   What did you put into the Google calendar; what
21      kinds of events?
22 A.   Typically I would say things that were after hours
23      or beyond a normal work obligation so that he could
24      then know that I had something I had to attend, so
25      if I was outside of -- I think most of the things

Page 67

1       eight to five were in the work calendar.  He
2       doesn't need to know about those, that's not -- it
3       was mostly so that we could capture letting out
4       dogs and different household things.
5  Q.   Was the Google calendar -- did you have one that
6       just was for you or was it one for you and one for
7       the two of you or just for the two of you?
8  A.   I would have to look at it.  We did have one that
9       was just for the two of us and we had one that was
10      just for me, but on Google you can share things
11      that are just for you with another person, so I
12      would have to --
13 Q.   Do you continue to maintain the Google calendar
14      just for you?
15 A.   No, because it -- I changed email addresses, so
16      that was an old email address.
17 Q.   Did you maintain the Google calendar throughout
18      your employment at Riley & Hurley?
19 A.   Yes, I used that email that entire time.
20 Q.   And did you maintain that Google calendar
21      throughout your time with OMP?
22 A.   No, not -- I don't -- maybe in the beginning.
23 Q.   Did you synch Lotus in your Outlook calendars to
24      your phone or gmail account?
25 A.   Okay.  Wait.  I'm sorry, I want to make sure I

Page 68

1       understand.  Did I synch Lotus and Outlook to my
2       phone or my gmail account or --
3  Q.   I'm saying to your phone or --
4  A.   I don't think you can synch them to your gmail
5       account; I don't know how to do that, synching any
6       of those to my gmail account.
7  Q.   Okay.
8  A.   I believe I synched -- I know I synched Outlook to
9       my phone.  And Lotus was a tricky software and I
10      think at times it would synch to my phone and at
11      times it wasn't just because of the technology,
12      some technology issues.  I know I received the
13      email to my phone, but there was always problems
14      with getting the calendar to show up in your phone.
15 Q.   When did you have your phone imaged?
16 A.   May.
17 Q.   May of 2025?
18 A.   April or May of 2025.
19 Q.   Okay.  And that was the phone that you used for
20      business and personal reasons while at Riley &
21      Hurley?
22 A.   I don't think it was the same phone, no, because
23      that would have been -- at Riley & Hurley, 2019 to
24      2021, and this would have been 2025, and I
25      definitely have gone through a few iPhones in that

Page 69

1       time.
2  Q.   Okay.  When you transition from one phone to
3       another, you save everything, correct?
4  A.   My understanding is that it's all -- the cloud has
5       moved everything over.
6  Q.   Yeah, okay.
7  A.   So while I don't have the physical phone, you turn
8       that into Apple --
9  Q.   So it's got all the information?
10 A.   I don't -- my understanding is it's all there, yes.
11 Q.   Okay.
12 A.   But I mean, I certainly didn't still have Lotus
13      synched on my phone after I left Riley & Hurley.
14 Q.   Well, you didn't because you weren't using it
15      anymore, correct?
16 A.   Sure, and I wasn't employed there anymore and that
17      would be inappropriate to -- yeah.
18 Q.   Okay.
19 A.   So I guess I don't know if Lotus -- I don't know
20      how that works; I'm sure some person does.
21 Q.   All right.  What about to your gmail account; did
22      you synch Outlook to it?
23 A.   I didn't know you could do that, so I did not do
24      that.
25 Q.   All right.  And what about Lotus?

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
70..73

Page 70

1  A.   Same.
2  Q.   All right.  So your Google calendar that you
3       maintained while you worked at Riley & Hurley, you
4       still have access to today, correct?
5  A.   I still have access to that email so --
6           MS. RUSSELL:  Objection.
7           THE WITNESS:  -- I believe I still
8       have -- I believe that that Google calendar was
9       produced in this discovery, so yes, I...
10          (Marked for identification:
11          Deposition Exhibit No. 1.)
12          MS. HARDY:  Let me show you Defendants'
13      Exhibit No. 1, which appears to be an excerpt from
14      a Google calendar.  It's Bates stamped PL599, 600.
15      Copy for the witness, copy for counsel.
16          MS. RUSSELL:  Thank you.
17 BY MS. HARDY:
18 Q.   Do you recognize this document?
19 A.   Yes, I believe this is the Google calendar that was
20      produced.
21 Q.   All right.  And where's the rest of the Google
22      calendar pertaining to your time at Riley & Hurley?
23 A.   I'm sure it's on Google.
24 Q.   So you produced in Exhibit 1 and in your production
25      just a portion of your Google calendar from the

Page 71

1       time that you were at Riley & Hurley, correct?
2  A.   Yes, I believe this is in response to a request
3       about meetings with Bob, so I produced the
4       responsive document of things that talk about Bob
5       in this document, yes.
6  Q.   You have the rest of the Google calendar, correct?
7  A.   I believe I have the rest of the Google calendar,
8       yes.
9  Q.   Okay.  And did you create this document by using
10      search terms?
11 A.   I believe search terms were used and paging through
12      to try to make sure that I didn't miss anything,
13      for instance, if Bob doesn't come up, but I had --
14      you know, there's a typo, so I tried to go through
15      the months.
16 Q.   So you both used search terms and you then visually
17      inspected to make sure it was complete?
18 A.   I believe my attorneys visually inspected and I
19      used search terms and also tried to visually
20      inspect, so yes.
21          MS. RUSSELL:  I apologize, somebody has
22      joined us.
23          MR. KIENBAUM:  Hi, I'm Tom Kienbaum.
24          MS. RUSSELL:  Hi.  Nice to meet you.  I'm
25      Kimberly Russell.  I represent the plaintiff.  I'm

Page 72

1       doing great this morning.  How are you?
2           MR. KEINBAUM:  I'm doing quite well as
3       well.
4           MS. RUSSELL:  Good to meet you.
5           MS. HARDY:  Okay.
6           THE WITNESS:  So I don't know if you had
7       a question pending or if I had answered, so I don't
8       know.
9           MS. HARDY:  Let me just ask a new
10      question.  I understood what you said before.
11 BY MS. HARDY:
12 Q.   Is it accurate to assume that every dinner you had
13      with Bob Riley that was scheduled is reflected on
14      Exhibit No. 1?
15          MS. RUSSELL:  Objection.
16          THE WITNESS:  I don't believe that that
17      is accurate because there are dinners that are not
18      on this calendar and probably -- when you say
19      scheduled, if they were impromptu dinners, they may
20      not have made it on the calendar.
21          MS. HARDY:  Because the impromptu is not
22      scheduled.
23          THE WITNESS:  Sure, I just want to
24      clarify, I mean, it's scheduled maybe 30 minutes
25      before --

Page 73

1           MS. HARDY:  Let me rephrase the question.
2           THE WITNESS:  I don't think all the
3       dinners are on this calendar.
4  BY MS. HARDY:
5  Q.   Are all the mandatory dinners that were -- that you
6       refer to in this litigation, are they reflected in
7       Exhibit No. 1?
8  A.   I don't know; I don't recall if each are.
9  Q.   Can you explain why they would not be in Exhibit
10      No. 1 if you intentionally searched your Google
11      calendar for all scheduled dinners with Bob?
12          MS. RUSSELL:  Objection.
13          THE WITNESS:  If I put them on another
14      calendar, if I forgot to put them on a calendar,
15      then they wouldn't be on the calendar.
16 BY MS. HARDY:
17 Q.   And so the only other place they would be in terms
18      of calendar would be the Lotus?
19 A.   Or the shared calendar with --
20 Q.   Your husband?
21 A.   -- my ex-husband, but I believe that this captures
22      that shared calendar as well, but I don't know that
23      for sure.  I think --
24 Q.   So we might have to go to the shared calendar with
25      your husband to get some of the events that you're

Page 74

1   placing at issue in this litigation?
2          MS. RUSSELL:  Objection.
3          THE WITNESS:  I don't think there's going
4   to be any, I guess, events -- sure, I think that
5   this would cover the shared calendar, but I would
6   have to look to know, to be able to answer your
7   question.
8          MS. HARDY:  All right.  We're going to
9   need an answer to that, so --
10         THE WITNESS:  Sure.
11         MS. HARDY:  -- just be on notice.
12         THE WITNESS:  Yep.  I think how your
13  Google calendar works is even the shared calendar
14  is aligned to your email, so this would still be in
15  that because I'm looking at my email.
16  BY MS. HARDY:
17  Q.   Okay.  Have you produced to date all messages from
18       Bob Riley, whether handwritten or electronic, that
19       you consider inappropriate for any reason?
20  A.   I believe that I have.  I mean, I produced
21       everything to my attorneys and I believe that -- I
22       don't know how to --
23  Q.   Let me stop you.
24  A.   Okay.
25  Q.   Have you made a thorough search of all your

Page 75

1   belongings -- for instance, the boxes you referred
2   to that have been in storage that just got moved to
3   Kentucky -- to see if there are any further
4   documents that are responsive to defendants'
5   document requests?  We know the poems are in
6   there --
7   A.   Sure.
8   Q.   -- but what else might be in there; do you know?
9          MS. RUSSELL:  Objection.  Form.  Can you
10  clarify what you're asking?  I'm not following.
11         MS. HARDY:  Yeah.  I started by asking
12  her for all messages from Bob Riley that she
13  considered inappropriate and she wasn't sure if she
14  had and then I wanted to know if she's done a
15  thorough search of all her records to find
16  documents, such as the messages, that are
17  responsive to the document requests.
18         MS. RUSSELL:  So the question is has she
19  done a thorough search for documents that are
20  responsive to discovery requests?
21         MS. HARDY:  Yes.
22         THE WITNESS:  I believe I've done a
23  thorough search.  I want to clarify something,
24  which is that I understand there are 115 pages of
25  missing document production.  And so I know that I

Page 76

1   produced everything to my former attorneys and I
2   don't know whether these are missing from you or
3   just on our end, but I believe everything --
4          MS. RUSSELL:  Those are two different
5   questions.
6          THE WITNESS:  Sure, but she asked if I --
7          MS. RUSSELL:  The question is about the
8   thorough search.
9          THE WITNESS:  But she had previously
10  asked if I had produced everything and I'm like --
11         MS. RUSSELL:  I will address the issue
12  with counsel.  Have you done a thorough search?
13         THE WITNESS:  I have done a thorough
14  search.
15         MS. RUSSELL:  So we have an issue where
16  we are missing Bates labels in our file.  I have
17  reached out to prior counsel.  She and I are
18  connecting this weekend to make sure you all have
19  everything, but to our knowledge, she has conducted
20  a thorough search.  I will get you anything if it
21  has not been produced.
22  BY MS. HARDY:
23  Q.   Ms. McKenna, the thing that's creating a problem
24       for me is trying to understand how you could have
25       done a thorough search if you've got boxes which

Page 77

1   you know the poems are in and those poems are about
2   workplace events.  How do you know there aren't
3   other materials in there that are responsive to the
4   document requests?
5          MS. RUSSELL:  Counsel, I think you're
6   confusing two things here -- and I'm just getting
7   clarity here, I'm not trying to clarify something on
8   the record.  You asked originally are there anymore
9   writings from Bob Riley.  That's where we started
10  in this line of questioning.  Are we still there or
11  are we somewhere else?
12         MS. HARDY:  We're still there.
13  BY MS. HARDY:
14  Q.   I'm asking you about writings that are responsive
15       to the document requests and whether you've done a
16       thorough search.  You have testified previously
17       that you have boxes in your new home in Kentucky
18       that came from storage in Michigan that you haven't
19       yet looked through.  So my question is, how can you
20       be certain you've done a thorough search if you
21       haven't yet looked at those boxes?
22         MS. RUSSELL:  Objection.
23         THE WITNESS:  When I moved to outside of
24  Michigan, that was before there was litigation
25  about this, before the complaint was filed, and

ELYSE McKENNA v ROBERT F. RILEY

Job 48239

MCKENNA, ELYSE 12/10/2025

78..81

Page 78

1    when I packed those boxes, I tried to -- I made
2    sure that I pulled any writings from Bob during
3    that time.
4         So I don't think there's going to be
5    additional -- unless it's crammed into the back of
6    something somewhere, I don't think there's going to
7    be additional things in these boxes, so I
8    thoroughly searched for writings prior to packing
9    those boxes.
10   BY MS. HARDY:
11   Q.   Okay.  Do you know what you packed in those boxes;
12   were they just your poems and --
13   A.   Oh, no, I mean, there was a house full of stuff, so
14   way more than just my poems.  Kitchen items.
15   Everything that goes into a house was in the boxes.
16   Q.   I'm talking about the boxes that contain the poems.
17   Are there other documents in those boxes other than
18   the poems?
19   A.   I think that probably those -- the journals ended
20   up in boxes with other things.  I don't know that
21   there's other -- they would have -- I would have
22   packed them with whatever they were with on a
23   shelf.
24   Q.   Let's switch gears and cover the pre-hire
25   negotiations with Riley & Hurley.

Page 79

1    A.   Okay.
2    Q.   Those started with you reaching out to Bob Riley,
3    correct?
4         MS. RUSSELL:  Objection.
5         THE WITNESS:  I was given Bob Riley's
6    information by Diane Gallagher and connected with
7    Bob Riley at Bob's request to Diane Gallagher to
8    have him connect with me.
9    BY MS. HARDY:
10   Q.   What did Diane Gallagher tell you that led you to
11   believe that Bob Riley had asked her to contact
12   you?
13   A.   Just that, that Bob Riley had asked her to contact
14   me.  That's what she communicated and that she --
15   Q.   Is that your best recall of the words she used?
16   A.   I'm not -- I would not quote that.  It could be,
17   "Bob Riley asked me to reach out to you and connect
18   you with him," something that means that.
19   Q.   Okay.  Was that in writing, over the phone, in
20   person?
21   A.   I believe it was over the phone, but she might have
22   sent me a text that said, "Hey, do you have a few
23   minutes to talk?" and prompted that phone
24   conversation.  It easily could have been an email
25   back during the time I was at FBMJ, so I don't --

Page 80

1    but she would have prompted a phone conversation
2    and I believe that could have been in writing.
3    Q.   Did she say anything or make any attributions to
4    Bob about why he had suggested that she reach out
5    to you?
6    A.   Because he wanted to be helpful in my career.
7    That's the gist that I was given.
8    Q.   Do you recall the words she used?
9    A.   I don't know if she would have called him a
10   sounding board.  I mean, it's six years ago.  She
11   would have said, "He's someone you can go to about"
12   -- "You're thinking about a move," that was the
13   gist, and I don't have -- I don't have an exact
14   quote; I don't.
15   Q.   Had you confided in Diane that you were thinking
16   about making a move?
17   A.   At some point in time the conversation was
18   happening regarding Diane talking to me about
19   confirming that work was circumvented, so I
20   don't know that I had at that point confided in
21   Diane about making the move.
22   Q.   Do you know whether you confided in Diane about
23   making a move before or after she mentioned
24   reaching out to Bob Riley?
25   A.   I believe when she reached out about Bob, I said --

Page 81

1    I would have communicated to her something like,
2    "Oh, my gosh, what a coincidence, Sommers Schwartz
3    just reached out to me," something like that.  I
4    mean, she had reached out about Bob and I thought
5    the timing was serendipitous, so I probably
6    expressed that, although I'm not -- I just am not
7    -- I don't recall exactly what I said to her
8    because she's a defense adjuster and Sommers
9    Schwartz is a plaintiffs' firm, so I'm not sure I
10   would have said that.
11   Q.   Do you know how Sommers Schwartz knew to reach out
12   to you and what prompted that?
13   A.   I was told later that their name was given -- my
14   name was given to them by Bob.
15   Q.   Before they called you initially?
16   A.   Yes.
17   Q.   Okay.  Had you talked to Bob before you talked to
18   Diane about the fact that you were considering
19   moving or were unhappy?
20   A.   No, I mean, I would have attended a facilitation or
21   so with Bob.  I mean, I would have talked to Bob in
22   that capacity, but I didn't have a relationship
23   with Bob such that I would talk to him about
24   anything that wasn't work related prior to talking
25   to Diane.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
82..85

Page 82

1  Q.   Who told you that Sommers Schwartz had heard from
2       Bob that you were thinking about moving?
3  A.   They did not tell me that Sommers Schwartz had
4       heard from Bob that I was thinking about moving.
5       They were given my name from Bob is what I was
6       told, so different, but --
7  Q.   Who was that person?
8  A.   Rick Groffsky told me that and I'm trying to think
9       if separately Lisa Esser-Weidenfeller also told me
10      that, but when I was talking to Sommers Schwartz, I
11      was talking to both Lisa Esser-Weidenfeller and
12      Rick Groffsky.
13 Q.   Okay.  You met Bob to talk about your potential
14      move to another firm at Starbucks on September 16,
15      correct?
16 A.   I don't have that date anywhere, but I would say it
17      was in September.
18 Q.   In September?
19 A.   Sure.  I'm not --
20 Q.   Tell me about that conversation.  What did you say
21      to Bob, what did he say to you during the course of
22      that conversation, if you have any recall?
23 A.   We talked about job opportunities and I would have
24      talked to him about the offer from Sommers
25      Schwartz.

Page 83

1  Q.   You already had the offer from Sommers Schwartz at
2       that point?
3  A.   I was definitely in discussions with Sommers
4       Schwartz.  I don't know when -- I never received a
5       written offer from Sommers Schwartz that I was sent
6       until after I had accepted the offer, so I
7       didn't -- I don't have a date for that, I just know
8       that after I said -- initially when I said yes,
9       then they sent me -- actually, I don't even know
10      that they sent it to me, maybe Rick handed it to
11      me, but I didn't get a paper until after I had said
12      yes.
13 Q.   Do you recall anything about your meeting with Bob
14      at Starbucks other than the fact that you told him
15      you had an offer from Sommers Schwartz?
16 A.   We would have talked about the different job roles
17      that I had had at Mellon Pries, at FBMJ, deposition
18      experience, general discussions about career.  I
19      think we would have -- I don't recall specifically,
20      but I believe we would have also covered what are
21      my goals for being an attorney and what am I
22      looking to do, and -- yeah, goals, experience.
23 Q.   What do you recall about your pre-hire discussions
24      with Bob Riley concerning your options with his
25      firm, with other firms; do you have any recall?

Page 84

1  A.   We talked about them, so like I would have talked
2       to him about the different options.  I talked to
3       him when I initially accepted the Sommers Schwartz
4       option, I talked to him after that point, like I
5       had a lot of, I guess, recall, I guess.  I don't
6       know where you --
7  Q.   I want to know what stands out in terms of your
8       discussions with Bob Riley about what should you
9       do, leave Foley Baron, if so, where to go, where
10      are good places to go, bad places to be; what do
11      you recall?
12          MS. RUSSELL:  Object to form.
13          THE WITNESS:  I recall obviously that
14      meeting at Starbucks.  I don't know when exactly it
15      was, but I was meeting at Starbucks -- I recall a
16      meeting at a restaurant in Birmingham.  I recall
17      talking then about ultimately making the decision
18      to go to Sommers Schwartz and talking through why I
19      made that decision, so I would have articulated
20      that, but I guess I'm trying to -- I would have
21      also talked to him about the other job offers and
22      said, "Oh, this place is this," or "I had that
23      interview," or things like that.
24 BY MS. HARDY:
25 Q.   What other job offers did you have?

Page 85

1  A.   I think the McKeen offer, I would have talked to
2       him about, and I would have said to him that I had
3       a conversation with the people at Kerr Russell who
4       were -- and then I also had a conversation with
5       Buckfire & Buckfire, but I don't think I had a firm
6       offer, I think it was a discussion, so that would
7       have been involved in those conversations.  And if
8       Cullen McKinney is in that list of 2019 people, I
9       would have also talked to him about that.
10 Q.   Okay.  What did Bob Riley have to say about any of
11      these various firms that you were talking to or had
12      offers from?
13          MS. RUSSELL:  Objection.
14 BY MS. HARDY:
15 Q.   What kind of feedback did you get from him?
16          MS. RUSSELL:  Objection.
17          THE WITNESS:  There's another place that
18      I forgot that is now occurring to me.  Ramar &
19      Paradiso was another firm that I did have an offer
20      from, so I just want to -- you've jogged memory.
21          MS. HARDY:  You had a --
22          THE WITNESS:  I didn't have a written
23      offer.
24 BY MS. HARDY:
25 Q.   All right.  But you had a specific offer of

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
86..89

Page 86

1     employment?
2 A.   I believe I did, yeah.
3 Q.   Who extended that offer?
4 A.   I don't know if it would have been John Ramar or
5     Tony Paradiso, one of the two.  I was talking to
6     the both of them.
7 Q.   Let's go back to my question a moment ago.
8 A.   Yeah.
9 Q.   What did Bob Riley have to say; what feedback did
10    he provide about these various firms that you were
11    considering going to after leaving Foley Baron?
12 A.   We would talk generally about what the work
13    environment would be like there, what the --
14    whether he thought it would be a place where I
15    could get direct assignments from a client or not.
16 Q.   Do you recall anything else that he said about the
17    various firms that either --
18 A.   Yeah, I mean, I recall about Sommers Schwartz, what
19    he told me about them, but I'm trying to recall
20    these other firms.
21        So Ramar & Paradiso, I think we would have
22    talked about whether Tony Paradiso and John Ramar
23    were willing to let an associate do substantive
24    work.  I mean, that was what I was seeking was a
25    place where I could have big responsibilities.

Page 87

1 Q.   So what, if anything, did he have to say about that
2     firm and your opportunity -- what he thought your
3     opportunities might be there, positive or negative?
4 A.   I think he -- I think he was concerned about John
5     Ramar sharing the work, like letting me do more
6     substantive things.  I don't -- maybe the same for
7     Tony Paradiso, but in my head, John Ramar sticks
8     out.
9 Q.   Do you recall any specific words that came from
10    Bob?
11 A.   Specific, like, quotes?
12 Q.   Yeah.
13 A.   Just generally I recall that there was concern
14    about --
15 Q.   Sharing of the work?
16 A.   Sure.
17 Q.   Okay.  What about Kerr Russell; did Bob offer any
18    opinion about the pros and cons of going to Kerr
19    Russell?
20 A.   I think we talked about the fact that in a firm
21    like Kerr Russell, there's associates and there's
22    partners and the associates kind of do more of the
23    grunt work and so like the discussion again was
24    sharing of the work, being able to litigate, would
25    I take deps or would I be writing or would I -- how

Page 88

1     much would I get to do?  I mean, that was the
2     discussion.  All of these, we were talking about
3     how much I would do.
4 Q.   Was he offering an opinion about what he thought a
5     particular firm would allow someone at your level
6     to do or was he raising that as an issue for you
7     to explore when you were interviewing with the
8     firms so you could ask more probing questions and
9     understand what the opportunity would be like?
10        MS. RUSSELL:  Object to form.
11        THE WITNESS:  Well, I don't know what his
12    intention was of like he was asking --
13        MS. HARDY:  I'm not asking intent, I'm
14    asking what he said.  Did he offer an opinion about
15    what he --
16        THE WITNESS:  I think he --
17        MS. HARDY:  -- professed to know about a
18    particular firm or was he telling you, "These are
19    issues that you need to be concerned about in firms
20    of this nature"?
21        MS. RUSSELL:  Object to form.
22        THE WITNESS:  I believe it was stuff that
23    he professed to know, but I think that also -- he
24    was giving me both.  "This is what I know about X
25    firm," and also, "You should also ask these

Page 89

1     questions.  In general, those are good questions to
2     ask."
3 BY MS. HARDY:
4 Q.   So let's stay with what he professed to know about
5     the different firms.
6 A.   Sure.
7 Q.   Did he profess to know anything specific about the
8     Raman [sic] firm and how they handled the sharing
9     of work or was it just a kind of general alert that
10    that should be on your radar screen?
11 A.   The Ramar firm, just trying to clarify.  I'm not
12    trying to be a stickler with names.
13        But he professed -- he knew the
14    relationship with their clients, the clients that
15    they had, like Henry Ford, and he knew about work
16    assignments and he knew who came into his office
17    and facilitated, and I think he was speaking from a
18    place of, "I don't see associates come in and
19    facilitate those cases, so they're not getting
20    those opportunities."  So he was speaking from
21    experience, but he was also saying, "Generally, you
22    should ask these questions," so I --
23 Q.   Fair enough.
24        Anything else that he said about the Ramar
25    firm?

Page 90

1 A.   I believe he would have -- or I believe he did tell
2      me that he didn't think there would be a lot of dep
3      opportunities and I'm sure he knew that by
4      seeing -- attached to the facilitation summary, you
5      see who took the dep.
6 Q.   Okay.  Do you know anything he said about the Ramar
7      firm that wasn't true?
8 A.   I don't know if it was true or not true.
9 Q.   Fair enough.
10      What about Kerr Russell; what did he have
11     to say about Kerr Russell?
12 A.   We would have talked -- we talked again about the
13     opportunities, how much latitude I would have or
14     how much responsibility I would be given based on
15     his experience with facilitation.
16 Q.   What did he have to say in that regard?
17 A.   That there would -- the sharing of the work, that
18     associates -- as I said before, associates
19     generally are doing more grunt work and partners
20     are doing more of the big work.
21 Q.   Okay.  Well, that's a generalization about all
22     firms.
23 A.   Sure, sure -- well, yeah.  I don't --
24 Q.   What specifically did he have to say about Kerr
25     Russell and what he knew about Kerr Russell; do you

Page 91

1      recall anything?
2           MS. RUSSELL:  Objection.
3           THE WITNESS:  We talked specifically
4      about the two female partners that I was talking
5      to.
6 BY MS. HARDY:
7 Q.   Who were they?
8 A.   One is Patricia Schabath, and the other -- I cannot
9      for the life of me remember her name right now, but
10     she works very closely with Patricia Schabath and
11     it will come to me eventually, I'm sure -- and
12     their -- what experiences he had had with them.
13 Q.   What did he say?
14 A.   That Patricia Schabath didn't get to do as much of
15     the stuff as this other person who I can't
16     remember, but Patricia Schabath had also been an
17     attorney for a long time, so that was a concern.
18 Q.   Can you recall anything else he said about Kerr
19     Russell?
20 A.   I feel like we talked about one other -- like one
21     other attorney at Kerr Russell, but I can't
22     remember his name and I can't recall the specific
23     conversation.
24 Q.   What did Bob have to say about the McKeen firm?
25 A.   That Brian is notoriously hard on his associates

Page 92

1      and --
2 Q.   Who is that?  I'm sorry.
3 A.   Brian McKeen is notoriously hard on his associates,
4      that he's very controlling, and that he doesn't
5      let them -- I mean, I think there are situations in
6      which he told me that people get sent to trial that
7      aren't good trials, so there's obviously
8      responsibility there, but that Brian has a temper
9      and is -- he knows of people that complain about
10     working there, so...
11 Q.   Anything else that he said about McKeen's firm,
12     Brian or anyone else?
13 A.   As I sit here today, nothing comes to mind, but
14     I -- it would have been a longer conversation than
15     just five minutes.  I mean, it would have been an
16     evolving conversation.
17 Q.   I want to know everything you can recall sitting
18     here today.
19 A.   Yeah, I'm trying to give you everything I can
20     recall sitting here today.
21 Q.   You don't have any notes to look to to refresh your
22     memory, do you?
23 A.   If I wrote it down, it would be in one of the
24     journals that I'm going to look for and look at, so
25     I can definitely tell you then, but nothing right

Page 93

1      now that I know of that I can look at to refresh my
2      memory.
3 Q.   All right.  The Sommers Schwartz offer you had
4      before talking to Bob Riley, right, if I understood
5      that correctly?
6 A.   They reached out before talking to Bob Riley, but I
7      don't think I had the offer until after talking to
8      Bob Riley, but I don't know.  I would have -- so
9      after they reached out, I was connected by Diane
10     with Bob.  I went to Bob's party, and I don't think
11     I had a job -- I don't know when the job offer came
12     in that timeframe of talking to Bob or the
13     Starbucks meeting; I don't know.
14 Q.   Do you know of any facts to suggest that Bob Riley
15     played a role in Sommers Schwartz deciding to make
16     an offer to you?
17 A.   I understand that Bob recommended me to them and
18     talked about my work and what he had seen me on as
19     far as case-wise so, I think that that obviously
20     was why -- it's my understanding of why they
21     reached out to me.
22          I don't know if they returned to him when
23     they were making an offer and said, "Hey, should we
24     make an offer" or -- I don't know if that played
25     into their decision; that's their decision.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
94..97

Page 94

1  Q.   Okay.  Who was --
2          MS. RUSSELL:  I objected to the last
3      question.  I'm sorry, I was very quiet and I didn't
4      see it on the feedback.
5  BY MS. HARDY:
6  Q.   Who was the person at Sommers Schwartz that you
7      believe Bob Riley spoke to about you?
8  A.   I understand it to be Rick Groffsky and Lisa
9      Esser-Weidenfeller or -- like one of the two of
10      them or both of them.
11  Q.   What's Lisa's last name?
12  A.   It's hyphenated, so it's Esser, E-S-S-E-R, hyphen,
13      Weidenfeller, W-E-I-D-E-N-F-E-L-L-E-R.
14          MS. RUSSELL:  She's on plaintiff's
15      initial disclosures and you all subpoenaed her as
16      well.
17  BY MS. HARDY:
18  Q.   What, if anything, did Bob Riley have to say about
19      the pros and cons of going to Sommers Schwartz?
20  A.   He talked to me about that women weren't treated
21      well there and he referenced Judy Susskind and her
22      experience at Sommers Schwartz and talked about not
23      only were they not treated well as far as sexual
24      assaults and other incidents like that, but the
25      payment for women was different, markedly different

Page 95

1      and the bonus structure and whether they were
2      recognized for their efforts, not just monetarily,
3      but also in the firm hierarchy or being put on the
4      board of directors or whatever Sommers Schwartz's
5      executive committee is.  And he told me about what
6      Judy -- what he said Judy had told him about that.
7  Q.   All right.  So is it your understanding that the
8      information he had about Sommers Schwartz and he
9      conveyed to you all came from Judy Susskind?
10          MS. RUSSELL:  Objection.
11          THE WITNESS:  I don't know how I would
12      know if it all came from Judy Susskind or not.
13          MS. HARDY:  If he told you where it came
14      from, you would at least know that.
15          THE WITNESS:  Well, I don't know if that
16      means it true, right?
17          MS. HARDY:  That has nothing to -- I'm
18      just asking, what do you know about where Bob Riley
19      claims that information or understanding came from?
20          MS. RUSSELL:  Objection.
21          THE WITNESS:  I think it came from his
22      experience with attorneys, including -- Judy
23      Susskind is the one I knew by name, along with her
24      associate, Dina -- I don't know her last name; it
25      starts, I think, with a Z or C or something, but

Page 96

1      it's a long last name and she's on their website --
2      but I think it came from a combination of Judy
3      Susskind, Dina, and his experience with Sommers
4      Schwartz.
5          MS. RUSSELL:  I don't know whose iPad
6      this is, but there are messages that keep popping
7      up.
8          (Reporter clarification.)
9  BY MS. HARDY:
10  Q.   What did Bob Riley say, if anything, about sexual
11      assaults at Sommers Schwartz?
12  A.   That women had been sexually assaulted at Sommers
13      Schwartz.
14  Q.   What did he tell you in that regard?
15  A.   That they had been and that's a concern -- I mean,
16      it's obviously concerning.
17  Q.   Did he give you any details?  Did he tell you
18      whether that was the rumor on the street or whether
19      he had first-hand knowledge or whether he talked to
20      the women or any details?
21          MS. RUSSELL:  Object to form.
22          THE WITNESS:  I believe that -- my
23      understanding from the conversation was that this
24      was, in part, information that he had from Judy
25      Susskind, so I don't think it was something where

Page 97

1      Bob saw a sexual assault.  I don't think that --
2      when you ask if it's first-hand, that is not the
3      impression that I got from the conversation, but it
4      was not described as rumors on the street, so more
5      concrete than that, but also I didn't get the
6      impression he sat there and saw something.
7  BY MS. HARDY:
8  Q.   Okay.  Did he describe what was involved with the
9      one or more than one sexual assault that he was --
10      he had heard about through another person, the
11      range?  That could be a lot of different things.
12  A.   Sure.  I mean, I think my understanding from it was
13      that it was rape or sexual assault.
14  Q.   Where did you get the idea it could have been rape?
15  A.   I believe that was a word he used at the dinner
16      that I -- we talked about this.
17  Q.   Is that a dinner in Birmingham?
18  A.   No, that was a dinner with Brandon, my ex-husband,
19      and I don't -- I don't think -- I think -- I don't
20      think this calendar goes back to that.
21  Q.   Your husband was at that dinner?
22  A.   Yes.
23  Q.   When he -- "he" being Bob --
24  A.   Talked about Sommers Schwartz.
25  Q.   Having had a problem with women being sexually

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
98..101

Page 98

1   assaulted, including raped?
2 A.   Yes, at that dinner, yes.
3 Q.   Okay.  And did he give you any other details?
4 A.   I'm not -- I don't think any more details were
5     needed at that point about that.  I didn't ask
6     for -- I didn't ask for more details and I
7     didn't --
8 Q.   Did he offer any more details?
9 A.   I don't know what type of -- I'm not sure what
10    details there could be to offer about such a
11    concept.
12 Q.   There doesn't have to be a lot of details, but
13    let's not debate that.
14 A.   Sure, I don't think that those details should be
15    discussed, but no, I don't know -- he did not tell
16    me who, so he did not offer that detail, and --
17 Q.   He wasn't specific about how he had heard that, you
18    just assume it was Judy, he didn't tell you when,
19    he didn't tell you how often, he didn't tell you
20    who, he didn't do anything other than say there had
21    been one or more sexual assaults and/or rape?
22         MS. RUSSELL:  Object to form.
23         THE WITNESS:  The conversation included
24    him telling me that he had a close friend that
25    works at Sommers Schwartz named Judy and he knew

Page 99

1   about what it was like to work there because of
2     that, and then in that conversation, we talked
3     about sexual assaults and rape and how people
4     weren't appointed to board of directors or
5     executive committee or whatever --
6         MS. HARDY:  So I'm focused on the rape
7     and the sexual assault.
8         THE WITNESS:  Sure, but I'm saying I
9     don't know -- he expressed that he knew this from
10    talking to Judy and his experience with Sommers
11    Schwartz, so I don't know if he got that from Judy
12    or from his experience with working with Sommers
13    Schwartz.  I would have to be assuming to answer
14    the question.
15 BY MS. HARDY:
16 Q.   And you don't know the name of the person who was
17    accused at Sommers Schwartz who had engaged in such
18    conduct?
19         MS. RUSSELL:  Objection.
20         THE WITNESS:  No, he told me that that
21    was all very private and he --
22         MS. HARDY:  The answer is just no; if you
23    don't know the name, just say no.
24         THE WITNESS:  Yeah, I don't.
25         MS. RUSSELL:  Counsel, we're about

Page 100

1   ten minutes to the hour.  I want to check on
2     plaintiff.  Are you okay to sit a little bit longer
3     than an hour?
4         THE WITNESS:  Sure.
5         MS. RUSSELL:  Okay.
6 BY MS. HARDY:
7 Q.   Did you interview with the Fieger firm prior to
8     accepting an offer with Riley & Hurley?
9 A.   I believe I interviewed with the Fieger firm when I
10    was leaving Riley & Hurley to go to Olsman
11    MacKenzie.  I don't think that I had interviewed
12    with Fieger prior to hiring at Riley & Hurley.
13 Q.   Prior to being hired at Riley & Hurley, did you
14    discuss the Fieger firm and what it was like to
15    work there with Bob Riley?
16 A.   At some point I talked to Bob Riley about the
17    Fieger firm, but I don't know that I can put a date
18    on it as I sit here today.
19 Q.   You can't put a date on it as pre-hire of Riley &
20    Hurley, correct?
21 A.   Not without looking at something to help me
22    remember, but I do know we talked about Fieger.
23 Q.   Did you follow up with Judy Susskind or her
24    associate about the conversation you had had with
25    Bob concerning how women were treated at Sommers

Page 101

1   Schwartz?
2         MS. RUSSELL:  Objection.
3         THE WITNESS:  No, Bob told me not to tell
4     anyone about the conversation that we had about how
5     women were treated and I did not talk to Judy or
6     Dina about that.
7 BY MS. HARDY:
8 Q.   All right.  So you decided not to go to Sommers
9     Schwartz, correct?
10 A.   Correct.
11 Q.   What was the reason?
12 A.   That was the reason.
13 Q.   All right.  And what was the date of your dinner
14    that you had with Bob Riley and Brandon Heid in
15    Birmingham in which you learned about the sexual
16    assault/rape issues at Sommers Schwartz?
17 A.   I don't know that date off the top of my head, but
18    I would have called Rick Groffsky -- I called Rick
19    Groffsky -- I left dinner in the middle of dinner
20    after learning it to call Rick Groffsky, and there
21    would be a phone record, I would think, about that
22    phone call, so that could tell you the date of the
23    dinner, and he couldn't talk then and we talked the
24    next day, so there's got to be a way to figure this
25    out.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
102..105

Page 102

1 Q.   So you called Rick and you turned down the offer?
2 A.   Well, he didn't answer the phone, but I called Rick
3       and I left him a voicemail saying, "I need to talk
4       to you," or something to that effect.
5 Q.   Okay.  And you then had a conversation with him?
6 A.   He then called me the next day or met -- I think we
7       met the next day; I don't think it was a phone
8       call, it was a meeting in person.
9 Q.   Okay.  And what did you say to him as to why you
10      were declining the offer?
11 A.  That I was going in a different direction and it
12      felt like that's -- I wanted to do something
13      different, "I'm sorry," and -- I apologize
14      profusely and I said I had second thoughts and I
15      was doing something else.
16 Q.  You didn't mention anything about hearing about the
17      mistreatment of women at his work?
18 A.  No, I did not.
19 Q.  Did you ever pursue job opportunities with Sommers
20      Schwartz after that point in time?
21 A.  Rick has reached out to me at times and I have
22      asked -- I believe when I was leaving Riley &
23      Hurley, I said, "Do you have any job
24      opportunities?" and he said no.
25 Q.  Okay.  Why would you ask Sommers Schwartz for a job

Page 103

1       opportunity when you're leaving Riley & Hurley if
2       you declined an offer in hand because of what you
3       had heard about the abuse of women at the firm?
4       MS. RUSSELL:  Objection.
5       THE WITNESS:  Because at that time I had
6       had a conversation with Rick Groffsky and I
7       believed what Bob had said was a lie and I --
8       otherwise, other than that reason, I was going to
9       accept the job at Sommers Schwartz, so I had
10      decided that Sommers Schwartz was a place I would
11      like to work.
12 BY MS. HARDY:
13 Q.  All right.  When did you have the conversation with
14      Rick Groffsky?
15 A.  Sometime before I left Riley & Hurley.  I would --
16 Q.  In person?
17 A.  I believe it was in person.  I think we went to
18      lunch.
19 Q.  Okay.  Did you initiate it?
20 A.  I believe it was -- he initiated asking me how
21      things were going at Riley & Hurley.
22 Q.  All right.
23 A.  So maybe it was a telephone conference.  At some
24      point, though, Rick and I ended up going to lunch.
25 Q.  Tell me about the conversation in which you

Page 104

1       disclosed to Rick Groffsky that Bob Riley had led
2       you to believe that there was a problem with sexual
3       assaults and rape at Sommers Schwartz.
4       MS. RUSSELL:  I'm sorry, can you re-ask
5       that?  I'm reading it and I don't understand.
6       MS. HARDY:  Can you read it back, please?
7       (Whereupon the question was read
8       back by the court reporter.)
9       THE WITNESS:  I believe it was either a
10      phone -- it was a verbal conversation, it was not a
11      text conversation, and I was talking to him about
12      the behavior from Bob which I thought was
13      concerning.
14 BY MS. HARDY:
15 Q.  What did you tell him in that regard?
16 A.  I would have told him about feeling uncomfortable
17      with what Bob was doing, so --
18 Q.  Did you tell him what was making you
19      uncomfortable?
20 A.  I would have given him some examples, but I don't
21      know that I can list everything that I told Rick,
22      so --
23 Q.  Tell me whatever you remember you mentioned.
24 A.  Cards and his communications were making me
25      uncomfortable --

Page 105

1       MS. RUSSELL:  Object to form.
2       THE WITNESS:  -- and I would have to know
3       the date of -- if I knew the first date that I
4       contacted Rick, I'm sure I could -- it would help
5       me remember what timeframe we're talking about, but
6       I would have told him the cards and the
7       communications made me uncomfortable.
8 BY MS. HARDY:
9 Q.  So that caused you, at some point during the course
10      of your employment with Riley & Hurley, to reach
11      out to Sommers Schwartz to initiate talks about a
12      job opportunity?
13 A.  Well, I reached out to Rick to talk to him about
14      what Bob had told me because by that point in time
15      I felt like what Bob had said was potentially a
16      lie, so that was...
17      MS. RUSSELL:  Can I have a second?
18 BY MS. HARDY:
19 Q.  What led you to believe that before you reached out
20      to Rick Groffsky that what Bob had told you about
21      Sommers Schwartz was potentially a lie?
22      THE WITNESS:  Are you trying to say
23      something, Kimberly?
24      MS. HARDY:  Please respond.
25      MS. RUSSELL:  You can go ahead.  I'm

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
106..109

Page 106

1  listening.
2         THE WITNESS:  Sometime prior to that,
3  Rick Groffsky had reached out to Bob, according to
4  Bob, and said, "How is Elyse doing at your office?"
5  something to that effect, and Bob had said back --
6  well, I don't know what Bob said back, but what Bob
7  told me is that, "Rick reached out to me and asked
8  how you were doing at the office, and don't worry,
9  I didn't make him feel like he was missing out on
10  anything and that way we won't have bad blood."
11  Something to that effect.
12         And I was like, "Wait a second.  Why
13  would you say that to Rick?"  I didn't like that, I
14  didn't appreciate that.  And he was like, "It's
15  better to just have things be smooth and not make
16  anyone upset."  So that sat with me wrong, it did
17  not sit with me well because I felt like there was
18  some lies going on.  Why was that being talked
19  about like that?
20         And Rick, at some point, sent me a
21  message on LinkedIn asking about how I was doing,
22  but I don't know if that was before or after I then
23  reached out to Rick.  I don't know without a
24  time -- without more timeframe, I don't know how to
25  give you that answer.

Page 107

1  BY MS. HARDY:
2  Q.   All right.  So what did you tell Rick Groffsky or
3       ask Rick Groffsky about the sexual assault/rape
4       story that you claim you heard from Bob?
5  A.   I asked him if it was true.
6  Q.   And how did you -- how did you describe it to him?
7  A.   I said, "Has there been inappropriate behavior at
8       Sommers Schwartz and have there been sexual
9       assaults?"  I asked that question and he said no.
10  Q.   Did you ask him if there had been a rape?
11  A.   I mean, I put rape under the umbrella of sexual
12       assault, so I -- if I covered sexual assault, I
13       would hope he didn't say, "Rape is different,"
14       but --
15  Q.   Well, rape can be the severe end of the sexual
16       assault.
17  A.   Sure, but if someone has not sexually assaulted
18       someone, they haven't raped them, so I don't know
19       if I --
20  Q.   Did you use the word rape?
21         MS. RUSSELL:  Allow plaintiff to answer.
22       Were you finished?
23         THE WITNESS:  No, but I would have made
24       sure -- what I got away from the conversation is no
25       one was sexually assaulted, so I don't know if I

Page 108

1  said to Rick, "Were they sexually assaulted or
2  raped?" but that's not -- he said no.
3  BY MS. HARDY:
4  Q.   And you made it clear to Rick that Bob had told you
5       that prior to you declining the offer?
6  A.   I believe I did, yes, identify Bob.
7  Q.   How did Rick respond?
8  A.   He was appalled by that and said, "No, that's not
9       happened," and I --
10         MS. RUSSELL:  I'm confused on the
11       timeframe here, counsel.  You said, "You made clear
12       to Rick that Bob had told you that prior to
13       declining the offer."  Is "prior to declining the
14       offer" -- you're asking if she made Rick aware of
15       that before she declined the Sommers Schwartz
16       offer?
17         MS. HARDY:  Yes, yes.
18         MS. RUSSELL:  So the question is, before
19       she declined the Sommers Schwartz offer, did she
20       make Rick aware of what Bob --
21         MS. HARDY:  No, that's not.
22         MS. RUSSELL:  That's my question.  I was
23       confused on how you asked it.
24         MS. HARDY:  She understood.
25         MS. RUSSELL:  So can you rephrase your

Page 109

1  question?
2         MS. HARDY:  I don't need to rephrase it.
3       The witness understood.
4         MS. RUSSELL:  Well, the record is not
5       clear.  Can you please rephrase it?
6         MS. HARDY:  The record will stand as it
7       is.
8         MS. RUSSELL:  No, because the question
9       reads ambiguously.
10         MS. HARDY:  Well, if that's true, that's
11       my problem.
12         MS. RUSSELL:  Then I object to it.
13         MS. HARDY:  Okay.  You can object.  Thank
14       you.
15  BY MS. HARDY:
16  Q.   What did Rick have to say, if anything, about Bob
17       in that conversation?
18  A.   That it was -- that that was wrong and that he was
19       disappointed and -- I mean, he was upset about it,
20       but he didn't -- I think he wondered why he said
21       it.
22  Q.   All right.  Do you know if Rick and Bob had any
23       communications thereafter about what Rick had been
24       led to believe was a false statement by Bob to
25       interfere with your taking a job with him?

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
110..113

Page 110

1 A.   At any point in time ever?
2 Q.   Did you have any knowledge about whether they
3       talked about the fact that Bob had allegedly made
4       a misrepresentation about Sommers Schwartz to
5       interfere with you taking a job with Sommers
6       Schwartz?
7             MS. RUSSELL:  Objection.
8             THE WITNESS:  I've been told subsequently
9       by Rick that he has confronted Bob about him
10      interfering with job offers and I don't know if
11      that is specific to me or in general.  I don't know
12      if my name came up -- or I think -- I think my name
13      might have come up, but in addition to other
14      people, so I don't -- I don't believe -- I am not
15      aware of a conversation that happened immediately
16      after my conversation with Rick.
17 BY MS. HARDY:
18 Q.   What's the LinkedIn message that you referred to
19      with respect to your communications with Rick?
20 A.   I think he sent me a LinkedIn message asking how
21      things are going.
22 Q.   And did you communicate back and forth with him
23      through LinkedIn on one or more occasions?
24 A.   I probably -- I think -- I do think I wrote back.
25 Q.   Was that the only communication on LinkedIn with

Page 111

1       Rick?
2 A.   I don't recall any others off the top of my head,
3       but he might have sent me like the standard
4       LinkedIn when someone has been somewhere for a
5       year, "Congrats, you've been there for a year."  I
6       don't know if -- I don't recall anymore.
7 Q.   All right.  Do you have any texts or email messages
8       with Rick Groffsky?
9 A.   I do have text messages with Rick Groffsky; I don't
10      recall any emails that I have or don't know of any
11      emails that I have with Rick Groffsky.
12            (Marked for identification:
13            Deposition Exhibit No. 2.)
14            MS. HARDY:  Let the record reflect I'm
15      showing the witness Exhibit No. 2 which is an
16      employment offer from Sommers Schwartz, providing a
17      copy to counsel.
18            MS. RUSSELL:  Counsel, will you be
19      producing these electronically or are we just
20      getting a hard copy?
21            MS. HARDY:  I believe these are
22      subpoenaed documents that came in response to a
23      subpoena.  We have not requested subpoenaed
24      documents.
25            MS. RUSSELL:  You have an obligation to

Page 112

1       turn them over if you've gotten them through a
2       subpoena.
3             MR. DAVIS:  That's not true; that's
4       absolutely not true, and I'll give you chapter and
5       verse if you want it after.
6             MS. HARDY:  Just not on this record.
7             MR. DAVIS:  Not on this record, but I
8       will be more than happy to let her know.
9             MS. RUSSELL:  You can spend your time
10      however you want on your dep time.
11            MS. HARDY:  I'm sorry, it's an October 1,
12      2019, employment offer to Elyse Heid from Joseph
13      Bourgon, chief executive officer.
14            MS. RUSSELL:  I'm sorry, counsel;
15      Ms. Gordon, do you have a copy of this?
16            MS. HARDY:  Why don't you send that
17      down --
18            MS. GORDON:  I'm not answering your
19      questions today.  Sorry.
20            MS. RUSSELL:  So you're not answering
21      whether or not you have a copy of this independent
22      of this deposition?
23            MS. GORDON:  I'm not answering your
24      questions today, no.
25            MS. RUSSELL:  Okay.  I just want the

Page 113

1       record to reflect that I've asked --
2             MS. GORDON:  You know what, it's
3       already --
4             MS. RUSSELL:  -- defense counsel if she
5       has a copy of a subpoenaed record that has not been
6       produced to plaintiff before this deposition.
7             MS. GORDON:  Nobody's here to answer your
8       questions today.
9 BY MS. HARDY:
10 Q.   Ms. McKenna, is this the offer letter you received?
11 A.   I don't know without comparing it to -- I don't
12      remember.  I don't know.
13 Q.   Do you recall if you ever signed an offer letter?
14 A.   I definitely did not sign an offer letter.
15 Q.   Do you recall how long after October 1, 2019, you
16      refused to -- you did -- I'm sorry.  Strike that.
17            After October 1, 2019, you accepted an
18      offer and then you called them or met with them and
19      told them you had changed your mind, correct?
20 A.   I don't know the date like that, so I don't --
21 Q.   The sequence is right though, correct?
22 A.   I don't remember if he gave me this offer letter
23      after he and I -- I had verbally accepted, because
24      then this would have memorialized the terms we came
25      up with, so I'm not sure about the sequence.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
114..117

Page 114

1     MS. RUSSELL:  I'm putting a standing
2  objection on the record to all documents that
3  haven't been produced, including third-party
4  subpoenaed documents.
5     MS. HARDY:  Objection noted.
6     All right.  If you need to take a break,
7  why don't we take a five-minute break.
8     MS. RUSSELL:  Are you good to keep going?
9     THE WITNESS:  Yeah, let's just keep --
10    MS. RUSSELL:  Let's keep going.
11    MS. HARDY:  All right.  Good.  I thought
12  she had to take a break every hour on the hour per
13  the doctor's note.
14    THE WITNESS:  Well, I'm not drinking any
15  water, unfortunately, which is probably bad for all
16  of us.
17    MS. HARDY:  So I'm going to go through a
18  line of questioning, so you're not going to need a
19  to take a break in five minutes, right?
20    THE WITNESS:  Is the line of
21  questioning -- can we say 20 to 30 minutes I can go
22  to the bathroom?
23    MS. HARDY:  Fair enough.  So right now
24  it's quarter of twelve.  By quarter after twelve,
25  we'll take a break.

Page 115

1     THE WITNESS:  It's already twelve?
2     MS. HARDY:  Pardon me?
3     THE WITNESS:  It's already twelve?
4     MS. HARDY:  It's quarter of.
5     MS. RUSSELL:  We can take a lunch.
6     MS. HARDY:  Short lunch.
7     MS. RUSSELL:  Is there a place in the
8  building to get --
9     MS. HARDY:  Not in the building.
10    THE REPORTER:  Do you guys want this on
11  the record?
12    MS. HARDY:  There is lots of options --
13    MS. RUSSELL:  We can talk about it when
14  we break.  I don't want to burn any of your time.
15  BY MS. HARDY:
16  Q.   So you became employed with Riley & Hurley October
17    21, correct?
18  A.   Yes.
19  Q.   Your last day of employment was August 20 -- I'm
20    sorry.
21       You became employed October 21, 2019,
22    correct?
23  A.   I believe that's correct.
24  Q.   All right.  And your last day of employment was
25    August 20, 2021?

Page 116

1  A.   I don't know that date off the top of my head, but
2    I believe both -- I don't know both dates -- I
3    believe both dates are around the right time, yes.
4  Q.   When you joined the Riley & Hurley firm, you had
5    been a litigator in the personal injury space,
6    including some insurance defense, correct, in your
7    career to date?
8  A.   Yes.
9  Q.   And you wanted to continue as a litigator in the
10    medical malpractice field when you joined Riley &
11    Hurley, correct?
12  A.   I did, yes.
13  Q.   And you also understood when you joined Riley &
14    Hurley that Bob Riley no longer could litigate,
15    correct?
16  A.   I believe Bob wanted to one day maybe litigate
17    again, but that he was not litigating at the time I
18    joined Riley & Hurley.
19  Q.   And you understood that he had not been litigating
20    because of his vision problems, correct?
21  A.   I understood that that was one of the reasons that
22    he had not been litigating.
23  Q.   What other reasons did you understand contributed
24    to the fact that he gave up litigation?
25  A.   I believe he also liked mediation.

Page 117

1  Q.   Okay.  You understood that Bob Riley could not
2    continue litigating unless his vision problems
3    somehow miraculously improved, correct?
4     MS. RUSSELL:  Objection.
5     THE WITNESS:  No, that was not my
6    understanding.
7  BY MS. HARDY:
8  Q.   You understood when you joined the firm that Bob
9    Riley hadn't been driving for a number of years,
10    correct?
11  A.   I knew he wasn't driving.
12  Q.   He didn't have a license, correct?
13    MS. RUSSELL:  Objection.
14    THE WITNESS:  Yes, I understood he didn't
15    have a license.
16  BY MS. HARDY:
17  Q.   He wasn't able to drive because he was legally
18    blind; you understood that, correct?
19    MS. RUSSELL:  Objection.
20    THE WITNESS:  I understood he wasn't able
21    to drive, not that --
22  BY MS. HARDY:
23  Q.   Because he was legally blind?
24    MS. RUSSELL:  Objection.
25    THE WITNESS:  I don't --

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
118..121

Page 118

1 BY MS. HARDY:
2 Q.    Did you ever bother to inquire about how severe his
3        vision problems were?
4              MS. RUSSELL:  Objection.
5              THE WITNESS:  You're asking me a couple
6        different questions, but my understanding was that
7        Bob wanted to litigate again and that he thought he
8        could litigate again, so I don't think his vision
9        problem was preventing him from litigating, so I
10       don't know, but I understood that he could not
11       drive and that he did not have a license and I
12       believe my understanding was that he voluntarily
13       gave up his license.
14 BY MS. HARDY:
15 Q.    Okay.  What led you to believe that he thought he
16       could litigate again?
17 A.    Him telling me that.
18 Q.    What did he say?  Tell me about that conversation.
19 A.    That he wanted to try cases again and he wanted to
20       try cases -- us to try cases together.
21 Q.    Okay.  Wanting to do something and having that be
22       realistic are two different things, would you
23       agree?
24              MS. RUSSELL:  Objection.
25              MS. HARDY:  Or they can be?

Page 119

1              THE WITNESS:  They can be, but he spoke
2        about it as if it was something he intended to do,
3        so I believe he intended to do so.
4 BY MS. HARDY:
5 Q.    During the time that you were at Riley & Hurley,
6        did you ever know him to litigate a single thing?
7 A.    He would offer to litigate things, so...
8 Q.    Did you ever know him to litigate a single thing?
9 A.    No, but my understanding was that he could.  He was
10       mediating cases and he was representing hockey
11       clients.
12 Q.    Okay.  But he was not litigating, correct?
13 A.    He wasn't during that time, no.
14 Q.    Okay.  The litigation clients were all the clients
15       of Bill Hurley, correct?
16 A.    Yes --
17              MS. RUSSELL:  Objection.
18              THE WITNESS:  -- but also his hockey
19       clients could have resulted in litigation, so I
20       don't --
21 BY MS. HARDY:
22 Q.    It doesn't mean that Bob Riley would have handled
23       it, does it?
24 A.    Based on what Bob said, I think he would have
25       handled it.

Page 120

1 Q.    But you never knew him to handle any litigation
2        when you were there, correct?
3 A.    No, yeah, I didn't -- he did not handle litigation
4        while I was there.
5 Q.    Do you know how long before you joined the firm
6        that he had to give up litigation because of his
7        vision?
8 A.    I don't know the number of years, no.
9 Q.    When you joined the firm, fair to say Bob was an
10       older man, correct?
11 A.    Yes.
12 Q.    Okay.  And it's fair to say you knew he had really
13       frail health?
14 A.    I don't know that he had frail health, no.
15              MS. RUSSELL:  Objection.
16              THE WITNESS:  I don't know that I would
17       characterize that that way.
18 BY MS. HARDY:
19 Q.    You are denying you had communications either via
20       text or email or verbal about the fact that he was
21       very careful due to heart issues, cardiac issues --
22              MS. RUSSELL:  Objection.
23              MS. HARDY:  -- that limited his activity?
24              THE WITNESS:  I believe he used -- I know
25       that he had an exercise bike and he would bike and

Page 121

1        he would walk his dogs and he -- so I don't view
2        that as a type of person being in frail health.
3        When you say frail health, I think of someone that
4        can't use an exercise bike and walk their dogs, so
5        I -- and I -- so whatever cardiac issues.
6 BY MS. HARDY:
7 Q.    So you had no knowledge of his general health
8        condition beyond his vision problems?
9 A.    I mean, his general health condition allowed him to
10       ride an exercise bike, so that is what I -- and go
11       on long walks with his dogs.
12 Q.    Okay.  You knew during the time you worked at Riley
13       & Hurley that his vision was so bad that he
14       couldn't even read a restaurant menu, correct?
15 A.    He regularly read restaurant menus.
16 Q.    Either with a reading assistant or somebody reading
17       it to him, correct?
18 A.    That's incorrect.
19 Q.    Okay.  Tell me when you saw him read a restaurant
20       menu on his own without any assistance.
21 A.    At the dinners that we went to.
22 Q.    You're saying at every one?
23 A.    He chose things off the menu and he looked at the
24       menu, and at times, if lighting was dark at a dark
25       restaurant, he would use a flashlight, but he read

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
122..125

Page 122

1    the -- I did not read the menu to him and I sat
2    across from him and there was nothing reading the
3    menu to him.
4 Q.   Did he select things that the wait person
5    suggested?
6 A.   No, he read the menu.
7         MS. RUSSELL:  Objection.
8 BY MS. HARDY:
9 Q.   How do you know he read the menu?
10 A.   Because we would talk about the menu.  "Oh, there's
11    an appetizer."  There was a discussion about the
12    menu, so I sort of...
13 Q.   Did you know his vision problem was progressive,
14    meaning it was continually getting worse as time
15    went on?
16 A.   I understand that generally about vision problems
17    and I understand that there are periods that they
18    progress and then they stay stagnant, so I
19    understood that his vision had worsened prior to
20    the point where he voluntarily relinquished his
21    license. I don't have anymore details about what I
22    knew about the progression.
23 Q.   Did you ever inquire as to what the nature was of
24    his vision problem; how bad it was at any point in
25    time and how much worse it was getting at various

Page 123

1    points in time?
2 A.   I understood that he had macular degeneration or
3    something of that nature and that he ended up
4    with -- he would use a light to help him read
5    things and he read dinner menus and he read
6    facilitation summaries and he used his iPad and he
7    read documents on his iPad.
8         I don't -- I believe he got a newer light
9    when we moved offices from one office to another
10    and I don't know that I could say that that's
11    related to his vision getting worse or not or if
12    he just got a new light because he was at the
13    office.
14 Q.   Do you know what Stargardt disease is?
15         MS. RUSSELL:  Objection.
16         THE WITNESS:  I have heard of Stargardt
17    disease.
18 BY MS. HARDY:
19 Q.   Do you know that Bob had Stargardt disease and that
20    that was the nature of his vision issue impairment?
21 A.   I don't know if he ever gave me that term or if he
22    described it as macular degeneration.  He would say
23    parts of his visual field he couldn't see out of,
24    so I don't --
25 Q.   Did you ever talk to Bob about why he needed an

Page 124

1    iPad to be able to see documents and people?
2 A.   I didn't know that he was seeing people with his
3    iPad. I --
4 Q.   You never asked him about what use he made of it;
5    you never had any kind of conversation like that?
6 A.   I didn't -- I don't know why anyone would use their
7    iPad --
8         MS. RUSSELL:  Objection.
9         THE WITNESS:  -- to see people.
10 BY MS. HARDY:
11 Q.   If you don't know anything about Stargardt disease
12    or that he even had it, then I guess you wouldn't
13    know to ask, right?
14         MS. RUSSELL:  Objection.
15         THE WITNESS:  I don't understand what
16    your question is.
17 BY MS. HARDY:
18 Q.   I'm just trying to understand what you know about
19    his vision problems and it sounds like nothing
20    other than the fact that he couldn't drive and that
21    he had to use a light to read menus in the
22    restaurant.  Is that all you knew about his vision
23    problem?
24 A.   He could read facilitation summaries on a piece of
25    paper and he could write notes on a legal pad and

Page 125

1    he could read those legal notes on -- he could read
2    those notes on a legal pad that he had written.  So
3    you're also saying -- you're asking me something
4    about whether I knew why he needed his iPad to view
5    documents, but I don't -- that's not my
6    understanding is not that he needed his iPad.
7 Q.   So when you say he could read a facilitation
8    statement just in front of him, how do you know
9    that?
10 A.   Because I watched him read the facilitation
11    statements.
12 Q.   How do you know that that statement had not been
13    read by him through the iPad prior to you observing
14    him looking at it on the table?
15 A.   Well, he also wrote notes down on the facilitation
16    summary and on other hockey documents and would use
17    them, and when we worked on hockey documents
18    together, there are many documents that weren't on
19    his iPad. I know that because I would print them
20    and they weren't otherwise accessible to him on the
21    iPad.
22 Q.   When was that?
23 A.   When I worked at Riley & Hurley.
24 Q.   When?
25 A.   When we worked on the hockey -- we worked on hockey

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
126..129

Page 126

1    the entire time I was there, so I don't -- I
2    don't...
3  Q.   Can you identify any specific time when that
4    happened?
5  A.    Routinely.  I mean, I would be printing out
6    documents and we were working on them together, so
7    I don't -- we worked on various different projects.
8  Q.    Let's talk about the Riley & Associates law firm.
9    When you joined, there was Bob Riley,
10    partner-owner, correct?
11  A.    Correct.
12  Q.    Bill Hurley, partner-owner, correct?
13  A.    Correct.
14  Q.    And Allison, a lawyer, associate, correct?
15  A.    Yes.
16  Q.    And then you, correct?
17  A.    Yes.
18  Q.    That's what the team consisted of?
19  A.    Yes.
20  Q.    There were no male lawyers that were employed by
21    Riley & Hurley, correct?
22  A.    Correct.
23  Q.    All right.  When you joined Riley & Hurley, what
24    did you generally know about Bob Riley in terms of
25    his reputation in the community?

Page 127

1  A.    That he was well respected and that he mediated
2    cases.  He was, I think, the go-to mediator for
3    medical malpractice cases.  I understood that he
4    also mediated other types of cases as well, but I
5    would say my understanding was that his majority
6    was medical malpractice before I was there.
7  Q.    He wasn't the only facilitator in the community who
8    mediated medical malpractice, correct?
9  A.    He wasn't, but he was the preferred mediator.
10  Q.    How do you know that he was preferred by everybody
11    in the medical malpractice?
12  A.    Well, FBMJ was a pretty big firm and I knew
13    everybody there was fighting for his time and his
14    calendar, and I knew that when you asked Bob for a
15    date for a mediation, you waited a long time, so he
16    was -- and of the clients that I worked with, he
17    was the top choice of, "Let's do Bob if we can, and
18    if we can't get in during the court-allotted time
19    for getting this mediation done, we'll use somebody
20    else."
21  Q.    Okay.
22    So that's...
23  Q.    So you know that he happened to be one of the
24    preferred, but you can't quantify like, you know,
25    why Bob is more preferred than other people or has

Page 128

1    more mediations than other mediators; you don't
2    have any way to quantify that, correct?
3  A.    I don't know that -- I'm not sure about what -- I
4    don't know what you're asking me to quantify, but I
5    would say Bob's practice was more mediation and a
6    lot of these other people mediated and also still
7    litigated, so I think there are times more -- like
8    the other mediators I know of were doing a little
9    of both and so he had more time to devote, and I'm
10    sure that's part of it, and also his experience and
11    I'm sure it -- I don't know what to quantify.
12  Q.    Did you hear anyone speak negatively of Bob
13    Hurley [sic] at any point in time prior to taking a
14    job with him or prior to leaving his firm?
15  A.    Just to clarify, Bob Riley, but --
16        MS. RUSSELL:  Object to form.
17        THE WITNESS:  -- prior to taking a job
18    with him, I would say I don't recall anyone
19    speaking negatively about him.  Prior to leaving
20    his firm, I would say Rick was not speaking -- was
21    not happy after I had told him that, so he's --
22    that was a negative conversation.  My ex-husband
23    certainly wasn't -- I mean, people -- do you mean
24    in the legal profession --
25        MS. HARDY:  Yes, inside the legal

Page 129

1    profession.
2        THE WITNESS:  -- or going outside of --
3    okay.
4        Beyond my -- I guess just to clarify,
5    beyond my representation, like beyond me talking to
6    people about Bob's behavior or just in general?
7        MS. HARDY:  Yes, in general.
8        THE WITNESS:  In general, I don't
9    recall -- I don't recall anyone, like, outside of
10    Rick, anyone else that would have expressed concern
11    to speaking negatively about Bob.
12  BY MS. HARDY:
13  Q.    Okay.  Where did you get the notion that Bob was so
14    powerful or people were so fearful of him that no
15    one would hire you if they thought you had left his
16    firm without his endorsement?
17        MS. RUSSELL:  Objection.
18        THE WITNESS:  The firms that I was
19    talking to expressed that.
20  BY MS. HARDY:
21  Q.    Who?
22  A.    So definitely Brian McKeen talked to me about
23    wanting to make sure Bob was okay with that, so I
24    spoke with Brian McKeen on two occasions, so we
25    already talked about the first one, but now we're

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
130..133

Page 130

1    talking about 2021.  Cullen McKinney would have
2    fallen into that category.
3 Q.   Who did you speak to there?
4 A.   Cullen McKinney at -- the firm is called Tanoury
5    Nauts McKinney & Garbarino -- or used to be.
6 Q.   Okay.  Anyone else?
7 A.   I talked to, at that firm, Marisa Cicotte, same
8    firm at Cullen.  And Lisa Andress would have -- I
9    believe she's retired now, but I also --
10 Q.   At the same firm?
11 A.   At the same firm.
12          I talked to -- separate firm -- Fieger's
13    office.
14 Q.   Who at Fieger's office?
15 A.   A couple different people, so Fieger and --
16 Q.   You talked to Geoff?
17 A.   Yeah.
18 Q.   Directly about Bob?
19 A.   Directly about Bob.
20 Q.   Who else?
21 A.   In some of those meetings, Jim Harrington was
22    there, but I don't know -- there were definitely
23    separate conversations I had just with Geoff, so
24    I'm not sure if he was in a conversation about Bob.
25          And Samantha Thiel was -- I talked to

Page 131

1    Samantha Thiel when trying to set up interviews
2    with Geoffrey Fieger, but I don't remember --
3    sorry, Jim Harrington and Samantha Thiel may or may
4    not have been there for conversations, but I had
5    conversations separately with Geoff Fieger himself.
6 Q.   What are you claiming Geoff Fieger said about Bob
7    Riley in terms of his interest in hiring you?
8 A.   That he would want to make sure it's okay with Bob.
9 Q.   Anything more than that?
10 A.   What he said about Bob Riley in general?
11 Q.   About the concern about "Gotta make sure Bob is
12    happy."
13 A.   That he -- yeah, that he wouldn't want to make Bob
14    mad; Bob mediates a lot of cases for him.  I think
15    he said that like --
16 Q.   But that's when you were looking for a job after
17    Bill had announced that he was going to be phasing
18    out of litigation and you started looking for a job
19    in the May, June, July timeframe of 2021?
20 A.   I'm not sure when Bill announced it, but that was
21    one of the reasons that I was using to try to get
22    out of Riley & Hurley is that Bill was retiring and
23    I thought I could get Bob to buy in to me leaving
24    and I -- yes, so I don't know that that was
25    public -- I don't know that Bill had announced that

Page 132

1    in a public way.
2 Q.   But you knew that, right?
3 A.   Yes.
4 Q.   You knew; he told you directly, right?
5 A.   I don't know if -- I think he told me directly, but
6    I also think Bob had told me.  I knew from multiple
7    different sources in our office.
8 Q.   That the litigation work would eventually dry up at
9    Riley & Hurley and you would not have any
10    litigation work left to do unless you could
11    generate it on your own?
12 A.   I don't know that I would characterize it like
13    that, but that Bill was retiring; I knew that.
14 Q.   Okay.  But Bill was the only one with litigation
15    clients, you did litigation and wanted to continue,
16    correct?
17 A.   Correct.
18 Q.   Okay.  And if Bill is retiring, eventually the
19    pipeline of cases is going to dry up unless you can
20    bring in your own cases to replenish it; that's
21    just a fact of life in a law firm, correct?
22          MS. RUSSELL:  Objection.
23          THE WITNESS:  Incorrect, because Bob
24    wanted to try cases with me and Bob wanted to get
25    litigation experience and he thought -- he was

Page 133

1    talking about doing that, so I know that we already
2    established that Bob didn't litigate while I was
3    there, but that's something he wanted to do.
4 BY MS. HARDY:
5 Q.   He was going to start up again in his 70s after
6    having quit litigation years before?
7 A.   Yes.
8          MS. RUSSELL:  I object to form.
9 BY MS. HARDY:
10 Q.   And you thought that was a reality?
11 A.   He thought that that was a reality.
12 Q.   Okay.  But at the time you're talking to the Fieger
13    firm, that's after you're looking for a job because
14    the litigation work is going to be phasing out,
15    correct?
16 A.   I believe that timing is correct.
17 Q.   All right.  And at that point in time, Bob knows
18    that you're leaving and is actually helping you
19    find another job, correct?
20 A.   By the time I was talking to Fieger, I don't
21    know -- I believe at that point Bob did know I was
22    looking for another job.
23 Q.   And Bob was trying to assist you in finding another
24    job, correct?
25 A.   In general or during the specific time?  When are

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
134..137

Page 134

1    you --
2 Q.    In the timeframe of June, July, August 2021.
3 A.    At first Bob was deterring me from finding another
4       job and telling me we could litigate cases
5       together, and at some point -- I don't have a
6       specific date for you -- Bob began assisting.
7 Q.    Because that idea died away, wasn't going anywhere
8       and so you know that you need to go outside the
9       firm to find litigation work and Bob starts to
10      assist you, fair?
11 A.   No, because I --
12          MS. RUSSELL:  Objection.
13          THE WITNESS:  -- don't think the idea
14      died away.  I told Bob "I don't want to do that,"
15      so Bob still had -- the idea wasn't dying and I
16      said, "I'm not doing that."
17 BY MS. HARDY:
18 Q.   Okay.  And then he switches gears and decides to
19      help you try to find a job, correct?
20 A.   I know that he then spoke with people; I don't know
21      what he decided to try to do.
22 Q.   You know that he did try to help you, correct,
23      because you know he tried to help you with Donna
24      MacKenzie, who is sitting at this table?
25          MS. RUSSELL:  Objection.

Page 135

1           THE WITNESS:  None of it feels like help
2       on this end of it, so I'm not going to agree to the
3       characterization of help.
4 BY MS. HARDY:
5 Q.    You mean the fact that he talked to them about
6       getting you $5,000 more was not assisting you?
7           MS. RUSSELL:  Objection.
8           THE WITNESS:  This entire process has not
9       felt like assistance.  What has gone on since
10      wanting to leave Bob Riley's office, I'm not going
11      to agree to your characterization of help.
12 BY MS. HARDY:
13 Q.   Bob Riley started in the summer of 2021 to talk to
14      OMP about possibly hiring you so that you could
15      litigate at their firm, correct?
16 A.   I don't know when Bob Riley started to talk to OMP.
17 Q.   You do know that he talked to OMP to help you get a
18      job, correct?
19          MS. RUSSELL:  Objection.
20          THE WITNESS:  First of all, I don't know
21      when he talked to OMP, so --
22          MS. HARDY:  I'm not asking when.
23          THE WITNESS:  I don't know what --
24          MS. HARDY:  You knew he talked to them.
25          THE WITNESS:  I don't know what his goal

Page 136

1       was.
2           MS. HARDY:  By the time --
3           MS. RUSSELL:  Is now a good time for a
4       break, by chance?
5           MS. HARDY:  Sure.
6           MS. RUSSELL:  We can take a bathroom
7       break or a lunch.  We can come back --
8           MS. HARDY:  No, let's just take our lunch
9       break and then be back --
10          MS. RUSSELL:  I'm not walking out in the
11      snow, ya'll.
12          VIDEOGRAPHER:  Off the record at
13      12:06 p.m.
14          (Whereupon a break was taken
15          from 12:06 p.m. to 12:27 p.m.)
16          VIDEOGRAPHER:  Back on the record at
17      12:27 p.m.
18 BY MS. HARDY:
19 Q.   Did you have any experience with legal work in the
20      hockey arena prior to joining Riley & Hurley?
21          MS. RUSSELL:  Objection.
22          THE WITNESS:  No.
23 BY MS. HARDY:
24 Q.   Had you ever had any experience with collective
25      bargaining prior to joining Riley & Hurley?

Page 137

1 A.    No.
2 Q.    Had you ever had any experience handling grievances
3       in a union setting prior to joining Riley & Hurley?
4 A.    Not in a union setting.
5 Q.    Had you had any experience, prior to joining Riley
6       & Hurley, that was relevant to the hockey work that
7       Bob Riley exposed you to at his firm?
8           THE WITNESS:  Any experience that was
9       relevant to the hockey work was your question?
10          MS. HARDY:  Right.
11          MS. RUSSELL:  Objection.
12          THE WITNESS:  When at Mellon Pries, Jim
13      Mellon was the general counsel for MMRMA -- or
14      served in a general counsel type capacity; I'm not
15      sure if that was the specific title -- and that was
16      relevant to the role because Bob served as legal
17      counsel for the union and some of the same types of
18      issues would come up.
19 BY MS. HARDY:
20 Q.   What kind of issues did you work on at the Mellon
21      firm that you thought were transferable to the kind
22      of work you did for Bob at Riley & Hurley that
23      related to the hockey leagues?
24 A.   Jim Mellon would provide corporate-type advice or
25      counsel to his client and the hockey union was

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
138..141

Page 138

1    looking for corporate general counsel-type advice.
2 Q.   He didn't have any connection to the hockey world,
3      did he?
4 A.   Not hockey specifically, no, but that type of --
5 Q.   What kind of work did you do for Jim Mellon that
6      you thought was transferable to the hockey work
7      that you did with Bob Riley?
8 A.   As issues would come up with Jim's clients, we
9      would do research to tackle specific topics.
10 Q.   Can you be more specific than that?
11 A.   If there was an employment issue that came up, we
12      would talk about -- we would do research and Jim
13      would provide advice regarding that employment
14      issue; if there was some sort of transition of
15      successors of one job over another, we would do
16      anything that came up, so employee discipline,
17      transition --
18 Q.   Anything more specific than that?
19 A.   I don't recall any.
20 Q.   Okay.  What percentage of the work that you did at
21      Riley & Hurley was litigation versus helping Bob on
22      some of his hockey matters?
23 A.   I don't know how to put a percentage on that
24      because it varied based on what type of hockey work
25      was happening at the time, so at times it was more

Page 139

1      and at times it was less.
2 Q.   You can't give any overall percentage to how much
3      of your workload and billable hours were devoted to
4      litigation versus hockey work, year end?  I know
5      everything fluctuates at different times depending
6      upon client needs.
7 A.   I don't know that I could because -- I'm sure those
8      records exist that would show that billable time.
9 Q.   It was mostly litigation, correct?
10 A.   I would say it was mostly litigation and certain --
11      across a year timeframe, I would say it was mostly
12      litigation.  Certain months, if there was a
13      grievance or performance-enhancing substance-type
14      matter, it might take up more of that particular
15      month.
16 Q.   To the extent you did litigation, Bill Hurley was
17      your supervisor, correct?
18 A.   Yes, and Bob also was involved in those litigation
19      assignments, so I guess he supervised me as well.
20 Q.   How did he supervise you; because you would go to
21      him and ask advice or ask him to read something or
22      bounce an idea off of him?
23 A.   He would ask me --
24           MS. RUSSELL:  Object to form.
25           THE WITNESS:  He would ask me to provide

Page 140

1      him work that I had done so that he could talk to
2      me about it.
3 BY MS. HARDY:
4 Q.   In a mentor capacity, correct?
5 A.   I don't know what capacity he intended it to be.
6 Q.   Was he actively working on any litigation file?
7      You said before he was not.
8 A.   He wanted to get back to litigating and he had said
9      that consistently and he asked me -- that was his
10      goal was to get back to litigating and so...
11 Q.   Did he ever put anything in writing to that effect;
12      have you ever seen anything in a note, a text, an
13      email?
14 A.   I don't recall, as I sit here today, if I have.
15 Q.   Bob did not report to Henry Ford or Beaumont,
16      correct; he was not the client contact?
17 A.   He was not the client contact, I don't believe.  I
18      guess I don't know for sure.
19 Q.   All right.  Tell me about your working relationship
20      with Bill Hurley.  Was it a good one?
21 A.   Yes.
22 Q.   Do you have any complaints about Bill Hurley of any
23      kind?
24 A.   General complaints?  I don't know what --
25 Q.   Any complaints relevant to Bill Hurley that relate

Page 141

1      to this litigation.
2 A.   Not relevant to this litigation, no.
3 Q.   Okay.  Did you ever bring to Bill Hurley's
4      attention any complaints you had about Bob Riley?
5           MS. RUSSELL:  Objection.
6           MS. HARDY:  What's the objection?
7           MS. RUSSELL:  Foundation.
8           MS. GORDON:  I can't hear what you said.
9           MS. MacKENZIE:  She said a foundation
10      objection.
11           MS. HARDY:  I was just curious.
12           Can you read that question back?  That
13      distracted me.
14           (Whereupon the question was read
15           back by the court reporter.)
16           MS. RUSSELL:  Objection still stands.
17      This one is relevance because I don't --
18           MS. GORDON:  You're just coaching over
19      there.
20           MS. RUSSELL:  No, no, no.
21           MS. GORDON:  Yes, you are.
22           MS. RUSSELL:  I'm not coaching.  She can
23      go ahead.  You asked what my basis was; I said what
24      it is.  Go ahead.
25           MS. HARDY:  I'm going to go ahead.  The

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
142..145

Page 142

1   question was read back. Please respond.
2        THE WITNESS: There were times that I
3   went to Bill Hurley regarding Bob's involvement in
4   the cases and I would -- I guess I don't -- I would
5   talk to him about Bob wanting to be involved in the
6   cases so --
7        MS. HARDY: What did you -- I'm sorry.
8        THE WITNESS: So I guess I'm -- that was
9   a complaint that I had is that Bob was being
10  involved in Bill's -- I felt like there was some
11  meddling in Bill's cases and I felt like it put me
12  in a bad spot, so I did raise that.
13  BY MS. HARDY:
14  Q.   What did Bill say in response?
15  A.   I think he might have said, "That's Bob being Bob,"
16  or something that was -- I don't recall specific,
17  his specific words.
18  Q.   All right. Were there any other complaints about
19  Bob Riley that you brought to the attention of Bill
20  Hurley that are relevant to the claims in this
21  litigation?
22  A.   I believe I told Bill when there was more hockey
23  work or more hockey obligations, when there was --
24  that was taking up more of my time.
25  Q.   Anything else?

Page 143

1   A.   I don't recall as I sit here today any other
2   complaints other than talking about the meddling
3   with the cases and the hockey work.
4   Q.   Okay. Do you know of anything about Bill Hurley
5   which would cause you to question his honesty and
6   integrity?
7   A.   No, I don't know of -- I...
8   Q.   Okay. Beaumont and Henry Ford were the two
9   significant med mal litigation clients of Bill
10  Hurley, correct?
11  A.   I -- yes, I don't recall other -- I don't know if
12  he had another client, but those are the two that I
13  recall.
14  Q.   And you worked on both of those, correct?
15  A.   Yes.
16  Q.   And Bill Hurley was making a concerted effort to
17  involve you in those cases, correct, and give you
18  litigation opportunities with those clients; is
19  that fair?
20  A.   I would say Bill involved me in the cases.
21  Q.   Okay. He actually took you to trial with him,
22  correct?
23  A.   We went to a trial, yes.
24  Q.   That was your first ever trial, jury trial,
25  correct?

Page 144

1   A.   I believe I helped on a jury trial with Jim Mellon
2   before. I don't --
3   Q.   When you were an associate attorney?
4   A.   Yes, I believe.
5   Q.   Were you at counsel table during trial?
6   A.   At times I was and at times I wasn't.
7   Q.   Okay. Did you ever take a witness in any case
8   prior to with Bill Hurley?
9   A.   I did not take a witness in that trial, no.
10  Q.   Okay. So the only -- well, strike that.
11       The first witness you ever took in a jury
12  trial was with Bill Hurley, correct?
13  A.   I believe that's correct.
14  Q.   Okay. Do you have any complaints about the efforts
15  that Bill made to give you training opportunities
16  and litigation opportunities with Beaumont and
17  Henry Ford?
18       MS. RUSSELL: Objection.
19       THE WITNESS: The opportunities were
20  different than what were described to me when I
21  was -- had accepted the job offer. There was a
22  discrepancy.
23  BY MS. HARDY:
24  Q.   What was the discrepancy?
25  A.   The work that I would be given and the

Page 145

1   responsibilities that I would be given.
2   Q.   Can you be more particular?
3   A.   When I went to work there, I was under the
4   understanding that I would have more
5   responsibilities and that was not -- I was not
6   given the same responsibilities as what was
7   represented to me.
8   Q.   Did you talk to Bill Hurley about why that was the
9   case?
10  A.   I believe on some occasions I did talk to Bill
11  Hurley, yes.
12  Q.   And complaining about the fact that you thought you
13  were going to have more responsibility or wanted
14  more responsibility?
15  A.   I don't know that I would have worded that as
16  complaining about it; seeking --
17  Q.   Seeking, requesting?
18  A.   Well, I wasn't done answering, but trying to
19  understand it. I don't know that I was -- I don't
20  know that it had risen to the level of a complaint
21  at that point; I was just trying to get more
22  information.
23  Q.   What did he tell you?
24  A.   I don't -- I don't recall that conversation.
25  Q.   Did you come to understand that the opportunities

Page 146

1    that he provided you were in some ways restricted
2    by what the clients would allow you to do?
3        MS. RUSSELL:  Objection.  I don't know
4    how any of this is relevant.
5        THE WITNESS:  Did I come to understand
6    if -- sorry, can you...
7        MS. HARDY:  Yeah.  That there were
8    concerns that Beaumont and/or Henry Ford had about
9    you that limited the opportunities that Bill could
10   give to you.
11       MS. RUSSELL:  Objection.
12       THE WITNESS:  No.
13 BY MS. HARDY:
14 Q.   Did you ever talk to Bill about how you were doing
15   with Henry Ford and Beaumont in terms of what their
16   opinion was of your work and your future with them
17   as clients?
18       MS. RUSSELL:  I'm going to object to all
19   these questions about Bill Hurley as irrelevant.
20       THE WITNESS:  Yes.
21 BY MS. HARDY:
22 Q.   And what did he tell you?
23 A.   He was positive about what the clients had
24   indicated with...
25 Q.   You were aware, weren't you, in the spring of 2021,

Page 147

1    when Bill Hurley told you that he would be phasing
2    out of litigation, that neither Henry Ford nor
3    Beaumont were willing, at that point in time, to
4    let you become first chair on their cases, correct?
5 A.   Are you asking me if Bill told me that or --
6 Q.   Yes.
7 A.   -- are you asking me --
8 Q.   Yes, either Bill or the client.
9 A.   That was -- that is inconsistent with what I had
10   heard separately, so I'm having a hard time with
11   your question.
12 Q.   All right.  Let's break it down then.
13 A.   Sure.
14 Q.   Bill informed you of that, correct?
15 A.   I don't recall if Bill informed me of that.
16 Q.   You're not denying it, are you?
17 A.   I'm saying --
18       MS. RUSSELL:  Objection.
19       THE WITNESS:  -- I don't recall.  That's
20   the answer.
21 BY MS. HARDY:
22 Q.   Did you talk with anyone with either Henry Ford or
23   Beaumont who told you that they viewed you as first
24   chair material and that you could take over the
25   litigation role that Bill Hurley left?

Page 148

1 A.   It was my understanding from people at Henry
2    Ford -- like not that I could first chair
3    everything certainly, but that they would be
4    willing to assign me cases, so I'm not -- I want to
5    be careful to specify "taking over all of Bill
6    Hurley's cases."  I don't have an understanding of
7    that.
8 Q.   Okay.  Who told you that you were ready to take
9    over some cases, not all, but some on your own?
10 A.   Well, Diane Gallagher had indicated that she was
11   going to -- that she had been trying to assign me
12   cases previously and that still remained.
13 Q.   So Diane Gallagher told you she had been trying to
14   assign you cases directly while you were at Riley &
15   Hurley?
16 A.   She said that she was still comfortable with me
17   handling certain cases.
18 Q.   She told you that while you were at Riley & Hurley?
19 A.   We had a conversation at some point while I was at
20   Riley & Hurley.
21 Q.   When was that?
22 A.   I don't have -- I don't recall that date.
23 Q.   Was that verbal or in writing?
24 A.   It would have been verbal.
25 Q.   Okay.  And your takeaway from the conversation

Page 149

1    was that Diane Gallagher was willing to let you
2    take some of her cases on your own as first
3    chair?
4 A.   My takeaway from that is that I could be directly
5    assigned cases.
6 Q.   Okay.  Did you ever approach Bill and tell him that
7    that was your understanding from Diane and then ask
8    why that wasn't happening?
9        MS. RUSSELL:  Objection.
10       THE WITNESS:  No.
11 BY MS. HARDY:
12 Q.   Why not?
13 A.   Because at that point I wanted to get away from Bob
14   and I thought Bill retiring was a good way to get
15   away from Bob and I wasn't going to stay and be
16   Bob's partner, to continue in that situation and
17   get directly assigned cases.  That did not -- so my
18   move then would have been to potentially go to a
19   defense firm and get direct assignments at a
20   different defense firm.
21 Q.   But you wanted to go to plaintiff litigation,
22   correct?
23 A.   When?  What timeframe are we --
24 Q.   The spring of 2021.
25 A.   I was also considering defense opportunities.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
150..153

---

Page 150

1 Q.   Okay.  If you wanted to get away from Bob, why did
2      you have to wait for Bill Hurley to retire to do
3      that?
4 A.   I was concerned at leaving a position quickly and
5      having everyone want to know, "Hey, why are you
6      moving jobs quickly?" and also, "What are you going
7      to do about" -- everyone had been very
8      complimentary of Bob when I started working there
9      and how great he was and I didn't know how I would
10     navigate that.
11 Q.   So what does that have to do with Bill Hurley
12      retiring?
13 A.   I think I've already explained that.
14 Q.   Well, if you felt you needed to stay longer to look
15      like you had stable employment at a firm and you
16      didn't have too quick a turnaround, that's a
17      different issue than leaving because Bill Hurley is
18      retiring.
19 A.   Bill Hurley retiring is a good reason --
20          MS. RUSSELL:  Object to form on the last
21      question.  Go ahead.
22          THE WITNESS:  Bill Hurley retiring is a
23      good reason to change a job if there's a difference
24      that's going to occur in workload.  That makes
25      sense.

---

Page 151

1 BY MS. HARDY:
2 Q.   Okay.  You had been hoping when you came in to
3      Riley & Hurley that you would inherit the
4      litigation business that Bill Hurley had developed
5      over the years, correct?
6 A.   I had been hoping to take on more responsibilities
7      and one day hoped to have clients, yes.
8 Q.   You had hoped that you would get litigation
9      experience by working with Bill and then you would,
10      as Bill -- because Bill was a bit older, toward the
11      end of his career, that when he phased out, you
12      would be there and ready to take over his clients,
13      correct?
14 A.   That was represented to me as a goal of me working
15      there and was included in the terms of me accepting
16      that employment, so that was --
17 Q.   And you heard from Bill at the time he decided to
18      begin his phaseout that Beaumont and Henry Ford
19      were not ready to have you fulfill that role with
20      respect to their cases, correct?
21 A.   I don't recall that.
22 Q.   Okay.  When did you decide you needed to get away
23      from Bob Riley?
24 A.   I don't have a specific date.
25 Q.   What timeframe?

---

Page 152

1 A.   His behavior was becoming increasingly concerning
2      to me and I -- throughout -- it escalated from 2019
3      through 2020 and then to 2021.
4 Q.   You can't be more specific?
5 A.   About what?
6 Q.   As to when it is you decided that, "I really don't
7      want to work with Mr. Riley anymore; I'm
8      uncomfortable"?
9 A.   I would say that began in 2020 and then -- I mean,
10      that feeling would come -- I would feel that way
11      and then he would act differently and then I would
12      think, "Okay, maybe I can still work here," so I
13      don't --
14 Q.   Was there a precipitating event in 2020 that caused
15      you to feel that way?
16 A.   No, it was an accumulation of events.
17          MS. RUSSELL:  Just for the record, at the
18      beginning of this deposition, it was represented
19      that she -- that Ms. Hardy was not going to have
20      any documents physically that she was going to be
21      referring to and she has now pulled out at least,
22      what, three red wells, so I'm just putting that on
23      the record.
24          MS. HARDY:  Thank you so much,
25      Ms. Russell.

---

Page 153

1          MS. RUSSELL:  You're welcome.
2          MS. HARDY:  These happen to be marked
3      exhibits that I'm going to show your client, so you
4      jumped the gun a little bit.
5          MS. RUSSELL:  No, that's good.
6 BY MS. HARDY:
7 Q.   Do you recall -- before I proceed with my
8      exhibits that I'll be showing you shortly, do
9      you recall recording Bob Riley on October 25,
10      2023, in his office?  It's a recording you
11      produced.
12 A.   I don't have that date memorized, but I remember --
13      I recall an October recording.
14 Q.   That was a surreptitious recording, correct?
15 A.   It was a recording that I took, yes.
16 Q.   He didn't know you were recording him, right?
17 A.   I don't know if he knew I was recording him.
18 Q.   You didn't tell him, did you?
19 A.   I didn't tell him.
20 Q.   You didn't make the recording device visible, did
21      you?
22 A.   I think the recording -- I don't know if the
23      recording device was visible.
24          MS. RUSSELL:  Objection to all of those
25      questions.

---

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
154..157

Page 154

1 BY MS. HARDY:
2 Q.   All right.  What device did you use?
3 A.   My phone.
4 Q.   And you just had the recording running on your
5     phone and didn't tell him that it was running,
6     correct?
7 A.   I did not tell him I was recording the
8     conversation.
9 Q.   Okay.  And where did you have the phone sitting
10    while you were recording it?
11 A.   Probably on the table.  I don't --
12 Q.   Across from his desk?
13 A.   We were at a table sitting together.
14 Q.   Okay.  You went to his office to see him, correct?
15 A.   We had a meeting, yes.
16 Q.   And you set that meeting up, correct?
17 A.   We had to have a meeting for hockey-related
18    matters, so I don't know -- it was to discuss
19    hockey.
20 Q.   You didn't happen to go to his office to see him in
21    October 2023, did you?
22 A.   I don't recall if I did.
23 Q.   You already had lawyers who were representing you
24    in connection with claims that you were preparing
25    to bring against Riley & Hurley at that time,

Page 155

1     correct?
2 A.   There was already a retainer agreement with
3     lawyers, yes.
4 Q.   And so while you've got a retainer agreement with
5     lawyers who are counseling you about suing Riley &
6     Hurley, you go to Mr. Riley's office and sit down
7     with him in a room across the table from him and
8     tape record him without telling him?
9         MS. RUSSELL:  Object to form.
10        MS. HARDY:  Correct?  Got that right?
11        THE WITNESS:  Are you asking me if they
12    were counseling me about suing Bob Riley or about
13    the -- I don't know what your question is.
14 BY MS. HARDY:
15 Q.   They were counseling you about suing Bob Riley,
16    correct?
17 A.   I don't -- I don't think that I should be talking
18    about what they were telling me because they're my
19    attorneys.
20 Q.   I'm not asking what advice they provided you, but
21    you retained them, as you indicated before, Ken
22    Mogill and Sarah Prescott, to advise you about your
23    rights against Riley & Hurley, correct?
24 A.   You're characterizing it as me talking about suing
25    him specifically, so I'm not --

Page 156

1 Q.   I'm not talking about whether you're going to sue
2     him as an individual defendant or just sue his
3     firm.  You were going to bring claims against Riley
4     & Hurley, they were counseling you about that, and
5     at the same time you go to his office and make a
6     secret tape recording of him, correct?
7         MS. RUSSELL:  Objection to form and
8     objection to attorney-client privilege here.
9         MS. HARDY:  She's already testified she
10    went to him to get advice about work issues at
11    Riley & Hurley.  It's already on this record.
12        MS. RUSSELL:  I put an objection earlier
13    on the record that that the judge's order is vague
14    and that anything she testifies is not going to --
15    does not constitute as a waiver.
16        MS. HARDY:  Objection is noted.
17        Can you read back my question, please?
18    (Whereupon the question was read
19        back by the court reporter.)
20        MS. RUSSELL:  So objection to
21    attorney-client privilege stands.  Don't answer.
22        MS. HARDY:  We'll put that on our list of
23    items to bring up with the Court.
24        MS. RUSSELL:  I love your list and it's
25    all on the record.  It's wonderful.

Page 157

1 BY MS. HARDY:
2 Q.   All right.  During that meeting with Mr. Riley that
3     you secretly recorded, you told him, "I've decided
4     to move on to a different firm because Bill was
5     retiring and there wasn't going to be the same work
6     here for me to do."  Do you recall making that
7     statement?
8 A.   During the October 2023 recording?
9 Q.   Yes.
10 A.   I don't recall the entirety of the October 2023
11    meeting.
12 Q.   Do you recall words to that effect?
13 A.   I don't recall.
14 Q.   Are you denying that you said such a thing?
15        MS. RUSSELL:  Objection.
16        THE WITNESS:  I'm saying I don't
17    recall.
18 BY MS. HARDY:
19 Q.   That's true, isn't it; that's a true statement,
20    correct?
21        MS. RUSSELL:  Objection.
22        MS. HARDY:  That you decided to move on
23    to a different firm because Bill was retiring?
24        THE WITNESS:  I decided to move on to a
25    different firm to get away from Bob and Bill

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
158..161

Page 158

1    retiring was a reason that I could move on to a
2    different firm.
3        (Marked for identification:
4        Deposition Exhibit No. 4.)
5        MS. HARDY:  All right.  Let's -- I'm
6    going to show you Exhibit No. 4, which, for the
7    record, is Bates stamped RH17 through 20.  Copy for
8    the witness, copy for counsel.
9  BY MS. HARDY:
10 Q.   Ms. McKenna, do you recognize this as a series of
11   text messages between you and Mr. Riley, you being
12   Elyse McKenna with your phone number being
13   810.278.4130, and the iPad of Mr. Riley at his
14   email -- at his gmail address rfr18.22@gmail.com.
15 A.   Yes, this appears to be text messages between me at
16   a phone number and email address from his iPad.
17 Q.   All right.  And this timeframe of 9-26-2019 through
18   9-27 is when you are finalizing your deal to go to
19   Riley & Hurley; is that a fair description?
20 A.   I don't know if I'm finalizing the deal to go to
21   Riley & Hurley at that time.
22 Q.   All right.  So let's just go to the specifics then.
23   I thought I could take an easier route.
24        At the bottom of the first page, which is
25   Bates stamped 17, you write, "This is Elyse PC here

Page 159

1    reopening Riley & Hurley talks."
2        You sent that text to Bob Riley, correct?
3  A.   Correct.
4  Q.   Then go to page 19.  And you are -- you received
5    the term sheet from the Riley & Hurley firm and Bob
6    writes, "I hope the term sheet accurately reflects
7    our conversations with a dose of legalese.
8    Honestly, I really want you to work with us and
9    hope we are on the right path."
10        You received that message, correct?
11 A.   Where are you?  Sorry.
12 Q.   On 19.
13 A.   Nineteen.
14 Q.   At 1:00 p.m.
15 A.   Yes, I received that message.
16 Q.   All right.  And you accepted the offer from Riley &
17   Hurley on 10-4-2019, correct?
18 A.   I don't have anything about 10-4-2019.
19 Q.   It's not contained in here.  Do you know that
20   independently or do I need to confirm that for you?
21 A.   I don't know that date.
22 Q.   You're not disputing that, are you?
23 A.   I don't know when --
24        MS. RUSSELL:  Objection.  She just said
25   she doesn't know the date.

Page 160

1  BY MS. HARDY:
2  Q.   All right.  So Exhibit 4 mentions you trying to
3    reach Diane before you accept the offer.  Is that
4    Diane Gallagher?
5  A.   Yes, I believe it is.
6  Q.   Why were you trying to reach Diane Gallagher before
7    you accepted the offer?
8  A.   I believe that Bob had indicated to me that Diane
9    might want to hear from me directly.
10 Q.   Do you know why?
11 A.   Probably because she had -- I don't know why Bob
12   told me that and I don't know -- no, I don't.
13 Q.   Did you ever reach Diane?
14 A.   I don't know when I reached Diane, but I did
15   eventually talk to Diane, but it could have been
16   after I started at Riley & Hurley; I don't know.
17 Q.   What was the purpose of talking to Diane?
18 A.   To let her know where I was going.
19 Q.   Okay.  So you had made your decision and you were
20   just informing her?
21 A.   I don't know that to be the case, especially
22   because this offer letter is October 1, 2019, so
23   I'm not sure about your dates, the dates here.
24 Q.   You're looking at Sommers Schwartz and I'm only
25   talking about Riley & Hurley.

Page 161

1  A.   Okay, but I'm trying to answer your question
2    whether I was finalizing my decision and I don't
3    know.
4  Q.   Well --
5  A.   I don't know the date.
6  Q.   The point is, you reached out to Bob Riley to
7    reopen discussions about Riley & Hurley talks,
8    correct?  That's what it says on Exhibit 4, Bates
9    stamp 20.
10 A.   Yes.
11        (Marked for identification:
12        Deposition Exhibit No. 3.)
13        MS. HARDY:  All right.  And you received
14   Exhibit No. 3, which is the offer letter and --
15        MS. RUSSELL:  Thank you.  I don't know
16   that we introduced this on the record yet.
17        MS. HARDY:  PL23238, 239.
18 BY MS. HARDY:
19 Q.   Is this the offer letter you received or the term
20   sheet offer letter?
21 A.   I couldn't tell you if this is the same version of
22   the offer letter I received without looking at the
23   version that I have, but yes, they appear generally
24   to be the same.
25 Q.   Well, you produced it.

Page 162

1  A.    Okay, well, then it's the right one.  I just don't
2        have the offer letter memorized is my point.
3  Q.    Did you ever sign it?
4  A.    I believe I did sign it, yes.
5  Q.    Where is the signed copy?
6  A.    I handed it in to Bob.
7  Q.    Did you ever get a signed copy back with the
8        signature of Riley & Hurley on it?
9  A.    I believe I did.
10 Q.    And where is that?
11 A.    I don't know.
12 Q.    All right.  Is this document, Exhibit No. 3, what
13       you referred to in your original complaint, the one
14       you drafted when you were serving as your own
15       lawyer, the contract that you are referencing in
16       your breach of contract claim?
17 A.    I believe it -- I believe this is the contract, as
18       well as an implied contract, yes.
19 Q.    Well, if this even -- let's put aside whether or
20       not this constitutes a contract.
21             What provision of this document that
22       you're calling a contract was breached?
23 A.    I would say No. 9 and I would say also the -- well,
24       let me just take one at a time.
25 Q.    What aspect of provision No. 9 in Exhibit No. 3 was

Page 163

1        breached?
2  A.    The opportunity to develop sufficient client
3        relationships and the retirement section of this
4        and -- yes.
5  Q.    How did they breach the opportunity to develop
6        sufficient client relationships?
7  A.    By speaking negatively about me to clients.
8  Q.    While you were employed at Riley & Hurley?
9  A.    Yes, that's one way.
10 Q.    Who -- well, let's get a list.
11             Is there any other way you claim they
12       breached the opportunity to develop sufficient
13       client relationships?
14 A.    Not allowing someone to have opportunities, I would
15       say, also contributes to that.
16 Q.    What opportunity did they not allow you to have
17       that the client otherwise would have endorsed you
18       having?
19 A.    It's my understanding from Bob that Bill wasn't
20       letting me have opportunities that I would have
21       otherwise had with work for the clients.
22 Q.    What are you referring to?
23 A.    Any number of things that you do during litigation,
24       such as a meeting with an expert or a deposition or
25       discrete opportunities that I could have taken and

Page 164

1        Bill was taking.
2  Q.    Can you identify any specific opportunity that
3        you're claiming you were denied that should have
4        been provided to you and instead Bill Hurley did?
5  A.    Meetings with experts and depositions --
6  Q.    Can you be specific?
7  A.    Not as I sit here today, I can't give you a
8        specific name.
9  Q.    So you're claiming that Bill Hurley took
10       depositions and met with experts and he was
11       contractually obligated pursuant to provision No. 9
12       to give those to you?
13 A.    Provision No. 9 says "the opportunity to develop
14       sufficient client relationships," so yes.  In
15       addition to that, he would change the work that I
16       did on the bills to say his name so that it looked
17       like he did it and so I think that undermines an
18       opportunity to develop sufficient client
19       relationships and would say that he attended motion
20       hearings that I had attended for the clients.
21 Q.    Can you give me a specific time when you claim he
22       did that?
23 A.    Not as I sit here today, I cannot.
24 Q.    All right.  And anything else that you can point to
25       that constitutes -- I want specific details.

Page 165

1  A.    Okay.
2  Q.    A breach of this language "opportunity to develop
3        sufficient client relationships."
4  A.    So I believe that there was a motion to amend a
5        complaint and I would have to think hard about what
6        case it was in, but it was -- that was one of the
7        motions that Bill had said he attended that I had
8        attended and the motion -- plaintiff's motion was
9        denied -- I was a defense attorney and I had
10       prevailed -- so that is a specific.
11             I'm trying really hard to think through a
12       name for you, but I believe it was an attorney --
13       the plaintiff's attorney was Fieger -- was an
14       attorney at Fieger's office.  I think it will come
15       to me at some point to be specific.
16 Q.    Okay.  Have you given me all the specifics you can
17       that relate to my question of what evidence you
18       have that Riley & Hurley breached the agreement set
19       forth in Exhibit 3?
20 A.    It's my understanding that Beaumont was comfortable
21       with me having meetings with experts and with
22       defendant doctors and that -- that I could do them
23       on my own, and that that was interfered with -- and
24       I would have to think through a case name for you,
25       but that's another.  I don't know if that's

ELYSE McKENNA v ROBERT F. RILEY                                    Job 48239
MCKENNA, ELYSE 12/10/2025                                          166..169

Page 166

1    specific enough.
2 Q.    How did you acquire the understanding that Beaumont
3    was comfortable with you doing that without Bill
4    involved?
5 A.    I believe conversations with -- conversations with
6    people at Beaumont.
7 Q.    Who?
8 A.    On the specific case that I'm thinking of right
9    now, Larry Rosenstock, in general, Amber Thomas
10    Wagenschutz also was a person at Beaumont.
11 Q.    Did they specifically tell you that they thought
12    you should have been given those opportunities
13    rather than Bill taking them?
14 A.    I believe the conversation with Larry was, "You
15    don't need Bill to sit in on those things with you;
16    you could handle those."
17 Q.    And "those things" is deps and expert meetings?
18 A.    We talked about work in general, but the ones that
19    occurred -- the specifics that I'm thinking of in
20    my head that I wish I could get you a case name
21    for, the deps and expert meetings.
22 Q.    So you can't identify what kind of dep or what case
23    or any of the specifics?
24 A.    Depositions throughout the discovery process.
25 Q.    That's pretty vague.

Page 167

1 A.    Well, it's also six years ago, so I'm trying to
2    give you some --
3 Q.    But, you know, there's deps, you know, that are
4    one-hour deps and then there are deps of the
5    employers.
6 A.    Sure, sure.
7 Q.    Those are totally different.
8 A.    Yep.
9 Q.    So we don't know what kind of deps you're talking
10    about?
11 A.    Well, I know defendant deps were in there, so I
12    know that. You don't -- you want me to answer if I
13    have specifics and so I'm trying to give you the
14    best answer I can give you.
15 Q.    All right. So your theory is that if you got more
16    deps or you had more interviews with experts that
17    you would have been able to maybe develop client
18    relationships?
19 A.    Certainly more time --
20        MS. RUSSELL: Object to form.
21        THE WITNESS: Certainly more time with
22    the client allows you to develop more of a
23    relationship I think --
24        MS. HARDY: As a general premise; that's
25    the point you're making.

Page 168

1        MS. RUSSELL: Object to form.
2        THE WITNESS: I think the general
3    premise is also if you don't give someone those
4    opportunities, they can't then excel at those
5    opportunities.
6 BY MS. HARDY:
7 Q.    Okay. Is there anything else at Riley & Hurley
8    that you consider a breach of Exhibit 3?
9 A.    Well, in the second sentence of the second
10    paragraph, it says -- which I think goes to what we
11    just discussed, but also comes up in paragraph 9
12    is, "It is expected that RH will provide exemplary
13    opportunities for ELH to maximize their
14    professional skills, to establish and secure client
15    relationships and the opportunity to develop the
16    professional skills and business acumen to
17    eventually have an ownership interest in RH."
18 Q.    And you don't -- in your opinion, they were not
19    opportunities that fit that definition?
20 A.    I think I've already answered the issue with the
21    opportunities, but I'm going --
22 Q.    Anything else?
23 A.    I will read it and let you know.
24        MS. RUSSELL: Our lunch is about to pull
25    up, too, so I don't know if that's a good stopping

Page 169

1    point. I see DoorDash is right downstairs.
2        MS. HARDY: Let's finish up Exhibit 3.
3        THE WITNESS: I would also state that
4    under 8(c), "Obtain full access and exposure to RH
5    clients." I don't think that that was allowed
6    given the arrangements.
7        And No. 10, "In furtherance of the goals
8    and objectives set forth in paragraph 9 above,
9    RH commits to ELH that reviews will take place
10    relative to potential partnership status."
11 BY MS. HARDY:
12 Q.    It says, "Such promotion, advancement and/or status
13    associated with partnership will be at the sole
14    discretion of RH." Did I read that correctly?
15 A.    I agree. And the sentence before says the reviews
16    will take place. It doesn't sound like the reviews
17    taking place will be at the sole discretion, but
18    the decision from the review would be at the sole
19    discretion.
20 Q.    Do you have anything further to add in response to
21    my question?
22 A.    As I sit here today, I do not have anything to
23    add.
24        MS. HARDY: We will take a one half-hour
25    lunch break and then return.

Page 170

1       VIDEOGRAPHER:  Off the record at
2    1:13 p.m.
3       (Whereupon a break was taken
4          from 1:13 p.m. to 1:51 p.m.)
5       VIDEOGRAPHER:  We are back on the record
6    at 1:51 p.m.
7  BY MS. HARDY:
8  Q.   You were previously married to Brandon Heid?
9  A.   Yes.
10 Q.   You were married to him in the fall of 2019?
11 A.   Oh, I'm still married to him then, yes.  Sorry, I
12       thought you were asking when I got married.  Yep.
13 Q.   You were married to him in 2019?
14 A.   Yes, I was married then, yes.
15 Q.   How did he learn that Bob Riley had bad vision
16       problems?
17 A.   How did he first learn of it?
18 Q.   Yeah.  Did you tell him about his bad vision
19       problems or did he observe them being in his
20       presence or perhaps some other means?
21 A.   I believe at that dinner that we were at in
22       Ferndale, we might have talked about vision
23       problems then, but I would have -- I might have
24       talked to Brandon about vision problems.  I don't
25       know how Brandon first learned of that.

Page 171

1  Q.   Okay.  Do you know what prompted Brandon to reach
2       out to Bob to help him get a new TV for the vision
3       impaired so that he would be able to see TV
4       programming?
5  A.   Do I know --
6       MS. RUSSELL:  Objection.
7       THE WITNESS:  -- what was --
8  BY MS. HARDY:
9  Q.   Do you know what prompted him to?
10 A.   Yes.
11 Q.   What?
12 A.   Bob wanted help with getting a TV.
13 Q.   Okay.  And Brandon agreed to help find the right
14       kind of technology that would help Bob in light of
15       his vision issues?
16 A.   Bob and Brandon then talked about different types
17       of TVs and how they work.
18 Q.   Okay.  Do you know anything about the technology of
19       the TV that Brandon arranged for Bob to get?
20 A.   Do I know anything about the technology?
21 Q.   Did you know anything about the technology of it?
22 A.   I know there are different TVs and how they work
23       with the pixels is different.  There's differences
24       between -- but I could not begin to tell you more
25       than that.

Page 172

1  Q.   Do you know what an H16H resolution is?
2       MR. DAVIS:  High resolution.
3       MS. HARDY:  I'm sorry.  You need better
4       handwriting, buddy.
5  BY MS. HARDY:
6  Q.   Do you know what a high-resolution TV is for the
7       vision impaired?
8  A.   Specifically one for the vision impaired, like a
9       specific TV?
10 Q.   Yeah.
11 A.   I don't know of a -- I know about high-resolution
12       TVs, I don't know what --
13 Q.   I expected this note to be more specific than just
14       saying high resolution.
15       So you don't know anything about the TV
16       that Brandon helped Bob get installed?
17 A.   The most I recall about this is that there are OLED
18       TVs and mini LEDs and different types of -- I know
19       that those have different pixels and I wouldn't
20       attest to know more about TVs than that they are, I
21       believe, a lot of them.  I thought all of those are
22       high resolution, so I don't know.
23 Q.   Okay.  Let's switch gears and go back to you
24       accepting an offer at Riley & Hurley.  As you
25       indicated earlier on this transcript, you

Page 173

1    reinitiated talks with them.  Why did you do so?
2  A.   It was after I had decided to no longer go to
3       Sommers Schwartz.
4  Q.   Okay.  But why Riley & Hurley rather than moving on
5       since you had other opportunities?
6  A.   I believe as of that date, I had turned down other
7       opportunities.
8  Q.   What other opportunity did you turn down?
9  A.   We talked about the other opportunities earlier
10       that were -- I was in discussions with, and when I
11       had accepted Sommers Schwartz, I recall that I had
12       turned down other opportunities by that time.
13 Q.   Well, yeah, but you never identified any
14       opportunity that you had a specific offer that was
15       turned down other than Sommers Schwartz.  What did
16       I miss?
17 A.   I believe we talked about McKeen and Ramar &
18       Paradiso.  I thought we went through a list of
19       opportunities.
20 Q.   Do you know if you had a specific opportunity from
21       them and when you turned it down?
22 A.   I don't have a specific date of when I got the
23       offer, no, and as -- I cannot give you a specific
24       date here.
25 Q.   Do you know when you turned it down?

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
174..177

Page 174

1 A.   In the timeframe around when I accepted the other
2      job, I would have turned down the jobs I wasn't
3      accepting, so I don't have a specific date for you.
4 Q.   But you had already turned down a specific offer
5      from McKeen before you reached out to Riley &
6      Hurley with the message, "This is Elyse PC here,
7      reopening Riley & Hurley talks"?
8 A.   I don't -- I'm not sure about the dates of those
9      things given the date of the offer letter with
10     Sommers Schwartz, so I don't have specific dates in
11     front of me to tell you --
12 Q.  I'm not talking about Sommers Schwartz.  I'm
13     talking about, what other opportunity had you
14     turned down prior to the text that I just read,
15     which is dated 9-26-19, from another law firm?
16 A.  I understand what you're asking me, but the offer
17     letter is dated October 1, 2019, and that's the
18     offer that I turned down, so there's a date mixup
19     here and I'm trying to --
20 Q.  Put aside Sommers Schwartz.  I want to focus on
21     other firms that you claim you had offers from that
22     you turned down.
23 A.  Okay.
24 Q.  And you just explained that the reason you went
25     back to Riley & Hurley and reopened talks is

Page 175

1      because you turned down the other offers you had.
2      What other offers had you turned down prior to
3      9-26-19?
4 A.   I don't -- I can't tell you that I turned them down
5      before a specific date.
6 Q.   Okay.  Why did you want to go to Riley & Hurley?
7 A.   It was represented to me that I would have
8      opportunities to -- just like were outlined in the
9      term sheet, to have good client relationships, take
10     on a lot of responsibility, work for the go-to
11     mediator in Michigan, who I had heard spoken of
12     very highly, all of those things.
13 Q.   You weren't interested in doing mediation work,
14     were you?
15       MS. RUSSELL:  Counsel, you interrupted
16     her.  Were you finished answering your question?
17       THE WITNESS:  I wasn't.
18       MS. RUSSELL:  Would you like to finish
19     it?  We can read it back.
20       THE WITNESS:  Yeah, I don't even know
21     what the question was.
22       MS. RUSSELL:  Can you read it back?
23       MS. HARDY:  No, I am in charge of this
24     dep --
25       MS. RUSSELL:  Allow the witness to

Page 176

1      finish.
2        MS. HARDY:  I'm in charge of this dep.
3      You can make your objection.  We're moving on.
4        MS. RUSSELL:  I object to the witness not
5      being allowed to answer.
6        MS. HARDY:  My question was, what -- why
7      did you want to go with Riley & Hurley?
8        THE WITNESS:  There were many reasons,
9      like being that Bob was a go-to -- I thought you
10     asked me if I wanted to do mediation.  I'm sorry,
11     I'm all over --
12       MS. HARDY:  You answered that question
13     and then you said --
14       MS. RUSSELL:  She hadn't answered it.
15       MS. HARDY:  -- he was a well-recognized
16     mediator and I asked you, you weren't interested in
17     doing mediation work, were you?
18       THE WITNESS:  I was interested in doing
19     mediation work.
20 BY MS. HARDY:
21 Q.   You were?  Did you ever express that?
22 A.   We talked about it; Bob and I talked about it,
23     yes.
24 Q.   Did you ever ask to be trained to do mediation
25     work?

Page 177

1 A.   It was in the discussion about when I was talking
2      to Bob about working at Riley & Hurley.  I don't
3      know that I specifically said to me -- "Will you
4      please train me in mediation work?"  It was a part
5      of the work that he was willing to work, train me
6      on, so --
7 Q.   Did you think as a four-year lawyer, it would be a
8      little premature to be mediating cases for other
9      people?
10       MS. RUSSELL:  Objection.
11       THE WITNESS:  I don't think that your
12     question was whether I would start mediating cases
13     as a four-year attorney.  Is that your new
14     question?
15 BY MS. HARDY:
16 Q.   Well, my question is, if you went to the firm with
17     an expectation of doing mediation work, did you
18     think you were ready to start doing it after only
19     four years of practice or was this some kind of
20     long-term ambition?
21 A.   It was my understanding when I went to the firm
22     that that would be another area that Bob would give
23     me training on is mediating cases; so no, I did not
24     anticipate when I first got there at four years
25     with no prior mediation experience that I would be

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
178..181

Page 178

1    handed cases to mediate.
2 Q.    Okay.  In any event, you were proud to be going to
3       and associated with Riley & Hurley when you
4       accepted the offer, correct?
5 A.    When I accepted the offer, yes.
6 Q.    And you were soliciting an offer from Riley &
7       Hurley as opposed to being chased by them to come
8       to their firm, correct?
9 A.    I disagree with that.
10              (Marked for identification:
11              Deposition Exhibit No. 5.)
12              MS. HARDY:  Let me show you Exhibit 5,
13      which are email exchanges between plaintiff and
14      Mr. Hurley [sic].  Copy to the witness, to counsel.
15              MS. RUSSELL:  I'm sorry, this is between
16      plaintiff and Mr. Hurley.
17              MS. HARDY:  I'm sorry, if I said that, I
18      misspoke.  Between plaintiff and Mr. Riley.  And
19      it's Bates stamped RH33.
20 BY MS. HARDY:
21 Q.    Isn't it true you wrote on 10-4-19 to Mr. Riley
22      that, "Question for you.  If I go with RH, I know
23      you said not to tell anyone and to say I'm
24      exploring my options, but I would be proud to say
25      I'm going there.  If that's truly your stance, I

Page 179

1    can respect it, but I'm just asking for
2    clarification."  Did I read that correctly?
3 A.    Yes.
4 Q.    Is it a fair characterization of that message to
5       Mr. Riley that you really want to go to Riley &
6       Hurley and you're hoping that there will be an
7       offer, and then you say at 10:00 a.m., "Woohoo"?
8              MS. RUSSELL:  Object to form.
9              MS. HARDY:  Isn't that what those
10      exchanges are about?
11             THE WITNESS:  No.
12 BY MS. HARDY:
13 Q.    What were they about?
14 A.    Well, on 9-26-19, we already have an offer sheet, a
15      term sheet that is discussed or offered, so when
16      you're saying I really hoped there was an offer,
17      there already had been an offer and then I was
18      reopening Riley & Hurley talks after being told
19      about everything that happened at Sommers Schwartz.
20             So -- and I already testified in response
21      to your question that I -- at the time that I
22      joined Riley & Hurley, I would say I would be
23      proud.  So you're adding a lot of things that I
24      don't think are right based on the timing,
25      but...

Page 180

1 Q.    Based on the Exhibits 4 and 5, do you disagree with
2       the characterization of your recruiting situation
3       that you were anxious to get an offer from Riley &
4       Hurley?
5 A.    Bob was the one who raised a job with Riley &
6       Hurley with me before I -- I didn't raise the job
7       with him first, so I don't -- I'm not sure what --
8       I don't know how to answer your question.
9 Q.    You're not denying that you wanted an offer and you
10      would be proud to be associated with Riley & Hurley
11      in the event you solidified a deal; you don't deny
12      that, do you?
13             MS. RUSSELL:  Object to form.
14             THE WITNESS:  That I -- your question is
15      that I wanted -- you have to -- can we read it
16      back?
17             (Whereupon the question was read
18             back by the court reporter.)
19             THE WITNESS:  I already had an offer.
20 BY MS. HARDY:
21 Q.    Let's put aside whether you already had one or not.
22      You wanted to go to Riley & Hurley; you were not
23      lured away from somebody, you wanted to go there on
24      your own, correct?
25 A.    No, Bob came to me and wanted to talk to me about

Page 181

1    potentially working at Riley & Hurley.  I didn't go
2    seek Riley & Hurley out to work there.
3 Q.    But once you started talking to him, you wanted to
4       go to that firm and you pursued it by contacting
5       them and trying to reopen discussions and then
6       telling him you would be proud to be associated
7       with them; that's all in those text messages that
8       are in Exhibits 3 and 4, correct?
9 A.    Okay.  But you just asked me if I was lured away or
10      if I did this of my own -- on my own, and I'm
11      telling you that Bob reached out to me, so I don't
12      agree with your characterization.
13             MS. HARDY:  Can you read the question
14      back, please?
15             (Whereupon the question was read
16             back by the court reporter.)
17             MS. RUSSELL:  Object to the form of that
18      question.
19             THE WITNESS:  And the question before you
20      asked was about being lured.
21             MS. HARDY:  Don't go back to the question
22      before.  Answer the question that has just been
23      read to you.
24             THE WITNESS:  I do want to finish my
25      answer so I think that's --

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239

182..185

---

Page 182

1    MS. HARDY:  Answer the question that's in
2    front of you.
3    MS. RUSSELL:  Counsel, she's trying to.
4    THE WITNESS:  I have agreed that I said I
5    would be proud to go there and that I reopened
6    Riley & Hurley talks.
7    MS. HARDY:  Thank you.  Let's move on.
8    (Marked for identification:
9    Deposition Exhibit No. 6.)
10   MS. HARDY:  Exhibit No. 6, I'm handing to
11   the witness and to counsel.  For the record, these
12   are Bates stamped PLAINTIFFS PL486 through 505.
13 BY MS. HARDY:
14 Q.   These are the Christmas cards you received from Bob
15   Riley Christmas 2019, correct?
16 A.   They're all dated Christmas of 2019; I do not know
17   specific dates of when I received them.
18 Q.   You can't tell me when you received any of these
19   various messages?
20 A.   I recall that one of the cards I received late
21   after Christmas, and no, I don't have a specific
22   date for them.  I don't have specific dates of when
23   I received any of these cards.
24 Q.   Do you have, with respect to dates or details of
25   the allegations in your lawsuit, any way to refresh

Page 183

1    your memory if you can't recall information at this
2    point in time?  Do you have anything to look to,
3    documents, calendars, anything that you could use
4    to fill in things that you can't recall?
5 A.   Any of the other text messages or other discovery
6    that's out there; that's what I would say I would
7    look to.
8 Q.   So you have produced everything -- at least it's
9    your representation that you've produced
10   everything in your possession that could be used
11   to reconstruct details or dates that are relevant
12   to the lawsuit?
13 A.   I think I've already testified today that I've
14   produced everything to my attorneys and then we
15   discussed journals and poetry and there could be
16   notes in those -- next to those poems.  I don't
17   recall other things that I could look to.
18   MS. RUSSELL:  I put an objection on the
19   record earlier about our file from prior counsel is
20   incomplete.  I've had emails with prior counsel and
21   we are meeting this weekend.
22   (Marked for identification:
23   Deposition Exhibit No. 7.)
24   MS. HARDY:  Let the record reflect I'm
25   showing the witness and giving a copy to counsel of

Page 184

1    Exhibit No. 7.  This is Bates stamped RH295.  It
2    purports to be text messages between Elyse McKenna
3    and Bob Riley, dated 12 -- 1-20 -- 2020.
4 BY MS. HARDY:
5 Q.   Do you recognize this?
6 A.   I don't know that I've seen it in this form before.
7 Q.   Okay.  Let me read for the record, and correct me
8    if I read this inaccurately, but on 1-20 --
9    1-2-2020 at 8:00 a.m. you sent Bob Riley a text
10   saying, "Good morning!  I'm excited to see you
11   today!!!  I can't wait to hear about your past few
12   days!"  Did I read that correctly?
13 A.   Yes, you read the text correctly.
14 Q.   Okay.  And you sent him another message at 10:59 on
15   that same day which reads, "Thank you for always
16   listening.  You've truly become one of my best
17   friends in a short time.  It makes me feel
18   incredibly blessed to be able to share some of
19   life's tough moments with you and to know you're by
20   my side.  Thank you."  Did you write that?
21 A.   Yes.
22 Q.   Did you write that of your own volition?
23 A.   Yes.
24 Q.   Was it genuine?
25 A.   Yes, I believed Bob was my mentor, yes.

Page 185

1 Q.   Okay.  And he was one of your best friends in a
2    short time?
3 A.   Yes.
4    (Marked for identification:
5    Deposition Exhibit No. 8.)
6    MS. HARDY:  Okay.  Let the record reflect
7    I'm showing the witness Exhibit No. 8.  Copy to the
8    witness, copy to counsel.
9    And Exhibit No. 8 is Bates stamped 331
10   through 33 --
11   MS. RUSSELL:  I don't know if this was
12   supposed to be with what you tossed over.
13   MS. HARDY:  And these are text messages
14   again between Elyse McKenna and Bob Riley.  They
15   are dated, on 331, 1-11-2020, on 332, 1-12-2020,
16   and 1-12-2020 on 333.
17 BY MS. HARDY:
18 Q.   Let me read to you some of the messages here and if
19   I read them inaccurately let me know.
20   1-11-2020 at 1:59 p.m.  Elyse McKenna
21   writes to Bob Riley, "Okay - big news!  I never got
22   your Christmas card until this morning!!!"
23   Next page, at 1-12-2020, Elyse McKenna
24   writes, at 12:17 a.m., "In short, the card made my
25   day and I want to make sure I do right by it."

---

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
186..189

Page 186

1     On page 333, on 1-12-2020 at 1:25 p.m.,
2  Elyse McKenna writes to Bob Riley, "Your card
3  really meant the world to me. I've read it over a
4  number of times. It brought me a lot of happiness
5  yesterday and today. I'm very lucky to have you in
6  my life." Did I read those correctly?
7  A.   You read those correctly.
8  Q.   Okay. And you wrote those messages to Mr. Riley?
9  A.   I wrote those messages to Mr. Riley.
10 Q.   Were they genuine?
11 A.   Yes, they were genuine.
12 Q.   Okay. And what Christmas card are you referring to
13    in your message on 1-12-2020 in which you say the
14    card made your day and then you further wrote that,
15    "It really means the world to me, I read it over a
16    number of times, it brought a lot of happiness
17    yesterday and today"?
18 A.   Without looking at something else, I don't have a
19    recollection of what card. I believe -- I don't
20    know if you're representing that these are all the
21    Christmas cards.
22       MS. HARDY: Those are all you produced
23    for 2019 cards.
24       THE WITNESS: Okay.
25       MS. HARDY: So I want to read to you, or

Page 187

1  for the record and to you -- this is going to take
2  a moment -- the Christmas card dated December 25,
3  2019.
4       THE WITNESS: Okay. So you're picking
5  one of the cards of Exhibit 6 to read?
6       MS. HARDY: Yes, I am.
7       THE WITNESS: Okay.
8       MS. HARDY: I'm picking the long one
9  that's 502 --
10      THE WITNESS: Okay.
11      MS. HARDY: -- to 505 that has the word
12   love in it.
13      THE WITNESS: Okay.
14      MS. HARDY: Okay?
15      THE WITNESS: Okay.
16      MS. HARDY: Since you've been complaining
17   about the word love being romantic or sexual, I
18   want to take the time to read this into the record.
19      MS. RUSSELL: Objection to counsel's
20   testimony.
21      MS. HARDY: Okay.
22 BY MS. HARDY:
23 Q.   "Good morning, Elyse. If there ever was a day when
24    I wished I could spend time with you, it would be
25    today. Were it otherwise, I think I would share in

Page 188

1  person the following thoughts.
2       "A meaningful reflection about Christmas
3  involves more than gifts, things and material
4  objects. I believe instead that it is best with
5  thoughts of joy, peace, new beginnings acceptance
6  and love. This applies to all mankind. They also
7  apply, from my perspective, to us.
8       "You have become a tremendous joy in my
9  life. Whether as a colleague, RH, or a dear
10 friend, you regularly bring a smile to my face.
11 You laugh easily and often. 'Joy' is a perfect
12 word for you.
13      "Peace involves quiet, serenity and the
14 absence of disturbance. It also involves trust.
15 There are very few people in my life who evidence
16 those qualities as you do. Indeed, I would trust
17 you with anything and be a peace" -- I think it
18 means "at peace" -- "for doing so.
19      "New beginnings? That is exactly us.
20 Moreover, the opportunity to be part of the
21 evolution as a lawyer means the world. I find this
22 opportunity to be incredibly satisfying and gives
23 me a sense of real purpose.
24      "Acceptance is also a virtue to celebrate
25 at Christmas. No matter our differences, there is

Page 189

1  a genuine and very real mutual acknowledgment of
2  all we share, a true acceptance of who and what we
3  are. Love is a powerful word, but what is
4  Christmas really all about? No matter its
5  implications, I cannot think of a better word to
6  describe the complete package of feelings I have
7  for you. My affection is real, respectful and
8  sincere and I see no reason to be tentative.
9       "I will miss you today, my friend, but
10 will think of you often. Enjoy a fabulous day with
11 family, friends and loved ones. Merry Christmas,
12 Elyse. Bob."
13      Do you have a problem with the fact that
14 this message was sent to you; do you think it was
15 inappropriate?
16 A.   I think when you take into account all of Bob's
17    different behaviors and when I later figured out
18    that he was taking surreptitious photographs of me,
19    I do think that the message is inappropriate.
20 Q.   Okay. So at the time you received it, you accepted
21    it as a message from a colleague and a friend and
22    not as one that you perceived as inappropriate or
23    sexual in any way; is that fair?
24 A.   No, I wouldn't necessarily say that's fair. I --
25    at the time I received it, I viewed Bob as a mentor

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
190..193

Page 190

1    and as a best friend and it didn't put into light
2    the meaning of what it meant until later, but I --
3    I don't know how to --
4 Q.    After you received it, you sent him the message on
5    January 12, 2020, that said in part, "The card
6    really meant the world to me.  I read it over a
7    number of times.  It brought me a lot of happiness
8    yesterday and today.  I'm very lucky to have you in
9    my life," correct?
10 A.    You're adding that that's when I received it and
11    this -- I received a number of cards for Christmas
12    and I don't have -- you've selected a card that you
13    would, I think, like me to say is responsive to
14    this so I can't answer that question.
15 Q.    You say his card came on the 11th and then on the
16    12th you write these very affectionate gushy
17    messages to him telling him how much the card means
18    to you and that you read it over and over.
19 A.    So there's a number of cards that I received from
20    Bob, so you're telling me that I received something
21    on the 11th, but that message on the 11th -- there
22    are a number of Christmas cards, so I can't agree
23    with what you're saying.
24 Q.    You have all the Christmas cards in front of you
25    that you produced, Exhibit 6.  They run from 486

Page 191

1    through 505.  If it wasn't the Christmas card that
2    is Bates stamped 502 through 505, which is the long
3    one, which card were you sending that response on
4    the 12th when?
5 A.    I don't -- I can't answer your question.
6 Q.    Okay.  You're not saying it wasn't the message
7    that's on 502 to 505?
8 A.    You're asking me to say it was the card that I'm
9    responding to and I'm saying I can't answer the
10    question without looking at something else.
11 Q.    What else would you need to look at?
12 A.    Well, you've already asked me if there's anything I
13    could use to refresh my recollection.  I've told
14    you other discovery and I don't know if there's --
15    I don't have all of that in front of me.
16 Q.    Well, do you know of anything, sitting here today,
17    that you can look at to refresh your recollection
18    as to what card you were talking about in the text
19    messages that you sent on 1-12-2020, the first one
20    being at 12:17 a.m. and the second one being at
21    1:25 p.m.?
22 A.    There could be any number of things I could look
23    at.  I don't --
24 Q.    Are you denying that those two particular text
25    messages are referring to the card that is 502

Page 192

1    through 505?
2 A.    As I sit here today, I cannot tell you; I don't
3    have an answer for you.
4 Q.    All right.  Do you think the word love used in the
5    card that I read into the record, which again is
6    Bates stamped 502 through 505, is used in a sexual
7    way?
8 A.    I think when you take into account the pictures and
9    the romantic dinners and the accumulation of all
10    the other events, yes.
11 Q.    So the dinners and the photos that you discovered
12    in August, in fact on August 18, 2021, are what
13    caused you to look back and believe that the word
14    love in this Christmas card in 2019 was sexual in
15    nature?
16 A.    In addition to all of Bob's other behaviors.  And
17    when you say I discovered the pictures on
18    August 18th, I don't know where you're getting that
19    date from, so I'm not going to agree to the date.
20 Q.    That's the day you hacked Bob's iPad, correct?
21 A.    I know that the text colloquially said hacked, but
22    I'm incapable of hacking something, but that's --
23    that does not -- that is not the date that I first
24    knew that photographs were being taken.  So yes, it
25    is the date I accessed the iPad.

Page 193

1 Q.    Okay.  You say on page 21 of your second amended
2    complaint, "August 18, 2021, McKenna discovers
3    Riley has a large collection of photographs of her
4    saved on his iPad," right?
5 A.    Yes, I'm not --
6 Q.    That's the day you went onto his iPad, right?
7 A.    I already have -- I already have said, Ms. Hardy,
8    that I went onto the iPad on August 18th, but
9    that's not the first date that I knew he was taking
10    photographs, so I'm not going to --
11 Q.    When did you first learn that he was taking
12    photographs?
13 A.    Earlier in 2021.
14 Q.    When?
15 A.    I don't have a specific date for you.  As I sit
16    here today, I don't.
17 Q.    Did you record it anywhere?
18 A.    I would have -- did I record -- like written?
19 Q.    Yeah.  Did you make a note of it anywhere; anything
20    you can look to to refresh your memory as to when
21    you first made that discovery?
22 A.    I don't know as I sit here today where I -- if I
23    wrote it the first time I made the discovery
24    anywhere.
25 Q.    Did you record any notes about when you first

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
194..197

Page 194

1  discovered or when you confirmed or obtained
2  information about Bob taking photos of you except
3  for August 18th?
4  A.   I believe there are text messages that predate
5  August 18th about photographs that were produced
6  that are in a group message that you're referring
7  to that are in the messages that end up saying I
8  hacked the iPad, but other than that, I don't --
9  you're talking about written.  You want written?
10  Q.   I want to know if there's anything you can look to
11  to refresh your memory, which is why I'm asking
12  about written.
13  A.   If they're in the journal, then -- Powertree or --
14  now I'm using the word journal even though I don't
15  have a journal, so I want to be very clear about
16  that.  If they're with notes that relate to poetry,
17  they could be there.  I talked about it with my
18  ex-husband, but I don't know that a text message
19  exists that's a written piece of information.
20  Q.   How did you come to the understanding that Bob
21  Riley was taking photos of you?
22  A.   We had moved to a new office from Dearborn to
23  Southfield on March 30th or March 31st of 2021 and
24  there was a reflection behind him in the window
25  much like right now there is a reflection behind

Page 195

1  you in the window and I saw him have the iPad
2  pushing a -- the part on your iPad that shows the
3  camera, so the camera is open and taking the
4  photographs, and I saw that in the reflection, so
5  it was after we moved to the new office.
6  Q.   And when was that?
7  A.   Well, I said March 30th or March 31st of 2021.
8  Those would be the dates that I think I first -- I
9  don't know if we -- I don't know if Riley & Hurley
10  had access to that before those dates, but I think
11  that was the first date staff were there, like
12  everyone else was there.
13  Q.   And you didn't say anything to Mr. Riley?
14  A.   No, I did not -- well, about that -- about the
15  photos?
16  Q.   Yeah.  To ask, "Are you taking a photo?  I see a
17  reflection.  What's all that about?"  Anything
18  along those lines?
19  A.   I did not.
20  Q.   Okay.  Did you talk to anyone in his firm about it?
21  A.   When are we talking?  I guess I should have asked
22  you to your last question, when are we talking?
23  Q.   Whenever -- after you discovered it, at any point
24  in time after you discovered or after you thought
25  you discovered he was taking photos of you, did you

Page 196

1  talk to anyone in the firm?
2  A.   Okay.  Well, going back to the Bob question because
3  you asked me if I ever talked to Bob about it and I
4  do email Bob about it.
5  Q.   No, you answered that --
6  A.   Well, no, no, I'm not going to -- I don't want this
7  to be that I'm lying.  I emailed Bob about it, so I
8  thought you were talking about on March 30th or
9  March -- when I first discovered it.  I emailed Bob
10  when I was leaving and so I'm saying -- I'm
11  correcting my answer so that I make sure because we
12  don't have a timeframe.
13  Q.   Well, that was actually after your last day, wasn't
14  it?
15  A.   It was whenever that email was dated.
16  Q.   August 21.
17  A.   Okay.  Yes.
18  Q.   Last day was on the 20th.
19  A.   Okay.
20  Q.   All right.  So between your -- what you describe as
21  your discovery in March, March 30th or 31st, and
22  August 20, who, if anyone, in the Riley & Hurley
23  firm did you talk to about your suspicion that Bob
24  was taking photographs of you?
25  A.   First I want to make clear that I'm not indicating

Page 197

1  I discovered it on March 30th or 31st.  That's when
2  we moved into the office and I don't have a
3  specific date of when I first saw him taking the
4  photographs.  It would have been around that time
5  in the March, April timeframe, but I'm not
6  committing to a date because I don't have something
7  regarding that date in front of me and I don't feel
8  confident with that.
9       After that, the person that I talked to
10  about the photographs -- and you're asking for
11  everyone in the firm I talked to about the
12  photographs?
13  Q.   Yes.
14  A.   Sonia Mullins.
15  Q.   Okay.  Anyone other than Sonia?
16  A.   No.  And I obviously talked to Bob, but we already
17  talked about that.
18  Q.   In relation to the March 30, 31 timeframe, not
19  holding you to a specific date, how soon after did
20  you approach Sonia or talk to Sonia?
21  A.   Not very -- not very quickly.  During that time
22  there was a lot of -- I couldn't give you a date.
23  Q.   Give me some idea of how long after it was.
24  A.   Well, if I recall in March -- in that timeframe is
25  when everyone was first starting to get vaccinated,

Page 198

1    March of 2021 -- no, sorry, that was March of 2020.
2    We all weren't in the office at the same time right
3    when we moved, so I don't know how to give you an
4    approximation.  It wouldn't have been -- I didn't
5    talk to Sonia the same day.  I don't know.
6  Q.   You were in the office -- where were you and where
7    was Mr. Riley when you first thought you noticed
8    him taking photos?
9  A.   Sitting across from one another in his office.
10 Q.   And that was roughly ten days after the onset of
11   COVID --
12 A.   No.
13 Q.   -- or shutdown of COVID?
14 A.   No, obviously I'm talking about 2021 and I believe
15   COVID started in 2020.
16 Q.   Okay.  I'm sorry.
17 A.   I don't -- 2019.  Sorry -- no, 2020, yeah.  I'm
18   like, hold on.  Yes, no, sorry.
19 Q.   Okay.
20 A.   March 31st.
21 Q.   2021?
22 A.   Right.  Because then I end up -- I leave in August,
23   yes.
24 Q.   Since you can't recall the dates, let's go to the
25   substance of your conversations with Sonia.

Page 199

1          Who approached whom about this topic?
2  A.   Well --
3  Q.   How did it come up?
4  A.   I would have --
5          MS. RUSSELL:  Object to form.
6          THE WITNESS:  Sonia didn't know about the
7    pictures until I told her, so I don't think she
8    brought it up.
9  BY MS. HARDY:
10 Q.   All right.  So what did you tell Sonia?
11 A.   That I thought Bob was taking pictures of me.
12 Q.   And what was her response?
13 A.   She was shocked.
14 Q.   And did you two talk about a plan to figure out
15   whether that's in fact what was happening?
16 A.   I don't believe that during that conversation we
17   talked about a plan.
18 Q.   Did you talk about a plan with Sonia to figure out
19   what was on Bob's iPad at any point between your
20   initial conversation with her and August 18?
21 A.   Did we talk about a plan?
22 Q.   Yeah, a plan to figure out what if anything is on
23   Bob's iPad that relates to photos of Elyse Heid.
24 A.   Yes.
25 Q.   What did you discuss with her?

Page 200

1  A.   She talked to me about how she was going to help --
2    Bob was getting a new iPad and we talked about --
3    she talked about -- we talked about confirming if
4    the pictures of me were on there, if there were
5    pictures.
6  Q.   And what did that have to do with getting a new
7    iPad; was she going to just take the old iPad or
8    you were going to take it?
9  A.   No, the -- what do you mean, what did it have to do
10   with getting a new one?
11 Q.   How did that relate to -- what's the connection
12   between Bob getting a new iPad and trying to figure
13   out what photos, if any, were on the iPad of you?
14 A.   The fact that if he got a new iPad, the photos
15   would be on the old iPad, I guess.  I'm not
16   understanding.
17 Q.   I'm not understanding.  Was she or you planning on
18   taking his old -- getting him a new iPad and taking
19   his old iPad and you then you would be able to look
20   on the old iPad for photos; was that the plan?
21 A.   He was getting the new iPad, like he had already
22   bought a new iPad.  There was a new iPad that
23   things were being transitioned from.
24 Q.   So you were talking about a way to get your hands
25   on the old iPad so that you could check it out?

Page 201

1  A.   No, we were -- we were talking about whether --
2    confirming if there were more photos.  I don't --
3    no one was going to take an iPad.  I guess I'm
4    trying -- when you're saying "get your hands on the
5    old iPad" --
6  Q.   To look to see what's on it.
7  A.   I never planned on taking an iPad.
8  Q.   I'm not saying taking it, like keeping it for
9    yourself, I'm saying getting physical possession of
10   it so you could look on it.  Did you have a plan
11   that you and Sonia talked about as to how you would
12   do that?
13 A.   I didn't plan to get physical possession of the
14   iPad, so I won't --
15 Q.   Well, would you agree that if you get on an iPad to
16   look at photos, it's in your physical possession at
17   that moment?
18 A.   No, I don't think I agree with that.  Like if
19   someone has their computer open and I don't have
20   physical possession of it, it's right there.  I
21   don't agree with that being physical possession.
22 Q.   What did you and Sonia discuss about how one or
23   both of you were going to determine what was on
24   Bob's iPad that related to photos of you?
25 A.   What did we discuss?

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
202..205

Page 202

1  Q.   Yes.  Why is this so difficult?
2  A.   I'm trying to understand --
3  Q.   That question, what's wrong with that question?  I
4        want to know if the two of you had a conversation
5        about how you were going to find out what was on
6        Bob's iPad.
7  A.   I think I already said yes.
8  Q.   What that conversation consisted of.
9  A.   I already said yes.
10 Q.   What did it consist of?
11 A.   I already said it's to confirm that there were
12       photographs and how many.
13 Q.   How were you going to accomplish that?
14 A.   We didn't really have a plan for that.
15 Q.   You eventually had a plan because that's exactly
16       what you did.
17       MS. RUSSELL:  Objection.
18       THE WITNESS:  She gave me the code for
19       the iPad, which I already knew, so I'm not sure
20       that that's...
21 BY MS. HARDY:
22 Q.   Why did she give it to you if you already knew it?
23 A.   Because she wanted me to go look for my own -- like
24       she wanted for me that I knew about the photos and
25       I don't know if she knew that I knew the code.

Page 203

1  Q.   Well, why did you even ask her for a code if you've
2        already got the code?
3  A.   I think she also volunteered the code, but I don't
4        know if the new code and the old -- the new iPad
5        and the old iPad, I guess, have the same code.
6  Q.   What code did she give you?
7  A.   The code to the iPad.
8  Q.   To the old iPad?
9  A.   Yeah.
10 Q.   All right.  And you asked her for that code,
11       correct?
12 A.   I don't recall, but I know she offered me the code
13       as well.
14 Q.   You're not denying that you asked her for it,
15       correct?
16 A.   I'm not -- I don't recall asking her for it.
17 Q.   You're not denying, are you, that you begged and
18       pleaded with her to give it to you?
19 A.   I definitely did not beg and plead her for a code.
20 Q.   In fact, you were crying and insisting --
21       MS. RUSSELL:  Objection.
22       MS. HARDY:  -- that she had to give you
23       the code, correct?
24       THE WITNESS:  Absolutely not.
25       MS. RUSSELL:  Counsel, when we wrap up

Page 204

1        this line of questioning, can we take a break?  I
2        really have to go to the bathroom.  I should have
3        gone before.
4        MS. HARDY:  When we wrap this up, yes.
5        MS. RUSSELL:  Thank you.
6  BY MS. HARDY:
7  Q.   How did you get the code to Bob's iPad?
8  A.   I think I've already stated this.
9  Q.   No, I didn't hear that answer if you did.  How did
10       you?
11 A.   Sonia gave me the code.  I did not beg and plead
12       her for it and I also had -- it was the same code
13       that I believed that was already being used for the
14       iPad, so it was the same code that I knew, so I
15       have the code both ways.
16 Q.   How did you get the code other than through Sonia?
17 A.   From Bob.
18 Q.   When did Bob give you the code to his iPad?
19 A.   Bob would often use his iPad to get onto things and
20       had told -- I believe it was the last years -- the
21       year his son was born or something, I don't know.
22       I don't have the code memorized.
23 Q.   When do you claim Bob Riley gave you the code to
24       his iPad so that you could access anything on his
25       iPad; when do you claim he did that?

Page 205

1  A.   We would use his iPad for documents for hockey, so
2        I don't have a date for you.
3  Q.   The fact that Bob uses the iPad in your presence
4        doesn't mean he's given you the code.
5  A.   Right, but if he tells me the code to his iPad,
6        then that does mean he's given me the code.
7  Q.   When did he tell you the code to his iPad?
8  A.   I don't have a date for you.
9  Q.   Can you give me any timeframe?
10 A.   We used the iPad for hockey.
11 Q.   The fact that he's using the iPad for hockey is
12       totally different than whether he's telling you his
13       confidential code to access his iPad.
14 A.   Okay.  I don't -- is that a question?
15 Q.   Did you watch him put his code in and figure it out
16       that way; is that how you got his code apart from
17       Sonia?
18 A.   I'm pretty sure Bob told me his code.
19 A.   Oh, you're pretty sure.  Okay.  Now we --
20 A.   I've already said that.
21 Q.   Did Bob Riley -- strike that.
22       Are you claiming Bob Riley told you you
23       had permission to access his iCode [sic] for any
24       reason at any time?
25       MR. DAVIS:  IPad.

Page 206

1              THE WITNESS: We did access his iPad.
2   BY MS. HARDY:
3   Q.   Listen to my question. Are you claiming that Bob
4        Riley told you you had permission to access his
5        iPad for any reason at any time?
6   A.   We accessed it for hockey documents.
7   A.   You're ignoring the question.
8   A.   I'm not ignoring it.
9   Q.   Your access that you're working with him on
10       firm-authorized work is totally different than
11       whether you're going onto his iPad and look at
12       things he's personally put on there that are not
13       related to a client.
14             MS. RUSSELL: Objection.
15  BY MS. HARDY:
16  Q.   So did he ever give you permission to go on his
17       iPad to just freely roam through it and look at
18       whatever you wanted?
19  A.   Well, he handed me his iPad at times, so I don't --
20  Q.   For work-related reasons, right?
21  A.   For work-related reasons.
22             MS. RUSSELL: Objection.
23  BY MS. HARDY:
24  Q.   Did he ever tell you that you were free just to
25       start looking through his personal stuff on his

Page 207

1        iPad?
2   A.   No, Bob never said to me, "You are free to look
3        through my personal stuff on my iPad."
4   Q.   And you knew you didn't have authorization to do
5        that, correct?
6   A.   Why would --
7   Q.   Didn't you know that was wrong?
8              MS. RUSSELL: Objection.
9   BY MS. HARDY:
10  Q.   Did you know that was wrong to go on somebody
11       else's iPad without their authorization and start
12       looking at their personal stuff?
13  A.   I don't know that it's wrong for an iPad that you
14       have access to.
15  Q.   If some work colleague learns my code to get into
16       my phone, does that mean that they're then free
17       to go on my phone at any time and start looking
18       through all my personal information just because
19       they happen to have accessed it with me in a
20       work-related matter at some prior point in time?
21  A.   I don't know how you want me to answer that
22       question. Like I don't -- if you give someone your
23       code to your phone, you're risking that they're --
24       they have access to your entire phone. I don't
25       know --

Page 208

1   Q.   Okay. So if he ever lets you have access to his
2        iPad for work-related reasons, then he's opened the
3        door to you going on it and looking for anything
4        and everything you want?
5              MS. RUSSELL: Objection.
6              MS. HARDY: Is that your testimony?
7              THE WITNESS: I don't know what -- I
8        don't know what you are looking for. I was not
9        told, "Here's the code to my iPad. You can never
10       access any of my personal information." That's not
11       what was said.
12  BY MS. HARDY:
13  Q.   Okay. And he has to tell you you don't have that
14       authorization for you to understand that you don't
15       just do that without somebody telling you it's
16       okay?
17  A.   It's not my practice to do that.
18             MS. HARDY: All right. Let's take a
19       break.
20             MS. RUSSELL: Great.
21             VIDEOGRAPHER: Off the record at 2:38.
22       (Whereupon a break was taken
23        from 2:38 p.m. to 2:47 p.m.)
24             VIDEOGRAPHER: Back on the record at
25       2:47 p.m.

Page 209

1   BY MS. HARDY:
2   Q.   When did you first form the opinion that Bob
3        Riley's actions were inherently sexual in nature?
4        The things that you're complaining about in this
5        lawsuit. When did you, in your mind, first come to
6        the conclusion that, "We're not just good friends
7        and colleagues, but this is a different category; I
8        think this is inherently sexual"?
9   A.   I don't know that -- you want me to pick a date as
10       a date I reached a conclusion?
11  Q.   As close to a date you can get.
12  A.   As I explained before, there were times throughout
13       2020 when things were making me uncomfortable and
14       then Bob would change how he was acting and they
15       went back and forth, so I don't -- I don't know how
16       to give you a specific date. Definitely by the
17       time I saw the pictures, I definitely felt that
18       way -- or by the time I knew the pictures were
19       happening, I definitely felt that way, but prior to
20       that --
21  Q.   But you --
22  A.   I wasn't done talking.
23             MS. RUSSELL: I'm sorry, there's
24       conversations happening at the end of the table and
25       it's inappropriate.

Page 210

1      MS. GORDON:  Okay.  Thank you.
2      MS. RUSSELL:  Are they miked up for this
3  to be on the record?  Okay.  Well, last time we
4  were in here we had a whole once voice, one lawyer
5  rule --
6      MS. GORDON:  We're not talking to you.
7  I'm sorry if you --
8      MS. RUSSELL:  Then you can quiet down or
9  leave.
10     MR. DAVIS:  Yeah, it's our conference
11  room, so -- but anyway...
12     MS. RUSSELL:  We can stop the deposition.
13  Be respectful.
14     MS. GORDON:  Can you?
15     MS. HARDY:  When did you first --
16     MS. RUSSELL:  Thank you for capturing
17  Ms. Gordon's remarks.  I appreciate that.
18  BY MS. HARDY:
19  Q.   When did you discovery the photos such that you
20       concluded, "This is sexual in nature"?
21  A.   Are you asking when I first discovered the photos?
22  Q.   No, let me rephrase that.
23       You indicated that in the end of March,
24  you came to the conclusion that Bob Riley was
25  taking photos of you because you saw a reflection

Page 211

1  in the window.  Did you think -- at that point in
2  time, did you form the opinion that, "Oh, my
3  goodness, this is sexual in nature"?
4  A.   I didn't indicate that it happened at the end of
5  March, I indicated that we moved into the office at
6  the end of March and that it was sometime around
7  there.  When I discovered the photographs and I saw
8  photographs being taken in the reflection behind
9  me, yes, that crystallized for me what I had
10  already been feeling prior to that, as I've
11  explained in 2020, which is that it was incredibly
12  inappropriate and sexual in nature.
13  Q.   You're talking about the photos right now?
14  A.   I'm talking about the accumulation of all the
15  behaviors.  You asked me about his actions and his
16  behaviors, when I reached the conclusion that they
17  were sexual.
18  Q.   And that was in this timeframe, you said before,
19  March 30, 31, 2021 or sometime shortly thereafter;
20  that's the timeframe you concluded that, "The
21  taking of photos sheds new light on all these other
22  things and now I conclude it's all sexual in
23  nature"?
24  A.   I think I've also said that during 2020 I was
25  feeling it was inappropriate, so I don't --

Page 212

1  Q.   Okay.
2  A.   I --
3  Q.   So you didn't -- did you learn anything more about
4       whether there were actually photos of you on his
5       iPad between that time when you were in the office
6       and you see the reflection and August 18 when you
7       actually access his iPad and look through his
8       stuff?  Did you obtain any information about photos
9       on his iPad in that interim period?
10  A.   What do you mean, obtain information?
11  Q.   Did you learn anything more from anyone about
12       whether there was something on his iPad that was --
13       that confirmed your fear that there were photos of
14       you?
15  A.   I was seeing it consistently happening, so I don't
16       know if you're considering that information
17       obtained.
18  Q.   Well, you haven't said that before.  So the first
19       time you noticed that you could see a reflection
20       was in the new office sometime shortly after
21       March 30 or 31; that's the first time you noticed
22       what you thought was Bob taking photos of you; is
23       that correct?
24  A.   I did not notice it prior to the new office.
25  Q.   Okay.  And then you noticed it continually

Page 213

1  thereafter?
2  A.   I noticed it when I was in his office.  I would
3       notice that he was taking photographs of me, yes.
4  Q.   Okay.  What were you communicating with Sonia about
5       in August of -- August 3, August 4, 2021, that you
6       were so upset about that concerned the photos?  You
7       have produced PL22340, which is a document that
8       indicates that you were communicating with Sonia
9       and you said to her, "Hey, can you talk?  It's
10       important."
11     MS. HARDY:  I'll mark this as an exhibit,
12  PL22340.  And it will be Exhibit No. --
13     MS. RUSSELL:  Nine?
14     MS. HARDY:  No, I'm marking them out of
15  order.  It will be Exhibit No. 36.
16     MS. RUSSELL:  Gotcha.
17     (Marked for identification:
18      Deposition Exhibit No. 36.)
19     MS. RUSSELL:  You have quite a few
20  exhibits to get through, counsel, in less than
21  three hours.
22     MS. HARDY:  Copy for counsel.
23  BY MS. HARDY:
24  Q.   What had happened on August 3, 2021, that caused
25       you to say to Sonia that you needed to talk to her;

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
214..217

Page 214

1    it's important? Can you hand that one page back to
2    me, please? Thank you.
3 A.  As I sit here today, I don't recall what had
4    happened on August 3, 2021, that date specifically.
5 Q.  Did you access Bob Riley's iPad to look at photos
6    prior to August 18, 2021?
7 A.  I don't have dates in front of me.
8 Q.  Did you access it prior to August 18, 2021?
9 A.  I accessed it on one occasion and I don't have
10    dates in front of me, Ms. Hardy, so I can't tell
11    you if I accessed it prior to August 18, 2021.
12 Q.  Well, we've just gone over, your complaint states
13    and you've acknowledged in your testimony you went
14    into the iPad -- as you said in the text, you
15    hacked into the iPad -- on August 18, 2021, to look
16    for photos of yourself. Did you go into that iPad
17    on any occasion prior to August 18?
18 A.  I was certainly on the iPad when we were using it
19    for hockey-related matters and to assist Bob and to
20    look at other documents, so yes, I've been on the
21    iPad prior to August 18, 2021.
22 Q.  To look at his personal stuff?
23 A.  I did not look at other personal things.
24 Q.  Did you go on the iPad to look at photos of
25    yourself prior to August 18, 2021?

Page 215

1 A.  I'm going to keep saying that I don't have a date
2    in front of me to know if August 18, 2021, is the
3    right date, so --
4 Q.  You have testified like within the last hour that
5    August 18, 2021, was the date. And I can show it
6    to you right here in your complaint. It says,
7    "August 18, 2021, McKenna discovers Riley has a
8    large collection of photographs of her saved on his
9    iPad." We've already been down this road before.
10 A.  Okay. If you're representing a specific date,
11    then --
12 Q.  You represented it in your --
13 A.  It's in the complaint; yes, I understand.
14 Q.  All right.
15 A.  You have asked me -- you've stated numerous times
16    during this deposition, "I want you to say what you
17    remember while you're here." Right now, as I sit
18    here right now, I don't remember August 18th. I
19    can look at documents and confirm that date for
20    you.
21 Q.  Do you need to look at your complaint again? Here.
22 A.  You've also gestured it, Ms. Hardy. Thank you very
23    much for your --
24 Q.  Now that we have that August 18 was the date where
25    you went in and took photos off his iPad of

Page 216

1    yourself, did you go on to his iPad to look for
2    photos of yourself prior to August 18?
3 A.  I have already said now multiple times, I only went
4    on the iPad on the one time to look for photos, so
5    no.
6 Q.  Did Sonia go on the iPad, to your knowledge, to
7    look for photos prior to August 18, 2021?
8        MS. RUSSELL: Objection.
9        THE WITNESS: I don't know.
10 BY MS. HARDY:
11 Q.  Did she tell you she went on the iPad to look for
12    photos prior to 2021?
13 Q.  Prior to 2021?
14 Q.  Prior to August 18, 2021.
15 A.  She did not tell me that, no.
16        MS. RUSSELL: While counsel is looking at
17    documents, I just want to say, on Exhibit 36, there
18    are at least two different dates in the column on
19    the text messages, which is in conflict with what
20    Counsel Davis has represented to the Court about
21    plaintiff's production. I just want that on the
22    record while they're searching.
23        MR. DAVIS: I don't even know what she's
24    talking about.
25        MS. HARDY: I don't either.

Page 217

1 BY MS. HARDY:
2 Q.  All right. Let's turn to your allegations of
3    sexual harassment. Insofar as they pertain to your
4    claims against the Riley parties -- and that is a
5    claim brought under the Michigan statute otherwise
6    known as the Elliott-Larsen Civil Rights Act -- it
7    requires that for an act to be probative of or
8    considered as an act of sexual harassment for a
9    hostile environment claim that it must be
10    inherently sexual.
11        Describe for me everything that occurred
12    with respect to Bob Riley either in writing, in
13    person that you consider inherently sexual.
14        MS. RUSSELL: Object to the form of the
15    entire question.
16        MS. HARDY: Do you understand the
17    question?
18        THE WITNESS: Can you rephrase the
19    question?
20        MS. HARDY: Sure. I'll make it shorter.
21    Consider what I just said as a kind of background
22    explanation.
23 BY MS. HARDY:
24 Q.  All right. I want to know every single thing that
25    occurred with respect to Bob Riley that you

Page 218

1  consider to be an inherently sexual act or comment
2  on his part.
3  A.   It was the accumulation of all of the behaviors and
4       actions of Bob Riley, so I -- all of it.
5  Q.   I want you to list every single act individually
6       that you consider to be inherently sexual.
7  A.   Okay.  Well, I -- the acts are in the complaint.
8  Q.   I'm not relying upon the complaint.
9  A.   Okay.
10 Q.   You are the complaining party.
11 A.   Okay.
12 Q.   You are a lawyer and you were a lawyer on your own
13      behalf and you drafted the original complaint and
14      you filed a sexual harassment complaint under
15      Michigan law.
16 A.   I agree.
17 Q.   Okay.  So --
18            MS. RUSSELL:  Objection.
19            MS. HARDY:  -- list everything that
20      occurred relative to Bob Riley that you considered
21      to be inherently sexual.
22            THE WITNESS:  Okay.  I have lawyers now,
23      just to be clear about this, so I know that you
24      want to say I'm a lawyer and I filed it on my
25      behalf and all of these things.  All of the things

Page 219

1  that I put in the complaint -- and we can go
2  through them -- are all of the things -- that's the
3  list of things in addition to all of Bob's
4  behavior.  So mandating dinners and making them --
5            MS. HARDY:  Stop.  I want you --
6            THE WITNESS:  I'm still answering.
7            MS. HARDY:  No, stop because it's not
8  responsive.
9            THE WITNESS:  It is.  You want a list.  I
10 just --
11            MS. HARDY:  I don't want you to just
12 refer generically to the complaint, all of his
13 actions.  I want you to list the specific things
14 that he did or said --
15            MS. RUSSELL:  Counsel, she was getting
16 into it and you interrupted her.
17            MS. HARDY:  -- that are inherently
18 sexual.
19            THE WITNESS:  I literally was starting a
20 list.
21            MS. HARDY:  Okay.  Start the list.
22            MS. RUSSELL:  Before she gets into the
23 list, I just want to object to this notion that
24 she's at a higher standard than a plaintiff simply
25 because she initially was a lawyer and represented

Page 220

1  herself pro se.
2            MS. HARDY:  She's not at a higher
3  standard; I'm not suggesting that.
4            MS. RUSSELL:  That's what your comment
5  did earlier, so I'm stating it on the record that
6  I'm objecting to that entire characterization of
7  what this question was leading up to be.
8            If you would like to start your list now,
9  you can.
10            MS. HARDY:  What's important is that she
11 is the person who claimed to have experienced these
12 acts and has to make her own judgment about what
13 she thinks is inherently sexual and that's what I'm
14 asking her.  It doesn't matter whether she's a
15 lawyer, whether she filed her own complaint on her
16 own behalf; she is the person who claims to have
17 experienced the conduct.
18            So let's start with the list of all the
19 conduct of Bob Riley, comments, actions, whatever,
20 that you considered inherently sexual.
21            MS. RUSSELL:  For the record, what you
22 just stated is in conflict with your earlier
23 statement.
24            THE WITNESS:  As I have stated before, it
25 is an accumulation of all of the events and all of

Page 221

1  the events include mandatory dinners, requiring
2  late night meetings --
3            MS. HARDY:  Slow down.  I'm making a
4  list.
5            THE WITNESS:  Okay.
6            MS. RUSSELL:  So we can check it twice.
7            MS. HARDY:  Okay.  Keep going.
8            THE WITNESS:  Talking about personal
9  topics.
10            MS. HARDY:  Okay.
11            THE WITNESS:  Requiring one-on-one time
12 in many different forms, whether via Zoom, via
13 dinners, via personal conversations.
14 BY MS. HARDY:
15 Q.   Anything more?
16 A.   The photographs, the attempt to kiss me on the
17      cheek.
18 Q.   When was that?
19 A.   One of the times I drove him home from dinner.
20 Q.   When was that?
21 A.   I don't have a specific date.
22 Q.   Do you have any way to refresh your memory?
23 A.   I can look in the text message for it.
24 Q.   Okay.  Anything else?
25 A.   His obsessive behaviors of wanting to spend time

Page 222

1   with me.
2          MS. RUSSELL:  Counsel, do we need to call
3   the judge?
4          MS. GORDON:  I'm not responding to you.
5          MS. RUSSELL:  I'm so glad that you can
6   respond to your client.
7          MS. GORDON:  My client and I are talking
8   quietly here.
9          THE WITNESS:  We can hear you.
10         MS. RUSSELL:  It's not quiet at all.
11         MS. HARDY:  It's not even registering
12   with me and I'm the one who's asking questions.
13         THE WITNESS:  Well, I'm the one who's
14   answering questions and it's --
15         MS. GORDON:  You must be concerned
16   about the questioning or something and you're upset
17   and so --
18         MS. RUSSELL:  She's listening -- I have
19   no problem here.  I'm barking at you because you're
20   being excessively disrespectful, which is a pattern
21   throughout this case.
22         MS. GORDON:  Okay.  Go ahead.
23         MS. HARDY:  Okay.  I can read back where
24   you're at if you'd like that.
25         THE WITNESS:  Sure.

Page 223

1          MS. HARDY:  Okay.  The first was
2   accumulation of events, second --
3          THE WITNESS:  Sorry, I don't mean that as
4   the first, I mean all of these events together.
5          MS. HARDY:  Okay.  Mandatory dinners,
6   late-night meetings, talking about personal topics,
7   requiring one-on-one time via Zoom, dinners or
8   personal conversations, photographs, the one
9   attempt to kiss you on the way home from a dinner
10   on the cheek, obsessive behaviors or obsessively --
11   obsessive behaviors, wanting to spend time with
12   you.
13         THE WITNESS:  Watching pornography in his
14   office, sending a pornographic photo or a scantily
15   clad person, woman, photograph via text message,
16   the cards that indicate love.
17         MS. HARDY:  Anything else?
18         THE WITNESS:  The card that he sent my
19   mother, the discussions that he had with my mom at
20   a dinner that we had, the discussions -- the
21   conversations that he had with me.  All of his
22   behavior, the accumulation of the behaviors.
23   BY MS. HARDY:
24   Q.   So let's go back to the mandatory dinners.  Were
25   they, standing alone, inherently sexual or do you

Page 224

1   only see them that way as part of the larger
2   picture?
3   A.   I see them that way as part of the larger picture,
4   but I think they're -- I would say they're comments
5   that are -- just the fact that there are dinners,
6   is that what you're asking me, the fact that there
7   are dinners, if I find that inherently sexual?
8   Q.   Yes.  Do you?
9   A.   No, I find the conduct in addition to the mandatory
10   dinners to be sexual.
11   Q.   This other conduct that you've listed?
12   A.   During the dinners, yes.
13   Q.   Okay.
14   A.   Yes.
15   Q.   So what happened during the dinners that was
16   inherently sexual?
17   A.   Conversations that veer into personal life are
18   definitely not appropriate for a boss to be having
19   with his associate who he's later taking
20   photographs of.
21   Q.   Anything else at the mandatory dinners other than
22   personal conversations that you considered
23   inherently sexual?
24   A.   When driving home after the personal dinners, the
25   attempts to kiss me on the cheek and require -- the

Page 225

1   amount -- the lateness of the dinners in addition
2   to the conduct, all of it taken together.
3   Q.   Is any one of those things inherently sexual or is
4   it again the feeling you get when you roll it all
5   together?
6          MS. RUSSELL:  Objection.
7          THE WITNESS:  It made me uncomfortable.
8   BY MS. HARDY:
9   Q.   Do you consider anything standing alone that
10   happened at the mandatory dinners to be inherently
11   sexual?
12   A.   I think I just answered that, depending on -- the
13   personal topics that were gone into and attempts to
14   kiss me after the dinner would be inherently
15   sexual.
16   Q.   Is the attempt to kiss you on the cheek inherently
17   sexual?
18   A.   In light of everything, yes, I believe it's
19   inherently sexual.
20   Q.   Okay.  But again, is there anything you could
21   describe as inherently sexual which stands on its
22   own as a part of becoming inherently sexual in
23   your mind because other things happened that you
24   didn't like?
25   A.   I think saying that you think of somebody 662,000

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
226..229

---

Page 226

1    times by 8:00 a.m. is inherently sexual and I think
2    there are other comments that are inherently
3    sexual.
4  Q.   What other comments?
5  A.   I think the love comment is inherently sexual.
6  Q.   The love comment in the 2019 Christmas card that I
7    read into the record; that's inherently sexual?
8  A.   In hindsight, yes, I think it's inherently sexual.
9  Q.   All right.  Let's go back to the mandatory dinners.
10   What conversations about personal issues were
11   inherently sexual in your mind?
12 A.   Delving into your associate's personal life in the
13   context of then later taking photographs of that
14   person.
15 Q.   What specifically did he ask about your personal
16   life that you consider inherently sexual?
17 A.   As I sit here today, I don't have specific
18   recollection --
19        MS. GORDON:  I'm sorry, I cannot hear
20   you.  You have your hand up over your mouth.
21        MS. RUSSELL:  I thought you weren't
22   speaking to us, Ms. Gordon.
23        MS. GORDON:  I'm sorry, I can't hear
24   you.
25        MS. HARDY:  Ms. Russell, don't be

---

Page 227

1    childish, please.  Come on.
2         MS. GORDON:  Thank you.  I appreciate
3    that.
4         MS. RUSSELL:  You're lecturing me when
5    they're over there whispering like third graders
6    about who is being childish?
7         MS. HARDY:  Look --
8         MS. RUSSELL:  I'm defending my client.
9         MS. HARDY:  Ms. Gordon is sitting with
10   her client, and yes, they may talk from time to
11   time.  This happens when you're with a client
12   during a major deposition.  That is not --
13        MS. RUSSELL:  No, there's a double
14   standard and that was a remark about me and my age.
15   It is noted.
16        MS. HARDY:  You and your age?
17        MR. DAVIS:  What?
18        MS. RUSSELL:  Yes, 100 percent.
19        MS. HARDY:  I don't have any idea what
20   you're referring to, but it's best not to get
21   distracted and stay focused.
22 BY MS. HARDY:
23 Q.   So back to Ms. McKenna.
24        What details did Mr. Riley inquire about
25   related to your personal life that you consider

---

Page 228

1    inherently sexual?
2  A.   I think I already answered this question.
3         MS. HARDY:  Well, I may have lost my
4    concentration because of your lawyer's comments
5    about what she thought Ms. Gordon was not supposed
6    to do, so could you read back her answer?
7         THE WITNESS:  I can just give the answer
8    again.
9         MS. RUSSELL:  It was a list.
10        MS. HARDY:  That's fine.
11        THE WITNESS:  As I recall, as I sit here
12   today, I don't have specifics about conversations.
13   We talked about personal topics like relationships
14   and -- personal topics, the death of my dad, the
15   things that are personal that are beyond what you
16   talk about with a boss --
17        MS. HARDY:  Okay.
18        THE WITNESS:  -- about your life.
19 BY MS. HARDY:
20 Q.   And you consider that inherently sexual?
21 A.   Again, the accumulation of all of it together, yes.
22 Q.   All right.  How many times was there an attempt to
23   give you a good-bye peck on the cheek after
24   dinners?
25 A.   I don't have a specific number for you.

---

Page 229

1  Q.   When did that --
2  A.   And I also disagree with the characterization of
3    the good-bye peck on the cheek, but that's --
4  Q.   Well, describe it to me then.  You said attempts to
5    kiss on cheek.
6  A.   Yes.  And that's what I would describe it as, but a
7    peck on the cheek I understand is your
8    characterization and that's not my
9    characterization.
10 Q.   Tell me what happened then.  Describe it.
11 A.   An embrace and trying to kiss me on my cheek.
12   That's what I would describe it as.
13 Q.   When he's getting out of the car?
14 A.   When he's getting out of the car across a center
15   console or when he was -- a time when he was
16   leaving the office.  I have a specific recollection
17   of that, I don't have a specific date for you, but
18   it was the new office, so I can tell you it was
19   after March 30 or 31, so I don't --
20 Q.   Can you tell me how many times he attempted to give
21   you a kiss on the cheek?
22 A.   I don't have -- I don't have a specific number off
23   the top of my head.
24 Q.   Can you give me an estimate?
25 A.   I can't give you an estimate.

---

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
230..233

Page 230

1 Q.   Okay.  Can you tell me when it first started and
2      when it ended?
3 A.   I don't know the first time it happened.  I think
4      it might have been at the new office, but I
5      don't -- no, actually, I don't -- I can't tell you
6      the first time it happened.
7 Q.   Can you tell me the last time it happened?
8 A.   Before I left his office -- like before I left
9      employment at Riley & Hurley.
10 Q.   But when?  You can't give me any sense of dates at
11     all?
12 A.   I actually did give you a sense of dates.
13 Q.   Like around the time of the new office but --
14 A.   Well, that window of time is from March 30th of
15     2021 to when I leave in August of 2021, so it's
16     kind of a tighter timeframe.
17 Q.   It never happened prior to March 31, 2021?
18 A.   No, I don't say that.
19 Q.   I asked you when it first happened and you said
20     around the time of the new office.
21 A.   No, I said I know it happened at the new office, I
22     know it happened after we moved to the new office
23     and I said it happened after the mandatory dinners,
24     which span the entire time that I worked there.  As
25     I sit here today, I can't specifically tell you

Page 231

1      which dinner it happened after.  I'm not sure if
2      one of the dinners specifically made it into the
3      complaint or not in a first amendment or second
4      amendment.
5 Q.   What specifics can you give me about these
6      attempted kisses other than they happened at some
7      point in time when you were employed at Riley &
8      Hurley and you really don't know when?
9 A.   I've given you more specifics than that.
10 Q.   No, you haven't because at one point you said they
11     might have started at the time of the new office,
12     and I said, "So it didn't happen before?"  And you
13     said, "No, it happened before; I just don't
14     remember when."
15         MS. RUSSELL:  Objection.  Argumentative.
16         THE WITNESS:  I clarified -- I clarified
17     my answer, which is that I know that they happened
18     during the time at the new office and they might
19     have happened before the time at the new office.  I
20     don't have a specific -- I know you want me to have
21     a specific recollection of a date.
22 BY MS. HARDY:
23 Q.   Can you recall any specifics about what dinner it
24     was, where you were, what time of night or day it
25     was?  Can you give me -- can you give me any

Page 232

1      details about it?
2 A.   I've already told you that it was after I drove him
3      home after dinner and so it was at night and it was
4      over -- at least one of the occasions was over the
5      center console of a car, so I have given you those
6      specifics.
7 Q.   Okay.  Can you give me any other specifics?
8 A.   There was a time when we were leaving the new
9      office and so that is after March 30th or
10     March 31st and I specifically recall that and it
11     was outside.
12 Q.   Okay.  How did you react to the attempt to kiss you
13     on the cheek?
14 A.   I pulled away and I got in my car.
15 Q.   So he didn't kiss you on the cheek?
16 A.   Well, he did kiss me on the cheek, but I exited the
17     situation.  I mean, I let the -- I guess, how long
18     the kiss was on the cheek for is as short as it
19     could have been.
20 Q.   Okay.  And then so each and every time that he
21     attempted to kiss you on the cheek, you pulled
22     away?
23 A.   Yes.
24 Q.   Okay.
25 A.   And then in the future when I was dropping him off

Page 233

1      after a dinner, I was distancing myself to my side
2      of the car so that there was no across the center
3      console.
4 Q.   When did you start doing that?
5 A.   After the kiss on the cheek in the car happened.
6 Q.   Well, when was that?
7 A.   I have -- I know you want me to -- I don't know --
8      you want me to have a date for you and I don't have
9      a date for you.
10 Q.   I'm only trying to get the details and I'm getting
11     nothing of specifics that relate to these attempted
12     kisses on the cheeks.
13 A.   You can characterize --
14         MS. RUSSELL:  Objection.
15         THE WITNESS:  -- it as saying nothing
16     about the specifics.  I disagree with the
17     characterization.  Is there a question?
18 BY MS. HARDY:
19 Q.   Well, when you -- after the first time, which you
20     don't know when that is, right, that he attempted
21     to kiss you on the cheek?
22 A.   Correct.
23 Q.   Okay.  After that, did you keep your distance so
24     that you wouldn't encounter that situation again?
25 A.   I did my best to do that, yes.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
234..237

Page 234

1 Q.   Okay.  But you weren't successful?
2 A.   Then it happened -- either the first time was the
3       time outside the office and the second time was in
4       the car or the opposite.
5 Q.   So there's two times we're talking about?
6 A.   As I sit here today, I recall two specific times.
7 Q.   Okay.  When he tried -- one time after a mandatory
8       dinner and one time outside the office?
9 A.   That's what I recall as I sit here today, yes.
10 Q.  All right.  That's all you recall in terms of
11      attempts to kiss you?
12 A.  Yes.  Hold on.  I recall -- I wouldn't -- as
13      attempts to kiss me, yes.
14 Q.  Is there anything more about the mandatory dinners
15      that you decided, upon reflection when you got down
16      the road, was inherently sexual?
17 A.  I don't know that I agree with your
18      characterization of that so --
19 Q.  Well, you mentioned that the trigger of you seeing
20      this all in the light of being sexual or inherently
21      sexual was the photos --
22          MS. RUSSELL:  Objection.
23          MS. HARDY:  -- and that you looked back
24      on events and concluded that that must have been
25      inherently sexual.

Page 235

1          MS. RUSSELL:  Is there a question?
2          MS. HARDY:  Isn't that correct?
3          THE WITNESS:  I don't think -- I think a
4       kiss on the cheek is inherently sexual.  Are you
5       trying to say that I'm only saying that the kiss on
6       the cheek is inherently sexual because of the
7       photos?  Because that's not what that is.
8 BY MS. HARDY:
9 Q.   So do you think all times when somebody, when
10      they're parting, attempt to kiss someone on the
11      cheek that it's inherently sexual?
12 A.  I think it depends on the circumstances.  And when
13      it's your boss and they are doing that and they are
14      also demanding one-on-one time and talking about
15      personal matters and the circumstances that were
16      present here, I think, yes, made it inherently
17      sexual.
18 Q.  So you have to roll those things together to
19      make -- to see the attempted kisses inherently
20      sexual?
21 A.  No, I think that it was inherently sexual.
22 Q.  What late-night meetings are you referring to?
23 A.  Late-night meetings via Zoom with Bob.
24 Q.  What about them made them inherently sexual?
25 A.  Going into the late hours of the night and talking

Page 236

1       about personal matters, I think, make it inherently
2       sexual.
3 Q.   Okay.  And how late were you on Zoom with Bob?
4 A.   You want a general?  It happened many times.
5 Q.   But how late; what are you talking about?  When you
6       say late night, I don't know whether you're talking
7       about 8:00, 9:00, 1:00 in the morning.  What are
8       you referring to?
9 A.   11:00, midnight.
10 Q.  How often were you on a Zoom meeting with Bob say
11      past 9:00 p.m. at night?
12 A.  Often.
13 Q.  Do you have any record of it?
14 A.  I'm sure in the -- one place there would be a
15      record of it would be Riley & Hurley emails that I
16      don't have access to that we are talking about
17      hockey work or setting up a Zoom or exchanging a
18      Zoom link.  I believe there are references in the
19      text messages which you have with Bob about
20      conversations late at night.  There are text
21      messages with other people where I talk about late
22      meetings.
23          I would also have calendar -- potential
24      calendar entries in the Lotus system, which I don't
25      have access to, but not every time a Zoom got set

Page 237

1       up did it prompt a calendar entry, sometimes it was
2       just sending a link.  I would have --
3 Q.   Do you have any record --
4 A.   I'm not done answering.
5 Q.   -- when the objectionable late-night meetings were?
6 A.   Did you want me to finish my prior answer?
7 Q.   You're not answering the question.
8 A.   You asked me where I would have a record of it and
9       I'm answering where I would have a record of it, so
10      I don't -- and now you cut me off.
11 Q.  Actually you're telling me why there probably would
12      be a record --
13 A.  No, I'm not.
14 Q.  -- with respect to Lotus.  That was your point, I
15      believe.
16 A.  No, I'm saying they wouldn't always be in there,
17      but there certainly would be Zoom meetings in
18      there, so I'm not telling you why there wouldn't be
19      a record.
20 Q.  Do you have any recall of when these late-night
21      meetings were that you objected to and considered
22      inherently sexual?
23 A.  Throughout 2020, yes.  And I believe there were
24      late-night meetings in the beginning of 2021 as
25      well.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
238..241

Page 238

1 Q.   Any other time?
2 A.   I don't have a specific recollection of late-night
3      meetings in 2019 when I first started working
4      there, so I believe they were in 2020 and 2021, and
5      I believe the meetings primarily started after the
6      COVID, so probably March 2020 or April 2020 to the
7      end -- through 2020 and 2021.
8 Q.   You said the beginning of the year in 2021?
9 A.   I believe the Zoom meetings primarily ramped up in
10     frequency when COVID started.
11 Q.  Okay.  But you earlier said that in 2021 they
12     occurred in the beginning of the year?
13 A.  I earlier -- sorry.
14 Q.  You said that in 2021 they were in the beginning of
15     the year.
16 A.  I thought I said throughout -- oh, I'm saying --
17 Q.  You said throughout 2020 and you said the beginning
18     of the year for 2021.
19 A.  I'm getting my years confused.  I'm sorry, I'm not
20     trying to be difficult.
21 Q.  All right.
22 A.  So before 20 -- before we moved into the new office
23     in 2021, I recall that there were more -- higher
24     concentration of late-night Zoom meetings before
25     that move, so that's why I said the beginning of

Page 239

1      2021.
2 Q.   And in terms of personal topics being discussed
3      during the late-night meetings, were they the same
4      personal topics you identified as being discussed
5      during the mandatory dinners?
6 A.   Can you tell me what I --
7 Q.   You said --
8 A.   Relationships?
9 Q.   -- personal relationships, your dad dying.
10 A.  Yes, we talked about personal relationships, my dad
11     dying, personal problems, yeah, I would...
12 Q.  What's inherently sexual about that?
13 A.  I think delving into someone's personal life can be
14     inherently sexual, depending on the circumstances.
15 Q.  Okay.  Are there any particular circumstances that
16     made that inherently sexual?
17 A.  The way the discussion occurred, I think makes it
18     inherently --
19 Q.  What's that mean?
20 A.  The conversation about it and Bob's other
21     behaviors.
22 Q.  Just the conversation itself or something in
23     particular?
24 A.  All of it.  All of it.
25 Q.  All right.  So requiring one-on-one time through

Page 240

1      Zoom dinners and personal conversations, that
2      sounds like a repeat of what you've already said
3      with respect to mandatory dinners, late-night
4      personal meetings and talking about personal
5      topics.  Is there anything distinct about that
6      particular item on your list that you haven't
7      covered?
8 A.   You asked me for a list of items, so I guess I'm --
9      so what?
10 Q.  You listed mandatory dinners, late-night meetings,
11     talking about personal topics, requiring one-on-one
12     time on Zoom, for dinners and personal
13     conversations.  That last one sounds like it's just
14     a repetition of the earlier examples you gave; is
15     that correct?
16 A.  No, because I think the personal conversations, I
17     mean, having -- no, I don't agree.
18 Q.  So let's go back to item No. 5, requiring
19     one-on-one time through Zoom meetings, dinners and
20     personal conversations.  What was inherently sexual
21     about that?
22 A.  Requiring that one-on-one time when it's not about
23     work.
24 Q.  Okay.  You already told me that about the earlier
25     items.  Is there something different, something

Page 241

1      additional about item No. 5 that separates it from
2      these earlier items?
3 A.   I think that those personal conversations can
4      happen at a dinner, not at a dinner, on the phone,
5      on Zoom, many different settings, and the dinners,
6      when they're a fancy dinner or a dropping off after
7      the dinner that involves the kiss on the cheek, I
8      think these are distinct items, so I don't know
9      that I'm --
10 Q.  I think I've heard all that already.
11 A.  Right, but you're trying to make the personal
12     conversations fit into the dinners and I don't --
13     unless I'm misunderstanding your question.
14 Q.  I'm taking your list.
15 A.  Yes.
16 Q.  Item No. 1 was accumulation, item No. 2 was
17     mandatory dinners, and then you elaborated by
18     saying conversations about personal life, attempts
19     to kiss on the cheek, lateness of evening, then you
20     go to late-night meetings, and that's Zoom, in
21     which it was too late for you and there were
22     personal topics discussed.  Then you have item
23     No. 4, talk about personal topics, which sounds
24     like a repetition of what you've already said in
25     the previous comments.  And then you have No. 5,

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
242..245

Page 242

1    requiring one-on-one time, Zoom, dinners and
2    personal conversations. I'm trying to figure out
3    if No. 5 is anything additional beyond what you've
4    already told me about.
5 A.    Okay. I think there were personal conversations
6       that aren't captured by those other ones.
7 Q.    Okay. Tell me what other personal conversations
8       you're referring to.
9 A.    Also, I just -- you wanted me to make a list and
10      I'm trying my best to comply with you wanting a
11      list. You're telling me it's my list and I don't
12      know that I agree that it's my list, but --
13         MS. RUSSELL: Counsel, you keep asking
14      about what was inherently sexual and she answered
15      your question that it was accumulation of what her
16      list was. You're trying to get into each one and
17      parse out what is and is not sexual. She said it
18      was accumulation of the entire -- I mean, if this
19      is how you want to spend the remaining, what, two
20      hours of your dep, go on right ahead. She's
21      already said it's an accumulation of what that list
22      is.
23 BY MS. HARDY:
24 Q.    All right. Were any of the acts standing alone
25      that you're complaining about in this lawsuit

Page 243

1    inherently sexual?
2 A.    Yes, I think I've already answered that.
3 Q.    Which ones were inherently sexual just if one thing
4       and one thing only occurred with Bob Riley?
5 A.    Inviting me into his office when he's watching
6       pornography is inherently sexual.
7 Q.    Okay.
8 A.    I believe that. Telling me that --
9 Q.    Even if nothing else occurred, that would be
10      inherently sexual?
11         MS. RUSSELL: Were you finished
12      answering?
13         THE WITNESS: I wasn't finished
14      answering.
15         MS. RUSSELL: Allow the witness to finish
16      answering.
17         THE WITNESS: Inviting someone into your
18      office when you're watching pornography at work is
19      inherently sexual.
20 BY MS. HARDY:
21 Q.    Standing alone --
22         MS. RUSSELL: She was not finished
23      answering. Allow her to --
24         MS. HARDY: She was --
25         MS. RUSSELL: You interrupted her mid

Page 244

1    word. She was not finished talking.
2       MR. DAVIS: The transcript shows a
3    period. She was finished talking.
4       MS. RUSSELL: You were in the middle of a
5    word.
6       THE WITNESS: I was not finished talking.
7       MS. RUSSELL: She was in the middle of a
8    word.
9       MR. DAVIS: You are on video. Please
10   lower your tone, Ms. Russell.
11      MS. RUSSELL: I'm not on video. The
12   video is on her. I can see it from here.
13      MR. DAVIS: You're on video and you're
14   arguing --
15      MS. RUSSELL: That's fine. You're been
16   argumentative this entire time. She was in the
17   middle of answering her question. Finish your
18   answer.
19      THE WITNESS: Inviting someone into your
20   office when you're watching pornography and then
21   making no attempt to minimize that pornography or
22   to get away from that viewing is inherently sexual.
23   I would think if that's a mistake or if that's
24   something that you didn't mean to do, you would be
25   ending that, so that's inherently sexual to me.

Page 245

1       Are you asking me to continue to a list
2    or do you --
3       MS. HARDY: No, I want you to finish.
4       THE WITNESS: -- want me to stop now?
5       MS. HARDY: You're done?
6       THE WITNESS: Well, no, I don't know what
7    the question was because I've been trying to get
8    out the same answer. If we're talking about
9    pornography specifically -- or are you asking me
10   for another list of everything that's inherently
11   sexual?
12      MS. HARDY: I switched gears because of
13   the difficulty we were having getting through
14   distinguishing between events and figuring out what
15   you thought was inherently sexual to asking you for
16   a list of events that occurred, comments made,
17   events that occurred that you consider, standing
18   alone, to be inherently sexual acts.
19      MS. RUSSELL: And then you asked for one
20   specific one and she answered that it was watching
21   pornography.
22      MS. HARDY: You've indicated pornography
23   fits that definition on that list. Is there
24   anything else?
25      MS. RUSSELL: You asked for one specific

Page 246

1     thing and the witness answered.
2  BY MS. HARDY:
3  Q.    I'm asking, is there anything else that is
4        inherently sexual if it's just a one-time act
5        without the other allegations being part of the
6        picture?
7  A.    I think kisses on the cheek are inherently sexual
8        and I think we've covered that.  If we haven't
9        covered that, I'm covering that again.
10 Q.    We don't need to cover that again.  Kisses on the
11       cheek.  What else, if anything?
12 A.    You've characterized what I said as only being
13       accumulation, so I'm trying to -- I think we're
14       going through inherently sexual standing on their
15       own.
16 Q.    Yes.
17 A.    So kisses on the cheek, pornography.  Sending
18       someone a photograph of a woman wearing not a lot
19       of clothes, I think that's inherently sexual.  I
20       think some of the obsessive behaviors about my time
21       are inherently sexual standing on their own.
22 Q.    Okay.
23 A.    Being offended at not getting more time with me, I
24       believe, is inherently sexual when it's about
25       personal time.

Page 247

1  Q.    Anything more?
2  A.    Can you give me the rest of the list that I gave
3        you before?  Because I can't keep track of what
4        we've decided is in one bucket or another now.
5  Q.    Well, just to clarify, the inherently sexual list
6        where these are stand-alone inherently sexual acts,
7        you've got pornography, kiss on the cheek, the
8        photo of a scantily clad person, obsessive
9        behaviors and being offended that he didn't get
10       more time with you.  That's what you have on your
11       inherently sexual list.
12 A.    Taking photographs of someone secretly who is
13       sitting across from you and taking a lot of
14       photographs in any one sitting is inherently
15       sexual.  And I know that we're -- and the
16       accumulation of all the photographs, it also is
17       inherently sexual.
18 Q.    All right.  Anything else?
19 A.    This is such a broad expansive time to make it a
20       full list, so I would say the actions that are
21       complained about in my complaint in addition to --
22 Q.    Take whatever time --
23 A.    -- all the lists --
24 Q.    Take whatever time you need to reflect on the
25       question and let me know if there's anything more

Page 248

1        that you consider to be an inherently sexual act
2        standing alone as opposed to your accumulation
3        approach.
4             MS. RUSSELL:  And plaintiff stands on
5        her answers that she's already given and her
6        complaint.
7             MS. HARDY:  The complaint is not her
8        testimony here today.
9             THE WITNESS:  I would incorporate my pro
10       se complaint, which is my writing.  I can't recite
11       my entire complaint to you, Ms. Hardy.
12            MS. HARDY:  I don't want you to recite
13       your entire complaint.
14            THE WITNESS:  I know.
15            MS. HARDY:  I want to know every
16       stand-alone event that occurred that you consider
17       to be inherently sexual.
18            MS. RUSSELL:  Ms. Hardy, she's gone
19       through this multiple times.
20 BY MS. HARDY:
21 Q.    Have you exhausted your recall of such events?
22 A.    No, I have not.  Orlando, stalking me outside my
23       hotel room door, I would say is inherently sexual.
24       Having the conversation that occurred inside the
25       shared conference room suite with me, telling me

Page 249

1        that a PHPA executive director would be joining us
2        and then he never did and that started at 8:00 p.m.
3        and went on for hours, I believe -- or an hour and
4        a half at least; I don't have the exact time -- I
5        believe all of that was inherently sexual.  And I'm
6        sure that I -- it is impossible to make you a
7        complete list as I sit here today of everything
8        that's inherently sexual.
9  Q.    Why is that?
10 A.    Because we as humans can't sit and remember
11       everything all at once, so as I recall, that's
12       my -- we're spanning six years, so --
13 Q.    You're bringing a sexual harassment claim and
14       you're claiming something is inherently sexual.
15       That would seem to be something that would stand
16       out.
17 A.    And I've already --
18            MS. RUSSELL:  She's given plenty.
19            THE WITNESS:  -- said that you can look
20       at my complaint and I --
21            MS. HARDY:  You never once used the words
22       inherently sexual in your complaint, so that
23       wouldn't help me anyway.
24            THE WITNESS:  Okay.  Well, you have
25       defined for me sexual harassment, so I think that

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
250..253

Page 250

1    you should --
2         MS. HARDY:  I told you under Michigan law
3    that it has to be inherently sexual acts.
4         THE WITNESS:  Right.  I understand the
5    complaint that I filed, yes.
6         MS. HARDY:  But you don't designate
7    anything in your complaint, even the one you filed,
8    as inherently sexual, so just referring to your
9    complaint is not -- wouldn't help to answer the
10   question even if that was appropriate to do.
11        MS. RUSSELL:  Objection.  None of this is
12   a question; it's all argumentative.
13 BY MS. HARDY:
14 Q.   All right.  So I've got the list, the only list you
15   can give me.
16        Let's go to pornography.  When do you
17   claim you walked into Bob Riley's office and saw
18   him watching pornography?
19 A.   I don't have that date off the top of my head.  It
20   was after we moved to the new office, so it's in
21   the timeframe, I believe, maybe April or May of
22   2021.
23 Q.   What device was he allegedly using to look at
24   pornography?
25 A.   His iPad.

Page 251

1 Q.   Okay.  And where was his iPad located?
2 A.   On his desk.  And he was asking me for help.
3 Q.   He was asking you for help with his iPad?
4 A.   He called me into his office.
5 Q.   Okay.  And where were you standing or sitting when
6    you concluded he had pornography on his iPad?
7 A.   He asked me to help him with his iPad and I walked
8    into his office, so I was standing.
9 Q.   Where?
10 A.   Next to him with his iPad that he was asking for
11   help with.  He was sitting and I was standing.
12 Q.   Okay.  And when you say you saw pornography, what
13   did you see?
14 A.   A pornographic video.
15 Q.   Of what?
16 A.   Naked people.  A woman that was naked.  I don't --
17   I did not spend too much time looking at what was
18   going on when it's, you know, pornography --
19 Q.   Did you know what you saw --
20 A.   I'm not done answering.  You know it when you see
21   it.  We all know that case about pornography.  I
22   didn't spend time figuring out what sexual act was
23   happening, so I know I saw pornography.  I know I
24   saw a naked woman.
25 Q.   A still photo?

Page 252

1 A.   No, it was a moving -- a movie or a video.  It was
2    a movement.
3 Q.   Okay.  And did you say anything to him?
4 A.   I think I was shocked and said -- I might have
5    gasped and said, like, "What the heck?"  And then
6    he told me he said he needed help getting on a Zoom
7    conference for a facilitation.  That was what I was
8    coming in there for was to get him help with the
9    Zoom conference and then there was pornography
10   being watched.
11 Q.   All right.  For what, a split second?
12 A.   I don't --
13 Q.   How long did you stay?
14 A.   He asked me to get him on the Zoom conference, so I
15   closed the pornography, so I can't give you a
16   number of seconds.  It wasn't minutes.
17 Q.   All right.  So he asked you to help him get onto a
18   Zoom conference and you came in and helped him do
19   that?
20 A.   And found him watching pornography, yes, and closed
21   the pornography and opened the Zoom conference.
22 Q.   All right.  And how do you know that he, at the
23   time you walked into the office and starting
24   looking at his iPad, wasn't himself trying to close
25   that?

Page 253

1 A.   He beeped into my office using the intercom in my
2    office and asked me to come here and help him get
3    on a Zoom conference.  He did not appear to be
4    closing anything when I came in there and there was
5    porn, so there was no indication that he was
6    closing anything and he specifically requested me
7    to come in.
8 Q.   All right.  Did you tell anybody about the
9    circumstance?
10 A.   Yes.
11 Q.   Who?
12 A.   I would have told my ex-husband and I told some
13   close friends of mine.
14 Q.   Did you tell anyone in the office?
15 A.   Not right away, not at that time.
16 Q.   Later on, did you?
17 A.   It came up with Sonia when I talked to Sonia.
18 Q.   When did you tell Sonia?
19 A.   That I had one time gone into his office and --
20 Q.   When?
21 A.   I said it came up with Sonia later on when I talked
22   to Sonia, so during the timeframe I talked to Sonia
23   about pictures.
24 Q.   When was that?  I mean, you've got, as far as I
25   know, an expansive time period, end of March,

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
254..257

Page 254

1    through --
2 A.   Summer of 2021.
3 Q.   -- August 18.
4 A.   Summer of 2021.
5 Q.   All right.  What did you tell Sonia?
6 A.   That I had one time gone into Bob's office and he
7    was watching pornography.
8 Q.   Is that the only time you saw pornography in his
9    office?
10 A.   Yes.
11 Q.   All right.  What friends did you tell?
12 A.   I believe I told my friend Kaitlyn.
13 Q.   Last name, please?
14 A.   Barrett.
15 Q.   And how did you communicate to Kaitlyn Barrett?
16 A.   I talked to her about it.
17 Q.   Did you text message or email with her?
18 A.   I don't believe -- I have produced the responsive
19    text messages with Kaitlyn and I don't think that
20    they're in there, but I definitely had a
21    conversation with her, so I don't have any reason
22    to believe there's texts.
23 Q.   Anyone else?
24 A.   My mom, my sister.  I've already said my
25    ex-husband.

Page 255

1 Q.   Anyone else?
2 A.   I don't -- I don't know off the top of my head.
3 Q.   All right.  What makes wanting to spend time with
4    you, even if you thought the amount of time was
5    obsessive, inherently sexual?
6 A.   Talking about topics that aren't related to work
7    and being upset when someone won't spend time with
8    you and talk to you about personal topics, to me,
9    shows an interest that is more than just an
10    appropriate mentor/mentee relationship.
11 Q.   Okay.  What personal topics beyond your dad dying
12    did you -- specific topics can you identify that
13    you talked to Bob about?
14 A.   What timeframe?
15 Q.   Any timeframe.  I mean, you don't really seem to
16    have any particular timeframe you're talking about,
17    so throughout the entire time you worked at Riley &
18    Hurley.
19 A.   Okay.  Well, the time I worked at Riley & Hurley is
20    separate than after Riley & Hurley, so if -- you're
21    asking me specific to Riley & Hurley?
22 Q.   Yeah, because the employment claims only apply to
23    when you're employed.
24 A.   Okay.  I don't need --
25 Q.   Okay.  That's why, all right?

Page 256

1 A.   I'm just trying to answer your questions.  If you
2    don't specify a timeframe in your question, I'm
3    going to ask.
4        MS. HARDY:  All right.
5        MS. RUSSELL:  Counsel, I'm just going to
6    flag, we're coming up on an hour.  How are you
7    doing?  Do you want to keep going?
8        THE WITNESS:  I can keep going for a
9    little bit, but in like 20 minutes, I need to pee.
10       MS. RUSSELL:  Is that workable,
11   20 minutes?
12       MS. HARDY:  Twenty minutes?  It's just
13   about quarter of so --
14       MS. RUSSELL:  So at four?
15       MS. HARDY:  No, that's not quite -- let's
16   say 4:05.
17       MS. RUSSELL:  That's fine.
18       MS. HARDY:  All right.
19 BY MS. HARDY:
20 Q.   So what personal topics did you discuss that are
21    inherently sexual?  You mentioned the death of your
22    dad.  Can you recall any other specifics?
23 A.   I believe I mentioned relationships with other
24    people, personal problems and --
25 Q.   But give me details.  What kind of details did you

Page 257

1    discuss?
2 A.   Prying into someone's personal life, I believe, can
3    be inherently sexual, so I -- relationships with my
4    ex-husband.  Like I don't know what you're --
5 Q.   What questions were asked of you that you consider
6    probing into something to a degree that it becomes
7    inherently sexual?
8 A.   I think when you're asking someone to tell you
9    about their childhood and tell you about how they
10    grew up and tell you about their dad dying and tell
11    you about intimate parts of their life and things
12    that I have vulnerabilities associated with, I
13    think, when taken into the context of everything,
14    that can be inherently sexual.  Depending on how
15    that conversation arises and what's said during
16    that conversation, those conversations can be
17    inherently sexual and they can make someone
18    uncomfortable.
19 Q.   Okay.  Is there anything more that you have to add
20    to the personal topics that were inquired into that
21    causes you to describe them as inherently sexual?
22 A.   Offering things about one's self, like the things
23    that Bob told me about Bob, his personal life, his
24    personal wants and needs and desires and his
25    relationships and bearing one's soul to someone and

ELYSE McKENNA v ROBERT F. RILEY                                Job 48239
MCKENNA, ELYSE 12/10/2025                                      258..261

Page 258

1    talking about things that are private and personal
2    can make something inherently sexual.
3  Q.   That's what friends do a lot of times, isn't it?
4  A.   It can be what friends do.
5  Q.   And the two of you were declaring your great
6    friendship for one another on multiple occasions,
7    right?
8  A.   At a point in time, we were declaring our great
9    friendship and I thought that Bob was my friend.
10 Q.   Okay. Did that stop at some point?
11 A.   Yes.
12 Q.   When?
13 A.   When he started to make me uncomfortable and when
14   I -- things became increasingly inappropriate and
15   when he became obsessive with my time, and yes, the
16   friendship did not feel like a friendship anymore.
17 Q.   When was that; when did that change from the
18   friendship to him making you uncomfortable and you
19   concluding, "This is not a friendship to me
20   anymore"?
21 A.   I feel like you've asked this question so many
22   different times, so many different ways and I've
23   said during 2020 he made me uncomfortable and that
24   his behavior would change and it would go back and
25   there's not -- I don't have a specific date.

Page 259

1  Q.   Well, you've got to give me some idea of what
2    you're talking about. You're just saying during
3    2020 it changed and went back and forth. Tell me
4    about the back and forth. When you go from being
5    friends in -- certainly in 2019, and then what was
6    the first thing that happened that caused you to,
7    like, think, "This isn't exactly what I thought it
8    was," or "I'm uncomfortable"?
9          MS. RUSSELL: Counsel, could you
10     streamline that question?
11         MS. HARDY: Sure.
12         MS. RUSSELL: It's a little all over the
13     place.
14 BY MS. HARDY:
15 Q.   When in 2020 did you first start to have questions
16   about whether Bob's conduct was that of a friend or
17   whether it was crossing the line into something
18   else?
19 A.   When I felt like he was becoming increasingly
20   obsessive of my time and increasing the frequency
21   of late-night meetings, delving into my personal
22   life and trying to talk to me about co-signing or
23   guarantying a lease for the new office and I was
24   resisting that and he was becoming very upset. All
25   of that, I don't have a specific date for you.

Page 260

1  Q.   What does becoming obsessive about your time mean?
2  A.   Becoming personally offended if I couldn't talk to
3    him on the phone; not about work.
4  Q.   Can you give me any reference in 2020 as to when
5    this relationship changed from a friendship to
6    something that was concerning to you?
7  A.   I would say after the onset of COVID, so I think
8    that's March or April of 2020. If there are -- I
9    don't have the documents, but there are documents
10   at some point about the signing of a new lease for
11   the new building. And that, I remember being a
12   time that it was feeling increasingly
13   inappropriate, but I don't have those documents in
14   front of me to give you that date.
15 Q.   How does the issue of signing a lease -- that would
16   only be in the event you became a partner in the
17   firm, right?
18 A.   No.
19         MS. RUSSELL: Object to form.
20 BY MS. HARDY:
21 Q.   Well, tell me then about the signing of the lease
22   discussions.
23 A.   He wanted me to sign the lease for the new building
24   whether I was -- that was tied to potentially
25   becoming a partner, but not only if I was a

Page 261

1    partner. And the fact that he became so personally
2    offended at someone who was at the time a
3    27-year-old co-signing or guarantying a huge
4    financial responsibility and that felt linked to
5    my career forward and my potential and my
6    employment, I think that's crossing the line. I
7    don't think --
8  Q.   How does the signing of the lease issue relate to
9    your sexual harassment charge?
10 A.   Because he wanted to be close to me and have a
11   future and have a long-term lease together and that
12   is part of -- you asked me about the obsessiveness.
13   That's part -- that's an aspect of it.
14 Q.   And is that inherently sexual to you?
15 A.   What?
16 Q.   The fact that he was attempting to get a commitment
17   out of you to be a long-term colleague of his.
18 A.   I think being as personally offended as Bob was
19   when I wouldn't do that made it inherently sexual
20   because I don't think that's a normal response.
21 Q.   So what behaviors did Bob exhibit that leads you to
22   describe him as so personally offended?
23 A.   Crying, getting upset, getting angry, being very
24   upset with me because I wouldn't do that, pleading
25   with me to change my mind; all of those behaviors.

Page 262

1 Q.   Describe a time when he was crying and the context
2      of that.
3 A.   On numerous occasions when we talked about it.
4      During that time, I believe we were on the phone
5      more than we were in person, but there would have
6      been occasional times when we were in person.
7 Q.   What timeframe are you talking about?
8 A.   Well, I told you that there's a document out there
9      of when the lease was signed for sure. I mean, you
10     guys have to have that somewhere. I believe that
11     was 2020, the end of -- I can't place it in 2020.
12        We moved into the leased building on
13     March 30th or March 31st and I believe the lease
14     was signed in the end of 2020, but I think it was
15     being definitely negotiated in the end of fall,
16     winter 2020.
17 Q.  On how many occasions are you claiming Bob cried on
18     the phone?
19 A.  I don't have a specific number of occasions.
20 Q.  And it was all over you not signing a lease that he
21     cried?
22 A.  He felt betrayed because he -- as he described
23     it -- that I was going to be there and that we were
24     going to have a firm and -- yes.
25 Q.  So the end of 2020, you're talking about the lease,

Page 263

1      he's wanting you to sign as an indication that
2      you're going to be committing to the firm for the
3      future, you're refusing, and he becomes very upset
4      with you, is that --
5 A.   Yes.
6 Q.   What did he do -- you described crying. What else
7      did he do that exhibited to you that he was very
8      upset with you?
9 A.   He was angry with me and he would retaliate against
10     me with the hockey client by causing -- by taking
11     it out on me by either burying me in work or
12     leaving me out of conversations or -- he was very
13     mad and...
14 Q.  How did he express his anger?
15 A.  By telling me he was mad.
16 Q.  What did he say; what were his words?
17 A.  I don't have a quote for you from five years ago.
18 Q.  Characterize them.
19 A.  Disappointed, that he felt betrayed. I think I've
20     already said those words, so I don't...
21 Q.  Okay. Anything else that indicated he was upset
22     about you not signing the lease?
23 A.  Well, he likened it to back when Bill Hurley was
24     going to leave Dye Sweeney (ph) with him when he
25     started his firm and at the last minute Bill Hurley

Page 264

1      backed out and it was a betrayal to Bob, and then
2      Bill eventually obviously joined him, but he talked
3      about it like that, that he felt like he was alone.
4      And also, my understanding during that time, based
5      on what Bob told me, Bill wasn't willing to co-sign
6      the lease or guarantee his additional time there
7      and so Bob felt like it was going to be on him
8      entirely and he was upset about it.
9 Q.   Okay. And how does that connect to your sexual
10     harassment claim?
11 A.   I think I've already answered that multiple times.
12 Q.   Just that he was wanting you to be a bigger part of
13     the firm than you wanted to be?
14 A.   Being as upset as he was about it, if I'm just an
15     associate and I'm working at the firm, and in
16     conjunction with all of his other behaviors and
17     actions is a part of my sexual harassment claim.
18 Q.   I'm not seeing the connection between being upset
19     about you not signing the lease to something
20     sexual.
21 A.   Okay. I don't know that I --
22 Q.   You can't explain it any further than you have?
23 A.   I feel like I've explained the same thing many
24     different times, so when someone is that upset --
25     I've never heard of a boss being that upset and

Page 265

1      taking it that personally that a 27-year-old isn't
2      willing to sign an over million-dollar lease. I
3      don't -- and getting -- and retaliating against
4      someone at work. What is the need for that? I
5      never had previously said I would sign a lease.
6 Q.   But whether it's appropriate or not appropriate
7      doesn't make it sexual.
8 A.   Well, and I've said multiple times, in conjunction
9      with all of his other behaviors, it felt sexual.
10        MS. RUSSELL: Counsel, her claims aren't
11     just for sexual harassment, it's also retaliation.
12        MS. HARDY: Well, I'm focused on the
13     sexual harassment in this testimony.
14        MS. RUSSELL: That's fine, but you're
15     conflating allegations and saying --
16        MS. HARDY: No.
17        MS. RUSSELL: -- that her allegations of
18     what would be retaliation have to be inherently
19     sexual.
20        MS. HARDY: Well, that's improper, plus
21     you're just misunderstanding what's going on here.
22        MS. RUSSELL: I'm not misunderstanding,
23     I'm just stating --
24        MS. HARDY: I'm not asking for her to
25     comment on her retaliation claim at the moment.

Page 266

1    I'm trying to get through the --
2           MS. RUSSELL:  No, but you're taking her
3    retaliation allegations and you're characterizing
4    them as harassment allegations.
5           MS. HARDY:  Then she shouldn't be
6    mentioning something that's strictly retaliation in
7    response to a question about sexual harassment.
8           MS. RUSSELL:  She already testified that
9    it's cumulative.  It's cumulative.  You're
10   isolating out these things to knock them down.
11          MS. HARDY:  Okay.
12          MS. RUSSELL:  We have about ten minutes
13   to when you wanted to take a break.
14          (Marked for identification:
15          Deposition Exhibit No. 37.)
16          MS. HARDY:  So let's look at Exhibit
17   No. 37.  It's Bates stamped RH1924 through 26 and
18   it purports to be email -- or text exchange, I'm
19   sorry -- between Mr. Riley and Elyse McKenna.
20          MS. RUSSELL:  Does plaintiff have a copy?
21          MS. HARDY:  I'm giving it to her right
22   now.
23          MS. RUSSELL:  I just wanted to verify.
24   BY MS. HARDY:
25   Q.   Okay.  Can you look at this, please?  Is this the

Page 267

1    document you're referring to of the text with a
2    scantily clad person?
3    A.   Yes.
4    Q.   Okay.
5    A.   From ultrafilms.com.  This photo doesn't show that
6    it's from ultrafilms.com, but -- oh, it is in
7    there -- ultrafilms.com in the bottom left-hand
8    corner, yes.
9    Q.   And that's what -- you're objecting to the photo on
10   1925?
11   A.   Well, objecting --
12          MS. RUSSELL:  I don't think she's
13   objecting.
14          THE WITNESS:  That's the scantily clad
15   photograph.
16   BY MS. HARDY:
17   Q.   And that's the one you're referring to as part of
18   your list of inherently sexual acts that support
19   your sexual harassment claim?
20   A.   Yes.
21   Q.   Okay.  So a couple things here.  Did you read this
22   before you jumped to that conclusion?
23   A.   I did read it.
24   Q.   Okay.  And you understand that that photo was sent
25   to Bob by Larry Rosenstock?

Page 268

1    A.   I understand that Bob says that Larry Rosenstock
2    sent him that photo as a solicitation -- per Bob's
3    message, a solicitation to his daughter to
4    participate in transgender pornography.
5    Q.   Okay.  Do you have a reason to question Bob's
6    representation?
7    A.   I don't believe that that is the truth based on --
8    yes, I have reason to question it.
9    Q.   Based on what?
10   A.   It's not my understanding that Larry Rosenstock
11   sent him a photo of that for transgender
12   pornography.
13          MS. GORDON:  I didn't hear.  Would you
14   please repeat that?  It's not your understanding
15   that what?
16          THE WITNESS:  Bob sent him a photograph
17   -- or that Larry sent Bob that photograph for
18   transgender pornography for solicitation porn.
19   BY MS. HARDY:
20   Q.   So did you talk to Larry Rosenstock?
21   A.   Not directly, no.
22   Q.   Did you hear that Larry Rosenstock denied sending
23   it to him through a third person?
24   A.   I talked to -- it would be shocking to me if Larry
25   Rosenstock sent this to Bob.

Page 269

1    Q.   So you're assuming that Larry Rosenstock did not
2    send it to Bob; is that correct?
3    A.   It was not included in the article that is being
4    sent here.  There's nothing here about transgender
5    pornography.
6    Q.   There's nothing about transgender issues in the
7    article?
8    A.   I didn't say that.
9    Q.   Okay.  You're just saying that you did not see the
10   photo contained in the article?
11   A.   Correct.  And the article isn't about transgender
12   pornography.
13   Q.   Well, it's about transgender issues and how people
14   describe transgender people, right?
15   A.   Well, everything that people say about transgender
16   people is not related to pornography, just like we
17   can talk about women and it --
18   Q.   Well, anyway, let's go back to the photo on 1925.
19          You are contending that Bob Riley is not
20   being truthful when he said it came from Larry
21   Rosenstock, but you don't have anything to base
22   that on other than your speculation, correct?
23          MS. RUSSELL:  Objection.
24          THE WITNESS:  I talked to people who knew
25   about this article and were shocked that Larry

Page 270

1  Rosenstock would be soliciting anyone to --
2  about -- soliciting his daughter about transgender
3  pornography.
4         MS. HARDY:  It doesn't say that in this.
5         MS. RUSSELL:  Yes, it does.
6         MS. HARDY:  You just said that Larry was
7  soliciting his own daughter and that's not what
8  this says.
9         MS. RUSSELL:  It says it on 1926.
10        THE WITNESS:  "Larry also sent the first
11  image, a solicitation to his daughter to
12  participate in transgender pornography."
13        MS. HARDY:  No, that's not what it says.
14  It says it's a solicitation to his daughter to
15  participate, not that Larry was -- Larry sent it
16  along indicating, "Somebody has solicited my
17  daughter to participate in transgender
18  pornography."
19        MS. RUSSELL:  She read it verbatim.
20        THE WITNESS:  I said exactly what it
21  says.  "A solicitation to his daughter to
22  participate in transgender pornography."
23        MS. RUSSELL:  I'm objecting to this
24  because this is speculation.
25        MS. HARDY:  Look, it says, "Larry also

Page 271

1  sent the first image - a solicitation to his
2  daughter to participate in transgender
3  pornography."
4         THE WITNESS:  We're saying the same
5  thing; I just said that, yes.
6         MS. RUSSELL:  Verbatim.
7  BY MS. HARDY:
8  Q.   Bob is not saying in that text that Larry solicited
9  from his daughter.  Is that how you're reading it?
10        MS. RUSSELL:  Objection.
11        THE WITNESS:  I would ask Bob what he's
12  saying.  I'm not going to testify as to what Bob's
13  saying.  I quoted this, a solicitation to
14  his daughter to --
15        MS. RUSSELL:  Your client can answer
16  questions about this in his dep on Monday about his
17  intent.  We don't have to speculate.
18  BY MS. HARDY:
19  Q.   The date of this is April 30, 2023.  You don't work
20  for Riley or Hurley, do you?
21  A.   No.
22  Q.   Okay.  You worked for OMP at that point?
23  A.   Correct.
24  Q.   All right.  And you're still claiming this is
25  related to you being sexually harassed while an

Page 272

1  employee of Riley & Hurley?
2         MS. RUSSELL:  Objection.
3         THE WITNESS:  You asked me a list of the
4  sexual -- inherently sexual conduct and I told you
5  it was cumulative, all of it together, and I gave
6  you a list.
7         MS. HARDY:  Okay.  Let's take a break.
8         VIDEOGRAPHER:  Off the record at
9  4:01 p.m.
10        (Whereupon a break was taken
11         from 4:01 p.m. to 4:19 p.m.)
12        VIDEOGRAPHER:  Back on the record at
13  4:19 p.m.
14  BY MS. HARDY:
15  Q.   If the attempts to kiss you on the cheek were
16  inherently sexual in your mind and offensive, why
17  did you not even make reference to them in your
18  380-some paragraph complaint that you drafted and
19  filed pro se with the court?
20        MS. RUSSELL:  Objection.  That's not
21  the operative complaint.  It's not relevant.  It's
22  not.
23        MS. HARDY:  That is just a mind-boggling
24  comment.
25        MS. RUSSELL:  It's not.  It will be

Page 273

1  excluded on MIL.  I've argued this with J&J.  Go
2  ahead.  If you want to do facts from a prior
3  complaint, it's not admissible.
4         MS. HARDY:  Do you understand it's a
5  verified complaint when she signs it and files it
6  with the court?
7         MS. RUSSELL:  Yeah, and then you had an
8  amended complaint, which now becomes the operative
9  complaint.
10        MS. HARDY:  Okay.  You can stay with that
11  view.
12        Read the question back, please, and
13  please respond.
14        (Whereupon the question was read
15         back by the court reporter.)
16        MS. RUSSELL:  Same objection.
17        THE WITNESS:  I did not include in my
18  complaint every single thing that I found to be
19  objectionable about Bob and I know that you guys
20  think it's overly long, but now it's accused of not
21  being long enough, I don't know where you're at
22  with it, but it didn't -- that drafting of that
23  complaint took a long time and it went through many
24  iterations, so at one point it was in there and
25  then it wasn't.  I don't...

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
274..277

Page 274

1 BY MS. HARDY:
2 Q.   Is that because the attempted kisses were so
3      innocuous that you didn't even think of them at
4      that time as sexual in nature?
5           MS. RUSSELL:  Objection.
6           THE WITNESS:  No.
7           MS. RUSSELL:  She's already answered
8      questions about these kisses.
9 BY MS. HARDY:
10 Q.   So when you're drafting that long a complaint,
11      trying to include every possible detail, how did
12      you forget to mention that there was an attempted
13      kiss?
14           MS. RUSSELL:  Objection.  Argumentative.
15           THE WITNESS:  I didn't include every
16      possible detail and it wasn't forgetting to mention
17      that there was an attempted kiss.
18 BY MS. HARDY:
19 Q.   Okay.  It just didn't make like the top couple
20      hundred list?
21           MS. RUSSELL:  Objection.
22           THE WITNESS:  The top couple hundred
23      list?  I don't understand what that means.
24           MS. HARDY:  Well, you've got 300 -- do
25      you know precisely?

Page 275

1           MR. DAVIS:  No.  300 plus.
2           MS. HARDY:  300 plus --
3           MS. RUSSELL:  Tom, good for you.
4           MS. HARDY:  -- and it didn't make the
5      list.  And that's the best answer you can provide?
6           THE WITNESS:  I included things in that
7      complaint that I had specific dates for and I
8      didn't include it.  I don't -- I already said that
9      I don't have specific dates for it and I didn't
10      include that, no.
11 BY MS. HARDY:
12 Q.   You mean you only included in your original
13      complaint events you had specific dates for?
14           MS. RUSSELL:  Objection.  You represented
15      yourself; you're going to enter into
16      attorney-client privilege, attorney-client
17      privilege with herself.  Go on.
18 BY MS. HARDY:
19 Q.   Did you only include in the original complaint that
20      you drafted events you had dates for, specific
21      dates?
22           MS. RUSSELL:  You don't have to answer.
23      Go ahead.  Next question.
24           MS. HARDY:  Are you instructing her --
25           MS. RUSSELL:  I'm directing her not to

Page 276

1      answer.
2           MS. HARDY:  On what basis?
3           MS. RUSSELL:  Attorney-client privilege,
4      work product, whatever you want to pick, Liz.  She
5      was her own attorney.  You're asking about her own,
6      like, strategy of developing her complaint.  That's
7      privileged.  You don't get it.  Next question.
8           MS. HARDY:  On the list.
9           MR. DAVIS:  On the list.
10           MS. HARDY:  I've just got to --
11           MS. RUSSELL:  I love ya'll's list.  It's
12      so cute.
13           MS. HARDY:  I have to recalibrate my head
14      right there because that threw me for a loop.
15           (Marked for identification:
16           Deposition Exhibit No. 31.)
17           MS. HARDY:  Let's go to the photographs
18      that you found on Bob Riley's computer.  I'm
19      showing you Exhibit No. 31, which is Bates stamped
20      PL569 through 570.  And you produced this in
21      response to a request for all the photographs that
22      you have in your possession that you claim Bob
23      Riley took of you and had on his iPad.
24 BY MS. HARDY:
25 Q.   Is this indeed all the photos you have in your

Page 277

1      possession that you claim Bob Riley had on his
2      iPad?
3 A.   No.  Sorry, hold on.  Are you asking if this is all
4      the photos Bob Riley had on his iPad or this is all
5      the photos I have of the photos?
6 Q.   Are these all the photos you took off of Bob's
7      iPad?
8 A.   This are the photos I have of the iPad.  This is
9      complete.
10 Q.   Do you have any other photos that you have not
11      given to us that are photos that you're claiming
12      Bob Riley took of you?
13 A.   I do not have any other photos of the photos.
14 Q.   That's not the question.
15 A.   Okay.
16 Q.   Do you have any other photos that you claim Bob
17      Riley took of you?
18 A.   With his iPad or with anything?  Sorry.
19 Q.   With anything.  Just listen to the very simple
20      question.  Do you have any other photos you're
21      claiming Bob Riley took of you?
22 A.   I don't know if there's photos in discovery that he
23      took of me.
24 Q.   Do you have any photos that you claim Bob Riley --
25           MS. RUSSELL:  She's answered she doesn't

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
278..281

Page 278

1    know, counsel.
2         THE WITNESS:  These are the photos --
3    these are all the photos I took of the iPad.
4 BY MS. HARDY:
5 Q.   And those are all the photos that you are aware of
6    that you're claiming Bob Riley took of you?
7 A.   These are the photos that I know of as I sit here
8    today that Bob Riley took of me.  I saw other
9    photos on his iPad and I didn't get pictures of
10    every photo on the iPad, so I don't have more --
11 Q.   Were there other photos of you on the iPad?
12 A.   Yes.
13         MS. RUSSELL:  For the record, we've had
14    no photos produced from your iPad from what we
15    know.
16         MR. DAVIS:  What?
17         MS. HARDY:  That's not correct.
18         MR. DAVIS:  You really need to review the
19    production which you said on the phone you didn't
20    review because that is just a false statement,
21    Ms. Russell.  We produced a lot of photos that were
22    requested, so please review it again.
23 BY MS. HARDY:
24 Q.   Did you see on your photo any -- any photos of you
25    that were any different in nature than these

Page 279

1    photos?
2 A.   Different in nature how?
3 Q.   Well, you know, I mean, you've got photos of you
4    sitting in his office, you've got photos of Bob
5    apparently with fish, fishing, you've got photos of
6    you and a gentleman who I believe is your former
7    husband, Brandon, you've got a photo of you with
8    another woman and then you have more photos of you
9    in the office.
10         Why did you select these photos to take
11    off his iPad, take into your possession?
12 A.   There was no selection process and there are photos
13    of -- so first of all, just because there was a
14    whole lot of narrative that went with that
15    question, that -- there's photos of me walking away
16    in the first picture in addition to sitting across
17    from the desk.  You said there's photos of Bob with
18    a fish, but I don't know that that first person up
19    there is Bob.
20 Q.   Can you tell me who that person is?
21 A.   It doesn't look like Bob as I -- the guy holding
22    the fish up there does not -- I think has -- looks --
23    I don't think that's Bob.  Okay.
24 Q.   Let's not waste time on whether that's Bob.
25 A.   My husband is not in here anywhere, my ex-husband,

Page 280

1    so that mystifies me.
2 Q.   Who is the guy in the right-hand side of 570?
3 A.   Ron Weiner.  That's not my ex-husband.
4 Q.   Okay.  Why did you take these photos of this person
5    with the fish?
6 A.   I went to Bob's gallery on his iPad and I got two
7    quick photographs, which you have right here,
8    before someone walked into his office and I left
9    his iPad.  I saw more photographs; I did not get to
10    take photographs of those photographs.
11 Q.   Who walked into his office?
12 A.   Someone on the U of M Anderson mediation cases.
13 Q.   Well, if you thought you had a right to get on his
14    iPad and use his passcode to do so, why did you
15    think you had to rush just because someone walked
16    into his office?
17 A.   Once I saw the photographs, I was extremely
18    appalled at the photographs and I was getting out
19    of his office regardless.  I wasn't in there to
20    take pictures of every photograph of me.
21 Q.   How did you copy the photos that you did copy; how
22    did you get copies of these photos?
23 A.   I took -- this is an iPad in this picture.
24 Q.   So this is a photo of his iPad gallery; page 569
25    and 70 are copies of a page of his gallery?

Page 281

1 A.   I used my phone to take a picture of the iPad.
2    This is a picture of the iPad.
3 Q.   Okay.  You had to open the photos app to get to
4    these, correct?
5 A.   I opened the gallery -- yes, the photo app, yep.
6 Q.   Okay.  Let's go back to my earlier question.
7    There's pictures of you in the office and there's a
8    couple pictures of you doing something that appears
9    to be social.  Were there any other photos that you
10    saw on the iPad of you that were different in
11    nature?
12 A.   So there's -- you keep skipping the pictures of me
13    walking away, so there was a picture down here of
14    me walking away.
15 Q.   Well, I'm covering that as in the office.  That's a
16    picture of you leaving his office, correct?
17 A.   It's not really covering that, but okay.  And also,
18    you're not covering the -- these other pictures of
19    me are via Zoom in my home, so not in the office.
20 Q.   Which ones are in your home?  Oh, the ones --
21 A.   Where I'm wearing a pink cardigan.
22 Q.   Okay.
23 A.   I mean, that's in my home.
24 Q.   Those are Zoom?
25 A.   Yes.

Page 282

1  Q.  Okay.
2  A.  I don't know where these pictures of me came from,
3      the other -- the social event pictures.  And I saw
4      other pictures of my face so -- you want me to say
5      if it's the same nature.  They were pictures of me.
6  Q.  Okay.  Were there any pictures that were sexual?
7  A.  Of me?
8  Q.  Uh-hum.
9  A.  They were pictures like this.
10 Q.  Okay.  They were all pictures like this, meaning
11     like 569 and 570, right?
12         MS. RUSSELL:  Objection.
13         THE WITNESS:  Which I think you want me
14     to say aren't sexual even though I've said the
15     taking of the pictures, to me, is inherently
16     sexual, so they were pictures like this.
17 BY MS. HARDY:
18 Q.  Okay.  So the taking of a picture of you dressed in
19     work clothes as you choose to dress for a
20     particular day of work that's at issue here is
21     sexual in nature?
22 A.  When you don't tell them about it?
23         MS. RUSSELL:  Is there a question there?
24         MS. HARDY:  Would you please stop --
25     you're interrupting her.  She's just answered --

Page 283

1          MS. RUSSELL:  Ask a question.  Object to
2      the form to your question.
3          MS. HARDY:  I did ask a question.
4          THE WITNESS:  What's the question?
5          MS. HARDY:  Read it back, please.
6      (Whereupon the question was read
7      back by the court reporter.)
8          MS. RUSSELL:  That's a statement.
9          MR. DAVIS:  That's literally question.
10         MS. HARDY:  There's a question mark at
11     the end.
12         MR. DAVIS:  There's a question mark on
13     the realtime that you're looking at, Ms. Russell.
14         MS. RUSSELL:  You can say a statement and
15     put a question mark at the end of it.
16         MS. HARDY:  Let me rephrase it and please
17     let your client answer without jumping into the
18     middle.
19         MS. RUSSELL:  That's fine.  I'm just
20     asking you to phrase your questions properly.
21         MS. HARDY:  Let's look at page 569.
22 BY MS. HARDY:
23 Q.  The pictures of you in 569 are sexual in nature in
24     your view?
25 A.  The collection of having that many photographs of

Page 284

1      someone that they don't know about is sexual in
2      nature to me, yes.
3  Q.  Okay.  And is the picture of you walking out of the
4      office somehow more offensive than you sitting --
5          MS. RUSSELL:  I'm sorry, does Tom
6      represent you?  This has been an ongoing thing.
7      Excuse me.
8          MS. GORDON:  She's not --
9          MS. RUSSELL:  Mr. Riley -- you just asked
10     Mr. Riley's counsel to come over and speak with
11     you.
12         MS. GORDON:  We're not talking --
13         MS. HARDY:  Off the record.
14         THE REPORTER:  Are we going off?
15         MS. RUSSELL:  No, no, no.  Stay on the
16     record.
17         MS. HARDY:  No, off the record.
18         THE REPORTER:  I can't go off --
19         MS. RUSSELL:  This is a dispute amongst
20     the parties on whether or not you have a joint
21     defense agreement.  You have denied it and you've
22     avoided answering it in discovery requests.  I
23     have -- you guys have avoided answering it.  I've
24     asked directly about whether or not you have
25     produced things that have to do with third-party

Page 285

1  subpoenas and you haven't given it to us.
2          MR. DAVIS:  I don't know, Ms. Russell --
3          MS. RUSSELL:  We can go off the record
4  now, but I want all that on the record.  Are you
5  good with going off the record?  It's your time.
6          MS. HARDY:  I object to you engaging in
7  your ongoing disputes about discovery on this
8  deposition record.
9          MS. RUSSELL:  This isn't a discovery --
10 this is not a discovery dispute.  This is a matter
11 of whether or not you have a joint defense
12 agreement, which comes down to whether or not
13 you want to bifurcate this trial.  You're
14 saying that you are individual defendants.  You
15 are representing to the court that you are
16 individual defendants and yet you are co-counsel
17 and --
18         MR. DAVIS:  You are not an attorney that
19 -- you don't even have a Michigan law license, so
20 don't -- I'm not going to take a lecture from you
21 on how the joint defense --
22         MS. RUSSELL:  I'm not lecturing.
23         MR. DAVIS:  Yeah, you're trying to and
24 you're doing a poor job of it, but whether or not
25 we're joint defendants and get bifurcation has

Page 286

1 nothing to do with what a joint defense agreement
2 is. And if you read -- again, read what's actually
3 produced to you, you'll see when we raise a joint
4 defense privilege on privileged documents,
5 Ms. Russell. So again, your failure to actually
6 review the documents is not my problem, that's your
7 problem, okay?
8 So we can now continue the deposition and
9 you can go read Michigan law -- I'll send you the
10 case if you'd like -- about how joint defense
11 privilege works instead of wasting our time, okay?
12 Learn Michigan law if you're going to practice in
13 Michigan.
14 MS. GORDON: It wouldn't matter anyway,
15 just very quickly. I mean --
16 MR. DAVIS: It sure doesn't.
17 MS. GORDON: We can talk to Tom at any
18 time and my client can talk to Tom at any time.
19 It's none of your business.
20 MS. RUSSELL: This doesn't come down to
21 confidentiality, this comes down to whether or not
22 -- you all want to take this to trial separately as
23 separate -- you have stated that you want to
24 bifurcate --
25 MS. GORDON: This is --

Page 287

1 MR. DAVIS: This has nothing to do with
2 joint defense --
3 MS. GORDON: This is wasting time.
4 MR. DAVIS: You're wasting time and you
5 don't know the law.
6 MS. GORDON: I'm sorry I interrupted.
7 MR. DAVIS: You do not know the law, so
8 why don't you go educate yourself before you waste
9 our time at the deposition, okay?
10 You've done this -- what, 20 issues that
11 you've had ruled against you because you don't know
12 the law? And it's going to continue if you don't
13 do your job as a lawyer and learn the law. She was
14 doing better pro se than you are doing as her
15 lawyer now.
16 MS. RUSSELL: No, that is so not true.
17 MR. DAVIS: That is actually very true
18 but --
19 MS. RUSSELL: I appreciate your opinion,
20 but that's not the truth.
21 MR. DAVIS: Okay. I'm sure Ms. McKenna
22 probably disagrees, but we'll go ahead.
23 MS. RUSSELL: Ms. McKenna agrees with me,
24 but go ahead.
25 MR. DAVIS: We'll see.

Page 288

1 BY MS. HARDY:
2 Q. Did you find it somehow more offensive that a photo
3 was taken of you walking out of the office than the
4 other photos where you're facing Mr. Riley? You've
5 mentioned it several times, so that's why I'm
6 asking.
7 A. I find them all to be offensive, but yes, I find
8 that to be more offensive.
9 Q. And why is that?
10 A. Because I am walking away and there's no need to
11 have a picture of the back of me or any -- there's
12 no need to have any of these pictures and Bob has
13 indicated that there's a need to have the pictures
14 because he can't see me, but I'm not sure why he
15 needs photographs of me walking away or in any
16 other situation. There's no way -- and I couldn't
17 in that -- yeah, yes, I find it to be more
18 offensive.
19 Q. Okay. Let's go to 570, the ones with -- what's his
20 name again, Richard?
21 A. Ron Weiner.
22 Q. Ron Weiner. And who is the woman on the left-hand
23 side?
24 A. Megan Bonanni.
25 Q. All right. Is there -- do you know how Mr. Riley

Page 289

1 got these photos?
2 A. I don't recall as I sit here today.
3 Q. Are you suggesting he did something improper to
4 obtain these photos?
5 A. I don't know if he got them from social media. I
6 don't know where he got them.
7 MS. RUSSELL: Objection to your last
8 question.
9 THE WITNESS: Ms. Hardy, are we done with
10 the photos?
11 BY MS. HARDY:
12 Q. For the record, when I was asking you about the
13 original complaint that you drafted and failed to
14 mention kissing, it was a 435-paragraph complaint
15 and kissing still did not -- there wasn't room in
16 there for a reference to the attempted kisses?
17 A. I never said that. Are you asking me if there was
18 room or not?
19 Q. Yeah.
20 A. I didn't say there wasn't room. You know, I really
21 do -- I love that spin that you've got going on,
22 but that's not what I said.
23 Q. Okay. You just forgot?
24 A. I didn't say that either.
25 Q. You didn't think it was important enough?

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
290..293

Page 290

1  A.   We can go back to what I said.
2  Q.   I still don't understand what you said.
3  A.   I said that I put things in the complaint where I
4        had dates for them.
5  Q.   And that's the only --
6  A.   I don't think I need to say anything more.
7  Q.   Okay.  Well, let me follow up on that.  So you put
8        a whole lot of allegations in your original
9        complaint for which there are no dates yet -- so
10       that obviously wasn't the criteria as to what went
11       in and what didn't go in.
12 A.   You're telling me there's no dates for things --
13            MS. RUSSELL:  No, she's trying to get
14       into your strategy of putting up the original
15       complaint.  She's not answering that.  Same
16       objection.  Move on.
17 BY MS. HARDY:
18 Q.   All right.  So who drafted the original complaint
19       with you, Jared and --
20            MS. RUSSELL:  No.  Same objection.  Move
21       on.  You're not -- first of all, she's already
22       answered about this.  Asked and answered two times.
23       Second of all, anymore details about what went on
24       to drafting the complaint is attorney-client
25       privilege.

Page 291

1            MS. HARDY:  I want to make my record.  So
2        you're instructing her not to answer a question
3        about the role Jared Smith played in drafting the
4        original complaint; is that correct?
5            MS. RUSSELL:  If that's the question, you
6        can answer that question, sure.
7            THE WITNESS:  I feel like I've already
8        answered this question.
9            MS. HARDY:  Answer the question.  What
10       role did Jared Smith --
11           MS. RUSSELL:  So on that basis,
12       objection, asked and answered, but go ahead and
13       answer again.
14           THE WITNESS:  Amanda and Jared helped me
15       write the complaint.
16 BY MS. HARDY:
17 Q.   Do you think that's responsive to my question?
18 A.   Yes.
19 Q.   Do you really?
20 A.   Yes, I do.
21 Q.   My question was, what role did Jared Smith play in
22       helping you draft the complaint?  To answer that he
23       helped to draft the complaint is not responsive, so
24       let's try again.
25           What role did he play in helping you draft

Page 292

1        the complaint?
2  A.   I dis --
3            MS. RUSSELL:  No, that's a different
4        question, Ms. Hardy.  Objection.  You're not to
5        answer that.  That's attorney-client privilege.
6            MS. HARDY:  You're instructing her not to
7        answer?
8            MS. RUSSELL:  I'm instructing her not to
9        answer.  Put it on the list.
10 BY MS. HARDY:
11 Q.   Was Jared Smith your attorney?  We've already been
12       over this, you said no, he wasn't representing you,
13       but are you now claiming he was your attorney?
14 A.   You have gone between whether I was represented,
15       whether someone -- we've accepted that Matt Besser
16       was consulting and providing consulting advice and
17       Amanda and Jared provided consulting advice, so
18       that's --
19 Q.   Did you have an attorney-client relationship with
20       Jared Smith at the time he assisted in drafting the
21       original complaint?
22 A.   He provided consulting, yes, I --
23 Q.   Did you have an attorney-client relationship?  The
24       fact that he's a friend --
25           MS. RUSSELL:  She just answered yes.

Page 293

1            MS. HARDY:  -- or the fact that he's a
2        lawyer does not mean you had an attorney-client
3        relationship.
4            THE WITNESS:  I consulted him and Amanda
5        for legal advice about the drafting of my
6        complaint.
7  BY MS. HARDY:
8  Q.   Did anyone else assist in drafting the original
9        complaint?
10 A.   I don't recall anyone else that assisted.  I did
11       ask my ex-husband to read the complaint, so yes, he
12       read the complaint.
13 Q.   Did he make any contributions to the substance of
14       the complaint?
15           MS. RUSSELL:  Objection.  You don't have
16       to answer that because you were your own attorney.
17           MS. HARDY:  I'm just confused.  Why can't
18       she say whether or not Brandon --
19           MS. RUSSELL:  It is litigation strategy.
20           MR. DAVIS:  Communications with a
21       non-lawyer who is not your client?  That is a
22       frivolous -- we'll just put it on the list.
23       There's no reason to argue about it.  This is just
24       frivolous and it's contrary to the Court's order.
25       The Court has been clear on this, Ms. Russell.

Page 294

1      You're just digging a hole.
2  BY MS. HARDY:
3  Q.   When you were an employee of the Riley & Hurley law
4      firm, did you engage in protected activity with
5      respect to anything that happened in the law firm?
6  A.   What do you mean by that?
7  Q.   Did you make a complaint about your civil rights
8      being violated at any point in time when you were
9      employed by the Riley & Hurley law firm?
10 A.   I told Bob before I had put in my notice that I was
11      uncomfortable, so I don't...
12 Q.   When did you make that statement to Bob?
13 A.   In 2021.
14 Q.   When?
15 A.   As he became -- as the conduct worsened throughout
16      2020 and went back and forth -- we already talked
17      about this back and forth -- and then got worse
18      during 2021, I definitely talked to him about it in
19      2021.
20 Q.   Can you give me any idea when you talked to Bob and
21      said you were "uncomfortable"?
22 A.   In 2021; that's the idea I can give you.
23 Q.   That's the best you can do?
24 A.   As I sit here today, that's the best I can do.
25 Q.   Okay.  And what did you tell him other than using

Page 295

1      the word uncomfortable, if anything?
2  A.   Well, I had also previously --
3           MS. RUSSELL:  Object to form.
4           MS. HARDY:  Stay with my question.
5  BY MS. HARDY:
6  Q.   When you told him you were uncomfortable, what else
7      did you say?
8  A.   I'm trying to give you your answer to your
9      question, Ms. Hardy, so let's just -- I want us to
10      get there.
11           In 2020, when the -- the date of the lease
12      situation where I'm not signing the lease, that
13      also made me uncomfortable, and I believe that was
14      in the end of 2020, but I don't have a date for
15      that, so I told him at that time as well, that I
16      thought that that was ridiculous that that was
17      being asked of me and that it was this upsetting
18      that I wouldn't do it, et cetera, and that that
19      made me uncomfortable.  So I had that conversation
20      in 2020.
21 Q.   All right.
22 A.   And then I had additional conversations in 2021
23      with Bob about being uncomfortable and how much
24      time he was taking and being uncomfortable with
25      that.

Page 296

1  Q.   Okay.  Did you say anything beyond, "I'm
2      uncomfortable with the time you're taking"?
3  A.   I think I might have used the word inappropriate.
4  Q.   Okay.  Is that --
5  A.   We're talking --
6  Q.   Is that the best you can recall?
7  A.   As I sit here today, that's the best I can recall.
8  Q.   All right.  Are you claiming that any conduct that
9      you consider retaliatory was taken against you for
10      saying you were uncomfortable with signing the
11      lease or that you were uncomfortable with the time
12      he was taking?
13 A.   Well, when he -- yes, but when he -- whenever I
14      would try to increase distance from Bob or not
15      reciprocate the cards, there was always a
16      retaliatory action after that with regard to the
17      hockey client and so that was all building up
18      throughout 2020, and when I wouldn't sign the
19      lease, that also came to a head with the hockey
20      client, and yes, when I tried to push back and
21      increase distance from Bob, there was retaliation
22      as a result of that.
23 Q.   What are you claiming occurred that you're
24      describing as retaliation?
25 A.   How he portrayed me to his hockey client, his

Page 297

1      conversations about me to other members of the firm
2      and various different things that occurred when I
3      was at Riley & Hurley.
4  Q.   What are those various other things?
5  A.   Okay.  Causing drama with other staff at the
6      office, making up things, having conversation with
7      Rick Groffsky about me and my lack of skill so that
8      Rick Groffsky doesn't feel like he's missing out on
9      something, talking negatively about me to his --
10      not only the union hockey client, but the other
11      clients that Bob had who were all -- who were
12      primarily hockey related.
13 Q.   Anything else?
14 A.   I believe that -- the negative conversations about me
15      with other people in the legal field.
16 Q.   This is all during the time that you're employed at
17      Riley & Hurley?
18 A.   During and after.
19 Q.   No, I've asked you to restrict it to when you were
20      employed at Riley & Hurley.
21 A.   Okay.  But the list also -- it applies to when I
22      was at Riley & Hurley and it also applies to after.
23 Q.   I know, but I didn't want you to get into other
24      matters.
25 A.   Okay.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
298..301

Page 298

1  Q.  I want a list about what happened that you consider
2      retaliatory when you were still at Riley & Hurley.
3  A.  Yep.  And this is that.  That's the list as I sit
4      here today that I can remember.
5  Q.  All right.  So what did he do while you were still
6      an employee at Riley & Hurley that relates to
7      saying negative things to the hockey client?
8  A.  He said negative things to the hockey client.
9  Q.  When and to whom?
10 A.  To the executive director of the hockey union, as I
11     understand it, and to his -- I don't know the names
12     of the hockey clients; I don't remember the names.
13     He has other hockey clients.  If I reviewed a
14     list...
15 Q.  How did you acquire the understanding that he said
16     negative things about you?
17 A.  Because he made it clear that, "Oh, well, he won't
18     get me the same work opportunities with the hockey
19     client," so he was -- and then he would talk
20     negatively to the hockey client and he would do it
21     on our Zoom calls in front of me, so it was pretty
22     clear.
23 Q.  What do you believe he said that was negative about
24     you, untrue and negative about you?
25 A.  One day I'm capable of doing something and he's

Page 299

1      happy to have me take on the responsibility and
2      the next day I'm not responding and we're not
3      reciprocating his text messages with the warmth
4      that he wants or the cards that he wants and the
5      next day I'm not able to do it and he's saying
6      that, so that's...
7  Q.  Is there anything else that he said to the hockey
8      client that you thought was retaliatory?
9  A.  That I wasn't capable when I was previously capable
10     and comments about my capability.  And not just --
11     you're saying hockey client and I'm saying hockey
12     clients; you know, there's more than just one.
13 Q.  I'm talking hockey clients generically.
14 A.  Okay.  I just want to make sure we're talking
15     about --
16 Q.  Did he specifically say you were capable of doing
17     something?
18 A.  It was previously my responsibility and then he
19     would take it and take control of it and say it
20     was because he needed to take it back over and it
21     was directly after times when I was increasing
22     distance with Bob or saying, "That's making me
23     uncomfortable."
24 Q.  Okay.
25 A.  And then --

Page 300

1  Q.  You don't know of anything specific he said to the
2      hockey client that suggested you were incapable?
3  A.  I think I just told you, like certain projects that
4      he said I could do and then he would get on the
5      phone and then say I couldn't, so I don't have a
6      list of projects for you.
7  Q.  So that's the complete description of what you
8      think he said to the hockey clients that was
9      suggesting you weren't capable?
10 A.  If I had a list of the hockey clients and the work
11     that was done, I could give you a list.
12 Q.  What do you believe he said to firm members that
13     was retaliatory?
14 A.  It's my understanding that he said negative things
15     to Bill and Kelly and Marilyn and Sonia about me
16     and I don't know about Allison.
17 Q.  What do you believe he said to Bill and how did you
18     acquire that understanding?
19 A.  I believe he said things about my capabilities,
20     made comments about how I had less capability than
21     he thought I had, and I came to understand that
22     from the other members of the office, mainly Kelly
23     and Sonia.
24 Q.  So Kelly and Sonia told you that they believed he
25     had said that to Bill?

Page 301

1  A.  Yes, and that Bill had told them he had said that.
2  Q.  Okay.  What do you believe he said to Marilyn that
3      reflected on your capabilities --
4          MS. RUSSELL:  Objection.
5          MS. HARDY:  -- or was retaliatory?
6          THE WITNESS:  Similar comments.  And
7      those were communicated to me by Kelly and Sonia.
8  BY MS. HARDY:
9  Q.  All right.  So is the gist of what you believe he
10     said to Bill, Marilyn, Kelly and Sonia that was
11     negative about you was that he didn't believe you
12     had all the capabilities that he had assumed you
13     had?
14 A.  Yes, in direct response to me increasing distance
15     and then it would change.  The other thing -- so
16     sorry, there's another.
17         He also told Kelly and Bill that I was
18     saying negative things about them to him being --
19     saying negative things about Kelly to Bob and
20     talked about that with Kelly and said things to
21     Kelly that I hadn't said about Kelly and that felt
22     retaliatory as well and it was in direct response
23     to me wanting to increase distance from Bob.
24 Q.  How do you know it was in direct response to that?
25 A.  It came immediately after that.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
302..305

Page 302

1  Q.   Okay.  So when was this timeframe that this
2       happened?  If it was immediately after you saying
3       that you didn't want to work as much with Bob and
4       that he was intruding upon your time and that
5       immediately after this happened, what timeframe are
6       we talking about?
7  A.   In 2020 and 2021.
8  Q.   End of 2020, beginning of 2021?
9  A.   Yes, and throughout -- 2021 until I left.
10 Q.   All right.
11 A.   But I would also say it happened earlier in 2020
12      than just the end, but...
13 Q.   What kind of drama do you believe he created for
14      retaliatory reasons?
15 A.   He would talk to Kelly about things I hadn't said
16      about Kelly; I think that creates drama.  And he
17      would tell me that Bill was upset with me about
18      something and then I would go to Bill and Bill
19      would say that wasn't the truth.  I think that's
20      creating drama.
21 Q.   Give me an example of what he attributed to Bill
22      that Bill denied being true.
23 A.   I recall a specific example of vacation time, Bob
24      being -- Bob communicating that Bill was upset
25      about me taking vacation time, and when I talked to

Page 303

1       Bill, he denied that that was an issue for him and
2       he doesn't need it in the calendar to be asked
3       about it.  It was not...
4  Q.   Okay.  Let's turn to the communications that you
5       claim Bob Riley had with either clients or people
6       in the legal community that disparaged you.  And
7       I'm not referring to any particular timeframe, I'm
8       talking about through today's date.
9            So let's start with the list.  What
10      things -- disparaging things do you claim Bob Riley
11      said and to whom?
12 A.   Okay.  Well, I'm not going to be able to give you a
13      full list of everything that's ever been --
14 Q.   How are we going to get a list?
15 A.   I know you know that it's unrealistic for there to
16      be someone that can just sit here and spout out
17      every single thing that's ever happened over six
18      years, so I'm going to give you the best list I can
19      and I'm going to say that's as I recall today and
20      there are -- I can't say that that list is complete
21      without looking through documents and looking
22      through other things.
23 Q.   What else would you look through to complete the
24      list?
25 A.   I would look through text messages, I would look at

Page 304

1       these notes that accompany poems, I would look
2       through -- and obviously also, as you know, like
3       your memory gets jogged by earlier things, just
4       like earlier I forgot about Ramar & Paradiso and I
5       was like, "Wait a second, Ramar & Paradiso."  So
6       you're asking me to make a list as it can be
7       exhaustive and I'm telling you --
8  Q.   Let's get the best list you can give me.  How did
9       Bob disparage you with clients and colleagues in
10      the legal community?
11 A.   He spoke negatively about me and about my
12      capabilities.
13 Q.   What do you claim he said that was disparaging?
14 A.   That I wasn't as good of an attorney as he thought,
15      that I wasn't capable of taking on cases.
16 Q.   What else?
17 A.   That I was -- at some point that I was having a
18      mental breakdown.
19 Q.   Anything else?
20 A.   I'm sure I'll think of more.
21 Q.   Who do you claim he told that you're not as good of
22      an attorney as he thought you would be?
23 A.   I believe he said that to Rick Groffsky.
24 Q.   Anyone else?
25 A.   I believe he spoke about me to Brian McKeen

Page 305

1       negatively.  I don't know if it was -- I can't know
2       exactly what Bob said to Brian McKeen or any of
3       these people, I can know what the impression was
4       they gave me, so it's probably a better question
5       for Bob.
6  Q.   Anyone else?
7  A.   I believe he talked about me to Amber Thomas
8       Wagenschutz.
9  Q.   The claims rep?
10 A.   Yep, at Beaumont at the time.  I don't know where
11      she is now or if she's still there.
12 Q.   Anyone else?
13 A.   Larry Rosenstock.
14 Q.   Anyone else?
15 A.   At some point, he talked about me to David
16      Ottenwess.
17 Q.   To who?
18 A.   David Ottenwess.
19 Q.   How's that last name spelled?
20 A.   O-T-T-E-N-W-E-S-S.
21 Q.   Is he a lawyer?
22 A.   I think he has his own law firm, Ottenwess Law,
23      maybe Ottenwess and some other people, law.
24           MS. RUSSELL:  Do we need to take a break?
25      It's okay.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
306..309

Page 306

1    MS. MacKENZIE:  I do not need a break.
2    Thank you.
3        THE WITNESS:  That was the one on the tip
4    of my tongue.  There was literally someone I was
5    just about to say, but I just lost it.  I think
6    it's going to come back.  Eric Tucciarone is
7    another person.
8 BY MS. HARDY:
9 Q.   Last name, how is it spelled?
10 A.   T-U-C-C-I-A-R-O-N-E.
11 Q.   Who is he with?
12 A.   Foley Baron Metzger & Juip.  I believe he also
13   talked about me, from my understanding, negatively
14   about me to Jules, Donna and Emily.
15 Q.   Anyone else?
16 A.   Those are what I can recall as -- I'll keep
17   thinking.
18 Q.   Did any of the individuals you've listed tell you
19   that Bob had said something negative about you?
20 A.   Yes.
21 Q.   Who?
22 A.   Can you help me out with the list again?  I mean,
23   Eric Tucciarone, yes.
24 Q.   So Rick, Brian, Amber, Larry, David, Eric.  That's
25   your list?

Page 307

1 A.   Rick, yes.
2 Q.   Okay.  Anyone else?  I'm sorry, Jules, Donna,
3   Emily.
4 A.   Sorry, hold on.  I'm sorry, I misspoke.  Rick, I
5   don't recall; Brian, yes.  Sorry.  I'm going down
6   this list with you at the same time.  Rick, Brian.
7   Can you hit me --
8 Q.   Amber, Larry, David, Eric, Jules, Donna, Emily.
9 A.   Now you're moving too fast for me.  Larry -- who is
10   next?
11 Q.   Amber.
12 A.   Amber.  I don't believe -- no, I don't believe
13   Amber said that to me.  That's something that came
14   indirectly through somebody else.
15 Q.   Okay.  Larry?
16 A.   Larry made a comment to me after I left that
17   implied that Bob wasn't happy with how I left.
18 Q.   Okay.  David?
19 A.   What was that?  Sorry.
20 Q.   David?
21 A.   Oh, Ottenwess.  I heard about that through someone
22   else.
23 Q.   Okay.  So hearsay?
24 A.   You can legally characterize it however you'd like.
25   I didn't talk to David Ottenwess directly.

Page 308

1 Q.   Eric?
2 A.   Yes, Eric told me.
3 Q.   Okay.  And Jules?
4 A.   Yes, Jules told me.
5 Q.   Donna?
6 A.   Donna did not tell me that.
7 Q.   Emily?
8 A.   Yes, Emily.
9 Q.   Okay.  What did Rick tell you that Robert Riley had
10   said about you that's disparaging?
11 A.   Rick, I said I don't recall for and then I said
12   yes.  We flipped those around.
13       But with regard to Rick, I knew that Bob
14   had said to him that he wasn't going -- I wasn't as
15   skilled of an attorney as he thought I was.  We
16   talked about that one earlier, so I'm not -- I
17   didn't put that in this list because we already
18   talked about it, but I guess it goes in the list.
19 Q.   What did Brian tell you?
20 A.   That Bob was not happy with how I had left and
21   didn't, you know, speak so highly of me.
22 Q.   Did he tell you anything more than that?
23 A.   I don't remember the exact conversation with Brian.
24 Q.   Do you recall anything beyond he wasn't happy with
25   how you left?

Page 309

1 A.   I don't -- no, I don't recall other -- more detail.
2 Q.   What did you -- Larry, what did he tell you?
3 A.   That it was -- I think we just -- I thought we just
4   talked about Larry with regard to not being happy
5   with how I left and that it was a disappointment
6   and Bob was disappointed in me.
7 Q.   Okay.  What about Eric?
8 A.   I don't recall the exact details with Eric.
9 Q.   Do you recall anything that Eric said or that he
10   attributed to Bob that you're describing as
11   disparaging of you?
12 A.   Generally, negative -- like Bob had a generally
13   negative view of me.  That's what -- that's what
14   Eric --
15 Q.   But no details?
16 A.   I don't think Eric gave me a lot of details other
17   than that Bob was --
18 Q.   What did Jules tell you that he attributed to Bob
19   as a comment that you considered disparaging?
20 A.   That I was having a mental breakdown and that I was
21   crying at home every day in my office and that I
22   needed to get my act together and my divorce had
23   ruined my life and...
24 Q.   Jules told you that Bob said that about you?
25 A.   Yes.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
310..313

---

Page 310

1 Q.   But when you were getting divorced, you didn't even
2      work for Bob, right?
3 A.   Right, but we had a shared hockey client during
4      that time.
5 Q.   Okay. So Jules said that Bob had told him that you
6      had a "mental breakdown"?
7 A.   Correct.
8 Q.   Okay.
9 A.   And I feel like we -- I don't know if we got to
10     the -- I feel like we forgot part of this list
11     being the hockey -- he also told the same -- I'm
12     just going to -- he also told the same thing to the
13     PHPA executive director and the PHPA staff and so
14     they're in -- I don't know if they're captured in
15     any of our lists, but it's the same mental
16     breakdown.
17 Q.   I'll put them on the list.
18 A.   Okay. But I didn't know if you just wanted
19     attorneys for this.
20 Q.   No, I didn't limit it to attorneys. I said clients
21     and colleagues. I was reading from your complaint.
22 A.   Oh, okay. Clients and colleagues. Okay.
23 Q.   Anything more that Jules attributed to Bob that you
24     considered disparaging?
25 A.   No, Jules made the comment that "We keep Bob Riley

---

Page 311

1      happy in this office" and talked to me about what
2      Bob thought about mental breakdowns, so I would say
3      it's all the same theme of divorce affecting my
4      work, so yes, the mental breakdown affecting my
5      work.
6 Q.   Okay. So that covers Jules, correct?
7 A.   I'm -- for all of these, as I sit here today, yes,
8      it covers Jules. I'm trying to recall everything,
9      yes.
10 Q.   What did Emily tell you that Bob had said that is
11     disparaging in your mind?
12 A.   The same mental breakdown-type comments about the
13     divorce and the effective work product with the
14     client, the hockey client.
15 Q.   Who do you claim at the PHPA that Bob made negative
16     or disparaging comments to about you?
17 A.   Larry Landon, Heather Sherbow, I believe Lenny
18     D'Auito. I don't know how to say his last name,
19     but I can spell it for you.
20 Q.   Go ahead.
21 A.   D, and then apostrophe, A-U-I-T-O.
22 Q.   Okay. Anyone else?
23 A.   Matthew Salewski.
24 Q.   Anyone else?
25 A.   Not at the PHPA specifically, but employer

---

Page 312

1      representatives who are the board of -- like for
2      the union, we have an executive committee that's
3      made of player representatives and so there were
4      some players.
5 Q.   Who were the players?
6 A.   Brett Sutter.
7 Q.   Who else, if anyone?
8 A.   I'd have to look through a list of the players'
9      names to jog. There's someone I can picture, but I
10     can't place his name right now, but I will think
11     about it.
12 Q.   All right. What do you claim he said to Larry that
13     was disparaging and how did you acquire that
14     knowledge?
15 A.   That I was having a mental breakdown and that I
16     couldn't do the work and that I was suffering with
17     my divorce and crying all the time, et cetera.
18 Q.   All right.
19 A.   Larry called me to check on me because of what Bob
20     had said and then also Heather and Matt and
21     Lenny -- Heather called and checked on me, also
22     told me that Bob was saying this negative stuff to
23     Larry about me, including he shouldn't give me work
24     because I can't handle it for certain things, and
25     Lenny checked on me because of the things that Bob

---

Page 313

1      had said about me, and Matt Salewski the same
2      thing, checked on me.
3 Q.   So with all the PHPA names that you provided, the
4      allegation that you're describing as disparaging is
5      references to your mental state when you were going
6      through your divorce and whether it was impacting
7      your work?
8 A.   That it was impacting my work and that I couldn't
9      do the work because I was going through a divorce
10     and that I was crying all the time and -- yes.
11 Q.   You're making the claim that he said -- that was
12     the same message that he gave to all these
13     different people on the list from the PHPA?
14 A.   Yes, that it was -- I don't think I follow your
15     question.
16 Q.   Well, I'm just trying to short-circuit going
17     through each and every one, but if it's all -- if
18     you're making the same allegation with respect to
19     Larry, Heather, Lenny and Matt, that they all were
20     told by Bob about you having a mental breakdown and
21     not being able to do your work as a result of the
22     divorce, I want to know if it's the same for all of
23     these people.
24 A.   I would say it's the same for Heather, Lenny and
25     Matt, and that it's like a Venn diagram with Larry

---

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
314..317

Page 314

1    because there was additional stuff with Larry about
2    not being able to do my work not just because of
3    the divorce, so his is kind of a little bit
4    broader, but I would say it's fair to loop in the
5    other three to the same bucket.
6  Q.   And what else do you believe he said to Larry?
7  A.   That I wasn't -- that I wasn't capable of doing
8    certain projects that I previously was capable of
9    doing.
10 Q.   Such as?  What were those?
11 A.   Like attending -- trying to protect attorney-client
12   privilege here so I'll speak about this vaguely --
13   attending a disciplinary hearing, for example.  And
14   I can't give you a specific example because it
15   would be attorney-client privilege, but that would
16   be an example.
17 Q.   Okay.  By the way, did you ever get the contract
18   settled for the union?
19 A.   For which contract?
20       MS. RUSSELL:  Objection.  Isn't that
21   attorney-client privilege?  It's your client.
22       MS. HARDY:  That's not --
23       THE WITNESS:  I didn't -- she's asking
24   about -- are you asking about CBA negotiations?
25       MS. HARDY:  Yes.  Is there a contract

Page 315

1    yet?
2        THE WITNESS:  There are -- neither one
3    has a contract -- a signed contract yet.
4        MS. HARDY:  Okay.
5        THE WITNESS:  That's common knowledge and
6    I'm not going to go into more detail because that's
7    attorney-client privilege.
8        MS. HARDY:  I just asked if they had a
9    contract.
10       MS. RUSSELL:  I just want to make sure.
11   It's her client.
12 BY MS. HARDY:
13 Q.   All right.  So have you described everything that
14   you claim Robert Riley said that was disparaging to
15   clients or colleagues in the legal community?
16 A.   As I said before, I'm obviously limited with what I
17   can recall as I sit here today, and as I sit here
18   today, that's what I can recall.
19 Q.   All right.  What do you claim Bob Riley shared
20   with OMP about you that was inappropriate; what
21   information do you claim Bob Riley shared with
22   them?  And I'm referring to Jules, Don and Emily --
23   and/or Emily.
24 A.   Jules, Donna --
25       MS. RUSSELL:  Object to form.

Page 316

1        THE WITNESS:  Sorry, Jules, Donna and
2    Emily specifically and not other people at OMP?  I
3    just want to make sure I understand the question.
4        MS. HARDY:  Yep, yep.
5        THE WITNESS:  I think sharing false
6    statements about my mental health and how much I'm
7    crying and whether I'm able to do work, et cetera,
8    is inappropriate.
9  BY MS. HARDY:
10 Q.   Okay.  Is there anything else?
11 A.   Those are the conversations that I'm aware of are
12   related to my work and my mental health status and
13   my divorce and whether I was capable of doing that
14   work.  I wasn't privy to the conversations, but
15   that's...
16 Q.   Did Bob allegedly make comments about your
17   capability apart from the time period when you were
18   going through the divorce?
19 A.   Can you ask that another way?
20 Q.   Well, you distinguished before with Larry Landon
21   that Bob had made comments about you being
22   incapable at the time of the divorce and making
23   comments generally about you not being capable of
24   handling certain assignments.
25 A.   Sure.

Page 317

1  Q.   Okay.  So with respect to what Bob allegedly shared
2    with OMP about you not being capable, was it
3    broader than the time period when you're going
4    through a divorce or was it just limited to that
5    timeframe and to the impact the divorce was having
6    on you?
7        MS. RUSSELL:  Object to form.
8        THE WITNESS:  I don't know the extent of
9    Bob's conversations with those individuals, but my
10   understanding is that -- like the first I heard of
11   the conversations was in the timeframe that I was
12   divorced, but it was related and unrelated to my
13   divorce, but it was in that timeframe.
14       So it's a little complicated because the
15   divorce hearing kept getting delayed because of a
16   judicial schedule, so it's like the divorce
17   timeframe is like eight months long, so I'm trying
18   to answer your question, but that's a pretty broad
19   timeframe and I know you don't like those, so I'm
20   trying to work with you here.
21 BY MS. HARDY:
22 Q.   Who at OMP told you that Bob Riley was making
23   disparaging comments about you?
24 A.   Jules told that to me and Emily told me that Bob
25   was talking about me to her.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
318..321

Page 318

1 Q.   All right.  And both of them, their comments were
2      restricted to your capabilities as a result of the
3      emotional trauma of your divorce?
4 A.   And I recall comments about my work for the hockey
5      client.  I don't know that it was always tied to a
6      comment about the divorce, but certainly the
7      divorce comments and the capabilities.
8 Q.   What was shared with you by anyone at OMP that
9      related to comments Bob had allegedly made about
10     your work for the hockey client?
11 A.  What I've just indicated about --
12 Q.  I know you've talked about the time period and I
13     understand it's not like a month long, it was
14     longer than that --
15 A.  Yeah.
16 Q.  -- and going through the divorce and the impact
17     that you claim Bob felt that was having on your
18     ability to perform.
19 A.  Uh-hum.
20 Q.  Beyond that, did somebody at OMP say that Bob had
21     made some comment that reflected generally on your
22     capabilities as a lawyer?
23 A.  Yes, Emily and Jules.  That's what I'm trying to --
24 Q.  So what did Emily and Jules say in that regard?
25 A.  Well, I've already said that Jules said that I

Page 319

1      wasn't capable -- as capable as doing as good --
2      able to do the same work product for the hockey
3      client, so I'm -- am I not understanding what
4      you're asking?  I'm sorry.
5 Q.   I'm trying to get outside of the impact of the
6      divorce on your performance.
7 A.   Yes, okay.  I understand that those conversations
8      were both ones that involved my divorce and ones
9      that didn't involve my divorce.  That's what I'm
10     trying to tell you.
11 Q.  Tell me specifically what you were told that Bob
12     had said.
13 A.  That I wasn't doing the same good work for the
14     client.  And I understood that sometimes to be
15     related in the same conversation as divorce and
16     not.
17 Q.  Were they ever more specific than, "Bob said you
18     weren't doing the same good work as you had been
19     before for the PHPA client"?
20 A.  Yes, they were more specific than that, but as I'm
21     sitting here, I don't have specifics for you
22     without looking at -- like looking at a list of a
23     bunch of hockey projects and working through a
24     list, so I don't --
25 Q.  You didn't put those details in any of your various

Page 320

1      complaints, and sitting here, this is your time in
2      a deposition to tell us about it, and now you're
3      saying you have to go look at various documents
4      related to hockey projects to recall what these
5      disparaging things are that were said that you make
6      general reference to in your complaint?
7 A.   I can't tell if you think my complaint is too long
8      or too short.
9         MS. RUSSELL:  I object to all of this.
10        THE WITNESS:  Here's the thing --
11        MS. HARDY:  It's way too long and it's
12     lacking in critical detail.
13        THE WITNESS:  Well, you want some more
14     detail --
15        MS. RUSSELL:  Objection.  Argumentative.
16        THE WITNESS:  Okay.  I can't tell you --
17     regardless of whether I went and looked for the
18     projects, I can't -- I'm not allowed to talk to you
19     about hockey projects that are specific to
20     projects, so I don't --
21        MS. HARDY:  I want to know what Bob said
22     that you're making a legal claim about that is
23     identified as disparaging.
24        THE WITNESS:  I think I've already told
25     you what Bob said though and Jules then afterwards

Page 321

1      came to my office and said, "I was talking to Bob
2      about you and Bob said you're having a mental
3      breakdown and you're crying every day at home."
4         MS. HARDY:  You have said that.  I don't
5      need to cover that.
6         THE WITNESS:  Okay.
7         MS. HARDY:  I'm trying to find out if
8      there's anything else he said that wasn't related
9      to the impact of the divorce on your work.
10        THE WITNESS:  Right, and he -- other
11     times, when he talked to Jules, would talk about my
12     work product.
13 BY MS. HARDY:
14 Q.  Can you be more specific than that?
15 A.  No, I can't.
16 Q.  What Bob allegedly said?
17 A.  I think Bob and Jules are the ones that had the
18     conversation about it, so I can only --
19 Q.  You're making the legal claim about it.
20 A.  Because Jules came into my office afterward and
21     said, "Bob's complaining about you," so Jules
22     should know the details.
23 Q.  So you didn't get the details from Jules then?
24 A.  I gave you the details that I remember and I've
25     said so many times that that's what I remember.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
322..325

Page 322

1  Q.   All right.  So what information are you claiming
2       that OMP shared with Bob about you that was
3       inappropriate?
4  A.   Across all of time?
5  Q.   Yes.
6  A.   What's our timeframe here?
7  Q.   All of time.
8  A.   Okay.  Well, I know now from reviewing discovery
9       that they talked about my bonus in the past, that
10      Donna had conversation with Bob about bonuses that
11      I had received in the past.
12 Q.   Why is that inappropriate?
13 A.   When I had already told Donna about the behavior
14      that Bob had that made me uncomfortable, I don't
15      know that you should increase the conver -- you
16      should increase the distance or decrease the
17      distance between someone who sexually harassed
18      someone and your employee and let them into their
19      aspects of their personal life about their bonus
20      numbers, but I also think the fact that someone at
21      OMP told Bob that I was getting divorced.  That's
22      not something that I believe is appropriate to
23      tell someone that you know sexually harassed
24      someone.
25 Q.   Okay.  Is there anything else that you claim OMP

Page 323

1       shared with Bob that's inappropriate?
2  A.   I think --
3  Q.   The bonus.  Anything else?
4  A.   Anything about my personal life that was shared
5       with Bob would be inappropriate.
6  Q.   But what are you talking about?
7  A.   I just said my divorce.
8  Q.   Okay.  Anything else?
9  A.   My mental health probably shouldn't be talked about
10      with someone who sexually harassed somebody.
11      Anything personal.  Mental health is obviously a
12      topic, someone's financial compensation is a topic
13      and my work product is a topic and my divorce,
14      yes.
15 Q.   Okay.  Does that cover everything that you can
16      recall sitting here today?
17 A.   As I can recall.  If I think of more, I'll let you
18      know.
19 Q.   All right.  So tell me what actions occurred that
20      you consider stalking with respect to Bob Riley.
21      What did he do?
22 A.   Definitely what he did outside my door in Orlando,
23      trying to talk to me and not listening when I
24      didn't want to talk to him, I would say, would be
25      stalking.

Page 324

1       MS. RUSSELL:  Counsel, you have about
2  40 minutes left in the dep.  I want to check in.
3  Are you okay or do you want to keep going?
4       THE WITNESS:  I don't know that I'm going
5  to make the full 40 minutes but --
6       MS. RUSSELL:  Check in at 20?
7       THE WITNESS:  Yeah.  I'll try to make it
8  the full 40.
9       MS. HARDY:  Let's try and do the full 40.
10      THE WITNESS:  I'm --
11      MS. RUSSELL:  We've been going an hour is
12 my point.
13      MS. HARDY:  I know, but if she needs a
14 break because she needs to go to the bathroom, you
15 would expect the witness to bring that up rather
16 than you.
17      MS. RUSSELL:  I'm her attorney; I do that
18 in any dep that I defend.  I always check in with
19 my clients and say, "How are you doing?"  She has a
20 doctor note that says she needs to take frequent
21 breaks and I'm checking in.
22      MS. HARDY:  She's fully capable of
23 speaking up if she --
24      MS. RUSSELL:  Which is why I asked, but
25 you've also asked for a heads up.

Page 325

1       MS. HARDY:  Okay.  We're going to take a
2  break right now and then we'll come back and do --
3       MS. RUSSELL:  What's the basis for the
4  break?  She just said that she could keep going.
5       MS. HARDY:  My client needs a break.
6       MS. RUSSELL:  Okay.  That's fine.  We're
7  happy to accommodate your client.
8       VIDEOGRAPHER:  Off the record at
9  5:20 p.m.
10      (Whereupon a break was taken
11       from 5:20 p.m. to 5:33 p.m.)
12      VIDEOGRAPHER:  Back on the record at
13 5:33 p.m.
14 BY MS. HARDY:
15 Q.   The Orlando conference that you're referring to was
16      in June 2023, correct?
17 A.   Correct.
18 Q.   Okay.  And that's where the stalking incidents
19      occurred?
20 A.   Yes.
21 Q.   Okay.  And it was Orlando, Florida, correct?
22 A.   Yes, Orlando, Florida.
23 Q.   All right.  And the first one was Bob trying to
24      talk to you outside -- from outside your door when
25      you were in your hotel room?

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
326..329

Page 326

1   A.   The first?  I'm sorry, the first --
2   Q.   When I asked you to list what incidents occurred
3        that you consider stalking, that's what you said,
4        "Trying to talk to me when outside my hotel room."
5   A.   Yes, not leaving me alone when I was asking him to
6        leave me alone and he was outside my hotel room
7        door.  You said the first and I don't --
8   Q.   Well, that's just the first thing you mentioned.
9   A.   Yes, I think we were also talking -- we were
10       talking about Orlando in general and I also said I
11       thought the meeting when we were in the shared
12       conference room suite was also inappropriate when
13       he said that the hockey client was going to show up
14       and never ended up showing up, but technically, in
15       the time sequence of events, that meeting came
16       before the thing we just talked about.
17  Q.   The --
18  A.   The first versus second is throwing me because I --
19       yeah.
20  Q.   All right.  Let's just finish up on the trying to
21       talk to you when he's outside your hotel door room.
22       He's standing in the hallway?
23  A.   At some points he was standing in the hallway and
24       at other points he was standing inside the shared
25       conference room suite door.  So there were two

Page 327

1        doors entering my hotel room.
2   Q.   And those doors that divided your hotel room
3        were -- was it a door in between the conference
4        room and the hotel room or between the two
5        different rooms?
6   A.   There was a hotel room -- there's Bob's hotel room,
7        Bob has a door into a conference room that he can
8        access and then there's a door from the conference
9        room into my hotel room.
10  Q.   So the conference room sits in between the two?
11  A.   Yes, and he can get into the conference room and I
12       can get into the conference room.
13  Q.   So one time he's standing outside the hotel -- your
14       hotel room from inside the conference room and the
15       other time he's in the hallway?
16  A.   Correct.
17  Q.   And were those both the same evening or same time?
18  A.   The incident that we're talking about where I was
19       asking him to leave me alone, those were both the
20       same evening.
21  Q.   Okay.  And was he trying to call you on the phone
22       or was he trying to talk to you actually through
23       the wall?
24  A.   Both.
25  Q.   Okay.  And how long did this go on?

Page 328

1   A.   I would have to look at phone records to tell you,
2        but he was -- a couple hours of this.
3   Q.   Couple hours of trying to reach you by phone?  He
4        wasn't standing in the hall for a couple hours
5        trying to talk to you through your door, was he?
6   A.   He was standing in the doorway for awhile; I
7        wouldn't say he was standing in the hallway for a
8        couple hours, and then he -- I don't have an exact
9        recollection of how long he was in the hallway --
10       and then he was in the shared conference room
11       suite.
12  Q.   How long did he spend in the hallway roughly --
13  A.   I don't --
14  Q.   -- trying to talk to you through your closed door?
15  A.   I don't think -- he was out there for longer than
16       just the time he was trying to talk to me for.  I
17       don't have --
18  Q.   How long was he trying to talk to you either
19       through your closed door to the hallway or through
20       the closed door into the shared --
21  A.   I don't have a -- I don't recall a specific number
22       of minutes.
23  Q.   Do you have phone records from that night?
24  A.   I think that phone records exist from that night,
25       yes.  I think Verizon would still have those phone

Page 329

1        records.
2   Q.   All right.  Have you seen those phone records in
3        the course of this litigation?
4   A.   I don't think that I have.
5   Q.   Do you recall what Bob said as to why he wanted to
6        talk to you?
7   A.   Sorry, I want to go back one second.  Phone
8        records, meaning call logs.  Because there would be
9        text messages and I have seen text messages during
10       this timeframe, so --
11  Q.   So there's text messages and then -- and when he
12       tried to call you on the phone --
13  A.   That would be in a phone record that you would get
14       from a phone company.  I'm just clarifying.
15  Q.   Have you seen any phone records from that evening?
16  A.   I don't think that I have.
17  Q.   What day was --
18  A.   That I recall.
19  Q.   The conference started on the -- I believe on the
20       19th of June.  What day did this issue occur with
21       respect to him trying to talk to you when you were
22       in your hotel room?
23  A.   I don't have a specific recollection of the date,
24       but I believe that it was the Thursday of that week
25       wherever -- the Wednesday or Thursday of that week;

Page 330

1    however that would fall on the dates, I don't know.
2  Q.    Okay.  So did it start on a Monday?
3  A.    I believe the -- as I recall, I think we flew down
4    there on Sunday.  And when you say "did it start,"
5    what did you mean?
6  Q.    Start of the meeting.
7  A.    We have some internal meetings that occurred before
8    the meeting starts, so those internal meetings
9    happen Monday, but the meeting doesn't --
10    conferences don't start until Tuesday.
11  Q.    So if you were to try to establish the phone
12    records that he was calling you and how often he
13    called you and how long he was on the phone, what
14    day would you be looking at?
15  A.    Yes, I just told you I believe it was Wednesday or
16    Thursday of that week, but I don't have date -- I
17    don't have a calendar in front of me to know what
18    that date falls on.
19  Q.    But Wednesday or Thursday is not exact enough?
20  A.    I would need to see what meetings fell on each date
21    and look at the conference schedule.
22  Q.    So what did you say to Bob when he tried to talk to
23    you?
24  A.    To leave me alone.
25  Q.    And you would hang up?

Page 331

1  A.    I was a -- well, we were talking through the door, so
2    there's that conversation happening, and I don't
3    believe -- I might have answered his phone --
4    answered his phone call and said leave me alone and
5    hung up or I said that through the door; I can't
6    tell you, I don't know which one.
7  Q.    All right.  The shared conference room situation
8    where you stayed on later than you thought you
9    should stay on, that was the first event in that
10    week that you considered stalking?
11  A.    Stayed on?  Sorry.
12  Q.    Well, what happened with the shared conference room
13    and the meeting in it?  I thought he delayed
14    closing the meeting down and compelled you to stay
15    later than you wanted.
16  A.    He instructed me that the client wanted to meet
17    with us in the shared conference room starting in
18    the evening around 8:00 p.m., I believe, but I'm
19    not final -- I'm not swearing to 8:00 p.m. exactly,
20    but that timeframe -- and told me that the client
21    would be coming to that meeting and the client did
22    not come to that meeting.
23         And Bob cried during that meeting and
24    talked about the photographs during the meeting and
25    my email to him and how it ruined his life and how

Page 332

1    he characterized it that he ruined my life, so I
2    ruined his.  And that's what he said to me during
3    that meeting and talked about how much it upset him
4    and how my email was devastating to him.
5  Q.    Why didn't you get up and leave?
6  A.    Because I thought my -- the client was going to get
7    there and I was like, Okay, the client has
8    instructed that we need to have this meeting and I
9    was --
10  Q.    Was that Larry Landon?
11  A.    Yes.
12  Q.    Why didn't you call Larry Landon and say, "Are you
13    coming?"
14  A.    I believe we texted Larry Landon or asked him,
15    "Hey, what's your status?"  And we were -- we had
16    previously been informed that he was coming, so I
17    don't --
18  Q.    Okay.  So you don't have any basis for contending
19    that Bob -- that this was all a ruse and that Larry
20    Landon had not intended to come, do you?
21  A.    Well, I have no --
22         MS. RUSSELL:  Objection.
23         THE WITNESS:  I have no understanding now
24    of why -- that Larry Landon was going -- ever going
25    to come and then didn't end up showing up.

Page 333

1  BY MS. HARDY:
2  Q.    So you don't have any facts one way or another as
3    to whether Larry intended to come, and if he did
4    intend to come, why he didn't come; you just don't
5    know any of those details; is that correct?
6  A.    Well, are you asking me if I have facts to indicate
7    that he did intend to come or he didn't intend to
8    come, either way?
9  Q.    That he never intended to come.  Do you have any
10    facts to support that claim?
11  A.    Larry certainly didn't say, "I'm sorry for missing
12    the meeting that I scheduled," or "Hey, we've got
13    to reschedule that," or "We have things to talk
14    about," so there's no indication that there was
15    supposed to be a meeting from Larry.
16  Q.    Other than that, do you have any reason to think
17    that he never intended to come in the first place?
18  A.    That it seemed to be a meeting that Bob was having
19    with me to discuss the pictures and the emails.
20  Q.    You've answered my question to the best of your
21    ability?
22  A.    As I sit here today, I don't recall other
23    documentation about this meeting.
24  Q.    Okay.  How long were you in the meeting?
25  A.    I don't know.

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
334..337

---

Page 334

1 Q.   It started at 8:00 p.m., you don't know when it
2      ended?
3 A.   I do not know when it ended.
4 Q.   Okay.
5 A.   It felt --
6 Q.   What else, if anything, did Bob do that you
7      consider stalking?
8 A.   The event we just talked about when he was outside
9      my door, that was a different night.
10 Q.  I understand.  Both in Orlando, both that same week
11     as the annual meeting?
12 A.  Yes.
13 Q.  Okay.  Is there anything other than trying to talk
14     to you from outside your hotel room and having a
15     meeting with you in the conference room which you
16     were expecting Larry Landon to come to, but he
17     never did, and then Bob talked about the issues
18     that you two were having?
19         MS. RUSSELL:  Object to form.
20         MS. HARDY:  Anything other than those two
21     events?
22         THE WITNESS:  I disagree with your
23     characterization about Bob trying to talk to me
24     outside the hotel room because that's not what made
25     it stalking to me and that's not what I've said.

Page 335

1 BY MS. HARDY:
2 Q.   What made it stalking to you?
3 A.   Being asked to be left alone and not being left
4      alone.  Sorry.
5 Q.   I'm glad you added that.
6         Anything else that you consider stalking?
7 A.   I would have to -- that's what stands out to me as
8      I'm here today.
9 Q.   Did having him stand outside -- let me back up.
10        Did you have your hotel door room locked?
11 A.  Yes.
12 Q.  Okay.  So he couldn't get in unless you let him in,
13     right?
14 A.  Correct.
15 Q.  Okay.  And was the door between your room and the
16     shared conference room locked?
17 A.  Yes.
18 Q.  Okay.  So he couldn't get in again unless you let
19     him in?
20 A.  Yes.
21 Q.  So were you in fear that you could be in physical
22     harm or that he could somehow do something to you
23     other than annoy you when he was standing outside
24     your hotel room trying to get your attention?
25 A.  Yes, because at some point I get to leave my hotel

Page 336

1      room, and if someone is outside your hotel room, I
2      was in physical -- I had fear of physically being
3      unable to leave a hotel room, yes.
4 Q.   Did you call anybody associated with the PHPA and
5      ask them to, you know, get Bob's attention and
6      distract him and tell him that, you know, like
7      leave you alone or --
8 A.   No.
9 Q.   No.  Did you do anything to engage in self-help?
10 A.  Yes, I called the hotline for help.
11 Q.  What hotline did you call?
12 A.  I believe it was the suicide hotline.
13 Q.  You called the suicide hotline with respect to
14     which of these two evenings?
15 A.  The night he was outside my hotel room door.
16 Q.  Okay.  Did you get a response from the suicide
17     hotline?
18 A.  I talked to someone on the phone.
19 Q.  What did you tell them?
20 A.  What has happening and that I felt like I was in
21     danger and that I wanted to -- that I was thinking
22     about killing myself to get out of the situation.
23 Q.  Okay.  Did you ask for security to be sent up?
24 A.  I did not.  Are you talking -- did I ask for
25     security from the suicide hotline or in general?

Page 337

1 Q.   No, security from the hotel to come up and tell Bob
2      Riley he needed to leave you alone.
3 A.   I did not ask for that.  I did not think that would
4      be safe.  And when I talked to the suicide hotline,
5      I also talked to them about telling the police and
6      we talked about the fact that that would probably
7      put me in increased danger.
8 Q.   What would have been wrong with having security
9      tell them to stop bothering somebody who was in a
10     locked hotel room?
11 A.  The ramifications on my career and my relationship
12     with the client and all of that would have been
13     wrong with that.
14 Q.  Okay.  All right.  So you have a conspiracy claim
15     related to what you allege was a conspiracy between
16     OMP and Bob Riley or Riley & Hurley to allow you to
17     be sexually harassed and stalked.  What facts do you
18     you have that support that claim?
19 A.  I understand they were communicating about me and
20     sharing my personal -- we have, I guess, discussed
21     the personal details being shared back and forth.
22 Q.  So let's assume for the sake of this discussion
23     that Jules and Bob or Emily and Bob discussed your
24     mental status during your divorce.  Let's also
25     assume that Bob made comments or Jules made

Page 338

1    comments about your performance as a lawyer and
2    whether it was going downhill.  Do you think that
3    means they had a conspiracy for you to be sexually
4    harassed?
5         MS. RUSSELL:  Object to form.
6         THE WITNESS:  I think, as I've stated
7    before, giving the personal details of someone's
8    life who says that they were sexually harassed to
9    the person that sexually harassed them decreases
10   the distance between those two people and allows
11   the sexual harasser into the sexual harassee's --
12   for lack of a better way to put it -- life, so I
13   don't know what you're -- that allows Bob into my
14   life.
15        MS. HARDY:  All right.
16        THE WITNESS:  That allows Bob to know
17   things about me that I'm not sharing with Bob.
18   That allows Bob to know personal details about me.
19   BY MS. HARDY:
20   Q.   Are you alleging there is an agreement between
21   someone at OMP and Bob Riley to condone you being
22   sexually harassed?
23        MS. RUSSELL:  Object to form.
24        THE WITNESS:  They continued to tell Bob
25   about my personal details.  I knew that I was

Page 339

1    uncomfortable with Bob Riley, so I don't know -- do
2    I think they have a written agreement?  I don't
3    know.
4    BY MS. HARDY:
5    Q.   Do you think they had a verbal agreement that,
6    "We're going to let Bob Riley do things to Elyse
7    McKenna that are considered sexually harassing"?
8    A.   They certainly were agreeing to --
9         MS. RUSSELL:  Objection.
10        THE WITNESS:  -- provide the information
11   to Bob and continuing to provide the information to
12   Bob, so that's an agreement.
13   BY MS. HARDY:
14   Q.   "The information," meaning information about your
15   work and how --
16   A.   About my divorce, about my personal life.
17   Q.   Who are you claiming was providing that
18   information?  Before you said Bob Riley was telling
19   OMP about your divorce and your mental breakdown.
20   A.   But I also told you that someone told Bob Riley --
21   at OMP, someone told Bob Riley that I was getting
22   divorced because I didn't tell Bob Riley that
23   myself.
24   Q.   Are you assuming someone at OMP told Bob Riley?
25   A.   Bob Riley talked about talking about it with Jules

Page 340

1    and Donna and Emily, all three of them, so they
2    definitely talked about it.
3    Q.   What did Bob Riley tell you he had talked to Jules
4    about concerning the fact that you were going to be
5    getting divorced?
6    A.   That he heard that I was getting divorced.
7    Q.   Okay.  And anything more between Bob and Jules on
8    that issue?
9         MS. RUSSELL:  Objection.
10        THE WITNESS:  The timing of when I was
11   getting divorced and --
12   BY MS. HARDY:
13   Q.   Those are just facts, right?
14   A.   My mental health, sure.
15   Q.   Well, what did they tell you Bob had said about
16   your mental health?
17   A.   We've already talked about that, that I was having
18   a mental breakdown, that --
19   Q.   I know, but before you told me that Bob Riley had
20   told them that he noticed in the context of your
21   PHPA work that you were having emotional problems
22   which he attributed to your divorce and the quality
23   of your work was falling off.  Now I'm asking you,
24   what do you claim OMP said to Bob about those
25   topics?

Page 341

1    A.   I know that Bob only became aware that I was
2    getting divorced because of what OMP told him.
3    Q.   Okay.  And that's the only thing you're attributing
4    to OMP, the fact that they shared with Bob that you
5    were in divorce proceedings?
6    A.   During all -- are we asking about every timeframe?
7    Q.   I'm asking about anything that you consider --
8    A.   A conspiracy.
9    Q.   -- part of this conspiracy claim, what it is OMP
10   told Bob, Bob told OMP, and then kind of what you
11   think they agreed upon that constitutes a
12   conspiracy.
13        So let's take it one at a time.  Other
14   than telling Bob that you'd filed for divorce, what
15   do you claim OMP told Bob that relates to your
16   conspiracy claim?
17   A.   I think they had an agreement regarding the hockey
18   client and how that was to be handled.
19        MS. GORDON:  I'm sorry, not what?
20        MS. HARDY:  The hockey client.
21        MS. GORDON:  Can you sit back?  I can't
22   see --
23        MS. RUSSELL:  How it was to be handled.
24        MS. GORDON:  I'll take it from the
25   witness.  I'm sorry, just the last part of the

ELYSE McKENNA v ROBERT F. RILEY                                       Job 48239
MCKENNA, ELYSE 12/10/2025                                              342..345

Page 342

1    sentence.
2          THE WITNESS:  And how that was to be
3    handled.
4          MS. GORDON:  How the hockey client --
5          THE WITNESS:  Yes, yes.
6          MS. GORDON:  Kimberly, when you sit
7    forward, I can't see the witness at all.
8          MS. RUSSELL:  I have to talk.  You're
9    welcome to move.
10         MS. GORDON:  I know, just while she's
11   talking.  Go ahead.  I got it.
12         MS. HARDY:  All right.
13         THE WITNESS:  Can you repeat your
14   question?
15         MS. HARDY:  Yes.
16   BY MS. HARDY:
17   Q.   I want to know what you're claiming OMP said to
18        Bob Riley that is supportive of your conspiracy
19        claim.
20   A.   Okay.  And I understand that they had agreement
21        regarding hockey and how it was to be handled and
22        discussions regarding me that are personal to me
23        that are about my -- not just my work product, but
24        specifically my divorce and my mental health and
25        things that allow Bob to have more access to my

Page 343

1    life.
2    Q.   What, other than telling Bob you filed for divorce,
3         gave him more access to your personal life?
4    A.   Having that knowledge in addition to the shared
5         hockey client work and that continued work.
6    Q.   But the shared hockey client work is not access to
7         your personal life.
8    A.   Okay.  I mean, if you're -- but Bob obviously
9         weaponized knowing that I was divorced and then
10        went and told the hockey client about it and acted
11        like I was having a mental breakdown, so it does
12        all -- it all connects to my personal life.
13   Q.   Okay.  But the conspiracy claim requires an
14        agreement between parties.
15   A.   I've already told you that clearly they agreed to
16        provide the requested information about my personal
17        life to Bob because they were providing it.
18   Q.   And the information they provided about your
19        personal life was the fact that you filed for
20        divorce?
21   A.   And other details about who I was dating and --
22   Q.   You've never mentioned that so --
23   A.   Okay, well, you're asking and I'm telling you, but
24        you're interrupting.
25   Q.   I've been going over this and over this and this is

Page 344

1    the first time that's come up.  So what other
2    details about your personal life do you claim OMP
3    shared with Bob Riley?
4    A.   My romantic relationships, including my divorce and
5         who I was dating and that I had moved and -- I
6         cannot give you a fully exhaustive list of
7         everything that was shared, but those are the
8         ones that come to mind.
9    Q.   Okay.  How did you acquire that information?
10   A.   That the -- sorry, which of that?
11   Q.   That OMP had shared information about your
12        boyfriends with Bob Riley and information about you
13        moving.
14   A.   One, because Bob acknowledged having that
15        information from OMP; and two, Sonia Mullins told
16        me that they were talking about my personal
17        details.
18   Q.   How did Sonia know that, listening in on someone's
19        conversation?
20   A.   I don't know how Sonia knows anything.  I would ask
21        Sonia.
22   Q.   Okay.  All right.  So the conspiracy claim is based
23        on the fact that OMP shared information about your
24        divorce, your mental health, how you were acting
25        during your divorce, who your boyfriends were and

Page 345

1    the fact that you had moved?
2    A.   I believe and travel as well, but I would also
3         caveat all of this with I would defer to my
4         attorneys on what -- on their basis for conspiracy
5         claim.  This is --
6    Q.   No, I need the facts from you.
7    A.   Well, you're getting the facts from me.
8          MS. HARDY:  Yeah, that's --
9          THE WITNESS:  But I'm --
10         MS. HARDY:  This is not a legal
11   discussion here.
12         THE WITNESS:  Okay, well, sometimes you
13   want to ask me --
14         MS. HARDY:  This is an inquiry into
15   facts.
16         THE WITNESS:  Sometimes you want to ask
17   me about my pro se complaint and sometimes you want
18   to ask about different complaints so --
19         MS. HARDY:  The only thing I asked you
20   about your pro se complaint is who helped you draft
21   it and why did you forget to mention that there was
22   attempted kisses.
23         THE WITNESS:  You love to characterize it
24   as me forgetting to mention.
25         MS. HARDY:  Well, you didn't mention it

Page 346

1    despite the 435 paragraphs.
2  BY MS. HARDY:
3  Q.    Okay.  The PHPA, they had some agreement about how
4       the shared client was going to be handled.  What
5       was that agreement and how does that relate to or
6       support a conspiracy claim?
7  A.   I don't have the details regarding the agreement.
8       I know that Bob talked to Jules and Donna about the
9       PHPA.
10  Q.   So what?  What does that have to do with anything
11       that's legal in nature unless you know something
12       specific that relates to a legal theory?
13  A.   What's your question?
14  Q.   So if you know nothing about what they discussed,
15       then how does it support a conspiracy claim?
16  A.   Well, if they have -- if they know that I've
17       been sexually harassed and they're conspiring with
18       the person that sexually harassed me about a
19       shared client, I think it supports a conspiracy
20       claim.
21  Q.    Well, that's just conclusory.  I want to know how
22       you know -- what facts you base the claim they're
23       conspiring together.
24            MS. RUSSELL:  Objection.  I think she's
25       asked and answered these questions.

Page 347

1  BY MS. HARDY:
2  Q.   So you think the mere fact that OMP and Bob Riley
3       talked about the details of how the shared client
4       relationship would work means that they were
5       supporting Bob Riley being able to sexually harass
6       you?
7            MS. RUSSELL:  Just as a courtesy,
8       counsel, you have 15 minutes left on the record.
9            THE WITNESS:  Yes.
10  BY MS. HARDY:
11  Q.   Okay.  Don't you think they were obligated to talk
12       about a shared client when it's a client that Bob
13       Riley represents and you represent, he's at Riley &
14       Hurley and you're at OMP; don't you think OMP had
15       some obligation to kind of figure out how that
16       shared relationship was going to work?
17            MS. RUSSELL:  Objection.
18            THE WITNESS:  I think after Bob had
19       indicated that he was stepping down from the shared
20       client, I'm not sure why continued conversations
21       about him being involved in that shared client,
22       there would be any obligation for those.
23  BY MS. HARDY:
24  Q.   Because you know that Bob Riley ended up staying
25       involved because the client wanted him to be

Page 348

1       involved?
2  A.   That's not true.
3            MS. RUSSELL:  Objection.
4  BY MS. HARDY:
5  Q.   How do you know that's not true?
6  A.   It's not what I was told.
7  Q.   By whom?
8  A.   By the client.
9  Q.   Who?
10  A.   Larry Landon.
11  Q.   What did Larry Landon allegedly tell you on that
12       issue?
13  A.   That Bob didn't want to step down.
14  Q.   Did Larry Landon tell you that he would be happy to
15       release Bob if Bob would just go away, words to
16       that effect?
17  A.   Larry Landon told me that Bob didn't want to step
18       down and Bob also later told me that Bob didn't
19       want to step down.
20  Q.   Well, maybe that's true; that doesn't mean that
21       Larry also wanted Bob to stay.  They're not
22       mutually exclusive.
23  A.   Okay.
24            MS. RUSSELL:  Objection.  Is that a
25       question?

Page 349

1            MS. HARDY:  Would you agree?
2            THE WITNESS:  That's not my understanding
3       from Larry Landon.
4  BY MS. HARDY:
5  Q.   So what did Larry Landon tell you, if anything,
6       beyond Bob did not want to step down?
7  A.   About what?
8  Q.   About why Bob continued at the PHPA, continued
9       doing work.
10  A.   Because Bob wanted to continue.
11  Q.   All right.  But you didn't discuss with Larry
12       Landon how Larry Landon felt about Bob continuing,
13       did you?
14  A.   Larry Landon told me that Bob wanted to continue,
15       so I didn't ask him, "Does that make you feel
16       upset, Larry?"  I did not have that conversation.
17  Q.   Larry Landon and you never discussed whether or not
18       Larry Landon wanted Bob to continue, did you?
19  A.   Larry Landon wanted to retire and said that Bob
20       wanted to keep going.  That's the conversation that
21       I had with Larry Landon.
22  Q.   That's not responsive to my question.  Let me
23       phrase it again.
24            Larry Landon never told you that he had no
25       problem with Bob leaving, correct?

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
350..353

Page 350

1  A.    Larry Landon represented to me that he would trust
2       me to be counsel for the PHPA.
3  Q.    So that's a totally new statement.
4  A.    Well --
5  Q.    So he told you when that he would trust you to be
6       counsel?
7  A.    That was always the intended plan when I began
8       working for Bob and then -- that was always a part
9       of the transition plan, so --
10 Q.    When did Larry Landon tell you he would trust you
11      to be sole counsel for the PHPA with Bob Riley out
12      of the picture?
13 A.    September or October of 2021, after I had had the
14      conversation -- I had sent an email to Bob and Bob
15      had had a conversation with Larry, and there's
16      emails to this effect during this time, and Bob
17      said that he was stepping down and that I would --
18      Larry was looking to contact me. So that's when
19      that conversation occurred.
20 Q.    All right. September or October 2021?
21 A.    The fall of 2021 after I had left.
22 Q.    Is that conversation by phone, by text; how did
23      that occur?
24 A.    It wouldn't have been via text; it would be via
25      phone or via Zoom.

Page 351

1  Q.    All right. And in that conversation, Larry Landon
2       told you that he would trust having you in the
3       picture as counsel for PHPA with Bob completely out
4       of the picture?
5  A.    Yes, Larry Landon represented to me that Bob had
6       told him he was stepping down and that we were
7       going to transition this and that I could be
8       counsel for the PHPA, yes, during that conversation
9       in the fall of 2021.
10 Q.    Okay. Did you share that with Bob?
11 A.    I was not talking to Bob at that point in time.
12 Q.    In 2021, you were not talking to Bob?
13 A.    Only for hockey-related matters.
14 Q.    Well, that's a hockey-related matter.
15 A.    Okay. Well, I wasn't talking to him beyond -- I
16      really wasn't even -- I was trying to not have us
17      talk at all about anything, but if a hockey project
18      required our communication, that was the scope of
19      what we communicated about.
20          MS. RUSSELL: Ten minutes, counsel.
21          THE WITNESS: I did not have a
22      conversation with Bob about Larry said XYZ at that
23      time.
24 BY MS. HARDY:
25 Q.    All right. Are there any further facts that

Page 352

1       support your conspiracy claim?
2  A.    You're asking me to make an exhaustive list and
3       I've tried to give you a list as best I can as I
4       sit here.
5  Q.    Are you alleging in connection with the conspiracy
6       claim that OMP and Riley & Hurley "aided, abetted
7       incited, compelled or coerced" someone to violate
8       the Civil Rights Act?
9  A.    Yes.
10 Q.    All right. What did they do in that regard?
11 A.    Allowed access to me as an employee. And we had
12      scheduled facilitations with Bob when I was at
13      OMP and did not have to facilitate cases with Bob
14      and was aware of the Orlando incident and
15      continued.
16 Q.    All right. So what do you think OMP should have
17      done to keep you away from Bob? I mean, do you
18      think that they should have -- that they were
19      responsible for making sure you never had any
20      contact with Bob Riley?
21          MS. RUSSELL: Object to form.
22          THE WITNESS: I certainly think they
23      shouldn't have scheduled facilitations with Bob
24      Riley on the cases that I was handling and forced
25      interactions between me and Bob Riley if they knew

Page 353

1       that he was sexually harassing me.
2  BY MS. HARDY:
3  Q.    How many cases did you facilitate with Bob Riley
4       when you were with -- when you were at OMP?
5  A.    I don't have any documents about that.
6  Q.    Can you -- was it one, two?
7  A.    Well, you were in the last deposition of me.
8  Q.    Yeah, I know. I think it was one or at most two.
9       Do you disagree with that?
10 A.    I don't think --
11          MS. RUSSELL: Objection.
12          THE WITNESS: I don't think all the
13      documents have been produced regarding all of my
14      facilitations, so I don't know how you would -- I
15      don't know how you expect me to know that.
16 BY MS. HARDY:
17 Q.    This is your claim that OMP was facilitating Bob
18      Riley sexually harassing you by requiring you to
19      mediate with him --
20 A.    Yes.
21 Q.    -- and you can't say from memory alone how many
22      times you were compelled to mediate with him?
23          MS. RUSSELL: Objection.
24          THE WITNESS: I don't have a specific
25      recollection of that. I was also talking to this

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
354..357

Page 354

1   person, talking to Bob during -- the side
2   conversation is completely distracting.
3        MS. RUSSELL:  You can pause until they're
4   done.
5        MS. GORDON:  I'm sorry?
6        MS. RUSSELL:  It's distracting the
7   witness so we're waiting for you to finish up your
8   side conversation.
9        MS. GORDON:  Well, there's no reason to
10  wait if you're asking her to respond down there.
11  Go ahead.
12  BY MS. HARDY:
13  Q.   Do you think OMP was obligated to interfere with
14  or --
15       MS. RUSSELL:  You guys are --
16       MS. HARDY:  -- somehow of going to the
17  PHPA conference in Orlando?
18       THE WITNESS:  I don't think that I was
19  able to answer the last question because of the
20  side conversation, so I think we should repeat that
21  and I should give you a full answer to that
22  before --
23       MS. HARDY:  Go back to that question,
24  please.
25       (Whereupon the question was read

Page 355

1        back by the court reporter.)
2        MS. RUSSELL:  I objected; I just want to
3   make sure.
4        THE WITNESS:  I don't have a number from
5   memory alone, but I do remember that we talked
6   about specific cases at the last deposition.  We
7   talked about case names.
8   BY MS. HARDY:
9   Q.   But you can't say whether it was one or two or five
10  or ten or -- you have no idea?
11       MS. RUSSELL:  Objection.
12       THE WITNESS:  No, because I was also
13  talking to Bob during that time about hockey stuff,
14  so my frequency or -- I understand you think that
15  it should stick out to me as a certain number, but
16  I'm also having -- there are other conversations
17  happening as well.
18  BY MS. HARDY:
19  Q.   Okay.  So you had regular contact with Bob during
20  that time concerning the PHPA, but you think it's
21  an act of sexual harassment to sit in a
22  facilitation with him and other lawyers and your
23  clients on however many occasions you did?
24  A.   So I can't agree with your characterization of
25  having frequent contact because when I first

Page 356

1   started at OMP there wasn't a lot of contact and we
2   had separate projects and we only had overlap very
3   infrequently, and then the longer that I was at
4   OMP, there was more and more hockey overlap, and
5   after the divorce, there was a lot more hockey
6   overlap and more time.  And yes, I think making
7   someone facilitate a case with someone who has
8   sexually harassed them is inappropriate.
9   Q.   You think that is sexual harassment on the part of
10  OMP?
11  A.   I think that it is certain -- I think it is
12  inappropriate, especially after the Orlando
13  conference.
14  Q.   Okay.  Oh, so it was after the Orlando conference
15  that you facilitated?
16  A.   It was both before and after.  I said the word
17  especially.
18  Q.   Are you alleging that Riley told Olsman or
19  conspired with Olsman to fire you?
20  A.   Am I alleging that?
21  Q.   Yeah.
22  A.   I believe that they met about it.
23  Q.   What makes you believe that that occurred?
24  A.   Because they were meeting on the -- I believe there
25  was a meeting between Bob and Donna on the day that

Page 357

1   Bob was confronted by counsel and the timing of
2   different meetings between Bob and Donna during
3   that time.
4   Q.   Can you be more specific as to what you're talking
5   about?
6   A.   In what regard?
7   Q.   How do you know that meetings occurred, the
8   meetings that you just referenced occurred?
9   A.   Well, I know that meetings occurred -- I know -- I
10  know that they were texting about me because it's
11  in the production about something about a silent
12  movie regarding Elyse, so I don't know -- that's in
13  the summer of 2021.  And I know that they were
14  talking about my work product and that they were
15  talking about the hockey clients, so that relates
16  to my work.
17       And then I know that there are meetings in
18  the beginning of 2024 where Bob and Donna are
19  meeting and I also know that Jules and Bob are
20  continuing to talk about me during this time and
21  about my work product.
22  Q.   How do you know in 2024, in the January, February
23  timeframe before you left OMP, that they were
24  meeting to talk about you?
25  A.   I don't -- that was what was indicated to me is

Page 358

1    that I was a topic of discussion.  Bob indicated
2    that to me.
3              MS. RUSSELL:  Two-minute warning,
4    counsel.
5    BY MS. HARDY:
6    Q.   You weren't talking to Bob in January 2024, were
7         you?
8    A.   I'm talking about the end of 2023, there's still
9         discussions with Bob.
10   Q.   That's before you tendered your resignation with
11        OMP.
12   A.   I love your characterization of that.  Before I was
13        terminated.  And I was still talking to Bob in 2024
14        because we were still working on the hockey client.
15   Q.   All right.  So let's say hypothetically that Bob
16        and OMP were talking, which would not be unusual
17        that they would have some conversation about
18        business or their profession or something.  How do
19        you know they were talking about you?
20   A.   Because Bob represented they were talking about me.
21   Q.   What did they tell you?
22   A.   That he was talking about me to Donna.
23   Q.   Did he tell you about what?
24   A.   At certain times he would tell me that Donna was
25        complaining about me, that he was trying to help

Page 359

1    me.  That was always the -- that was the major
2    theme, that Bob was trying to help me.
3    Q.   This all started -- my question, do you have any
4         proof that there is an agreement between -- strike
5         that.
6              Do you have any proof that Bob Riley told
7         Olsman or conspired with Olsman to have you fired?
8    A.   I know that they were talking about me and having
9         conversations during that time.
10   Q.   Talking about you is a very general thing.  I'm
11        asking about whether they talked about or had an
12        agreement to get you fired.
13   A.   They talked about my work product and they talked
14        about my caseload and they talked about Donna's
15        opinions of me as an attorney per what Bob said to
16        me.
17   Q.   And that's all the -- specific you can be?
18   A.   That's as specific as I can be here right now.
19   Q.   Okay.  Do you have any evidence to support an
20        accusation that OMP and Bob Riley or Riley & Hurley
21        agreed with the other to have you stalked?
22             MS. RUSSELL:  Counsel, that's time.  You
23        can go ahead and answer the question, but that's
24        it.  That's seven hours.
25             THE WITNESS:  I know that they were

Page 360

1    talking to one another during this time about me
2    and my personal life and my divorce.  I don't know
3    that there was a written agreement about agreeing
4    to let me be stalked, but I know that I went to
5    Orlando as a part of my work for the client and
6    being employed for OMP.
7              MS. HARDY:  Okay.  Well, I have been
8    notified by opposing counsel that my time is up.
9    I'm just putting you on notice that I will be
10   requesting more time because, two -- two reasons:
11   One, there's clearly documents that you have not
12   produced, I mean, so many identified on this record
13   today, including these poems and documents that
14   were called a journal before and now are called
15   like a loose collection of documents that relate to
16   allegations in this case.  There's also missing
17   text messages, LinkedIn.  I mean, the list is long.
18             Second, when you file three complaints
19   and they're all in the 360 to 400-paragraph range,
20   it's a voluminous case and it just takes more than
21   seven hours.
22             MS. RUSSELL:  You can take your request,
23   but we were all in the same hearing with the Court
24   when she said absolutely no more time for deps.
25             MR. DAVIS:  That's not what she said.  In

Page 361

1    fact, the Court earlier in the case, as the Court
2    told you to consult with your client about earlier
3    proceedings, she made very clear that any party can
4    come and request more time given the --
5              MS. RUSSELL:  She said absolutely no more
6    time.
7              MS. HARDY:  No more -- she said the deps
8    are going forward.
9              MS. RUSSELL:  No, she said absolutely no
10   more time.
11             MR. DAVIS:  There's no reason to argue.
12   It's wrong and we'll go to court.
13             MS. HARDY:  It doesn't -- it doesn't
14   matter what you and I agree to --
15             MS. RUSSELL:  She said absolutely no more
16   time.
17             MS. HARDY:  Well, if that's what you
18   think she said, you can make that argument to her.
19             MS. RUSSELL:  I will.  And my two
20   co-counsel will make that argument as well because
21   I wasn't the only one there.
22             MR. DAVIS:  Well, she knows what she
23   meant so --
24             MS. GORDON:  Before we close out the
25   record, I'm going to echo Ms. Hardy's point.  I

Page 362

1  have some cross examination questions --
2       MS. RUSSELL:  You have no more time.
3  You're up.
4       MS. GORDON:  I was talking.
5       MS. RUSSELL:  You guys have already
6  admitted that you're jointly --
7       MS. GORDON:  Excuse me.  I was --
8       MS. RUSSELL:  You don't get to do this.
9  If you have more questions that you want to ask,
10  take it up with the Court.
11       MS. GORDON:  Do you want to leave?
12       MS. RUSSELL:  We haven't been able to
13  cross examine our own plaintiff, which is something
14  we stipulated to last time we were here.
15       MS. GORDON:  Ms. Russell, I suggest you
16  let me make my statement and not interrupt me and
17  then you can speak, of course.
18       I am entitled -- any party at a dep
19  under FRCP 30, obviously any party to this case is
20  entitled to cross examination at the conclusion of
21  the original direct exam, so I'm definitely
22  entitled to cross examination, as would you be
23  actually, technically.
24       But if you -- so to echo Ms. Hardy's
25  points from earlier, given the deficiencies in

Page 363

1  discovery and, in my case, my relatively short
2  cross examination I have based on what your witness
3  just testified to this afternoon with regards to my
4  clients and my case, I have cross examination on it
5  and I'm reserving the right to take that.
6       MS. RUSSELL:  That's fine.  I mean, I
7  have reserved the right to cross examine her during
8  your dep, reserving it here.  It sounds like we
9  need to have a follow-up meet and confer.
10       MS. GORDON:  Who's dep?  You have to use
11  names.  I'm not sure what you're talking about
12  here.
13       MS. RUSSELL:  My client's deposition.
14       MS. GORDON:  She's been deposed twice.
15       MS. RUSSELL:  We stipulated on the
16  record -- this is before you threatened me with
17  sanctions.  No, we stipulated on the record --
18       MS. GORDON:  Okay.
19       MS. RUSSELL:  -- that we would allow for
20  30 more minutes --
21       MS. GORDON:  This is --
22       MS. RUSSELL:  I allowed you to finish
23  speaking.  Allow me to make my record.  So we
24  stipulated on the record --
25       THE REPORTER:  Sorry, guys --

Page 364

1       MS. RUSSELL:  Can I finish?
2       MR. DAVIS:  Time out.
3       MS. HARDY:  You know what, let's go off
4  the record.
5       MS. RUSSELL:  No, this needs to be on
6  the record.  This needs to be on the record
7  because --
8       MS. HARDY:  This has nothing to do --
9       MS. RUSSELL:  No, this gets
10  misrepresented to the Court.  I want it on the
11  record.  You all misrepresent conversations all the
12  time and I want it on the record so it reads
13  directly to the Court that I have something to
14  read.
15       MS. GORDON:  There's no stipulation.
16       MS. RUSSELL:  You made yours on the
17  record.
18       MS. GORDON:  There's no stipulation.
19       MS. RUSSELL:  Last time we had a
20  stipulation on the record --
21       MS. GORDON:  No, we didn't.
22       MS. RUSSELL:  -- that we were going to
23  sit for 30 minutes and that we were going to have
24  time to cross examine her.  We clearly need to have
25  another meet and confer so we can talk about what

Page 365

1  we're going to do there, what we're going to do
2  with the complaint --
3       MS. GORDON:  You're incorrect.
4       MS. RUSSELL:  -- even though the judge
5  already gave us clearance to file the complaint and
6  the motion to compel without a conference.
7       MS. GORDON:  You're wrong.  You suggested
8  that and I didn't agree.
9       MS. HARDY:  She gave you the right to
10  file a motion, not file a complaint.
11       MS. RUSSELL:  Right, file a motion.
12  We're clear to file a motion.  We're doing that.
13       MS. GORDON:  Okay.  Go ahead.  You go
14  ahead.
15       MS. HARDY:  So you're going to skip the
16  meet and confer and the filing --
17       MS. RUSSELL:  I offered it.  You all are
18  being obstructionist on it.  I said that we -- do
19  you want to talk about it right now?  We can talk
20  abut it right now.  Are you guys going to oppose or
21  concur with our motion for leave to amend?
22       MS. HARDY:  We're not engaging in a meet
23  and confer right now --
24       MS. RUSSELL:  It's a yes or no question.
25  Are you going to concur or are you going to oppose

Page 366

1  our motion for leave to amend?
2        MS. GORDON:  I think you need to
3  circulate some new times for some -- not new, but
4  some time --
5        MS. RUSSELL:  Are you all going to get us
6  dates today for the 30(b)(6)s ordered by the Court?
7        MS. GORDON:  I don't know what you're
8  talking about.
9        MR. DAVIS:  File a motion for the
10  30(b)(6) --
11        MS. RUSSELL:  Okay.  So you guys are
12  going to violate the Court's order that said that
13  you give us --
14        MR. DAVIS:  No, we did, and you better be
15  asking those questions on Monday on his deposition
16  because we've already told you --
17        MS. RUSSELL:  No, no, no.
18        THE REPORTER:  Guys, guys, I can't --
19            (Cross-talk)
20        MS. GORDON:  Will somebody go out -- Liz,
21  will you tell her to go off?
22        THE REPORTER:  Guys, I can't go off the
23  record until everybody agrees.
24        MS. RUSSELL:  I didn't agree to go off
25  the record.

Page 367

1        MR. DAVIS:  She can scream.  She's making
2  our point for the sanctions motion.  Please
3  continue.
4        MS. GORDON:  I couldn't understand what
5  was being said.
6        MR. DAVIS:  Please continue.
7        MS. RUSSELL:  You all are not going to
8  get us the dates for the 30(b)(6).  The Court said
9  that we have a separate 30(b)(6) and you're
10  refusing to get us dates for the deposition so --
11        MS. GORDON:  We have not had a meet and
12  confer, Ms. Russell.
13        MS. RUSSELL:  You are violating your --
14        MS. GORDON:  You didn't show up for the
15  meet and confer.
16        MS. RUSSELL:  And I offered multiple
17  times to meet and confer and you all -- you, Tom,
18  emailed me and said that you would get me separate
19  dates to meet and confer and you --
20        MR. DAVIS:  You demanded that I call you
21  on the phone when I was with my daughter to see
22  Santa Claus.  Ms. Russell, you are so beyond --
23        MS. RUSSELL:  Seeing Santa Claus is very
24  cute --
25        MS. GORDON:  Why don't you circulate new

Page 368

1  times.
2        MR. DAVIS:  Circulate times.
3        MS. RUSSELL:  No, you all can because it
4  was represented to me that you all would --
5        MS. GORDON:  It's your motion.
6        MR. DAVIS:  We told you --
7        MS. RUSSELL:  No, it's --
8        MR. DAVIS:  -- that we're cross -- file a
9  motion on that, Ms. Russell.
10        MS. GORDON:  Tom, wait a second.  It's
11  your 30(b)(6), it's your responsibility.
12        MR. DAVIS:  Exactly.
13        MS. RUSSELL:  The 30(b)(6) is covered by
14  the fact witness deposition, it is, and the Court
15  ruled on that.
16        MS. GORDON:  Guys --
17        MR. DAVIS:  I know you don't read
18  authority, but read the authority that we provided
19  and it says just the opposite.  We will be filing a
20  motion and --
21        MS. RUSSELL:  You're going to lose.  Tom,
22  I know you're going to lose because I argued your
23  position in Virginia a couple months ago and lost
24  for a sole proprietor.
25        MR. DAVIS:  You know what?  We are in the

Page 369

1  Eastern District of Michigan --
2        MS. RUSSELL:  The law is the same.
3        MR. DAVIS:  Really?  Because the
4  published authority from the Eastern District says
5  otherwise, so we will see you in front of the Court
6  on this issue, Ms. Russell.
7        MS. RUSSELL:  All right.  I'll see you
8  in court.  Thank you for violating the Court's
9  order.
10        MR. DAVIS:  You know what, Ms. Russell --
11        MS. RUSSELL:  I'm ready to go off the
12  record now.  Is everybody ready to go off the
13  record?  Are we all good to go off the record,
14  counsel?
15        MS. HARDY:  Yes.
16        MS. RUSSELL:  Are you good to go off the
17  record?  Are you good to go off the record, Deb?
18        VIDEOGRAPHER:  This concludes today's
19  deposition.  The time is 6:19 p.m.  We are off the
20  record.
21
22      (Deposition adjourned at 6:19 p.m.)
23
24
25

ELYSE McKENNA v ROBERT F. RILEY                                    Job 48239
MCKENNA, ELYSE 12/10/2025                                              370

                                                        Page 370

 1   STATE OF MICHIGAN)
 2   COUNTY OF OAKLAND)
 3
 4                Certificate of Notary Public
 5        I do hereby certify the witness, whose attached
 6   testimony was taken in the above matter, was first duly
 7   sworn to tell the truth; the testimony contained herein
 8   was reduced to writing in the presence of the witness, by
 9   means of stenography; afterwards transcribed; and is a
10   true and complete transcript of the testimony given.  I
11   further certify that I am not connected by blood or
12   marriage with any of the parties, their attorneys or
13   agents, and that I am not interested directly, indirectly
14   or financially in the matter of controversy.
15        In witness whereof, I have hereunto set my hand
16   this day at Clarkston, Michigan, State of Michigan.
17        I hereby set my hand this day, December 11, 2025.
18
19
20   *Karen Fortna*
21   _____
22        Karen Fortna, CRR/RMR/RPR/CSR-5067
23        Notary Public, Oakland County, Michigan
24        My Commission expires 4/30/2031
25

scheduling@fortzlegal.com        fortzlegal.com        Toll Free: 844.730.4066

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
Index: $5,000..30

**Exhibits**

**Exhibit 1** 4:4 70:11,13,24 72:14 73:7,9,10

**Exhibit 2** 4:6 111:13,15

**Exhibit 3** 4:7 161:12,14 162:12,25 165:19 168:8 169:2

**Exhibit 4** 4:9 158:4,6 160:2 161:8

**Exhibit 5** 4:10 178:11,12

**Exhibit 6** 4:11 182:9,10 187:5 190:25

**Exhibit 7** 4:13 183:23 184:1

**Exhibit 8** 4:14 185:5,7,9

**Exhibit 31** 4:16 276:16,19

**Exhibit 36** 4:18 213:15,18 216:17

**Exhibit 37** 4:20 266:15,16,17

**$**

**$5,000** 135:6

**1**

**1** 17:20 70:11,13,24 72:14 73:7,10 112:11 113:15,17 160:22 174:17 241:16

**1-11-2020** 185:15,20

**1-12-2020** 185:15,16,23 186:1,13 191:19

**1-2-2020** 184:9

**1-20** 184:3,8

**10** 5:1,7 33:9,12 169:7

**10-4-19** 178:21

**10-4-2019** 159:17,18

**100** 227:18

**10:00** 179:7

**10:19** 58:2,4

**10:37** 58:4,6

**10:59** 184:14

**115** 75:24

**11:00** 236:9

**11th** 190:15,21

**12** 184:3 190:5

**12-9-2025** 9:15

**12:06** 136:13,15

**12:17** 185:24 191:20

**12:27** 136:15,17

**12th** 190:16 191:4

**14** 17:2

**15** 45:4 347:8

**15-minute** 8:11

**16** 82:14

**17** 158:25

**18** 192:12 193:2 199:20 212:6 214:6,8,11,15,17,21,25 215:2,5,7, 24 216:2,7,14 254:3

**18th** 192:18 193:8 194:3,5 215:18

**19** 159:4,12

**1925** 267:10 269:18

**1926** 270:9

**19th** 329:20

**1:00** 159:14 236:7

**1:13** 170:2,4

**1:25** 186:1 191:21

**1:51** 170:4,6

**1:59** 185:20

**2**

**2** 111:13,15 241:16

**20** 114:21 115:19,25 158:7 161:9 196:22 238:22 256:9,11 287:10 324:6

**2015** 31:17,24

**2018** 31:17 32:2

**2019** 28:9,11 29:2 30:5 32:2

36:15,18 38:6 40:25 42:22 43:21 44:15 68:23 85:8 112:12 113:15, 17 115:21 152:2 160:22 170:10, 13 174:17 182:15,16 186:23 187:3 192:14 198:17 226:6 238:3 259:5

**2020** 152:3,9,14 184:3 190:5 198:1,15,17 209:13 211:11,24 237:23 238:4,6,7,17 258:23 259:3,15 260:4,8 262:11,14,16,25 294:16 295:11,14,20 296:18 302:7,8,11

**2021** 44:14 45:9,10 46:13 47:3 68:24 115:25 130:1 131:19 134:2 135:13 146:25 149:24 152:3 192:12 193:2,13 194:23 195:7 198:1,14,21 211:19 213:5,24 214:4,6,8,11,15,21,25 215:2,5,7 216:7,12,13,14 230:15,17 237:24 238:4,7,8,11,14,18,23 239:1 250:22 254:2,4 294:13,18,19,22 295:22 302:7,8,9 350:13,20,21 351:9,12 357:13

**2023** 153:10 154:21 157:8,10 271:19 325:16 358:8

**2024** 357:18,22 358:6,13

**2025** 5:1,7 68:17,18,24

**20th** 45:15 196:18

**21** 115:17,21 193:1 196:16

**239** 161:17

**25** 153:9 187:2

**26** 266:17

**27-year-old** 261:3 265:1

**2:24-CV-12347** 5:10

**2:38** 208:21,23

**2:47** 208:23,25

**3**

**3** 161:12,14 162:12,25 165:19 168:8 169:2 181:8 213:5,24 214:4

**30** 72:24 114:21 197:18 211:19 212:21 229:19 271:19 362:19 363:20 364:23

**30(b)(6)** 366:10 367:8,9 368:11, 13

**30(b)(6)s** 366:6

**30-second** 8:1

**300** 274:24 275:1,2

**30th** 194:23 195:7 196:8,21 197:1 230:14 232:9 262:13

**31** 197:18 211:19 212:21 229:19 230:17 276:16,19

**31st** 194:23 195:7 196:21 197:1 198:20 232:10 262:13

**33** 185:10

**331** 185:9,15

**332** 185:15

**333** 185:16 186:1

**36** 213:15,18 216:17

**360** 360:19

**37** 266:15,17

**380-some** 272:18

_____

**4**

**4** 158:4,6 160:2 161:8 180:1 181:8 213:5 241:23

**40** 33:2,11 324:2,5,8,9

**400-paragraph** 360:19

**435** 346:1

**435-paragraph** 289:14

**486** 190:25

**4:01** 272:9,11

**4:05** 256:16

**4:19** 272:11,13

_____

**5**

**5** 178:11,12 180:1 240:18 241:1, 25 242:3

**50** 32:24 33:11

**50/40/10** 33:11

**50/50** 32:23

**502** 187:9 191:2,7,25 192:6

**505** 182:12 187:11 191:1,2,7 192:1,6

**569** 280:24 282:11 283:21,23

**570** 276:20 280:2 282:11 288:19

**5:20** 325:9,11

**5:33** 325:11,13

_____

**6**

**6** 182:9,10 187:5 190:25

**60** 33:1

**60/40** 33:1

**600** 70:14

**662,000** 225:25

**6:19** 369:19,22

_____

**7**

**7** 183:23 184:1

**70** 280:25

**70s** 133:5

_____

**8**

**8** 185:5,7,9

**8(c)** 169:4

**810.278.4130** 158:13

**859.278.0396** 10:3

**8:00** 184:9 226:1 236:7 249:2 331:18,19 334:1

_____

**9**

**9** 162:23,25 164:11,13 168:11 169:8

**9-26-19** 174:15 175:3 179:14

**9-26-2019** 158:17

**9-27** 158:18

**9:00** 236:7,11

**9:18** 5:3,6

_____

**A**

**A-U-I-T-O** 311:21

**a.m.** 5:3,6 58:4,6 179:7 184:9 185:24 191:20 226:1

**abandon** 63:5

**abandons** 63:4

**abetted** 352:6

**ability** 318:18 333:21

**able** 11:12 30:9,14 39:13 74:6 87:24 117:17,20 124:1 167:17 171:3 184:18 200:19 299:5 303:12 313:21 314:2 316:7 319:2 347:5 354:19 362:12

**about** 6:15,21 15:18 17:13 18:8 21:19 24:2,7,13 26:20 29:10 31:15 35:12,16 37:12,13,20 38:20 39:3,9,15,16,19,24 40:2 44:5,23 45:7 46:8 48:2,21 49:1 51:7,20 54:19 59:24 61:9 62:3,4,20 65:24 66:2,4 67:2 69:21,25 71:3,4 76:7 77:1,14,25 78:16 80:4,11,12,16, 18,21,22,25 81:4,18,23 82:2,4,13, 20,23,24 83:13,16,18,23 84:1,2,8, 17,21 85:2,9,10 86:10,12,16,18, 19,22 87:1,4,14,17,18,20 88:2,4, 14,17,19,24 89:4,7,15,24 90:6,10, 11,12,21,24,25 91:4,18,20,24 92:9,11 93:18 94:7,18,20,22 95:5, 6,8,18 96:10 97:10,16,24 98:5,10, 17 99:1,3,25 100:16,22,24 101:4, 6,15,21 102:16 103:3,25 104:11, 16 105:5,11,13,20 106:19,21 107:3 109:16,19,23 110:2,3,4,9 113:25 115:13 118:2,18 119:2 120:20 122:10,11,16,21,22 123:25 124:4,11,18,22 125:4 126:8,24 128:3,19 129:6,11,22,25 130:1,18,19,24 131:6,10,11 133:1 135:5,14 138:12 140:2,19,22 141:4 142:5,18 143:2,4 144:14 145:8,12,16 146:8,14,19,23 150:7 152:5 155:5,12,15,18,22,24 156:1,4,10 159:18 160:23,25 161:7 163:7 165:5 166:18 167:10 168:24 170:18,22,24 171:16,18,

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
Index: above..advice

20,21 172:11,15,17,20 173:9,17
174:8,12,13 176:22 177:1,2
179:10,13,19 180:25 181:20
183:19 184:11 187:17 188:2
189:4 191:4,18 193:25 194:2,5,9,
12,15,17 195:14,17,20 196:3,4,7,
8,23 197:10,11,17 198:14 199:1,
6,14,17,18,21 200:1,2,3,24 201:1,
11,22 202:5,24 209:4 211:13,14,
15 212:3,8,11 213:4,6 216:20,24
218:23 220:12 221:8 222:16
223:6 226:10,15 227:6,14,24
228:5,12,13,16,18 231:5,23 232:1
233:16 234:5,14 235:14,24 236:1,
5,7,16,19,21 239:10,12,20 240:4,
5,11,21,22,24 241:1,18,23 242:4,
14,25 245:8 246:20,24 247:21
251:21 253:8,23 254:16 255:6,8,
13,16 256:13 257:9,10,11,22,23
258:1 259:2,4,16,22 260:1,3,10,
21 261:12 262:3,7,25 263:22
264:3,8,14,19 266:7,12 269:4,6,
11,13,15,17,25 270:2 271:16
273:19 274:8 276:5 282:22 284:1,
24 285:7 286:10 289:12 290:22,
23 291:3 293:5,23 294:7,17,18
295:23 297:1,7,9,14 298:1,16,23,
24 299:10,15 300:15,16,19,20
301:11,18,19,20,21 302:6,15,16,
17,25 303:3,8 304:4,11,25 305:7,
15 306:5,13,14,19 307:21 308:10,
16,18 309:4,7,24 311:1,2,12,16
312:11,23 313:1,20 314:1,12,24
315:20 316:6,16,21,23 317:2,23,
25 318:4,6,9,11,12 320:2,19,22
321:2,11,18,19,21 322:2,9,10,13,
19 323:4,6,9 324:1 326:10,16
327:18 331:24 332:3 333:14,23
334:8,17,23 336:22 337:5,6,19
338:1,17,18,25 339:14,16,19,25
340:2,4,15,17,24 341:6,7 342:23
343:10,16,18,21 344:2,11,12,16,
23 345:17,18,20 346:3,8,14,18
347:3,12,21 349:7,8,12 351:17,
19,22 353:5 355:6,7,13 356:22
357:5,10,11,14,15,20,21,24
358:8,17,19,20,22,23,25 359:8,
10,11,13,14 360:1,3 361:2 363:11
364:25 365:19 366:8

**above** 34:15 169:8

**absence** 188:14

**absolutely** 112:4 203:24 360:24
361:5,9,15

**abuse** 103:3

**abut** 365:20

**accept** 103:9 160:3

**acceptable** 18:6

**acceptance** 188:5,24 189:2

**accepted** 43:10 83:6 84:3
113:17,23 144:21 159:16 160:7
173:11 174:1 178:4,5 189:20
292:15

**accepting** 100:8 151:15 172:24
174:3

**access** 70:4,5 169:4 195:10
204:24 205:13,23 206:1,4,9
207:14,24 208:1,10 212:7 214:5,8
236:16,25 327:8 342:25 343:3,6
352:11

**accessed** 192:25 206:6 207:19
214:9,11

**accessible** 125:20

**accommodate** 7:25 325:7

**accompany** 304:1

**accomplish** 202:13

**according** 106:3

**accordingly** 8:5

**account** 67:24 68:2,5,6 69:21
189:16 192:8

**accumulation** 152:16 192:9
211:14 218:3 220:25 223:2,22
228:21 241:16 242:15,18,21
246:13 247:16 248:2

**accurate** 11:13,18 41:10,12,13
72:12,17

**accurately** 159:6

**accusation** 359:20

**accused** 99:17 273:20

**acknowledged** 214:13 344:14

**acknowledgment** 189:1

**acquire** 166:2 298:15 300:18
312:13 344:9

**across** 122:2 139:11 154:12
155:7 198:9 229:14 233:2 247:13
279:16 322:4

**act** 152:11 217:6,7,8 218:1,5
246:4 248:1 251:22 309:22 352:8
355:21

**acted** 343:10

**acting** 209:14 344:24

**action** 296:16

**actions** 209:3 211:15 218:4
219:13 220:19 247:20 264:17
323:19

**actively** 140:6

**activity** 120:23 294:4

**acts** 218:7 220:12 242:24 245:18
247:6 250:3 267:18

**actually** 19:13 83:9 133:18
143:21 196:13 212:4,7 230:5,12
237:11 286:2,5 287:17 327:22
362:23

**acumen** 168:16

**acute** 14:11 22:24

**add** 52:24 59:8 169:20,23 257:19

**added** 51:17 335:5

**adding** 44:1 53:2 179:23 190:10

**addition** 37:16 110:13 164:15
192:16 219:3 224:9 225:1 247:21
279:16 343:4

**additional** 9:24 78:5,7 241:1
242:3 264:6 295:22 314:1

**address** 9:9 67:16 76:11 158:14,
16

**addresses** 67:15

**adjourned** 369:22

**adjuster** 37:22 81:8

**admissible** 273:3

**admission** 23:14

**admits** 24:25

**admitted** 22:19,25 24:24 362:6

**advancement** 169:12

**advice** 46:3,18,25 47:4,6 52:9,11,
20 137:24 138:1,13 139:21
155:20 156:10 292:16,17 293:5

**advise** 155:22

**affecting** 311:3,4

**affection** 189:7

**affectionate** 190:16

**affidavit** 51:7

**after** 5:16 21:17 22:14 23:11,18, 21 38:20 43:10 45:13 46:4 49:11 63:4 66:22 69:13 80:23 83:6,8,11 84:4 86:11 93:7,9 101:20 102:20 106:22 110:16 112:5 113:15,17, 23 114:24 128:21 131:16 133:5, 13 160:16 173:2 177:18 179:18 182:21 190:4 195:5,23,24 196:13 197:9,19,23 198:10 212:20 224:24 225:14 228:23 229:19 230:22,23 231:1 232:2,3,9 233:1, 5,19,23 234:7 238:5 241:6 250:20 255:20 260:7 296:16 297:18,22 299:21 301:25 302:2,5 307:16 347:18 350:13,21 356:5,12,14,16

**afternoon** 363:3

**afterward** 321:20

**afterwards** 320:25

**again** 25:23 32:15 53:5 87:23 90:12 116:17 118:7,8,16,19 133:5 185:14 192:5 215:21 225:4,20 228:8,21 233:24 246:9,10 278:22 286:2,5 288:20 291:13,24 306:22 335:18 349:23

**against** 6:16 154:25 155:23 156:3 217:4 263:9 265:3 287:11 296:9

**age** 227:14,16

**ago** 14:24 15:7,8 59:25 80:10 86:7 167:1 263:17 368:23

**agree** 40:18 46:24 118:23 135:2, 11 169:15 181:12 190:22 192:19 201:15,18,21 218:16 234:17 240:17 242:12 349:1 355:24 361:14 365:8 366:24

**agreed** 46:16,18,20 50:4 171:13 182:4 341:11 343:15 359:21

**agreeing** 339:8 360:3

**agreement** 47:1 49:16,18,20,23 50:1,6,8,9,12 155:2,4 165:18 284:21 285:12 286:1 338:20

339:2,5,12 341:17 342:20 343:14 346:3,5,7 359:4,12 360:3

**agrees** 287:23 366:23

**ahead** 7:7 17:23 33:22 51:18,23 52:14 53:9 57:20 105:25 141:23, 24,25 150:21 222:22 242:20 273:2 275:23 287:22,24 291:12 311:20 342:11 354:11 359:23 365:13,14

**aided** 352:6

**alert** 89:9

**aligned** 74:14

**allegation** 313:4,18

**allegations** 182:25 217:2 246:5 265:15,17 266:3,4 290:8 360:16

**allege** 337:15

**allegedly** 110:3 250:23 316:16 317:1 318:9 321:16 348:11

**Allegiance** 37:23

**alleging** 338:20 352:5 356:18,20

**Allison** 65:4 126:14 300:16

**allow** 24:21 88:5 107:21 146:2 163:16 175:25 243:15,23 337:16 342:25 363:19,23

**allowed** 9:23 121:9 169:5 176:5 320:18 352:11 363:22

**allowing** 163:14

**allows** 167:22 338:10,13,16,18

**alone** 223:25 225:9 242:24 243:21 245:18 248:2 264:3 326:5, 6 327:19 330:24 331:4 335:3,4 336:7 337:2 353:21 355:5

**along** 95:23 195:18 270:16

**already** 9:17 32:13 37:15 41:11 60:7 83:1 113:3 115:1,3 129:25 133:1 150:13 154:23 155:2 156:9, 11 168:20 174:4 179:14,17,20 180:19,21 183:13 191:12 193:7 197:16 200:21 202:7,9,11,19,22 203:2 204:8,13 205:20 211:10 215:9 216:3 228:2 232:2 240:2,24 241:10,24 242:4,21 243:2 248:5 249:17 254:24 263:20 264:11 266:8 274:7 275:8 290:21 291:7

292:11 294:16 308:17 318:25 320:24 322:13 340:17 343:15 362:5 365:5 366:16

**also** 5:20 9:22,23 14:22 32:19 33:8 59:10,13 61:17 66:16 71:19 82:9 83:20 84:21 85:4,9 88:23,25 89:21 91:16 95:3 97:5 116:13,25 119:18 125:3,15 127:4 128:6,10 130:9 132:6 139:18 149:25 150:6 162:23 163:15 166:10 167:1 168:3,11 169:3 188:6,14,24 203:3 204:12 211:24 215:22 229:2 235:14 236:23 242:9 247:16 264:4 265:11 270:10,25 281:17 295:2,13 296:19 297:21,22 301:17 302:11 304:2 306:12 310:11,12 312:20,21 322:20 324:25 326:9,10,12 337:5,24 339:20 345:2 348:18,21 353:25 355:12,16 357:19 360:16

**although** 32:19 81:6

**Altman** 50:10

**always** 34:15,18 40:21,22 61:18 63:7 68:13 184:15 237:16 296:15 318:5 324:18 350:7,8 359:1

**am** 6:18 9:13 22:3,24 39:5 54:20 81:6 83:21 110:14 175:23 187:6 288:10 319:3 356:20 362:18

**Amanda** 50:22 51:9,25 52:20 291:14 292:17 293:4

**Amber** 166:9 305:7 306:24 307:8,11,12,13

**ambiguously** 109:9

**ambition** 177:20

**amend** 165:4 365:21 366:1

**amended** 193:1 273:8

**amendment** 231:3,4

**amongst** 284:19

**amount** 225:1 255:4

**and/or** 98:21 146:8 169:12 315:23

**Anderson** 280:12

**Andress** 130:8

**anger** 263:14

**angry** 261:23 263:9

**Anne** 25:6

**announced** 131:17,20,25

**annoy** 335:23

**annual** 36:19 334:11

**another** 51:16,20 67:11 69:3
73:13 82:14 85:17,19 97:10 123:9
133:19,22,23 134:3 138:15
143:12 165:25 174:15 177:22
184:14 198:9 245:10 247:4 258:6
279:8 301:16 306:7 316:19 333:2
360:1 364:25

**answer** 6:24 7:19 12:14 15:3
16:18 19:22 21:10,16 22:18 24:21
29:21,22 30:1,21 40:20 42:3
51:15,25 52:14 53:24 54:20 59:7,
10 74:6,9 99:13,22 102:2 106:25
107:21 113:7 147:20 156:21
161:1 167:12,14 176:5 180:8
181:22,25 182:1 190:14 191:5,9
192:3 196:11 204:9 207:21 228:6,
7 231:17 237:6 244:18 245:8
250:9 256:1 271:15 275:5,22
276:1 283:17 291:2,6,9,13,22
292:5,7,9 293:16 295:8 317:18
354:19,21 359:23

**answered** 55:5,11 72:7 168:20
176:12,14 196:5 225:12 228:2
242:14 243:2 245:20 246:1
264:11 274:7 277:25 282:25
290:22 291:8,12 292:25 331:3,4
333:20 346:25

**answering** 9:3 112:18,20,23
145:18 175:16 219:6 222:14
237:4,7,9 243:12,14,16,23 244:17
251:20 284:22,23 290:15

**answers** 7:5 22:12 36:23 248:5

**anticipate** 177:24

**anxiety** 10:1 16:2

**anxiety-producing** 12:20

**anxious** 12:23 14:11 16:10 180:3

**any** 8:22 10:2,25 11:3,6,12,15
13:10,21,25 14:10 15:1,15,24
21:23 23:4 25:2,18,25 26:2 27:16
33:24 34:2,3 40:25 42:12 44:20
46:12 50:14 58:22 60:10,21 61:2
62:5 63:17,20,23 64:5,6 65:17,24

66:1,9,10 68:5 74:4,19 75:3 78:2
80:3 82:22 83:25 85:10 87:9,17
92:21 93:14 96:17,20 98:3,4,8
102:23 109:22 110:1,2 111:2,7,10
114:14 115:14 120:1 121:20
122:24 124:5 126:3 128:2,13
132:9 136:19,24 137:2,5,8 138:2,
19 139:2 140:6,22,25 141:4
142:18 143:1 144:7,14 146:4
152:20 163:11,23 164:2 166:23
173:13 178:2 182:18,23,25 183:5
189:23 191:22 193:25 195:23
199:19 200:13 205:9,23,24 206:5
207:17 208:10 212:8 214:17
221:22 225:3 227:19 230:10
231:23,25 232:7 236:13 237:3,20
238:1 239:15 242:24 247:14
254:21 255:15,16 256:22 260:4
264:22 277:10,13,16,20,24
278:24,25 281:9 282:6 286:17,18
288:11,12,15 293:13 294:8,20
296:8 303:7 305:2 306:18 310:15
319:25 324:18 329:15 332:18
333:2,5,9,16 347:22 351:25
352:19 353:5 359:3,6,19 361:3
362:18,19

**anybody** 27:7 253:8 336:4

**anymore** 44:4 69:15,16 77:8
111:6 122:21 152:7 258:16,20
290:23

**anyone** 14:3 15:4 24:25 47:3
92:12 101:4 106:16 124:6 128:12,
18 129:9,10 130:6 147:22 178:23
195:20 196:1,22 197:15 212:11
253:14 254:23 255:1 270:1 293:8,
10 304:24 305:6,12,14 306:15
307:2 311:22,24 312:7 318:8

**anyplace** 65:19,23

**anything** 10:8 14:6 19:7 39:9
40:21 53:22 60:23 71:12 76:20
80:3 81:24 83:13 86:16 87:1 89:7,
24 90:6 91:1,18 92:11 94:18
96:10 98:20 102:16 106:10
109:16 124:11 131:9 138:16,18
140:11,12 142:25 143:4 156:14
159:18 164:24 168:7,22 169:20,
22 171:18,20,21 172:15 183:2,3
188:17 191:12,16 193:19 194:10
195:13,17 199:22 204:24 208:3
212:3,11 221:15,24 223:17
224:21 225:9,20 234:14 240:5

242:3 245:24 246:3,11 247:1,18,
25 250:7 252:3 253:4,6 257:19
263:21 269:21 277:18,19 290:6
294:5 295:1 296:1 297:13 299:7
300:1 304:19 308:22,24 309:9
310:23 316:10 321:8 322:25
323:3,4,8,11 334:6,13,20 335:6
336:9 340:7 341:7 344:20 346:10
349:5 351:17

**anyway** 210:11 249:23 269:18
286:14

**anywhere** 82:16 134:7 193:17,
19,24 279:25

**apart** 205:16 316:17

**apologize** 71:21 102:13

**apostrophe** 311:21

**app** 59:9,12,17 60:12,16,20 62:15
63:6 64:8 281:3,5

**appalled** 108:8 280:18

**apparently** 279:5

**appear** 161:23 253:3

**appeared** 23:4

**appears** 70:13 158:15 281:8

**appetizer** 122:11

**Apple** 69:8

**applies** 49:2 188:6 297:21,22

**apply** 188:7 255:22

**appointed** 99:4

**appointment** 9:17 25:11,12

**appreciate** 51:22 106:14 210:17
227:2 287:19

**approach** 149:6 197:20 248:3

**approached** 199:1

**appropriate** 7:16 224:18 250:10
255:10 265:6 322:22

**approximation** 198:4

**April** 68:18 197:5 238:6 250:21
260:8 271:19

**area** 46:10 177:22

**aren't** 63:8 77:2 92:7 242:6 255:6
265:10 282:14

**arena** 136:20

**argue** 293:23 361:11

**argued** 273:1 368:22

**arguing** 244:14

**argument** 17:16 361:18,20

**argumentative** 231:15 244:16
250:12 274:14 320:15

**arises** 257:15

**around** 116:3 174:1 197:4 211:6
230:13,20 308:12 331:18

**arranged** 171:19

**arrangements** 169:6

**article** 269:3,7,10,11,25

**articulate** 62:6

**articulated** 84:19

**aside** 27:17 60:25 162:19 174:20
180:21

**ask** 6:14,23 7:13 8:19,23 9:5
12:22 13:15 16:9 72:9 88:8,25
89:2,22 97:2 98:5,6 102:25 107:3,
10 124:13 139:21,23,25 149:7
176:24 195:16 203:1 226:15
256:3 271:11 283:1,3 293:11
316:19 336:5,23,24 337:3 344:20
345:13,16,18 349:15 362:9

**asked** 16:10 21:1 32:14 35:16
54:18 55:4,10 76:6,10 77:8 79:11,
13,17 102:22 106:7 107:5,9
108:23 113:1 124:4 127:14 140:9
141:23 176:10,16 181:9,20
191:12 195:21 196:3 203:10,14
211:15 215:15 230:19 237:8
240:8 245:19,25 251:7 252:14,17
253:2 257:5 258:21 261:12 272:3
284:9,24 290:22 291:12 295:17
297:19 303:2 315:8 324:24,25
326:2 332:14 335:3 345:19
346:25

**asking** 6:21 8:15 12:12 29:23
30:3 40:18,19 49:1 75:10,11
77:14 88:12,13,14 95:18 103:20
106:21 108:14 110:20 118:5
125:3 128:4 135:22 147:5,7
155:11,20 170:12 174:16 179:1
191:8 194:11 197:10 203:16
210:21 220:14 222:12 224:6

**assault** 97:1,9,13 99:7 107:12,16

**assault/rape** 101:16 107:3

**assaulted** 96:12 98:1 107:17,25
108:1

**assaults** 94:24 96:11 98:21 99:3
104:3 107:9

**assert** 30:10 51:14

**asserting** 52:17

**assessment** 12:8,9 26:16

**assign** 37:18 38:1 148:4,11,14

**assigned** 149:5,17

**assignments** 86:15 89:16
139:19 149:19 316:24

**assist** 133:23 134:10 214:19
293:8

**assistance** 121:20 135:9

**assistant** 121:16

**assisted** 292:20 293:10

**assisting** 134:6 135:6

**associate** 31:18 32:5,6 86:23
95:24 100:24 126:14 144:3
224:19 264:15

**associate's** 226:12

**associated** 169:13 178:3 180:10
181:6 257:12 336:4

**associates** 38:16 87:21,22 89:18
90:18 91:25 92:3 126:8

**assume** 8:2,21 36:5 72:12 98:18
337:22,25

**assumed** 36:10,13 301:12

**assuming** 99:13 269:1 339:24

**attached** 90:4

242:13 245:1,9,15 246:3 251:2,3,
10 255:21 257:8 265:24 276:5
277:3 283:20 288:6 289:12,17
304:6 314:23,24 319:4 326:5
327:19 333:6 340:23 341:6,7
343:23 352:2 354:10 359:11
366:15

**aspect** 162:25 261:13

**aspects** 322:19

**attempt** 221:16 223:9 225:16
228:22 232:12 235:10 244:21

**attempted** 229:20 231:6 232:21
233:11,20 235:19 274:2,12,17
289:16 345:22

**attempting** 261:16

**attempts** 224:25 225:13 229:4
234:11,13 241:18 272:15

**attend** 66:24

**attended** 81:20 164:19,20 165:7,
8

**attending** 314:11,13

**attention** 141:4 142:19 335:24
336:5

**attest** 172:20

**attorney** 31:18 32:6 33:21 46:7,
12,23 83:21 91:17,21 144:3
165:9,12,13,14 177:13 276:5
285:18 292:11,13 293:16 304:14,
22 308:15 324:17 359:15

**attorney-client** 48:17,21 51:14
52:4,6,9 156:8,21 275:16 276:3
290:24 292:5,19,23 293:2 314:11,
15,21 315:7

**attorneys** 40:8 50:14,17 51:10
52:2 53:2 63:18,19,20 64:6,13
65:5 71:18 74:21 76:1 95:22
155:19 183:14 310:19,20 345:4

**attributed** 302:21 309:10,18
310:23 340:22

**attributing** 341:3

**attributions** 80:3

**August** 42:21 45:9,10,15,18
46:5,13 47:3 115:19,25 134:2
192:12,18 193:2,8 194:3,5
196:16,22 198:22 199:20 212:6
213:5,24 214:4,6,8,11,15,17,21,
25 215:2,5,7,18,24 216:2,7,14
230:15 254:3

**authentic** 27:20

**authority** 32:21 368:18 369:4

**authorization** 10:17 207:4,11
208:14

**authorizations** 13:3 15:20 16:22

17:1

**aversion** 31:5

**avoided** 284:22,23

**aware** 56:13 108:14,20 110:15
146:25 278:5 316:11 341:1
352:14

**away** 107:24 134:7,14 149:13,15
150:1 151:22 157:25 180:23
181:9 232:14,22 244:22 253:15
279:15 281:13,14 288:10,15
348:15 352:17

**awhile** 328:6

────────────

**B**

**back** 8:13 20:14,16 28:7 35:12
43:13 58:5 78:5 79:25 86:7 97:20
104:6,8 106:5,6 110:22,24 136:7,
9,16 140:8,10 141:12,15 142:1
156:17,19 162:7 170:5 172:23
174:25 175:19,22 180:16,18
181:14,16,21 192:13 196:2
208:24 209:15 214:1 222:23
223:24 226:9 227:23 228:6
234:23 240:18 258:24 259:3,4
263:23 269:18 272:12 273:12,15
281:6 283:5,7 288:11 290:1
294:16,17 296:20 299:20 306:6
325:2,12 329:7 335:9 337:21
341:21 354:23 355:1

**backed** 264:1

**background** 217:21

**backstop** 34:18

**bad** 84:10 106:10 114:15 121:13
122:24 142:12 170:15,18

**Bailey** 5:13

**bar** 31:25

**bargaining** 136:25

**barking** 222:19

**Baron** 32:1 33:15,25 34:5,15
35:3,12,18 36:3,15,18 38:2,7,16
39:1 40:1 41:1,20 43:14,20 84:9
86:11 306:12

**barred** 46:22

**Barrett** 254:14,15

**base** 269:21 346:22

**based** 38:16 39:14 64:2 90:14
119:24 138:24 179:24 180:1
264:4 268:7,9 344:22 363:2

**basically** 41:4

**basis** 11:4 22:24 23:21 25:19
141:23 276:2 291:11 325:3
332:18 345:4

**Bates** 70:14 76:16 158:7,25
161:8 178:19 182:12 184:1 185:9
191:2 192:6 266:17 276:19

**bathroom** 7:23 8:2 114:22 136:6
204:2 324:14

**bear** 6:22

**bearing** 257:25

**Beaumont** 140:15 143:8 144:16
146:8,15 147:3,23 151:18 165:20
166:2,6,10 305:10

**became** 28:20 56:13 115:16,21
258:14,15 260:16 261:1 294:15
341:1

**because** 18:10,13 21:12,15 24:7
25:10 36:24 37:2 47:19 48:23
52:15 56:9 63:7,23 65:7 67:15
68:11,22 69:14 72:17,21 74:15
80:6 81:8 99:1 103:2,5 105:14
106:17 109:8 113:23 116:20
117:17,23 120:6 122:10 123:12
125:10,19 132:23 133:13 134:7,
11,23 137:16 138:24 139:7,20
141:17 149:13 150:17 151:10
155:18 157:4,23 160:11,22 175:1
196:2,11 197:6 198:22 202:15,23
207:18 210:25 219:7,25 222:19
225:23 228:4 231:10 235:6,7
240:16 245:7,12 247:3 249:10
255:22 261:10,20,24 262:22
270:24 274:2 276:14 278:20
279:13 280:15 287:11 288:10,14
293:16 298:17 299:20 308:17
312:19,24,25 313:9 314:1,2,14
315:6 317:14,15 321:20 324:14
326:18 329:8 332:6 334:24
335:25 339:22 341:2 343:17
344:14 347:24,25 349:10 354:19
355:12,25 356:24 357:10 358:14,
20 360:10 361:20 364:7 366:16

368:3,22 369:3

**become** 8:10 28:22 147:4 184:16
188:8

**becomes** 61:10 257:6 263:3
273:8

**becoming** 12:16 152:1 225:22
259:19,24 260:1,2,25

**been** 6:8,16 11:5,7,20 13:6 14:23
19:11,16 22:18 25:16 32:14,22
33:21 43:2 45:19,24 55:2 56:11
58:15,16,21 60:8 61:2,9 64:12
66:3 68:23,24 75:2 76:21 79:24
80:2,19 85:7 86:4 91:16 92:14,15
96:12,15 97:14 98:21 107:7,8,10
109:23 110:8 111:4,5 113:5 114:3
116:5,19,22 117:9 125:12 131:4
148:11,13,24 149:18 150:7 151:2,
6 160:15 164:4 166:12 167:17
179:17 181:22 187:16 197:4
198:4 211:10 214:20 215:9 230:4
232:19 234:24 244:15 245:7
262:6 284:6 292:11 293:25
303:13 319:18 324:11 332:16
337:8,12 343:25 346:17 350:24
353:13 360:7 362:12 363:14

**beeped** 253:1

**before** 6:12,24 7:19 8:6 10:8 11:8
13:22 24:16 25:16 28:12,19,21
31:20 38:7,8 41:21 45:13,14,15
50:21 56:21 57:8 61:8,10 62:12,
13 72:10,25 77:24,25 80:23
81:15,17 90:18 93:4,6 103:15
105:19 106:22 108:15,18 113:6
120:5 127:6 133:6 140:7 144:2
153:7 155:21 160:3,6 169:15
174:5 175:5 180:6 181:19,22
184:6 195:10 204:3 209:12
211:18 212:18 215:9 219:22
220:24 230:8 231:12,13,19
238:22,24 247:3 267:22 280:8
287:8 294:10 315:16 316:20
319:19 326:16 330:7 338:7
339:18 340:19 354:22 356:16
357:23 358:10,12 360:14 361:24
363:16

**beforehand** 7:12

**beg** 203:19 204:11

**began** 56:15 134:6 152:9 350:7

**begged** 203:17

**begin** 151:18 171:24

**beginning** 21:2 67:22 152:18 237:24 238:8,12,14,17,25 302:8 357:18

**beginnings** 188:5,19

**begins** 5:7

**behalf** 5:22,24 6:1,4 7:3 218:13, 25 220:16

**behavior** 104:12 107:7 129:6 152:1 219:4 223:22 258:24 322:13

**behaviors** 189:17 192:16 211:15,16 218:3 221:25 223:10, 11,22 239:21 246:20 247:9 261:21,25 264:16 265:9

**behind** 194:24,25 211:8

**being** 11:15 22:1,4 29:13 35:4 38:13,15 41:4 56:22 62:20 63:3 64:10 83:21 87:24 95:3 97:23,25 100:13 106:18 121:2 142:9,15 158:11,12 170:19 176:5,9 178:7 179:18 181:20 187:17 191:20 192:24 200:23 201:21 204:13 211:8 222:20 227:6 234:20 239:2, 4 246:5,12,23 247:9 252:10 255:7 259:4 260:11 261:18,23 262:15 264:14,18,25 269:3,20 271:25 273:21 294:8 295:17,23,24 301:18 302:22,24 309:4 310:11 313:21 314:2 316:21,23 317:2 335:3 336:2 337:21 338:21 347:5, 21 360:6 365:18 367:5

**believe** 16:10 24:22 26:7 35:23, 24 36:20 38:8,11 39:4,10,20 41:15 42:18,23 44:14,17 45:9,17, 18 47:22 55:19 56:7 63:21 64:7 66:6,8 68:8 70:7,8,19 71:2,7,11, 18 72:16 73:21 74:20,21 75:22 76:3 79:11,21 80:2,25 83:20 86:2 88:22 90:1 94:7 96:22 97:15 100:9 102:22 103:17,20 104:2,9 105:19 108:6 109:24 110:14 111:21 115:23 116:2,3,16,25 118:12,15 119:3 120:24 123:8 130:9 133:16,21 140:17 142:22 144:1,4,13 145:10 160:5,8 162:4, 9,17 165:4,12 166:5,14 170:21 172:21 173:6,17 186:19 188:4

192:13 194:4 198:14 199:16 204:20 225:18 236:18 237:15,23 238:4,5,9 243:8 246:24 249:3,5 250:21 254:12,18,22 256:23 257:2 262:4,10,13 268:7 279:6 295:13 297:14 298:23 300:12,17, 19 301:2,9,11 302:13 304:23,25 305:7 306:12 307:12 311:17 314:6 322:22 329:19,24 330:3,15 331:3,18 332:14 336:12 345:2 356:22,23,24

**believed** 103:7 184:25 204:13 300:24

**belong** 17:13

**belongings** 75:1

**Besser** 45:25 46:18 47:20 48:2,5 49:11,24 292:15

**best** 15:9 40:13 42:3 54:20 79:15 167:14 184:16 185:1 188:4 190:1 227:20 233:25 242:10 275:5 294:23,24 296:6,7 303:18 304:8 333:20 352:3

**betrayal** 264:1

**betrayed** 262:22 263:19

**better** 27:13 106:15 172:3 189:5 287:14 305:4 338:12 366:14

**between** 21:5 32:4 158:11,15 171:24 178:13,15,18 184:2 185:14 196:20 199:19 200:12 212:5 245:14 264:18 266:19 292:14 322:17 327:3,4,10 335:15 337:15 338:10,20 340:7 343:14 352:25 356:25 357:2 359:4

**beyond** 39:25 64:2 66:23 121:8 129:4,5 228:15 242:3 255:11 296:1 308:24 318:20 349:6 351:15 367:22

**Bible** 54:22,23

**bifurcate** 285:13 286:24

**bifurcation** 285:25

**big** 86:25 90:20 127:12 185:21

**bigger** 36:25 264:12

**bike** 120:25 121:4,10

**Bill** 65:4 119:15 126:12 131:17, 20,22,25 132:13,14,18 139:16

140:20,22,25 141:3 142:3,14,19, 22 143:4,9,16,20 144:8,12,15 145:8,10 146:9,14,19 147:1,5,8, 14,15,25 148:5 149:6,14 150:2, 11,17,19,22 151:4,9,10,17 157:4, 23,25 163:19 164:1,4,9 165:7 166:3,13,15 263:23,25 264:2,5 300:15,17,25 301:1,10,17 302:17, 18,21,22,24 303:1

**Bill's** 142:10,11

**billable** 139:3,8

**bills** 164:16

**binders** 64:5

**Birmingham** 5:2,12 84:16 97:17 101:15

**birth** 36:11

**bit** 100:2 151:10 153:4 256:9 314:3

**blanket** 30:19

**blessed** 184:18

**blind** 117:18,23

**blood** 106:10

**board** 80:10 95:4 99:4 312:1

**Bob** 38:18,23 39:6,7,9,15 65:5 66:8 71:3,4,13 72:13 73:11 74:18 75:12 77:9 78:2 79:2,5,7,11,13,17 80:4,24,25 81:4,14,17,21,23 82:2, 4,5,13,21 83:13,24 84:8 85:10 86:9 87:10,17 91:24 93:4,6,8,10, 12,14,17 94:7,18 95:18 96:10 97:1,23 100:15,16,25 101:3,14 103:7 104:1,12,17 105:14,15,20 106:3,4,5,6 107:4 108:4,6,12,20 109:16,22,24 110:3,9 116:14,16 117:1,8 118:7 119:22,24 120:9 123:19,25 126:9,24 127:14,17,25 128:12,15 129:11,13,23 130:18, 19,24 131:6,8,10,11,13,14,23 132:6,23,24 133:2,17,21,23 134:3,6,9,14,15 135:10,13,16 137:7,16,22 138:7,21 139:18 140:15 141:4 142:5,9,15,19 149:13,15 150:1,8 151:23 153:9 155:12,15 157:25 159:2,5 160:8, 11 161:6 162:6 163:19 170:15 171:2,12,14,16,19 172:16 176:9, 22 177:2,22 180:5,25 181:11

182:14 184:3,9,25 185:14,21
186:2 189:12,25 190:20 194:2,20
196:2,3,4,7,9,23 197:16 199:11
200:2,12 204:17,18,19,23 205:3,
18,21,22 206:3 207:2 209:2,14
210:24 212:22 214:5,19 217:12,
25 218:4,20 220:19 235:23 236:3,
10,19 243:4 250:17 255:13
257:23 258:9 261:18,21 262:17
264:1,5,7 267:25 268:1,16,17,25
269:2,19 271:8,11 273:19 276:18,
22 277:1,4,12,16,21,24 278:6,8
279:4,17,19,21,23,24 288:12
294:10,12,20 295:23 296:14,21
297:11 299:22 301:19,23 302:3,
23,24 303:5,10 304:9 305:2,5
306:19 307:17 308:13,20 309:6,
10,12,17,18,24 310:2,5,23,25
311:2,10,15 312:19,22,25 313:20
315:19,21 316:16,21 317:1,22,24
318:9,17,20 319:11,17 320:21,25
321:1,2,16,17 322:2,10,14,21
323:1,5,20 325:23 327:7 329:5
330:22 331:23 332:19 333:18
334:6,17,23 337:1,16,23,25
338:13,16,17,18,21,24 339:1,6,
11,12,18,20,21,22,24,25 340:3,7,
15,19,24 341:1,4,10,14,15
342:18,25 343:2,8,17 344:3,12,14
346:8 347:2,5,12,18,24 348:13,
15,17,18,21 349:6,8,10,12,14,18,
19,25 350:8,11,14,16 351:3,5,10,
11,12,22 352:12,13,17,20,23,25
353:3,17 354:1 355:13,19 356:25
357:1,2,18,19 358:1,6,9,13,15,20
359:2,6,15,20

**Bob's** 79:7 93:10 128:5 129:6
142:3 149:16 189:16 192:16,20
199:19,23 201:24 202:6 204:7
219:3 239:20 254:6 259:16 268:2,
5 271:12 277:6 280:6 317:9
321:21 327:6 336:5

**Bonanni** 288:24

**bonus** 95:1 322:9,19 323:3

**bonuses** 322:10

**born** 204:21

**boss** 224:18 228:16 235:13
264:25

**both** 23:14 71:16 82:11 86:6
88:24 94:10 116:2,3 128:9 143:14

201:23 204:15 318:1 319:8
327:17,19,24 334:10 356:16

**bother** 118:2

**bothering** 337:9

**bottom** 62:17 158:24 267:7

**bought** 200:22

**bounce** 139:22

**bound** 54:6 62:25 63:2,5,8

**Bourgon** 112:13

**box** 64:16

**boxes** 56:17 64:18 75:1 76:25
77:17,21 78:1,7,9,11,15,16,17,20

**boyfriends** 344:12,25

**brain** 60:22

**Brandon** 97:18 101:14 170:8,24,
25 171:1,13,16,19 172:16 279:7
293:18

**breach** 162:16 163:5 165:2 168:8

**breached** 162:22 163:1,12
165:18

**break** 7:19,21 8:9,11 24:4 56:21
57:7 58:3 114:6,7,12,19,25
115:14 136:4,7,9,14 147:12
169:25 170:3 204:1 208:19,22
266:13 272:7,10 305:24 306:1
324:14 325:2,4,5,10

**breakdown** 304:18 309:20
310:6,16 311:4 312:15 313:20
321:3 339:19 340:18 343:11

**breakdown-type** 311:12

**breakdowns** 311:2

**breakfast** 9:22

**breaks** 7:15,16 9:21,22,24
324:21

**Brett** 312:6

**Brian** 37:16 42:18 91:25 92:3,8,
12 129:22,24 304:25 305:2
306:24 307:5,6 308:19,23

**brief** 48:16

**bright** 33:22

**bring** 57:19 132:20 141:3 154:25

156:3,23 188:10 324:15

**bringing** 7:1,2 57:17 249:13

**broad** 247:19 317:18

**broaden** 66:11

**broader** 34:10 39:16 48:19,22
64:3 66:12,13 314:4 317:3

**brought** 7:3 13:17,19 49:15
142:19 186:4,16 190:7 199:8
217:5

**Brown** 5:20 50:11

**bucket** 247:4 314:5

**Buckfire** 85:5

**buddy** 172:4

**building** 28:6 115:8,9 260:11,23
262:12 296:17

**bunch** 58:14,16 319:23

**burden** 9:5

**burn** 115:14

**burying** 263:11

**business** 64:22 65:24 68:20
151:4 168:16 286:19 358:18

**buy** 63:5 131:23

**buys** 63:3

---

**C**

---

**calendar** 64:20,23 65:1,14 66:6,
14,15,16,17,20 67:1,5,13,17,20
68:14 70:2,8,14,19,22,25 71:6,7
72:18,20 73:3,11,14,15,18,19,22,
24 74:5,13 97:20 127:14 236:23,
24 237:1 303:2 330:17

**calendars** 67:23 183:3

**call** 54:13 101:20,22 102:8 222:2
327:21 329:8,12 331:4 332:12
336:4,11 367:20

**called** 47:10 48:4 54:15 57:12
64:25 80:9 81:15 101:18 102:1,2,
6 113:18 130:4 251:4 312:19,21
330:13 336:10,13 360:14

**calling** 54:10,11 162:22 330:12

**calls** 298:21

**came** 12:20 39:7 62:3 77:18 87:9
89:16 93:11 95:9,12,13,19,21
96:2 110:12 111:22 113:24
138:11,16 151:2 180:25 190:15
210:24 252:18 253:4,17,21
269:20 282:2 296:19 300:21
301:25 307:13 321:1,20 326:15

**camera** 195:3

**can** 6:24 8:2,4,5 10:1,17 12:6
13:24 14:14,16 20:2,12 24:4
26:11,15,22,23 27:7 28:15 29:8
39:17 40:22,25 42:12 43:11 49:7
52:25 56:24 57:3,20,25 58:20
60:3 67:10 68:4 73:9 75:9 77:19
80:11 91:18 92:17,19,25 93:1
100:17 104:4,6,21 105:17,25
107:15 108:25 109:5,13 112:9
114:21 115:5,13 118:25 119:1
126:3 127:17 132:19 136:6,7
138:10 141:12,22 145:2 146:6
152:12 156:17 164:2,6,21,24
165:16 167:14 175:19,22 176:3
179:1 180:15 181:13 191:17
193:20 194:10 204:1 205:9 208:9
209:11 210:8,12,14 213:9 214:1
215:5,19 217:18 219:1 220:9
221:6,23 222:5,9,23 228:7
229:18,20,24 230:1,7 231:5,23,25
232:7 233:13 239:6,13 241:3
244:12 247:2 249:19 250:15
255:12 256:8,22 257:2,14,16,17
258:2,4 260:4 266:25 269:17
271:15 273:10 275:5 279:20
283:14 285:3 286:8,9,17,18 290:1
291:6 294:20,22,23,24 296:6,7
298:4 303:16,18 304:6,8 305:3
306:16,22 307:7,24 311:19 312:9
315:17,18 316:19 321:14,18
323:15,17 327:7,11,12 341:21
342:13 352:3 353:6 354:3 357:4
359:17,18,23 360:22 361:3,18
362:17 364:1,25 365:19 367:1
368:3

**can't** 8:12 13:20 20:2 28:1 29:21,
22 30:1 59:2 91:15,21,22 100:19
121:4 127:18,24 139:2 141:8
152:4 164:7 166:22 168:4 175:4
182:18 183:1,4 184:11 190:14,22
191:5,9 198:24 214:10 226:23
229:25 230:5,10,25 247:3 248:10
249:10 252:15 262:11 264:22

**cannot** 14:17 91:8 164:23 173:23
189:5 192:2 226:19 344:6

**capabilities** 300:19 301:3,12
304:12 318:2,7,22

**capability** 299:10 300:20 316:17

**capable** 9:3 40:4 41:2 298:25
299:9,16 300:9 304:15 314:7,8
316:13,23 317:2 319:1 324:22

**capacity** 30:15 81:22 137:14
140:4,5

**capture** 67:3

**captured** 65:12 66:3 242:6
310:14

**captures** 73:21

**capturing** 210:16

**car** 229:13,14 232:5,14 233:2,5
234:4

**card** 185:22,24 186:2,12,14,19
187:2 190:5,12,15,17 191:1,3,8,
18,25 192:5,14 223:18 226:6

**cardiac** 120:21 121:5

**cardigan** 281:21

**cards** 104:24 105:6 182:14,20,23
186:21,23 187:5 190:11,19,22,24
223:16 296:15 299:4

**care** 12:21,25 13:8 15:14,17,25
16:8

**career** 31:16 80:6 83:18 116:7
151:11 261:5 337:11

**careful** 120:21 148:5

**case** 5:9 7:24 11:21 34:3,13,20
36:11 38:24 65:13 144:7 145:9
160:21 165:6,24 166:8,20,22
222:21 251:21 286:10 355:7
356:7 360:16,20 361:1 362:19
363:1,4

**case-wise** 93:19

**caseload** 359:14

**cases** 33:9 34:5,6,16,20 35:7,9

36:7,8,9,12,13 37:18,19 38:1
89:19 118:19,20 119:10 127:2,3,4
131:14 132:19,20,24 134:4 142:4,
6,11 143:3,17,20 147:4 148:4,6,9,
12,14,17 149:2,5,17 151:20
177:8,12,23 178:1 280:12 304:15
352:13,24 353:3 355:6

**categories** 59:15

**category** 130:2 209:7

**cause** 143:5

**caused** 37:20 105:9 152:14
192:13 213:24 259:6

**causes** 257:21

**causing** 263:10 297:5

**caveat** 345:3

**CBA** 314:24

**celebrate** 188:24

**center** 18:25 19:18 24:4 229:14
232:5 233:2

**certain** 35:7,9 36:7 65:8 77:20
139:10,12 148:17 300:3 312:24
314:8 316:24 355:15 356:11
358:24

**certainly** 35:10 36:11 69:12
128:23 148:3 167:19,21 214:18
237:17 259:5 318:6 333:11 339:8
352:22

**certainty** 44:20

**cetera** 295:18 312:17 316:7

**chain** 48:7

**chair** 34:9 35:5,6 36:5,10,13
147:4,24 148:2 149:3

**challenge** 13:11

**challenges** 20:10

**chance** 136:4

**change** 33:10 150:23 164:15
209:14 258:17,24 261:25 301:15

**changed** 27:11 67:15 113:19
259:3 260:5

**chapter** 112:4

**characteristics** 27:16

**characterization** 135:3,11
179:4 180:2 181:12 220:6 229:2,
8,9 233:17 234:18 334:23 355:24
358:12

**characterize** 13:20 120:17
132:12 233:13 263:18 307:24
345:23

**characterized** 246:12 332:1

**characterizing** 155:24 266:3

**charge** 35:5 175:23 176:2 261:9

**chased** 178:7

**check** 18:9 100:1 200:25 221:6
312:19 324:2,6,18

**checked** 312:21,25 313:2

**checking** 324:21

**cheek** 221:17 223:10 224:25
225:16 228:23 229:3,5,7,11,21
232:13,15,16,18,21 233:5,21
235:4,6,11 241:7,19 246:7,11,17
247:7 272:15

**cheeks** 233:12

**chief** 112:13

**childhood** 257:9

**childish** 227:1,6

**choice** 127:17

**choose** 282:19

**chose** 121:23

**Christmas** 182:14,15,16,21
185:22 186:12,21 187:2 188:2,25
189:4,11 190:11,22,24 191:1
192:14 226:6

**Cicotte** 130:7

**circulate** 366:3 367:25 368:2

**circumstance** 253:9

**circumstances** 39:21 40:14,15,
21,23 235:12,15 239:14,15

**circumvented** 80:19

**circumventing** 38:4

**civil** 217:6 294:7 352:8

**clad** 223:15 247:8 267:2,14

**claim** 7:1,2,3 107:4 162:16
163:11 164:21 174:21 204:23,25
217:5,9 249:13 250:17 264:10,17
265:25 267:19 276:22 277:1,16,
24 303:5,10 304:13,21 311:15
312:12 313:11 315:14,19,21
318:17 320:22 321:19 322:25
333:10 337:14,18 340:24 341:9,
15,16 342:19 343:13 344:2,22
345:5 346:6,15,20,22 352:1,6
353:17

**claimed** 220:11

**claiming** 52:16 131:6 164:3,9
205:22 206:3 249:14 262:17
271:24 277:11,21 278:6 292:13
296:8,23 322:1 339:17 342:17

**claims** 6:16 52:1,21 95:19 142:20
154:24 156:3 217:4 220:16
255:22 265:10 305:9

**clarification** 30:3 96:8 179:2

**clarified** 231:16

**clarify** 22:16 33:4 35:8 72:24
75:10,23 77:7 89:11 128:15 129:4
247:5

**clarifying** 329:14

**clarity** 77:7

**class** 27:3

**Claus** 367:22,23

**clear** 22:17 23:2 44:5 53:1 108:4,
11 109:5 194:15 196:25 218:23
293:25 298:17,22 361:3 365:12

**clearance** 365:5

**clearly** 343:15 360:11 364:24

**clerk** 31:21

**client** 19:11 34:12,17 37:17,21
40:9 51:15 86:15 137:25 139:6
140:16,17 143:12 147:8 153:3
163:2,6,13,17 164:14,18 165:3
167:17,22 168:14 175:9 206:13
222:6,7 227:8,10,11 263:10
271:15 283:17 286:18 293:21
296:17,20,25 297:10 298:7,8,19,
20 299:8,11 300:2 310:3 311:14
314:21 315:11 318:5,10 319:3,14,
19 325:5,7 326:13 331:16,20,21
332:6,7 337:12 341:18,20 342:4

343:5,6,10 346:4,19 347:3,12,20,
21,25 348:8 358:14 360:5 361:2

**client's** 363:13

**clients** 33:24 39:19,22 57:9
89:14 119:11,14,19 127:16
132:15 138:8 143:9,18 146:2,17,
23 151:7,12 163:7,21 164:20
169:5 297:11 298:12,13 299:12,
13 300:8,10 303:5 304:9 310:20,
22 315:15 324:19 355:23 357:15
363:4

**clinic** 21:23 23:21,23 24:5 25:8

**clinical** 26:5

**close** 45:19 62:18 98:24 209:11
252:24 253:13 261:10 361:24

**closed** 252:15,20 328:14,19,20

**closely** 91:10

**closing** 253:4,6 331:14

**clothes** 246:19 282:19

**cloud** 69:4

**Clyde** 38:20 39:24

**co-counsel** 285:16 361:20

**co-sign** 264:5

**co-signing** 259:22 261:3

**coach** 45:23

**coaching** 141:18,22

**code** 202:18,25 203:1,2,3,4,5,6,7,
10,12,19,23 204:7,11,12,14,15,
16,18,22,23 205:4,5,6,7,13,15,16,
18 207:15,23 208:9

**coerced** 352:7

**coincidence** 81:2

**colleague** 188:9 189:21 207:15
261:17

**colleagues** 209:7 304:9 310:21,
22 315:15

**collected** 54:6

**collection** 64:3 193:3 215:8
283:25 360:15

**collective** 136:24

**colloquially** 192:21

column 216:18

combination 96:2

combinations 26:25

come 71:13 89:18 91:11 110:13
136:7 137:18 138:8 145:25 146:5
152:10 165:14 178:7 194:20
199:3 209:5 227:1 253:2,7 284:10
286:20 306:6 325:2 331:22
332:20,25 333:3,4,7,8,9,17
334:16 337:1 344:1,8 361:4

comes 92:13 168:11 285:12
286:21

comfortable 31:7 148:16 165:20
166:3

coming 45:8 53:13 252:8 256:6
331:21 332:13,16

comment 218:1 220:4 226:5,6
265:25 272:24 307:16 309:19
310:25 318:6,21

comments 220:19 224:4 226:2,4
228:4 241:25 245:16 299:10
300:20 301:6 311:12,16 316:16,
21,23 317:23 318:1,4,7,9 337:25
338:1

commitment 261:16

commits 169:9

committed 46:16

committee 95:5 99:5 312:2

committing 197:6 263:2

common 315:5

communicate 110:22 254:15

communicated 79:14 81:1
301:7 351:19

communicating 213:4,8 302:24
337:19

communication 49:3 110:25
351:18

communications 104:24 105:7
109:23 110:19 120:19 293:20
303:4

community 126:25 127:7 303:6
304:10 315:15

comp 33:12

company 329:14

compared 29:19

comparing 113:11

compel 365:6

compelled 331:14 352:7 353:22

compensation 33:9 36:18,25
37:3 323:12

complain 92:9

complained 247:21

complaining 145:12,16 187:16
209:4 218:10 242:25 321:21
358:25

complaint 19:18 23:22 24:8
50:22,23 53:3 58:18 77:25 142:9
145:20 162:13 165:5 193:2
214:12 215:6,13,21 218:7,8,13,14
219:1,12 220:15 231:3 247:21
248:6,7,10,11,13 249:20,22
250:5,7,9 272:18,21 273:3,5,8,9,
18,23 274:10 275:7,13,19 276:6
289:13,14 290:3,9,15,18,24
291:4,15,22,23 292:1,21 293:6,9,
11,12,14 294:7 310:21 320:6,7
345:17,20 365:2,5,10

complaints 140:22,24,25 141:4
142:18 143:2 144:14 320:1
345:18 360:18

complete 71:17 189:6 249:7
277:9 300:7 303:20,23

completely 351:3 354:2

completion 63:9

complicated 317:14

complimentary 150:8

comply 242:10

component 55:2

computer 54:2 58:21 201:19
276:18

concentration 228:4 238:24

concept 98:11

concern 9:16,19 61:6 87:13
91:17 96:15 129:10 131:11

concerned 87:4 88:19 150:4
213:6 222:15

concerning 13:18 39:21 61:24
65:22 83:24 96:16 100:25 104:13
152:1 260:6 340:4 355:20

concerns 10:2 146:8

concerted 143:16

conclude 211:22

concluded 36:2 210:20 211:20
234:24 251:6

concludes 369:18

concluding 258:19

conclusion 209:6,10 210:24
211:16 267:22 362:20

conclusory 346:21

concrete 41:19 54:21 97:5

concur 365:21,25

condition 121:8,9

condone 338:21

conduct 99:18 220:17,19 224:9,
11 225:2 259:16 272:4 294:15
296:8

conducted 76:19

confer 363:9 364:25 365:16,23
367:12,15,17,19

conference 103:23 210:10
248:25 252:7,9,14,18,21 253:3
325:15 326:12,25 327:3,7,8,10,
11,12,14 328:10 329:19 330:21
331:7,12,17 334:15 335:16
354:17 356:13,14 365:6

conferences 330:10

confided 80:15,20,22

confidence 28:6

confident 197:8

confidential 205:13

confidentiality 286:21

confirm 38:9 39:4 159:20 202:11
215:19

confirmed 38:22 39:6 194:1
212:13

confirming 80:19 200:3 201:2

**conflating** 265:15

**conflict** 216:19 220:22

**confronted** 110:9 357:1

**confused** 108:10,23 238:19
263:17

**confusing** 77:6

**Congrats** 111:5

**conjunction** 264:16 265:8

**connect** 47:9,15,20,24 79:8,17
264:9

**connected** 45:25 79:6 93:9

**connecting** 76:18

**connection** 48:12 49:12 50:15
51:11 52:1,12,21 138:2 154:24
200:11 264:18 352:5

**connects** 343:12

**cons** 87:18 94:19

**consider** 61:11 74:19 168:8
217:13,21 218:1,6 225:9 226:16
227:25 228:20 245:17 248:1,16
257:5 296:9 298:1 323:20 326:3
334:7 335:6 341:7

**considered** 75:13 217:8 218:20
220:20 224:22 237:21 309:19
310:24 331:10 339:7

**considering** 81:18 86:11 149:25
212:16

**consist** 202:10

**consisted** 126:18 202:8

**consistently** 140:9 212:15

**console** 229:15 232:5 233:3

**conspiracy** 337:14,15 338:3
341:8,9,12,16 342:18 343:13
344:22 345:4 346:6,15,19 352:1,5

**conspired** 356:19 359:7

**conspiring** 346:17,23

**constitute** 54:8 156:15

**constitutes** 162:20 164:25
341:11

**consult** 45:7,21 50:20 361:2

**consultation** 46:19

**consulted** 50:18,22 293:4

**consulting** 292:16,17,22

**contact** 10:2 79:11,13 140:16,17
350:18 352:20 355:19,25 356:1

**contacted** 37:8 105:4

**contacting** 48:1 181:4

**contain** 78:16

**contained** 159:19 269:10

**contemplated** 53:3

**contemplating** 43:20

**contending** 269:19 332:18

**context** 53:7 226:13 257:13
262:1 340:20

**contingency** 50:8

**continually** 6:23 122:14 212:25

**continue** 35:15 49:7 67:13 116:9
117:2 132:15 149:16 245:1 286:8
287:12 349:10,14,18 367:3,6

**continued** 338:24 343:5 347:20
349:8 352:15

**continuing** 339:11 349:12
357:20

**contract** 162:15,16,17,18,20,22
314:17,19,25 315:3,9

**contractually** 164:11

**contrary** 30:14 31:7,12 40:11
41:16 293:24

**contributed** 116:23

**contributes** 163:15

**contributions** 293:13

**control** 299:19

**controlling** 92:4

**conver** 322:15

**conversation** 39:23 43:24,25
44:4,18 48:5 79:24 80:1,17 82:20,
22 85:3,4 91:23 92:14,16 96:23
97:3 98:23 99:2 100:24 101:4
102:5 103:6,13,25 104:10,11
107:24 109:17 110:15,16 118:18

124:5 128:22 130:24 145:24
148:19,25 154:8 166:14 199:16,
20 202:4,8 239:20,22 248:24
254:21 257:15,16 295:19 297:6
308:23 319:15 321:18 322:10
331:2 344:19 349:16,20 350:14,
15,19,22 351:1,8,22 354:2,8,20
358:17

**conversations** 85:7 130:23
131:4,5 159:7 166:5 198:25
209:24 221:13 223:8,21 224:17,
22 226:10 228:12 236:20 240:1,
13,16,20 241:3,12,18 242:2,5,7
257:16 263:12 295:22 297:1,14
316:11,14 317:9,11 319:7 347:20
355:16 359:9 364:11

**conveyed** 95:9

**copies** 58:10,25 64:12 65:14
280:22,25

**copy** 10:6 53:12 58:8,10 70:15
111:17,20 112:15,21 113:5 158:7,
8 162:5,7 178:14 183:25 185:7,8
213:22 266:20 280:21

**corner** 267:8

**corporate** 138:1

**corporate-type** 137:24

**correct** 16:2 18:18 19:4,24 22:2
30:22,23 31:14,18,20 32:3,7,10,
18 33:3 40:13 50:2,3,4,5 56:5
60:24 64:14 69:3,15 70:4 71:1,6
79:3 82:15 100:20 101:9,10
113:19,21 115:17,22,23 116:6,11,
15,20 117:3,10,12,18 119:12,15
120:2,10 121:14,17 126:10,11,12,
13,14,16,21,22 127:8 128:2
132:16,17,21 133:15,16,19,24
134:19,22 135:15,18 139:9,17
140:4,16 143:10,14,17,22,25
144:12,13 147:4,14 149:22 151:5,
13,20 153:14 154:6,14,16 155:1,
10,16,23 156:6 157:20 159:2,3,
10,17 161:8 178:4,8 180:24 181:8
182:15 184:7 190:9 192:20
203:11,15,23 207:5 212:23
233:22 235:2 240:15 269:2,11,22
271:23 278:17 281:4,16 291:4
310:7 311:6 325:16,17,21 327:16
333:5 335:14 349:25

**correcting** 196:11

correctly 93:5 169:14 179:2
184:12,13 186:6,7

could 14:10,22 21:22,23 25:11
30:19 36:9,13,15,17 37:11 40:7,
11 41:16 45:16,18 60:8 64:4
66:23 67:3 69:23 76:24 79:16,24
80:2 86:15,25 88:8 97:11,14
98:10 101:22 105:4 116:14 117:1
118:8,10,16 119:9,19 123:10
124:24,25 125:1,7 131:23 132:10
134:4 135:14 139:7 140:1 146:9
147:24 148:2 149:4 158:1,23
160:15 163:25 165:22 166:16,20
171:24 183:3,10,15,17 187:24
191:13,22 194:17 200:25 201:10
204:24 212:19 225:20 228:6
232:19 259:9 300:4,11 325:4
335:21,22 351:7

couldn't 14:12 24:11 60:2
101:23 121:14 123:23 124:20
161:21 197:22 260:2 288:16
300:5 312:16 313:8 335:12,18
367:4

counsel 5:15 9:9 16:3 24:19 30:2
45:3,7 46:15 47:6 48:11 50:10
52:16 53:14 70:15 76:12,17 77:5
99:25 108:11 111:17,18 112:14
113:4 137:13,14,17,25 144:5
158:8 175:15 178:14 182:3,11
183:19,20,25 185:8 203:25
213:20,22 216:16,20 219:15
222:2 242:13 256:5 259:9 265:10
278:1 284:10 324:1 347:8 350:2,
6,11 351:3,8,20 357:1 358:4
359:22 360:8 369:14

counsel's 187:19

counsel-type 138:1

counseling 46:21 47:4,6 155:5,
12,15 156:4

counselors 15:19

couple 9:8 24:15 47:13 63:4
118:5 130:15 267:21 274:19,22
281:8 328:2,3,4,8 368:23

course 6:20 29:7 40:22 82:21
105:9 329:3 362:17

court 5:16 16:21 17:22 20:16
104:8 141:15 156:19,23 180:18
181:16 216:20 272:19 273:6,15
283:7 285:15 293:25 355:1

360:23 361:1,12 362:10 364:10,
13 366:6 367:8 368:14 369:5,8

Court's 293:24 366:12 369:8

court-allotted 127:18

courtesy 347:7

cover 74:5 78:24 246:10 321:5
323:15

covered 83:20 107:12 240:7
246:8,9 368:13

covering 246:9 281:15,17,18

covers 311:6,8

COVID 198:11,13,15 238:6,10
260:7

crammed 78:5

create 62:9 71:9

created 59:22 60:10,12,13,18
61:3 302:13

creates 302:16

creating 61:12 76:23 302:20

cried 262:17,21 331:23

crisis 25:11

criteria 290:10

critical 320:12

cross 362:1,13,20,22 363:2,4,7
364:24 368:8

Cross-talk 366:19

crossing 259:17 261:6

crying 203:20 261:23 262:1
263:6 309:21 312:17 313:10
316:7 321:3

crystallized 211:9

Cullen 44:10 85:8 130:1,4,8

cumulative 266:9 272:5

curious 141:11

current 50:10,12

currently 55:20 56:4

custodian 57:10

cut 237:10

cute 276:12 367:24

---

## D

D'AUITO 311:18

dad 228:14 239:9,10 255:11
256:22 257:10

danger 336:21 337:7

dark 121:24

date 23:19 25:18 45:12,17 65:2
74:17 82:16 83:7 100:17,19
101:13,17,22 105:3 113:20 116:1,
7 127:15 134:6 148:22 151:24
153:12 159:21,25 161:5 173:6,22,
24 174:3,9,18 175:5 182:22
192:19,23,25 193:9,15 195:11
197:3,6,7,19,22 205:2,8 209:9,10,
11,16 214:4 215:1,3,5,10,19,24
221:21 229:17 231:21 233:8,9
250:19 258:25 259:25 260:14
271:19 295:11,14 303:8 329:23
330:16,18,20

dated 9:15 174:15,17 182:16
184:3 185:15 187:2 196:15

dates 116:2,3 160:23 174:8,10
182:17,22,24 183:11 195:8,10
198:24 214:7,10 216:18 230:10,
12 275:7,9,13,20,21 290:4,9,12
330:1 366:6 367:8,10,19

dating 343:21 344:5

daughter 268:3 270:2,7,11,14,
17,21 271:2,9,14 367:21

David 305:15,18 306:24 307:8,
18,20,25

Davis 6:1 18:9,15,18 112:3,7
172:2 205:25 210:10 216:20,25
227:17 244:2,9,13 275:1 276:9
278:16,18 283:9,12 285:2,18,23
286:16 287:1,4,7,17,21,25 293:20
360:25 361:11,22 364:2 366:9,14
367:1,6,20 368:2,6,8,12,17,25
369:3,10

day 29:8 45:13,14 101:24 102:6,7
115:19,24 116:16 151:7 184:15
185:25 186:14 187:23 189:10
192:20 193:6 196:13,18 198:5
231:24 282:20 298:25 299:2,5
309:21 321:3 329:17,20 330:14

356:25

**days** 22:5 28:1 184:12 198:10

**deal** 40:8 158:18,20 180:11

**dear** 188:9

**Dearborn** 194:22

**death** 228:14 256:21

**Deb** 46:4 50:2 369:17

**debate** 98:13

**debating** 18:5,16

**Deborah** 5:24

**December** 5:1,7 187:2

**decide** 151:22

**decided** 101:8 103:10 134:21
151:17 152:6 157:3,22,24 173:2
234:15 247:4

**decides** 134:18

**deciding** 93:15

**decision** 42:14 84:17,19 93:25
160:19 161:2 169:18

**declaring** 258:5,8

**declined** 103:2 108:15,19

**declining** 102:10 108:5,13

**decrease** 322:16

**decreases** 338:9

**deeply** 24:7

**defend** 41:6 324:18

**defendant** 156:2 165:22 167:11

**defendants** 56:9 285:14,16,25

**defendants'** 70:12 75:4

**defending** 227:8

**defense** 32:17,20,24 33:2,3,12
81:8 113:4 116:6 149:19,20,25
165:9 284:21 285:11,21 286:1,4,
10 287:2

**defer** 345:3

**deficiencies** 362:25

**defined** 249:25

**definitely** 42:7 60:1 68:25 83:3
92:25 113:14 129:22 130:22
203:19 209:16,17,19 224:18
254:20 262:15 294:18 323:22
340:2 362:21

**definition** 168:19 245:23

**degeneration** 123:2,22

**degree** 257:6

**delayed** 317:15 331:13

**delving** 226:12 239:13 259:21

**demanded** 367:20

**demanding** 235:14

**denied** 164:3 165:9 268:22
284:21 302:22 303:1

**deny** 180:11

**denying** 120:19 147:16 157:14
180:9 191:24 203:14,17

**dep** 16:24 90:2,5 112:10 166:22
175:24 176:2 242:20 271:16
324:2,18 362:18 363:8,10

**depart** 22:7

**departing** 41:1

**depending** 40:14 139:5 225:12
239:14 257:14

**depends** 27:14,24 235:12

**deposed** 363:14

**deposition** 5:8,10 6:20 8:23
16:21 17:14,15 18:4 21:3 34:22
53:7 54:16 56:14 70:11 83:17
111:13 112:22 113:6 152:18
158:4 161:12 163:24 178:11
182:9 183:23 185:5 210:12
213:18 215:16 227:12 266:15
276:16 285:8 286:8 287:9 320:2
353:7 355:6 363:13 366:15
367:10 368:14 369:19,22

**depositions** 35:17 164:5,10
166:24

**depressed** 12:23

**deps** 87:25 166:17,21 167:3,4,9,
11,16 360:24 361:7

**describe** 12:4 26:8 27:6,10,19
28:2 29:3,6 41:11 55:8 63:1 97:8

107:6 189:6 196:20 217:11
225:21 229:4,6,10,12 257:21
261:22 262:1 269:14

**described** 54:5 55:3 97:4 123:22
144:20 262:22 263:6 315:13

**describing** 296:24 309:10 313:4

**description** 26:9 41:7,8,10,12
158:19 300:7

**descriptions** 26:11

**descriptor** 13:25 14:5

**designate** 250:6

**desires** 257:24

**desk** 154:12 251:2 279:17

**despite** 346:1

**destroyed** 57:2

**detail** 98:16 274:11,16 309:1
315:6 320:12,14

**details** 96:17,20 98:3,4,6,8,10,
12,14 122:21 164:25 182:24
183:11 227:24 232:1 233:10
256:25 290:23 309:8,15,16
319:25 321:22,23,24 333:5
337:21 338:7,18,25 343:21 344:2,
17 346:7 347:3

**determine** 201:23

**determining** 41:2

**deterring** 134:3

**Detroit** 46:10

**devastating** 332:4

**develop** 163:2,5,12 164:13,18
165:2 167:17,22 168:15

**developed** 33:17 151:4

**developing** 276:6

**development** 33:14,16

**device** 153:20,23 154:2 250:23

**devices** 62:24

**devote** 128:9

**devoted** 139:3

**diagnosis** 26:6

**diagram** 313:25

**Diane** 37:24 38:9,19,22 39:2,7,
14,16,18,21,25 79:6,7,10 80:15,
18,21,22 81:18,25 93:9 148:10,13
149:1,7 160:3,4,6,8,13,14,15,17

**dictated** 28:13

**did** 6:23 12:25 13:10 14:10 15:1,
13 17:13 18:20 19:22 21:6,17
22:20 23:17 24:1,5,9,18 25:2,8,
10,13,24 27:1 28:11 30:15,16,24
31:3,5,7,12 32:19 33:17,19,24
34:1,2,22 35:3,18 36:3,24 38:5,9,
12 39:4 40:1,4,7 41:19 42:24
43:11,13,22,24,25 45:7,21,22
46:3,12 47:3,8,9,11,13,15,20
48:2,10 49:11,16,19,23 50:1,6,20,
25 51:1,9 52:11,20 61:20 62:9,24,
25 64:19 65:2,17,18,19 66:20
67:5,8,17,20,23 68:1,15 69:21,23
71:9 79:10 80:3 82:3,20,21 84:25
85:10,15,19 86:2,9 87:1,17 88:14
89:7 90:1,10,16,24 91:13,24
94:18 96:10,14,17 97:8,14 98:3,8,
15,16 100:7,13,23 101:5 102:9,
18,19 103:13,19 104:15,18
106:16 107:2,6,10,20 108:6,7,19
109:16 110:2,22 113:14,16
116:12,23 118:2,11,18 119:6,8
120:3 122:1,4,13,23 123:25
126:24 128:12 129:13 130:3
132:15 133:21 134:22 136:19
137:20,22 138:3,5,7,20 139:16,20
140:11,15 141:3 142:7,12,14
144:7,9 145:8,10,23,25 146:5,14,
22 147:22 149:6,17 150:1 151:22
153:18,20 154:2,7,9,21,22
160:13,14 162:3,4,7,9 163:5,16
164:4,16,17,22 166:2,11 169:14
170:15,17,18,19 171:21 173:1,8,
15 175:6 176:7,21,24 177:7,17,23
179:2 181:10 184:12,20,22 186:6
193:11,17,18,19,25 194:20
195:14,19,20,25 196:23 197:19
199:3,10,14,18,21,25 200:6,9,11
201:10,22,25 202:10,16,22 203:1,
6,19 204:7,9,11,16,18,25 205:7,
15,21 206:1,16,24 207:10 209:2,5
210:15,19 211:1,2 212:3,8,11,24
214:5,8,16,23,24 216:1,6,11,15
219:14 220:5 226:15 227:24
229:1 230:12 232:12,16 233:4,23,
25 237:1,6 249:2 251:13,17,19
252:3,13 253:3,8,14,16,18 254:5,
11,15,17 255:12 256:20,25
258:10,16,17 259:15 261:21
263:6,7,14,16 267:21,23 268:20,
22 269:1,9 272:17 273:17 274:11
275:19 278:24 279:10 280:4,9,14,
21,22 283:3 288:2 289:3,15
291:10,21,25 292:19,23 293:8,10,
13 294:4,7,12,25 295:7 296:1
298:5,15 299:16 300:17 304:8
306:18 308:6,9,19,22 309:2,18
311:10 312:13 314:17 316:16
318:20,24 323:21,22 327:25
328:12 329:20 330:2,4,5,22
331:21 333:3,7 334:6,17 335:9,10
336:4,9,11,16,19,23,24 337:3
340:3,15 344:9,18 345:21 348:11,
14 349:5,6,13,16,18 350:10,22
351:10,21 352:10,13 353:3
355:23 358:21,23 366:14

**didn't** 20:21,25 21:6 24:2 25:18,
22,23 37:2 40:12 43:4,8,12 47:14,
19 69:12,14,23 71:12 81:22 83:7,
11 85:22 90:2 91:14 94:3 97:5
98:5,6,7,18,19,20 102:2,16 106:9,
13,14 107:13 109:20 117:12,14
120:3 124:2,6 133:2 138:2 150:9,
16 153:16,18,19,20 154:5,20
180:6 181:1 190:1 195:13 198:4
199:6 201:13 202:14 204:9 207:4,
7 211:4 212:3 225:24 230:18
231:12 232:15 244:24 247:9
251:22 268:13 269:8 273:22
274:3,15,19 275:4,8,9 278:9,19
289:20,24,25 290:11 297:23
301:11 302:3 307:25 308:17,21
310:1,18,20 314:23 319:9,25
321:23 323:24 332:5,12,25 333:4,
7,11 339:22 345:25 348:13,17,18
349:11,15 364:21 365:8 366:24
367:14

**died** 134:7,14

**difference** 21:5,8 150:23

**differences** 171:23 188:25

**different** 21:23 22:1 28:20 52:6
53:23 54:4 55:6 67:4 76:4 82:6
83:16 84:2 89:5 94:25 97:11
102:11,13 107:13 118:6,22 126:7
130:15 132:7 139:5 144:20
149:20 150:17 157:4,23,25 158:2
167:7 171:16,22,23 172:18,19
189:17 205:12 206:10 209:7
216:18 221:12 240:25 241:5
258:22 264:24 278:25 279:2
281:10 292:3 297:2 313:13 327:5
334:9 345:18 357:2

**differently** 152:11

**difficult** 202:1 238:20

**difficulty** 245:13

**digging** 294:1

**digital** 57:12

**Dina** 95:24 96:3 101:6

**dinner** 9:23 72:12 97:15,17,18,21
98:2 101:13,19,23 123:5 170:21
221:19 223:9,20 225:14 231:1,23
232:3 233:1 234:8 241:4,6,7

**dinners** 66:8 72:17,19 73:3,5,11
121:21 192:9,11 219:4 221:1,13
223:5,7,24 224:5,7,10,12,15,21,
24 225:1,10 226:9 228:24 230:23
231:2 234:14 239:5 240:1,3,10,
12,19 241:5,12,17 242:1

**direct** 51:15 86:15 149:19
301:14,22,24 362:21

**directed** 7:4

**directing** 52:14 275:25

**direction** 102:11

**directly** 25:9 37:18 38:24 130:18,
19 132:4,5 148:14 149:4,17 160:9
268:21 284:24 299:21 307:25
364:13

**director** 249:1 298:10 310:13

**directors** 95:4 99:4

**dis** 292:2

**disagree** 178:9 180:1 229:2
233:16 334:22 353:9

**disagreed** 30:10

**disagrees** 287:22

**disappear** 57:2

**disappointed** 109:19 263:19
309:6

**disappointment** 309:5

**disciplinary** 314:13

**discipline** 138:16

**disclose** 24:1

**disclosed** 104:1

**disclosures** 94:15

**discovered** 192:11,17 194:1
195:23,24,25 196:9 197:1 210:21
211:7

**discovers** 193:2 215:7

**discovery** 17:16 18:5,16 34:7,
11,12 36:21 41:24 42:8,9 56:25
57:16,18 58:1 70:9 75:20 166:24
183:5 191:14 193:21,23 196:21
210:19 277:22 284:22 285:7,9,10
322:8 363:1

**discrepancy** 144:22,24

**discrete** 54:7 163:25

**discretion** 169:14,17,19

**discuss** 13:12 100:14 154:18
199:25 201:22,25 256:20 257:1
333:19 349:11

**discussed** 15:23 38:10 98:15
168:11 179:15 183:15 239:2,4
241:22 337:20,23 346:14 349:17

**discussion** 35:15 38:18,19 85:6
87:23 88:2 122:11 177:1 239:17
337:22 345:11 358:1

**discussions** 83:3,18,23 84:8
161:7 173:10 181:5 223:19,20
260:22 342:22 358:9

**disease** 123:14,17,19 124:11

**disparage** 304:9

**disparaged** 303:6

**disparaging** 303:10 304:13
308:10 309:11,19 310:24 311:11,
16 312:13 313:4 315:14 317:23
320:5,23

**dispute** 20:11,19 284:19 285:10

**disputes** 17:16 18:5,17 50:16
51:11 57:16,18 285:7

**disputing** 159:22

**disrespectful** 222:20

**distance** 233:23 296:14,21
299:22 301:14,23 322:16,17

338:10

**distancing** 233:1

**distinct** 240:5 241:8

**distinguished** 316:20

**distinguishing** 245:14

**distract** 336:6

**distracted** 141:13 227:21

**distracting** 354:2,6

**distress** 24:8

**District** 369:1,4

**disturbance** 188:14

**divided** 327:2

**divorce** 11:21,22,24,25 309:22
311:3,13 312:17 313:6,9,22 314:3
316:13,18,22 317:4,5,13,15,16
318:3,6,7,16 319:6,8,9,15 321:9
323:7,13 337:24 339:16,19
340:22 341:5,14 342:24 343:2,20
344:4,24,25 356:5 360:2

**divorced** 310:1 317:12 322:21
339:22 340:5,6,11 341:2 343:9

**doctor** 9:13 10:12 324:20

**doctor's** 114:13

**doctors** 12:19 165:22

**document** 6:21,24 7:6 54:3
58:15,19 59:16,22 70:18 71:4,5,9
75:5,17,25 77:4,15 162:12,21
213:7 262:8 267:1

**documentation** 333:23

**documents** 6:19 7:9,13 55:15
64:3 75:4,16,19 78:17 111:22,24
114:2,4 123:7 124:1 125:5,16,17,
18 126:6 152:20 183:3 205:1
206:6 214:20 215:19 216:17
260:9,13 286:4,6 303:21 320:3
353:5,13 360:11,13,15

**does** 26:19 46:23 56:23 69:20
119:23 150:11 156:15 192:23
205:6 207:16 260:1,15 261:8
264:9 266:20 270:5 279:22 284:5
293:2 323:15 343:11 346:5,10,15
349:15

**doesn't** 54:23 67:2 71:13 92:4

98:12 119:22 159:25 169:16
205:4 220:14 265:7 267:5 270:4
277:25 279:21 286:16,20 297:8
303:2 330:9 348:20 361:13

**dogs** 67:4 121:1,4,11

**doing** 15:9 33:6 40:15 54:20 62:5
72:1,2 90:19,20 102:15 104:17
106:4,8,21 128:8 133:1 134:16
146:14 166:3 175:13 176:17,18
177:17,18 188:18 233:4 235:13
256:7 281:8 285:24 287:14
298:25 299:16 314:7,9 316:13
319:1,13,18 324:19 349:9 365:12

**Don** 315:22

**don't** 7:5 8:1,10,22 9:4 11:17,18
12:6,12,13,14,23 13:5,13,15,16,
17 14:5,20 16:7,13,15,16 18:14
19:6,7,19 20:3,5,17,19,22 21:1,3,
7,9,15,16 22:11,24 23:3,5 24:10,
12,23,24 25:17 26:2,7,24 27:8,14
28:15 30:19 32:14 35:23 36:20,21
38:11 39:3,5,6,8,11,12,17,18,21,
23 42:9,10 43:9 44:3,4,15,18
46:9,10 47:13,16 48:6 51:2 53:24
54:13 56:6 57:7 58:19,21 59:7,18
60:6,21,23 61:18 63:14,19 64:10
65:7,11 66:6,8 67:22 68:4,5,22
69:7,10,19 72:6,7,16 73:2,8,22
74:3,22 76:2 78:4,6,20 79:25
80:9,13,14,20 81:7 82:16 83:4,7,
9,19 84:5,14 85:5 86:4 87:6 88:11
89:18 90:8,23 92:21 93:7,8,10,11,
13,22,24 95:11,15,24 96:5,25
97:1,19 98:4,9,14,19 99:9,11,16,
23,24 100:11,17 101:17 102:7
104:5,20 106:6,8,22,23,24
107:18,25 109:2 110:10,11,14
111:2,6,9,10 112:16 113:11,12,
20,22 114:7 115:14 116:1,2
117:25 118:8,10 119:20 120:8,14,
16 121:1 122:12,21 123:8,10,21,
24 124:6,11,15 125:5 126:1,2,7
128:1,3,4,11,18 129:8,9 130:22
131:2,24,25 132:5,12 133:20
134:5,13,14,20 135:16,20,23,25
138:19,23 139:7 140:5,14,17,18,
24 141:17 142:4,16 143:1,7,11
144:2 145:15,19,24 146:3 147:15,
19 148:6,22 151:21,24 152:6,13
153:12,17,22 154:11,18,22
155:13,17 156:21 157:10,13,16
158:20 159:18,21,23 160:11,12,

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
Index: done..elevated

14,16,21 161:2,5,15 162:1,11
165:25 166:15 167:9,12 168:3,18,
25 169:5 170:24 172:11,12,15,22
173:22 174:3,8,10 175:4,20
177:2,11 179:24 180:7,8,11
181:11,21 182:21,22 183:16
184:6 185:11 186:18,19 190:3,12
191:5,14,15,23 192:2,18 193:15,
16,22 194:8,14,18 195:9 196:6,12
197:2,6,7 198:3,5,17 199:7,16
201:2,18,19,21 202:25 203:3,12,
16 204:21,22 205:2,8,14 206:19
207:13,21,22,24 208:7,8,13,14
209:9,15 211:25 212:15 214:3,7,9
215:1,18 216:9,23,25 219:11
221:21 223:3 226:17,25 227:19
228:12,25 229:17,19,22 230:3,5
231:8,13,20 233:7,8,20 234:17
235:3 236:6,16,24 237:10 238:2
240:17 241:8,12 242:11 245:6
246:10 248:12 249:4 250:6,19
251:16 252:12 254:18,19,21
255:2,15,24 256:2 257:4 258:25
259:25 260:9,13 261:7,20 262:19
263:17,20 264:21 265:3 267:12
268:7 269:21 271:17,19 273:21,
25 274:23 275:8,9,22 276:7
277:22 278:10 279:18,23 282:2,
22 284:1 285:2,19,20 287:5,8,11,
12 289:2,5,6 290:2,6 293:10,15
294:11 295:14 298:11,12 300:1,5,
16 305:1,10 307:5,12 308:11,23
309:1,8,16 310:9,14 311:18
313:14 317:8,19 318:5 319:21,24
320:20 321:4 322:14 324:4 326:7
328:8,13,15,17,21 329:4,16,23
330:1,10,16,17 331:2,6 332:17,18
333:2,4,22,25 334:1 338:13
339:1,2 344:20 346:7 347:11,14
353:5,10,12,14,15,24 354:18
355:4 357:12,25 360:2 362:8
366:7 367:25 368:17

**done**  57:13 60:11,19,20 75:14,
19,22 76:12,13,25 77:15,20
127:19 140:1 145:18 209:22
237:4 245:5 251:20 287:10 289:9
300:11 352:17 354:4

**Donna**  134:23 306:14 307:2,8
308:5,6 315:24 316:1 322:10,13
340:1 346:8 356:25 357:2,18
358:22,24

**Donna's**  359:14

**door**  8:12 208:3 248:23 323:22
325:24 326:7,21,25 327:3,7,8
328:5,14,19,20 331:1,5 334:9
335:10,15 336:15

**Doordash**  169:1

**doors**  327:1,2

**doorway**  328:6

**dose**  159:7

**double**  227:13

**down**  28:15 53:18,20 61:8 62:6,
17 92:23 102:1 112:17 125:15
147:12 155:6 173:6,8,12,15,21,25
174:2,4,14,18,22 175:1,2,4 210:8
215:9 221:3 234:15 266:10
281:13 285:12 286:20,21 307:5
330:3 331:14 347:19 348:13,18,
19 349:6 350:17 351:6 354:10

**downhill**  338:2

**downstairs**  169:1

**draft**  291:22,23,25 345:20

**drafted**  162:14 218:13 272:18
275:20 289:13 290:18

**drafting**  50:21 273:22 274:10
290:24 291:3 292:20 293:5,8

**drama**  297:5 302:13,16,20

**drawn**  57:21

**dress**  282:19

**dressed**  282:18

**drinking**  114:14

**drive**  117:17,21 118:11 124:20

**driving**  117:9,11 224:24

**dropping**  232:25 241:6

**drove**  221:19 232:2

**dry**  132:8,19

**due**  120:21

**duly**  6:8

**during**  8:23 23:10 32:9 33:18
34:4 60:5 65:8 78:2 79:25 82:21
105:9 119:5,13 121:12 127:18
133:25 144:5 157:2,8 163:23
197:21 199:16 211:24 215:16
224:12,15 227:12 231:18 239:3,5

253:22 257:15 258:23 259:2
262:4 264:4 294:18 297:16,18
310:3 329:9 331:23,24 332:2
337:24 341:6 344:25 350:16
351:8 354:1 355:13,19 357:2,20
359:9 360:1 363:7

**Dye**  263:24

**dying**  134:15 239:9,11 255:11
257:10

---

**E**

**E-S-S-E-R**  94:12

**each**  61:18 73:8 232:20 242:16
313:17 330:20

**earlier**  57:24 156:12 172:25
173:9 183:19 193:13 220:5,22
238:11,13 240:14,24 241:2 281:6
302:11 304:3,4 308:16 361:1,2
362:25

**early**  43:21

**easier**  30:12 63:6 158:23

**easily**  79:24 188:11

**Eastern**  369:1,4

**echo**  361:25 362:24

**educate**  287:8

**effect**  47:1,25 102:4 106:5,11
140:11 157:12 348:16 350:16

**effective**  311:13

**effort**  143:16

**efforts**  95:2 144:14

**eight**  26:24 67:1 317:17

**either**  15:14 42:21 47:3 50:15
51:9 60:19 61:3,18,23 86:17
104:9 120:19 121:16 147:8,22
216:25 217:12 234:2 263:11
289:24 303:5 328:18 333:8

**elaborated**  241:17

**electronic**  58:8,10,25 59:10,13,
15 60:15,22 61:4 64:7 74:18

**electronically**  60:11,13 111:19

**elevated**  9:25

**ELH** 168:13 169:9

**Elizabeth** 5:22 6:13

**Elliott-larsen** 217:6

**else** 18:6 46:3 47:3 50:20 52:16 75:8 77:11 86:16 89:24 91:18 92:11,12 102:15 127:20 129:10 130:6,20 142:25 164:24 168:7,22 186:18 191:10,11 195:12 221:24 223:17 224:21 243:9 245:24 246:3,11 247:18 254:23 255:1 259:18 263:6,21 293:8,10 295:6 297:13 299:7 303:23 304:16,19, 24 305:6,12,14 306:15 307:2,14, 22 311:22,24 312:7 314:6 316:10 321:8 322:25 323:3,8 334:6 335:6

**else's** 207:11

**Elyse** 5:8,9,19 6:7 9:19 48:8 106:4 112:12 158:12,25 174:6 184:2 185:14,20,23 186:2 187:23 189:12 199:23 266:19 339:6 357:12

**email** 47:11,19 48:2 67:15,16,19 68:13 70:5 74:14,15 79:24 111:7 120:20 140:13 158:14,16 178:13 196:4,15 254:17 266:18 331:25 332:4 350:14

**emailed** 47:18 196:7,9 367:18

**emails** 18:10 111:10,11 183:20 236:15 333:19 350:16

**embrace** 229:11

**emergency-type** 24:3

**emergent** 23:21

**Emily** 306:14 307:3,8 308:7,8 311:10 315:22,23 316:2 317:24 318:23,24 337:23 340:1

**emotional** 12:4,10,18 13:11,21 14:1 15:2,13,23 18:21 19:12 25:15 26:1,3 318:3 340:21

**employed** 12:17 69:16 115:16, 21 126:20 163:8 231:7 255:23 294:9 297:16,20 360:6

**employee** 138:16 272:1 294:3 298:6 322:18 352:11

**employer** 311:25

**employers** 167:5

**employment** 12:3 13:1 14:2 15:22 18:22 25:13 67:18 86:1 105:10 111:16 112:12 115:19,24 138:11,13 150:15 151:16 230:9 255:22 261:6

**encounter** 233:24

**end** 25:18,22 45:19,20 76:3 107:15 135:2 139:4 151:11 194:7 198:22 209:24 210:23 211:4,6 238:7 253:25 262:11,14,15,25 283:11,15 295:14 302:8,12 332:25 358:8

**ended** 43:25 78:19 103:24 123:3 230:2 326:14 334:2,3 347:24

**ending** 244:25

**endorsed** 163:17

**endorsement** 129:16

**engage** 294:4 336:9

**engaged** 99:17

**engaging** 285:6 365:22

**Enjoy** 189:10

**enough** 36:5 41:5 62:19 89:23 90:9 114:23 166:1 273:21 289:25 330:19

**enter** 275:15

**entering** 327:1

**entire** 67:19 126:1 135:8 207:24 217:15 220:6 230:24 242:18 244:16 248:11,13 255:17

**entirely** 264:8

**entirety** 157:10

**entitled** 362:18,20,22

**entries** 236:24

**entry** 237:1

**environment** 86:13 217:9

**Eric** 306:6,23,24 307:8 308:1,2 309:7,8,9,14,16

**escalated** 152:2

**ESI** 57:10

**especially** 160:21 356:12,17

**Esser** 94:12

**Esser-weidenfeller** 37:9 82:9, 11 94:9

**establish** 168:14 330:11

**established** 133:2

**estimate** 15:9 229:24,25

**et** 295:18 312:17 316:7

**et al** 5:9

**even** 16:25 43:11 51:2 54:6 74:13 83:9 121:14 124:12 162:19 175:20 194:14 203:1 216:23 222:11 243:9 250:7,10 255:4 272:17 274:3 282:14 285:19 310:1 351:16 365:4

**evening** 241:19 327:17,20 329:15 331:18

**evenings** 336:14

**event** 9:24 16:1 62:11 66:18 152:14 178:2 180:11 248:16 260:16 282:3 331:9 334:8

**events** 61:22 64:21,25 65:20,25 66:1,9,10,21 73:25 74:4 77:2 152:16 192:10 220:25 221:1 223:2,4 234:24 245:14,16,17 248:21 275:13,20 326:15 334:21

**eventually** 91:11 132:8,18 160:15 168:17 202:15 264:2

**ever** 11:20 19:19 25:14,25 26:5 34:11,22 47:11 102:19 110:1 113:13 118:2 119:6,8 122:23 123:21,25 136:24 137:2 140:11, 12 141:3 143:24 144:7,11 146:14 149:6 160:13 162:3,7 176:21,24 187:23 196:3 206:16,24 208:1 303:13,17 314:17 319:17 332:24

**every** 7:13,24 8:10 62:5 72:12 114:12 121:22 217:24 218:5 232:20 236:25 248:15 273:18 274:11,15 278:10 280:20 303:17 309:21 313:17 321:3 341:6

**everybody** 127:10,13 366:23 369:12

**everyone** 16:7 29:8 65:7,9 150:5,7 195:12 197:11,25

**everything** 22:17 32:13 54:22 56:1 57:10 69:3,5 74:21 76:1,3, 10,19 78:15 92:17,19 104:21

139:5 148:3 179:19 183:8,10,14
208:4 217:11 218:19 225:18
245:10 249:7,11 257:13 269:15
303:13 311:8 315:13 323:15
344:7

**evidence** 18:12 165:17 188:15
359:19

**evolution** 188:21

**evolving** 92:16

**ex-husband** 73:21 97:18 128:22
194:18 253:12 254:25 257:4
279:25 280:3 293:11

**exact** 35:24 80:13 249:4 308:23
309:8 328:8 330:19

**exactly** 16:16,24 39:2 81:7 84:14
188:19 202:15 259:7 270:20
305:2 331:19 368:12

**exam** 362:21

**examination** 10:23 362:1,20,22
363:2,4

**examine** 362:13 363:7 364:24

**examined** 6:8

**example** 302:21,23 314:13,14,16

**examples** 104:20 240:14

**excel** 168:4

**except** 194:2

**excerpt** 70:13

**excessively** 222:20

**exchange** 266:18

**exchanges** 178:13 179:10

**exchanging** 236:17

**excited** 184:10

**excluded** 273:1

**exclusive** 348:22

**Excuse** 284:7 362:7

**executive** 95:5 99:5 112:13
249:1 298:10 310:13 312:2

**exemplary** 168:12

**exercise** 120:25 121:4,10

**exhausted** 248:21

**exhaustive** 304:7 344:6 352:2

**exhibit** 9:14 10:6 70:11,13,24
72:14 73:7,9 111:13,15 158:4,6
160:2 161:8,12,14 162:12,25
165:19 168:8 169:2 178:11,12
182:9,10 183:23 184:1 185:5,7,9
187:5 190:25 213:11,12,15,18
216:17 261:21 266:15,16 276:16,
19

**exhibited** 263:7

**exhibits** 153:3,8 180:1 181:8
213:20

**exist** 54:23 61:18 63:14 139:8
328:24

**exists** 194:19

**exited** 232:16

**expansive** 247:19 253:25

**expect** 8:1,10 324:15 353:15

**expectation** 177:17

**expected** 7:18 168:12 172:13

**expecting** 334:16

**experience** 32:5 83:18,22 89:21
90:15 94:22 95:22 96:3 99:10,12
128:10 132:25 136:19,24 137:2,5,
8 151:9 177:25

**experienced** 220:11,17

**experiences** 9:25 91:12

**expert** 163:24 166:17,21

**experts** 164:5,10 165:21 167:16

**explain** 9:5 12:6 34:10 73:9
264:22

**explained** 150:13 174:24 209:12
211:11 264:23

**explanation** 8:24 217:22

**explore** 88:7

**exploring** 178:24

**exposed** 137:7

**exposure** 169:4

**express** 176:21 263:14

**expressed** 81:6 99:9 129:10,19

**extended** 22:5 86:3

**extent** 58:25 62:9,15 139:16
317:8

**extenuating** 40:21,22

**extremely** 280:17

**F**

**fabulous** 189:10

**face** 188:10 282:4

**facilitate** 89:19 352:13 353:3
356:7

**facilitated** 89:17 356:15

**facilitating** 353:17

**facilitation** 81:20 90:4,15 123:6
124:24 125:7,10,15 252:7 355:22

**facilitations** 352:12,23 353:14

**facilitator** 127:7

**facilities** 21:24

**facility** 24:15,25

**facing** 288:4

**fact** 27:24 81:18 83:14 87:20
110:3 116:24 120:20 124:20
132:21 135:5 145:12 189:13
192:12 199:15 200:14 203:20
205:3,11 224:5,6 261:1,16 292:24
293:1 322:20 337:6 340:4 341:4
343:19 344:23 345:1 347:2 361:1
368:14

**factors** 27:14 28:13,14

**facts** 6:15 93:14 273:2 333:2,6,10
337:17 340:13 345:6,7,15 346:22
351:25

**failed** 289:13

**failure** 286:5

**fair** 62:19 89:23 90:9 114:23
120:9,12 134:10 143:19 158:19
179:4 189:23,24 314:4

**fall** 43:21 170:10 262:15 330:1
350:21 351:9

ELYSE McKENNA v ROBERT F. RILEY
MCKENNA, ELYSE 12/10/2025

Job 48239
Index: fallen..focused

**fallen**  130:2

**falling**  340:23

**falls**  330:18

**false**  18:9,11 109:24 278:20
316:5

**family**  189:11

**fancy**  241:6

**far**  33:16 44:20 93:19 94:23
253:24

**fashion**  13:21

**fast**  307:9

**FBMJ**  43:10 79:25 83:17 127:12

**fear**  212:13 335:21 336:2

**fearful**  129:14

**February**  357:22

**feedback**  85:15 86:9 94:4

**feel**  31:7 33:17 35:3 36:3 40:2,4,
18 44:23 54:11 91:20 106:9
152:10,15 184:17 197:7 258:16,
21 264:23 291:7 297:8 310:9,10
349:15

**feeling**  26:21 29:8 40:7 61:9
104:16 152:10 211:10,25 225:4
260:12

**feelings**  189:6

**feels**  135:1

**fell**  330:20

**felt**  29:9 35:7 102:12 105:15
106:17 135:9 142:10,11 150:14
209:17,19 259:19 261:4 262:22
263:19 264:3,7 265:9 301:21
318:17 334:5 336:20 349:12

**female**  40:5 46:7 91:4

**Ferndale**  170:22

**fetus**  10:1

**few**  68:25 79:22 184:11 188:15
213:19

**Fieger**  100:7,9,12,14,17,22
130:15 131:2,5,6 133:12,20
165:13

**Fieger's**  130:12,14 165:14

**field**  116:10 123:23 297:15

**fighting**  127:13

**figure**  28:21 101:24 199:14,18,22
200:12 205:15 242:2 347:15

**figured**  189:17

**figuring**  245:14 251:22

**file**  76:16 140:6 183:19 360:18
365:5,10,11,12 366:9 368:8

**filed**  77:25 218:14,24 220:15
250:5,7 272:19 341:14 343:2,19

**files**  273:5

**filing**  19:18 23:21 24:7 365:16
368:19

**fill**  183:4

**final**  45:13,14 331:19

**finalizing**  158:18,20 161:2

**financial**  261:4 323:12

**find**  24:4 42:11 45:11,17 56:18
75:15 133:19 134:9,19 171:13
188:21 202:5 224:7,9 288:2,7,17
321:7

**finding**  6:25 133:23 134:3

**fine**  228:10 244:15 256:17 265:14
283:19 325:6 363:6

**finish**  8:5 169:2 175:18 176:1
181:24 237:6 243:15 244:17
245:3 326:20 354:7 363:22 364:1

**finished**  16:18 107:22 175:16
243:11,13,22 244:1,3,6

**finishes**  16:3

**fire**  356:19

**fired**  359:7,12

**firm**  12:4,11,17 13:23 14:20
15:22 18:23 31:17 32:1 42:12,15
43:22 44:1,6,16 49:13 50:16 81:9
82:14 83:25 85:5,19 87:2,20 88:5,
18,25 89:8,11,25 90:7 91:24
92:11 95:3 100:7,9,14,17 103:3
116:4 117:8 120:5,9 126:8 127:12
128:14,20 129:16 130:4,7,8,10,
11,12 132:21 133:13 134:19
135:15 137:7,21 149:19,20
150:15 156:3 157:4,23,25 158:2

159:5 174:15 177:16,21 178:8
181:4 195:20 196:1,23 197:11
260:17 262:24 263:2,25 264:13,
15 294:4,5,9 297:1 300:12 305:22

**firm-authorized**  206:10

**firms**  32:4 41:20 83:25 85:11
86:10,17,20 88:8,19 89:5 90:22
129:18 174:21

**first**  6:8 17:4,11,12 29:16,17 32:5
33:13 34:9 35:5,22 36:2,5,10,13
37:8,9,13 38:10,11,12 39:7 42:19
45:7 49:15 60:14 105:3 129:25
134:3 135:20 143:24 144:11
147:4,23 148:2 149:2 158:24
170:17,25 177:24 180:7 191:19
192:23 193:9,11,21,23,25 195:8,
11 196:9,25 197:3,25 198:7
209:2,5 210:15,21 212:18,21
223:1,4 230:1,3,6,19 231:3
233:19 234:2 238:3 259:6,15
270:10 271:1 279:13,16,18
290:21 317:10 325:23 326:1,7,8,
18 331:9 333:17 344:1 355:25

**first-chair**  34:2,7

**first-hand**  96:19 97:2

**fish**  279:5,18,22 280:5

**fishing**  279:5

**fit**  26:12 168:19 241:12

**fits**  245:23

**five**  8:13 12:25 56:3 67:1 92:15
114:19 263:17 355:9

**five-minute**  114:7

**five-year**  14:18

**flag**  256:6

**Flagyl**  11:9

**flashlight**  121:25

**flew**  330:3

**flipped**  308:12

**Florida**  325:21,22

**fluctuates**  139:5

**focus**  29:2 174:20

**focused**  14:25 32:17 42:4 43:19
44:6 99:6 227:21 265:12

**Foley** 32:1 33:15,24 34:4,14 35:3, 12,18 36:3,15,18 38:2,7,16,25 40:1 41:1,20 43:14,20 84:9 86:11 306:12

**follow** 100:23 290:7 313:14

**follow-up** 363:9

**following** 42:14 75:10 188:1

**follows** 6:9

**followup** 25:4

**forced** 352:24

**Ford** 37:22 89:15 140:15 143:8 144:17 146:8,15 147:2,22 148:2 151:18

**forensic** 57:11

**forget** 274:12 345:21

**forgetful** 11:16

**forgetting** 274:16 345:24

**forgot** 73:14 85:18 289:23 304:4 310:10

**form** 19:15 60:14 75:9 84:12 88:10,21 96:21 98:22 105:1 128:16 133:8 139:24 150:20 155:9 156:7 167:20 168:1 179:8 180:13 181:17 184:6 199:5 209:2 211:2 217:14 260:19 283:2 295:3 315:25 317:7 334:19 338:5,23 352:21

**formal** 46:14 51:1 56:12,24 57:25

**format** 60:15

**former** 45:23 47:23 76:1 279:6

**forms** 221:12

**Forrest** 5:12

**forth** 21:2 110:22 165:19 169:8 209:15 259:3,4 294:16,17 337:21

**Fortz** 5:14

**forward** 261:5 342:7 361:8

**found** 63:22 252:20 273:18 276:18

**foundation** 141:7,9

**four** 26:24 32:4 33:13,21 35:22 36:2 53:14 177:19,24 256:14

**four-year** 177:7,13

**Fox** 50:22 51:9,25 52:20

**frail** 120:13,14 121:2,3

**frame** 29:25

**FRCP** 362:19

**free** 206:24 207:2,16

**freely** 206:17

**frequency** 62:5 238:10 259:20 355:14

**frequent** 9:21 324:20 355:25

**friend** 47:17 98:24 188:10 189:9, 21 190:1 254:12 258:9 259:16 292:24

**friends** 184:17 185:1 189:11 209:6 253:13 254:11 258:3,4 259:5

**friendship** 258:6,9,16,18,19 260:5

**frivolous** 293:22,24

**from** 9:13 11:17 27:18 31:17 32:2 35:4 36:3 38:23,25 39:9 40:15 41:19,22,23 42:13,21,24 43:5,6,8, 9,12,23 44:25 46:1 56:9 57:13,22 58:4 63:24 64:8 69:2 70:13,25 74:17 75:12 76:2 77:9,18 78:2 82:1,4,5,24 83:1,5,15 85:12,15,20 86:15 87:9 89:17,20 95:9,12,14, 19,21 96:2,23,24 97:3,12 99:9,11, 12 104:12 107:4,24 111:16 112:12 118:9 122:2 123:9 132:6 134:3 136:15 148:1,25 149:4,7, 13,15 150:1 151:17,23 152:2 154:12 155:7 157:25 158:16 159:5,16 160:9 163:19 169:18 170:4 173:20 174:5,15,21 178:6 180:3,23 182:14 183:19 188:7 189:21 190:19,25 192:19 194:22 198:9 200:23 204:17 205:16 208:23 212:11 221:19 223:9 227:10 230:14 241:1 244:12,22 247:13 258:17 259:4 260:5 263:17 267:5,6 269:20 271:9 272:11 273:2 278:14 279:17 282:2 285:20 289:5 296:14,21 300:22 301:23 306:13 310:21 313:13 316:17 321:23 322:8 325:11,24 327:8,14 328:23,24

329:14,15 333:15 334:14 336:16, 25 337:1 341:24 344:15 345:6,7 347:19 349:3 352:17 353:21 355:4 362:25 369:4

**front** 125:8 174:11 182:2 190:24 191:15 197:7 214:7,10 215:2 260:14 298:21 330:17 369:5

**fulfill** 151:19

**full** 78:13 169:4 247:20 303:13 324:5,8,9 354:21

**fully** 41:1 324:22 344:6

**further** 75:3 169:20 186:14 264:22 351:25

**furtherance** 169:7

**future** 33:22 40:2 146:16 232:25 261:11 263:3

---

**G**

**Gallagher** 37:24 38:9,19,22 39:14 79:6,7,10 148:10,13 149:1 160:4,6

**gallery** 280:6,24,25 281:5

**Garbarino** 44:13 130:5

**gasped** 252:5

**gave** 38:7,8 47:21 113:22 116:24 118:13 123:21 202:18 204:11,23 240:14 247:2 272:5 305:4 309:16 313:12 321:24 343:3 365:5,9

**gears** 78:24 134:18 172:23 245:12

**Gemma** 16:25

**general** 16:9 29:25 31:1,3,10,11, 13 35:20,21 38:15 39:25 40:18,19 41:15 83:18 89:1,9 110:11 121:7, 9 129:6,7,8 131:10 133:25 137:13,14 138:1 140:24 166:9,18 167:24 168:2 236:4 320:6 326:10 336:25 359:10

**generalization** 90:21

**generally** 28:2 29:7,9,11 30:5 86:12 87:13 89:21 90:19 122:16 126:24 161:23 309:12 316:23 318:21

**generate** 132:11

**generically** 219:12 299:13

**gentleman** 279:6

**genuine** 184:24 186:10,11 189:1

**Geoff** 130:16,23 131:5,6

**Geoffrey** 131:2

**gestured** 215:22

**gets** 219:22 304:3 364:9

**getting** 7:20 8:3 68:14 77:6 89:19 111:20 122:14,25 123:11 127:19 135:6 171:12 192:18 200:2,6,10, 12,18,21 201:9 219:15 229:13,14 233:10 238:19 245:13 246:23 252:6 261:23 265:3 280:18 310:1 317:15 322:21 339:21 340:5,6,11 341:2 345:7

**Gialanella** 25:6,7,9

**gifts** 188:3

**gist** 80:7,13 301:9

**give** 10:5 13:25 14:10 15:9 26:11 42:2 46:18,25 52:11,20 56:24 60:3,4 92:19 96:17 98:3 106:25 112:4 120:6 139:2 143:17 144:15 146:10 164:7,12,21 167:2,13,14 168:3 173:23 177:22 197:22,23 198:3 202:22 203:6,18,22 204:18 205:9 206:16 207:22 209:16 228:7,23 229:20,24,25 230:10,12 231:5,25 232:7 247:2 250:15 252:15 256:25 259:1 260:4,14 294:20,22 295:8 300:11 302:21 303:12,18 304:8 312:23 314:14 344:6 352:3 354:21 366:13

**given** 14:7 17:4 63:17 64:5,12 79:5 80:7 81:13,14 82:5 90:14 104:20 144:25 145:1,6 165:16 166:12 169:6 174:9 205:4,6 231:9 232:5 248:5 249:18 277:11 285:1 361:4 362:25

**gives** 188:22

**giving** 88:24 183:25 266:21 338:7

**glad** 222:5 335:5

**gmail** 67:24 68:2,4,6 69:21 158:14

**go** 7:7,21,23 8:9 17:23 19:17 22:6 25:4,8 43:13 49:9 51:18,23 52:14 53:9,11 56:21 57:8,20 61:12 71:14 73:24 80:11 84:9,10,18 86:7 100:10 101:8 105:25 114:17, 21 121:10 134:8 139:20 141:23, 24,25 149:18,21 150:21 154:20 155:6 156:5 158:18,20,22 159:4 172:23 173:2 175:6 176:7 178:22 179:5 180:22,23 181:1,4,21 182:5 198:24 202:23 204:2 206:16 207:10,17 214:16,24 216:1,6 219:1 222:22 223:24 226:9 240:18 241:20 242:20 250:16 258:24 259:4 269:18 273:1 275:17,23 276:17 281:6 284:18 285:3 286:9 287:8,22,24 288:19 290:1,11 291:12 302:18 311:20 315:6 320:3 324:14 327:25 329:7 342:11 348:15 354:11,23 359:23 361:12 364:3 365:13 366:20,21, 22,24 369:11,12,13,16,17

**go-to** 127:2 175:10 176:9

**goal** 135:25 140:10 151:14

**goals** 83:21,22 169:7

**goes** 35:12 61:10 78:15 97:20 168:10 308:18

**going** 6:18 7:4,7,12,19 8:21 17:12,21 18:24 19:19 21:20,22 23:3,20 27:24 28:14 32:12 37:12 44:16 46:24 47:24 51:13,17 57:18 74:3,8 78:4,6 86:11 87:18 92:24 94:19 102:11 103:8,21,24 106:18 110:21 114:8,10,17,18 129:2 131:17 132:19 133:5,14 134:7 135:2,10 141:25 145:13 146:18 148:11 149:15 150:6,24 152:19, 20 153:3 156:1,3,14 157:5 158:6 160:18 168:21 178:2,25 187:1 192:19 193:10 196:2,6 200:1,7,8 201:3,23 202:5,13 206:11 208:3 215:1 221:7 235:25 246:14 251:18 256:3,5,7,8 262:23,24 263:2,24 264:7 265:21 271:12 275:15 284:14 285:5,20 286:12 287:12 289:21 303:12,14,18,19 306:6 307:5 308:14 310:12 313:5, 9,16 315:6 316:18 317:3 318:16 324:3,4,11 325:1,4 326:13 332:6, 24 338:2 339:6 340:4 343:25 346:4 347:16 349:20 351:7

354:16 361:8,25 364:22,23 365:1, 15,20,25 366:5,12 367:7 368:21, 22

**gone** 68:25 135:9 204:3 214:12 225:13 248:18 253:19 254:6 292:14

**good** 5:5 6:10,11 29:7,10 41:3 44:23 53:22 72:4 84:10 89:1 92:7 114:8,11 136:3 140:20 149:14 150:19,23 153:5 168:25 175:9 184:10 187:23 209:6 275:3 285:5 304:14,21 319:1,13,18 369:13,16, 17

**good-bye** 228:23 229:3

**goodness** 211:3

**Google** 66:6,14,20 67:5,10,13, 17,20 70:2,8,14,19,21,23,25 71:6, 7 73:10 74:13

**Gordon** 5:24 6:23 10:7,9,12,15, 19 46:4 50:2 51:6 54:18 112:15, 18,23 113:2,7 141:8,18,21 210:1, 6,14 222:4,7,15,22 226:19,22,23 227:2,9 228:5 268:13 284:8,12 286:14,17,25 287:3,6 341:19,21, 24 342:4,6,10 354:5,9 361:24 362:4,7,11,15 363:10,14,18,21 364:15,18,21 365:3,7,13 366:2,7, 20 367:4,11,14,25 368:5,10,16

**Gordon's** 210:17

**gosh** 81:2

**got** 15:5 33:10 42:21 43:9 48:8 59:21 60:8 69:9 75:2 76:25 97:3 99:11 101:24 107:24 123:8,12 155:4,10 167:15 170:12 173:22 177:24 185:21 200:14 203:2 205:16 232:14 234:15 236:25 247:7 250:14 253:24 259:1 274:24 276:10 279:3,4,5,7 280:6 289:1,5,6,21 294:17 310:9 333:12 342:11

**Gotcha** 213:16

**Gotta** 131:11

**gotten** 43:2 112:1

**graders** 227:5

**graduate** 35:4

**great** 27:13 28:16 72:1 150:9

208:20 258:5,8

**greater** 36:24

**grew** 257:10

**grievance** 139:13

**grievances** 137:2

**Groffsky** 82:8,12 94:8 101:18,19, 20 103:6,14 104:1 105:20 106:3 107:2,3 111:8,9,11 297:7,8 304:23

**group** 194:6

**grunt** 87:23 90:19

**guarantee** 264:6

**guarantying** 259:23 261:3

**guess** 26:9 27:14 29:20 33:7 38:14 45:11,16,18 69:19 74:4 84:5,20 124:12 129:4 139:19 140:18 142:4,8 195:21 200:15 201:3 203:5 232:17 240:8 308:18 337:20

**guilty** 63:3

**gun** 153:4

**gushy** 190:16

**guy** 279:21 280:2

**guys** 54:11 115:10 262:10 273:19 284:23 354:15 362:5 363:25 365:20 366:11,18,22 368:16

**guys'** 54:20

**GYN** 9:17

---

**H**

**H16h** 172:1

**habit** 61:20 62:3

**hacked** 192:20,21 194:8 214:15

**hacking** 192:22

**had** 7:9,11 9:16 13:10 14:4 15:3 16:2,11 20:8,9 21:14 25:19 29:7 32:4 33:8,21 37:19 38:14,15,17, 22 39:23 41:4,16,22 42:12 43:5, 10,24 44:3,17 48:4,12 49:13,18, 20 59:12 60:7 63:21,23 64:24 66:2,6,16,18,24 67:9 71:13 72:6,

7,12 75:14 76:9,10 79:11,13 80:4, 15,20 81:4,17 82:1,3 83:1,6,11, 15,17 84:5,22 85:2,4,5,11,21,25 89:15 91:12,16 93:3,7,11,18 95:6, 8 96:12,15,19,24 97:10,25 98:17, 20,24 99:17 100:11,24 101:4,14 102:5,14 103:3,5,6,7,9 104:1 105:14,15,20 106:3,5 107:10 108:4,12 109:22,23 110:3 113:19, 23 114:12 116:4,19,22 120:6,12, 14,19,25 121:7 122:19 123:2,19 124:5,12,21 125:2,12 128:9,21 129:15 130:23 131:4,17,25 132:6 134:15 136:24 137:2,5 140:1,8 141:4 142:9 143:12 144:21 145:20 146:8,23 147:9 148:10,11, 13,19 150:7,15 151:2,4,6,8 154:4, 15,17,23 160:8,11,19 163:21 164:20 165:7,9 167:16 170:15 173:2,5,6,11,14,20 174:4,13,21 175:1,2,11 179:17 180:19,21 183:20 194:22 195:10 200:21 202:4,15 203:22 204:12,20 205:23 206:4 210:4 211:9 213:24 214:3 223:19,20,21 251:6 253:19 254:6,20 265:5 273:7 275:7,13,20 276:23 277:1,4 278:13 280:13,15 281:3 287:11 290:4 293:2 294:10 295:2,19,22 297:11 300:10,20,21, 25 301:1,12,13 303:5 306:19 308:9,14,20 309:12,22 310:3,5,6 311:10 312:20 313:1 315:8 316:21 318:9,20 319:12,18 321:17 322:10,11,13,14 332:15, 20 336:2 338:3 339:5 340:3,15,19 341:17 342:20 344:5,11 345:1 346:3 347:14,18 349:21,24 350:13,14,15,21 351:5 352:11,19 355:19 356:2 359:11 364:19 367:11

**hadn't** 63:22 117:9 176:14 301:21 302:15

**half** 249:4

**half-hour** 169:24

**hall** 328:4

**hallway** 326:22,23 327:15 328:7, 9,12,19

**hand** 103:2 214:1 226:20

**handed** 83:10 162:6 178:1 206:19

**handing** 182:10

**handle** 120:1,3 166:16 312:24

**handled** 34:3 89:8 119:22,25 341:18,23 342:3,21 346:4

**handling** 34:13 137:2 148:17 316:24 352:24

**hands** 200:24 201:4

**handwriting** 60:20 61:4 172:4

**handwritten** 60:15 74:18

**hang** 330:25

**happen** 20:21,25 21:6 22:21 153:2 154:20 207:19 231:12 241:4 330:9

**happened** 38:14,16 61:5 65:10, 22 108:9 110:15 126:4 127:23 179:19 211:4 213:24 214:4 224:15 225:10,23 229:10 230:3,6, 7,17,19,21,22,23 231:1,6,13,17, 19 233:5 234:2 236:4 259:6 294:5 298:1 302:2,5,11 303:17 331:12

**happening** 19:8 38:25 80:18 138:25 149:8 199:15 209:19,24 212:15 251:23 331:2 336:20 355:17

**happens** 227:11

**happiness** 186:4,16 190:7

**happy** 9:13 23:25 112:8 128:21 131:12 299:1 307:17 308:20,24 309:4 311:1 325:7 348:14

**harass** 347:5

**harassed** 271:25 322:17,23 323:10 337:17 338:4,8,9,22 346:17,18 356:8

**harassee's** 338:11

**harasser** 338:11

**harassing** 339:7 353:1,18

**harassment** 217:3,8 218:14 249:13,25 261:9 264:10,17 265:11,13 266:4,7 267:19 355:21 356:9

**hard** 31:12 58:10 64:12 91:25 92:3 111:20 147:10 165:5,11

**Hardy** 5:11,22 6:3,10,12,13 7:15

8:21 9:1 10:7,24 15:12 16:20
17:7,11,20,24 18:3,13,16,19 19:9,
21 20:1,6,14,20 21:4 25:1 26:18
28:8,24 29:1 30:4 31:22 32:16
35:14,20,22 36:1 41:18 42:17,20
45:5,6 49:1,6,9,10 51:8,16,20,24
52:5,10,15,19,24 53:5,10,15
54:14,24 55:7,14 56:20 57:1,6,15,
21 58:7 62:8 70:12,17 72:5,9,11,
21 73:1,4,16 74:8,11,16 75:11,21
76:22 77:12,13 78:10 79:9 84:24
85:14,21,24 88:13,17 89:3 91:6
94:5,17 95:13,17 96:9 97:7 99:6,
15,22 100:6 101:7 103:12 104:6,
14 105:8,18,24 107:1 108:3,17,
21,24 109:2,6,10,13,15 110:17
111:14,21 112:6,11,16 113:9
114:5,11,17,23 115:2,4,6,9,12,15
117:7,16,22 118:1,14,25 119:4,21
120:18,23 121:6 122:8 123:18
124:10,17 128:25 129:7,12,20
133:4,9 134:17 135:4,12,22,24
136:2,5,8,18,23 137:10,19 140:3
141:6,11,25 142:7,13 144:23
146:7,13,21 147:21 149:11 151:1
152:19,24 153:2,6 154:1 155:10,
14 156:9,16,22 157:1,18,22
158:5,9 160:1 161:13,17,18
167:24 168:6 169:2,11,24 170:7
171:8 172:3,5 175:23 176:2,6,12,
15,20 177:15 178:12,17,20 179:9,
12 180:20 181:13,21 182:1,7,10,
13 183:24 184:4 185:6,13,17
186:22,25 187:6,8,11,14,16,21,22
193:7 199:9 202:21 203:22 204:4,
6 206:2,15,23 207:9 208:6,12,18
209:1 210:15,18 213:11,14,22,23
214:10 215:22 216:10,25 217:1,
16,20,23 218:19 219:5,7,11,17,21
220:2,10 221:3,7,10,14 222:11,23
223:1,5,17,23 225:8 226:25
227:7,9,16,19,22 228:3,10,17,19
231:22 233:18 234:23 235:2,8
242:23 243:20,24 245:3,5,12,22
246:2 248:7,11,12,15,18,20
249:21 250:2,6,13 256:4,12,15,
18,19 259:11,14 260:20 265:12,
16,20,24 266:5,11,16,21,24
267:16 268:19 270:4,6,13,25
271:7,18 272:7,14,23 273:4,10
274:1,9,18,24 275:2,4,11,18,24
276:2,8,10,13,17,24 278:4,17,23
282:17,24 283:3,5,10,16,21,22
284:13,17 285:6 288:1 289:9,11

290:17 291:1,9,16 292:4,6,10
293:1,7,17 294:2 295:4,5,9 301:5,
8 306:8 314:22,25 315:4,8,12
316:4,9 317:21 320:11,21 321:4,
7,13 324:9,13,22 325:1,5,14
333:1 334:20 335:1 338:15,19
339:4,13 340:12 341:20 342:12,
15,16 345:8,10,14,19,25 346:2
347:1,10,23 348:4 349:1,4 351:24
353:2,16 354:12,16,23 355:8,18
358:5 360:7 361:7,13,17 364:3,8
365:9,15,22 369:15

**Hardy's** 361:25 362:24

**harm** 335:22

**harmful** 10:1

**Harrington** 130:21 131:3

**has** 7:13 11:16 14:3 15:4 27:18
47:16 52:2,7 69:4 71:21 75:18
76:19,21 80:19 92:8 95:17 102:21
107:7,17 110:9 111:4 113:5
127:25 135:8,9 152:21 181:22
187:11 193:3 201:19 208:13
215:7 216:20 220:12 250:3
270:16 279:22 284:6 285:25
287:1 288:12 293:25 298:13
305:22 315:3 324:19 327:7 332:7
336:20 356:7 364:8

**hasn't** 43:2

**have** 5:20 6:3,15,16 7:23 8:9 9:6
10:2,7,25 11:6,20 12:22 13:3,6,
14,15,16,17,18 14:5,18,22 15:1,
17,19,20 16:7,10,11,17 17:3
18:11 19:10,13,17,22 22:17,18
23:2,24 25:10,16 26:9,20 27:17
28:6,11,18,21 29:8,24 30:15,24
31:3,5,12 32:14,22 33:24 34:2
35:15,25 36:10,13,15,17 41:19
43:22 44:4 45:16,19 46:23 47:12,
18,21 48:4,5,15 49:16,19,22,23
50:1,6,9,12,14,21 51:18 53:18,19
55:2,12,13,24 56:6,8,17,22,23
57:2,9,10,11,13 58:8,9,10,15,16,
17,20,21,22 59:5,9,17,18 60:6,7,
8,17,23 61:3,11,16,20,21 63:7,17
64:5,12,15 65:13,14,19 66:3 67:5,
8,12 68:15,23,24,25 69:7,12 70:4,
5,8 71:6,7 72:20 73:24 74:6,17,
20,25 75:2 76:12,13,15,16,18,24
77:16,17 78:21 79:8,21,22,24
80:1,2,9,11,13 81:1,10,20,21,22

82:16,22,23 83:7,16,19,20,25
84:1,19,20,25 85:1,2,7,9,10,19,22
86:4,9,21,25 87:1 90:1,10,12,13,
16,24 91:24 92:14,15,21 93:8
94:18 97:14 98:12 99:13 101:18
102:21,23 103:13 104:16,20
105:2,6,17 106:10,15 107:8,23
109:16 110:2,13 111:3,7,9,10,11,
23,25 112:15,21 113:24 117:12,
15 118:11 119:19,22,24 122:21
123:16 128:2 129:10 130:1,8
131:4 132:9 134:5 136:19 138:2
140:12,14,22 142:15 144:14
145:4,13,15 148:6,22,24 149:18
150:2,11,16 151:7,19,24 152:19
153:12 154:9,17 159:18 160:15
161:23 162:2 163:14,16,17,20,25
164:3 165:5,16,18,24 166:12
167:13,17 168:17 169:20,22
170:22,23 172:19 173:22 174:2,3,
10 175:7,9 179:14 180:15 182:4,
21,22,24 183:2,8 186:5,18 188:8
189:6,13 190:8,12,24 191:15
192:3 193:7,15,18 194:15 195:1,
21 196:12 197:2,4,6 198:4 199:4
200:6,9 201:10,19 202:14 203:5
204:2,15,22 205:2,8 207:4,14,19,
24 208:1,13 213:7,19 214:7,9
215:1,4,15,24 216:3 218:22
220:11,16,24 221:21,22 222:18
226:17,20 227:19 228:3,12,25
229:16,17,22 230:4 231:11,19,20
232:5,19 233:7,8 234:24 235:18
236:13,16,19,23,25 237:2,3,8,9,
20 238:2 241:22,25 247:10
248:21,22 249:4,24 250:19 252:4
253:12 254:18,21 255:16 257:12,
19 258:25 259:15,25 260:9,13
261:10,11 262:5,10,19,24 263:17
264:22 265:18 266:12,20 268:5,8
269:21 271:17 275:9,22 276:13,
22,25 277:5,8,10,13,16,20,24
278:10 279:8 280:7 284:20,21,23,
24,25 285:11,19 286:23 288:11,
12,13 292:14,19,23 293:15
295:14 296:3 299:1 300:5 312:2,8
315:13 319:21 320:3 321:4 324:1
328:1,8,17,21,23,25 329:2,4,9,15,
16,23 330:7,16,17 331:3 332:8,
18,21,23 333:2,6,9,13,16 335:7,
10 337:8,12,14,18,20 339:2
342:8,25 346:7,10,16 347:8
349:16 350:24 351:16,21 352:13,
16,18,23 353:5,13,24 355:4,10

358:17 359:3,6,7,19,21 360:7,11
362:1,2,5,9 363:2,4,7,9,10
364:13,23,24 367:9,11

**haven't** 43:2 77:18,21 107:18
114:3 212:18 231:10 240:6 246:8
285:1 362:12

**having** 6:8 97:25 118:21 133:6
147:10 150:5 163:18 165:21
224:18 240:17 245:13 248:24
283:25 297:6 304:17 309:20
312:15 313:20 317:5 318:17
321:2 333:18 334:14,18 335:9
337:8 340:17,21 343:4,11 344:14
351:2 355:16,25 359:8

**Haynes** 16:25

**he's** 80:11 92:4 128:21 205:4,6,
11,12 206:12 208:2 224:19
229:13,14 243:5 263:1 271:11
292:24 293:1 297:8 298:25 299:5
326:21,22 327:13,15 347:13

**head** 13:5 60:2 87:7 101:17 111:2
116:1 166:20 229:23 250:19
255:2 276:13 296:19

**heads** 324:25

**health** 12:5,10,18 13:11,22 14:1
15:2,14,23 18:21 19:12 20:9,10
23:20 25:15 26:1,3,6 120:13,14
121:2,3,7,9 316:6,12 323:9,11
340:14,16 342:24 344:24

**healthy** 12:11 13:23 28:11

**hear** 128:12 141:8 160:9 184:11
204:9 222:9 226:19,23 268:13,22

**heard** 38:23 44:20 82:1,4 97:10
98:17 103:3 107:4 123:16 147:10
151:17 175:11 241:10 264:25
307:21 317:10 340:6

**hearing** 102:16 314:13 317:15
360:23

**hearings** 164:20

**hearsay** 307:23

**heart** 9:25 120:21

**Heather** 311:17 312:20,21
313:19,24

**heck** 252:5

**Heid** 101:14 112:12 170:8 199:23

**help** 25:14 26:13 100:21 105:4
123:4 134:19,22,23 135:1,3,11,17
171:2,12,13,14 200:1 249:23
250:9 251:2,3,7,11 252:6,8,17
253:2 306:22 336:10 358:25
359:2

**helped** 144:1 172:16 252:18
291:14,23 345:20

**helpful** 80:6

**helping** 133:18 138:21 291:22,25

**Henry** 37:22 89:15 140:15 143:8
144:17 146:8,15 147:2,22 148:1
151:18

**here** 6:14 7:1 9:18 13:20 18:6
22:1 39:8,11 43:11 44:23 46:23
48:15 77:6,7 92:13,18,20 100:18
108:11 113:7 140:14 143:1
152:12 156:8 157:6 158:25
159:19 160:23 164:7,23 169:22
173:24 174:6,19 185:18 191:16
192:2 193:16,22 210:4 214:3
215:6,17,18,21 222:8,19 226:17
228:11 230:25 234:6,9 235:16
244:12 248:8 249:7 253:2 265:21
267:21 269:4 278:7 279:25 280:7
281:13 282:20 289:2 294:24
296:7 298:4 303:16 311:7 314:12
315:17 317:20 319:21 320:1
322:6 323:16 333:22 335:8
345:11 352:4 359:18 362:14
363:8,12

**here's** 48:7 208:9 320:10

**herself** 220:1 275:17

**Hey** 47:12 48:7 79:22 93:23 150:5
213:9 332:15 333:12

**Hi** 48:6 71:23,24

**hierarchy** 95:3

**high** 172:2,14,22

**high-resolution** 172:6,11

**higher** 219:24 220:2 238:23

**highly** 175:12 308:21

**hindsight** 226:8

**HIPAA** 10:17 16:22 17:1

**hire** 129:15

**hired** 10:20 100:13

**hiring** 100:12 131:7 135:14

**hit** 61:19 307:7

**hockey** 119:10,18 125:16,17,25
136:20 137:6,9,23,25 138:2,4,6,
22,24 139:4 142:22,23 143:3
154:19 205:1,10,11 206:6 236:17
263:10 296:17,19,25 297:10,12
298:7,8,10,12,13,18,20 299:7,11,
13 300:2,8,10 310:3,11 311:14
318:4,10 319:2,23 320:4,19
326:13 341:17,20 342:4,21 343:5,
6,10 351:17 355:13 356:4,5
357:15 358:14

**hockey-related** 154:17 214:19
351:13,14

**hold** 40:9 198:18 234:12 277:3
307:4

**holding** 40:4 197:19 279:21

**hole** 294:1

**home** 58:9 77:17 221:19 223:9
224:24 232:3 281:19,20,23
309:21 321:3

**Honestly** 159:8

**honesty** 143:5

**hooked** 6:4

**hope** 107:13 159:6,9

**hoped** 151:7,8 179:16

**hopefully** 56:23

**hoping** 151:2,6 179:6

**hospital** 18:24,25 21:21,22 22:23

**hospitalization** 19:23

**hostile** 217:9

**hotel** 248:23 325:25 326:4,6,21
327:1,2,4,6,9,13,14 329:22
334:14,24 335:10,24,25 336:1,3,
15 337:1,10

**hotline** 336:10,11,12,13,17,25
337:4

**hour** 7:24 8:10 45:4 53:14 100:1,
3 114:12 215:4 249:3 256:6
324:11

**hourly** 9:21

**hours** 24:16 65:13 66:22 139:3 213:21 235:25 242:20 249:3 328:2,3,4,8 359:24 360:21

**house** 55:17,18,19 56:16 78:13, 15

**household** 67:4

**how** 8:15 12:4 21:13 24:14 26:8 27:10,12 34:24 35:17 39:12 47:9, 20 48:24 59:5,23,25 65:3 68:5 69:20 72:1 74:12,22 76:24 77:2, 19 81:11 87:25 88:3 89:8 90:13, 14 95:11 98:17,19 99:3 100:25 101:4 103:20 106:4,8,21,24 107:6 108:7,23 110:20 113:15 118:2 120:5 122:9,24,25 125:8,12 127:10 138:23 139:2,20 146:4,14 150:9 163:5 166:2 170:15,17,25 171:17,22 180:8 190:3,17 194:20 197:19,23 198:3 199:3 200:1,11 201:11,22 202:5,12,13 204:7,9,16 205:16 207:21 209:14,15 228:22 229:20 232:12,17 236:3,5,10 242:19 252:13,22 254:15 256:6 257:9,14 260:15 261:8 262:17 263:14 264:9 269:13 271:9 274:11 279:2 280:21 285:21 286:10 288:25 295:23 296:25 298:15 300:17,20 301:24 303:14 304:8 306:9 307:17 308:20,25 309:5 311:18 312:13 316:6 324:19 327:25 328:9,12,18 330:12,13 331:25 332:3,4 333:24 339:15 341:18,23 342:2,4,21 344:9,18,20,24 346:3,5,15,21 347:3,15 348:5 349:12 350:22 353:3,14,15,21 357:7,22 358:18

**How's** 305:19

**however** 112:10 307:24 330:1 355:23

**huge** 261:3

**humans** 249:10

**hundred** 274:20,22

**hung** 331:5

**Hurley** 12:3,11,17 13:2,23 14:2, 19,23 15:1,6,7,8,16,22 18:22 19:3,20 20:11,18 21:18 22:12,14, 15,19 23:5,6,9,18 25:13,17,25

26:4,5 28:19 29:3,14,15,17 30:6, 8,11,12,13,18,25 31:9,16 41:21, 23 42:2,6,13 43:6,22 44:21 45:8, 13 48:13 49:13 50:16 51:11 60:3 61:3,23 64:19,24 65:4,5,9,15 67:18 68:21,23 69:13 70:3,22 71:1 78:25 100:8,10,12,13,20 102:23 103:1,15,21 105:10 115:16 116:4,11,14,18 119:5,15 121:13 125:23 126:12,21,23 128:13 131:22 132:9 136:20,25 137:3,6,22 138:21 139:16 140:20, 22,25 142:3,20 143:4,10,16 144:8,12 145:8,11 146:19 147:1, 25 148:15,18,20 150:2,11,17,19, 22 151:3,4 154:25 155:6,23 156:4,11 158:19,21 159:1,5,17 160:16,25 161:7 162:8 163:8 164:4,9 165:18 168:7 172:24 173:4 174:6,7,25 175:6 176:7 177:2 178:3,7,14,16 179:6,18,22 180:4,6,10,22 181:1,2 182:6 195:9 196:22 230:9 231:8 236:15 255:18,19,20,21 263:23,25 271:20 272:1 294:3,9 297:3,17, 20,22 298:2,6 337:16 347:14 352:6 359:20

**Hurley's** 141:3 148:6

**hurt** 28:5

**husband** 66:17 73:20,25 97:21 279:7,25

**hyphen** 94:12

**hyphenated** 94:12

**hypothetically** 358:15

---

**I**

**I'D** 312:8

**I'LL** 6:12 112:4 153:8 213:11 217:20 286:9 304:20 306:16 310:17 314:12 323:17 324:7 341:24 369:7

**I'M** 6:13,20,25 7:7 8:14,19,21 10:21 12:21 14:15 15:9 17:12,18 20:5 21:12 22:20 23:12 26:16 28:20 32:12 33:5 35:7,9 37:10,11 39:2,3,4 40:20 42:2,4 43:19 44:1, 6,12 47:24 48:14 51:13 52:13 54:10 55:9,22 56:15 57:15,18

59:4,11 60:21 61:9 63:2,5,10,14, 15 66:10 67:25 68:3 69:20 70:23 71:23,24,25 72:2 74:15 75:10 76:10 77:6,7,14 78:16 79:16 81:6, 9 82:8,19 84:20 86:19 88:13 89:11 90:3 91:11 92:2,19,24 94:3 95:17 98:4,9 99:6,8 102:13 104:4, 5 105:4,25 108:10 111:14 112:11, 14,18,23 113:16,25 114:1,14,17 115:19 124:18 128:3,9,11 130:24 131:20 134:16 135:2,10,22 136:10 137:14 139:7 141:22,25 142:7,8 146:18 147:10,17 148:4 152:7,22 153:3 155:20,25 156:1 157:16 158:5,20 160:23,24 161:1 165:11 166:8,19 167:1,13 168:21 170:11 172:3 174:8,12,19 176:2, 10,11 178:15,17,23,25 179:1 180:7 181:10 182:10 183:24 184:10 185:7 186:5 187:8 190:8 191:8,9 192:19,22 193:5,10 194:11,14 196:6,7,10,25 197:5 198:14,16,17 200:15,17 201:3,8,9 202:2,19 203:16 205:18 206:8 209:23 210:7 211:14 213:14 215:1 218:8,24 219:6 220:3,5,6, 13 221:3 222:4,5,12,13,19 226:19,23 227:8 231:1 233:10 235:5 236:14 237:4,9,13,16,18 238:16,19 240:8 241:9,13,14 242:2,10 244:11 246:3,9,13 249:5 251:20 256:1,2,5 259:8 264:14, 15,18 265:12,22,23,24 266:1,18, 21 270:23 271:12 275:25 276:18 281:15,21 283:19 284:5 285:20, 22 287:6,21 288:5,14 292:8 293:17 295:8,12 296:1 298:25 299:2,5,11,13 303:7,12,18,19 304:7,20 307:2,4,5 308:16 310:11 311:7,8 313:16 315:6,16,22 316:6,7,11 317:17,19 318:23 319:3,4,5,9,20 320:18 321:7 324:4,10,17,21 326:1 329:14 331:18,19 333:11 335:5,8 338:17 340:23 341:7,19,25 343:23 345:9 347:20 354:5 355:16 358:8 359:10 360:9 361:25 362:21 363:5,11 369:11

**I'VE** 11:5 15:18 19:16 41:24 43:3 44:20 46:8 50:17 54:2 59:21 60:21 75:22 110:8 113:1 150:13 157:3 168:20 183:13,20 184:6 186:3 191:13 204:8 205:20 211:10,24 214:20 231:9 232:2

241:10 243:2 245:7 249:17
250:14 254:24 258:22 263:19
264:11,23,25 265:8 273:1 276:10
282:14 284:23 291:7 297:19
318:11,25 320:24 321:24 334:25
338:6 343:15,25 346:16 352:3

**icode** 205:23

**idea** 29:24 97:14 134:7,13,15
139:22 197:23 227:19 259:1
294:20,22 355:10

**identification** 70:10 111:12
158:3 161:11 178:10 182:8
183:22 185:4 213:17 266:14
276:15

**identified** 173:13 239:4 320:23
360:12

**identify** 108:6 126:3 164:2
166:22 255:12

**ignoring** 206:7,8

**image** 270:11 271:1

**imaged** 68:15

**immediately** 110:15 301:25
302:2,5

**impact** 317:5 318:16 319:5 321:9

**impacting** 313:6,8

**impaired** 171:3 172:7,8

**impairment** 123:20

**implications** 189:5

**implied** 162:18 307:17

**implying** 21:14

**important** 65:21,22,25 66:1,10
213:10 214:1 220:10 289:25

**impossible** 249:6

**impression** 12:13,14 97:3,6
305:3

**impromptu** 65:10 72:19,21

**improper** 265:20 289:3

**improved** 117:3

**in-patient** 18:20,24 19:11,17,19,
23 20:8,17 21:14,17,20,25 22:4,9,
10,11,13,18,20,23,25 23:5,12,13,
17

**in-patient/out-patient** 23:3

**inaccurately** 184:8 185:19

**inappropriate** 17:17 51:21 53:6,
9 69:17 74:19 75:13 107:7
189:15,19,22 209:25 211:12,25
258:14 260:13 296:3 315:20
316:8 322:3,12 323:1,5 326:12
356:8,12

**inappropriately** 18:4

**incapable** 192:22 300:2 316:22

**incident** 327:18 352:14

**incidents** 94:24 325:18 326:2

**incited** 352:7

**include** 221:1 273:17 274:11,15
275:8,10,19

**included** 98:23 151:15 269:3
275:6,12

**including** 54:2 57:10 95:22 98:1
114:3 116:6 312:23 344:4 360:13

**incomplete** 183:20

**inconsistent** 147:9

**incorporate** 248:9

**incorrect** 18:11 121:18 132:23
365:3

**increase** 296:14,21 301:23
322:15,16

**increased** 9:25 337:7

**increasing** 259:20 299:21
301:14

**increasingly** 152:1 258:14
259:19 260:12

**incredibly** 184:18 188:22 211:11

**indeed** 8:9 188:16 276:25

**independent** 112:21

**independently** 159:20

**indicate** 211:4 223:16 333:6

**indicated** 146:24 148:10 155:21
160:8 172:25 210:23 211:5
245:22 263:21 288:13 318:11
347:19 357:25 358:1

**indicates** 213:8

**indicating** 196:25 270:16

**indication** 253:5 263:1 333:14

**indirectly** 307:14

**individual** 156:2 285:14,16

**individually** 218:5

**individuals** 306:18 317:9

**inference** 57:21

**INFJ** 26:17

**informal** 51:2,5

**information** 17:6 65:23 69:9
79:6 95:8,19 96:24 145:22 183:1
194:2,19 207:18 208:10 212:8,10,
16 315:21 322:1 339:10,11,14,18
343:16,18 344:9,11,12,15,23

**informed** 147:14,15 332:16

**informing** 160:20

**infrequently** 356:3

**inherently** 209:3,8 217:10,13
218:1,6,21 219:17 220:13,20
223:25 224:7,16,23 225:3,10,14,
16,19,21,22 226:1,2,5,7,8,11,16
228:1,20 234:16,20,25 235:4,6,
11,16,19,21,24 236:1 237:22
239:12,14,16,18 240:20 242:14
243:1,3,6,10,19 244:22,25
245:10,15,18 246:4,7,14,19,21,24
247:5,6,11,14,17 248:1,17,23
249:5,8,14,22 250:3,8 255:5
256:21 257:3,7,14,17,21 258:2
261:14,19 265:18 267:18 272:4,
16 282:15

**inherit** 151:3

**initial** 94:15 199:20

**initially** 7:3 81:15 83:8 84:3
219:25

**initiate** 103:19 105:11

**initiated** 103:20

**injury** 116:5

**innocuous** 274:3

**inquire** 118:2 122:23 227:24

**inquired** 257:20

**inquiry** 345:14

**inside** 128:25 248:24 326:24 327:14

**insisting** 203:20

**Insofar** 217:3

**inspect** 71:20

**inspected** 71:17,18

**installed** 172:16

**instance** 71:13 75:1

**instances** 38:23

**instead** 164:4 188:4 286:11

**instructed** 331:16 332:8

**instructing** 51:24 275:24 291:2 292:6,8

**instruction** 52:23

**instructions** 51:21

**insurance** 32:20,24 33:2,3,11 116:6

**intake** 24:18,23

**integrity** 143:6

**intelligent** 9:2

**intend** 333:4,7

**intended** 119:2,3 140:5 332:20 333:3,9,17 350:7

**intent** 16:24 17:5 88:13 271:17

**intention** 88:12

**intentionally** 73:10

**interactions** 352:25

**intercom** 253:1

**interest** 131:7 168:17 255:9

**interested** 175:13 176:16,18

**interests** 40:13 48:11 49:12

**interfere** 109:25 110:5 354:13

**interfered** 38:3 165:23

**interfering** 18:3 110:10

**interim** 212:9

**internal** 330:7,8

**interrupt** 362:16

**interrupted** 175:15 219:16 243:25 287:6

**interrupting** 24:20 282:25 343:24

**interview** 84:23 100:7

**interviewed** 100:9,11

**interviewing** 43:14 88:7

**interviews** 131:1 167:16

**intimate** 257:11

**intimidated** 30:18,20

**introduced** 161:16

**Introverted** 26:21

**intruding** 302:4

**intuitive** 26:21

**Inviting** 243:5,17 244:19

**involve** 143:17 319:9

**involved** 34:21 66:8 85:7 97:8 139:18 142:5,10 143:20 166:4 319:8 347:21,25 348:1

**involvement** 142:3

**involves** 188:3,13,14 241:7

**ipad** 96:5 123:6,7 124:1,3,7 125:4,6,13,19,21 158:13,16 192:20,25 193:4,6,8 194:8 195:1, 2 199:19,23 200:2,7,12,13,14,15, 18,19,20,21,22,25 201:3,5,7,14, 15,24 202:6,19 203:4,5,7,8 204:7, 14,18,19,24,25 205:1,3,5,7,10,11, 13,25 206:1,5,11,17,19 207:1,3, 11,13 208:2,9 212:5,7,9,12 214:5, 14,15,16,18,21,24 215:9,25 216:1,4,6,11 250:25 251:1,3,6,7, 10 252:24 276:23 277:2,4,7,8,18 278:3,9,10,11,14 279:11 280:6,9, 14,23,24 281:1,2,10

**iphones** 68:25

**irrelevant** 146:19

**Irrespective** 54:25

**isn't** 157:19 178:21 179:9 235:2 258:3 259:7 265:1 269:11 285:9 314:20

**isolating** 266:10

**issue** 16:2 17:12,20 35:13 38:13 61:6 74:1 76:11,15 88:6 123:20 138:11,14 150:17 168:20 260:15 261:8 282:20 303:1 329:20 340:8 348:12 369:6

**issues** 15:24 17:21 45:8 48:12 49:13 68:12 88:19 101:16 120:21 121:5 137:18,20 138:8 156:10 171:15 226:10 269:6,13 287:10 334:17

**it's** 9:15 14:15,22,23 15:21 18:3 27:11,13 28:15 34:11 35:14 36:21 39:20 46:15 48:18,19 51:20 52:3 54:21,25 57:12 61:9,18 62:15,17 63:6 66:18 69:4,9,10 70:14,23 72:24 78:5 80:10 93:20 94:12 96:1,16 97:2 106:14 112:11 113:2 114:24 115:1,3,4 120:12 131:8 153:10 156:11,24,25 159:19 162:1 163:19 165:20 167:1 178:19 183:8 201:16,20 202:11 207:13 208:15,17 209:25 210:10 211:22 213:9 214:1 215:13 219:7 222:10,11,14 225:18 226:8 227:20 230:15 235:11,13 240:13, 22 242:11,12,21 246:4,24 250:12, 20 251:18 256:12 259:12 265:6, 11 266:9,17 267:6 268:10,14 269:13 270:14 272:21,25 273:3,4, 20 276:11 281:17 282:5 285:5 286:19 287:12 293:24 300:14 303:15 305:4,25 306:6 310:15 311:3 313:17,22,24,25 314:4,21 315:11 317:14,16 318:13 320:11 347:12 348:6 354:6 355:20 357:10 360:20 361:12 365:24 368:5,7,10,11

**item** 240:6,18 241:1,16,22

**items** 78:14 156:23 240:8,25 241:2,8

**iterations** 273:24

**itself** 46:21 239:22

---

J

**J&j** 273:1

**January** 190:5 357:22 358:6

**Jared** 50:23 51:10,25 52:11 290:19 291:3,10,14,21 292:11,17,

20

**Jim** 130:21 131:3 137:12,24 138:5,12 144:1

**Jim's** 138:8

**job** 43:14 44:9 82:23 83:16 84:21, 25 93:11 102:19,23,25 103:9 105:12 109:25 110:5,10 128:14, 17 131:16,18 133:13,19,22,24 134:4,19 135:18 138:15 144:21 150:23 174:2 180:5,6 285:24 287:13

**jobs** 150:6 174:2

**Joe** 47:9,21,22 48:6

**jog** 61:22 312:9

**jogged** 85:20 304:3

**John** 86:4,22 87:4,7

**joined** 29:16,17 30:6,13,17,25 31:8 71:22 116:4,10,13,18 117:8 120:5,9 126:9,23 179:22 264:2

**joining** 136:20,25 137:3,5 249:1

**joint** 284:20 285:11,21,25 286:1, 3,10 287:2

**jointly** 49:21 362:6

**Joseph** 45:24 112:12

**journal** 53:11,16,18,21,25 54:5,8, 11,12,13,15,16,19 55:3 62:12 63:5,9 64:3 194:13,14,15 360:14

**journals** 54:1 62:25 63:2,8,22,23 64:4 78:19 92:24 183:15

**joy** 188:5,8,11

**judge** 222:3 365:4

**judge's** 48:17,22,24 53:4 156:13

**judgment** 220:12

**judgmental** 26:22

**judgments** 41:2

**judicial** 317:16

**Judy** 94:21 95:6,9,12,22 96:2,24 98:18,25 99:10,11 100:23 101:5

**Juip** 306:12

**Jules** 306:14 307:2,8 308:3,4 309:18,24 310:5,23,25 311:6,8

315:22,24 316:1 317:24 318:23, 24,25 320:25 321:11,17,20,21,23 337:23,25 339:25 340:3,7 346:8 357:19

**July** 45:19 131:19 134:2

**jumped** 153:4 267:22

**jumping** 283:17

**June** 31:17 32:2 131:19 134:2 325:16 329:20

**jury** 143:24 144:1,11

**just** 6:21 11:24 14:3 15:4 16:5 17:8 18:1 20:21 22:3,16 23:2 27:7 28:24 29:21 30:1 33:4 34:11 39:5, 16,25 44:5,6 54:13 58:10 62:25 64:2,21,22 67:6,7,9,10,11,14 68:11 70:25 72:9,23 74:11 75:2 76:3 77:6 78:12,14 79:13 81:3,6 83:7 85:20 87:13 89:9,11 92:15 95:2,18 98:18 99:22,23 106:15 111:19 112:6,25 114:9 123:12 124:18 125:8 128:15 129:4,6 130:23 132:21 136:8 141:11,18 145:21 152:17,22 154:4 156:2 158:22 159:24 160:20 162:1,24 168:11 172:13 174:14,24 175:8 179:1 181:9,22 200:7 206:17,24 207:18 208:15 209:6 214:12 216:17,21 217:21 218:23 219:10, 11,23 220:22 224:5 225:12 228:7 231:13 237:2 239:22 240:13 242:9 243:3 246:4 247:5 250:8 255:9 256:1,5,12 259:2 264:12,14 265:11,21,23 266:23 269:9,16 270:6 271:5 272:23 274:19 276:10 277:19 278:20 279:13 280:15 282:25 283:19 284:9 286:15 289:23 292:25 293:17,22, 23 294:1 295:9 299:10,12,14 300:3 302:12 303:16 304:3 306:5 309:3 310:12,18 313:16 314:2 315:8,10 316:3 317:4 318:11 323:7 325:4 326:8,16,20 328:16 329:14 330:15 333:4 334:8 340:13 341:25 342:10,23 346:21 347:7 348:15 355:2 357:8 360:9, 20 363:3 368:19

---

### K

**Kaitlyn** 254:12,15,19

**Kalahar** 50:7 63:21 64:8

**Karen** 10:3,14

**keep** 48:16 57:3 64:20 65:2,17 96:6 114:8,9,10 215:1 221:7 233:23 242:13 247:3 256:7,8 281:12 306:16 310:25 324:3 325:4 349:20 352:17

**keeping** 54:19 201:8

**KEINBAUM** 72:2

**Keith** 50:10

**Kelly** 300:15,22,24 301:7,10,17, 19,20,21 302:15,16

**Ken** 49:14,16,18,19 155:21

**Kentucky** 10:16 55:20,22,23 56:1,2,5,16 58:9 75:3 77:17

**kept** 53:21 317:15

**Kerr** 43:24 85:3 87:17,18,21 90:10,11,24,25 91:18,21

**Kienbaum** 5:11 71:23

**killing** 336:22

**Kimberly** 5:18 50:10,13 71:25 105:23 342:6

**kind** 15:24 26:9 27:16 29:24,25 61:4,18,21 64:21 85:15 87:22 89:9 124:5 137:20,21 138:5 140:23 166:22 167:9 171:14 177:19 217:21 230:16 256:25 302:13 314:3 341:10 347:15

**kinds** 36:8 62:24 66:21

**kiss** 221:16 223:9 224:25 225:14, 16 229:5,11,21 232:12,15,16,18, 21 233:5,21 234:11,13 235:4,5,10 241:7,19 247:7 272:15 274:13,17

**kisses** 231:6 233:12 235:19 246:7,10,17 274:2,8 289:16 345:22

**kissing** 289:14,15

**Kitchen** 78:14

**knew** 11:8 38:14,15 81:11 89:13, 15,16 90:3,25 95:23 98:25 99:9 105:3 117:11 120:1,12 121:12 122:22 124:22 125:4 127:12,14 132:2,4,6,13 135:24 153:17 192:24 193:9 202:19,22,24,25

204:14 207:4 209:18 269:24
308:13 338:25 352:25

**knock** 266:10

**know** 7:22 10:21 11:12,15 12:13,
14,23 13:15 14:20 15:6 16:12,13
19:6,16 20:24 24:10,12,23,24
25:17 26:24 27:9 28:15 29:21
34:25 36:20 37:15 39:11,12,17,
19,21 41:22,23,24 42:7 44:13,15
46:10 47:13,16,19 48:1,6,15 51:2
56:6 58:18,19 59:3,7,23 60:1,6
64:22 65:7,11 66:7,18,24 67:2
68:5,8,12 69:19,23 71:14 72:6,8
73:8,22 74:6,22 75:5,8,14,25 76:2
77:1,2 78:11,20 80:9,20,22 81:11
83:4,7,9 84:6,7,14 86:4 88:11,17,
23,24 89:4,7 90:6,8 92:17 93:1,8,
11,13,14,22,24 95:11,12,14,15,
18,24 96:5 98:9,15 99:9,11,16,23
100:17,22 101:17 104:21 105:2
106:6,22,23,24 107:18,25 109:22
110:10,11 111:6,10 112:8 113:2,
11,12,20 116:1,2 118:10 119:6,8
120:5,8,14,16,24 122:9,13
123:10,14,19,21 124:2,6,11,13,18
125:8,12,19 126:24 127:10,23,24
128:3,4,8,11 130:22 131:24,25
132:5,12 133:1,21 134:8,20,22,23
135:16,17,20,23,25 138:23 139:4,
7 140:5,18,24 143:4,7,11 145:15,
19,20 146:3 150:5,9 153:16,17,22
154:18 155:13 158:20 159:19,21,
23,25 160:10,11,12,14,16,18,21
161:3,5,15 162:11 165:25 167:3,
9,11,12 168:23,25 170:25 171:1,
5,9,18,20,21,22 172:1,6,11,12,15,
18,20,22 173:20,25 175:20 177:3
178:22 180:8 182:16 184:6,19
185:11,19 186:20 190:3 191:14,
16 192:18,21 193:22 194:10,18
195:9 198:3,5 199:6 202:4,25
203:4,12 204:21 207:7,10,13,21,
25 208:7,8 209:9,15 212:16 215:2
216:9,23 217:24 218:23 230:3,21,
22 231:8,17,20 233:7,20 234:17
236:6 241:8 242:12 245:6 247:15,
25 248:14,15 251:18,19,20,21,23
252:22 253:25 255:2 257:4
264:21 273:19,21 274:25 277:22
278:1,7,15 279:3,18 282:2 284:1
285:2 287:5,7,11 288:25 289:5,6,
20 297:23 298:11 299:12 300:1,
16 301:24 303:15 304:2 305:1,3,

10 308:21 310:9,14,18 311:18
313:22 317:8,19 318:5,12 320:21
321:22 322:8,15,23 323:18 324:4,
13 330:1,17 331:6 333:5,25
334:1,3 336:5,6 338:13,16,18
339:1,3 340:19 341:1 342:10,17
344:18,20 346:8,11,14,16,21,22
347:24 348:5 353:8,14,15 357:7,
9,10,12,13,17,19,22 358:19
359:8,25 360:2,4 364:3 366:7
368:17,22,25 369:10

**knowing** 343:9

**knowledge** 76:19 96:19 110:2
121:7 216:6 312:14 315:5 343:4

**known** 217:6

**knows** 92:9 133:17 344:20
361:22

—— L ——

**labeled** 59:23

**labels** 76:16

**lack** 57:22 297:7 338:12

**lacking** 320:12

**land** 10:22

**Landon** 311:17 316:20 332:10,
12,14,20,24 334:16 348:10,11,14,
17 349:3,5,12,14,17,18,19,21,24
350:1,10 351:1,5

**language** 165:2

**large** 193:3 215:8

**larger** 224:1,3

**Larry** 166:9,14 267:25 268:1,10,
17,20,22,24 269:1,20,25 270:6,
10,15,25 271:8 305:13 306:24
307:8,9,15,16 309:2,4 311:17
312:12,19,23 313:19,25 314:1,6
316:20 332:10,12,14,19,24 333:3,
11,15 334:16 348:10,11,14,17,21
349:3,5,11,14,16,17,18,19,21,
24 350:1,10,15,18 351:1,5,22

**last** 7:8 15:10 27:5 54:15 56:14
94:2,11 95:24 96:1 115:19,24
150:20 195:22 196:13,18 204:20
210:3 215:4 230:7 240:13 254:13
263:25 289:7 305:19 306:9

311:18 341:25 353:7 354:19
355:6 362:14 364:19

**late** 182:20 221:2 235:25 236:3,5,
6,20,21 241:21

**late-night** 223:6 235:22,23
237:5,20,24 238:2,24 239:3
240:3,10 241:20 259:21

**lateness** 225:1 241:19

**later** 28:20 81:13 189:17 190:2
224:19 226:13 253:16,21 331:8,
15 348:18

**latitude** 90:13

**laugh** 188:11

**law** 12:3,11,17 13:23 14:19 15:22
18:22 31:21 41:20 42:12,15 49:13
50:16 126:8 132:21 174:15
218:15 250:2 285:19 286:9,12
287:5,7,12,13 294:3,5,9 305:22,
23 369:2

**lawsuit** 28:18 182:25 183:12
209:5 242:25

**lawyer** 7:2 9:1 10:21 21:12 31:23
40:2 46:1 126:14 162:15 177:7
188:21 210:4 218:12,24 219:25
220:15 287:13,15 293:2 305:21
318:22 338:1

**lawyer's** 7:5 228:4

**lawyering** 41:5

**lawyers** 21:13 126:20 154:23
155:3,5 218:22 355:22

**lead** 34:6

**leadership** 27:3

**leading** 220:7

**leads** 261:21

**leagues** 137:23

**learn** 38:5 170:15,17 193:11
212:3,11 286:12 287:13

**learned** 37:17 38:20 39:9 101:15
170:25

**learning** 101:20

**learns** 207:15

**lease** 259:23 260:10,15,21,23
261:8,11 262:9,13,20,25 263:22

264:6,19 265:2,5 295:11,12
296:11,19

**leased** 262:12

**least** 95:14 152:21 183:8 216:18
232:4 249:4

**leave** 8:7,8 36:24 37:2,11 40:7
84:9 135:10 198:22 210:9 230:15
263:24 326:6 327:19 330:24
331:4 332:5 335:25 336:3,7 337:2
362:11 365:21 366:1

**leaving** 36:16 43:14,20 86:11
100:10 102:22 103:1 128:14,19
131:23 133:18 150:4,17 196:10
229:16 232:8 263:12 281:16
326:5 349:25

**lecture** 285:20

**lecturing** 227:4 285:22

**led** 62:23 79:10 104:1 105:19
109:24 118:15

**LEDS** 172:18

**left** 30:7 33:15 35:3 36:3 37:6,7
40:1 41:20 69:13 101:19 102:3
103:15 129:15 132:10 147:25
230:8 280:8 302:9 307:16,17
308:20,25 309:5 324:2 335:3
347:8 350:21 357:23

**left-hand** 267:7 288:22

**legal** 5:13,14 31:16 45:7 46:18
47:6 48:11 52:21 53:19,20 54:1
55:12,15 62:20 64:4 124:25
125:1,2 128:24,25 136:19 137:16
293:5 297:15 303:6 304:10
315:15 320:22 321:19 345:10
346:11,12

**legalese** 159:7

**legally** 117:17,23 307:24

**legs** 7:17

**Lenny** 311:17 312:21,25 313:19,
24

**less** 139:1 213:20 300:20

**let** 7:22 17:11 34:10 56:20 70:12
72:9 73:1 74:23 86:23 92:5
111:14 112:8 147:4 149:1 160:18
162:24 168:23 178:12 183:24
184:7 185:6,18,19 210:22 232:17

247:25 283:16,17 290:7 322:18
323:17 335:9,12,18 339:6 349:22
360:4 362:16

**let's** 18:12,13 22:9 23:15 29:2
31:15 49:9 53:11 60:25 78:24
86:7 89:4 98:13 114:9,10 126:8
127:17 136:8 147:12 158:5,22
162:19 163:10 169:2 172:23
180:21 182:7 198:24 208:18
217:2 220:18 223:24 226:9
240:18 250:16 256:15 266:16
269:18 272:7 276:17 279:24
281:6 283:21 288:19 291:24
295:9 303:4,9 304:8 324:9 326:20
337:22,24 341:13 358:15 364:3

**lets** 208:1

**letter** 113:10,13,14,22 160:22
161:14,19,20,22 162:2 174:9,17

**letting** 67:3 87:5 163:20

**level** 88:5 145:20

**license** 46:23 117:12,15 118:11,
13 122:21 285:19

**lie** 103:7 105:16,21

**lies** 106:18

**life** 15:4 27:15,25 91:9 132:21
186:6 188:9,15 190:9 224:17
226:12,16 227:25 228:18 239:13
241:18 257:2,11,23 259:22
309:23 322:19 323:4 331:25
332:1 338:8,12,14 339:16 343:1,
3,7,12,17,19 344:2 360:2

**life's** 184:19

**light** 123:4,8,12 124:21 171:14
190:1 211:21 225:18 234:20

**lighting** 121:24

**like** 8:1 10:8,10 12:20 14:3 15:4
16:4 22:17 24:2,3 26:22 27:7
28:16 29:20 40:18,19 43:2,3,10
47:6 53:19,21,22 54:11,12,21,22
56:6 58:12,16,23 59:2,3,12,24
61:16,17 62:7,11 63:3,6,8 64:20
76:10 81:1,3 84:1,4,23 86:13
87:5,11,21,23 88:9,12 89:15
91:20 94:9,24 99:1 100:14 102:12
103:11 105:15 106:9,12,13,14,17,
19 111:3 113:20 124:5,19 127:24
128:7 129:5,9 131:15 132:12

135:1,9 142:10,11 148:2 150:15
164:17 169:16 172:8 175:8,18
176:9 190:13 193:18 194:25
195:11 198:18 200:21 201:8,18
202:23 207:22 215:4 220:8
222:24 225:24 227:5 228:13
230:8,13 240:2,13 241:24 252:5
256:9 257:4,22 258:16,21 259:7,
19 264:3,7,23 269:16 274:19
276:6 279:21 282:9,10,11,16
286:10 291:7 297:8 300:3 304:2,
4,5 307:24 309:12 310:9,10 312:1
313:25 314:11 317:10,16,17,19
318:13 319:22 332:7 336:6,20
343:11 360:15 363:8

**liked** 116:25

**likened** 263:23

**limit** 310:20

**limitations** 7:25

**limited** 48:18 120:23 146:9
315:16 317:4

**line** 8:5 17:9 77:10 114:18,20
204:1 259:17 261:6

**lines** 195:18

**link** 236:18 237:2

**linked** 261:4

**Linkedin** 106:21 110:18,20,23,25
111:4 360:17

**Lisa** 37:9 82:9,11 94:8 130:8

**Lisa's** 94:11

**list** 17:21 41:24 44:3 51:17 52:25
53:2 63:16 85:8 104:21 156:22,24
163:10 173:18 218:5,19 219:3,9,
13,20,21,23 220:8,18 221:4 228:9
240:6,8 241:14 242:9,11,12,16,21
245:1,10,16,23 247:2,5,11,20
249:7 250:14 267:18 272:3,6
274:20,23 275:5 276:8,9,11 292:9
293:22 297:21 298:1,3,14 300:6,
10,11 303:9,13,14,18,20,24
304:6,8 306:22,25 307:6 308:17,
18 310:10,17 312:8 313:13
319:22,24 326:2 344:6 352:2,3
360:17

**listed** 13:4 15:18 53:3 224:11
240:10 306:18

**listen** 206:3 277:19

**listening** 9:3 106:1 184:16
222:18 323:23 344:18

**lists** 51:19 247:23 310:15

**literally** 219:19 283:9 306:4

**litigate** 87:24 116:14,16 118:7,8,
16 119:6,7,8 133:2 134:4 135:15

**litigated** 128:7

**litigating** 116:17,19,22 117:2
118:9 119:12 140:8,10

**litigation** 11:20 33:3,6,17 36:4,
25 46:21 47:5 52:3 57:4 61:7 73:6
74:1 77:24 116:24 119:14,19
120:1,3,6 131:18 132:8,10,14,15,
25 133:6,14 134:9 138:21 139:4,
9,10,12,16,18 140:6 141:1,2
142:21 143:9,18 144:16 147:2,25
149:21 151:4,8 163:23 293:19
329:3

**litigator** 32:9 116:5,9

**little** 11:16 100:2 128:8 153:4
177:8 256:9 259:12 314:3 317:14

**live** 10:21 57:18,19

**lived** 58:18 60:2

**Liz** 6:3 276:4 366:20

**located** 13:7,8,9 251:1

**location** 10:15

**locked** 335:10,16 337:10

**logs** 329:8

**long** 8:15 24:14 59:25 91:17 96:1
113:15 120:5 121:11 127:15
187:8 191:2 197:23 232:17
252:13 273:20,21,23 274:10
317:17 318:13 320:7,11 327:25
328:9,12,18 330:13 333:24
360:17

**long-term** 177:20 261:11,17

**longer** 92:14 100:2 116:14
150:14 173:2 318:14 328:15
356:3

**look** 13:16 23:24 56:16 58:20
67:8 74:6 92:21,24 93:1 150:14
183:2,7,17 191:11,17,22 192:13
193:20 194:10 200:19 201:6,10,

16 202:23 206:11,17 207:2 212:7
214:5,15,20,22,23,24 215:19,21
216:1,4,7,11 221:23 227:7 249:19
250:23 266:16,25 270:25 279:21
283:21 303:23,25 304:1 312:8
320:3 328:1 330:21

**looked** 34:12 36:22 42:10 77:19,
21 121:23 164:16 234:23 320:17

**looking** 26:10 36:24 37:2 42:14
63:15 74:15 83:22 100:21 125:14
131:16,18 133:13,22 138:1
160:24 161:22 186:18 191:10
206:25 207:12,17 208:3,8 216:16
251:17 252:24 283:13 303:21
319:22 330:14 350:18

**looks** 279:22

**loop** 276:14 314:4

**loose** 360:15

**lose** 368:21,22

**lost** 228:3 306:5 368:23

**lot** 8:18 20:9 43:2,3 84:5 90:2
97:11 98:12 128:6 131:14 172:21
175:10 179:23 186:4,16 190:7
197:22 246:18 247:13 258:3
278:21 279:14 290:8 309:16
356:1,5

**lots** 115:12

**Lotus** 64:25 65:14,19 67:23 68:1,
9 69:12,19,25 73:18 236:24
237:14

**love** 156:24 187:12,17 188:6
189:3 192:4,14 223:16 226:5,6
276:11 289:21 345:23 358:12

**loved** 189:11

**low** 29:8

**lower** 244:10

**lucky** 186:5 190:8

**lunch** 9:22 103:18,24 115:5,6
136:7,8 168:24 169:25

**lured** 180:23 181:9,20

**lying** 196:7

## M

**Mackenzie** 100:11 134:24 141:9
306:1

**macular** 123:2,22

**mad** 131:14 263:13,15

**made** 11:16 43:1 44:24 58:10
72:20 74:25 78:1 84:19 105:7
107:23 108:4,11,14 110:3 124:4
144:15 160:19 185:24 186:14
193:21,23 225:7 231:2 235:16,24
239:16 245:16 258:23 261:19
295:13,19 298:17 300:20 307:16
310:25 311:15 312:3 316:21
318:9,21 322:14 334:24 335:2
337:25 361:3 364:16

**mainly** 300:22

**maintain** 29:13 67:13,17,20

**maintained** 66:15 70:3

**major** 227:12 359:1

**majority** 127:5

**make** 21:19 22:3 34:8 47:25
67:25 71:12,17 76:18 80:3 93:15,
24 106:9,15 108:20 129:23 131:8,
11,13 153:20 156:5 176:3 185:25
193:19 196:11,25 217:20 220:12
235:19 236:1 241:11 242:9
247:19 249:6 257:17 258:2,13
265:7 272:17 274:19 275:4 291:1
293:13 294:7,12 299:14 304:6
315:10 316:3,16 320:5 324:5,7
349:15 352:2 355:3 361:18,20
362:16 363:23

**makes** 150:24 184:17 239:17
255:3 356:23

**making** 41:2 80:16,21,23 84:17
93:23 104:18,24 143:16 157:6
167:25 209:13 219:4 221:3
244:21 258:18 297:6 299:22
313:11,18 316:22 317:22 320:22
321:19 352:19 356:6 367:1

**mal** 33:11 143:9

**male** 40:8 126:20

**malpractice** 32:17,25 33:1,5
116:10 127:3,6,8,11

**man** 120:10

**Management** 32:21

**mandating** 219:4

**mandatory** 73:5 221:1 223:5,24 224:9,21 225:10 226:9 230:23 234:7,14 239:5 240:3,10 241:17

**mankind** 188:6

**many** 34:24 35:17 56:17 59:5 64:18 125:18 176:8 202:12 221:12 228:22 229:20 236:4 241:5 258:21,22 262:17 264:23 273:23 283:25 321:25 353:3,21 355:23 360:12

**March** 194:23 195:7 196:8,9,21 197:1,5,18,24 198:1,20 210:23 211:5,6,19 212:21 229:19 230:14, 17 232:9,10 238:6 253:25 260:8 262:13

**Marilyn** 300:15 301:2,10

**Marisa** 130:7

**mark** 52:25 213:11 283:10,12,15

**marked** 70:10 111:12 153:2 158:3 161:11 178:10 182:8 183:22 185:4 213:17 266:14 276:15

**markedly** 94:25

**marking** 213:14

**married** 170:8,10,11,12,13,14

**Maryland** 24:3 55:21

**Marzotto** 6:3

**material** 147:24 188:3

**materials** 77:3

**Matt** 46:18 47:22 48:7,9 292:15 312:20 313:1,19,25

**matter** 5:8 139:14 188:25 189:4 207:20 220:14 285:10 286:14 351:14 361:14

**matters** 138:22 154:18 214:19 235:15 236:1 297:24 351:13

**Matthew** 45:25 47:20 48:2,5 49:11,24 311:23

**mature** 36:4

**maximize** 168:13

**may** 9:16,19 68:16,17,18 72:19 131:3,19 227:10 228:3 250:21

**maybe** 26:23 33:1,9,11 44:21 67:22 72:24 83:10 87:6 103:23 116:16 152:12 167:17 250:21 305:23 348:20

**Mcginn** 50:7 63:21

**Mckeen** 43:8 44:22,23,25 45:2 85:1 91:24 92:3 129:22,24 173:17 174:5 304:25 305:2

**Mckeen's** 42:18 92:11

**Mckenna** 5:8,9,19 6:7,10 9:19 10:25 76:23 113:10 158:10,12 184:2 185:14,20,23 186:2 193:2 215:7 227:23 266:19 287:21,23 339:7

**Mckinney** 44:11,13 85:8 130:1,4, 5

**mean** 12:6 14:24 26:19 34:19 35:7,18 36:9 40:17 44:16 47:6 51:2 52:16 59:1 60:3,14 65:8 69:12 72:24 74:20 78:13 80:10 81:4,20,21 86:18,24 88:1 92:5,15 96:15 97:12 107:11 109:19 119:22 121:9 126:5 128:23 135:5 152:9 200:9 205:4,6 207:16 212:10 223:3,4 232:17 239:19 240:17 242:18 244:24 253:24 255:15 260:1 262:9 275:12 279:3 281:23 286:15 293:2 294:6 306:22 330:5 343:8 348:20 352:17 360:12,17 363:6

**meaning** 18:24 21:20 122:14 190:2 282:10 329:8 339:14

**meaningful** 188:2

**means** 26:20 60:22 79:18 95:16 170:20 186:15 188:18,21 190:17 274:23 338:3 347:4

**meant** 35:20 186:3 190:2,6 361:23

**med** 33:11 143:9

**meddling** 142:11 143:2

**media** 47:15,17,18 289:5

**mediate** 178:1 353:19,22

**mediated** 127:1,4,8 128:6

**mediates** 131:14

**mediating** 119:10 177:8,12,23

**mediation** 116:25 127:15,19 128:5 175:13 176:10,17,19,24 177:4,17,25 280:12

**mediations** 128:1

**mediator** 127:2,9 175:11 176:16

**mediators** 128:1,8

**medical** 9:20 10:20 16:23 32:17, 24 33:1,4 116:10 127:3,6,8,11

**medication** 14:6 25:14 26:1,2

**medications** 11:1,3,6

**Medici** 45:24 47:9

**meet** 71:24 72:4 331:16 363:9 364:25 365:16,22 367:11,15,17, 19

**meeting** 64:21 65:3,4 83:13 84:14,15,16 93:13 102:8 154:15, 16,17 157:2,11 163:24 183:21 236:10 326:11,15 330:6,8,9 331:13,14,21,22,23,24 332:3,8 333:12,15,18,23,24 334:11,15 356:24,25 357:19,24

**meetings** 65:10,21,24 71:3 130:21 164:5 165:21 166:17,21 221:2 223:6 235:22,23 236:22 237:5,17,21,24 238:3,5,9,24 239:3 240:4,10,19 241:20 259:21 330:7,8,20 357:2,7,8,9,17

**Megan** 288:24

**Mellon** 31:17,21 32:19,22 33:7 34:14 35:19 43:12,16 83:17 137:12,13,20,24 138:5 144:1

**members** 297:1 300:12,22

**memorialized** 113:24

**memorized** 153:12 162:2 204:22

**memory** 6:19 61:22 85:20 92:22 93:2 183:1 193:20 194:11 221:22 304:3 353:21 355:5

**men** 30:18,20,24 31:5,8,13

**mental** 12:5,10,18 13:11,22 14:1 15:2,13,23 18:21 19:12 20:9,10

23:20 25:15 26:1,3,6 304:18
309:20 310:6,15 311:2,4,12
312:15 313:5,20 316:6,12 321:2
323:9,11 337:24 339:19 340:14,
16,18 342:24 343:11 344:24

**mention**  102:16 274:12,16
289:14 345:21,24,25

**mentioned**  12:21 22:12 80:23
104:23 234:19 256:21,23 288:5
326:8 343:22

**mentioning**  266:6

**mentions**  160:2

**mentor**  140:4 184:25 189:25

**mentor/mentee**  255:10

**menu**  121:14,20,23,24 122:1,3,6,
9,10,12

**menus**  121:15 123:5 124:21

**mere**  347:2

**Merry**  189:11

**message**  106:21 110:18,20
159:10,15 174:6 179:4 184:14
186:13 189:14,19,21 190:4,21
191:6 194:6,18 221:23 223:15
254:17 268:3 313:12

**messages**  74:17 75:12,16 96:6
111:7,9 158:11,15 181:7 182:19
183:5 184:2 185:13,18 186:8,9
190:17 191:19,25 194:4,7 216:19
236:19,21 254:19 299:3 303:25
329:9,11 360:17

**met**  6:12 82:13 102:6,7 113:18
164:10 356:22

**Metro**  46:10

**Metzger**  38:20 39:24 306:12

**Meyers-briggs**  27:18

**Michigan**  5:2,12 13:6,7,8,9 32:20
46:22 55:25 58:18 60:2 63:24
77:18,24 175:11 217:5 218:15
250:2 285:19 286:9,12,13 369:1

**mid**  243:25

**middle**  101:19 244:4,7,17 283:18

**midnight**  236:9

**might**  7:21 25:16 32:22 47:12

48:5 51:6 56:14 73:24 75:8 79:21
87:3 110:13 111:3 139:14 142:15
160:9 170:22,23 230:4 231:11,18
252:4 296:3 331:3

**miked**  210:2

**MIL**  273:1

**million-dollar**  265:2

**mind**  6:22 29:25 92:13 113:19
209:5 225:23 226:11 261:25
272:16 311:11 344:8

**mind-boggling**  272:23

**mine**  47:23 253:13

**mini**  172:18

**minimize**  244:21

**minute**  263:25

**minutes**  8:13 45:4 47:13 53:14
72:24 79:23 92:15 100:1 114:19,
21 252:16 256:9,11,12 266:12
324:2,5 328:22 347:8 351:20
363:20 364:23

**miraculously**  117:3

**mischaracterize**  7:12

**misrepresent**  364:11

**misrepresentation**  110:4

**misrepresented**  364:10

**miss**  61:19 71:12 173:16 189:9

**missing**  75:25 76:2,16 106:9
297:8 333:11 360:16

**misspoke**  178:18 307:4

**mistake**  244:23

**mistreatment**  102:17

**misunderstanding**  53:17
241:13 265:21,22

**mixup**  174:18

**MMRMA**  137:13

**mock**  45:23 47:23

**Mogill**  49:14,17 155:22

**mom**  223:19 254:24

**moment**  15:25 31:15 44:19 86:7
187:2 201:17 265:25

**moments**  184:19

**Monday**  271:16 330:2,9 366:15

**monetarily**  95:2

**month**  139:15 318:13

**months**  22:6 71:15 139:12
317:17 368:23

**more**  11:16 15:8 23:21 29:15,20
30:7 32:22 35:1,2 37:2,3,13,18
44:18 64:10 78:14 87:5,22 88:8
90:19,20 97:4,9 98:4,6,8,21
106:24 110:23 112:8 127:25
128:1,5,7,9 131:9 135:6 138:10,
18,25 139:14 142:22,23,24 145:2,
4,13,14,21 151:6 152:4 167:15,
16,19,21,22 171:24 172:13,20
188:3 201:2 212:3,11 221:15
231:9 234:14 238:23 246:23
247:1,10,25 255:9 257:19 262:5
278:10 279:8 280:9 284:4 288:2,
8,17 290:6 299:12 304:20 308:22
309:1 310:23 315:6 319:17,20
320:13 321:14 323:17 340:7
342:25 343:3 356:4,5,6 357:4
360:10,20,24 361:4,5,7,10,15
362:2,9 363:20

**Moreover**  188:20

**morning**  5:5 6:10,11 11:1 72:1
184:10 185:22 187:23 236:7

**most**  66:25 172:17 353:8

**mostly**  67:3 139:9,10,11

**mother**  223:19

**motion**  17:25 18:2,6 164:19
165:4,8 365:6,10,11,12,21 366:1,
9 367:2 368:5,9,20

**motions**  165:7

**motivated**  29:4

**mouth**  226:20

**move**  18:12,13 37:4 56:16 80:12,
16,21,23 82:14 149:18 157:4,22,
24 158:1 182:7 238:25 290:16,20
342:9

**moved**  63:23,25 69:5 75:2 77:23
123:9 194:22 195:5 197:2 198:3
211:5 230:22 238:22 250:20
262:12 344:5 345:1

**movement** 252:2

**movie** 252:1 357:12

**moving** 81:19 82:2,4 150:6 173:4
176:3 252:1 307:9 344:13

**Mr** 6:1 18:9,15,18 71:23 72:2
112:3,7 152:7 155:6 157:2
158:11,13 172:2 178:14,16,18,21
179:5 186:8,9 195:13 198:7
205:25 210:10 216:23 227:17,24
244:2,9,13 266:19 275:1 276:9
278:16,18 283:9,12 284:9,10
285:2,18,23 286:16 287:1,4,7,17,
21,25 288:4,25 293:20 360:25
361:11,22 364:2 366:9,14 367:1,
6,20 368:2,6,8,12,17,25 369:3,10

**Ms** 5:18,22,24 6:3,10,12,23 7:7,
15 8:17,21 9:1,7,8 10:7,9,10,12,
14,15,16,19,20,24,25 15:10,12
16:3,18,20,25 17:7,8,11,18,20,23,
24 18:1,3,7,10,13,16,19 19:5,9,
15,21,25 20:1,4,6,14,20,23 21:4
24:19 25:1 26:14,18 28:4,8,23,24
29:1 30:2,4 31:19,22 32:12,16
35:11,14,20,22 36:1 41:14,18
42:16,17,20 45:3,5,6 48:14 49:1,
4,6,7,9,10 51:5,6,8,13,16,18,20,
22,24 52:2,5,10,13,15,18,19,22,
24 53:1,5,8,10,13,15 54:9,14,17,
18,24 55:4,7,10,14 56:11,20,24
57:1,6,8,15,17,21,23,24 58:7
62:1,8 63:21 64:8 70:6,12,16,17
71:21,24 72:4,5,9,11,15,21 73:1,
4,12,16 74:2,8,11,16 75:9,11,18,
21 76:4,7,11,15,22,23 77:5,12,13,
22 78:10 79:4,9 84:12,24 85:13,
14,16,21,24 88:10,13,17,21 89:3
91:2,6 94:2,5,14,17 95:10,13,17,
20 96:5,9,21 97:7 98:22 99:6,15,
19,22,25 100:5,6 101:2,7 103:4,
12 104:4,6,14 105:1,8,17,18,24,
25 107:1,21 108:3,10,17,18,21,
22,24,25 109:2,4,6,8,10,12,13,15
110:7,17 111:14,18,21,25 112:6,
9,11,14,15,16,18,20,23,25 113:2,
4,7,9,10 114:1,5,8,10,11,17,23
115:2,4,5,6,7,9,12,13,15 117:4,7,
13,16,19,22,24 118:1,4,14,24,25
119:4,17,21 120:15,18,22,23
121:6 122:7,8 123:15,18 124:8,
10,14,17 128:16,25 129:7,12,17,
20 132:22 133:4,8,9 134:12,17,25
135:4,7,12,19,22,24 136:2,3,5,6,

8,10,18,21,23 137:10,11,19
139:24 140:3 141:5,6,7,8,9,11,16,
18,20,21,22,25 142:7,13 144:18,
23 146:3,7,11,13,18,21 147:18,21
149:9,11 150:20 151:1 152:17,19,
24,25 153:1,2,5,6,24 154:1 155:9,
10,14 156:7,9,12,16,20,22,24
157:1,15,18,21,22 158:5,9,10
159:24 160:1 161:13,15,17,18
167:20,24 168:1,6,24 169:2,11,24
170:7 171:6,8 172:3,5 175:15,18,
22,23,25 176:2,4,6,12,14,15,20
177:10,15 178:12,15,17,20 179:8,
9,12 180:13,20 181:13,17,21
182:1,3,7,10,13 183:18,24 184:4
185:6,11,13,17 186:22,25 187:6,
8,11,14,16,19,21,22 193:7 199:5,
9 202:17,21 203:21,22,25 204:4,
5,6 206:2,14,15,22,23 207:8,9
208:5,6,12,18,20 209:1,23 210:1,
2,6,8,12,14,15,16,17,18 213:11,
13,14,16,19,22,23 214:10 215:22
216:8,10,16,25 217:1,14,16,20,23
218:18,19 219:5,7,11,15,17,21,22
220:2,4,10,21 221:3,6,7,10,14
222:2,4,5,7,10,11,15,18,22,23
223:1,5,17,23 225:6,8 226:19,21,
22,23,25 227:2,4,7,8,9,13,16,18,
19,22,23 228:3,5,9,10,17,19
231:15,22 233:14,18 234:22,23
235:1,2,8 242:13,23 243:11,15,
20,22,24,25 244:4,7,10,11,15
245:3,5,12,19,22,25 246:2 248:4,
7,11,12,15,18,20 249:18,21
250:2,6,11,13 256:4,5,10,12,14,
15,17,18,19 259:9,11,12,14
260:19,20 265:10,12,14,16,17,20,
22,24 266:2,5,8,11,12,16,20,21,
23,24 267:12,16 268:13,19
269:23 270:4,5,6,9,13,19,23,25
271:6,7,10,15,18 272:2,7,14,20,
23,25 273:4,7,10,16 274:1,5,7,9,
14,18,21,24 275:2,3,4,11,14,18,
22,24,25 276:2,3,8,10,11,13,17,
24 277:25 278:4,13,17,21,23
282:12,17,23,24 283:1,3,5,8,10,
13,14,16,19,21,22 284:5,8,9,12,
13,15,17,19 285:2,3,6,9,22 286:5,
14,17,20,25 287:3,6,16,19,21,23
288:1 289:7,9,11 290:13,17,20
291:1,5,9,11,16 292:3,4,6,8,10,25
293:1,7,15,17,19,25 294:2 295:3,
4,5,9 301:4,5,8 305:24 306:1,8
314:20,22,25 315:4,8,10,12,25

316:4,9 317:7,21 320:9,11,15,21
321:4,7,13 324:1,6,9,11,13,17,22,
24 325:1,3,5,6,14 332:22 333:1
334:19,20 335:1 338:5,15,19,23
339:4,9,13 340:9,12 341:19,20,
21,23,24 342:4,6,8,10,12,15,16
345:8,10,14,19,25 346:2,24
347:1,7,10,17,23 348:3,4,24
349:1,4 351:20,24 352:21 353:2,
11,16,23 354:3,5,6,9,12,15,16,23
355:2,8,11,18 358:3,5 359:22
360:7,22 361:5,7,9,13,15,17,19,
24,25 362:2,4,5,7,8,11,12,15,24
363:6,10,13,14,15,18,19,21,22
364:1,3,5,8,9,15,16,18,19,21,22
365:3,4,7,9,11,13,15,17,22,24
366:2,5,7,11,17,20,24 367:4,7,11,
12,13,14,16,22,23,25 368:3,5,7,9,
10,13,16,21 369:2,6,7,10,11,15,
16

**MSW** 24:12

**much** 57:7 88:1,3 90:13,14 91:14
122:25 139:2 152:24 190:17
194:25 215:23 251:17 295:23
302:3 316:6 332:3

**Mullins** 197:14 344:15

**multi-million-dollar** 36:11

**multiple** 53:25 54:1,4 55:1 132:6
216:3 248:19 258:6 264:11 265:8
367:16

**Municipal** 32:20

**must** 217:9 222:15 234:24

**mutual** 189:1

**mutually** 348:22

**my** 5:13 9:20 10:3 11:22 12:12,13
13:4,5,8,19 14:5,22,25 15:3,9,17
16:6 17:21 21:16 22:18 25:4,5
26:3 28:6 33:16 38:8 45:14,23
46:25 48:16 49:4 52:18 54:2,11,
12,13,20 55:17,19 56:14,16
57:16,22 58:23,24 59:9,12,17
60:2,22 63:15 65:4 66:11,17 68:1,
2,6,9,10,13 69:4,10,13 71:18
73:21 74:15,21 76:1 77:19 78:14
80:6 81:2,13 82:5 83:21 86:7 87:7
93:1,18,20 96:22 97:12,18 101:17
108:22 109:11 110:12,16 111:2
116:1 117:5 118:6,12 119:9 125:5
127:5 128:22 129:4,5 141:23

142:24 148:1 149:4,17 153:7
154:3 155:18 156:17 161:2 162:2
163:19 165:17,20,23 166:20
169:21 176:6 177:16,21 178:24
181:10,24 183:14 184:16,20,25
185:24 186:6 188:7,8,10,15
189:7,9 190:9 191:13 194:17
196:11 202:23 206:3 207:3,15,16,
17,18 208:9,10,17 211:2 218:24
222:7 223:18,19 227:8,14 228:3,
14 229:8,11,23 231:17 232:14
233:1,25 237:6 238:19 239:10
242:10,11,12 246:20 247:21
248:9,10,11,22 249:12,20 250:19
253:1,12 254:12,24 255:2 257:3
258:9,15 259:20,21 261:5,25
264:4,17 268:10 270:16 273:17
276:13 279:25 280:3 281:1,6,19,
23 282:4 286:6,18 291:1,17,21
293:5,11 294:10 295:4 297:7
299:10,18 300:14,19 304:11
306:4,13 309:21,22,23 311:3,4
312:17 313:8 314:2 316:6,12,13
317:9,12 318:4 319:8,9 320:7
321:1,11,20 322:9 323:4,7,9,13,
22 324:12,19 325:5 326:4,6
327:1,9 331:25 332:1,4,6 333:20
334:9 335:25 336:15 337:11,20
338:13,25 339:16 340:14 342:23,
24,25 343:12,16 344:4,16 345:3,
17 349:2,22 353:13 355:14
357:14,16,21 359:3,13,14 360:2,
5,8 361:19 362:16 363:1,3,4,13,
23 367:21

**Mychart** 13:4

**Myers-briggs** 26:16 27:1

**myself** 6:13 233:1 336:22 339:23

**mystifies** 280:1

---

**N**

**naked** 251:16,24

**name** 5:13,15 15:25 23:24 24:1
45:24 46:9,11 81:13,14 82:5 91:9,
22 94:11 95:23,24 96:1 99:16,23
110:12 164:8,16 165:12,24
166:20 254:13 288:20 305:19
306:9 311:18 312:10

**named** 98:25

**names** 13:5 89:12 298:11,12
312:9 313:3 355:7 363:11

**narrative** 279:14

**narrowed** 53:4

**nature** 88:20 122:23 123:3,20
192:15 209:3 210:20 211:3,12,23
274:4 278:25 279:2 281:11 282:5,
21 283:23 284:2 346:11

**Nauts** 44:11,13 130:5

**navigate** 150:10

**necessarily** 189:24

**necessary** 16:23 40:8

**need** 7:5,6,21,23 8:2,4 9:6 67:2
74:9 88:19 102:3 109:2 114:6,18
134:8 159:20 166:15 172:3
191:11 215:21 222:2 246:10
247:24 255:24 256:9 265:4
278:18 288:10,12,13 290:6 303:2
305:24 306:1 321:5 330:20 332:8
345:6 363:9 364:24 366:2

**needed** 9:10 13:12 98:5 123:25
125:4,6 150:14 151:22 213:25
252:6 299:20 309:22 337:2

**needs** 139:6 257:24 288:15
324:13,14,20 325:5 364:5,6

**negative** 87:3 128:22 297:14
298:7,8,16,23,24 300:14 301:11,
18,19 306:19 309:12,13 311:15
312:22

**negatively** 128:12,19 129:11
163:7 297:9 298:20 304:11 305:1
306:13

**negotiated** 262:15

**negotiations** 78:25 314:24

**neither** 147:2 315:2

**never** 22:18,19,20,25 37:12 50:4,
25 54:15,16 83:4 120:1 124:4,5
173:13 185:21 201:7 207:2 208:9
230:17 249:2,21 264:25 265:5
289:17 326:14 333:9,17 334:17
343:22 349:17,24 352:19

**new** 10:16 34:13 72:9 77:17
123:12 171:2 177:13 188:5,19
194:22 195:5 200:2,6,10,12,14,
18,21,22 203:4 211:21 212:20,24

229:18 230:4,13,20,21,22 231:11,
18,19 232:8 238:22 250:20
259:23 260:10,11,23 350:3 366:3
367:25

**newer** 123:8

**news** 185:21

**next** 48:10 49:11 101:24 102:6,7
183:16 185:23 251:10 275:23
276:7 299:2,5 307:10

**Nice** 71:24

**night** 19:1 221:2 231:24 232:3
235:25 236:6,11,20 328:23,24
334:9 336:15

**Nine** 213:13

**Nineteen** 159:13

**no** 5:10 6:22 7:11 8:12 10:9 11:2,
15,24 13:14 14:16 15:17 17:20
19:4,18,22 20:2 21:5 23:8 24:2
25:4 26:9 29:24 30:21 31:3,6,10,
11 34:1,14 42:25 43:9,18 47:1,8,
16,18 49:25 51:1 53:21 56:11
57:21 63:22 67:15,22 68:22
70:11,13 72:14 73:7,10 78:13
81:20 97:18 98:15 99:20,22,23
101:3 102:18,24 107:9,23,24
108:2,8,21 109:8 111:13,15
112:24 116:14 117:5 119:9,13
120:3,8,14 121:7 122:6 126:20
129:14 134:11 136:8,22 137:1
138:4 141:2,20 143:7 144:9
146:12 149:10 152:16 153:5
158:4,6 160:12 161:12,14 162:12,
23,25 164:11,13 169:7 173:2,23
175:23 177:23,25 178:11 179:11
180:25 182:9,10,21 183:23 184:1
185:5,7,9 188:25 189:4,8,24
195:14 196:5,6 197:16 198:1,12,
14,17,18 200:9 201:1,3,18 204:9
207:2 210:22 213:12,14,15,18
216:5,15 219:7 222:19 224:9
227:13 230:5,18,21 231:10,13
233:2 235:21 237:13,16 240:16,
17,18 241:1,16,23,25 242:3
244:21 245:3,6 248:22 252:1
253:5 256:15 260:18 265:16
266:2,15,17 268:21 270:13
271:21 274:6 275:1,10 276:16,19
277:3 278:14 279:12 284:15,17
287:16 288:10,12,16 290:9,12,13,
20 292:3,12 293:23 297:19

307:12 309:1,15 310:20,25
321:15 332:21,23 333:14 336:8,9
337:1 345:6 349:24 354:9 355:10,
12 360:24 361:5,7,9,11,15 362:2
363:17 364:5,9,15,18,21 365:24
366:14,17 368:3,7

**Nobody's** 113:7

**non-lawyer** 293:21

**none** 64:12 135:1 250:11 286:19

**nor** 147:2

**normal** 66:23 261:20

**note** 9:12,18 10:11,13 62:16
114:13 140:12 172:13 193:19
324:20

**notebooks** 55:13,16

**noted** 35:14 114:5 156:16 227:15

**notes** 24:22 53:20 59:9,12,17
60:12,16,20 61:5,8,11,17 62:9,12,
15,17,23 63:6 64:8 92:21 124:25
125:1,2,15 183:16 193:25 194:12
304:1

**nothing** 52:7 57:13 92:13,25
95:17 122:2 124:19 233:11,15
243:9 269:4,6 286:1 287:1 346:14
364:8

**notice** 8:1 16:24 17:4 38:7,8
56:22 74:11 212:24 213:3 294:10
360:9

**noticed** 198:7 212:19,21,25
213:2 340:20

**notified** 360:8

**notion** 129:13 219:23

**notoriously** 91:25 92:3

**number** 21:23 34:25 35:24 47:21
117:9 120:8 158:12,16 163:23
186:4,16 190:7,11,19,22 191:22
228:25 229:22 252:16 262:19
328:21 355:4,15

**numbers** 36:22 322:20

**numerous** 215:15 262:3

----

**O**

**O-T-T-E-N-W-E-S-S** 305:20

**object** 7:8 15:10 19:15 48:14,20
84:12 88:10,21 96:21 98:22 105:1
109:12,13 128:16 133:8 139:24
146:18 150:20 155:9 167:20
168:1 176:4 179:8 180:13 181:17
199:5 217:14 219:23 260:19
283:1 285:6 295:3 315:25 317:7
320:9 334:19 338:5,23 352:21

**objected** 94:2 237:21 355:2

**objecting** 220:6 267:9,11,13
270:23

**objection** 17:9 19:5,25 20:4,23
26:14 28:4 30:2 31:19 32:13,15
35:11,14 41:14 42:16 48:20 49:5
51:13 52:13,17,18,22 54:9,17
55:4,10 56:11 62:1 70:6 72:15
73:12 74:2 75:9 77:22 79:4 85:13,
16 91:2 95:10,20 99:19 101:2
103:4 110:7 114:2,5 117:4,13,19,
24 118:4,24 119:17 120:15,22
122:7 123:15 124:8,14 129:17
132:22 134:12,25 135:7,19
136:21 137:11 141:5,6,10,16
144:18 146:3,11 147:18 149:9
153:24 156:7,8,12,16,20 157:15,
21 159:24 171:6 176:3 177:10
183:18 187:19 202:17 203:21
206:14,22 207:8 208:5 216:8
218:18 225:6 231:15 233:14
234:22 250:11 269:23 271:10
272:2,20 273:16 274:5,14,21
275:14 282:12 289:7 290:16,20
291:12 292:4 293:15 301:4
314:20 320:15 332:22 339:9
340:9 346:24 347:17 348:3,24
353:11,23 355:11

**objectionable** 237:5 273:19

**objectives** 169:8

**objects** 188:4

**obligated** 164:11 347:11 354:13

**obligation** 57:3,9 66:23 111:25
347:15,22

**obligations** 142:23

**observe** 170:19

**observing** 125:13

**obsessive** 221:25 223:10,11
246:20 247:8 255:5 258:15
259:20 260:1

**obsessively** 223:10

**obsessiveness** 261:12

**obstetrical** 9:19

**obstructionist** 365:18

**obtain** 169:4 212:8,10 289:4

**obtained** 194:1 212:17

**obviously** 37:3 40:17,20 41:23
66:2 84:13 92:7 93:19 96:16
197:16 198:14 264:2 290:10
304:2 315:16 323:11 343:8
362:19

**occasion** 14:7 214:9,17

**occasional** 13:24 14:3,4 15:3
16:11 30:22 262:6

**occasionally** 25:21

**occasions** 110:23 129:24
145:10 232:4 258:6 262:3,17,19
355:23

**occur** 150:24 329:20 350:23

**occurred** 61:22 65:20 166:19
217:11,25 218:20 238:12 239:17
243:4,9 245:16,17 248:16,24
296:23 297:2 323:19 325:19
326:2 330:7 350:19 356:23 357:7,
8,9

**occurring** 85:18

**October** 31:17,24 32:2 42:22
112:11 113:15,17 115:16,21
153:9,13 154:21 157:8,10 160:22
174:17 350:13,20

**off** 13:5 38:12,15 57:8 58:2
101:17 111:2 116:1 121:23
136:12 139:22 170:1 208:21
215:25 229:22 232:25 237:10
241:6 250:19 255:2 272:8 277:6
279:11 284:13,14,17,18 285:3,5
325:8 340:23 364:3 366:21,22,24
369:11,12,13,16,17,19

**offended** 246:23 247:9 260:2
261:2,18,22

**offensive** 272:16 284:4 288:2,7,
8,18

**offer** 42:13,21,24 44:1,7,16,24
82:24 83:1,5,6,15 85:1,6,19,23,25
86:3 87:17 88:1 88:14 93:3,7,11,16,23,

24 98:8,10,16 100:8 102:1,10
103:2 108:5,13,14,16,19 111:16
112:12 113:10,13,14,18,22 119:7
144:21 159:16 160:3,7,22 161:14,
19,20,22 162:2 172:24 173:14,23
174:4,9,16,18 178:4,5,6 179:7,14,
16,17 180:3,9,19

**offered** 179:15 203:12 365:17
367:16

**offering** 44:9 88:4 257:22

**offers** 41:19 42:1 43:3,22 44:5
84:21,25 85:12 110:10 174:21
175:1,2

**office** 9:20 10:3 42:19 65:9 89:16
106:4,8 123:9,13 130:13,14 132:7
135:10 153:10 154:14,20 155:6
156:5 165:14 194:22 195:5 197:2
198:2,6,9 211:5 212:5,20,24
213:2 223:14 229:16,18 230:4,8,
13,20,21,22 231:11,18,19 232:9
234:3,8 238:22 243:5,18 244:20
250:17,20 251:4,8 252:23 253:1,
2,14,19 254:6,9 259:23 279:4,9
280:8,11,16,19 281:7,15,16,19
284:4 288:3 297:6 300:22 309:21
311:1 321:1,20

**officer** 112:13

**offices** 5:11 123:9

**official** 57:11

**often** 65:3 98:19 188:11 189:10
204:19 236:10,12 330:12

**oh** 37:11 78:13 81:2 84:22 122:10
170:11 205:19 211:2 238:16
267:6 281:20 298:17 307:21
310:22 356:14

**Ohio** 46:1

**okay** 8:25 9:6 11:6,12 16:20 21:9
22:10,16 23:1,12,16 27:1 29:12
30:17,21,24 32:1,4 33:17 35:3
38:22 40:1,4 42:10 43:19 45:5,21
46:6,20 47:8 49:20 50:14 52:11
54:10 59:14,21 61:1,20 62:14,19
63:11,14,17,21 64:9 65:2 67:25
68:7,19 69:2,6,11,18 71:9 72:5
74:17,24 78:11 79:1,19 81:17
82:13 85:10 87:17 90:6,21 94:1
97:8 98:3 100:2,5 102:5,9,25
103:19 109:13 112:25 117:1

118:15,21 119:12,14 120:12
121:12,19 127:21 129:3,13,23
130:6 131:8 132:14,18 133:12
134:18 138:20 141:3 143:4,8,21
144:7,10,14 148:8,25 149:6 150:1
151:2,22 152:12 154:9,14 160:19
161:1 162:1 165:1,16 168:7
171:1,13,18 172:23 173:4 174:23
175:6 178:2 181:9 184:7,14
185:1,6,21 186:8,12,24 187:4,7,
10,13,14,15,21 189:20 191:6
193:1 195:20 196:2,17,19 197:15
198:16,19 205:14,19 208:1,13,16
210:1,3 212:1,25 213:4 215:10
218:7,9,11,17,22 219:21 221:5,7,
10,24 222:22,23 223:1,5 224:13
225:20 228:17 230:1 232:7,12,20,
24 233:23 234:1,7 236:3 238:11
239:15 240:24 242:5,7 243:7
246:22 249:24 251:1,5,12 252:3
255:11,19,24,25 257:19 258:10
263:21 264:9,21 266:11,25 267:4,
21,24 268:5 269:9 271:22 272:7
273:10 274:19 277:15 279:23
280:4 281:3,6,17,22 282:1,6,10,
18 284:3 286:7,11 287:9,21
288:19 289:23 290:7 294:25
296:1,4 297:5,21,25 299:14,24
301:2 302:1 303:4,12 305:25
307:2,15,18,23 308:3,9 309:7
310:5,8,18,22 311:6,22 314:17
315:4 316:10 317:1 319:7 320:16
321:6 322:8,25 323:8,15 324:3
325:1,6,18,21 327:21,25 330:2
332:7,18 333:24 334:4,13 335:12,
15,18 336:16,23 337:14 340:7
341:3 342:20 343:8,13,23 344:9,
22 345:12 346:3 347:11 348:23
351:10,15 355:19 356:14 359:19
360:7 363:18 365:13 366:11

**old** 35:8 58:21 67:16 200:7,15,18,
19,20,25 201:5 203:4,5,8

**older** 120:10 151:10

**OLED** 172:17

**Olsman** 5:25 100:10 356:18,19
359:7

**OMP** 6:5 23:12 32:14 50:16 51:7,
12 60:5,9 61:3,24 64:19 65:1
67:21 135:14,16,17,21 271:22
315:20 316:2 317:2,22 318:8,20
322:2,21,25 337:16 338:21

339:19,21,24 340:24 341:2,4,9,
10,15 342:17 344:2,11,15,23
347:2,14 352:6,13,16 353:4,17
354:13 356:1,4,10 357:23 358:11,
16 359:20 360:6

**once** 181:3 210:4 249:11,21
280:17

**one** 7:9 8:8 13:23 14:7,18 16:24
22:12 25:22,24 28:16,19 38:18
41:22 43:5,6,8,9,12 46:7 49:19
54:6,25 56:4 62:20 64:11 67:5,6,
8,9 69:2 86:5 91:8,20 92:23 94:9
95:23 97:9 98:21 107:25 110:23
116:16,21 121:22 123:9 127:23
129:15,25 131:21 132:14 138:15
140:20 141:17 151:7 162:1,13,24
163:9 165:6 169:24 172:8 180:5,
21 182:20 184:16 185:1 187:5,8
189:22 191:3,19,20 198:9 200:10
201:3,22 210:4 214:1,9 216:4
221:19 222:12,13 223:8 225:3
231:2,10 232:4 234:7,8 236:14
240:13 242:16 243:3,4 245:19,20,
25 247:4,14 250:7 253:19 254:6
258:6 267:17 273:24 298:25
299:12 306:3 308:16 313:17
315:2 325:23 327:13 329:7 331:6
333:2 341:13 344:14 353:6,8
355:9 360:1,11 361:21

**one's** 257:22,25

**one-hour** 167:4

**one-on-one** 221:11 223:7
235:14 239:25 240:11,19,22
242:1

**one-time** 246:4

**ones** 59:16,17 60:11 63:8 166:18
189:11 242:6 243:3 281:20
288:19 319:8 321:17 344:8

**ongoing** 284:6 285:7

**only** 15:23 34:9 59:8 73:17 94:23
110:25 127:7 132:14 144:10
160:24 177:18 216:3 224:1
233:10 235:5 243:4 246:12
250:14 254:8 255:22 260:16,25
275:12,19 290:5 297:10 321:18
341:1,3 345:19 351:13 356:2
361:21

**onset** 198:10 260:7

**onto** 193:6,8 204:19 206:11 252:17

**open** 195:3 201:19 281:3

**opened** 208:2 252:21 281:5

**operative** 272:21 273:8

**opinion** 9:20 30:15 31:8,13 40:11 41:17 87:18 88:4,14 146:16 168:18 209:2 211:2 287:19

**opinions** 359:15

**opportunities** 42:15 82:23 87:3 89:20 90:3,13 102:19,24 143:18 144:15,16,19 145:25 146:9 149:25 163:14,20,25 166:12 168:4,5,13,19,21 173:5,7,9,12,19 175:8 298:18

**opportunity** 7:11 37:19 87:2 88:9 103:1 105:12 163:2,5,12,16 164:2,13,18 165:2 168:15 173:8, 14,20 174:13 188:20,22

**oppose** 365:20,25

**opposed** 25:8 36:16 58:9 60:15 178:7 248:2

**opposing** 360:8

**opposite** 234:4 368:19

**opposition** 41:3,4

**optimistic** 27:21,22 29:12,13,15 40:2

**option** 84:4

**options** 26:24 83:24 84:2 115:12 178:24

**order** 48:17,22,24 53:4 156:13 213:15 293:24 366:12 369:9

**ordered** 366:6

**original** 162:13 218:13 275:12,19 289:13 290:8,14,18 291:4 292:21 293:8 362:21

**originally** 60:19 77:8

**Orlando** 248:22 323:22 325:15, 21,22 326:10 334:10 352:14 354:17 356:12,14 360:5

**other** 8:8 15:15 16:16 25:24 26:2 38:14,16 39:19,22 42:12,15 46:7 50:14,17 59:8 60:11,16,22,24

62:18,24 65:19 73:17 77:3 78:17, 20,21 83:14,25 84:21,25 86:20 91:8,15,20,21 94:24 98:3,20 103:8 110:13 116:23 124:20 125:16 127:4,25 128:1,6,8 142:18 143:1,2,11 163:11 170:20 173:5, 6,8,9,12,15 174:1,13,21 175:1,2 177:8 183:5,17 191:14 192:10,16 194:8 197:15 204:16 211:21 214:20,23 224:11,21 225:23 226:2,4 231:6 232:7 236:21 238:1 239:20 242:6,7 246:5 256:22,23 264:16 265:9 269:22 277:10,13, 16,20 278:8,11 281:9,18 282:3,4 288:4,16 294:25 297:1,4,5,10,15, 23 298:13 300:22 301:15 303:22 305:23 309:1,16 314:5 316:2 321:10 326:24 327:15 333:16,22 334:13,20 335:23 341:13 343:2, 21 344:1 355:16,22 359:21

**others** 111:2

**otherwise** 103:8 125:20 163:17, 21 187:25 217:5 369:5

**Ottenwess** 305:16,18,22,23 307:21,25

**out-patient** 21:25 22:6

**outlined** 175:8

**Outlook** 65:1 67:23 68:1,8 69:22

**outside** 8:11 11:20,23,24 48:23 66:25 77:23 129:2,9 134:8 232:11 234:3,8 248:22 319:5 323:22 325:24 326:4,6,21 327:13 334:8, 14,24 335:9,23 336:1,15

**over** 27:11 32:15 69:5 79:19,21 112:1 138:15 141:18 147:24 148:5,9 151:5,12 176:11 185:12 186:3,15 190:6,18 214:12 226:20 227:5 232:4 259:12 262:20 265:2 284:10 292:12 299:20 303:17 343:25

**overall** 139:2

**overlap** 356:2,4,6

**overly** 273:20

**own** 7:3 12:22 27:17 33:24 40:5,9 41:2 51:19 56:1 121:20 132:11,20 148:9 149:2 162:14 165:23 180:24 181:10 184:22 202:23 218:12 220:12,15,16 225:22

246:15,21 270:7 276:5 293:16 305:22 362:13

**ownership** 168:17

---

**P**

**p.m.** 136:13,15,17 159:14 170:2, 4,6 185:20 186:1 191:21 208:23, 25 236:11 249:2 272:9,11,13 325:9,11,13 331:18,19 334:1 369:19,22

**package** 189:6

**packed** 78:1,11,22

**packing** 78:8

**pad** 124:25 125:2

**pads** 53:19,20 54:1 55:13,15 62:20,24 64:4

**page** 62:13 158:24 159:4 185:23 186:1 193:1 214:1 280:24,25 283:21

**pages** 75:24

**paging** 71:11

**paper** 83:11 124:25

**Paradiso** 85:19 86:5,21,22 87:7 173:18 304:4,5

**paragraph** 168:10,11 169:8 272:18

**paragraphs** 346:1

**Pardon** 115:2

**parse** 242:17

**part** 54:5 96:24 128:10 177:4 188:20 190:5 195:2 218:2 224:1,3 225:22 246:5 261:12,13 264:12, 17 267:17 310:10 341:9,25 350:8 356:9 360:5

**participate** 268:4 270:12,15,17, 22 271:2

**particular** 88:5,18 139:14 145:2 191:24 239:15,23 240:6 255:16 282:20 303:7

**parties** 5:23,25 6:2,14,17 217:4 284:20 343:14

**parting** 235:10

**partner** 34:15,17,20 35:5 149:16
260:16,25 261:1

**partner-owner** 126:10,12

**partners** 87:22 90:19 91:4

**partnership** 169:10,13

**parts** 55:2 123:23 257:11

**party** 7:1 11:20 93:10 218:10
361:3 362:18,19

**passcode** 280:14

**passed** 31:25

**past** 184:11 236:11 322:9,11

**path** 159:9

**patient** 9:20

**Patricia** 91:8,10,14,16

**pattern** 222:20

**pause** 354:3

**payment** 94:25

**PC** 158:25 174:6

**peace** 188:5,13,17,18

**peck** 228:23 229:3,7

**pee** 256:9

**Pelton** 5:11

**pending** 7:18 72:7

**people** 13:3 16:16 30:22 37:4
41:16,25 64:23 85:3,8 92:6,9 99:3
110:14 124:1,2,9 127:25 128:6,23
129:6,14 130:15 134:20 148:1
166:6 177:9 188:15 236:21
251:16 256:24 269:13,14,15,16,
24 297:15 303:5 305:3,23 313:13,
23 316:2 338:10

**per** 114:12 268:2 359:15

**perceived** 189:22

**percent** 32:24 33:10,12 227:18

**percentage** 138:20,23 139:2

**perfect** 188:11

**perform** 318:18

**performance** 319:6 338:1

**performance-enhancing**
139:13

**perhaps** 14:7 30:21 46:20
170:20

**period** 14:19 22:5 212:9 244:3
253:25 316:17 317:3 318:12

**periods** 122:17

**permission** 205:23 206:4,16

**Perry** 50:22

**person** 28:3,9,19 29:4,24 30:5
34:11,13,16 63:10 67:11 69:20
79:20 82:7 91:15 94:6 97:10
99:16 102:8 103:16,17 121:2
122:4 166:10 188:1 197:9 217:13
220:11,16 223:15 226:14 247:8
262:5,6 267:2 268:23 279:18,20
280:4 306:7 338:9 346:18 354:1

**personal** 66:15,16,18 68:20
116:5 206:25 207:3,12,18 208:10
214:22,23 221:8,13 223:6,8
224:17,22,24 225:13 226:10,12,
15 227:25 228:13,14,15 235:15
236:1 239:2,4,9,10,11,13 240:1,4,
11,12,16,20 241:3,11,18,22,23
242:2,5,7 246:25 255:8,11
256:20,24 257:2,20,23,24 258:1
259:21 322:19 323:4,11 337:20,
21 338:7,18,25 339:16 342:22
343:3,7,12,16,19 344:2,16 360:2

**personality** 26:8,12,16 27:17
30:1

**personally** 206:12 260:2 261:1,
18,22 265:1

**perspective** 188:7

**pertain** 45:8 217:3

**pertaining** 70:22

**ph** 263:24

**phased** 151:11

**phaseout** 151:18

**phasing** 131:17 133:14 147:1

**phone** 6:4 47:21 48:4,8 58:24
59:6,9,13,17 67:24 68:2,3,9,10,
13,14,15,19,22 69:2,7,13 79:19,
21,23 80:1 101:21,22 102:2,7

104:10 154:3,5,9 158:12,16
207:16,17,23,24 241:4 260:3
262:4,18 278:19 281:1 300:5
327:21 328:1,3,23,24,25 329:2,7,
12,13,14,15 330:11,13 331:3,4
336:18 350:22,25 367:21

**photo** 195:16 223:14 247:8
251:25 267:5,9,24 268:2,11
269:10,18 278:10,24 279:7
280:24 281:5 288:2

**photograph** 58:13 223:15
246:18 267:15 268:16,17 280:20

**photographs** 58:24 189:18
192:24 193:3,10,12 194:5 195:4
196:24 197:4,10,12 202:12 211:7,
8 213:3 215:8 221:16 223:8
224:20 226:13 247:12,14,16
276:17,21 280:7,9,10,17,18
283:25 288:15 331:24

**photos** 59:5 192:11 194:2,21
195:15,25 198:8 199:23 200:13,
14,20 201:2,16,24 202:24 210:19,
21,25 211:13,21 212:4,8,13,22
213:6 214:5,16,24 215:25 216:2,
4,7,12 234:21 235:7 276:25
277:4,5,6,8,10,11,13,16,20,22,24
278:2,3,5,7,9,11,14,21,24 279:1,
3,4,5,8,10,12,15,17 280:4,21,22
281:3,9 288:4 289:1,4,10

**PHPA** 249:1 310:13 311:15,25
313:3,13 319:19 336:4 340:21
346:3,9 349:8 350:2,11 351:3,8
354:17 355:20

**phrase** 283:20 349:23

**physical** 53:12 69:7 201:9,13,16,
20,21 335:21 336:2

**physically** 64:5 152:20 336:2

**physician** 15:15,18,25 16:1

**pick** 28:15 209:9 276:4

**picking** 187:4,8

**picture** 59:3,18 224:2,3 246:6
279:16 280:23 281:1,2,13,16
282:18 284:3 288:11 312:9
350:12 351:3,4

**pictures** 58:23 192:8,17 199:7,
11 200:4,5 209:17,18 253:23
278:9 280:20 281:7,8,12,18

282:2,3,4,5,6,9,10,15,16 283:23
288:12,13 333:19

**piece** 124:24 194:19

**pieces** 54:7

**pink** 281:21

**pipeline** 132:19

**pixels** 171:23 172:19

**PL22340** 213:7,12

**PL23238** 161:17

**PL486** 182:12

**PL569** 276:20

**PL599** 70:14

**place** 32:12 35:15 37:11 55:1
56:4 57:3 62:21 73:17 84:22
85:17 86:14,25 89:18 103:10
115:7 169:9,16,17 236:14 259:13
262:11 312:10 333:17

**places** 37:5 53:20,23 54:1 55:1,6,
8 56:3,4 84:10

**placing** 74:1

**plaintiff** 5:19,21 7:11 9:11 11:25
16:22 35:17 71:25 100:2 107:21
113:6 149:21 178:13,16,18
219:24 248:4 266:20 362:13

**plaintiff's** 9:13 34:22 94:14
165:8,13 216:21

**PLAINTIFFS** 182:12

**plaintiffs'** 81:9

**plan** 8:4 199:14,17,18,21,22
200:20 201:10,13 202:14,15
350:7,9

**planned** 201:7

**planner** 63:3,4

**planning** 200:17

**play** 291:21,25

**played** 93:15,24 291:3

**player** 312:3

**players** 312:4,5

**players'** 312:8

**plead** 203:19 204:11

**pleaded** 203:18

**pleading** 261:24

**please** 5:15 10:2 20:14 35:15
52:25 104:6 105:24 109:5 142:1
156:17 177:4 181:14 214:2 227:1
244:9 254:13 266:25 268:14
273:12,13 278:22 282:24 283:5,
16 354:24 367:2,6

**pled** 6:16

**plenty** 51:18 249:18

**plus** 265:20 275:1,2

**poem** 59:1,2,12,19 61:8,10,12,18
62:12,13,17,24 66:2

**poems** 53:20 58:8,14,15,16,22,
23 59:5,8,24 60:10,25 63:22 64:7
75:5 77:1 78:12,14,16,18 183:16
304:1 360:13

**poetry** 53:23 54:2,19 55:2,12,13
183:15 194:16

**point** 7:20 8:3,23 15:5 25:3 27:2
28:16 29:25 38:18 44:10 45:21
46:5 58:14 61:2 65:7,8 80:17,20
83:2 84:4 98:5 100:16 102:20
103:24 105:9,14 106:20 110:1
122:20,24 128:13 133:17,21
134:5 145:21 147:3 148:19
149:13 161:6 162:2 164:24
165:15 167:25 169:1 183:2
195:23 199:19 207:20 211:1
231:7,10 237:14 258:8,10 260:10
271:22 273:24 294:8 304:17
305:15 324:12 335:25 351:11
361:25 367:2

**points** 123:1 326:23,24 362:25

**police** 337:5

**poor** 285:24

**popping** 96:6

**porn** 253:5 268:18

**pornographic** 223:14 251:14

**pornography** 223:13 243:6,18
244:20,21 245:9,21,22 246:17
247:7 250:16,18,24 251:6,12,18,
21,23 252:9,15,20,21 254:7,8
268:4,12,18 269:5,12,16 270:3,

12,18,22 271:3

**portion** 65:17 70:25

**portrayed** 296:25

**posed** 28:24

**position** 150:4 368:23

**positive** 87:3 146:23

**possession** 183:10 201:9,13,16,
20,21 276:22 277:1 279:11

**possible** 38:13 274:11,16

**possibly** 135:14

**post** 19:18 23:6 29:15 30:12 42:1,
17 60:3

**post-complaint** 23:7

**post-riley** 23:6

**potential** 47:5 82:13 169:10
236:23 261:5

**potentially** 105:15,21 149:18
181:1 260:24

**powerful** 129:14 189:3

**Powertree** 194:13

**practice** 16:9 31:23 128:5 177:19
208:17 286:12

**Pre** 42:5

**pre-hire** 78:24 83:23 100:19

**preceding** 13:1 14:19

**precipitating** 152:14

**precisely** 274:25

**predate** 194:4

**predict** 8:3

**preferred** 127:9,10,24,25

**pregnant** 7:23 11:5,7,8,16

**premature** 177:8

**premise** 167:24 168:3

**prepare** 16:23

**preparing** 154:24

**Prescott** 49:15 155:22

**prescribed** 14:14,15,17,20,21
16:1,14 25:16

**prescription** 11:1,3,6 14:6,8,18 15:5 16:13 25:19

**presence** 170:20 205:3

**present** 23:17 24:5 235:16

**presentation** 23:14

**presented** 22:22 23:4

**preserving** 61:25

**presumably** 9:2

**pretty** 44:23 127:12 166:25 205:18,19 298:21 317:18

**prevailed** 165:10

**prevailing** 27:16

**prevent** 11:17 40:15

**prevented** 38:25

**preventing** 118:9

**previous** 241:25

**previously** 46:8 55:3 76:9 77:16 148:12 170:8 265:5 295:2 299:9, 18 314:8 332:16

**Pries** 31:21 32:19,22 33:8 34:14 35:19 43:12,16 83:17 137:12

**primarily** 238:5,9 297:12

**primary** 12:20,25 13:8 15:14,17, 24 16:8 34:16 37:5

**principle** 40:19

**print** 125:19

**printing** 126:5

**prior** 12:3,10,16 14:1,25 15:6,7, 15,21 16:20 18:21 19:2,19 20:10, 18 22:11,19 23:5 25:13,17,25 26:3,5 29:14 30:11 31:16 37:10 42:6,13 58:17 60:9 76:17 78:8 81:24 100:7,12,13 106:2 108:5, 12,13 122:19 125:13 128:13,14, 17,19 136:20,25 137:3,5 144:8 174:14 175:2 177:25 183:19,20 207:20 209:19 211:10 212:24 214:6,8,11,17,21,25 216:2,7,12, 13,14 230:17 237:6 273:2

**private** 99:21 258:1

**privilege** 48:18,21,25 49:2 51:14 52:4,6 156:8,21 275:16,17 276:3

286:4,11 290:25 292:5 314:12,15, 21 315:7

**privileged** 49:2 52:8 276:7 286:4

**privy** 316:14

**pro** 220:1 248:9 272:19 287:14 345:17,20

**probably** 24:4 53:25 58:20 59:24 62:16 72:18 78:19 81:5 110:24 114:15 154:11 160:11 237:11 238:6 287:22 305:4 323:9 337:6

**probative** 217:7

**probing** 88:8 257:6

**problem** 17:6 30:24 31:4 76:23 97:25 104:2 109:11 118:9 122:13, 24 124:23 189:13 222:19 286:6,7 349:25

**problems** 13:24 14:4 15:1,3,4,14 16:12 18:21 20:9 68:13 116:20 117:2 118:3 121:8 122:16 124:19 170:16,19,23,24 239:11 256:24 340:21

**procedure** 24:18,23

**proceed** 153:7

**proceeding** 11:21,22,24 12:1

**proceedings** 341:5 361:3

**process** 34:7 61:10 135:8 166:24 279:12

**produce** 9:13 10:6 56:10

**produced** 7:10 13:3 17:1,4,5 57:4 70:9,20,24 71:3 74:17,20 76:1,10,21 113:6 114:3 153:11 161:25 183:8,9,14 186:22 190:25 194:5 213:7 254:18 276:20 278:14,21 284:25 286:3 353:13 360:12

**producing** 111:19

**product** 52:3,5,7 61:5 276:4 311:13 319:2 321:12 323:13 342:23 357:14,21 359:13

**production** 66:7 70:24 75:25 216:21 278:19 357:11

**profess** 89:7

**professed** 88:17,23 89:4,13

**profession** 40:5 128:24 129:1 358:18

**professional** 15:15,24 33:14,16 36:3 168:14,16

**profusely** 102:14

**program** 64:24 65:1,20

**programming** 171:4

**progress** 122:18

**progression** 122:22

**progressive** 122:13

**project** 351:17

**projects** 126:7 300:3,6 314:8 319:23 320:4,18,19,20 356:2

**promotion** 169:12

**prompt** 17:16 237:1

**prompted** 79:23 80:1 81:12 171:1,9

**proof** 359:4,6

**properly** 283:20

**proprietor** 368:24

**pros** 87:18 94:19

**protect** 314:11

**protected** 294:4

**proud** 178:2,24 179:23 180:10 181:6 182:5

**provide** 7:16 11:13 23:25 36:22 47:4 86:10 137:24 138:13 139:25 168:12 275:5 339:10,11 343:16

**provided** 52:8 146:1 155:20 164:4 292:17,22 313:3 343:18 368:18

**provider** 12:21 13:19

**providers** 12:25 13:9 16:8 17:2

**providing** 11:17 111:16 292:16 339:17 343:17

**provision** 162:21,25 164:11,13

**Prying** 257:2

**psychologist** 24:11

**public** 24:3 131:25 132:1

**published** 369:4

**pull** 56:8 63:16 168:24

**pulled** 54:8 78:2 152:21 232:14,
21

**purports** 184:2 266:18

**purpose** 160:17 188:23

**purposely** 59:2

**purposes** 46:21

**pursuant** 164:11

**pursue** 102:19

**pursued** 181:4

**push** 296:20

**pushing** 195:2

**put** 35:11 41:23,24 42:7 48:6
56:22 59:19 60:25 64:23 66:9,20
73:13,14 95:3 100:17,19 107:11
138:23 140:11 142:11 156:12,22
162:19 174:20 180:21 183:18
190:1 205:15 206:12 219:1
283:15 290:3,7 292:9 293:22
294:10 308:17 310:17 319:25
337:7 338:12

**putting** 38:4 114:1 152:22
290:14 360:9

**Q**

**qualities** 188:16

**quality** 340:22

**quantify** 127:24 128:2,4,11

**quarter** 114:24 115:4 256:13

**question** 7:18,19 12:7,15 14:25
15:11 16:4 20:2,13,15 28:23,25
35:9 41:8 49:1 53:24 59:10 65:4
72:7,10 73:1 74:7 75:18 76:7
77:19 86:7 94:3 99:14 104:7
107:9 108:18,22 109:1,8 124:16
137:9 141:12,14 142:1 143:5
147:11 150:21 155:13 156:17,18
161:1 165:17 169:21 175:16,21
176:6,12 177:11,12,14,16 178:22
179:21 180:8,14,17 181:13,15,18,
19,21,22 182:1 190:14 191:5,10
195:22 196:2 202:3 205:14 206:3,

7 207:22 217:15,17,19 220:7
228:2 233:17 235:1 237:7 241:13
242:15 244:17 245:7 247:25
250:10,12 256:2 258:21 259:10
266:7 268:5,8 273:12,14 275:23
276:7 277:14,20 279:15 281:6
282:23 283:1,2,3,4,6,9,10,12,15
289:8 291:2,5,6,8,9,17,21 292:4
295:4,9 305:4 313:15 316:3
317:18 333:20 342:14 346:13
348:25 349:22 354:19,23,25
359:3,23 365:24

**questioning** 8:6 17:10 49:8
77:10 114:18,21 204:1 222:16

**questions** 6:15 7:4 9:3 10:2
48:21 53:8 54:19,20 76:5 88:8
89:1,22 112:19,24 113:8 118:6
146:19 153:25 222:12,14 256:1
257:5 259:15 271:16 274:8
283:20 346:25 362:1,9 366:15

**quick** 150:16 280:7

**quickly** 150:4,6 197:21 286:15

**quiet** 94:3 188:13 210:8 222:10

**quietly** 222:8

**quit** 133:6

**quite** 72:2 213:19 256:15

**quote** 79:16 80:14 263:17

**quoted** 271:13

**quotes** 87:11

**R**

**radar** 89:10

**raise** 13:10 17:15,21 38:20
142:12 180:6 286:3

**raised** 180:5

**raising** 88:6

**Raman** 89:8

**Ramar** 85:18 86:4,21,22 87:5,7
89:11,24 90:6 173:17 304:4,5

**ramifications** 337:11

**ramped** 238:9

**random** 55:13 62:12,17

**range** 97:11 360:19

**rape** 97:13,14 98:21 99:3,6 104:3
107:10,11,13,15,20

**raped** 98:1 107:18 108:2

**rate** 9:25

**rather** 166:13 173:4 324:15

**ratio** 33:10

**re-ask** 104:4

**reach** 45:22 46:3 79:17 80:4
81:11 105:10 160:3,6,13 171:1
328:3

**reached** 45:23 46:4 47:22 49:14
76:17 80:25 81:3,4 93:6,9,21
102:21 105:13,19 106:3,7,23
160:14 161:6 174:5 181:11
209:10 211:16

**reaching** 79:2 80:24

**react** 232:12

**read** 9:12 20:14,15 104:6,7
121:14,15,19,25 122:1,6,9 123:4,
5,7 124:21,24 125:1,7,10,13
139:21 141:12,14 142:1 156:17,
18 168:23 169:14 174:14 175:19,
22 179:2 180:15,17 181:13,15,23
184:7,8,12,13 185:18,19 186:3,6,
7,15,25 187:5,18 190:6,18 192:5
222:23 226:7 228:6 267:21,23
270:19 273:12,14 283:5,6 286:2,9
293:11,12 354:25 364:14 368:17,
18

**reading** 104:5 121:16 122:2
271:9 310:21

**reads** 109:9 184:15 364:12

**ready** 35:4 148:8 151:12,19
177:18 369:11,12

**real** 188:23 189:1,7

**realistic** 118:22

**reality** 133:10,11

**really** 29:21 59:7 65:12 120:12
152:6 159:8 165:11 179:5,16
186:3,15 189:4 190:6 202:14
204:2 231:8 255:15 278:18
281:17 289:20 291:19 351:16
369:3

**realtime** 283:13

**reason** 6:22 8:12 11:12,15 37:1,
5,7 40:25 65:12 74:19 101:11,12
103:8 150:19,23 158:1 174:24
189:8 205:24 206:5 254:21 268:5,
8 293:23 333:16 354:9 361:11

**reasons** 68:20 116:21,23 131:21
176:8 206:20,21 208:2 302:14
360:10

**recalibrate** 276:13

**recall** 6:25 13:13,14,17 16:7,8,12,
15,16 19:2,7,13,19 20:3,5,17,19,
22 21:1,3,7,9,15,16 22:11,25
23:3,5,20,24 26:2 35:24 36:20
39:2,5,6,8 42:12 44:3,18 46:11
59:19 64:10 73:8 79:15 80:8 81:7
82:22 83:13,19,23,25 84:5,11,13,
15,16 86:16,18,19 87:9,13 91:1,
18,22 92:17,20 111:2,6,10
113:13,15 128:18 129:9 138:19
140:14 142:16 143:1,11,13
145:24 147:15,19 148:22 151:21
153:7,9,13 154:22 157:6,10,12,
13,17 172:17 173:11 182:20
183:1,4,17 197:24 198:24 203:12,
16 214:3 228:11 231:23 232:10
234:6,9,10,12 237:20 238:23
248:21 249:11 256:22 289:2
293:10 296:6,7 302:23 303:19
306:16 307:5 308:11,24 309:1,8,9
311:8 315:17,18 318:4 320:4
323:16,17 328:21 329:5,18 330:3
333:22

**receive** 24:9

**received** 17:6 20:8 43:3 57:12
68:12 83:4 113:10 159:4,10,15
161:13,19,22 182:14,17,18,20,23
189:20,25 190:4,10,11,19,20
322:11

**recently** 10:17

**reciprocate** 296:15

**reciprocating** 299:3

**recite** 248:10,12

**recognize** 70:18 158:10 184:5

**recognized** 95:2

**recollection** 186:19 191:13,17
226:18 229:16 231:21 238:2

**recommended** 9:23 93:17

**reconstruct** 183:11

**record** 5:6 7:8 9:12,16 16:5 17:9,
19 18:2,8,14 35:12 48:20 53:6
57:9,18,19 58:2,5 61:20,22 77:8
101:21 109:4,6 111:14 112:6,7
113:1,5 114:2 115:11 136:12,16
152:17,23 155:8 156:11,13,25
158:7 161:16 170:1,5 182:11
183:19,24 184:7 185:6 187:1,18
192:5 193:17,18,25 208:21,24
210:3 216:22 220:5,21 226:7
236:13,15 237:3,8,9,12,19 272:8,
12 278:13 284:13,16,17 285:3,4,
5,8 289:12 291:1 325:8,12 329:13
347:8 360:12 361:25 363:16,17,
23,24 364:4,6,11,12,17,20
366:23,25 369:12,13,17,20

**recorded** 64:20 65:20,23 157:3

**recording** 153:9,10,13,14,15,16,
17,20,22,23 154:4,7,10 156:6
157:8

**records** 12:22 13:16 14:15 15:19
16:23 57:11 75:15 139:8 328:1,
23,24 329:1,2,8,15 330:12

**recruiting** 180:2

**red** 152:22

**refer** 42:9 73:6 219:12

**reference** 260:4 272:17 289:16
320:6

**referenced** 94:21 357:8

**references** 236:18 313:5

**referencing** 162:15

**referred** 54:16 75:1 110:18
162:13

**referring** 152:21 163:22 186:12
191:25 194:6 227:20 235:22
236:8 242:8 250:8 267:1,17 303:7
315:22 325:15

**reflect** 61:5 111:14 113:1 183:24
185:6 247:24

**reflected** 72:13 73:6 301:3
318:21

**reflection** 188:2 194:24,25
195:4,17 210:25 211:8 212:6,19
234:15

**reflects** 159:6

**refresh** 6:19 92:21 93:1 182:25
191:13,17 193:20 194:11 221:22

**refused** 113:16

**refusing** 263:3 367:10

**regard** 90:16 96:14 104:15
296:16 308:13 309:4 318:24
352:10 357:6

**regarding** 26:6 80:18 138:13
142:3 197:7 341:17 342:21,22
346:7 353:13 357:12

**regardless** 280:19 320:17

**regards** 363:3

**registering** 222:11

**regular** 11:4 25:19 355:19

**regularly** 25:4 65:2 121:15
188:10

**regulate** 25:14 26:1,3

**regurgitating** 7:6

**reinitiated** 173:1

**reintroduce** 6:13

**relate** 140:25 165:17 194:16
200:11 233:11 261:8 346:5
360:15

**related** 81:24 123:11 137:23
201:24 206:13 227:25 255:6
269:16 271:25 297:12 316:12
317:12 318:9 319:15 320:4 321:8
337:15

**relates** 199:23 298:6 341:15
346:12 357:15

**relation** 197:18

**relationship** 81:22 89:14 140:19
167:23 255:10 260:5 292:19,23
293:3 337:11 347:4,16

**relationships** 163:3,6,13
164:14,19 165:3 167:18 168:15
175:9 228:13 239:8,9,10 256:23
257:3,25 344:4

relative 169:10 218:20

relatively 363:1

release 348:15

relevance 141:17

relevant 137:6,9,16 140:25 141:2
142:20 146:4 183:11 272:21

relinquished 122:20

relying 218:8

remained 148:12

remaining 242:19

remark 227:14

remarks 210:17

remember 11:19 13:5 19:11 46:9
91:9,16,22 100:22 104:23 105:5
113:12,22 131:2 153:12 215:17,
18 231:14 249:10 260:11 298:4,
12 308:23 321:24,25 355:5

Renee 33:8

reopen 161:7 181:5

reopened 174:25 182:5

reopening 159:1 174:7 179:18

rep 305:9

repeat 20:12 59:11 240:2 268:14
342:13 354:20

repetition 240:14 241:24

rephrase 73:1 108:25 109:2,5
210:22 217:18 283:16

replenish 132:20

report 140:15

reporter 5:17 20:16 96:8 104:8
115:10 141:15 156:19 180:18
181:16 273:15 283:7 284:14,18
355:1 363:25 366:18,22

reporting 35:5

represent 5:16 6:14 40:8 46:12,
17,20,24 47:4 48:11 49:12 50:4
51:9,10 71:25 284:6 347:13

representation 48:3 51:3,4,5
129:5 183:9 268:6

representatives 312:1,3

represented 16:21 50:15,18,25
51:6 52:1 145:7 151:14 152:18
175:7 215:12 216:20 219:25
275:14 292:14 350:1 351:5
358:20 368:4

representing 5:14,19,20 119:10
154:23 186:20 215:10 285:15
292:12

represents 347:13

reputation 126:25

request 8:8,17 9:10 56:9,12,25
58:1 71:2 79:7 276:21 360:22
361:4

requested 111:23 253:6 278:22
343:16

requesting 145:17 360:10

requests 8:19,20 75:5,17,20
77:4,15 284:22

require 224:25

required 14:6 351:18

requires 217:7 343:13

requiring 221:1,11 223:7 239:25
240:11,18,22 242:1 353:18

reschedule 333:13

research 138:9,12

reserved 363:7

reserving 363:5,8

residence 56:5

resignation 358:10

resisting 259:24

resolution 172:1,2,14,22

respect 7:15 50:19 110:19
151:20 179:1 182:24 217:12,25
237:14 240:3 294:5 313:18 317:1
323:20 329:21 336:13

respected 127:1

respectful 189:7 210:13

respond 105:24 108:7 142:1
222:6 273:13 354:10

responding 57:15 191:9 222:4
299:2

response 57:22 71:2 111:22
142:14 169:20 179:20 191:3
199:12 261:20 266:7 276:21
301:14,22,24 336:16

responses 36:21 41:25 42:8,9

responsibilities 34:2,8 86:25
145:1,5,6 151:6

responsibility 36:6,10,14 90:14
92:8 145:13,14 175:10 261:4
299:1,18 368:11

responsible 352:19

responsive 44:2 61:13 71:4
75:4,17,20 77:3,14 190:13 219:8
254:18 291:17,23 349:22

rest 70:21 71:6,7 247:2

restaurant 84:16 121:14,15,19,
25 124:22

restrict 297:19

restricted 146:1 318:2

restroom 7:16,22 8:4,9,11,13,15
9:22 56:21

result 44:1 296:22 313:21 318:2

resulted 119:19

retain 46:12 47:3 48:10 49:11

retained 10:18,19 49:2 155:21

retainer 46:14 49:16,18,20,23
50:1,6,9,12 155:2,4

retaliate 263:9

retaliating 265:3

retaliation 265:11,18,25 266:3,6
296:21,24

retaliatory 296:9,16 298:2 299:8
300:13 301:5,22 302:14

retire 150:2 349:19

retired 130:9

retirement 163:3

retiring 131:22 132:13,18 149:14
150:12,18,19,22 157:5,23 158:1

return 25:2 169:25

returned 93:22

**retyped** 59:16 60:17

**review** 7:11,13 10:5,10 169:18
278:18,20,22 286:6

**reviewed** 298:13

**reviewing** 322:8

**reviews** 169:9,15,16

**rfr18.22@gmail.com.** 158:14

**RH** 168:12,17 169:4,9,14 178:22
188:9

**RH17** 158:7

**RH1924** 266:17

**RH295** 184:1

**RH33** 178:19

**Richard** 288:20

**Rick** 82:8,12 83:10 94:8 101:18,
20 102:1,2,21 103:6,14,24 104:1,
21 105:4,13,20 106:3,7,13,20,23
107:2,3 108:1,4,7,12,14,20
109:16,22,23 110:9,16,19 111:1,
8,9,11 128:20 129:10 297:7,8
304:23 306:24 307:1,4,6 308:9,
11,13

**ride** 121:10

**ridiculous** 295:16

**right** 7:13 8:11 10:25 15:21 18:20
29:6 31:15 39:15,20 48:10 49:9
52:20,24 54:25 56:3 57:6 58:1
64:17 69:21,25 70:2,21 74:8
85:25 91:9 92:25 93:3,4 95:7,16
101:8,13 103:13,22 107:2 109:22
111:7 113:21 114:6,11,19,23
115:24 116:3 124:13 126:23
132:2,4 133:17 137:10 140:19
142:18 147:12 153:16 154:2
155:10 157:2 158:5,17,22 159:9,
16 160:2 161:13 162:1,12 164:24
166:8 167:15 169:1 171:13
179:24 185:25 192:4 193:4,6
194:25 196:20 198:2,22 199:10
201:20 203:10 205:5 206:20
208:18 211:13 215:3,6,14,17,18
217:2,24 226:9 228:22 233:20
234:10 238:21 239:25 241:11
242:20,24 247:18 250:4,14
252:11,17,22 253:8,15 254:5,11
255:3,25 256:4,18 258:7 260:17

266:21 269:14 271:24 276:14
280:7,13 282:11 288:25 290:18
295:21 296:8 298:5 301:9 302:10
310:2,3 312:10,12,18 315:13,19
318:1 321:10 322:1 323:19 325:2,
23 326:20 329:2 331:7 335:13
337:14 338:15 340:13 342:12
344:22 349:11 350:20 351:1,25
352:10,16 358:15 359:18 363:5,7
365:9,11,19,20,23 369:7

**right-hand** 280:2

**rights** 155:23 217:6 294:7 352:8

**Riley** 5:9,23 6:2,14,17 12:3,11,17
13:1,22 14:2,19,23 15:1,6,7,8,16,
22 18:22 19:2,20 20:10,18 21:18
22:11,14,19 23:5,9,18 25:13,17,
25 26:4,5 28:19 29:3,14,15,17
30:6,8,11,12,13,17,25 31:9,16
41:21,23 42:2,5,6,13 43:6,22
44:21 45:8,13 48:12 49:13 50:16
51:11 60:3 61:2,23 64:19,24 65:3,
5,8,14 67:18 68:20,23 69:13 70:3,
22 71:1 72:13 74:18 75:12 77:9
78:25 79:2,7,11,13,17 80:24
83:24 84:8 85:10 86:9 93:4,6,8,14
94:7,18 95:18 96:10 100:8,10,12,
13,15,16,19 101:14 102:22 103:1,
15,21 104:1 105:10 115:16 116:4,
10,13,14,18 117:1,9 119:5,22
121:12 125:23 126:8,9,21,23,24
128:15 131:7,10,22 132:9 135:13,
16 136:20,25 137:3,5,7,22 138:7,
21 141:4 142:19 148:14,18,20
151:3,23 152:7 153:9 154:25
155:5,12,15,23 156:3,11 157:2
158:11,13,19,21 159:1,2,5,16
160:16,25 161:6,7 162:8 163:8
165:18 168:7 170:15 172:24
173:4 174:5,7,25 175:6 176:7
177:2 178:3,6,18,21 179:5,18,22
180:3,5,10,22 181:1,2 182:6,15
184:3,9 185:14,21 186:2,8,9
193:3 194:21 195:9,13 196:22
198:7 204:23 205:21,22 206:4
210:24 215:7 217:4,12,25 218:4,
20 220:19 227:24 230:9 231:7
236:15 243:4 255:17,19,20,21
266:19 269:19 271:20 272:1
276:23 277:1,4,12,17,21,24
278:6,8 284:9 288:4,25 294:3,9
297:3,17,20,22 298:2,6 303:5,10
308:9 310:25 315:14,19,21
317:22 323:20 337:2,16 338:21

339:1,6,18,20,21,22,24,25 340:3,
19 342:18 344:3,12 347:2,5,13,24
350:11 352:6,20,24,25 353:3,18
356:18 359:6,20

**Riley's** 79:5 135:10 155:6 209:3
214:5 250:17 276:18 284:10

**rise** 44:16

**risen** 145:20

**Risk** 32:21

**risking** 207:23

**road** 215:9 234:16

**roam** 206:17

**Robert** 5:9 308:9 315:14

**role** 36:25 93:15 137:16 147:25
151:19 291:3,10,21,25

**roles** 83:16

**roll** 225:4 235:18

**romantic** 187:17 192:9 344:4

**Ron** 280:3 288:21,22

**room** 8:7,9 155:7 210:11 248:23,
25 289:15,18,20 325:25 326:4,6,
12,21,25 327:1,2,4,6,7,9,10,11,
12,14 328:10 329:22 331:7,12,17
334:14,15,24 335:10,15,16,24
336:1,3,15 337:10

**rooms** 327:5

**Rosenstock** 166:9 267:25
268:1,10,20,22,25 269:1,21 270:1
305:13

**roughly** 198:10 328:12

**route** 158:23

**Routinely** 126:5

**row** 24:20

**ruined** 309:23 331:25 332:1,2

**rule** 30:19 210:5

**ruled** 287:11 368:15

**rules** 21:2

**rumor** 96:18

**rumors** 97:4

**run** 8:2 190:25

**running** 154:4,5

**ruse** 332:19

**rush** 280:15

**Russell** 5:18 7:7 8:17 9:7,8
10:10,14,16,20 15:10 16:3,18,20
17:8,18,23 18:1,7,10 19:5,15,25
20:4,23 24:19 26:14 28:4,23 30:2
31:19 32:12 35:11 41:14 42:16
43:24 45:3 48:14 49:4,7 50:10,13
51:5,13,18,22 52:2,13,18,22 53:1,
8,13 54:9,17 55:4,10 56:11,24
57:8,17,23,24 62:1 70:6,16 71:21,
24,25 72:4,15 73:12 74:2 75:9,18
76:4,7,11,15 77:5,22 79:4 84:12
85:3,13,16 87:17,19,21 88:10,21
90:10,11,25 91:2,19,21 94:2,14
95:10,20 96:5,21 98:22 99:19,25
100:5 101:2 103:4 104:4 105:1,
17,25 107:21 108:10,18,22,25
109:4,8,12 110:7 111:18,25
112:9,14,20,25 113:4 114:1,8,10
115:5,7,13 117:4,13,19,24 118:4,
24 119:17 120:15,22 122:7
123:15 124:8,14 128:16 129:17
132:22 133:8 134:12,25 135:7,19
136:3,6,10,21 137:11 139:24
141:5,7,16,20,22 144:18 146:3,
11,18 147:18 149:9 150:20
152:17,25 153:1,5,24 155:9
156:7,12,20,24 157:15,21 159:24
161:15 167:20 168:1,24 171:6
175:15,18,22,25 176:4,14 177:10
178:15 179:8 180:13 181:17
182:3 183:18 185:11 187:19
199:5 202:17 203:21,25 204:5
206:14,22 207:8 208:5,20 209:23
210:2,8,12,16 213:13,16,19
216:8,16 217:14 218:18 219:15,
22 220:4,21 221:6 222:2,5,10,18
225:6 226:21,25 227:4,8,13,18
228:9 231:15 233:14 234:22
235:1 242:13 243:11,15,22,25
244:4,7,10,11,15 245:19,25
248:4,18 249:18 250:11 256:5,10,
14,17 259:9,12 260:19 265:10,14,
17,22 266:2,8,12,20,23 267:12
269:23 270:5,9,19,23 271:6,10,15
272:2,20,25 273:7,16 274:5,7,14,
21 275:3,14,22,25 276:3,11
277:25 278:13,21 282:12,23
283:1,8,13,14,19 284:5,9,15,19

285:2,3,9,22 286:5,20 287:16,19,
23 289:7 290:13,20 291:5,11
292:3,8,25 293:15,19,25 295:3
301:4 305:24 314:20 315:10,25
317:7 320:9,15 324:1,6,11,17,24
325:3,6 332:22 334:19 338:5,23
339:9 340:9 341:23 342:8 346:24
347:7,17 348:3,24 351:20 352:21
353:11,23 354:3,6,15 355:2,11
358:3 359:22 360:22 361:5,9,15,
19 362:2,5,8,12,15 363:6,13,15,
19,22 364:1,5,9,16,19,22 365:4,
11,17,24 366:5,11,17,24 367:7,
12,13,16,22,23 368:3,7,9,13,21
369:2,6,7,10,11,16

---

## S

**safe** 57:3 337:4

**said** 28:12 38:17 39:6,7,18 44:6
47:12,22,25 48:6,7 56:23 57:23,
24 59:25 60:12 72:10 79:22
80:11,25 81:7,10 83:8,11 84:22
85:2 86:16 88:14 89:24 90:6,18
91:18 92:11 93:23 95:6 102:14,
23,24 103:7 105:15 106:4,5,6
107:7,9 108:1,2,8,11 109:20
119:24 131:6,10,15 134:16 140:7,
8 141:8,9,23 142:15 148:16
157:14 159:24 165:7 176:13
177:3 178:17,23 182:4 190:5
192:21 193:7 195:7 202:7,9,11
205:20 207:2 208:11 211:18,24
212:18 213:9 214:14 216:3
217:21 219:14 229:4 230:19,21,
23 231:10,12,13 238:8,11,14,16,
17,25 239:7 240:2 241:24 242:17,
21 246:12 249:19 252:4,5,6
253:21 254:24 257:15 258:23
263:20 265:5,8 269:20 270:6,20
271:5 275:8 278:19 279:17
282:14 289:17,22 290:1,2,3
292:12 294:21 298:8,15,23 299:7
300:1,4,8,12,14,17,19,25 301:1,2,
10,20,21 302:15 303:11 304:13,
23 305:2 306:19 307:13 308:10,
11,14 309:9,24 310:5,20 311:10
312:12,20 313:1,11 314:6 315:14,
16 318:25 319:12,17 320:5,21,25
321:1,2,4,8,16,21,25 323:7 325:4
326:3,7,10,13 329:5 331:4,5
332:2 334:25 339:18 340:15,24
342:17 349:19 350:17 351:22

356:16 359:15 360:24,25 361:5,7,
9,15,18 365:18 366:12 367:5,8,18

**sake** 337:22

**salary** 36:19

**Salewski** 311:23 313:1

**Samantha** 130:25 131:1,3

**same** 21:20 52:13,22 57:9,14
62:16 68:22 70:1 87:6 130:7,10,
11 137:17 145:6 156:5 157:5
161:21,24 184:15 198:2,5 203:5
204:12,14 239:3 245:8 264:23
271:4 273:16 282:5 290:15,20
298:18 307:6 310:11,12,15 311:3,
12 313:1,12,18,22,24 314:5
319:2,13,15,18 327:17,20 334:10
360:23 369:2

**Sammy** 5:20 50:11

**sanctions** 17:24 18:2 363:17
367:2

**Santa** 367:22,23

**Sarah** 49:15,18 155:22

**sat** 97:6 106:16 122:1

**satisfied** 33:13

**satisfying** 188:22

**save** 69:3

**saved** 59:23 193:4 215:8

**saw** 12:19,20 97:1,6 121:19
195:1,4 197:3 209:17 210:25
211:7 250:17 251:12,19,23,24
254:8 278:8 280:9,17 281:10
282:3

**say** 9:7 10:8 11:19 12:24 14:3
16:4,5 20:2 24:23 27:8,18 29:11,
13,14,21 30:1,11,16,19,23 32:14,
21 34:7,14 37:12 39:17 46:19
50:17,18 61:17 62:2 64:18 65:13
66:22 72:18 80:3 82:16,20,21
85:10 86:9 87:1 90:11,16,24
91:13,24 94:18 96:10 98:20 99:23
102:9 105:22 106:13 107:13
109:16 114:21 118:18 120:9,12
121:3 123:10,22 125:7 127:5
128:5,18,20 139:10,11 142:14
143:20 152:9 162:23 163:15
164:16,19 178:23,24 179:7,22
183:6 186:13 189:24 190:13,15

191:8 192:17 193:1 195:13 213:25 215:16 216:17 218:24 224:4 230:18 235:5 236:6,10 247:20 248:23 251:12 252:3 256:16 260:7 263:16 269:8,15 270:4 282:4,14 283:14 289:20,24 290:6 293:18 295:7 296:1 299:16, 19 300:5 302:11,19 303:19,20 306:5 311:2,18 313:24 314:4 318:20,24 323:24 324:19 328:7 330:4,22 332:12 333:11 353:21 355:9 358:15

**saying** 19:4 20:5,21,22 22:20,24 33:5 39:16 40:20 54:12 61:14 66:10 68:3 89:21 99:8 102:3 121:22 125:3 147:17 157:16 172:14 179:16 184:10 190:23 191:6,9 194:7 196:10 201:4,8,9 215:1 225:25 233:15 235:5 237:16 238:16 241:18 259:2 265:15 269:9 271:4,8,12,13 285:14 296:10 298:7 299:5,11,22 301:18,19 302:2 312:22 320:3

**says** 9:15,18 161:8 164:13 168:10 169:12,15 215:6 268:1 270:8,9,13,14,21,25 324:20 338:8 368:19 369:4

**scan** 58:13 59:1,3 60:22

**scanner** 59:20

**scanning** 59:2

**scans** 58:12,22

**scantily** 223:14 247:8 267:2,14

**Schabath** 91:8,10,14,16

**schedule** 317:16 330:21

**scheduled** 9:17 25:5,10 72:13, 19,22,24 73:11 333:12 352:12,23

**Schell** 10:4,14

**Schwartz** 41:22 43:5 44:21 81:2, 9,11 82:1,3,10,25 83:1,4,5,15 84:3,18 86:18 93:3,15 94:6,19,22 95:8 96:4,11,13 97:24 98:25 99:11,13,17 101:1,9,16 102:20,25 103:9,10 104:3 105:11,21 107:8 108:15,19 110:4,6 111:16 160:24 173:3,11,15 174:10,12,20 179:19

**Schwartz's** 95:4

**scope** 48:22 351:18

**scream** 367:1

**screen** 89:10

**se** 220:1 248:10 272:19 287:14 345:17,20

**search** 71:10,11,16,19 74:25 75:15,19,23 76:8,12,14,20,25 77:16,20

**searched** 56:8 73:10 78:8

**searching** 216:22

**second** 35:4 102:14 105:17 106:12 168:9 191:20 193:1 223:2 231:3 234:3 252:11 290:23 304:5 326:18 329:7 360:18 368:10

**seconds** 252:16

**secret** 156:6

**secretly** 157:3 247:12

**section** 163:3

**secure** 168:14

**security** 336:23,25 337:1,8

**see** 12:25 18:6 19:13 75:3 89:18 90:5 94:4 123:23 124:1,9 154:14, 20 169:1 171:3 184:10 189:8 195:16 201:6 212:6,19 224:1,3 235:19 244:12 251:13,20 269:9 278:24 286:3 287:25 288:14 330:20 341:22 342:7 367:21 369:5,7

**seeing** 12:16 90:4 124:2 212:15 234:19 264:18 367:23

**seek** 15:13 18:20,24 21:17 181:2

**seeking** 86:24 145:16,17

**seem** 21:11,13 28:18 249:15 255:15

**seemed** 333:18

**seen** 24:16 93:18 140:12 184:6 329:2,9,15

**select** 122:4 279:10

**selected** 190:12

**selecting** 21:9

**selection** 279:12

**self** 257:22

**self-confident** 27:23 28:2,9 29:16,19,20 30:5,7 33:20 41:4

**self-esteem** 27:10 28:11,12,17 29:7

**self-help** 336:9

**send** 57:25 112:16 269:2 286:9

**sending** 191:3 223:14 237:2 246:17 268:22

**senior** 32:6

**sense** 34:10 150:25 188:23 230:10,12

**sent** 64:7 79:22 83:5,9,10 92:6 106:20 110:20 111:3 159:2 184:9, 14 189:14 190:4 191:19 223:18 267:24 268:2,11,16,17,25 269:4 270:10,15 271:1 336:23 350:14

**sentence** 168:9 169:15 342:1

**separate** 130:12,23 255:20 286:23 356:2 367:9,18

**separately** 49:19 82:9 131:5 147:10 286:22

**separates** 241:1

**September** 42:22 82:14,17,18 350:13,20

**sequence** 39:5 113:21,25 326:15

**sequester** 56:19

**serendipitous** 81:5

**serenity** 188:13

**series** 158:10

**seriously** 37:13

**serve** 16:25 17:5

**served** 17:1,3 18:10 137:14,16

**services** 18:21 19:12 20:18 21:14,17,20 24:3

**serving** 162:14

**session** 25:5

**set** 21:2 131:1 154:16 165:18 169:8 236:25

**setting** 137:3,4 236:17

settings 241:5

settled 314:18

seven 359:24 360:21

seven-hour 17:15

several 288:5

severe 107:15 118:2

sexual 94:23 96:10 97:1,9,13
98:21 99:3,7 101:15 104:2 107:3,
8,11,12,15 187:17 189:23 192:6,
14 209:3,8 210:20 211:3,12,17,22
217:3,8,10,13 218:1,6,14,21
219:18 220:13,20 223:25 224:7,
10,16,23 225:3,11,15,17,19,21,22
226:1,3,5,7,8,11,16 228:1,20
234:16,20,21,25 235:4,6,11,17,
20,21,24 236:2 237:22 239:12,14,
16 240:20 242:14,17 243:1,3,6,
10,19 244:22,25 245:11,15,18
246:4,7,14,19,21,24 247:5,6,11,
15,17 248:1,17,23 249:5,8,13,14,
22,25 250:3,8 251:22 255:5
256:21 257:3,7,14,17,21 258:2
261:9,14,19 264:9,17,20 265:7,9,
11,13,19 266:7 267:18,19 272:4,
16 274:4 282:6,14,16,21 283:23
284:1 338:11 355:21 356:9

sexually 96:12 97:25 107:17,25
108:1 271:25 322:17,23 323:10
337:17 338:3,8,9,22 339:7
346:17,18 347:5 353:1,18 356:8

share 67:10 184:18 187:25 189:2
351:10

shared 66:17,19 73:19,22,24
74:5,13 248:25 310:3 315:19,21
317:1 318:8 322:2 323:1,4
326:11,24 328:10,20 331:7,12,17
335:16 337:21 341:4 343:4,6
344:3,7,11,23 346:4,19 347:3,12,
16,19,21

sharing 87:5,15,24 89:8 90:17
316:5 337:20 338:17

she 7:13 9:16,21,23,24 16:3
24:10,11,18,22 38:1,10,24 39:4,6
46:9 48:23 49:2 50:4 52:2,7
75:12,13,18 76:6,9,17,19 79:14,
15,21 80:1,3,4,8,9,10,23,25 81:4
91:10 108:14,15,19,24 113:4
114:12 141:9,22 148:10,11,13,16,

18 152:19,20,21 156:9,14 159:24,
25 160:11 176:14 199:7,13 200:1,
3,7,17 202:18,22,23,24,25 203:3,
6,12,22 216:11,15 219:15,22,25
220:10,13,15,16 228:5 242:14,17
243:22,24 244:1,3,7,16 245:20
266:5,8 270:19 273:5 276:4
277:25 287:13 292:25 293:18
305:11 324:13,14,19,20,23 325:4
360:24,25 361:3,5,7,9,15,18,22
365:9 367:1

she's 10:16,17 30:2 48:25 75:14
81:8 94:14 96:1 130:9 156:9
182:3 216:23 219:24 220:2,14
222:18 242:20 248:5,18 249:18
267:12 274:7 277:25 282:25
284:8 290:13,15,21 305:11
314:23 324:22 342:10 346:24
363:14 367:1

sheds 211:21

sheet 159:5,6 161:20 175:9
179:14,15

shelf 78:23

Sherbow 311:17

shocked 199:13 252:4 269:25

shocking 21:15 268:24

short 115:6 184:17 185:2,24
232:18 320:8 363:1

short-circuit 313:16

shorter 217:20

shortly 153:8 211:19 212:20

should 8:16 11:17 56:1 57:21
64:18 84:8 88:25 89:10,22 93:23
98:14 155:17 164:3 166:12
195:21 204:2 250:1 321:22
322:15,16 331:9 352:16,18
354:20,21 355:15

shouldn't 56:22 266:5 312:23
323:9 352:23

show 6:23 19:7,10 68:14 70:12
139:8 153:3 158:6 178:12 215:5
267:5 326:13 367:14

showing 6:18 111:15 153:8
183:25 185:7 276:19 326:14
332:25

shows 195:2 244:2 255:9

shutdown 198:13

sic 89:8 128:13 178:14 205:23

side 184:20 233:1 280:2 288:23
354:1,8,20

sign 43:11 113:14 162:3,4 260:23
263:1 265:2,5 296:18

signature 162:8

signed 47:1 113:13 162:5,7
262:9,14 315:3

significant 143:9

signing 260:10,15,21 261:8
262:20 263:22 264:19 295:12
296:10

signs 273:5

silence 57:16

silent 357:11

Similar 301:6

similarly 53:19

simple 277:19

simply 18:7 219:24

since 11:5,7 23:9 53:1 58:17 61:2
135:9 173:5 187:16 198:24

sincere 189:8

single 119:6,8 217:24 218:5
273:18 303:17

sister 254:24

sit 39:8,11 44:23 92:13 100:2,18
106:17 140:14 143:1 155:6 164:7,
23 166:15 169:22 192:2 193:15,
22 214:3 215:17 226:17 228:11
230:25 234:6,9 249:7,10 278:7
289:2 294:24 296:7 298:3 303:16
311:7 315:17 333:22 341:21
342:6 352:4 355:21 364:23

sits 327:10

sitting 7:1 13:20 92:17,20 134:24
154:9,13 191:16 198:9 227:9
247:13,14 251:5,11 279:4,16
284:4 319:21 320:1 323:16

situation 23:4 28:5 37:16 39:3,
10 59:19 149:16 180:2 232:17

233:24 288:16 295:12 331:7
336:22

**situations** 92:5

**six** 14:24 15:7,8 80:10 167:1
249:12 303:17

**skill** 297:7

**skilled** 308:15

**skills** 33:18 36:4 41:5 168:14,16

**skip** 365:15

**skipping** 281:12

**Slow** 221:3

**small** 25:19 34:19

**smaller** 36:9,12

**smile** 188:10

**Smith** 50:23 51:10,25 52:11
291:3,10,21 292:11,20

**smooth** 106:15

**snow** 136:11

**so** 6:21 7:3,19 8:5,12 9:18 11:24
12:24 13:20 14:18 15:21 18:12
20:18 21:16 22:9,16 25:21 28:10
30:21 32:4,14,21 33:9,10 34:4,7,9
36:23 37:11,24 39:5,17,20 40:21
42:2 44:1 45:15,16 50:21 51:20,
24 53:9 54:12 56:1,2,3 57:3,16,19
59:4,15 60:8,11,18,19 61:10,12,
20,21 62:11,17 63:7,14,22 64:19,
25 65:10 66:10,17,18,23,24 67:3,
11,15 69:7,9,19,23 70:2,5,9,24
71:3,14,16,20 72:6,7 73:17,24
74:9,14 75:18,25 76:15 77:19
78:4,7,13 79:25 80:19 81:5,9,21
82:6 83:6 84:1,9,19 85:6,20 86:21
87:1,23 88:8 89:4,19,20,22 91:17
92:7,10,24 93:8,19 94:12 95:7
96:25 97:4 98:16 99:6,11 101:8,
22,24 102:1 103:9,23 104:17,22
105:9,16 106:16 107:2,12,18,25
108:18,25 110:14 112:20 113:20,
25 114:17,18,23 115:16 118:8,9
119:3,7,19 121:1,4,5,7,10,13
122:12,18 123:24 125:2,7 126:1,6
127:15,22,23 128:7,9,21 129:13,
14,22,23,24 130:15,23 131:24
133:1 134:8,15 135:2,14,21
138:16,25 139:19 140:1,10 142:6,

8,12 144:10 147:10 148:4,13
149:17 150:11 151:16 152:12,22,
24 153:3 154:18 155:4,25 156:20
158:22 160:2,19,22 164:9,14,16,
17 165:4,10 166:22 167:1,9,11,
13,15 168:25 171:3 172:15,22
173:1 174:3,10,18 177:6,23
179:15,20,23 180:7 181:11,25
183:8 186:25 187:4 188:18
189:20 190:14,19,20,22 192:11,
19,24 193:10 194:15 195:3,4
196:7,10,11,20 198:3 199:7,10
200:24,25 201:10,14 202:1,19
204:14,24 205:1 206:16,19 208:1
209:15 210:11 211:25 212:3,15,
18 213:6 214:10,20 215:3 216:4
218:4,17,23 219:4 220:5,18 221:6
222:5,17 223:24 224:15 227:23
228:6 229:18,19 230:15 231:12
232:3,5,9,15,20 233:2,23 234:5,
18 235:9,18 237:9,18 238:4,6,22,
25 239:25 240:8,9,18 241:8
244:25 246:13,17 247:20 249:11,
12,22,25 250:8,14,20 251:8,23
252:14,15,17 253:5,22 254:21
255:17,20 256:13,14,20 257:3
258:21,22 260:7 261:1,21,22
262:25 263:20 264:7,24 266:16
267:21 268:20 269:1 273:24
274:2,10 276:12 278:10,22
279:13 280:1,14,24 281:12,13,19
282:4,16,18 285:19 286:5,8
287:7,16 288:5 290:7,9,18 291:1,
11,23 292:17 293:11 294:11
295:9,15,19 296:17 297:7 298:5,
19,21 299:6 300:5,7,24 301:9,15
302:1 303:9,18 304:5 305:4
306:24 307:23 308:16,21 310:5,
13 311:2,4,6 312:3 313:3 314:3,
12 315:13 317:1,14,16,17,19
318:24 319:3,24 320:20 321:18,
21,23,25 322:1 323:19 326:25
327:10,13 329:10,11 330:2,8,11,
22 331:1 332:1,16,18 333:2,14
335:12,18,21 337:14,22 338:12
339:1,12 340:1 341:13 343:11,22
344:1,22 345:18 346:10,14 347:2
349:5,15 350:3,5,9,18 352:16
353:14 354:7,20 355:14,19,24
356:14 357:12,15 358:15 360:12
361:23 362:21,24 363:23 364:12,
25 365:15 366:11 367:10,22
369:5

**social** 47:15,17 281:9 282:3
289:5

**software** 65:19 68:9

**sole** 169:13,17,18 350:11 368:24

**solicitation** 268:2,3,18 270:11,
14,21 271:1,13

**solicited** 270:16 271:8

**soliciting** 178:6 270:1,2,7

**solidified** 180:11

**some** 7:25 13:10 14:11 15:4 22:4
27:1 28:1 32:20 44:10 46:4 54:21,
22 58:14,23 59:15 61:4,17,21
62:16,25 63:2,7,22 66:7 68:12
69:20 73:25 80:17 100:16 103:23
104:20 105:9 106:18,20 116:6
130:21 134:5 137:17 138:14,22
142:10 145:10 146:1 148:9,19
149:2 165:15 167:2 170:20
177:19 184:18 185:18 197:23
207:15,20 231:6 246:20 253:12
258:10 259:1 260:10 304:17
305:15,23 312:4 318:21 320:13
326:23 330:7 335:25 346:3
347:15 358:17 362:1 366:3,4

**somebody** 28:20 29:4,6,9 30:9,
17 38:25 71:21 121:16 127:19
180:23 207:10 208:15 225:25
235:9 270:16 307:14 318:20
323:10 337:9 366:20

**somehow** 17:16 117:3 284:4
288:2 335:22 354:16

**someone** 24:10 38:2 40:12 63:3
80:11 88:5 107:17,18 111:4 121:3
163:14 168:3 201:19 207:22
235:10 243:17 244:19 246:18
247:12 255:7 257:8,17,25 261:2
264:24 265:4 280:8,12,15 284:1
292:15 303:16 306:4 307:21
312:9 322:17,18,20,23,24 323:10
336:1,18 338:21 339:20,21,24
352:7 356:7

**someone's** 239:13 257:2 323:12
338:7 344:18

**someplace** 22:22

**something** 9:4,6 11:19 12:19
13:18 16:4 19:10,13 22:16,23
35:8 37:4 40:12 43:11 45:17

47:24,25 56:15 59:24 61:24 62:4,
6 65:11,21 66:14,24 75:23 78:6
79:18 81:1,3 95:25 96:25 97:6
100:21 102:4,12,15 105:23 106:5,
11 118:21 119:2 123:3 125:3
133:3 139:21 142:16 186:18
190:20 191:10 192:22 197:6
204:21 212:12 222:16 239:22
240:25 244:24 249:14,15 257:6
258:2 259:17 260:6 264:19 266:6
281:8 289:3 297:9 298:25 299:17
302:18 306:19 307:13 322:22
335:22 346:11 357:11 358:18
362:13 364:13

**sometime** 38:6 60:1,4 103:15
106:2 211:6,19 212:20

**sometimes** 27:13 237:1 319:14
345:12,16,17

**somewhere** 36:21 77:11 78:6
111:4 262:10

**Sommers** 41:22 43:5 44:21 81:2,
8,11 82:1,3,10,24 83:1,3,5,15
84:3,18 86:18 93:3,15 94:6,19,22
95:4,8 96:3,11,12 97:24 98:25
99:10,12,17 100:25 101:8,16
102:19,25 103:9,10 104:3 105:11,
21 107:8 108:15,19 110:4,5
111:16 160:24 173:3,11,15
174:10,12,20 179:19

**son** 204:21

**Sonia** 197:14,15,20 198:5,25
199:6,10,18 201:11,22 204:11,16
205:17 213:4,8,25 216:6 253:17,
18,21,22 254:5 300:15,23,24
301:7,10 344:15,18,20,21

**soon** 197:19

**sorry** 20:12 23:6,12 35:8,10
44:12 48:14 59:11 67:25 92:2
94:3 102:13 104:4 112:11,14,19
113:16 115:20 131:3 142:7 146:6
159:11 170:11 172:3 176:10
178:15,17 198:1,16,17,18 209:23
210:7 223:3 226:19,23 238:13,19
266:19 277:3,18 284:5 287:6
301:16 307:2,4,5,19 316:1 319:4
326:1 329:7 331:11 333:11 335:4
341:19,25 344:10 354:5 363:25

**sort** 138:14

**sought** 22:13 37:8

**soul** 257:25

**sound** 169:16

**sounding** 80:10

**sounds** 124:19 240:2,13 241:23
363:8

**sources** 132:7

**Southfield** 194:23

**space** 116:5

**span** 230:24

**spanning** 249:12

**speak** 17:11 30:9 41:6 128:12
130:3 284:10 308:21 314:12
362:17

**speaking** 48:16 89:17,20 128:19,
20 129:11 163:7 226:22 324:23
363:23

**specific** 22:7 45:11,17 48:19
65:12 85:25 87:9,11 89:7 91:22
98:17 110:11 126:3 133:25 134:6
137:15 138:9,10,18 142:16,17
151:24 152:4 164:2,6,8,21,25
165:10,15 166:1,8 172:9,13
173:14,20,22,23 174:3,4,10 175:5
182:17,21,22 193:15 197:3,19
209:16 215:10 219:13 221:21
226:17 228:25 229:16,17,22
231:20,21 234:6 238:2 245:20,25
255:12,21 258:25 259:25 262:19
275:7,9,13,20 300:1 302:23
314:14 319:17,20 320:19 321:14
328:21 329:23 346:12 353:24
355:6 357:4 359:17,18

**specifically** 6:20 37:22 83:19
90:24 91:3 138:4 155:25 166:11
172:8 177:3 214:4 226:15 230:25
231:2 232:10 245:9 253:6 299:16
311:25 316:2 319:11 342:24

**specifics** 158:22 165:16 166:19,
23 167:13 228:12 231:5,9,23
232:6,7 233:11,16 256:22 319:21

**specify** 148:5 256:2

**speculate** 271:17

**speculation** 269:22 270:24

**spell** 311:19

**spelled** 305:19 306:9

**spend** 18:14 19:1 22:4 65:13
112:9 187:24 221:25 223:11
242:19 251:17,22 255:3,7 328:12

**spent** 33:9

**spin** 289:21

**spiral** 64:5

**split** 252:11

**spoke** 24:13,16 94:7 119:1
129:24 134:20 304:11,25

**spoken** 16:7 175:11

**spot** 142:12

**spout** 303:16

**spring** 146:25 149:24

**stable** 150:15

**staff** 195:11 297:5 310:13

**stagnant** 122:18

**stalked** 337:17 359:21 360:4

**stalking** 248:22 323:20,25
325:18 326:3 331:10 334:7,25
335:2,6

**stamp** 161:9

**stamped** 70:14 158:7,25 178:19
182:12 184:1 185:9 191:2 192:6
266:17 276:19

**stance** 178:25

**stand** 109:6 249:15 335:9

**stand-alone** 247:6 248:16

**standard** 111:3 219:24 220:3
227:14

**standing** 17:9 32:13 114:1
223:25 225:9 242:24 243:21
245:17 246:14,21 248:2 251:5,8,
11 326:22,23,24 327:13 328:4,6,7
335:23

**standpoint** 36:4

**stands** 49:5 84:7 141:16 156:21
225:21 248:4 335:7

**Starbucks** 82:14 83:14 84:14,15

93:13

**Stargardt** 123:14,16,19 124:11

**start** 10:8 18:4 29:2 42:14 43:21
60:8 62:23 133:5 177:12,18
206:25 207:11,17 219:21 220:8,
18 233:4 259:15 303:9 330:2,4,6,
10

**started** 23:18 31:23 41:21 75:11
77:9 79:2 131:18 135:13,16 150:8
160:16 181:3 198:15 230:1
231:11 238:3,5,10 249:2 258:13
263:25 329:19 334:1 356:1 359:3

**starting** 42:6,13 197:25 219:19
252:23 331:17

**starts** 95:25 134:9 330:8

**state** 5:15 12:9 13:21,25 169:3
313:5

**stated** 16:15 18:1 25:16 204:8
215:15 220:22,24 286:23 338:6

**statement** 7:8 17:13 18:7,9,11
53:6 57:22 109:24 125:8,12
157:7,19 220:23 278:20 283:8,14
294:12 350:3 362:16

**statements** 125:11 316:6

**states** 214:12

**stating** 17:18 220:5 265:23

**status** 169:10,12 316:12 332:15
337:24

**statute** 217:5

**stay** 22:9 89:4 122:18 149:15
150:14 227:21 252:13 273:10
284:15 295:4 331:9,14 348:21

**stayed** 36:15 331:8,11

**staying** 347:24

**step** 348:13,17,19 349:6

**stepping** 347:19 350:17 351:6

**steps** 23:15

**stick** 355:15

**stickler** 89:12

**sticks** 87:7

**still** 7:10 13:6 55:21 69:12 70:4,5,
7 74:14 77:10,12 128:6 134:15

141:16 148:12,16 152:12 170:11
219:6 251:25 271:24 289:15
290:2 298:2,5 305:11 328:25
358:8,13,14

**stipulated** 362:14 363:15,17,24

**stipulation** 364:15,18,20

**stop** 74:23 210:12 219:5,7 245:4
258:10 282:24 337:9

**stopping** 168:25

**storage** 55:24,25 63:24 75:2
77:18

**stored** 59:6 62:10

**story** 107:4

**strategy** 276:6 290:14 293:19

**streamline** 259:10

**street** 96:18 97:4

**stress** 13:24

**stressed** 24:7

**stretch** 7:17

**strictly** 266:6

**strike** 113:16 144:10 205:21
359:4

**strong** 33:17

**structure** 95:1

**student** 47:23

**stuff** 53:22 57:25 78:13 88:22
91:15 206:25 207:3,12 212:8
214:22 312:22 314:1 355:13

**subpoena** 16:25 35:13 45:24
111:23 112:2

**subpoenaed** 94:15 111:22,23
113:5 114:4

**subpoenas** 7:10 17:3,5 285:1

**subsequent** 25:2

**subsequently** 110:8

**subset** 61:16

**substance** 49:3 198:25 293:13

**substance-type** 139:13

**substantive** 86:23 87:6

**successful** 33:21 234:1

**successors** 138:15

**such** 62:9 65:23 75:16 81:23
98:10 99:17 157:14 163:24
169:12 210:19 247:19 248:21
314:10

**sue** 156:1,2

**suffering** 312:16

**sufficient** 163:2,6,12 164:14,18
165:3

**suggest** 93:14 362:15

**suggested** 80:4 122:5 300:2
365:7

**suggesting** 220:3 289:3 300:9

**suicide** 336:12,13,16,25 337:4

**suing** 155:5,12,15,24

**suite** 248:25 326:12,25 328:11

**summaries** 123:6 124:24

**summary** 90:4 125:16

**summer** 38:6 43:21 135:13
254:2,4 357:13

**Sunday** 330:4

**supervise** 139:20

**supervised** 139:19

**supervisor** 139:17

**support** 5:14 6:16 267:18 333:10
337:18 346:6,15 352:1 359:19

**supporting** 347:5

**supportive** 342:18

**supports** 346:19

**supposed** 185:12 228:5 333:15

**sure** 8:14 12:8,21 14:15 21:19
22:3,8 34:8,14 37:10 39:4 40:24
43:7 44:8,14 47:25 55:9 59:5
61:16 62:22 63:2 64:1,24 67:25
69:16,20 70:23 71:12,17 72:23
73:23 74:4,10 75:7,13 76:6,18
78:2 81:9 82:19 87:16 89:6 90:3,
23 91:11 97:12 98:9,14 99:8
100:4 105:4 107:17,24 113:25
128:3,10,11 129:23 130:24 131:8,
11,20 136:5 137:15 139:7 140:18

147:13 160:23 167:6 174:8 180:7
185:25 196:11 202:19 205:18,19
217:20 222:25 231:1 236:14
249:6 259:11 262:9 286:16
287:21 288:14 291:6 299:14
304:20 315:10 316:3,25 340:14
347:20 352:19 355:3 363:11

**surreptitious** 153:14 189:18

**suspicion** 196:23

**Susskind** 94:21 95:9,12,23 96:3,
25 100:23

**Sutter** 312:6

**swear** 5:17

**swearing** 331:19

**Sweeney** 263:24

**switch** 78:24 172:23

**switched** 245:12

**switches** 134:18

**sworn** 6:8 11:13

**synch** 67:23 68:1,4,10 69:22

**synched** 68:8 69:13

**synching** 68:5

**system** 236:24

---

**T**

---

**T-U-C-C-I-A-R-O-N-E** 306:10

**table** 7:18 125:14 134:24 144:5
154:11,13 155:7 209:24

**tackle** 138:9

**take** 8:16 9:24 11:3 14:10,12
23:15 25:14,23,25 27:1 34:22
38:24 56:20 57:7,16 87:25 114:6,
7,12,19,25 115:5 136:6,8 139:14
144:7,9 147:24 148:8 149:2
151:6,12 158:23 162:24 169:9,16,
24 175:9 187:1,18 189:16 192:8
200:7,8 201:3 204:1 208:18
247:22,24 266:13 272:7 279:10,
11 280:4,10,20 281:1 285:20
286:22 299:1,19,20 305:24
324:20 325:1 341:13,24 360:22
362:10 363:5

**takeaway** 148:25 149:4

**taken** 5:8 10:25 11:6 58:3,22
59:5,18 136:14 163:25 170:3
192:24 208:22 211:8 225:2
257:13 272:10 288:3 296:9
325:10

**takes** 9:21 360:20

**taking** 5:10 25:18,22 26:2 34:6
109:25 110:5 128:13,17 142:24
148:5 164:1 166:13 169:17
189:18 193:9,11 194:2,21 195:3,
16,25 196:24 197:3 198:8 199:11
200:18 201:7,8 210:25 211:21
212:22 213:3 224:19 226:13
241:14 247:12,13 263:10 265:1
266:2 282:15,18 295:24 296:2,12
302:25 304:15

**talk** 31:15 47:13 71:4 79:23 81:23
82:13 86:12 101:5,23 102:3
105:13 115:13 122:10 123:25
126:8 135:13,16 138:12 140:1
142:5 145:8,10 146:14 147:22
160:15 180:25 195:20 196:1,23
197:20 198:5 199:14,18,21 213:9,
25 227:10 228:16 236:21 241:23
255:8 259:22 260:2 268:20
269:17 286:17,18 298:19 302:15
307:25 320:18 321:11 323:23,24
325:24 326:4,21 327:22 328:5,14,
16,18 329:6,21 330:22 333:13
334:13,23 342:8 347:11 351:17
357:20,24 364:25 365:19

**talked** 15:17 16:17 24:10 39:15
44:10,14 46:8 48:8 62:20 66:3
81:17,21 82:23,24 83:16 84:1,2,4,
21 85:1,9 86:22 87:20 90:12 91:3,
20 93:18 94:20,22 96:19 97:16,24
99:2 100:16,22 101:23 106:18
110:3 129:22,25 130:7,12,16,25
135:5,17,21,24 166:18 170:22,24
171:16 173:9,17 176:22 194:17
196:3 197:9,11,16,17 199:17
200:1,2,3 201:11 228:13 239:10
253:17,21,22 254:16 255:13
262:3 264:2 268:24 269:24
294:16,18,20 301:20 302:25
305:7,15 306:13 308:16,18 309:4
311:1 318:12 321:11 322:9 323:9
326:16 331:24 332:3 334:8,17
336:18 337:4,5,6 339:25 340:2,3,
17 346:8 347:3 355:5,7 359:11,

13,14

**talking** 21:19 34:17 39:24 65:24
78:16 80:18 81:24 82:10,11
84:17,18 85:11 86:5 88:2 91:4
93:4,6,7,12 99:10 104:11 105:5
129:5,19 130:1 133:1,12,20 143:2
155:17,24 156:1 160:17,25 167:9
174:12,13 177:1 181:3 191:18
194:9 195:21,22 196:8 198:14
200:24 201:1 209:22 210:6
211:13,14 216:24 221:8 222:7
223:6 234:5 235:14,25 236:5,6,16
240:4,11 244:1,3,6 245:8 255:6,
16 258:1 259:2 262:7,25 284:12
296:5 297:9 299:13,14 302:6
303:8 317:25 321:1 323:6 326:9,
10 327:18 331:1 336:24 339:25
342:11 344:16 351:11,12,15
353:25 354:1 355:13 357:4,14,15
358:6,8,13,16,19,20,22 359:8,10
360:1 362:4 363:11 366:8

**talks** 105:11 159:1 161:7 173:1
174:7,25 179:18 182:6

**tampered** 57:2

**Tanoury** 44:11,13 130:4

**tape** 155:8 156:6

**Taylor** 6:4

**teacher** 51:22

**team** 126:18

**technically** 326:14 362:23

**technology** 68:11,12 171:14,18,
20,21

**telephone** 103:23

**tell** 14:12,14,16,17 24:11 26:11,
15 39:18 41:16 79:10 82:3,20
90:1 92:25 96:14,17 98:15,18,19
101:3,22 103:25 104:15,18,23
107:2 118:18 121:19 140:19
145:23 146:22 149:6 153:18,19
154:5,7 161:21 166:11 170:18
171:24 174:11 175:4 178:23
182:18 192:2 199:10 205:7
206:24 208:13 214:10 216:11,15
229:10,18,20 230:1,5,7,25 239:6
242:7 253:8,14,18 254:5,11
257:8,9,10 259:3 260:21 279:20
282:22 294:25 302:17 306:18
308:6,9,19,22 309:2,18 311:10

319:10,11 320:2,7,16 322:23
323:19 328:1 331:6 336:6,19
337:1,9 338:24 339:22 340:3,15
348:11,14 349:5 350:10 358:21,
23,24 366:21

**telling** 40:12 88:18 98:24 118:17
134:4 155:8,18 181:6,11 190:17,
20 205:12 208:15 237:11,18
242:11 243:8 248:25 263:15
290:12 304:7 337:5 339:18
341:14 343:2,23

**tells** 205:5

**temper** 92:8

**ten** 35:1,2,17 56:4 100:1 198:10
266:12 351:20 355:10

**tendered** 358:10

**tentative** 189:8

**tenure** 60:5

**term** 10:21 34:9 123:21 159:5,6
161:19 175:9 179:15

**terminated** 358:13

**terms** 33:14 71:10,11,16,19
73:17 84:7 113:24 126:24 131:7
146:15 151:15 234:10 239:2

**test** 27:1

**testified** 6:9 20:7 37:15 46:8
50:21 77:16 156:9 179:20 183:13
215:4 266:8 363:3

**testifies** 48:23 156:14

**testify** 77:7 271:12

**testimony** 11:14,18 14:21,22
15:21 16:6 64:2 187:20 208:6
214:13 248:8 265:13

**text** 47:11 48:2,7 79:22 104:11
111:9 120:20 140:12 158:11,15
159:2 174:14 181:7 183:5 184:2,
9,13 185:13 191:18,24 192:21
194:4,18 214:14 216:19 221:23
223:15 236:19,20 254:17,19
266:18 267:1 271:8 299:3 303:25
329:9,11 350:22,24 360:17

**texted** 47:12 332:14

**texting** 357:10

**texts** 111:7 254:22

**than** 15:8 25:24 29:15 30:7,12
35:1,2 39:16 44:18 48:22 60:11,
16,24 64:10 65:19 66:12,13
78:14,17 83:14 92:14 97:5,9
98:20 100:3 103:8 112:8 124:20
127:25 128:1 131:9 138:10,18
143:2 144:20 150:17 166:13
171:25 172:13,20 173:4,15 188:3
194:8 197:15 204:16 205:12
206:10 213:20 219:24 224:21
231:6,9 255:9,20 262:5 264:13,22
269:22 278:25 284:4 287:14
288:3 294:25 299:12 300:20
302:12 308:22 309:17 317:3
318:14 319:17,20 321:14 324:16
328:15 331:8,15 333:16 334:13,
20 335:23 341:14 343:2 360:20

**Thank** 10:3 23:1 45:5 57:6 70:16
109:13 152:24 161:15 182:7
184:15,20 204:5 210:1,16 214:2
215:22 227:2 306:2 369:8

**that** 6:15,16,22 7:10,11,19,24,25
8:1,2,5,19 9:8,21,23 11:8,10,17,
19 12:6 13:10,11,19 14:4,6,9,21,
23 15:3,6,21 16:1,2,5,6,7,8,11,14,
15,16,22 17:6,8,13,17,20 18:5
19:2,7,14,16 20:2,7,9,11,19 21:3,
14,16,19 22:3,13,16,20,24 23:2,6,
23 24:1,5,6,24 25:4,18,24 26:7,
12,15,19,20 27:4,17,18,24 28:13,
14,15,16,19 29:25 30:11,14,15,
19,20,22 31:20 32:7,9,14 33:18,
20 34:3,5,6,8,16,17,20,25 35:3,7,
15 36:4,12,13,20 37:4,5,9,11,12,
16,17,19,21,24 38:2,3,4,5,6,9,13,
14,15,23,25 39:3,4,9,10,17 40:7,
11,12,16 41:6,7,10,12,15,25 42:3,
7,12,19,23,25 43:3,24 44:1,15,17,
18 45:8,21,24 46:4 47:1,16,23,25
48:1,12,15,18,20,21,23,24 49:4
50:17 51:14,22 52:15,17,25
53:18,21,22,23 54:5,7,13 55:2,20
56:14,15,17 57:1,5,13 58:9,17,20,
23,24 59:3,8,11,13,16,18,22,23,
25 60:1,4,10,11,17,22,24 61:5,6,
21,22,24 62:5,7,23 63:3,7,8,14
64:4,7,23 65:7,11,20,22,23 66:6,
13,15,17,22,23,24 67:3,5,8,9,11,
16,19,20 68:5,19,23,25 69:4,8,16,
20,23,24 70:2,5,8,19 71:1,4,12
72:12,13,16,17 73:5,21,22,25
74:4,9,15,18,20,21 75:2,4,12,16,
19,24,25 77:3,14,17,18,24 78:2,3,

15,16,19,20 79:10,11,13,14,15,
16,18,19,22,23 80:2,4,7,12,15,19,
20 81:3,6,10,12,13,18,22,23,24
82:1,2,3,4,7,8,10,16,20,22 83:2,5,
7,8,10,14,17 84:4,13,19,20,22,23
85:2,6,8,9,11,17,18,19 86:3,10,
16,17,24 87:1,9,13,20 88:1,6,19,
22,23 89:9,10,14,24 90:2,3,7,16,
17 91:4,14,17,25 92:2,4,6,8,9,11,
24 93:1,5,12,14,17,19,24 94:6,20,
24 95:6,7,14,15,17,19 96:6,12,14,
15,18,22,23,24 97:1,2,3,5,9,11,
13,15,16,17,18,20,21 98:2,5,13,
14,16,17,24 99:2,9,11,20 100:11,
17 101:4,6,12,14,17,21,22 102:4,
11,20 103:5,8,10 104:1,2,5,15,21
105:3,9,14,16,19,20 106:2,5,7,10,
11,13,14,16,18,19,22,25 107:4,9
108:4,5,8,12,15 109:17,18 110:3,
9,11,15,18,25 111:10,11,22
112:16 113:1,5,16,20 114:2
116:1,14,17,19,21,24 117:1,5,8,
18,21 118:6,7,10,11,12,15,17,18,
19,21 119:5,9,13,22 120:6,14,16,
17,20,23,25 121:2,3,10,13,21
122:4,16,17,19 123:2,3,10,19,20,
21 124:2,5,12,20,22 125:2,6,9,12,
18,19,22 126:3,20 127:1,3,5,10,
14,16,23 128:2,3,21,22 129:10,
13,14,18,19,23 130:2,7 131:8,9,
13,15,17,20,21,22,24,25 132:2,8,
12,13 133:1,2,10,11,16,17,18,21
134:7,8,14,16,20,22 135:5,14,17
137:6,8,15,21,22 138:4,5,7,10,11,
13,16,18,20,23 139:7,8,14 140:1,
9,11,25 141:12 142:2,8,9,12,16,
19,20,24 143:12,19,24 144:9,10,
15,25 145:1,4,5,8,12,15,19,20,21,
24,25 146:1,7,8,9 147:1,2,3,5,9,
14,15,23,24,25 148:2,3,7,8,10,11,
12,16,18,21,22,23 149:1,4,6,7,8,
13,16,17 150:3,10,11,13,24
151:3,4,8,11,14,16,18,19,21
152:6,9,10,14,15,16,19,22 153:3,
8,12,14,15 154:5,16,24,25
155:10,17 156:4,13,14,22 157:2,
6,12,14,22 158:1,19,21 159:2,10,
15,19,20,21,22 160:3,8,12,21
161:16,22 162:10,15,21 163:15,
17,19,20,23,25 164:2,3,9,15,16,
17,19,20,22,24,25 165:4,6,7,10,
17,18,20,22,23 166:2,3,8,11,18,
19,20 167:3,12,15,16 168:8,12,19
169:3,5,9,14 170:15,21,25 171:3,

14,19,25 172:16,17,19,20 173:6,
10,11,12,14 174:14,18,21,24
175:4,7 176:9,12,21 177:3,5,11,
13,22,25 178:9,17,22 179:2,4,5,6,
9,15,19,21,23 180:3,9,12,14,15
181:4,7,11,17,22 182:4,5,20
183:3,4,9,10,11,13,17 184:6,12,
15,20,22 186:14,20 187:11 188:4,
19 189:13,18,19,22,23 190:5,10,
12,14,18,19,20,21,25 191:1,3,8,
15,17,19,24,25 192:5,11,13,18,
21,23,24 193:8,9,11,21 194:4,5,6,
7,8,16,18,20 195:2,4,6,8,10,11,
14,17 196:5,7,11,13,15,23,25
197:4,7,8,9,17,21,24 198:1,10
199:11,16,23 200:6,11,14,20,22,
25 201:11,12,15,17,18,21,24
202:3,8,11,13,14,20,24,25
203:10,14,17,22 204:9,13,14,24,
25 205:3,6,11,14,16,20,21 206:3,
9,12,24 207:5,7,10,13,16,21,23
208:6,13,14,15,17 209:2,4,6,9,17,
19,20 210:17,19,22,23,24 211:1,
2,4,5,6,9,10,11,16,18,20,24
212:5,9,12,13,16,18,19,23 213:3,
5,6,7,8,24,25 214:1,4,16 215:1,4,
19,24 216:15,21 217:4,7,9,11,13,
24,25 218:6,19,20,23 219:1,14,
17,23 220:3,5,6,10,20 221:18,20
222:5,24 223:3,16,18,19,20,21
224:1,3,5,6,7,11,15,17,22 225:9,
12,13,23,25 226:2,6,13,16 227:3,
12,14,25 228:15,20 229:1,17
230:14,18,24 231:9,17 232:2,9,
10,20 233:2,4,6,11,20,23,24,25
234:15,17,18,19,23,24 235:2,5,7,
11,13,15,21 236:15,16 237:14,21
238:11,14,23,25 239:12,15,16,19
240:1,5,6,13,15,21,22,24 241:1,3,
7,9,10 242:6,12,15,21,25 243:2,8,
9 244:21,22,24,25 245:16,17,20,
23 246:3,8,9,10 247:2,9,15,20
248:1,5,16,24 249:1,2,5,6,9,15,
19,22,25 250:3,5,10,19 251:10,
16,21 252:7,19,22,25 253:5,15,
19,24 254:6,8,19 255:6,9,12
256:10,20 257:5,6,12,14,15,16,
19,20,23 258:1,9,10,17,23 259:6,
10,16,24,25 260:6,11,12,14,15,24
261:1,4,11,14,16,19,21,24 262:2,
4,8,10,20,23 263:1,4,7,19,21
264:3,4,9,11,12,21,24,25 265:1,4,
17 266:8 267:5,18,22,24 268:1,2,
7,10,11,14,15,17,22 269:1,2,3,8,

9,15,19,22,25 270:4,6,15 271:5,8,
9,22 272:18,23 273:10,18,19,22
274:2,3,4,10,12,17,23 275:6,7,8,
10,19 276:14,18,21,22 277:1,10,
11,16,22,24 278:5,6,7,8,20,21,25
279:14,15,18,20 280:1,21 281:8,
9,10,15,17 282:6 283:13,25
284:1,25 285:4,14,15,18 286:23
287:10,16,17 288:2,8,9,13,17
289:13,17,21,24 290:3,7,10,15
291:4,6,11,22 292:5,15,24 293:1,
10,16,21 294:5,6,10,12 295:12,
13,15,16,17,18,19,25 296:4,6,8,
11,16,17,19,22,23 297:2,7,11,16
298:1,3,4,6,15,17,23 299:4,6,7,8,
9 300:2,3,8,11,12,14,18,21,24,25
301:1,2,10,11,12,17,20,21,24,25
302:1,3,4,16,17,19,22,24 303:1,4,
6,15,16,20 304:1,13,14,15,17,21,
23 305:19 306:3,19 307:13,16,17,
19,21 308:6,9,13,14,16,17,20,22
309:3,5,9,10,17,18,19,20,21,24
310:4,5,23,25 311:6,10,15
312:12,13,15,16,22,25 313:3,4,8,
10,11,12,14,19,25 314:7,8,15,20
315:13,14,20 316:11,13,19,21
317:4,10,11,13,22,24 318:5,8,14,
17,20,21,24,25 319:7,8,9,11,13,
14,20 320:5,19,22 321:4,5,8,14,
17,24,25 322:2,9,10,12,14,15,20,
21,22,23,25 323:4,15,19 324:4,
15,17,18,20 325:4,15 326:3,13,15
327:2,7,18 328:23,24 329:4,13,
15,16,18,24,25 330:1,7,12,16,18
331:2,5,9,10,16,20,21,22,23
332:1,3,8,10,16,19,24 333:5,7,9,
10,12,13,14,16,17,18 334:6,9,10,
18 335:5,6,21,22 336:6,20,21
337:3,6,12,13,18,23,25 338:2,8,9,
13,16,17,18,25 339:5,7,17,20,21,
22 340:4,6,8,17,18,19,20,21
341:1,4,7,11,14,15,18 342:2,18,
20,22,23,25 343:4,5,9,15,19,22
344:5,7,8,9,10,11,14,16,18,23
345:1,21 346:5,8,10,12,16,18
347:2,4,12,15,19,21,24 348:11,
13,14,16,17,18,20,24 349:14,15,
16,19,20,24 350:1,5,7,8,17,19,22,
23 351:1,2,5,6,7,8,10,11,18,22,25
352:6,10,18,24 353:1,5,9,15,17,
25 354:18,20,21,23 355:5,13,14,
20 356:3,9,11,15,18,20,22,23,25
357:3,7,8,9,10,13,14,15,17,19,23,
25 358:1,2,12,15,17,22,24,25

359:1,2,4,5,6,8,9,20,25 360:3,4,8,
9,11,13,15 361:3,18,20 362:6,9
363:5,19 364:13,22,23 365:8,12,
18 366:12 367:9,18,20 368:4,8,9,
15,18

**that's**   10:12 14:22 17:6,20 21:16
30:23 31:25 32:13 36:20 41:8
44:2,16 46:1,25 51:14,16 53:5,21
58:19 60:2 64:9 67:2 76:23 77:9
79:14 80:7 90:21 93:25 96:15
102:12 108:2,8,21,22 109:10
112:3 115:23 121:18 123:10
125:5 126:18 127:22 128:10
131:16 132:20 133:3,13 142:15
144:13 147:19 150:16,24 153:5
157:19 161:8 163:9 165:25
166:25 167:24 168:25 174:17
178:25 181:7,25 182:1 183:6
187:9 189:24 190:10 191:7
192:20,22 193:6,9 194:19 197:1
199:15 202:15,20 208:10 211:20
212:21 219:2 220:4,13 226:7
228:10 229:3,6,8,12 234:9,10
235:7 238:25 241:20 244:15,23,
25 245:10 246:19 247:10 249:8,
11 255:25 256:15,17 258:3 260:8
261:6,13,20 265:14,20 266:6
267:9,14,17 270:7,13 272:20
275:5 276:6 277:14 278:17
279:23,24 280:3 281:15,23
282:20 283:8,9,19 286:6 287:20
288:5 289:22 290:5 291:5,17
292:3,5,18 294:22,23,24 296:7
298:3 299:6,22 300:7 302:19
303:13,17,19 306:24 307:13
308:10 309:13 312:2 314:22
315:5,6,18 316:15 317:18 318:23
319:9 321:25 322:21 323:1 325:6,
18 326:3,8 332:2 334:24,25 335:7
339:12 341:3 344:1 345:8 346:11,
21 348:2,5,20 349:2,20,22 350:3,
18 351:14 357:12 358:10 359:17,
18,22,23,24 360:25 361:17 363:6

**their**   12:22 16:8 64:23 81:13
89:14 91:12 93:25 95:2 96:1
121:4 124:6 135:15 146:15 147:4
151:20 168:13 178:8 201:19
207:11,12 246:14,21 257:9,10,11
318:1 322:18,19 345:4 358:18

**them**   7:9,14 9:4 13:4,10 16:11
20:8 42:21,24 43:13 49:21 52:3
55:8,23 56:8,10,17,18,19 57:3,19
58:11 60:10,13,17 63:1,16,17

68:4 73:13,14 78:22 81:14 84:1
86:6,19 91:12 92:5 93:17 94:10
107:18 112:1 113:18,19 125:17,
19 126:6 135:5,24 146:16 155:21
165:22 166:13 170:19 172:21
173:1,21 175:4 178:7 181:5,7
182:17,22 185:19 213:14 219:2,4
224:1,3 235:24 257:21 263:18
266:4,10 272:17 274:3 282:22
288:7 289:5,6 290:4 301:1,18
310:17 315:22 318:1 322:18
336:5,19 337:5,9 338:9 340:1,20
356:8

**theme** 311:3 359:2

**themselves** 55:15

**then** 24:16 26:21 30:7,21 32:1,6,
24 33:7 37:19 38:17 39:18 40:19
42:1 44:18 48:8 54:22 62:23 63:4,
5 66:16,24 71:16 73:15 75:14
83:9 84:17 85:4 92:25 99:2
101:23 102:5,6 106:22 109:12
113:18,24 122:18 124:12 126:16
134:18,20 136:9 147:12 149:7,18
151:9 152:3,9,11 158:22 159:4
162:1 167:4 168:4 169:25 170:11,
14,23 171:16 176:13 179:7,17
181:5 183:14 186:14 190:15
194:13 198:22 200:19 205:6
207:16 208:2 209:14 210:8
212:25 215:11 226:13 229:4,10
232:20,25 234:2 241:17,19,22,25
244:20 245:19 249:2 252:5,9
259:5 260:21 264:1 266:5 273:7,
25 279:8 294:17 295:22 298:19
299:18,25 300:4,5 301:15 302:18
308:11 311:21 312:20 320:25
321:23 325:2 327:8 328:8,10
329:11 332:25 334:17 341:10
343:9 346:15 350:8 356:3 357:17
362:17

**theory** 28:18 167:15 346:12

**therapist** 25:5

**therapists** 15:18

**therapy** 25:5,10,12

**there** 8:18 13:18,24 16:24 20:7
22:4 23:10 26:5,7 27:16 28:23
33:7,8 34:5,6,15,16,20 36:12
37:17 38:23 39:9 40:22 41:25
42:1 43:2,15 46:7 47:1 50:14,17
53:23 59:24 60:5,6,8,14 63:7

64:10 65:6,12 66:3,7,9 68:13
69:10,16 72:17 75:3,6,8,24 77:2,
3,8,10,12,24 78:13,17 86:13 87:3,
13 90:2,17 92:5,8,10 94:21 96:6
97:6 98:10,12,20 99:1 100:15
101:20 104:2 106:17 107:7,8,10
111:5 115:7,12 120:2,4 122:2,11,
17 125:18 126:1,9,20 127:6,13
128:7 130:3,22 131:4 133:3
138:11,14 139:12 141:19 142:2,
10,18,22,23 144:21 145:3 146:7
150:8 151:12,15 152:14 155:2
157:5 163:11 165:4 167:4,11
168:7 171:22 172:17 176:8
177:24 178:25 179:6,16,17
180:23 181:2 182:5 183:6,15
187:23 188:15,25 190:21 191:22
194:4,17,24,25 195:11,12 197:22
200:4,22 201:2,20 202:11 206:12
209:12 211:7 212:4,12,13 216:17
224:5,6 225:20 226:2 227:5
228:22 230:24 232:8 233:2,17
234:14 235:1 236:14,18,20
237:11,16,17,18,23 238:4,23
239:15 240:5,25 241:21 242:5
245:23 246:3 252:8,9 253:4,5
254:20 257:19 260:8,9 262:5,8,23
264:6 267:7 273:24 274:12,17
276:14 278:11 279:12,13,19
280:19 281:9,13 282:6,23 288:25
289:15,16,17,20 290:9 295:10
296:15,21 299:7 303:15,20
305:11 306:4 312:3 314:1,25
315:2 316:10 322:25 326:25
327:6 328:15 329:8 330:4 332:7
333:14 334:13 338:20 345:21
347:22 351:25 354:10 355:16
356:1,4,5,24 357:17 359:4 360:3
361:21 365:1

**there's** 6:22 7:17 8:12 21:5,8
26:22,24 40:17,20 45:24 47:23
51:3,4 53:17,21,25 54:21,22
56:11 59:1,15 60:23 63:2 71:14
74:3 78:4,6,21 85:17 87:21 92:7
101:24 122:10 150:23 167:3
171:23 174:18 190:19 191:12,14
194:10 209:23 227:13 234:5
247:25 254:22 258:25 262:8
269:4,6 277:22 279:15,17 281:7,
12 283:10,12 288:10,11,13,16
290:12 293:23 299:12 301:16
312:9 321:8 327:6,8 329:11 331:2
333:14 350:15 354:9 358:8
360:11,16 361:11 364:15,18

**thereafter** 109:23 211:19 213:1

**these** 7:9 42:7 52:1 53:2 56:14
76:2 78:7 85:11 86:10,20 88:2,18,
25 89:22 111:19,21 128:6 146:19
153:2 181:7 182:11,14,18,23
185:13 186:20 190:16 211:21
218:25 220:11 223:4 231:5
233:11 237:20 241:2,8 247:6
266:10 274:8 277:6 278:2,3,7,25
279:10 280:4,22 281:4,18 282:2
288:12 289:1,4 304:1 305:3 311:7
313:12,23 320:4 336:14 346:25
360:13

**they** 12:22 13:7 16:9 26:12 34:18,
19 37:4 38:17 46:15,16 50:18,25
51:1,9 52:8 57:1,3 58:15,16 60:17
61:12,13 62:10,11 63:15,23 72:19
73:6,9,15,17 78:12,21,22 81:15
82:3,5 83:9,10 89:8,15 91:7 93:6,
9,20,22,23 94:23 95:1 96:15
107:18 108:1 110:2 118:25 119:1
122:17,18 125:20 129:15 147:23
148:3 155:11,15,18,20 156:4
161:23 163:5,11,16 166:11 168:4,
18 171:17,22 172:20 179:13
185:14 186:10,11 188:6 190:25
194:17 207:19,24 209:14 210:2
211:16 217:3 223:25 227:10
231:6,10,17,18 235:13 237:16
238:4,11,14 239:3 257:9,17
282:5,9,10,16 284:1 300:24 305:4
313:19 315:8 319:17,20 322:9
337:19 338:3,8,24 339:2,5,8
340:1,15 341:4,11,17 342:20
343:15,17,18 344:16 346:3,14,16
347:4,11 352:10,18,22,25 356:22,
24 357:10,13,14,23 358:17,19,20
359:8,11,13,14,25

**they're** 42:23 52:2 54:6 55:19
56:3,4,7 60:19 89:19 155:18
182:16 194:13,16 207:16,23
216:22 224:4 227:5 235:10 241:6
254:20 310:14 346:17,22 348:21
354:3 360:19

**Thiel** 130:25 131:1,3

**thing** 21:20 51:16 59:8 62:18
64:22 76:23 119:6,8 157:14
217:24 243:3,4 246:1 259:6
264:23 271:5 273:18 284:6
301:15 303:17 310:12 313:2
320:10 326:8,16 341:3 345:19

359:10

**things**  9:8 22:1 27:24 28:13
42:11 53:18 55:25 61:5,6 64:22
66:22,25 67:4,10 71:4 77:6 78:7,
20 84:23 87:6 97:11 103:21
106:15 110:21 118:22 119:7
121:23 122:4 123:5 163:23
166:15,17 174:9 175:12 179:23
183:4,17 188:3 191:22 200:23
204:19 206:12 209:4,13 211:22
214:23 218:25 219:2,3,13 225:3,
23 228:15 235:18 257:11,22
258:1,14 266:10 267:21 275:6
284:25 290:3,12 297:2,4,6 298:7,
8,16 300:14,19 301:18,19,20
302:15 303:10,22 304:3 312:24,
25 320:5 333:13 338:17 339:6
342:25

**think**  7:20 11:8,17 12:21 14:7
16:14 24:2,15 26:20 27:7,11,14,
24 28:5,10,12 29:19 30:19 35:2
36:9,12 37:20 38:4 40:13,17,25
41:11 43:9 47:16 48:18,19 53:17
58:21,24 59:2,15 60:7,21,23
61:13 63:2 64:9 66:25 68:4,10,22
73:2,23 74:3,4,12 77:5 78:4,6,19
82:8 83:19 85:1,5,6 86:21 87:4,20
88:16,23 89:17 90:2 92:5 93:7,10,
19 95:21,25 96:2,25 97:1,12,19,
20 98:4,14 100:11 101:21 102:6,7
103:17 109:20 110:12,20,24
118:8 119:24 121:3 127:2 128:7
131:14 132:5,6 134:13 142:15
150:13 152:12 153:22 155:17
164:17 165:5,11,14,24 167:23
168:2,10,20 169:5 177:7,11,18
179:24 181:25 183:13 187:25
188:17 189:5,10,14,16,19 190:13
192:4,8 195:8,10 199:7 201:18
202:7 203:3 204:8 209:8 211:1,24
224:4 225:12,25 226:1,5,8 228:2
230:3 235:3,9,12,16,21 236:1
239:13,17 240:16 241:3,8,10
242:5 243:2 244:23 246:7,8,13,
19,20 249:25 252:4 254:19 257:8,
13 259:7 260:7 261:6,7,18,20
262:14 263:19 264:11 267:12
273:20 274:3 279:22,23 280:15
282:13 289:25 290:6 291:17
296:3 300:3,8 302:16,19 304:20
305:22 306:5 309:3,16 312:10
313:14 316:5 320:7,24 321:17
322:20 323:2,17 326:9 328:15,24,

25 329:4,16 330:3 333:16 337:3
338:2,6 339:2,5 341:11,17
346:19,24 347:2,11,14,18 352:16,
18,22 353:8,10,12 354:13,18,20
355:14,20 356:6,9,11 361:18
366:2

**thinking**  37:10 43:13 80:12,15
82:2,4 166:8,19 306:17 336:21

**thinks**  220:13

**third**  227:5 268:23

**third-party**  7:10 114:3 284:25

**this**  5:7,10,18 6:20 7:3 8:23 9:14
10:1,5 11:1,21 16:4,21,23 17:9,
11,12,14 18:4,14 19:18 21:2,12,
13 28:5,18 33:10 35:12 37:11,19
41:24 42:1 43:19 44:19 52:3 53:6,
7,11 57:4,25 61:7 64:3 68:24
70:9,18,19 71:2,5,9 72:1,18 73:3,
6,21 74:1,5,14 76:18 77:10,25
84:22 88:20,24 91:15 96:6,23
97:16,20 99:9 101:24 112:6,7,15,
21,22 113:6,10,22,24 115:10
127:19 134:24 135:2,8 141:1,2,17
142:20 146:4 152:18 156:11
158:10,15,17,25 160:22 161:16,
19,21 162:12,17,19,20,21 163:3
165:2 172:13,17,25 174:6 175:23
176:2 177:19 178:15 181:10
183:1,21 184:1,5,6,8 185:11,22
187:1,18 188:6,21 189:14 190:11,
14 192:14 196:6 199:1 202:1
204:1,4,8 209:4,7,8 210:2,20
211:3,18 213:11 215:9,16 218:23
219:23 220:7 222:21 224:11
227:11 228:2 234:20 242:18,25
244:16 247:19 248:19 250:11
258:19,21 259:7 260:5 265:13
266:25 267:5,21 268:25 269:25
270:4,8,23,24 271:13,16,19,24
273:1 276:20,25 277:3,4,8 280:4,
23,24 281:2 282:9,10,16 284:6,19
285:7,9,10,13 286:20,21,22,25
287:1,3,10 290:22 291:8 292:12
293:23,25 294:17 295:17 297:16
298:3 302:1,5 307:6 308:17
310:10,19 311:1 312:22 314:12
320:1,9 327:25 328:2 329:3,10,20
332:8,19 333:23 337:22 341:9
343:25 345:3,5,10,14 350:16
351:7 353:17,25 357:20 359:3
360:1,12,16 362:8,19 363:3,16,21

364:5,6,8,9 369:6,18

**Thomas**  6:1 166:9 305:7

**thorough**  74:25 75:15,19,23
76:8,12,13,20,25 77:16,20

**thoroughly**  78:8

**those**  12:24 13:3,5,16 15:19,20
28:13 32:4 36:22 42:11 50:19
54:4 55:8 61:11,17 63:14 64:6,15
65:11 66:4 67:2 68:6 76:4 77:1,21
78:1,9,11,17,19 79:2 85:7 89:1,
19,20 98:14 125:1,2 130:21
139:7,18 143:12,14,17,18 153:24
164:12 166:12,15,16,17 167:7
168:3,4 172:19,21 174:8 175:12
179:9 183:16 186:6,7,8,9,22
188:16 191:24 195:8,10,18 225:3
232:5 235:18 241:3 242:6 257:16
260:13 261:25 263:20 278:5
280:10 281:24 297:4 301:7
306:16 308:12 314:10 316:11
317:9,19 319:7,25 327:2,17,19
328:25 329:2 330:8 333:5 334:20
338:10 340:13,24 344:7 347:22
366:15

**though**  16:25 33:3 50:25 103:24
113:21 194:14 282:14 320:25
365:4

**thought**  37:10,12,13 61:25 81:4
86:14 87:2 88:4 104:12 114:11
118:7,15 129:15 131:23 132:25
133:10,11 137:21 138:6 145:12
149:14 158:23 166:11 170:12
172:21 173:18 176:9 195:24
196:8 198:7 199:11 212:22
226:21 228:5 238:16 245:15
255:4 258:9 259:7 280:13 295:16
299:8 300:21 304:14,22 308:15
309:3 311:2 326:11 331:8,13
332:6

**thoughts**  102:14 188:1,5

**threatened**  363:16

**three**  22:5,6 48:6 65:5 152:22
213:21 314:5 340:1 360:18

**threw**  276:14

**through**  23:18 28:14 32:2 42:10
61:4,10 68:25 71:11,14 77:19
84:18 97:10 110:23 112:1 114:17
125:13 152:3 158:7,17 165:11,24

173:18 182:12 185:10 191:1,2
192:1,6 204:16 206:17,25 207:3,
18 212:7 213:20 219:2 238:7
239:25 240:19 245:13 246:14
248:19 254:1 266:1,17 268:23
273:23 276:20 303:8,21,22,23,25
304:2 307:14,21 312:8 313:6,9,17
316:18 317:4 318:16 319:23
327:22 328:5,14,19 331:1,5

**throughout** 6:19 67:17,21 152:2
166:24 209:12 222:21 237:23
238:16,17 255:17 294:15 296:18
302:9

**throwing** 326:18

**Thursday** 329:24,25 330:16,19

**thus** 44:20

**tied** 260:24 318:5

**tighter** 230:16

**time** 7:8 15:23 17:14 18:14 22:5
23:10 24:6 25:6,22,24 27:11
28:16,17 29:2 30:13,25 31:8,12
32:9,21 33:14,18 34:4 36:2 37:10,
13 40:1 41:7 42:1,2 44:11 48:16
60:7 61:2 65:9,10 66:17 67:19,21
69:1 70:22 71:1 78:3 79:25 80:17
91:17 102:20 103:5 105:14
106:24 110:1 112:9,10 115:14
116:3,17 119:5,13 121:12 122:14,
25 123:1 126:1,3 127:13,15,18
128:9,13 133:12,17,20,25 136:2,3
138:25 139:8 142:24 147:3,10
151:17 154:25 156:5 158:21
162:24 164:21 167:19,21 173:12
179:21 183:2 184:17 185:2
187:18,24 189:20,25 193:23
195:24 197:4,21 198:2 205:24
206:5 207:17,20 209:17,18 210:3
211:2 212:5,19,21 216:4 221:11,
25 223:7,11 227:10,11 229:15
230:3,6,7,13,14,20,24 231:7,11,
18,19,24 232:8,20 233:19 234:2,
3,7,8 235:14 236:25 238:1 239:25
240:12,19,22 242:1 244:16
246:20,23,25 247:10,19,22,24
249:4 251:17,22 252:23 253:15,
19,25 254:6,8 255:3,4,7,17,19
258:8,15 259:20 260:1,12 261:2
262:1,4 264:4,6 273:23 274:4
279:24 285:5 286:11,18 287:3,4,9
292:20 294:8 295:15,24 296:2,11

297:16 302:4,23,25 305:10 307:6
310:4 312:17 313:10 316:17,22
317:3 318:12 320:1 322:4,7
326:15 327:13,15,17 328:16
341:13 344:1 350:16 351:11,23
355:13,20 356:6 357:3,20 359:9,
22 360:1,8,10,24 361:4,6,10,16
362:2,14 364:2,12,19,24 366:4
369:19

**timeframe** 14:24 16:15 23:7
43:19 60:4 93:12 105:5 106:24
108:11 131:19 134:2 139:11
149:23 151:25 158:17 174:1
196:12 197:5,18,24 205:9 211:18,
20 230:16 250:21 253:22 255:14,
15,16 256:2 262:7 302:1,5 303:7
317:5,11,13,17,19 322:6 329:10
331:20 341:6 357:23

**times** 16:11 24:20 27:7 61:8
68:10,11 102:21 121:24 128:7
138:25 139:1,5 142:2 144:6
186:4,16 190:7 206:19 209:12
215:15 216:3 221:19 226:1
228:22 229:20 234:5,6 235:9
236:4 248:19 258:3,22 262:6
264:11,24 265:8 288:5 290:22
299:21 321:11,25 353:22 358:24
366:3 367:17 368:1,2

**timid** 27:6,7,8

**timing** 81:5 133:16 179:24
340:10 357:1

**tip** 306:3

**tipped** 38:12,15

**title** 24:12 137:15

**today** 11:13 13:20 39:8,12 62:10
70:4 92:13,18,20 100:18 112:19,
24 113:8 140:14 143:1 164:7,23
169:22 183:13 184:11 186:5,17
187:25 189:9 190:8 191:16 192:2
193:16,22 214:3 226:17 228:12
230:25 234:6,9 248:8 249:7 278:8
289:2 294:24 296:7 298:4 303:19
311:7 315:17,18 323:16 333:22
335:8 360:13 366:6

**today's** 23:19 303:8 369:18

**together** 41:24 50:24 54:8 56:9
118:20 125:18 126:6 134:5
154:13 223:4 225:2,5 228:21
235:18 261:11 272:5 309:22

346:23

**told** 16:11 20:7 39:2,14 81:13
82:1,6,8,9 83:14 86:19 92:6 95:5,
6,13 99:20 101:3 104:16,21
105:6,14,20 106:7 108:4,12 110:8
113:19 128:21 132:4,5,6 134:14
142:22 147:1,5,23 148:8,13,18
157:3 160:12 179:18 191:13
199:7 204:20 205:18,22 206:4
208:9 232:2 240:24 242:4 250:2
252:6 253:12 254:12 257:23
262:8 264:5 272:4 294:10 295:6,
15 300:3,24 301:1,17 304:21
308:2,4 309:24 310:5,11,12
312:22 313:20 317:22,24 319:11
320:24 322:13,21 330:15 331:20
339:20,21,24 340:19,20 341:2,10,
15 343:10,15 344:15 348:6,17,18
349:14,24 350:5 351:2,6 356:18
359:6 361:2 366:16 368:16

**Tom** 18:13 71:23 275:3 284:5
286:17,18 367:17 368:10,21

**tone** 244:10

**tongue** 306:4

**Tony** 86:5,22 87:7

**took** 11:8 24:22 25:21,22,24 27:3
90:5 143:21 144:11 153:15 164:9
215:25 273:23 276:23 277:6,12,
17,21,23 278:3,6,8 280:23

**top** 13:5 62:16 101:17 111:2
116:1 127:17 229:23 250:19
255:2 274:19,22 279:22

**topic** 199:1 323:12,13 358:1

**topics** 138:9 221:9 223:6 225:13
228:13,14 239:2,4 240:5,11
241:22,23 255:6,8,11,12 256:20
257:20 340:25

**tossed** 185:12

**totally** 167:7 205:12 206:10
350:3

**tough** 184:19

**toward** 151:10

**track** 247:3

**train** 177:4,5

**trained** 176:24

training 144:15 177:23

transcript 172:25 244:2

transferable 137:21 138:6

transgender 268:4,11,18 269:4,
6,11,13,14,15 270:2,12,17,22
271:2

transition 69:2 138:14,17 350:9
351:7

transitioned 200:23

trapped 20:25

trauma 36:11 318:3

travel 345:2

treated 94:20,23 100:25 101:5

treater's 12:12,13

treaters 12:9,16

treatment 15:13 18:20,25 19:17,
23 20:8 23:17 24:5,9 25:2

tremendous 188:8

trial 34:5,9 45:23 47:23 92:6
143:21,23,24 144:1,5,9,12 285:13
286:22

trials 92:7

tricky 68:9

tried 19:17 29:13 38:19 41:11
56:8 71:14,19 78:1 134:23 234:7
296:20 329:12 330:22 352:3

trigger 234:19

troubling 61:24

true 90:7,8 95:16 107:5 109:10
112:3,4 157:19 178:21 189:2
287:16,17 302:22 348:2,5,20

truly 7:24 178:25 184:16

trust 188:14,16 350:1,5,10 351:2

truth 268:7 287:20 302:19

truthful 11:13,18 39:10,11,20
269:20

try 27:8,20,22 37:4 45:11,16
71:12 118:19,20 131:21 132:24
134:19,21,22 291:24 296:14
324:7,9 330:11

trying 8:19 17:15 22:3 23:13
28:20 37:17 38:1 39:2 42:2 59:4
60:21 61:20 66:10 76:24 77:7
82:8 84:20 86:19 89:11,12 92:19
105:22 124:18 131:1 133:23
145:18,21 148:11,13 160:2,6
161:1 165:11 167:1,13 174:19
181:5 182:3 200:12 201:4 202:2
229:11 233:10 235:5 238:20
241:11 242:2,10,16 245:7 246:13
252:24 256:1 259:22 266:1
274:11 285:23 290:13 295:8
311:8 313:16 314:11 317:17,20
318:23 319:5,10 321:7 323:23
325:23 326:4,20 327:21,22 328:3,
5,14,16,18 329:21 334:13,23
335:24 351:16 358:25 359:2

Tucciarone 306:6,23

Tuesday 330:10

turn 69:7 112:1 173:8 217:2
303:4

turnaround 150:16

turned 102:1 173:6,12,15,21,25
174:2,4,14,18,22 175:1,2,4

TV 171:2,3,12,19 172:6,9,15

TVS 171:17,22 172:12,18,20

twelve 114:24 115:1,3

Twenty 256:12

twice 221:6 363:14

two 22:5 24:20 32:4 49:21 52:6
64:7,10,11 65:13 67:7,9 76:4 77:6
86:5 91:4 94:9 118:22 129:24
143:8,12 191:24 199:14 202:4
216:18 234:5,6 242:19 258:5
280:6 290:22 326:25 327:4,10
334:18,20 336:14 338:10 344:15
353:6,8 355:9 360:10 361:19

Two-minute 358:3

type 13:11 98:9 121:2 137:14
138:4,24

types 21:23 127:4 137:17 171:16
172:18

typical 64:22

Typically 66:22

typo 71:14

U

Uh-hum 282:8 318:19

ultimately 84:17

ultrafilms.com 267:6,7

ultrafilms.com. 267:5

umbrella 107:11

unable 336:3

uncomfortable 104:16,19,25
105:7 152:8 209:13 225:7 257:18
258:13,18,23 259:8 294:11,21
295:1,6,13,19,23,24 296:2,10,11
299:23 322:14 339:1

under 107:11 145:3 169:4 217:5
218:14 250:2 362:19

undermines 164:17

understand 7:22 8:15,17,22 9:4,
9 12:7 20:24 21:5,8,12,13 34:9
44:8 48:16 49:4 57:5 63:13 68:1
75:24 76:24 88:9 93:17 94:8
104:5 116:23 122:16,17 124:15,
18 145:19,25 146:5 174:16 202:2
208:14 215:13 217:16 229:7
250:4 267:24 268:1 273:4 274:23
290:2 298:11 300:21 316:3
318:13 319:7 334:10 337:19
342:20 355:14 367:4

understanding 38:2 46:25 69:4,
10 93:20 95:7,19 96:23 97:12
117:6 118:6,12 119:9 125:6 127:5
145:4 148:1,6 149:7 163:19
165:20 166:2 177:21 194:20
200:16,17 264:4 268:10,14
298:15 300:14,18 306:13 317:10
319:3 332:23 349:2

understood 8:13,22 48:25 72:10
93:4 108:24 109:3 116:13,19,21
117:1,8,14,18,20 118:10 122:19
123:2 127:3 319:14

unfortunately 114:15

unhappy 81:19

union 137:3,4,17,25 297:10
298:10 312:2 314:18

unit 55:24,25 63:24

**unknown** 15:25

**unless** 6:20 65:12 78:5 117:2 132:10,19 241:13 335:12,18 346:11

**unlikely** 60:16

**unpack** 56:17

**unpacked** 56:18

**unpacking** 56:16 63:15

**unrealistic** 303:15

**unrelated** 317:12

**until** 43:10 83:6,11 93:7 185:22 190:2 199:7 302:9 330:10 354:3 366:23

**untrue** 298:24

**unusual** 358:16

**up** 6:4 8:6 12:20 13:17,19 23:18 25:18,22 28:6,15 30:9 33:10 34:4 45:3 53:13 57:17,19 58:19 60:1 62:3,16 65:2 68:14 71:13 78:20 96:7 100:23 103:24 110:12,13 113:25 116:24 118:13 120:6 123:3 131:1 132:8,19 133:5 137:18 138:8,11,16 139:14 142:24 154:16 156:23 168:11,25 169:2 194:7 198:22 199:3,8 203:25 204:4 210:2 220:7 226:20 236:17 237:1 238:9 253:17,21 256:6 257:10 279:18,22 290:7,14 296:17 297:6 324:15,23,25 326:13,14,20 330:25 331:5 332:5, 25 335:9 336:23 337:1 344:1 347:24 354:7 360:8 362:3,10 367:14

**updated** 58:17

**upon** 139:6 218:8 234:15 302:4 341:11

**upset** 106:16 109:19 213:6 222:16 255:7 259:24 261:23,24 263:3,8,21 264:8,14,18,24,25 302:17,24 332:3 349:16

**upsetting** 295:17

**us** 17:4 48:7 56:24 57:25 67:9 71:22 114:16 118:20 159:8 188:7, 19 226:22 249:1 277:11 285:1 295:9 320:2 331:17 351:16 365:5 366:5,13 367:8,10

**use** 7:16 8:4 9:21 27:19 62:25 107:20 121:4,25 123:4 124:4,6,21 125:16 127:19 154:2 183:3 191:13 204:19 205:1 280:14 363:10

**used** 55:24 67:19 68:19 71:11,16, 19 79:15 80:8 97:15 120:24 123:6 130:5 183:10 192:4,6 204:13 205:10 249:21 281:1 296:3

**uses** 205:3

**using** 69:14 71:9 131:21 194:14 205:11 214:18 250:23 253:1 294:25

**usually** 64:23

**UTI** 11:11

**V**

**vacation** 302:23,25

**vaccinated** 197:25

**vague** 48:24 156:13 166:25

**vaguely** 314:12

**varied** 138:24

**various** 55:6,8 58:8 64:6 85:11 86:10,17 122:25 126:7 182:19 297:2,4 319:25 320:3

**veer** 224:17

**Venn** 313:25

**verbal** 44:24 104:10 120:20 148:23,24 339:5

**verbally** 113:23

**verbatim** 270:19 271:6

**verified** 273:5

**verify** 266:23

**Verizon** 328:25

**verse** 112:5

**version** 161:21,23

**versus** 5:9 31:13 33:5 138:21 139:4 326:18

**very** 45:19 57:6 60:16 62:18 91:10 92:4 94:3 99:21 120:21 150:7 175:12 186:5 188:15 189:1 190:8,16 194:15 197:21 215:22 259:24 261:23 263:3,7,12 277:19 286:15 287:17 356:2 359:10 361:3 367:23

**via** 120:19 221:12,13 223:7,15 235:23 281:19 350:24,25

**video** 244:9,11,12,13 251:14 252:1

**videographer** 5:5,14 58:2,5 136:12,16 170:1,5 208:21,24 272:8,12 325:8,12 369:18

**videotaped** 5:7

**view** 121:1 125:4 273:11 283:24 309:13

**viewed** 147:23 189:25

**viewing** 244:22

**violate** 352:7 366:12

**violated** 294:8

**violating** 367:13 369:8

**Virginia** 368:23

**virtue** 188:24

**visible** 153:20,23

**vision** 116:20 117:2 118:3,8 120:7 121:8,13 122:13,16,19,24 123:11,20 124:19,22 170:15,18, 22,24 171:2,15 172:7,8

**visit** 22:7

**visual** 123:23

**visually** 71:16,18,19

**Viviano** 5:11

**voice** 30:14 40:11 210:4

**voicemail** 102:3

**voicing** 31:7,12 41:3

**volition** 184:22

**volume** 54:7

**voluminous** 360:20

**voluntarily** 118:12 122:20

**volunteered** 203:3

**vulnerabilities** 257:12

## W

**W-E-I-D-E-N-F-E-L-L-E-R**
94:13

**Wagenschutz** 166:10 305:8

**wait** 25:12 67:25 106:12 122:4
150:2 184:11 304:5 354:10
368:10

**waited** 24:15 127:15

**waiting** 354:7

**waiver** 156:15

**waiving** 48:25

**walk** 121:1,4

**walked** 250:17 251:7 252:23
280:8,11,15

**walking** 136:10 279:15 281:13,
14 284:3 288:3,10,15

**walks** 121:11

**wall** 327:23

**want** 9:9,12 13:15 16:5 17:8
18:14 19:6 20:25 21:19 22:16
23:2 33:4 34:8 35:8,11 42:9 44:5
45:11 48:14,15,19 53:24 57:25
59:8 67:25 72:23 75:23 84:7
85:20 92:17 100:1 112:5,10,25
115:10,14 131:8,13 134:14 148:4
150:5 152:7 159:8 160:9 164:25
167:12 174:20 175:6 176:7 179:5
181:24 185:25 186:25 187:18
194:9,10,15 196:6,25 202:4
207:21 208:4 209:9 215:16
216:17,21 217:24 218:5,24 219:5,
9,11,13,23 231:20 233:7,8 236:4
237:6 242:19 245:3,4 248:12,15
256:7 273:2 276:4 282:4,13
285:4,13 286:22,23 291:1 295:9
297:23 298:1 299:14 302:3
313:22 315:10 316:3 320:13,21
323:24 324:2,3 329:7 342:17
345:13,16,17 346:21 348:13,17,
19 349:6 355:2 362:9,11 364:10,
12 365:19

**wanted** 38:24 56:15 62:3 63:9
75:14 80:6 102:12 116:9,16
118:7,19 132:15,24 133:3 140:8
145:13 149:13,21 150:1 171:12

176:10 180:9,15,22,23,25 181:3
202:23,24 206:18 242:9 260:23
261:10 264:13 266:13,23 310:18
329:5 331:15,16 336:21 347:25
348:21 349:10,14,18,19,20

**wanting** 118:21 129:23 135:10
142:5 221:25 223:11 242:10
255:3 263:1 264:12 301:23

**wants** 257:24 299:4

**warmth** 299:3

**warn** 17:12

**warning** 51:20 358:3

**was** 6:8 11:8,10,22 12:8,11,13,
14,19 13:6,8,18,21,23,25 14:7,9,
11,13,20,23 15:6,7,24 16:10,13,
14,21,24 18:7,10 20:15 22:19,20,
25 23:23 24:2,7,8,10,11,12,16,24,
25 25:4,6,11,18 26:5,7 27:4 28:16
29:4,14,19 30:1,7,9,11,18,20
31:21 32:22 33:2,7,8 34:4,6,15,
16,17,18 36:18,19 37:1,2,5,7,8,9,
10,13,17,21,24 38:1,4,17,18,23
39:10,11,15,16,24 40:12,13 41:6
44:11 45:18,19 46:7,19,22,23,24
47:1 52:16 56:14 58:3 59:25
60:14 61:25 62:2,5 65:1,7,9,12,22
66:7,14,15,25 67:3,5,6,9,16 68:9,
13,19,22 70:8,19 71:17 72:13
77:24,25 78:13,15 79:5,19,21,25
80:7,12,17 81:5,13,14 82:4,5,7,
10,11,17 83:3,5 84:15 85:6,19
86:5,24 87:4,13,23 88:1,4,6,12,
18,22,24 89:9,17,20,21 90:8 91:4,
17 93:9,20 94:1,3,6,25 96:18,23,
24,25 97:4,8,9,12,13,15,18,21
98:18 99:1,16,21 100:10,14
101:11,12,13 102:7,8,11,15,22
103:7,8,10,17,20,23 104:2,7,9,10,
11,12,17,18 105:15,16,21 106:9,
12,14,17,18,21,22 107:5,25
108:8,22 109:18,19,24 110:25
115:19,24 116:17,21 117:5,17,23
118:6,9,12 119:2,9,10,12 120:4,9,
20 121:13,24 122:2,11,13,14,23,
24,25 123:12,20 124:2 125:22
126:1,9 127:1,2,5,6,9,10,12,13,
16,17 128:5,20,22 129:13,18,23
130:21,24,25 131:17,20,21,22,24
132:13,14,25 133:2,5,10,11,20,
21,23 134:3 135:6 136:1,14
137:6,8,9,13,15,25 138:6,11,14,

21,25 139:1,9,10,11,12,16,18
140:6,7,9,10,16,17,20 141:11,14,
23 142:1,8,9,10,16,22,23,24
143:16,24 144:6,12,21,24 145:3,
5,6,8,19,21 146:16,23 147:9
148:1,10,16,19,21,23 149:1,7,14,
25 150:4,9 151:10,14,15,16
152:1,14,16,18,19,20 153:14,15,
17,23 154:5,7,18 155:2 156:18
157:4,23 158:1 160:17,18 161:2
162:22,25 164:1,10 165:4,6,8,9,
12,13,20,23 166:3,10,14 169:5
170:3,14 171:7 173:2,10,14
175:7,21 176:6,9,15,18 177:1,4,5,
12,19,21 179:16,17 180:5,17
181:9,15,20 184:24,25 185:1,11
187:23 189:14,18 191:8 192:14
193:9,11 194:21,24 195:5,6,11,
12,25 196:10,13,15,18,24 197:22,
23,25 198:1,7,10 199:11,12,13,
15,19 200:1,2,7,17,20,21,22
201:3,23 202:5 204:12,13,14,20,
21 207:7,10 208:8,11,22 209:14
210:24 211:6,11,18,24,25 212:12,
15,20,22 213:2,3 214:18 215:5,24
218:3 219:15,19,25 220:7 221:18,
20 223:1 224:15 227:14 228:5,9,
22 229:15,18 231:24,25 232:2,3,
4,8,11,18,25 233:1,2,6 234:2,3,
16,21 235:21 237:1,14 240:20
241:16,21 242:14,15,16,18
243:22,24 244:1,3,6,7,16 245:7,
15,20 249:5 250:10,20,23 251:1,
2,3,8,10,11,16,17,22 252:1,4,7,8,
9 253:4,5,24 254:7 255:4 258:9,
17 259:5,8,16,17,19,23,24 260:6,
12,24,25 261:2,16,18 262:1,9,11,
14,20,23 263:7,9,12,15,21,23
264:1,3,7,8,12,14 267:24 269:3
270:6,15 272:5,10 273:14,24
274:12,17 276:5 279:12,13
280:17,18 281:13 283:6 287:13
288:3 289:12,14,17,25 291:21
292:11,13,14,16 294:10 295:13,
16,17,24 296:9,12,15,17,21
297:3,22 298:19,21,23 299:8,9,
18,20,21 300:8,11,13 301:5,10,
11,17,22,24 302:1,2,4,17,24
303:1,3 304:5,13,17 305:1,3
306:3,4 307:19 308:15,20 309:3,
5,6,17,20 310:21 312:13,15,16,22
313:6,8,9,10,11,14 314:1,8
315:14,20 316:13 317:2,4,5,11,
12,13,22,25 318:5,8,13,17 321:1

322:2,21 323:4 325:10,15,21,23
326:5,6,12,13,23,24 327:3,6,18,
21,22 328:2,5,6,7,9,10,15,16,18
329:17,24 330:12,13,15 331:1,9
332:4,6,7,9,10,16,19,24 333:14,
18 334:8,9 335:15,23 336:2,12,
15,20,21 337:9,15 338:2,25
339:17,18,21 340:6,10,17,23
341:1,18,23 342:2,21 343:9,11,
19,21 344:5,7 345:21 346:4,5
347:16,19 348:6 350:7,8,17,18
351:6,11,16,18 352:12,14,24
353:1,6,8,17,25 354:13,18,25
355:9,12 356:3,4,5,14,16,25
357:1,25 358:1,12,13,22,24,25
359:1,2 360:3 362:4,7 367:5,21
368:4

**wasn't** 33:5 34:20 42:25 44:17
47:17 60:17 62:4 68:11 69:16
75:13 81:24 90:7 98:17 117:11,
17,20 119:13 127:7,9 128:23
134:7,15 144:6 145:18 149:8,15
157:5 163:19 174:2 175:17 191:1,
6 196:13 209:22 243:13 252:16,
24 264:5 273:25 274:16 280:19
289:15,20 290:10 292:12 299:9
302:19 304:14,15 307:17 308:14,
24 314:7 316:14 319:1,13 321:8
328:4 351:15,16 356:1 361:21

**waste** 279:24 287:8

**wasting** 17:14 286:11 287:3,4

**watch** 205:15

**watched** 125:10 252:10

**watching** 223:13 243:5,18
244:20 245:20 250:18 252:20
254:7

**water** 114:15

**way** 32:14 35:7 41:20 48:10,19
51:1 53:14 78:14 101:24 106:10
120:17 128:2 132:1 149:14
152:10,15 163:9,11 182:25
189:23 192:7 200:24 205:16
209:18,19 221:22 223:9 224:1,3
239:17 288:16 314:17 316:19
320:11 333:2,8 338:12

**ways** 146:1 204:15 258:22

**we'll** 114:25 127:19 156:22
287:22,25 293:22 325:2 361:12

**we're** 14:24 21:19 22:3,17 23:12,
13 45:3 53:13 65:24 74:8 77:12
99:25 105:5 129:25 176:3 209:6
210:6 234:5 245:8 246:13 247:15
249:12 256:6 271:4 284:12
285:25 296:5 299:2,14 325:1,6
327:18 339:6 354:7 365:1,12,22
368:8

**we've** 6:12 33:10 41:11 57:12
63:25 66:3 214:12 215:9 246:8
247:4 278:13 292:11,15 324:11
333:12 340:17 366:16

**weaponized** 343:9

**wearing** 246:18 281:21

**website** 96:1

**Wednesday** 5:1,6 329:25
330:15,19

**week** 62:5 329:24,25 330:16
331:10 334:10

**weekend** 76:18 183:21

**weeks** 22:6 63:4

**Weidenfeller** 94:13

**Weiner** 280:3 288:21,22

**welcome** 153:1 342:9

**well** 5:21 12:16 18:2 19:16 21:25
28:18 29:23 37:8 42:10 43:19
44:15 52:5 63:20 69:14 72:2,3
73:22 88:11 90:21,23 94:16,21,23
95:15 102:2 105:13 106:6,17
107:15 109:4,10 114:14 125:15
127:1,4,12 139:19 144:10 145:18
148:10 150:14 161:4,25 162:1,18,
19,23 163:10 167:1,11 168:9
173:13 177:16 179:14 191:12,16
195:7,14 196:2,6,13 197:24 199:2
201:15 203:1,13 206:19 210:3
212:18 214:12 218:7 222:13
228:3 229:4 230:14 232:16 233:6,
19 234:19 237:25 245:6 247:5
249:24 255:19 259:1 260:21
262:8 263:23 265:8,12,20 267:11
269:13,15,18 274:24 279:3
280:13 281:15 290:7 295:2,15
296:13 298:17 301:22 303:12
313:16 316:20 318:25 320:13
322:8 326:8 331:1,12 332:21
333:6 340:15 343:23 345:2,7,12,
25 346:16,21 348:20 350:4

351:14,15 353:7 354:9 355:17
357:9 360:7 361:17,20,22

**well-recognized** 176:15

**Wellman** 5:13

**wells** 152:22

**went** 13:4 23:20 32:1 34:4,5
42:10 93:10 103:17 121:21
122:15 142:3 143:23 145:3
154:14 156:10 173:18 174:24
177:16,21 193:6,8 209:15 214:13
215:25 216:3,11 249:3 259:3
273:23 279:14 280:6 290:10,23
294:16 320:17 343:10 360:4

**were** 7:9 8:18 11:25 12:16 13:7,9,
24 16:23 20:7 22:13 24:19 28:9,
19,21 29:9,16,24 30:5,9,13,14,17
31:16 32:9 33:13,20 34:5,6,10,16,
18,19,20 35:4 36:4,24 38:23 40:4
41:1 43:13 46:15 53:2 60:10,14,
17 61:6,24 64:7,19,21,25 65:3,11
66:22 67:1 71:1,11 72:19 73:5
78:12,22 80:15 81:18,19 82:2,5
85:4,11 86:10,23 88:2,7 91:7
93:23 94:23 95:1 98:4 100:25
101:5 102:10 103:21 104:24
106:8 107:22 108:1 118:3 119:5,
14 120:2 126:6,20 128:8 129:14
130:22 131:16 137:21 139:3
142:2,18 143:8 144:3,5,19,20
145:13 146:1,7,14,25 147:3
148:8,14,18 151:19 153:16
154:10,13,23,24 155:12,15,18
156:3,4 160:6,19 162:14 163:8
164:3 167:11 168:18 170:8,10,12,
13,21 173:10 175:8,14,16 176:8,
17,21 177:18 178:2,6 179:13
180:3,22 186:10,11 187:25 191:3,
18 192:24 194:5 195:11 196:8
198:6 200:4,8,13,23,24 201:1,2,
23 202:5,11,13 203:20 206:24
209:3,12,13,18 210:4 211:17
212:4,5,13 213:4,6,8 214:18
218:12 223:24 225:13 226:10
231:7,24 232:8 235:15 236:3,10
237:5,21,23 238:4,14,23 239:3
241:21 242:5,24 243:3,11 244:4
245:13 251:5 257:5,20 258:5,8
262:4,5,6,23 263:16 269:25
272:15 274:2 278:11,21,25 281:9,
10 282:5,6,9,10,16 293:16 294:3,
8,21 295:6 296:10,11 297:11,19

298:2,5 299:16 300:2 301:7 310:1
312:3,5 313:5,19 314:10 316:17
318:1 319:8,11,17,20 320:5
325:25 326:9,11,25 327:3,17,19
329:21 330:11 331:1 332:15
333:24 334:16,18 335:21 337:19
338:8 339:8 340:4,21 341:5
343:17 344:16,24,25 347:4,11
351:6,12 352:18 353:4,7,22
356:24 357:10,13,14,23 358:6,14,
16,19,20 359:8,25 360:14,23
362:14 364:22,23

**weren't** 69:14 94:20 99:4 125:18,
20 146:25 175:13 176:16 198:2
226:21 234:1 300:9 319:18 358:6

**what** 6:15,25 8:14,19 9:10 11:10
12:6,8,12,13,24,25 13:21,25 18:1
22:24 23:7,23 24:12,23 25:17
26:9,19 27:18 28:25 29:19,24,25
36:8,18,19,25 37:7,21 38:17,22
39:2,14,18 40:15 48:22 49:6 51:2,
6 52:11,18,20 53:4,17 54:12 61:9,
13 62:24 63:14 66:20 69:21,25
72:10 75:8,10 78:11 79:10,14
81:2,7,12 82:5,20,21 83:20,21,23
84:7,8,10,25 85:10,15 86:9,12,13,
18,24 87:1,2,17 88:4,9,11,14,15,
24 89:4 90:10,16,24,25 91:12,13,
24 93:18 94:18 95:5,6,18 96:10,
14 97:8 98:9 99:1 100:14 101:11,
13 102:9 103:2,7 104:15,17,18
105:5,14,15,19,20 106:6 107:2,24
108:20 109:16,23 113:2 116:23
118:15,18 119:24 121:10 122:21,
23 123:14 124:4,15,18 126:18,23
128:3,4,11 131:6,10 134:21
135:9,23,25 137:20 138:5,20,24
140:5,24 141:8,23 142:7,14
144:20,24 145:6,23 146:2,15,22,
23 147:9 149:23 150:6,11 151:25
152:5,22 154:2 155:13,18,20
160:17 161:8 162:12,21,25
163:16,22 165:5,17 166:22 167:9
168:10 171:1,7,9,11 172:1,6,12
173:8,15 174:13,16 175:2,21
176:6 179:9,13 180:7 183:6
185:12 186:12,19 189:2,3 190:2,
23 191:11,18 192:12 196:20
199:10,12,15,19,22,25 200:6,9,13
201:22,23,25 202:5,8,10,16 203:6
208:7,8,11 211:9 212:10,22
213:4,24 214:3 215:16 216:19,23
217:21 220:4,7,12,13,21 224:6,15

226:4,10,15 227:17,19,24 228:5,
15 229:6,10,12 231:5,23,24 234:9
235:7,22,24 236:5,7 239:6 240:2,
9,20 241:24 242:3,7,14,15,17,19,
21 245:6,14 246:11,12 247:3,10
250:23 251:12,15,17,19,22 252:5,
7,11 254:5,11 255:3,11,14
256:20,25 257:4,5 258:3,4 259:1,
5,7 260:1 261:15,21 262:7 263:6,
16 264:5 265:4,18 267:9 268:9,15
270:7,13,20 271:11,12 274:23
276:2 278:14,16 286:1 287:10
289:22 290:1,2,10,11,23 291:9,
21,25 294:6,25 295:6 296:23
297:4 298:1,5,23 300:7,12,17
301:2,9 302:5,13,21 303:9,23
304:13,16 305:2,3 306:16 307:19
308:9,19 309:2,7,13,18 311:1,10
312:12,19 314:6,10 315:16,18,19,
20 317:1 318:8,11,23,24 319:3,9,
11 320:4,21,25 321:16,25 322:1
323:6,19,21,22 326:2,3 329:5,17,
20 330:5,13,17,20,22 331:12
332:2 334:6,24,25 335:2,7
336:11,19,20 337:8,15,17 338:13
340:3,15,24 341:2,9,10,14,19
342:17 343:2 344:1 345:4 346:4,
10,14,22 348:6,11 349:5,7 351:19
352:10,16 356:23 357:4,6,25
358:21,23 359:15 360:25 361:14,
17,22 363:2,11 364:3,25 365:1
366:7 367:4 368:25 369:10

**what's** 7:6 10:15 41:3,13 94:11
110:18 141:6 195:17 200:11
201:6 202:3 220:10 239:12,19
257:15 265:21 283:4 286:2
288:19 322:6 325:3 332:15
346:13

**whatever** 10:20 29:9 57:12,22
78:22 95:4 99:5 104:23 121:5
206:18 220:19 247:22,24 276:4

**when** 7:9,17 8:3,8 14:9,12,21
16:3,12,13,14 21:17 24:23 27:4
30:6,7,9,17 31:25 34:7 35:3,16
37:4 38:5,24 39:5,15,23 41:3,20
43:13,19,21 45:7,10 54:7,12
56:13 58:18,19 59:23 60:1,10,13,
17 63:15 64:19 68:15 69:2 72:18
77:23 78:1 80:25 82:10 83:4,8
84:3,14 88:7 93:11,22 97:2,23
98:18 100:9 102:22 103:1,13
111:4 115:13 116:4,10,13 117:8
120:2,9 121:3,19 123:9 125:7,17,

22,23,24,25 126:3,9,23 127:14
131:1,16,20 133:25 135:16,21,22
137:12 142:22,23 144:3,20 145:3
147:1 148:21 149:23 150:8 151:2,
11,22 152:6 158:18 159:23
160:14 162:14 164:21 170:12
173:10,21,22,25 174:1 177:1,21,
24 178:3,5 179:15 182:17,18,22
187:23 189:16,17 190:10 192:8,
17 193:11,14,20,25 194:1 195:6,
21,22 196:9,10 197:1,3,25 198:3,
7 201:4 203:25 204:4,18,23,25
205:7 209:2,5,13 210:15,19,21
211:7,16 212:5,6 213:2 214:18
221:18,20 224:24 225:4 227:4,11
229:1,13,14,15 230:12,15,16,19
231:7,8,14 232:8,25 233:4,6,19,
20 234:7,15 235:9,12 236:5
237:5,20 238:3,10 240:22 241:6
243:5,18 244:20 246:24 250:16
251:5,12,18,20 253:4,17,18,20,
21,24 255:7,23 257:8,13 258:12,
13,15,17 259:4,15,19 260:4
261:19 262:1,3,6,9 263:23,24
264:24 266:13 269:20 273:5
274:10 282:22 286:3 289:12
294:3,8,12,14,20 295:6,11
296:13,18,20 297:2,19,21 298:2,9
299:9,21 302:1,25 310:1 313:5
316:17 317:3 321:11 322:13
323:23 325:24 326:2,4,5,11,12,21
329:11,21 330:4,22 334:1,3,8
335:23 337:4 340:10 342:6
347:12 350:5,7,10,18 352:12
353:4 355:25 360:18,24 367:21

**whenever** 195:23 196:15 296:13

**where** 7:20 8:3 18:25 22:4,6 29:8
44:12 46:15,16 53:11,12,16,22,25
54:2,4,7 55:1,8,15,20 56:6 62:9
76:15 77:9 84:6,9 86:14,25 95:13,
18 96:25 97:14 122:20 129:13
154:9 159:11 160:18 162:5,10
192:18 193:22 198:6 215:24
222:23 231:24 236:21 237:8,9
247:6 251:1,5,9 273:21 281:21
282:2 288:4 289:6 290:3 295:12
305:10 325:18 327:18 331:8
357:18

**where's** 70:21

**whereupon** 20:15 58:3 104:7
136:14 141:14 156:18 170:3
180:17 181:15 208:22 272:10

273:14 283:6 325:10 354:25

**wherever** 62:18 329:25

**whether** 22:22 26:12 34:11 39:17
41:8 46:15 51:25 52:7,8 54:25
56:3 74:18 76:2 77:15 80:22
86:14,22 95:1 96:18,19 110:2
112:21 125:4 156:1 161:2 162:19
177:12 180:21 188:9 199:15
201:1 205:12 206:11 212:4,12
220:14,15 221:12 236:6 259:16,
17 260:24 265:6 279:24 284:20,
24 285:11,12,24 286:21 292:14,
15 293:18 313:6 316:7,13 320:17
333:3 338:2 349:17 355:9 359:11

**which** 5:16 14:20 23:4,9 25:6
38:23 53:3 56:13,22 59:19 63:19
64:20 66:7 70:13 75:24 76:25
92:6 101:15 103:25 104:12
111:15 114:15 143:5 158:6,24
161:14 168:10 174:15 178:13
184:15 186:13 191:2,3 192:5
194:11 202:19 211:11 213:7
216:19 222:20 225:21 230:24
231:1,17 233:19 236:19,24
241:21,23 243:3 248:10 273:8
276:19 278:19 280:7 281:20
282:13 285:12 290:9 314:19
324:24 331:6 334:15 336:14
340:22 344:10 358:16 362:13

**while** 13:6 14:23 22:13 68:20
69:7 70:3 120:4 133:2 148:14,18,
19 154:10 155:4 163:8 215:17
216:16,22 271:25 298:5 342:10

**whispering** 227:5

**Whitelaw** 37:16

**who** 5:20 6:4 7:2 14:14,15,17,21
20:7 28:21 29:4,7,9 30:9,18 34:12
38:12 41:19 43:1,22 44:11,24
45:21,25 46:3,7,8,9 48:10 49:1,
11,14 50:14,20 64:21 65:5 82:1,7
85:3 86:3 89:16 90:5 91:7,15 92:2
94:1,6 98:16,20 99:16,17 127:7
129:21 130:3,14,20 134:24
147:23 148:8 154:23 155:5
163:10 166:7 175:11 180:5
188:15 189:2 196:22 199:1
220:11,16 224:19 227:6 247:12
253:11 261:2 269:24 279:6,20
280:2,11 288:22 290:18 293:21
297:11 304:21 305:17 306:11,21

307:9 311:15 312:1,5,7 317:22
322:17 323:10 337:9 338:8
339:17 343:21 344:5,25 345:20
348:9 356:7

**who's** 10:12 222:12,13 363:10

**whole** 210:4 279:14 290:8

**whom** 5:16 9:16,18 199:1 298:9
303:11 348:7

**whose** 45:23 96:5

**why** 24:5 25:8 37:5 40:25 52:16
57:7 73:9 80:4 84:18 93:20 102:9,
25 106:12,18 109:20 112:16
114:7 123:25 124:6 125:4 127:25
145:8 149:8,12 150:1,5 160:6,10,
11 173:1,4 175:6 176:6 194:11
202:1,22 203:1 207:6 237:11,18
238:25 249:9 255:25 272:16
279:10 280:4,14 287:8 288:5,9,14
293:17 322:12 324:24 329:5
332:5,12,24 333:4 345:21 347:20
349:8 367:25

**willing** 46:25 86:23 147:3 148:4
149:1 177:5 264:5 265:2

**window** 194:24 195:1 211:1
230:14

**winter** 262:16

**wish** 166:20

**wished** 187:24

**within** 8:13 215:4

**without** 100:21 106:23,24 113:11
121:20 129:16 155:8 161:22
166:3 186:18 191:10 207:11
208:15 246:5 283:17 303:21
319:22 365:6

**witness** 5:17 6:11 8:14,18,25
16:6,19 19:6,16 20:5,12,17,24
24:20,21,22 26:15 28:5,25 31:20
35:16,21,23 41:15 42:18 54:10,18
55:6,12 56:13 57:5 62:2 70:7,15
72:6,16,23 73:2,13 74:3,10,12
75:22 76:6,9,13 77:23 79:5 84:13
85:17,22 88:11,16,22 91:3 95:11,
15,21 96:22 98:23 99:8,20,24
100:4 101:3 103:5 104:9 105:2,22
106:2 107:23 109:3 110:8 111:15
114:9,14,20 115:1,3 117:5,14,20,
25 118:5 119:1,18 120:16,24

123:16 124:9,15 128:17 129:2,8,
18 132:23 134:13 135:1,8,20,23,
25 136:22 137:8,12 139:25 142:2,
8 144:7,9,11,19 146:5,12,20
147:19 149:10 150:22 155:11
157:16,24 158:8 167:21 168:2
169:3 171:7 175:17,20,25 176:4,
8,18 177:11 178:14 179:11
180:14,19 181:19,24 182:4,11
183:25 185:7,8 186:24 187:4,7,
10,13,15 199:6 202:18 203:24
206:1 208:7 216:9 217:18 218:22
219:6,9,19 220:24 221:5,8,11
222:9,13,25 223:3,13,18 225:7
228:7,11,18 231:16 233:15 235:3
243:13,15,17 244:6,19 245:4,6
246:1 248:9,14 249:19,24 250:4
256:8 267:14 268:16 269:24
270:10,20 271:4,11 272:3 273:17
274:6,15,22 275:6 278:2 282:13
283:4 289:9 291:7,14 293:4 301:6
306:3 314:23 315:2,5 316:1,5
317:8 320:10,13,16,24 321:6,10
324:4,7,10,15 332:23 334:22
338:6,16,24 339:10 340:10
341:25 342:2,5,7,13 345:9,12,16,
23 347:9,18 349:2 351:21 352:22
353:12,24 354:7,18 355:4,12
359:25 363:2 368:14

**witnesses** 20:7

**woman** 9:2 223:15 246:18
251:16,24 279:8 288:22

**women** 31:8,13 94:20,25 96:12,
20 97:25 100:25 101:5 102:17
103:3 269:17

**won't** 106:10 201:14 255:7
298:17

**wondered** 109:20

**wonderful** 156:25

**Woohoo** 179:7

**word** 54:3 58:14 59:16,22 64:2
97:15 107:20 187:11,17 188:12
189:3,5 192:4,13 194:14 244:1,5,
8 295:1 296:3 356:16

**worded** 145:15

**wording** 6:21

**words** 79:15 80:8 87:9 142:17
157:12 249:21 263:16,20 348:15

**work**  28:6 52:3,5,7 64:20 65:5
66:9,23 67:1 80:19 81:24 86:12,
24 87:5,15,23,24 89:9,15 90:17,
19,20 93:18 99:1 100:15 102:17
103:11 132:8,10 133:14 134:9
136:19 137:6,9,20,22 138:5,6,20,
24 139:4 140:1 142:23 143:3
144:25 145:3 146:16 152:7,12
156:10 157:5 159:8 163:21
164:15 166:18 171:17,22 175:10,
13 176:17,19,25 177:4,5,17 181:2
206:10 207:15 236:17 240:23
243:18 255:6 260:3 263:11 265:4
271:19 276:4 282:19,20 298:18
300:10 302:3 310:2 311:4,5,13
312:16,23 313:7,8,9,21 314:2
316:7,12,14 317:20 318:4,10
319:2,13,18 321:9,12 323:13
339:15 340:21,23 342:23 343:5,6
347:4,16 349:9 357:14,16,21
359:13 360:5

**work-related**  45:8 206:20,21
207:20 208:2

**workable**  256:10

**worked**  13:22 22:14 23:10 50:23
70:3 121:12 125:17,23,25 126:7
127:16 143:14 230:24 255:17,19
271:22

**worker's**  33:8,12

**working**  12:10 14:19,25 15:16
19:2 21:17 22:13 23:9 29:2 30:24
31:5 43:21 92:10 93:21 126:6
140:6,19 150:8 151:9,14 177:2
181:1 206:9 238:3 264:15 319:23
350:8 358:14

**workload**  139:3 150:24

**workplace**  61:23 65:21 77:2

**works**  69:20 74:13 91:10 98:25
286:11

**world**  138:2 186:3,15 188:21
190:6

**worry**  106:8

**worse**  122:14,25 123:11 294:17

**worsened**  122:19 294:15

**worth**  61:25

**would**  10:8,10 11:19 12:4 13:6,
17,18 14:3,4 15:8,17 16:4,7,9,10,
17 18:25 19:10,12 20:11,18 21:15
23:10,24 26:8,12,20 27:6,8,10,18
29:3,6,11,13,14 30:11,16,23
32:21 34:14 35:2,24 39:12 40:15
42:8 45:16 46:19 47:21 48:1,4
50:17 52:16 58:16,21,22,23,24
59:9,13,17,18 60:6,7,16,23 61:11,
12,13,16,17,21 62:2,4,11,23 66:3,
9,18,22 67:8,12 68:10,23,24
69:17 73:9,17,18 74:5,14 78:21
79:16 80:1,9,11 81:1,10,20,21,23
82:16,23 83:16,19,20 84:1,19,20
85:1,2,6,9 86:4,12,13,14,21
87:24,25 88:1,3,5,9 90:1,2,12,13,
14,17 92:14,15,23 93:8 95:11,14
99:13 101:18,21 102:25 103:10,
15 104:16,20 105:2,4,6 106:13
107:13,23 113:24 118:22 119:7,
22,24 120:16,25 121:1,25 122:10
123:4,22 124:6 125:16,19 126:5
127:5 128:5,18,20 129:10,15
130:1,8 131:8 132:8,9,12 137:18,
24 138:8,9,12,13,15 139:8,10,11,
20,23,25 142:4 143:5,20 144:25
145:1,4,15 146:2 147:1 148:3,24
149:18 150:9 151:3,8,9,12 152:9,
10,11 162:23 163:14,17,20
164:15,19 165:5,24 167:17 169:3,
18 170:23 171:3,14 174:2 175:7,
18 177:7,12,22,25 178:24 179:22
180:10 181:6 182:5 183:6 187:24,
25 188:16 190:13 191:11 193:18
195:8 197:4 199:4 200:15,19
201:11,15 204:19 205:1 207:6
209:14 213:2 220:8 224:4 225:14
229:6,12 236:14,15,23 237:2,8,9,
11,17 239:11 243:9 244:23,24
247:20 248:9,23 249:1,15 253:12
258:24 260:7,15 262:5 263:9
265:5,18 268:13,24 270:1 271:11
282:24 296:14 298:19,20 299:19
300:4 301:15 302:11,15,17,18,19
303:23,25 304:1,22 311:2 313:24
314:4,15 321:11 323:5,24 324:15
328:1,25 329:8,13 330:1,14,20,25
331:21 335:7 337:3,6,8,12 344:20
345:2,3 347:4,22 348:14,15 349:1
350:1,5,10,17,24 351:2 353:14
358:16,17,24 362:22 363:19
367:18 368:4

**wouldn't**  36:9 47:18 50:18 58:15,
17 61:11 62:6 64:11 73:15 124:12
131:13 172:19 189:24 198:4
233:24 234:12 237:16,18 249:23

250:9 261:19,24 286:14 295:18
296:18 328:7 350:24

**wrap**  8:6 203:25 204:4

**write**  53:18,19,20,23 61:8 62:3,4
63:6 124:25 158:25 184:20,22
190:16 291:15

**writes**  159:6 185:21,24 186:2

**writing**  19:13 46:16 62:6 79:19
80:2 87:25 140:11 148:23 217:12
248:10

**writings**  54:4 77:9,14 78:2,8

**written**  42:24 43:3,5,6,8,9,12
44:4,6,17 49:20,23 50:1,6,9 54:2
59:9,12,17 60:6,21,23 61:16 66:2
83:5 85:22 125:2 193:18 194:9,
12,19 339:2 360:3

**wrong**  106:16 109:18 202:3
207:7,10,13 337:8,13 361:12
365:7

**wrote**  58:14,19 60:1 63:9 92:23
110:24 125:15 178:21 186:8,9,14
193:23

---

**X**

**Xanax**  14:8,11,12,20 15:5 16:1,
13 25:17,20,24

**XYZ**  351:22

---

**Y**

**ya'll**  136:11

**ya'll's**  276:11

**yeah**  18:15 27:3 28:24 29:18 31:2
33:1 38:11 39:3,23 42:7 46:22
60:14,21 66:5,14 69:6,17 75:11
83:22 86:2,8,18 87:12 90:23
92:19 99:24 114:9 120:3 130:17
131:13 146:7 170:18 172:10
173:13 175:20 193:19 195:16
198:17 199:22 203:9 210:10
239:11 255:22 273:7 285:23
288:17 289:19 318:15 324:7
326:19 345:8 353:8 356:21

**year**  27:5 29:16,17 111:5 139:4,
11 204:21 238:8,12,15,18

**years** 13:1 14:24 15:7,8 32:5
33:13,21 35:22 36:2 80:10 117:9
120:8 133:6 151:5 167:1 177:19,
24 204:20 238:19 249:12 263:17
303:18

**yep** 63:16 74:12 167:8 170:12
281:5 298:3 305:10 316:4

**yes** 12:2 13:8 16:19 21:6,8,11
29:5,14 30:12,16,23 31:13,25
32:8,11,19 33:4,16,19,23 34:23
35:2,9,21,23,24 36:7 37:25 38:4,8
40:3,6,10,14,20 41:10,16 43:17
45:1,16 46:2 47:7 49:22 50:8,12,
13 55:19,22,24 56:2,6 61:15
64:16,24 67:19 69:10 70:9,19
71:2,5,8,20 75:21 81:16 83:8,12
97:22 98:2 108:6,17 115:18
116:3,8,12 117:14 119:16 120:11
126:15,17,19 128:25 129:7
131:24 132:3 133:7 139:18
140:21 141:21 143:11,15,23
144:4 145:11 146:20 147:6,8
151:7 153:15 154:15 155:3 157:9
158:15 159:15 160:5 161:10,23
162:4,18 163:4,9 164:14 170:9,
11,14 171:10 176:23 178:5 179:3
184:13,21,23,25 185:3 186:11
187:6 192:10,24 193:5 196:17
197:13 198:18,23 199:24 202:1,7,
9 204:4 211:9 213:3 214:20
215:13 224:8,12,14 225:18 226:8
227:10,18 228:21 229:6 232:23
233:25 234:9,12,13 235:16
237:23 239:10 241:15 243:2
246:16 250:5 252:20 253:10
254:10 258:11,15 262:24 263:5
267:3,8,20 268:8 270:5 271:5
278:12 281:5,25 284:2 288:7,17
291:18,20 292:22,25 293:11
296:13,20 301:1,14 302:9 306:20,
23 307:1,5 308:2,4,8,12 309:25
311:4,7,9 313:10,14 314:25
318:23 319:7,20 322:5 323:14
325:20,22 326:5,9 327:11 328:25
330:15 332:11 334:12 335:11,17,
20,25 336:3,10 342:5,15 347:9
351:5,8 352:9 353:20 356:6
365:24 369:15

**yesterday** 9:17 186:5,17 190:8

**yet** 63:17 77:19,21 161:16 285:16
290:9 315:1,3

**you'd** 222:24 286:10 307:24
341:14

**you'll** 18:6 286:3

**you're** 7:12,20,22 8:3,14 9:1,2
12:12 14:11 19:4 20:21 21:9 28:1,
14 29:8,12,23 40:18,19 41:1
43:20 51:24 52:15 53:1 54:12
57:17 61:14 66:9 73:25 75:10
77:5 80:12 103:1 108:14 112:20
114:18 118:5 121:22 125:3 128:4
133:12,13,18 141:18 147:16
153:1 155:24 156:1 159:22
160:24 162:22 164:3,9 167:9,25
174:16 179:6,16,23 180:9 184:19
186:20 187:4 190:10,20,23 191:6,
8 192:18 194:6,9 197:10 201:4
203:14,17 205:19 206:7,9,11
207:23 209:4 211:13 212:16
215:10,17 222:16,19,24 224:6
227:4,11,20 236:6 237:7,11
241:11 242:8,11,16,25 243:18
244:13,15,20 245:5 249:13,14
255:16,20,23 257:4,8 259:2
262:25 263:2,3 265:14,21 266:2,
3,9 267:1,9,17 269:1,9 271:9,24
273:21 274:10 275:15 276:5
277:11,20 278:6 281:18 282:25
283:13 285:13,23,24 286:12
287:4 288:4 290:12,21 291:2
292:4,6 294:1 296:2,23 297:16
299:11 304:6,21 307:9 309:10
313:4,11,18 317:3 319:4 320:2,22
321:2,3,19 325:15 338:13 341:3
342:8,17 343:8,23,24 345:7
347:14 352:2 354:10 357:4 362:3,
6 363:11 365:3,7,15 366:7 367:9
368:21,22

**you've** 11:7 16:15 19:11 21:1
54:5,15 61:2 62:20 76:25 77:15,
20 85:20 111:5 112:1 155:4 183:9
184:16 187:16 190:12 191:12
203:1 214:13 215:15,22 224:11
240:2 241:24 242:3 245:22
246:12 247:7 253:24 258:21
259:1 274:24 279:3,4,5,7 284:21
287:10,11 288:4 289:21 306:18
318:12 324:25 333:20 343:22

**your** 5:13,15 6:16,19,25 7:5,17
9:9 11:21 12:4,7,8,9,14,17 13:1,
21 14:1,12,21 15:1,21 16:18 17:4,
15 18:10,11,22 19:22 21:10 22:12
25:13,14 26:6,8,12 27:10,17

29:25 31:15,23 33:13,14,24 35:22
36:2,4,18,19 38:2,7 40:2,5,9,13
41:2,5,8 42:14 44:3,16 45:13
46:15 48:11 49:7,12 50:9,15
51:11 52:21 53:8,11,16 54:5,8,15,
20 55:2,18 56:5,20 57:7,9 58:9
59:6,10 60:5,12,20 61:22 63:6,17
64:2,6 65:14 67:18,21,23,24 68:3,
4,14,15 69:21 70:2,22,24,25
73:10,20,25 74:6,12,14,25 77:17
78:12 79:15 82:13 83:13,23,24
84:7 87:2 88:5 89:10 92:21 95:7
97:21 101:13 105:10 106:4
108:25 109:25 110:19 112:9,10,
18,23 113:7,19 115:14,19,24
116:6 124:16 132:11,20 135:11
137:9 139:3,17 140:19 143:24
146:16 147:11 148:9,25 149:2,7
153:3 154:4 155:13,22 156:24
158:12,18 160:19,23 161:1
162:13,14,16 167:15 168:18
175:16 176:3 177:11,13 178:25
179:21 180:2,8,14,24 181:12
182:25 183:1,9,10 184:11,22
185:1,22 186:2,13,14 191:5,17
193:1,20 194:11 195:2,22 196:13,
20,21,23 198:25 199:19 200:24
201:4,16 205:3 206:9 207:22,23,
24 208:6 209:5 212:13 214:12,13
215:6,12,21,23 216:6 217:2,3
218:12 220:4,8,22 221:22 222:6
225:23 226:11,12,15,20 227:16,
25 228:4,18 229:7 233:23 234:17
235:13 237:14 239:9 240:6
241:13,14 242:15,20 243:17
244:10,17,19 247:10 248:2,13,21
249:22 250:7,8 255:11 256:1,2,21
258:5 260:1 261:9 264:9 267:18,
19 268:14 269:22 271:15 272:16,
17 275:12 276:22,25 278:14,24
279:6,11 281:20 283:2,17,20,24
285:5,7 286:5,6,19 287:13,19
289:7 290:8,14 292:11,13 293:16,
21 294:7 295:8 301:3 302:4 304:3
306:25 310:21 311:11 313:5,6,7,
14,21 314:21 316:16 317:18
318:2,3,10,17,21 319:6,25 320:1,
6 321:9 322:18 325:7,24,25
326:21 327:2,13 328:5,14,19
329:22 332:15 333:20 334:14,22
335:10,15,24 336:1 337:23,24
338:1 339:14,19 340:16,20,22,23
341:15 342:13,18 343:3,7,18
344:2,11,23,24,25 345:20 346:13

352:1 353:17 354:7 355:22,24
358:10,12 360:22 361:2 363:2,8
367:13 368:5,11,22

**yours** 53:12 364:16

**yourself** 23:17 27:6 28:2 29:3,6,
10 30:10 41:5,6 61:21 201:9
214:16,25 216:1,2 275:15 287:8

---

### Z

---

**Zoom** 5:20 221:12 223:7 235:23
236:3,10,17,18,25 237:17 238:9,
24 240:1,12,19 241:5,20 242:1
252:6,9,14,18,21 253:3 281:19,24
298:21 350:25