# EXHIBIT 25

Page 1

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF MICHIGAN

3                    SOUTHERN DIVISION

4

5   ELYSE MCKENNA,

6           Plaintiff,

7

                              Case No. 24-cv-12347

8   -vs-                      Hon. Brandy R. McMillion

9

10  ROBERT F. RILEY, an individual,

11  RILEY & HURLEY, PC, a domestic professional

12  corporation, and OLSMAN, MACKENZIE,

13  PEACOCK, PC, a domestic professional

14  corporation,

15           Defendants.

16  _____/

17

18          VIDEO DEPOSITION of ELYSE MCKENNA

19

20     Taken by the Defendant on the 17th day of November,

21     2025 at Deborah Gordon Law, 33 Bloomfield Hills

22     Parkway, Suite 220, Bloomfield Hills, Michigan 48304

23     commencing at 10:08 a.m.

24

25

Page 2

```
1   APPEARANCES:
2   For the Plaintiff:     KIMBERLY RUSSELL
3                          SAMUEL BROWN (via Zoom)
4                          The Russell Law Firm PLLC
                           rd
5                          1143 3   Street NE
6                          Washington DC 20002
7                          202-430-5085
8   For the Plaintiff:     KEITH ALTMAN (P81702)
9                          The Law Office of Keith Altman
10                         33228 W. 12 Mile Rd, Ste 375
11                         Farmington Hills Michigan 48334
12                         248-987-8929
13  For the Plaintiff:     DEBORAH L. GORDON (P27058)
14                         ELIZABETH M. TAYLOR (P82061)
15                         Deborah Gordon Law
16                         33 Bloomfield Hills Pkwy Ste 220
17                         Bloomfield Hills, Michigan 48304
18                         248-258-2500
19
20  Also Present:          Justin Dloski, Videographer
21                         Edward Boike, Videographer (Via
22                         Zoom)
23  Reported By:           Amy Bertin, CER-3871
24                         Certified Electronic Reporter
25                         586-468-2411
```

Page 3

```
1
2                    TABLE OF CONTENTS
3   WITNESS                              PAGE
4
5   ELYSE MCKENNA
6
7      Examination by Ms. Gordon              4
8
9
10  EXHIBITS: (Retained by Atty. Gordon)      IDENTIFIED
11
12  Defendant's Exhibit #1   EEOC Claim        232
13  Defendant's Exhibit #2   EEOC Dismissal    234
14  Defendant's Exhibit #3   Facilitation      280
15  Defendant's Exhibit #4   Facilitation      284
16  Defendant's Exhibit #5   Document          288
17
18
19
20
21
22
23
24
25
```

Page 4

```
1   Bloomfield Hills, Michigan
2   Monday, November 17, 2025
3   10:08 a.m.
4                ELYSE MCKENNA
5   was thereupon called as a witness herein, and after
6   having first been duly sworn to tell the truth, the
7   whole truth and nothing but the truth, was examined
8   and testified as follows:
9       VIDEOGRAPHER: We are on the record at 10:08 on
10  November 17th, 2025. This is the video recorded
11  deposition of Elyse McKenna taken by defendant in
12  the matter of McKenna v. Riley et al. Filed in the
13  US District Court, Eastern District of Michigan,
14  Case 24-cv-12347.
15      We are located at 33 Bloomfield Hills Parkway,
16  Bloomfield Hills, Michigan. My name is Justin
17  Dloski, representing Veritext. Counsel may now
18  introduce themselves for the record then the
19  reporter will swear in the witness.
20      MS. GORDON: Deborah Gordon and Elizabeth
21  Marzotto Taylor on behalf of defendants, Olsman,
22  Mackenzie and Riley. I'm sorry. Olsman, the OMP
23  defendants.
24      MS. HARDY: Elizabeth Hardy on behalf of Robert
25  Riley and Riley and Hurley.
```

Page 5

```
1       MR. DAVIS: Thomas Davis on behalf of Riley and
2   Hurley and Robert Riley.
3       MR. ALTMAN: Keith Altman on behalf of the
4   plaintiff.
5       MS. RUSSELL: Kimberly Russell on behalf of the
6   plaintiff. And Sammy Brown Jr. is also joining on
7   behalf of the plaintiff via Zoom. We also have a
8   court reporter where we have cross-video recorded
9   notice of this deposition.
10      Bill, would you please make your
11  appearance for the record? You can just state it.
12      MR. BOIKE: This is Ed Boike. I'm the
13  videographer recording.
14      MS. GORDON: Ed, could you please provide your
15  full name and business address and phone number?
16      MR. BOIKE: Ed Boike. I'm here with Chapa,
17  Giblin and Cicchini for today.
18      MS. GORDON: What is the address of where you
19  are you located?
20      MR. BOIKE: I'm located - this is a remote
21  Zoom. So our local office is at 30665 Northwestern
22  Highway, Suite 105, Farmington Hills, Michigan
23  48334.
24      MS. GORDON: Thank you.
25                EXAMINATION
```

2 (Pages 2 - 5)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 6

1  BY MS. GORDON:
2  Q   Hi, Ms. McKenna. I'm Deb Gordon, as you know. I
3      don't think we've ever met before. How do you
4      prefer me to refer to you? Is Ms. McKenna, Elyse,
5      which do you prefer?
6  A   You can call me Ms. McKenna or Elyse.
7  Q   Okay, that's fine. And you are here today for your
8      deposition. You understand that. And this
9      deposition is under oath, do you understand that?
10 A   I do understand that.
11 Q   Do you understand that it's illegal to lie under
12     oath?
13 A   I do understand that it's illegal to lie under
14     oath.
15 Q   And you're aware that as an attorney, you have a
16     duty to not lie under oath as well, is that
17     correct?
18 A   Yes.
19 Q   Have you been deposed before?
20 A   No.
21 Q   You have had an appearance in this case on a couple
22     of different occasions, is that correct?
23 A   Yes. I believe I've had an appearance on two
24     occasions in this case.
25 Q   You are the attorney who filed this lawsuit, is

Page 7

1      that correct?
2  A   I was pro se at the time that I filed the lawsuit.
3      That is correct.
4  Q   And there was another time you became pro se, is
5      that correct?
6  A   Yes, there is another time that I became pro se.
7  Q   And what was the reason for that? Explain on the
8      record what the reason for that was.
9  A   A motion to withdraw was filed and it was granted.
10     And after the motion to withdraw was granted, I
11     became pro se again.
12 Q   What have you reviewed to get ready for your
13     deposition?
14 A   Just to clarify that last answer. I didn't become
15     pro se immediately after that motion to withdraw.
16     It was after the stay was lifted that I became pro
17     se.
18 Q   What have you reviewed to get ready for your
19     deposition?
20 A   I spoke with my attorneys to get ready for my
21     deposition. And I tried to stay as calm as I could
22     because I'm pregnant and I'm trying not to get too
23     stressed out.
24 Q   Well, good luck with that. It's going to be a long
25     haul with the pregnancy. But in any event, are you

Page 8

1      telling us here today under oath that you have not
2      looked at any documents to get ready for this
3      deposition?
4      MS. RUSSELL: Objection.
5      THE WITNESS: I'm not saying I haven't. I've
6      generally looked at documents.
7  BY MS. GORDON:
8  Q   I asked you what you did to get ready for your
9      deposition. Have you looked at any documents to
10     refresh your recollection and/or to get ready for
11     this deposition?
12     MS. RUSSELL: Objection.
13     THE WITNESS: I have generally reviewed
14     discovery. But I spoke with my attorneys to prepare
15     for this deposition.
16 BY MS. GORDON:
17 Q   I heard that. You already said that. And then I
18     moved on and I asked you what you had reviewed. So
19     I would - first of all, when did you review these
20     documents?
21 A   When discovery was produced, I reviewed. I don't
22     have an exact date for you.
23 Q   So when's the last time you would have reviewed any
24     documents that, in your opinion, were relevant to
25     your testimony today?

Page 9

1      MS. RUSSELL: Objection.
2      THE WITNESS: I'm not sure what we're going to
3      cover today. But I know that the calendar, the 200
4      or so pages that were missing from the OMP
5      production, I looked at those yesterday. And I
6      didn't have a lot of time to spend on them so that
7      would be the last time I looked at a document, a
8      specific document.
9  BY MS. GORDON:
10 Q   Have you produced documents in this case in
11     response to our discovery request?
12 A   Yes.
13 Q   What have you produced?
14     MS. RUSSELL: Objection.
15     THE WITNESS: I don't know that off the top of
16     my head what I've produced.
17 BY MS. GORDON:
18 Q   You have no idea what you've produced?
19 A   No, I don't.
20 Q   What were you asked to produce?
21 A   Well, I believe there are tens of requests for
22     production and interrogatories. And I turned over
23     items to my attorneys and documents were produced.
24     So I don't – I'm - are you looking for a number of
25     documents or?

Page 10

1  Q   No, my question was very clear. And my question
2      was, have you produced any documents in response to
3      requests to produce in this case?
4  A   My understanding is, yes, that there have been
5      documents produced.
6  Q   What do you recall -
7      MR. ALTMAN: Hold on. Can you please let her
8      Finish –
9      MS. GORDON: Yes. She had.
10     MR. ALTMAN:  No, she hadn't. You're jumping on
11     top of it.
12     MS. GORDON: We're just going to have one
13     lawyer here today.
14     MR. ALTMAN: No. I'm going to put this on the
15     record. Would you please allow her to finish
16     answering your question. It's common courtesy.
17     MS. GORDON: We're only having one - just like
18     in trial. Keith, you can't keep interrupting. Do
19     you think you're both going to be placing
20     objections today?
21     MR. ALTMAN: Okay. Would you put the -
22     MS. RUSSELL: I'll put the objection on the
23     record. Allow her to finish her answer.
24 BY MS. GORDON:
25 Q   Ms. McKenna, feel free to finish your answer. Did

Page 11

1      you have anything to add?
2      MS. RUSSELL: I think you need to re-ask your
3      question.
4      THE WITNESS: I don't even know what you asked.
5      I'm sorry.
6  BY MS. GORDON:
7  Q   You don't remember the question I asked?
8  A   I don't remember the question you asked.
9  Q   Have you - were you asked to produce documents in
10     this case?
11 A   Yes.
12 Q   What did you produce?
13 A   I do not recall exactly what was produced.
14 Q   What do you remember, in general?
15 A   I produced documents to my attorneys and then my
16     attorneys produced documents to you all. So I'm not
17     - I wasn't a part of the production to you all.
18 Q   I didn't ask you that. I asked you what you
19     produced to your counsel in response to discovery
20     requests.
21 A   You're asking me what I produced to -
22 Q   Yes. You were asked to produce documents because,
23     of course, we asked for documents. I assume either
24     while you were acting pro se or while you had
25     counsel, you were asked to produce documents and

Page 12

1      you produced some documents.
2      MS. RUSSELL: Counsel, I'm sorry. I'm not
3      trying to be difficult here but it seems - I'm
4      confused on what the question is.
5  BY MS. GORDON:
6  Q   Is that accurate? You were asked to produce
7      documents by counsel?
8  A   There were requests for production in this case.
9  Q   Yes.
10 A   That's accurate.
11 Q   Did you produce documents from your cell phone?
12 A   Yes.
13 Q   What's your cell phone number?
14 A   It's 810-278-4130.
15 Q   Do you use any other cellular device?
16 A   No.
17 Q   So the documents you produced would have come from
18     your cell phone?
19 A   As one item of docu – as one source of documents,
20     sure.
21 Q   Have you reviewed text messages produced by Robert
22     Riley in this case?
23 A   No. I have not reviewed them specifically, no.
24 Q   What do you mean by specifically? Have you ever
25     seen any of the text messages that were produced in

Page 13

1      this case by Robert Riley between you and Mr.
2      Riley?
3  A   I have not seen Robert Riley's production of text
4      messages, no.
5  Q   You've reviewed none of them?
6  A   I have reviewed text messages that I have with
7      Robert Riley. But I have not reviewed, page by
8      page, Robert Riley's production. I understand that
9      they're in the production of documents.
10 Q   And have you reviewed your text messages with Donna
11     Mackenzie?
12 A   I've reviewed what I produced from my text messages
13     with Donna Mackenzie. I have not reviewed - if you
14     produced those text messages as well, I've not
15     reviewed your production.
16 Q   How about Emily Peacock? Have you –
17 A   The same as with Donna Mackenzie.
18 Q   Have you ever practiced law in federal court? Have
19     you had any cases in federal court or been a party
20     in a federal court case?
21 A   I don't know if it counts as practicing law in
22     federal court to be pro se in this case. So I'm not
23     trying to get -
24 Q   Hang on. Other than this case?
25 A   Yeah. I was trying to finish my answer to your

Carroll Reporting & Video
A Veritext Company

586-468-2411

Page 14

1  question so I -
2  Q  I'll retract my question. Other than this case,
3     have you ever had any case in federal court where
4     you have been counsel or a party?
5  A  Again, I was trying to finish the answer to my
6     question so.
7  Q  I retracted it, so I have a new question.
8  A  And you're interrupting me again so I'm just
9     asking –
10 Q  No, I'm not.
11 A  - that I be able to finish speaking.
12 Q  I retracted my question. Try to listen to my
13    question, okay? Other than this litigation that
14    we're here for today, have you ever had a case in
15    federal court either as a party or as an attorney?
16 A  I was admitted pro hac vice and I believe those
17    documents were produced to assist with a terrorism
18    case that is in federal court in Washington, D.C.
19    And I do not recall the name of the case off the
20    top of my head.
21 Q  Is that the only other case you've been involved,
22    where you've had a role or involvement in federal
23    court? Other than this one?
24 A  As I sit here today, that's the only case that I
25    can remember other than this one and the terrorism

Page 15

1  case.
2  Q  Are you familiar with federal rule civil procedure
3     11 with regard to sanctions?
4        MS. RUSSELL: Objection.
5        THE WITNESS: I am generally familiar - no.
6  BY MS. GORDON:
7  Q  Are you aware that the federal court has a
8     procedure whereby if a party makes a complaint that
9     is not well founded in fact or law, that the
10    individual bringing the case can be penalized
11    including by money damages? Are you aware of that
12    rule?
13       MS. RUSSELL: Objection.
14       THE WITNESS: I'm generally aware that a
15    complaint has to be truthful.
16 BY MS. GORDON:
17 Q  No. But I'm talking specifically about Rule 11
18    sanctions where - which doesn't necessarily apply
19    in state court. And I know most of your practice is
20    in state court. This is one of the reasons I'm
21    asking you this. In federal court, any paper you
22    submit to the court must be accurate and you must
23    have a valid legal theory. Are you aware of that?
24    Are you aware of that?
25 A  I'm generally aware of that concept. I could not

Page 16

1  quote that rule to you and I'm happy to review the
2  rule if you're going to ask me about it.
3  Q  And are you aware, sitting here today that monetary
4     sanctions can be awarded against you in this
5     matter?
6        MS. RUSSELL: Objection. She doesn't have the
7     rule in front of her. If you want her to review it,
8     she can.
9        MS. GORDON: I don't.
10 BY MS. GORDON:
11 Q  I just want to know whether you're aware of that in
12    Rule 11 sanctions.
13 A  I'd like to review the rule.
14 Q  Okay, so you're not sure. I spoke to your
15    attorneys, your prior attorneys, about Rule 11
16    sanctions. And I wondered whether you became aware
17    of the fact that I raised Rule 11 sanctions with
18    your counsel.
19       MS. RUSSELL: Objection. Privilege.
20       MS. GORDON: It's not privilege. It's whether
21    she is aware that I raised it with her counsel.
22       MS. RUSSELL: Objection. I'm instructing the
23    client not to answer on the basis of privilege.
24       MS. GORDON: Okay. That's not privilege.
25 BY MS. GORDON:

Page 17

1  Q  Have you given any thought to the fact that you may
2     be sanctioned in this case?
3        MS. RUSSELL: Objection.
4  BY MS. GORDON:
5  Q  Go ahead.
6  A  I don't believe that I have done anything that
7     would be sanctionable in this case.
8  Q  And are you aware that my client takes the position
9     that your actions are sanctionable and that we are
10    going to file a motion for sanctions?
11       MS. RUSSELL: Objection.
12 BY MS. GORDON:
13 Q  Are you aware of that? Have you been told that?
14 A  You're telling me that now. So the answer as of
15    right now would be yes. I'm aware of it now.
16 Q  No prior counsel told you that OMP is going to file
17    a motion for sanctions against you?
18       MS. RUSSELL: Objection. Privilege.
19 BY MS. GORDON:
20 Q  You have not learned that?
21       MS. RUSSELL: Privilege. Counsel, let's go off
22    the record for a minute.
23       MS. GORDON: No, I'm not going off the record
24    right now.
25 BY MS. GORDON:

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com
www.veritext.com

Page 18

1  Q   Did you - you told your therapist at one point you
2      were considering dropping the case. Do you recall
3      that?
4  A   I would have to see the document you're referring
5      to.
6  Q   Does that sounds familiar?
7  A   I would have to see the document you're referring
8      to.
9  Q   Well, have you ever considered dropping this case
10     as an alternative –
11         MR. ALTMAN: Hold on, hold on. We're not going
12     to continue this if you are going to cut her off
13     every time she's giving an answer. It's common
14     courtesy. Are you going to let her finish her
15     answers instead of consistently cutting her off?
16         MS. GORDON: You want to read back the
17     question, Amy, the last question?
18         (Whereupon the question was read back by the
19     court reporter.)
20  BY MS. GORDON:
21  Q   Does that sound familiar that you've discussed with
22     your therapist that one option for you was to
23     dismiss this case?
24  A   I would have to see the document that you're
25     referring to.

Page 19

1  Q   You don't dispute it if it's in the records?
2  A   I would have to see the document that you're
3      referring to.
4  Q   So sitting here today, you don't recall whether
5      you've considered dismissing this case against OMP?
6  A   Those are two different questions.
7  Q   Sitting here today, do you recall ever thinking
8      about dismissing the case against OMP?
9  A   Sitting here today, I have withstood a great deal
10     of stress to try to stick up for what I believe is
11     right. And I have thought about the stress that
12     this has now put on being pregnant, a baby, which
13     sounds like you have some deal of acknowledgement
14     for.
15         And I have wondered whether dismissing this
16     case would be what I need to do to protect my
17     child. I don't know that I could sit here as
18     someone to be a mother in the future and tell you
19     that that isn't something that crosses your mind.
20     And I know that you have a daughter and you think
21     about your kid and you think about who that is. And
22     I've thought about how much stress this has caused
23     on my pregnancy.
24  Q   What is your date of birth?
25  A   February 16th, 1993.

Page 20

1  Q   What is your current resident address?
2          MS. RUSSELL: We're going off the record.
3          MS. GORDON: For what?
4          MS. RUSSELL: We're going off the record.
5          MS. GORDON: For what?
6          MS. RUSSELL: We need to take a break.
7          MS. GORDON: No. I'm not taking a break. You
8      guys can get up and leave. We are not taking a
9      break unless you give me a reason.
10         MR. ALTMAN: Well, it's just that we want to
11     put her address - we'll give you her address.
12         MS. GORDON: It's on Intelius.
13         MR. ALTMAN: Just off the record.
14         MS. GORDON: Let's give it off the record.
15         (Brief pause.)
16  BY MS. GORDON:
17  Q   As to the D.C. address, how long have you been at
18     that address?
19  A   A couple of months.
20  Q   So we're now in November. Since September of 2025
21     or before?
22  A   I think August is technically when I moved in.
23  Q   And is that a home, an apartment or what is that?
24  A   It is the basement level of a townhome, so an
25     apartment. So, sorry. Can we go back off the record

Page 21

1      for me to finish the address? I forgot to give you
2      one detail.
3  Q   We'll come back to it.
4  A   Okay. It's just apartment B, I think.
5  Q   So that's okay. That can be on the record. So
6      that's in D.C. And you've been there roughly since
7      August.
8  A   Yes. I think my lease started in July and I
9      finished moving there in August.
10  Q   And did you reside there with anybody else?
11  A   No.
12  Q   So you were living by yourself at that address in
13     D.C.?
14  A   Correct. Well, with my dogs.
15  Q   And when did you first – and prior to that address,
16     where were you living? What city?
17  A   Chevy Chase, Maryland.
18  Q   And is that the address of Ms. Fox?
19  A   It was the address of Ms. Fox.
20  Q   Is she still at that address?
21  A   No.
22  Q   So that was a home in Chevy Chase, is that
23     accurate?
24  A   Correct.
25  Q   And that was her home and then you moved into her

6 (Pages 18 - 21)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 22

1    home for a period?
2  A   Yes. She was renting that home. She didn't own it.
3  Q   I see.
4  A   But yes.
5  Q   And then did she sell the home or, I'm sorry, move
6    out of the home?
7  A   She moved out of the home.
8  Q   And at that time you relocated to a different
9    location?
10 A   Correct.
11 Q   And where did she relocate to, as you understand
12   it?
13 A   The home that she had previously lived in.
14 Q   And was anybody else residing in that home in Chevy
15   Chase other than you and Ms. Fox?
16 A   Her daughter who is now five.
17 Q   And you are now relocating to Kentucky?
18 A   Correct.
19 Q   What is the reason for relocating to Kentucky in
20   that you've been, your main point of residence has
21   been D.C.?
22 A   To be with the father of the child of my baby and
23   be in the same place.
24 Q   And what is his name?
25 A   Jared Smith.

Page 23

1  Q   And he resides in Kentucky?
2  A   Correct.
3  Q   And has he resided there for some time?
4  A   Yes.
5  Q   When did you first meet Jared Smith?
6        MS. RUSSELL: Objection.
7        THE WITNESS: I think I met him in July of
8    2022. I don't know that date for sure.
9  BY MS. GORDON:
10 Q   Fair enough. That's while you were employed at OMP,
11   is that correct?
12 A   I believe I met him while I was employed at OMP.
13 Q   And where did you meet him?
14 A   At an AAJ conference.
15 Q   Right. So you were at a –
16       MS. RUSSELL: I'm placing a standing objection
17   on the record to all questions related to Jared
18   Smith based on relevance.
19       MS. GORDON: They're relevant.
20 BY MS. GORDON:
21 Q   So you were at an AAJ event. Did the Olsman firm
22   pay for your travel to that event and lodging?
23 A   I'm sure they paid for at least some of it.
24 Q   So you were there at the AAJ event vis-a-vis your
25   position with the Olsman firm. And while you were

Page 24

1    there, it looks like, I'll refer to him as Jared.
2    Jared was there as well and you met, would that be
3    accurate?
4  A   That's the first time I've met him, yeah.
5  Q   And is he an attorney?
6  A   He is.
7  Q   And where was his law practice?
8  A   In Kentucky.
9        MS. RUSSELL: Same objections to these
10   questions.
11 BY MS. GORDON:
12 Q   And when do you expect that you will be relocated
13   to Kentucky?
14 A   I'm in the process of moving now. So in the next
15   couple weeks. I'm trying to move a lot of stuff
16   from both Michigan and D.C. because I've had stuff
17   in a storage unit here.
18 Q   And where are you licensed to practice law? In what
19   states?
20       MS. RUSSELL: Objection.
21       THE WITNESS: Michigan only.
22 BY MS. GORDON:
23 Q   And are - will you be practicing law in Kentucky?
24   Is that your plan?
25       MS. RUSSELL: Objection.

Page 25

1        THE WITNESS: As I sit here today, that is not
2    my plan.
3  BY MS. GORDON:
4  Q   What is your plan going forward employment-wise
5    once you move to Kentucky?
6  A   I intend to keep my employment with Fox McKenna.
7  Q   And Ms. Fox is located in the Washington, D.C.
8    area. You've already established that.
9  A   Is her residence, yes.
10 Q   Do you have a business address in D.C.? Or have you
11   had one since you moved there?
12 A   Yes.
13 Q   What was the business address?
14 A   14 Ridge Square, 3rd floor, Washington, D.C. 20016.
15 Q   What is that location? Is that an office building
16   or what is it?
17 A   It is a shared co-working space.
18 Q   Did you pay rent there?
19 A   Yes.
20 Q   So since you have become part of Fox McKenna, you
21   have been licensed only in Michigan. And then you
22   mentioned a pro hac vice that you were involved in.
23   Do you have current cases in the state of Michigan?
24 A   Yes, I do.
25 Q   How many?

1  A  I don't know that number off the top of my head.
2  Q  Roughly.
3     MS. RUSSELL: Foundation.
4  BY MS. GORDON:
5  Q  Roughly.
6  A  I couldn't even tell you roughly. More than 20.
7     That's about as detailed as I can get.
8  Q  What types of cases are they, in general?
9     MS. RUSSELL: Objection.
10    THE WITNESS: They are a combination of general
11    PI, nursing home negligence, medical malpractice,
12    slip and fall.
13 BY MS. GORDON:
14 Q  Generally, personal injury stuff?
15 Q  Generally, personal injury.
16 Q  Negligence cases?
17 A  I don't believe - in one-off, I've provided some
18    hourly work to some people that need help
19    navigating business disputes.
20 Q  Are all of your cases that you're currently
21    handling located in the state of Michigan?
22    MS. RUSSELL: Objection.
23    THE WITNESS: We have cases in Maryland and
24    D.C. that I assist Amanda with, Ms. Fox with. And
25    Montana.

1  BY MS. GORDON:
2  Q  Do you have the ability to practice in D.C.?
3  A  I can apply for pro hoc admission when those cases
4     reach the litigation phase. They aren't in
5     litigation yet. They're in the investigation phase
6     so they haven't gotten to that point yet.
7  Q  So then as of today's date, you aren't officially
8     admitted to any Bar in D.C.? You may in the future
9     but as of this time, you're just assisting with
10    cases, is that correct?
11 A  That's correct.
12    MS. RUSSELL: Objection.
13    THE WITNESS: Other than the pro hoc for the
14    case that I can't remember the name of.
15 BY MS. GORDON:
16 Q  Yes. You already mentioned that. So with regard to
17    you moving to Kentucky, will you be - is it your
18    expectation you will be traveling to Michigan as
19    needed for your cases, your Michigan cases?
20 A  As needed, yes. I have – yes.
21 Q  Will you have any reason to be traveling to the
22    District of Columbia or that general vicinity once
23    you move to Kentucky for your employment?
24    MS. RUSSELL: Objection.
25    THE WITNESS: Yes, for those cases as well.

1  BY MS. GORDON:
2  Q  When did you meet Amanda Fox?
3  A  I don't know. I think 2022 or '23.
4  Q  Where would you have met her?
5  A  I think I might have met her in passing in July of
6     2022 at the AAJ conference that I met Jared at. But
7     I don't know that for sure.
8  Q  Did you stay in touch with her after that meeting?
9  A  Not initially, no. I just met, hi, you're Amanda,
10    I'm Elyse. That was - I didn't.
11 Q  When would have been the next time you would have
12    connected up with her in some fashion?
13 A  I think someone put me in touch with her in
14    February or March of 2023.
15 Q  For what?
16 A  Just to introduce us.
17 Q  In February or March of 2023? Is that what you
18    said?
19 A  Yes, I think that's correct.
20 Q  And who was that person that connected you up?
21 A  I think both Ingrid Halstrom and Jared Smith would
22    have said, you should meet Amanda, Amanda should
23    meet you.
24 Q  Who are they?
25 A  Well, Jared Smith we've discussed. And Ingrid is an

1     attorney in the Boston area.
2  Q  Why did Jared and/or Ingrid think you should
3     connect with Ms. Fox? Is that because you were
4     looking for different work?
5     MS. RUSSELL: Objection, foundation.
6     THE WITNESS: No. I don't know what they would
7     have - I don't know their connection - I don't know
8     why they would have other than they thought we'd
9     get along. That was my understanding.
10 BY MS. GORDON:
11 Q  Well, you were living in two different locations
12    though, correct?
13 A  Sure.
14 Q  And you already had met Ms. Fox?
15 A  As a one-time thing, yes.
16 Q  So there had to be a point of somebody connecting
17    you up with another lawyer from out of state,
18    correct? What did you understand the purpose to be?
19    MS. RUSSELL: Objection, foundation.
20 BY MS. GORDON:
21 Q  What did you understand the purpose to be?
22 A  I think everyone likes to grow their network and
23    connect people that are like-minded people. And I
24    understood that Ingrid thought Amanda and I would
25    be friends. And I understood the same about what

8 (Pages 26 - 29)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com
www.veritext.com

Page 30

1    Jared thought Amanda and I would be friends. That's
2    my understanding of that. And we were both in the
3    new lawyers division in AAJ, so I think they
4    thought we would cross paths as a part of that.
5 Q    What's Ingrid's last name?
6 A    Halstrom.
7 Q    Spell that.
8 A    H-A-L-S-T-R-O-M.
9 Q    Where is she located?
10 A    Boston.
11 Q    Boston, Massachusetts?
12 A    Yes.
13 Q    And the idea was that she was leaving her firm, is
14    that correct?
15 A    No, that was not the idea.
16       MS. RUSSELL: Objection.
17 BY MS. GORDON:
18 Q    When did she first tell you she was thinking about
19    leaving her firm?
20 A    December of 2023.
21 Q    And when you were connected up with her by Jared
22    and/or Ingrid, what month was that?
23 A    I believe it was February or March of 2023.
24 Q    And she left her firm in December 2023?
25 A    She left her firm in February of '24. But you asked

Page 31

1    me the first time I'd ever heard that she might
2    want to leave her firm. And that was the first I'd
3    ever heard was December of '23.
4 Q    And you understood it, why did she want to leave
5    her firm?
6       MS. RUSSELL: Objection.
7       THE WITNESS: I understood that she wanted to
8    potentially start a firm or she wanted to be made
9    partner at her firm.
10 BY MS. GORDON:
11 Q    And when did she for the very first time discuss
12    with you two forming a firm?
13 A    The first time we ever discussed that was in
14    December of 2023.
15 Q    And why did she want to leave her firm, as you
16    understood it?
17       MS. RUSSELL: Objection.
18       THE WITNESS: I think it had to do with the
19    experiences she had had at her firm and thinking
20    that she wanted to have a bigger role. I don't have
21    the full details on every - I was not – I did not
22    know her the entire time she worked at that firm
23    but that's the general understanding.
24 BY MS. GORDON:
25 Q    You two texted about - after you got together and

Page 32

1    reconnected through Jared and or Ingrid. And then
2    you started talking about a law firm you two
3    texted, is that correct?
4       MS. RUSSELL: Objection. You can show her the
5    texts.
6 BY MS. GORDON:
7 Q    Is that correct?
8 A    Yes. If you're referring to specific texts, I'm
9    happy to review them.
10 Q    And I see that you do a lot of texting. In general,
11    that's your - you like to communicate, it's a
12    convenient way for you to communicate with people,
13    is that correct?
14       MS. RUSSELL: Objection.
15       THE WITNESS: I text.
16 BY MS. GORDON:
17 Q    Yes. I noticed. And so I assume you texted with Ms.
18    Fox, you know, as you guys were talking about
19    getting a firm underway and what you were going to
20    do to do that. That would be in text messages,
21    correct?
22       MS. RUSSELL: Objection.
23       THE WITNESS: Are you referring to a specific
24    timeframe or just in general?
25 BY MS. GORDON:

Page 33

1 Q    From when you first started discussing a new firm
2    with her?
3 A    Would I have texted her about it after I first
4    started discussing a new firm with her?
5 Q    Yeah.
6 A    Well, during December of 2023, I was not only
7    looking at - I knew Amanda was leaving her firm. I
8    was also trying to find different employment for
9    myself. So I would've - I don't know how much there
10    would be via text. I'm sure - I don't - if you're
11    referring to a text I can -
12 Q    My point is, you texted with her about you guys
13    forming a firm and that would be from your cell
14    phone, correct?
15 A    As I sit here today, I do not recall if there's a
16    specific text about starting a firm.
17 Q    But presumably you texted with Ms. Fox somewhere
18    in –
19       MS. RUSSELL: Objection.
20 BY MS. GORDON:
21 Q    - late 2023 and into early 2024, agreed?
22 A    You're asking me if I texted with her during that
23    time?
24 Q    Yes, I am.
25 A    About the firm or just - you asked in general.

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                  586-468-2411
                                                  www.veritext.com

Page 34

1 Q About anything.
2 A I definitely texted with her about something during
3    that time for sure.
4 Q What is your due date for your pregnancy?
5 A February 28.
6 Q Of 2026?
7 A I hope so.
8 Q When did you find out you were pregnant?
9 A In the beginning of July.
10 Q Are you married at this time?
11 A I am not.
12     MS. RUSSELL: Objection.
13 BY MS. GORDON:
14 Q Do you have plans to be married?
15     MS. RUSSELL: Objection.
16 BY MS. GORDON:
17 Q A specific plan. I realize anything can happen. But
18    right now do you have any plan to become married?
19 A I hope one day I'm married again.
20 Q But you don't have a – okay. You hope so but you
21    don't have a specific at this time plan to do so?
22     MS. RUSSELL: Objection.
23     THE WITNESS: There are two people in
24    relationships, so.
25 BY MS. GORDON:

Page 35

1 Q And you've been married previously, is that
2    correct?
3 A I have.
4 Q And you were married to whom?
5 A Brandon Hyde.
6 Q And when did you marry Brandon Hyde?
7 A October 30th, 2015.
8 Q And when did you file for divorce or he file for
9    divorce?
10 A We decided to get divorced in the - I believe it
11    was the New Year's Day or January 2nd or so. I
12    don't want to be quoted on that exact day of 2023.
13    And I moved out. And I don't have the exact date of
14    when we filed. But we started that process then.
15 Q In around January 2023, is that what you're saying?
16 A I don't know that that was the filing date. We
17    started to get our ducks in a row to get it filed.
18 Q Did you separate residences in 2023?
19 A Yes.
20 Q Where did you move at that point?
21 A I moved into an Airbnb in Ferndale for a couple of
22    days and then turned that into a long-term rental.
23 Q And when was the divorce final?
24 A The divorce wasn't final until the end of August of
25    2023. The hearing kept getting kicked. But it was,

Page 36

1    I think it was supposed to be initially in May.
2 Q Are you on a salary at Fox McKenna at this time?
3 A I don't know how - can you rephrase that question?
4 Q Just do you have a standard draw or salary at Fox
5    McKenna?
6 A No. I withdraw the money that I need to live, so
7    it's not a standard amount.
8 Q Does anybody other than you and Ms. Fox provide a
9    revenue or income to Fox McKenna?
10     MS. RUSSELL: Objection.
11 BY MS. GORDON:
12 Q Are you the two producers or is there anybody else
13    there that produces revenue?
14 A We are the -
15     MS. RUSSELL: Objection.
16     THE WITNESS: - we are the people that handle
17    the cases. We have a paralegal and an assistant and
18    two law clerks. And I hope they kind of contribute
19    to producing, but no, I guess they're not
20    considered producers.
21 BY MS. GORDON:
22 Q What was your in - your IRS reported income for
23    2024, roughly?
24     MS. RUSSELL: Objection.
25     THE WITNESS: I have no idea.

Page 37

1 BY MS. GORDON:
2 Q You literally have no idea much money you earned in
3    2024? Literally none?
4 A Literally none.
5 Q So did you make more than $50,000?
6     MS. RUSSELL: Objection.
7     THE WITNESS: I have literally no idea.
8 BY MS. GORDON:
9 Q Did you file a tax return?
10 A Yes.
11 Q Why do you have no idea?
12     MS. RUSSELL: Objection.
13 BY MS. GORDON:
14 Q Do you have some other means of support other than
15    work?
16     MS. RUSSELL: Objection.
17     THE WITNESS: I have gone through all of my
18    savings and all of my, almost all of my 401Ks. And
19    so that, I used that money obviously to live. And I
20    didn't need to pull that much money from Fox
21    McKenna because I was using that money. So I don't
22    have an idea. I pulled the minimum, the bare
23    minimum and I don't know what that number is.
24 BY MS. GORDON:
25 Q Does Fox McKenna keep track of revenue produced by

Page 38

1    you and Ms. Fox?
2        MS. RUSSELL: Objection. If you want to ask
3    about Fox McKenna you can notice a 30B6.
4    BY MS. GORDON:
5    Q   Go ahead.
6    A   How you – can you –
7    Q   Yes. Do you guys keep - I assume, you must keep
8        track of the income, the fees that come in, is that
9        correct?
10       MS. RUSSELL: Same objection.
11       THE WITNESS: Yes. We keep track of money that
12       comes in.
13   BY MS. GORDON:
14   Q   Who handles that?
15       MS. RUSSELL: Objection.
16       THE WITNESS: We have an accounting service and
17       then Amanda and I handle that.
18   BY MS. GORDON:
19   Q   Who is the accounting service?
20       MS. RUSSELL: Objection.
21       THE WITNESS: Abacus. A-B-A-C-U-S.
22   BY MS. GORDON:
23   Q   Do you work with somebody in particular there?
24       MS. RUSSELL: Objection.
25       THE WITNESS: Not yet. And we don't work with

Page 39

1    someone specifically yet.
2    BY MS. GORDON:
3    Q   So did you generate fees in 2024 at Fox McKenna?
4        Did you have any fee income that found its way into
5        your law firm in 2024?
6    A   I guess we did.
7    Q   Did you have any fee income that came into your
8        firm other than from cases that were Olsman cases?
9    A   Yes.
10       MS. RUSSELL: Objection.
11   BY MS. GORDON:
12   Q   In addition to the Olsman cases that you took when
13       you left Olsman, you had additional revenue in
14       2024?
15   A   Yes.
16   Q   And were those cases, was the revenue from cases
17       located in Michigan?
18       MS. RUSSELL: Objection.
19       THE WITNESS: I don't believe so. But I don't
20       remember off the top of my head.
21   BY MS. GORDON:
22   Q   And how much income have you earned in 2025,
23       roughly?
24       MS. RUSSELL: Objection.
25       THE WITNESS: I don't know the answer to that

Page 40

1    question.
2    BY MS. GORDON:
3    Q   Is it more than $50,000 that you have, you've
4        gotten from Fox McKenna based on your contributions
5        or however you guys split it up?
6    A   I don't know.
7    Q   Is there reason you don't know how much, whether
8        you've had any income from your law firm?
9        MS. RUSSELL: Objection.
10       THE WITNESS: You're asking me how much income
11       I've had and I don't know the answer to how much. I
12       have had some income from my law firm but I've
13       continued - I started the year continuing to use
14       savings. And as I have stated before, I draw what I
15       need to so.
16   BY MS. GORDON:
17   Q   Have you taken out of the firm $50,000 or more in
18       2025?
19   A   As I've said, I don't know the exact number.
20   Q   I know that. Roughly. Do you think you've taken out
21       more than $50,000?
22   A   I don't know.
23   Q   More than $20,000?
24   A   I think I've taken out more than $20,000.
25   Q   Not sure if it's more than 50?

Page 41

1    A   Correct. I don't - I do have those numbers and
2        those can be provided to you. But I don't know that
3        off the top of - I don't know the answer.
4    Q   And for 2025 you're continuing to provide services
5        for PHPA?
6    A   Yes.
7        MS. RUSSELL: Objection.
8    BY MS. GORDON:
9    Q   And you send them invoices, is that correct?
10   A   I send them invoices.
11   Q   How much money, roughly, have you obtained from
12       PHPA in 2025?
13       MS. RUSSELL: Objection.
14       THE WITNESS: I do not know the amount of
15       money. We are in the middle of collective
16       bargaining agreement negotiations for both leagues
17       for the union. And so there are - we've had some
18       heavier months than before. So I could try to –
19   BY MS. GORDON:
20   Q   Do you send invoices?
21   A   Yes. And I can - we can.
22   Q   How often do you send invoices?
23   A   Every month.
24   Q   And then you get money in every - after that
25       invoice goes out?

Page 42

1  A   Yes.
2  Q   But you have no idea sitting here today roughly how
3      much you've received?
4  A   For 2025?
5          MS. RUSSELL: Objection.
6  BY MS. GORDON:
7  Q   Yes.
8          MS. RUSSELL: Asked and answered. Let's move
9      on, Counsel.
10 BY MS. GORDON:
11 Q   Go ahead.
12 A   I would say, every month of 2025 - I'm not a
13     mathematician but I have billed at least $10,000
14     for the PHPA. Sometimes some months have been
15     significantly more than that. But that is probably
16     around the minimum.
17 Q   Do you have a residential address in the state of
18     Michigan?
19 A   No.
20         MS. RUSSELL: Objection.
21 BY MS. GORDON:
22 Q   Do you have a business address in the state of
23     Michigan?
24 A   I have a business address that is moving in the
25     state of Michigan.

Page 43

1  Q   What's your business address that's listed with the
2      State Bar of Michigan? If that's the address that
3      you call your business address.
4  A   Right now what's listed with the state of Michigan
5      that's in the process of changing is 625 Purdy
6      Street, Birmingham, Michigan.
7  Q   What is that location?
8  A   48009.
9  Q   What is that location?
10 A   That's a location of an office space that a friend
11     was letting me use.
12 Q   Is there an office set up for you in there or is it
13     just sort of a mail drop or something else?
14         MS. RUSSELL: Objection.
15         THE WITNESS: There was an office setup there
16     before I moved to D.C. It was just a desk and a
17     room. And now it's a mail drop off but I'm
18     switching that to a different location.
19 BY MS. GORDON:
20 Q   In Michigan?
21 A   In Michigan.
22 Q   And what are you switching to?
23         MS. RUSSELL: Objection.
24         THE WITNESS: That is still being discussed
25     between Amanda and I. And I plan to have it solved

Page 44

1      before November 30th when I need to have it solved
2      for the State Bar deadline.
3  BY MS. GORDON:
4  Q   So you're planning to have a residence or a
5      business address in Michigan?
6  A   A business address.
7  Q   When you come to Michigan for your court cases or
8      any other purpose, where do you stay?
9  A   With my mother.
10 Q   And what city is she in?
11 A   Howell.
12 Q   Are you currently seeing any counselors or treaters
13     of any type with regard to mental health?
14 A   Ann Gialanella is the provider that I understand
15     you have received records for and that's been
16     produced. But I will need to get a new mental
17     health provider when I finish moving to Kentucky
18     and I do not have that person identified yet.
19 Q   But right now you have Ms. Gialanella?
20 A   M'hm.
21 Q   Is that a yes?
22 A   That's a yes. Sorry.
23 Q   And you're continuing to treat with her at this
24     time?
25 A   I think I'll probably have one more appointment

Page 45

1      before I'm officially moved, so yes.
2  Q   Are any of those appointments with her remote?
3  A   She cannot do remote. I don't believe she can do
4      remote appointments unless I'm in the state of
5      Maryland. She has certain states she can do. But
6      she will not be able to do remote with Kentucky,
7      so.
8  Q   And in the last 10 years, who else have you treated
9      with as a counselor, as a psychologist in any
10     manner for any mental health or psychological
11     purposes other than Ms. Gialanella, who have you
12     treated with in the last 10 years?
13 A   Katie -
14         MS. RUSSELL: Objection.
15 BY MS. GORDON:
16 Q   Go ahead.
17 A   Katy Cranston.
18 Q   And other than Ms. Cranston, who have you treated
19     with?
20 A   I have seen physicians who have prescribed anxiety
21     medications and depression medications. And I
22     believe that list has been produced to you. But I
23     don't recall the names of all those people off the
24     top of my head.
25 Q   Have you treated with a psychologist or do you have

Page 46

1    a psychologist other than, other than Ms.
2    Gialanella?
3  A    I treat with a psychologist. I don't have anyone
4    that I'm treating with currently. But as if Ms.
5    Gialanella thinks that medication is helpful, then
6    she connects me with someone to get that
7    medication.
8  Q    I just - who have you talked to either in person or
9    on Zoom that you were paying for assistance with a
10    mental health issue of any kind other than Ms.
11    Gialanella and Ms. Cranston?
12  A    The psychologists and people that would've
13    diagnosed me with or prescribed anxiety or
14    depression medication.
15  Q    And were they psychologists? Was one or more of
16    them a psychologist?
17  A   I don't know the -
18  Q    What were their names?
19  A    The list of names has been produced in discovery
20    and I don't know them off the top of my head.
21  Q    Did you attend any marital counseling?
22        MS. RUSSELL: Objection.
23        THE WITNESS: Yes.
24  BY MS. GORDON:
25  Q    And who was the marital counselor?

Page 47

1  A    Gemma Haynes.
2        MS. RUSSELL: Objection.
3  BY MS. GORDON:
4  Q    And when did that counseling begin?
5        MS. RUSSELL: Objection.
6        THE WITNESS: June of 2017 or 2018. I don't
7    know which year. Well, it could be 2019. Somewhere
8    before COVID but June or July.
9        MS. RUSSELL: Counsel, this is privilege that
10    she does not have. Move on.
11  BY MS. GORDON:
12  Q    And for roughly how long did you treat with her?
13        MS. RUSSELL: Objection. Don't answer based off
14    of privilege.
15        MS. GORDON: This has already been ruled on by
16    the court.
17        MS. RUSSELL: No, it hasn't.
18        MS. GORDON: There is a court order with regard
19    to these treaters. I'm sorry if you're not aware of
20    it. You can pull up the federal docket. But I am
21    going to take the answer to this question.
22        MS. RUSSELL: And I have already given you all
23    our position on this. We've talked with the
24    provider. She was never billed. She has no
25    privilege with this provider. The privilege is held

Page 48

1    by Mr. Hyde.
2        MS. GORDON: The judge has ruled on this.
3    How many times - what was my last question on that?
4        (Whereupon the question was read back by the
5        court reporter.)
6  BY MS. GORDON:
7  Q    When did you -- yes. Roughly, how many times did you
8    treat with her?
9        MS. RUSSELL: Objection, privilege.
10        MS. GORDON: It's not privilege how many times
11    you treated with somebody is not privileged. It is
12    a 100 percent not privileged. We will be seeking
13    sanctions for this if you're actually going to
14    instruct her not to answer. We'll get the court
15    order. We'll come back to it. I'm sorry you don't
16    know about this. I don't know if you were aware of
17    it or not.
18        MS. RUSSELL: I was at the ruling on the HIPAA
19    releases. I was there. This is a matter of a
20    discovery dispute that's ongoing right now.
21        MS. GORDON: Well, it's - it's no longer a
22    dispute. And I'll note for the record that this is
23    not going to come out of my seven hour time.
24  BY MS. GORDON:
25  Q    All right. I'm going to go back to your -

Page 49

1        MS. RUSSELL: No, it will. We are on the
2    record. As long as we're on the record that comes
3    out of your time.
4        MS. GORDON: You're not the judge, so I'll
5    just -
6        MS. RUSSELL: We're shutting it down after
7    seven hours on the record point blank period.
8        MS. GORDON: I didn't ask you what you were
9    doing.
10  BY MS. GORDON:
11  Q    So let me go back to your questions about your
12    marital counselor. You think you started that
13    around '17, '18, something in there? Is that what
14    you said? Go ahead and tell me when you started
15    treating.
16        MS. RUSSELL: She's not going to answer based
17    off of privilege.
18        MS. GORDON: There is no privilege as to
19    whether she was treating. Your whole theory was
20    that there was some kind of a marital privilege
21    here.
22        MS. RUSSELL: No. That's not - the theory -
23        MS. GORDON: Okay. Now, you're interrupting me.
24    Now you're interrupting as far as -
25        MS. RUSSELL: No. You were addressing me. You

1  said your whole theory is that there is marital
2  privilege. The theory is not marital privilege. The
3  theory is that she was never a patient of Gemma
4  Haynes. The patient was Brandon Hyde. We can go off
5  the record we'll have this conversation.
6      MS. GORDON: We can go off the record so this
7  doesn't eat into my time.
8      MR. ALTMAN: You can't go off the record unless
9  both of us agree to go off the record.
10     MS. GORDON: Okay. We're going off the record.
11     MR. ALTMAN: No, we are not.
12     MS. GORDON: We're off the record.
13     MR. ALTMAN: No, you're not. You can't – the
14  reporter knows full well you have to have an
15  agreement.
16     MS. RUSSELL: We will agree to go off the
17  record right now. Thank you.
18     (Brief pause.)
19  BY MS. GORDON:
20  Q   Back to the last question, Ms. McKenna. Ms. Haynes,
21  I think she's a social worker. Is that accurate as
22  far as you know?
23     MS. RUSSELL: Objection.
24     THE WITNESS: I don't know of her full
25  credentials but I think one of them is social work.

1  BY MS. GORDON:
2  Q   And you've treated with her individually, is that
3  correct?
4      MS. RUSSELL: Objection.
5  BY MS. GORDON;
6  Q   Or seen her individually?
7      MS. RUSSELL: Clarify the question, Counselor.
8  BY MS. GORDON:
9  Q   Separate and apart from marital.
10     MS. GORDON: Please don't interrupt.
11  BY MS. GORDON:
12  Q   Separate and apart from marital counseling, you've
13  seen her on your own, correct?
14     MS. RUSSELL: Objection.
15     THE WITNESS: I don't believe that I have. As I
16  sit here today. I don't recall that.
17  BY MS. GORDON:
18  Q   You're not sure? You're not one way or another?
19  A   As I sit here today, I don't recall treating with
20  Ms. Haynes individually.
21  Q   You're not denying it, you're just not sure?
22     MS. RUSSELL: Objection.
23     THE WITNESS: Ms. Haynes advised that I did not
24  treat with her individually and I don't recall
25  treating with her individually so.

1  BY MS. GORDON:
2  Q   So we're not asking you about what she said. I'm
3  just asking you about you.
4  A   I don't recall treating with Ms. Haynes
5  individually.
6  Q   You're not denying it but you're not sure?
7      MS. RUSSELL: Objection, she's answered.
8      THE WITNESS: I do not recall treating with her
9  individually.
10  BY MS. GORDON:
11  Q   Okay. I'll take that as you're not denying it but
12  your answer is on the record.
13     And you treated for marital counseling with
14  Ms. Haynes, correct?
15  A   My ex-husband -
16     MS. RUSSELL: Objection.
17     THE WITNESS: - Brandon Hyde treated with Ms.
18  Haynes and I do not believe I treated with Ms.
19  Haynes in that context.
20  BY MS. GORDON:
21  Q   When did the time - was the time period you treated
22  with her as a marital counselor?
23     MS. RUSSELL: Objection.
24     THE WITNESS: I did not treat with her. My ex-
25  husband treated with Ms. Haynes.

1  BY MS. GORDON:
2  Q   Did you attend any sessions?
3      MS. RUSSELL: Objection.
4      THE WITNESS: Yes. For his counseling with Ms.
5  Haynes.
6  BY MS. GORDON:
7  Q   And did you go to all those sessions? Like were
8  they joint marital counseling sessions?
9      MS. RUSSELL: Objection.
10     THE WITNESS: I don't believe I'm entitled to
11  talk about his –
12  BY MS. GORDON:
13  Q   Your attorney will tell you –
14  A   - his counseling.
15  Q   Your attorney will tell you.
16     MR. ALTMAN: Hold on. Please let her – please
17  let her finish her answer.
18     MS. GORDON: Well, it's not – it wasn't an
19  answer.
20     MR. ALTMAN: No, no.
21  BY MS. GORDON:
22  Q   Your attorney will let you know if they want you to
23  not answer a question. But let's go back to my
24  question. You were in those sessions, is that
25  correct?

1    MR. ALTMAN: No. Hold on.
2       MS. GORDON: This is not coming out of my time.
3       MR. ALTMAN: It is coming out of your time.
4       MS. GORDON: I'm noting it for the record.
5       MR. ALTMAN: You will treat the witness with
6    courtesy. Okay. You will let her finish her answer.
7    It is common courtesy in a deposition.
8       MS. GORDON: You are incorrect about what's
9    occurring here.
10      MR. ALTMAN: Oh, it's okay - I just want to be
11   clear for the court.
12      MS. GORDON: Please lower your voice and stop
13   screaming, Mr. Altman.
14      MR. ALTMAN: I'm not screaming at you. But I
15   just want you to put on the record for the court
16   that it's appropriate for you to interrupt the
17   witness and not let her answer your questions.
18      MS. GORDON: We are wasting time here.
19      MR. ALTMAN: No. We're going to get that on the
20   record.
21      MS. GORDON: Okay. This is going to - I'm
22   marking the record. This is coming off of the seven
23   hours.
24      MR. ALTMAN: You can do that.
25      MS. GORDON: So is that.

1    MR. ALTMAN: Please confirm that it's
2    appropriate for you to cut the witness off and not
3    allow her to answer your questions.
4    BY MS. GORDON:
5    Q   Ms. McKenna –
6       MR. ALTMAN: No. No. You're going to confirm
7    that or -
8       MS. GORDON: Are you going to instruct the
9    witness not to answer? If you are going to, go
10   ahead.
11      MR. ALTMAN: I'm going to let the witness
12   finish the answer to her question.
13      MS. GORDON: You're not going to tell me what
14   to do about anything.
15      MR. ALTMAN: Oh, yes. Okay. You know what?
16      MS. GORDON: Then you go, then you tell her to
17   answer.
18      MR. ALTMAN: You know what? Your rudeness here
19   is inappropriate and we're going to call the court
20   and see if it's appropriate that you cut the
21   witness off.
22      MS. GORDON: Oh. Oh, that's scary. That's
23   scary.
24      MR. ALTMAN: Okay. Let's go off the record. Get
25   the number for the court.

1    MS. RUSSELL: I've got it.
2       MR. ALTMAN: Let's call. We're off the record.
3       MS. GORDON: I am not going off the record.
4       MR. ALTMAN: She is not answering any of your
5    questions until we –
6       MS. GORDON: Then we're going to make our
7    record.
8       MR. ALTMAN: Good. We're making a motion for
9    protective order.
10      MS. GORDON: Good.
11      MR. ALTMAN: Good. So we're suspending the
12   deposition as we have the right to do. We have the
13   right to suspend the deposition and move for
14   protective order. She is not answering any
15   questions.
16      MS. GORDON: Protective order as to what?
17      MR. ALTMAN: For your abusive nature with the
18   witness.
19      MS. GORDON: What was the abusive nature?
20      MR. ALTMAN: You keep cutting her off
21   consistently
22      MS. GORDON: Okay. That's a reason for
23   protective order?
24      MR. ALTMAN: Absolutely.
25      MS. GORDON: Okay.

1    BY MS. GORDON:
2    Q   Okay. Finish your statement, Ms. McKenna. Go ahead
3    and finish.
4       MR. ALTMAN: Would you please ask her the
5    question again.
6       MS. RUSSELL: Please ask your question again.
7       (Whereupon the question was read back by the
8    court reporter.)
9    BY MS. GORDON:
10   Q   Go ahead. Did you go to any of the counseling
11   sessions?
12      MS. RUSSELL: That's a different question.
13   BY MS. GORDON:
14   Q   With your husband.
15   A   I went to some of the counseling sessions that my
16   ex-husband had with Gemma Haynes. I do not – I did
17   not go to all of his counseling sessions.
18   Q   Prior to becoming pregnant, what medications were
19   you on? For psychological reasons?
20   A   I had Xanax as needed. And I was not - I had a
21   medication for depression that I cannot remember
22   the name of that I had in case I needed it. But I
23   was not taking it daily in the time immediately
24   preceding being pregnant.
25   Q   And for how long had you been taking those

15 (Pages 54 - 57)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 58

1   medications or been prescribed?
2   A   I don't know that off the top of my head.
3   Q   Several years I assume or more?
4   Following the events that are the subject of this
5   lawsuit.
6   Q   Well, when did you start taking Xanax for the first
7   time in your life?
8   A   I don't have that date.
9   Q   Well, roughly.
10  A   Roughly, I don't have that date either.
11  Q   Were you taking Xanax in 2020?
12  A   I think I might have had a prescription for that
13  but I don't know.
14  Q   Who do you use for pharmacy?
15  A   Now or in 2020?
16  Q   2020, 2021, '22, '23, '24.
17  MS. RUSSELL: Let's take it year by year
18  Counsel.
19  MS. GORDON: Well, I don't know if they're
20  different.
21  BY MS. GORDON:
22  Q   Did you use different pharmacies?
23  A   Yes. I would've used different, some different
24  pharmacies.
25  Q   We can get those from you.

Page 59

1   Is it correct that you have a history of abuse
2   in your family?
3   MS. RUSSELL: Objection.
4   THE WITNESS: If you're referring to a
5   document, I would need to see the document.
6   BY MS. GORDON:
7   Q   I just asked you a question. I'm not referring to a
8   document. I said, is that accurate?
9   MS. RUSSELL: Objection.
10  THE WITNESS: I don't know what you're
11  referring to.
12  BY MS. GORDON:
13  Q   I asked you a question. I'm not referring to
14  anything. I'm asking you a question here.
15  MS. RUSSELL: Counsel, specify your question.
16  BY MS. GORDON:
17  Q   I just asked that there was sexual abuse in your
18  family history. You're -
19  MS. RUSSELL: That's not the question that you
20  asked you.
21  MS. GORDON: Can I please get it out?
22  BY MS. GORDON:
23  Q   Did you have a history of sexual – I'm sorry. Of
24  abuse in your family? I'll remove the word sexual.
25  MS. RUSSELL: Those are two different

Page 60

1   questions.
2   BY MS. GORDON:
3   Q   Go ahead. Do you have a history of abuse in your
4   family that you have shared with others?
5   MS. RUSSELL: Objection stands.
6   BY MS. GORDON:
7   Q   Go ahead.
8   A   I don't know what your question means. Can you
9   rephrase the question?
10  Q   Yes. Have you told anybody that you had a history
11  of abuse in your family? Have you ever told anybody
12  that?
13  A   I would need to see the document that you're
14  referring to.
15  Q   Didn't you tell Dr. Cranston that?
16  A   I don't think that Katy Cranston is a doctor.
17  Q   Well, I'm sorry. I apologize. But we'll call her
18  Ms. Cranston. Did you tell her that?
19  A   I don't think that I would have used the words, I
20  have abuse in my family. Ms. Cranston may have
21  documented - if you want to show it to me I can
22  answer probably more accurately. But if you're
23  telling me that - if you're asking me have I said,
24  do I recall saying to Ms. Cranston, I have a
25  history of abuse in my family, I don't.

Page 61

1   Q   I didn't ask you that. That really wasn't my
2   question.
3   MS. RUSSELL: That was your question. Can we
4   read it back?
5   MS. GORDON: No, it wasn't.
6   BY MS. GORDON:
7   Q   Have you reviewed Ms. Cranston's notes at any time?
8   A   I reviewed them very briefly around the time that
9   they were produced and I do not know when that was.
10  Q   You don't remember seeing anything in there that
11  was inaccurate?
12  MS. RUSSELL: Objection.
13  THE WITNESS: I remember seeing things that Ms.
14  Cranston worded differently than I would word but
15  I'm not a provider.
16  BY MS. GORDON:
17  Q   Do you remember telling her that you had a history
18  of abuse in your family and that poetry helped you
19  survive?
20  MS. RUSSELL: Objection.
21  BY MS. GORDON:
22  Q   Does that refresh your recollection?
23  A   If you can show me the document that you're
24  referring to I'll be able to better answer the
25  question.

Page 62

1  Q   So just to be clear, you don't remember whether you
2      had any abuse in your family without looking at
3      medical records?
4          MS. RUSSELL: Objection. I'm going to place an
5      objection on the record that this is getting
6      dangerously close to rape shield here.
7          MS.GORDON: That doesn't exist when you're
8      seeking money damages.
9          MS. RUSSELL: It does.
10         MS. GORDON: The rape shield is a criminal
11     matter. You're incorrect.
12  BY MS. GORDON:
13  Q   Okay. Themes discussed. This is from Ms. Cranston's
14     records which have been produced and you do have.
15     Says, difficult conversation with mom because of
16     abuse in the family dynamics, sixth grade. Poetry
17     helped her survive. Does that refresh your
18     recollection?
19  A   It doesn't. But I'm happy to look at that document.
20  Q   Well, is it going to - is it going to help you if I
21     show it to you? I mean, you just don't remember
22     saying that?
23         MS. RUSSELL: Counsel, what's the basis of
24     this, of this question here.
25         MS. GORDON: Is your client seeking money

Page 63

1      damages in this case? Last time I checked she was.
2          MS. RUSSELL: Yes.
3          MS. GORDON: Yes. That's the reason.
4          MS. RUSSELL: What does what happened in sixth
5      grade have to do with this case, Counsel?
6  BY MS. GORDON:
7  Q   Did you tell her –
8          MS. RUSSELL: Well, I don't know. She reported
9      it to Dr. Cranston in recent years so maybe she
10     could tell you.
11  BY MS. GORDON:
12  Q   And did you also state that you had a history of
13     sexual assault in college?
14         MS. RUSSELL: Objection. It's the same abusive
15     line of questioning here.
16  BY MS. GORDON:
17  Q   To Ms. Cranston?
18  A   Can I please see the document? If you're referring
19     to a document -
20  Q   Let me ask you this. Were you sexually assaulted in
21     college?
22  A   I was.
23  Q   Did that cause you emotional distress?
24  A   At the time it did cause me emotional distress.
25  Q   Has it continued to cause you any emotional

Page 64

1      distress since college?
2          MS. RUSSELL: Objection.
3          THE WITNESS: I wouldn't say it has.
4  BY MS. GORDON:
5  Q   Did you report it to Dr. Cranston?
6          MS. RUSSELL: Objection.
7          THE WITNESS: You're referring to documents
8      that I'm happy to review so that I can accurately
9      answer your questions. I do not recall every
10     conversation that I had with Ms. Cranston as I sit
11     here today.
12  BY MS. GORDON:
13  Q   Did you tell Dr. Cranston - or I'm sorry. I'll say
14     Ms. Cranston – that you had a history of assault in
15     marriage?
16         MS. RUSSELL: Objection.
17  BY MS. GORDON:
18  Q   You remember telling her that?
19  A   I have told you that if you are referring to a
20     document that you can –
21  Q   No. I just asked -
22  A   I'm going to finish my answer now. If you're
23     referring to a document, I'm happy to review the
24     document. And yes, I had a history of assault in my
25     marriage.

Page 65

1  Q   And for how long did that go on? Throughout your
2      entire marriage or were there particular time,
3      specific time periods?
4          MS. RUSSELL: Objection.
5          THE WITNESS: Can you please rephrase your
6      question?
7  BY MS. GORDON:
8  Q   Yes. You have said you had a history of assault in
9      your marriage. So I'm asking you whether that was
10     throughout the course of your marriage to Mr. Hyde.
11  A   It was during times of my marriage. I don't know
12     how - if you would like to ask me a more specific
13     question.
14  Q   Did you have emotional distress from the assault
15     during your marriage or the assaults?
16         MS. RUSSELL: Objection.
17         THE WITNESS: Yes. It was distressing to be
18     assaulted during my marriage.
19  BY MS. GORDON:
20  Q   Did your husband throw or break things during the
21     time you were married to him?
22  A   Yes, he did.
23  Q   Did that cause emotional distress?
24  A   Yes, it did.
25  Q   I assume it did. Is that accurate?

Page 66

1        MS. RUSSELL: Objection. You're testifying.
2   BY MS. GORDON:
3   Q   Did it cause emotional distress?
4   A   Yes, it caused emotional distress. I would
5       appreciate the opportunity to finish my answer
6       before you continue to the next question.
7   Q   Was your first job out of law school with McKeen &
8       Associates as a law clerk?
9   A   Yes, it was. Actually, a first job out of law
10      school, you mean, as a paid position?
11  Q   Yes.
12  A   I had internships during law school that would have
13      been before that.
14  Q   While you were at the McKeen office, he
15      specializes, by the way, in med mal, is that
16      correct?
17  A   Yes, he specializes in medical malpractice.
18  Q   Right. And he used Bob Riley as a facilitator, is
19      that correct?
20  A   I'm sure he did but I wasn't aware of that at the
21      time, I don't believe.
22  Q   Well, you attended various facilitations that were
23      mediated by Robert Riley while you were at McKeen's
24      office, correct?
25  A   I don't think I attended any facilitations with - I

Page 67

1       don't recall attending facilitations with Bob Riley
2       at McKeen's office.
3   Q   Well, in your complaint in paragraph 34, you state
4       between 2014 and the summer of 2019, while working
5       as a law clerk and then a lawyer, McKenna attended
6       various facilitations that were mediated by Riley.
7       Was that a correct statement in your complaint or
8       an incorrect statement?
9        MS. RUSSELL: Objection.
10       THE WITNESS: It was a correct statement in my
11      complaint.
12  BY MS. GORDON:
13  Q   So you did attend mediations with Robert Riley
14      while you worked for McKeen, correct?
15  A   I was a law clerk at Mellon Pries and that is what
16      that sentence in that complaint is referring to.
17  Q   So did you attend any facilitations while you were
18      working for Brian McKeen with Riley?
19  A   As I previously said, as I sit here today, I do not
20      recall attending facilitations with Bob Riley while
21      working with Brian McKeen.
22  Q   And so that was at your next job, is that correct?
23  A   Yes. I went from McKeen's office as a law clerk to
24      Mellon Pries as a law clerk.
25  Q   Why did you leave McKeen's office?

Page 68

1   A   Because I wanted to try both the plaintiff side and
2       the defense side of medical malpractice.
3   Q   Were you terminated by McKeen?
4   A   No.
5   Q   So then you went to Mellon Pries, and what was
6       their area of expertise?
7   A   Defense medical malpractice and insurance defense
8       and some other miscellaneous, I would say, PI
9       defense.
10  Q   And you worked there for one year, is that
11      accurate?
12  A   No. I worked there for longer than that.
13  Q   I thought you worked from September 2014 to October
14      2015, is that inaccurate?
15  A   October of 2015 would have been when I became an
16      attorney. So I would have worked as a law clerk
17      during that time and then would have passed the bar
18      and my role would have shifted.
19  Q   And so you were there for one year as a clerk and
20      then you had 2.5 years as an attorney, is that
21      correct?
22  A   Yes.
23  Q   Why did you leave?
24  A   Because Mr. Mellon had just had a significant back
25      surgery and was talking about retirement due to

Page 69

1       complications he had as a result of that back
2       surgery.
3   Q   So was the firm closing down?
4   A   It didn't -
5        MS. RUSSELL: Objection.
6   A   His practice was changing so his intention was not
7       to close it down.
8   Q   So in any event, while you were at Mellon Pries,
9       you did sit in on or were aware of facilitations
10      that were mediated by Bob Riley?
11  A   Yes, I was.
12       MS. RUSSELL: Objection.
13  BY MS. GORDON:
14  Q   And at that time you learned that Bob Riley did a
15      lot of medical, or that he was handling medical
16      malpractice facilitations, correct?
17  A   The facilitations that I attended while at Mellon
18      Pries were medical malpractice.
19  Q   And then you went to Foley Baron?
20  A   Yes.
21  Q   And what was their expertise or specialty?
22  A   I think they have a number of areas of expertise.
23  Q   Was medical malpractice defense one of them?
24  A   Yes.
25  Q   And they used Robert Riley as a facilitator as

Page 70

1    well?
2  A   In addition to others, yes.
3  Q   Sure. And you were aware of that at the time you
4      were there, correct?
5  A   Yes, I was -
6  Q   Did you sit in - I'm sorry. Were you finished? Yes,
7      you were aware?
8  A   I went, I attended facilitations –
9  Q   Did you attend facili –
10 A   - with Bob Riley.
11 Q   I'm sorry?
12 A   I attended facilitations in which Bob Riley was the
13     facilitator while at Foley Baron.
14 Q   So who else was used by Foley Baron as a med mal
15     facilitator that you can recall?
16 A   I believe Michael Dolenga was used, and potentially
17     Dan Makarski, perhaps. Those are the two names that
18     come to mind. Oh. And I can't remember her name but
19     it's Paula. Manis. Paula Manis?
20 Q   Yes.
21 A   I think that would be the other person that I
22     recall.
23 Q   And these lawyers are still around handling
24     facilitations as far as you're aware, is that
25     correct?

Page 71

1      MS. RUSSELL: Objection.
2      THE WITNESS: I don't know about Paula Manis.
3  But Michael Dolenga, I believe, is still handling
4  facilitations. I facilitated a case with him. And I
5  don't know about Dan Makarski.
6  BY MS. GORDON:
7  Q   And based on your experience at these law firms
8      that were doing med mal defense work, generally
9      they had a group of facilitators that they would
10     use. Was that the way you understood it? There were
11     the regulars that –
12     MS. RUSSELL: Objection.
13 BY MS. GORDON:
14 Q   - had a specialty in med mal, is that accurate?
15 A   I believe who an attorney wanted to use was
16     dependent on their preference. And it depended on
17     the attorney who, their list of people to
18     facilitate a case entailed.
19 Q   Did you have any people – well, strike that.
20     Did you handle any facilitations on your own
21     when you were working for these law firms?
22     MS. RUSSELL: Objection.
23     THE WITNESS: Yes.
24 BY MS. GORDON:
25 Q   And who did you use during those facilitations?

Page 72

1  A   Whoever the lead. There would be a lead attorney
2      who would decide on a facilitator. So I worked for
3      other attorneys and then they would send me to the
4      facilitation. So I didn't choose anyone.
5  Q   And during your time doing med mal defense work,
6      explain to me how a facilitator would be selected,
7      typically. I know it was up to the defense and the
8      plaintiff's lawyer. But just from your experience,
9      how does that process work? Somebody would suggest
10     a name?
11 A   From my -
12     MS. RUSSELL: Objection.
13 BY MS. GORDON:
14 Q   Go ahead.
15 A   From my experience, the lead attorney on the case
16     would talk to the lead attorney on the plaintiff's
17     side of the case and they would suggest a name. And
18     if they couldn't come to an agreement on the name,
19     obviously the client, from the defense perspective,
20     the hospital client or the insurance provider
21     client would weigh in on whether they approved of
22     whatever particular facilitator. So it would be the
23     defense attorney that's handling the case, the
24     plaintiff's attorney and then the defense client.
25     And then if there was an agreement reached on a

Page 73

1      name, then that would be the person.
2  Q   And both sides obviously had to agree on the person
3      unless it was court-ordered, correct?
4  A   That was my experience.
5  Q   And then the fee of the facilitator would be split,
6      is that accurate, by the parties usually?
7  A   Usually.
8  Q   And the insurance adjuster had played a - who would
9      have been your client when you were on the defense
10     side would have had a role in selecting the
11     facilitator, correct?
12 A   Yes. I – yes.
13 Q   And Bob Riley at the time, we're talking about here
14     with these earlier firms, he had specialized in med
15     mal defense work, correct, as you understood it?
16 A   I did not under - specialized in - I'm sorry. Can
17     you rephrase the question?
18 Q   His firm, Riley Hurley, handled - aside from Bob
19     eventually becoming more or less a full-time
20     facilitator, they had handled med mal defense work,
21     correct?
22 A   As I understood it, Bill Hurley handled med mal
23     defense work. And I thought that Bob had been a
24     facilitator for some - I didn't know that Bob was
25     still handling med mal defense work if that's -

Page 74

1  Q  I'm not saying he was. But did you know that was
2     his background? That's how he was - why he was
3     being used, because he had expertise on the defense
4     side?
5  A  I thought he had expertise on both sides.
6  Q  And you knew Hurley handled med mal defense,
7     correct?
8  A  Primarily, yes.
9  Q  And did you use him as a facilitator prior to
10    getting to OMP as an employee?
11 A  No.
12 Q  You never used Hurley?
13 A  I don't believe Hurley was facilitating cases when
14    I was at Foley Baron. And then I was at Riley and
15    Hurley, so I wasn't using him then. So no, I don't
16    recall ever using Hurley.
17 Q  You used him at Olsman, is that correct?
18 A  Yes, I did use him at Olsman.
19 Q  And he and Bob shared the same office, is that
20    accurate? He and -
21       MS. RUSSELL: Objection.
22 BY MS. GORDON:
23 Q  - Bob Riley, is that correct?
24 A  They share an office location.
25 Q  They were partners, correct?

Page 75

1  A  They are partners.
2       MS. RUSSELL: Let her finish her answer,
3     Counsel.
4  BY MS. GORDON:
5  Q  Who else worked at the OMP firm when you arrived
6     there?
7  A  I believe they have like 50 employees so do you -
8     do want me to - can we start with attorneys or?
9  Q  Let's go by categories.
10 A  Okay.
11 Q  How many attorneys did you understand were working
12    at Riley Hurley when you arrived there as an
13    employee?
14 A  Okay, I'm sorry. The question you asked before was
15    about Olsman. But you're talking about Riley and
16    Hurley now?
17 Q  Yeah.
18 A  Okay. So attorneys at Riley and Hurley would be
19    Bill Hurley, Bob Riley and Allison Ensch.
20 Q  Who else was employed there?
21 A  Sonia Mullins, Marilyn Kaliszewski and Kelly
22    Thweatt. And there was, Dave Baldridge had office
23    space there. And I couldn't tell you - he's an
24    attorney but I don't believe he was technically an
25    employee but I don't know the exact arrangement of

Page 76

1     that.
2  Q  And Sonia, Marilyn and Kelly did what?
3  A  During what time period?
4  Q  At the time you joined the Olsman firm.
5  A  Sorry. The Riley firm or the Olsman firm?
6  Q  I'm sorry. The Riley firm.
7  A  I believe Marilyn was Bob's assistant and also the
8     office manager. Kelly was Bill's assistant. And
9     Sonia's role shifted during the time I was there.
10    But as I recall, she was the assistant for both
11    Allison and she did some work for Dave Baldridge
12    when I got there. But, again, the roles of those
13    three people shifted a little bit.
14 Q  And how did you end up applying at Riley Hurley?
15 A  I did not apply to work at Riley Hurley.
16 Q  Were you approached to work there?
17 A  I was connected to Bob Riley by a woman named Diane
18    Gallagher, who was an adjuster for Henry Ford
19    Health.
20 Q  Was that in July or August of 2019, approximately?
21 A  It was in the summer of 2019.
22 Q  Had you been looking for other work at that time?
23 A  I had been approached by a different firm prior to
24    her reaching out to me.
25 Q  And who was that? What firm?

Page 77

1  A  Sommers Schwartz.
2  Q  And did you talk to Sommers Schwartz about a job?
3  A  Yes.
4  Q  And what happened with that?
5  A  I was still talking to them about that job when I
6     was approached by Diane Gallagher.
7  Q  And then after you were approached by Gallagher,
8     did she connect you up with Riley Hurley?
9  A  She connected me with Bob Riley.
10 Q  And did you ever get an offer from Sommers
11    Schwartz?
12 A  Yes, I did.
13 Q  And when you were going to – when you did join the
14    Riley firm, Hurley was handling med mal cases at
15    that time, is that correct?
16 A  That is correct.
17 Q  And Riley was handling facilitation, is that
18    correct?
19 A  Yes, he was.
20 Q  And just give us an overview of your work that you
21    did for Bill Hurley on his med mal defense cases.
22       MS. RUSSELL: Objection.
23       THE WITNESS: So he also had a case that was a
24    premises liability case for Beaumont in addition to
25    the med mal cases. So I assisted with that as well.

Page 78

1    But I acted as an associate on the case and I did
2    legal research and assisted him with prepping. That
3    particular premises liability case needed to be
4    prepared for trial. But I would meet with experts,
5    meet with fact witnesses, write summaries, write
6    reports for the defense, for hospitals, the
7    reporting that they expected. And generally I acted
8    as an associate to Bill.
9  BY MS. GORDON:
10  Q    And the facilitators at the Riley Hurley firm when
11    needed were selected the same way, is that correct,
12    as what you previously described?
13  A    A decision between the plaintiff and the defendant
14    with the clients involved, yes.
15  Q    And also around this time of you looking at other
16    jobs, you met up with Donna Mackenzie, is that
17    correct?
18  A    What time frame are we talking about?
19  Q    This is 2019.
20  A    When in 2019?
21  Q    Okay. Let me roll back. You left Foley Baron, is
22    that correct?
23  A    Yes.
24  Q    And that would have been in September of 2019, is
25    that correct?

Page 79

1  A    Correct.
2  Q    So you stated that one of the reasons you left was
3    that the workload was too heavy, is that correct?
4       MS. RUSSELL: Objection.
5       THE WITNESS: I don't recall stating that.
6  BY MS. GORDON:
7  Q    Have you seen the file that's been produced by that
8    law firm with regard to you?
9  A    I have not.
10       MS. RUSSELL: We don't have a copy of that,
11    Counsel.
12       MS. GORDON: Okay.
13       MS. RUSSELL: Do you plan to produce it?
14       MS. GORDON: I'll discuss that with you at some
15    other time. I don't know what you have or what you
16    don't or what you yourself have subpoenaed from
17    third parties. Or if you've asked us to give you -
18       MS. RUSSELL: I've not subpoenaed anything.
19       MS. GORDON: Well, I don't know if you've asked
20    us to provide you with subpoenaed documents.
21  BY MS. GORDON:
22  Q    Wasn't it also accurate that you took the position
23    you had too heavy of a workload at -
24       MS. RUSSELL: Counsel, we can't answer any of
25    this based off of Rule 26, mandatory disclosures.

Page 80

1    If you're not going to let us see this and you
2    haven't produced it, move on.
3       MS. GORDON: I'm entitled to ask whatever I
4    want about whatever I want. If you have sought a
5    document and it has not been produced, you should
6    certainly mention that.
7       MS. RUSSELL: We haven't sought any documents.
8    You all subpoenaed this. You have not -
9       MS. GORDON: Okay. I have no rule where I am
10    required to give you anything. You are entitled to
11    copies of subpoenas, which you've received. And if
12    you want them from us, you can get them, or you can
13    get them from the other side. But you must make a
14    request. There's nothing in the federal rules or
15    the state rules that require us to cover documents.
16    Nonetheless -
17       MR. ALTMAN: Yes, it does. Rule 26A, mandatory
18    disclosure says any document you intend to use to
19    further your claims or defenses you must produce.
20    So under 26A, please produce the document.
21       MS. GORDON: Okay, I disagree this falls under
22    that category.
23       MR. ALTMAN: Okay.
24  BY MS. GORDON:
25  Q    Do you recall taking the position that the workload

Page 81

1    was too heavy for you at Foley Baron? Did you feel
2    that way? Did you feel the workload was too heavy?
3       MS. RUSSELL: Objection.
4       THE WITNESS: I recall billing 260-hour-plus
5    months at Foley Baron. And there were a number of
6    things that I felt about working at Foley Baron.
7  BY MS. GORDON:
8  Q    What were they?
9       MS. RUSSELL: Objection.
10       THE WITNESS: I had made a decision to leave
11    Foley Baron.
12  BY MS. GORDON:
13  Q    Why did you want to leave?
14  A    That is a - there are multiple reasons.
15  Q    Give me the multiple reasons.
16  A    I was approached by Diane Gallagher, the adjuster
17    for Henry Ford, who told me that the partners at
18    Foley Baron were circumventing work from me that
19    would have been assigned to me. That was
20    corroborated by Bob Riley, who had spoken to me at
21    this point in time.
22       I had confronted sexual harassment by Brian
23    Whitelaw of other associates. And I was working
24    260-plus-hour weeks or months billing those hours
25    at Foley Baron.

21 (Pages 78 - 81)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 82

1 Q So there was some sexual harassment from Brian
2 Whitelaw and others while you were there that was a
3 part of your thought process?
4 A Brian Whitelaw made inappropriate comments to other
5 employees and I confronted him about it.
6 Q Did he make inappropriate comments to you?
7 A Yes. But it was primarily other employees.
8 Q Okay. And who did you report to?
9 A I reported it to Clyde Metzger. And then I sat in a
10 meeting with Brian Whitelaw, Clyde Metzger, Randy
11 Juip, and Karen Dierkes and was told to confront
12 Brian Whitelaw with what he had said and I did so.
13 Q And then what happened?
14 A He said he was sorry.
15 Q And who is the individual that you said you went to
16 to report this?
17 A Clyde Metzger, who was the managing partner at the
18 time. And I don't know what his position is now.
19 Q And what happened with Whitelaw, if anything, if
20 you're aware?
21 A I have indicated what happened, which is that I sat
22 in a meeting and I discussed with him his
23 inappropriate conduct and he said he was sorry.
24 Q Did you seek any money damages from the firm for
25 what you had experienced?

Page 83

1 A No, I asked for him to stop.
2 Q So you did not seek money damages?
3 A I did not.
4 Q Did you receive any money damages?
5 A I did not.
6 Q And how often were these comments made, roughly?
7 A They were made on – they weren't at a frequency
8 that I could describe.
9 Q Often, though?
10 A They happened over a period of time. And I
11 confronted them, so they stopped. I don't know how
12 I could tell you how often they happened.
13 Q What was the nature of his comments? I realize you
14 probably don't remember them word for word but what
15 was sort of the nature of them?
16 A They were sexual and about other people's
17 appearance.
18 Q What do you mean when you say they were sexual?
19 A He talked about an orgasm at one point in time. He
20 talked about handcuffing a legal assistant in a
21 sexual manner at another point in time. He talked
22 about recognizing someone he ran into in Meijer by
23 her butt and a different sexual fantasy involving a
24 different associate.
25 Q Most of these were - some of them at least were in

Page 84

1 your presence?
2 A Yes. And I confronted him about them when we sat at
3 the meeting.
4 Q So that was one of the other issues or concerns you
5 had about this law firm, correct?
6 A I hoped that it had resolved but it certainly -
7 Q Made you think you should look elsewhere?
8 A I didn't look elsewhere because of it. I was
9 approached. So, no, it didn't make me think I
10 looked elsewhere. But it was something I had in the
11 back of my mind as, okay, this is a little
12 concerning.
13 Q What other issues did you have with the law firm
14 that caused you to leave?
15 A As I previously stated, I was told by Diane
16 Gallagher that work was being circumvented from
17 being assigned to me.
18 Q You already said that. Do you recall having the
19 thought process that they didn't respect you saying
20 no?
21 MS. RUSSELL: Objection.
22 THE WITNESS: In what context? I don't - I'm
23 sorry. Can you rephrase the question?
24 BY MS. GORDON:
25 Q I believe it was a comment you made to the firm

Page 85

1 about one of the reasons you left was that the firm
2 just didn't respect the word no when you said no
3 about something.
4 A I don't recall the context of that. I can't give
5 you more than that. But if you show me a document,
6 I would be able to probably answer more accurately.
7 Q So you've now been connected up with the Riley Law
8 Firm. And do you interview - you've mentioned
9 Sommers Schwarz. Did you interview any place else
10 at around this time period for a new job?
11 A I did, yes.
12 Q Your complaint alleges that you were approached by
13 other law firms, is that accurate?
14 A Yes.
15 Q What other law firms approached you in July or
16 August 2019 with regard to possible jobs?
17 A As I sit here today, I don't know that I recall
18 every law firm. But Bob connected me with a few
19 other law firms or had law firms approach me as I
20 understand it. I believe I spoke with Brian McKeen.
21 And I did speak with someone from Kerr Russell and
22 Randy Blau's office. And I don't - I'd have to give
23 that more thought to make sure that list is
24 complete.
25 Q Did you get talk to people from those specific law

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 90

1  A   I believe his intention was to wind down his
2      practice.
3  Q   Right. And based on his winding down his practice
4      and hence the litigation part of the firm no longer
5      being existent, the employees were encouraged to
6      look for work, is that correct? Different work, new
7      jobs?
8  A   I don't know that that's correct.
9  Q   I have a text message between you and Emily Peacock
10     dated 7/29/2021 where you state, you're being asked
11     by her what's happening. And you say, well, Bob is
12     in Alaska and he didn't want me to tell anyone at
13     the office until he was back. But everyone knows
14     Bill is done soon and that we were encouraged to
15     find new jobs.
16        MS. RUSSELL: Counsel, are you entering this as
17     an exhibit?
18        MS. GORDON: No. I'm just identifying as a
19     Bates number 795.
20  BY MS. GORDON:
21  Q   Do you remember that?
22  A   Can I see the document?
23  Q   Sure. I've highlighted it. That's what you -
24        MR. ALTMAN: Do you have a copy for us by any
25     chance?

Page 91

1        MS. GORDON: No. Sorry.
2  BY MS. GORDON:
3  Q   That's your text?
4        MS. GORDON: These are all produced.
5        MR. ALTMAN: I understand. But we don't have
6      the whole production.
7        MS. GORDON: Yeah. As you can – we've got a lot
8      of texts here. But if you want to take a look at
9      it, please do. She can hand it down to you.
10       MR. ALTMAN: I wish I could.
11       THE WITNESS: In response to Emily's question
12     about it being hush hush that I was leaving Bob's
13     office.
14  BY MS. GORDON:
15  Q   Right.
16  A   Yes. I said this, that people knew that Bill was
17     done soon.
18  Q   So Hurley's leaving, everyone's being encouraged to
19     find new jobs. And you yourself were looking for a
20     job and you had connected up with the Olsman Firm,
21     correct?
22  A   What do you mean by connected up with Olsman?
23  Q   You had already been in touch with Donna Mackenzie
24     in 2019 earlier, correct?
25        MS. RUSSELL: Counsel, one more time. What was

Page 92

1      the Bates number on that?
2        MS. GORDON: 795.
3        THE WITNESS: You were saying in 2019 that I
4      was –
5  BY MS. GORDON:
6  Q   Yeah, I'm sorry. I apologize. On June 3rd, 2021 you
7      contacted Donna about a job. Do you recall that?
8  A   I don't know the specific date of when I contacted
9      Donna. And Bob put me in touch with Donna.
10  Q   And I think you had actually met Donna in 2019. Do
11     you recall that from some other activity?
12  A   I might have met her at a legal event. If you could
13     point me to a – something, I could tell you if
14     that's -
15  Q   I'm just asking you.
16  A   I couldn't pick the year that I met Donna out of
17     the past so many years. I couldn't.
18  Q   And so Bob connected you up with Donna, is that
19     what you just said?
20  A   Well, if you're telling me that I met Donna
21     previously and I met - I'm just asking if you have
22     something that can help me better answer your
23     question I'm happy to do that.
24  Q   No. I moved on. At the time of this Bates 795, Bob
25     - everyone knows Bill is gone soon. We are

Page 93

1      encouraged to find new jobs. And it was around this
2      time that you were connected up or a little bit
3      earlier with Donna. Are you saying that was by Bob?
4      He connected you up?
5  A   Bob was involved in my talking to Donna. I don't
6      have exact dates in front of me. But at the time of
7      those text messages, I believe those are after I've
8      accepted a position with Olsman Mackenzie.
9  Q   Right. They are.
10        MS. RUSSELL: Counsel, we are about 10 minutes
11     to the next hour of this dep so I think we're
12     looking at another break, if not lunch. I'm just
13     putting that out here.
14        MS. GORDON: Off the record for a second.
15        (Brief pause.)
16  BY MS. GORDON:
17  Q   Back to you getting connected up with the Olsman
18     Firm. You had actually - you've already said you
19     met Donna. I have a text between you and Donna.
20     Apparently, you were at the Riley office for a
21     facilitation. I'm sorry. Donna was at the Riley
22     office for a facilitation and she stopped in to see
23     you. Do you remember that?
24  A   I do remember that.
25  Q   You do?

1  A  I don't recall a year, but yes, I remember that.
2  Q  That was November 8th, 2019. And you sent her a
3     nice note saying, thank you for stopping by to
4     chat. It means a lot to me. You are so kind. Also,
5     I definitely should not have talked badly about
6     FBMJ. That would be your prior employer, correct?
7  A  Correct.
8        MS. RUSSELL: Counsel, what's the Bates on
9     this?
10       MS. GORDON: Plaintiff 2.
11 BY MS. GORDON:
12 Q  That's of course between us but I should have been
13    better. I'm so sorry about that. Does that refresh
14    your recollection that Donna, she was mediating
15    with Bob and she you were there and she stuck her
16    head in and said hello?
17 A  I don't know why Donna was there. But I remember
18    Donna at some point sticking her head in my office
19    and saying hello.
20 Q  And then you connected back up with her or she with
21    you in June 2021. Do you recall that? If you wanted
22    to get drinks?
23 A  If you show me a document.
24 Q  Does it sound familiar?
25 A  In the summer of 2021 we were reconnecting.

1  Q  And you were excited to see her, do you remember
2     that?
3  A  I don't recall. I'm sure I looked forward to seeing
4     her.
5  Q  You liked Donna, is that correct?
6        MS. RUSSELL: Objection.
7        THE WITNESS: At the time of this?
8  BY MS. GORDON:
9  Q  Yeah.
10 A  Did I like Donna?
11 Q  Yes.
12 A  Yes. I thought she was a nice person.
13 Q  Did there come a time you stopped thinking Donna
14    was a nice person?
15       MS. RUSSELL: Objection.
16       THE WITNESS: Yes.
17 BY MS. GORDON:
18 Q  When was that?
19       MS. RUSSELL: Objection.
20       THE WITNESS: When she started treating me
21    differently.
22 BY MS. GORDON:
23 Q  Oh. When did that start?
24 A  After I complained about Bob riley.
25 Q  What's the date she started treating you

1     differently?
2        MS. RUSSELL: Objection.
3        THE WITNESS: I don't recall a specific date.
4  BY MS. GORDON:
5  Q  You don't have a general date?
6  A  What do you mean by a general date?
7  Q  Do you have any kind of a date or are you just
8     saying you have no date where Donna started
9     treating you differently?
10 A  I began complaining more about Bob Riley's
11    behaviors in early 2023.
12 Q  But beyond that, you don't have a date as to when
13    Donna started treating you differently?
14 A  In 2023, she started treating me differently.
15 Q  And then you thought she wasn't nice?
16       MS. RUSSELL: Objection.
17       THE WITNESS: I was disappointed by her
18    response.
19 BY MS. GORDON:
20 Q  And when in 2023 do you think this would've been?
21 A  In around Easter of 2023. Bob had invited me to his
22    house and I would say in the months in March 2023
23    and on. I don't have a specific date for you.
24 Q  Donna and you continued to interact with one
25    another via text in an extremely cordial and

1     friendly way throughout 2023, didn't you?
2  A  She was my employer and I was cordial with her,
3     yes.
4  Q  Where you thought she was treating you differently.
5     You never said that in any of your text messages,
6     did you?
7        MS. RUSSELL: Objection.
8        THE WITNESS: I don't know if I said it. I
9     don't recall if I said it in a text message.
10 BY MS. GORDON:
11 Q  Well, you're sitting here today in a lawsuit suing
12    somebody. And one of your allegations is that you
13    were treated differently than others. So sitting
14    here today, under those circumstances, you don't
15    have any knowledge of a record you ever made that
16    Donna treated you differently, is that correct?
17       MS. RUSSELL: Objection.
18       THE WITNESS: I spoke with Donna about treating
19    me differently.
20 BY MS. GORDON:
21 Q  You have nothing in writing, is that correct?
22       MS. RUSSELL: Objection.
23       THE WITNESS: I don't recall if there's
24    anything in writing.
25 BY MS. GORDON:

1  Q  And to the extent you spoke to her, you continued
2     to communicate with her in an extremely friendly
3     manner, didn't you?
4  A  I am sure I treated her kindly as she was my
5     employer.
6  Q  You treated her kindly? I'm not sure what kindly
7     means in your context.
8  A  Well, you're saying cordially so I'm not sure.
9  Q  Well, you did stuff like communicate with her about
10    what you were wearing to events and getting
11    together and going out to drinks and work matters.
12    This went on throughout 2023, didn't it?
13  A  Yes. I tried to stay on a good side of Donna
14    because she was my employer.
15       MS. RUSSELL: Counsel, what Bates are you
16    referring to?
17       MS. GORDON: I've got Bates Plaintiff 4 all the
18    way through Plaintiff 205.
19  BY MS. GORDON:
20  Q  And throughout 2023 Donna stayed in touch with you
21     on your cases and what you were doing and you
22     stayed in touch with her, is that correct?
23  A  Yes.
24  Q  And you discussed business matters with her via
25    text, didn't you?

1  A  I don't have a text message in front of me. But if
2    you want to show me the document I can better and
3    more accurately answer your question.
4  Q  You produced these documents to us, so I assume you
5     had some familiarity with them. Did you review them
6     before you produced them?
7  A  I believe the entire text thread with Donna was
8     produced.
9  Q  Did you see it before it was produced?
10  A  I did not go through every text I've had with Donna
11    prior to its production. I produced the entire
12    thing.
13  Q  So what all these cheerful, cheery texts between
14    you and Donna were fake?
15       MS. RUSSELL: Objection.
16  BY MS. GORDON:
17  Q  In 2023? Is - are you testifying to that?
18  A  As I've said before, Donna was my employer and I
19    was trying to keep her happy.
20  Q  But if somebody is mistreating you, as a
21    professional you have a right to raise the issue,
22    don't you?
23  A  And I raised the issue with Donna and I - yes.
24  Q  Well, I don't have a date that you raised an issue
25    and I don't have anything in writing where you

1    raised an issue. Agreed?
2       MS. RUSSELL: Objection.
3       THE WITNESS: What do you mean you - I don't
4    know what you mean by that question.
5  BY MS. GORDON:
6  Q  You have not been able to give me a date where you
7    raised this with Donna that you felt you were being
8    treated differently, correct? You don't have a
9    date. We've already covered this.
10  A  I told you I don't recall a specific date.
11  Q  Yes. And you don't remember a date in general
12    either, correct?
13  A  I told you that she started treating me differently
14    in 2023.
15  Q  Well, that's a long period of time. But you don't
16    remember when you raised it with her. I think we've
17    covered this, correct?
18  A  It was raised with her on numerous occasions.
19  Q  It seems odd that you would continue to mention
20    something. You're saying you want to stay on the
21    good side of her. It didn't stop you from raising
22    issues with her, apparently, correct?
23       MS. RUSSELL: Objection.
24       THE WITNESS: I don't understand the question.
25  BY MS. GORDON:

1  Q  You just got done saying you raised it with her
2    numerous times verbally about you being treated,
3    not being accommodated or treated differently. You
4    just said those words. You said it to her multiple
5    times. You don't have a date, is that your
6    testimony?
7  A  I don't have the first date that it happened. That
8    would be my testimony.
9  Q  Did you say it to her more than one time?
10  A  Yes.
11  Q  And you have no written record of any of that, is
12    that correct?
13  A  I believe a recording has been produced of a
14    conversation that I had with Donna and there was a
15    date associated with that recording that I don't
16    have off the top of my head.
17  Q  Yeah. That's when you had –
18  A  And so that was in January and I don't have those
19    dates. And I raised it multiple times. And I raised
20    it before then. But I don't have the dates of when
21    I raised it before then.
22  Q  You set up a recording to catch people because you
23    were already starting your new law firm. And so on
24    your way out the door you went looking to try to
25    get Donna and Emily to say things and you secretly

Page 102

1  recorded them.
2      MS. RUSSELL: Counsel, objection. Rephrase your
3  question. Because that is argumentative and
4  testifying.
5  BY MS. GORDON:
6  Q  That's the recording you're talking about, correct?
7  A  I disagree with your characterization of the
8  recording.
9  Q  Well, that's fine. I've got documents to back up
10  everything. So let's go back to where I was. So in
11  June of 2021, you were contacting Donna, you were
12  getting together on July 7th. I don't know if you
13  remember this or not. You met for a drink, does
14  that sound right? You met for a drink, does
15      MS. RUSSELL: Are we still in the same Bates
16  range?
17      MS. GORDON: Yes, we are.
18  BY MS. GORDON:
19  Q  Do you remember that?
20  A  I met - as I recall, I met Donna for dinner in the
21  summer. I could not tell you if that's the correct
22  date. If you have a doc -
23  Q  Do you remember telling -
24  A  If you would let me finish my answer.
25  Q  I'm looking down at a page, so I'm sorry, I can't

Page 103

1  see that you're still talking. Go ahead.
2      MS. RUSSELL: You can hear her.
3      THE WITNESS: You can hear that I'm still
4  speaking.
5  BY MS. GORDON:
6  Q  Well, you paused. Go ahead. Are you done?
7  A  Please re-ask your question.
8  Q  I'll withdraw it. We've got what we've got on the
9  record.
10      MR. ALTMAN: Well, no. Then you need to
11  withdraw her answer if you withdraw your question.
12      MS. GORDON: I didn't know there was an answer
13  there.
14  BY MS. GORDON:
15  Q  So on July 7 -
16      MS. RUSSELL: There's a partial answer. That's
17  been the whole dispute.
18      MR. ALTMAN: Hold on. Do we have an agreement
19  that you're going to withdraw her answer?
20      MS. GORDON: No.
21      MS. RUSSELL: Then you –
22      MR. ALTMAN: Then you can't withdraw the
23  question.
24      MS. RUSSELL: Then we ask reporter, can you
25  please read back her prior question?

Page 104

1      (Whereupon the question was read back by the
2  court reporter.)
3      MR. ALTMAN: She was in the process of giving
4  an answer.
5  BY MS. GORDON:
6  Q  What's your answer?
7  A  Well, there are a number of questions in that
8  question.
9  Q  No. Does that sound right that you met Donna for a
10  drink?
11  A  And it's also that Donna reached out to me and I
12  don't recall whether -
13  Q  That wasn't in the question.
14      MS. RUSSELL: Object to form.
15  BY MS. GORDON:
16  Q  You already answered.
17  A  The premise of the question is the - I don't - I'm
18  happy to look at a –
19  Q  We passed the premise.
20  A  I'm happy to look at if you have a document that
21  you want me to look at so that I can best accurate.
22  Q  I just asked you if you remembered it.
23  A  I recall that I went to dinner with Donna in the
24  summer of 2021.
25  Q  And you knew Donna was friends with or friendly

Page 105

1  with Bob Riley and worked with him, correct? At
2  this time?
3      MS. RUSSELL: Counsel, when you're referring
4  to – sorry. When you're referring to the dinner
5  that we just talked about, were you're referring to
6  specific Bates ranges? I saw you looking at your -
7      MS. RUSSELL: No. I don't have to tell you what
8  I'm looking at in my notes. Go ahead.
9      MS. RUSSELL: I just want to know so that we
10  can go back and review the production. If you're
11  talking about a specific text message, I'd like to
12  know what the Bates range is.
13      MS. GORDON: No, I'll let you know if I am.
14      THE WITNESS: Can you -
15  BY MS. GORDON:
16  Q  You knew at the time you had that drink or dinner
17  with Donna, you knew that she and her firm were
18  friendly with Bob Riley, correct?
19  A  Yes. I knew they had a relationship.
20  Q  So you knew that they used Bob as a facilitator, is
21  that correct?
22  A  Yes.
23  Q  And is it your testimony that Bob told you to apply
24  at OMP or not?
25  A  Bob was involved in connecting me with Donna.

27 (Pages 102 - 105)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 106

1  Q   And you appreciated his assistance?
2        MS. RUSSELL: Objection.
3        THE WITNESS: I don't know what you mean by
4    that question.
5  BY MS. GORDON:
6  Q   Did you appreciate his assistance in trying to
7    connect you up with a new employer?
8  A   I appreciated being able to get away from Bob.
9  Q   Did you appreciate Bob's assistance?
10       MS. RUSSELL: Asked and answered. Objection.
11  BY MS. GORDON:
12  Q   Were you happy to have Bob assist you?
13  A   I was happy to get away from Bob.
14  Q   Okay. You didn't - you're not answering my
15    question. I hear your words about you're happy to
16    get away from Bob. But now here you've got Bob, the
17    man you're happy to get away from is assisting you
18    and working on your behalf to place you elsewhere.
19    Were you happy about that? This is the man you're
20    trying to get away from but yet he's connecting you
21    up.
22       MS. RUSSELL: Objection to counsel's testifying
23    here.
24  BY MS. GORDON:
25  Q   You agreed with that, didn't you? You agreed with

Page 107

1    Bob assisting you, right?
2  A   I agreed with him assisting me?
3  Q   Yes. You participated with Bob in Bob setting up
4    meetings with you and Olsman. You talked to Bob
5    about everything you discussed with Olsman. Bob
6    assisted you. Were you happy about that?
7        MS. RUSSELL: Objection.
8        THE WITNESS: It's hard to use the word happy
9    because of the situation that was occurring. I was
10    – I don't - you're characterizing –
11  BY MS. GORDON:
12  Q   I'll help.
13  A   I would like to be able to finish my answer.
14  Q   Go ahead. I thought you were done. Go ahead. No,
15    please. Go ahead.
16  A   I was happy to get away from Bob.
17  Q   Okay, that's great. But that's not addressing my
18    question and you are here to answer questions. So
19    you're happy to get away from Bob. But the man
20    you're happy to get away from is making contacts
21    for you and setting up meetings for you. Agreed?
22  A   Yes. He was involved in -
23  Q   Yes, he was.
24  A   - the connection with Donna.
25  Q   And at that time you were how old? What was your

Page 108

1    age at that time?
2        MS. RUSSELL: Objection.
3  BY MS. GORDON:
4  Q   In 2021.
5  A   28.
6  Q   You were 28 and you'd worked at multiple other
7    firms by this time, hadn't you?
8  A   Yes.
9  Q   And you'd found jobs on your own, hadn't you?
10  A   Yes.
11  Q   And you'd connected up with Donna actually all on
12    your own in 2019, and you talked to her about
13    getting together with her. You already yourself
14    knew Donna by 2021, correct?
15  A   As you stated, Donna was at Bob's office for a
16    facilitation so I'm not sure I connected with her
17    on my own but I did meet her in 2019.
18  Q   So you were a grown woman, you were a lawyer of
19    several years. You're looking for jobs. You gave us
20    a list of all the people you were looking at.
21    You've mentioned many law firms that you on your
22    own contacted or had somebody reached out and you
23    responded, correct? We've covered all this, right?
24       MS. RUSSELL: Objection.
25  BY MS. GORDON:

Page 109

1  Q   Correct?
2  A   I'm not, I'm confused at what you're asking me.
3  Q   Well, you've already talked about looking at other
4    law firms previously to go to. You mentioned a
5    bunch of names. Do you remember that?
6  A   When we talked about the timeframe that I was going
7    - then I then chose Riley Hurley, yes. we talked
8    about that.
9  Q   Yes.
10  A   It sounds like you're trying to talk to me about
11    2021 and I'm trying to make sure I understand your
12    question.
13  Q   You had previously on your own been able to obtain
14    other job offers, correct?
15  A   Prior to Riley and Hurley, yes.
16  Q   Yes. Okay. So according to you, Bob facilitated
17    your meeting with Jules Olsman and/or the firm. Is
18    that what your testimony is here today?
19  A   I know that Bob talked to Donna. I don't know what
20    date that you -
21  Q   I'm going to read you from your complaint then,
22    okay.
23       MR. ALTMAN: This is, you interrupted her
24    again.
25       MS. GORDON: Her face is down and I can't see

Page 110

1  what she's talking -
2      MR. ALTMAN: I'm sorry. You need to slow down.
3      MS. GORDON: Well, you need to come over here
4  then and sit on this side of the table and you
5  can -
6      MR. ALTMAN: Well, since I'm blind it wouldn't
7  help me very much. But maybe you should just take a
8  little bit of time and let her finish her answer.
9  It's not too much to ask.
10  BY MS. GORDON:
11  Q   Here's paragraph 90 of your complaint. Are you
12  ready to listen?
13  A   Can you show the complaint to me?
14  Q   I'm going to read it to you and if you need to see
15  it, you can see it. Riley facilitated a meeting
16  between Mackenzie and McKenna, after which McKenna
17  met Jules Olsman. And Olsman offered McKenna a job
18  at $75,000. Do you recall that being in your
19  complaint?
20  A   Yes.
21  Q   So according to you, Riley, the man you were
22  anxious to get away from, facilitated a connection
23  with you. That's in your complaint, correct?
24  A   Yes.
25  Q   Also, Bob connected you up directly to Emily

Page 111

1  Peacock, didn't he?
2      MS. RUSSELL: Objection.
3      THE WITNESS: If you're referring to a specific
4  document, I'm happy to review the document so that
5  I can most appropriately answer your question.
6  BY MS. GORDON:
7  Q   On 7/17/2021. Hi Emily, this is Elyse Hyde. Bob
8  Riley shared your contact with me. I was wondering
9  if you might have some time tomorrow for a quick
10  chat about switching over to the plaintiff's side
11  and your current role. Thank you. You wrote,
12  absolutely. Call anytime! That refresh your
13  recollection?
14      MS. RUSSELL: Counsel, what's the Bates number
15  on that?
16      THE WITNESS: It sounds like Bob connected me
17  with Emily, yes.
18  BY MS. GORDON:
19  Q   Right. So Bob helped you again. Were you upset with
20  him?
21      MS. RUSSELL: Counsel, the Bates number.
22      MS. GORDON: Yeah. I said, 793.
23  BY MS. GORDON:
24  Q   Were you upset that Bob connected you with Emily
25  and he's somebody you were desperate to get away

Page 112

1  from. Were you upset?
2  A   Are you done with your question?
3  Q   Yes, I am.
4  A   I was not upset that Bob connected me with Emily.
5  Q   Now, according to you Bob talked to Jules and
6  Donna. And because of his relationship with Jules
7  he got you a bonus. Do you remember that in your
8  complaint?
9  A   Yes.
10  Q   So you are interviewing with the Olsman crew, they
11  offer you a salary of $75,000. Remember that?
12  A   Yes.
13      MS. RUSSELL: Objection.
14  BY MS. GORDON:
15  Q   And you thought that was not high enough or a
16  little too low, something to that effect, correct?
17  A   I could not afford to make the move and keep my
18  family, and handle my family expenses with that
19  amount of money.
20  Q   So at that time you discuss that with Bob, correct?
21  You confided in him about that.
22  A   Yes. I told him that I could not afford that.
23  Q   Right.
24  A   Yes.
25  Q   And you discussed with him that he would get on a

Page 113

1  call with Donna. Do you remember that?
2  A   Yes, I recall that. Just to clarify, you were
3  talking about a bonus versus a salary.
4  Q   You're correct. I misspoke. I misspoke.
5  A   I just wanted to make sure we're talking about the
6  same thing.
7  Q   No. I appreciate it. So you were offered 75. You
8  contacted Bob, you texted him. And you said to him
9  this is what you were offered. You said, I was
10  offered 75.
11  A   Yes. Bob was in communication with me during this
12  time I still worked for him.
13  Q   You were leaning on him to help you. This man you
14  wanted to get away from and were looking for
15  lawyers actually to sue him. But you used him to
16  call Donna and to get Donna to, according to you,
17  bump up to 80, right?
18      MS. RUSSELL: Objection.
19      THE WITNESS: Bob was my employer.
20  BY MS. GORDON:
21  Q   We all knew that but thank you for offering.
22      MS. RUSSELL: Objection to counsel's testimony.
23  BY MS. GORDON:
24  Q   So then, after Bob contacted Donna at your request,
25  you got an extra - the offer went up to 80K,

Page 114

1  correct?
2  A   If you're referring to a document about me
3  requesting Bob contact Donna I'd like to see the
4  document.
5  Q   So while we're pulling the document. It is 1596,
6  7/22/2021. I'm going to pull the document for you,
7  okay, Elyse.
8      MS. RUSSELL: What's the - I could maybe pull
9  it up if you just tell it to me.
10     MS. GORDON: I'm fine. Well, you can pull it
11 for yourself. 1596, 7/22/2021.
12 BY MS. GORDON:
13 Q   You talked to Bob. And then you told Bob Donna was
14 waiting for a call from him on the extra $5,000. Do
15 you remember that? And then he contacted you back
16 at Bates 1597 and you said, I just talked to Donna.
17 You were supposed to call her. Do you remember
18 that?
19     MS. RUSSELL: Counsel, my Bates only goes to
20 1554. From OMP or is this Riley.
21     MS. GORDON: Riley.
22 BY MS. GORDON:
23 Q   You wrote back to Bob, I just talked to Donna. You
24 were supposed to call her. You're directing Bob
25 Riley now to go get you an extra 5K and Donna is

Page 115

1  waiting for him to call her and that's what you
2  were telling Bob on 7/17, correct?
3  A   I would like to see the document that you're
4  referring to.
5  Q   You write on 7/22/2021 - I'm going to read it and
6  then I'll hand it to you, okay.
7      MS. RUSSELL: I definitely don't have this.
8  BY MS. GORDON:
9  Q   Hey, Bob. Sorry I was very scattered when you came
10 in because of this presentation. I want to clarify
11 something. I just misspoke to you earlier about the
12 Donna, Emily, Jules thing. Emily did not tell me
13 the Jules is generous. Obviously, that is something
14 you had told me yesterday. Basically, Emily told me
15 she was really screwed for the first year and a
16 half but it sounds like it got better after that.
17 She told me the worst-case scenario is nothing
18 about 75K for the first 18 months and potentially
19 nothing about 75K until 30 months later.
20     Okay. Do you remember writing that?
21     MS. RUSSELL: Counsel, I apologize. I don't –
22 I'm looking at my files from prior counsel. I don't
23 have this production.
24     MS. GORDON: RH 1596.
25     MS. RUSSELL: I know. I'm looking at it. I

Page 116

1  don't see it. Can I see it?
2      MS. GORDON: Hang on one second, please. I'm
3  going to keep going.
4  BY MS. GORDON:
5  Q   So here we have you reaching out to Bob with a lot
6  of detail about Jules and how much money Jules
7  might offer you. He's really not generous. And that
8  you're going to be stuck with 75K. And Bob writes
9  back and says, I'm on a call. Will call you
10 shortly. And then you write back and say, I'm
11 currently on a second PHPA call. If you want to
12 drop by. And he says, I'm juggling.
13     So I will show this to you guys, you can take
14 a look at that. Where you are finagling with Bob
15 Riley to save you.
16     MS. RUSSELL: I just want to put an objection
17 on the record to all counsel's testimony here.
18     MR. DAVIS: For the record, we produced this. I
19 heard you say it wasn't in prior counsel's
20 production.
21     MS. RUSSELL: No. I, like I'm just saying –
22     MS. GORDON: Let him finish.
23     MR. DAVIS: We produced this to Ms. McKenna
24 when she was pro se before you had made your
25 appearance and she acknowledged that she had

Page 117

1  downloaded it from our sharefile. So it was
2  produced.
3      MS. HARDY: So if you didn't get it, you didn't
4  get it because your client failed to give it to
5  you.
6      MS. RUSSELL: There's been no allegation that I
7  don't have it. I'm just saying that my files are a
8  mess and I don't have them.
9      MR. ALTMAN: Can we just make it simple and you
10 just resend it to us. Would that be –
11     MS. RUSSELL: I asked. They don't want to but
12 that's okay.
13     MS. GORDON: We don't need interruptions you
14 guys. We can talk about documents later that you
15 didn't get from other counsel.
16 BY MS. GORDON:
17 Q   All right. Have you read that now, Elyse?
18 A   Yes, I've read it.
19 Q   Okay. So here again, I'm just repeating myself.
20     MS. RUSSELL: May I review it?
21     MS. GORDON: Yeah. I just read it into the
22 record. I'm going to keep going and if you need me
23 to pause, let me know.
24     MR. ALTMAN: Can you please pause so she can
25 review it for a moment.

30 (Pages 114 - 117)

Carroll Reporting & Video
A Veritext Company
www.veritext.com

586-468-2411
www.veritext.com

1  MS. GORDON: She's a big girl, I promise you.
2  MS. RUSSELL: I'm asking you to pause so I can
3  review it.
4  MS. GORDON: Okay. Go ahead. I'm going to keep
5  going.
6  MS. RUSSELL: I'm not done.
7  MS. GORDON: I'm going to keep going anyway.
8  MS. RUSSELL: I'm not done. Please wait until I
9  finish.
10  MS. GORDON: You should have these documents
11  and you're wasting my time.
12  MS. RUSSELL: I'm not. I'm reviewing it.
13  MS. GORDON: Well, I read it into the record. Go
14  ahead.
15  MS. RUSSELL: Okay.
16  BY MS. GORDON:
17  Q   So are you recalling now what this all said now
18  that we've taken a bit of a break here. You are
19  telling Bob some words about you're unhappy with
20  the 75K. And you want him to parachute in for you.
21  MS. RUSSELL: Objection. That's not a
22  question.
23  BY MS. GORDON:
24  Q   Do you recall that that's where we were in the
25  conversation. And he says, I'm on a call. Will call

1  you shortly. What time you planning to leave. You
2  say, I'm currently on the second PHPA call. If you
3  want to drop in. Where were you at that time,
4  Elyse? Where should Bob have dropped in to talk to
5  you about all this? In your office or where?
6  A   I don't recall specifically where I was but I'm
7  assuming that I was at the Riley and Hurley office.
8  Q   So you were –
9  A   And I am going to finish my answer to your
10  question.
11  Q   Okay.
12  A   So I would ask that you be a little patient with
13  me. I know it's hard. These text messages are
14  different than ones that you were just referring to
15  where I requested Bob call Donna. So if you're
16  trying to show me –
17  Q   You're just here to answer my questions.
18  A   Wait. But if you're going to show me - you said you
19  were going to get me the document that I asked for.
20  And the document that I asked for had to do with me
21  requesting that Bob call Donna. So I'm trying to
22  make sure I see that document, too.
23  Q   You're here to answer questions.
24  A   Yes.
25  Q   So I don't know what it is you were just talking

1  about. I read, this is now in the record about
2  three or four times. Okay. I'm asking you now.
3  You've got the document in your hand. It's 1596.
4  You are in your office and you are asking Bob to
5  drop into your office to talk about the 75K, is
6  that correct? Because that's where you were
7  probably at that time.
8  A   So it appears that this is an hour and a half later
9  and Bob has asked me, what time are you planning on
10  leaving. And I reply to him, FYI, I'm currently on
11  the second PHPA call if you want to drop by. And so
12  he was also an attorney for the PHPA. So it's
13  likely that he should be involved and up-to-date on
14  that call.
15  Q   But I didn't ask you any of that. I just asked you
16  - excuse me. I just asked you where your office was
17  located when you said, do you want to drop by? All
18  I wanted to know was, was it in the Riley Hurley
19  office building and you said, yes. So I got my
20  answer.
21  So now after this colloquy when you're upset
22  and you go to Bob to get you an extra 5K, does Bob
23  talk to Donna?
24  A   I would like to see the document that you are
25  referring to.

1  Q   Do you remember him talking to Donna?
2  A   I remember Bob talking to Donna. And I would like
3  to see the document that you are referring to.
4  Q   Do you remember then learning you were getting an
5  additional 5K in your salary?
6  A   I remember learning that, yes.
7  MS. RUSSELL: Counsel, what Bates range are we
8  in?
9  MS. GORDON: I'm not referring to a Bates right
10  now.
11  BY MS. GORDON:
12  Q   Now, you state in your complaint, Elyse, that you
13  didn't want Bob Riley to interfere with your
14  negotiations with Olsman. Are you aware that that's
15  what you say in your sworn complaint?
16  A   One, are you referencing –
17  Q   Do you know that?
18  MS. RUSSELL: Counsel, what paragraph are you
19  referring to?
20  Q   92. I'll be happy to read it to you.
21  MS. RUSSELL: This is the second amended?
22  THE WITNESS: I didn't get to say anything. So,
23  are we talking – there's three complaints.
24  BY MS. GORDON:
25  Q   You're not here to ask –

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 122

1  A   Okay. There's three complaints. I'm just asking you
2     which complaint you're referencing.
3  Q   You know what, I know what the complaint is. I
4     really actually do know that.
5  A   I'm not implying you don't.
6  Q   By the way are you preparing to file additional
7     claims against any party in this case?
8        MS. RUSSELL: Objection. That's privileged
9     information.
10       MS. GORDON: It's not privileged.
11       MS. RUSSELL: Yes, it is.
12       MS. GORDON: All right. I'm going to change it
13    then people.
14 BY MS. GORDON:
15 Q   Do you have any additional claims that you are
16    aware of that exist in this case that are not –
17       MS. RUSSELL: Objection. Privilege.
18 BY MS. GORDON:
19 Q   - not yet been –
20       MS. GORDON: Talk about interrupting.
21 BY MS. GORDON:
22 Q   Are you aware of any claims you have against any
23    party in this lawsuit, you personally? Are you
24    aware of any claims you have that you have not yet
25    brought?

Page 123

1        MS. RUSSELL: Same objection. Don't answer.
2     Privilege.
3        MS. GORDON: Okay. That is not privileged.
4        MS. RUSSELL: Yes, it is.
5        MS. GORDON: Could you please mark the dep. We
6     can get on, definitely in the court, you're going
7     to be back here.
8        MS. RUSSELL: Is that a threat?
9        MS. GORDON: Yes. It's a promise.
10       MS. RUSSELL: So on the record counsel has just
11    threatened my client.
12       MS. GORDON: Oh, I said, you're going to be
13    back here. Because this is – because you're –
14       MS. RUSSELL: She said, is that a threat. You
15    said, yes.
16       MS. GORDON: Well, I changed it. I said, it's a
17    promise.
18 BY MS. GORDON:
19 Q   So let's keep going here. So in your complaint.
20    Back to your complaint. Your second amended
21    complaint. Yes, I do know what your current
22    complaint is.
23       You say in your second complaint you did not
24    want Bob Riley to negotiate your pay. Do you know
25    that that's what's in your complaint, your sworn

Page 124

1     complaint?
2        MS. RUSSELL: Objection.
3        THE WITNESS: If you're telling me that's
4     what's in there, then yes that's in there.
5  BY MS. GORDON:
6  Q   Then either you're lying in your complaint or
7     you're lying in the text messages.
8  A   That's incorrect.
9  Q   Because in the text messages you contact Bob Riley
10    and you tell him you want $5,000 more and he's
11    supposed to call Donna. In your complaint you say,
12    Riley later told McKenna he had negotiated this on
13    McKenna's behalf. Which -
14       MS. RUSSELL: Counsel, what paragraph are
15    you referring to.
16       MS. GORDON: I already told you, 92.
17       MS. RUSSELL: I'm looking at the paragraph
18    right now and I don't know that I see what you're
19    saying right there.
20       MS. GORDON: Well, then I guess you're on the
21    wrong complaint. I'm in 92.
22 BY MS. GORDON:
23 Q   You state in your complaint shortly after this
24    conversation Mackenzie offered McKenna $5,000 more
25    in salary. We just covered all this, didn't we,

Page 125

1     Elyse? We just covered that you contacted Bob, you
2     told him it was low with the 75. You said Donna was
3     waiting to hear from him. He called Donna. And then
4     the next thing that happens is you get an extra 5K.
5     We've already covered all this.
6  A   I have yet to see a document that says you're
7     supposed to call Donna. And I said that I wanted to
8     see that document. So I understand that you think
9     we've covered it and I see this document that I was
10    shown so.
11 Q   Do you dispute that you directed Bob to call Donna?
12    Do you dispute that?
13 A   Well, I –
14 Q   Do you dispute it?
15       MS. RUSSELL: Objection.
16       THE WITNESS:  I would like to see the
17    document.
18 BY MS. GORDON:
19 Q   Okay. You don't get to do that. Do you dispute that
20    you told Bob to call Donna about your 5K, yes or
21    no?
22 A   I would like to see the document.
23 Q   I don't have a document for you right now and I'm
24    not required to hand you documents to help protect
25    yourself for your testimony under oath. So I have a

Page 126

1    very simple question. Do - are you –
2         MS. RUSSELL: Objection to all of counsel's
3    testimony just then.
4    BY MS. GORDON:
5    Q   Are you denying that you told Bob to call Donna?
6    A   Bob was involved in the negotiations with Donna.
7    Q   You can just answer my question.
8    A   I will answer your question, and I am. Bob was
9        involved in the negotiations with Donna and had had
10       conversations with me about it. And I understand
11       that Bob then did call Donna.
12   Q   And you asked him to call Donna. You went to him
13       for the very purpose of having him call Donna.
14   A   I don't recall that and I've asked to see the
15       document about it.
16   Q   Well, I'm sorry you're, you know, not really aware
17       of what occurred here and you didn't read your
18       complaint before you got here. But you state in a
19       complaint -
20            MS. RUSSELL: Objection to all counsel's
21       testimony just then.
22   BY MS. GORDON:
23   Q   You just state in your complaint, Riley later told
24       McKenna that he had negotiated this on McKenna's
25       behalf. Is that a true statement by Riley to Donna,

Page 127

1        that he had negotiated an extra 5K for you?
2    A   Yes.
3    Q   And then you state this. McKenna did not know about
4        or want this interference by Riley. That's a false
5        statement in your complaint, isn't it?
6            MS. RUSSELL: Objection.
7            THE WITNESS: No, it's not.
8    BY MS. GORDON:
9    Q   Well, it's completely at odds with everything you
10       just testified to.
11   A   It's not.
12   Q   So you can explain that later to the judge. Let's
13       keep going.
14            Now, you meet with Jules as well as Donna, is
15       that correct? Do you remember meeting with Jules on
16       July 21st, 2021?
17   A   I do. I recall a meeting with Jules alone, not with
18       Donna, just to be clear.
19   Q   And what was that discussion? What was that meeting
20       about?
21   A   I think it was about potentially working at Olsman.
22       They wanted to meet me.
23   Q   Tell me what happened at the meeting with you and
24       Jules?
25   A   We talked about the work that I do at Riley and

Page 128

1        Hurley and it was a job interview.
2    Q   Did you talk to Jules about the fact that you use
3        Bob Riley for – that you knew that Bob Riley
4        facilitated for Jules' office. Did you mention that
5        at the July 2021 lunch?
6    A   I don't believe that we had lunch.
7    Q   Okay. I'm sorry. It was just a meeting then. I
8        think you have lunch with him later. I think on
9        January 20 he takes you out to lunch. Let's go back
10       to July 2021.
11           MS. RUSSELL: Objection to counsel's testimony.
12   BY MS. GORDON:
13   Q   On July 2021 you had a meeting with Jules and you
14       were discussing, what, your prior work history with
15       him?
16   A   With Jules?
17   Q   Yeah. Is that what you discussed at the meeting?
18   A   I was meeting with Jules and I discussed my prior
19       work history, yes.
20   Q   And did you tell him you knew that his office
21       facilitated, did facilitations. Did that come up?
22   A   I don't recall, specifically. I understand that med
23       mal cases involve facilitations. I don't know that
24       we specifically discussed that.
25   Q   And of course, you knew this was a med mal

Page 129

1        plaintiff contingency firm, right?
2    A   Yes.
3    Q   And other PI matters, right?
4    A   Yes.
5    Q   They did not do any defense work, as far as you
6        knew, correct?
7    A   As far as I knew, yes.
8    Q   And they didn't do any hourly fee work, as far as
9        you knew, correct?
10   A   I believe some of the attorneys there had
11       miscellaneous hourly work. But no, that was not the
12       primary practice.
13   Q   So you knew that Bob Riley had facilitated for
14       Jules previously. You're now meeting with Jules.
15       And one of your allegations in this case is that
16       you were supposed to facilitate with Bob Riley once
17       you got to Olsman's office. Is that one of your
18       allegations?
19           MS. RUSSELL: Objection.
20           THE WITNESS: Yes. I did not initially - yes.
21   BY MS. GORDON:
22   Q   No. That didn't come up at all. We're going to get
23       to that. Until after you were fired. I mean, excuse
24       me. After you came on board. But here you've got a
25       meeting with Jules. And you're coming off the

Page 130

1  situation where you're here to say in your second
2  amendment complaint that Bob Riley had sexually
3  harassed you and you couldn't take - you couldn't
4  even going into a facilitation with him.
5  That's one of your allegations against my clients,
6  correct?
7      MS. RUSSELL: Counsel, whose deposition is
8  this? Are you testifying or is my client?
9  BY MS. GORDON:
10 Q   This is one of your allegations against my client,
11  is that correct? That you shouldn't have had to -
12  you wanted them to protect you from facilitating
13  with Bob. That's one of your claims against my
14  client, isn't it?
15      MS. RUSSELL: Objection.
16 BY MS. GORDON:
17 Q   Do you know that that's a claim?
18 A   Yes.
19 Q   I'm sorry? Did you just say, I guess?
20      MS. RUSSELL: Those are two questions.
21      THE WITNESS: I said yes. And I would actually
22  - if you could just keep it to one question, I will
23  make sure that I answer your one question. So
24  what's the question.
25 BY MS. GORDON:

Page 131

1 Q   You've answered it. You knew –
2      MS. RUSSELL: Can we get clarify on the record,
3  what was your yes to?
4      MS. GORDON: No. We're not get - the record is
5  here. I'm not stopping to, you know, take care of
6  everybody's needs and wants.
7      MS. RUSSELL: Then stop asking compound
8  questions.
9 BY MS. GORDON:
10 Q   So here we have you sitting down with Jules Olsman
11  who started this firm, correct?
12 A   I don't know who started the firm.
13 Q   Well, isn't the name of the firm Olsman, McKenna,
14  Peacock? Mackenzie, I'm sorry, and Peacock?
15 A   Yes.
16 Q   And you certainly knew Jules was an older man,
17  correct?
18 A   Yes. I believe he owned the firm with someone else
19  before so I'm not saying I know who started it.
20 Q   So when you got hired, did you know that Jules had
21  formed the firm? Was the founder of the firm?
22 A   I think he was one of the founding partners.
23 Q   And you knew he'd known Bob Riley for a long time
24  because of course they were both in the med mal
25  world. Bob was facilitating and Jules had

Page 132

1  facilitations. You knew that when you met with
2  Jules.
3 A   Yes.
4      MS. RUSSELL: Objection.
5 BY MS. GORDON:
6 Q   But you never at this meeting say to Jules, Jules,
7  I'd love to come on board here but I cannot
8  facilitate with Bob Riley?
9      MS. RUSSELL: Objection.
10 BY MS. GORDON:
11 Q   You never said that, did you?
12 A   Not with Jules.
13 Q   You never said it to anybody before you were hired
14  ever, correct?
15 A   I said it to Donna.
16 Q   You did not say it to Donna. There is zero record
17  of you ever saying it to Donna.
18      MS. RUSSELL: Counsel is testifying. Objection.
19 BY MS. GORDON:
20 Q   So you tell - you don't have it in your complaint
21  that you told her that before you were hired.
22      MS. RUSSELL: Objection.
23 BY MS. GORDON:
24 Q   You don't have that in your complaint, Elyse. So
25  what is your position in this room today under oath

Page 133

1  that you told anybody at Olsman's Firm that you -
2  before you were hired, that you wouldn't, didn't
3  want to facilitate with Bob? Do you have any record
4  of that anywhere?
5      MS. RUSSELL: Objection.
6      THE WITNESS: I told Donna before I
7  started work at Olsman about the situation that had
8  occurred with Bob Riley.
9 BY MS. GORDON:
10 Q   What record do you have that that ever occurred?
11      MS. RUSSELL: Objection.
12 BY MS. GORDON:
13 Q   What record do you have that those words -
14 A   I have texts.
15 Q   Hang on. What record do you have that those words
16  you just used are true? You have no record
17  whatsoever, do you?
18      MS. RUSSELL: Counsel is testifying.
19  Objection. Ask your question.
20 BY MS. GORDON:
21 Q   You have no record whatsoever that you complained
22  to anybody at the Olsman office about Bob Riley
23  before they hired you. You have zero record of
24  that, is that correct?
25 A   No.

Page 134

1   Q   What record do you have?
2   A   I have text messages.
3   Q   With who? I've got every one of your text messages.
4        MS. RUSSELL: Allow her to answer the question.
5   BY MS. GORDON:
6   Q   So you tell me who you texted with, Elyse.
7   A   I'm not sure how you have all of my text messages.
8   Q   They were all produced.
9   A   They're supposed to be produced by November 20
10      something, I believe.
11  Q   Well, who did you text with that I don't have?
12  A   I'm confused that all the text messages that you
13      have so I don't –
14  Q   Guess what, when you text, there's two parties,
15      okay?
16  A   Okay.
17  Q   So I have all the Olsman parties texts with you.
18      Whether you produced them to me or you did not, I
19      have them.
20  A   Okay.
21  Q   There's nothing in those text messages whatsoever
22      from you saying one single negative word about Bob
23      Riley before you were hired by the Olsman office.
24      Do you disagree?
25        MS. RUSSELL: Counsel, what is your question?

Page 135

1   BY MS. GORDON:
2   Q   Do you disagree?
3   A   You asked me if I had a record of telling someone
4       and I said I have text messages. I didn't say those
5       text messages were with the Olsman parties. You
6       assumed that.
7   Q   Well, the only thing I'm focused on here, Elyse, is
8       the Olsman office and what you put them on notice
9       of. I don't care who you told anything to other
10      than Olsman. You know why, they're about to put you
11      on their payroll. And you haven't told them that
12      you can't facilitate with Bob Riley and, oh, he
13      sexually harassed you. So you have no record that
14      you told anybody at Olsman this, am I correct?
15        MS. RUSSELL: Objection. She's answered.
16  BY MS. GORDON:
17  Q   A minute ago you tried to say I have texts. You
18      don't have any texts where you said that.
19        MS. RUSSELL: Objection.
20        THE WITNESS: I texted other people about the
21      conversation that I had with Donna in which I told
22      her that before I was on her payroll.
23  BY MS. GORDON:
24  Q   Who did you text that to?
25  A   I believe there are multiple people but the one

Page 136

1       person -
2   Q   Who are they?
3   A   I'm going to - I would love to finish my answer.
4   Q   Please do.
5   A   I think it would make things easier for both of us.
6   Q   Go ahead. What are the names.
7   A   Thank you. Lauren Studley is one person that I know
8       I texted about the conversation.
9   Q   Who is Lauren –
10  A   And I also –
11  Q   Go ahead.
12  A   - told you that I was going to talk to Olsman
13      because you knew that I was going to go there to
14      work there.
15  Q   You've already lied about me so many times. And
16      you've been proven to lie about me.
17        MS. RUSSELL: Objection.
18  BY MS. GORDON:
19  Q   So anything you tell me - so you're telling me -
20  A   You asked me where I was going to go work. And I
21      told you I was going to work at Olsman.
22  Q   When you called me, you already had a job offer.
23      That's literally what you told me.
24        MS. RUSSELL: Counsel, are you testifying or
25      are you going to ask questions? You don't have to

Page 137

1       answer her questions.
2   BY MS. GORDON:
3   Q   So I'm one of the people that you told that to. And
4       who else –
5        MS. RUSSELL: You can answer these questions
6       when you sit for your deposition.
7   BY MS. GORDON:
8   Q   She just gave me her names, I'm been one of them.
9       So you told me and you told - what was the other
10      gentleman's name?
11  A   I have text messages with Lauren Studley.
12  Q   Who was he?
13  A   She's a woman.
14  Q   Who is she?
15  A   She's an attorney that works for Giamarco Mullins
16      and Horton.
17  Q   And what does she do there?
18  A   Med mal defense.
19  Q   She's still at the firm today?
20  A   The last I knew she was, yes.
21  Q   When was the last time you talked to her?
22  A   When was - pardon me?
23  Q   Last time you spoke with her, connected with her?
24  A   A few weeks ago. A month ago.
25  Q   Do you stay in touch with her?

1   A   I stay in touch with her. I've moved now and I
2       don't see her as frequently.
3   Q   So on our upcoming date I'm going to be getting
4       this text from you and Lauren Studler, is that what
5       you're telling me?
6   A   Her last name is Studley.
7   Q   Thank you. I'm sorry. I'm going to be getting that
8       text between you and Lauren Studley that's going to
9       be before July 27, 2021?
10  A   I don't know the date of when the text is. It was
11      before I started working at Olsman that I had the
12      conversation with Donna. So I don't have a date.
13  Q   You accepted the job offer quite a bit before you
14      started.
15  A   I don't have the dates.
16  Q   Well, I do.
17  A   Okay.
18  Q   You made a deal with them on July 7, 2021 and you
19      did not start until - you were supposed to start
20      September 7. You didn't start, I don't think, till
21      the 8th or 9th but we'll get to all this. Let's
22      keep going.
23      MS. RUSSELL: Is there a question there,
24      Counsel? There's an objection anytime that she
25      testifies on the record, standing. I'm putting it

1       on from now on. Did you have a question you want to
2       ask, Deb?
3       MS. GORDON: If I do, I'll ask it.
4       MS. RUSSELL: Are we at a point to break for
5       lunch? I know we've been going close to an hour.
6       MS. GORDON: Is the lunch here? Is it here?
7       MS. RUSSELL: Yes.
8       (Whereupon a luncheon recess was taken.)
9   BY MS. GORDON:
10  Q   So it appears that on July 23rd, you accepted a job
11      offer, a verbal job offer from Olsman's firm. Does
12      that sound correct to you?
13  A   I don't know what document you're referring to. It
14      was in the summer of 2021.
15  Q   You know, I have my notes here. I'm not necessarily
16      - just so FYI. I'm not necessarily referring to a
17      document. I have read everything, of course. But
18      I'm just asking you whether you agree. I'll help
19      you. I have an email, a text here to you from Donna
20      where you're confirming that she's now told Emily.
21      Emily was apparently waiting, she was waiting to
22      tell Emily that you were coming on board. And Donna
23      tells you that, you know, everybody's now approved.
24      She's talking about Emily. We've texted. She's very
25      excited, too. She's on vacay. You're apparently at

1       dinner with Bob. You say, ah, good, I'm glad. We're
2       all celebrating and I'm so happy.
3       Does that sound accurate to you?
4       MS. RUSSELL: What's the Bates on this?
5   Q   11. Does that sound accurate? You don't dispute it?
6       MS. RUSSELL: For Plaintiffs?
7       THE WITNESS: I would like to read the messages
8       that we're referring to.
9   BY MS. GORDON:
10  Q   Pardon me?
11  A   I would like to read the messages you're
12      referencing.
13  Q   I'm not going to read everything because I don't
14      have time. Because I'm under seven hours. Do you
15      disagree that you learned on July 23rd that you
16      guys had a deal and you were coming on board?
17  A   I don't recall the exact date.
18  Q   It was around then?
19  A   It was in the summer of 2021, yes.
20  Q   So that's the best you can do sitting here today as
21      to when you got your job offer?
22  A   Yes. I do not have the exact date in my head.
23  Q   That's fine. And then on the 24th, Donna texted you
24      and invited you to a MHA Women's Caucus party. Do
25      you remember that?

1   A   Yes, I remember.
2   Q   And she was excited to get you involved and there
3       were going to be judges there and the like. Do you
4       recall that?
5   A   Yes.
6   Q   Did you go to that?
7   A   I believe I did.
8   Q   And then on August 3rd you put in your two-weeks
9       notice with the Riley firm, correct?
10  A   I don't know that exact date.
11  Q   It sounds likely or around then, is that correct?
12  A   I don't know because it sounds like Bob knew I was
13      involved in the negotiations before. So I'm not
14      sure when I put in my formal two-weeks notice. I
15      don't have that date.
16  Q   Well, he was involved in negotiations but I don't
17      think a start date had been set. And in fact, you
18      put in your notice on August 3rd but apparently you
19      wanted to take some time off because the start date
20      wasn't until end of September. So I'm going to go
21      with my date of 8/3 that you put in the notice. And
22      you intended to start with Donna on or around
23      September - Donna and the office on or around
24      September 7th.
25      Now, after you've already accepted the offer

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com
www.veritext.com

Page 142

1  from Donna and Jules, on August 18th you get
2  somebody from Bob Riley's office to give you the
3  passcode and you break into his iPad. Do you recall
4  that, on August 18th?
5       MS. RUSSELL: Objection.
6  BY MS. GORDON:
7  Q   Do you recall that?
8  A   I disagree with the characterization of your
9  question.
10 Q   Did you break into his iPad?
11 A   I don't think I broke into his iPad.
12      MS. RUSSELL: Objection.
13 BY MS. GORDON:
14 Q   Did you access his iPad?
15 A   I accessed his iPad.
16 Q   You did not have a passcode. You had to get it from
17   a third party.
18      MS. RUSSELL: Objection.
19      THE WITNESS: I was given a passcode.
20 BY MS. GORDON:
21 Q   Okay. You asked for a passcode, correct?
22 A   I was given the passcode.
23 Q   Can you answer my question now?
24 A   I'm answering your question.
25 Q   No, you're not. You said you were given a passcode.

Page 143

1  Nobody walked up to you, tapped your shoulder and
2  said, Hi, here's Bob Riley's passcode. You had
3  asked for the passcode, is that correct?
4      MS. RUSSELL: Objection.
5      THE WITNESS: I don't recall.
6  BY MS. GORDON:
7  Q   Who gave you the passcode?
8  A   Sonia.
9  Q   Well, we can find out from Sonia how that went
10   down. Sonia gave you a passcode. And once you had
11   that passcode, you went and found Bob's iPad, is
12   that accurate?
13 A   I also separately had the passcode from Bob having
14   given me the passcode.
15 Q   I didn't ask you.
16 A   So I'm answering the questions and I -
17 Q   No, you're not. You're adding stuff now.
18      MR. ALTMAN: You're interrupting her again.
19   This is unacceptable.
20      MS. GORDON: She's interrupting me.
21      MR. ALTMAN: No, it doesn't matter. You can
22   object to her as being nonresponsive but you cannot
23   interrupt her.
24      MS. GORDON: I'm going to make, again, a point
25   that this is not going to come out of my - just

Page 144

1  mark it down whenever Altman pops up with this.
2  BY MS. GORDON:
3  Q   So on the 18 -
4      MR. ALTMAN: No. Let's be clear. You're going
5   to treat the witness with respect or we're going to
6   call the judge or we're going to suspend the
7   deposition. If you can't treat the witness with
8   respect –
9      MS. GORDON: You can do whatever you like.
10      MR. ALTMAN: You know what?
11      MS. GORDON: You're very disrespectful. I'm
12   treating the witness just fine.
13      MR. ALTMAN: No, you are not.
14      MS. GORDON: The problem is she's not able to
15   answer a lot of questions.
16      MR. ALTMAN: No, to be clear. If you interrupt
17   her again, we are going to suspend the deposition.
18   You are on notice.
19      MS. GORDON: I'm sure you would love to suspend
20   this deposition. But you know what, you're under a
21   court order. So you do it at your peril.
22      MR. ALTMAN: That's fine. I have every right.
23      MS. GORDON: Mr. Big Man, I'm going to tell all
24   you ladies what up.
25      MR. ALTMAN: You know what? That's it. Step out

Page 145

1  with me. We're off the record.
2      MS. GORDON: Okay. We're not off the record.
3      MR. ALTMAN: Yes, we are.
4      MS. GORDON: I'm going to make my record.
5      MR ALTMAN: Go make your record. We're stepping
6   down after that comment. Let's go.
7      MS. GORDON: Would you keep him under control,
8   please? We are not ending the dep. I am going to
9   get the court on the –
10      MR. ALTMAN: I am conferring with counsel. I am
11   conferring with counsel and the client.
12      MS. RUSSELL: I have the number right here so
13   we can go ahead and call.
14      MS. GORDON: Okay. This is off the record. I'm
15   making a record.
16      MR. ALTMAN: I don't care.
17      MS. RUSSELL: This has all been on the record.
18   I know it is hard to capture but it is all on the
19   record.
20      MR. ALTMAN: The reference that you just made,
21   insulting –
22      MS. GORDON: I'm continuing.
23      MR. ALTMAN: No, you're not. Let's step out,
24   please.
25 BY MS. GORDON:

37 (Pages 142 - 145)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 146

1  Q  Okay. On the 18, Elyse –
2        MR. ALTMAN: We're stepping out.
3        MS. GORDON: At your peril.
4  BY MS. GORDON:
5  Q  On the 18, Elyse, you accessed Bob's photos.
6        (Brief pause.)
7        MR. ALTMAN: I'm making it very clear to you,
8     Deb, that if you interrupt this witness again while
9     she is answering your questions, we are suspending
10    the depo and moving for a protective order that you
11    are harassing the witness by not allowing her to
12    answer your questions.
13       MS. GORDON: My response to that is that the
14    witness is not being responsive to the questions.
15       MR. ALTMAN: Then you have the ability to
16    object as non-responsive. But what you don't have
17    the ability to do is to cut her off and interrupt
18    her.
19       MS. GORDON: You know, deps are - people talk
20    over at deps all the time and they don't do it on
21    purpose. Let's get back on the record.
22       MR. ALTMAN: You are absolutely doing it on
23    purpose.
24       MS. RUSSELL: We're already on the record, Deb.
25       MS. GORDON: You are incorrect.

Page 147

1        MR. ALTMAN: We'll let the judge decide that.
2        MS. RUSSELL: So for the record you are not
3     confirming whether or not  you are communicating ex
4     parte with the court right now through an email?
5        MS. GORDON: I don't tell you what I do. I
6     don't tell you what I do.
7        MS. RUSSELL: Shall we call the court?
8  BY MS. GORDON:
9  Q  On August 18 you accessed Bob Riley's iPad and you
10    took photos off of it. Now, at this time, you were
11    starting a new job with Olsman, Mackenzie. Why were
12    you accessing Bob Riley's iPad? You were leaving
13    the law firm.
14       MS. RUSSELL: Objection.
15       THE WITNESS: I don't know what date. You've
16    added a lot to the question. I don't know about the
17    date. And I did access the iPad at some point in
18    August around that time frame. And what was your
19    question? Why?
20 BY MS. GORDON:
21 Q  Why did you do it? You had accepted another job and
22    you had given Riley notice. Why were you taking
23    your time to access his iPad?
24       MS. RUSSELL: Objection.
25       THE WITNESS: Because he had been taking

Page 148

1     photographs again of me that day and it was
2     upsetting. And I wanted to know what was going on.
3  BY MS. GORDON:
4  Q  What was the date that he was taking photos of you?
5  A  If you're telling me that –
6        MS. RUSSELL: Objection.
7        THE WITNESS: - on August 18 I accessed the
8     iPad I know for certain it happened that date. But
9     I don't know if that's what you're telling me or
10    not.
11 BY MS. GORDON:
12 Q  Well, do you know the date?
13 A  I just have said that I don't recall the exact date
14    but that that was around the time frame that I
15    accessed the iPad.
16 Q  And were you in the office on the 18th?
17 A  I do not know what date I was in the office. And if
18    you would like to refer me to a document or show me
19    a calendar.
20 Q  Again, I'm not going to.
21 A  I'm going to finish answering my question.
22 Q  So my question to you is, you were trying to get
23    evidence of some kind? Is that what it was?
24       MS. RUSSELL: Objection.
25       THE WITNESS:  That's not what I said.

Page 149

1  BY MS. GORDON:
2  Q  Why did you get the photos off on the 18th and that
3     you were leaving the firm? You had accepted a job
4     somewhere else and you had given notice. Why did
5     you do that? What was your goal?
6  A  I've answered that question.
7  Q  Tell me the answer again.
8  A  Because Bob had just been taking photographs again
9     of me and it made me extremely uncomfortable.
10 Q  Well, were you planning to sue him? Is that why you
11    wanted the photos?
12       MS. RUSSELL: Objection.
13       THE WITNESS: My intention at that time was not
14    to sue him, no.
15 BY MS. GORDON:
16 Q  A few days later, after the 18th, you started
17    calling lawyers, is that correct?
18 A  I believe the first lawyer I had called was before
19    the 18th but I don't have a specific date.
20 Q  And who was the first lawyer you called?
21 A  Matt Besser.
22 Q  And what does he do? What's his expertise?
23 A  Employment law in Ohio.
24       MS. RUSSELL: I'm going to place an objection
25    on the record. I know that the court has ruled that

Page 150

1    attorney-client privilege has been waived in a
2    limited capacity but I'm just putting everybody on
3    notice.
4  Q   So what did you ask him about there?
5  A   I talked to him about the situation.
6  Q   And what did he say? Was he willing to bring a
7    lawsuit for you?
8        MS. RUSSELL: Objection.
9        THE WITNESS: He was willing to bring a lawsuit
10   for me.
11 BY MS. GORDON:
12 Q   So why didn't you have him do that? Why did you
13   keep calling people?
14       MS. RUSSELL: Objection.
15       THE WITNESS: He is not an attorney barred in
16   Michigan. And he thought that I should find an
17   attorney barred in Michigan, and that's when I
18   reached out to you at your office. And I also
19   didn't want to sue Bob because I knew of his
20   prominence in the legal field. And you advised me
21   that I'd have to leave the state of Michigan if I
22   wanted –
23 BY MS. GORDON:
24 Q   Okay. That's a false -
25 A   I'm still continuing.

Page 151

1  Q   Go ahead.
2  A   I'm continuing my answer. And I didn't want to sue
3    Bob. I wanted him to leave me alone. And I wanted
4    to move on with my career and stay in the medical
5    malpractice community. And I understood his
6    position in the community as the facilitator and I
7    wanted to know how to navigate that situation.
8  Q   Well, did the attorney you talked to from Ohio give
9    you some tips on how to navigate the situation?
10 A   Yes.
11       MS. RUSSELL: Objection.
12       THE WITNESS: And one of the things that he
13   told me to do is call you, and I did.
14 BY MS. GORDON:
15 Q   He knew who I was?
16 A   He looked up employment attorneys in Michigan and
17   you come up.
18 Q   And I told you, you didn't have enough for a case.
19   It wasn't a case.
20 A   That's not true.
21       MS. RUSSELL: Objection, testifying.
22 BY MS. GORDON:
23 Q   Who else did you call as an attorney in Michigan?
24 A   I don't recall as I sit here today.
25 Q   Well, is there a way you can refresh your

Page 152

1    recollection? Because we've been to court on this,
2    trying to get the names. And your counsel has said
3    they're privileged and you cannot give the names.
4    Nobody has ever said you don't have the names.
5        So are you telling me you have no recollection
6    of who you called?
7        MS. RUSSELL: For the record, that's prior
8    counsel and you've not renewed your request for the
9    names. We can get that to you by what - is that
10   part of the supplemental request which is due 12 –
11       MS. GORDON: No. No, it's not.
12 BY MS. GORDON:
13 Q   So you do have names? Have you given names to your
14   counsel? You just said you didn't know. Now she
15   says she has names.
16 A   Are we talking about in August of 2021?
17 Q   Yes, we are.
18 A   Or are we talking about all the way up until -
19 Q   August 2021. Do you have names of individuals you
20   contacted?
21 A   I contacted Matt Besser and I contacted your
22   office. And I believe there was one other attorney
23   that I contacted in that time frame and I do not
24   recall her name right as I sit here today. She's a
25   Michigan attorney.

Page 153

1  Q   Are you aware that your complaint states that you
2    contacted numerous people and that nobody would
3    touch Bob Riley with a 10-foot pole?
4        MS. RUSSELL: What paragraph are you referring
5    to, Counsel?
6        MS. GORDON: 10.
7        MS. RUSSELL: In the Second Amended?
8        MS. GORDON: That's the only complaint that I
9    know that's viable, so that's what I'm referring to
10   all day today.
11 BY MS. GORDON:
12 Q   Who was the third attorney you contacted?
13 A   I have now stated multiple times that I don't
14   recall at this moment.
15 Q   So when you filed your complaint originally, your
16   original complaint, did you know who these
17   attorneys were? Because you have this in your
18   original complaint as well.
19 A   Yes. And you asked - I asked you specifically what
20   time frame you were talking about. And you said
21   August of 2021. And there is a lot of time between
22   August of 2021 and when the complaint was filed.
23   And in August of 2021, I recall three attorneys.
24   Maybe – there could - there is a fourth attorney
25   but he doesn't do that type of law.

Carroll Reporting & Video
A Veritext Company

Page 154

1  Q   Did you contact the Michael Pitt firm?
2  A   When are we talking about?
3  Q   Either time. You've reached out to get lawyers on
4      two different occasions you've said.
5  A   That's incorrect.
6  Q   In your complaint.
7  A   Well, let's talk about August of 2021. And then I
8      start working at Olsman and then I obviously
9      communicated with attorneys during the time that I
10     was working at Olsman. And then there's attorneys
11     prior to the filing of the complaint. And then
12     there's in my, after the motion to withdraw was
13     filed.
14 Q   I'm talking about August 2022. You were looking for
15     a Michigan attorney. You got that advice.
16 A   I don't - August of '22, I don't -
17 Q   I'm sorry. It's August 20th of 2021. Did you
18     contact other lawyers in Michigan? I think you've
19     said you don't recall, is that right?
20 A   I told you that I've contacted a female employment
21     attorney in Michigan that I do not recall her name,
22     that I talked to you, and that I talked to Matt
23     Besser.
24 Q   Did you contact Sarah Prescott in August of '21?
25 A   No.

Page 155

1  Q   Did you contact Mike Pitt's office, Megan Bonanni,
2      or any of those people in August of 2021?
3  A   No.
4  Q   Did you contact Ray Sterling's office in 2021?
5  A   I don't think I contacted Ray Sterling's office
6      then. But I did subsequently talk to Ray Sterling's
7      office.
8  Q   Who did you talk to over there?
9  A   I would have to look at a list of names.
10 Q   Carol Laughbaum?
11 A   No, it wouldn't have been -
12 Q   Ray Sterling?
13 A   No. It was a male at Ray Sterling's office. But
14     you've jogged a memory of the Sterling office.
15 Q   And what did they tell you? What did the Ray
16     Sterling office person tell you?
17 A   Are we talking about August of 2021 still?
18 Q   Yes, we are.
19 A   I don't know if that's who I talked to in August of
20     '21. I know I talked to him in the pendency of this
21     entire time or someone from their office.
22 Q   What did that person tell you?
23 A   Not in August of 2021?
24 Q   Any time you talked to him, you seem a little
25     unclear.

Page 156

1  A   That they didn't want to get involved because of
2      the parties involved.
3  Q   Who were the parties involved that that person was
4      referring to?
5  A   Jules Olsman and Bob Riley.
6  Q   Do you think Bob Riley is involved with the
7      employment bar in Michigan?
8  A   I don't know what Bob Riley -
9  Q   Well, you've never – you worked with the man for
10     years. You never knew him to do any employment
11     facilitations, did you?
12 A   I recall that he did employment facilitations -
13         MS. RUSSELL: Objection.
14         THE WITNESS: - that involved Ford Motor
15     Company and some other big companies.
16 BY MS. GORDON:
17 Q   He has no expertise. He never practiced employment
18     law, correct?
19         MS. RUSSELL: Objection.
20         THE WITNESS: I have no idea.
21 BY MS. GORDON:
22 Q   As far as you know. He's only  - I asked you
23     earlier, you said med mal.
24         MS. RUSSELL: Is there a question there?
25 BY MS. GORDON:

Page 157

1  Q   Do you have anything different other than that?
2  A   Are you asking me if he practiced it in his –
3  Q   Okay. Here's -
4          MS. RUSSELL: Let her ask you the question.
5  BY MS. GORDON:
6  Q   Here's what I'm asking you. You just indicated that
7      somebody didn't want to get involved in the case
8      because of Bob Riley and who he was and this person
9      was an employment lawyer. Okay. So I'll move on.
10     Did you talk to Barry Fagan's office?
11 A   Not in an official capacity, no.
12 Q   In an unofficial capacity?
13 A   I spoke with an associate that worked there.
14 Q   About this matter in August?
15 A   Yes. Not - I don't know if - not in August, sorry.
16     I need to know what time frame we're talking about.
17 Q   Right now I'm going to say it again, it's August
18     2021.
19 A   Okay. No. The answer is no.
20 Q   Did you talk to Sue Ellen Eisenberg's office?
21 A   In August of 2021?
22 Q   Yes.
23 A   No.
24 Q   And the third attorney you talked to, what was her
25     name?

40 (Pages 154 - 157)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 158

1  A   I have now stated multiple times that I don't
2      recall as I sit here today.
3  Q   Do you recall who the office was?
4  A   I'm going to finish my answer.
5  Q   I thought you were finished.
6  A   I was still talking so I'm not sure how you could
7      think that I was finished.
8  Q   You're talking very low. Could you raise your voice
9      a little bit?
10 A   Sure.
11 Q   Go ahead.
12 A   As I sit here today, I do not recall the name of
13     the other female attorney.
14 Q   What did she tell you?
15 A   That she didn't want to get involved due to the
16     people involved.
17 Q   And who was the office you talked to? What was the
18     office?
19 A   I don't recall the office.
20 Q   Do you remember the city?
21 A   It was Metro Detroit.
22 Q   Was she an employment lawyer?
23 A   It was my understanding that her expertise included
24     employment.
25 Q   And was there a fourth attorney?

Page 159

1  A   The attorney that referred me to Matt Besser.
2  Q   Who's that?
3  A   His name is Joe Medici. He does not do employment
4      law.
5  Q   And did you call him for legal advice on this?
6  A   Yes.
7  Q   What did he say?
8  A   He connected me with Matt Besser who does do this
9      type of law.
10 Q   Your complaint states that you started work at the
11     Olsman Firm – excuse me, at the Riley Firm in
12     September 2021. It's Olsman, I'm sorry. In 2021,
13     and that you mistakenly believed you were escaping
14     Riley's harassment and control.
15         MS. RUSSELL: What paragraph are you referring
16     to?
17         MS. GORDON: 110.
18 BY MS. GORDON:
19 Q   Do you remember taking that position in your
20     complaint?
21 A   My former attorneys wrote my complaint.
22 Q   No, actually, you wrote the first complaint and
23     this has been in there.
24 A   That would not be my wording in the first
25     complaint.

Page 160

1         MS. RUSSELL: If we're going to move to other
2      than the operative complaint, I want the paragraph
3      that we're referring to.
4  BY MS. GORDON:
5  Q   So you were going to a firm where you knew they
6      used Bob Riley for a facilitator, and you were
7      going to a firm where you knew that the owners of
8      the firm were friendly with Bob Riley. But you
9      believed you were going to escape Bob Riley.
10 A   Yes. I had talked to Donna Mackenzie and she had
11     told me I wouldn't need to facilitate cases with
12     Bob Riley so, yes.
13 Q   We will get to that in a minute. In addition to
14     what I just said, that you knew that they used
15     Jules as a facilitator and that they were friends,
16     you also had made a decision that you were going to
17     continue to work with the hockey client that you
18     had worked on with Bob. And that this was very
19     important to you, correct?
20         MS. RUSSELL: Objection.
21         THE WITNESS: That's incorrect.
22 BY MS. GORDON:
23 Q   Was it important for you to stay on with the hockey
24     client?
25 A   I don't know what you mean by that.

Page 161

1  Q   It was important to you. You made a request to the
2      Olsman firm that you be allowed to continue working
3      on the PHA hockey client, correct?
4  A   I sent an email to Bob Riley stepping down from
5      working on the hockey client.
6  Q   You pursued working on the hockey client, correct?
7  A   I disagree with that statement.
8  Q   Once you got to the Olsman office – one you got to
9      the Olsman office, you made a request that you be
10     able to work for the hockey client, correct?
11 A   Bob had advised that he was stepping down from the
12     hockey client.
13 Q   I didn't ask you that. I asked you, once you got to
14     the Olsman Firm, you made a request that you
15     continue to work with the hockey client, correct?
16 A   Because Bob had advised he was stepping down.
17 Q   But at the time you made that request, Bob had not
18     stepped down, had he?
19 A   That's incorrect.
20 Q   Bob did not step down from the hockey organization
21     as of September 2021, had he?
22 A   Ultimately, Bob never stepped down until September
23     of 2024.
24 Q   Exactly.
25 A   So he had represented that he would step down and

41 (Pages 158 - 161)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 162

1  he did not do what he said he would do.

2  Q   But you knew he hadn't stepped down because from

3     the time you got to Olsman, you were immediately

4     working on the hockey stuff and you knew that Bob

5     was working on it from September when you arrived

6     there, correct?

7  A   I believed Bob when he said he was stepping down.

8  Q   I didn't ask you that. I said you were working with

9     Bob on the hockey client as of September and

10     October 2021, correct?

11     MS. RUSSELL: Objection.

12     THE WITNESS: We were working on different

13     projects. We were not working together during that

14     timeframe.

15  BY MS. GORDON:

16  Q   You were working for the same client, correct?

17  A   And I understood Bob was stepping down.

18  Q   Yeah, you said that. You don't have to repeat it.

19     It's already on the record.

20  A   Well, you keep trying to mischaracterize what I'm

21     saying.

22  Q   That's you're, you know. That's not an answer to a

23     question. So let's go back to the timeline. You

24     discovered the pictures on August 18 from Bob's

25     iPad. It was only after you discussed the pictures

Page 163

1  on August 18, after you'd already accepted the job

2  with Olsman's office, that you went to Donna

3  Mackenzie and told her that you believed that Bob

4  had done some inappropriate things. It was only

5  after August 18, correct?

6     MS. RUSSELL: Objection.

7     THE WITNESS: I don't know if it was after

8     August 18, that specific date.

9  BY MS. GORDON:

10  Q   Well, in your complaint, in paragraph 112 -

11     MS. RUSSELL: Are we in the operative complaint

12     or the initial one?

13     MS. GORDON: Okay. I am - so far I've only read

14     from one complaint and I've made it clear -

15     MS. RUSSELL: Well, you alleged that it was the

16     initial one.

17     MS. GORDON: No, I didn't.

18     MS. RUSSELL: Yes, you did.

19     MS. GORDON: Okay, I'm not arguing with you.

20  BY MS. GORDON:

21  Q   Again, to go back, you got into the iPad, you got

22     the photos on August 18. And after you received the

23     photos, you contacted Donna to tell her about the

24     photos. Do you recall that?

25     MS. RUSSELL: Objection.

Page 164

1     THE WITNESS: I recall that I had a

2     conversation with Donna. And without having

3     something to look at regarding dates, I don't

4     recall if the first conversation I had with her was

5     before I accessed the iPad or after I accessed the

6     iPad.

7  BY MS. GORDON:

8  Q   Well, according to your complaint, you do have a

9     paragraph in here where you say you talked to Donna

10     about Bob Riley.

11     MS. RUSSELL: What's the paragraph number?

12     MS. GORDON: Can I get my question out, please?

13     I didn't ask a question yet.

14  BY MS. GORDON:

15  Q   In your complaint you state that you talked to

16     Donna Mackenzie about Bob Riley at one point. And

17     in your complaint, the time you talked to Donna is

18     after you had obtained the photos, which would have

19     been on or after August 18. Does that sound correct

20     to you?

21     MS. RUSSELL: What paragraph number?

22     MS. GORDON: I don't have a paragraph number

23     right now.

24  BY MS. GORDON:

25  Q   Does that sound correct to you?

Page 165

1  A   I know I definitely talked to Donna after I got

2     onto the iPad and I may have talked to her before

3     then. I don't have the dates in front of me.

4  Q   Is there anywhere you could get the dates?

5  A   Well, you appear to be looking at something so you

6     might have the dates. But I'm sure there are text

7     messages that reflect this. And I've already told

8     you that there are text messages with Lauren

9     Studley about the conversation that I had with

10     Donna, so those will also have dates.

11     MS. RUSSELL: I also want to put an objection

12     on the record that any attempt to take the

13     allegations in the complaint that is not signed and

14     verified by the plaintiff is not testimony, not the

15     plaintiff's testimony. These are mere allegations.

16  BY MS. GORDON:

17  Q   Are there false allegations in your complaint, as

18     far as you know?

19     MS. RUSSELL: Objection, citing what I just

20     stated.

21     THE WITNESS: I don't think there are false

22     alleg -

23  BY MS. GORDON:

24  Q   Have you read your second amendment complaint?

25  A   I would love to be able to finish my answer.

Page 166

1  Q   I think you have.
2  A   No, you did not because I was at the word alleg
3      which isn't a word.
4  Q   Your counsel interrupted you and said these are
5      only allegations.
6         MS. RUSSELL: No, you interrupted her. You
7      asked one question that said is there anything
8      that's wrong in your complaint. And then in the
9      middle of her answering –
10        MS. GORDON: Then you interrupted me.
11        MS. RUSSELL: You said something else.
12 BY MS. GORDON:
13 Q   Let's go back. Let's go back. I assume you read
14     your second amendment complaint before it was
15     filed?
16 A   Yes.
17 Q   Is there anything in there that is not accurate, as
18     far as you know?
19 A   Not off the top of my head, no.
20 Q   Are you aware that you're responsible for the
21     content of this complaint, whether it's signed or
22     not signed?
23        MS. RUSSELL: The objection still stands.
24        THE WITNESS: My attorneys wrote the complaint
25     at the time and I don't believe there's anything

Page 167

1      false in there.
2  BY MS. GORDON:
3  Q   Did you write the first complaint that was filed in
4      the court?
5  A   With the assistance of others, yes.
6  Q   Sarah Prescott assist you with that?
7  A   I talked to Sarah Prescott about the complaint. She
8      didn't draft the complaint or -
9  Q   Did she read it, review it for you?
10 A   I don't recall if she did.
11 Q   You said others. Who are you referring to?
12 A   Amanda Fox Perry, who we've stated has assisted me
13     with the complaint and Jared Smith.
14 Q   From the time you accepted the offer to work at the
15     Olsman office, you were in regular text
16     communications with Donna and Emily, is that
17     correct?
18        MS. RUSSELL: Objection.
19        THE WITNESS: From the time I – when? Sorry.
20 BY MS. GORDON:
21 Q   Accepted the job offer, you were in regular text
22     communication with Donna and Emily, is that
23     correct?
24 A   Is there a time frame that you're – like I - the
25     time I started to when?

Page 168

1  Q   I said up until the date you left. You were in
2      regular text communication with them.
3         MS. RUSSELL: Objection.
4         THE WITNESS: Up until the date I was
5      terminated, yes.
6  BY MS. GORDON:
7  Q   Do you have a date when you discussed PHPA? Did you
8      ever discuss PHPA with Jules Olsman?
9  A   In general? Just the client in general?
10 Q   No. The fact that you were going to be working -
11     let me retract the question.
12     You had to let Jules Olsman and Donna know
13     that you wanted to do this work for PHPA, correct?
14 A   Yes, that was communicated.
15 Q   And you told Donna it would generate roughly around
16     $20,000 a year, correct?
17 A   I don't recall the exact number.
18        MS. RUSSELL: Objection.
19 BY MS. GORDON:
20 Q   Is that around what you would have expected to
21     generate from it?
22 A   I discussed with Bob what he thought it would
23     generate and that I - I shared the number Bob
24     shared with me. I don't recall the exact number. If
25     you have a document you want to show me so that I

Page 169

1      can best answer your question, I would be happy to
2      look at it.
3  Q   You know, just for the record, if I want to show
4      you a document, I will. But if you don't know the
5      answer to a question without a document, you can
6      just say so.
7  A   Okay. Well, you showed me this one when - I'm
8      trying to answer your questions the best I can.
9  Q   I said if I want to –
10 A   I'm still going. I'm trying to answer your
11     questions the best I can. And if you want me to
12     answer something and you're referring to something,
13     I'm happy to look at it so that I can answer it.
14 Q   Just to save time on the record, if I want you to
15     look at a document, I will hand it to you.
16     Otherwise, please don't ask me for a document. I
17     know enough to offer you a document if I need to do
18     so.
19     So with regard to PHPA, the Olsman firm had
20     never had any connection with PHPA of any kind,
21     correct?
22 A   Not that I know of.
23 Q   There is nothing in writing that you know of that
24     ever existed between the Olsman firm and PHPA,
25     correct?

43 (Pages 166 - 169)

1        MS. RUSSELL: Objection.
2   BY MS. GORDON:
3   Q   Including up to the time you left the firm,
4       correct?
5   A   Up to the time I left what firm?
6   Q   The Olsman Firm. There was never anything in
7       writing between the Olsman Firm and PHPA
8       whatsoever, other than the fact that the bookkeeper
9       sent invoices once a month, correct?
10  A   I sent the invoices and the PHPA would send a check
11      to Olsman.
12  Q   Right. There was no agreement of any kind between
13      the Olsman Firm and PHPA, correct?
14  A   I don't know that answer. I didn't know of any
15      agreement.
16  Q   You don't know of any agreement?
17  A   Yes. But I don't know that it didn't exist.
18  Q   You've never seen such an agreement, is that
19      accurate?
20  A   Correct.
21  Q   And the Olsman Firm had nothing to do with
22      arranging your relationship with PHPA, correct?
23  A   I don't know.
24  Q   Who set the pay rate for what you would be getting
25      at PHPA after you started working there while you

1       were at the Olsman's office? How did that come to
2       pass?
3        MS. RUSSELL: Objection.
4        THE WITNESS: Bob informed me that he
5       negotiated a raise from $175 per hour to $225 per
6       hour at some point. But I don't think that that was
7       when I immediately started working at the Olsman
8       Firm. I don't have the exact date for you.
9   BY MS. GORDON:
10  Q   You had told him that you thought the hourly rate
11      they were offering was too low, correct? The $175?
12       MS. RUSSELL: Objection.
13       THE WITNESS: I don't recall telling him that I
14      thought that. But I believe it was communicated to
15      me by the Olsman, by Jules or Donna, that a higher
16      rate would be better. I think that's a general
17      understanding.
18  BY MS. GORDON:
19  Q   And then Bob negotiated that for you, is that
20      correct?
21  A   Bob negotiated that, yes. That's what he said to
22      me. I ended up having a conversation with the
23      executive director myself.
24  Q   As of July 27 of 2021, you had never told anybody
25      at the Olsman Firm that you did not want to work on

1       PHPA because of Bob Riley, correct?
2        MS. RUSSELL: Objection.
3        THE WITNESS: As I stated before, I had that
4       conversation with Donna and I don't have the exact
5       date of that conversation.
6   BY MS. GORDON:
7   Q   But you didn't tell her you did not want to work
8       for PHPA. You never said, I don't want to work
9       there, correct?
10  A   I ultimately did in the conversation that I had.
11      And I don't have the date of that conversation.
12  Q   What did you say to her?
13  A   I informed her of the pictures and told her that I
14      told Bob I was stepping down from hockey.
15  Q   So why didn't you step down?
16  A   Because Bob told me he was stepping down from
17      hockey.
18  Q   But then when you learned he didn't step down, why
19      didn't you step down?
20       MS. RUSSELL: Let her finish, Counsel.
21       MS. GORDON: She was finished.
22       MR. ALTMAN: No, she wasn't finished.
23       MS. RUSSELL: No, she's not.
24  BY MS. GORDON:
25  Q   Go ahead. Go ahead. Why didn't you step down?

1   A   I was not finished, for clarification.
2   Q   Why didn't you step down, that was my question.
3   A   Because Bob told me he was stepping down and he
4       told me that there would be a transition period.
5       And so that entire time, I thought Bob was stepping
6       down, he's stepping down, he's stepping down
7       because that's what Bob communicated.
8   Q   So during the time there was a transition period
9       and you thought Bob was stepping down, you were
10      working on the hockey client, correct?
11  A   Correct.
12  Q   And Bob was working on the hockey client, correct?
13  A   We were working on different projects, correct.
14  Q   And you never said anything to anybody at the
15      Olsman Firm about not wanting to work on PHPA with
16      Bob, correct?
17       MS. RUSSELL: Objection.
18       THE WITNESS: I expressed to multiple people at
19      the Olsman Firm that Bob wasn't stepping down,
20      including Donna and Emily.
21  BY MS. GORDON:
22  Q   And when did you –
23  A   And I also talked to Bob about Bob not stepping
24      down.
25  Q   Well, I'm sure you did. But when did you talk to

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 174

1    anybody at the Olsman Firm about it?
2  A   I talked to Emily didn't - I talked to Donna about
3    the fact that he's supposed to step down and he
4    isn't stepping down.
5  Q   I asked you when.
6  A   Are you looking for a specific date?
7  Q   Yes. When did you tell them?
8  A   Early 2022, I definitely had that conversation
9    because it had been three months since I had
10    started there. And how long is this transition
11    period going to go on.
12  Q   There's nothing in writing from you whatsoever
13    about that point, is that correct?
14        MS. RUSSELL: Objection.
15        THE WITNESS: I don't know.
16  BY MS. GORDON:
17  Q   Nothing you know of, correct?
18  A   There could be a text message about that.
19  Q   Well, there's not.
20  A   Well, you're telling me that but you don't have all
21    my text messages.
22  Q   Yes, I do.
23  A   You have all my text messages with Olsman parties.
24    You don't have all the text messages where I've
25    texted other people.

Page 175

1  Q   My question today is directed to your
2    communication. I had a very specific question.
3    Whether you communicated to the Olsman Firm.
4  A   And I had a specific answer, which is that I did.
5  Q   You didn't let me finish.
6  A   Okay.
7  Q   You didn't let me finish. My question was whether
8    you ever communicated to the Olsman Firm that you
9    did not want to work with the hockey client because
10    of Bob Riley.
11  A   And my answer is yes.
12  Q   And do you have a date for that?
13  A   I told you it was in early 2022 and there are other
14    dates. I don't recall them off the top of my head.
15  Q   And who did you talk to?
16  A   I talked to Donna.
17  Q   Do you have a month in early 2022?
18  A   I expressed to Donna that Bob was not stepping down
19    from hockey in early 2022 and that I was hoping
20    that he would step down. And I continued to talk to
21    Bob about stepping down during that time.
22  Q   I know. I asked you when you thought you said that
23    to her. Early 2022. Are you talking about January,
24    February?
25  A   I'm telling you, I don't have a date.

Page 176

1  Q   I have all of your communications with Donna for
2    early 2022 and there's no reference. You have many
3    communications with Donna about all kinds of
4    things. But I see absolutely nothing in here about
5    you mentioning the hockey client. I assume you have
6    no reason to think otherwise, is that correct?
7        MS. RUSSELL: Objection.
8  BY MS. GORDON:
9  Q   There's nothing other than - any other way you
10    would have communicated with her other than through
11    text, is that right? In writing?
12        MS. RUSSELL: Objection.
13        THE WITNESS: So we would have spoken, had a
14    verbal conversation. Other methods of writing
15    include emails. I don't know if you have all the
16    emails.
17  BY MS. GORDON:
18  Q   I have emails. There's nothing in there. There's
19    one email between you and Donna. I can tell you -
20    I'm going to ask you about it in a minute. But
21    other than that, there's no emails about hockey and
22    there's no texts about hockey.
23        So as I understand it, you kept a diary, is
24    that correct?
25        MS. RUSSELL: Objection.

Page 177

1        THE WITNESS: A diary?
2  BY MS. GORDON:
3  Q   Yes. That you wrote your thoughts down in a diary.
4    One of your treaters has that in her notes. That
5    you kept a diary. So I'm going to ask you, did you
6    keep a diary?
7  A   I write poetry. I don't know that I would call it a
8    diary at all. I don't - if that's the word that was
9    put on it.
10  Q   It was. Do you keep notes about what you're doing
11    at work anywhere in any format? Or the people
12    you're working with?
13  A   Can you rephrase the question?
14  Q   Do you keep notes about work? Do you take notes
15    during the day, in the evening? Do you take notes
16    about what you're doing, who you're talking to,
17    what you need to follow up on? Do you have any kind
18    of documentation of what you do at work or who
19    you've talked to at work?
20        MS. RUSSELL: Objection.
21        THE WITNESS: Well, I take notes on a legal pad
22    throughout the day as things come up. And I would
23    have – and if it were a client-related matter, I
24    would have made notes.
25  BY MS. GORDON:

Page 178

1  Q   I didn't ask you about a client.
2  A   Well, you're trying to -
3       MS. RUSSELL: You did.
4       THE WITNESS: You're asking me what I did
5   during the day about my work and I'm trying to
6   answer the questions. I'm trying to tell you where
7   I would have taken notes about my work. I don't
8   understand the question.
9  BY MS. GORDON:
10 Q   Sitting here today, you cannot think of anything
11  you have ever put in writing where you would have
12  said to Donna anything about your dissatisfaction
13  with Bob and the hockey client. You can't identify
14  anything here today in writing from you, correct?
15 A   A writing between me and Donna directly?
16 Q   You just said it was Donna you were -
17 A   I'm asking for clarification on the question.
18 Q   Well, I'll start with Donna, sure. Can you think of
19  anything you have in writing with Donna whatsoever
20  about hockey client?
21 A   I don't have all of the emails with Donna. I don't
22  have access to those. They're in the Olsman
23  Mackenzie email server.
24 Q   I didn't ask you -
25 A   I'm not done with my answer. So I don't know -

Page 179

1  Q   It's not responsive.
2  A   I don't know if those emails.
3       MS. RUSSELL: How do you know it's not
4   responsive if she isn't finished answering.
5   hasn't finished answering.
6  BY MS. GORDON:
7  Q   It's not responsive to my question, which is
8   there's nothing you can identify or think of today
9   that you put in writing to Donna, anything
10  specific?
11      MS. RUSSELL: Objection.
12      THE WITNESS: I don't recall.
13 BY MS. GORDON:
14 Q   Did you have a journal or notebook where you wrote
15  down your feelings?
16 A   As I stated before, I write poetry.
17 Q   I didn't ask you if you wrote poetry. I asked you
18  whether you kept a journal or notebook where you
19  wrote down your feelings. It's a yes or no.
20 A   I've written down feelings sometimes on a piece of
21  paper. I don't keep a journal of that nature.
22 Q   But you do make notes or write down your feelings.
23  Do you keep those?
24 A   I typically, when I write down my feelings then
25  turn it into a poem. So I know that that's not, you

Page 180

1   don't, that's not the answer that you're looking
2   for but I'm just -
3  Q   That's fine. You read one of your poems to Emily. I
4   mean, I know you wrote poems. I know you read them
5   to people. And I think it was from your diary that
6   you were reading it but it was some booklet of some
7   kind. So I want to know whether or not you have
8   anything in writing in a diary or a notebook or a
9   poem about the hockey client.
10      MS. RUSSELL: Objection.
11      THE WITNESS: I write poems in a book. So
12  that's like there - it's in a journal-type book,
13  but it doesn't mean that it's a journal. But would
14  I have written a poem about the hockey client? Is
15  that your question?
16 BY MS. GORDON:
17 Q   Any reference about the hockey client and your
18  concerns and you talking to Donna or anyone from
19  OMP about it?
20 A   I have written poetry about this situation.
21 Q   And where is that right now?
22      MS. RUSSELL: Objection.
23 BY MS. GORDON:
24 Q   Where is that kept? How do you keep that? Is it on
25  a laptop or what is that?

Page 181

1  A   It's written in a book of poetry.
2  Q   Like a journal?
3  A   Like a journal that's poetry, yep.
4  Q   So you do journaling then?
5  A   It's not really journaling because it's poems. But
6   like I don't write a journal, it's not a journal
7   entry. I'm trying to answer your question. I
8   don't -
9  Q   Yeah. I saw you wrote a poem to one of your
10  employers as to you were asked to make comments
11  about your performance and you wrote a poem.
12 A   I don't know what –
13 Q   I saw that.
14      MS. RUSSELL: Is there a question there,
15  Counsel?
16      THE WITNESS: Is there a question?
17      MS. GORDON: No, I was getting to one.
18      MS. RUSSELL: I object to that testimony.
19      MS. GORDON: Can I just get my question out?
20 BY MS. GORDON:
21 Q   I've seen that you wrote a poem to one of your
22  earlier employers with regard to a performance
23  review. So it appeared to me that you do write
24  poetry about things that are happening. And I'm
25  asking you whether you keep these.

Page 182

1   A   I don't know what poem you're referring to. I don't
2       remember that. But I do keep my poetry, yes.
3   Q   The Olsman Firm had no interest whatsoever in you
4       - strike that.
5           The Olsman Firm had no desire for you to work
6       for the hockey client, is that correct?
7           MS. RUSSELL: Objection.
8           THE WITNESS: I have no idea.
9   BY MS. GORDON:
10  Q   When did you tell anybody at Olsman, if you did,
11      that you were going to have to do some fairly
12      significant travel for the hockey client?
13  A   When it became apparent to me that I had to do
14      travel for the hockey client.
15  Q   And when was that?
16  A   I believe the first travel that I did related to
17      hockey was in June of 2023.
18  Q   And when did you let them know you would be
19      traveling? Was that the Orlando travel?
20  A   Yes.
21  Q   And that lasted, I think you gone like five days or
22      something, roughly?
23  A   Yes. I believe that's correct. Four or five days,
24      yes.
25  Q   And when did you let them know about that?

Page 183

1   A   It was my understanding that Bob had a conversation
2       with Donna about that a month or so in advance,
3       maybe more. And I believe I then had a follow-up
4       conversation around the same time.
5   Q   Why was Bob talking to your employer about your
6       travel?
7           MS. RUSSELL: Objection.
8   BY MS. GORDON:
9   Q   Why would that even happen?
10          MS. RUSSELL: Objection.
11          THE WITNESS: I don't know.
12  BY MS. GORDON:
13  Q   Did you ask him to do that?
14  A   No.
15  Q   And when you were doing hockey work – strike that.
16          The hockey work you did bill for was part of
17      the time you spent from which you obtained a
18      salary, correct? So you had a salary, you had a set
19      amount, we know you had 80K.
20          MS. RUSSELL: Objection.
21  BY MS. GORDON:
22  Q   And you spent work time working on the hockey
23      client during the same period of time you were
24      employed by the Olsman Firm, correct? During your
25      work day or whatever your work hours were, correct?

Page 184

1   A   Yes. And they were getting the hockey money, yes.
2   Q   And had you been working on cases, they would have
3       gotten the fees from the cases money, correct?
4   A   Correct.
5   Q   And how many hours a week were you working in 2021
6       roughly on hockey?
7   A   I have no idea.
8   Q   Did you keep track of your hours?
9   A   Yes. As an attorney that was billing the time, I
10      billed the time in invoices.
11  Q   Did your time start to go up after, let's say, mid-
12      2021?
13  A   I don't recall.
14  Q   And presumably if you had not been doing the hockey
15      work, you would have been working on OMP cases,
16      correct?
17  A   I was also working on OMP cases regardless.
18  Q   I know. But part of your time was devoted to
19      hockey, we know that. And that took away from time
20      you would have spent on case law, correct? Cases?
21  A   Yes.
22  Q   I have nothing in writing whatsoever - strike that.
23          I have one document between you and Donna
24      where you tell Donna on November 16, 2021 that you
25      are going to continue working for the PHPA and that

Page 185

1       there's been an agreed upon rate of $175 an hour.
2       And that the client has agreed to pay the firm
3       directly. Do you remember that email?
4           MS. RUSSELL: Counsel, what Bates number and
5       what party?
6           MS. GORDON: OMP3.
7   BY MS. GORDON:
8   Q   Do you remember that email?
9   A   I remember the email, I don't remember that exact
10      date. I have no reason to dispute that.
11  Q   And you were confirming with Donna that the funds
12      for this work would be paid to you directly in my
13      paycheck and will not be counted toward the column
14      system up to $10,000. Do you recall that?
15  A   Yes.
16  Q   So I'm looking at some of your numbers and it looks
17      like for 2022 you worked roughly 343 hours on the
18      hockey client. Does that sound about right to you?
19  A   I do not know that number.
20  Q   You have no idea?
21  A   I have no idea.
22  Q   Olsman's Firm did not direct you to travel for
23      PHPA, correct?
24          MS. RUSSELL: Objection.
25  BY MS. GORDON:

47 (Pages 182 - 185)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 186

1  Q   It had nothing to do with your travel, correct? You
2      told them you were going. I see some notes from you
3      saying you're going to have to travel.
4  A   If you're referring to specific notes, I'd like to
5      see the notes.
6  Q   No. Just in general, they had nothing to do with
7      your travel. You weren't assigned to travel by
8      Olsman, correct?
9      MS. RUSSELL: Objection.
10 BY MS. GORDON:
11 Q   To hockey events?
12     MS. RUSSELL: Objection.
13     THE WITNESS: Who had the client, the PHPA
14     client and that money was going to Olsman and it
15     was expected from the client that I would be
16     traveling. So I'm not sure how to –
17 BY MS. GORDON:
18 Q   What's –
19 A   - answer. I don't know how to answer your
20     question.
21 Q   Well, it's a really clear question. The Olsman Firm
22     never directed you to travel, correct? They never
23     told you you had to travel.
24 A   It's my understanding that it was an expectation of
25     having the PHPA as a client is that I would travel.

Page 187

1  Q   But you never told my clients that, correct?
2      MS. RUSSELL: Objection.
3      THE WITNESS: I never told your clients what?
4  BY MS. GORDON:
5  Q   That you were going to have to travel. You never
6      told them that.
7  A   I believe they knew I was going to have to travel
8      for the PHPA.
9  Q   That was after you were hired, correct?
10 A   I don't recall.
11 Q   You never got anything in writing from the Olsman
12     Firm directing you to travel for the hockey client,
13     correct?
14 A   I would have to look through everything to see if
15     there was something in writing.
16 Q   And the Olsman Firm did not pay for your travel, is
17     that correct?
18     MS. RUSSELL: Objection.
19     THE WITNESS: I don't know. I don't recall.
20 BY MS. GORDON:
21 Q   Who would know?
22 A   Probably the bookkeeper at Olsman.
23 Q   So you don't know who paid for your travel?
24 A   I might have gotten it reimbursed.
25     MS. RUSSELL: Objection.

Page 188

1      THE WITNESS: I don't recall.
2  BY MS. GORDON:
3  Q   Didn't the Hockey Association pay for it?
4  A   I don't know. If the Hockey Association paid for
5      it, they would have reimbursed Olsman if Olsman
6      paid for it on my behalf. I don't know.
7  Q   And the Olsman firm made no travel arrangements for
8      you, correct?
9  A   What do you mean by that?
10 Q   The firm didn't take over finding you a hotel,
11     booking a flight or anything like that. That was
12     strictly up to the hockey client or you, is that
13     correct?
14     MS. RUSSELL: Objection.
15     THE WITNESS: No.
16 BY MS. GORDON:
17 Q   What's incorrect about it?
18 A   A legal assistant would also assist with booking my
19     travel from the Olsman Firm.
20 Q   You traveled quite a bit when you were with the
21     Olsman firm, didn't you?
22 A   I don't know what that means.
23 Q   Like 10 trips a year?
24 A   I don't have a number off the top of my head or
25     couldn't tell you.

Page 189

1  Q   So you have no idea how many times you traveled
2      every year at Olsman. Give me a ballpark number?
3  A   I can look at a calendar and tell you.
4  Q   Well, we sent you your calendars. Did you look at
5      them?
6  A   I paged through the calendars. I didn't know you
7      were going to ask me how many trips I had so I
8      didn't count them.
9  Q   In any event, the Olsman Firm had nothing to do
10     with scheduling your travel or setting up your
11     travel unless you asked somebody to do it. And you
12     don't remember if you did, is that correct?
13     MS. RUSSELL: Objection.
14     THE WITNESS: No, that's not what I said.
15 BY MS. GORDON:
16 Q   Okay. What's incorrect about it?
17 A   A legal assistant from the Olsman Firm also booked
18     my travel.
19 Q   Who would that be?
20 A   It would have been Tiffany Shanahan.
21 Q   Are you guessing or do you remember Tiffany
22     actually booking something for you?
23     MS. RUSSELL: Objection.
24     THE WITNESS: I was going to give you another
25     name so I was going to finish my answer. Or Callie

Page 190

1 Peterson. Those would have been the two people that
2 would have been involved with booking.
3 BY MS. GORDON:
4 Q Did they book travel for you or you don't know?
5 A I recall that at least one PHPA trip was booked.
6 Q And that would have been your direction to them to
7 book you travel, correct? It certainly wasn't the
8 Olsman Firm that directed them to book your travel,
9 correct?
10 A I don't know if the Olsman Firm directed them to
11 book my travel.
12 Q Well, you would know whether you asked them to book
13 travel. You would know whether you did. Can you
14 remember that?
15 A Are you asking me for every single time or one time
16 in particular?
17 Q Any time.
18 A Okay. There are certainly times I directed my
19 travel to be booked, yes.
20 Q No one from the Olsman Firm ever attended any
21 hockey meeting or event, is that correct?
22     MS. RUSSELL: Objection.
23     THE WITNESS: Not that I know of.
24 BY MS. GORDON:
25 Q So by November 16, 2021, you knew Bob Riley was not

Page 191

1 immediately stepping down from the hockey client.
2 And you advised Donna that you were continuing to
3 work for the Hockey Association, correct?
4 A Yes. And Bob continued to advise me that he was
5 stepping down.
6     MS. RUSSELL: We've been going for about an
7 hour. How are you feeling? Do you want to continue
8 a little bit more?
9     THE WITNESS: Yeah.
10     MS. RUSSELL: Like a half hour?
11     THE WITNESS: Yes.
12     MS. GORDON: Are we going to be taking a break
13 every hour, is that the idea.
14     MS. RUSSELL: Well, she's pregnant so.
15     MS. GORDON: Okay. You know, I've been
16 pregnant. A lot of people have been pregnant. I've
17 tried cases pregnant. I didn't know that required a
18 break every hour. If that's what –
19     MS. RUSSELL: My normal deposition rhythm is an
20 hour.
21     MS. GORDON: Okay. Well, then that's fine.
22     MS. RUSSELL: I break every hour.
23     MS. GORDON: Then fair enough.
24     MS. RUSSELL: But in addition, the deponent is
25 pregnant and need to go to the bathroom.

Page 192

1     MS. GORDON: Okay. Well, feel free to speak up
2 if you have to go to the bathroom at any time,
3 Elyse, obviously. That goes for everybody.
4     MS. RUSSELL: There was just a lull so I
5 figured I would check in.
6     MS. GORDON: Okay. Do you guys want to take a
7 break now? Is that what you're saying?
8     MS. RUSSELL: No. That's why I checked in.
9 She's good to go. Let's keep going.
10 BY MS. GORDON:
11 Q In your complaint you state RH and Olsman decided
12 that the representation of the organizational
13 client would be shared by Olsman and RH with
14 McKenna assigned to the client on behalf of Olsman.
15 That's not an accurate statement, isn't it?
16     MS. RUSSELL: What paragraph are we looking at?
17     MS. GORDON: 117.
18     THE WITNESS: I believe that is an accurate
19 statement.
20 BY MS. GORDON:
21 Q Jules Olsman never did any - nor did anybody from
22 Olsman make any decision about the representation
23 of the hockey client. Who from Jules Olsman's
24 office do you think decided anything with Bob Riley
25 about the hockey client?

Page 193

1 A It's my understanding that Donna and Bob talked
2 about the hockey client after the fact.
3 Q What do you mean?
4 A I did not know that at the time that I started
5 working at Olsman.
6 Q Well, what did they talk about about the hockey
7 client? Are you guessing or do you have some
8 information?
9     MS. RUSSELL: Objection.
10 BY MS. GORDON:
11 Q Do you have some specific information on this or
12 are you guessing?
13 A Bob informed me that he talked to Donna.
14 Q About what?
15 A About the hockey client and the work for the hockey
16 client and the amount of -
17 Q What did he -
18 A - I'm not done with my answer.
19 Q I can't hear you. Speak up.
20 A This is the amount of work that was to be done for
21 the hockey client and the type of work to be done.
22 Q You're telling me that Bob talked to Donna about
23 that.
24 A That's what Bob told me, yes.
25 Q And when did he tell you that?

49 (Pages 190 - 193)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 194

1  A   In the fall of 2021.
2  Q   And why was he talking to Donna about the hockey
3      client, as you understood it?
4  A   I don't know why they -
5  Q   I said, as you understood it. Bob's now confiding
6      in you and he's telling you, oh, I talked to Donna
7      about the hockey client. So did you know what he
8      was talking to Donna about?
9          MS. RUSSELL: Objection.
10         THE WITNESS: When Bob represented that to me,
11     that was in the same conversation as I'm going to
12     be stepping down and I've talked to Donna about
13     your work for the hockey client. So I don't –
14 BY MS. GORDON:
15 Q   That's not true. That's not the way your complaint
16     is set up. Your complaint is set up so that this
17     alleged conversation occurred after Bob had not
18     stepped down. You say he did not keep his promise
19     to step down. Accordingly, RH and Olsman decided
20     that the representation of the organizational
21     client would be shared by Olsman and RH.
22         You have no evidence whatsoever to support
23     that RH and Olsman decided that the representation
24     of the organizational client would be shared. Is
25     that correct?

Page 195

1          MS. RUSSELL: Objection.
2          THE WITNESS: No.
3  BY MS. GORDON:
4  Q   None of my clients ever entered into any agreement
5      with Bob Riley whatsoever about the hockey client.
6      Are you aware of that?
7          MS. RUSSELL: Objection.
8          THE WITNESS: I don't know what they entered
9      into as far as you're talking about a written
10     agreement.
11 BY MS. GORDON:
12 Q   Anything. Any written or verbal agreement about the
13     hockey client. My clients entered into no agreement
14     of any kind with Bob Riley about the hockey client.
15     Are you aware of that?
16 A   Bob told me that they did.
17 Q   Well, what did he tell you they did?
18 A   I just told you that Bob told me that he had a
19     conversation with Donna about the work for the
20     hockey client, the amount of work to be done, the
21     scope of work that was being done and the work that
22     I would be doing for the hockey client. That's what
23     Bob informed me, that there was an agreement.
24 Q   That doesn't have anything to do with your
25     complaint that says, the representation of the

Page 196

1      organizational client would be shared. Bob never
2      discussed that with anybody.
3  A   That's not what he told me.
4  Q   Hang on. You got to let me finish.
5  A   Okay.
6  Q   You're making a complaint - you're making a
7      statement in a complaint that's binding in many
8      ways that Olsman and Riley had decided that there
9      would be a sharing of the client. That never
10     happened. Do you have some evidence that that ever
11     happened? That they decided that there would be a
12     sharing of the client? Do you have anything in
13     writing to support that?
14         MS. RUSSELL: Objection again on the basis of
15     asserting that the allegations are testimony.
16 BY MS. GORDON:
17 Q   Do you have anything in writing to support the
18     following: Accordingly, RH and Olsman decided that
19     the representation of the organizational client
20     would be shared by Olsman and RH with McKenna
21     assigned to the client on behalf of Olsman. Do you
22     have anything in writing whatsoever that supports
23     that statement?
24         MS. RUSSELL: Objection.
25         THE WITNESS: I don't know if there's something

Page 197

1      in writing.
2  BY MS. GORDON:
3  Q   And do you have any conversation that you can
4      identify where that would've been said verbally?
5  A   Yes. Conversations with Bob on numerous occasions.
6  Q   What are the dates?
7  A   He - I don't have specific dates for you.
8  Q   And in September 2021, once you obviously were
9      working for Olsman on the hockey client, you were
10     also working with Bob, correct?
11         MS. RUSSELL: Objection.
12 BY MS. GORDON:
13 Q   About the hockey client, regularly, right?
14 A   What do you mean working with Bob?
15 Q   I see emails where you two are constantly at a
16     conference, setting up a call, exchanging
17     information about the client, text after text after
18     text. My question was very simple.
19         MS. RUSSELL: Objection.
20 BY MS. GORDON:
21 Q   After you started with Olsman, you were working
22     with Bob on the hockey client?
23 A   He and I both represented the hockey client after I
24     started working for Olsman, yes.
25 Q   That wasn't my – okay. So you were working with Bob

Page 198

1    on a regular basis, correct?
2  A  Yes.
3  Q  And you talked to him multiple times a week, is
4    that correct?
5  A  When are we talking?
6  Q  From 2021 to February 2024?
7  A  Well, the amount of - the frequency of which we
8    talked changed during that time period. So I can't
9    answer that broad of a timeframe.
10 Q  Well, your complaint says this. This sharing
11   agreement required McKenna to talk with Riley
12   multiple times per week.
13 A  Okay.
14 Q  Is that an accurate statement?
15     MS. RUSSELL: Objection.
16     THE WITNESS: I don't understand the timeframe
17   that we're talking about.
18 BY MS. GORDON:
19 Q  Well, it's your complaint, so I didn't write it,
20   but I heard your answer.
21 A  I didn't write it either.
22 Q  I'm sorry?
23 A  I didn't write it either.
24 Q  You state in your complaint that you told Donna of
25   the history of sexually harassing conduct that

Page 199

1    apparently occurred according to you with Bob
2    Riley. Agree?
3      MS. RUSSELL: Objection.
4      THE WITNESS: Agree that I state that in the
5    complaint and that I did that?
6  BY MS. GORDON:
7  Q  Yes.
8  A  Yes. Yeah.
9  Q  And what was the sexual harassing conduct you told
10   Donna about?
11 A  The inappropriate cards and notes and letters that
12   I received along with the photographs that I didn't
13   know that he was taking about me. Along with the
14   other conduct that I had experienced while I was
15   working there.
16 Q  I'm just asking you what you told my client.
17 A  Well, it was a -
18 Q  So I want to know. I heard what you said about
19   cards and letters. I heard what you said about
20   photos. Did you tell her anything else about
21   alleged sexually harassing conduct or is that what
22   you explained to her?
23     MS. RUSSELL: Objection.
24     THE WITNESS: This is four years, four and a
25   half years ago and I talked to her about how

Page 200

1    uncomfortable Bob made me and I talked about those
2    things. I don't recall every detailed conversation.
3  BY MS. GORDON:
4  Q  Do you know what the term sexual harassment means
5    in legal context?
6      MS. RUSSELL: Objection.
7      THE WITNESS: Yes.
8  BY MS. GORDON:
9  Q  What is your understanding of that?
10     MS. RUSSELL: Objection.
11 BY MS. GORDON:
12 Q  Go ahead. You can answer.
13 A  To be harassed by someone and for it to have sexual
14   implications. And also for it to be on the basis of
15   your sex. I'm not sure not – I'm sure I'm
16   butchering the exact definition.
17 Q  And so the things you've mentioned so far have no
18   sexual connotation. You said Bob sent you letters
19   or gave you cards.
20     MS. RUSSELL: Is there a question there,
21   Counselor?
22     MS. GORDON: Yeah. I was about to get it out.
23 BY MS. GORDON:
24 Q  That none of those had a sexual connotation that
25   were indicative of that he liked you or appreciated

Page 201

1    you but there was nothing sexual about the cards,
2    is that correct?
3      MS. RUSSELL: Objection.
4      THE WITNESS: They were romantic.
5  BY MS. GORDON:
6  Q  They weren't sexual, were they?
7  A  My understanding is that romantic is also sexual
8    harassment. And they came up - the behavior to me
9    seemed sexual in nature and based on my sex.
10 Q  You're not aware that conduct that is primarily
11   romantic overtures is not sexual harassment?
12     MS. RUSSELL: Objection.
13     THE WITNESS: It was than romantic overtures to
14   me.
15 BY MS. GORDON:
16 Q  Well, I just asked you what it was. I asked you
17   what you told my client. That's how this all
18   started. And you mentioned cards, that you told her
19   about the cards and the photos. So I'm just back
20   with what you told my client. You've said in your
21   complaint that you told her about the so-called
22   sexual harassment. And so now I want to know what
23   you advised my client of. Was there more than the
24   cards and the photos that you told Donna about?
25 A  I advised Donna that I was sexually harassed by Bob

51 (Pages 198 - 201)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com
www.veritext.com

1    Riley.
2  Q   But what did that – what does – I mean, that's a
3    very, very broad term. What did you say actually
4    happened on the job? What did you tell Donna
5    actually occurred with Bob Riley?
6  A   That there was inappropriate conduct. That there
7    were notes, that there were cards, that there were
8    romantic gestures, that there were secretive
9    photographs being taken. And I would've described
10    the entire situation. I don't recall as I sit here
11    today of every single detail that I shared.
12  Q   But you have a lawsuit going that's based on the
13    so-called sexual harassment.
14  A   Yes.
15  Q   And so I would assume that today you would know
16    what the sexual harassment consisted of.
17        MS. RUSSELL: Objection.
18  BY MS. GORDON:
19  Q   Do you know sitting here today, do you recall what
20    the sexual harassment that you're alleging
21    consisted of? Or are you not sure?
22        MS. RUSSELL: Objection.
23        THE WITNESS: I don't understand what your
24    question is.
25  BY MS. GORDON:

1  Q   You are in this lawsuit alleging that you were
2    sexually harassed by my client and by Bob. So I'm
3    trying to find out what you told Donna. You say you
4    told Donna that Bob sexually harassed you. I asked
5    you, what does that consist of?
6  A   And I've told you the answer to that question.
7  Q   And you've told me about notes, cards, photos. And
8    then you said something about conduct but you
9    didn't say what the conduct was. So other than
10    getting notes, getting cards and secret pictures, I
11    think is the way you put it, being taken. What are
12    the other specifics when you use the term sexual
13    harassment that you told Donna Mackenzie about? If
14    there are any.
15        MS. RUSSELL: Objection.
16        THE WITNESS: Mandatory dinners that I had to
17    go to that were expected as a part of my employment
18    to not be in trouble with Bob. And I believe I
19    described some of the cards to her.
20  BY MS. GORDON:
21  Q   What did you describe?
22  A   That they used the word love in some of them.
23  Q   And did they include anything else that you told
24    Donna about, other than love?
25  A   I don't recall the details that I

1  Q   Well, again, it's your case.
2  A   I'm not done.
3  Q   Go ahead. What else? You had cards, they may have
4    included the word love. What else? Dinners,
5    pictures. What else did you tell Donna about?
6  A   I told Donna that I was very uncomfortable with
7    Bob's behavior.
8        MS. RUSSELL: Let's take a break.
9        MS. GORDON: I'm not quite done with this,
10    finish this.
11        MS. RUSSELL: No. You finished the question,
12    we're going to take a break.
13        MS. GORDON: No, no, no. I'm not –
14        MS. RUSSELL: I want to take a break. I need to
15    go to the bathroom.
16        MS. GORDON: You want to coach your client.
17        MS. RUSSELL: No, I don't.
18        MS. GORDON: I'm going to finish up.
19        MS. RUSSELL: No. You asked your question. She
20    finished answering it. We're going to take a break.
21    We're taking a break.
22        MS. GORDON: This is really patently obvious
23    with you guys. You're going to go out there and
24    coach here and she's going to come back in here and
25    she's going to have some new words to tell us. I'm

1    going to finish out this area.
2        MS. RUSSELL: We've been going for over an
3    hour. We're going to take a break.
4        MS. GORDON: You need to give me –
5        MR. ALTMAN: When somebody says they need to
6    take a bathroom break, we do it.
7        MS. GORDON: Any other lawyer gives a couple,
8    people two minutes.
9  BY MS. GORDON:
10  Q   Is there anything you can remember sitting here
11    right now other than what you've listed? I think
12    you've now told me everything you can remember that
13    you told Donna about. Is that fair?
14  A   As I sit here today, I recall the things that I've
15    now told you that I told Donna about and that I was
16    very uncomfortable with the behavior.
17  Q   Right.
18  A   And that I'm sure I explained that I felt like Bob
19    was obsessive and that that made me uncomfortable.
20    I'm uncomfortable. I wanted him to leave me alone.
21    I would've explained that. I would've told her that
22    during the conversation that I'm thinking of in
23    particular that I had confronted him and I asked
24    him to leave me alone and that I was stepping down
25    from hockey and that I had a picture of the

52 (Pages 202 - 205)

Page 206

1    pictures. And then she told me far worse has
2    happened to her in her career. And whatever about
3    my balls. Then I would've described trying to get
4    away from Bob. That's the conversation as I
5    generally recall it.
6        MS. RUSSELL: So we're at break time. Thank
7    you.
8    BY MS. GORDON:
9    Q    So just to close off - this is, you've now given –
10       MS. RUSSELL: We're at break time. We're taking
11   a break.
12   BY MS. GORDON:
13   Q    You've now given me an – this was an overview of
14   what you told Donna? This is –
15       MR. ALTMAN: Somebody needs a bathroom break,
16   we're going to take a bathroom break.
17       MS. GORDON: Okay. Guys, here's what we're
18   going to do from now on, if anybody wants a
19   bathroom break –
20       MS. RUSSELL: You don't get to change the
21   rules, Deb. Good-bye.
22       MS. GORDON: Give everybody a minute or two
23   above so you can finish out your area.
24       (Brief pause.)
25   BY MS. GORDON:

Page 207

1    Q    I'm handing you Plaintiff's Bates 278, 279. So this
2    is 278 is the first page, Elyse. This is a
3    memorandum to you from the PHPA billing and revenue
4    allocation, correct?
5    A    This first page is a memorandum to me from Bob.
6    Q    I'm sorry. It's to you from Bob, RE, the PHPA
7    billing and revenue allocation, correct?
8    A    That's what it says, yes.
9    Q    Date August 17th, 2021. And you received this, I
10   suppose.
11   A    I received this, yes.
12   Q    And this is telling you what's going to happen with
13   the PHPA billing, correct?
14   A    That is what Bob proposed to happen.
15   Q    And this was a proposal for how you two would
16   handle billing with PHPA, correct?
17   A    This was his proposal, yes.
18   Q    Let's go to the next page, 279. This is a letter to
19   you care of Riley and Hurley from Larry Landon,
20   who's the executive director of PHPA, correct?
21   A    That is what the letter appears to be, yes.
22   Q    Now, you obviously – you probably had already been
23   working with Larry Landon at this point, correct?
24   You knew him?
25   A    I knew him, yes.

Page 208

1    Q    And you continued to work with him, correct?
2    A    Correct.
3    Q    This says, Dear Elyse, as you begin employment with
4    a new law firm, we want to thank you for your
5    service to the PHPA through Riley and Hurley PC. I
6    wish you the very best with this new opportunity
7    and trust that it is all you could ask for. Your
8    continued association with Bob Riley is important.
9    He serves as our lead counsel and is our legal
10   quarterback. I envision maintaining a status quo
11   and expect that you will work fully and completely
12   under Bob's guidance and direction. He will be an
13   invaluable resource as you become more familiar
14   with all aspects of the PHPA and how our legal
15   needs are met. It is my understanding that your
16   work for the PHPA will be outside the normal
17   services provided by your new law firm. This is
18   acceptable so long as you continue to work through
19   Riley and Hurley PC. In this relationship, Bob will
20   serve as your supervisor for all PHPA activities,
21   including assignments, projects, meetings,
22   negotiations, et cetera. This also includes
23   invoices, which must be prepared through Riley
24   Hurley PC. All invoices must be reviewed and
25   approved by Bob. I'm certain there are other

Page 209

1    details to work out and I trust that you and Bob
2    will address these. Very truly yours, Larry Landon.
3        Okay. We've, learned that the invoices ended
4    up being sent by the Olsman Firm, correct?
5    A    Correct.
6    Q    I assume - do you recall getting this letter?
7    A    I don't recall getting the letter, no.
8    Q    You're not denying it. You just, it's not coming to
9    mind right now.
10   A    It's not coming to mind right now.
11   Q    So this letter makes it very clear that your
12   continued association with Bob is very important,
13   correct?
14       MS. RUSSELL: Objection.
15       THE WITNESS: Yes. It's my understanding that
16   Bob wrote this letter.
17   BY MS. GORDON:
18   Q    Well, whatever. It's signed by Larry Landon, isn't
19   it?
20   A    Yes.
21   Q    Signed.
22       MS. RUSSELL: Objection.
23   BY MS. GORDON:
24   Q    And just to give us a quick overview. What does,
25   he's executive director of the association. Who

Page 210

1    does he report to as you understand it or as you
2    understood it at this time?
3         MS. RUSSELL: Object to form. I think you asked
4    about three questions there. Which one do you want
5    her to start with?
6    BY MS. GORDON:
7    Q   Who do you understand that he was reporting to?
8    A   As the executive director of a union he reports to
9    union membership.
10   Q   With regard to the invoices, did you yourself send
11       the invoices?
12   A   Which invoices are we talking about?
13   Q   PHPA invoices.
14   A   When are we talking?
15   Q   Starting in 2021. Were you the one that got out the
16       invoices and then they wrote the check back to the
17       Olsman Firm?
18   A   In 2021 I was working at Bob's firm and then I
19       switched over to Olsman. So during the time when I
20       was at Bob's firm, I did not send out invoice.
21   Q   No.
22   A   I'm trying to, I'm clarifying what timeframe you're
23       asking.
24   Q   I know what happened to Bob. That's very obvious to
25       all of us. We know that he sent any invoices. So

Page 211

1    here at the Olsman Firm, this was new to them, this
2    client. Did you send the invoices to PHPA from your
3    work on the Olsman Firm's time?
4         MS. RUSSELL: Objection.
5         THE WITNESS: Yes. I would've emailed the
6    invoices.
7    BY MS. GORDON:
8    Q   So you prepared the invoices and you sent them,
9        correct?
10   A   Yes.
11   Q   Did anybody from Olsman review them first? I think
12       not but you'll tell me if that's incorrect.
13        MS. RUSSELL: Objection.
14        THE WITNESS: Sorry. What's the question?
15   BY MS. GORDON:
16   Q   You sent them out. Nobody from the Olsman Firm
17       reviewed them before they were sent, correct?
18   A   I believe I had a legal assistant review them to
19       make sure they didn't have any typos, potentially,
20       occasionally when I couldn't - when I needed to
21       just have a spell check run. But that would be the
22       extent of that involvement.
23   Q   Then you'd get them out and then in turn they would
24       send a check back to the Olsman Firm.
25   A   Directed to Olsman, yes.

Page 212

1    Q   And then Olsman firm kept track of the PHPA money
2        that came in for your work, correct?
3    A   Correct.
4    Q   And then you had an arrangement with them on how
5        that would be shared, correct? And we will get to
6        that later.
7         MS. RUSSELL: Object to form. Do you want her
8    to answer or not?
9    BY MS. GORDON:
10   Q   Yes, I want her to answer. That's the way it
11       worked, correct?
12   A   I don't know how to answer your question regarding
13       the arrangement.
14   Q   Do you not understand it? You sent out an invoice,
15       a check came back into the Olsman Firm. It went
16       into the Olsman account, it was credited to you,
17       correct?
18   A   There's a question of whether it was credited to me
19       so I don't think I can answer that question.
20   Q   You don't know that?
21   A   It changed during my employment there. How it was
22       credited to me changed.
23   Q   We already covered this written document where
24       there was a rate agreed upon and the client has
25       agreed to pay the firm directly. That would be the

Page 213

1    hockey association. This will confirm our
2    understanding that the funds for this work will be
3    paid to me directly. This is from you, Elyse. In my
4    paychecks and will not be counted toward the column
5    system. Remember that? Up to $10,000. Does that
6    sound right?
7    A   I remember that email, yes. And that was not the
8        way the arrangement stayed during the rest of my
9        employment.
10   Q   Let's go back to Bates 279.
11   A   Sure.
12   Q   As to the rest of this letter, you did continue to
13       work for the association with Bob Riley, correct?
14       We know that, right?
15   A   Yes. This letter is –
16   Q   He was the lead – I'm sorry. Go ahead.
17   A   This letter is before Bob said he was stepping
18       down.
19   Q   Yes. We know that. We already picked that up today
20       from you.
21   A   Okay.
22   Q   Bob served as lead counsel, is that accurate?
23   A   At that time, yes.
24   Q   When did that end? When was he stopped being lead
25       counsel?

54 (Pages 210 - 213)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

1  A   When I would say we probably shifted to co-lead
2     counsel at some point in time. But he stepped down
3     from the position for the PHPA, is my
4     understanding, after the complaint was filed in
5     this case.
6  Q   Yeah. So you filed your lawsuit. That's what
7     happened.
8        MS. RUSSELL: Object to form.
9  BY MS. GORDON:
10 Q   Prior to that, up until that time he remained lead
11    counsel, correct?
12 A   I don't know that I would have – I don't know that
13    he was lead counsel prior to that.
14 Q   Well, he was far more experienced than you were. I
15    think we've already agreed to that, correct?
16 A   Sure.
17       MS. RUSSELL: Objection.
18 BY MS. GORDON:
19 Q   You had a good relationship with Larry Landon, had
20    known him for a long time, correct?
21 A   Yes.
22 Q   He took the lead on most of the PHPA things. You
23    assisted, you did some projects on your own,
24    correct?
25 A   What timeframe are we talking about?

1  Q   The entire time up until he left.
2  A   No, incorrect.
3  Q   Well, what changed? I mean, again, I've got all the
4     emails.
5  A   Larry Landon was no longer with the PHPA. Larry
6     Landon was no longer working for the PHPA and
7     things changed significantly at that time.
8  Q   That was late though, wasn't it? When did Larry
9     leave?
10 A   Larry was no longer in that same position in the
11    first week of July.
12 Q   On what year?
13 A   2024.
14 Q   July 2024, is that what you said?
15 A   Yes, I believe that's right.
16 Q   That was about two months before you retained legal
17    counsel?
18 A   No.
19 Q   I'm sorry. It's '24. You got legal counsel in '23.
20    So with Larry Landon leaving Bob's role continued
21    the same as it always had, is that correct? He did
22    the same work he'd always done even after Larry
23    left, correct?
24 A   No. But I would say that we are – again, I don't
25    think that I can answer questions that are about

1     the representation of a client. It's my privilege.
2  Q   Who told you not to? You have an attorney.
3  A   Well, my client has attorney-client privilege with
4     me and so I don't think that -
5  Q   No.
6  A   Yeah, that is the case.
7  Q   It's not privileged. If I'm asking about Bob
8     Riley's job duties, that's not attorney-client
9     privilege material, okay.
10 A   Well, you're asking me if he had the same role.
11 Q   I can tell you that right now.
12       I'm sorry?
13 A   You're asking me if he had the same role.
14 Q   Yes. That's not privileged material. How did Bob's
15    role change, if it did at all, after Larry Landon
16    left? If you're saying it changed. If you are, tell
17    me what changed.
18 A   I was doing more work.
19 Q   What does that mean? What kind of more work were
20    you doing? Did your billings go up?
21       MS. RUSSELL: Object to form. Pick a question.
22    You asked three there.
23       MS. GORDON: Because I'm getting a blank look.
24    I'm trying to help.
25       THE WITNESS: Which question would you like me

1     to answer?
2  BY MS. GORDON:
3  Q   How did your role change or increase after Larry
4     Landon left?
5  A   I was taking on more of the responsibilities for
6     the PHPA as the primary person doing the job.
7  Q   Such as what?
8  A   Such as hiring the new executive director, I had
9     more of an involvement of that.
10       MS. RUSSELL: All right. This is getting into
11    privileged material here. How she provided counsel
12    to PHPA.
13       MS. GORDON: No, it's not.
14       MS. RUSSELL: Objection, privilege.
15 BY MS. GORDON:
16 Q   When - up until Bob left, I have all of your emails
17    with Bob up until Bob actually left and you were
18    leaning heavily on Bob for advice up until the time
19    that he was removed from the organization. Do you
20    disagree with that?
21       MS. RUSSELL: Objection.
22       THE WITNESS: I believe that my role as counsel
23    for the PHPA involves working with the other
24    attorney for the PHPA to provide appropriate
25    representation. So we emailed, yes.

Carroll Reporting & Video
A Veritext Company
www.veritext.com                              586-468-2411
                                              www.veritext.com

Page 218

1 BY MS. GORDON:
2 Q   Did your pay rate change at any time?
3 A   We spoke earlier about the change from $175 to
4      $225.
5 Q   I know. After that, did it ever change?
6 A   It did not.
7 Q   Did your title change?
8 A   I believe my title is counsel for the PHPA.
9 Q   So it never changed, is that accurate?
10 A   I think it remains the same, yes. It's counsel for
11      the PHPA.
12 Q   Bob Riley obviously was not an Olsman employee,
13      correct?
14 A   I don't know. I have no indication that he was an
15      Olsman employee.
16 Q   He had no legal relationship with the Olsman Firm
17      that you are aware of, is that correct?
18      MS. RUSSELL: Objection.
19      THE WITNESS: I have no idea.
20 BY MS. GORDON:
21 Q   He had no contract with the Olsman organization
22      that you're aware of, is that accurate?
23 A   I have no idea. I know that he routinely
24      facilitated for them.
25 Q   He had no fiduciary duty to the Olsman Firm or they

Page 219

1      to him –
2      MS. RUSSELL: Objection.
3 BY MS. GORDON:
4 Q   - as far as you're aware, is that correct?
5 A   I know that Bob was negotiating the sale of the
6      firm between Jules and Donna. But I do not know, I
7      don't know what fiduciary duties he owed.
8 Q   What year was that?
9 A   As I understand that, that was a couple years. It
10      was a couple year long, year's long transition.
11 Q   What years are we talking about?
12 A   '22, '23, '24 are the years I know. I don't know
13      what other years.
14 Q   After you left the Riley firm, you had no legal
15      relationship with that firm, is that correct?
16 A   That's correct.
17 Q   You had no contract with them of any kind, is that
18      correct?
19 A   That is correct.
20 Q   Did you consider yourself an employee of PHPA?
21      MS. RUSSELL: Objection.
22      THE WITNESS: I considered myself an attorney
23      for the PHPA.
24 BY MS. GORDON:
25 Q   But not an employee.

Page 220

1 A   Not an employee.
2 Q   A contractor perhaps?
3 A   Sure.
4      MS. RUSSELL: Objection.
5 BY MS. GORDON:
6 Q   And certainly Bob Riley was not your employer after
7      you left his firm, correct?
8 A   He was no longer my employer.
9 Q   You made no written documentation as to any
10      complaints you had about Bob Riley from the day you
11      began working for him until the day you stopped
12      working for him. You had no written complaints made
13      about him to his partner, Bill Hurley, correct?
14      MS. RUSSELL: Objection.
15      THE WITNESS: I believe that's correct.
16 BY MS. GORDON:
17 Q   You had no complaints made about him to any of his
18      office staff or office manager, is that correct?
19      MS. RUSSELL: Objection.
20      THE WITNESS: I did complain about him to his
21      office manager and office staff.
22 BY MS. GORDON:
23 Q   I said in writing.
24 A   That last question did not say in writing.
25 Q   All of these questions, I'm just continuing. You

Page 221

1      have nothing in writing, any complaints as to Bob
2      Riley as to any staff in his office, is that
3      correct?
4 A   I'm not sure.
5 Q   Nothing you know of today, correct?
6      MS. RUSSELL: Objection.
7      THE WITNESS: I believe there may be writings
8      with Sonia Mullins and I'm not sure about the other
9      two.
10 BY MS. GORDON:
11 Q   Did you produce those? Did you put something in
12      writing with Sonia?
13      MS. RUSSELL: Objection, discovery's ongoing.
14      THE WITNESS: I have now stated I –
15 BY MS. GORDON:
16 Q   Did you put something in writing to Sonia?
17 A   I believe there might be something in writing and
18      I'm not sure as I sit here today.
19 Q   Would've been a text? What would it have been?
20 A   It would've been a text.
21 Q   And that, you would have access to that text,
22      correct?
23 A   Correct.
24 Q   You made no complaints about Bob Riley to Larry
25      Landon in writing, is that correct?

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com
www.veritext.com

Page 222

1   A   What timeframe are we talking about?
2   Q   Anytime between the date you started working with
3       Bob Riley until the date he left PHPA. You made no
4       complaints of any kind about Bob Riley to Larry
5       Landon.
6   A   I'm not sure.
7   Q   You made no complaints about Bob Riley to PHPA
8       during that same timeframe, correct?
9   A   You're saying in writing. I'm not sure.
10  Q   You made no complaints to Jules Olsman of any kind
11      about Bob Riley, correct?
12      MS. RUSSELL: Objection.
13      THE WITNESS: Correct. In writing? Yes.
14      Correct.
15  BY MS. GORDON:
16  Q   You made no verbal complaints about Bob Riley to
17      Jules Olsman, correct?
18  A   What type of complaints?
19  Q   About sexual harassment?
20  A   I did not complain to him about sexual harassment,
21      no.
22  Q   Did you complain to Jules about anything else about
23      Bob Riley?
24  A   Yeah. That hockey work was taking up a lot of time
25      because of Bob. Yes, I recall that conversation and

Page 223

1       I don't believe that's in writing.
2   Q   Were you unhappy that hockey work was taking up a
3       lot of time?
4   A   I went to lunch with Jules at some point and said
5       that I would like to step down from hockey and that
6       I could work a hundred percent of the time on the
7       cases. So I had that conversation with Jules. And
8       yes, I was because I then had to work with Bob and
9       Bob wasn't stepping down. And yes, I was upset that
10      it was taking up more time.
11  Q   You could have stepped down at any time from the
12      PHPA work, correct?
13      MS. RUSSELL: Objection. Were you finished
14      answering when she asked your question?
15      THE WITNESS: No. But it's –
16  BY MS. GORDON:
17  Q   You could have stepped down at any time from PHPA.
18      There was nobody at Olsman, the Olsman Firm that
19      wanted you to stay there, is that correct?
20      MS. RUSSELL: Objection.
21      THE WITNESS: Jules specifically told me not to
22      step down from the PHPA work when I –
23  BY MS. GORDON:
24  Q   He didn't say that. What he said is, you are not
25      bringing in -

Page 224

1       MS. RUSSELL: Objection. You're
2   testifying.
3       MS. GORDON: I'm not testifying. I'm asking a
4   question.
5       MS. RUSSELL: Yes, you are. Were you at this
6   lunch, Deborah?
7       MS. GORDON: I have emails. I have information
8   about exactly what was said.
9       MS. RUSSELL: Then show us the emails.
10      MS. GORDON: I'm not - you know what? I'm not
11  here to take your direction.
12  BY MS. GORDON:
13  Q   So Jules, you went to lunch with Jules Olsman. You
14      never - was this a lunch meeting with Jules or is
15      this in a different, at his office?
16  A   We had multiple conversations and one of them was a
17      lunch meeting. What is this at a lunch meeting?
18      What is the this you're talking about?
19  Q   You had one conversation with Jules about PHPA,
20      only one, correct?
21  A   I disagree that I had one.
22  Q   That's how your complaint reads. Is there more than
23      one meeting where you - is there any other time you
24      talked to Jules about PHPA?
25  A   Yes. I talked to him about how it was taking up

Page 225

1       more time. And there's more than one time that I
2       talked to him.
3   Q   So we're going to get to this. But the fact of the
4       matter is, you were not bringing any money into the
5       Olsman firm from lawsuits that you were handling.
6       And your numbers were low, and you went to Jules
7       and you asked him what did he think about you
8       leaving hockey. Not knowing anything that you've
9       now since created in your complaint, he said, I
10      don't know why you'd leave there if you're enjoying
11      it. That's what he said. He never told you to stay
12      there, is that correct?
13      MS. RUSSELL: Objection.
14      THE WITNESS: That's incorrect.
15  BY MS. GORDON:
16  Q   You're telling me that Jules Olsman told you to
17      stay at the Hockey Association?
18  A   Yes. And I'm telling you a lot of what you just
19      said in that question is incorrect.
20  Q   So you have nothing in writing from Jules telling
21      you to stay at hockey, correct?
22  A   I'm not sure.
23  Q   And when you recorded, secretly recorded Donna
24      Mackenzie when you were setting her up for a
25      lawsuit a few days before you left -

57 (Pages 222 - 225)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 226

1    MS. RUSSELL: Objection. Counsel is testifying
2    repeatedly.
3  BY MS. GORDON:
4  Q   A few days before you left and you told Donna this,
5    she said, there is no way Jules would ever tell you
6    to do anything other than to leave PHPA. Do you
7    remember her telling you that?
8    MS. RUSSELL: Objection.
9    THE WITNESS: I don't recall that.
10  BY MS. GORDON:
11  Q   And were you aware that the office was extremely -
12    well, I think we're going to get into all this in a
13    short time here. You were very concerned about how
14    the office was viewing your work and you started
15    confiding in Bob about it. Do you recall that in
16    2023?
17    MS. RUSSELL: Objection.
18    THE WITNESS: Bob reached out to me in 2023 and
19    told me about conversations that he and Donna were
20    having about me.
21  BY MS. GORDON:
22  Q   We're going to get to all of that.
23  A   Okay.
24  Q   But you became worried because you knew that you
25    were underperforming and you were worried about how

Page 227

1    you were being viewed at the Olsman office. Is that
2    accurate, in 2023?
3    MS. RUSSELL: Objection.
4    THE WITNESS: I don't view what I was doing as
5    underperforming. But Bob certainly told me that
6    Donna had a number of negative things to say about
7    me.
8  BY MS. GORDON:
9  Q   We're going to - you know what, we've got all of it
10    so we'll see.
11  A   Okay.
12  Q   You filed a complaint with the EEOC, is that
13    correct?
14  A   Yes.
15  Q   You state in your second amended complaint in page
16    27- paragraph 27 of your second amended complaint
17    you state the following. McKenna exhausted her
18    administrative remedies at the US Equal Employment
19    Opportunity Commission, EEOC. Paragraph 28. The
20    EEOC found reasonable cause to believe violations
21    of Title VII occurred. The EEOC issued McKenna a
22    Notice of Right to Sue, which McKenna received on
23    or about October 15th, 2024. A true and copy of
24    that notification is attached as Exhibit A.
25    It is a false statement that the EEOC found

Page 228

1    reasonable cause to believe violations of Title VII
2    occurred. Are you aware of that? That your
3    statement –
4    MS. RUSSELL: Objection.
5  BY MS. GORDON:
6  Q   - was false in this complaint?
7    MS. RUSSELL: Objection.
8    THE WITNESS: I don't know that – I don't - I
9    have no idea what - you are asking me if it's
10    false?
11  BY MS. GORDON:
12  Q   Yeah. You made a false statement to a federal
13    court –
14    MS. RUSSELL: Objection.
15  BY MS. GORDON:
16  Q   - about the EEOC making a finding that they found
17    reasonable cause to believe that violations had
18    occurred.
19  A   I did not write the complaint. Attorneys wrote the
20    complaint and that -
21  Q   Who wrote this? This paragraph?
22    MR. ALTMAN: She wasn't finished with her
23    answer.
24  BY MS. GORDON:
25  Q   Do you know who wrote this complaint?

Page 229

1    MR. ALTMAN: She was not finished with her
2    answer.
3  BY MS. GORDON:
4  Q   I have a question. Do you know who wrote the
5    complaint?
6    MR. ALTMAN: She was not finished with her
7    answer.
8    MS. GORDON: You can stop screaming now.
9    MR. ALTMAN: I'm not screaming.
10    MS. GORDON: Yes, you are.
11    MR. ALTMAN: This is on video. She was not
12    finished with her answer. Are you going to allow
13    her to finish her answer?
14  BY MS. GORDON:
15  Q   What did you want to say? You took a long pause.
16    What did you want to add, Elyse? What did you want
17    to add to that? You are saying, well, I didn't sign
18    this, I didn't, this isn't - I didn't write it so I
19    want to know who wrote it? Who wrote this?
20    MR. ALTMAN: She did not finish her answer.
21  BY MS. GORDON:
22  Q   Finish.
23  A   I did not write the complaint. My attorneys at the
24    time wrote the complaint. I couldn't tell you who
25    wrote that specific paragraph. I don't know how you

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com
www.veritext.com

Page 230

1     would anticipate that I would know that other than
2     watching them write a complaint.
3   Q   Oh, wow. Who were your attorneys at this time?
4   A   I think you know who they were.
5   Q   No, I don't. I have no idea.
6   A   Well, did they not submit the complaint?
7   Q   This second amended? This is in the first amended
8     complaint, I believe. This is in the one you wrote.
9     Let me just double check that. That is a good
10    point.
11  A   It's not. Because I got the right to sue letter on
12    October 15th, 2024. My complaint was filed on
13    September 9th, 2024. So it can't be in the
14    complaint that I wrote.
15  Q   In any event. I'm going to stick with this
16    complaint. I take your point that you didn't write
17    it. I assume you had read it before it was filed,
18    is that correct?
19  A   Yes.
20  Q   Huh?
21  A   Yes.
22  Q   So you read your own complaint, you're a lawyer.
23    And you were the one that filed the EEOC complaint,
24    correct?
25  A   Correct.

Page 231

1   Q   And so I'm telling you here today that that is a
2     false statement in your complaint.
3   A   What basis do you have for it being a false
4     statement?
5   Q   I'm going to hand you the EEOC charge of
6     discrimination that was filed. First thing I'm
7     going to hand you is –
8       MS. GORDON: I'll take a sticker on this.
9     There's no Bates.
10      (Document marked for identification as
11      Plaintiff's Deposition Exhibit Number 1.)
12  BY MS. GORDON:
13  Q   I'm going to read this into the record and then I'm
14    going to hand this to you. Here's your complaint.
15    Did you file the complaint with the EEOC? Did you
16    fill out a form and file a complaint?
17  A   I filled out a form, yes.
18  Q   I'm sorry.
19  A   I filled out a form with – yes, with the EEOC.
20  Q   The complaint says the particulars are: I began
21    with the above-named employer in around September
22    '21 as an attorney. In around 2019 while at my
23    previous employer, my immediate supervisor on a
24    continuous basis would sexually harass me. I stated
25    on many times that his behavior was unwelcome,

Page 232

1     however, to no avail. In around September '21, I
2     gained employment at the above-named employer.
3     However, I quickly discovered that the law firm I
4     was now employed with was working with my previous
5     supervisor who would continually sexually harass
6     me. Once confirmed, I immediately informed the
7     owner of the new law firm that I did not feel
8     comfortable working with him. However, to no avail.
9     In around the halfway point to the end of 2023
10    going into the first half of 2024, the sexual
11    harassment became so egregious from my former
12    supervisor that I, again, informed the employer,
13    the owner of my company this was making me
14    extremely uncomfortable. I was told to just do what
15    I want to do. On or around February 4th, I was
16    questioned my honor and integrity with the law firm
17    was immediately discharged from my employment.
18      So I'm going to ask you a few questions about
19    this complaint that you filed. Are you making a
20    complaint here against the Olsman office for sexual
21    harassment?
22  A   I'm making a complaint for the - not for - I don't
23    understand your question.
24  Q   You filed a charge of discrimination with the EEOC?
25  A   Yes.

Page 233

1   Q   It included my client.
2   A   Yes.
3   Q   Were you alleging that the Olsman firm "sexually
4     harassed" you?
5       MS. RUSSELL: Objection.
6       THE WITNESS: I was alleging that the sexual
7     harassment occurred by my former supervisor is what
8     that says that you've just read to me.
9   BY MS. GORDON:
10  Q   You are not alleging that you were sexually
11    harassed by any employee of OMP, is that correct?
12      MS. RUSSELL: Objection.
13      THE WITNESS: That's correct. I'm saying that
14    there was sex discrimination, I believe.
15  BY MS. GORDON:
16  Q   There was sex discrimination at OMP. That's your
17    claim?
18      MS. RUSSELL: Objection.
19      THE WITNESS: That's one of the claims.
20      MS. RUSSELL: We want you to answer to your
21    best recollection. If you're not going to show her
22    the complaint to see what the actual charges are,
23    she can't answer.
24  BY MS. GORDON:
25  Q   So this is a complaint you filed. And you next

59 (Pages 230 - 233)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 234

1    received a document giving you a dismissal of the
2    charge. And it states, the EEOC is closing this
3    charge because: ongoing lawsuit in the federal
4    court, Eastern District docket. And then they give
5    a docket number.
6        So I'm going to hand you the Dismissal of
7    Rights.
8        (Document marked for identification as
9        Defendant's Deposition Exhibit Number 2.)
10   BY MS. GORDON:
11   Q   I'm going to give you Number 2 which is going to be
12       the dismissal. And I'd like you to acknowledge for
13       me that nowhere in this dismissal anywhere is there
14       a finding of reasonable cause to believe violations
15       of Title VII occurred.
16       MR. ALTMAN: Do you have a copy for us?
17       MS. GORDON: No.
18       MS. RUSSELL: Objection once again on the basis
19       of the complaint speaks for itself and it's on -
20       counsel is trying to assign testimony of
21       allegations.
22       MR. ALTMAN: Aside from that, can we have an
23       agreement amongst counsel that when we're going to
24       use deposition exhibits that we bring copies for
25       the other counsel and that we don't just.

Page 235

1        MS. HARDY: Don't you have electronic access to
2        them?
3        MR. ALTMAN: But not in the deposition. It's
4        custom –
5        MS. HARDY: We do. We're sitting here looking
6        at it all together.
7        MR. ALTMAN: Except I'm blind.
8        MS. HARDY: Well, are you going to be able to
9        read a hard copy better than electronic.
10       MR. ALTMAN: Held up to my face, yeah, I would
11       potentially. But nevertheless, it's customary that
12       when you do a deposition.
13       MS. HARDY: Can you use a computer? Can you
14       read it?
15       MR. ALTMAN: No, I really can't. It's customary
16       though, that when you use deposition exhibits –
17       MS. GORDON: I don't think it's customary but –
18       MR. ALTMAN: - that you bring copies for other
19       counsel. I've never seen this before.
20       MS. GORDON: So Keith, can you - while the
21       witness is reading, are you able to read a
22       document?
23       MR. ALTMAN: To some degree, yes. But I have
24       other people who might be able to read the
25       document. But nevertheless, it is customary.

Page 236

1        MS. GORDON: I don't agree. I almost never
2        bring copies.
3        MR. ALTMAN: So you're going to tell me what I
4        can see? Are you're refusing to bring copies?
5        MS. GORDON: No. I'm just saying that you said
6        it's customary and I'm -
7        MR. ALTMAN: It is customary that in a
8        deposition you bring copies. You bring one for the
9        witness to be marked.
10       MS. GORDON: Do you see all these? Do you see
11       all these right here?
12       MR. ALTMAN: What?
13       MS. GORDON: Do you see all these documents?
14       MS. HARDY: Not anymore because of the
15       electronic access.
16       MR. ALTMAN: I'm sorry but -
17       MS. GORDON: Can I continue with my exam?
18       MR. ALTMAN: Sure.
19       THE WITNESS: What's your question.
20       MR. ALTMAN: So I just want - wait, hold on. I
21       just want to be sure that none of counsel is
22       willing to bring copies of exhibits to depositions.
23       MS. GORDON: It's going to be on a catch as
24       catch can basis. So just bring your computer laptop
25       and we'll do our best. Or I can - I'm happy to hand

Page 237

1        you stuff to read if you need it. I've already said
2        that.
3    BY MS. GORDON:
4    Q   So I just handed you the Notice of Dismissal. Did
5        you notice in there that you, there was no
6        statement in that dismissal that the EEOC had found
7        reasonable cause to believe that there were
8        violations of Title VII? Did you notice that?
9        MS. RUSSELL: Same objection before about
10       assignment of the allegations as testimony and the
11       complaint speaking for itself.
12   BY MS. GORDON:
13   Q   Do you see there that there's no such reference?
14   A   I agree that in that document there is no such
15       reference.
16   Q   There is no other document that says that. Are you
17       aware of that?
18   A   I'm not aware of that.
19   Q   Did you receive any other EEOC documents?
20   A   I believe I did.
21       MS. RUSSELL: So this is marked as an exhibit.
22   Is this Exhibit 1, 2? I can't read it.
23       MS. GORDON: It's Exhibit 2.
24       MS. RUSSELL: So what was Exhibit 1?
25       MS. GORDON: It's the charge.

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 238

1    MS. RUSSELL: Where's the charge?
2    MS. GORDON: I've got it.
3  BY MS. GORDON:
4  Q   So now I want to go back to the charge of
5      discrimination. And what you're telling me is that
6      you are not claiming that Olsman Mackenzie
7      sexually, none of their employees sexually harassed
8      you. So what is your claim of sex discrimination as
9      set forth in this complaint, Charge of
10     Discrimination, Exhibit 1, against Olsman?
11 A   I don't understand what your question is.
12 Q   This charge of discrimination sets forth claims of
13     illegal activity. Do you understand that?
14 A   Yes.
15 Q   It says discrimination based on retaliation, sex.
16     Do you see that?
17 A   I do.
18 Q   And my client's firm name is on this document. Do
19     you see this?
20 A   Yes.
21 Q   So one of the things you reference on here is sex
22     discrimination. Do you see that?
23 A   Yes.
24 Q   Are you claiming sex discrimination against the
25     Olsman office?

Page 239

1  A   Yes. And I believe that's what I stated earlier.
2  Q   What is the sex discrimination?
3      MS. RUSSELL: Objection.
4      THE WITNESS: Discrimination on the basis of my
5      sex.
6  BY MS. GORDON:
7  Q   So let's go through a list of who you worked with
8      at the Olsman office as lawyers.
9  A   Sure.
10 Q   Give me the list of lawyers that work there.
11 A   Jules Olsman, Donna Mackenzie, Emily Peacock.
12 Q   Say again?
13 A   From the top. Jules Olsman.
14 Q   Yeah. And Donna.
15 A   Yes.
16 Q   And who did you say?
17 A   I said Emily Peacock. Ronda Little, Randy Wallace,
18     Lauren Walson.
19 Q   So Randy Wallace left while you were at the office.
20     Is that accurate, or no?
21 A   I believe he left after I was terminated.
22 Q   So were you treated differently than a male
23     employee?
24 A   Yes. I was treated differently than Randy Wallace.
25 Q   And how are you treated differently than Randy

Page 240

1      Wallace? Based on gender. Based on gender.
2  A   I was forced to mediate cases and work with Bob
3      Riley and that was different based on gender.
4  Q   Hang on one second.
5  A   And I understand – okay.
6  Q   Just take it one by one. You were forced to mediate
7      cases. What does the word forced mean to you?
8  A   Mediations were scheduled with Bob on cases that I
9      was primarily handling over my objection to such.
10 Q   Well, we're going to get out all your facilitations
11     in a minute. We're going to all have a chance to
12     look at them together and we're going to see when,
13     what you did with Bob Riley.
14     MS. RUSSELL: Object to form.
15 BY MS. GORDON:
16 Q   Do you think Randy Wallace was treated differently
17     than you with regard to what? I'm not tracking
18     this. What? He wasn't forced to facilitate with
19     Bob, is that your point here? And that that's sex
20     discrimination?
21     MS. RUSSELL: Objection.
22     THE WITNESS: Well, I know for a fact that
23     there's text messages that indicate that I brought
24     in more money than Randy Wallace and Randy Wallace
25     wasn't terminated and I was. So that's a big

Page 241

1      difference.
2  BY MS. GORDON:
3  Q   Hang on. I'm still on your first point, Elyse.
4  A   Okay.
5  Q   Where you said you were forced to facilitate with
6      Jules Olsman.
7  A   With Bob Riley, but not Jules Olsman.
8  Q   I'm sorry. Well, you worked for Jules. You were
9      forced to facilitate with Bob. But Randy Wallace
10     was not required to facilitate with Bob, is that
11     one of your theories of sex discrimination?
12     MS. RUSSELL: Object to form.
13     THE WITNESS: I answered the question about
14     Randy Wallace with regard to the money being
15     brought in.
16 BY MS. GORDON:
17 Q   I'm still on, you were forced to facilitate with
18     Bob and then you compared - in order to have a sex
19     discrimination case - maybe you don't know this but
20     I assume you do. You have to have a difference in
21     treatment to somebody from a different gender. So
22     I'm looking for how you were treated differently
23     than male employees. Are you saying something about
24     facilitation that was gender discrimination or not?
25 A   I'm saying that I was forced to mediate cases with

61 (Pages 238 - 241)

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 242

1     Bob Riley when I didn't -
2  Q  Is that because you're a female?
3  A  I believe it probably is, yeah.
4  Q  You think that Donna - so who forced you to
5    facilitate with Riley?
6  A  Emily and Donna.
7  Q  Do you think they -
8  A  And Jules, I guess, yes.
9  Q  They hired you as a female, right?
10  A  I'm female, yes.
11  Q  And their whole office is females except for Jules
12    and Randy who left?
13      MS. RUSSELL: Objection.
14  BY MS. GORDON:
15  Q  So you think they treated you differently because
16    you're a woman than who? Different than Jules or
17    different than Randy?
18  A  I definitely think they treated me differently than
19    Randy. I think I'm treated differently than Jules.
20  Q  Hang on.
21  A  You have asked a question, I'm going to answer.
22  Q  Well, Jules is the owner.
23  A  Well, that's what I'm trying – I'm providing you
24    with that answer. I wish I could answer the
25    questions.

Page 243

1  Q  So let's go back.
2      MR. ALTMAN: No. Please let her answer the
3    question.
4      THE WITNESS: You just, you're interrupt me.
5  BY MS. GORDON:
6  Q  I don't understand your answer. I'm still on the
7    facilitation part. Are you still claiming that you
8    were, it was sex discrimination, something about
9    facilitation. Is that your claim here today or not?
10      MS. RUSSELL: Objection.
11  BY MS. GORDON:
12  Q  Something about you being required to facilitate,
13    was that based on gender?
14      MS. RUSSELL: Objection.
15  BY MS. GORDON:
16  Q  Is that your claim?
17  A  My claim is that there was retaliation and sex
18    discrimination and that I was forced to mediate
19    cases with Bob Riley over my objection about such.
20  Q  I'm talking about sexual harassment which means a
21    difference in treatment based on gender as a matter
22    of law. Is it your claim you were treated
23    differently based on your gender at the Olsman Law
24    Firm?
25  A  Yes. Because I am a female. Yes.

Page 244

1  Q  So now I want to know what the elements of that
2    are. Is one of them a facilitation element? You've
3    mentioned it.
4  A  Pardon? A facilitation element. I don't understand
5    what you're asking?
6  Q  I asked you how you were discriminated against on
7    the basis of your sex.
8  A  Yes.
9  Q  And you said you were forced to facilitate with Bob
10    Riley.
11  A  Yes, I've answered that.
12  Q  So you believe that that was sex discrimination?
13  A  Yes.
14  Q  Were other women in the office facilitating with
15    Bob Riley?
16  A  Yes. That weren't subject to having secret
17    photographs taken of them and notes that they
18    received and romantic gestures and who hadn't
19    complained about it, yes. They willingly chose to
20    facilitate with someone who had not had that type
21    of behavior towards them.
22  Q  So you think having you facilitate with Bob Riley
23    was intentional on the part of Olsman to harm you?
24  A  Yes. And I had asked, specifically I talked to
25    Donna in August of 2021 and I said, I asked

Page 245

1    specifically to not have to facilitate with Bob
2    Riley. And that was an agreement that was made that
3    that was then gone back on so that's pretty
4    intentional.
5  Q  But we don't have that in writing, do we? We've
6    already covered this. Do we?
7  A  I already answered the question about it being in
8    writing.
9  Q  So let me ask you this. In that you had a conflict
10    with Bob Riley, didn't want to work with him, yet
11    you intentionally did not tell the Olsman firm this
12    before you accepted their job offer.
13      MS. RUSSELL: Objection.
14  BY MS. GORDON:
15  Q  And hence they did not know when they hired you
16    that you would take the position that you could not
17    facilitate with one of their facilitators.
18      MS. RUSSELL: Objection.
19  BY MS. GORDON:
20  Q  Why wouldn't you tell them before they made you a
21    job offer, I'm not going to facilitate with Bob
22    Riley. Why didn't you do that?
23  A  Because I was acting – one, I was trying to seek
24    employment at another place. And two, I was hoping
25    that I would be able to resolve things and get Bob

62 (Pages 242 - 245)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 246

1   to leave me alone without the need for this entire
2   situation that has now happened.
3   Q   So then after they hire you, you spring on them,
4       hey, I'm not going to facilitate with one of the
5       guys you use on a regular basis. And if you make
6       me, you're discriminating against me. That's not
7       fair to their law firm, is it? You didn't give them
8       a chance to factor that in to the decision as to
9       whether they would even offer you a job?
10          MS. RUSSELL: Objection. Counsel's testifying.
11  BY MS. GORDON:
12  Q   Correct. By - if you were ethical, you would've
13      said to them, listen guys, I know you used Bob
14      Riley but I cannot facilitate with him. I have a
15      conflict with him. And then they could have decided
16      whether they wanted to hire you.
17          MS. RUSSELL: Objection.
18  BY MS. GORDON:
19  Q   But you intentionally did not do that. Why not?
20          MS. RUSSELL: Objection. Counsel –
21  BY MS. GORDON:
22  Q   I retract that. You already said why not. You said
23      because you wanted the job. But anybody that has a
24      conflict with somebody, if you're being hired to a
25      new office and you're going to have a conflict with

Page 247

1   somebody, a facilitator for whatever reason, you're
2   going to want to tell your potential employer, hey,
3   you guys need to know, I got a conflict with this
4   guy. Is that okay with you?
5       MS. RUSSELL: Objection.
6       THE WITNESS: I think if everyone were being
7   ethical in this situation, when I leave Bob Riley's
8   firm and I go to another firm, there should
9   probably be a period of time where I'm not
10  facilitating cases with someone who I've just
11  worked for and who I share a client with. That
12  would be ethical. And so for the first so many, for
13  the time that I was employed by Olsman and being
14  asked to facilitate cases with Bob, I informed
15  defense attorneys on the other side ethically
16  because I think –
17  BY MS. GORDON:
18  Q   You did one time.
19  A   - there is a conflict. I did more than one time.
20  Q   Okay. Well, that's fine. And Jules had no - nobody
21      had any objection to that. And in fact, as we're
22      going to see in a minute, you picked and chose
23      whoever you wanted to facilitate with. But let's
24      keep going back to your sex discrimination.
25          MS. RUSSELL: Objection. Counsel's testifying.

Page 248

1   Also, you have about three pending questions from
2   earlier. Can we agree that those have all been
3   retracted?
4   BY MS. GORDON:
5   Q   No. Let's go back to the sex discrimination. Other
6       than the facilitation issue, what was sex
7       discrimination at the Olsman Firm?
8   A   Being treated differently because of my sex
9       discrimination.
10  Q   Now, who were you treated differently than? Randy?
11      Is that what you were saying? Randy Wallace?
12  A   I was definitely treated differently than Randy
13      Wallace.
14  Q   How?
15  A   But I feel that I complained about the treatment
16      and I was -
17  Q   We're talking about difference in treatment between
18      you and Randy Wallace specifically. So was there a
19      difference in treatment between you and Randy
20      Wallace by Olsman based on your gender?
21  A   As I understand it, yes.
22          MS. RUSSELL: Objection. Asked and answered.
23  BY MS. GORDON:
24  Q   What was your understanding of how you were treated
25      differently than Randy Wallace based on your

Page 249

1   gender?
2       MS. RUSSELL: Objection. Asked and answered.
3   BY MS. GORDON:
4   Q   Go ahead.
5   A   Well, there's documentation that indicates that I'm
6       slated to bring in more money than Randy Wallace
7       and I ended up terminated and Randy Wallace ended
8       up promoted to be a court of appeals judge. So I
9       think that's a little, those are a little different
10      paths.
11  Q   Did Jules have the ability to appoint him to the
12      Court of Appeals? I didn't know that.
13  A   Well, politics are a funny thing and the
14      connections that you have with people can
15      certainly –
16  Q   Doesn't the governor appoint him?
17  A   Yeah. Didn't Jules talk to the governor?
18  Q   I don't know. Do you? But let me ask you this.
19  A   I believe he gloated about it, so, yes.
20  Q   Well, I still don't know what you're talking about.
21      Are you saying you got paid differently than Randy
22      Wallace?
23  A   I know I ended up terminated.
24  Q   But that's a different – that's not because your
25      gender, that's your retaliation theory. I think

Page 250

1    you're mixed up on your theories. That's your
2    retaliation theory, Elyse. That's not your gender
3    theory. So you've just said to me, you were treated
4    differently based on sex as to Randy Wallace. I
5    still don't know what you're talking about. What
6    specifically was the difference in treatment
7    between you and Randy Wallace?
8        MS. RUSSELL: Objection. Asked and answered.
9    BY MS. GORDON:
10   Q   I haven't heard anything. What was it?
11   A   I was treated differently than Randy Wallace
12   because I was treated horribly. Especially after I
13   complained about Bob Riley.
14   Q   But under the law you have to have something
15   specific. For example, they didn't let women do any
16   of the vice president jobs. Or I did the exact same
17   job and I got paid differently and they can't
18   explain a reason. I mean, you have to have
19   something specific you can point to. Is there
20   anything you're pointing to with regard to this so-
21   called sex discrimination claim?
22       MS. RUSSELL: Objection. Asked and answered.
23       THE WITNESS: I believe that I was treated
24   differently because of my sex. I don't know what
25   you're looking for.

Page 251

1    BY MS. GORDON:
2    Q   I'm looking for the specific - it's called an
3    adverse action. Was there an adverse action that
4    occurred because of your gender?
5    A   I was given the cases where the facilities were
6    bankrupt. I was assigned cases of lower value. And
7    as you've pointed out, I had hockey work going on
8    at the same time as other cases. And I was given
9    the cases that couldn't settle for much money. They
10   settled for $10,000. They settled for nothing
11   because the facility was bankrupt. That wasn't what
12   Randy was -
13   Q   Was Randy Wallace a partner of the firm?
14   A   Yes.
15   Q   Were you a partner?
16   A   No.
17   Q   Was there anybody at the firm that had less
18   experience than you?
19   A   Yes.
20   Q   Who?
21   A   Lauren Walson.
22   Q   She didn't handle cases though, did she?
23       MS. RUSSELL: Objection.
24   BY MS. GORDON:
25   Q   Was there anybody that handled cases in the firm

Page 252

1    that had less seniority than you?
2        MS. RUSSELL: Objection.
3        THE WITNESS: No.
4    BY MS. GORDON:
5    Q   In any event, do you agree with me that you see
6    nothing on these doc - do you have any other
7    documents that say the EEOC actually made a finding
8    in your favor as you set forth in your complaint?
9        MS. RUSSELL: Object to form. And same
10   objection about the complaint and allegations.
11       THE WITNESS: I sent all of the EEOC
12   documentation to my attorney and I believe there
13   are more documents than the ones that you just
14   showed me there.
15   BY MS. GORDON:
16   Q   You never saw a document that said that, correct?
17       MS. RUSSELL: Objection.
18       THE WITNESS: I don't recall. I recall that
19   there are more documents than the ones you just
20   showed me.
21       (Brief pause.)
22   BY MS. GORDON:
23   Q   You did some travel as we've already discussed. And
24   we know when February 2023 you attended an AAJ
25   convention of Phoenix X, is that correct?

Page 253

1    A   That's correct.
2    Q   And was it there that you met Jared?
3    A   I had met Jared before that.
4    Q   And Jared was at this AAJ convention, is that
5    accurate?
6    A   Yes.
7        MS. RUSSELL: So I'm going to reassert the same
8    objection earlier about relevance around Jared
9    Smith.
10       MS. GORDON: It's relevant.
11   BY MS. GORDON:
12   Q   And this was an event you were attending with
13   regard to your employer, correct? Your employer
14   knew you were going, paid for you to go, is that
15   accurate?
16       MS. RUSSELL: Objection.
17   BY MS. GORDON:
18   Q   AAJ, correct?
19   A   Yes. I attended, yes.
20   Q   And other people from the office attended, correct?
21   A   Emily Peacock.
22   Q   And you was there as a professional event, is that
23   correct?
24   A   Yes.
25   Q   And Jared invited you to one of the dinners, is

64 (Pages 250 - 253)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 254

1    that correct?
2  A   Yes.
3  Q   And you were drinking quite a bit, is that correct?
4        MR. RUSSELL: Objection.
5  BY MS. GORDON:
6  Q   At this event that evening.
7  A   I have no idea how this is relevant or how much I
8      drank.
9  Q   Well, it's a work event and I'm asking you about
10     it, okay. So you were drinking quite a bit, is that
11     correct?
12       MS. RUSSELL: Objection, asked and answered.
13       THE WITNESS: I drank at the event.
14  BY MS. GORDON:
15  Q   So you developed an interest in Jared at this
16     event, is that correct?
17       MS. RUSSELL: Objection.
18  BY MS. GORDON:
19  Q   Is that correct?
20       MS. RUSSELL: Can you clarify what you mean by
21     Interest, Counsel?
22  BY MS. GORDON:
23  Q   Yeah, romantic interest. Romantic interest,
24     correct?
25       MS. RUSSELL: Same objection, but go ahead.

Page 255

1        THE WITNESS: Yes, I started to get to know
2      Jared at this event.
3        MS. RUSSELL: What Bates label are we living in
4      here?
5        MS. GORDON: I'm not there yet.
6  BY MS. GORDON:
7  Q   And by the way, let me segue off of Jared for a
8      second. You texted, as we've already said, often
9      with Donna and Emily about personal matters,
10     correct? Including in this case it's going to be
11     Jared. But you guys often communicated about very
12     personal matters, didn't you?
13       MS. RUSSELL: Objection.
14       THE WITNESS: Yes. And I would - yes.
15  BY MS. GORDON:
16  Q   So you would've had no problem communicating with
17     Donna and Emily about any of your concerns about
18     Bob Riley via text, correct?
19  A   No.
20  Q   I mean, you talked to them about everything. You
21     wouldn't have been any concerns?
22  A   Not correct.
23  Q   Mhm?
24  A   Not correct.
25  Q   Well, in fact, you did talk about Bob in a text to

Page 256

1    Elyse - I'm sorry, to Emily. And you complained
2    about Bob to Emily. Do you remember that? In great
3    detail? You don't remember that?
4  A   I don't recall that from off the top of my head.
5  Q   Why did you tell me you wouldn't have talked,
6    complained to them about Bob and his conduct that
7    you disapproved of? Why wouldn't you talk to Emily
8    and Donna about that in your texts?
9        MS. RUSSELL: Objection.
10       THE WITNESS: I told you that I did talk to
11     both of them about his conduct.
12  BY MS. GORDON:
13  Q   I'm talking about texts.
14  A   I told you that I'm not sure about what's in texts.
15     So I don't understand.
16  Q   I just asked you a moment ago, did you talk to them
17     in your texts about Bob Riley and sexual harassment
18     and you just said no. Why wouldn't you do that?
19  A   I don't understand what you're asking me. You have
20     a text I guess so that's -
21  Q   Don't look at what I've got. I've, just focus on
22     questions and answers. Okay?
23  A   I know that I talked to Donna and Emily on numerous
24     occasions about Bob Riley's conduct. You're asking,
25     I don't know if you're trying to ask me if I did it

Page 257

1    in writing or verbally. I know I did it.
2  Q   No, just listen to the question, Elyse.
3  A   I wish that the question would make sense.
4        MR. ALTMAN: Please stop cutting her off.
5  BY MS. GORDON:
6  Q   So here's the situation, okay.
7        MR. ALTMAN: Hold on. Were you done with your
8      answer?
9        THE WITNESS: No, but it doesn't seem to
10     matter.
11       MR. ALTMAN: Yes, it does. Please finish your
12     answer.
13       MS. GORDON: You're trying to kill the clock
14     because you don't like the dep.
15       MR. ALTMAN: No. I'm not trying to do anything
16     but you're being so disrespectful to this witness.
17       MS. GORDON: I'm being – no.
18       MS. RUSSELL: I love the dep. The dep is fab.
19     Keep going.
20       MS. GORDON: Well, then good. Let me get my
21     questions in.
22       MR. ALTMAN: You know what? I told you that I'm
23     not going to allow you to –
24       MS. RUSSELL: They don't make any sense.
25     There's four of them at a time.

65 (Pages 254 - 257)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com
www.veritext.com

Page 258

1  MR. ALTMAN: I told you that if you kept
2  interrupting the witness, we were going to suspend
3  the deposition.
4  MS. GORDON: You go ahead.
5  MR. ALTMAN: Now I'm going to have conversation
6  and we're going to move for a protective order,
7  which we have the right to do.
8  MS. GORDON: You're leaving the room right now.
9  MR. ALTMAN: We are going to speak for a minute
10  and I'm going to talk with my co-counsel and the
11  witness.
12  MS. GORDON: Can we just - go ahead.
13  MR. ALTMAN: Go ahead and do that.
14  MS. GORDON: Are you agreeing with this, Ms.
15  Russell?
16  MR. ALTMAN: We are off the record while I
17  confer with my client.
18  MS. RUSSELL: Hold on, hold on.
19  MS. GORDON: This is ridiculous. Your witness
20  continually wants to shift between what she said
21  verbally and what she put in writing. When she gets
22  caught on something about there's no writing, she
23  shifts back to I told them verbally. I'm sticking
24  on the writing. And I suggest we start from scratch
25  with this line. Sit down, Keith, relax and let's

Page 259

1  go.
2  MR. ALTMAN: Are you going to allow her to
3  finish answering her questions?
4  MS. GORDON: You asked me this before.
5  MR. ALTMAN: Are you going to allow her to -
6  MS. GORDON: Are you going to allow me to
7  answer you? Do you promise you're going to stop
8  interrupting?
9  MR. ALTMAN: Yes. I –
10  MS. GORDON: Okay. You just interrupted me.
11  MR. ALTMAN: Go ahead.
12  MS. GORDON: Are you going to allow me to get
13  an answer from the witness without her dilly-
14  dallying around.
15  MR. ALTMAN: You have the right to object as
16  non responsive.
17  MS. GORDON: Let's just keep going.
18  MR. ALTMAN: Hold on. But you don't have the
19  right to cut her off.
20  MS. GORDON: Please don't tell me anything that
21  I can do and not do.
22  MR. ALTMAN: Well, I am telling you.
23  MS. GORDON: Well, you don't know what you're
24  talking about.
25  MR. ALTMAN: I don't know what I'm talking

Page 260

1  about?
2  MS. GORDON: No.
3  MR. ALTMAN: That's fine. Let's step outside.
4  We're not going to continue.
5  MS. GORDON: I'm going to continue with the
6  dep.
7  MR. ALTMAN: You continue with the dep.
8  MS. GORDON: Let the record reflect that
9  counsel is intentionally disrupting this dep which
10  we are here under a court order. And you are
11  intentionally trying to derail the dep which you
12  have done, Keith, the entire time. You should only
13  have one lawyer handling the dep as far as
14  objections. You do not stop talking. Go out and
15  we're just going to deal with you violating a court
16  order. I'm going to file a motion on that.
17  MR. ALTMAN: Good. We're also going to put on
18  the record that I have repeatedly asked counsel to
19  allow the witness to finish answering her
20  questions. And that repeatedly she insists on
21  cutting off the witness. The proper procedure is if
22  she doesn't like the witness's answer, she can
23  object as non-responsive. What she cannot do is
24  continuously cut off the witness. I have advised
25  her and asked her to allow the witness to answer

Page 261

1  her questions and she refuses to allow that. And
2  now I have also advised her that if she did not
3  allow that to happen, we would consider that as
4  harassing. We would consider suspending the
5  deposition and moving for a protective order, which
6  is the witness's right. I am now going to confer
7  with my co-counsel and the witness as to whether
8  we're going down that path. Thank you.
9  MS. GORDON: Well, before we get off the
10  record, I believe this is all part of your refusal
11  to prosecute this case. Everything that's happened
12  here today is intentional on your part. I would
13  like to - Elyse is probably tired. You're over
14  there mouthing off with stuff that's needless. We
15  could have easily gotten an answer to this
16  question, which everybody has probably now
17  forgotten about. But I'm going to move forward.
18  MR. ALTMAN: No. We're going to –
19  BY MS. GORDON:
20  Q   Elyse –
21  MS. RUSSELL: We are going for over an hour
22  now. Let's take a break. Regardless of what we're
23  doing, can we please take a break for 10 minutes.
24  MS. GORDON: I'm objecting to Keith continuing
25  to make - are you handling this dep or not?

Page 262

1  MS. RUSSELL: I am handling this dep but he's
2  my co-counsel. You all have been passing notes. He
3  is my local counsel.
4  MS. GORDON: This is on the record. This is
5  wasting a lot of time.
6  MS. RUSSELL: It's really not, Deb. If you want
7  that time back, we'll give it to you.
8  MS. GORDON: Okay. Thank you.
9  MS. RUSSELL: That's not an issue. And we've
10  also said that we're willing to stay until seven.
11  Keith has a conflict but we're willing to stay.
12  MS. GORDON: Okay. I appreciate that.
13  MS. RUSSELL: As late as we need.
14  MS. GORDON: I don't know what you're meeting
15  about. Honestly, I have no idea.
16  MR. ALTMAN: We're meeting about whether we're
17  going to suspend the deposition because you
18  continue to harass the witness.
19  MS. GORDON: You're not going to. We all know
20  that. The record won't show that, Keith. It will
21  show that you're -
22  MR. ALTMAN: Are you sure about that?
23  MS. GORDON: Yeah, I'm positive.
24  MR. ALTMAN: I wouldn't be so positive.
25  MS. RUSSELL: All right. So are we going off

Page 263

1  the record? We're taking a 10-minute break.
2  MS. GORDON: Not because of us. Because your
3  co-counsel has said we're off the record.
4  MS. RUSSELL: Are we going off the record? Are
5  we off the record?
6  MS. GORDON: Well, I'm not agreeing to go off
7  the record.
8  MS. RUSSELL: Okay, well if you want to stay on
9  the record and stay in here, go ahead. We'll leave
10  our things –
11  MS. GORDON: No. I'm not eating up my time. I
12  don't agree -
13  MS. RUSSELL: Okay. So then are we off the
14  record?
15  MS. GORDON: I do not agree with this going off
16  the record. But if you're leaving the room, yeah,
17  we're going off the record because I'm not eating
18  my time.
19  MS. RUSSELL: Yeah, we're going off the record.
20  (Brief pause.)
21  MS. RUSSELL: Do you want to go first, Deb, or
22  do you want me to go first with your statement?
23  MS. GORDON: I just want to make a note that we
24  had a break that I objected to that took 22
25  minutes. We're now back on the record. I have

Page 264

1  something else I wanted to say but if you want to
2  go next, go ahead.
3  MS. RUSSELL: No, go ahead.
4  MS. GORDON: I want to point out that
5  throughout this deposition I have been objecting to
6  Mr. Altman handling the dep as if he is the second
7  counsel to conduct the dep along with Ms. Russell
8  who is lead counsel on the case. I've objected that
9  several times. It's caused a great deal of, in my
10  opinion, delay and confusion. I want read from a
11  case Webster v. Target Corporation from Eastern
12  District of Michigan 2023.
13  MS. RUSSELL: I'm sorry, Counsel, did you print
14  out a copy for us?
15  MS. GORDON: No. I didn't print it out. I'll
16  give you the, be happy to give you the site. I just
17  got one myself. And this is October 5th, 2023. It's
18  Judge Behm. And what Judge Behm says is that,
19  Webster's counsel appears to ask this court for a
20  ruling on this issue on a going forward basis. And
21  the court finds that only one attorney may act as
22  counsel during any future depositions. There does
23  not appear to be such a per se when it comes
24  to objecting or speaking during a deposition.
25  Courts routinely, however, grant protective orders

Page 265

1  holding that only one attorney can act as counsel
2  during a deposition.
3  MR. ALTMAN: And we'll put on the record -
4  MS. GORDON: I'm not done yet.
5  MR. ALTMAN: Oh, I thought you were.
6  MS. GORDON: I'm not done yet, Keith. Hold on.
7  So it may or may not be customary, to Mr.
8  Altman's point. But this is a ruling of our local
9  court in the Eastern District of Michigan. And it
10  says, again, only – to continue. Only one attorney
11  for each party shall be permitted to act as
12  counsel. The examination and cross-examination
13  during a deposition proceed in the same manner as
14  trial. Which of course at trial only one lawyer
15  takes a witness at a time.
16  So I am reiterating my request that there only
17  be one lawyer. And I do not expect Mr. Altman after
18  I've read that case to continue to participate as a
19  second lawyer during this deposition.
20  MS. RUSSELL: Does that case refer to second
21  chairing when you are taking the deposition or
22  defending the deposition?
23  MS. GORDON: It refers to both.
24  MS. RUSSELL: It refers to both?
25  MS. GORDON: Yes. It's saying at a deposition

67 (Pages 262 - 265)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 266

1  you get one lawyer. What was the point you wanted
2  to make?
3      MS. RUSSELL: So the point that I want to make
4  on the record is that plaintiff anticipates that
5  the following line of questioning is going, is
6  intended to harass, intimidate and embarrass, that
7  it is irrelevant. As such, we will be moving
8  forward protective order. We will continue the dep,
9  we will stay here for as long as we need to tonight
10 to continue the dep. Mr. Altman will depart at
11 5:25.
12     MR. ALTMAN: Correct.
13     MS. RUSSELL: Ms. Russell will continue,
14 myself will continue as lead counsel. But we
15 anticipate the forthcoming line of questioning to
16 become more and more harassing, abusive,
17 intimidating as the tactics have been this entire
18 dep.
19     MS. GORDON: Oh, right. So you -
20     MR. ALTMAN: And I'll put my statement on the
21 record now. Despite you -
22     MS. GORDON: Okay. You're not supposed to talk
23 further.
24     MS. RUSSELL: You've addressed him. Let him
25 have his moment on the record.

Page 267

1      MR. ALTMAN: Despite your case that you cite,
2  the fact is you have been harassing this witness
3  through the entire deposition by asking her
4  questions and then refusing to allow her to answer
5  the questions. So if you would like to raise this
6  with the court, we will certainly raise the fact
7  that you will not let the witness answer questions
8  which is causing her undue stress.
9      MS. GORDON: Oh, wow.
10     MR. ALTMAN: You know, I got to tell you.
11     MS. GORDON: No, you don't. You just like to
12 hear yourself talk.
13     MR. ALTMAN: No. I got to tell you, you are so
14 disrespectful.
15     MS. GORDON: You really, really do, Keith.
16     MR. ALTMAN: You know what, I'm going to be
17 moving - do you consent? I'm moving for a civility
18 order. Do you consent or no?
19     MS. GORDON: You're not going to get it, sir?
20     MR. ALTMAN: Do you consent or no? I'm asking
21 you now.
22     MS. HARDY: I'm not engaging with you.
23     MR. ALTMAN: Are you going to go -
24     MS. HARDY: I am not engaging.
25     MR. ALTMAN: So you're not consenting?

Page 268

1      MS. GORDON: Mr. Altman, you have eaten up so
2  much of our time.
3      MR. ALTMAN: Are you consenting to a civility
4  motion?
5      MS. GORDON: This is now off of our time.
6      MR. ALTMAN: Okay, that's fine. We will be
7  moving for a civility order from the court.
8      MS. GORDON: You can move whatever you want.
9      MS. RUSSELL: That's fine.
10     MS. GORDON: You really don't know what you're
11 talking about. And you know what's so great about
12 this dep? We have a record.
13     MR. ALTMAN: You're right.
14     MS. GORDON: And any judge can – see, now
15 you're interrupting me again. You really get upset
16 when I try to get - you continually, continually
17 interrupt. But in any event, we all have a record
18 and the judge can watch a video if she likes.
19     MR. ALTMAN: Absolutely. You are right.
20     MS. GORDON: So you don't need to keep
21 repeating this over and over again that I'm
22 interrupting. The court will see exactly what went
23 on here.
24     MR. ALTMAN: That's fine.
25     MS. RUSSELL: Counsel, can you send the case

Page 269

1  identifier to me so I can look it up, please? Or
2  you can hand me what you were looking at, one of
3  the two. It doesn't matter. Would you answer my
4  question before you proceed?
5      MS. GORDON: Answer what question?
6      MS. RUSSELL: I'm asking the case that you just
7  cited.
8      MS. GORDON: No. We're not providing any case
9  law right now.
10     MS. RUSSELL: Is somebody going to provide it
11 to me?
12     MS. GORDON: Do you have a computer here?
13 Look it up.
14     MS. RUSSELL: I do. You read off the case name
15 before I could type it in.
16     MS. GORDON: Yes. It's my copy. No.
17     MR. ALTMAN: And you're not going to provide us
18 the citation?
19     MS. GORDON: See, you know, here you go again.
20     MR. ALTMAN: That's right.
21     MS. GORDON: I don't have a citation. It's not
22 a published opinion.
23     MR. ALTMAN: Come on.
24     MS. RUSSELL: You're going to sit here and read
25 the case?

Carroll Reporting & Video
A Veritext Company

www.veritext.com                                          www.veritext.com

Page 270

1          MS. GORDON: No. I am going -
2          MR. ALTMAN: Give us the citation.
3          MS. GORDON: I'm going to now make my record.
4      Are you directing this witness not to answer
5      my questions about her conduct at an AAJ meeting?
6      Is that what you're doing or no?
7          MS. RUSSELL: Before we get into that, I'm
8      asking for the case citation. You are saying that
9      it's an unpublished opinion and you said that you
10     would get it to me and you're not getting it to me.
11         MS. TAYLOR: She did read the caption to you
12     and you could have used that. But the citation is
13     this 2023 WL 6509097.
14         MS. RUSSELL: Can I confirm?
15         MS. GORDON: I want to know –
16         MS. RUSSELL: 2023 WL 65096, is that correct?
17     MS. TAYLOR: Yeah.
18         MS. RUSSELL: Thank you.
19         MS. GORDON: I raised this issue first thing
20     this morning. You guys had plenty of time to look
21     it up. Are you direct going to direct this witness
22     not to answer my questions? Is that what you're
23     saying here?
24         MS. RUSSELL: No. That's the opposite of what
25     I'm saying.

Page 271

1          MS. GORDON: You're preserving your objection.
2          MS. RUSSELL: I'm telling you that we're going
3      to move for a protective order. You can ask
4      questions all that you want.
5      BY MS. GORDON:
6      Q   So let's go back on the record now. You were at AAJ
7      meeting with others. It was a professional event.
8      I'm getting back to where we were. This was at
9      Crystal Mountain. Does that sound about right?
10     February 24th.
11     A   Yes, I recall.
12     Q   And your husband was with you at this event, is
13     that correct?
14         MS. RUSSELL: Objection.
15     BY MS. GORDON:
16     Q   Phoenix. I apologize. Your husband was with you at
17     this event?
18     A   He came to the -
19         MS. RUSSELL: Wait, hold on. If we are talking
20     about two different things, let's clarify that
21     we're talking about the same event.
22     BY MS. GORDON:
23     Q   And your husband was with you at this event, AAJ
24     meeting, is that correct?
25         MS. RUSSELL: Objection.

Page 272

1          THE WITNESS: I believe that – sorry. Are we
2      talking about the Crystal Mountain event?
3          MS. RUSSELL: Have we clarified what we're
4      talking about here?
5      BY MS. GORDON:
6      Q   We are talking about the February 23, '23 meeting.
7      Phoenix.
8      A   Yes. Brandon Hyde was with me.
9      Q   You guys flew out there for the meeting?
10     A   Brandon Hyde was with me at that event, yes.
11     Q   And at the meeting you spotted Jared, is that
12     correct?
13         MS. RUSSELL: Objection.
14     BY MS. GORDON:
15     Q   And he invited you out to dinner, correct?
16         MS. RUSSELL: Objection.
17         THE WITNESS: I went to an -
18         MS. RUSSELL: You asked two questions there,
19     Deb. Can you clarify which one you want her to
20     answer first?
21     BY MS. GORDGON:
22     Q   Jared asked you to go out to dinner, is that
23     correct?
24     A   I went to an NLD dinner of which Jared attended in
25     addition to other people.

Page 273

1      Q   And then you began a conversation with Emily
2      Peacock who is one of your superiors at the firm, I
3      believe, about Jared and your ability to connect up
4      with him. Do you recall that?
5          MS. RUSSELL: Objection.
6          THE WITNESS: At some point I talked to Emily
7      about it.
8      BY MS. GORDON:
9      Q   And you asked Emily for a photo where you look hot.
10     Do you remember that?
11         MS. RUSSELL: Objection.
12         THE WITNESS: I have no idea how this is
13     relevant.
14     BY MS. GORDON:
15     Q   Well, that's up to the court, okay.
16     A   I know. And it seems like –
17     Q   You're seeking money damages.
18     A   It seems like you want to harass me and intimidate
19     me and -
20     Q   It seems like you want to do that to my clients.
21     A   Does it?
22     Q   That's what -
23         MS. RUSSELL: Objection. Counsel is testifying.
24         MS. GORDON: Let's not talk back and forth with
25     each other. Let's just answer the questions.

Page 274

1       MS. RUSSELL: Ask questions, Deborah.
2       MS. GORDON: I was asking questions and then I
3   got a colloquy from your client. I will re-ask my
4   question.
5   BY MS. GORDON:
6   Q   You asked Emily - you told Emily I need a photo
7   soon where I look hot. Do you remember that?
8       MS. RUSSELL: Objection.
9   BY MS. GORDON:
10  Q   Do you remember that?
11  A   If you point me to a document, I would like to look
12  at a document.
13  Q   Do you remember this whole event where you spent
14  the night with Jared?
15      MS. RUSSELL: Objection. This is harassing.
16      THE WITNESS: I didn't spend the night with
17  Jared.
18  BY MS. GORDON:
19  Q   You were in his room until 11:00 a.m. the next
20  morning?
21      MS. RUSSELL: Objection.
22      THE WITNESS: I was not in his room until 11:00
23  a.m. the next morning.
24      MS. GORDON: You can have a standing objection.
25      MS. RUSSELL: I'll continue to object when I

Page 275

1   feel like it, Counsel.
2       MS. GORDON: Well, I'm just telling you so the
3   court will know when we get to the court about this
4   dep I offered you a standing objection so we would,
5   could move a little more quickly.
6       MS. RUSSELL: That's fine. That may be standard
7   for you. I'm going to sit here and –
8       MS. GORDON: I know.
9       MS. RUSSELL: I'm going to stand here and give
10  my objection.
11      MS. GORDON: I know. You want to disrupt the
12  dep and coach. I get all that. Just keep them
13  coming.
14  BY MS. GORDON:
15  Q   So now I'm on 1227.
16      MS. RUSSELL: Are we looking at documents here?
17  Do you want to give us a Bates number here?
18      MS. GORDON: Yeah, I'm going to. I always do.
19      MS. RUSSELL: You don't, but that's fair.
20  BY MS. GORDON:
21  Q   At 1227 and 1228. These are between you and Emily
22  Peacock.
23      MS. RUSSELL: Are these Riley, OMP, plaintiff
24  who? OMP 227?
25  BY MS. GORDON:

Page 276

1   Q   That's a conversation between you and Emily
2   Peacock, is that correct?
3       MS. RUSSELL: May I review?
4       THE WITNESS: Yes. This is definitely designed
5   to embarrass, harass me, intimidate me.
6   BY MS. GORDON:
7   Q   I'm sorry you feel that way but you've sued people
8   about very serious matters. And you hold yourself
9   to a different standard, I guess. You want to
10  complain about other people's conduct.
11      MS. RUSSELL: I'm objecting once again because
12  this is harassing and counsel is testifying.
13      MS. GORDON: No.
14      MS. RUSSELL: And intentionally intimidating.
15      MS. GORDON; Your client is lecturing me.
16  BY MS. GORDON:
17  Q   So did you get a photo, a hot photo so you could
18  send that to Jared? Do you remember that from
19  Emily?
20  A   I don't know that I would remember it and I would
21  like a break.
22  Q   We just had a break and you cannot take another
23  break.
24  A   I am taking a break.
25  Q   There's a question pending. You cannot take a

Page 277

1   break.
2   A   I just answered that I do not remember.
3   Q   Why are you taking a break? We're in the middle of
4   a deposition. Why are you taking a break? You just
5   returned from a break.
6   A   My heart is racing and I feel things happening in
7   my belly where a baby is and I am concerned for my
8   health. And I know that you don't care. I
9   understand that.
10  Q   Well, I think we can all sit through deps. Many of
11  us have done the same or more than you.
12  A   I'm taking a break for my health.
13      MS. RUSSELL: We appreciate your medical
14  opinion.
15      MS. GORDON: Well, how long are you going to be
16  taking a break?
17      MR. ALTMAN: We don't know.
18      MS. GORDON: Are you saying that you can't get
19  through this material? It's too upsetting right
20  now? Is that what you're saying?
21      THE WITNESS: I'm saying that you seem to be
22  insistent on harassing me and my heart is racing.
23  BY MS. GORDON:
24  Q   Let me do this so we can make a good use of our
25  time, Elyse. I know this is upsetting material to

Page 278

1        you.
2    A   It's not –
3    Q   Let me finish, okay.
4    A   I wasn't even done talking so.
5    Q   I'm going to have a work around. What if we go to
6        another topic? Will you be okay to sit here and
7        answer questions as to another topic?
8    A   I need to get my heart rate down because it is too
9        high right now. So I will be leaving the room to
10       get my heart rate down and then return.
11           MS. RUSSELL: So let's split the baby. We will
12       come back, we'll go to another topic.
13           (Brief pause.)
14   BY MS. GORDON:
15   Q   That was an eight-minute break. It was right on the
16       heels of another break of 22 minutes that had been
17       taken. That's not going to come out of our time.
18       I'm going to move on to your facilitation.
19           MS. RUSSELL: It was off the record, so of
20       course it wouldn't come out of your time, Deborah.
21           MS. GORDON: Well, some of it was on the record
22       here, but, yes.
23   BY MS. GORDON:
24   Q   Elyse, I'm going to hand you, I'm going to talk to
25       you about facilitations now. You've made quite an

Page 279

1        issue of facilitations and who you've had to
2        facilitate with. According to the way I read your
3        complaint, you're alleging that there were two
4        facilitations that you were scheduled to attend
5        with Robert Riley. Is that accurate? That you're
6        complaining about in this case?
7            MS. RUSSELL: Objection.
8            THE WITNESS: Are you asking what the complaint
9        says or what are you asking?
10   BY MS. GORDON:
11   Q   Your theory. Whether it's a complaint or what you -
12       you have a position in the case about
13       facilitations. And as I understand what your
14       complaint says, and your discovery, is that you're
15       taking the position there were two facilitations
16       with Robert Riley while you were employed with
17       Olsman, is that correct?
18           MS. RUSSELL: Objection.
19           THE WITNESS: That there were at least two.
20   BY MS. GORDON:
21   Q   Well, you've mentioned two and one ended up being
22       on Zoom and the other one Emily Peacock attended
23       with you. Does that sound correct?
24   A   Sure. There were at least two.
25   Q   Phone. I apologize. It was not Zoom. It was phone.

Page 280

1        You were traveling, I believe, is that correct?
2    A   I believe it was via Zoom and there were at least
3        two. I believe there might have been more. I don't
4        have -
5    Q   So your position on this case though is that you
6        took a position that you did not want to facilitate
7        with Bob Riley, correct?
8    A   Correct.
9    Q   So I'm going to hand you –
10           (Document marked for identification as
11       Defendant's Deposition Exhibit 3.)
12   BY MS. GORDON:
13   Q   So Elyse, here's Exhibit 3. This is dated January
14       12th, 2023. This is an email from you to Donna
15       Mackenzie.
16           MS. RUSSELL: I'd like to review it first,
17       please. Thank you.
18   BY MS. GORDON:
19   Q   I am going to read it into the record, part of it
20       from you. January 12th, 2023 at 10:57 a.m. Hey,
21       Donna.
22           MS. RUSSELL: Wait. Allow the witness to
23       review.
24           MS. GORDON: She can read the along with me.
25       I'm going to start reading it out loud.

Page 281

1    BY MS. GORDON:
2    Q   Hey, Donna. Tom Goodwin took over for David T and
3        it seems like we had the real potential of
4        resolving this. However, then Tom Goodwin assigned
5        the case to another attorney at Brookdale by the
6        name of Matthew Cohen. I'm going to skip down a
7        paragraph and I'm going to read the third
8        paragraph.
9            I just received a letter from Butcher with a
10       bunch of authorizations he wants signed. He also
11       wanted to use Bob Riley as the arbitrator. I am
12       good with using Bob. But based on talking with
13       Jules, I think I need to disclose I worked there
14       and make sure Butcher is okay with it. I don't
15       think that will be a real deal breaker. But in case
16       it is, do you have any other arbitrators?
17           Okay, did I read that correctly, Ms. McKenna?
18   A   Yes. You read the email correctly.
19   Q   So you took the position on January 12th, 2023 that
20       you were good using Bob?
21           MS. RUSSELL: Objection.
22           THE WITNESS: That has no context with it.
23       That's what the email says.
24   BY MS. GORDON:
25   Q   Do you have any context to add today?

Page 282

1  A   Yes. It was expected that I would use Bob going
2      forward and I have already talked about that during
3      this deposition.
4  Q   There's nowhere in your complaint that says it was,
5      you were expected to use Bob. Your complaint says
6      that there were two events where you had to attend
7      facilitations with Bob.
8          MS. RUSSELL: Objection. Is there a question
9      there?
10 BY MS. GORDON:
11 Q   Was that a lie to - is the document that I just had
12     you read to Donna, was that a false statement by
13     Donna? About Donna by you?
14 A   This is a - not provided with any context.
15 Q   Well, you could have provided context back to Donna
16     and you could have easily said in this document, as
17     I told you, I don't want to do facilitations with
18     Bob.
19 A   I had already made that clear many times.
20         MS. RUSSELL: Objection.
21 BY MS. GORDON:
22 Q   Let's go to - did you agree to use Bob Riley as a
23     facilitator on the Hines v. Sparrow Hospital case
24     all by yourself? Decide to use Bob?
25 A   I don't believe Hines was my case to decide that

Page 283

1      on. I think that was Jules Olsman's case and he
2      wanted to use Bob. I don't think I, that was my
3      choice.
4  Q   You didn't disagree with using Riley, is that
5      correct?
6  A   As I stated before, I communicated to Donna
7      Mackenzie that I did not want to use Bob Riley.
8  Q   I'm not asking you about what you communicated
9      before. I'm asking about this particular document.
10 A   I can't see that document.
11         MS. RUSSELL: Objection.
12 BY MS. GORDON:
13 Q   I know. I'm going to get to it. Do you recall using
14     Bob or agreeing to use Bob Riley in the Hines v.
15     Sparrow Hospital case dated on or around December
16     18th, 2023 was the date of your letter to your co-
17     counsel or cross counsel?
18 A   I would not have been attending that facilitation.
19     It was Jules' case. I would happy to look at the
20     document.
21 Q   You did not attend the facilitation?
22 A   I don't think that I did. And I don't think I chose
23     Bob. I think Jules told me to choose Bob.
24 Q   Do you have any evidence of that?
25 A   I'm sure Jules could speak to it.

Page 284

1  Q   You don't have any in your materials? Just asking
2      what you've got.
3          MS. RUSSELL: Objection.
4          THE WITNESS: I can look for materials.
5          (Document marked for identification as
6          Defendant's Deposition Exhibit Number 4.)
7  BY MS. GORDON:
8  Q   What was the –
9          MS. RUSSELL: She's not finished reviewing,
10     Counsel. Neither am I.
11 BY MS. GORDON:
12 Q   What was the Harris DeBore case?
13         MS. RUSSELL: Objection.
14         THE WITNESS: What is the question? What do you
15     mean by that?
16 BY MS. GORDON:
17 Q   What was the case? What's it about? Whose case was
18     it?
19 A   It was a nursing home negligence case.
20 Q   And who was handling the case?
21 A   I was handling the case. Just so you know, you
22     marked both of these as Exhibit 3.
23 Q   Okay, I appreciate that. Thank you.
24 A   So I think we should remark one of them.
25 Q   You can just leave them there. So apparently on the

Page 285

1      Harris v. DeBore case, do you recall that your
2      opponent wanted to use Bob Riley as a facilitator?
3  A   I don't recall that off the top of my head. I'm not
4      surprised. Bob Riley was the first pick of
5      facilitators for many people.
6  Q   He was the first what?
7  A   The first pick as a facilitator for many people. I
8      don't recall this.
9  Q   So your office -
10 A   I'm not surprised.
11 Q   So the Olsman office was in a position where a lot
12     of people wanted to use Bob Riley?
13         MS. RUSSELL: Objection.
14 BY MS. GORDON:
15 Q   Is that what you're telling me?
16 A   He facilitates a lot of these cases. I think we've
17     established that.
18 Q   So then you're telling us if - I didn't know that.
19     But since you've so advised then you not wanting to
20     work with Bob Riley would've had a really negative
21     impact on the firm because all these opponents
22     counsel wanted to use Bob from what you're telling
23     me. But yet you thought you shouldn't have to work
24     with Bob at all. That would've had a deleterious
25     effect on Olsman's law practice, wouldn't it?

72 (Pages 282 - 285)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 286

1    MS. RUSSELL: Objection.
2    THE WITNESS: There are many facilitators in
3  Michigan.
4  BY MS. GORDON:
5  Q   But you just said he's a go-to and defendants are
6    always - excuse me, plaintiffs often ask for him.
7    But okay. You're already on the record.
8  A   You mischaracterized what I stated. But if you're
9    referring to a document, I'm happy to look at it.
10 Q   As to the Harris case, there was an earlier
11   communication where this facilitation apparently
12   occurred in 2023. Does that sound right to you at
13   all?
14 A   That the facilitation occurred in 2023?
15 Q   Yes.
16 A   Yes. If you're referring to a specific document, I
17   can - I will be able to give you a better answer.
18 Q   It's a note from you saying, about the David Harris
19   case, I talked with Ryan to Cobb on the date. He
20   informed Marissa Castro needs to be subpoenaed so
21   we're going to proceed with that. He agreed to
22   adjourn 60 days instead of 90 days with the caveat,
23   the trial would take place in February, not January
24   due to his schedule. He agreed we should have a
25   second facilitation with Bob in late October or

Page 287

1    early November when discovery is closed. I said our
2    office would reach out to Bob's office dates. He
3    will send me the proposed stip.
4    Do you remember that?
5  A   If I wrote that that's - sure.
6  Q   That's from you, is that correct? Are you done
7    reading it?
8  A   Yes. Is there a question?
9  Q   Yeah. Well, you asked to see it. I'd already asked
10   you the question. Does that refresh your
11   recollection about wanting to use Bob again?
12 A   I did not want to use Bob but I did agree to use
13   Bob, yes.
14 Q   So did you attend that facilitation with Bob?
15   MS. RUSSELL: This doesn't have a Bates number
16   on this, Counsel. Are we entering this as an
17   exhibit?
18   MS. GORDON: Yes.
19   MS. RUSSELL: Okay. There's not a sticker on
20   it.
21   MS. GORDON: I will.
22   MS. RUSSELL: Thank you.
23   (Document marked for identification as
24   Defendant's Deposition Exhibit Number 5.)
25   THE WITNESS: Are you asking me if I attended?

Page 288

1  BY MS. GORDON:
2  Q   Did you attend the facilitation?
3  A   In what timeframe? The second facilitation or the
4    first facilitation?
5  Q   You had two facilitations in this case.
6  A   I don't believe the second facilitation happened
7    that I recall.
8  Q   So did you have a facilitation in this case with
9    Bob Riley?
10 A   Via Zoom, yes. The first facilitation.
11 Q   Was the whole facilitation on Zoom or just you?
12 A   What do you mean by that?
13 Q   Was everybody on Zoom?
14 A   Yes. As I understand - I don't know how the defense
15   or - I think the defense also attended via Zoom.
16   But I was in the plaintiff room via in Zoom with
17   plaintiffs.
18 Q   And Bob was running the facilitation?
19 A   Yes.
20 Q   And you were in Philadelphia for a conference, is
21   that correct, at that time?
22   MS. RUSSELL: Objection.
23   THE WITNESS: I was traveling to Philadelphia.
24   Yes.
25 BY MS. GORDON:

Page 289

1  Q   And how did that go for you, that facilitation with
2    Bob?
3  A   We did not settle the case during the facilitation.
4  Q   Did you have any problems working with Bob on the
5    facilitation?
6  A   What do you mean by that?
7  Q   Did you have any problems with Bob?
8    MS. RUSSELL: Objection.
9  BY MS. GORDON:
10 Q   Did everything go well between you and Bob being on
11   the facilitation Zoom?
12   MS. RUSSELL: Those are two questions. Which
13   one do you want her to answer?
14 BY MS. GORDON:
15 Q   Did things go well?
16 A   I don't think they went well. We didn't facilitate,
17   we didn't settle the case.
18 Q   Aside from that. With regard to Bob Riley's conduct
19   and your conduct toward him and whether it was a
20   normal experience, was it a normal experience?
21 A   I don't know. I hope he wasn't taking photographs
22   of me on the Zoom.
23 Q   Can you answer my question now instead of being
24   snide? Was it a normal facilitation as far as you
25   were aware?

Carroll Reporting & Video
A Veritext Company

586-468-2411

www.veritext.com                                    www.veritext.com

Page 290

1     MS. RUSSELL: Objection.
2     THE WITNESS: It was a tense facilitation.
3  BY MS. GORDON:
4  Q   Unlike other facilitations? Was there something
5     special about this that made it?
6  A   Yeah. Bob and I's background with one another made
7     things awkward.
8  Q   Why was it tense?
9     MS. RUSSELL: Objection. Let the witness
10     answer.
11  BY MS. GORDON:
12  Q   So what do you mean it was, whatever the negative
13     thing you just said about the facilitation was?
14     What caused it to be a problem?
15     MS. RUSSELL: Why don't we have the record
16     read back on what she said?
17     MS. GORDON: No. We're not going to take time.
18     MS. RUSSELL: Because that's not
19     mischaracterized.
20     MS. GORDON: We're not going to take time on
21     that.
22     MS. RUSSELL: Well, then she can't answer your
23     question.
24     MS. GORDON: Yes, she can.
25     MS. RUSSELL: Because you're going to

Page 291

1     mischaracterize her testimony.
2  BY MS. GORDON:
3  Q   Did any issue come up between you and Bob during
4     the Zoom?
5  A   I hope that Bob didn't take pictures of me during
6     the -
7  Q   I didn't ask you what you hoped. I said, did
8     anything come up between you and Bob during the
9     facilitation that caused you some problem or him
10     some problem?
11  A   I don't know what that question means.
12  Q   What don't you understand?
13  A   We didn't settle the case at that facilitation.
14  Q   I know. But was there some conflict between you and
15     Bob at the facilitation?
16     MS. RUSSELL: Objection.
17     THE WITNESS: I don't recall a specific
18     conflict.
19  BY MS. GORDON:
20  Q   Do you remember a case of Bertha Warsaw or Warshaw?
21  A   Yes. I believe that is referenced in your exhibit -
22     well, there's two Exhibit 3s. But one of the
23     Exhibit 3s is about if Bertha Warsaw. Warshaw,
24     sorry.
25  Q   And did you use Mr. Riley for a facilitation on

Page 292

1     that matter?
2     MS. RUSSELL: Objection.
3     THE WITNESS: I don't recall that. But in this
4     email that we discussed earlier, we talked about
5     using him as an arbitrator.
6  BY MS. GORDON:
7  Q   And you were agreeable to using Bob, is that
8     correct? If the other side saw it to be fit and
9     appropriate, is that correct?
10  A   I've already stated that I did not want to use Bob.
11  Q   I didn't ask you that. You were going to use him if
12     the other side agreed, is that accurate?
13  A   I would like to be able to finish my answer.
14  Q   What's the end of your answer?
15  A   What's the question?
16  Q   You said you hadn't finished your answer.
17  A   I'd like to know what the question is.
18  Q   If you don't remember, there's nothing to finish, I
19     guess.
20  A   Well, you interrupted me when I was talking, so.
21  Q   I can't hear you. I'm sorry. Say it again.
22  A   You interrupted me when I was talking.
23  Q   What else did you want to say?
24  A   Well, I would like to know what the question is
25     again so that I can remember where I was going when

Page 293

1     you interrupted me.
2  Q   Did you use Mona Majzoub as a mediator, too,
3     facilitator?
4  A   I think I might have but I don't recall. Probably.
5     I don't have a specific recollection of the case.
6  Q   I have an email from you from November 30th, 2023.
7     RE Joyce Smith where you say, let's go with Mona
8     Majzoub. Would you like to advise the court? Does
9     that refresh your recollection?
10  A   What date is that?
11     MS. RUSSELL: Objection.
12  BY MS. GORDON:
13  Q   November 30th, 2023.
14  A   I don't know that I -
15     MS. RUSSELL: Have these emails been produced,
16     Counsel? I don't see that it's labeled.
17  BY MS. GORDON:
18  Q   Go ahead. Did you say something?
19  A   I don't know that I attended that facilitation. I
20     don't know that that had happened by the time I was
21     fired.
22     MS. RUSSELL: Counsel, if you have documents
23     that you want her to address, please produce them
24     and enter them as exhibits.
25     MS. GORDON: Can I just –

Page 294

1    MS. RUSSELL: And for the record, we've
2    received no emails from OMP.
3    MS. GORDON: I'm in the middle of an exam. If
4    you would like to make a record later, please do.
5    MS. RUSSELL: Well, you weren't talking, so I
6    went ahead and said it.
7    MS. GORDON: You haven't produced any of these
8    texts and they're all from your, involved with your
9    client.
10    MS. RUSSELL: She doesn't have access to her
11    own OMP email. How could she produce these emails
12    to you?
13    BY MS. GORDON:
14    Q    And during the time you worked at Olsman's office,
15    you didn't have any difficulties with any
16    facilitation involving Bob Riley, is that correct?
17    A    I don't know what that question means. I didn't
18    have any difficulties?
19    Q    Yes. You didn't have any difficulties. You acted as
20    a normal lawyer and the case proceeded normally as
21    any other case would at a facilitation, is that
22    accurate?
23    MS. RUSSELL: Objection.
24    THE WITNESS: I still am not sure what the
25    question means. I represented my clients during

Page 295

1    facilitations with Bob Riley, yes.
2    BY MS. GORDON:
3    Q    And there were no problems with regard to
4    representing your client during the facilitation
5    with Bob Riley, is that correct?
6    MS. RUSSELL: Objection.
7    THE WITNESS: I did not want to facilitate
8    cases with Bob Riley.
9    BY MS. GORDON:
10    Q    I didn't ask you that.
11    A    Okay.
12    Q    Now, throughout 2023 you stayed in regular text
13    communication with Bob Riley, correct?
14    A    What time period in 2023?
15    Q    Throughout 2023.
16    A    During parts of 2023, yes.
17    Q    On 4/28/2023 you contacted Bob because you were
18    upset that Donna Mackenzie had asked you to meet
19    with Donna and Emily on the following Monday. And
20    you reached out to Bob to get some advice from him
21    and input, correct?
22    MS. RUSSELL: Objection. Can we see what you're
23    looking at?
24    MS. GORDON: In a minute.
25    BY MS. GORDON:

Page 296

1    Q    Do you recall that?
2    MS. RUSSELL: What's the Bates number?
3    MS. GORDON: 1913.
4    BY MS. GORDON:
5    Q    Do you recall that?
6    MS. RUSSELL: Plaintiff's, OMP or Riley?
7    MS. GORDON: Riley.
8    BY MS. GORDON:
9    Q    Do you recall that?
10    A    I recall Bob talking to me about Donna Mackenzie
11    during that time, yes.
12    Q    You reached out to him to talk about Donna
13    Mackenzie. You said this, I got a calendar invite
14    from Donna to meet with her and Emily on Monday.
15    Not looking forward to it. This is you reaching out
16    to Bob. Do you grasp what I'm saying?
17    A    Yes. And Bob had reached out to me before that. I
18    grasp what you're saying, Deb.
19    Q    And when had he reached out to you? About what?
20    About Donna and Emily?
21    A    Yes. He talked to me on the phone about Donna and
22    Emily.
23    Q    Okay. Well, we'll get to all of that. But right now
24    I'm just asking my questions.
25    A    You just asked me when.

Page 297

1    Q    Well, I thought you meant like the day before he
2    had discussed something with you about Donna and
3    Emily. You're talking about something different?
4    A    I would love to see the documents that you're
5    looking at because you're referencing something and
6    I want to be able to answer the questions that
7    you're asking me. And you're -
8    Q    And I'm what?
9    A    You're talking about - I don't even know what date
10    we're -
11    Q    Well, okay. Then I gave you the date.
12    A    I was still talking.
13    Q    No you weren't.
14    A    Yes, I was.
15    Q    This is Bates 1913. This is you reaching out to
16    Bob. 1913. This is at 10:43 p.m. You are reaching
17    out to Bob. We're going to start this again now
18    since you've got the document. Do you see that?
19    A    I do. And I see at 4:16 p.m. before that, Bob has
20    reached out to me and written Donna antidote and
21    has sent me some sort of motivational quote,
22    perhaps.
23    Q    You've been complaining about Donna to Bob,
24    correct?
25    A    And Bob had been telling me all the different

Page 298

1  things Donna was saying about me to him.
2  Q  Let's just stick with the questions that I'm asking
3    you. If your counsel wants to follow up with you on
4    all this, she'll have every opportunity to do so.
5    Okay? Otherwise, it's going to be a long night. So
6    I'm just asking you about a document that's right
7    in front of you. Do you see that? And now you're
8    pointing me to something else. You reached out to
9    Bob, is that correct?
10 A  It looks like I'm responding to Bob. I'm not - I
11   know you want to characterize this however you want
12   to.
13 Q  Is that your text to Bob about Donna and Emily?
14 A  In response to his text, yes.
15 Q  What's his text that it's in response to?
16 A  The text that says, Donna Antidote. And the caption
17   says, next time you're stressed, take a step back,
18   inhale and laugh. Remember who you are and why
19   you're here. You're never given anything in this
20   world that you can't he handle. Be strong, be
21   flexible. Love yourself and love others. Always
22   remember, just keep moving forward. And he says,
23   Donna antidote. And I replied back and said, as
24   you've quoted me already, I got a calendar invite
25   from Donna to meet with her and Emily on Monday,

Page 299

1  not looking forward to it.
2  Q  And then he asked you, oh, no, was this an invite
3    without a call or an explanation? And then you say
4    on the bottom of the page, I don't know what I did
5    wrong. Do you see that?
6  A  Yes. And you've skipped messages in between there.
7  Q  And you're reaching out to Bob. And then the next
8    page you go on to Bob and you say -
9  A  I don't have a next page.
10 Q  Trying to kill everyone with kindness is not
11   helping me. This is, I'm now on Bates stamp 1914.
12   Okay. Look at the top of 1914. This is from Elyse
13   McKenna to Bob Riley. 4/29/2023. You say, trying to
14   kill everyone with kindness is not helping me. Do
15   you - are you there yet? Are you on the page? Looks
16   like you're flipping through the book. Are you on
17   the page?
18 A  I have not flipped anything this entire time.
19 Q  Are you on the page?
20 A  Yes, I'm on the page.
21 Q  So you see what you're writing to Bob? Trying to
22   kill everyone with kindness is not helping me,
23   correct?
24 A  Sure. Yep.
25 Q  And then Bob wrote back and said, I assume it's

Page 300

1  somehow related to productivity or goal profits. Do
2  you see that?
3  A  I see that.
4  Q  And he's saying, I can't imagine it's anything
5    else, right?
6  A  Yes. I see that.
7  Q  So he's pointing out to you that if Donna and Emily
8    want to meet with you and you're concerned about
9    it, it must be because of your productivity. Is
10   that your assumption as to what Bob was saying?
11 A  You're taking this conversation out of context.
12 Q  I'm just asking.
13 A  I'm not going to make an assumption about what Bob
14   was saying.
15 Q  Well, you know what. You're just here to answer
16   questions, not to tell me what I'm taking out of
17   context.
18 A  You're asking -
19 Q  This is on a page.
20     MS. RUSSELL: Objection to the last two
21   questions.
22 BY MS. GORDON:
23 Q  Okay, let's keep going. And then you respond to Bob
24   and you say, that shitty. What were you referring
25   to?

Page 301

1      MS. RUSSELL: Objection.
2      THE WITNESS: The statement that it's related
3  to productivity or profits. And you're taking this
4  conversation out of context but I know you don't
5  want me to give that to you.
6  BY MS. GORDON:
7  Q  You know what, these are your words and your
8    documents.
9  A  Yep.
10 Q  So that's what I'm working with here.
11 A  Okay.
12     MS. RUSSELL: Objection, counsel is testifying.
13 BY MS. GORDON:
14 Q  Were you worried at this time about your position
15   with productivity at the firm?
16 A  Not with productivity, no.
17     MS. RUSSELL: Objection.
18 BY MS. GORDON:
19 Q  Are you aware of what your productivity was?
20 Q  Do you have any cognizance sitting here today?
21     MS. RUSSELL: Object to form.
22     MS. GORDON: Can you let me get my question
23   out?
24     MS. RUSSELL: You asked two questions there.
25     MS. GORDON: Then just hold up till I get the

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com
www.veritext.com

Page 302

1  second one out and then say object to form.
2  BY MS. GORDON:
3  Q    Isn't it correct that your productivity was way off
4     in 2023 compared to what it was expected to be?
5        MS. RUSSELL: Object to form. Which one do you
6     want to ask first or answer first?
7        MS. GORDON: I just had the one question.
8  BY MS. GORDON:
9  Q    Go ahead.
10 A    What's the question?
11 Q    Will you read it back?
12       (Whereupon the question was read back by the
13       court reporter.)
14       THE WITNESS: I disagree.
15 BY MS. GORDON:
16 Q    And we'll pull out your numbers. And how many cases
17       had you, as of this point in 2023, had you closed?
18       MS. RUSSELL: Object to form.
19 BY MS. GORDON:
20 Q    Do you know?
21       MS. RUSSELL: Object to form.
22       THE WITNESS: I don't know.
23       MS. RUSSELL: Which question do you want her to
24    answer?
25       THE WITNESS: I don't know that number off the

Page 303

1       top of my head.
2  BY MS. GORDON:
3  Q    And were you on the column system as of 2023?
4        MS. RUSSELL: Objection.
5        THE WITNESS: I believe I was.
6        MS. GORDON: You've got to let the witness
7     answer before you start. And this is another thing
8     I think I'm going to raise with the court. You are
9     objecting to virtually every single question I ask.
10    And it's very improper and it's disruptive to the
11    witness and to me. And your objections are not well
12    taken. You're very limited on what you can object
13    to at a deposition to begin with is I assume you
14    would know. And just to object is not going to
15    work. All right, so let's keep going here.
16       MS. RUSSELL: I'm happy to state what I'm
17    objecting on but the federal rules say to not have
18    speaking objections.
19       MS. GORDON: I'll leave it up to you to figure
20    out what you're going to do and if you're following
21    the rules. Okay.
22 BY MS. GORDON:
23 Q    So you continue on with Bob.
24       MS. RUSSELL: Appreciate the counsel.
25       MS. GORDON: You're welcome.

Page 304

1  BY MS. GORDON:
2  Q    If you go to the next page 1915, you thank Bob for
3     his words of wisdom. This is now a 10:08 a.m. And
4     you say, I appreciate the words of wisdom, Bob. I
5     think what I'm stuck by is how passive aggressive
6     and unnecessary all of this is.
7        MS. RUSSELL: For the record, what Bates are we
8     at?
9        MS. GORDON: I just said it. 1915. Okay.
10 BY MS. GORDON:
11 Q    And then you go on to say without Bob responding to
12    you, you go on to say she clearly has an issue with
13    how many cases in suit I have. She is part of the
14    problem as well. The balance of being Jule's part-
15    time associate and trying to get a caseload going
16    and not having the nursing and other staff support
17    She and Emily enjoy and doing hockey work makes my
18    portfolio work different from hers and has less
19    volume. She is not wrong. However, she is not
20    looking to understand or help.
21       Are you referring to Donna Mackenzie here?
22 A    It appears that I am.
23 Q    Did you write any of this to Donna and tell her
24    what you said to Bob in this text where you were
25    looking to him for guidance?

Page 305

1  A    Did I write any of it to Donna?
2  Q    Yes. Did you tell Donna these things?
3  A    I discussed with Donna this stuff.
4  Q    But no text, nothing in writing?
5  A    It doesn't seem we – it doesn't seem like something
6     that should happen via text.
7  Q    Well, you certainly texted it to Robert Riley.
8  A    Well, I then had a meeting with Donna Mackenzie.
9  Q    You picked Bob out to be the one to -
10       MS. RUSSELL: Objection. You're interrupting
11    her answer.
12 BY MS. GORDON:
13 Q    - to look to. All right. Let's keep going. Because
14    Bob still hasn't responded to you. You've now been
15    at this for several minutes. Next you say to Bob,
16    she's looking to prove her point. I just had a
17    conversation with her, sent her the follow up
18    email, asked for work. Any additional meeting is
19    just to rub my nose in it.
20       MS. RUSSELL: For the record. Counsel. We don't
21    know whether or not Bob Riley has responded.
22       MS. GORDON: Can I finish?
23       MS. RUSSELL: That's not redacted. We don't
24    know if it's the full –
25       MS. GORDON: Can I please - you can take that

Page 306

1  up elsewhere. Can I please finish what I was
2  reading?
3  BY MS. GORDON:
4  Q   While I am all for killing with kindness, I don't
5      deserve to be mistreated. You said I just had a
6      conversation with her and sent the follow up email.
7      What is that referring to?
8  A   The follow up email that Bob had discussed that I
9      should send to her.
10 Q   And do you remember what that was?
11 A   I believe that I - if you have an email if you want
12     to point me to it, I can.
13 Q   No. You just referenced a follow up email that Bob
14     had either put together for you or has suggested
15     you send. What was the email about?
16 A   I don't know what as I recall, I don't remember the
17     exact content of the email.
18 Q   So Bob was helping you respond to Donna, correct?
19 A   Yes.
20 Q   And then you continued on here and you said, I will
21     make sure that I'm calm and composed when we meet
22     but this is digging a hole that is unnecessary.
23     This is your meeting with Donna where you're going
24     to remain calm and composed, I presume? That's what
25     you're referring to.

Page 307

1      MS. RUSSELL: Object to form.
2  BY MS. GORDON:
3  Q   Is that correct?
4      MS. RUSSELL: I object to form. You've asked
5      three questions now.
6      MS. GORDON: You already said it. You already –
7      you can only – you only need to say it one time.
8      MS. RUSSELL: Those were three questions.
9      MS. GORDON: You only need one objection
10     though.
11 BY MS. GORDON:
12 Q   Go ahead, Elyse.
13     MS. RUSSELL: There's a new question.
14     THE WITNESS: What is the question?
15 BY MS. GORDON:
16 Q   You were talking about the meeting with Donna when
17     you said, I will make sure I'm calm and composed
18     when we meet but this is digging a hole that is
19     unnecessary. Is that correct?
20 A   I don't recall what - I don't know the answer to
21     that. I don't recall as I sit here today.
22 Q   And who's digging a hole that is unnecessary?
23 A   I'm sure I meant that this, the whole situation was
24     digging a hole.
25 Q   What's that? What's the whole situation? With Donna

Page 308

1      being -
2      MS. RUSSELL: Object form.
3      MS. GORDON: You got to let me get my question
4      out.
5  BY MS. GORDON:
6  Q   Is the whole situation Donna being displeased about
7      something with you? Is that what you're referring
8      to?
9      MS. RUSSELL: Object to form. Three questions.
10     MS. GORDON: You can have a standing objection
11     to form. But I will be seeking relief from the
12     court with your continual, repetitive objections.
13 BY MS. GORDON:
14 Q   Go ahead. Is that -
15 A   What's the question?
16 Q   Yeah. See. This is the problem. Are you referring
17     to Donna's issues with you when you say, this is
18     digging a hole?
19 A   I believe that this had to do with applying for the
20     AAJ leadership academy.
21 Q   And then you say, I think I've made some mental
22     progress. What is that referring to?
23 A   I couldn't tell you as I look at this.
24 Q   And then you went on a run. You want to tell Bob
25     you went on a run, the bottom of the page, correct?

Page 309

1  A   Yes. You're skipping over text messages from Bob.
2      But yes.
3  Q   Yeah. He responded briefly. And then you continued
4      to confide in Bob with your thoughts and personal
5      ideas. I decided that life is beautiful and I'm a
6      good attorney, whether it's recognized or not. All
7      I can do is work on myself and try to represent my
8      clients the best way I know how. If that doesn't
9      come together, there's nothing I can change. I can
10     only work on me. And Bob responded, the run was a
11     very good choice. You are wise.
12     And then you continue on with Bob, pouring
13     your heart out. Next one says, this is now at 4/29
14     at - 4/29/2023, 3;49. And if all else fails, I plan
15     to move to Thailand and grow old and fat eating my
16     favorite type of food. I assume that was some kind
17     of a little banter or joke. Would that be accurate?
18 A   Is there a question?
19 Q   Yes. I assume that was some kind of banter or a
20     joke. Is that correct? I assume you didn't mean to
21     move to Thailand, am I right?
22 A   I probably should have moved to Thailand. Well, I
23     didn't -
24 Q   Or are you just being silly? Well, yeah, maybe. But
25     that's not what you meant here, correct?

78 (Pages 306 - 309)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 310

1   A   I was making a conversation.
2   Q   And then you continue to kind of joke around with
3       Bob about Thailand, correct? The rest of this page?
4       In fact, on page 1917, you go ha, ha, ha, ha. And
5       you continue to banter with Bob. Maybe I should
6       change sports, shot put. At least I can laugh. Do
7       you see all that?
8   A   Yes. Are you asking me if those are the text
9       messages that exist on this page?
10  Q   Yes. I'm just for the record, making a record here
11      and that you are enjoying talking to Bob Riley who
12      you wanted to escape.
13  A   You're adding testimony that -
14  Q   No, I'm not.
15  A   No. You're saying I'm enjoying talking to Bob Riley
16      and I knew working with Bob was a part of my career
17      and I've said that during this entire thing.
18  Q   Do you take responsibility for anything you do
19      ever?
20      MS. RUSSELL: Counsel, let her finish talking.
21  BY MS. GORDON:
22  Q   Or is it just even your own text messages, they're
23      not real. They're just because you -
24      MS. RUSSELL: Objection. Counsel testifying.
25      MS. GORDON: I'm asking a –

Page 311

1       MS. RUSSELL: Ask her a question.
2       MS. GORDON: Stop screaming.
3   BY MS. GORDON:
4   Q   I'm asking you a question. Is this how you conduct
5       yourself as a professional that you just write
6       things that you don't really mean so you can later
7       come into a dep and just say, oh, I was just
8       expected to do this.
9       MS. RUSSELL: Objection. Counsel is testifying.
10      And that's argumentative.
11  BY MS. GORDON:
12  Q   Is that how you conduct yourself?
13      MS. GORDON: Okay. Can you – again, I'm going
14      to be going to the court. This is absolutely
15      ludicrous. This is called -
16      MS. RUSSELL: We'll go arm in arm, Deborah.
17      MS. GORDON: This is called cross-examination
18      and I'm sorry you don't understand it.
19  BY MS. GORDON:
20  Q   In any event, now you're here today. Are you saying
21      that you just felt you had to banter with Bob or is
22      this sincere? Is this sincere or is this banter and
23      BS from you?
24      MS. RUSSELL: Object to form.
25      THE WITNESS: I knew that I had to have a good

Page 312

1       relationship with Bob to have a career.
2   BY MS. GORDON:
3   Q   So a good relationship could have certainly left
4       out contacting him to talk about your boss and
5       bantering about moving to Thailand, correct?
6       MS. RUSSELL: Object to form.
7   BY MS. GORDON:
8   Q   Correct?
9   A   I don't know what you want me to answer.
10  Q   If you don't know, then there's nothing I can do to
11      help you.
12      MS. RUSSELL: Objection. Counsel's
13      testifying.
14  BY MS. GORDON:
15  Q   Let's keep going on now. Now you're talking - let's
16      go over to 5/17. This is Bates 1942. Now you're
17      confiding in Bob again and you are asking him for
18      insight. I'm sorry. Go to 1941. And you're writing
19      to Bob. First thing you say at the top of the page
20      is, did Papa Bear's case settle? Who are you
21      referring to?
22  A   Bob called Jules Papa Bear.
23  Q   Okay. So you're referring to Jules and you're
24      asking Bob about Jules Olsman's facilitation,
25      correct?

Page 313

1   A   Yeah.
2   Q   And then Bob responds. And one of the things he
3       says is Donna said nice thing about things about
4       the attorneys in your office, including you. And
5       you liked that, didn't you? You emphasized that he
6       had said that to you, correct?
7       MS. RUSSELL: Object to form.
8       THE WITNESS: Yes, I said that.
9   BY MS. GORDON:
10  Q   Go to page 1942. We're now into May 17, 2023.
11      You're now asking Bob to provide you with insight
12      on Jules's mood, correct?
13  A   Yes.
14  Q   And then you say, he is here, seems cranky. And
15      Donna is here. What is that referring to, Elyse?
16      Where are you? Where are you physically located
17      here?
18  A   I couldn't tell you by looking at these texts.
19  Q   Well, let's just think about it for a minute. It's
20      just not even two, just over two years ago. Where
21      would you be where Donna was at 1:51? Would this be
22      in the Olsman office or somewhere else?
23  A   I don't recall by looking at these texts. I'm
24      guessing it was the Olsman office but I don't know
25      that. So I'm not going to say something I don't

Carroll Reporting & Video
A Veritext Company

www.veritext.com
www.veritext.com

Page 314

1  know.
2  Q   Then you continue on with Bob a little bit later
3      and you tell him I'm on a Zoom meeting. Oh, I'm
4      sorry. Before I get to that, you write back to Bob
5      with regard to Jules being cranky, I am worried.
6      And you have a frowny face, correct?
7  A   Yes.
8  Q   And then you continue on to say, okay, I'm on a
9      Zoom meeting with Donna and nurses and I have been
10     since one 1:00 p.m. And then Bob responds about
11     Papa Bear.
12 A   Is there a question?
13 Q   No. I'm about to give you one. And you continue the
14     banter on page 1943, correct, with Bob?
15 A   Sure. I continue talking to Bob on 1943, yes.
16     MS. RUSSELL: Counsel, do you have any
17     substantive questions coming up or are we reading
18     text messages into the record for the rest of the
19     time?
20 BY MS. GORDON:
21 Q   And then on 5/17/2023 at 2:06 p.m. you talked to
22     him again and you asked about he and Mama Bear seem
23     mad at each other as well. Are you talking about
24     Donna and Jules?
25 A   Yes. One of the text messages you skipped over

Page 315

1      earlier is the one where Bob refers to Jules as
2      Mama Bear and Papa Bear.
3  Q   You certainly don't sound like you're intimidated
4      and scared of Bob Riley in any of these texts, do
5      you?
6      MS. RUSSELL: Objection.
7  BY MS. GORDON:
8  Q   You sound very friendly and like old friends.
9      MS. RUSSELL: Object to form. There's not
10     a question there.
11 BY MS. GORDON:
12 Q   Was that the case?
13     MS. GORDON: Again, you cannot stop objecting
14     to every single question.
15     THE WITNESS: Bob had -
16     MS. RUSSELL: You can't ask a clean question.
17     MS. GORDON: Go ahead. Yeah. It's a very clear
18     question.
19 BY MS. GORDON:
20 Q   Go ahead.
21 A   Bob had told me on numerous occasions up to this
22     point that he was sorry and that he was, wanted us
23     to move forward. And I was hopeful that Bob meant
24     that. And I was trying - and at this point in time,
25     I hoped that he was being honest about that so.

Page 316

1  Q   Hence, this really was a friendly, nice
2      conversation, is that what you're saying?
3      MS. RUSSELL: Objection.
4      MS. GORDON: What's that objection to?
5      MS. RUSSELL: You're characterizing and
6      argumentative.
7      MS. GORDON: That's not an objection.
8      MS. RUSSELL: It's argumentative.
9      MS. GORDON: Okay. You are just making things
10     up. This is really next level. I don't know how
11     many deps you've attended, but this is the next
12     level.
13 BY MS. GORDON:
14 Q   So now let's keep going. Still on -
15     MS. RUSSELL: I appreciate counsel's ageism.
16     MS. GORDON: Excuse me? Listen, you know, you -
17     experience helps. And hence, and people don't
18     experience they tend to do stuff like you do which
19     is object to every question when they don't really
20     have a basis for it. So that's just what I'm noting
21     here for the record.
22 BY MS. GORDON:
23 Q   Okay. So let's go, continue on to 1994. You're
24     continuing to chat with Bob. He's talking about
25     helping with your stress. Did you have a lot of

Page 317

1      stress at this point?
2  A   What page?
3  Q   1944.
4  A   He's telling me that my - he's talking about it,
5      appears he's talking about one of Donna's cases
6      settled this afternoon for $920,000. And I said,
7      wow, that's pretty damn nice. And he said, should
8      help stress. So I believe he's talking about
9      Donna's stress.
10 Q   And on 5/18 you asked Bob to send you his Orlando
11     flight arrangements, correct?
12 A   Yes.
13 Q   This continues on - I'm not going to cover every
14     page. On page 1954, you're again confiding in Bob.
15     And you say, I'm about to start a meeting with
16     Jules, but this might be one of the worst days of
17     my life with how it's going. What are you referring
18     to?
19 A   I don't know what I'm referring to without having
20     more context to that.
21 Q   Were you having a meeting with Jules?
22 A   It sounds like I say - you just quoted me as saying
23     I'm about to start a meeting with Jules but this
24     might be one of the -
25 Q   No, I didn't say that.

Page 318

1   A   Did you - I think you did.
2   Q   I read, I'm about to start a meeting with Jules.
3   A   Sure.
4   Q   But this might be one of the worst days of my life
5       with how it's going. What were you referring to?
6       The meeting with Jules or something else?
7           MS. RUSSELL: Object to form.
8           THE WITNESS: I don't have the context for
9       that. With you're taking me from random dates to
10      new random dates.
11  BY MS. GORDON:
12  Q   Yeah, I know. That's what I had to do, too, with
13      reading this.
14  A   I think you probably read it in order.
15  Q   Well, you have it.
16  A   We're skipping through pages. I know. But I know
17      you don't want me to look at anything else so.
18  Q   You had every opportunity to read it, too.
19          MS. RUSSELL: Objection to counsel's continued
20      Testimony.
21  BY MS. GORDON:
22  Q   What was your meeting with Jules that you were
23      worried about? Were you concerned that he was going
24      to tell you you weren't performing up to par?
25  A   You're adding that I am worried about the meeting.

Page 319

1       It doesn't say that.
2   Q   Your sentence says, but this might be one of the
3       worst days of my life with how it's going. I
4       already asked you what that meant and you said you
5       didn't know.
6   A   I don't believe -
7   Q   So I'm now asking - hang on. I'm now asking you
8       another question. Were you worried about the
9       meeting with Jules, a meeting with Jules?
10  A   I don't recall by looking at this. But I do not
11      interpret this text message as being – as that
12      being the meeting with Jules that was making it the
13      worst day of my life.
14  Q   You don't know?
15  A   I believe what I was meeting with Jules about was
16      potentially a facilitation number on a case. So I
17      don't think that that was why I was not having a
18      good day. But I don't have anything else in front
19      right now.
20  Q   Then on if you go to page 1978. This is 6/19/2023.
21  A   Pardon me? What page?
22  Q   1978. You write to Bob again seeking, I guess, some
23      guidance or support from him. No reply from Jules.
24      Has me nervous. What were you nervous about?
25  A   I have no context for this, so I don't know.

Page 320

1   Q   You don't remember what was going on with you and
2       Jules Olsman at this time and any concerns he had
3       about you?
4   A   I don't think that this - what's your question?
5       What's the question?
6   Q   Were you concerned about a meeting with Jules
7       because he had concerns about your performance?
8   A   You're adding in details about things.
9   Q   Yes. I'm asking a question and if that's what was
10      happening.
11  A   I would love to be able to finish my answer. I
12      believe I was trying to get in touch with Jules and
13      hadn't heard back from him about something. What
14      that was, I don't know by just looking at these
15      random text messages. I don't think it had to do
16      with performance.
17  Q   Now, around this time in May that you're talking to
18      Bob and talking - we've already covered, I'm not
19      going to repeat it. You told your therapist, Ms.
20      Cranston, that you were feeling you weren't meeting
21      expectations at work. Do you recall that?
22  A   I would have to look at the document that you're
23      looking at.
24  Q   You also told Ms. Cranston, there's more work
25      piling on, hidden expectations and communications.

Page 321

1       What's that referring to?
2   A   I'd have to look at the document that you're
3       referring to.
4   Q   I'm sorry? I can't understand what you're saying.
5       Say it again.
6   A   Is – what can't you understand about what I'm
7       saying?
8   Q   Your words are not distinctive. Say them again.
9   A   I would have to look at the document that you are
10      referring to.
11  Q   So assuming that Ms. Cranston says you're feeling
12      you weren't meeting expectations but no
13      communication about it. What is that referring to?
14      That you felt you weren't meeting expectations at
15      work?
16          MS. RUSSELL: Object to form.
17          THE WITNESS: What is what referring to?
18  BY MS. GORDON:
19  Q   "Feeling she wasn't meeting expectations."
20          MS. RUSSELL: Counsel, are you referring to a
21      Bates number?
22          MS. GORDON: That's the Cranston records. I
23      don't think they're Bates numbered. Maybe they are.
24          MS. RUSSELL: Are you going to enter it as an
25      exhibit or just refer to it?

Page 322

1     MS. GORDON: I just asked a question about it.
2   BY MS. GORDON:
3   Q   Did you feel you weren't meeting expectations at
4       work?
5   A   I didn't feel that I wasn't meeting expectations at
6       work.
7   Q   You'd been told that though, correct?
8   A   I don't know that I'd been told that, no. Bob had
9       communicated with me that Donna had complained
10      so, I guess I'd been told that by Bob.
11  Q   Did you ask what Donna was complaining about?
12  A   Yes, I did.
13  Q   What were you told?
14  A   Bob described Donna as being jealous of me.
15  Q   Why? Donna was doing extremely well.
16  A   I agree.
17  Q   So what in the world would she be jealous of you
18      about? As you understood it?
19  A   As Bob described it, being a young and up and
20      coming attorney.
21  Q   As compared to being an established really good
22      attorney making a lot of money.
23  A   You asked me a question and I've answered your
24      question.
25  Q   It seems like an odd thing. But okay. If that's

Page 323

1       what your testimony is.
2         MS. RUSSELL: Object to counsel's testifying.
3   BY MS. GORDON:
4   Q   That's what it is. You also told Cranston on May
5       4th, 2023 that you were frustrated by the work
6       meeting, raised voice, interruptions, feeling she
7       wasn't meeting expectations. Does that refresh your
8       recollection?
9   A   If you're referring to a document, I'd like to see
10      it.
11  Q   Do you remember telling Cranston that? That you
12      were frustrated by a work meeting in May? Do you
13      remember that?
14  A   I remember being frustrated by a work meeting in
15      May.
16  Q   Why were you frustrated?
17  A   And Bob afterwards telling me that Donna was
18      complaining about me, yes. And I was -
19  Q   And you were telling – and you were telling Bob
20      about that you were irritated with Donna and wanted
21      you under her thumb. Remember telling Bob that? She
22      wants me under her thumb?
23        MS. RUSSELL: Object to form.
24        THE WITNESS: I believe I've seen that in these
25      text messages.

Page 324

1   BY MS. GORDON:
2   Q   Yes. Yes, you have. You made a lot of complaints
3       about your boss to Bob, the man that you were,
4       wanted to escape from. You took it upon yourself to
5       tear down your boss to Bob Riley. Did you tear down
6       your boss to anybody else other than Bob?
7         MS. RUSSELL: Object to form.
8         THE WITNESS: Did I tear down my boss?
9   BY MS. GORDON:
10  Q   Yeah. You're telling – you're saying very negative
11      things about Donna.
12  A   Yes.
13  Q   She wants you under - right. You're admitting it
14      here. You thought Donna was being very hard on you,
15      didn't you?
16  A   And I thought - and Bob was telling me a bunch of
17      negative things that Donna was saying about me, so,
18      yes.
19  Q   Well, you already - I asked you that and you said
20      one, that she was jealous of you. What else did Bob
21      say she said about you?
22  A   That she didn't like me. Like and that she -
23  Q   Okay. What else? Anything else?
24  A   It was an evolving, multiple conversations where it
25      was talked about so I don't.

Page 325

1   Q   You knew as of 2023 that your boss was dissatisfied
2       with you and not happy with you, correct?
3         MS. RUSSELL: Objection.
4         THE WITNESS: I knew that she didn't like me.
5       That was clear. And as I complained more about Bob,
6       it became more and more clear.
7   BY MS. GORDON:
8   Q   You didn't - there was no other times you
9       complained about Bob. There's no record either from
10      your mouth, your complaint or anywhere else.
11  A   Yes, there is.
12  Q   You know, I was talking.
13  A   You're testifying.
14  Q   Where is the – no. I said there is no record. And
15      then I was going to say, do you know differently?
16      I've gone through all your records. I see your
17      complaint. I don't see anything where you are going
18      to Donna in May of 2023 to complain about Bob
19      Riley. Is there such a thing?
20        MS. RUSSELL: Object to counsel's testimony.
21  BY MS. GORDON:
22  Q   Is there such a complaint that you made in May of
23      2023?
24        MS. RUSSELL: Object to for.
25  BY MS. GORDON:

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

Page 326

1  Q   About Donna? About Bob to Donna?
2  A   I complained to Donna about Bob on multiple
3     occasions. And there are writings about it with
4     other people, which I've already testified to that.
5  Q   Where's the writings about you complaining about -
6  A   I said that they're in text messages.
7  Q   I wasn't finish asking you a question.
8  A   I'd like to finish my answer.
9  Q   I was in the middle of asking you a question. Who
10     did you complain to in writing about Bob in 2023?
11  A   Many people.
12  Q   I have binders of hundreds and hundreds of pages of
13     texts with you and Emily Peacock. You talk about
14     defecating, you talk about sleeping with men, you
15     talk about what to wear.
16         MS. RUSSELL: Counsel, this line of questioning
17     is not questions.
18  BY MS. GORDON:
19  Q   I see nothing -
20         MS. RUSSELL: It's intended to intimidate and
21     harass.
22         MS. GORDON: You are interrupting me again and
23     I'm not going to be able to finish this Dep. I'm in
24     the middle of a question and you take it upon
25     yourself to interrupt the question.

Page 327

1         MS. RUSSELL: Then ask a question.
2         MS. GORDON: I was going to. You didn't like
3     the preface. And you continually do this and
4     improperly object. I'm going to go back.
5  BY MS. GORDON:
6  Q   I've got hundreds of pages of texts with you and
7     Emily. You talk about literally everything from
8     being drunk, from not being able to move your
9     bowels, to wanting to fuck Jared, to what are you
10     going to do about Jared, to what about your
11     husband. I mean, you talk - there is no topic that
12     is off limits with you using your texts to
13     communicate with Emily. Yet somehow, somehow,
14     Elyse, there is nothing existent in those texts to
15     Emily, not one about Bob Riley.
16  A   I believe you're -
17  Q   Is that just a weird coincidence? Out of all the
18     complaints you make all day long Bob just isn't in
19     there. Why is that?
20         MS. RUSSELL: Object to counsel's –
21  BY MS. GORDON:
22  Q   Why is that?
23         MS. RUSSELL: - improper form and
24     argumentative testimony.
25  BY MS. GORDON:

Page 328

1  Q   You have no answer, do you?
2  A   You're assuming I don't have an answer.
3  Q   Well, what's your answer to my point that I have
4     hundreds of pages of you talking about your private
5     life, your love life, the men you want, your dating
6     apps are in there. All these pictures of men, one
7     after another are in these texts. We don't have
8     time to go through them all. Everything about your
9     life, your depression goes right to Emily Peacock.
10     But yet nowhere do you mention Bob Riley.
11  A   I talked to Emily about it.
12  Q   Okay, great.
13         MS. RUSSELL: Object to counsel's prior
14     testimony on the record.
15  BY MS. GORDON:
16  Q   I guess that's just all a coincidence. Similarly,
17     you text with Donna a lot. Not as much but you
18     texted with Donna, especially before you figured
19     out she didn't really like you and you really
20     weren't doing a good job. Before she figured that
21     out, you guys were very cheery with each other. And
22     again, I've got hundreds of pages of texts. But I
23     have nothing between you and Donna about Bob Riley.
24         MS. RUSSELL: Object to counsel's testimony
25     that Donna does not like Elyse.

Page 329

1  BY MS. GORDON:
2  Q   Another coincidence?
3  A   Do you have a question?
4  Q   Yes. Is that another coincidence that you text with
5     these people constantly about everything personal
6     in your life but Bob Riley's name is missing. But
7     I'm to believe that you were going to them all the
8     time and complaining about Bob. So that can't be.
9     you're just making this up here today, aren't you?
10  A   Absolutely not.
11         MS. RUSSELL: Objection.
12  BY MS. GORDON:
13  Q   And then also, of course, you text with Bob. I've
14     got a whole notebook full of binders with you and
15     Bob. And nowhere in this binder with you and Bob
16     which starts in August, August of 2021. And then we
17     go all the way through until late 2023, early 2024.
18     And in all these messages that you send to Bob,
19     you're chattering with him about all kinds of
20     things. Never once do you say to him, ever in a
21     text, Bob, you are sexually harassing me. Bob, I
22     don't want to be around you. Bob, start doing these
23     things. There's not a single text from you that
24     says that. Are you aware of that?
25  A   I don't know if there's a text about it but we

Carroll Reporting & Video
A Veritext Company
www.veritext.com

586-468-2411
www.veritext.com

Page 330

1 certainly all know that there are emails about it.
2 Q   I don't have emails from you to Bob talking about
3     Bob. Are you saying you have emails you're going to
4     be producing from you to Bob about Bob?
5 A   Yes. I believe they've been produced.
6 Q   What's the dates on them and what do they say?
7 A   There's an August 2021 email to Bob about Bob.
8 Q   About the hockey association?
9 A   And about his inappropriate behavior and about -
10    the email speaks volume to itself.
11 Q   Okay. Well, that's 2021.
12 A   Okay. So you told me I've never -
13 Q   Okay. I'll change my question. After you get to the
14    Oldman Firm, you continue to constantly communicate
15    with Bob. I got the folder right in front of me.
16    Okay. There's nothing in there about Bob to Bob
17    about his behavior. You can't get yourself to put
18    anything in writing. Were you upset with Bob during
19    2022, 2023 and 2024?
20 A   I believe there are things in writing to Bob during
21    that time. And I did have multiple conversations
22    with Bob.
23 Q   Have you produced them?
24 A   And I also - I'm not done. I am not done.
25 Q   Go ahead.

Page 331

1 A   And I also retained attorneys who also talked to
2     Bob about his behavior.
3 Q   We know that. And they made financial demands,
4     didn't they?
5     MS. RUSSELL: Objection.
6     MS. GORDON: Object to what? Object to what?
7 BY MS. GORDON:
8 Q   They made financial demands, didn't they?
9 A   They talked to Bob about stopping his behavior.
10 Q  Okay, listen. You filed a complaint with your name
11    to it where you put right in the public record
12    exactly what you demanded from Bob Riley, didn't
13    you?
14 A  I don't believe that I was demanding from him.
15 Q  Well, it's in there.
16    MS. RUSSELL: Counsel, allow her to finish
17    answering that question.
18 BY MS. GORDON:
19 Q  But you expected - you sued him for breach of
20    contract.
21    MS. RUSSELL: Counsel, this is becoming
22    harassing.
23 BY MS. GORDON:
24 Q  Do you recall that?
25    MS. RUSSELL: If we need to shut it down, we'll

Page 332

1     shut it down.
2     MS. GORDON: You shut it down.
3 BY MS. GORDON:
4 Q   Do you recall?
5     MS. RUSSELL: Are you going to treat her with
6     respect or are we going to have to shut it down?
7     MS. GORDON: I'm not answering you.
8 BY MS. GORDON:
9 Q   Do you remember in your original complaint, putting
10    out into the public sphere what kind of money you
11    expected Bob Riley to pay you? Do you remember
12    that?
13 A   You're characterizing this in a way that I don't
14    agree with. I remember that the settlement
15    agreement amount was put into the public sphere,
16    yes.
17 Q   By you.
18 A   By me.
19 Q   But then you didn't settle because you wanted more
20    money.
21 A   Because there were conditions that didn't go with
22    the settlement agreement.
23 Q   Okay. You wanted more -
24    MS. RUSSELL: Objection to counsel's testimony.
25 BY MS. GORDON:

Page 333

1 Q   Your lawyer told me she needed a hundred thousand
2     dollars from my client or they weren't going to
3     settle with Bob Riley. Was that incorrect?
4 A   I don't know what my lawyer told you.
5 Q   Well, I didn't ask you what she told me. I said,
6     was that correct? Is it a correct statement that
7     you wanted an additional hundred thousand dollars
8     to resolve your matter with Bob Riley? And when you
9     didn't get it, you didn't take what was on the
10    table?
11    MS. RUSSELL: Objection. Asked and answered.
12    MS. GORDON: Oh, my God.
13 BY MS. GORDON:
14 Q   Go ahead.
15 A   I don't know what you're asking me if – ask -
16    please ask me the question a different way.
17 Q   Your lawyer, you hired a lawyer. You hired Sarah
18    Prescott and Ken Mogill. And when did you hire
19    them?
20 A   In the summer of 2023.
21 Q   And this is during the exact time when I'm reading
22    all these texts between you - you're calling Bob,
23    you're texting Bob, you want him to help you.
24    MS. RUSSELL: Counsel, this is harassing. Ask a
25    question.

Carroll Reporting & Video
A Veritext Company

www.veritext.com                                    www.veritext.com

Page 334

1  BY MS. GORDON:
2  Q   You want him to help you at the identical time you
3      have retained legal counsel to come after him. Do I
4      have that right?
5  A   He stalked me at a conference in Orlando and I
6      contacted the attorneys after that incident.
7  Q   Well, let's talk about the stalking in Orlando.
8      MS. RUSSELL: Counsel, let her finish answering
9      your question before you ask the next one.
10 BY MS. GORDON:
11 Q   Go ahead. Who was at the conference in Orlando with
12     you? Who was at that - who was at that conference
13     with you from the office?
14 A   No one.
15 Q   You were at the hockey event and you were texting
16     with the office during that time, is that correct?
17 A   If you want to point me to a document, I'm happy to
18     look at that.
19 Q   What was the date of the conference? I don't have
20     it in front of mind right now.
21 A   June of 2023.
22 Q   And you texted with Bob during that meeting, didn't
23     you? The alleged stalking meeting, you texted with
24     him, didn't you?
25     MS. RUSSELL: Object to form. Counsel, we've

Page 335

1      been going for about an hour. I'll let you finish
2      your line of questioning but I think it's time for
3      a break soon.
4      MS. GORDON: I don't.
5      MS. RUSSELL: Did you just say you don't think
6      that it's time for a break soon? Are you going to
7      deny a break? We've been going for about an hour of
8      questions.
9  BY MS. GORDON:
10 Q   Hang on. Let me get to this. So you flew down there
11     and Bob was down there as well. Do we have that
12     right?
13 A   Yes.
14 Q   This was the stalking event. What's the date?
15     MS. RUSSELL: I think now's a good time for a
16     break. You all need to get your stuff together.
17     Let's go off the record. Let's take a 10-minute
18     break.
19     MS. GORDON: How long has it been since we took
20     a break?
21     MS. RUSSELL: It's been an hour.
22     MS. GORDON: Does anybody need a break right
23     now?
24     MS. RUSSELL: I need a break.
25     MS. TAYLOR: We do not.

Page 336

1      MS. RUSSELL: That's fine. But I need break.
2      MS. TAYLOR: I've never been at a deposition
3      where we take breaks on the hour.
4      MS. RUSSELL: I have in every single one that
5      I've taken.
6      MS. TAYLOR: Well, we just have a lot more
7      perseverance here in Michigan.
8      MS. RUSSELL: Off the record.
9      (Brief pause.)
10     MS. GORDON: I'm just going to note for the
11     record that the plaintiff took another break. They
12     seem to be coming every hour and this last one was
13     15 minutes which has slowed down the day, you know,
14     in a very significant way.
15 BY MS. GORDON:
16 Q   I'm going to go back to the conference that you
17     before the break you referenced the word stalking.
18     I was stalked at the conference. And the conference
19     we're talking about occurred in June of 2023, is
20     that correct? And it was a hockey conference?
21 A   Yes.
22 Q   And it looks like from what I - I've got extensive
23     text messages for over, throughout the time of the
24     trip. It looks like you were down there roughly
25     from June 18. Does that sound right? And then right

Page 337

1      through like June 24th or 5th.
2  A   I would have to look at a calendar but those
3      approximate dates are around the time.
4  Q   So I have, it looks like I've got about 40 or 50
5      pages of texts between you and Bob that occurred
6      during that conference where you say you were
7      stalked.
8  A   Okay.
9  Q   Nowhere in those roughly 40 or 50 pages, nowhere do
10     you say a single word to Bob Riley about him
11     stalking you or doing anything remotely like
12     stalking or even telling him, don't be around me.
13     Do you agree with that you didn't send him any such
14     texts?
15 A   I disagree with that.
16 Q   So you think you sent him a text about stalking
17     you?
18 A   You asked me if there was a number of things in
19     there with stalking. But I communicated with Bob
20     that he needed to leave me alone.
21 Q   Well, you've got a lot of very chit chatty things
22     in here. Are you planning to be off of this call at
23     one o'clock? Let's sign off. What time are we going
24     down to the banquet? I'm inundated today. What time
25     is your flight? I'm changing my plans. I mean, I

Carroll Reporting & Video
A Veritext Company

586-468-2411

www.veritext.com

Page 338

1   don't have time to go through all these. The
2   records will speak for themselves. But from my
3   reading of them, you are not critical of Bob to Bob
4   whatsoever during that conference.
5       MS. RUSSELL: Objection to plaintiff's
6   testimony here.
7       THE WITNESS: Is there a question?
8   BY MS. GORDON:
9   Q   No, there's not.
10      MS. RUSSELL: Objection to counsel's
11  testifying.
12      MS. GORDON: It wasn't testimony.
13      THE WITNESS: I disagree with your
14  characterization.
15      MS. RUSSELL: Well, there's no question.
16      MS. GORDON: I was responding to her comment
17  that she thinks there's something in there.
18  BY MS. GORDON:
19  Q   Do you have any such texts? Are you producing any
20  such texts that you think are going to show  -
21  A   I can look for those texts.
22  Q   No. You're not going to look for the texts. Did you
23  produce any? These are our texts right here that we
24  produced. Are you producing any texts with regard
25  to Bob stalking you?

Page 339

1       MS. RUSSELL: Object to form.
2       THE WITNESS: I believe that there are texts
3   produced about asking him to leave me alone, yes.
4   BY MS. GORDON:
5   Q   So asking him to leave you alone, what's the date
6   on that?
7   A   I don't have the text in front of me.
8   Q   What year is it?
9   A   During this conference.
10  Q   Now, during this conference you told Bob that a
11  hockey player threatened to rape you, is that
12  correct?
13  A   That did happen, yes.
14  Q   So at this conference, how did you end up with this
15  hockey player who threatened to rape you at this
16  conference?
17      MS. RUSSELL: Objection.
18  BY MS. GORDON:
19  Q   Please don't look at old documents. You know, let's
20  just – why don't you just give us back your
21  notebook. I don't need you leafing through a
22  notebook.
23  A   Well, you asked me about texts, so.
24  Q   Okay. I've moved on. I never asked you to go
25  through a notebook. Just hand it back to me and go,

Page 340

1   and look for texts. I asked you if you produced any
2   is what I've asked you.
3   A   I produced all of the texts I have with Bob.
4   Q   I've read the texts in here but I just don't know
5   if you have something else. I assume not.
6   A   I believe there are texts.
7   Q   Well, I will see. I'll see what you guys produce.
8   In any event, let's go back to the so-called
9   stalking conference.
10      MS. RUSSELL: Briefly, for the record,
11  discovery is ongoing and we have until -
12      MS. GORDON: I know. I didn't say you don't.
13      MS. RUSSELL: 11/24 to supplement.
14      MS. GORDON: I didn't say you didn't. I look
15  forward to seeing it.
16  BY MS. GORDON:
17  Q   I'm going to go back to what happened to you at
18  this conference. Because at this conference,
19  apparently some bad things happened and you met up
20  with a hockey player at the conference. Is that
21  correct?
22  A   I didn't meet up with any hockey players. Hockey
23  players are at a hockey conference.
24  Q   Well, somehow you ended up in the situation where
25  he said he was going to rape you so that's what I'm

Page 341

1   referring to. So how did that come to be? Where
2   were you and where was he?
3   A   There was an event with a whole bunch of hockey
4   players at it.
5   Q   And what kind of an event?
6   A   A networking event between hockey players.
7   Q   Was it in a conference room?
8   A   No, it wasn't in a conference room.
9   Q   Was it in a bar? Was it in a - where was it? Was it
10  in a hotel?
11  A   It was in an outdoor area outside of the hotel.
12  Q   What time of day or night?
13  A   Probably - I don't know the exact time.
14  Q   Was this like a cocktail hour thing? After cocktail
15  hour? What was it?
16  A   Cocktail hour after - evening.
17  Q   You were drinking, correct?
18  A   I was drinking.
19  Q   Okay.
20      MS. RUSSELL: Objection. Let the witness
21  answer.
22      MS. GORDON: She answered.
23  BY MS. GORDON:
24  Q   So you're at this event. Did you know this guy that
25  threatened later or that night threatened to rape

Page 342

1  you? Did you know who he was? Had you met him
2  before or did you just meet him that evening?
3      MS. RUSSELL: Object to form.
4      THE WITNESS: He is a –
5  BY MS. GORDON:
6  Q  He's a what?
7  A  Member of the union. And I would say that I - this
8  is stuff that goes to attorney-client privilege.
9  Because it's the PHPA is the client and he is a
10  member of the union.
11  Q  I'm not asking about the PHPA.
12  A  Well, you're asking me about details which I think
13  he -
14  Q  I asked you when did you meet him? When did you
15  meet him? How did this connection between you and
16  he occur? Did you meet him at this cocktail hour?
17      MS. RUSSELL: Objection, counsel. Let her
18  answer one question at a time.
19      MS. GORDON: She is not answering. She's
20  prevaricating.
21      MS. RUSSELL: You're asking over and over
22  different questions and not giving her a chance to
23  answer.
24  BY MS. GORDON:
25  Q  Go ahead.

Page 343

1      MS. RUSSELL: Allow her to answer. Which
2  question do you want her to answer first?
3      MS. GORDON: I want you to stop making
4  nonsensical objections so we can get this done.
5  BY MS. GORDON:
6  Q  Where did you meet this individual who later - I
7  realize you were at this event. Is that where you
8  first met him or had you already met him during
9  this conference?
10  A  I don't know that - I don't know. I don't remember
11  if I'd met him the day before, the day before that.
12  I had not met him before June of 2023.
13  Q  So what happened after you met him that night that
14  led to him saying he was going to rape you and
15  making sexual comments to you? How did that occur?
16  Did, were you standing around talking to him?
17  A  He was talking to other hockey players.
18  Q  How did he end up with you?
19  A  He didn't end up with me at all. I don't
20  understand. I don't understand.
21  Q  Did he yell across the room, I'm going to rape you?
22  You were with him someplace where he used his
23  words. So where was that place?
24  A  I was in the general vicinity of where he was and
25  he was referring to me as a puck slut and then went

Page 344

1  on to say he wanted to rape me. And I again, don't
2  think I should be going into further discussion of
3  this because he -
4  Q  Well, I'm really sorry but this is not privileged
5  material.
6  A  Well, it is privileged material because the PHPA is
7  my client.
8  Q  No, it's not. Did you report this to the PHPA?
9  A  Yes. And they are still my client.
10  Q  But you never reported Bob to the PHPA and his
11  stalking, did you?
12  A  You already asked me if I talked to people at the
13  PHPA about it and I told you I did.
14  Q  You never reported anything in writing. I'm not
15  going to - we've already got the record here. Let's
16  go back to the hockey player who don't want to
17  talk to but there is no privilege. So where were
18  you when he referred to you as a slut? Or however
19  you just said it. I don't remember the exact words.
20  Where were you outdoors or indoors?
21  A  I was outdoors. And I'm not going to continue to
22  discuss information that I believe is privileged
23  attorney-client information.
24  Q  A man calling you a slut and saying he wants to
25  rape you is privileged information in your world?

Page 345

1  A  That man is a member of the union and I am counsel
2  for the union.
3  Q  So you know what, you weren't talking about legal
4  advice. I'll tell you what's privileged is when
5  you're communicating about legal advice. Not facts
6  and not things about people wanting to engage in a
7  crime. So you are completely incorrect that this is
8  in any way privileged. It's just that you don't
9  want to talk about it. But the privilege will never
10  hold up in court and we'll be back here. What is
11  this individual's name?
12      MS. RUSSELL: Objection to the counsel's
13  testimony.
14      MS. GORDON: It's not testimony. It's
15  explaining the law.
16  BY MS. GORDON:
17  Q  What is this individual's name?
18  A  I don't know that I can answer these questions.
19  Q  Why?
20  A  Because my client -
21  Q  Names aren't privileged, Elyse.
22  A  I'm not – you're - I know that – I'm not - I don't
23  actually accept your counsel to me because you're
24  not my attorney.
25  Q  Well, you got counsel standing there and she's not

Page 346

1  saying the word privileged out of her mouth.
2      MS. RUSSELL: Well, I don't have to. She's
3  counsel to them. She can object to this on her own.
4      MS. GORDON: This has nothing to do, as you
5  must know, Kimberly, with a legal privilege. I'm
6  just eating up more time.
7  BY MS. GORDON:
8  Q   Are you refusing to answer the question? Just. if
9  you're going to refuse to answer, you guys, just
10  put it on the record now. What are you doing?
11  A   I don't even remember the guy's first name. His
12  last name is McNevin. But I'm not going to say
13  things that I believe are privilege that are
14  protected by attorney-client privilege with my
15  client. And I understand that you are telling me
16  that you don't feel it's privileged. I understand
17  that. But I'm not trying to violate any of the
18  duties of representation that I owe the union.
19  Q   So you are refusing to answer questions about the -
20  A   I answered the question.
21  Q   You know, I was talking.
22  A   I answered the question.
23  Q   You're not going to answer any additional questions
24  about this event that occurred at this conference
25  that you were at where Mr. Riley was also at the

Page 347

1  conference. You're not going to answer any further
2  questions about somebody threatening to rape you?
3  Is that what you're telling me? Because you believe
4  it's privileged.
5      MS. RUSSELL: Object to form.
6      THE WITNESS: I'm just trying to –
7  BY MS. GORDON:
8  Q   I want to know whether I should keep going with
9  this or you're going to refuse to answer.
10  A   Depending on the question that you ask, if it's
11  privileged, I'm going to refuse to answer. I'm not,
12  I'm not saying I'm going to refuse to answer every
13  question.
14  Q   Well, a second ago you refused to give me his name
15  and then you decided to give me his last name.
16  A   You successfully -
17  Q   So you changed your mind.
18  A   You successfully bullied me into giving you his
19  last name, yes, Deb. Thank you.
20  Q   So I want to know exactly what happened between him
21  and you at this time.
22  A   I told you already.
23  Q   Well, it can't be that somebody calls you a slut
24  out of the blue and that he somebody threatens to
25  rape you and there's no more to the story. Were you

Page 348

1  standing there talking to him?
2      MS. RUSSELL: Objection to counsel's testimony.
3  BY MS. GORDON:
4  Q   Go ahead.
5  A   I was talking to other people that are my friends,
6  that are people that - I was talking to other
7  people in the vicinity and he started talking about
8  how I must be a puck slut and that's why I do work
9  for the PHPA.
10  Q   Why would he say you're a puck slut?
11      MS. RUSSELL: Objection. This is harassing.
12  BY MS. GORDON:
13  Q   Were you drunk?
14  A   No.
15      MS. RUSSELL: Object to form.
16  BY MS. GORDON:
17  Q   Speaking of that, didn't you once say that you
18  didn't want to be known as an AAJ slut to Donna or
19  Emily?
20      MS. RUSSELL: Objection.
21  BY MS. GORDON:
22  Q   Haven't you said that? I don't want to be known as
23  the AAJ slut?
24      MS. RUSSELL: Object to form.
25  BY MS. GORDON:

Page 349

1  Q   I've got that in your texts.
2      MS. RUSSELL: Object to counsel's
3  testifying.
4  BY MS. GORDON:
5  Q   Have you said that before. You've already made a
6  statement. I'm asking a question, haven't you said
7  that before?
8      MS. RUSSELL: You've asked about four questions
9  and not allowed the witness to answer.
10      MS. GORDON: There is no way I will ever finish
11  this dep in seven hours because I am unable to get
12  any questions out. And I fully intend to count up
13  the number of objections that have been made here
14  and the amount of time they take. But this is
15  really out of control.
16  BY MS. GORDON:
17  Q   What is this gentleman's name that called you a
18  puck slut?
19  A   I've already told you.
20  Q   Well, I didn't get it. Please repeat it.
21  A   I told you.
22      MS. RUSSELL: It's on the record.
23  BY MS. GORDON:
24  Q   What is it?
25      MS. RUSSELL: You can get it later.

88 (Pages 346 - 349)

Carroll Reporting & Video
A Veritext Company
www.veritext.com                    586-468-2411
www.veritext.com

Page 350

1   BY MS. GORDON:
2   Q   No. What is his name?
3   A   I already told you his last name's McNevin.
4   Q   Well, I'm asking for it again. What's his last
5       name?
6   A   I just went to say the name again and you
7       interrupted.
8   Q   Well, please say it. Go ahead.
9   A   Are you sure? McNevin.
10  Q   How do you spell it?
11  A   M-C-N-E-V-I-N.
12  Q   What's the first name?
13  A   I've already told you that I don't remember his
14      first name.
15  Q   You took this event to your psychological treater.
16      You were traumatized by this, correct?
17  A   It was disruptive, yes.
18  Q   In what way was it disruptive?
19  A   Being told that someone wants to rape you is
20      disruptive.
21  Q   So you took it seriously, is that correct? You
22      thought this was a serious threat to you?
23      MS. RUSSELL: Object to form.
24      THE WITNESS: Yes. If you're referring to a
25      document, I would like to see the document so that

Page 351

1       I can better answer your questions.
2   BY MS. GORDON:
3   Q   Okay. You're not allowed to ask me what I'm
4       referring to or ask for anything unless I hand it
5       to you. It's not part of the process. So you were
6       very upset about this and you took this, you took
7       this to your treater and you explained to her what
8       happened. Is that correct?
9   A   I don't recall without looking at a document.
10  Q   And you also let Bob know during this conference
11      what had happened to you, didn't you? You were
12      upset and you shared the information with him,
13      didn't you?
14  A   Yes. As an attorney for the PHPA and I also shared
15      it with the executive director. And there were
16      members of the executive committee who witnessed
17      the situation.
18  Q   And you were very tearful and upset about this at
19      the time it occurred, correct?
20  A   I was upset about it.
21  Q   We just got done talking about the hockey
22      association and your role there. To be clear, my
23      client did not require you to go on any of these
24      trips. You let them know when the trips were
25      scheduled and you went ahead and attended. You felt

Page 352

1       you needed to be there, is that accurate?
2   A   No.
3   Q   What's inaccurate about it?
4   A   I had talked to Jules about stepping down from the
5       hockey client, stepping away from it and not having
6       the hockey client. And he said to keep the hockey
7       client. And to keep the hockey client, I would have
8       to go to a conference like this.
9   Q   Where is that in writing? Where do I have that in
10      writing from the hockey association that in order
11      for you to keep working on their matters that you
12      would have to be at a conference. Where does that
13      exist in writing?
14      MS. RUSSELL: Object to form.
15      THE WITNESS: I don't know where it exists in
16      writing off the top of my head.
17  BY MS. GORDON:
18  Q   I'm sorry?
19  A   I don't know where it exists in writing off the top
20      of my head.
21  Q   I have nothing in writing from the hockey
22      association whatsoever requiring you to be at any
23      meeting. Do you know of anything in writing that
24      requires you to be at a meeting that puts in
25      writing you must be here?

Page 353

1   A   It was the expectation. And I don't off the top of
2       my head have something in writing for you, but I
3       don't - I'm not -
4   Q   Well, Bob was going. Bob was going and the two of
5       you - it was not required that the two of you be
6       there, correct?
7   A   Incorrect.
8   Q   Well, you have nothing in writing to tell me it was
9       required. But let's leave that aside.
10  A   You're saying that I don't have something in
11      writing. I've told you -
12  Q   Well, you can't identify here under oath a single
13      thing that exists in writing that requires you to
14      be at these hockey meetings. You haven't identified
15      anything yet you're their legal counsel. So are you
16      unable - am I incorrect, you're not able to
17      identify anything that exists in writing where you
18      are directed that this is a mandatory meeting, you
19      must attend? That does not exist, does it?
20      MS. RUSSELL: Object to form.
21      THE WITNESS: What's the question?
22  BY MS. GORDON:
23  Q   It doesn't exist. Nothing in writing exists.
24  A   I don't agree with that.
25  Q   Is that correct?

Page 354

1  A   No.
2  Q   Well, what exists in writing?
3  A   I've already told you that there - I don't know
4      what's in writing or not.
5  Q   So then what –
6  A   And I don't have all my –
7  Q   So then when you tell me no –
8  A   I'm not done.
9  Q   - I'm incorrect, that's an accurate answer.
10 A   No. I don't have –
11 Q   Your answer is, I don't know if anything exists.
12     MS. RUSSELL: Counsel, stop talking over my
13     client.
14 BY MS. GORDON:
15 Q   The answer is, I don't know if anything exists,
16     correct?
17 A   I don't have all of the emails from Olsman
18     Mackenzie. And I don't know as I sit here today off
19     the top of my head whether something exists.
20 Q   You've never seen any such thing, have you?
21 A   I'm not agreeing with that.
22 Q   Anyway, no matter what the Hockey Association said,
23     you could have stepped away from the Hockey
24     Association at any time you wanted to. And in fact,
25     Donna told you that in one of the secret recorded

Page 355

1      meetings that you taped her in. It's very loud and
2      clear that she's quite explicit, get out of hockey.
3      And in fact, we don't have time right now, but I've
4      got plenty of texts with you and Emily Peacock
5      where she's stating you should just get out of
6      hockey. Donna told you to get out of hockey. Emily
7      told you to get out of hockey and you never really
8      asked Jules whether he wanted you in it or not.
9          In any event, you have nothing that you will
10     be able to produce that says that the Olsman Firm
11     told you to attend this meeting, is that correct?
12         MS. RUSSELL: I'm going to put a standing
13     objection on the record to all of counsel's
14     testifying.
15 BY MS. GORDON:
16 Q   Is that correct?
17 A   All of the lead up to that that you said I disagree
18     with. And what's the question?
19 Q   Yeah. The question is, you have nothing in writing
20     whatsoever at any time or place where the Olsman
21     Firm directed you on behalf of the Olsman Firm to
22     attend any hockey meeting. Nothing exists.
23 A   I don't recall.
24 Q   I want to ask you about the attorneys. Are you
25     aware that this issue of you naming attorneys that

Page 356

1      you talked to during the time you worked at the
2      Olsman Firm came up in court? Are you aware of
3      that? Do you know there's a court order about you
4      giving names? Have you been made aware of that?
5  A   During the time that I worked at the Olsman Firm?
6  Q   Yes. Or before. Anytime.
7  A   I'm not sure what the question is.
8  Q   I'll just take that time off. Any time that you
9      contacted an attorney about anything involving Bob
10     Riley or the Olsman Firm.
11         MS. RUSSELL: I don't understand the question.
12     Counsel, can you ask it again?
13 BY MS. GORDON:
14 Q   Are you aware that the court has ordered that you
15     must provide names of all attorneys who you
16     contacted with regard to matters concerning Bob
17     Riley or the Olsman Firm?
18 A   I don't, I'm not aware of that.
19 Q   You're not aware of that?
20 A   All of the names of the attorneys? Is that what
21     you're asking me?
22 Q   Are you aware that the court has ordered that you -
23     so it's not privileged information and we are
24     entitled to know the names of all the attorneys.
25     Are you aware of that?

Page 357

1  A   I'm not aware of that.
2      MS. RUSSELL: Counsel, if you're referring to a
3      specific court order, why don't you show us so we
4      can -
5      MS. GORDON: I don't have time. The court - I'm
6      sorry if you don't know what the court order is.
7      You should know it, you were at the hearing so.
8      MS. RUSSELL: She can't answer questions if we
9      can't verify whether or not you're misrepresenting
10     it.
11     MS. GORDON: Well, then I suggest you come to a
12     depth like this prepared with your order.
13 BY MS. GORDON:
14 Q   Who are the attorneys you spoke with during the
15     time you worked at Bob Riley's office and/or the
16     time you worked at Jules Olsman's office with
17     regard to possible claims against Riley or Olsman?
18     Give us a list of all of the attorneys that you
19     contacted and the list of people who you spoke
20     with. So let's start with the list of attorneys you
21     contacted.
22     MS. RUSSELL: Didn't we go over this already
23     earlier?
24     MS. GORDON: We went over part of it.
25 BY MS. GORDON:

Page 358

1   Q   Go ahead.
2   A   During the time that I worked at Bob Riley's office
3       and at Olsman, Mackenzie.
4   Q   Right. You've sought counsel - you've testified
5       already here you've sought counsel on several, a
6       couple of different occasions, correct? You with
7       me?
8   A   I'm with you.
9   Q   So now I want to know the names of everybody who
10      you contacted.
11  A   During the time that I worked at Bob Riley - I'm
12      trying to clarify your timeframe. During the time I
13      worked at Bob Riley's office or at Olsman
14      Mackenzie?
15  Q   That is correct.
16  A   So those people would be the four people that I
17      referenced earlier. And then Sarah Prescott and Ken
18      Mogill.
19  Q   Because you have said in court or people have said
20      on your behalf in court, your complaint says how
21      many different attorneys you tried to get to
22      represent you or help you but - so many of them
23      that you contacted, nobody, nobody would be willing
24      to help you.
25          MS. RUSSELL: Object to counsel's

Page 359

1       testimony.
2           MS. GORDON: I'm going to ask.
3           MS. RUSSELL: There's no question there.
4           MS. GORDON: Yeah.
5           MS. RUSSELL: A lot of pausing to be so
6       concerned with time.
7   BY MS. GORDON:
8   Q   In paragraph 196 of your complaint, you state the
9       attorney's McKenna consulted would not take her
10      case due to Riley's prominent status in the legal
11      field.
12          MS. RUSSELL: What's the paragraph number
13      again?
14          MS. GORDON: 196.
15  BY MS. GORDON:
16  Q   So who would those individuals be?
17  A   What timeframe are we speaking about?
18  Q   You're going to have to tell us. This is your
19      complaint.
20  A   Sure. And I would love to see complaint.
21  Q   Hang on. Let me finish. The attorney's McKenna
22      consulted would not take her case due to Riley's
23      prominent status in the legal field.
24          MS. RUSSELL: Is there a question?
25  BY MS. GORDON:

Page 360

1   Q   Yes. You know, you tried to get me disqualified off
2       of this case and you filed motions talking about
3       all the attorneys. That's also in other pleadings
4       with the court about all the various attorneys you
5       tried to get ahold of and people told you you would
6       have to move out of the state and nobody would take
7       your case. So I want to know who you are talking
8       about that told you they would not take your case.
9       It wasn't Sarah Prescott, obviously. Or did she
10      tell you she wouldn't take your case?
11  A   It wasn't Sarah Prescott. And I'm asking you -
12          MS. RUSSELL: Object to form of all that. There
13      were like five questions.
14          THE WITNESS: Yeah. I don't know what the exact
15      question you want to ask me is but –
16  BY MS. GORDON:
17  Q   Who told you – it's very clear -
18  A   I'm not done with my answer, Deb. I am asking you
19      what timeframe you are referring to. And I know
20      you're saying that it's in my complaint, so please
21      if you could show me the complaint I'll figure out
22      the timeframe.
23  Q   I've already given you the timeframe. It's from,
24      throughout the time you worked for Bob Riley or the
25      Olsman Firm.

Page 361

1   A   Okay.
2   Q   I want to know every attorney you contacted.
3       Earlier you gave us four names and now you've added
4       two names. Is that the entirety of the number of
5       lawyers you contacted throughout your employment
6       with Bob Riley and Jules Olsman?
7   A   I don't recall additional people during the
8       timeframe that you are asking me.
9   Q   Because in your earlier papers you have certainly
10      taken the position that you looked high and low for
11      somebody to help you with this. But people just
12      wouldn't help you because they couldn't dare sue
13      Bob Riley.
14          MS. RUSSELL: What are you referring to,
15      Counsel?
16  BY MS. GORDON:
17  Q   So my question to you to is, who are those people
18      that wouldn't help you because it was Bob Riley?
19      Wouldn't take the case.
20          MS. RUSSELL: Objection.
21  BY MS. GORDON:
22  Q   Or for whatever reason that told you, I can't take
23      your case. Who are those people?
24          MS. RUSSELL: Object to form.
25          THE WITNESS: Okay. Sarah - you're actually

91 (Pages 358 - 361)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 362

1    asking me a few different questions. One, you asked
2    me the attorneys that I consulted while I was
3    employed with Riley and Hurley and with Olsman,
4    Mackenzie, Peacock. And then there are - now you're
5    asking me in general for any attorney that I've
6    consulted. Those are two different - one timeframe
7    is a limited timeframe and the other is broader. So
8    what timeframe do you want?
9    BY MS. GORDON:
10   Q   During the time you worked for Bob Riley, did you
11       contact attorneys?
12   A   Yes. And I've answered that question already.
13   Q   And did any of the attorneys you contacted say they
14       would not take your case because it was Bob Riley?
15   A   You did.
16   Q   What year was that?
17   A   In August of 2021. We've already talked about that.
18   Q   You contacted me after you already had a new job
19       offer from Olsman.
20           MS. RUSSELL: Objection.
21   BY MS. GORDON:
22   Q   You contacted me and you told me you had a job
23       offer from Olsman and you were taking it. And I
24       said, well, that's good. You got a job, you don't
25       need damages.

Page 363

1           MS. RUSSELL: Objection. Counsel's testifying.
2    BY MS. GORDON:
3    Q   So when you contacted me, you were already at that
4        stage. But leaving that aside, who told you that?
5    A   When are we talking?
6           MS. RUSSELL: Can you clarify the question.
7           THE WITNESS: Are we talking about August of
8        2021? We've already talked about that.
9    BY MS. GORDON:
10   Q   We're talking about any other timeframe. Any other
11       - strike that.
12           A timeframe I've given you and all of the
13       people who you talked to. Have you now given us the
14       name of every attorney you reached out to with
15       regard to a claim against Riley or a claim against
16       the Olsman Firm? Are there any others?
17           MS. RUSSELL: Objection. Asked and answered.
18           THE WITNESS: No. You have asked me about who I
19       contacted while I was employed at Riley and Hurley
20       and while I was employed at Olsman, Mackenzie. And
21       I contacted attorneys after that timeframe. So we
22       have not talked about that timeframe. I've asked
23       you what timeframes you want talk about.
24   BY MS. GORDON:
25   Q   So does that mean when you were trying to find

Page 364

1    lawyers to represent you on this case that was
2    filed? Is that what you're talking about?
3    A   Is that what you're trying to ask me about?
4    Q   No. You just offered up a new timeframe.
5    A   I don't - you're referring to a paragraph in the
6        complaint. If you show it to me, then - I've asked
7        what timeframe you want.
8    Q   I'm not just referring to the paragraph. I was
9        using it as an example.
10   A   What timeframe do you want?
11   Q   You got to stop interrupting.
12   A   I don't know what timeframe you want.
13   Q   I've given you the timeframe multiple times. Are
14       there any other attorneys you've ever spoken to
15       about Bob Riley other than the names you've given
16       today, about any topic about Bob Riley?
17           MS. RUSSELL: Objection. Asked and answered.
18   BY MS. GORDON:
19   Q   I know you must have talked to Katie Kalahar about
20       Bob Riley.
21   A   Yes. You've asked me the timeframe of while I was
22       employed at Riley and Hurley and Olsman, Mackenzie,
23       Peacock. So what timeframe do you want?
24   Q   I gave you the timeframe about five times.
25   A   Can you give it to me again?

Page 365

1    Q   During - throughout the time you worked for Riley
2        and throughout the time you worked for Olsman.
3    A   I don't - as I sit here today, I do not recall
4        anyone else during that timeframe that you're
5        talking about. So Katie Kalahar would not be during
6        that timeframe.
7    Q   Were there other lawyers outside of that timeframe?
8    A   Yes.
9    Q   That you talked to? And what would that timeframe
10       be when you contacted them?
11   A   Following - being terminated by Olsman, Mackenzie
12       to present. If you want to take it as a big block.
13   Q   Did Sarah Prescott say she would not sue Bob Riley
14       because of who he was or Jules Olsman because of
15       who he was?
16           MS. RUSSELL: Objection.
17           THE WITNESS: That is - Sarah Prescott could
18       not sue Bob Riley or Jules Olsman.
19   BY MS. GORDON:
20   Q   Did she explain why?
21   A   I believe she - well, I know there were a couple
22       different factors for her.
23   Q   What were they?
24   A   One being that her daughter has maybe a close
25       relationship with one of Donna's children. Or I'm

Page 366

1    sorry. Not her daughter, her partner's daughter.
2    Some sort of closeness there. And another being, I
3    know she had some staffing issues due to people
4    going out on maternity leave and having the
5    bandwidth.
6  Q   Why couldn't she sue Olsman?
7  A   I just indicated the answer to that question.
8  Q   I thought you said Riley. She had some connection
9      with Riley. Why couldn't she sue Jules Olsman?
10 A   Because as I understood it, one of her law partners
11     has a close relationship. Their children have a
12     close relationship with Donna's children. And the
13     same thing about the bandwidth and the staff and
14     her maternity leave.
15 Q   And what about Ken Mogill? Why was he not willing
16     to take it on?
17 A   He described himself as no longer - he wasn't ever
18     going to litigate a case like that. He had brought
19     Sarah in.
20 Q   You went to him first and then he brought Sarah in?
21 A   Yes.
22 Q   Did you, I'll use the word fire them but I'm not,
23     you know, did you remove them from the case or stop
24     working with them for some reason? Was it your
25     decision to stop working with them or their

Page 367

1    decision?
2  A   I knew that they were not going to file suit. That
3      wasn't in the scope of their representation. So
4      there was no firing that occurred.
5  Q   Did they recommend you to somebody when they said,
6      we're not going to be able to do this? Why don't
7      you call so-and-so? Did they give you some names?
8  A   They gave me some names, yes.
9  Q   Who did they give you?
10 A   I don't recall the list of names off the top of my
11     head.
12 Q   Do you recall anybody? How many did they give you,
13     roughly. I mean, they know a lot of people
14     obviously.
15 A   I called a lot of people. And I don't know how
16     many. They maybe gave me three names. I can get
17     that information for you.
18 Q   So you called a lot of people?
19 A   Yes.
20 Q   Roughly, how many?
21 A   More than 10.
22 Q   Do you remember those names?
23 A   I remember some names but I don't remember all of
24     the names.
25 Q   Who are the names you remember that you called?

Page 368

1  A   We talked about Ray Sterling.
2  Q   Who's we?
3  A   You asked me if someone I talked to earlier was Ray
4      Sterling. So that was -
5  Q   Somebody recommended Ray Sterling to you? Or you
6      did call Ray?
7  A   I did call Ray. I would have to look at his, the
8      firm website to tell you who I talked to from his
9      office because I don't think I talked to Ray
10     specifically. I talked to Paladin Employment Law.
11     That's not his last name. That's just the name of
12     the firm. I don't know his name. I could - I - I'll
13     have to think through the list of names that I -
14     I've put together a list so that can -
15 Q   When did you do that?
16 A   I provided it to my former attorneys.
17 Q   Ms. Kalahar?
18 A   Yes.
19     MS. GORDON: Are you having questions for your
20     witness today?
21     MS. RUSSELL: Not today.
22 BY MS. GORDON:
23 Q   I have some questions about the complaint that you
24     filed.
25     MS. RUSSELL: I think we have about 30 minutes

Page 369

1    left. I don't know if you want to reserve time for
2    after I ask questions but that's - I'm not going to
3    tell you how to prosecute your case so.
4      MS. GORDON: Well, if you have a cross notice,
5    I'm just going to do whatever I would normally do.
6    I'm not going to reserve time. You're not – I mean,
7    you're doing it a different date and a different
8    time. It's not a part of this dep. You have a cross
9    dep notice, you said.
10     MS. RUSSELL: No. We'll do our questions of her
11   after the Riley party's deposition.
12     MS. GORDON: You can show me some law on that
13   but I don't agree.
14     MS. RUSSELL: Everything's going to come up in
15   y'all's dep. There's no reason for us to do it
16   twice.
17     MR. DAVIS: You're not superseding our
18   Deposition, Ms. Russell. I don't know what you're
19   talking about.
20     MS. RUSSELL: I'm not.
21     MR. DAVIS: Yeah, you're right. We're taking
22   our full seven hours and you're not - you don't
23   actually get to take two depositions. You get to
24   take one. You cross noticed your witness for today.
25   So you will not be noticing them for a deposition

93 (Pages 366 - 369)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

1    during our deposition.
2        MS. RUSSELL: I still get to ask rehabilitation
3    questions during your deposition. That's when we'll
4    ask our rehabilitation questions.
5    BY MS. GORDON:
6    Q   I'd like to ask you a few questions about the
7    creation of your new law firm. When did you first
8    discuss with Ms. Fox creating a law firm?
9    A   I believe the first time that it was ever
10   contemplated was December of 2023.
11   Q   That's the first time it was ever contemplated?
12   A   Ever discussed with Ms. Fox. It was definitely the
13   end of 2023. I guess I should say the - the end of
14   2023. I don't have a specific date for you.
15   Q   So you guys had been texting about this for a
16   while, obviously. And because I see that you
17   immediately started taking action to set up a law
18   firm in November - excuse me, in December and in
19   January. So for how long had you been talking about
20   it?
21   A   What's your question?
22   Q   I'll rephrase it. You talked to your therapist in
23   November of 2023 about starting your own firm,
24   correct?
25   A   I don't recall that.

1    Q   Ms. Cranston.
2    A   I don't recall that discussion.
3    Q   You're not denying it, correct?
4    A   I'm not denying it. During that time, I was also
5    looking for employment at other firms.
6    Q   Where did you look for employment?
7    A   I looked for employment at other law firms and I
8    looked for employment at other corporations.
9    Q   What law firms did you apply to?
10   A   I discussed a potential position with Moses Kim's
11   law firm in Atlanta, Georgia.
12   Q   And did you apply to any law firms here in
13   Michigan?
14       MS. RUSSELL: I don't believe the deponent was
15   done answering.
16       THE WITNESS: I was not done answering.
17   BY MS. GORDON:
18   Q   Well, I'm going to retract the question. Did you
19   apply anywhere in Michigan?
20   A   I spoke with Brian McKeen about a job. And I think
21   there were a few other places but I'll have to give
22   it some thought.
23   Q   Did Brian offer you job?
24   A   He ultimately did not.
25   Q   And you said Moses is somebody who you applied

1    with?
2    A   Yes.
3    Q   And he offered you a job?
4    A   Yes.
5    Q   At $140,000 plus bonus, is that correct?
6    A   I don't recall the amount.
7    Q   Something around that.
8    A   I don't recall as I sit here today.
9    Q   Well, do you have any idea what the job offer was?
10   I think our records show it's about 140K. You were
11   texting with a photographer in November about
12   getting headshots taken, correct?
13   A   That does not sound correct to me.
14   Q   When's the first time you emailed with Mr. Kovacs?
15   A   I believe it would've been January.
16   Q   When were your headshots taken?
17   A   I believe they were in January.
18   Q   And that was during working hours that you had
19   those headshots taken, is that correct?
20   A   I don't recall.
21   Q   And you applied for insurance coverage on around or
22   before January 13th, 2024, correct?
23   A   I don't recall the date.
24   Q   Does that sound about right? I've got the document
25   that shows that that's the date. If that's what's

1    on the document, you have no reason to dispute it?
2    A   I'd like to see the document.
3    Q   Hudson LPL Application, Plaintiff's 443. You
4    produce this to us. And it's signed 1/13, dated
5    1/13/2024. Does that sound right?
6    A   I'd like to see the document.
7    Q   Can you see it from there?
8    A   I can't see it from there. It appears that this is
9    a form that Amanda completed.
10   Q   Is that the date on the form? Is that when you all
11   would've applied for insurance?
12   A   I cannot tell by looking at this.
13   Q   Well, do you see a date?
14   A   I see a date that Amanda completed it on January
15   13th, 2024.
16   Q   You applied for a domain name on January 13,
17   correct?
18   A   I don't have that date.
19   Q   You don't dispute it, do you? You know I've got the
20   document.
21   A   I would have to see the document to know if that's
22   the right date.
23       MS. GORDON: I'm going to take a brief break.
24       (Brief pause.)
25       MS. GORDON: So we've been here a long time.

Page 374

1   It's now about 7:30 Eastern. And we're talking
2   about concluding this dep. I take the position that
3   this dep for me has been extremely shortened for
4   two reasons. Number one, the continual - the two
5   attorneys both trying to conduct the dep. And Mr.
6   Altman continually going off and making lengthy
7   speaking objections that were not really apropos of
8   anything.
9       And Ms. Russell has, I would say I'm just
10  guesstimating she's objected to at least 50% of
11  every single thing I've asked which has definitely
12  stop the flow of this deposition and it's been a
13  very difficult dep to conclude.
14      In addition to that, there have been lengthy,
15  lengthy, numerous, numerous breaks. I think almost
16  every single hour, which is why we're still
17  here at 7:30 at night. Which puts pressure on
18  everybody to try to wrap this up. If we'd gotten
19  done earlier and I'd said to Ms. Russell, I'd like
20  another 30 minutes, it would probably be easier to
21  agree. Which I've just told her, I'm going to ask
22  for an extra 30 minutes right now to wrap up this
23  dep so that I don't have to go to the court and
24  explain everything I just put on the record.
25      Again, if we weren't here so late, I don't

Page 375

1   think it would be a big deal to give somebody an
2   extra 30 minutes. But it is 7:30 at night. But that
3   is what I'm asking.
4       Now, in addition, there was a cross notice of
5   deposition for today that was issued by Ms.
6   Russell. And I contacted her and asked her what it
7   was about. And I still remain a little unclear what
8   it was about. But apparently I'll let you take it
9   away, Kimberly, as to what you think your cross
10  notice of dep, the function of it is for purposes
11  of the deposition of your client.
12      First you said you had a few questions that
13  you were going to do today and then there would be
14  no further dep of your client. And then there was
15  some confusion about whether I could ask questions
16  when you got done with your, I'll call it direct
17  because that's what you'd be doing here. You'd be
18  doing a direct of your client because you filed a
19  cross notice which means when I'm done, you get to
20  start a direct exam. Hence, that's the way you
21  noticed this up. When you get done with your direct
22  exam, then I get to cross-examine.
23      So in that you filed a cross notice of
24  deposition, we're in an unusual posture here. And I
25  a hundred percent take the position that when you

Page 376

1   get done examining your witness now in response to
2   what I've already elicited, of course I will have a
3   chance to go back and ask additional questions
4   based on what you've asked. Just as if I would if
5   you were starting from scratch and doing her direct
6   dep.
7       MS. RUSSELL: Well, why don't we do this? Since
8   you would like to go to the court and ask for more
9   time, we will represent the same thing. Or we can
10  work out at a later date additional time for both
11  of us. Because you want some more time, I want some
12  more time. Let's do it.
13      MS. GORDON: I'm sorry. I'm not tracking. I'm
14  not tracking.
15      MS. RUSSELL: You said that you would like at
16  least -
17      MS. GORDON: I'd like some more - another 30
18  minutes.
19      MS. HARDY: So you're going to give her an
20  hour, the 30 minutes she has left today and an
21  additional half an hour?
22      MS. RUSSELL: No. I don't understand.
23      MS. GORDON: Talk more. I'm not tracking what
24  you're saying here.
25      MS. RUSSELL: Right. And I don't know if you

Page 377

1   want this to be on the record because this is
2   eating into your time right now. We can go off. I
3   mean.
4       MS. GORDON: No. This isn't going to eat into
5   my - I appreciate you're saying that but this is
6   obviously not questioning. I mean, so.
7       MS. RUSSELL: This is negotiating time on the
8   record.
9       (Brief pause.)
10      MS. RUSSELL: So I'd like to briefly state that
11  I understand defense counsel's request for
12  additional time. We've agreed to try to come to an
13  agreement on the continuation of this dep for both
14  plaintiff and defendants.
15      MS. GORDON: So I'm going to start my 30
16  minutes from now.
17      MS. RUSSELL: Well, we had 28 and you made it
18  on the record so I don't know what time we're at.
19      MS. GORDON: Well, I'm sure you won't mind if I
20  take 30. Maybe it'll be a little more, a little
21  less.
22  BY MS. GORDON:
23  Q   Question for you. You have brought claims against
24      my client with regard to the actions of a third
25      party, that third party being Bob Riley that

Page 378

1    occurred while you were employed by my clients, not
2    employed by Mr. Riley. Mr. Riley was not employed
3    by my clients. What did you think my clients were
4    going to do if you came to them and said, I don't
5    want to have to facilitate with Bob - strike that.
6        If they came to you and said, Bob Riley is
7    harassing me on the hockey conference events we're
8    attending, what did you expect them to do?
9  A  If I went to them or if they came to me?
10  Q  If you went to Jules Olsman and said, I am going to
11    - I've been at a hockey conference with Bob Riley
12    and he did, said some stuff or did some stuff I
13    didn't like, I feel I'm being harassed. What did
14    you think Jules Olsman was capable of doing of
15    that, about that?
16  A  I think he was capable of doing a lot of things.
17  Q  He has no control over Bob Riley. Bob Riley does
18    not work for him, correct? Correct? It's a simple
19    answer. Bob Riley -
20  A  Well, Bob Riley does work for him when he hires him
21    for his, as a facilitator.
22  Q  So, okay. Well, we all hire our gardeners and we
23    hire our facilitators and he hire people to do
24    DoorDash for us. But I think we all know we're not
25    responsible for their actions. So do you have any

Page 379

1    legal theory that you are relying on in this case
2    where somehow the Olsman Law Firm is responsible
3    for some conduct alleged to have occurred by Bob
4    Riley at some conference that involves another
5    organization? Do you have any legal theory that
6    would support such a claim?
7        MS. RUSSELL: I think you're getting into
8    attorney-client privilege. This is work product.
9  BY MS. GORDON:
10  Q  Nothing that your attorney -
11        MS. RUSSELL: You're asking about legal
12    theories.
13        MS. GORDON: Okay. She - again, I'm being
14    delayed here. Yes. And I'm allowed to ask about
15    legal theories. This whole case is about legal
16    theories.
17        MS. RUSSELL: You can ask it a different way.
18        MS. GORDON: Okay. Thank you.
19  BY MS. GORDON:
20  Q  Do you have a legal claim or theory that would hold
21    my client's responsible for the acts of a third
22    party, here Bob Riley? For somebody who does not
23    work for them, does not have a contract with them.
24    What is your theory for holding my clients
25    responsible?

Page 380

1        MS. RUSSELL: Objection.
2  BY MS. GORDON:
3  Q  Go ahead.
4  Q  I don't think that I understand your question as
5    far as what you mean by a legal theory. It's my
6    understanding that an employer has to keep their
7    employees safe. So I don't - when you say legal
8    theory, what are you asking me?
9  Q  Okay. Well, so what do you - in order to keep your
10    employees safe under law you have to have some
11    ability to control that person's actions. For
12    example, you could fire them or not allow them back
13    into your restaurant. Those are the kinds of things
14    that can occur. What legal theory do you have that
15    would stand for the proposition that if you told
16    Jules Olsman, I don't like how Bob Riley acts
17    toward me, that Jules Olsman could do anything? He
18    couldn't fire Bob, could he?
19  A  I believe he could not use Bob as a facilitator and
20    I could also not be made to go facilitate cases
21    with Bob. And when you say legal theory, I still
22    don't understand what you mean by legal theory.
23  Q  So you expected Jules - hypothetically, your answer
24    to my question is if you complained about Bob Riley
25    you would have Jules not use him as a facilitator.

Page 381

1    Is that what you're saying?
2        MS. RUSSELL: Objection to the hypothetical.
3  BY MS. GORDON:
4  Q  For any case or just for you?
5  A  Just rephrased my answer as a totally different
6    answer than what you asked me so I don't -
7  Q  What is the legal theory? Is it a fiduciary duty
8    theory? Is it a vicarious liability theory? What is
9    your legal theory?
10        MS. RUSSELL: Object to form.
11  BY MS. GORDON:
12  Q  For holding my client's responsible for the acts of
13    a third party.
14  A  I don't - I believe I've answered your question.
15  Q  No, you haven't given me a legal theory. Do you
16    have one?
17  A  I've said that I believe an employer needs to keep
18    their employees safe.
19  Q  That's not a legal theory, that's an opinion.
20  A  I've said a million -
21        MS. RUSSELL: Counselor, I'll direct you to her
22    complaint.
23        MS. GORDON: I've looked at her complaint.
24    There's no viable legal theory in there that's been
25    articulated. There's been none. There's just very

Page 382

1    broad claims.
2  BY MS. GORDON:
3  Q   So today you cannot articulate for me a law that's
4      in place that would provide a remedy where Jules
5      Olsman is required to do something with regard to
6      Bob Riley. You have no law that you can point me
7      to.
8  A   I believe Elliot Larson would be the applicable law
9      and it's corresponding federal counterpart.
10 Q   So that's means –
11 A   So that would, if that's what you want as far as a
12     legal theory.
13 Q   So what is it about Elliot?
14 A   I'm not done answering.
15 Q   What is it about – okay. I hear you. You think
16     Elliot Larson does.
17         In your remedy, if you had gone to Jules would
18     be that you thought he should never use Bob Riley
19     as a facilitator again?
20         MS. RUSSELL: Objection.
21 BY MS. GORDON:
22 Q   Is that what you're saying?
23 A   I have said now multiple times, it's my
24     understanding that it's an employer's job and I
25     think they're required, they should be keeping

Page 383

1      their employees safe. So I don't know what you're
2      asking me.
3  Q   Well, okay. I think it's pretty clear but I think
4      you just don't know the answer. But let's not argue
5      about it.
6          I'm going to go to your complaint and certain
7      claims you're making here. Let's go to paragraph
8      319. You say, as a direct approximate result of
9      having engaged in the above protected activity
10     plaintiff was retaliated against by defendant
11     Olsman, including but not limited to the following.
12     Let me just do the following. A, denial of bonuses.
13     Which bonus were you denied?
14 A   One, can you show me the document that you're
15     referring to?
16 Q   Sure. It's page 63.
17         MS. RUSSELL: I have it here. I can show her.
18 BY MS. GORDON:
19 Q   What bonus were you denied?
20 A   I did not receive a bonus in 2023.
21 Q   What bonus were you entitled to in 2023?
22 A   If hockey work had been calculated the same way it
23     was calculated in 2022, I would've been entitled to
24     a bonus.
25 Q   What would you have been entitled to?

Page 384

1  A   I don't know that number off the top of my head.
2  Q   Well, let's look at your - let's look at your 2022
3      -- strike that.
4          Are you familiar with the column system that
5      you were working under during the time at Olsman
6      Firm?
7          MS. RUSSELL: Objection. Asked and answered.
8          THE WITNESS: Generally, I'm familiar with the
9      column system.
10 BY MS. GORDON:
11 Q   And you know you had a base salary, correct?
12 A   Correct.
13 Q   Are you aware that other people, other lawyers had
14     a lower base salary than you did at the office?
15 A   I don't know that I'm aware of that, no.
16 Q   And let's go to 2022, which is Bates 489. And you
17     worked there the entire year, is that correct?
18 A   I'm sorry. Which year are we talking about?
19 Q   2022.
20         MS. RUSSELL: Bates - who's file are we in?
21         MS. GORDON: OMP 489.
22         THE WITNESS: I worked at OMP the entire year
23     in 2022.
24 BY MS. GORDON:
25 Q   And you settled two cases, is that accurate?

Page 385

1  A   I don't know without looking at something in front
2      of me.
3  Q   And the total amount of money you brought in from
4      handling cases was - your total fees that you
5      brought in were $71,328.92, right?
6  A   From cases?
7  Q   Yes.
8  A   I would have to see a document to know that.
9  Q   So we'll take the time. So go to the top of 489. Go
10     across the top. Have you seen these documents
11     before?
12 A   I don't remember seeing them.
13 Q   Go to total compensation. It's toward the right-
14     hand side. It says total comp. And underneath it
15     says $22,825.
16 A   Yes.
17 Q   Do you see that?
18 A   Yes.
19 Q   Do you understand what that number comes from?
20 A   I do not.
21 Q   So we'll go back on the same column top to OMPW
22     fee.
23 A   Yes, I see that.
24 Q   This is the fees you brought in and they added up
25     to $71,328. Do you see that?

97 (Pages 382 - 385)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 386

1  A  Right. I see that.
2  Q  But the whole amount of your fee doesn't go into
3     your column because there are other ways to handle
4     that amount. You understand that, correct?
5  A  I understand the different accreditation like –
6  Q  Yes.
7  A  - percentages are given to different people.
8  Q  So you ended up with in the entire year for 2022 as
9     to the cases you had, you brought in this
10    $22,825.25. And as to your hockey work, if you go
11    to the bottom, you generated hourly fees in the
12    amount of $57,960. Do you see that? Go to the
13    bottom where it says total. The bottom of the page.
14  A  Yes. Is there a question from before about the
15    other number or - you asked me, you said something
16    about $22,000. What's the question?
17  Q  I showed you the $22,000. It's at the top of the
18    page. Are you with me? Do you see it? You want me
19    to circle it for you or do you see it?
20  A  I see the number. I'm just wondering what question
21    is.
22       MS. RUSSELL: Counsel, she's asking if you have
23    a question, if there's a question pending on it.
24  BY MS. GORDON:
25  Q  Yes. I got an answer to it. I've moved on. Now go

Page 387

1     down to the bottom to the hockey numbers and you
2     will see that in your column your hockey total was
3     $57,960 and you get $10,000 of that. Is that
4     correct?
5  A  Yes.
6  Q  So $10,000 goes into your column, correct? I'm
7     sorry. Liz is correcting me. $10,000 goes directly
8     into your pocket and then the rest of it goes into
9     your column. So that means that - so 40% of the
10    $47,960 would go into your column and that would be
11    $18,800. So we would add that to the $22,825. And
12    we would come up with a total that you generated of
13    $41,625. Do you see that? I mean, are you tracking
14    me?
15  A  Are you just asking me if that's what this document
16    says?
17  Q  I'm showing you the document and are you following
18    the columns?
19  A  I'm listening to your math.
20  Q  Otherwise, I'm going to circle everything for you
21    if you're having difficulty.
22  A  Are you asking me if that's what this says?
23  Q  I'm asking you to grasp that that's what I'm
24    telling you. This is what you brought in.
25  A  You are reciting numbers and I see the numbers.

Page 388

1  Q  Then I will tell you, if you see the numbers, you
2     brought in 2022 $18,800 into the firm, okay. And
3     then you brought in $22,825 for a total of $41,625.
4     That's what you brought in to your column.
5  A  I don't see the $18,000 number or the $41,000
6     number so I think I'll take you up on the circling.
7  Q  So let's just assume that I'm correct that you
8     brought in $41,625. Okay?
9  A  I don't agree with that.
10  Q  Well, you're going to have to tell me why you don't
11    agree with it. And I don't know why you don't agree
12    with it. You've got a lawsuit filed saying people
13    are denying you bonuses. I would've thought by now
14    you would've figured out what you think you were
15    entitled to. But let's go ahead.
16       MS. RUSSELL: Well, Counsel, your number's not
17    the same as the column. There's $41,000, that
18    doesn't match.
19       MS. GORDON: That's because there's two
20    different numbers we're adding up here everybody.
21    41K is what went into her column, not what she
22    brought in. So I'll restate.
23       MS. RUSSELL: I'm seeing 47 in her column.
24  BY MS. GORDON:
25  Q  There's two different things here. The bottom is

Page 389

1     hockey. You guys have had this document for a
2     while.
3       MS. RUSSELL: No.
4       MS. GORDON: Yes. We produced it a while ago.
5     It's a Bates stamp number that was produced.
6  BY MS. GORDON:
7  Q  So the bottom is hockey, the top is fees. So I'm
8     going to take a few extra minutes on the other end
9     because you guys are, you know, you've had this
10    document but.
11       MS. RUSSELL: You're done at 8:05 and you're
12    not being clear in your questions so.
13       MS. GORDON: I'm not be done at 8:05 but I'll
14    try to wrap this up.
15  BY MS. GORDON:
16  Q  If I'm correct, Elyse, that your total in your
17    column for 2022 is $41,625. Let's assume I'm
18    correct on that. Are you with me? Are you with me?
19  A  Am I - what does am I with you -
20       MS. RUSSELL: Can you circle on it for her as
21    you've offered so kindly?
22       THE WITNESS: - mean?
23  BY MS. GORDON:
24  Q  Hmm?
25  A  Am I with you? Are you – I don't -

Page 390

1 MS. RUSSELL: Let her circle it for you. She
2 offered –
3 BY MS. GORDON:
4 Q No. No. I'm asking you to make an assumption.
5 Because this is not going to –
6 MS. RUSSELL: She's not going to make an
7 assumption.
8 BY MS. GORDON:
9 Q I can see it's not going to work with you two. I'm
10 going to ask a hypothetical here. If it's correct
11 that what you brought into your column was $41,625,
12 that means you didn't even cover your salary for
13 2022.
14 MS. RUSSELL: Objection.
15 MS. GORDON: You cannot just object in the
16 middle of a sentence.
17 MS. RUSSELL: I thought that you finished.
18 MS. GORDON: Again, I need more time for the
19 step because of continual interruptions.
20 BY MS. GORDON:
21 Q Elyse, if my number is correct that your column is
22 $41,625, you didn't remotely come close to covering
23 your own salary in 2022. Do you see that?
24 A My understanding is not that I was on the column
25 system in 2022. So the entire premise of this

Page 391

1 questioning is hard to follow. And I don't agree
2 with the numbers that you're saying. And I would
3 love for you to circle something for me as you've
4 offered so that I can better answer your questions.
5 Q So but you did get a column. You weren't on the -
6 unfortunately you didn't, or fortunately for you,
7 actually. It was very fortunate for you. This
8 column system wasn't applied to you because you
9 ended up getting a bonus you never would've gotten
10 had you been on the column system. I'm showing you
11 if this column system applied to you, you took out
12 80K and you brought in about 41K.
13 MS. RUSSELL: Objection. Counsel's testifying
14 and complaining about not having enough time.
15 THE WITNESS: I disagree with the question for
16 numerous reasons. One being that I wasn't
17 designated to be on the column system because it's,
18 in Michigan there are notice periods of 182 days
19 before medical malpractice cases get filed.
20 BY MS. GORDON:
21 Q Yes.
22 A And it was contemplated - I'm not done answering,
23 Deb.
24 Q I understand your point. I'm on a limited clock
25 here.

Page 392

1 A I know you are but I'm also a witness that can
2 answer your question.
3 Q You're not answering the question right now.
4 A I'm not done so I'm going to keep going. So, one,
5 not being on the column system was designed that
6 way because of the nature of the plaintiff's firm.
7 That was my understanding. And the other thing that
8 you keep saying is that this is all I brought in on
9 these cases. And I worked on a number of other
10 cases that are not reflected here.
11 Q Well, this is, you know, the bookkeeper will be
12 testifying in this case. If it's not dismissed
13 after this deposition today.
14 MS. RUSSELL: We'll look forward to that
15 notice.
16 THE WITNESS: Is that another threat?
17 BY MS. GORDON:
18 Q No. I'm trying to explain to you that reality is
19 going to be set forth on the record since you don't
20 see -
21 MS. RUSSELL: Counsel, you have nine minutes.
22 Are you ready to ask some questions?
23 MS. GORDON: I'm not going to be done in nine
24 minutes.
25 MS. RUSSELL: That's fine. But we'll leave at

Page 393

1 nine - and we'll leave at 8:05. And you can go to
2 the court for more time or we can talk about it
3 earlier like we did. You've got nine minutes.
4 BY MS. GORDON:
5 Q What do you think you were entitled to in 2022 for
6 a bonus? Given the fact that you brought in, your
7 total comp from your cases was about $23,000 and
8 you took out 80, what do you think you should have
9 gotten as a bonus?
10 A I disagree with you that the total comp from my
11 cases was -
12 Q What do you think you should have gotten as a
13 bonus?
14 A I'm not done answering.
15 MS. RUSSELL: Allow her to answer.
16 MS. GORDON: This is impossible. It's
17 impossible.
18 BY MS. GORDON:
19 Q What do you think you should have gotten as a
20 bonus? Were you happy with the 30K?
21 A This is not –
22 Q Were you happy with the 30K?
23 A I was happy with the 30K.
24 Q Let's go to 2023. What did you expect to get in
25 2023 as a bonus?

99 (Pages 390 - 393)

Carroll Reporting & Video
A Veritext Company

586-468-2411
www.veritext.com

www.veritext.com

Page 394

1  MS. RUSSELL: What's the Bates?
2  MS. GORDON: 482.
3 BY MS. GORDON:
4 Q  What did you expect to get in 2023 for a bonus? You
5  brought in $76,000? What went into your column for
6  2023 when you were on the column system was
7  $76,445. Do you see that? That went into your
8  column. That was hockey and cases? Are you with me?
9 A  No. I do not agree that that was - I don't – no.
10 Q  You don't know one way or another?
11 A  What is your question?
12 Q  It sounds like you don't know how to read this
13  document, am I correct on that? I am asking you to
14  look at where it says total comp and tell me what
15  these numbers are? You did not bring in enough
16  money in 2023 to surpass your base salary, is that
17  correct? Between hockey and your cases?
18 A  You are representing that this document is
19  calculated to say that that's the number. I will
20  agree with you that this says $76,445.63.
21 Q  And that's not as much as you were paid in salary,
22  correct?
23 A  That's correct. And hockey is counted in a
24  completely different way than it was counted the
25  year prior.

Page 395

1 Q  What did you think you should get as a bonus in
2  2023 that you're complaining about in this lawsuit?
3 A  I don't have a number off the top of my head.
4 Q  Well, you're suing us over that and you're saying
5  that you're missing a bonus. So you don't know what
6  it is?
7 A  I agree that I'm missing a bonus and that hockey
8  was counted differently than it was previously
9  counted. And that the columns that I had been sent
10  by the bookkeeper who you've indicated will be
11  deposed previously represented that hockey would be
12  calculated differently towards my total
13  compensation.
14 Q  How was it calculated in 2022? How was hockey
15  calculated in 2022?
16 A  It was not on the column system.
17 Q  So how was it calculated?
18 A  I don't know what that -what do you mean how was it
19  calculated? I don't understand.
20 Q  How was your hockey money treated in 2022?
21 A  I don't know that I have a description of that for
22  you.
23 Q  Okay. I guess you don't know. That's okay. We'll,
24  you know. But the point is, you can't sit here
25  today and tell me what bonus you believe you should

Page 396

1  have gotten. I think we've already covered this. In
2  2023. You're unable to say, correct?
3  MS. RUSSELL: Objection. Asked and answered.
4  THE WITNESS: I don't have a specific number
5  for you.
6 BY MS. GORDON:
7 Q  And at the time you filed this lawsuit, you didn't
8  have a specific number either, accurate?
9 A  Inaccurate.
10 Q  What was your number of when you filed the lawsuit?
11 A  As I sit here today, I do not recall, Deb.
12 Q  Okay, fair enough. So you were denied a bonus. On
13  C, you were blacklisted in the legal community. Who
14  told you you were blacklisted?
15 A  What are you referring to?
16 Q  Your complaint.
17  MS. RUSSELL: What paragraph?
18  MS. GORDON: 63C. Paragraph 319. Yeah. Page 63
19  of your complaint, paragraph 319.
20 BY MS. GORDON:
21 Q  You say you were blacklisted. Blacklisting. Olsman
22  blacklisted you in the legal community. All right.
23  Correct? So let me start with this. You're still a
24  member of the Michigan Association of Justice,
25  aren't you?

Page 397

1 A  I've been kicked off the executive board.
2 Q  You've been kicked off or your term expired?
3 A  My term was not renewed, even though it's my
4  understanding that Michigan Association for
5  Justice Executive Board is just huge and everyone
6  just gets added to it. And so I was no longer
7  renewed.
8 Q  You don't even live here anymore, do you?
9 A  I practice law here.
10 Q  So did you ask somebody why you were not re-upped
11  on the board? Did you ask?
12 A  I was informed by people in MAJ that I needed to
13  make nice with Olsman Mackenzie.
14 Q  Who told you that?
15 A  Stuart Sklar.
16 Q  And when did he tell you that?
17 A  I don't have a specific date for you. I could try
18  to give you a -
19 Q  What else goes into black - but you're still a
20  member of MAJ, correct?
21 A  I pay dues.
22 Q  You attend their events, correct?
23 A  I don't still attend their events.
24 Q  That's because you're out of town. But when you're
25  in town, I've seen you sign up for stuff.

100 (Pages 394 - 397)

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

Page 398

1   A   I don't know what you've seen because I -
2       MS. RUSSELL: Objection. Counsel is testifying.
3   BY MS. GORDON:
4   Q   What goes into the blacklisting other than what you
5       said?
6   A   There are probably a lot of things that go into
7       blacklisting.
8   Q   It's not probably what might go into. It's what are
9       you claiming in this lawsuit that you have evidence
10      of?
11      MS. RUSSELL: Then ask that question.
12  BY MS. GORDON:
13  Q   Go ahead.
14  A   What's the question?
15  Q   Go to your own complaint where you say you've been
16      subjected to blacklisting in a legal community.
17      What are, what is your evidence of that that you're
18      relying on in this case?
19  A   People that will no longer talk to me anymore
20      because they don't want to get on the other side of
21      Bob Riley and Olsman, Mackenzie, Peacock.
22  Q   Who refuses to talk to you?
23  A   Attorneys in the legal field.
24  Q   Who are they? Who refuses to talk to you?
25  A   Do you want as a full list of -

Page 399

1   Q   I want you to go to your document 319C.
2   A   I saw it. I'm answering your question.
3   Q   I want you to tell me what specifically you are
4       referring to in that paragraph with regard to
5       having been blacklisted. You've just said people
6       won't speak to you.
7   A   No longer being included in the legal community.
8   Q   Maybe that's because - is it - I don't - what's -
9       MS. RUSSELL: Counsel, allow her to answer your
10      question.
11      MS. GORDON: I'm going to withdraw that. I'm
12      going to withdraw that.
13  BY MS. GORDON:
14  Q   What's your definition of blacklisting in this
15      document?
16  A   I am sure you can look up the definition of
17      blacklisting.
18  Q   No, it's your complaint. I need to know what you
19      meant.
20  A   I didn't write the complaint, Deb.
21  Q   People aren't speaking to you. Maybe they don't
22      speak to you because they read your complaint and
23      they think you're not the kind of person that want
24      to talk to anymore. There's other reasons people
25      may not be talking to you.

Page 400

1       MS. RUSSELL: Objection. Counsel is testifying.
2       Two-minute warning, by the way.
3   BY MS. GORDON:
4   Q   Hence, I asked you about the blacklist definition.
5       Who doesn't speak to you? I'll take the names.
6   A   What is the question?
7   Q   Who doesn't speak to you because you've been
8       blacklisted in the legal community?
9   A   The people in my MAJ Leadership Academy class.
10  Q   I'm going to have to have names if you're going to
11      try to continue with this claim in this case. Who
12      are they?
13  A   I can get you names.
14  Q   I'm asking you today, tonight, right now. It's your
15      deposition and you've known about this complaint.
16      Who is not speaking to you due to you being
17      blacklisted? Do you have any names right now?
18  A   Sure.
19  Q   What are they?
20  A   Melissa Hines.
21  Q   Melissa Hines. Who else?
22  A   Other people in MAJ Leadership.
23  Q   I need names.
24  A   Well, I can - we can get you names of people.
25  Q   No. You're not going to - this is your dep and I

Page 401

1       need to know.
2   A   And it's been seven hours of my dep, Deb.
3   Q   Well, that is not my fault.
4   A   I've answered your questions. I'm not, I'm
5       answering your questions.
6   Q   It doesn't matter. It doesn't matter. We're here
7       for you to answer questions. It's a simple
8       question.
9       MS. RUSSELL: What time are we at?
10  BY MS. GORDON:
11  Q   And the blacklisting -
12      MS. RUSSELL: Counsel, You're two minutes over.
13      Wrap it up.
14      MS. GORDON: Well, I told you I'm not going to
15      be able to wrap it up. It was very difficult with
16      you guys.
17      MS. RUSSELL: That's fine. All right. So we
18      will go ahead and we will conclude.
19      MS. GORDON: No, I'm going to keep asking. I'm
20      going to -
21      MS. RUSSELL: No. We're done. We're at over
22      seven hours.
23      MR. DAVIS: There's a question pending.
24      MS. RUSSELL: Okay. So what's the question?
25      We'll answer the question.

Carroll Reporting & Video
A Veritext Company

www.veritext.com                                              586-468-2411
                                                             www.veritext.com

Page 402

1    MS. GORDON: I've asked the question about five
2    times.
3    MS. RUSSELL: She's going to answer then we're
4    done.
5    MS. GORDON: I am not going to be able to
6    finish this in two minutes.
7    MS. RUSSELL: So then we'll pick it back up.
8    MS. GORDON: Well, I'll take it up with the
9    court.
10    MS. RUSSELL: Great. That's the conclusion of
11    the deposition. Thank you, everybody.
12    (Deposition concluded at 8:04 p.m.)
13        - - -
14
15
16
17
18
19
20
21
22
23
24
25

Page 403

1    CERTIFICATE OF NOTARY
2
3    STATE OF MICHIGAN   )
4            )
5    COUNTY OF OAKLAND   )
6
7    I certify that this transcript, consisting
8    of 403 pages, is a complete, true, and correct record of
9    the testimony of ELYSE MCKENNA, held in this case on
10    Monday, November 17th, 2025.
11    I also certify that prior to taking this
12    deposition, ELYSE MCKENNA, was duly sworn to tell the
13    truth.
14    I also certify that I am not a relative or
15    employee of or an attorney for a party or financially
16    interested in the action.
17
18
19    Amy Bertin, CER-3871
20    Notary Public
21    Oakland County, Michigan
22    My Commission Expires: 08-12-30
23
24
25

**[& - 2021]**                                                                    Page 1

| & | | | |
|---|---|---|---|
| **&**  1:11 66:7 | **110**  159:17 | 146:1,5 147:9 | **2.5**  68:20 |
| **0** | **112**  163:10 | 148:7 162:24 | **20**  26:6 128:9 |
| **08-12-30** | **1143**  2:5 | 163:1,5,8,22 | 134:9 |
| 403:22 | **117**  192:17 | 164:19 336:25 | **20,000**  40:23,24 |
| **1** | **12**  2:10 152:10 | **18,000**  388:5 | 168:16 |
| **1**  3:12 231:11 | **1227**  275:15,21 | **18,800**  387:11 | **200**  9:3 |
| 237:22,24 | **1228**  275:21 | 388:2 | **20002**  2:6 |
| 238:10 | **12347**  1:7 4:14 | **182**  391:18 | **20016**  25:14 |
| **1/13**  373:4 | **12th**  280:14,20 | **18th**  142:1,4 | **2014**  67:4 |
| **1/13/2024** | 281:19 | 148:16 149:2 | 68:13 |
| 373:5 | **13**  373:16 | 149:16,19 | **2015**  35:7 |
| **10**  45:8,12 | **13th**  372:22 | 283:16 | 68:14,15 |
| 93:10 153:3,6 | 373:15 | **1913**  296:3 | **2017**  47:6 |
| 188:23 261:23 | **14**  25:14 | 297:15,16 | **2018**  47:6 |
| 263:1 335:17 | **140,000**  372:5 | **1914**  299:11,12 | **2019**  47:7 67:4 |
| 367:21 | **140k**  372:10 | **1915**  304:2,9 | 76:20,21 78:19 |
| **10,000**  42:13 | **15**  336:13 | **1917**  310:4 | 78:20,24 85:16 |
| 185:14 213:5 | **1554**  114:20 | **1941**  312:18 | 86:22 87:18 |
| 251:10 387:3,6 | **1596**  114:5,11 | **1942**  312:16 | 88:19,23 89:3 |
| 387:7 | 115:24 120:3 | 313:10 | 89:5 91:24 |
| **100**  48:12 | **1597**  114:16 | **1943**  314:14,15 | 92:3,10 94:2 |
| **105**  5:22 | **15th**  227:23 | **1944**  317:3 | 108:12,17 |
| **10:08**  1:23 4:3 | 230:12 | **1954**  317:14 | 231:22 |
| 4:9 304:3 | **16**  184:24 | **196**  359:8,14 | **202-430-5085** |
| **10:43**  297:16 | 190:25 | **1978**  319:20,22 | 2:7 |
| **10:57**  280:20 | **16th**  19:25 | **1993**  19:25 | **2020**  58:11,15 |
| **11**  15:3,17 | **17**  4:2 49:13 | **1994**  316:23 | 58:16 |
| 16:12,15,17 | 313:10 | **1:00**  314:10 | **2021**  58:16 |
| 140:5 | **175**  171:5,11 | **1:51**  313:21 | 89:22,22 92:6 |
| **11/24**  340:13 | 185:1 218:3 | **2** | 94:21,25 |
| | **17th**  1:20 4:10 | **2**  3:13 94:10 | 102:11 104:24 |
| | 207:9 403:10 | 234:9,11 | 108:4,14 |
| | **18**  49:13 | 237:22,23 | 109:11 127:16 |
| | 115:18 144:3 | | 128:5,10,13 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                586-468-2411
www.veritext.com

**[2021 - 3]**

138:9,18
139:14 140:19
152:16,19
153:21,22,23
154:7,17 155:2
155:4,17,23
157:18,21
159:12,12
161:21 162:10
171:24 184:5
184:12,24
190:25 194:1
197:8 198:6
207:9 210:15
210:18 244:25
329:16 330:7
330:11 362:17
363:8
**2022**  23:8 28:3
28:6 154:14
174:8 175:13
175:17,19,23
176:2 185:17
330:19 383:23
384:2,16,19,23
386:8 388:2
389:17 390:13
390:23,25
393:5 395:14
395:15,20
**2023**  28:14,17
30:20,23,24
31:14 33:6,21
35:12,15,18,25

96:11,14,20,21
96:22 97:1
98:12,20 99:17
100:14 182:17
226:16,18
227:2 232:9
252:24 264:12
264:17 270:13
270:16 280:14
280:20 281:19
283:16 286:12
286:14 293:6
293:13 295:12
295:14,15,16
302:4,17 303:3
313:10 323:5
325:1,18,23
326:10 329:17
330:19 333:20
334:21 336:19
343:12 370:10
370:13,14,23
383:20,21
393:24,25
394:4,6,16
395:2 396:2
**2024**  33:21
36:23 37:3
39:3,5,14
161:23 198:6
215:13,14
227:23 230:12
230:13 232:10
329:17 330:19

372:22 373:15
**2025**  1:21 4:2
4:10 20:20
39:22 40:18
41:4,12 42:4
42:12 403:10
**2026**  34:6
**205**  98:18
**20th**  154:17
**21**  154:24
155:20 231:22
232:1
**21st**  86:22
127:16
**22**  58:16
154:16 219:12
263:24 278:16
**22,000**  386:16
386:17
**22,825**  385:15
387:11 388:3
**22,825.25.**
386:10
**220**  1:22 2:16
**225**  171:5
218:4
**227**  275:24
**23**  28:3 31:3
58:16 215:19
219:12 272:6,6
**23,000**  393:7
**232**  3:12
**234**  3:13

**23rd**  139:10
140:15
**24**  1:7 4:14
30:25 58:16
215:19 219:12
**248-258-2500**
2:18
**248-987-8929**
2:12
**24th**  140:23
271:10 337:1
**26**  79:25
**260**  81:4,24
**26738**  403:18
**26a**  80:17,20
**27**  138:9
171:24 227:16
227:16
**278**  207:1,2
**279**  207:1,18
213:10
**28**  34:5 108:5,6
227:19 377:17
**280**  3:14
**284**  3:15
**288**  3:16
**2:06**  314:21
**2nd**  35:11

**3**

**3**  2:5 3:14
280:11,13
284:22

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[30 - 8:05]**

**30**  115:19 368:25 374:20 374:22 375:2 376:17,20 377:15,20
**30665**  5:21
**30b6**  38:3
**30k**  393:20,22 393:23
**30th**  35:7 44:1 293:6,13
**319**  383:8 396:18,19
**319c**  399:1
**33**  1:21 2:16 4:15
**33228**  2:10
**34**  67:3
**343**  185:17
**375**  2:10
**3871**  2:23 403:19
**3:49**  309:14
**3rd**  25:14 92:6 141:8,18
**3s**  291:22,23

**4**

**4**  3:7,15 98:17 284:6
**4/28/2023**  295:17
**4/29**  309:13

**4/29/2023**  299:13 309:14
**40**  337:4,9 387:9
**401ks**  37:18
**403**  403:8
**41,000**  388:5,17
**41,625**  387:13 388:3,8 389:17 390:11,22
**41k**  388:21 391:12
**443**  373:3
**47**  388:23
**47,960**  387:10
**48009**  43:8
**482**  394:2
**48304**  1:22 2:17
**48334**  2:11 5:23
**489**  384:16,21 385:9
**4:16**  297:19
**4th**  232:15 323:5

**5**

**5**  3:16 287:24
**5,000**  114:14 124:10,24
**5/17**  312:16
**5/17/2023**  314:21

**5/18**  317:10
**50**  40:25 75:7 337:4,9 374:10
**50,000**  37:5 40:3,17,21
**57,960**  386:12 387:3
**586-468-2411**  2:25
**5:25**  266:11
**5k**  114:25 120:22 121:5 125:4,20 127:1
**5th**  264:17 337:1

**6**

**6/19/2023**  319:20
**60**  286:22
**625**  43:5
**63**  383:16 396:18
**63c**  396:18
**6509097**  270:13
**65096**  270:16

**7**

**7**  103:15 138:18,20
**7/17**  115:2
**7/17/2021**  111:7
**7/22/2021**  114:6,11 115:5

**7/29/2021**  90:10
**71,328**  385:25
**71,328.92**  385:5
**75**  113:7,10 125:2
**75,000**  110:18 112:11
**75k**  115:18,19 116:8 118:20 120:5
**76,000**  394:5
**76,445**  394:7
**76,445.63.**  394:20
**793**  111:22
**795**  90:19 92:2 92:24
**7:30**  374:1,17 375:2
**7th**  102:12 141:24

**8**

**8/3**  141:21
**80**  113:17 393:8
**80k**  113:25 183:19 391:12
**810-278-4130**  12:14
**8:04**  402:12
**8:05**  389:11,13 393:1

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[8th - actually]                                                                                           Page 4

**8th**  94:2 138:21

**9**

**90**  110:11
  286:22
**92**  121:20
  124:16,21
**920,000**  317:6
**9th**  138:21
  230:13

**a**

**a.m.**  1:23 4:3
  274:19,23
  280:20 304:3
**aaj**  23:14,21,24
  28:6 30:3
  252:24 253:4
  253:18 270:5
  271:6,23
  308:20 348:18
  348:23
**abacus**  38:21
**ability**  27:2
  146:15,17
  249:11 273:3
  380:11
**able**  14:11 45:6
  61:24 85:6
  100:6 106:8
  107:13 109:13
  144:14 161:10
  165:25 235:8
  235:21,24
  245:25 286:17

292:13 297:6
320:11 326:23
327:8 353:16
355:10 367:6
401:15 402:5
**above**  231:21
232:2 383:9
**absolutely**
  56:24 111:12
  146:22 176:4
  268:19 311:14
  329:10
**abuse**  59:1,17
  59:24 60:3,11
  60:20,25 61:18
  62:2,16
**abusive**  56:17
  56:19 63:14
  266:16
**academy**
  308:20 400:9
**accept**  345:23
**acceptable**
  208:18
**accepted**  93:8
  138:13 139:10
  141:25 147:21
  149:3 163:1
  167:14,21
  245:12
**access**  142:14
  147:17,23
  178:22 221:21
  235:1 236:15

294:10
**accessed**
  142:15 146:5
  147:9 148:7,15
  164:5,5
**accessing**
  147:12
**accommodated**
  101:3
**account**  212:16
**accounting**
  38:16,19
**accreditation**
  386:5
**accurate**  12:6
  12:10 15:22
  21:23 24:3
  50:21 59:8
  65:25 68:11
  71:14 73:6
  74:20 79:22
  85:13 88:14
  89:7 104:21
  140:3,5 143:12
  166:17 170:19
  192:15,18
  198:14 213:22
  218:9,22 227:2
  239:20 253:5
  253:15 279:5
  292:12 294:22
  309:17 352:1
  354:9 384:25
  396:8

**accurately**
  60:22 64:8
  85:6 99:3
**acknowledge**
  234:12
**acknowledged**
  116:25
**acknowledge...**
  19:13
**act**  264:21
  265:1,11
**acted**  78:1,7
  294:19
**acting**  11:24
  245:23
**action**  251:3,3
  370:17 403:16
**actions**  17:9
  377:24 378:25
  380:11
**activities**
  208:20
**activity**  92:11
  238:13 383:9
**acts**  379:21
  380:16 381:12
**actual**  233:22
**actually**  48:13
  66:9 92:10
  93:18 108:11
  113:15 122:4
  130:21 159:22
  189:22 202:3,5
  217:17 252:7

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[actually - ahead]**                                                     Page 5

345:23 361:25
369:23 391:7
**add**   11:1
229:16,17
281:25 387:11
**added**   147:16
361:3 385:24
397:6
**adding**   143:17
310:13 318:25
320:8 388:20
**addition**   39:12
70:2 77:24
160:13 191:24
272:25 374:14
375:4
**additional**
39:13 121:5
122:6,15
305:18 333:7
346:23 361:7
376:3,10,21
377:12
**address**   5:15,18
20:1,11,11,17
20:18 21:1,12
21:15,18,19,20
25:10,13 42:17
42:22,24 43:1
43:2,3 44:5,6
209:2 293:23
**addressed**
266:24

**addressing**
49:25 107:17
**adjourn**   286:22
**adjuster**   73:8
76:18 81:16
**administrative**
227:18
**admission**   27:3
**admitted**   14:16
27:8
**admitting**
324:13
**advance**   183:2
206:23
**adverse**   251:3,3
**advice**   154:15
159:5 217:18
295:20 345:4,5
**advise**   191:4
293:8
**advised**   51:23
150:20 161:11
161:16 191:2
201:23,25
260:24 261:2
285:19
**afford**   112:17
112:22
**afternoon**
317:6
**age**   108:1
**ageism**   316:15
**aggressive**
304:5

**ago**   135:17
137:24,24
199:25 256:16
313:20 347:14
389:4
**agree**   50:9,16
73:2 139:18
199:2,4 236:1
237:14 248:2
252:5 263:12
263:15 282:22
287:12 322:16
332:14 337:13
353:24 369:13
374:21 388:9
388:11,11
391:1 394:9,20
395:7
**agreeable**
292:7
**agreed**   33:21
100:1 106:25
106:25 107:2
107:21 185:1,2
212:24,25
214:15 286:21
286:24 292:12
377:12
**agreeing**
258:14 263:6
283:14 354:21
**agreement**
41:16 50:15
72:18,25

103:18 170:12
170:15,16,18
195:4,10,12,13
195:23 198:11
234:23 245:2
332:15,22
377:13
**ah**   140:1
**ahead**   17:5
38:5 42:11
45:16 49:14
55:10 57:2,10
60:3,7 72:14
103:1,6 105:8
107:14,14,15
118:4,14 136:6
136:11 145:13
151:1 158:11
172:25,25
200:12 204:3
213:16 249:4
254:25 258:4
258:12,13
259:11 263:9
264:2,3 293:18
294:6 302:9
307:12 308:14
315:17,20
330:25 333:14
334:11 342:25
348:4 350:8
351:25 358:1
380:3 388:15
398:13 401:18

**[ahold - answer]**                                                    Page 6

| | | | |
|---|---|---|---|
| **ahold**  360:5 | 343:1 380:12 | 228:22 229:1,6 | 153:7 227:15 |
| **airbnb**  35:21 | 393:15 399:9 | 229:9,11,20 | 227:16 230:7,7 |
| **al**  4:12 | **allowed**  161:2 | 234:16,22 | **amendment** |
| **alaska**  90:12 | 349:9 351:3 | 235:3,7,10,15 | 130:2 165:24 |
| **alleg**  165:22 | 379:14 | 235:18,23 | 166:14 |
| 166:2 | **allowing** | 236:3,7,12,16 | **amount**  36:7 |
| **allegation** | 146:11 | 236:18,20 | 41:14 112:19 |
| 117:6 | **alternative** | 243:2 257:4,7 | 183:19 193:16 |
| **allegations** | 18:10 | 257:11,15,22 | 193:20 195:20 |
| 97:12 129:15 | **altman**  2:8,9 | 258:1,5,9,13,16 | 198:7 332:15 |
| 129:18 130:5 | 5:3,3 10:7,10 | 259:2,5,9,11,15 | 349:14 372:6 |
| 130:10 165:13 | 10:14,21 18:11 | 259:18,22,25 | 385:3 386:2,4 |
| 165:15,17 | 20:10,13 50:8 | 260:3,7,17 | 386:12 |
| 166:5 196:15 | 50:11,13 53:16 | 261:18 262:16 | **amy**  2:23 18:17 |
| 234:21 237:10 | 53:20 54:1,3,5 | 262:22,24 | 403:19 |
| 252:10 | 54:10,13,14,19 | 264:6 265:3,5 | **ann**  44:14 |
| **alleged**  163:15 | 54:24 55:1,6 | 265:17 266:10 | **answer**  7:14 |
| 194:17 199:21 | 55:11,15,18,24 | 266:12,20 | 10:23,25 13:25 |
| 334:23 379:3 | 56:2,4,8,11,17 | 267:1,10,13,16 | 14:5 16:23 |
| **alleges**  85:12 | 56:20,24 57:4 | 267:20,23,25 | 17:14 18:13 |
| **alleging**  202:20 | 80:17,23 90:24 | 268:1,3,6,13,19 | 39:25 40:11 |
| 203:1 233:3,6 | 91:5,10 103:10 | 268:24 269:17 | 41:3 47:13,21 |
| 233:10 279:3 | 103:18,22 | 269:20,23 | 48:14 49:16 |
| **allison**  75:19 | 104:3 109:23 | 270:2 277:17 | 52:12 53:17,19 |
| 76:11 | 110:2,6 117:9 | 374:6 | 53:23 54:6,17 |
| **allocation** | 117:24 143:18 | **altman's**  265:8 | 55:3,9,12,17 |
| 207:4,7 | 143:21 144:1,4 | **amanda**  26:24 | 60:22 61:24 |
| **allow**  10:15,23 | 144:10,13,16 | 28:2,9,22,22 | 64:9,22 66:5 |
| 55:3 134:4 | 144:22,25 | 29:24 30:1 | 75:2 79:24 |
| 229:12 257:23 | 145:3,5,10,16 | 33:7 38:17 | 85:6 89:5 |
| 259:2,5,6,12 | 145:20,23 | 43:25 167:12 | 92:22 99:3 |
| 260:19,25 | 146:2,7,15,22 | 373:9,14 | 102:24 103:11 |
| 261:1,3 267:4 | 147:1 172:22 | **amended** | 103:12,16,19 |
| 280:22 331:16 | 205:5 206:15 | 121:21 123:20 | 104:4,6 107:13 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                    586-468-2411
www.veritext.com

**[answer - appearance]**                                                    Page 7

107:18 110:8
111:5 119:9,17
119:23 120:20
123:1 126:7,8
130:23 134:4
136:3 137:1,5
142:23 144:15
146:12 149:7
151:2 157:19
158:4 162:22
165:25 169:1,5
169:8,10,12,13
170:14 175:4
175:11 178:6
178:25 180:1
181:7 186:19
186:19 189:25
193:18 198:9
198:20 200:12
203:6 212:8,10
212:12,19
215:25 217:1
228:23 229:2,7
229:12,13,20
233:20,23
242:21,24,24
243:2,6 257:8
257:12 259:7
259:13 260:22
260:25 261:15
267:4,7 269:3
269:5 270:4,22
272:20 273:25
278:7 286:17

289:13,23
290:10,22
292:13,14,16
297:6 300:15
302:6,24 303:7
305:11 307:20
312:9 320:11
326:8 328:1,2
328:3 341:21
342:18,23
343:1,2 345:18
346:8,9,19,23
347:1,9,11,12
349:9 351:1
354:9,11,15
357:8 360:18
366:7 378:19
380:23 381:5,6
383:4 386:25
391:4 392:2
393:15 399:9
401:7,25 402:3
**answered**   42:8
52:7 104:16
106:10 131:1
135:15 149:6
241:13 244:11
245:7 248:22
249:2 250:8,22
254:12 277:2
322:23 333:11
341:22 346:20
346:22 362:12
363:17 364:17

381:14 384:7
396:3 401:4
**answering**
10:16 56:4,14
106:14 142:24
143:16 146:9
148:21 166:9
179:4,5 204:20
223:14 259:3
260:19 331:17
332:7 334:8
342:19 371:15
371:16 382:14
391:22 392:3
393:14 399:2
401:5
**answers**   18:15
256:22
**anticipate**
230:1 266:15
**anticipates**
266:4
**antidote**   297:20
298:16,23
**anxiety**   45:20
46:13
**anxious**   110:22
**anybody**   21:10
22:14 36:8,12
60:10,11
132:13 133:1
133:22 135:14
171:24 173:14
174:1 182:10

192:21 196:2
206:18 211:11
246:23 251:17
251:25 324:6
335:22 367:12
**anymore**
236:14 397:8
398:19 399:24
**anytime**   111:12
138:24 222:2
356:6
**anyway**   118:7
354:22
**apart**   51:9,12
**apartment**
20:23,25 21:4
**apologize**   60:17
92:6 115:21
271:16 279:25
**apparent**
182:13
**apparently**
93:20 100:22
139:21,25
141:18 199:1
284:25 286:11
340:19 375:8
**appeals**   249:8
249:12
**appear**   165:5
264:23
**appearance**
5:11 6:21,23
83:17 116:25

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**appearances**
2:1
**appeared**
181:23
**appears**  120:8
139:10 207:21
264:19 304:22
317:5 373:8
**applicable**
382:8
**application**
373:3
**applied**  371:25
372:21 373:11
373:16 391:8
391:11
**apply**  15:18
27:3 76:15
105:23 371:9
371:12,19
**applying**  76:14
308:19
**appoint**  249:11
249:16
**appointment**
44:25
**appointments**
45:2,4
**appreciate**  66:5
106:6,9 113:7
262:12 277:13
284:23 303:24
304:4 316:15
377:5

**appreciated**
106:1,8 200:25
**approach**
85:19
**approached**
76:16,23 77:6
77:7 81:16
84:9 85:12,15
**appropriate**
54:16 55:2,20
217:24 292:9
**appropriately**
111:5
**approved**
72:21 139:23
208:25
**approximate**
337:3 383:8
**approximately**
76:20
**apps**  328:6
**apropos**  374:7
**arbitrator**
281:11 292:5
**arbitrators**
281:16
**area**  25:8 29:1
68:6 205:1
206:23 341:11
**areas**  69:22
**argue**  383:4
**arguing**  163:19
**argumentative**
102:3 311:10

316:6,8 327:24
**arm**  311:16,16
**arose**  89:2
**arrangement**
75:25 212:4,13
213:8
**arrangements**
188:7 317:11
**arranging**
170:22
**arrived**  75:5,12
162:5
**articulate**
382:3
**articulated**
381:25
**aside**  73:18
234:22 289:18
353:9 363:4
**asked**  8:8,18
9:20 11:4,7,8,9
11:18,22,23,25
12:6 30:25
33:25 42:8
59:7,13,17,20
64:21 75:14
79:17,19 83:1
90:10 104:22
106:10 117:11
119:19,20
120:9,15,16
126:12,14
135:3 136:20
142:21 143:3

153:19,19
156:22 161:13
166:7 174:5
175:22 179:17
181:10 189:11
190:12 201:16
201:16 203:4
204:19 205:23
210:3 216:22
223:14 225:7
242:21 244:6
244:24,25
247:14 248:22
249:2 250:8,22
254:12 256:16
259:4 260:18
260:25 272:18
272:22 273:9
274:6 287:9,9
295:18 296:25
299:2 301:24
305:18 307:4
314:22 317:10
319:4 322:1,23
324:19 333:11
337:18 339:23
339:24 340:1,2
342:14 344:12
349:8 355:8
362:1 363:17
363:18,22
364:6,17,21
368:3 374:11
375:6 376:4

**[asked - attorney]**

| | | | |
|---|---|---|---|
| 381:6 384:7 | 360:18 361:8 | 189:17 211:18 | **assumed**  135:6 |
| 386:15 396:3 | 362:1,5 375:3 | **assisted**  77:25 | **assuming**  119:7 |
| 400:4 402:1 | 379:11 380:8 | 78:2 107:6 | 321:11 328:2 |
| **asking**  11:21 | 383:2 386:22 | 167:12 214:23 | **assumption** |
| 14:9 15:21 | 387:15,22,23 | **assisting**  27:9 | 300:10,13 |
| 33:22 40:10 | 390:4 394:13 | 106:17 107:1,2 | 390:4,7 |
| 52:2,3 59:14 | 400:14 401:19 | **associate**  78:1,8 | **atlanta**  371:11 |
| 60:23 65:9 | **aspects**  208:14 | 83:24 89:1 | **attached** |
| 92:15,21 109:2 | **assault**  63:13 | 157:13 304:15 | 227:24 |
| 118:2 120:2,4 | 64:14,24 65:8 | **associated** | **attempt**  165:12 |
| 122:1 131:7 | 65:14 | 101:15 | **attend**  46:21 |
| 139:18 157:2,6 | **assaulted**  63:20 | **associates**  66:8 | 53:2 67:13,17 |
| 178:4,17 | 65:18 | 81:23 | 70:9 88:2 |
| 181:25 190:15 | **assaults**  65:15 | **association** | 279:4 282:6 |
| 199:16 210:23 | **asserting** | 88:8 188:3,4 | 283:21 287:14 |
| 216:7,10,13 | 196:15 | 191:3 208:8 | 288:2 353:19 |
| 224:3 228:9 | **assign**  234:20 | 209:12,25 | 355:11,22 |
| 244:5 254:9 | **assigned**  81:19 | 213:1,13 | 397:22,23 |
| 256:19,24 | 84:17 186:7 | 225:17 330:8 | **attended**  66:22 |
| 267:3,20 269:6 | 192:14 196:21 | 351:22 352:10 | 66:25 67:5 |
| 270:8 274:2 | 251:6 281:4 | 352:22 354:22 | 69:17 70:8,12 |
| 279:8,9 283:8 | **assignment** | 354:24 396:24 | 190:20 252:24 |
| 283:9 284:1 | 237:10 | 397:4 | 253:19,20 |
| 287:25 296:24 | **assignments** | **assume**  11:23 | 272:24 279:22 |
| 297:7 298:2,6 | 208:21 | 32:17 38:7 | 287:25 288:15 |
| 300:12,18 | **assist**  14:17 | 58:3 65:25 | 293:19 316:11 |
| 310:8,25 311:4 | 26:24 106:12 | 99:4 166:13 | 351:25 |
| 312:17,24 | 167:6 188:18 | 176:5 202:15 | **attending**  67:1 |
| 313:11 319:7,7 | **assistance**  46:9 | 209:6 230:17 | 67:20 253:12 |
| 320:9 326:7,9 | 106:1,6,9 | 241:20 299:25 | 283:18 378:8 |
| 333:15 339:3,5 | 167:5 | 303:13 309:16 | **attorney**  6:15 |
| 342:11,12,21 | **assistant**  36:17 | 309:19,20 | 6:25 14:15 |
| 349:6 350:4 | 76:7,8,10 | 340:5 388:7 | 24:5 29:1 |
| 356:21 360:11 | 83:20 188:18 | 389:17 | 53:13,15,22 |

**[attorney - back]**                                              Page 10

| | | | |
|---|---|---|---|
| 68:16,20 71:15 | 154:9,10 | **authority**  89:19 | 278:11 |
| 71:17 72:1,15 | 159:21 166:24 | **authorizations** | **back**  18:16,18 |
| 72:16,23,24 | 228:19 229:23 | 281:10 | 20:25 21:3 |
| 75:24 120:12 | 230:3 247:15 | **avail**  232:1,8 | 48:4,15,25 |
| 137:15 150:1 | 313:4 331:1 | **awarded**  16:4 | 49:11 50:20 |
| 150:15,17 | 334:6 355:24 | **aware**  6:15 | 53:23 57:7 |
| 151:8,23 | 355:25 356:15 | 15:7,11,14,23 | 61:4 68:24 |
| 152:22,25 | 356:20,24 | 15:24,25 16:3 | 69:1 78:21 |
| 153:12,24 | 357:14,18,20 | 16:11,16,21 | 84:11 90:13 |
| 154:15,21 | 358:21 360:3,4 | 17:8,13,15 | 93:17 94:20 |
| 157:24 158:13 | 362:2,11,13 | 47:19 48:16 | 102:9,10 |
| 158:25 159:1 | 363:21 364:14 | 66:20 69:9 | 103:25 104:1 |
| 184:9 216:2,3 | 368:16 374:5 | 70:3,7,24 | 105:10 114:15 |
| 216:8 217:24 | 398:23 | 82:20 121:14 | 114:23 116:9 |
| 219:22 231:22 | **atty**  3:10 | 122:16,22,24 | 116:10 123:7 |
| 252:12 264:21 | **august**  20:22 | 126:16 153:1 | 123:13,20 |
| 265:1,10 281:5 | 21:7,9 35:24 | 166:20 195:6 | 128:9 146:21 |
| 309:6 322:20 | 76:20 85:16 | 195:15 201:10 | 162:23 163:21 |
| 322:22 342:8 | 141:8,18 142:1 | 218:17,22 | 166:13,13 |
| 344:23 345:24 | 142:4 147:9,18 | 219:4 226:11 | 201:19 204:24 |
| 346:14 351:14 | 148:7 152:16 | 228:2 237:17 | 210:16 211:24 |
| 356:9 361:2 | 152:19 153:21 | 237:18 289:25 | 212:15 213:10 |
| 362:5 363:14 | 153:22,23 | 301:19 329:24 | 238:4 243:1 |
| 379:8,10 | 154:7,14,16,17 | 355:25 356:2,4 | 245:3 247:24 |
| 403:15 | 154:24 155:2 | 356:14,18,19 | 248:5 258:23 |
| **attorney's** | 155:17,19,23 | 356:22,25 | 262:7 263:25 |
| 359:9,21 | 157:14,15,17 | 357:1 384:13 | 271:6,8 273:24 |
| **attorneys**  7:20 | 157:21 162:24 | 384:15 | 278:12 282:15 |
| 8:14 9:23 | 163:1,5,8,22 | **awkward**  290:7 | 290:16 298:17 |
| 11:15,16 16:15 | 164:19 207:9 | **b** | 298:23 299:25 |
| 16:15 72:3 | 244:25 329:16 | | 302:11,12 |
| 75:8,11,18 | 329:16 330:7 | **b**  21:4 38:21 | 314:4 320:13 |
| 129:10 151:16 | 362:17 363:7 | **baby**  19:12 | 327:4 336:16 |
| 153:17,23 | | 22:22 277:7 | 339:20,25 |

**[back - believe]**                                            Page 11

340:8,17
344:16 345:10
376:3 380:12
385:21 402:7
**background**
74:2 290:6
**bad**   340:19
**badly**   94:5
**balance**   304:14
**baldridge**
75:22 76:11
**ballpark**   189:2
**balls**   206:3
**bandwidth**
366:5,13
**bankrupt**
251:6,11
**banquet**   337:24
**banter**   309:17
309:19 310:5
311:21,22
314:14
**bantering**
312:5
**bar**   27:8 43:2
44:2 68:17
156:7 341:9
**bare**   37:22
**bargaining**
41:16
**baron**   69:19
70:13,14 74:14
78:21 81:1,5,6
81:11,18,25

**barred**   150:15
150:17
**barry**   157:10
**base**   384:11,14
394:16
**based**   23:18
40:4 47:13
49:16 71:7
79:25 90:3
201:9 202:12
238:15 240:1,1
240:3 243:13
243:21,23
248:20,25
250:4 281:12
376:4
**basement**
20:24
**basically**
115:14
**basis**   16:23
62:23 196:14
198:1 200:14
231:3,24
234:18 236:24
239:4 244:7
246:5 264:20
316:20
**bates**   90:19
92:1,24 94:8
98:15,17
102:15 105:6
105:12 111:14
111:21 114:16

114:19 121:7,9
140:4 185:4
207:1 213:10
231:9 255:3
275:17 287:15
296:2 297:15
299:11 304:7
312:16 321:21
321:23 384:16
384:20 389:5
394:1
**bathroom**
191:25 192:2
204:15 205:6
206:15,16,19
**bear**   312:22
314:11,22
315:2,2
**bear's**   312:20
**beaumont**
77:24
**beautiful**   309:5
**becoming**
57:18 73:19
331:21
**began**   86:22
96:10 220:11
231:20 273:1
**beginning**   34:9
**behalf**   4:21,24
5:1,3,5,7
106:18 124:13
126:25 188:6
192:14 196:21

355:21 358:20
**behavior**   201:8
204:7 205:16
231:25 244:21
330:9,17 331:2
331:9
**behaviors**
96:11
**behm**   264:18
264:18
**believe**   6:23
9:21 14:16
17:6 19:10
23:12 26:17
30:23 35:10
39:19 45:3,22
51:15 52:18
53:10 66:21
70:16 71:3,15
74:13 75:7,24
76:7 84:25
85:20 86:4,15
87:19 88:14
90:1 93:7 99:7
101:13 128:6
129:10 131:18
134:10 135:25
141:7 149:18
152:22 166:25
171:14 182:16
182:23 183:3
187:7 192:18
203:18 211:18
215:15 217:22

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[believe - bob]**                                    Page 12

218:8 220:15
221:7,17 223:1
227:20 228:1
228:17 230:8
233:14 234:14
237:7,20 239:1
239:21 242:3
244:12 249:19
250:23 252:12
261:10 272:1
273:3 280:1,2
280:3 282:25
288:6 291:21
303:5 306:11
308:19 317:8
319:6,15
320:12 323:24
327:16 329:7
330:5,20
331:14 339:2
340:6 344:22
346:13 347:3
365:21 370:9
371:14 372:15
372:17 380:19
381:14,17
382:8 395:25
**believed**  159:13
160:9 162:7
163:3
**belly**  277:7
**bertha**  291:20
291:23

**bertin**  2:23
403:19
**besser**  149:21
152:21 154:23
159:1,8
**best**  104:21
140:20 169:1,8
169:11 208:6
233:21 236:25
309:8
**better**  61:24
92:22 94:13
99:2 115:16
171:16 235:9
286:17 351:1
391:4
**beyond**  96:12
**big**  118:1
144:23 156:15
240:25 365:12
375:1
**bigger**  31:20
**bill**  5:10 73:22
75:19 77:21
78:8 87:1,7
89:23 90:14
91:16 92:25
183:16 220:13
**bill's**  76:8
**billed**  42:13
47:24 184:10
**billing**  81:4,24
184:9 207:3,7
207:13,16

**billings**  216:20
**binder**  329:15
**binders**  326:12
329:14
**binding**  196:7
**birmingham**
43:6
**birth**  19:24
**bit**  76:13 89:19
93:2 110:8
118:18 138:13
158:9 188:20
191:8 254:3,10
314:2
**black**  397:19
**blacklist**  400:4
**blacklisted**
396:13,14,21
396:22 399:5
400:8,17
**blacklisting**
396:21 398:4,7
398:16 399:14
399:17 401:11
**blank**  49:7
216:23
**blau's**  85:22
**blau's**  86:11
**blind**  110:6
235:7
**block**  365:12
**bloomfield**
1:21,22 2:16
2:17 4:1,15,16

**blue**  347:24
**board**  129:24
132:7 139:22
140:16 397:1,5
397:11
**bob**  66:18 67:1
67:20 69:10,14
70:10,12 73:13
73:18,23,24
74:19,23 75:19
76:17 77:9
81:20 85:18
87:22 88:25
89:1 90:11
92:9,18,24
93:3,5 94:15
95:24 96:10,21
105:1,18,20,23
105:25 106:8
106:12,13,16
106:16 107:1,3
107:3,4,5,16,19
109:16,19
110:25 111:7
111:16,19,24
112:4,5,20
113:8,11,19,24
114:3,13,13,23
114:24 115:2,9
116:5,8,14
118:19 119:4
119:15,21
120:4,9,22,22
121:2,13

Carroll Reporting & Video
www.veritext.com          A Veritext Company          586-468-2411
www.veritext.com

**[bob - bob]**                                                          Page 13

| | | | |
|---|---|---|---|
| 123:24 124:9 | 195:23 196:1 | 283:14,14,23 | 317:10,14 |
| 125:1,11,20 | 197:5,10,14,22 | 283:23 285:2,4 | 319:22 320:18 |
| 126:5,6,8,11 | 197:25 199:1 | 285:12,20,22 | 322:8,10,14,19 |
| 128:3,3 129:13 | 200:1,18 | 285:24 286:25 | 323:17,19,21 |
| 129:16 130:2 | 201:25 202:5 | 287:11,12,13 | 324:3,5,6,16,20 |
| 130:13 131:23 | 203:2,4,18 | 287:14 288:9 | 325:5,9,18 |
| 131:25 132:8 | 205:18 206:4 | 288:18 289:2,4 | 326:1,2,10 |
| 133:3,8,22 | 207:5,6,14 | 289:7,10,18 | 327:15,18 |
| 134:22 135:12 | 208:8,19,25 | 290:6 291:3,5 | 328:10,23 |
| 140:1 141:12 | 209:1,12,16 | 291:8,15 292:7 | 329:6,8,13,15 |
| 142:2 143:2,13 | 210:24 213:13 | 292:10 294:16 | 329:15,18,21 |
| 147:9,12 149:8 | 213:17,22 | 295:1,5,8,13,17 | 329:21,22 |
| 150:19 151:3 | 216:7 217:16 | 295:20 296:10 | 330:2,3,4,4,7,7 |
| 153:3 156:5,6 | 217:17,17,18 | 296:16,17 | 330:15,16,16 |
| 156:8 157:8 | 218:12 219:5 | 297:16,17,19 | 330:18,20,22 |
| 160:6,8,9,12,18 | 220:6,10 221:1 | 297:23,25 | 331:2,9,12 |
| 161:4,11,16,17 | 221:24 222:3,4 | 298:9,10,13 | 332:11 333:3,8 |
| 161:20,22 | 222:7,11,16,23 | 299:7,8,13,21 | 333:22,23 |
| 162:4,7,9,17 | 222:25 223:8,9 | 299:25 300:10 | 334:22 335:11 |
| 163:3 164:10 | 226:15,18 | 300:13,23 | 337:5,10,19 |
| 164:16 168:22 | 227:5 240:2,8 | 303:23 304:2,4 | 338:3,3,25 |
| 168:23 171:4 | 240:13,19 | 304:11,24 | 339:10 340:3 |
| 171:19,21 | 241:7,9,10,18 | 305:9,14,15,21 | 344:10 351:10 |
| 172:1,14,16 | 242:1 243:19 | 306:8,13,18 | 353:4,4 356:9 |
| 173:3,5,7,9,12 | 244:9,15,22 | 308:24 309:1,4 | 356:16 357:15 |
| 173:16,19,23 | 245:1,10,21,25 | 309:10,12 | 358:2,11,13 |
| 173:23 175:10 | 246:13 247:7 | 310:3,5,11,15 | 360:24 361:6 |
| 175:18,21 | 247:14 250:13 | 310:16 311:21 | 361:13,18 |
| 178:13 183:1,5 | 255:18,25 | 312:1,17,19,22 | 362:10,14 |
| 190:25 191:4 | 256:2,6,17,24 | 312:24 313:2 | 364:15,16,20 |
| 192:24 193:1 | 280:7 281:11 | 313:11 314:2,4 | 365:13,18 |
| 193:13,22,24 | 281:12,20 | 314:10,14,15 | 377:25 378:5,6 |
| 194:10,17 | 282:1,5,7,18,22 | 315:1,4,15,21 | 378:11,17,17 |
| 195:5,14,16,18 | 282:24 283:2,7 | 315:23 316:24 | 378:19,20 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

[bob - butcher] Page 14

379:3,22
380:16,18,19
380:21,24
382:6,18
398:21
**bob's** 76:7
91:12 106:9
108:15 143:11
162:24 194:5
204:7 208:12
210:18,20
215:20 216:14
287:2
**bob's** 146:5
**boike** 2:21 5:12
5:12,16,16,20
**bonanni** 155:1
**bonus** 112:7
113:3 372:5
383:13,19,20
383:21,24
391:9 393:6,9
393:13,20,25
394:4 395:1,5
395:7,25
396:12
**bonuses** 383:12
388:13
**book** 180:11,12
181:1 190:4,7
190:8,11,12
299:16
**booked** 189:17
190:5,19

**booking** 188:11
188:18 189:22
190:2
**bookkeeper**
170:8 187:22
392:11 395:10
**booklet** 180:6
**boss** 312:4
324:3,5,6,8
325:1
**boston** 29:1
30:10,11
**bottom** 299:4
308:25 386:11
386:13,13
387:1 388:25
389:7
**bowels** 327:9
**brandon** 35:5,6
50:4 52:17
272:8,10
**brandy** 1:8
**breach** 331:19
**breadth** 89:4
**break** 20:6,7,9
65:20 93:12
118:18 139:4
142:3,10
191:12,18,22
192:7 204:8,12
204:14,20,21
205:3,6 206:6
206:10,11,15
206:16,19

261:22,23
263:1,24
276:21,22,23
276:24 277:1,3
277:4,5,12,16
278:15,16
335:3,6,7,16,18
335:20,22,24
336:1,11,17
373:23
**breaker** 281:15
**breaks** 336:3
374:15
**brian** 67:18,21
81:22 82:1,4
82:10,12 85:20
86:15 371:20
371:23
**brief** 20:15
50:18 93:15
146:6 206:24
252:21 263:20
278:13 336:9
373:23,24
377:9
**briefly** 61:8
309:3 340:10
377:10
**bring** 150:6,9
234:24 235:18
236:2,4,8,8,22
236:24 249:6
394:15

**bringing** 15:10
223:25 225:4
**broad** 198:9
202:3 382:1
**broader** 362:7
**broke** 142:11
**brookdale**
281:5
**brought** 122:25
240:23 241:15
366:18,20
377:23 385:3,5
385:24 386:9
387:24 388:2,3
388:4,8,22
390:11 391:12
392:8 393:6
394:5
**brown** 2:3 5:6
**bs** 311:23
**building** 25:15
120:19
**bullied** 347:18
**bump** 113:17
**bunch** 109:5
281:10 324:16
341:3
**business** 5:15
25:10,13 26:19
42:22,24 43:1
43:3 44:5,6
98:24
**butcher** 281:9
281:14

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**butchering**
200:16

**butt** 83:23

**bye** 206:21

**c**

**c** 38:21 350:11
396:13

**calculated**
383:22,23
394:19 395:12
395:14,15,17
395:19

**calendar** 9:3
148:19 189:3
296:13 298:24
337:2

**calendars**
189:4,6

**call** 6:6 43:3
55:19 56:2
60:17 89:22
111:12 113:1
113:16 114:14
114:17,24
115:1 116:9,9
116:11 118:25
118:25 119:2
119:15,21
120:11,14
124:11 125:7
125:11,20
126:5,11,12,13
144:6 145:13

147:7 151:13
151:23 159:5
177:7 197:16
299:3 337:22
367:7 368:6,7
375:16

**called** 4:5 125:3
136:22 149:18
149:20 152:6
201:21 202:13
250:21 251:2
311:15,17
312:22 340:8
349:17 367:15
367:18,25

**callie** 189:25

**calling** 149:17
150:13 333:22
344:24

**calls** 347:23

**calm** 7:21
306:21,24
307:17

**can't** 50:8,13
109:25 315:16

**capable** 378:14
378:16

**capacity** 150:2
157:11,12

**caption** 270:11
298:16

**capture** 145:18

**cards** 199:11
199:19 200:19

201:1,18,19,24
202:7 203:7,10
203:19 204:3

**care** 131:5
135:9 145:16
207:19 277:8

**career** 151:4
206:2 310:16
312:1

**carol** 155:10

**case** 1:7 4:14
6:21,24 9:10
10:3 11:10
12:8,22 13:1
13:20,22,24
14:2,3,14,18,19
14:21,24 15:1
15:10 17:2,7
18:2,9,23 19:5
19:8,16 27:14
57:22 63:1,5
71:4,18 72:15
72:17,23 77:23
77:24 78:1,3
115:17 122:7
122:16 129:15
151:18,19
157:7 184:20
204:1 214:5
216:6 241:19
255:10 261:11
264:8,11
265:18,20
267:1 268:25

269:6,8,14,25
270:8 279:6,12
280:5 281:5,15
282:23,25
283:1,15,19
284:12,17,17
284:19,20,21
285:1 286:10
286:19 288:5,8
289:3,17
291:13,20
293:5 294:20
294:21 312:20
315:12 319:16
359:10,22
360:2,7,8,10
361:19,23
362:14 364:1
366:18,23
369:3 379:1,15
381:4 392:12
398:18 400:11
403:9

**caseload**
304:15

**cases** 13:19
25:23 26:8,16
26:20,23 27:3
27:10,19,19,25
36:17 39:8,8
39:12,16,16
44:7 74:13
77:14,21,25
87:12 88:4

[cases - citation]                                                    Page 16

89:24 98:21
128:23 160:11
184:2,3,15,17
184:20 191:17
223:7 240:2,7
240:8 241:25
243:19 247:10
247:14 251:5,6
251:8,9,22,25
285:16 295:8
302:16 304:13
317:5 380:20
384:25 385:4,6
386:9 391:19
392:9,10 393:7
393:11 394:8
394:17
**castro** 286:20
**catch** 101:22
236:23,24
**categories** 75:9
**category** 80:22
**caucus** 140:24
**caught** 258:22
**cause** 63:23,24
63:25 65:23
66:3 227:20
228:1,17
234:14 237:7
**caused** 19:22
66:4 84:14
264:9 290:14
291:9

**causing** 267:8
**caveat** 286:22
**celebrating**
140:2
**cell** 12:11,13,18
33:13
**cellular** 12:15
**cer** 2:23 403:19
**certain** 45:5
148:8 208:25
383:6
**certainly** 80:6
84:6 131:16
190:7,18 220:6
227:5 249:15
267:6 305:7
312:3 315:3
330:1 361:9
**certificate**
403:1
**certified** 2:24
**certify** 403:7,11
403:14
**cetera** 208:22
**chairing**
265:21
**chance** 90:25
240:11 246:8
342:22 376:3
**change** 122:12
206:20 216:15
217:3 218:2,3
218:5,7 309:9
310:6 330:13

**changed**
123:16 198:8
212:21,22
215:3,7 216:16
216:17 218:9
347:17
**changing** 43:5
69:6 337:25
**chapa** 5:16
**characterizati...**
102:7 142:8
338:14
**characterize**
298:11
**characterizing**
107:10 316:5
332:13
**charge** 231:5
232:24 234:2,3
237:25 238:1,4
238:9,12
**charges** 233:22
**chase** 21:17,22
22:15
**chat** 94:4
111:10 316:24
**chattering**
329:19
**chatty** 337:21
**check** 170:10
192:5 210:16
211:21,24
212:15 230:9

**checked** 63:1
192:8
**cheerful** 99:13
**cheery** 99:13
328:21
**chevy** 21:17,22
22:14
**child** 19:17
22:22
**children**
365:25 366:11
366:12
**chit** 337:21
**choice** 283:3
309:11
**choose** 72:4
283:23
**chose** 109:7
244:19 247:22
283:22
**cicchini** 5:17
**circle** 386:19
387:20 389:20
390:1 391:3
**circling** 388:6
**circumstances**
97:14
**circumvented**
84:16
**circumventing**
81:18
**citation** 269:18
269:21 270:2,8
270:12

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                    586-468-2411
www.veritext.com

cite   267:1
cited   269:7
citing   165:19
city   21:16
   44:10 158:20
civil   15:2
civility   267:17
   268:3,7
claim   3:12
   130:17 233:17
   238:8 243:9,16
   243:17,22
   250:21 363:15
   363:15 379:6
   379:20 400:11
claiming   238:6
   238:24 243:7
   398:9
claims   80:19
   122:7,15,22,24
   130:13 233:19
   238:12 357:17
   377:23 382:1
   383:7
clarification
   173:1 178:17
clarified   272:3
clarify   7:14
   51:7 113:2
   115:10 131:2
   254:20 271:20
   272:19 358:12
   363:6

clarifying
   210:22
class   400:9
clean   315:16
clear   10:1
   54:11 62:1
   127:18 144:4
   144:16 146:7
   163:14 186:21
   209:11 282:19
   315:17 325:5,6
   351:22 355:2
   360:17 383:3
   389:12
clearly   304:12
clerk   66:8 67:5
   67:15,23,24
   68:16,19
clerks   36:18
client   16:23
   17:8 62:25
   72:19,20,21,24
   73:9 117:4
   123:11 130:8
   130:10,14
   145:11 150:1
   160:17,24
   161:3,5,6,10,12
   161:15 162:9
   162:16 168:9
   173:10,12
   175:9 176:5
   177:23 178:1
   178:13,20

180:9,14,17
182:6,12,14
183:23 185:2
185:18 186:13
186:14,15,25
187:12 188:12
191:1 192:13
192:14,23,25
193:2,7,15,16
193:21 194:3,7
194:13,21,24
195:5,13,14,20
195:22 196:1,9
196:12,19,21
197:9,13,17,22
197:23 199:16
201:17,20,23
203:2 204:16
211:2 212:24
216:1,3,3,8
233:1 247:11
258:17 274:3
276:15 294:9
295:4 333:2
342:8,9 344:7
344:9,23
345:20 346:14
346:15 351:23
352:5,6,7,7
354:13 375:11
375:14,18
377:24 379:8
client's   238:18
379:21 381:12

clients   78:14
   130:5 187:1,3
   195:4,13
   273:20 294:25
   309:8 378:1,3
   378:3 379:24
clock   257:13
   391:24
close   62:6 69:7
   139:5 206:9
   365:24 366:11
   366:12 390:22
closed   287:1
   302:17
closeness   366:2
closing   69:3
   234:2
clyde   82:9,10
   82:17
coach   204:16
   204:24 275:12
cobb   286:19
cocktail   341:14
   341:14,16
   342:16
cognizance
   301:20
cohen   281:6
coincidence
   327:17 328:16
   329:2,4
collective   41:15
college   63:13
   63:21 64:1

**[colloquy - complaint]**                                            Page 18

**colloquy**
  120:21 274:3
**columbia**  27:22
**column**  185:13
  213:4 303:3
  384:4,9 385:21
  386:3 387:2,6
  387:9,10 388:4
  388:17,21,23
  389:17 390:11
  390:21,24
  391:5,8,10,11
  391:17 392:5
  394:5,6,8
  395:16
**columns**
  387:18 395:9
**combination**
  26:10
**come**  12:17
  21:3 38:8 44:7
  48:15,23 70:18
  72:18 95:13
  110:3 128:21
  129:22 132:7
  143:25 151:17
  171:1 177:22
  204:24 269:23
  278:12,17,20
  291:3,8 309:9
  311:7 334:3
  341:1 357:11
  369:14 377:12
  387:12 390:22

**comes**  38:12
  49:2 264:23
  385:19
**comfortable**
  232:8
**coming**  54:2,3
  54:22 129:25
  139:22 140:16
  209:8,10
  275:13 314:17
  322:20 336:12
**commencing**
  1:23
**comment**  84:25
  145:6 338:16
**comments**  82:4
  82:6 83:6,13
  181:10 343:15
**commission**
  227:19 403:22
**committee**
  351:16
**common**  10:16
  18:13 54:7
**communicate**
  32:11,12 98:2
  98:9 327:13
  330:14
**communicated**
  154:9 168:14
  171:14 173:7
  175:3,8 176:10
  255:11 283:6,8
  322:9 337:19

**communicating**
  147:3 255:16
  345:5
**communication**
  113:11 167:22
  168:2 175:2
  286:11 295:13
  321:13
**communicati...**
  167:16 176:1,3
  320:25
**community**
  151:5,6 396:13
  396:22 398:16
  399:7 400:8
**comp**  385:14
  393:7,10
  394:14
**companies**
  156:15
**company**
  156:15 232:13
**compared**
  241:18 302:4
  322:21
**compensation**
  385:13 395:13
**complain**
  220:20 222:20
  222:22 276:10
  325:18 326:10
**complained**
  95:24 133:21
  244:19 248:15

  250:13 256:1,6
  322:9 325:5,9
  326:2 380:24
**complaining**
  96:10 279:6
  297:23 322:11
  323:18 326:5
  329:8 391:14
  395:2
**complaint**  15:8
  15:15 67:3,7
  67:11,16 85:12
  109:21 110:11
  110:13,19,23
  112:8 121:12
  121:15 122:2,3
  123:19,20,21
  123:22,23,25
  124:1,6,11,21
  124:23 126:18
  126:19,23
  127:5 130:2
  132:20,24
  153:1,8,15,16
  153:18,22
  154:6,11
  159:10,20,21
  159:22,25
  160:2 163:10
  163:11,14
  164:8,15,17
  165:13,17,24
  166:8,14,21,24
  167:3,7,8,13

**[complaint - connected]** Page 19

192:11 194:15
194:16 195:25
196:6,7 198:10
198:19,24
199:5 201:21
214:4 224:22
225:9 227:12
227:15,16
228:6,19,20,25
229:5,23,24
230:2,6,8,12,14
230:16,22,23
231:2,14,15,16
231:20 232:19
232:20,22
233:22,25
234:19 237:11
238:9 252:8,10
279:3,8,11,14
282:4,5 325:10
325:17,22
331:10 332:9
358:20 359:8
359:19,20
360:20,21
364:6 368:23
381:22,23
383:6 396:16
396:19 398:15
399:18,20,22
400:15
**complaints**
121:23 122:1
220:10,12,17

221:1,24 222:4
222:7,10,16,18
324:2 327:18
**complete** 85:24
403:8
**completed**
373:9,14
**completely**
127:9 208:11
345:7 394:24
**complications**
69:1
**composed**
306:21,24
307:17
**compound**
131:7
**computer**
235:13 236:24
269:12
**concept** 15:25
**concerned**
226:13 277:7
300:8 318:23
320:6 359:6
**concerning**
84:12 356:16
**concerns** 84:4
180:18 255:17
255:21 320:2,7
**conclude**
374:13 401:18
**concluded**
402:12

**concluding**
374:2
**conclusion**
402:10
**conditions**
332:21
**conduct** 82:23
198:25 199:9
199:14,21
201:10 202:6
203:8,9 256:6
256:11,24
264:7 270:5
276:10 289:18
289:19 311:4
311:12 374:5
379:3
**confer** 258:17
261:6
**conference**
23:14 28:6
197:16 288:20
334:5,11,12,19
336:16,18,18
336:20 337:6
338:4 339:9,10
339:14,16
340:9,18,18,20
340:23 341:7,8
343:9 346:24
347:1 351:10
352:8,12 378:7
378:11 379:4

**conferring**
145:10,11
**confide** 309:4
**confided**
112:21
**confiding** 194:5
226:15 312:17
317:14
**confirm** 55:1,6
213:1 270:14
**confirmed**
232:6
**confirming**
139:20 147:3
185:11
**conflict** 245:9
246:15,24,25
247:3,19
262:11 291:14
291:18
**confront** 82:11
**confronted**
81:22 82:5
83:11 84:2
205:23
**confused** 12:4
109:2 134:12
**confusion**
264:10 375:15
**connect** 29:3,23
77:8 106:7
273:3
**connected**
28:12,20 30:21

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[connected - contribute]**                                    Page 20

76:17 77:9
85:7,18 91:20
91:22 92:18
93:2,4,17
94:20 108:11
108:16 110:25
111:16,24
112:4 137:23
159:8

**connecting**
29:16 105:25
106:20

**connection**
29:7 107:24
110:22 169:20
342:15 366:8

**connections**
249:14

**connects**  46:6

**connotation**
200:18,24

**consent**  267:17
267:18,20

**consenting**
267:25 268:3

**consider**
219:20 261:3,4

**considered**
18:9 19:5
36:20 219:22

**considering**
18:2

**consist**  203:5

**consisted**
202:16,21

**consistently**
18:15 56:21

**consisting**
403:7

**constantly**
197:15 329:5
330:14

**consulted**
359:9,22 362:2
362:6

**contact**  111:8
114:3 124:9
154:1,18,24
155:1,4 362:11

**contacted**  92:7
92:8 108:22
113:8,24
114:15 125:1
152:20,21,21
152:23 153:2
153:12 154:20
155:5 163:23
295:17 334:6
356:9,16
357:19,21
358:10,23
361:2,5 362:13
362:18,22
363:3,19,21
365:10 375:6

**contacting**
102:11 312:4

**contacts**  107:20

**contemplated**
370:10,11
391:22

**content**  166:21
306:17

**contents**  3:2

**context**  52:19
84:22 85:4
98:7 200:5
281:22,25
282:14,15
300:11,17
301:4 317:20
318:8 319:25

**contingency**
129:1

**continual**
308:12 374:4
390:19

**continually**
232:5 258:20
268:16,16
327:3 374:6

**continuation**
377:13

**continue**  18:12
66:6 100:19
160:17 161:2
161:15 184:25
191:7 208:18
213:12 236:17
260:4,5,7
262:18 265:10

265:18 266:8
266:10,13,14
274:25 303:23
309:12 310:2,5
314:2,8,13,15
316:23 330:14
344:21 400:11

**continued**
40:13 63:25
96:24 98:1
175:20 191:4
208:1,8 209:12
215:20 306:20
309:3 318:19

**continues**
317:13

**continuing**
40:13 41:4
44:23 145:22
150:25 151:2
191:2 220:25
261:24 316:24

**continuous**
231:24

**continuously**
260:24

**contract**
218:21 219:17
331:20 379:23

**contractor**
220:2

**contribute**
36:18

contributions
40:4
control   145:7
159:14 349:15
378:17 380:11
convenient
32:12
convention
252:25 253:4
conversation
50:5 62:15
64:10 101:14
118:25 124:24
135:21 136:8
138:12 164:2,4
165:9 171:22
172:4,5,10,11
174:8 176:14
183:1,4 194:11
194:17 195:19
197:3 200:2
205:22 206:4
222:25 223:7
224:19 258:5
273:1 276:1
300:11 301:4
305:17 306:6
310:1 316:2
conversations
88:3 126:10
197:5 224:16
226:19 324:24
330:21

copies   80:11
234:24 235:18
236:2,4,8,22
copy   79:10
90:24 227:23
234:16 235:9
264:14 269:16
cordial   96:25
97:2
cordially   98:8
corporate
89:13
corporation
1:12,14 264:11
corporations
371:8
correct   6:17,22
7:1,3,5 21:14
21:24 22:10,18
23:2,11 27:10
27:11 28:19
29:12,18 30:14
32:3,7,13,21
33:14 35:2
38:9 41:1,9
51:3,13 52:14
53:25 59:1
66:16,19,24
67:7,10,14,22
68:21 69:16
70:4,25 73:3
73:11,15,21
74:7,17,23,25
77:15,16,18

78:11,17,22,25
79:1,3 84:5
86:23,24 88:9
88:10,12 89:10
89:24 90:6,8
91:21,24 94:6
94:7 95:5
97:16,21 98:22
100:8,12,17,22
101:12 102:6
102:21 105:1
105:18,21
108:14,23
109:1,14
110:23 112:16
112:20 113:4
114:1 115:2
120:6 127:15
129:6,9 130:6
130:11 131:11
131:17 132:14
133:24 135:14
139:12 141:9
141:11 142:21
143:3 149:17
156:18 160:19
161:3,6,10,15
162:6,10,16
163:5 164:19
164:25 167:17
167:23 168:13
168:16 169:21
169:25 170:4,9
170:13,20,22

171:11,20
172:1,9 173:10
173:11,12,13
173:16 174:13
174:17 176:6
176:24 178:14
182:6,23
183:18,24,25
184:3,4,16,20
185:23 186:1,8
186:22 187:1,9
187:13,17
188:8,13
189:12 190:7,9
190:21 191:3
194:25 197:10
198:1,4 201:2
207:4,7,13,16
207:20,23
208:1,2 209:4
209:5,13 211:9
211:17 212:2,3
212:5,11,17
213:13 214:11
214:15,20,24
215:21,23
218:13,17
219:4,15,16,18
219:19 220:7
220:13,15,18
221:3,5,22,23
221:25 222:8
222:11,13,14
222:17 223:12

[correct - counsel's]                                                    Page 22

| | | | |
|---|---|---|---|
| 223:19 224:20 | 350:16,21 | 79:11,24 88:25 | 275:1 276:12 |
| 225:12,21 | 351:8,19 353:6 | 89:2,12,16 | 283:17,17 |
| 227:13 230:18 | 353:25 354:16 | 90:16 91:25 | 284:10 285:22 |
| 230:24,25 | 355:11,16 | 93:10 94:8 | 287:16 293:16 |
| 233:11,13 | 358:6,15 | 98:15 102:2 | 293:22 298:3 |
| 246:12 252:16 | 370:24 371:3 | 105:3 111:14 | 301:12 303:24 |
| 252:25 253:1 | 372:5,12,13,19 | 111:21 114:19 | 305:20 310:20 |
| 253:13,18,20 | 372:22 373:17 | 115:21,22 | 310:24 311:9 |
| 253:23 254:1,3 | 378:18,18 | 117:15 121:7 | 314:16 321:20 |
| 254:11,16,19 | 384:11,12,17 | 121:18 123:10 | 326:16 331:16 |
| 254:24 255:10 | 386:4 387:4,6 | 124:14 130:7 | 331:21 333:24 |
| 255:18,22,24 | 388:7 389:16 | 132:18 133:18 | 334:3,8,25 |
| 266:12 270:16 | 389:18 390:10 | 134:25 136:24 | 342:17 345:1 |
| 271:13,24 | 390:21 394:13 | 138:24 145:10 | 345:23,25 |
| 272:12,15,23 | 394:17,22,23 | 145:11 152:2,8 | 346:3 353:15 |
| 276:2 279:17 | 396:2,23 | 152:14 153:5 | 354:12 356:12 |
| 279:23 280:1,7 | 397:20,22 | 166:4 172:20 | 357:2 358:4,5 |
| 280:8 283:5 | 403:8 | 181:15 185:4 | 361:15 386:22 |
| 287:6 288:21 | **correcting** | 208:9 213:22 | 388:16 392:21 |
| 292:8,9 294:16 | 387:7 | 213:25 214:2 | 398:2 399:9 |
| 295:5,13,21 | **correctly** | 214:11,13 | 400:1 401:12 |
| 297:24 298:9 | 281:17,18 | 215:17,19 | **counsel's** |
| 299:23 302:3 | **corresponding** | 217:11,22 | 106:22 116:17 |
| 306:18 307:3 | 382:9 | 218:8,10 226:1 | 116:19 126:20 |
| 307:19 308:25 | **corroborated** | 234:20,23,25 | 246:10 247:25 |
| 309:20,25 | 81:20 | 235:19 236:21 | 312:12 316:15 |
| 310:3 312:5,8 | **counsel**   4:17 | 246:20 254:21 | 318:19 323:2 |
| 312:25 313:6 | 11:19,25 12:2 | 258:10 260:9 | 325:20 328:13 |
| 313:12 314:6 | 12:7 14:4 | 260:18 261:7 | 328:24 338:10 |
| 314:14 317:11 | 16:18,21 17:16 | 262:2,3 263:3 | 345:12 348:2 |
| 322:7 325:2 | 17:21 42:9 | 264:7,8,13,19 | 349:2 355:13 |
| 333:6,6 334:16 | 47:9 58:18 | 264:22 265:1 | 358:25 363:1 |
| 336:20 339:12 | 59:15 62:23 | 265:12 266:14 | 377:11 391:13 |
| 340:21 341:17 | 63:5 75:3 | 268:25 273:23 | |

| | | | |
|---|---|---|---|
| **counseling** 46:21 47:4 51:12 52:13 53:4,8,14 57:10,15,17 | 278:20 329:13 376:2 | **courts** 264:25 **cover** 9:3 80:15 317:13 390:12 **coverage** | **credited** 212:16 212:18,22 **crew** 112:10 **crime** 345:7 |
| **counselor** 45:9 46:25 49:12 51:7 52:22 200:21 381:21 | **court** 1:1 4:13 5:8 13:18,19 13:20,22 14:3 14:15,18,23 15:7,19,20,21 15:22 18:19 | 372:21 **covered** 100:9 100:17 108:23 124:25 125:1,5 125:9 212:23 | **criminal** 62:10 **critical** 338:3 **cross** 5:8 30:4 265:12 283:17 311:17 369:4,8 |
| **counselors** 44:12 | 44:7 47:16,18 48:5,14 54:11 | 245:6 320:18 396:1 | 369:24 375:4,9 375:19,22,23 **crosses** 19:19 |
| **counsel's** 113:22 126:2 128:11 327:20 332:24 | 54:15 55:19,25 57:8 73:3 104:2 123:6 144:21 145:9 147:4,7 149:25 | **covering** 390:22 **covid** 47:8 87:17,20 **cranky** 313:14 | **crystal** 271:9 272:2 **current** 20:1 25:23 111:11 123:21 |
| **count** 189:8 349:12 | 152:1 167:4 228:13 234:4 | 314:5 **cranston** 45:17 | **currently** 26:20 44:12 46:4 |
| **counted** 185:13 213:4 394:23 394:24 395:8,9 | 249:8,12 260:10,15 264:19,21 265:9 267:6 268:7,22 | 45:18 46:11 60:15,16,18,20 60:24 61:14 63:9,17 64:5 | 116:11 119:2 120:10 **custom** 235:4 **customary** |
| **counterpart** 382:9 | 273:15 275:3,3 293:8 302:13 | 64:10,13,14 320:20,24 | 235:11,15,17 235:25 236:6,7 |
| **counts** 13:21 **county** 403:5 403:21 | 303:8 308:12 311:14 345:10 356:2,3,14,22 357:3,5,6 | 321:11,22 323:4,11 371:1 **cranston's** 61:7 | 265:7 **cut** 18:12 55:2 55:20 146:17 |
| **couple** 6:21 20:19 24:15 35:21 87:19 205:7 219:9,10 358:6 365:21 | 358:19,20 360:4 374:23 376:8 393:2 402:9 | 62:13 **created** 225:9 **creating** 370:8 **creation** 370:7 **credentials** | 259:19 260:24 **cutting** 18:15 56:20 257:4 260:21 |
| **course** 11:23 65:10 94:12 128:25 131:24 139:17 265:14 | **courtesy** 10:16 18:14 54:6,7 | 50:25 | **cv** 1:7 4:14 |

| d | | | |
|---|---|---|---|
| **d.c.**  14:18 20:17 21:6,13 22:21 24:16 25:7,10 25:14 26:24 27:2,8 43:16 | 148:4,8,12,13 148:17 149:19 163:8 168:1,4 168:7 171:8 172:5,11 174:6 175:12,25 | **david**  281:2 286:18 | 296:18 347:19 360:18 391:23 396:11 399:20 401:2 |
| **daily**  57:23 | 185:10 207:9 | **davis**  5:1,1 116:18,23 369:17,21 401:23 | **deborah**  1:21 2:13,15 4:20 224:6 274:1 278:20 311:16 |
| **dallying**  259:14 | 222:2,3 283:16 | **day**  1:20 34:19 35:11,12 148:1 153:10 177:15 177:22 178:5 183:25 220:10 220:11 297:1 319:13,18 327:18 336:13 341:12 343:11 343:11 | **debore**  284:12 285:1 |
| **damages**  15:11 62:8 63:1 82:24 83:2,4 273:17 362:25 | 286:19 293:10 297:9,11 334:19 335:14 339:5 369:7 370:14 372:23 372:25 373:10 373:13,14,18 373:22 376:10 397:17 | | **decades**  88:11 **december** 30:20,24 31:3 31:14 33:6 283:15 370:10 370:18 |
| **damn**  317:7 | | | |
| **dan**  70:17 71:5 | | | |
| **dangerously** 62:6 | | | |
| **dare**  361:12 | **dated**  90:10 280:13 283:15 373:4 | **days**  35:22 87:19 149:16 182:21,23 225:25 226:4 286:22,22 317:16 318:4 319:3 391:18 | **decide**  72:2 147:1 282:24 282:25 |
| **date**  8:22 19:24 23:8 27:7 34:4 35:13,16 58:8 58:10 86:24 92:8 95:25 96:3,5,6,7,8,12 96:23 99:24 100:6,9,10,11 101:5,7,15 102:22 109:20 120:13 138:3 138:10,12 140:17,22 141:10,15,17 141:19,21 147:15,17 | **dates**  93:6 101:19,20 138:15 164:3 165:3,4,6,10 175:14 197:6,7 287:2 318:9,10 330:6 337:3 | | **decided**  35:10 192:11,24 194:19,23 196:8,11,18 246:15 309:5 347:15 |
| | **dating**  328:5 | **dc**  2:6 | **decision**  78:13 81:10 160:16 192:22 246:8 366:25 367:1 |
| | **daughter**  19:20 22:16 365:24 366:1,1 | **deadline**  44:2 | |
| | | **deal**  19:9,13 138:18 140:16 260:15 264:9 281:15 375:1 | |
| | **dave**  75:22 76:11 | **dear**  208:3 | **defecating** 326:14 |
| | | **deb**  6:2 86:20 139:2 146:8,24 206:21 262:6 263:21 272:19 | **defendant**  1:20 4:11 78:13 383:10 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**defendant's**
88:5
**defendants**
1:15 4:21,23
286:5 377:14
**defendant's**
3:12,13,14,15
3:16 234:9
280:11 284:6
287:24
**defending**
265:22
**defense** 68:2,7
68:7,9 69:23
71:8 72:5,7,19
72:23,24 73:9
73:15,20,23,25
74:3,6 77:21
78:6 129:5
137:18 247:15
288:14,15
377:11
**defenses** 80:19
**definitely** 34:2
86:25 94:5
115:7 123:6
165:1 174:8
242:18 248:12
276:4 370:12
374:11
**definition**
200:16 399:14
399:16 400:4

**degree** 235:23
**delay** 264:10
**delayed** 379:14
**deleterious**
285:24
**demanded**
331:12
**demanding**
331:14
**demands** 331:3
331:8
**denial** 383:12
**denied** 383:13
383:19 396:12
**deny** 335:7
**denying** 51:21
52:6,11 126:5
209:8 371:3,4
388:13
**dep** 93:11
123:5 145:8
257:14,18,18
260:6,7,9,11,13
261:25 262:1
264:6,7 266:8
266:10,18
268:12 275:4
275:12 311:7
326:23 349:11
369:8,9,15
374:2,3,5,13,23
375:10,14
376:6 377:13
400:25 401:2

**depart** 266:10
**depended**
71:16
**dependent**
71:16
**depending**
347:10
**depo** 146:10
**deponent**
191:24 371:14
**deposed** 6:19
395:11
**deposition** 1:18
4:11 5:9 6:8,9
7:13,19,21 8:3
8:9,11,15 54:7
56:12,13 130:7
137:6 144:7,17
144:20 191:19
231:11 234:9
234:24 235:3
235:12,16
236:8 258:3
261:5 262:17
264:5,24 265:2
265:13,19,21
265:22,25
267:3 277:4
280:11 282:3
284:6 287:24
303:13 336:2
369:11,18,25
370:1,3 374:12
375:5,11,24

392:13 400:15
402:11,12
403:12
**depositions**
236:22 264:22
369:23
**depression**
45:21 46:14
57:21 328:9
**deps** 146:19,20
277:10 316:11
**depth** 357:12
**derail** 260:11
**describe** 83:8
203:21
**described**
78:12 202:9
203:19 206:3
322:14,19
366:17
**description**
395:21
**deserve** 306:5
**designated**
391:17
**designed** 276:4
392:5
**desire** 182:5
**desk** 43:16
**desperate**
111:25
**despite** 266:21
267:1

[detail - discovery]

Page 26

**detail** 21:2 116:6 202:11 256:3
**detailed** 26:7 200:2
**details** 31:21 203:25 209:1 320:8 342:12
**detroit** 158:21
**developed** 254:15
**device** 12:15
**devoted** 184:18
**diagnosed** 46:13
**diane** 76:17 77:6 81:16 84:15
**diary** 176:23 177:1,3,5,6,8 180:5,8
**didn't** 60:15 69:4 97:1 106:14 117:3,3 117:15 120:15 121:22 143:15 174:2 175:7 191:17 229:18 289:17 309:23 325:8 340:14 340:14
**dierkes** 82:11
**difference** 241:1,20

243:21 248:17 248:19 250:6
**different** 6:22 19:6 22:8 29:4 29:11 33:8 43:18 57:12 58:20,22,23,23 59:25 76:23 83:23,24 90:6 119:14 154:4 157:1 162:12 173:13 224:15 240:3 241:21 242:16,17 249:9,24 271:20 276:9 297:3,25 304:18 333:16 342:22 358:6 358:21 362:1,6 365:22 369:7,7 379:17 381:5 386:5,7 388:20 388:25 394:24
**differently** 61:14 95:21 96:1,9,13,14 97:4,13,16,19 100:8,13 101:3 239:22,24,25 240:16 241:22 242:15,18,19 243:23 248:8 248:10,12,25

249:21 250:4 250:11,17,24 325:15 395:8 395:12
**difficult** 12:3 62:15 374:13 401:15
**difficulties** 294:15,18,19
**difficulty** 387:21
**digging** 306:22 307:18,22,24 308:18
**dilly** 259:13
**dinner** 102:20 104:23 105:4 105:16 140:1 272:15,22,24
**dinners** 203:16 204:4 253:25
**direct** 185:22 270:21,21 375:16,18,20 375:21 376:5 381:21 383:8
**directed** 125:11 175:1 186:22 190:8,10,18 211:25 353:18 355:21
**directing** 114:24 187:12 270:4

**direction** 190:6 208:12 224:11
**directly** 110:25 178:15 185:3 185:12 212:25 213:3 387:7
**director** 171:23 207:20 209:25 210:8 217:8 351:15
**disagree** 80:21 102:7 134:24 135:2 140:15 142:8 161:7 217:20 224:21 283:4 302:14 337:15 338:13 355:17 391:15 393:10
**disappointed** 96:17
**disapproved** 256:7
**discharged** 232:17
**disclose** 281:13
**disclosure** 80:18
**disclosures** 79:25
**discovered** 162:24 232:3
**discovery** 8:14 8:21 9:11

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[discovery - document]                                                    Page 27

11:19 46:19
48:20 279:14
287:1 340:11
**discovery's**
221:13
**discriminated**
244:6
**discriminating**
246:6
**discrimination**
231:6 232:24
233:14,16
238:5,8,10,12
238:15,22,24
239:2,4 240:20
241:11,19,24
243:8,18
244:12 247:24
248:5,7,9
250:21
**discuss**  31:11
79:14 112:20
168:8 344:22
370:8
**discussed**  18:21
28:25 31:13
43:24 62:13
82:22 98:24
107:5 112:25
128:17,18,24
162:25 168:7
168:22 196:2
252:23 292:4
297:2 305:3

306:8 370:12
371:10
**discussing**  33:1
33:4 128:14
**discussion**
127:19 344:2
371:2
**dismiss**  18:23
**dismissal**  3:13
234:1,6,12,13
237:4,6
**dismissed**
392:12
**dismissing**  19:5
19:8,15
**displeased**
308:6
**dispute**  19:1
48:20,22
103:17 125:11
125:12,14,19
140:5 185:10
373:1,19
**disputes**  26:19
**disqualified**
360:1
**disrespectful**
144:11 257:16
267:14
**disrupt**  275:11
**disrupting**
260:9
**disruptive**
303:10 350:17

350:18,20
**dissatisfaction**
178:12
**dissatisfied**
325:1
**distinctive**
321:8
**distress**  63:23
63:24 64:1
65:14,23 66:3
66:4
**distressing**
65:17
**district**  1:1,2
4:13,13 27:22
234:4 264:12
265:9
**division**  1:3
30:3
**divorce**  35:8,9
35:23,24
**divorced**  35:10
**dloski**  2:20
4:17
**doc**  102:22
252:6
**docket**  47:20
234:4,5
**doctor**  60:16
**docu**  12:19
**document**  3:16
9:7,8 18:4,7,24
19:2 59:5,5,8
60:13 61:23

62:19 63:18,19
64:20,23,24
80:5,18,20
85:5 90:22
94:23 99:2
104:20 111:4,4
114:2,4,5,6
115:3 119:19
119:20,22
120:3,24 121:3
125:6,8,9,17,22
125:23 126:15
139:13,17
148:18 168:25
169:4,5,15,16
169:17 184:23
212:23 231:10
234:1,8 235:22
235:25 237:14
237:16 238:18
252:16 274:11
274:12 280:10
282:11,16
283:9,10,20
284:5 286:9,16
287:23 297:18
298:6 320:22
321:2,9 323:9
334:17 350:25
350:25 351:9
372:24 373:1,2
373:6,20,21
383:14 385:8
387:15,17

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| 389:1,10 | 217:6 227:4 | 114:3,13,16,23 | 201:25 202:4 |
| 394:13,18 | 261:23 270:6 | 114:25 115:12 | 203:3,4,13,24 |
| 399:1,15 | 304:17 322:15 | 119:15,21 | 204:5,6 205:13 |
| **documentation** | 328:20 329:22 | 120:23 121:1,2 | 205:15 206:14 |
| 177:18 220:9 | 337:11 346:10 | 124:11 125:2,3 | 219:6 225:23 |
| 249:5 252:12 | 369:7 375:17 | 125:7,11,20 | 226:4,19 227:6 |
| **documented** | 375:18 376:5 | 126:5,6,9,11,12 | 239:11,14 |
| 60:21 | 378:14,16 | 126:13,25 | 242:4,6 244:25 |
| **documents** 8:2 | **dolenga** 70:16 | 127:14,18 | 255:9,17 256:8 |
| 8:6,9,20,24 | 71:3 | 132:15,16,17 | 256:23 280:14 |
| 9:10,23,25 | **dollars** 333:2,7 | 133:6 135:21 | 280:21 281:2 |
| 10:2,5 11:9,15 | **domain** 373:16 | 138:12 139:19 | 282:12,13,13 |
| 11:16,22,23,25 | **domestic** 1:11 | 139:22 140:23 | 282:15 283:6 |
| 12:1,7,11,17,19 | 1:13 | 141:22,23 | 295:18,19 |
| 13:9 14:17 | **donna** 13:10,13 | 142:1 160:10 | 296:10,12,14 |
| 64:7 79:20 | 13:17 78:16 | 163:2,23 164:2 | 296:20,21 |
| 80:7,15 99:4 | 91:23 92:7,9,9 | 164:9,16,17 | 297:2,20,23 |
| 102:9 117:14 | 92:10,16,18,20 | 165:1,10 | 298:1,13,16,23 |
| 118:10 125:24 | 93:3,5,19,19,21 | 167:16,22 | 298:25 300:7 |
| 236:13 237:19 | 94:14,17,18 | 168:12,15 | 304:21,23 |
| 252:7,13,19 | 95:5,10,13 | 171:15 172:4 | 305:1,2,3,8 |
| 275:16 293:22 | 96:8,13,24 | 173:20 174:2 | 306:18,23 |
| 297:4 301:8 | 97:16,18 98:13 | 175:16,18 | 307:16,25 |
| 339:19 385:10 | 98:20 99:7,10 | 176:1,3,19 | 308:6 313:3,15 |
| **doesn't** 50:7 | 99:14,18,23 | 178:12,15,16 | 313:21 314:9 |
| 62:19 249:16 | 100:7 101:14 | 178:18,19,21 | 314:24 322:9 |
| **dogs** 21:14 | 101:25 102:11 | 179:9 180:18 | 322:11,14,15 |
| **doing** 49:9 71:8 | 102:20 104:9 | 183:2 184:23 | 323:17,20 |
| 72:5 88:18,20 | 104:11,23,25 | 184:24 185:11 | 324:11,14,17 |
| 88:21 98:21 | 105:17,25 | 191:2 193:1,13 | 325:18 326:1,1 |
| 146:22 177:10 | 107:24 108:11 | 193:22 194:2,6 | 326:2 328:17 |
| 177:16 183:15 | 108:14,15 | 194:8,12 | 328:18,23,25 |
| 184:14 195:22 | 109:19 112:6 | 195:19 198:24 | 348:18 354:25 |
| 216:18,20 | 113:1,16,16,24 | 199:10 201:24 | 355:6 |

[donna's - elyse]                                                          Page 29

**donna's** 308:17
  317:5,9 365:25
  366:12
**don't** 9:24 16:9
  34:20 63:8
  84:22 85:22
  102:12 107:10
  115:7 117:7,8
  117:11,13
  123:1 125:19
  145:16 147:5,6
  180:1 186:19
  204:17 206:20
  214:12 228:8
  235:17 256:15
  257:14 321:23
  335:4 339:20
  343:20 354:10
  381:6 389:25
  392:19
**door** 101:24
**doordash**
  378:24
**double** 230:9
**downloaded**
  117:1
**dr** 60:15 63:9
  64:5,13
**draft** 167:8
**drank** 254:8,13
**draw** 36:4
  40:14
**drink** 102:13
  104:10 105:16

**drinking** 254:3
  254:10 341:17
  341:18
**drinks** 94:22
  98:11
**drop** 43:13,17
  116:12 119:3
  120:5,11,17
**dropped** 119:4
**dropping** 18:2
  18:9
**drunk** 327:8
  348:13
**ducks** 35:17
**due** 34:4 68:25
  152:10 158:15
  286:24 359:10
  359:22 366:3
  400:16
**dues** 397:21
**duly** 4:6 403:12
**duties** 216:8
  219:7 346:18
**duty** 6:16
  218:25 381:7
**dynamics**
  62:16

                e

**e** 350:11
**earlier** 73:14
  91:24 93:3
  115:11 156:23
  181:22 218:3

239:1 248:2
  253:8 286:10
  292:4 315:1
  357:23 358:17
  361:3,9 368:3
  374:19 393:3
**early** 33:21
  96:11 174:8
  175:13,17,19
  175:23 176:2
  287:1 329:17
**earned** 37:2
  39:22
**easier** 136:5
  374:20
**easily** 261:15
  282:16
**easter** 96:21
**eastern** 1:2
  4:13 234:4
  264:11 265:9
  374:1
**eat** 50:7 377:4
**eaten** 268:1
**eating** 263:11
  263:17 309:15
  346:6 377:2
**ed** 5:12,14,16
**edward** 2:21
**eeoc** 3:12,13
  227:12,19,20
  227:21,25
  228:16 230:23
  231:5,15,19

232:24 234:2
  237:6,19 252:7
  252:11
**effect** 112:16
  285:25
**egregious**
  232:11
**eight** 278:15
**eisenberg's**
  157:20
**either** 11:23
  14:15 46:8
  58:10 100:12
  124:6 154:3
  198:21,23
  306:14 325:9
  396:8
**electronic** 2:24
  235:1,9 236:15
**element** 244:2
  244:4
**elements** 244:1
**elicited** 376:2
**elizabeth** 2:14
  4:20,24
**ellen** 157:20
**elliot** 382:8,13
  382:16
**elyse** 1:5,18 3:5
  4:4,11 6:4,6
  28:10 111:7
  114:7 117:17
  119:4 121:12
  125:1 132:24

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[elyse - enter]**                                                    Page 30

| | | | |
|---|---|---|---|
| 134:6 135:7 | 330:3 354:17 | **emphasized** | **employment** |
| 146:1,5 192:3 | **embarrass** | 313:5 | 25:4,6 27:23 |
| 207:2 208:3 | 266:6 276:5 | **employed** | 33:8 89:4 |
| 213:3 229:16 | **emily**  13:16 | 23:10,12 75:20 | 149:23 151:16 |
| 241:3 250:2 | 90:9 101:25 | 183:24 232:4 | 154:20 156:7 |
| 256:1 257:2 | 110:25 111:7 | 247:13 279:16 | 156:10,12,17 |
| 261:13,20 | 111:17,24 | 362:3 363:19 | 157:9 158:22 |
| 277:25 278:24 | 112:4 115:12 | 363:20 364:22 | 158:24 159:3 |
| 280:13 299:12 | 115:12,14 | 378:1,2,2 | 203:17 208:3 |
| 307:12 313:15 | 139:20,21,22 | **employee**  74:10 | 212:21 213:9 |
| 327:14 328:25 | 139:24 167:16 | 75:13,25 | 227:18 232:2 |
| 345:21 389:16 | 167:22 173:20 | 218:12,15 | 232:17 245:24 |
| 390:21 403:9 | 174:2 180:3 | 219:20,25 | 361:5 368:10 |
| 403:12 | 239:11,17 | 220:1 233:11 | 371:5,6,7,8 |
| **email**  139:19 | 242:6 253:21 | 239:23 403:15 | **encouraged** |
| 147:4 161:4 | 255:9,17 256:1 | **employees**  75:7 | 90:5,14 91:18 |
| 176:19 178:23 | 256:2,7,23 | 82:5,7 90:5 | 93:1 |
| 185:3,8,9 | 273:1,6,9 | 238:7 241:23 | **ended**  171:22 |
| 213:7 280:14 | 274:6,6 275:21 | 380:7,10 | 209:3 249:7,7 |
| 281:18,23 | 276:1,19 | 381:18 383:1 | 249:23 279:21 |
| 292:4 293:6 | 279:22 295:19 | **employer**  94:6 | 340:24 386:8 |
| 294:11 305:18 | 296:14,20,22 | 97:2 98:5,14 | 391:9 |
| 306:6,8,11,13 | 297:3 298:13 | 99:18 106:7 | **engage**  345:6 |
| 306:15,17 | 298:25 300:7 | 113:19 183:5 | **engaged**  383:9 |
| 330:7,10 | 304:17 326:13 | 220:6,8 231:21 | **engaging** |
| **emailed**  211:5 | 327:7,13,15 | 231:23 232:2 | 267:22,24 |
| 217:25 372:14 | 328:9,11 | 232:12 247:2 | **enjoy**  304:17 |
| **emails**  176:15 | 348:19 355:4,6 | 253:13,13 | **enjoying** |
| 176:16,18,21 | **emily's**  91:11 | 380:6 381:17 | 225:10 310:11 |
| 178:21 179:2 | **emotional** | **employer's** | 310:15 |
| 197:15 215:4 | 63:23,24,25 | 382:24 | **ensch**  75:19 |
| 217:16 224:7,9 | 65:14,23 66:3 | **employers** | **entailed**  71:18 |
| 293:15 294:2 | 66:4 | 181:10,22 | **enter**  293:24 |
| 294:11 330:1,2 | | | 321:24 |

[entered - exhibit]                                               Page 31

| | | | |
|---|---|---|---|
| **entered** 195:4,8 | **ethical** 246:12 | 402:11 | **examination** |
| 195:13 | 247:7,12 | **everybody's** | 3:7 5:25 |
| **entering** 90:16 | **ethically** | 131:6 139:23 | 265:12,12 |
| 287:16 | 247:15 | **everyone's** | 311:17 |
| **entire** 31:22 | **evening** 177:15 | 91:18 | **examine** |
| 65:2 88:6 99:7 | 254:6 341:16 | **everything's** | 375:22 |
| 99:11 155:21 | 342:2 | 369:14 | **examined** 4:7 |
| 173:5 202:10 | **event** 7:25 | **evidence** | **examining** |
| 215:1 246:1 | 23:21,22,24 | 148:23 194:22 | 376:1 |
| 260:12 266:17 | 69:8 92:12 | 196:10 283:24 | **example** |
| 267:3 299:18 | 189:9 190:21 | 398:9,17 | 250:15 364:9 |
| 310:17 384:17 | 230:15 252:5 | **evolving** | 380:12 |
| 384:22 386:8 | 253:12,22 | 324:24 | **except** 235:7 |
| 390:25 | 254:6,9,13,16 | **ex** 52:15,24 | 242:11 |
| **entirety** 361:4 | 255:2 268:17 | 57:16 147:3 | **exchanging** |
| **entitled** 53:10 | 271:7,12,17,21 | **exact** 8:22 | 197:16 |
| 80:3,10 356:24 | 271:23 272:2 | 35:12,13 40:19 | **excited** 95:1 |
| 383:21,23,25 | 272:10 274:13 | 75:25 93:6 | 139:25 141:2 |
| 388:15 393:5 | 311:20 334:15 | 140:17,22 | **excuse** 120:16 |
| **entity** 89:13 | 335:14 340:8 | 141:10 148:13 | 129:23 159:11 |
| **entry** 181:7 | 341:3,5,6,24 | 168:17,24 | 286:6 316:16 |
| **envision** 208:10 | 343:7 346:24 | 171:8 172:4 | 370:18 |
| **equal** 227:18 | 350:15 355:9 | 185:9 200:16 | **executive** |
| **escape** 160:9 | **events** 58:4 | 250:16 306:17 | 171:23 207:20 |
| 310:12 324:4 | 98:10 186:11 | 333:21 341:13 | 209:25 210:8 |
| **escaping** | 282:6 378:7 | 344:19 360:14 | 217:8 351:15 |
| 159:13 | 397:22,23 | **exactly** 11:13 | 351:16 397:1,5 |
| **especially** | **eventually** | 161:24 224:8 | **exhausted** |
| 250:12 328:18 | 73:19 86:19 | 268:22 331:12 | 227:17 |
| **established** | **everybody** | 347:20 | **exhibit** 3:12,13 |
| 25:8 285:17 | 150:2 192:3 | **exam** 236:17 | 3:14,15,16 |
| 322:21 | 206:22 261:16 | 294:3 375:20 | 90:17 227:24 |
| **et** 4:12 208:22 | 288:13 358:9 | 375:22 | 231:11 234:9 |
| | 374:18 388:20 | | 237:21,22,23 |

Carroll Reporting & Video
www.veritext.com                    A Veritext Company                    586-468-2411
www.veritext.com

237:24 238:10
280:11,13
284:6,22
287:17,24
291:21,22,23
321:25
**exhibits** 3:10
234:24 235:16
236:22 293:24
**exist** 62:7
122:16 170:17
310:9 352:13
353:19,23
**existed** 169:24
**existent** 90:5
327:14
**exists** 352:15
352:19 353:13
353:17,23
354:2,11,15,19
355:22
**expect** 24:12
208:11 265:17
378:8 393:24
394:4
**expectation**
27:18 186:24
353:1
**expectations**
320:21,25
321:12,14,19
322:3,5 323:7
**expected** 78:7
168:20 186:15

203:17 282:1,5
302:4 311:8
331:19 332:11
380:23
**expenses**
112:18
**experience** 71:7
72:8,15 73:4
89:9,20,21
251:18 289:20
289:20 316:17
316:18
**experienced**
82:25 199:14
214:14
**experiences**
31:19
**expertise** 68:6
69:21,22 74:3
74:5 149:22
156:17 158:23
**experts** 78:4
**expired** 397:2
**expires** 403:22
**explain** 7:7
72:6 127:12
250:18 365:20
374:24 392:18
**explained**
199:22 205:18
205:21 351:7
**explaining**
345:15

**explanation**
299:3
**explicit** 355:2
**expressed**
173:18 175:18
**extensive**
336:22
**extent** 98:1
211:22
**extra** 113:25
114:14,25
120:22 125:4
127:1 374:22
375:2 389:8
**extremely**
96:25 98:2
149:9 226:11
232:14 322:15
374:3

### f

**f** 1:10
**fab** 257:18
**face** 109:25
235:10 314:6
**facili** 70:9
**facilitate** 71:18
129:16 132:8
133:3 135:12
160:11 240:18
241:5,9,10,17
242:5 243:12
244:9,20,22
245:1,17,21

246:4,14
247:14,23
279:2 280:6
289:16 295:7
378:5 380:20
**facilitated** 71:4
109:16 110:15
110:22 128:4
128:21 129:13
218:24
**facilitates**
285:16
**facilitating**
74:13 130:12
131:25 244:14
247:10
**facilitation**
3:14,15 72:4
77:17 88:6
93:21,22
108:16 130:4
241:24 243:7,9
244:2,4 248:6
278:18 283:18
283:21 286:11
286:14,25
287:14 288:2,3
288:4,6,8,10,11
288:18 289:1,3
289:5,11,24
290:2,13 291:9
291:13,15,25
293:19 294:16
294:21 295:4

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                586-468-2411
www.veritext.com

**[facilitation - fiduciary]**                                                    Page 33

312:24 319:16
**facilitations**
66:22,25 67:1
67:6,17,20
69:9,16,17
70:8,12,24
71:4,20,25
87:22 88:4
128:21,23
132:1 156:11
156:12 240:10
278:25 279:1,4
279:13,15
282:7,17 288:5
290:4 295:1
**facilitator**
66:18 69:25
70:13,15 72:2
72:6,22 73:5
73:11,20,24
74:9 105:20
151:6 160:6,15
247:1 282:23
285:2,7 293:3
378:21 380:19
380:25 382:19
**facilitators**
71:9 78:10
245:17 285:5
286:2 378:23
**facilities**  251:5
**facility**  251:11
**fact**  15:9 16:17
17:1 78:5

128:2 141:17
168:10 170:8
174:3 193:2
225:3 240:22
247:21 255:25
267:2,6 310:4
354:24 355:3
393:6
**factor**  246:8
**factors**  365:22
**facts**  345:5
**fagan's**  157:10
**failed**  117:4
**fails**  309:14
**fair**  23:10
191:23 205:13
246:7 275:19
396:12
**fairly**  182:11
**fake**  99:14
**fall**  26:12 194:1
**falls**  80:21
**false**  127:4
150:24 165:17
165:21 167:1
227:25 228:6
228:10,12
231:2,3 282:12
**familiar**  15:2,5
18:6,21 94:24
208:13 384:4,8
**familiarity**
99:5

**family**  59:2,18
59:24 60:4,11
60:20,25 61:18
62:2,16 112:18
112:18
**fantasy**  83:23
**far**  49:24 50:22
70:24 129:5,7
129:8 156:22
163:13 165:18
166:18 195:9
200:17 206:1
214:14 219:4
260:13 289:24
380:5 382:11
**farmington**
2:11 5:22
**fashion**  28:12
**fat**  309:15
**father**  22:22
**fault**  401:3
**favor**  252:8
**favorite**  309:16
**fbmj**  94:6
**february**  19:25
28:14,17 30:23
30:25 34:5
175:24 198:6
232:15 252:24
271:10 272:6
286:23
**federal**  13:18
13:19,20,22
14:3,15,18,22

15:2,7,21
47:20 80:14
228:12 234:3
303:17 382:9
**fee**  39:4,7 73:5
129:8 385:22
386:2
**feel**  10:25 81:1
81:2 192:1
232:7 248:15
275:1 276:7
277:6 322:3,5
346:16 378:13
**feeling**  191:7
320:20 321:11
321:19 323:6
**feelings**  179:15
179:19,20,22
179:24
**fees**  38:8 39:3
184:3 385:4,24
386:11 389:7
**felt**  81:6 100:7
205:18 311:21
321:14 351:25
**female**  154:20
158:13 242:2,9
242:10 243:25
**females**  242:11
**ferndale**  35:21
**fewer**  89:24,24
**fiduciary**
218:25 219:7
381:7

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[field - firm]**                                                    Page 34

**field** 150:20
359:11,23
398:23
**figure** 303:19
360:21
**figured** 192:5
328:18,20
388:14
**file** 17:10,16
35:8,8 37:9
79:7 122:6
231:15,16
260:16 367:2
384:20
**filed** 4:12 6:25
7:2,9 35:14,17
153:15,22
154:13 166:15
167:3 214:4,6
227:12 230:12
230:17,23
231:6 232:19
232:24 233:25
331:10 360:2
364:2 368:24
375:18,23
388:12 391:19
396:7,10
**files** 115:22
117:7
**filing** 35:16
154:11
**fill** 231:16

**filled** 231:17,19
**finagling**
116:14
**final** 35:23,24
**financial** 331:3
331:8
**financially**
403:15
**find** 33:8 34:8
90:15 91:19
93:1 143:9
150:16 203:3
363:25
**finding** 188:10
228:16 234:14
252:7
**finds** 264:21
**fine** 6:7 102:9
114:10 140:23
144:12,22
180:3 191:21
247:20 260:3
268:6,9,24
275:6 336:1
392:25 401:17
**finger** 86:5
**finish** 10:8,15
10:23,25 13:25
14:5,11 18:14
21:1 44:17
53:17 54:6
55:12 57:2,3
64:22 66:5
75:2 102:24

107:13 110:8
116:22 118:9
119:9 136:3
148:21 158:4
165:25 172:20
175:5,7 189:25
196:4 204:10
204:18 205:1
206:23 229:13
229:20,22
257:11 259:3
260:19 278:3
292:13,18
305:22 306:1
310:20 320:11
326:7,8,23
331:16 334:8
335:1 349:10
359:21 402:6
**finished** 21:9
70:6 158:5,7
172:21,22
173:1 179:4,5
204:11,20
223:13 228:22
229:1,6,12
284:9 292:16
390:17
**fire** 366:22
380:12,18
**fired** 129:23
293:21
**firing** 367:4

**firm** 2:4 23:21
23:25 30:13,19
30:24,25 31:2
31:5,8,9,12,15
31:19,22 32:2
32:19 33:1,4,7
33:13,16,25
39:5,8 40:8,12
40:17 69:3
73:18 75:5
76:4,5,5,6,23
76:25 77:14
78:10 79:8
82:24 84:5,13
84:25 85:1,8
85:18 86:5,16
87:2 89:7 90:4
91:20 93:18
101:23 105:17
109:17 129:1
131:11,12,13
131:18,21,21
133:1 137:19
139:11 141:9
147:13 149:3
154:1 159:11
159:11 160:5,7
160:8 161:2,14
169:19,24
170:3,5,6,7,13
170:21 171:8
171:25 173:15
173:19 174:1
175:3,8 182:3

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                    586-468-2411
www.veritext.com

**[firm - former]**                                                      Page 35

| | | | |
|---|---|---|---|
| 182:5 183:24 | 86:7,9 108:7 | **flew**  272:9 | **ford**  76:18 |
| 185:2,22 | 108:21 109:4 | 335:10 | 81:17 156:14 |
| 186:21 187:12 | 371:5,7,9,12 | **flexible**  298:21 | **forgot**  21:1 |
| 187:16 188:7 | **first**  4:6 8:19 | **flight**  188:11 | **forgotten** |
| 188:10,19,21 | 21:15 23:5 | 317:11 337:25 | 261:17 |
| 189:9,17 190:8 | 24:4 30:18 | **flipped**  299:18 | **form**  104:14 |
| 190:10,20 | 31:1,2,11,13 | **flipping**  299:16 | 210:3 212:7 |
| 208:4,17 209:4 | 33:1,3 58:6 | **floor**  25:14 | 214:8 216:21 |
| 210:17,18,20 | 66:7,9 101:7 | **flow**  374:12 | 231:16,17,19 |
| 211:1,16,24 | 115:15,18 | **focus**  256:21 | 240:14 241:12 |
| 212:1,15,25 | 149:18,20 | **focused**  135:7 | 252:9 301:21 |
| 218:16,25 | 159:22,24 | **folder**  330:15 | 302:1,5,18,21 |
| 219:6,14,15 | 164:4 167:3 | **foley**  69:19 | 307:1,4 308:2 |
| 220:7 223:18 | 182:16 207:2,5 | 70:13,14 74:14 | 308:9,11 |
| 225:5 232:3,7 | 211:11 215:11 | 78:21 81:1,5,6 | 311:24 312:6 |
| 232:16 233:3 | 230:7 231:6 | 81:11,18,25 | 313:7 315:9 |
| 238:18 243:24 | 232:10 241:3 | **follow**  177:17 | 318:7 321:16 |
| 245:11 246:7 | 247:12 263:21 | 183:3 298:3 | 323:23 324:7 |
| 247:8,8 248:7 | 263:22 270:19 | 305:17 306:6,8 | 327:23 334:25 |
| 251:13,17,25 | 272:20 280:16 | 306:13 391:1 | 339:1 342:3 |
| 273:2 285:21 | 285:4,6,7 | **following**  58:4 | 347:5 348:15 |
| 301:15 330:14 | 288:4,10 302:6 | 196:18 227:17 | 348:24 350:23 |
| 355:10,21,21 | 302:6 312:19 | 266:5 295:19 | 352:14 353:20 |
| 356:2,5,10,17 | 343:2,8 346:11 | 303:20 365:11 | 360:12 361:24 |
| 360:25 363:16 | 350:12,14 | 383:11,12 | 373:9,10 |
| 368:8,12 370:7 | 366:20 370:7,9 | 387:17 | 381:10 |
| 370:8,18,23 | 370:11 372:14 | **follows**  4:8 | **formal**  86:12 |
| 371:11 379:2 | 375:12 | **food**  309:16 | 86:14 141:14 |
| 384:6 388:2 | **fit**  292:8 | **foot**  153:3 | **format**  177:11 |
| 392:6 | **five**  22:16 | **forced**  240:2,6 | **formed**  131:21 |
| **firm's**  211:3 | 182:21,23 | 240:7,18 241:5 | **former**  159:21 |
| **firms**  71:7,21 | 360:13 364:24 | 241:9,17,25 | 232:11 233:7 |
| 73:14 85:13,15 | 402:1 | 242:4 243:18 | 368:16 |
| 85:19,19 86:1 | | 244:9 | |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**forming**  31:12
33:13
**forth**  238:9,12
252:8 273:24
392:19
**forthcoming**
266:15
**fortunate**  391:7
**fortunately**
391:6
**forward**  25:4
95:3 261:17
264:20 266:8
282:2 296:15
298:22 299:1
315:23 340:15
392:14
**found**  39:4
108:9 143:11
227:20,25
228:16 237:6
**foundation**
26:3 29:5,19
**founded**  15:9
**founder**  131:21
**founding**
131:22
**four**  120:2
182:23 199:24
199:24 257:25
349:8 358:16
361:3
**fourth**  153:24
158:25

**fox**  21:18,19
22:15 25:6,7
25:20 26:24
28:2 29:3,14
32:18 33:17
36:2,4,8,9
37:20,25 38:1
38:3 39:3 40:4
167:12 370:8
370:12
**frame**  78:18
147:18 148:14
152:23 153:20
157:16 167:24
**free**  10:25
192:1
**frequency**  83:7
198:7
**frequently**
138:2
**friend**  43:10
**friendly**  97:1
98:2 104:25
105:18 160:8
315:8 316:1
**friends**  29:25
30:1 104:25
160:15 315:8
348:5
**front**  16:7 93:6
99:1 165:3
298:7 319:18
330:15 334:20
339:7 385:1

**frowny**  314:6
**frustrated**
323:5,12,14,16
**fuck**  327:9
**full**  5:15 31:21
50:14,24 73:19
305:24 329:14
369:22 398:25
**fully**  208:11
349:12
**function**
375:10
**funds**  185:11
213:2
**funny**  249:13
**further**  80:19
266:23 344:2
347:1 375:14
**future**  19:18
27:8 264:22
**fyi**  120:10
139:16

**g**

**gained**  232:2
**gallagher**  76:18
77:6,7 81:16
84:16
**gardeners**
378:22
**gemma**  47:1
50:3 57:16
**gender**  240:1,1
240:3 241:21

241:24 243:13
243:21,23
248:20 249:1
249:25 250:2
251:4
**general**  11:14
26:8,10 27:22
31:23 32:10,24
33:25 88:24
89:2,11,16
96:5,6 100:11
168:9,9 171:16
186:6 343:24
362:5
**generally**  8:6
8:13 15:5,14
15:25 26:14,15
71:8 78:7
206:5 384:8
**generate**  39:3
168:15,21,23
**generated**
386:11 387:12
**generous**
115:13 116:7
**gentleman's**
137:10 349:17
**georgia**  371:11
**gestures**  202:8
244:18
**getting**  32:19
35:25 62:5
74:10 93:17
98:10 102:12

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                        586-468-2411
www.veritext.com

**[getting - going]**                                                          Page 37

| | | | |
|---|---|---|---|
| 108:13 121:4 | 376:19 397:18 | 118:4,13 | 312:18 313:10 |
| 138:3,7 170:24 | **given** 17:1 | 120:22 128:9 | 315:17,20 |
| 181:17 184:1 | 47:22 87:16 | 136:6,11,13,20 | 316:23 319:20 |
| 203:10,10 | 142:19,22,25 | 141:6,20 145:5 | 327:4 328:8 |
| 209:6,7 216:23 | 143:14 147:22 | 145:6,13 151:1 | 329:17 330:25 |
| 217:10 270:10 | 149:4 152:13 | 158:11 162:23 | 332:21 333:14 |
| 271:8 372:12 | 206:9,13 251:5 | 163:21 166:13 | 334:11 335:17 |
| 379:7 391:9 | 251:8 298:19 | 166:13 172:25 | 336:16 338:1 |
| **gialanella** | 360:23 363:12 | 172:25 174:11 | 339:24,25 |
| 44:14,19 45:11 | 363:13 364:13 | 184:11 191:25 | 340:8,17 |
| 46:2,5,11 | 364:15 381:15 | 192:2,9 200:12 | 342:25 344:16 |
| **giamarco** | 386:7 393:6 | 203:17 204:3 | 348:4 350:8 |
| 137:15 | **gives** 205:7 | 204:15,23 | 351:23 352:8 |
| **giblin** 5:17 | **giving** 18:13 | 207:18 213:10 | 357:22 358:1 |
| **girl** 118:1 | 104:3 234:1 | 213:16 216:20 | 374:23 376:3,8 |
| **give** 20:9,11,14 | 342:22 347:18 | 238:4 239:7 | 377:2 380:3,20 |
| 21:1 77:20 | 356:4 | 243:1 247:8 | 383:6,7 384:16 |
| 79:17 80:10 | **glad** 140:1 | 248:5 249:4 | 385:9,9,13,21 |
| 81:15 85:4,22 | **gloated** 249:19 | 253:14 254:25 | 386:2,10,12,25 |
| 100:6 117:4 | **go** 17:5,21 | 258:4,12,13 | 387:10 388:15 |
| 142:2 151:8 | 20:25 38:5 | 259:1,11 | 393:1,24 398:6 |
| 152:3 189:2,24 | 42:11 45:16 | 260:14 263:6,9 | 398:8,13,15 |
| 205:4 206:22 | 48:25 49:11,14 | 263:21,22 | 399:1 401:18 |
| 209:24 234:4 | 50:4,6,8,9,16 | 264:2,2,3 | **goal** 149:5 |
| 234:11 239:10 | 53:7,23 55:9 | 267:23 269:19 | 300:1 |
| 246:7 262:7 | 55:16,24 57:2 | 271:6 272:22 | **god** 333:12 |
| 264:16,16 | 57:10,10,17 | 278:5,12 | **goes** 41:25 |
| 270:2 275:9,17 | 60:3,7 65:1 | 282:22 286:5 | 114:19 192:3 |
| 286:17 301:5 | 72:14 75:9 | 289:1,10,15 | 328:9 342:8 |
| 314:13 339:20 | 99:10 102:10 | 293:7,18 299:8 | 387:6,7,8 |
| 347:14,15 | 103:1,6 105:8 | 302:9 304:2,11 | 397:19 398:4 |
| 357:18 364:25 | 105:10 107:14 | 304:12 307:12 | **going** 7:24 9:2 |
| 367:7,9,12 | 107:14,15 | 308:14 310:4 | 10:12,14,19 |
| 371:21 375:1 | 109:4 114:25 | 311:16 312:16 | 16:2 17:10,16 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[going - good]                                                          Page 38

| | | | |
|---|---|---|---|
| 17:23 18:11,12 | 168:10 169:10 | 262:19,25 | 340:25 343:14 |
| 18:14 20:2,4 | 174:11 176:20 | 263:4,15,17,19 | 343:21 344:2 |
| 25:4 32:19 | 177:5 182:11 | 264:20 266:5 | 344:15,21 |
| 47:21 48:13,23 | 184:25 186:2,3 | 267:16,19,23 | 346:9,12,23 |
| 48:25 49:16 | 186:14 187:5,7 | 269:10,17,24 | 347:1,8,9,11,12 |
| 50:10 54:19,21 | 189:7,24,25 | 270:1,3,21 | 353:4,4 355:12 |
| 55:6,8,9,11,13 | 191:6,12 192:9 | 271:2 275:7,9 | 359:2,18 366:4 |
| 55:19 56:3,6 | 194:11 202:12 | 275:18 277:15 | 366:18 367:2,6 |
| 62:4,20,20 | 204:12,18,20 | 278:5,17,18,24 | 369:2,5,6,14 |
| 64:22 77:13 | 204:23,24,25 | 278:24 280:9 | 371:18 373:23 |
| 80:1 98:11 | 205:1,2,3 | 280:19,25 | 374:6,21 |
| 103:19 109:6 | 206:16,18 | 281:6,7 282:1 | 375:13 376:19 |
| 109:21 110:14 | 207:12 225:3 | 283:13 286:21 | 377:4,15 378:4 |
| 114:6 115:5 | 226:12,22 | 290:17,20,25 | 378:10 383:6 |
| 116:3,3,8 | 227:9 229:12 | 292:11,25 | 387:20 388:10 |
| 117:22,22 | 230:15 231:5,7 | 297:17 298:5 | 389:8 390:5,6 |
| 118:4,5,7,7 | 231:13,14 | 300:13,23 | 390:9,10 392:4 |
| 119:9,18,19 | 232:10,18 | 303:8,14,15,20 | 392:4,19,23 |
| 122:12 123:6 | 233:21 234:6 | 304:15 305:13 | 399:11,12 |
| 123:12,19 | 234:11,11,23 | 306:23 311:13 | 400:10,10,25 |
| 127:13 129:22 | 235:8 236:3,23 | 311:14 312:15 | 401:14,19,20 |
| 130:4 136:3,12 | 240:10,11,12 | 313:25 316:14 | 402:3,5 |
| 136:13,20,21 | 242:21 245:21 | 317:13,17 | **good**   7:24 56:8 |
| 136:25 138:3,7 | 246:4,25 247:2 | 318:5,23 319:3 | 56:10,11 87:11 |
| 138:8,22 139:5 | 247:22,24 | 320:1,19 | 98:13 100:21 |
| 140:13 141:3 | 251:7 253:7,14 | 321:24 325:15 | 140:1 192:9 |
| 141:20 143:24 | 255:10 257:19 | 325:17 326:23 | 206:21 214:19 |
| 143:25 144:4,5 | 257:23 258:2,5 | 327:2,4,10 | 230:9 257:20 |
| 144:6,17,23 | 258:6,9,10 | 329:7 330:3 | 260:17 277:24 |
| 145:4,8 148:2 | 259:2,5,6,7,12 | 332:5,6 333:2 | 281:12,20 |
| 148:20,21 | 259:17 260:4,5 | 335:1,6,7 | 309:6,11 |
| 149:24 157:17 | 260:15,16,17 | 336:10,16 | 311:25 312:3 |
| 158:4 160:1,5 | 261:6,8,17,18 | 337:23 338:20 | 319:18 322:21 |
| 160:7,9,16 | 261:21 262:17 | 338:22 340:17 | 328:20 335:15 |

**[good - gordon]** Page 39

| | | | |
|---|---|---|---|
| 362:24 | 47:15,18 48:2 | 95:8,17,22 | 133:9,12,20 |
| **goodwin** 281:2 | 48:6,10,21,24 | 96:4,19 97:10 | 134:5 135:1,16 |
| 281:4 | 49:4,8,10,18,23 | 97:20,25 98:17 | 135:23 136:18 |
| **gordgon** | 50:6,10,12,19 | 98:19 99:16 | 137:2,7 139:3 |
| 272:21 | 51:1,5,8,10,11 | 100:5,25 102:5 | 139:6,9 140:9 |
| **gordon** 1:21 | 51:17 52:1,10 | 102:17,18 | 142:6,13,20 |
| 2:13,15 3:7,10 | 52:20 53:1,6 | 103:5,12,14,20 | 143:6,20,24 |
| 4:20,20 5:14 | 53:12,18,21 | 104:5,15 105:7 | 144:2,9,11,14 |
| 5:18,24 6:1,2 | 54:2,4,8,12,18 | 105:13,15 | 144:19,23 |
| 8:7,16 9:9,17 | 54:21,25 55:4 | 106:5,11,24 | 145:2,4,7,14,22 |
| 10:9,12,17,24 | 55:8,13,16,22 | 107:11 108:3 | 145:25 146:3,4 |
| 11:6 12:5 15:6 | 56:3,6,10,16,19 | 108:25 109:25 | 146:13,19,25 |
| 15:16 16:9,10 | 56:22,25 57:1 | 110:3,10 111:6 | 147:5,8,20 |
| 16:20,24,25 | 57:9,13 58:19 | 111:18,22,23 | 148:3,11 149:1 |
| 17:4,12,19,23 | 58:21 59:6,12 | 112:14 113:20 | 149:15 150:11 |
| 17:25 18:16,20 | 59:16,21,22 | 113:23 114:10 | 150:23 151:14 |
| 20:3,5,7,12,14 | 60:2,6 61:5,6 | 114:12,21,22 | 151:22 152:11 |
| 20:16 23:9,19 | 61:16,21 62:10 | 115:8,24 116:2 | 152:12 153:6,8 |
| 23:20 24:11,22 | 62:12,25 63:3 | 116:4,22 | 153:11 156:16 |
| 25:3 26:4,13 | 63:6,8,11,16 | 117:13,16,21 | 156:21,25 |
| 27:1,15 28:1 | 64:4,12,17 | 118:1,4,7,10,13 | 157:5 159:17 |
| 29:10,20 30:17 | 65:7,19 66:2 | 118:16,23 | 159:18 160:4 |
| 31:10,24 32:6 | 67:12 69:13 | 121:9,11,24 | 160:22 162:15 |
| 32:16,25 33:20 | 71:6,13,24 | 122:10,12,14 | 163:9,13,17,19 |
| 34:13,16,25 | 72:13 74:22 | 122:18,20,21 | 163:20 164:7 |
| 36:11,21 37:1 | 75:4 78:9 79:6 | 123:3,5,9,12,16 | 164:12,14,22 |
| 37:8,13,24 | 79:12,14,19,21 | 123:18 124:5 | 164:24 165:16 |
| 38:4,13,18,22 | 80:3,9,21,24 | 124:16,20,22 | 165:23 166:10 |
| 39:2,11,21 | 81:7,12 84:24 | 125:18 126:4 | 166:12 167:2 |
| 40:2,16 41:8 | 87:5 89:15 | 126:22 127:8 | 167:20 168:6 |
| 41:19 42:6,10 | 90:18,20 91:1 | 128:12 129:21 | 168:19 170:2 |
| 42:21 43:19 | 91:2,4,7,14 | 130:9,16,25 | 171:9,18 172:6 |
| 44:3 45:15 | 92:2,5 93:14 | 131:4,9 132:5 | 172:21,24 |
| 46:24 47:3,11 | 93:16 94:10,11 | 132:10,19,23 | 173:21 174:16 |

Carroll Reporting & Video
www.veritext.com                    A Veritext Company                    586-468-2411
www.veritext.com

[gordon - gordon]                                                    Page 40

| | | | |
|---|---|---|---|
| 176:8,17 177:2 | 219:24 220:5 | 258:4,8,12,14 | 285:14 286:4 |
| 177:25 178:9 | 220:16,22 | 258:19 259:4,6 | 287:18,21 |
| 179:6,13 | 221:10,15 | 259:10,12,17 | 288:1,25 289:9 |
| 180:16,23 | 222:15 223:16 | 259:20,23 | 289:14 290:3 |
| 181:17,19,20 | 223:23 224:3,7 | 260:2,5,8 | 290:11,17,20 |
| 182:9 183:8,12 | 224:10,12 | 261:9,19,24 | 290:24 291:2 |
| 183:21 185:6,7 | 225:15 226:3 | 262:4,8,12,14 | 291:19 292:6 |
| 185:25 186:10 | 226:10,21 | 262:19,23 | 293:12,17,25 |
| 186:17 187:4 | 227:8 228:5,11 | 263:2,6,11,15 | 294:3,7,13 |
| 187:20 188:2 | 228:15,24 | 263:23 264:4 | 295:2,9,24,25 |
| 188:16 189:15 | 229:3,8,10,14 | 264:15 265:4,6 | 296:3,4,7,8 |
| 190:3,24 | 229:21 231:8 | 265:23,25 | 300:22 301:6 |
| 191:12,15,21 | 231:12 233:9 | 266:19,22 | 301:13,18,22 |
| 191:23 192:1,6 | 233:15,24 | 267:9,11,15,19 | 301:25 302:2,7 |
| 192:10,17,20 | 234:10,17 | 268:1,5,8,10,14 | 302:8,15,19 |
| 193:10 194:14 | 235:17,20 | 268:20 269:5,8 | 303:2,6,19,22 |
| 195:3,11 | 236:1,5,10,13 | 269:12,16,19 | 303:25 304:1,9 |
| 196:16 197:2 | 236:17,23 | 269:21 270:1,3 | 304:10 305:12 |
| 197:12,20 | 237:3,12,23,25 | 270:15,19 | 305:22,25 |
| 198:18 199:6 | 238:2,3 239:6 | 271:1,5,15,22 | 306:3 307:2,6 |
| 200:3,8,11,22 | 240:15 241:2 | 272:5,14 273:8 | 307:9,11,15 |
| 200:23 201:5 | 241:16 242:14 | 273:14,24 | 308:3,5,10,13 |
| 201:15 202:18 | 243:5,11,15 | 274:2,5,9,18,24 | 310:21,25 |
| 202:25 203:20 | 245:14,19 | 275:2,8,11,14 | 311:2,3,11,13 |
| 204:9,13,16,18 | 246:11,18,21 | 275:18,20,25 | 311:17,19 |
| 204:22 205:4,7 | 247:17 248:4 | 276:6,13,15,16 | 312:2,7,14 |
| 205:9 206:8,12 | 248:23 249:3 | 277:15,18,23 | 313:9 314:20 |
| 206:17,22,25 | 250:9 251:1,24 | 278:14,21,23 | 315:7,11,13,17 |
| 209:17,23 | 252:4,15,22 | 279:10,20 | 315:19 316:4,7 |
| 210:6 211:7,15 | 253:10,11,17 | 280:12,18,24 | 316:9,13,16,22 |
| 212:9 214:9,18 | 254:5,14,18,22 | 281:1,24 | 318:11,21 |
| 216:23 217:2 | 255:5,6,15 | 282:10,21 | 321:18,22 |
| 217:13,15 | 256:12 257:5 | 283:12 284:7 | 322:1,2 323:3 |
| 218:1,20 219:3 | 257:13,17,20 | 284:11,16 | 324:1,9 325:7 |

| | | | |
|---|---|---|---|
| 325:21,25 | 369:12 370:5 | **grant** 264:25 | **guys** 20:8 32:18 |
| 326:18,22 | 371:17 373:23 | **granted** 7:9,10 | 33:12 38:7 |
| 327:2,5,21,25 | 373:25 376:13 | **grasp** 296:16 | 40:5 116:13 |
| 328:15 329:1 | 376:17,23 | 296:18 387:23 | 117:14 140:16 |
| 329:12 331:6,7 | 377:4,15,19,22 | **great** 19:9 | 192:6 204:23 |
| 331:18,23 | 379:9,13,18,19 | 107:17 256:2 | 206:17 246:5 |
| 332:2,3,7,8,25 | 380:2 381:3,11 | 264:9 268:11 | 246:13 247:3 |
| 333:12,13 | 381:23 382:2 | 328:12 402:10 | 255:11 270:20 |
| 334:1,10 335:4 | 382:21 383:18 | **grievances** 89:3 | 272:9 328:21 |
| 335:9,19,22 | 384:10,21,24 | **group** 71:9 | 340:7 346:9 |
| 336:10,15 | 386:24 388:19 | 88:9 | 370:15 389:1,9 |
| 338:8,12,16,18 | 388:24 389:4,6 | **grow** 29:22 | 401:16 |
| 339:4,18 | 389:13,15,23 | 309:15 | **h** |
| 340:12,14,16 | 390:3,8,15,18 | **grown** 108:18 | **h** 30:8 |
| 341:22,23 | 390:20 391:20 | **guess** 36:19 | **ha** 310:4,4,4,4 |
| 342:5,19,24 | 392:17,23 | 39:6 124:20 | **hac** 14:16 |
| 343:3,5 345:14 | 393:4,16,18 | 130:19 134:14 | 25:22 |
| 345:16 346:4,7 | 394:2,3 396:6 | 242:8 256:20 | **half** 115:16 |
| 347:7 348:3,12 | 396:18,20 | 276:9 292:19 | 120:8 191:10 |
| 348:16,21,25 | 398:3,12 | 319:22 322:10 | 199:25 232:10 |
| 349:4,10,16,23 | 399:11,13 | 328:16 370:13 | 376:21 |
| 350:1 351:2 | 400:3 401:10 | 395:23 | **halfway** 232:9 |
| 352:17 353:22 | 401:14,19 | **guessing** | **halstrom** 28:21 |
| 354:14 355:15 | 402:1,5,8 | 189:21 193:7 | 30:6 |
| 356:13 357:5 | **gotten** 27:6 | 193:12 313:24 | **hand** 91:9 |
| 357:11,13,24 | 40:4 184:3 | **guesstimating** | 115:6 120:3 |
| 357:25 359:2,4 | 187:24 261:15 | 374:10 | 125:24 169:15 |
| 359:7,14,15,25 | 374:18 391:9 | **guidance** | 231:5,7,14 |
| 360:16 361:16 | 393:9,12,19 | 208:12 304:25 | 234:6 236:25 |
| 361:21 362:9 | 396:1 | 319:23 | 269:2 278:24 |
| 362:21 363:2,9 | **governor** | **guy** 247:4 | 280:9 339:25 |
| 363:24 364:18 | 249:16,17 | 341:24 | 351:4 385:14 |
| 365:19 368:19 | **grade** 62:16 | **guy's** 346:11 | |
| 368:22 369:4 | 63:5 | | |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**handcuffing**
83:20
**handed**   237:4
**handing**   207:1
**handle**   36:16
38:17 71:20
112:18 207:16
251:22 298:20
386:3
**handled**   73:18
73:20,22 74:6
87:12 251:25
**handles**   38:14
**handling**   26:21
69:15 70:23
71:3 72:23
73:25 77:14,17
87:23 225:5
240:9 260:13
261:25 262:1
264:6 284:20
284:21 385:4
**hang**   13:24
116:2 133:15
196:4 240:4
241:3 242:20
319:7 335:10
359:21
**happen**   34:17
183:9 207:12
207:14 261:3
305:6 339:13
**happened**   63:4
77:4 82:13,19

82:21 83:10,12
101:7 127:23
148:8 196:10
196:11 202:4
206:2 210:24
214:7 246:2
261:11 288:6
293:20 340:17
340:19 343:13
347:20 351:8
351:11
**happening**
90:11 181:24
277:6 320:10
**happens**   125:4
**happy**   16:1
32:9 62:19
64:8,23 92:23
99:19 104:18
104:20 106:12
106:13,15,17
106:19 107:6,8
107:16,19,20
111:4 121:20
140:2 169:1,13
236:25 264:16
283:19 286:9
303:16 325:2
334:17 393:20
393:22,23
**harass**   231:24
232:5 262:18
266:6 273:18
276:5 326:21

**harassed**   130:3
135:13 200:13
201:25 203:2,4
233:4,11 238:7
378:13
**harassing**
146:11 198:25
199:9,21 261:4
266:16 267:2
274:15 276:12
277:22 329:21
331:22 333:24
348:11 378:7
**harassment**
81:22 82:1
159:14 200:4
201:8,11,22
202:13,16,20
203:13 222:19
222:20 232:11
232:21 233:7
243:20 256:17
**hard**   107:8
119:13 145:18
235:9 324:14
391:1
**hardy**   4:24,24
117:3 235:1,5
235:8,13
236:14 267:22
267:24 376:19
**harm**   244:23
**harris**   284:12
285:1 286:10

286:18
**haul**   7:25
**haynes**   47:1
50:4,20 51:20
51:23 52:4,14
52:18,19,25
53:5 57:16
**head**   9:16
14:20 26:1
39:20 45:24
46:20 58:2
94:16,18
101:16 140:22
166:19 175:14
188:24 256:4
285:3 303:1
352:16,20
353:2 354:19
367:11 384:1
395:3
**headshots**
372:12,16,19
**health**   44:13,17
45:10 46:10
76:19 277:8,12
**hear**   103:2,3
106:15 125:3
193:19 267:12
292:21 382:15
**heard**   8:17 31:1
31:3 116:19
198:20 199:18
199:19 250:10
320:13

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

**hearing** 35:25
357:7
**heart** 277:6,22
278:8,10
309:13
**heavier** 41:18
**heavily** 217:18
**heavy** 79:3,23
81:1,2
**heels** 278:16
**held** 47:25
235:10 403:9
**hello** 94:16,19
**help** 26:18
62:20 92:22
107:12 110:7
113:13 125:24
139:18 216:24
304:20 312:11
317:8 333:23
334:2 358:22
358:24 361:11
361:12,18
**helped** 61:18
62:17 111:19
**helpful** 46:5
**helping** 299:11
299:14,22
306:18 316:25
**helps** 316:17
**henry** 76:18
81:17
**here's** 157:3
206:17

**hey** 115:9
246:4 247:2
280:20 281:2
**he'd** 131:23
**he's** 156:22
342:6
**hi** 6:2 28:9
111:7 143:2
**hidden** 320:25
**high** 112:15
278:9 361:10
**higher** 171:15
**highlighted**
90:23
**highway** 5:22
**hills** 1:21,22
2:11,16,17 4:1
4:15,16 5:22
**hines** 282:23,25
283:14 400:20
400:21
**hipaa** 48:18
**hire** 246:3,16
333:18 378:22
378:23,23
**hired** 131:20
132:13,21
133:2,23
134:23 187:9
242:9 245:15
246:24 333:17
333:17
**hires** 378:20

**hiring** 217:8
**history** 59:1,18
59:23 60:3,10
60:25 61:17
63:12 64:14,24
65:8 128:14,19
198:25
**hmm** 389:24
**hoc** 27:3,13
**hockey** 88:9
160:17,23
161:3,5,6,10,12
161:15,20
162:4,9 172:14
172:17 173:10
173:12 175:9
175:19 176:5
176:21,22
178:13,20
180:9,14,17
182:6,12,14,17
183:15,16,22
184:1,6,14,19
185:18 186:11
187:12 188:3,4
188:12 190:21
191:1,3 192:23
192:25 193:2,6
193:15,15,21
194:2,7,13
195:5,13,14,20
195:22 197:9
197:13,22,23
205:25 213:1

222:24 223:2,5
225:8,17,21
251:7 304:17
330:8 334:15
336:20 339:11
339:15 340:20
340:22,22,23
341:3,6 343:17
344:16 351:21
352:5,6,6,7,10
352:21 353:14
354:22,23
355:2,6,6,7,22
378:7,11
383:22 386:10
387:1,2 389:1
389:7 394:8,17
394:23 395:7
395:11,14,20
**hold** 10:7 18:11
18:11 53:16
54:1 103:18
236:20 257:7
258:18,18
259:18 265:6
271:19 276:8
301:25 345:10
379:20
**holding** 265:1
379:24 381:12
**hole** 306:22
307:18,22,24
308:18

**home**  20:23
21:22,25 22:1
22:2,5,6,7,13
22:14 26:11
284:19
**hon**  1:8
**honest**  315:25
**honestly**
262:15
**honor**  232:16
**hope**  34:7,19
34:20 36:18
289:21 291:5
**hoped**  84:6
291:7 315:25
**hopeful**  315:23
**hoping**  175:19
245:24
**horribly**
250:12
**horton**  137:16
**hospital**  72:20
282:23 283:15
**hospitals**  78:6
**hot**  273:9 274:7
276:17
**hotel**  188:10
341:10,11
**hour**  48:23
81:4,24 93:11
120:8 139:5
171:5,6 185:1
191:7,10,13,18
191:20,22

205:3 261:21
335:1,7,21
336:3,12
341:14,15,16
342:16 374:16
376:20,21
**hourly**  26:18
129:8,11
171:10 386:11
**hours**  49:7
54:23 81:24
140:14 183:25
184:5,8 185:17
349:11 369:22
372:18 401:2
401:22
**house**  96:22
**howell**  44:11
**hudson**  373:3
**huge**  397:5
**huh**  230:20
**hundred**  223:6
333:1,7 375:25
**hundreds**
326:12,12
327:6 328:4,22
**hurley**  1:11
4:25 5:2 73:18
73:22 74:6,12
74:13,15,16
75:12,16,18,19
76:14,15 77:8
77:14,21 78:10
86:23 87:1,6,7

87:24 88:7,16
89:23 109:7,15
119:7 120:18
128:1 207:19
208:5,19,24
220:13 362:3
363:19 364:22
**hurley's**  91:18
**husband**  52:15
52:25 57:14,16
65:20 271:12
271:16,23
327:11
**hush**  91:12,12
**hyde**  35:5,6
48:1 50:4
52:17 65:10
111:7 272:8,10
**hypothetical**
381:2 390:10
**hypothetically**
380:23

| **i** |
| --- |

**idea**  9:18 30:13
30:15 36:25
37:2,7,11,22
42:2 156:20
182:8 184:7
185:20,21
189:1 191:13
218:19,23
228:9 230:5
254:7 262:15

273:12 372:9
**ideas**  309:5
**identical**  334:2
**identification**
231:10 234:8
280:10 284:5
287:23
**identified**  3:10
44:18 353:14
**identifier**  269:1
**identify**  178:13
179:8 197:4
353:12,17
**identifying**
90:18
**illegal**  6:11,13
238:13
**imagine**  300:4
**immediate**
231:23
**immediately**
7:15 57:23
162:3 171:7
191:1 232:6,17
370:17
**impact**  285:21
**implications**
200:14
**implying**  122:5
**important**
160:19,23
161:1 208:8
209:12

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**impossible**
  393:16,17
**improper**
  303:10 327:23
**improperly**
  327:4
**inaccurate**
  61:11 68:14
  352:3 396:9
**inappropriate**
  55:19 82:4,6
  82:23 163:4
  199:11 202:6
  330:9
**incident**  334:6
**include**  176:15
  203:23
**included**
  158:23 204:4
  233:1 399:7
**includes**  208:22
**including**  15:11
  170:3 173:20
  208:21 255:10
  313:4 383:11
**income**  36:9,22
  38:8 39:4,7,22
  40:8,10,12
**incorrect**  54:8
  62:11 67:8
  124:8 146:25
  154:5 160:21
  161:19 188:17
  189:16 211:12

215:2 225:14
  225:19 333:3
  345:7 353:7,16
  354:9
**increase**  217:3
**indicate**  240:23
**indicated**  82:21
  157:6 366:7
  395:10
**indicates**  249:5
**indication**
  218:14
**indicative**
  200:25
**individual**  1:10
  15:10 82:15
  343:6
**individual's**
  345:11,17
**individually**
  51:2,6,20,24,25
  52:5,9
**individuals**
  152:19 359:16
**indoors**  344:20
**information**
  122:9 193:8,11
  197:17 224:7
  344:22,23,25
  351:12 356:23
  367:17
**informed**  171:4
  172:13 193:13
  195:23 232:6

232:12 247:14
  286:20 397:12
**ingrid**  28:21,25
  29:2,24 30:22
  32:1
**ingrid's**  30:5
**inhale**  298:18
**initial**  163:12
  163:16
**initially**  28:9
  36:1 129:20
**injury**  26:14,15
**input**  295:21
**insight**  312:18
  313:11
**insistent**
  277:22
**insists**  260:20
**instruct**  48:14
  55:8
**instructing**
  16:22
**insulting**
  145:21
**insurance**  68:7
  72:20 73:8
  372:21 373:11
**integrity**
  232:16
**intelius**  20:12
**intend**  25:6
  80:18 349:12
**intended**
  141:22 266:6

326:20
**intention**  69:6
  90:1 149:13
**intentional**
  244:23 245:4
  261:12
**intentionally**
  245:11 246:19
  260:9,11
  276:14
**interact**  96:24
**interest**  182:3
  254:15,21,23
  254:23
**interested**
  403:16
**interfere**
  121:13
**interference**
  127:4
**internships**
  66:12
**interpret**
  319:11
**interrogatories**
  9:22
**interrupt**  51:10
  54:16 143:23
  144:16 146:8
  146:17 243:4
  268:17 326:25
**interrupted**
  109:23 166:4,6
  166:10 259:10

292:20,22
293:1 350:7
**interrupting**
10:18 14:8
49:23,24
122:20 143:18
143:20 258:2
259:8 268:15
268:22 305:10
326:22 364:11
**interruptions**
117:13 323:6
390:19
**interview** 85:8
85:9 128:1
**interviewing**
112:10
**intimidate**
266:6 273:18
276:5 326:20
**intimidated**
315:3
**intimidating**
266:17 276:14
**introduce** 4:18
28:16
**inundated**
337:24
**invaluable**
208:13
**investigation**
27:5
**invite** 296:13
298:24 299:2

**invited** 96:21
140:24 253:25
272:15
**invoice** 41:25
210:20 212:14
**invoices** 41:9
41:10,20,22
170:9,10
184:10 208:23
208:24 209:3
210:10,11,12
210:13,16,25
211:2,6,8
**involve** 88:3
128:23
**involved** 14:21
25:22 78:14
93:5 105:25
107:22 120:13
126:6,9 141:2
141:13,16
156:1,2,3,6,14
157:7 158:15
158:16 190:2
294:8
**involvement**
14:22 211:22
217:9
**involves** 217:23
379:4
**involving** 83:23
294:16 356:9
**ipad** 142:3,10
142:11,14,15

143:11 147:9
147:12,17,23
148:8,15
162:25 163:21
164:5,6 165:2
**irrelevant**
266:7
**irritated**
323:20
**irs** 36:22
**isn't** 179:4
229:18
**issue** 46:10
99:21,23,24
100:1 248:6
262:9 264:20
270:19 279:1
291:3 304:12
355:25
**issued** 227:21
375:5
**issues** 84:4,13
100:22 308:17
366:3
**it'll** 377:20
**item** 12:19
**items** 9:23
**it's** 10:16 48:21
123:9 127:9,11
152:11 186:21
204:1 223:15
278:2 293:16
335:2 344:8
360:17 374:12

393:16 401:2,7
**i'd** 370:6
**i'll** 59:24 139:3
231:8 400:5
**i'm** 9:24 11:16
14:10 54:4
59:23 89:4
93:12 114:10
116:2,21 117:7
122:1 130:19
145:4,14,22
146:7 180:2
200:15 204:13
204:18,25
213:16 236:6
242:23 257:17
260:16 275:15
285:10 298:10
310:25 311:13
345:22 356:7
373:23 393:14
**i've** 56:1
154:20 163:14
191:15,16
215:3 349:19
401:4

| j |
|---|

**january** 35:11
35:15 101:18
128:9 175:23
280:13,20
281:19 286:23
370:19 372:15

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                            586-468-2411
                                                           www.veritext.com

372:17,22
373:14,16
**jared** 22:25
23:5,17 24:1,2
28:6,21,25
29:2 30:1,21
32:1 167:13
253:2,3,4,8,25
254:15 255:2,7
255:11 272:11
272:22,24
273:3 274:14
274:17 276:18
327:9,10
**jealous** 322:14
322:17 324:20
**jim** 89:17
**job** 66:7,9
67:22 77:2,5
85:10 86:3
87:14,18 91:20
92:7 109:14
110:17 128:1
136:22 138:13
139:10,11
140:21 147:11
147:21 149:3
163:1 167:21
202:4 216:8
217:6 245:12
245:21 246:9
246:23 250:17
328:20 362:18
362:22,24

371:20,23
372:3,9 382:24
**jobs** 78:16
85:16 86:7,9
86:10 90:7,15
91:19 93:1
108:9,19
250:16
**joe** 159:3
**jogged** 155:14
**join** 77:13
**joined** 76:4
**joining** 5:6
**joint** 53:8
**joke** 309:17,20
310:2
**journal** 179:14
179:18,21
180:12,13
181:2,3,6,6
**journaling**
181:4,5
**joyce** 293:7
**jr** 5:6
**judge** 48:2 49:4
127:12 144:6
147:1 249:8
264:18,18
268:14,18
**judges** 141:3
**juggling** 116:12
**juip** 82:11
**jule's** 304:14

**jules** 109:17
110:17 112:5,6
115:12,13
116:6,6 127:14
127:15,17,24
128:2,13,16,18
129:14,14,25
131:10,16,20
131:25 132:2,6
132:6,12 142:1
156:5 160:15
168:8,12
171:15 192:21
192:23 219:6
222:10,17,22
223:4,7,21
224:13,13,14
224:19,24
225:6,16,20
226:5 239:11
239:13 241:6,7
241:8 242:8,11
242:16,19,22
247:20 249:11
249:17 281:13
283:1,19,23,25
312:22,23,24
314:5,24 315:1
317:16,21,23
318:2,6,22
319:9,9,12,15
319:23 320:2,6
320:12 352:4
355:8 357:16

361:6 365:14
365:18 366:9
378:10,14
380:16,17,23
380:25 382:4
382:17
**jules's** 313:12
**jules'** 128:4
**july** 21:8 23:7
28:5 34:9 47:8
76:20 85:15
102:12 103:15
127:16 128:5
128:10,13
138:9,18
139:10 140:15
171:24 215:11
215:14
**jumping** 10:10
**june** 47:6,8
92:6 94:21
102:11 182:17
334:21 336:19
336:25 337:1
343:12
**justice** 396:24
397:5
**justin** 2:20 4:16

**k**

**kalahar** 364:19
365:5 368:17
**kaliszewski**
75:21

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**karen** 82:11
**katie** 45:13
  364:19 365:5
**katy** 45:17
  60:16
**keep** 10:18 25:6
  37:25 38:7,7
  38:11 56:20
  99:19 112:17
  116:3 117:22
  118:4,7 123:19
  127:13 130:22
  138:22 145:7
  150:13 162:20
  177:6,10,14
  179:21,23
  180:24 181:25
  182:2 184:8
  192:9 194:18
  247:24 257:19
  259:17 268:20
  275:12 298:22
  300:23 303:15
  305:13 312:15
  316:14 347:8
  352:6,7,11
  380:6,9 381:17
  392:4,8 401:19
**keeping** 382:25
**keith** 2:8,9 5:3
  10:18 235:20
  258:25 260:12
  261:24 262:11
  262:20 265:6

  267:15
**kelly** 75:21
  76:2,8
**ken** 333:18
  358:17 366:15
**kentucky** 22:17
  22:19 23:1
  24:8,13,23
  25:5 27:17,23
  44:17 45:6
**kept** 35:25
  176:23 177:5
  179:18 180:24
  212:1 258:1
**kerr** 85:21
  86:11
**kicked** 35:25
  397:1,2
**kid** 19:21
**kill** 257:13
  299:10,14,22
**killing** 306:4
**kim's** 371:10
**kimberly** 2:2
  5:5 346:5
  375:9
**kind** 36:18
  46:10 49:20
  88:21 94:4
  96:7 148:23
  169:20 170:12
  177:17 180:7
  195:14 216:19
  219:17 222:4

  222:10 309:16
  309:19 310:2
  332:10 341:5
  399:23
**kindly** 98:4,6,6
  389:21
**kindness**
  299:10,14,22
  306:4
**kinds** 176:3
  329:19 380:13
**knew** 33:7 74:6
  91:16 104:25
  105:16,17,19
  105:20 108:14
  113:21 128:3
  128:20,25
  129:6,7,9,13
  131:1,16,23
  132:1 136:13
  137:20 141:12
  150:19 151:15
  156:10 160:5,7
  160:14 162:2,4
  187:7 190:25
  207:24,25
  226:24 253:14
  310:16 311:25
  325:1,4 367:2
**know** 6:2 9:3
  9:15 11:4
  13:21 15:19
  16:11 19:17,20
  23:8 26:1 28:3

  28:7 29:6,7,7
  31:22 32:18
  33:9 35:16
  36:3 37:23
  39:25 40:6,7
  40:11,19,20,22
  41:2,3,14
  46:17,20 47:7
  48:16,16 50:22
  50:24 53:22
  55:15,18 58:2
  58:13,19 59:10
  60:8 61:9 63:8
  65:11 71:2,5
  72:7 73:24
  74:1 75:25
  79:15,19 82:18
  83:11 85:17
  86:13 87:20
  89:5 90:8 92:8
  94:17 97:8
  100:4 102:12
  103:12 105:9
  105:12,13
  106:3 109:19
  109:19 115:25
  117:23 119:13
  119:25 120:18
  121:17 122:3,3
  122:4 123:21
  123:24 124:18
  126:16 127:3
  128:23 130:17
  131:5,12,19,20

**[know - ladies]** Page 49

| | | | |
|---|---|---|---|
| 135:10 136:7 | 191:15,17 | 285:18 288:14 | 357:7 358:9 |
| 138:10 139:5 | 193:4 194:4,7 | 289:21 291:11 | 360:1,7,14,19 |
| 139:13,15,23 | 195:8 196:25 | 291:14 292:17 | 361:2 364:12 |
| 141:10,12 | 199:13,18 | 292:24 293:14 | 364:19 365:21 |
| 144:10,20,25 | 200:4 201:22 | 293:19,20 | 366:3,23 |
| 145:18 146:19 | 202:15,19 | 294:17 297:9 | 367:13,15 |
| 147:15,16 | 210:24,25 | 298:11 299:4 | 368:12 369:1 |
| 148:2,8,9,12,17 | 212:12,20 | 300:15 301:4,7 | 369:18 373:19 |
| 149:25 151:7 | 213:14,19 | 302:20,22,25 | 373:21 376:25 |
| 152:14 153:9 | 214:12,12 | 303:14 305:21 | 377:18 378:24 |
| 153:16 155:19 | 218:5,14,23 | 305:24 306:16 | 383:1,4 384:1 |
| 155:20 156:8 | 219:5,6,7,12,12 | 307:20 309:8 | 384:11,15 |
| 156:22 157:15 | 221:5 224:10 | 312:9,10 | 385:1,8 388:11 |
| 157:16 160:25 | 225:10 227:9 | 313:24 314:1 | 389:9 392:1,11 |
| 162:22 163:7 | 228:8,25 229:4 | 316:10,16 | 394:10,12 |
| 165:1,18 | 229:19,25 | 317:19 318:12 | 395:5,18,21,23 |
| 166:18 168:12 | 230:1,4 240:22 | 318:16,16 | 395:24 398:1 |
| 169:3,4,17,22 | 241:19 244:1 | 319:5,14,25 | 399:18 401:1 |
| 169:23 170:14 | 245:15 246:13 | 320:14 322:8 | **knowing** 225:8 |
| 170:14,16,17 | 247:3 249:12 | 325:12,15 | **knowledge** |
| 170:23 174:15 | 249:18,20,23 | 329:25 330:1 | 97:15 |
| 174:17 175:22 | 250:5,24 | 331:3 333:4,15 | **known** 131:23 |
| 176:15 177:7 | 252:24 255:1 | 336:13 339:19 | 214:20 348:18 |
| 178:25 179:2,3 | 256:23,25 | 340:4,12 | 348:22 400:15 |
| 179:25 180:4,4 | 257:1,22 | 341:13,24 | **knows** 50:14 |
| 180:7 181:12 | 259:23,25 | 342:1 343:10 | 90:13 92:25 |
| 182:1,18,25 | 262:14,19 | 343:10 345:3 | **kovacs** 372:14 |
| 183:11,19 | 267:10,16 | 345:18,22 | **l** |
| 184:18,19 | 268:10,11 | 346:5,21 347:8 | **l** 2:13 30:8 |
| 185:19 186:19 | 269:19 270:15 | 347:20 351:10 | **label** 255:3 |
| 187:19,21,23 | 273:16 275:3,8 | 351:24 352:15 | **labeled** 293:16 |
| 188:4,6,22 | 275:11 276:20 | 352:19,23 | **ladies** 144:24 |
| 189:6 190:4,10 | 277:8,17,25 | 354:3,11,15,18 | |
| 190:12,13,23 | 283:13 284:21 | 356:3,24 357:6 | |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**landon** 207:19
207:23 209:2
209:18 214:19
215:5,6,20
216:15 217:4
221:25 222:5
**laptop** 180:25
236:24
**larry** 207:19,23
209:2,18
214:19 215:5,5
215:8,10,20,22
216:15 217:3
221:24 222:4
**larson** 382:8,16
**lasted** 182:21
**late** 33:21
215:8 262:13
286:25 329:17
374:25
**laugh** 298:18
310:6
**laughbaum**
155:10
**lauren** 136:7,9
137:11 138:4,8
165:8 239:18
251:21
**law** 1:21 2:4,9
2:15 13:18,21
15:9 24:7,18
24:23 32:2
36:18 39:5
40:8,12 66:7,8

66:9,12 67:5
67:15,23,24
68:16 71:7,21
79:8 84:5,13
85:7,13,15,18
85:19,19,25
86:5 101:23
108:21 109:4
147:13 149:23
153:25 156:18
159:4,9 184:20
208:4,17 232:3
232:7,16
243:22,23
246:7 250:14
269:9 285:25
345:15 366:10
368:10 369:12
370:7,8,17
371:7,9,11,12
379:2 380:10
382:3,6,8
397:9
**lawsuit** 6:25
7:2 58:5 97:11
122:23 150:7,9
202:12 203:1
214:6 225:25
234:3 388:12
395:2 396:7,10
398:9
**lawsuits** 225:5
**lawyer** 10:13
29:17 67:5

72:8 108:18
149:18,20
157:9 158:22
205:7 230:22
260:13 265:14
265:17,19
266:1 294:20
333:1,4,17,17
**lawyers** 30:3
70:23 113:15
149:17 154:3
154:18 239:8
239:10 361:5
364:1 365:7
384:13
**lead** 72:1,1,15
72:16 208:9
213:16,22,24
214:1,10,13,22
264:8 266:14
355:17
**leadership**
308:20 400:9
400:22
**leafing** 339:21
**leagues** 41:16
**leaning** 113:13
217:18
**learn** 88:12
**learned** 17:20
69:14 140:15
172:18 209:3
**learning** 121:4
121:6

**lease** 21:8
**leave** 20:8 31:2
31:4,15 67:25
68:23 81:10,13
84:14 119:1
150:21 151:3
205:20,24
215:9 225:10
226:6 246:1
247:7 263:9
284:25 303:19
337:20 339:3,5
353:9 366:4,14
392:25 393:1
**leaving** 30:13
30:19 33:7
91:12,18
120:10 147:12
149:3 215:20
225:8 258:8
263:16 278:9
363:4
**lecturing**
276:15
**led** 343:14
**left** 30:24,25
39:13 78:21
79:2 85:1
168:1 170:3,5
215:1,23
216:16 217:4
217:16,17
219:14 220:7
222:3 225:25

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[left - longer]

226:4 239:19
239:21 242:12
312:3 369:1
376:20
**legal** 15:23
78:2 83:20
92:12 150:20
159:5 177:21
188:18 189:17
200:5 208:9,14
211:18 215:16
215:19 218:16
219:14 334:3
345:3,5 346:5
353:15 359:10
359:23 379:1,5
379:11,15,15
379:20 380:5,7
380:14,21,22
381:7,9,15,19
381:24 382:12
396:13,22
398:16,23
399:7 400:8
**lengthy** 374:6
374:14,15
**letter** 207:18,21
209:6,7,11,16
213:12,15,17
230:11 281:9
283:16
**letters** 199:11
199:19 200:18

**letting** 43:11
**let's** 56:2 145:6
145:23 192:9
259:17 335:17
388:15
**level** 20:24
316:10,12
**liability** 77:24
78:3 381:8
**licensed** 24:18
25:21
**lie** 6:11,13,16
136:16 282:11
**lied** 136:15
**life** 58:7 309:5
317:17 318:4
319:3,13 328:5
328:5,9 329:6
**lifted** 7:16
**liked** 95:5
200:25 313:5
**likely** 120:13
141:11
**likes** 29:22
268:18
**limited** 150:2
303:12 362:7
383:11 391:24
**limits** 327:12
**line** 63:15
258:25 266:5
266:15 326:16
335:2

**list** 45:22 46:19
71:17 85:23
108:20 155:9
239:7,10
357:18,19,20
367:10 368:13
368:14 398:25
**listed** 43:1,4
205:11
**listen** 14:12
110:12 246:13
257:2 316:16
331:10
**listening**
387:19
**literally** 37:2,3
37:4,7 136:23
327:7
**litigate** 366:18
**litigation** 14:13
27:4,5 90:4
**little** 76:13
84:11 89:19
93:2 110:8
112:16 119:12
155:24 158:9
191:8 239:17
249:9,9 275:5
309:17 314:2
375:7 377:20
377:20
**live** 36:6 37:19
397:8

**lived** 22:13
**living** 21:12,16
29:11 255:3
**liz** 387:7
**local** 5:21
262:3 265:8
**located** 4:15
5:19,20 25:7
26:21 30:9
39:17 120:17
313:16
**location** 22:9
25:15 43:7,9
43:10,18 74:24
**locations** 29:11
**lodging** 23:22
**long** 7:24 20:17
35:22 47:12
49:2 57:25
65:1 88:8
100:15 131:23
174:10 208:18
214:20 219:10
219:10 229:15
266:9 277:15
298:5 327:18
335:19 370:19
373:25
**longer** 48:21
68:12 90:4
215:5,6,10
220:8 366:17
397:6 398:19
399:7

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[look - made]**                                                    Page 52

**look**   62:19 84:7
84:8 90:6 91:8
104:18,20,21
116:14 155:9
164:3 169:2,13
169:15 187:14
189:3,4 216:23
240:12 256:21
269:1,13
270:20 273:9
274:7,11
283:19 284:4
286:9 299:12
305:13 308:23
318:17 320:22
321:2,9 334:18
337:2 338:21
338:22 339:19
340:1,14 368:7
371:6 384:2,2
392:14 394:14
399:16
**looked**   8:2,6,9
9:5,7 84:10
95:3 151:16
361:10 371:7,8
381:23
**looking**   9:24
29:4 33:7 62:2
76:22 78:15
91:19 93:12
101:24 102:25
105:6,8 108:19
108:20 109:3

113:14 115:22
115:25 124:17
154:14 165:5
174:6 180:1
185:16 192:16
235:5 241:22
250:25 251:2
269:2 275:16
295:23 296:15
297:5 299:1
304:20,25
305:16 313:18
313:23 319:10
320:14,23
351:9 371:5
373:12 385:1
**looks**   24:1
185:16 298:10
299:15 336:22
336:24 337:4
**lot**   9:6 24:15
32:10 69:15
91:7 94:4
116:5 144:15
147:16 153:21
191:16 222:24
223:3 225:18
262:5 285:11
285:16 316:25
322:22 324:2
328:17 336:6
337:21 359:5
367:13,15,18
378:16 398:6

**loud**   280:25
355:1
**love**   132:7
136:3 144:19
165:25 203:22
203:24 204:4
257:18 297:4
298:21,21
320:11 328:5
359:20 391:3
**low**   112:16
125:2 158:8
171:11 225:6
361:10
**lower**   54:12
251:6 384:14
**lpl**   373:3
**luck**   7:24
**ludicrous**
311:15
**lull**   192:4
**lunch**   93:12
128:5,6,8,9
139:5,6 223:4
224:6,13,14,17
224:17
**luncheon**   139:8
**lying**   124:6,7

**m**

**m**   2:14 30:8
350:11
**mackenzie**   1:12
4:22 13:11,13

13:17 78:16
91:23 93:8
110:16 124:24
131:14 147:11
160:10 163:3
164:16 178:23
203:13 225:24
238:6 239:11
280:15 283:7
295:18 296:10
296:13 304:21
305:8 354:18
358:3,14 362:4
363:20 364:22
365:11 397:13
398:21
**mad**   314:23
**made**   31:8
81:10 82:4
83:6,7 84:7,25
97:15 116:24
138:18 145:20
149:9 160:16
161:1,9,14,17
163:14 177:24
188:7 200:1
205:19 220:9
220:12,17
221:24 222:3,7
222:10,16
228:12 245:2
245:20 252:7
278:25 282:19
290:5,6 308:21

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[made - matters]**                                                    Page 53

324:2 325:22
331:3,8 349:5
349:13 356:4
377:17 380:20
**mail** 43:13,17
**main** 22:20
**maintaining**
208:10
**maj** 397:12,20
400:9,22
**majzoub** 293:2
293:8
**makarski** 70:17
71:5
**make** 5:10 37:5
56:6 80:13
82:6 84:9
85:23 109:11
112:17 113:5
117:9 119:22
130:23 136:5
143:24 145:4,5
179:22 181:10
192:22 211:19
246:5 257:3,24
261:25 263:23
266:2,3 270:3
277:24 281:14
294:4 300:13
306:21 307:17
327:18 390:4,6
397:13
**makes** 15:8
209:11 304:17

**making** 56:8
107:20 145:15
146:7 196:6,6
228:16 232:13
232:19,22
310:1,10 316:9
319:12 322:22
329:9 343:3,15
374:6 383:7
**mal** 66:15
70:14 71:8,14
72:5 73:15,20
73:22,25 74:6
77:14,21,25
128:23,25
131:24 137:18
156:23
**male** 155:13
239:22 241:23
**malpractice**
26:11 66:17
68:2,7 69:16
69:18,23 151:5
391:19
**mama** 314:22
315:2
**man** 106:17,19
107:19 110:21
113:13 131:16
144:23 156:9
324:3 344:24
345:1
**management**
89:19

**manager** 76:8
220:18,21
**managing**
82:17
**mandatory**
79:25 80:17
203:16 353:18
**manis** 70:19,19
71:2
**manner** 45:10
83:21 98:3
265:13
**march** 28:14,17
30:23 96:22
**marilyn** 75:21
76:2,7
**marissa** 286:20
**marital** 46:21
46:25 49:12,20
50:1,2 51:9,12
52:13,22 53:8
**mark** 123:5
144:1
**marked** 231:10
234:8 236:9
237:21 280:10
284:5,22
287:23
**marking** 54:22
**marriage** 64:15
64:25 65:2,9
65:10,11,15,18
**married** 34:10
34:14,18,19

35:1,4 65:21
**marry** 35:6
**maryland**
21:17 26:23
45:5
**marzotto** 4:21
**massachusetts**
30:11
**match** 388:18
**material** 216:9
216:14 217:11
277:19,25
344:5,6
**materials** 284:1
284:4
**maternity**
366:4,14
**math** 387:19
**mathematician**
42:13
**matt** 149:21
152:21 154:22
159:1,8
**matter** 4:12
16:5 48:19
62:11 143:21
157:14 177:23
225:4 243:21
257:10 269:3
292:1 333:8
354:22 401:6,6
**matters** 98:11
98:24 129:3
255:9,12 276:8

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

**[matters - meijer]** Page 54

352:11 356:16
**matthew** 281:6
**mckeen** 66:7,14
67:14,18,21
68:3 85:20
86:15 371:20
**mckeen's** 66:23
67:2,23,25
**mckenna** 1:5
1:18 3:5 4:4,11
4:12 6:2,4,6
10:25 25:6,20
36:2,5,9 37:21
37:25 38:3
39:3 40:4
50:20 55:5
57:2 67:5
110:16,16,17
116:23 124:12
124:24 126:24
127:3 131:13
192:14 196:20
198:11 227:17
227:21,22
281:17 299:13
359:9,21 403:9
403:12
**mckenna's**
124:13 126:24
**mcmillion** 1:8
**mcnevin**
346:12 350:3,9
**mean** 12:24
62:21 66:10

83:18 88:1
91:22 96:6
100:3,4 106:3
129:23 160:25
180:4,13 188:9
193:3 197:14
202:2 215:3
216:19 240:7
250:18 254:20
255:20 284:15
288:12 289:6
290:12 309:20
311:6 327:11
337:25 363:25
367:13 369:6
377:3,6 380:5
380:22 387:13
389:22 395:18
**means** 37:14
60:8 94:4 98:7
188:22 200:4
243:20 291:11
294:17,25
375:19 382:10
387:9 390:12
**meant** 297:1
307:23 309:25
315:23 319:4
399:19
**med** 66:15
70:14 71:8,14
72:5 73:14,20
73:22,25 74:6
77:14,21,25

128:22,25
131:24 137:18
156:23
**mediate** 240:2
240:6 241:25
243:18
**mediated** 66:23
67:6 69:10
**mediating**
94:14
**mediations**
67:13 240:8
**mediator** 293:2
**medical** 26:11
62:3 66:17
68:2,7 69:15
69:15,18,23
151:4 277:13
391:19
**medication**
46:5,7,14
57:21
**medications**
45:21,21 57:18
58:1
**medici** 159:3
**meet** 23:5,13
28:2,22,23
78:4,5 108:17
127:14,22
295:18 296:14
298:25 300:8
306:21 307:18
340:22 342:2

342:14,15,16
343:6
**meeting** 28:8
82:10,22 84:3
109:17 110:15
127:15,17,19
127:23 128:7
128:13,17,18
129:14,25
132:6 190:21
224:14,17,17
224:23 262:14
262:16 270:5
271:7,24 272:6
272:9,11 305:8
305:18 306:23
307:16 314:3,9
317:15,21,23
318:2,6,22,25
319:9,9,12,15
320:6,20
321:12,14,19
322:3,5 323:6
323:7,12,14
334:22,23
352:23,24
353:18 355:11
355:22
**meetings** 107:4
107:21 208:21
353:14 355:1
**megan** 155:1
**meijer** 83:22

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

[melissa - mischaracterize]                                    Page 55

| | | | |
|---|---|---|---|
| **melissa** 400:20 | **message** 90:9 | **methods** | **mike** 155:1 |
| 400:21 | 97:9 99:1 | 176:14 | **mile** 2:10 |
| **mellon** 67:15 | 105:11 174:18 | **metro** 158:21 | **million** 381:20 |
| 67:24 68:5,24 | 319:11 | **metzger** 82:9 | **mind** 19:19 |
| 69:8,17 89:17 | **messages** 12:21 | 82:10,17 | 70:18 84:11 |
| **member** 342:7 | 12:25 13:4,6 | **mha** 140:24 | 209:9,10 |
| 342:10 345:1 | 13:10,12,14 | **mhm** 255:23 | 334:20 347:17 |
| 396:24 397:20 | 32:20 93:7 | **michael** 70:16 | 377:19 |
| **members** | 97:5 119:13 | 71:3 154:1 | **minded** 29:23 |
| 351:16 | 124:7,9 134:2 | **michigan** 1:2 | **minimum** |
| **membership** | 134:3,7,12,21 | 1:22 2:11,17 | 37:22,23 42:16 |
| 210:9 | 135:4,5 137:11 | 4:1,13,16 5:22 | **minute** 17:22 |
| **memorandum** | 140:7,11 165:7 | 24:16,21 25:21 | 135:17 160:13 |
| 207:3,5 | 165:8 174:21 | 25:23 26:21 | 176:20 206:22 |
| **memory** 155:14 | 174:23,24 | 27:18,19 39:17 | 240:11 247:22 |
| **men** 326:14 | 240:23 299:6 | 42:18,23,25 | 258:9 263:1 |
| 328:5,6 | 309:1 310:9,22 | 43:2,4,6,20,21 | 278:15 295:24 |
| **mental** 44:13 | 314:18,25 | 44:5,7 89:18 | 313:19 335:17 |
| 44:16 45:10 | 320:15 323:25 | 150:16,17,21 | 400:2 |
| 46:10 308:21 | 326:6 329:18 | 151:16,23 | **minutes** 93:10 |
| **mention** 80:6 | 336:23 | 152:25 154:15 | 205:8 261:23 |
| 100:19 128:4 | **met** 6:3 23:7,12 | 154:18,21 | 263:25 278:16 |
| 328:10 | 24:2,4 28:4,5,6 | 156:7 264:12 | 305:15 336:13 |
| **mentioned** | 28:9 29:14 | 265:9 286:3 | 368:25 374:20 |
| 25:22 27:16 | 78:16 92:10,12 | 336:7 371:13 | 374:22 375:2 |
| 85:8 108:21 | 92:16,20,21 | 371:19 391:18 | 376:18,20 |
| 109:4 200:17 | 93:19 102:13 | 396:24 397:4 | 377:16 389:8 |
| 201:18 244:3 | 102:20,20 | 403:3,21 | 392:21,24 |
| 279:21 | 104:9 110:17 | **mid** 89:22 | 393:3 401:12 |
| **mentioning** | 132:1 208:15 | 184:11 | 402:6 |
| 176:5 | 253:2,3 340:19 | **middle** 41:15 | **miscellaneous** |
| **mere** 165:15 | 342:1 343:8,8 | 166:9 277:3 | 68:8 129:11 |
| **mess** 117:8 | 343:11,12,13 | 294:3 326:9,24 | **mischaracteri...** |
| | | 390:16 | 162:20 291:1 |

Carroll Reporting & Video
www.veritext.com                A Veritext Company                586-468-2411
                                                                www.veritext.com

**[mischaracterized - name]** Page 56

| | | | |
|---|---|---|---|
| **mischaracteri...** 286:8 290:19 | 225:4 240:24 241:14 249:6 | **mouth** 325:10 346:1 | **multiple** 81:14 81:15 101:4,19 |
| **misrepresenti...** 357:9 | 251:9 273:17 322:22 332:10 | **mouthing** 261:14 | 108:6 135:25 153:13 158:1 |
| **missing** 9:4 329:6 395:5,7 | 332:20 385:3 394:16 395:20 | **move** 22:5 24:15 25:5 | 173:18 198:3 198:12 224:16 |
| **misspoke** 113:4 113:4 115:11 | **montana** 26:25 **month** 30:22 | 27:23 35:20 42:8 47:10 | 324:24 326:2 330:21 364:13 |
| **mistakenly** 159:13 | 41:23 42:12 137:24 170:9 | 56:13 80:2 112:17 151:4 | 382:23 **municipal** |
| **mistreated** 306:5 | 175:17 183:2 **months** 20:19 | 157:9 160:1 258:6 261:17 | 89:18 **m'hm** 44:20 |
| **mistreating** 99:20 | 41:18 42:14 81:5,24 96:22 | 268:8 271:3 275:5 278:18 | **n** |
| **mixed** 250:1 | 115:18,19 174:9 215:16 | 309:15,21 315:23 327:8 | **n** 350:11,11 |
| **mogill** 333:18 358:18 366:15 | **mood** 313:12 **morning** | 360:6 **moved** 8:18 | **name** 4:16 5:15 14:19 22:24 |
| **mom** 62:15 | 270:20 274:20 274:23 | 20:22 21:25 22:7 25:11 | 27:14 30:5 57:22 70:18 |
| **moment** 117:25 153:14 256:16 | **moses** 371:10 371:25 | 35:13,21 43:16 45:1 92:24 | 72:10,17,18 73:1 131:13 |
| 266:25 | **mother** 19:18 44:9 | 138:1 309:22 339:24 386:25 | 137:10 138:6 152:24 154:21 |
| **mona** 293:2,7 | **motion** 7:9,10 7:15 17:10,17 | **moving** 21:9 24:14 27:17 | 157:25 158:12 159:3 189:25 |
| **monday** 4:2 295:19 296:14 | 56:8 154:12 260:16 268:4 | 42:24 44:17 146:10 261:5 | 238:18 269:14 281:6 329:6 |
| 298:25 403:10 | **motions** 360:2 | 266:7 267:17 267:17 268:7 | 331:10 345:11 345:17 346:11 |
| **monetary** 16:3 | **motivational** 297:21 | 298:22 312:5 **ms.gordon** 62:7 | 346:12 347:14 347:15,19 |
| **money** 15:11 36:6 37:2,19 | **motor** 156:14 **mountain** | **mullins** 75:21 137:15 221:8 | 349:17 350:2,5 350:6,12,14 |
| 37:20,21 38:11 41:11,15,24 | 271:9 272:2 | | 363:14 368:11 |
| 62:8,25 82:24 83:2,4 112:19 | | | |
| 116:6 184:1,3 186:14 212:1 | | | |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

368:11,12
373:16
**name's** 350:3
**named** 76:17
231:21 232:2
**names** 45:23
46:18,19 70:17
109:5 136:6
137:8 152:2,3
152:4,9,13,13
152:15,19
155:9 345:21
356:4,15,20,24
358:9 361:3,4
364:15 367:7,8
367:10,16,22
367:23,24,25
368:13 400:5
400:10,13,17
400:23,24
**naming** 355:25
**nature** 56:17
56:19 83:13,15
88:24 179:21
201:9 392:6
**nauts** 86:16
**navigate** 151:7
151:9
**navigating**
26:19
**ne** 2:5
**necessarily**
15:18 139:15
139:16

**need** 11:2 19:16
20:6 26:18
36:6 37:20
40:15 44:1,16
59:5 60:13
103:10 110:2,3
110:14 117:13
117:22 157:16
160:11 169:17
177:17 191:25
204:14 205:4,5
237:1 246:1
247:3 262:13
266:9 268:20
274:6 278:8
281:13 307:7,9
331:25 335:16
335:22,24
336:1 339:21
362:25 390:18
399:18 400:23
401:1
**needed** 27:19
27:20 57:20,22
78:3,11 211:20
333:1 337:20
352:1 397:12
**needless** 261:14
**needs** 131:6
206:15 208:15
286:20 381:17
**negative**
134:22 227:6
285:20 290:12

324:10,17
**negligence**
26:11,16
284:19
**negotiate**
123:24
**negotiated**
124:12 126:24
127:1 171:5,19
171:21
**negotiating**
219:5 377:7
**negotiations**
41:16 121:14
126:6,9 141:13
141:16 208:22
**neither** 284:10
**nervous** 319:24
319:24
**network** 29:22
**networking**
341:6
**never** 47:24
50:3 74:12
86:13 97:5
132:6,11,13
156:9,10,17
161:22 169:20
170:6,18
171:24 172:8
173:14 186:22
186:22 187:1,3
187:5,11
192:21 196:1,9

218:9 224:14
225:11 235:19
236:1 252:16
298:19 329:20
330:12 336:2
339:24 344:10
344:14 345:9
354:20 355:7
382:18 391:9
**nevertheless**
235:11,25
**new** 14:7 30:3
33:1,4 35:11
44:16 85:10
90:6,15 91:19
93:1 101:23
106:7 147:11
204:25 208:4,6
208:17 211:1
217:8 232:7
246:25 307:13
318:10 362:18
364:4 370:7
**nice** 94:3 95:12
95:14 96:15
313:3 316:1
317:7 397:13
**night** 274:14,16
298:5 341:12
341:25 343:13
374:17 375:2
**nine** 392:21,23
393:1,3

**nld**  272:24
**non**  146:16
  259:16 260:23
**nonresponsive**
  143:22
**nonsensical**
  343:4
**normal**  191:19
  208:16 289:20
  289:20,24
  294:20
**normally**
  294:20 369:5
**northwestern**
  5:21
**nose**  305:19
**notary**  403:1
  403:20
**note**  48:22 94:3
  263:23 286:18
  336:10
**notebook**
  179:14,18
  180:8 329:14
  339:21,22,25
**notes**  61:7
  105:8 139:15
  177:4,10,14,14
  177:15,21,24
  178:7 179:22
  186:2,4,5
  199:11 202:7
  203:7,10
  244:17 262:2

**notice**  5:9 38:3
  135:8 141:9,14
  141:18,21
  144:18 147:22
  149:4 150:3
  227:22 237:4,5
  237:8 369:4,9
  375:4,10,19,23
  391:18 392:15
**noticed**  32:17
  369:24 375:21
**noticing**  369:25
**notification**
  227:24
**noting**  54:4
  316:20
**november**  1:20
  4:2,10 20:20
  44:1 94:2
  134:9 184:24
  190:25 287:1
  293:6,13
  370:18,23
  372:11 403:10
**now's**  335:15
**number**  5:15
  9:24 12:13
  26:1 37:23
  40:19 55:25
  69:22 81:5
  90:19 92:1
  104:7 111:14
  111:21 145:12
  164:11,21,22

168:17,23,24
185:4,19
188:24 189:2
227:6 231:11
234:5,9,11
275:17 284:6
287:15,24
296:2 302:25
319:16 321:21
337:18 349:13
359:12 361:4
374:4 384:1
385:19 386:15
386:20 388:5,6
389:5 390:21
392:9 394:19
395:3 396:4,8
396:10
**number's**
  388:16
**numbered**
  321:23
**numbers**  41:1
  185:16 225:6
  302:16 387:1
  387:25,25
  388:1,20 391:2
  394:15
**numerous**
  100:18 101:2
  153:2 197:5
  256:23 315:21
  374:15,15
  391:16

**nurses**  314:9
**nursing**  26:11
  284:19 304:16

**o**

**o**  30:8
**o'clock**  337:23
**oakland**  403:5
  403:21
**oath**  6:9,12,14
  6:16 8:1
  125:25 132:25
  353:12
**object**  104:14
  143:22 146:16
  181:18 210:3
  212:7 214:8
  216:21 240:14
  241:12 252:9
  259:15 260:23
  274:25 301:21
  302:1,5,18,21
  303:12,14
  307:1,4 308:2
  308:9 311:24
  312:6 313:7
  315:9 316:19
  318:7 321:16
  323:2,23 324:7
  325:20,24
  327:4,20
  328:13,24
  331:6,6 334:25
  339:1 342:3

[object - objection]                                    Page 59

| | | | |
|---|---|---|---|
| 346:3 347:5 | 45:14 46:22 | 142:5,12,18 | 214:17 217:14 |
| 348:15,24 | 47:2,5,13 48:9 | 143:4 147:14 | 217:21 218:18 |
| 349:2 350:23 | 50:23 51:4,14 | 147:24 148:6 | 219:2,21 220:4 |
| 352:14 353:20 | 51:22 52:7,16 | 148:24 149:12 | 220:14,19 |
| 358:25 360:12 | 52:23 53:3,9 | 149:24 150:8 | 221:6,13 |
| 361:24 381:10 | 59:3,9 60:5 | 150:14 151:11 | 222:12 223:13 |
| 390:15 | 61:12,20 62:4 | 151:21 156:13 | 223:20 224:1 |
| **objected** | 62:5 63:14 | 156:19 160:20 | 225:13 226:1,8 |
| 263:24 264:8 | 64:2,6,16 65:4 | 162:11 163:6 | 226:17 227:3 |
| 374:10 | 65:16 66:1 | 163:25 165:11 | 228:4,7,14 |
| **objecting** | 67:9 69:5,12 | 165:19 166:23 | 233:5,12,18 |
| 261:24 264:5 | 71:1,12,22 | 167:18 168:3 | 234:18 237:9 |
| 264:24 276:11 | 72:12 74:21 | 168:18 170:1 | 239:3 240:9,21 |
| 303:9,17 | 77:22 79:4 | 171:3,12 172:2 | 242:13 243:10 |
| 315:13 | 81:3,9 84:21 | 173:17 174:14 | 243:14,19 |
| **objection**   8:4 | 87:3 89:14 | 176:7,12,25 | 245:13,18 |
| 8:12 9:1,14 | 95:6,15,19 | 177:20 179:11 | 246:10,17,20 |
| 10:22 15:4,13 | 96:2,16 97:7 | 180:10,22 | 247:5,21,25 |
| 16:6,19,22 | 97:17,22 99:15 | 182:7 183:7,10 | 248:22 249:2 |
| 17:3,11,18 | 100:2,23 102:2 | 183:20 185:24 | 250:8,22 |
| 23:6,16 24:20 | 106:2,10,22 | 186:9,12 187:2 | 251:23 252:2 |
| 24:25 26:9,22 | 107:7 108:2,24 | 187:18,25 | 252:10,17 |
| 27:12,24 29:5 | 111:2 112:13 | 188:14 189:13 | 253:8,16 254:4 |
| 29:19 30:16 | 113:18,22 | 189:23 190:22 | 254:12,17,25 |
| 31:6,17 32:4 | 116:16 118:21 | 193:9 194:9 | 255:13 256:9 |
| 32:14,22 33:19 | 122:8,17 123:1 | 195:1,7 196:14 | 271:1,14,25 |
| 34:12,15,22 | 124:2 125:15 | 196:24 197:11 | 272:13,16 |
| 36:10,15,24 | 126:2,20 127:6 | 197:19 198:15 | 273:5,11,23 |
| 37:6,12,16 | 128:11 129:19 | 199:3,23 200:6 | 274:8,15,21,24 |
| 38:2,10,15,20 | 130:15 132:4,9 | 200:10 201:3 | 275:4,10 279:7 |
| 38:24 39:10,18 | 132:18,22 | 201:12 202:17 | 279:18 281:21 |
| 39:24 40:9 | 133:5,11,19 | 202:22 203:15 | 282:8,20 |
| 41:7,13 42:5 | 135:15,19 | 209:14,22 | 283:11 284:3 |
| 42:20 43:14,23 | 136:17 138:24 | 211:4,13 | 284:13 285:13 |

**[objection - office]** Page 60

286:1 288:22
289:8 290:1,9
291:16 292:2
293:11 294:23
295:6,22
300:20 301:1
301:12,17
303:4 305:10
307:9 308:10
310:24 311:9
312:12 315:6
316:3,4,7
318:19 325:3
329:11 331:5
332:24 333:11
338:5,10
339:17 341:20
342:17 345:12
348:2,11,20
355:13 361:20
362:20 363:1
363:17 364:17
365:16 380:1
381:2 382:20
384:7 390:14
391:13 396:3
398:2 400:1
**objections**
10:20 24:9
260:14 303:11
303:18 308:12
343:4 349:13
374:7

**observe**  88:2
**obsessive**
205:19
**obtain**  109:13
**obtained**  41:11
164:18 183:17
**obvious**  89:22
204:22 210:24
**obviously**
37:19 72:19
73:2 115:13
154:8 192:3
197:8 207:22
218:12 360:9
367:14 370:16
377:6
**occasionally**
211:20
**occasions**  6:22
6:24 100:18
154:4 197:5
256:24 315:21
326:3 358:6
**occur**  342:16
343:15 380:14
**occurred**
126:17 133:8
133:10 194:17
199:1 202:5
227:21 228:2
228:18 233:7
234:15 251:4
286:12,14
336:19 337:5

346:24 351:19
367:4 378:1
379:3
**occurring**  54:9
107:9
**october**  35:7
68:13,15 86:22
87:18 162:10
227:23 230:12
264:17 286:25
**odd**  100:19
322:25
**odds**  127:9
**offer**  77:10
86:12,14,18
112:11 113:25
116:7 136:22
138:13 139:11
139:11 140:21
141:25 167:14
167:21 169:17
245:12,21
246:9 362:19
362:23 371:23
372:9
**offered**  86:7,9
86:10 110:17
113:7,9,10
124:24 275:4
364:4 372:3
389:21 390:2
391:4
**offering**  113:21
171:11

**offers**  109:14
**office**  2:9 5:21
25:15 43:10,12
43:15 66:14,24
67:2,23,25
74:19,24 75:22
76:8 85:22
86:11 87:14,18
90:13 91:13
93:20,22 94:18
108:15 119:5,7
120:4,5,16,19
128:4,20
129:17 133:22
134:23 135:8
141:23 142:2
148:16,17
150:18 152:22
155:1,4,5,7,13
155:14,16,21
157:10,20
158:3,17,18,19
161:8,9 163:2
167:15 171:1
192:24 220:18
220:18,21,21
221:2 224:15
226:11,14
227:1 232:20
238:25 239:8
239:19 242:11
244:14 246:25
253:20 285:9
285:11 287:2,2

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| 294:14 313:4 | 117:12,19 | 316:9,23 | 138:11 147:11 |
| 313:22,24 | 118:4,15 | 322:25 324:23 | 154:8,10 156:5 |
| 334:13,16 | 119:11 120:2 | 328:12 330:11 | 159:11,12 |
| 357:15,16 | 122:1 123:3 | 330:12,13,16 | 161:2,8,9,14 |
| 358:2,13 368:9 | 125:19 128:7 | 331:10 332:23 | 162:3 167:15 |
| 384:14 | 134:15,16,20 | 337:8 339:24 | 168:8,12 |
| **official**  157:11 | 138:17 142:21 | 341:19 351:3 | 169:19,24 |
| **officially**   27:7 | 145:2,14 146:1 | 361:1,25 | 170:6,7,11,13 |
| 45:1 | 150:24 157:3,9 | 378:22 379:13 | 170:21 171:7 |
| **oh**   54:10 55:15 | 157:19 163:13 | 379:18 380:9 | 171:15,25 |
| 55:22,22 70:18 | 163:19 169:7 | 382:15 383:3 | 173:15,19 |
| 95:23 123:12 | 175:6 189:16 | 388:2,8 395:23 | 174:1,23 175:3 |
| 135:12 194:6 | 190:18 191:15 | 395:23 396:12 | 175:8 178:22 |
| 230:3 265:5 | 191:21 192:1,6 | 401:24 | 182:3,5,10 |
| 266:19 267:9 | 196:5 197:25 | **old**   107:25 | 183:24 186:8 |
| 299:2 311:7 | 198:13 206:17 | 309:15 315:8 | 186:14,21 |
| 314:3 333:12 | 209:3 213:21 | 339:19 | 187:11,16,22 |
| **ohio**   149:23 | 216:9 226:23 | **older**   131:16 | 188:5,5,7,19,21 |
| 151:8 | 227:11 240:5 | **oldman**   330:14 | 189:2,9,17 |
| **okay**   6:7 10:21 | 241:4 247:4,20 | **olsman**   1:12 | 190:8,10,20 |
| 14:13 16:14,24 | 254:10 256:22 | 4:21,22 23:21 | 192:11,13,14 |
| 21:4,5 34:20 | 257:6 259:10 | 23:25 39:8,12 | 192:21,22 |
| 49:23 50:10 | 262:8,12 263:8 | 39:13 74:17,18 | 193:5 194:19 |
| 52:11 54:6,10 | 263:13 266:22 | 75:15 76:4,5 | 194:21,23 |
| 54:21 55:15,24 | 268:6 273:15 | 91:20,22 93:8 | 196:8,18,20,21 |
| 56:22,25 57:2 | 278:3,6 281:14 | 93:17 107:4,5 | 197:9,21,24 |
| 62:13 75:10,14 | 281:17 284:23 | 109:17 110:17 | 209:4 210:17 |
| 75:18 78:21 | 286:7 287:19 | 110:17 112:10 | 210:19 211:1,3 |
| 79:12 80:9,21 | 295:11 296:23 | 121:14 127:21 | 211:11,16,24 |
| 80:23 82:8 | 297:11 298:5 | 131:10,13 | 211:25 212:1 |
| 84:11 106:14 | 299:12 300:23 | 133:7,22 | 212:15,16 |
| 107:17 109:16 | 301:11 303:21 | 134:17,23 | 218:12,15,16 |
| 109:22 114:7 | 304:9 311:13 | 135:5,8,10,14 | 218:21,25 |
| 115:6,20 | 312:23 314:8 | 136:12,21 | 222:10,17 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                              586-468-2411
                                                             www.veritext.com

223:18,18
224:13 225:5
225:16 227:1
232:20 233:3
238:6,10,25
239:8,11,13
241:6,7 243:23
244:23 245:11
247:13 248:7
248:20 279:17
285:11 313:22
313:24 320:2
354:17 355:10
355:20,21
356:2,5,10,17
357:17 358:3
358:13 360:25
361:6 362:3,19
362:23 363:16
363:20 364:22
365:2,11,14,18
366:6,9 378:10
378:14 379:2
380:16,17
382:5 383:11
384:5 396:21
397:13 398:21
**olsman's**
129:17 133:1
139:11 163:2
171:1 185:22
192:23 283:1
285:25 294:14
312:24 357:16

**omp** 4:22 9:4
17:16 19:5,8
23:10,12 74:10
75:5 105:24
114:20 180:19
184:15,17
233:11,16
275:23,24
294:2,11 296:6
384:21,22
**omp3** 185:6
**ompw** 385:21
**once** 25:5 27:22
87:6 129:16
143:10 161:8
161:13 170:9
197:8 232:6
234:18 276:11
329:20 348:17
**ones** 119:14
252:13,19
**ongoing** 48:20
221:13 234:3
340:11
**operative** 160:2
163:11
**opinion** 8:24
264:10 269:22
270:9 277:14
381:19
**opponent** 285:2
**opponents**
285:21

**opportunity**
66:5 208:6
227:19 298:4
318:18
**opposite**
270:24
**option** 18:22
**order** 47:18
48:15 56:9,14
56:16,23
144:21 146:10
241:18 258:6
260:10,16
261:5 266:8
267:18 268:7
271:3 318:14
352:10 356:3
357:3,6,12
380:9
**ordered** 73:3
356:14,22
**orders** 264:25
**organization**
161:20 217:19
218:21 379:5
**organizational**
192:12 194:20
194:24 196:1
196:19
**orgasm** 83:19
**original** 153:16
153:18 332:9
**originally**
153:15

**orlando** 182:19
317:10 334:5,7
334:11
**outdoor** 341:11
**outdoors**
344:20,21
**outside** 208:16
260:3 341:11
365:7
**overtures**
201:11,13
**overview** 77:20
206:13 209:24
**owe** 346:18
**owed** 219:7
**own** 22:2 51:13
71:20 108:9,12
108:17,22
109:13 214:23
230:22 294:11
310:22 346:3
370:23 390:23
398:15
**owned** 131:18
**owner** 232:7,13
242:22
**owners** 160:7

| **p** |
| --- |

**p.m.** 297:16,19
314:10,21
402:12
**p27058** 2:13

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[p81702 - pay]**                                            Page 63

p81702   2:8
p82061   2:14
pad   177:21
page   3:3 13:7,8
  102:25 207:2,5
  207:18 227:15
  299:4,8,9,15,17
  299:19,20
  300:19 304:2
  308:25 310:3,4
  310:9 312:19
  313:10 314:14
  317:2,14,14
  319:20,21
  383:16 386:13
  386:18 396:18
paged   189:6
pages   9:4
  318:16 326:12
  327:6 328:4,22
  337:5,9 403:8
paid   23:23
  66:10 185:12
  187:23 188:4,6
  213:3 249:21
  250:17 253:14
  394:21
paladin   368:10
papa   312:20,22
  314:11 315:2
paper   15:21
  179:21
papers   361:9

par   318:24
parachute
  118:20
paradiso   86:21
paragraph
  67:3 110:11
  121:18 124:14
  124:17 153:4
  159:15 160:2
  163:10 164:9
  164:11,21,22
  192:16 227:16
  227:19 228:21
  229:25 281:7,8
  359:8,12 364:5
  364:8 383:7
  396:17,18,19
  399:4
paralegal   36:17
pardon   137:22
  140:10 244:4
  319:21
parkway   1:22
  4:15
part   11:17
  25:20 30:4
  82:3 90:4
  152:10 183:16
  184:18 203:17
  243:7 244:23
  261:10,12
  280:19 304:13
  304:14 310:16
  351:5 357:24

  369:8
parte   147:4
partial   103:16
participate
  265:18
participated
  107:3
particular
  38:23 65:2
  72:22 78:3
  89:10 190:16
  205:23 283:9
particulars
  231:20
parties   73:6
  79:17 134:14
  134:17 135:5
  156:2,3 174:23
partner   31:9
  82:17 220:13
  251:13,15
partner's   366:1
partners   74:25
  75:1 81:17
  131:22 366:10
parts   295:16
party   13:19
  14:4,15 15:8
  122:7,23
  140:24 142:17
  185:5 265:11
  377:25,25
  379:22 381:13
  403:15

party's   369:11
pass   171:2
passcode   142:3
  142:16,19,21
  142:22,25
  143:2,3,7,10,11
  143:13,14
passed   68:17
  104:19
passing   28:5
  262:2
passive   304:5
past   92:17
patently   204:22
path   261:8
paths   30:4
  249:10
patient   50:3,4
  119:12
paula   70:19,19
  71:2
pause   20:15
  50:18 93:15
  117:23,24
  118:2 146:6
  206:24 229:15
  252:21 263:20
  278:13 336:9
  373:24 377:9
paused   103:6
pausing   359:5
pay   23:22
  25:18 123:24
  170:24 185:2

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

187:16 188:3
212:25 218:2
332:11 397:21
**paycheck**
185:13
**paychecks**
213:4
**paying**  46:9
**payroll**  135:11
135:22
**pc**  1:11,13
208:5,19,24
**peacock**  1:13
13:16 90:9
111:1 131:14
131:14 239:11
239:17 253:21
273:2 275:22
276:2 279:22
326:13 328:9
355:4 362:4
364:23 398:21
**penalized**
15:10
**pendency**
155:20
**pending**  248:1
276:25 386:23
401:23
**people**  26:18
29:23,23 32:12
34:23 36:16
45:23 46:12
71:17,19 76:13

85:25 91:16
101:22 108:20
122:13 135:20
135:25 137:3
146:19 150:13
153:2 155:2
158:16 173:18
174:25 177:11
180:5 190:1
191:16 205:8
235:24 249:14
253:20 272:25
276:7 285:5,7
285:12 316:17
326:4,11 329:5
344:12 345:6
348:5,6,7
357:19 358:16
358:16,19
360:5 361:7,11
361:17,23
363:13 366:3
367:13,15,18
378:23 384:13
386:7 388:12
397:12 398:19
399:5,21,24
400:9,22,24
**people's**  83:16
276:10
**percent**  48:12
223:6 375:25
**percentages**
386:7

**performance**
181:11,22
320:7,16
**performing**
318:24
**peril**  144:21
146:3
**period**  22:1
49:7 52:21
76:3 83:10
85:10 100:15
173:4,8 174:11
183:23 198:8
247:9 295:14
**periods**  65:3
391:18
**permitted**
265:11
**perry**  167:12
**perseverance**
336:7
**person**  28:20
44:18 46:8
70:21 73:1,2
87:17 95:12,14
136:1,7 155:16
155:22 156:3
157:8 217:6
399:23
**person's**
380:11
**personal**  26:14
26:15 255:9,12
309:4 329:5

**personally**
122:23
**perspective**
72:19
**peterson**  190:1
**pha**  161:3
**pharmacies**
58:22,24
**pharmacy**
58:14
**phase**  27:4,5
**philadelphia**
288:20,23
**phoenix**  252:25
271:16 272:7
**phone**  5:15
12:11,13,18
33:14 279:25
279:25 296:21
**photo**  273:9
274:6 276:17
276:17
**photographer**
372:11
**photographs**
148:1 149:8
199:12 202:9
244:17 289:21
**photos**  146:5
147:10 148:4
149:2,11
163:22,23,24
164:18 199:20
201:19,24

203:7
**phpa** 41:5,12
42:14 88:9,15
88:18,25 89:7
116:11 119:2
120:11,12
168:7,8,13
169:19,20,24
170:7,10,13,22
170:25 172:1,8
173:15 184:25
185:23 186:13
186:25 187:8
190:5 207:3,6
207:13,16,20
208:5,14,16,20
210:13 211:2
212:1 214:3,22
215:5,6 217:6
217:12,23,24
218:8,11
219:20,23
222:3,7 223:12
223:17,22
224:19,24
226:6 342:9,11
344:6,8,10,13
348:9 351:14
**physically**
313:16
**physicians**
45:20
**pi** 26:11 68:8
129:3

**pick** 92:16
216:21 285:4,7
402:7
**picked** 213:19
247:22 305:9
**picture** 205:25
**pictures** 162:24
162:25 172:13
203:10 204:5
206:1 291:5
328:6
**piece** 179:20
**piling** 320:25
**pitt** 154:1
**pitt's** 155:1
**pkwy** 2:16
**place** 22:23
62:4 85:9
106:18 149:24
245:24 286:23
343:23 355:20
382:4
**places** 371:21
**placing** 10:19
23:16
**plaintiff** 1:6 2:2
2:8,13 5:4,6,7
68:1 78:13
88:5 94:10
98:17,18 129:1
165:14 266:4
275:23 288:16
336:11 377:14
383:10

**plaintiff's** 72:8
72:16,24
111:10 165:15
207:1 296:6
338:5 373:3
392:6
**plaintiffs** 140:6
286:6 288:17
**plaintiff's**
231:11
**plan** 24:24 25:2
25:4 34:17,18
34:21 43:25
79:13 309:14
**planning** 44:4
119:1 120:9
149:10 337:22
**plans** 34:14
337:25
**played** 73:8
**player** 339:11
339:15 340:20
344:16
**players** 340:22
340:23 341:4,6
343:17
**pleadings**
360:3
**please** 5:10,14
10:7,15 51:10
53:16,16 54:12
55:1 57:4,6
59:21 63:18
65:5 80:20

91:9 103:7,25
107:15 116:2
117:24 118:8
123:5 136:4
145:8,24
164:12 169:16
243:2 257:4,11
259:20 261:23
269:1 280:17
293:23 294:4
305:25 306:1
333:16 339:19
349:20 350:8
360:20
**plenty** 270:20
355:4
**pllc** 2:4
**plus** 81:4,24
372:5
**pocket** 387:8
**poem** 179:25
180:9,14 181:9
181:11,21
182:1
**poems** 180:3,4
180:11 181:5
**poetry** 61:18
62:16 177:7
179:16,17
180:20 181:1,3
181:24 182:2
**point** 18:1
22:20 27:6
29:16 33:12

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

35:20 49:7
81:21 83:19,21
88:15 92:13
94:18 139:4
143:24 147:17
164:16 171:6
174:13 207:23
214:2 223:4
230:10,16
232:9 240:19
241:3 250:19
264:4 265:8
266:1,3 273:6
274:11 302:17
305:16 306:12
315:22,24
317:1 328:3
334:17 382:6
391:24 395:24
**pointed** 251:7
**pointing**
250:20 298:8
300:7
**pole** 153:3
**politics** 249:13
**pops** 144:1
**portfolio**
304:18
**position** 17:8
23:25 47:23
66:10 79:22
80:25 82:18
93:8 132:25
151:6 159:19

214:3 215:10
245:16 279:12
279:15 280:5,6
281:19 285:11
301:14 361:10
371:10 374:2
375:25
**positive** 262:23
262:24
**possible** 85:16
86:3 357:17
**posture** 86:12
375:24
**potential** 247:2
281:3 371:10
**potentially**
31:8 70:16
115:18 127:21
211:19 235:11
319:16
**pouring** 309:12
**practice** 15:19
24:7,18 27:2
69:6 89:23
90:2,3 129:12
285:25 397:9
**practiced** 13:18
156:17 157:2
**practicing**
13:21 24:23
**preceding**
57:24
**preface** 327:3

**prefer** 6:4,5
**preference**
71:16
**pregnancy** 7:25
19:23 34:4
**pregnant** 7:22
19:12 34:8
57:18,24
191:14,16,16
191:17,25
**premise** 104:17
104:19 390:25
**premises** 77:24
78:3
**prepare** 8:14
**prepared** 78:4
208:23 211:8
357:12
**preparing**
122:6
**prepping** 78:2
**prescott** 154:24
167:6,7 333:18
358:17 360:9
360:11 365:13
365:17
**prescribed**
45:20 46:13
58:1
**prescription**
58:12
**presence** 84:1
**present** 2:20
365:12

**presentation**
115:10
**preserving**
271:1
**president**
250:16
**pressure**
374:17
**presumably**
33:17 184:14
**presume**
306:24
**pretty** 245:3
317:7 383:3
**prevaricating**
342:20
**previous**
231:23 232:4
**previously**
22:13 35:1
67:19 78:12
84:15 89:17
92:21 109:4,13
129:14 395:8
395:11
**pries** 67:15,24
68:5 69:8,18
**primarily** 74:8
82:7 201:10
240:9
**primary**
129:12 217:6
**print** 264:13,15

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[prior - proper]                                                          Page 67

**prior**  16:15
   17:16 21:15
   57:18 74:9
   76:23 89:9
   94:6 99:11
   103:25 109:15
   115:22 116:19
   128:14,18
   152:7 154:11
   214:10,13
   328:13 394:25
   403:11
**private**  328:4
**privilege**  16:19
   16:20,23,24
   17:18,21 47:9
   47:14,25,25
   48:9,10 49:17
   49:18,20 50:2
   50:2 122:17
   123:2 150:1
   216:1,3,9
   217:14 342:8
   344:17 345:9
   346:5,13,14
   379:8
**privileged**
   48:11,12 122:8
   122:10 123:3
   152:3 216:7,14
   217:11 344:4,6
   344:22,25
   345:4,8,21
   346:1,16 347:4

347:11 356:23
**pro**  7:2,4,6,11
   7:15,16 11:24
   13:22 14:16
   25:22 27:3,13
   116:24
**probably**  42:15
   44:25 60:22
   83:14 85:6
   120:7 187:22
   207:22 214:1
   242:3 247:9
   261:13,16
   293:4 309:22
   318:14 341:13
   374:20 398:6,8
**problem**
   144:14 255:16
   290:14 291:9
   291:10 304:14
   308:16
**problems**  289:4
   289:7 295:3
**procedure**  15:2
   15:8 260:21
**proceed**  265:13
   269:4 286:21
**proceeded**
   294:20
**process**  24:14
   35:14 43:5
   72:9 82:3
   84:19 104:3
   351:5

**produce**  9:20
   10:3 11:9,12
   11:22,25 12:6
   12:11 79:13
   80:19,20
   221:11 293:23
   294:11 338:23
   340:7 355:10
   373:4
**produced**  8:21
   9:10,13,16,18
   9:23 10:2,5
   11:13,15,16,19
   11:21 12:1,17
   12:21,25 13:12
   13:14 14:17
   37:25 44:16
   45:22 46:19
   61:9 62:14
   79:7 80:2,5
   91:4 99:4,6,8,9
   99:11 101:13
   116:18,23
   117:2 134:8,9
   134:18 293:15
   294:7 330:5,23
   338:24 339:3
   340:1,3 389:4
   389:5
**producers**
   36:12,20
**produces**  36:13
**producing**
   36:19 330:4

338:19,24
**product**  379:8
**production**  9:5
   9:22 11:17
   12:8 13:3,8,9
   13:15 91:6
   99:11 105:10
   115:23 116:20
**productivity**
   300:1,9 301:3
   301:15,16,19
   302:3
**professional**
   1:11,13 99:21
   253:22 271:7
   311:5
**profits**  300:1
   301:3
**progress**
   308:22
**projects**  162:13
   173:13 208:21
   214:23
**prominence**
   150:20
**prominent**
   359:10,23
**promise**  118:1
   123:9,17
   194:18 259:7
**promoted**
   249:8
**proper**  260:21

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                586-468-2411
                                                                www.veritext.com

**proposal**
207:15,17
**proposed**
207:14 287:3
**proposition**
380:15
**prosecute**
261:11 369:3
**protect** 19:16
125:24 130:12
**protected**
346:14 383:9
**protective** 56:9
56:14,16,23
146:10 258:6
261:5 264:25
266:8 271:3
**prove** 305:16
**proven** 136:16
**provide** 5:14
36:8 41:4
79:20 217:24
269:10,17
313:11 356:15
382:4
**provided** 26:17
41:2 208:17
217:11 282:14
282:15 368:16
**provider** 44:14
44:17 47:24,25
61:15 72:20
**providing**
242:23 269:8

**psychological**
45:10 57:19
350:15
**psychologist**
45:9,25 46:1,3
46:16
**psychologists**
46:12,15
**public** 331:11
332:10,15
403:20
**published**
269:22
**puck** 343:25
348:8,10
349:18
**pull** 37:20
47:20 114:6,8
114:10 302:16
**pulled** 37:22
**pulling** 114:5
**purdy** 43:5
**purpose** 29:18
29:21 44:8
126:13 146:21
146:23
**purposes** 45:11
375:10
**pursued** 161:6
**put** 10:14,21,22
19:12 20:11
28:13 54:15
86:5 92:9
116:16 135:8

135:10 141:8
141:14,18,21
165:11 177:9
178:11 179:9
203:11 221:11
221:16 258:21
260:17 265:3
266:20 306:14
310:6 330:17
331:11 332:15
346:10 355:12
368:14 374:24
**puts** 352:24
374:17
**putting** 93:13
138:25 150:2
332:9

**q**

**quarterback**
208:10
**question** 10:1,1
10:16 11:3,7,8
12:4 14:1,2,6,7
14:12,13 18:17
18:17,18 36:3
40:1 47:21
48:3,4 50:20
51:7 53:23,24
55:12 57:5,6,7
57:12 59:7,13
59:14,15,19
60:8,9 61:2,3
61:25 62:24

65:6,13 66:6
73:17 75:14
84:23 91:11
92:23 99:3
100:4,24 102:3
103:7,11,23,25
104:1,8,13,17
106:4,15
107:18 109:12
111:5 112:2
118:22 119:10
126:1,7,8
130:22,23,24
133:19 134:4
134:25 138:23
139:1 142:9,23
142:24 147:16
147:19 148:21
148:22 149:6
156:24 157:4
162:23 164:12
164:13 166:7
168:11 169:1,5
173:2 175:1,2
175:7 177:13
178:8,17 179:7
180:15 181:7
181:14,16,19
186:20,21
197:18 200:20
202:24 203:6
204:11,19
211:14 212:12
212:18,19

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[question - randy]

216:21,25
220:24 223:14
224:4 225:19
229:4 232:23
236:19 238:11
241:13 242:21
243:3 245:7
257:2,3 261:16
269:4,5 274:4
276:25 282:8
284:14 287:8
287:10 289:23
290:23 291:11
292:15,17,24
294:17,25
301:22 302:7
302:10,12,23
303:9 307:13
307:14 308:3
308:15 309:18
311:1,4 314:12
315:10,14,16
315:18 316:19
319:8 320:4,5
320:9 322:1,23
322:24 326:7,9
326:24,25
327:1 329:3
330:13 331:17
333:16,25
334:9 338:7,15
342:18 343:2
346:8,20,22
347:10,13

349:6 353:21
355:18,19
356:7,11 359:3
359:24 360:15
361:17 362:12
363:6 366:7
370:21 371:18
377:23 380:4
380:24 381:14
386:14,16,20
386:23,23
391:15 392:2,3
394:11 398:11
398:14 399:2
399:10 400:6
401:8,23,24,25
402:1
**questioned**
232:16
**questioning**
63:15 266:5,15
326:16 335:2
377:6 391:1
**questions**   19:6
23:17 24:10
49:11 54:17
55:3 56:5,15
60:1 64:9
104:7 107:18
119:17,23
130:20 131:8
136:25 137:1,5
143:16 144:15
146:9,12,14

169:8,11 178:6
210:4 215:25
220:25 232:18
242:25 248:1
256:22 257:21
259:3 260:20
261:1 267:4,5
267:7 270:5,22
271:4 272:18
273:25 274:1,2
278:7 289:12
296:24 297:6
298:2 300:16
300:21 301:24
307:5,8 308:9
314:17 326:17
335:8 342:22
345:18 346:19
346:23 347:2
349:8,12 351:1
357:8 360:13
362:1 368:19
368:23 369:2
369:10 370:3,4
370:6 375:12
375:15 376:3
389:12 391:4
392:22 401:4,5
401:7
**quick**   111:9
209:24
**quickly**   232:3
275:5

**quite**   138:13
188:20 204:9
254:3,10
278:25 355:2
**quo**   208:10
**quote**   16:1
297:21
**quoted**   35:12
298:24 317:22

**r**

**r**   1:8 30:8
**racing**   277:6,22
**raise**   99:21
158:8 171:5
267:5,6 303:8
**raised**   16:17,21
99:23,24 100:1
100:7,16,18
101:1,19,19,21
270:19 323:6
**raising**   100:21
**ramar**   86:21
**ran**   83:22
**random**   318:9
318:10 320:15
**randy**   82:10
85:22 86:10
239:17,19,24
239:25 240:16
240:24,24
241:9,14
242:12,17,19
248:10,11,12

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

248:18,19,25
249:6,7,21
250:4,7,11
251:12,13
**range**   102:16
105:12 121:7
**ranges**   105:6
**rape**   62:6,10
339:11,15
340:25 341:25
343:14,21
344:1,25 347:2
347:25 350:19
**rate**   170:24
171:10,16
185:1 212:24
218:2 278:8,10
**ray**   155:4,5,6
155:12,13,15
368:1,3,5,6,7,9
**rd**   2:4,10
**reach**   27:4
287:2
**reached**   72:25
104:11 108:22
150:18 154:3
226:18 295:20
296:12,17,19
297:20 298:8
363:14
**reaching**   76:24
116:5 296:15
297:15,16
299:7

**read**   18:16,18
48:4 57:7 61:4
103:25 104:1
109:21 110:14
115:5 117:17
117:18,21
118:13 120:1
121:20 126:17
139:17 140:7
140:11,13
163:13 165:24
166:13 167:9
180:3,4 230:17
230:22 231:13
233:8 235:9,14
235:21,24
237:1,22
264:10 265:18
269:14,24
270:11 279:2
280:19,24
281:7,17,18
282:12 290:16
302:11,12
318:2,14,18
340:4 394:12
399:22
**reading**   180:6
235:21 280:25
287:7 306:2
314:17 318:13
333:21 338:3
**reads**   224:22

**ready**   7:12,18
7:20 8:2,8,10
110:12 392:22
**real**   281:3,15
310:23
**reality**   392:18
**realize**   34:17
83:13 343:7
**really**   61:1
115:15 116:7
122:4 126:16
181:5 186:21
204:22 235:15
262:6 267:15
267:15 268:10
268:15 285:20
311:6 316:1,10
316:19 322:21
328:19,19
344:4 349:15
355:7 374:7
**reason**   7:7,8
20:9 22:19
27:21 40:7
56:22 63:3
176:6 185:10
247:1 250:18
361:22 366:24
369:15 373:1
**reasonable**
227:20 228:1
228:17 234:14
237:7

**reasons**   15:20
57:19 79:2
81:14,15 85:1
374:4 391:16
399:24
**reassert**   253:7
**recall**   10:6
11:13 14:19
18:2 19:4,7
33:15 45:23
51:16,19,24
52:4,8 60:24
64:9 67:1,20
70:15,22 74:16
76:10 79:5
80:25 81:4
84:18 85:4,17
86:17 88:22
92:7,11 94:1
94:21 95:3
96:3 97:9,23
100:10 102:20
104:12,23
110:18 113:2
118:24 119:6
126:14 127:17
128:22 140:17
141:4 142:3,7
143:5 148:13
151:24 152:24
153:14,23
154:19,21
156:12 158:2,3
158:12,19

**[recall - referenced]** Page 71

| | | | |
|---|---|---|---|
| 163:24 164:1,4 | **received** 42:3 | 50:5,6,8,9,10 | 294:1,4 304:7 |
| 167:10 168:17 | 44:15 80:11 | 50:12,17 52:12 | 305:20 310:10 |
| 168:24 171:13 | 86:13 163:22 | 54:4,15,20,22 | 310:10 314:18 |
| 175:14 179:12 | 199:12 207:9 | 55:24 56:2,3,7 | 316:21 325:9 |
| 184:13 185:14 | 207:11 227:22 | 62:5 93:14 | 325:14 328:14 |
| 187:10,19 | 234:1 244:18 | 97:15 101:11 | 331:11 335:17 |
| 188:1 190:5 | 281:9 294:2 | 103:9 116:17 | 336:8,11 |
| 200:2 202:10 | **recent** 63:9 | 116:18 117:22 | 340:10 344:15 |
| 202:19 203:25 | **recess** 139:8 | 118:13 120:1 | 346:10 349:22 |
| 205:14 206:5 | **reciting** 387:25 | 123:10 131:2,4 | 355:13 374:24 |
| 209:6,7 222:25 | **recognized** | 132:16 133:3 | 377:1,8,18 |
| 226:9,15 | 309:6 | 133:10,13,15 | 392:19 403:8 |
| 252:18,18 | **recognizing** | 133:16,21,23 | **recorded** 4:10 |
| 256:4 271:11 | 83:22 | 134:1 135:3,13 | 5:8 102:1 |
| 273:4 283:13 | **recollection** | 138:25 145:1,2 | 225:23,23 |
| 285:1,3,8 | 8:10 61:22 | 145:4,5,14,15 | 354:25 |
| 288:7 291:17 | 62:18 94:14 | 145:17,19 | **recording** 5:13 |
| 292:3 293:4 | 111:13 152:1,5 | 146:21,24 | 101:13,15,22 |
| 296:1,5,9,10 | 233:21 287:11 | 147:2 149:25 | 102:6,8 |
| 306:16 307:20 | 293:5,9 323:8 | 152:7 162:19 | **records** 19:1 |
| 307:21 313:23 | **recommend** | 165:12 169:3 | 44:15 62:3,14 |
| 319:10 320:21 | 367:5 | 169:14 231:13 | 321:22 325:16 |
| 331:24 332:4 | **recommended** | 258:16 260:8 | 338:2 372:10 |
| 351:9 355:23 | 368:5 | 260:18 261:10 | **redacted** |
| 361:7 365:3 | **reconnected** | 262:4,20 263:1 | 305:23 |
| 367:10,12 | 32:1 | 263:3,4,5,7,9 | **refer** 6:4 24:1 |
| 370:25 371:2 | **reconnecting** | 263:14,16,17 | 148:18 265:20 |
| 372:6,8,20,23 | 94:25 | 263:19,25 | 321:25 |
| 396:11 | **record** 4:9,18 | 265:3 266:4,21 | **reference** |
| **recalling** | 5:11 7:8 10:15 | 266:25 268:12 | 145:20 176:2 |
| 118:17 | 10:23 17:22,23 | 268:17 270:3 | 180:17 237:13 |
| **receive** 83:4 | 20:2,4,13,14,25 | 271:6 278:19 | 237:15 238:21 |
| 237:19 383:20 | 21:5 23:17 | 278:21 280:19 | **referenced** |
| | 48:22 49:2,2,7 | 286:7 290:15 | 291:21 306:13 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[referenced - remember]** Page 72

336:17 358:17
**referencing**
121:16 122:2
140:12 297:5
**referred** 159:1
344:18
**referring** 18:4
18:7,25 19:3
32:8,23 33:11
59:4,7,11,13
60:14 61:24
63:18 64:7,19
64:23 67:16
98:16 105:3,4
105:5 111:3
114:2 115:4
119:14 120:25
121:3,9,19
124:15 139:13
139:16 140:8
153:4,9 156:4
159:15 160:3
167:11 169:12
182:1 186:4
286:9,16
300:24 304:21
306:7,25 308:7
308:16,22
312:21,23
313:15 317:17
317:19 318:5
321:1,3,10,13
321:17,20
323:9 341:1

343:25 350:24
351:4 357:2
360:19 361:14
364:5,8 383:15
396:15 399:4
**refers** 265:23
265:24 315:1
**reflect** 165:7
260:8
**reflected**
392:10
**refresh** 8:10
61:22 62:17
94:13 111:12
151:25 287:10
293:9 323:7
**refusal** 261:10
**refuse** 346:9
347:9,11,12
**refused** 347:14
**refuses** 261:1
398:22,24
**refusing** 236:4
267:4 346:8,19
**regard** 15:3
27:16 44:13
47:18 79:8
85:16 89:6
169:19 181:22
210:10 240:17
241:14 250:20
253:13 289:18
295:3 314:5
338:24 356:16

357:17 363:15
377:24 382:5
399:4
**regarding** 88:4
164:3 212:12
**regardless**
184:17 261:22
**regular** 167:15
167:21 168:2
198:1 246:5
295:12
**regularly**
197:13
**regulars** 71:11
**rehabilitation**
370:2,4
**reimbursed**
187:24 188:5
**reiterating**
265:16
**related** 23:17
177:23 182:16
300:1 301:2
**relationship**
87:11 105:19
112:6 170:22
208:19 214:19
218:16 219:15
312:1,3 365:25
366:11,12
**relationships**
34:24
**relative** 403:14

**relax** 258:25
**releases** 48:19
**relevance**
23:18 253:8
**relevant** 8:24
23:19 253:10
254:7 273:13
**relief** 308:11
**relocate** 22:11
**relocated** 22:8
24:12
**relocating**
22:17,19
**relying** 379:1
398:18
**remain** 306:24
375:7
**remained**
214:10
**remains** 218:10
**remark** 284:24
**remedies**
227:18
**remedy** 382:4
382:17
**remember** 11:7
11:8,14 14:25
27:14 39:20
57:21 61:10,13
61:17 62:1,21
64:18 70:18
83:14 90:21
93:23,24 94:1
94:17 95:1

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

100:11,16
102:13,19,23
109:5 112:7,11
113:1 114:15
114:17 115:20
121:1,2,4,6
127:15 140:25
141:1 158:20
159:19 182:2
185:3,8,9,9
189:12,21
190:14 205:10
205:12 213:5,7
226:7 256:2,3
273:10 274:7
274:10,13
276:18,20
277:2 287:4
291:20 292:18
292:25 298:18
298:22 306:10
306:16 320:1
323:11,13,14
323:21 332:9
332:11,14
343:10 344:19
346:11 350:13
367:22,23,23
367:25 385:12
**remembered**
104:22
**remote** 5:20
45:2,3,4,6
87:17,19,21

**remotely** 87:14
337:11 390:22
**remove** 59:24
366:23
**removed**
217:19
**renewed** 152:8
397:3,7
**rent** 25:18
**rental** 35:22
**renting** 22:2
**repeat** 162:18
320:19 349:20
**repeatedly**
226:2 260:18
260:20
**repeating**
117:19 268:21
**repetitive**
308:12
**rephrase** 36:3
60:9 65:5
73:17 84:23
87:4 102:2
177:13 370:22
**rephrased**
381:5
**replied** 298:23
**reply** 120:10
319:23
**report** 64:5
82:8,16 210:1
344:8

**reported** 2:23
36:22 63:8
82:9 344:10,14
**reporter** 2:24
4:19 5:8 18:19
48:5 50:14
57:8 103:24
104:2 302:13
**reporting** 78:7
210:7
**reports** 78:6
210:8
**represent**
309:7 358:22
364:1 376:9
**representation**
192:12,22
194:20,23
195:25 196:19
216:1 217:25
346:18 367:3
**represented**
161:25 194:10
197:23 294:25
395:11
**representing**
4:17 88:12
295:4 394:18
**request** 9:11
80:14 113:24
152:8,10 161:1
161:9,14,17
265:16 377:11

**requested**
119:15
**requesting**
114:3 119:21
**requests** 9:21
10:3 11:20
12:8
**require** 80:15
351:23
**required** 80:10
125:24 191:17
198:11 241:10
243:12 353:5,9
382:5,25
**requires**
352:24 353:13
**requiring**
352:22
**research** 78:2
**resend** 117:10
**reserve** 369:1,6
**reside** 21:10
**resided** 23:3
**residence** 22:20
25:9 44:4
**residences**
35:18
**resident** 20:1
**residential**
42:17
**resides** 23:1
**residing** 22:14
**resolve** 245:25
333:8

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[resolved - right]                                                    Page 74

resolved   84:6
resolving   281:4
resource
   208:13
respect   84:19
   85:2 144:5,8
   332:6
respond   300:23
   306:18
responded
   108:23 305:14
   305:21 309:3
   309:10
responding
   298:10 304:11
   338:16
responds   313:2
   314:10
response   9:11
   10:2 11:19
   91:11 96:18
   146:13 298:14
   298:15 376:1
responsibilities
   217:5
responsibility
   310:18
responsible
   166:20 378:25
   379:2,21,25
   381:12
responsive
   146:14,16
   179:1,4,7

259:16 260:23
rest   213:8,12
   310:3 314:18
   387:8
restate   388:22
restaurant
   380:13
result   69:1
   383:8
retained   3:10
   215:16 331:1
   334:3
retaliated
   383:10
retaliation
   238:15 243:17
   249:25 250:2
retirement
   68:25
retract   14:2
   168:11 246:22
   371:18
retracted   14:7
   14:12 248:3
return   37:9
   278:10
returned   277:5
revenue   36:9
   36:13 37:25
   39:13,16 207:3
   207:7
review   8:19
   16:1,7,13 32:9
   64:8,23 99:5

105:10 111:4
   117:20,25
   118:3 167:9
   181:23 211:11
   211:18 276:3
   280:16,23
reviewed   7:12
   7:18 8:13,18
   8:21,23 12:21
   12:23 13:5,6,7
   13:10,12,13,15
   61:7,8 208:24
   211:17
reviewing
   118:12 284:9
rh   115:24
   192:11,13
   194:19,21,23
   196:18,20
rhythm   191:19
ridge   25:14
ridiculous
   258:19
right   17:15,24
   19:11 23:15
   34:18 43:4
   44:19 48:20,25
   50:17 56:12,13
   66:18 89:25
   90:3 91:15
   93:9 99:21
   102:14 104:9
   107:1 108:23
   111:19 112:23

113:17 117:17
   121:9 122:12
   124:18,19
   125:23 129:1,3
   144:22 145:12
   147:4 152:24
   154:19 157:17
   164:23 170:12
   176:11 180:21
   185:18 197:13
   205:11,17
   209:9,10 213:6
   213:14 215:15
   216:11 217:10
   227:22 230:11
   236:11 242:9
   258:7,8 259:15
   259:19 261:6
   262:25 266:19
   268:13,19
   269:9,20 271:9
   277:19 278:9
   278:15 286:12
   296:23 298:6
   300:5 303:15
   305:13 309:21
   319:19 324:13
   328:9 330:15
   331:11 334:4
   334:20 335:12
   335:22 336:25
   336:25 338:23
   355:3 358:4
   369:21 372:24

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[right - roughly]

| | | | |
|---|---|---|---|
| 373:5,22 | 129:13,16 | 295:8,13 296:6 | 359:22 |
| 374:22 376:25 | 130:2 131:23 | 296:7 299:13 | **risk** 89:18 |
| 377:2 385:5,13 | 132:8 133:8,22 | 305:7,21 | **robert** 1:10 |
| 386:1 392:3 | 134:23 135:12 | 310:11,15 | 4:24 5:2 12:21 |
| 396:22 400:14 | 141:9 147:22 | 315:4 324:5 | 13:1,3,7,8 |
| 400:17 401:17 | 153:3 156:5,6 | 325:19 327:15 | 66:23 67:13 |
| **rights** 234:7 | 156:8 157:8 | 328:10,23 | 69:25 88:8 |
| **riley** 1:10,11 | 159:11 160:6,8 | 331:12 332:11 | 279:5,16 305:7 |
| 4:12,22,25,25 | 160:9,12 161:4 | 333:3,8 337:10 | **role** 14:22 |
| 5:1,2 12:22 | 164:10,16 | 346:25 356:10 | 31:20 68:18 |
| 13:1,2,7 66:18 | 172:1 175:10 | 356:17 357:17 | 73:10 76:9 |
| 66:23 67:1,6 | 190:25 192:24 | 358:11 360:24 | 89:2,12,18,21 |
| 67:13,18,20 | 195:5,14 196:8 | 361:6,13,18 | 111:11 215:20 |
| 69:10,14,25 | 198:11 199:2 | 362:3,10,14 | 216:10,13,15 |
| 70:10,12 73:13 | 202:1,5 207:19 | 363:15,19 | 217:3,22 |
| 73:18 74:14,23 | 208:5,8,19,23 | 364:15,16,20 | 351:22 |
| 75:12,15,18,19 | 213:13 218:12 | 364:22 365:1 | **roles** 76:12 |
| 76:5,6,14,15,17 | 219:14 220:6 | 365:13,18 | **roll** 78:21 |
| 77:8,9,14,17 | 220:10 221:2 | 366:8,9 369:11 | **romantic** 201:4 |
| 78:10 81:20 | 221:24 222:3,4 | 377:25 378:2,2 | 201:7,11,13 |
| 85:7 86:23 | 222:7,11,16,23 | 378:6,11,17,17 | 202:8 244:18 |
| 87:6,22,24 | 240:3,13 241:7 | 378:19,20 | 254:23,23 |
| 88:7,8,16 | 242:1,5 243:19 | 379:4,22 | **ronda** 239:17 |
| 93:20,21 95:24 | 244:10,15,22 | 380:16,24 | **room** 43:17 |
| 105:1,18 109:7 | 245:2,10,22 | 382:6,18 | 88:6 132:25 |
| 109:15 110:15 | 246:14 250:13 | 398:21 | 258:8 263:16 |
| 110:21 111:8 | 255:18 256:17 | **riley's** 13:3,8 | 274:19,22 |
| 114:20,21,25 | 275:23 279:5 | 96:10 142:2 | 278:9 288:16 |
| 116:15 119:7 | 279:16 280:7 | 143:2 147:9,12 | 341:7,8 343:21 |
| 120:18 121:13 | 281:11 282:22 | 159:14 216:8 | **roughly** 21:6 |
| 123:24 124:9 | 283:4,7,14 | 247:7 256:24 | 26:2,5,6 36:23 |
| 124:12 126:23 | 285:2,4,12,20 | 289:18 329:6 | 39:23 40:20 |
| 126:25 127:4 | 288:9 291:25 | 357:15 358:2 | 41:11 42:2 |
| 127:25 128:3,3 | 294:16 295:1,5 | 358:13 359:10 | 47:12 48:7 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[roughly - russell]** Page 76

| | | | |
|---|---|---|---|
| 58:9,10 83:6 | 26:3,9,22 | 80:7 81:3,9 | 133:5,11,18 |
| 168:15 182:22 | 27:12,24 29:5 | 84:21 85:21 | 134:4,25 |
| 184:6 185:17 | 29:19 30:16 | 86:11 87:3 | 135:15,19 |
| 336:24 337:9 | 31:6,17 32:4 | 89:14 90:16 | 136:17,24 |
| 367:13,20 | 32:14,22 33:19 | 91:25 93:10 | 137:5 138:23 |
| **routinely** | 34:12,15,22 | 94:8 95:6,15 | 139:4,7 140:4 |
| 218:23 264:25 | 36:10,15,24 | 95:19 96:2,16 | 140:6 142:5,12 |
| **row** 35:17 | 37:6,12,16 | 97:7,17,22 | 142:18 143:4 |
| **rub** 305:19 | 38:2,10,15,20 | 98:15 99:15 | 145:12,17 |
| **rudeness** 55:18 | 38:24 39:10,18 | 100:2,23 102:2 | 146:24 147:2,7 |
| **rule** 15:2,12,17 | 39:24 40:9 | 102:15 103:2 | 147:14,24 |
| 16:1,2,7,12,13 | 41:7,13 42:5,8 | 103:16,21,24 | 148:6,24 |
| 16:15,17 79:25 | 42:20 43:14,23 | 104:14 105:3,9 | 149:12,24 |
| 80:9,17 264:23 | 45:14 46:22 | 106:2,10,22 | 150:8,14 |
| **ruled** 47:15 | 47:2,5,9,13,17 | 107:7 108:2,24 | 151:11,21 |
| 48:2 149:25 | 47:22 48:9,18 | 111:2,14,21 | 152:7 153:4,7 |
| **rules** 80:14,15 | 49:1,6,16,22,25 | 112:13 113:18 | 156:13,19,24 |
| 206:21 303:17 | 50:16,23 51:4 | 113:22 114:8 | 157:4 159:15 |
| 303:21 | 51:7,14,22 | 114:19 115:7 | 160:1,20 |
| **ruling** 48:18 | 52:7,16,23 | 115:21,25 | 162:11 163:6 |
| 264:20 265:8 | 53:3,9 56:1 | 116:16,21 | 163:11,15,18 |
| **run** 211:21 | 57:6,12 58:17 | 117:6,11,20 | 163:25 164:11 |
| 308:24,25 | 59:3,9,15,19,25 | 118:2,6,8,12,15 | 164:21 165:11 |
| 309:10 | 60:5 61:3,12 | 118:21 121:7 | 165:19 166:6 |
| **running** 288:18 | 61:20 62:4,9 | 121:18,21 | 166:11,23 |
| **russell** 2:2,4 | 62:23 63:2,4 | 122:8,11,17 | 167:18 168:3 |
| 5:5,5 8:4,12 | 63:14 64:2,6 | 123:1,4,8,10,14 | 168:18 170:1 |
| 9:1,14 10:22 | 64:16 65:4,16 | 124:2,14,17 | 171:3,12 172:2 |
| 11:2 12:2 15:4 | 66:1 67:9 69:5 | 125:15 126:2 | 172:20,23 |
| 15:13 16:6,19 | 69:12 71:1,12 | 126:20 127:6 | 173:17 174:14 |
| 16:22 17:3,11 | 71:22 72:12 | 128:11 129:19 | 176:7,12,25 |
| 17:18,21 20:2 | 74:21 75:2 | 130:7,15,20 | 177:20 178:3 |
| 20:4,6 23:6,16 | 77:22 79:4,10 | 131:2,7 132:4 | 179:3,11 |
| 24:9,20,25 | 79:13,18,24 | 132:9,18,22 | 180:10,22 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                    586-468-2411
www.veritext.com

| | | | |
|---|---|---|---|
| 181:14,18 | 224:9 225:13 | 270:24 271:2 | 310:24 311:1,9 |
| 182:7 183:7,10 | 226:1,8,17 | 271:14,19,25 | 311:16,24 |
| 183:20 185:4 | 227:3 228:4,7 | 272:3,13,16,18 | 312:6,12 313:7 |
| 185:24 186:9 | 228:14 233:5 | 273:5,11,23 | 314:16 315:6,9 |
| 186:12 187:2 | 233:12,18,20 | 274:1,8,15,21 | 315:16 316:3,5 |
| 187:18,25 | 234:18 237:9 | 274:25 275:6,9 | 316:8,15 318:7 |
| 188:14 189:13 | 237:21,24 | 275:16,19,23 | 318:19 321:16 |
| 189:23 190:22 | 238:1 239:3 | 276:3,11,14 | 321:20,24 |
| 191:6,10,14,19 | 240:14,21 | 277:13 278:11 | 323:2,23 324:7 |
| 191:22,24 | 241:12 242:13 | 278:19 279:7 | 325:3,20,24 |
| 192:4,8,16 | 243:10,14 | 279:18 280:16 | 326:16,20 |
| 193:9 194:9 | 245:13,18 | 280:22 281:21 | 327:1,20,23 |
| 195:1,7 196:14 | 246:10,17,20 | 282:8,20 | 328:13,24 |
| 196:24 197:11 | 247:5,25 | 283:11 284:3,9 | 329:11 331:5 |
| 197:19 198:15 | 248:22 249:2 | 284:13 285:13 | 331:16,21,25 |
| 199:3,23 200:6 | 250:8,22 | 286:1 287:15 | 332:5,24 |
| 200:10,20 | 251:23 252:2,9 | 287:19,22 | 333:11,24 |
| 201:3,12 | 252:17 253:7 | 288:22 289:8 | 334:8,25 335:5 |
| 202:17,22 | 253:16 254:4 | 289:12 290:1,9 | 335:15,21,24 |
| 203:15 204:8 | 254:12,17,20 | 290:15,18,22 | 336:1,4,8 |
| 204:11,14,17 | 254:25 255:3 | 290:25 291:16 | 338:5,10,15 |
| 204:19 205:2 | 255:13 256:9 | 292:2 293:11 | 339:1,17 |
| 206:6,10,20 | 257:18,24 | 293:15,22 | 340:10,13 |
| 209:14,22 | 258:15,18 | 294:1,5,10,23 | 341:20 342:3 |
| 210:3 211:4,13 | 261:21 262:1,6 | 295:6,22 296:2 | 342:17,21 |
| 212:7 214:8,17 | 262:9,13,25 | 296:6 300:20 | 343:1 345:12 |
| 216:21 217:10 | 263:4,8,13,19 | 301:1,12,17,21 | 346:2 347:5 |
| 217:14,21 | 263:21 264:3,7 | 301:24 302:5 | 348:2,11,15,20 |
| 218:18 219:2 | 264:13 265:20 | 302:18,21,23 | 348:24 349:2,8 |
| 219:21 220:4 | 265:24 266:3 | 303:4,16,24 | 349:22,25 |
| 220:14,19 | 266:13,13,24 | 304:7 305:10 | 350:23 352:14 |
| 221:6,13 | 268:9,25 269:6 | 305:20,23 | 353:20 354:12 |
| 222:12 223:13 | 269:10,14,24 | 307:1,4,8,13 | 355:12 356:11 |
| 223:20 224:1,5 | 270:7,14,16,18 | 308:2,9 310:20 | 357:2,8,22 |

Carroll Reporting & Video
www.veritext.com                A Veritext Company                586-468-2411
                                                                  www.veritext.com

**[russell - school]**                                                    Page 78

| | | | |
|---|---|---|---|
| 358:25 359:3,5 | **safe** 380:7,10 | 252:16 292:8 | 392:8 395:4 |
| 359:12,24 | 381:18 383:1 | 399:2 | **says** 62:15 |
| 360:12 361:14 | **salary** 36:2,4 | **saying** 8:5 | 80:18 116:9,12 |
| 361:20,24 | 112:11 113:3 | 35:15 60:24 | 118:25 125:6 |
| 362:20 363:1,6 | 121:5 124:25 | 62:22 74:1 | 152:15 195:25 |
| 363:17 364:17 | 183:18,18 | 84:19 92:3 | 198:10 205:5 |
| 365:16 368:21 | 384:11,14 | 93:3 94:3,19 | 207:8 208:3 |
| 368:25 369:10 | 390:12,23 | 96:8 98:8 | 231:20 233:8 |
| 369:14,18,20 | 394:16,21 | 100:20 101:1 | 237:16 238:15 |
| 370:2 371:14 | **sale** 219:5 | 116:21 117:7 | 264:18 265:10 |
| 374:9,19 375:6 | **sammy** 5:6 | 124:19 131:19 | 279:9,14 |
| 376:7,15,22,25 | **samuel** 2:3 | 132:17 134:22 | 281:23 282:4,5 |
| 377:7,10,17 | **sanctionable** | 162:21 186:3 | 298:16,17,22 |
| 379:7,11,17 | 17:7,9 | 192:7 216:16 | 309:13 313:3 |
| 380:1 381:2,10 | **sanctioned** | 222:9 229:17 | 319:2 321:11 |
| 381:21 382:20 | 17:2 | 233:13 236:5 | 329:24 355:10 |
| 383:17 384:7 | **sanctions** 15:3 | 241:23,25 | 358:20 385:14 |
| 384:20 386:22 | 15:18 16:4,12 | 248:11 249:21 | 385:15 386:13 |
| 388:16,23 | 16:16,17 17:10 | 265:25 270:8 | 387:16,22 |
| 389:3,11,20 | 17:17 48:13 | 270:23,25 | 394:14,20 |
| 390:1,6,14,17 | **sarah** 154:24 | 277:18,20,21 | **scared** 315:4 |
| 391:13 392:14 | 167:6,7 333:17 | 286:18 296:16 | **scary** 55:22,23 |
| 392:21,25 | 358:17 360:9 | 296:18 298:1 | **scattered** 115:9 |
| 393:15 394:1 | 360:11 361:25 | 300:4,10,14 | **scenario** |
| 396:3,17 398:2 | 365:13,17 | 310:15 311:20 | 115:17 |
| 398:11 399:9 | 366:19,20 | 316:2 317:22 | **schedule** |
| 400:1 401:9,12 | **sat** 82:9,21 84:2 | 321:4,7 324:10 | 286:24 |
| 401:17,21,24 | 88:5 | 324:17 330:3 | **scheduled** |
| 402:3,7,10 | **save** 116:15 | 343:14 344:24 | 240:8 279:4 |
| **ryan** 286:19 | 169:14 | 346:1 347:12 | 351:25 |
| | **savings** 37:18 | 353:10 360:20 | **scheduling** |
| **s** | 40:14 | 376:24 377:5 | 189:10 |
| **s** 30:8 38:21 | **saw** 105:6 | 381:1 382:22 | **school** 66:7,10 |
| | 181:9,13 | 388:12 391:2 | 66:12 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com                                                    586-468-2411
www.veritext.com

**schwartz** 77:1
  77:2,11 86:10
**schwarz** 85:9
**scope** 195:21
  367:3
**scratch** 258:24
  376:5
**screaming**
  54:13,14 229:8
  229:9 311:2
**screwed** 115:15
**se** 7:2,4,6,11,15
  7:17 11:24
  13:22 116:24
  264:23
**second** 93:14
  116:2,11 119:2
  120:11 121:21
  123:20,23
  130:1 153:7
  165:24 166:14
  227:15,16
  230:7 240:4
  255:8 264:6
  265:19,20
  286:25 288:3,6
  302:1 347:14
**secret** 203:10
  244:16 354:25
**secretive** 202:8
**secretly** 101:25
  225:23
**see** 18:4,7,24
  19:2 22:3

32:10 55:20
59:5 60:13
63:18 80:1
90:22 93:22
95:1 99:9
103:1 109:25
110:14,15
114:3 115:3
116:1,1 119:22
120:24 121:3
124:18 125:6,8
125:9,16,22
126:14 138:2
176:4 186:2,5
187:14 197:15
227:10 233:22
236:4,10,10,13
237:13 238:16
238:19,22
240:12 247:22
252:5 268:14
268:22 269:19
283:10 287:9
293:16 295:22
297:4,18,19
298:7 299:5,21
300:2,3,6
308:16 310:7
323:9 325:16
325:17 326:19
340:7,7 350:25
359:20 370:16
373:2,6,7,8,13
373:14,21

385:8,17,23,25
386:1,12,18,19
386:20 387:2
387:13,25
388:1,5 390:9
390:23 392:20
394:7
**seeing** 44:12
  61:10,13 95:3
  340:15 385:12
  388:23
**seek** 82:24 83:2
  245:23
**seeking** 48:12
  62:8,25 273:17
  308:11 319:22
**seem** 155:24
  257:9 277:21
  305:5,5 314:22
  336:12
**seemed** 201:9
**seems** 12:3
  100:19 273:16
  273:18,20
  281:3 313:14
  322:25
**seen** 12:25 13:3
  45:20 51:6,13
  79:7 170:18
  181:21 235:19
  323:24 354:20
  385:10 397:25
  398:1

**segue** 255:7
**selected** 72:6
  78:11
**selecting** 73:10
**sell** 22:5
**send** 41:9,10,20
  41:22 72:3
  170:10 210:10
  210:20 211:2
  211:24 268:25
  276:18 287:3
  306:9,15
  317:10 329:18
  337:13
**seniority** 252:1
**sense** 257:3,24
**sent** 94:2 161:4
  170:9,10 189:4
  200:18 209:4
  210:25 211:8
  211:16,17
  212:14 252:11
  297:21 305:17
  306:6 337:16
  395:9
**sentence** 67:16
  319:2 390:16
**separate** 35:18
  51:9,12
**separately**
  143:13
**september**
  20:20 68:13
  78:24 138:20

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[september - shown]** Page 80

141:20,23,24
159:12 161:21
161:22 162:5,9
197:8 230:13
231:21 232:1
**serious** 276:8
350:22
**seriously**
350:21
**serve** 208:20
**served** 88:25
89:18 213:22
**server** 178:23
**serves** 208:9
**service** 38:16
38:19 208:5
**services** 41:4
208:17
**sessions** 53:2,7
53:8,24 57:11
57:15,17
**set** 43:12
101:22 141:17
170:24 183:18
194:16,16
238:9 252:8
370:17 392:19
**sets** 238:12
**setting** 107:3
107:21 189:10
197:16 225:24
**settle** 251:9
289:3,17
291:13 312:20

332:19 333:3
**settled** 251:10
251:10 317:6
384:25
**settlement**
332:14,22
**setup** 43:15
**seven** 48:23
49:7 54:22
140:14 262:10
349:11 369:22
401:2,22
**several** 58:3
108:19 264:9
305:15 358:5
**sex** 200:15
201:9 233:14
233:16 238:8
238:15,21,24
239:2,5 240:19
241:11,18
243:8,17 244:7
244:12 247:24
248:5,6,8
250:4,21,24
**sexual** 59:17,23
59:24 63:13
81:22 82:1
83:16,18,21,23
199:9 200:4,13
200:18,24
201:1,6,7,9,11
201:22 202:13
202:16,20

203:12 222:19
222:20 232:10
232:20 233:6
243:20 256:17
343:15
**sexually** 63:20
130:2 135:13
198:25 199:21
201:25 203:2,4
231:24 232:5
233:3,10 238:7
238:7 329:21
**shanahan**
189:20
**share** 74:24
247:11
**shared** 25:17
60:4 74:19
111:8 168:23
168:24 192:13
194:21,24
196:1,20
202:11 212:5
351:12,14
**sharefile** 117:1
**sharing** 196:9
196:12 198:10
**she'll** 298:4
**she's** 110:1
135:15 172:23
191:14 192:9
204:24,25
284:9 390:6

**shield** 62:6,10
**shift** 258:20
**shifted** 68:18
76:9,13 214:1
**shifts** 258:23
**shitty** 300:24
**short** 226:13
**shortened**
374:3
**shortly** 116:10
119:1 124:23
**shot** 310:6
**shoulder** 143:1
**show** 32:4
60:21 61:23
62:21 85:5
94:23 99:2
110:13 116:13
119:16,18
148:18 168:25
169:3 224:9
233:21 262:20
262:21 338:20
357:3 360:21
364:6 369:12
372:10 383:14
383:17
**showed** 169:7
252:14,20
386:17
**showing** 387:17
391:10
**shown** 125:10

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[shows - sorry]**                                                  Page 81

shows   372:25
shut   331:25
    332:1,2,6
shutting   49:6
side   68:1,2
    72:17 73:10
    74:4 80:13
    98:13 100:21
    110:4 111:10
    247:15 292:8
    292:12 385:14
    398:20
sides   73:2 74:5
sign   229:17
    337:23 397:25
signature
    403:18
signed   165:13
    166:21,22
    209:18,21
    281:10 373:4
significant
    68:24 182:12
    336:14
significantly
    42:15 215:7
silly   309:24
similarly
    328:16
simple   117:9
    126:1 197:18
    378:18 401:7
sincere   311:22
    311:22

single   134:22
    190:15 202:11
    303:9 315:14
    329:23 336:4
    337:10 353:12
    374:11,16
sir   267:19
sit   14:24 19:17
    25:1 33:15
    51:16,19 64:10
    67:19 69:9
    70:6 85:17
    87:22 88:1
    110:4 137:6
    151:24 152:24
    158:2,12
    202:10 205:14
    221:18 258:25
    269:24 275:7
    277:10 278:6
    307:21 354:18
    365:3 372:8
    395:24 396:11
site   264:16
sitting   16:3
    19:4,7,9 42:2
    97:11,13
    131:10 140:20
    178:10 202:19
    205:10 235:5
    301:20
situation   107:9
    130:1 133:7
    150:5 151:7,9

180:20 202:10
    246:2 247:7
    257:6 307:23
    307:25 308:6
    340:24 351:17
sixth   62:16
    63:4
skip   281:6
skipped   299:6
    314:25
skipping   309:1
    318:16
sklar   397:15
slated   249:6
sleeping   326:14
slip   26:12
slow   110:2
slowed   336:13
slut   343:25
    344:18,24
    347:23 348:8
    348:10,18,23
    349:18
smith   22:25
    23:5,18 28:21
    28:25 167:13
    253:9 293:7
snide   289:24
social   50:21,25
solved   43:25
    44:1
somebody
    29:16 38:23
    48:11 72:9

97:12 99:20
    108:22 111:25
    142:2 157:7
    189:11 205:5
    206:15 241:21
    246:24 247:1
    269:10 347:2
    347:23,24
    361:11 367:5
    368:5 371:25
    375:1 379:22
    397:10
someplace
    343:22
sommers   77:1
    77:2,10 85:9
    86:10
sonia   75:21
    76:2 143:8,9
    143:10 221:8
    221:12,16
sonia's   76:9
soon   90:14
    91:17 92:25
    274:7 335:3,6
sorry   4:22 11:5
    12:2 20:25
    22:5 44:22
    47:19 48:15
    59:23 60:17
    64:13 70:6,11
    73:16 75:14
    76:5,6 82:14
    82:23 84:23

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[sorry - stalking]** Page 82

86:20,20 87:9
91:1 92:6
93:21 94:13
102:25 105:4
110:2 115:9
126:16 128:7
130:19 131:14
138:7 154:17
157:15 159:12
167:19 198:22
207:6 211:14
213:16 215:19
216:12 231:18
236:16 241:8
256:1 264:13
272:1 276:7
291:24 292:21
311:18 312:18
314:4 315:22
321:4 344:4
352:18 357:6
366:1 376:13
384:18 387:7
**sort** 43:13
83:15 297:21
366:2
**sought** 80:4,7
358:4,5
**sound** 18:21
89:25 94:24
102:14 104:9
139:12 140:3,5
164:19,25
185:18 213:6

271:9 279:23
286:12 315:3,8
336:25 372:13
372:24 373:5
**sounds** 18:6
19:13 86:24
109:10 111:16
115:16 141:11
141:12 317:22
394:12
**source** 12:19
**southern** 1:3
**space** 25:17
43:10 75:23
**sparrow**
282:23 283:15
**speak** 85:21
89:3 192:1
193:19 258:9
283:25 338:2
399:6,22 400:5
400:7
**speaking** 14:11
86:16 103:4
237:11 264:24
303:18 348:17
359:17 374:7
399:21 400:16
**speaks** 234:19
330:10
**special** 290:5
**specialized**
73:14,16

**specializes**
66:15,17
**specialty** 69:21
71:14
**specific** 9:8
32:8,23 33:16
34:17,21 65:3
65:12 85:25
86:18 92:8
96:3,23 100:10
105:6,11 111:3
149:19 163:8
174:6 175:2,4
179:10 186:4
193:11 197:7
229:25 250:15
250:19 251:2
286:16 291:17
293:5 357:3
370:14 396:4,8
397:17
**specifically**
12:23,24 15:17
39:1 88:23
119:6 128:22
128:24 153:19
223:21 244:24
245:1 248:18
250:6 368:10
399:3
**specifics**
203:12
**specify** 59:15

**spell** 30:7
211:21 350:10
**spend** 9:6
274:16
**spent** 183:17
183:22 184:20
274:13
**sphere** 332:10
332:15
**split** 40:5 73:5
278:11
**spoke** 7:20 8:14
16:14 85:20
97:18 98:1
137:23 157:13
218:3 357:14
357:19 371:20
**spoken** 81:20
176:13 364:14
**sports** 310:6
**spotted** 272:11
**spring** 246:3
**square** 25:14
**staff** 220:18,21
221:2 304:16
366:13
**staffing** 366:3
**stage** 363:4
**stalked** 334:5
336:18 337:7
**stalking** 334:7
334:23 335:14
336:17 337:11
337:12,16,19

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[stalking - sterling]

Page 83

338:25 340:9
344:11
**stamp** 299:11
389:5
**stand** 275:9
380:15
**standard** 36:4
36:7 275:6
276:9
**standing** 23:16
138:25 274:24
275:4 308:10
343:16 345:25
348:1 355:12
**stands** 60:5
166:23
**start** 31:8 58:6
75:8 88:18
95:23 138:19
138:19,20
141:17,19,22
154:8 178:18
184:11 210:5
258:24 280:25
297:17 303:7
317:15,23
318:2 329:22
357:20 375:20
377:15 396:23
**started** 21:8
32:2 33:1,4
35:14,17 40:13
49:12,14 87:6
87:16,17 95:20

95:25 96:8,13
96:14 100:13
131:11,12,19
133:7 138:11
138:14 149:16
159:10 167:25
170:25 171:7
174:10 193:4
197:21,24
201:18 222:2
226:14 255:1
348:7 370:17
**starting** 33:16
101:23 147:11
210:15 370:23
376:5
**starts** 329:16
**state** 5:11
15:19,20 25:23
26:21 29:17
42:17,22,25
43:2,4 44:2
45:4 63:12
67:3 80:15
90:10 121:12
124:23 126:18
126:23 127:3
150:21 164:15
192:11 198:24
199:4 227:15
227:17 303:16
359:8 360:6
377:10 403:3

**stated** 40:14
79:2 84:15
108:15 153:13
158:1 165:20
167:12 172:3
179:16 221:14
231:24 239:1
283:6 286:8
292:10
**statement** 57:2
67:7,8,10
126:25 127:5
161:7 192:15
192:19 196:7
196:23 198:14
227:25 228:3
228:12 231:2,4
237:6 263:22
266:20 282:12
301:2 333:6
349:6
**states** 1:1 24:19
45:5 153:1
159:10 234:2
**stating** 79:5
86:18 355:5
**status** 208:10
359:10,23
**stay** 7:16,21
28:8 44:8
98:13 100:20
137:25 138:1
151:4 160:23
223:19 225:11

225:17,21
262:10,11
263:8,9 266:9
**stayed** 98:20,22
213:8 295:12
**ste** 2:10,16
**step** 144:25
145:23 161:20
161:25 172:15
172:18,19,25
173:2 174:3
175:20 194:19
223:5,22 260:3
298:17 390:19
**stepped** 161:18
161:22 162:2
194:18 214:2
223:11,17
354:23
**stepping** 145:5
146:2 161:4,11
161:16 162:7
162:17 172:14
172:16 173:3,5
173:6,6,9,19,23
174:4 175:18
175:21 191:1,5
194:12 205:24
213:17 223:9
352:4,5
**sterling** 155:12
155:14,16
368:1,4,5

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

**sterling's** 155:4
  155:5,6,13
**stick** 19:10
  230:15 298:2
**sticker** 231:8
  287:19
**sticking** 94:18
  258:23
**stip** 287:3
**stop** 54:12 83:1
  100:21 131:7
  229:8 257:4
  259:7 260:14
  311:2 315:13
  343:3 354:12
  364:11 366:23
  366:25 374:12
**stopped** 83:11
  93:22 95:13
  213:24 220:11
**stopping** 94:3
  131:5 331:9
**storage** 24:17
**story** 347:25
**street** 2:5 43:6
**stress** 19:10,11
  19:22 267:8
  316:25 317:1,8
  317:9
**stressed** 7:23
  298:17
**strictly** 188:12
**strike** 71:19
  182:4 183:15

184:22 363:11
  378:5 384:3
**strong** 298:20
**stuart** 397:15
**stuck** 94:15
  116:8 304:5
**studler** 138:4
**studley** 136:7
  137:11 138:6,8
  165:9
**stuff** 24:15,16
  26:14 98:9
  143:17 162:4
  237:1 261:14
  305:3 316:18
  335:16 342:8
  378:12,12
  397:25
**subject** 58:4
  244:16
**subjected**
  398:16
**submit** 15:22
  230:6
**subpoenaed**
  79:16,18,20
  80:8 286:20
**subpoenas**
  80:11
**subsequently**
  155:6
**substantive**
  314:17

**successfully**
  347:16,18
**sue** 113:15
  149:10,14
  150:19 151:2
  157:20 227:22
  230:11 361:12
  365:13,18
  366:6,9
**sued** 276:7
  331:19
**suggest** 72:9,17
  258:24 357:11
**suggested**
  306:14
**suing** 97:11
  395:4
**suit** 304:13
  367:2
**suite** 1:22 5:22
**summaries**
  78:5
**summer** 67:4
  76:21 94:25
  102:21 104:24
  139:14 140:19
  333:20
**superiors** 273:2
**superseding**
  369:17
**supervision**
  89:6,8
**supervisor**
  208:20 231:23

232:5,12 233:7
**supplement**
  340:13
**supplemental**
  152:10
**support** 37:14
  194:22 196:13
  196:17 304:16
  319:23 379:6
**supports**
  196:22
**suppose** 207:10
**supposed** 36:1
  114:17,24
  124:11 125:7
  129:16 134:9
  138:19 174:3
  266:22
**sure** 9:2 12:20
  16:14 23:8,23
  28:7 29:13
  33:10 34:3
  40:25 51:18,21
  52:6 66:20
  70:3 85:23
  86:11 90:23
  95:3 98:4,6,8
  108:16 109:11
  113:5 119:22
  130:23 134:7
  141:14 144:19
  158:6,10 165:6
  173:25 178:18
  186:16 200:15

200:15 202:21
205:18 211:19
213:11 214:16
220:3 221:4,8
221:18 222:6,9
225:22 236:18
236:21 239:9
256:14 262:22
279:24 281:14
283:25 287:5
294:24 299:24
306:21 307:17
307:23 314:15
318:3 350:9
356:7 359:20
377:19 383:16
399:16 400:18
**surgery**  68:25
69:2
**surpass**  394:16
**surprised**
285:4,10
**survive**  61:19
62:17
**suspend**  56:13
144:6,17,19
258:2 262:17
**suspending**
56:11 146:9
261:4
**swear**  4:19
**switched**
210:19

**switching**
43:18,22
111:10
**sworn**  4:6
121:15 123:25
403:12
**system**  185:14
213:5 303:3
384:4,9 390:25
391:8,10,11,17
392:5 394:6
395:16

**t**

**t**  30:8 281:2
**table**  3:2 110:4
333:10
**tactics**  266:17
**take**  20:6 47:21
52:11 58:17
91:8 110:7
116:13 130:3,4
131:5 141:19
165:12 177:14
177:15,21
188:10 192:6
204:8,12,14,20
205:3,6 206:16
224:11 230:16
231:8 240:6
245:16 261:22
261:23 276:22
276:25 286:23
290:17,20

291:5 298:17
305:25 310:18
326:24 333:9
335:17 336:3
349:14 356:8
359:9,22 360:6
360:8,10
361:19,22
362:14 365:12
366:16 369:23
369:24 373:23
374:2 375:8,25
377:20 385:9
388:6 389:8
400:5 402:8
**taken**  1:20 4:11
40:17,20,24
118:18 139:8
178:7 202:9
203:11 244:17
278:17 303:12
336:5 361:10
372:12,16,19
**takes**  17:8
128:9 265:15
**talk**  53:11
72:16 77:2
85:25 109:10
117:14 119:4
120:5,23
122:20 128:2
136:12 146:19
154:7 155:6,8
157:10,20

173:25 175:15
175:20 193:6
198:11 249:17
255:25 256:7
256:10,16
258:10 266:22
267:12 273:24
278:24 296:12
312:4 326:13
326:14,15
327:7,11 334:7
344:17 345:9
363:23 376:23
393:2 398:19
398:22,24
399:24
**talked**  46:8
47:23 83:19,20
83:21 94:5
105:5 107:4
108:12 109:3,6
109:7,19 112:5
114:13,16,23
127:25 137:21
150:5 151:8
154:22,22
155:19,20,24
157:24 158:17
160:10 164:9
164:15,17
165:1,2 167:7
173:23 174:2,2
175:16 177:19
193:1,13,22

**[talked - telling]**                                         Page 86

194:6,12 198:3
198:8 199:25
200:1 224:24
224:25 225:2
244:24 255:20
256:5,23 273:6
282:2 286:19
292:4 296:21
314:21 324:25
328:11 331:1,9
344:12 352:4
356:1 362:17
363:8,13,22
364:19 365:9
368:1,3,8,9,10
370:22
**talking**  15:17
32:2,18 68:25
73:13 75:15
77:5 78:18
93:5 102:6
103:1 105:11
110:1 113:3,5
119:25 121:1,2
121:23 139:24
152:16,18
153:20 154:2
154:14 155:17
157:16 158:6,8
175:23 177:16
180:18 183:5
194:2,8 195:9
198:5,17
210:12,14

214:25 219:11
222:1 224:18
243:20 248:17
249:20 250:5
256:13 259:24
259:25 260:14
268:11 271:19
271:21 272:2,4
272:6 278:4
281:12 292:20
292:22 294:5
296:10 297:3,9
297:12 307:16
310:11,15,20
312:15 314:15
314:23 316:24
317:4,5,8
320:17,18
325:12 328:4
330:2 336:19
343:16,17
345:3 346:21
348:1,5,6,7
351:21 354:12
360:2,7 363:5
363:7,10 364:2
365:5 369:19
370:19 374:1
384:18 399:25
**tanoury**  86:16
**taped**  355:1
**tapped**  143:1
**target**  264:11

**tax**  37:9
**taylor**  2:14
4:21 270:11,17
335:25 336:2,6
**tear**  324:5,5,8
**tearful**  351:18
**technically**
20:22 75:24
**tell**  4:6 19:18
26:6 30:18
49:14 53:13,15
55:13,16 60:15
60:18 63:7,10
64:13 75:23
83:12 90:12
92:13 102:21
105:7 114:9
115:12 124:10
127:23 128:20
132:20 134:6
136:19 139:22
144:23 147:5,6
149:7 155:15
155:16,22
158:14 163:23
172:7 174:7
176:19 178:6
182:10 184:24
188:25 189:3
193:25 195:17
199:20 202:4
204:5,25
211:12 216:11
216:16 226:5

229:24 236:3
245:11,20
247:2 256:5
259:20 267:10
267:13 300:16
304:23 305:2
308:23,24
313:18 314:3
318:24 345:4
353:8 354:7
359:18 360:10
368:8 369:3
373:12 388:1
388:10 394:14
395:25 397:16
399:3 403:12
**telling**  8:1
17:14 60:23
61:17 64:18
92:20 102:23
115:2 118:19
124:3 135:3
136:19 138:5
148:5,9 152:5
171:13 174:20
175:25 193:22
194:6 207:12
225:16,18,20
226:7 231:1
238:5 259:22
271:2 275:2
285:15,18,22
297:25 317:4
323:11,17,19

**[telling - that's]** Page 87

| | | | |
|---|---|---|---|
| 323:19,21 | 355:14 363:1 | 165:6,8 167:15 | 133:14 134:17 |
| 324:10,16 | 391:13 392:12 | 167:21 168:2 | 135:17,18 |
| 337:12 346:15 | 398:2 400:1 | 174:18,21,23 | 176:22 256:8 |
| 347:3 387:24 | **testimony** 8:25 | 174:24 176:11 | 256:13,14,17 |
| **tells** 139:23 | 101:6,8 105:23 | 197:17,17,18 | 294:8 313:18 |
| **tend** 316:18 | 109:18 113:22 | 221:19,20,21 | 313:23 315:4 |
| **tens** 9:21 | 116:17 125:25 | 240:23 255:18 | 326:13 327:6 |
| **tense** 290:2,8 | 126:3,21 | 255:25 256:20 | 327:12,14 |
| **term** 35:22 | 128:11 165:14 | 295:12 298:13 | 328:7,22 |
| 200:4 202:3 | 165:15 181:18 | 298:14,15,16 | 333:22 337:5 |
| 203:12 397:2,3 | 196:15 234:20 | 304:24 305:4,6 | 337:14 338:19 |
| **terminated** | 237:10 291:1 | 309:1 310:8,22 | 338:20,21,22 |
| 68:3 168:5 | 310:13 318:20 | 314:18,25 | 338:23,24 |
| 239:21 240:25 | 323:1 325:20 | 319:11 320:15 | 339:2,23 340:1 |
| 249:7,23 | 327:24 328:14 | 323:25 326:6 | 340:3,4,6 |
| 365:11 | 328:24 332:24 | 328:17 329:4 | 349:1 355:4 |
| **terrorism** | 338:6,12 | 329:13,21,23 | **thailand** |
| 14:17,25 | 345:13,14 | 329:25 336:23 | 309:15,21,22 |
| **testified** 4:8 | 348:2 359:1 | 337:16 339:7 | 310:3 312:5 |
| 127:10 326:4 | 403:9 | **texted** 31:25 | **thank** 5:24 |
| 358:4 | **text** 12:21,25 | 32:3,17 33:3 | 50:17 94:3 |
| **testifies** 138:25 | 13:3,6,10,12,14 | 33:12,17,22 | 111:11 113:21 |
| **testifying** 66:1 | 32:15,20 33:10 | 34:2 113:8 | 136:7 138:7 |
| 99:17 102:4 | 33:11,16 90:9 | 134:6 135:20 | 206:6 208:4 |
| 106:22 130:8 | 91:3 93:7,19 | 136:8 139:24 | 261:8 262:8 |
| 132:18 133:18 | 96:25 97:5,9 | 140:23 174:25 | 270:18 280:17 |
| 136:24 151:21 | 98:25 99:1,7 | 255:8 305:7 | 284:23 287:22 |
| 224:2,3 226:1 | 99:10 105:11 | 328:18 334:22 | 304:2 347:19 |
| 246:10 247:25 | 119:13 124:7,9 | 334:23 | 379:18 402:11 |
| 273:23 276:12 | 134:2,3,7,11,12 | **texting** 32:10 | **that's** 16:24 |
| 301:12 310:24 | 134:14,21 | 333:23 334:15 | 32:11 49:22 |
| 311:9 312:13 | 135:4,5,24 | 370:15 372:11 | 55:22,22 56:22 |
| 323:2 325:13 | 137:11 138:4,8 | **texts** 32:5,8 | 63:3 73:25 |
| 338:11 349:3 | 138:10 139:19 | 91:8 99:13 | 90:23 92:14 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[that's - third]                                                        Page 88

| | | | |
|---|---|---|---|
| 101:17 117:12 | 135:7 231:6 | 23:7 28:3,5,13 | 283:1,2,22,22 |
| 150:24 162:22 | 249:13 270:19 | 28:19,21 29:2 | 283:23 284:24 |
| 180:1 191:18 | 290:13 303:7 | 29:22 30:3 | 285:16 288:15 |
| 191:21 192:8 | 310:17 312:19 | 31:18 36:1 | 289:16 293:4 |
| 225:14 233:19 | 313:3 322:25 | 40:20,24 44:25 | 303:8 304:5 |
| 240:25 249:24 | 325:19 341:14 | 49:12 50:21,25 | 308:21 313:19 |
| 256:20 287:5 | 353:13 354:20 | 58:12 60:16,19 | 318:1,14 |
| 322:25 369:2 | 366:13 374:11 | 66:25 69:22 | 319:17 320:4 |
| 382:11 | 376:9 392:7 | 70:21 84:7,9 | 320:15 321:23 |
| **themes**  62:13 | **things**  61:13 | 92:10 93:11 | 335:2,5,15 |
| **theories**  241:11 | 65:20 81:6 | 96:20 100:16 | 337:16 338:20 |
| 250:1 379:12 | 101:25 136:5 | 125:8 127:21 | 342:12 344:2 |
| 379:15,16 | 151:12 163:4 | 128:8,8 131:22 | 368:9,13,25 |
| **theory**  15:23 | 176:4 177:22 | 136:5 138:20 | 371:20 372:10 |
| 49:19,22 50:1 | 181:24 200:2 | 141:17 142:11 | 374:15 375:1,9 |
| 50:2,3 249:25 | 200:17 205:14 | 154:18 155:5 | 378:3,14,16,24 |
| 250:2,3 279:11 | 214:22 215:7 | 156:6 158:7 | 379:7 380:4 |
| 379:1,5,20,24 | 227:6 238:21 | 165:21 166:1 | 382:15,25 |
| 380:5,8,14,21 | 245:25 263:10 | 171:6,16 176:6 | 383:3,3 388:6 |
| 380:22 381:7,8 | 271:20 277:6 | 178:10,18 | 388:14 393:5,8 |
| 381:8,9,15,19 | 289:15 290:7 | 179:8 180:5 | 393:12,19 |
| 381:24 382:12 | 298:1 305:2 | 182:21 192:24 | 395:1 396:1 |
| **therapist**  18:1 | 311:6 313:2,3 | 203:11 205:11 | 399:23 |
| 18:22 320:19 | 316:9 320:8 | 210:3 211:11 | **thinking**  19:7 |
| 370:22 | 324:11,17 | 212:19 214:15 | 30:18 31:19 |
| **there's**  117:6 | 329:20,23 | 215:25 216:4 | 95:13 205:22 |
| 121:23 122:1 | 330:20 337:18 | 218:10 225:7 | **thinks**  46:5 |
| 231:9 257:25 | 337:21 340:19 | 226:12 230:4 | 338:17 |
| 307:13 | 345:6 346:13 | 235:17 240:16 | **third**  79:17 |
| **they're**  310:23 | 378:16 380:13 | 242:4,7,15,18 | 142:17 153:12 |
| 382:25 | 388:25 398:6 | 242:19 244:22 | 157:24 281:7 |
| **thing**  29:15 | **think**  6:3 10:19 | 247:6,16 249:9 | 377:24,25 |
| 99:12 113:6 | 11:2 19:20,21 | 249:25 277:10 | 379:21 381:13 |
| 115:12 125:4 | 20:22 21:4,8 | 281:13,15 | |

[thomas - time]                                                                Page 89

| | | | |
|---|---|---|---|
| **thomas**  5:1 | **three**  76:13 | 77:15 78:15,18 | 210:2,19 211:3 |
| **thought**  17:1 | 120:2 121:23 | 79:15 81:21 | 213:23 214:2 |
| 19:11,22 29:8 | 122:1 153:23 | 82:18 83:10,19 | 214:10,20 |
| 29:24 30:1,4 | 174:9 210:4 | 83:21 85:10 | 215:1,7 217:18 |
| 68:13 73:23 | 216:22 248:1 | 86:17 88:7,8 | 218:2 222:24 |
| 74:5 82:3 | 307:5,8 308:9 | 89:1 91:25 | 223:3,6,10,11 |
| 84:19 85:23 | 367:16 | 92:24 93:2,6 | 223:17 224:23 |
| 95:12 96:15 | **throw**  65:20 | 95:7,13 100:15 | 225:1,1 226:13 |
| 97:4 107:14 | **thumb**  323:21 | 101:9 105:2,16 | 229:24 230:3 |
| 112:15 150:16 | 323:22 | 107:25 108:1,7 | 247:9,13,18,19 |
| 158:5 168:22 | **thweatt**  75:22 | 110:8 111:9 | 251:8 257:25 |
| 171:10,14 | **tiffany**  189:20 | 112:20 113:12 | 260:12 262:5,7 |
| 173:5,9 175:22 | 189:21 | 118:11 119:1,3 | 263:11,18 |
| 265:5 285:23 | **till**  138:20 | 120:7,9 131:23 | 265:15 268:2,5 |
| 297:1 324:14 | 301:25 | 137:21,23 | 270:20 277:25 |
| 324:16 350:22 | **time**  7:2,4,6 | 140:14 141:19 | 278:17,20 |
| 366:8 371:22 | 8:23 9:6,7 | 146:20 147:10 | 288:21 290:17 |
| 382:18 388:13 | 18:13 22:8 | 147:18,23 | 290:20 293:20 |
| 390:17 | 23:3 24:4 27:9 | 148:14 149:13 | 294:14 295:14 |
| **thoughts**  177:3 | 28:11 29:15 | 152:23 153:20 | 296:11 298:17 |
| 309:4 | 31:1,11,13,22 | 153:21 154:3,9 | 299:18 301:14 |
| **thousand**  333:1 | 33:23 34:3,10 | 155:21,24 | 304:15 307:7 |
| 333:7 | 34:21 36:2 | 157:16 161:17 | 314:19 315:24 |
| **thread**  99:7 | 44:24 48:23 | 162:3 164:17 | 320:2,17 328:8 |
| **threat**  123:8,14 | 49:3 50:7 | 166:25 167:14 | 329:8 330:21 |
| 350:22 392:16 | 52:21,21 54:2 | 167:19,24,25 | 333:21 334:2 |
| **threatened** | 54:3,18 57:23 | 169:14 170:3,5 | 334:16 335:2,6 |
| 123:11 339:11 | 58:7 61:7,8 | 173:5,8 175:21 | 335:15 336:23 |
| 339:15 341:25 | 63:1,24 65:2,3 | 183:4,17,22,23 | 337:3,23,24 |
| 341:25 | 65:21 66:21 | 184:9,10,11,18 | 338:1 341:12 |
| **threatening** | 68:17 69:14 | 184:19 190:15 | 341:13 342:18 |
| 347:2 | 70:3 72:5 | 190:15,17 | 346:6 347:21 |
| **threatens** | 73:13,19 76:3 | 192:2 193:4 | 349:14 351:19 |
| 347:24 | 76:4,9,22 | 198:8 206:6,10 | 354:24 355:3 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[time - told]** Page 90

| | | | |
|---|---|---|---|
| 355:20 356:1,5 | **timeline** 162:23 | 205:14 213:19 | 137:3,9,9 |
| 356:8,8 357:5 | **times** 48:3,7,10 | 221:5,18 231:1 | 139:20 151:13 |
| 357:15,16 | 65:11 101:2,5 | 243:9 261:12 | 151:18 154:20 |
| 358:2,11,12 | 101:19 120:2 | 281:25 301:20 | 160:11 163:3 |
| 359:6 360:24 | 136:15 153:13 | 307:21 311:20 | 165:7 168:15 |
| 362:10 365:1,2 | 158:1 189:1 | 329:9 337:24 | 171:10,24 |
| 369:1,6,8 | 190:18 198:3 | 354:18 364:16 | 172:13,14,16 |
| 370:9,11 371:4 | 198:12 231:25 | 365:3 368:20 | 173:3,4 175:13 |
| 372:14 373:25 | 264:9 282:19 | 368:21 369:24 | 186:2,23 187:1 |
| 376:9,10,11,12 | 325:8 364:13 | 372:8 375:5,13 | 187:3,6 193:24 |
| 377:2,7,12,18 | 364:24 382:23 | 376:20 382:3 | 195:16,18,18 |
| 384:5 385:9 | 402:2 | 392:13 395:25 | 196:3 198:24 |
| 390:18 391:14 | **tips** 151:9 | 396:11 400:14 | 199:9,16 |
| 393:2 396:7 | **tired** 261:13 | **today's** 27:7 | 201:17,18,20 |
| 401:9 | **title** 218:7,8 | **together** 31:25 | 201:21,24 |
| **timeframe** | 227:21 228:1 | 98:11 102:12 | 203:3,4,6,7,13 |
| 32:24 86:18,24 | 234:15 237:8 | 108:13 162:13 | 203:23 204:6 |
| 87:16 109:6 | **today** 5:17 6:7 | 235:6 240:12 | 205:12,13,15 |
| 162:14 198:9 | 8:1,25 9:3 | 306:14 309:9 | 205:15,21 |
| 198:16 210:22 | 10:13,20 14:14 | 335:16 368:14 | 206:1,14 216:2 |
| 214:25 222:1,8 | 14:24 16:3 | **told** 17:13,16 | 223:21 225:11 |
| 288:3 358:12 | 19:4,7,9 25:1 | 18:1 60:10,11 | 225:16 226:4 |
| 359:17 360:19 | 33:15 42:2 | 64:19 81:17 | 226:19 227:5 |
| 360:22,23 | 51:16,19 64:11 | 82:11 84:15 | 232:14 256:10 |
| 361:8 362:6,7 | 67:19 85:17 | 100:10,13 | 256:14 257:22 |
| 362:8 363:10 | 97:11,14 | 105:23 112:22 | 258:1,23 274:6 |
| 363:12,21,22 | 109:18 132:25 | 114:13 115:14 | 282:17 283:23 |
| 364:4,7,10,12 | 137:19 140:20 | 115:14,17 | 315:21 320:19 |
| 364:13,21,23 | 151:24 152:24 | 124:12,16 | 320:24 322:7,8 |
| 364:24 365:4,6 | 153:10 158:2 | 125:2,20 126:5 | 322:10,13 |
| 365:7,9 | 158:12 175:1 | 126:23 132:21 | 323:4 330:12 |
| **timeframes** | 178:10,14 | 133:1,6 135:9 | 333:1,4,5 |
| 363:23 | 179:8 202:11 | 135:11,14,21 | 339:10 344:13 |
| | 202:15,19 | 136:12,21,23 | 347:22 349:19 |

[told - trip]

Page 91

349:21 350:3
350:13,19
353:11 354:3
354:25 355:6,7
355:11 360:5,8
360:17 361:22
362:22 363:4
374:21 380:15
396:14 397:14
401:14
**tom**  281:2,4
**tomorrow**
111:9
**tonight**  266:9
400:14
**took**  39:12
79:22 147:10
184:19 214:22
229:15 263:24
280:6 281:2,19
324:4 335:19
336:11 350:15
350:21 351:6,6
391:11 393:8
**top**  9:15 10:11
14:20 26:1
39:20 41:3
45:24 46:20
58:2 101:16
166:19 175:14
188:24 239:13
256:4 285:3
299:12 303:1
312:19 352:16

352:19 353:1
354:19 367:10
384:1 385:9,10
385:21 386:17
389:7 395:3
**topic**  278:6,7
278:12 327:11
364:16
**total**  385:3,4,13
385:14 386:13
387:2,12 388:3
389:16 393:7
393:10 394:14
395:12
**totally**  381:5
**touch**  28:8,13
91:23 92:9
98:20,22
137:25 138:1
153:3 320:12
**toward**  185:13
213:4 289:19
380:17 385:13
**towards**  244:21
395:12
**town**  397:24,25
**townhome**
20:24
**track**  37:25
38:8,11 184:8
212:1
**tracking**
240:17 376:13
376:14,23

387:13
**transcript**
403:7
**transition**
173:4,8 174:10
219:10
**traumatized**
350:16
**travel**  23:22
182:12,14,16
182:19 183:6
185:22 186:1,3
186:7,7,22,23
186:25 187:5,7
187:12,16,23
188:7,19
189:10,11,18
190:4,7,8,11,13
190:19 252:23
**traveled**  188:20
189:1
**traveling**  27:18
27:21 182:19
186:16 280:1
288:23
**treat**  44:23
46:3 47:12
48:8 51:24
52:24 54:5
144:5,7 332:5
**treated**  45:8,12
45:18,25 48:11
51:2 52:13,17
52:18,21,25

97:13,16 98:4
98:6 100:8
101:2,3 239:22
239:24,25
240:16 241:22
242:15,18,19
243:22 248:8
248:10,12,24
250:3,11,12,23
395:20
**treater**  350:15
351:7
**treaters**  44:12
47:19 177:4
**treating**  46:4
49:15,19 51:19
51:25 52:4,8
95:20,25 96:9
96:13,14 97:4
97:18 100:13
144:12
**treatment**
241:21 243:21
248:15,17,19
250:6
**trial**  10:18 78:4
265:14,14
286:23
**tried**  7:21
98:13 135:17
191:17 358:21
360:1,5
**trip**  190:5
336:24

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[trips - understand]**                                                  Page 92

**trips**   188:23
   189:7 351:24
   351:24
**trouble**   203:18
**true**   126:25
   133:16 151:20
   194:15 227:23
   403:8
**truly**   209:2
**trust**   208:7
   209:1
**truth**   4:6,7,7
   403:13
**truthful**   15:15
**try**   14:12 19:10
   41:18 68:1
   101:24 268:16
   309:7 374:18
   377:12 389:14
   397:17 400:11
**trying**   7:22
   12:3 13:23,25
   14:5 24:15
   33:8 86:5
   99:19 106:6,20
   109:10,11
   119:16,21
   148:22 152:2
   162:20 169:8
   169:10 178:2,5
   178:6 181:7
   203:3 206:3
   210:22 216:24
   234:20 242:23

   245:23 256:25
   257:13,15
   260:11 299:10
   299:13,21
   304:15 315:24
   320:12 346:17
   347:6 358:12
   363:25 364:3
   374:5 392:18
**turn**   179:25
   211:23
**turned**   9:22
   35:22
**twice**   369:16
**two**   6:23 19:6
   29:11 31:12,25
   32:2 34:23
   36:12,18 59:25
   70:17 87:11
   130:20 134:14
   141:8,14 154:4
   190:1 197:15
   205:8 206:22
   207:15 215:16
   221:9 245:24
   269:3 271:20
   272:18 279:3
   279:15,19,21
   279:24 280:3
   282:6 288:5
   289:12 291:22
   300:20 301:24
   313:20,20
   353:4,5 361:4

   362:6 369:23
   374:4,4 384:25
   388:19,25
   390:9 400:2
   401:12 402:6
**type**   44:13
   89:10,11,12,21
   153:25 159:9
   180:12 193:21
   222:18 244:20
   269:15 309:16
**types**   26:8
**typically**   72:7
   179:24
**typos**   211:19

**u**

**u**   38:21
**ultimately**
   161:22 172:10
   371:24
**unable**   349:11
   353:16 396:2
**unacceptable**
   143:19
**unclear**   155:25
   375:7
**uncomfortable**
   149:9 200:1
   204:6 205:16
   205:19,20
   232:14
**under**   6:9,11
   6:13,16 8:1

   73:16 80:20,21
   89:6,8 97:14
   125:25 132:25
   140:14 144:20
   145:7 208:12
   250:14 260:10
   323:21,22
   324:13 353:12
   380:10 384:5
**underneath**
   385:14
**underperfor...**
   226:25 227:5
**understand**   6:8
   6:9,10,11,13
   13:8 22:11
   29:18,21 44:14
   75:11 85:20
   91:5 100:24
   109:11 125:8
   126:10 128:22
   176:23 178:8
   198:16 202:23
   210:1,7 212:14
   219:9 232:23
   238:11,13
   240:5 243:6
   244:4 248:21
   256:15,19
   277:9 279:13
   288:14 291:12
   304:20 311:18
   321:4,6 343:20
   343:20 346:15

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

346:16 356:11
376:22 377:11
380:4,22
385:19 386:4,5
391:24 395:19
**understanding**
10:4 29:9 30:2
31:23 158:23
171:17 183:1
186:24 193:1
200:9 201:7
208:15 209:15
213:2 214:4
248:24 380:6
382:24 390:24
392:7 397:4
**understood**
29:24,25 31:4
31:7,16 71:10
73:15,22 151:5
162:17 194:3,5
210:2 322:18
366:10
**underway**
32:19
**undue**  267:8
**unfortunately**
391:6
**unhappy**
118:19 223:2
**union**  41:17
210:8,9 342:7
342:10 345:1,2
346:18

**unit**  24:17
**united**  1:1
**unnecessary**
304:6 306:22
307:19,22
**unofficial**
157:12
**unpublished**
270:9
**unusual**  375:24
**unwelcome**
231:25
**upcoming**
138:3
**upped**  397:10
**upset**  111:19
111:24 112:1,4
120:21 223:9
268:15 295:18
330:18 351:6
351:12,18,20
**upsetting**  148:2
277:19,25
**use**  12:15 40:13
43:11 58:14,22
71:10,15,25
74:9,18 80:18
107:8 128:2
203:12 234:24
235:13,16
246:5 277:24
281:11 282:1,5
282:22,24
283:2,7,14

285:2,12,22
287:11,12,12
291:25 292:10
292:11 293:2
366:22 380:19
380:25 382:18
**used**  37:19
58:23 60:19
66:18 69:25
70:14,16 74:3
74:12,17
105:20 113:15
133:16 160:6
160:14 203:22
246:13 270:12
343:22
**using**  37:21
74:15,16
281:12,20
283:4,13 292:5
292:7 327:12
364:9
**usually**  73:6,7

### v

**v**  4:12 264:11
282:23 283:14
285:1 350:11
**vacay**  139:25
**valid**  15:23
**value**  251:6
**various**  66:22
67:6 360:4

**verbal**  139:11
176:14 195:12
222:16
**verbally**  101:2
197:4 257:1
258:21,23
**verified**  165:14
**verify**  357:9
**veritext**  4:17
**versus**  113:3
**viable**  153:9
381:24
**vicarious**  381:8
**vice**  14:16
25:22 250:16
**vicinity**  27:22
343:24 348:7
**video**  1:18 4:10
5:8 229:11
268:18
**videographer**
2:20,21 4:9
5:13
**view**  227:4
**viewed**  227:1
**viewing**  226:14
**vii**  227:21
228:1 234:15
237:8
**violate**  346:17
**violating**
260:15
**violations**
227:20 228:1

Carroll Reporting & Video
A Veritext Company
586-468-2411
www.veritext.com
www.veritext.com

**[violations - wasn't]** Page 94

228:17 234:14
237:8
**virtually**   303:9
**vis**   23:24,24
**voice**   54:12
158:8 323:6
**volume**   304:19
**vs**   1:8

**w**

**w**   2:10
**wait**   118:8
119:18 236:20
271:19 280:22
**waiting**   114:14
115:1 125:3
139:21,21
**waived**   150:1
**walked**   143:1
**wallace**   239:17
239:19,24
240:1,16,24,24
241:9,14
248:11,13,18
248:20,25
249:6,7,22
250:4,7,11
251:13
**walson**   239:18
251:21
**want**   16:7,11
18:16 20:10
31:2,4,15
35:12 38:2

53:22 54:10,15
60:21 75:8
80:4,4,12
81:13 90:12
91:8 99:2
100:20 104:21
105:9 115:10
116:11,16
117:11 118:20
119:3 120:11
120:17 121:13
123:24 124:10
127:4 133:3
139:1 150:19
151:2 156:1
157:7 158:15
160:2 165:11
168:25 169:3,9
169:11,14
171:25 172:7,8
175:9 180:7
191:7 192:6
199:18 201:22
204:14,16
208:4 210:4
212:7,10
229:15,16,16
229:19 232:15
233:20 236:20
236:21 238:4
244:1 245:10
247:2 262:6
263:8,21,22,23
264:1,4,10

266:3 268:8
270:15 271:4
272:19 273:18
273:20 275:11
275:17 276:9
280:6 282:17
283:7 287:12
289:13 292:10
292:23 293:23
295:7 297:6
298:11,11
300:8 301:5
302:6,23
306:11 308:24
312:9 318:17
328:5 329:22
333:23 334:2
334:17 343:2,3
344:16 345:9
347:8,20
348:18,22
355:24 358:9
360:7,15 361:2
362:8 363:23
364:7,10,12,23
365:12 369:1
376:11,11
377:1 378:5
382:11 386:18
398:20,25
399:1,3,23
**wanted**   31:7,8
31:20 68:1
71:15 94:21

113:5,14
120:18 125:7
127:22 130:12
141:19 148:2
149:11 150:22
151:3,3,7
168:13 205:20
223:19 246:16
246:23 247:23
264:1 266:1
281:11 283:2
285:2,12,22
310:12 315:22
323:20 324:4
332:19,23
333:7 344:1
354:24 355:8
**wanting**   173:15
285:19 287:11
327:9 345:6
**wants**   131:6
206:18 258:20
281:10 298:3
323:22 324:13
344:24 350:19
**warning**   400:2
**warsaw**   291:20
291:23
**warshaw**
291:20,23
**washington**   2:6
14:18 25:7,14
**wasn't**   53:18
61:5 104:13

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[wasn't - witness]** Page 95

197:25 338:12
**wasting**  54:18
118:11 262:5
**watch**  268:18
**watching**  230:2
**way**  32:12 39:4
51:18 66:15
71:10 78:11
81:2 97:1
98:18 101:24
122:6 151:25
152:18 176:9
194:15 203:11
212:10 213:8
226:5 255:7
276:7 279:2
302:3 309:8
329:17 332:13
333:16 336:14
345:8 349:10
350:18 375:20
379:17 383:22
392:6 394:10
394:24 400:2
**ways**  196:8
386:3
**we've**  6:3 28:25
41:17 47:23
100:9,16 103:8
103:8 108:23
118:18 125:9
139:24 152:1
167:12 191:6
209:3 214:15

227:9 245:5
252:23 255:8
262:9 285:16
294:1 320:18
334:25 335:7
344:15 363:8
373:25 377:12
396:1
**wear**  326:15
**wearing**  98:10
**website**  368:8
**webster**  264:11
**webster's**
264:19
**week**  184:5
198:3,12
215:11
**weeks**  24:15
81:24 137:24
141:8,14
**weigh**  72:21
**weird**  327:17
**welcome**
303:25
**went**  57:15
67:23 68:5
69:19 70:8
82:15 98:12
101:24 104:23
113:25 126:12
143:9,11 163:2
212:15 223:4
224:13 225:6
268:22 272:17

272:24 289:16
294:6 308:24
308:25 343:25
350:6 351:25
357:24 366:20
378:9,10
388:21 394:5,7
**weren't**  83:7
**we'll**  236:25
395:23
**we're**  50:10,12
56:2,6,8,11
93:11 145:2,5
146:2 204:12
204:20,21
205:3 206:10
206:10,16,17
248:17 261:18
263:17 290:17
**we've**  91:7
125:5 139:5
205:2 362:17
**whatsoever**
133:17,21
134:21 170:8
174:12 178:19
182:3 184:22
194:22 195:5
196:22 338:4
352:22 355:20
**what's**  54:8
114:8 186:18
236:19 320:5

**when's**  8:23
372:14
**whitelaw**  81:23
82:2,4,10,12,19
**wide**  89:4
**willing**  150:6,9
236:22 262:10
262:11 358:23
366:15
**willingly**
244:19
**wind**  90:1
**winding**  89:23
90:3
**wisdom**  304:3,4
**wise**  25:4
309:11
**wish**  91:10
208:6 242:24
257:3
**withdraw**  7:9
7:10,15 36:6
103:8,11,11,19
103:22 154:12
399:11,12
**withstood**  19:9
**witness**  3:3 4:5
4:19 8:5,13 9:2
9:15 11:4 15:5
15:14 23:7
24:21 25:1
26:10,23 27:13
27:25 29:6
31:7,18 32:15

Carroll Reporting & Video
www.veritext.com   A Veritext Company   586-468-2411
www.veritext.com

**[witness - word]** Page 96

| | | | |
|---|---|---|---|
| 32:23 34:23 | 149:13 150:9 | 233:19 235:21 | 342:4 347:6 |
| 36:16,25 37:7 | 150:15 151:12 | 236:9,19 239:4 | 349:9 350:24 |
| 37:17 38:11,16 | 156:14,20 | 240:22 241:13 | 352:15 353:21 |
| 38:21,25 39:19 | 160:21 162:12 | 243:4 247:6 | 360:14 361:25 |
| 39:25 40:10 | 163:7 164:1 | 250:23 252:3 | 363:7,18 |
| 41:14 43:15,24 | 165:21 166:24 | 252:11,18 | 365:17 368:20 |
| 46:23 47:6 | 167:19 168:4 | 254:13 255:1 | 369:24 371:16 |
| 50:24 51:15,23 | 171:4,13 172:3 | 255:14 256:10 | 376:1 384:8,22 |
| 52:8,17,24 | 173:18 174:15 | 257:9,16 258:2 | 389:22 391:15 |
| 53:4,10 54:5 | 176:13 177:1 | 258:11,19 | 392:1,16 396:4 |
| 54:17 55:2,9 | 177:21 178:4 | 259:13 260:19 | **witness's** |
| 55:11,21 56:18 | 179:12 180:11 | 260:21,24,25 | 260:22 261:6 |
| 59:4,10 61:13 | 181:16 182:8 | 261:7 262:18 | **witnessed** |
| 64:3,7 65:5,17 | 183:11 186:13 | 265:15 267:2,7 | 351:16 |
| 67:10 71:2,23 | 187:3,19 188:1 | 270:4,21 272:1 | **witnesses**   78:5 |
| 77:23 79:5 | 188:15 189:14 | 272:17 273:6 | **wl**   270:13,16 |
| 81:4,10 84:22 | 189:24 190:23 | 273:12 274:16 | **woman**   76:17 |
| 87:4 91:11 | 191:9,11 | 274:22 276:4 | 108:18 137:13 |
| 92:3 95:7,16 | 192:18 194:10 | 277:21 279:8 | 242:16 |
| 95:20 96:3,17 | 195:2,8 196:25 | 279:19 280:22 | **women**   244:14 |
| 97:8,18,23 | 198:16 199:4 | 281:22 284:4 | 250:15 |
| 100:3,24 103:3 | 199:24 200:7 | 284:14 286:2 | **women's** |
| 105:14 106:3 | 201:4,13 | 287:25 288:23 | 140:24 |
| 107:8 111:3,16 | 202:23 203:16 | 290:2,9 291:17 | **wondered** |
| 113:19 121:22 | 209:15 211:5 | 292:3 294:24 | 16:16 19:15 |
| 124:3 125:16 | 211:14 216:25 | 295:7 301:2 | **wondering** |
| 127:7 129:20 | 217:22 218:19 | 302:14,22,25 | 111:8 386:20 |
| 130:21 133:6 | 219:22 220:15 | 303:5,6,11 | **word**   59:24 |
| 135:20 140:7 | 220:20 221:7 | 307:14 311:25 | 61:14 83:14,14 |
| 142:19 143:5 | 221:14 222:13 | 313:8 315:15 | 85:2 107:8 |
| 144:5,7,12 | 223:15,21 | 318:8 321:17 | 134:22 166:2,3 |
| 146:8,11,14 | 225:14 226:9 | 323:24 324:8 | 177:8 203:22 |
| 147:15,25 | 226:18 227:4 | 325:4 338:7,13 | 204:4 240:7 |
| 148:7,25 | 228:8 233:6,13 | 339:2 341:20 | 336:17 337:10 |

**[word - wouldn't]**

| | | | |
|---|---|---|---|
| 346:1 366:22 | 183:16,22,25 | 156:9 157:13 | 301:10 310:16 |
| **worded**  61:14 | 183:25 184:15 | 160:18 185:17 | 352:11 366:24 |
| **wording** | 185:12 191:3 | 212:11 239:7 | 366:25 372:18 |
| 159:24 | 193:15,20,21 | 241:8 247:11 | 384:5 |
| **words**  60:19 | 194:13 195:19 | 281:13 294:14 | **workload**  79:3 |
| 101:4 106:15 | 195:20,21,21 | 356:1,5 357:15 | 79:23 80:25 |
| 118:19 133:13 | 208:1,11,16,18 | 357:16 358:2 | 81:2 |
| 133:15 204:25 | 209:1 211:3 | 358:11,13 | **works**  137:15 |
| 301:7 304:3,4 | 212:2 213:2,13 | 360:24 362:10 | **world**  131:25 |
| 321:8 343:23 | 215:22 216:18 | 365:1,2 384:17 | 298:20 322:17 |
| 344:19 | 216:19 222:24 | 384:22 392:9 | 344:25 |
| **work**  26:18 | 223:2,6,8,12,22 | **worker**  50:21 | **worried**  226:24 |
| 29:4 37:15 | 226:14 239:10 | **working**  25:17 | 226:25 301:14 |
| 38:23,25 50:25 | 240:2 245:10 | 67:4,18,21 | 314:5 318:23 |
| 71:8 72:5,9 | 251:7 254:9 | 71:21 75:11 | 318:25 319:8 |
| 73:15,20,23,25 | 278:5 285:20 | 81:6,23 87:11 | **worse**  206:1 |
| 76:11,15,16,22 | 285:23 303:15 | 88:22 106:18 | **worst**  115:17 |
| 77:20 81:18 | 304:17,18 | 127:21 138:11 | 317:16 318:4 |
| 84:16 87:14,19 | 305:18 309:7 | 154:8,10 161:2 | 319:3,13 |
| 88:15,21,24 | 309:10 320:21 | 161:5,6 162:4 | **would've**  33:9 |
| 89:1,4,7,10,11 | 320:24 321:15 | 162:5,8,12,13 | 46:12 58:23 |
| 90:6,6 98:11 | 322:4,6 323:5 | 162:16 168:10 | 86:14 88:22 |
| 127:25 128:14 | 323:12,14 | 170:25 171:7 | 89:3 96:20 |
| 128:19 129:5,8 | 348:8 376:10 | 173:10,12,13 | 197:4 202:9 |
| 129:11 133:7 | 378:18,20 | 177:12 183:22 | 205:21,21 |
| 136:14,20,21 | 379:8,23 | 184:2,5,15,17 | 206:3 211:5 |
| 159:10 160:17 | 383:22 386:10 | 184:25 193:5 | 221:19,20 |
| 161:10,15 | 390:9 | 197:9,10,14,21 | 246:12 255:16 |
| 167:14 168:13 | **worked**  31:22 | 197:24,25 | 285:20,24 |
| 171:25 172:7,8 | 67:14 68:10,12 | 199:15 207:23 | 372:15 373:11 |
| 173:15 175:9 | 68:13,16 72:2 | 210:18 215:6 | 383:23 388:13 |
| 177:11,14,18 | 75:5 88:7 89:6 | 217:23 220:11 | 388:14 391:9 |
| 177:19 178:5,7 | 89:17 105:1 | 220:12 222:2 | **wouldn't** |
| 182:5 183:15 | 108:6 113:12 | 232:4,8 289:4 | 361:19 |

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

[wow - you're]                                                    Page 98

**wow**   230:3
267:9 317:7
**wrap**   374:18,22
389:14 401:13
401:15
**write**   78:5,5
115:5 116:10
167:3 177:7
179:16,22,24
180:11 181:6
181:23 198:19
198:21,23
228:19 229:18
229:23 230:2
230:16 304:23
305:1 311:5
314:4 319:22
399:20
**writes**   116:8
**writing**   86:14
97:21,24 99:25
115:20 169:23
170:7 174:12
176:11,14
178:11,14,15
178:19 179:9
180:8 184:22
187:11,15
196:13,17,22
197:1 220:23
220:24 221:1
221:12,16,17
221:25 222:9
222:13 223:1

225:20 245:5,8
257:1 258:21
258:22,24
299:21 305:4
312:18 326:10
330:18,20
344:14 352:9
352:10,13,16
352:19,21,23
352:25 353:2,8
353:11,13,17
353:23 354:2,4
355:19
**writings**   221:7
326:3,5
**written**   101:11
179:20 180:14
180:20 181:1
195:9,12
212:23 220:9
220:12 297:20
**wrong**   124:21
166:8 299:5
304:19
**wrote**   111:11
114:23 159:21
159:22 166:24
177:3 179:14
179:17,19
180:4 181:9,11
181:21 209:16
210:16 228:19
228:21,25
229:4,19,19,24

229:25 230:8
230:14 287:5
299:25

**x**

**x**   252:25
**xanax**   57:20
58:6,11

**y**

**y'all's**   369:15
**yeah**   13:25
24:4 33:5
75:17 87:6
89:13 91:7
92:6 95:9
101:17 111:22
117:21 128:17
162:18 181:9
191:9 199:8
200:22 214:6
216:6 222:24
228:12 235:10
239:14 242:3
249:17 254:23
262:23 263:16
263:19 270:17
275:18 287:9
290:6 308:16
309:3,24 313:1
315:17 318:12
324:10 355:19
359:4 360:14
369:21 396:18

**year**   40:13 47:7
58:17,17 68:10
68:19 92:16
94:1 115:15
168:16 188:23
189:2 215:12
219:8,10 339:8
362:16 384:17
384:18,22
386:8 394:25
**year's**   35:11
**years**   45:8,12
58:3 63:9
68:20 92:17
108:19 156:10
199:24,25
219:9,11,12,13
313:20
**year's**   219:10
**yell**   343:21
**yep**   181:3
299:24 301:9
**yesterday**   9:5
115:14
**young**   322:19
**you'd**   108:6
**you're**   18:7
49:23,24 50:13
51:18 59:18
82:20 113:4
119:18 121:25
123:6,12,13
126:16 138:5
140:11 145:23

Carroll Reporting & Video
A Veritext Company
www.veritext.com
586-468-2411
www.veritext.com

**[you're - zoom]**                                            Page 99

162:22 178:2
192:7 204:23
243:4 259:7
262:21 268:13
269:24 303:12
312:15 324:10
327:16 345:22
369:7
**you've**   18:21
131:1 154:18
203:7 206:9,13
251:7 388:12
393:3

**z**

**zero**   132:16
133:23
**zoom**   2:3,22
5:7,21 46:9
279:22,25
280:2 288:10
288:11,13,15
288:16 289:11
289:22 291:4
314:3,9

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.