MS. GORDON:.

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN


ELYSE MCKENNA,

Case No. 2:24-cv-12347

        Plaintiff,                    Hon. Brandy R. McMillion

Mag. Judge Elizabeth A. Stafford

vs


ROBERT F. RILEY, et al.,

        Defendants.

_____/


DEPOSITION OF: ROBERT F. RILEY

DATE & TIME: December 15, 2025, at 9:00 a.m.

LOCATION: 280 N. Old Woodward, Birmingham, Michigan


Taken in the above-entitled cause, before James A. Hengstebeck,

Certified Electronic Recorder, CER #4623, and Notary Public for

the County of Oakland.

American Reporting, Inc.
248-559-6750

Robert Riley                                                          McKenna v. Riley

```
 1        A.   That is true.  I do not refer to them as clients.
 2        Q.   Okay.  So you negotiate between parties; is that
 3   right?
 4        A.   Yes.
 5        Q.   All right.  How do parties find you?
 6        A.   I guess in many ways.  You'd have to ask them.  I'm a
 7   very private person.  I do not advertise.  I do not go seeking
 8   work.  I have over time received requests to do my work.
 9        Q.   Do you have relationships with law firms that refer
10   you business?
11        A.   What do you mean by relationships?
12        Q.   Do you have a referral network between other law
13   firms for business?
14        A.   No.
15        Q.   So you don't receive referrals from law firms at all?
16        A.   Not that I know of.  They call my assistants.  They
17   schedule through my assistants.  They find dates that work and
18   I just go to work.  I do not do any of that and --
19        Q.   Are your -- I'm sorry?
20        A.   Go ahead.
21        Q.   Were you finished?  You can continue.
22        A.   No, but you go ahead, please.
23        Q.   Were -- are you assigned cases by judges?
24        A.   Yes.
25        Q.   How does that process work?
```

Page  27

Robert Riley                                                    McKenna v. Riley

```
 1    mediator?
 2                MS. HARDY:  Objection, form, asked and answered.
 3                THE WITNESS:  I told you that you should ask others
 4    what my reputation is.  I don't worry about it too much.
 5       Q.   (By Ms. Russell)  Is that the same for now because I
 6    previously asked about before you started your own firm.  This
 7    is about your reputation as a mediator now.
 8                MS. HARDY:  Objection, form.  You mean today as
 9    opposed to prior to this lawsuit?
10                MS. RUSSELL:  I asked as a mediator.  I've asked
11    earlier as a lawyer.  We distinguished that he's -- that there
12    is a difference between a practicing lawyer and a mediator.
13    I'm asking him --
14       Q.   (By Ms. Russell)  Mr. Riley, how has your
15    reputation -- how do you perceive your reputation as a
16    mediator?
17       A.   Right now?
18       Q.   Yes.
19       A.   It's been shattered by the law -- excuse me.  It's
20    been shattered by Ms. McKenna, the remarks she's made about me,
21    her trip to the newspapers, the things she said to countless
22    people.  She has done everything she can to destroy me.
23       Q.   But you say you don't have an ego, correct?
24       A.   There is a big difference between ego and
25    bastardizing me.
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

1          Q.     So do you feel that the lawsuit has tarnished your
2    reputation?
3          A.     Yes.
4          Q.     In what way?
5          A.     A number of clients have terminated their
6    relationship, clients, your word.  I would say it differently.
7    Those who had regularly sent me work elected not to and told me
8    so, that they wouldn't be using me anymore.
9          Q.     I'm sorry.  You testified earlier that you don't have
10   any referral relationships, so you're saying now that people
11   terminated their relationships with you in sending you work?
12   Is that what you're saying?
13         A.     The word referral is not accurate.
14         Q.     Okay.  Explain it.  Correct me on my accuracy, then.
15   Help me understand.
16         A.     After she said these things to a widespread body of
17   people, a number of people said we are not coming back, Bob, or
18   we are not going to use you anymore.
19         Q.     Did they tell you that directly?
20         A.     In some instances, yes.
21         Q.     So they didn't go through your secretary like you
22   testified earlier?
23         A.     They did, in fact, go through my secretary.
24         Q.     But they also talked to you directly?
25         A.     In a roundabout way, yes.

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1   become evident.
 2        Q.   (By Ms. Russell)  Okay.  So tell me about your
 3   family.  Are you married?
 4        A.   Yes.
 5        Q.   How long have you been married?
 6        A.   Almost 50 years.
 7        Q.   What's your wife's name?
 8        A.   Jackie.
 9        Q.   Did she know about this lawsuit?
10        A.   Yes.
11        Q.   What did she think about it?
12             MS. HARDY:  Objection --
13             THE WITNESS:  None of your business.
14        Q.   (By Ms. Russell)  Have you talked about it with
15   Jackie?
16             MS. HARDY:  Marital communications, objection.
17             THE WITNESS:  I'm not going to talk about my wife.
18             MS. RUSSELL:  I'm sorry.  You are directing him not
19   to answer about his wife because of marital privilege?
20             MS. HARDY:  Communication with his wife, yes.
21             MR. DAVIS:  Marital communications were covered,
22   Ms. Russell, as the Court made clear, not writings, but verbal
23   communications are covered.
24        Q.   (By Ms. Russell)  Have you ever messaged with your
25   wife about this lawsuit?
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                  McKenna v. Riley

```
 1        A.    What do you mean by messaged?

 2        Q.    Text message, email?

 3        A.    Nope.

 4        Q.    You've never communicated with your wife about this

 5  in text message or email or any other written form?

 6        A.    Correct.

 7        Q.    Did you ever show her any writings like the notes

 8  that you sent to Ms. McKenna?

 9        A.    I did not.

10        Q.    Has she seen the notes?

11        A.    No.

12        Q.    And you don't dispute that you sent handwritten notes

13  to Ms. McKenna, correct?

14        A.    There were handwritten notes to McKenna, correct.

15        Q.    Do you recall how many?

16        A.    No.

17        Q.    More than five?

18        MS. HARDY:  Don't speculate.

19        THE WITNESS:  I didn't count them.  Still haven't

20  counted.

21        Q.    (By Ms. Russell)  Okay.  We have a copy of these.

22        MS. HARDY:  So at this point, I'd like to note for

23  the record that I sent an email to Mr. Altman who had

24  previously announced he was going to take the deposition last

25  Thursday, December 11th, with a copy to Kimberly Russell
```

Page  63

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

1   explaining that in light of the vision problems of the witness
2   we needed to work out a protocol for the handling of documents
3   because he would not be able to read a hard copy document in
4   this deposition.
5        MR. ALTMAN:  Except I brought this which should
6   assist.
7        MS. HARDY:  Well --
8        MR. ALTMAN:  I brought this which should assist.  If
9   he can handwrite documents, then with this digital magnifier
10  that he can magnify extensively, I suspect he can read the
11  documents.
12       MS. HARDY:  Well, I have no idea what that device is.
13  Let me finish my statement.
14       MR. ALTMAN:  Okay.
15       MS. HARDY:  All right.  So I asked to have a
16  constructive dialogue with you all about this.  I got zero
17  response.  You didn't even acknowledge my email.
18       MR. ALTMAN:  I'm sorry, but I don't -- unfortunately,
19  I don't really read my emails and I apologize for not having
20  responded to you.  This is the first I'm hearing that there was
21  an email.  I understand your point.
22       MS. HARDY:  You didn't know that one had been
23  received previously?  Because I sent it to Ms. Russell, as
24  well.
25       MR. ALTMAN:  Listen --

American Reporting, Inc.
248-559-6750

Robert Riley                                                                    McKenna v. Riley

1              MS. HARDY:   I didn't hear from you either,

2    Ms. Russell.

3              MR. ALTMAN:   I've been in hearings all week.

4              MS. HARDY:   And she's nodding that she did not

5    respond.

6              MR. ALTMAN:   I was in hearings all week --

7              MS. HARDY:   Yeah.

8              MR. ALTMAN:   -- and so I apologize, but nevertheless,

9    we don't have to tell you in advance the documents that we want

10   to use with Mr. Riley.   Listen, I understand your point --

11             MS. HARDY:   When you have somebody who is disabled,

12   you work out an accommodation.   I proposed an accommodation.   I

13   expressly said I look forward to hearing from you on this

14   issue.   If you had other ideas such as your own device, you

15   should have communicated with me in advance so that I could

16   discuss with my client whether or not the device you have would

17   be one that he would be comfortable using.

18        Q.   (By Ms. Russell)   Mr. Riley, you testified earlier

19   that you used adaptive devices.   Can you walk me back through

20   which adaptive advices you use on a regular basis?

21        A.   Number one, it's people reading to me.

22        Q.   Not an adaptive device, but noted.

23        A.   Well, this goes to the percentage of things.

24   Thereafter, I try to do things in devices that will enlarge

25   information.

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1        Q.   (By Ms. Russell)  We have an adaptive device here.
 2             MS. GORDON:  I'm sorry, guys, is this entire packet
 3   1?
 4             MR. ALTMAN:  Yes.
 5             MS. GORDON:  Has one number on it?
 6             MR. ALTMAN:  Yes.
 7             MS. RUSSELL:  Yes.
 8             MS. GORDON:  And it's Exhibit 1?
 9             MS. RUSSELL:  Yes.
10             MR. ALTMAN:  Yes -- well, no, it's 101.  I'm sorry.
11             MS. GORDON:  101 is what you are starting with?
12             MR. ALTMAN:  Yes.
13             MS. GORDON:  So it looks like this exhibit is
14   Plaintiff 23196, I don't know if these are in order, through
15   23237, me for the record.  Is that the --
16             MS. RUSSELL:  Yes.
17        Q.   (By Ms. Russell)  Can you identify that document
18   without an adaptive device whether or not that's your
19   handwriting?
20        A.   I cannot.
21        Q.   All right.  Here is a digital magnifier.
22        A.   Okay.  I have never used a device quite like this
23   before.
24             MR. ALTMAN:  You can zoom in on it even more if that
25   is helpful to you.
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1              THE WITNESS:  I cannot read it.
 2         Q.    (By Ms. Russell)  What can you tell about the
 3   document?
 4         A.    It has a bluish-white background and it has something
 5   in a darker thing going left to right and it is probably
 6   writing, but I can't make it out.
 7         Q.    Can you identify whether or not that's your
 8   handwriting at all?
 9         A.    I cannot.
10         Q.    You can't at all?
11              MR. ALTMAN:  Let's try to zoom in.
12         Q.    (By Ms. Russell)  Let's try to zoom in.
13              MR. ALTMAN:  Here is the plus buttons.
14              THE WITNESS:  Okay.  So bear with me.
15              MR. ALTMAN:  We are going to try to -- there's a way
16   to zoom in.  I don't know if you can tell on the side there's a
17   plus and a minus, but if not, we are happy to do it for you.
18              THE WITNESS:  I can take my thumb and I can make this
19   smaller or larger seemingly.  Neither helps.
20              MR. ALTMAN:  Okay.  Try to zoom in, Kimberly.
21              THE WITNESS:  So there's a larger view, right?
22              MR. ALTMAN:  I don't know if that is zooming in as
23   much as you can, but there is a plus and a minus button.
24              MS. HARDY:  Here's the plus and the minus button over
25   here.
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1              MR. ALTMAN:  You can zoom in, like, 6 to 8 times.
 2              MS. HARDY:  I think that is going to do the same
 3    thing that his hands are going to do, but --
 4              MR. ALTMAN:  I'm not sure.
 5              MS. HARDY:  I'm pushing the buttons.
 6              MR. ALTMAN:  No, I understand.  I'm just saying I'm
 7    not sure.
 8              MS. HARDY:  Okay.  I can say for the record that I'm
 9    pushing the button and I seeing nothing change on this screen.
10    It says in the top left corner 12X.
11              MR. ALTMAN:  Okay.  That's as big as it will go.
12              MS. HARDY:  Yeah.
13              THE WITNESS:  And I do not see a 12X.  I can see what
14    looks like a bluish-white background.  There is something dark
15    across here.  I cannot make out what it is.
16         Q.   (By Ms. Russell)  So you can't look at this piece of
17    paper in front of you and tell me whether or not that's your
18    handwriting when that's fully zoomed in, correct?
19         A.   I cannot verify it.
20         Q.   So you say that you look at some documents.  How do
21    you look at documents?
22              MS. HARDY:  He uses a different device than the one
23    you gave him.
24         Q.   (By Ms. Russell)  Is that device with you today?  Do
25    you use a different device then the device -- do you use a
```

Page 70

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1   device to look at documents?
 2        A.   I've tried lots of devices without much success.
 3   That's what I've been trying to tell you.
 4        Q.   So how do you review documents prior to mediation?
 5        A.   I've told you, the overwhelming issue is handled by
 6   someone reading to me.  Otherwise, there just isn't much to do.
 7   You can in an iPad enlarge words sometimes, depending on how
 8   it's prepared by others.  Typed words are way better than
 9   handwritten, but they are not efficient in any large number of
10   times.  It is awkward.  It does not offer information.
11   Sometimes, I can get the letters.
12        Q.   Okay.  All right.  So that we can do a handwriting
13   comparison, can you please write on this notepad?  I will
14   direct your hand.
15        A.   What do you want me to write?
16        Q.   My name is Bob Riley, and I am an attorney.
17             MS. HARDY:  No, wait a minute.  What's the purpose of
18   this?
19             MS. RUSSELL:  So that we can verify whether or not
20   this is his handwriting.
21             MS. HARDY:  That's not -- I'm going to object to
22   that.  This is 2019.
23             MR. ALTMAN:  What difference does it make whether
24   that's his handwriting?
25             MS. RUSSELL:  His handwriting changes?
```

Page 71

Robert Riley                                                    McKenna v. Riley

```
 1              MS. HARDY:  Well, sure, your ability to see what
 2    you're writing on the page impacts how well you can write
 3    something.
 4              MR. ALTMAN:  Well, then, we can compare that.  You
 5    can object to that.  Are you --
 6              MS. HARDY:  And that's not what you do in a
 7    deposition.
 8              MR. ALTMAN:  Are you instructing him --
 9              MS. HARDY:  You know what, I am not having a dialogue
10    with you.
11              MR. ALTMAN:  That's fine.
12              MS. HARDY:  You are not supposed to be on this
13    record.
14              MR. ALTMAN:  You're right.  Okay.
15              MS. RUSSELL:  You have no problem with your counsel
16    doing this to me when you were deposing my client.
17              MS. HARDY:  Yeah, right.
18              MR. ALTMAN:  Are you instructing --
19              MS. RUSSELL:  Are you instructing him not to answer
20    anything to do with the handwritten notes?
21              MS. HARDY:  Oh, no, I not instructing him not to
22    answer questions.  That's what he is here to do.  He has
23    answered questions about what he can see or not see even using
24    your adaptive device which you brought and surprised us with
25    and never responded to my emails, but asking him to create
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1    documents is not asking questions and that, he is not obligated
 2    to you and will not do.
 3              MR. ALTMAN:  Okay.  We'll file a motion.  No problem.
 4              MS. HARDY:  All right.
 5              MR. ALTMAN:  I'm glad you think that's funny, but
 6    it's really not funny.  Okay?  We are entitled to reasonably
 7    inquire of this witness whether this is his handwriting or not
 8    and if he can't read that this is his handwriting, then we are
 9    entitled to use alternate methods to try to establish that this
10    is his handwriting.  It's not funny at all.
11              MR. THOMAS:  As an attorney in Michigan, you are
12    obligated not to discriminate against someone's disability,
13    which is what you did by refusing our reasonable
14    accommodation --
15              MR. ALTMAN:  I didn't refuse anything.  I wasn't
16    aware of the email.  Did you guys pick up the phone and -- you
17    pick up the phone --
18              MS. HARDY:  Ms. Russell had the emails.  She --
19              MR. ALTMAN:  She was busy doing other stuff.
20              MS. HARDY:  Oh, because she is too busy to respond?
21              MR. ALTMAN:  No, maybe she missed the email.
22              MS. HARDY:  I'm going to read it into the record.
23              MR. ALTMAN:  Nobody intentionally --
24              MS. HARDY:  This is Thursday, December 11th at 10:47.
25    It states -- it's directed to Mr. Altman with a copy to
```

Robert Riley                                                        McKenna v. Riley

 1    Kimberly Russell.
 2            MS. RUSSELL:  10:47 a.m. or p.m.?
 3            MS. HARDY:  A.M.
 4            MS. RUSSELL:  Okay.
 5            MS. HARDY:  All right.
 6            Mr. Altman, I writing concerning the logistics for
 7    the handling of documents in Mr. Riley's December 15
 8    deposition.  As you know from the medical records produced by
 9    Mr. Riley, he has severe visual impairments.  In light of his
10    condition, asking him to review hard copy documents during the
11    course of his deposition will not be feasible.  Mr. Riley has
12    used an iPad for many years as a reading aid and it has allowed
13    him to enhance the size of images so that he can read.  This
14    process is slow, but at least allows him to read the words on
15    the page.
16            I do not know whether you have a plan to deal with
17    the logistical challenges that Mr. Riley's vision impairments
18    will present.  I presume you have thought about this given your
19    own experiences with vision problems.
20            Please let me know how you intend to address this
21    issue.  My suggestion is that you send me in advance the
22    documents you intend to question Mr. Riley about in his
23    deposition so that he can review them in advance and have a
24    readable version of the documents displayed on his iPad during
25    the questioning.  I believe this is a reasonable accommodation

Robert Riley                                                    McKenna v. Riley

```
 1    considering Mr. Riley's disability and the most efficient way

 2    to proceed.  I look forward to hearing from you on this issue.

 3         Q.  (By Ms. Russell)  Mr. Riley, is your iPad here?

 4         A.  Yes.

 5              MS. HARDY:  He doesn't have the documents on his

 6    iPad.

 7              MR. ALTMAN:  But he can use the camera on the iPad to

 8    zoom in on the document and I highly doubt that he could do

 9    more than 12X.

10              MS. HARDY:  Well, first, you are not getting his

11    email.  You're not sending them to him directly and

12    communicating with him directly.  So you could have

13    communicated with me so that could have been worked out in

14    advance.

15              MR. ALTMAN:  How do you know I got that email?

16              MS. HARDY:  Well, you --

17              MR. ALTMAN:  How do you know?

18              MS. HARDY:  I just heard you say over there after you

19    proclaimed that you didn't get it that you were --

20              MR. ALTMAN:  I happened to be in a hearing for three

21    straight days that day.  How do you know I saw that email?  How

22    do you know she saw the email and why didn't you pick up the

23    phone and call?

24              MS. HARDY:  This is ridiculous.

25              MS. RUSSELL:  All right.  Every exhibit that we have
```

Page 75

Robert Riley                                                    McKenna v. Riley

1    this point, unfortunately, because we are going to have to find
2    out whether or not we are going to be able to get the documents
3    onto his iPad at this point in a way that he can read.  So we
4    will take a break and try to figure that out.
5                MR. ALTMAN:  Can I ask a question?  Is there any
6    special software --
7                MS. HARDY:  No, no --
8                MR. ALTMAN:  -- that you use?  I'm trying to -- we're
9    trying to resolve the issue because I have an iPad here that
10   it's on and if it's something that he can do with the basic
11   iPad, I'm happy to give him my iPad, which is probably larger
12   that doesn't have this issue.  If he is using special --
13               MS. HARDY:  Direct the question to me.
14               MR. ALTMAN:  Okay.  If he is using special software,
15   I may not be able to do that.  If he is just simply using the
16   iPad --
17               MS. HARDY:  What is your iPad?
18               MR. ALTMAN:  I can get it on my iPad.
19               MR. DAVIS:  Just send me the document and we will try
20   to get it on his iPad.
21               MR. ALTMAN:  That's fine.  If we cannot do that, I
22   have a very big iPad here.  I'm happy to make that available to
23   him so that he can --
24               MS. HARDY:  Just a regular iPad?
25               MR. ALTMAN:  It's a regular iPad.

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1              MS. HARDY:  I will inquire when I leave the room.
 2              MS. RUSSELL:  All right.  So we are taking a break?
 3              MS. HARDY:  Yes.
 4              MS. RUSSELL:  How long do you need?
 5              MR. ALTMAN:  Let them have whatever they need.
 6              MS. RUSSELL:  20 minutes?
 7              MR. ALTMAN:  Whatever they need.  Whatever they need.
 8              MS. HARDY:  Let's say the master time.
 9              MR. DAVIS:  We'll come back when we figure it out.
10              MS. HARDY:  I think everyone should stay in the room.
11   We can maybe figure it out in the few minutes.
12              MR. ALTMAN:  Okay.  Thank you.
13              COURT REPORTER:  The time is 11:18.  We are now off
14   the record.
15              (Brief recess, 11:18 a.m. to 11:26 a.m.)
16              COURT REPORTER:  The time is 11:26.  We are now back
17   on the record.
18         Q.   (By Ms. Russell)  All right.  Mr. Riley --
19              MS. HARDY:  Please note for the record that Mr. Riley
20   brought his own iPad to help cooperate with the document
21   processes even though we didn't work out any protocol.  He also
22   brought an adaptive magnifying glass to further facilitate his
23   ability to read.  It doesn't mean he's going to be able to read
24   everything, but he has done whatever he can in his power to
25   increase his, you know, his vision capability for reading
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1     purposes.

 2              MS. RUSSELL:  Noted.

 3       Q.   (By Ms. Russell)  Mr. Riley, are you able to see

 4     Plaintiff's Exhibit 101 now?

 5              MS. HARDY:  Objection, form.

 6              THE WITNESS:  In part.

 7       Q.   (By Ms. Russell)  Is that your handwriting?

 8       A.   Can I explain what I can see and can't see?

 9       Q.   Sure.

10       A.   You have something that I can't make out and right

11     next to it is PDF.  It says 2025 and the rest of that line

12     slowly can be read.  This is typed.

13              Next --

14              MS. HARDY:  You are referring to the label that's at

15     the top of the document that's not -- that has been attached --

16              THE WITNESS:  Correct.

17              MS. HARDY:  -- by somebody in the litigation process?

18              THE WITNESS:  I don't know its origin, but I am

19     showing you right here.  I can't make out what this thing is.

20              MR. DAVIS:  It just closed out anyway.

21              THE WITNESS:  What happened?

22              MR. DAVIS:  She sent a Dropbox link and the Dropbox

23     link just said enter your password, so I don't know.  I going

24     to just --

25              MS. RUSSELL:  There shouldn't be a password for this
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1    PDF.
 2              MR. DAVIS:   Well, that's how you sent it.  It was a
 3    Box link.  So I'm going to go back to the email for the record
 4    and I'm going to click on the Box link again.  The Box link is
 5    opening.  It's circling right now.  All right.  The document is
 6    up again.  All right.
 7              THE WITNESS:  Okay.  So, like I said, I was able to
 8    read that first line and that was basically typed.
 9              I don't think we are on the same thing that we were
10    on before.  This, I think, is something different.  This is a
11    letter.  This is a -- if you want to look at this, this is a
12    letter.  This is not what we were looking at before.
13              MR. ALTMAN:  Is he looking at this 23196?
14              MS. HARDY:  You can't -- because it's enlarged, you
15    can see the Bates number.
16              MR. ALTMAN:  The Bates number?
17              MS. HARDY:  Yeah.
18              MR. ALTMAN:  I mean, is this the document he's
19    looking at?
20              MS. RUSSELL:  Can you just turn the iPad to me and I
21    can tell you if you're looking at the right thing?
22              Yes, that's the right thing.
23              THE WITNESS:  Okay.  So that which is typed, when
24    enlarged --
25         Q.   (By Ms. Russell)  Mr. Riley, I not concerned with
```

Robert Riley                                                    McKenna v. Riley

 1    what's typed.  Do you see the blue ink on that page in front of
 2    you on your iPad?
 3          A.    Okay.  I won't answer that question.  I will go to a
 4    different one.
 5                Okay.  There is handwriting.  It is today marks
 6    a -- can't read the next one.
 7          Q.    That's fine.  Is that your handwriting, Mr. Riley?
 8          A.    Well, can I look at the signature?  Is there a
 9    signature?
10          Q.    There should be.
11          A.    Bad handwriting, but that's me.
12          Q.    That's you?
13          A.    Yes.
14          Q.    And you can confirm that that is your handwriting?
15          A.    I just did.
16          Q.    Okay.  Great.  So you have Plaintiff's Exhibit 101.
17    We are going to go through these notes.  I'm going to hold on
18    them for a minute and now that we have a working solution for
19    your visual aid, let's talk about when you first met
20    Ms. McKenna.  Do you remember when you first met her?
21                MS. HARDY:  I have one statement to make for the
22    record.  Exhibit 1 is different --
23                MR. DAVIS:  101.
24                MS. HARDY:  Pardon me?
25                MR. DAVIS:  101.

American Reporting, Inc.
248-559-6750

Robert Riley                                                McKenna v. Riley

```
1              MS. HARDY:  101.  Okay.  Is different documents.  You
2    asked him to identify one document in this stack.  That doesn't
3    mean he's identified all the documents.
4              MS. RUSSELL:  But he can confirm his handwriting
5    based off the same one.  We'll do that for each page that we go
6    to.
7              MS. HARDY:  Okay.
8              MS. RUSSELL:  Awesome.
9         Q.   (By Ms. Russell)  All right.  So, Mr. Riley --
10             MS. HARDY:  You asked him to confirm his handwriting
11   on page 23197.
12             MS. RUSSELL:  Liz, we've established that.
13        Q.   (By Ms. Russell)  Mr. Riley --
14             MS. HARDY:  No, you don't need to speak to me like
15   that.  You did not make clear where that was and it's important
16   to do that.  23197 is the page on which he said his signature
17   appears.  That's it.
18        Q.   (By Ms. Russell)  Mr. Riley?
19        A.   Yes, please.
20        Q.   Do you remember when you first met Ms. McKenna?
21        A.   My memory of first meeting her was when she called
22   me, said she had a discussion with someone at Henry Ford and
23   was considering different options regarding her future and it
24   was thought that I might be able to assist her.
25        Q.   Did you meet Ms. McKenna when she was a law clerk
```

Page 85

American Reporting, Inc.
248-559-6750

Robert Riley                                                McKenna v. Riley

```
 1              MS. HARDY:  Objection, form.
 2              THE WITNESS:  She said she was there.  I don't
 3  remember it.  My first memory --
 4         Q.  (By Ms. Russell)  You said she was with a man.
 5         A.  Pardon?
 6         Q.  You said that she was with a man.  You don't remember
 7  his name, correct?
 8              MS. HARDY:  Objection, form.
 9              THE WITNESS:  Jim somebody.  The point is I met her,
10  in my opinion, when that phone call occurred.
11         Q.  (By Ms. Russell)  Did you reach out to
12  Diane Gallagher about Ms. McKenna?
13         A.  The other way around.  I would not have known one
14  thing.
15         Q.  Have you ever reached out to young attorneys to
16  mentor them in the past?
17         A.  Yes.
18              MS. HARDY:  Objection, form.
19         Q.  (By Ms. Russell)  When?
20         A.  Many times over the years.
21         Q.  Who?
22         A.  It's a private matter, particularly the subject
23  matters of things that I was asked to do.
24         Q.  Are you refusing to answer who you reached out to, to
25  mentor?
```

Page 87

Robert Riley                                                     McKenna v. Riley

```
 1              MS. HARDY:  You can answer that question.

 2              THE WITNESS:  I'll give you two relatively recent

 3    examples if that helps.  Samantha Teal, an assistant at a law

 4    firm.

 5              MS. HARDY:  You were just asked for the name.

 6              THE WITNESS:  Well, okay.

 7              MS. HARDY:  Okay.

 8              THE WITNESS:  Samantha Teal and Amanda Wagenschutz.

 9    I helped both.

10         Q.   (By Ms. Russell)  Is Samantha Teal a lawyer?

11         A.   No.

12         Q.   And so you've given me an example of one lawyer out

13    of those names, correct?

14         A.   Samantha Teal is smarter than most lawyers.

15         Q.   They are both women that you just listed, correct?

16         A.   Yes, two examples.

17         Q.   How old are they?

18         A.   I'd have to guess.

19         Q.   Did you reach out to them affirmatively?

20         A.   Both reached out to me.

21         Q.   So you didn't initiate contact with either of those

22    women to mentor them?

23         A.   True.

24         Q.   And you didn't -- you didn't reach out to Ms. McKenna

25    affirmatively, correct?
```

Page 88

Robert Riley                                                      McKenna v. Riley

```
 1          A.    I did not.
 2          Q.    And your testimony today is that you did not reach
 3   out to Ms. McKenna affirmatively through a third party named
 4   Diane Gallagher, correct?
 5              MS. HARDY:   He's already answered that question.
 6          Q.   (By Ms. Russell)   Answer the question.
 7          A.    Same answer.
 8          Q.    Which is?
 9          A.    Just what I said.
10          Q.    Which is no, you did not reach -- just so that the
11   record is clear --
12              MS. HARDY:   It was clear.   He said the other way
13   around.   Those were his words.
14              MS. RUSSELL:   I don't believe it was clear so I'm
15   going to ask it again.
16          Q.   (By Ms. Russell)   Did you reach out to
17   Diane Gallagher to contact Ms. McKenna about mentoring her?
18          A.    I have no memory of that occurring at all.   What I
19   know is that she contacted -- she, Elyse, contacted me.
20          Q.    That's a different answer than no, isn't it?
21          A.    I have no idea what you want me to say.   Go ahead.
22   Start all over.
23          Q.    Did you contact Diane Gallagher to reach out to
24   Elyse McKenna to initiate mentorship?
25              MS. HARDY:   Just answer that question.
```

Page  89

Robert Riley                                                          McKenna v. Riley

```
 1        A.    I told you I don't have a count.
 2        Q.    Were they more in-person or over the phone?
 3        A.    Both.
 4        Q.    Which was more?
 5        A.    I don't have an answer.
 6        Q.    Do you remember when you offered Ms. McKenna a job?
 7        A.    Not specifically.
 8        Q.    Do you remember the terms of the employment that you
 9   offered her?
10        A.    Well, you've left a lot out, but the gist of it was
11   she would be working with Bill Hurley.
12        Q.    Do you remember when you offered her the job?
13              MS. HARDY:  Asked and answered.
14              THE WITNESS:  After she got the vote from
15   Bill Hurley.  I had no files for her, he did.
16        Q.    (By Ms. Russell)  Do you remember a specific date, is
17   what I'm asking?
18        A.    No.
19        Q.    All right.  Have you ever offered employment to
20   people that you've reached out to as a mentor before?
21              MS. HARDY:  Objection, form.  I don't understand that
22   question.
23              MS. RUSSELL:  I'm happy to rephrase.
24              THE WITNESS:  And the answer is I've never done that
25   and that's not how I hired Elyse, so it's not a fair question.
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1        Q.    And Stephanie Arndt?
 2        A.    Stephanie Arndt.  She has talked to me about firm
 3   after firm after firm.  So yes, there've been discussions, but
 4   I don't remember them.
 5        Q.    Okay.  What about Dina Zalewski?
 6        A.    She also departed from the same firm that
 7   Judy Susskind did and, yes, we talked about her departure from
 8   that firm into a new firm.
 9        Q.    So all of these names I've just listed you assisted
10   in some way, correct?
11        A.    Sure.
12              MS. HARDY:  Objection, form.
13        Q.    (By Ms. Russell)  Do you have any children?
14        A.    Yes.
15        Q.    How many?
16        A.    Two.
17        Q.    Do they know about this lawsuit?
18        A.    They can't help but know.
19        Q.    They don't know about this lawsuit?
20        A.    I said --
21              MS. HARDY:  He said they cannot help but know and I
22   am going to object to any further inquiries into his children
23   and what they know or don't know about this lawsuit.
24              MS. RUSSELL:  You can object, but there's no
25   privilege there.
```

Page 101

Robert Riley                                                        McKenna v. Riley

```
 1              MS. HARDY:  Well --
 2         Q.   (By Ms. Russell)  Have you talked about this lawsuit
 3    with your children?
 4         A.   Can I talk to my attorney for a minute?
 5         Q.   No.  There's a question pending.  You need to answer
 6    my question.  Have you talked to --
 7              MS. HARDY:  No, not --
 8              MS. RUSSELL:  He needs to answer the question.
 9              MS. HARDY:  Not if it's privileged.
10              MS. RUSSELL:  It's not privileged.
11              THE WITNESS:  No, actually --
12              MS. HARDY:  Would you please stop, Bob?  All right.
13    I told you, when I talk, you stop.
14              And I don't take my advice on what's privileged from
15    you.  I am going to consult with my co-counsel.  Thank you.
16              MR. DAVIS:  Yeah.  Let's go on the record.
17              MS. RUSSELL:  Let's go off the record then.
18              COURT REPORTER:  The time is 11:54.  We are now off
19    the record.
20              (Brief recess, 11:54 a.m. to 11:57 a.m.)
21              COURT REPORTER:  The time is 11:57.  We are now back
22    on the record.
23              MS. HARDY:  I'm asking that you move on to relevant
24    questions.  Asking about his children and what they know about
25    this lawsuit does not fall anywhere close to the realm of
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                                    McKenna v. Riley

```
 1   what's relevant.  So it's just a harassing designed to annoy.
 2   You pose those kinds of questions, we will file a motion for a
 3   protective order.
 4              I could not anticipate that you would spend this much
 5   time the way you have.  There's lots to raise with the Court,
 6   but when you start getting into his wife, his kids, what they
 7   know about this lawsuit, you are not doing what you are
 8   supposed to be doing here, which is asking fact questions that
 9   are germane to the lawsuit.  You're just here trying to harass,
10   annoy, embarrass and that will lead to a 30(b)(3) motion.
11              MS. RUSSELL:  Finished?
12              MS. HARDY:  Yep, I am.
13              MS. RUSSELL:  All right.  So I would like to make a
14   statement on the record.
15              While we were -- while there was a question pending,
16   Mr. Riley and his counsel left.  There was a conversation that
17   occurred.  There was an objection that was made as to me
18   questioning about his family.  The objection is noted.
19       Q.   (By Ms. Russell)  Mr. Riley, what did you discuss
20   with your attorneys?
21              MS. HARDY:  One, you are not asking him that.  That's
22   privileged.  And, two, we had a privileged question to discuss
23   with him.  We are allowed to leave the room to do that, to sort
24   that out.  His oldest son, who is a lawyer is -- does represent
25   him in addition to my firm and I needed to speak with him about
```

Page  103

```
 1    that before he answered.

 2              MS. RUSSELL:  So your basis for objecting is

 3    attorney-client privilege?

 4              MS. HARDY:  That, in addition to what I laid out

 5    before, that you are asking totally inappropriate questions

 6    designed to harass and annoy, not to --

 7              MS. RUSSELL:  I'm sorry --

 8              MS. HARDY:  -- develop facts supportive of this

 9    lawsuit.

10              MS. RUSSELL: -- help me understand here.  You are

11    simultaneously objecting that, one, his son is representing him

12    and that what he knows, what he shared about the lawsuit is

13    privileged information, but you are also saying that what he

14    shared with his son is not relevant to this lawsuit and that

15    it's harassing.  Is that correct?

16              MS. HARDY:  He has two sons.  One's a lawyer.  One's

17    not.  One represents him.  One does not.  So yes, I made two

18    statements.  They apply first son privilege, second son that

19    falls into the 30(b) category.

20        Q.   (By Ms. Russell)  All right.  Have you discussed this

21    lawsuit with the son who is not an attorney?

22              MS. HARDY:  You can ask that question and if you go

23    any further I'm going to instruct him not to answer.

24              MS. RUSSELL:  Fine.

25              THE WITNESS:  Not in any detail.
```

Page 104

Robert Riley                                                    McKenna v. Riley

```
 1        Q.    (By Ms. Russell)  What do you mean by not in any
 2   detail?
 3             MS. HARDY:  No, stop.  Move on to something germane
 4   to this lawsuit.
 5        Q.    (By Ms. Russell)  Answer the question.
 6             MS. HARDY:  No, I instruct him not to answer.
 7             MS. RUSSELL:  On what basis?
 8             MS. HARDY:  I am going to follow up because you are
 9   violating the rule that you are supposed to not engage in
10   harassing, annoying, because you are asking questions --
11             MS. RUSSELL:  How is it harassing?
12             MS. HARDY:  We are going to -- because you are
13   probing into his kids who have nothing to do with this lawsuit.
14             MR. ALTMAN:  Didn't she ask her about her mother and
15   her sister --
16             MS. GORDON:  Wow.
17             MR. ALTMAN:  -- during the deposition?
18             MR. DAVIS:  And she listed in her initial
19   disclosures, Mr. Altman, as --
20             MR. ALTMAN:  What is --
21             MR. DAVIS:  -- we have not -- we have not disclosed
22   his son as a witness with substantial information.
23             MR. ALTMAN:  It doesn't matter.  You have no basis
24   and if you want to move for a protective order, you need to
25   stop the depo.
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1              MS. RUSSELL:  That's fine.  I think we have what we
 2    need here.  He's talked with his son.
 3              MR. ALTMAN:  Okay.
 4              MS. RUSSELL:  But not in any substantial way and he
 5    has been instructed not to answer --
 6              MS. HARDY:  Correct.
 7              MS. RUSSELL:  -- we will raise that with the Court.
 8              MS. HARDY:  Move on, please.
 9      Q.    (By Ms. Russell)  Is your other son representing
10    him -- representing you in this matter?
11              MS. RUSSELL:  Is that what you testified to,
12    Ms. Hardy?
13              MS. HARDY:  I didn't testify.
14              MS. RUSSELL:  Or stated on the record?
15              MS. HARDY:  I stated that --
16              You can answer that question.
17              THE WITNESS:  Yes.
18      Q.    (By Ms. Russell)  Okay.  All right.  So, again, you
19    left while there was a question pending and you met with your
20    attorneys.  What did you discuss with your attorneys?
21              MS. HARDY:  You know, Ms. Russell, we left to consult
22    about the status of his oldest son who represents Mr. Riley in
23    this lawsuit and you are not going to go any further than that.
24    I've told you that --
25              MS. RUSSELL:  Your objection is noted.
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1                MS. HARDY:  And you are not asking --
 2        Q.   (By Ms. Russell)  Answer the question, Mr. Riley.
 3                MS. HARDY:  No, I instruct him not to answer.
 4                MR. DAVIS:  Privileged.
 5                MS. RUSSELL:  All right.  Understood.  Okay.
 6        Q.   (By Ms. Russell)  You stated earlier, Mr. Riley, that
 7   Ms. McKenna was to work directly with Mr. Hurley.  Is that
 8   correct?
 9                MS. HARDY:  The record speaks for itself.
10                THE WITNESS:  She was hired to work with Bill Hurley
11   in medical malpractice cases, that's why.
12        Q.   (By Ms. Russell)  Okay.  Who extended the job offer
13   to Ms. McKenna?
14        A.   Technically, both of us, Bill and I.
15        Q.   How was the job offer extended?
16        A.   We both had a role.  I don't know what you mean
17   otherwise.
18        Q.   Did you call her to tell her that you were offering
19   her a job?
20        A.   I don't remember.
21        Q.   Did you send her an offer of employment?
22        A.   I'm not sure what you mean by an offer.  Can you
23   define what you are looking for?
24        Q.   We'll come back to that.  Prior to Ms. McKenna
25   joining your firm, do you recall if she was interviewing with
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1        A.    I was not finished with my answer,
 2              THE WITNESS:  What did I start saying, please?
 3              (Whereupon the answer was read back by the reporter.)
 4              THE WITNESS:  Because I have no basis for knowing
 5   what is occurring at this or any other firm, I recommended that
 6   she get sources within the firms, period.
 7        Q.    (By Ms. Russell)  Did you tell Ms. McKenna that women
 8   at Sommers Schwartz were mistreated?
 9        A.    No.  I said that that issue, to the extent it exists,
10   should be asked to the people.
11        Q.    You said that verbatim?
12        A.    I cannot all these years later give you verbatim.
13   None of us probably could six or seven years later.  My point
14   is I --
15              MS. HARDY:  Bob, you made your point
16              THE WITNESS: -- answered the question.
17        Q.    (By Ms. Russell)  How would you explain the
18   mistreatment to Judy, the rumors of the mistreatment to Judy?
19              MS. HARDY:  Could you ask that again?
20        Q.    (By Ms. Russell)  How would you explain the Sommers
21   Schwartz rumors of -- or the rumors of mistreatment at Sommers
22   Schwartz to Judy Susskind?
23              MS. HARDY:  Objection.  I have no idea what that
24   question means and there is all kinds of foundation issues, as
25   well.
```

Page  114

Robert Riley                                                    McKenna v. Riley

 1              THE WITNESS:  And I know nothing of what you're

 2      saying.  What are you asking?

 3          Q.  (By Ms. Russell)  Let's come back to that.  So when

 4      Ms. McKenna received an offer from Sommers Schwartz, did she

 5      decline your job offer?

 6          A.  I guess so.

 7          Q.  How did you feel about that?

 8          A.  Just fine.

 9          Q.  Did you follow up with Ms. McKenna?

10          A.  I wished her well.

11          Q.  Did you go to dinner with her and her husband after

12      she rejected your offer to go work for Sommers Schwartz?

13          A.  I can't put that in context.  Did I have dinner with

14      her and her husband, several times.  So to link that to some

15      specific conversation on some date, I can't answer.

16          Q.  Do you recall having dinner with Ms. McKenna and her

17      husband before she was employed with you but after she accepted

18      the job at Sommers Schwartz?

19          A.  I have no memory of that.  I can't do the dates,

20      sorry.

21          Q.  Do you dispute that such a dinner took place?

22              MS. HARDY:  He already answered the question.  He has

23      no memory of it.

24              MS. RUSSELL:  It's a different question.

25              THE WITNESS:  I told you I had several dinners with

Robert Riley                                        McKenna v. Riley

```
 1        Q.   All right.
 2             MS. HARDY:  It's like the third time you've asked
 3   that, the third or fourth time.
 4        Q.   (By Ms. Russell)  All right.  So this was read into
 5   the record during Ms. McKenna's deposition last week, but I
 6   want to read a specific portion of it here.
 7             MS. HARDY:  I object to you reading anything --
 8             MS. RUSSELL:  That's fine.
 9             MS. HARDY:  -- out of context.
10             MS. RUSSELL:  Do you want me to read the whole
11   record?  We'll read the whole letter then.  Fine.  Let's do
12   that.
13        Q.   (By Ms. Russell)  So here's your letter from December
14   25th, 2019, Christmas Day.
15             Before I read it, where was your wife on Christmas
16   Day 2019?
17             MS. HARDY:  Counsel, just move on.  Read the letter.
18        Q.   (By Ms. Russell)  Answer the question.
19        A.   I assume she was in the house.
20        Q.   Were your children in the house?
21             MS. HARDY:  Counsel, this is so inappropriate.  Just
22   move on with your questions.
23        Q.   (By Ms. Russell)  Answer the question, Mr. Riley.
24        A.   Well, I'm trying to figure out where they were, with
25   their families or elsewhere, so I don't remember precisely.
```

Robert Riley                                                    McKenna v. Riley

```
 1    you are talking about right now?
 2         A.   There were issues that emerged, but we usually found
 3    a solution to whatever our differences were.
 4         Q.   So was this before September 9, 2024?
 5         A.   Yes.
 6         Q.   Didn't you just testify that there weren't any issues
 7    prior to September 9, 2024?
 8              MS. HARDY:  No, that's not correct.
 9              THE WITNESS:  That's not what I said.
10         Q.   (By Ms. Russell)  What did you say?
11              MS. HARDY:  We don't need to repeat what he said.
12    It's on the record.
13         Q.   (By Ms. Russell)  Answer the question.
14         A.   I answered your question.
15              MS. HARDY:  Counsel, you know, your time is ticking
16    away and you are just treading over the same questions over and
17    over and over.  It's been asked and answered.
18              MS. RUSSELL:  That's fine.  I'll move on.
19         Q.   (By Ms. Russell)  So talk about this birthday
20    scavenger hunt that happened in February of 2020.  What gave
21    you the idea to do that?
22         A.   This was an opportunity to bring gifts to her in
23    advance of her birthday and it was important to me as a
24    newcomer to the firm to make her feel welcome.  I have been
25    very keen with gifts and I wanted to make a difference with
```

Robert Riley                                                    McKenna v. Riley

```
 1   going to need to become partner at Riley & Hurley?
 2        A.   I'm not going to use the word metrics because I have
 3   no use for it in this setting.  What is required is growth
 4   always.
 5        Q.   Did you require certain things of Ms. McKenna in
 6   expectation or with the representation, let me say that.  Did
 7   you require certain things of Ms. McKenna representing that
 8   this would lead to partnership one day?
 9        A.   Any example I would use is based on the word growth.
10   She was somewhat educated.  A greater education was required
11   and growth as a lawyer was absolutely necessary to become a
12   partner.
13        Q.   What growth did you want to see?
14        A.   All phases of the job.
15        Q.   So what phases specifically?
16        A.   Every one.  You name one and it was there.
17        Q.   Like what?  Give me some examples.
18        A.   Preparing documents.  Doing depositions.  Trying
19   cases.  Having clients of her own who would give her work,
20   trust her to be a trial attorney and handle these by herself.
21   These and many other elements of growth as an attorney are
22   exactly what I'm talking about.
23        Q.   But you didn't see yourself as a supervisor, correct?
24        MS. GORDON:  This has been asked and answered.
25        Q.   (By Ms. Russell)  So how would you measure that
```

Page 149

Robert Riley                                                    McKenna v. Riley

```
 1        Q.    Okay.  So did you take any steps from January 31,
 2   2024, to September 9, 2024, to preserve evidence for this
 3   lawsuit?
 4              MS. HARDY:  Objection, form.
 5              THE WITNESS:  I don't think I did anything to protect
 6   until the request was made.
 7        Q.    (By Ms. Russell)  Did you delete any photos of
 8   Elyse McKenna?
 9        A.    Prior to that?
10        Q.    Ever?
11        A.    Sure.  Do you want my answer as to why I got rid of
12   stuff?
13              MS. HARDY:  Go ahead, yeah.  Go ahead.
14              THE WITNESS:  She wanted me out of her life.  These
15   pictures were wrong and it was appropriate for me to get rid of
16   them.
17        Q.    (By Ms. Russell)  So what did you -- sorry.  Go
18   ahead.
19        A.    I did.
20        Q.    When did you delete these photos of Ms. McKenna?
21        A.    In the aftermath of her complaints about me.
22        Q.    Do you know what time?
23        A.    Sometime after the 20th or 21st of August.
24        Q.    Of what year?
25        A.    Well, it started then.  If I found a loose end, I
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                        McKenna v. Riley

1    probably clicked that one off, too.  The point was she made it

2    clear and I then started to get rid of them.  She did not want

3    me to have these pictures.

4           Q.   Okay.  So did you delete any photos after January 31,

5    2024?

6                MS. HARDY:  After when, January?

7           Q.   (By Ms. Russell)  January 31, 2024.

8           A.   I don't know whether I did.  What I can say is after

9    the word came that there was this legal motion requiring me to

10   preserve, I may have done it before, but my point is, I don't

11   remember what that date is.

12          Q.   So you don't remember whether or not you deleted

13   information after litigation hold existed?

14          A.   I don't think I did.

15          Q.   You don't think or you know that you don't?

16          A.   I don't know the date, so I have to say that I don't

17   know the date.

18               MS. HARDY:  There's a discussion about this in the

19   tape recording that Ms. McKenna made in which he told her in

20   September or October 2023 that they'd already been deleted and

21   she was happy about that and that was before Ken Mogill and

22   Sarah Prescott.

23          Q.   (By Ms. Russell)  So, Mr. Riley, was your iPad ever

24   imaged or preserved by a forensic expert?

25          A.   I don't know the answer.  That would be up to my

Robert Riley                                                McKenna v. Riley

```
 1              MS. HARDY:  Okay.  Go ahead and read it.
 2              MS. RUSSELL:  It says, and this is an email from
 3     Elyse McKenna.  It says Elyse, hi.  To Robert F. Riley.
 4     Sunday, August 22nd, 2021, at 9:31 a.m. this is the
 5     correspondence I believe you are referring to.
 6              MS. HARDY:  Wait a minute.  That's says August 17.
 7              MR. DAVIS:  Which document are we talking about?
 8              MS. HARDY:  Yeah, I don't know which document.
 9              MS. RUSSELL:  I said this a few times.  It's PL 00281
10     is where we are looking right now.
11              MR. DAVIS:  This one.  This one right here.
12              MS. RUSSELL:  Okay.  All right?
13              MS. HARDY:  All right.
14              MS. RUSSELL:  The subject line is PHPA Work and it
15     says Bob, I received the draft agreement regarding my proposed
16     independent contractor status with Riley & Hurley, PC.  I
17     cannot agree to this arrangement.  I am aware that you took
18     photographs of me surreptitiously while I was in your office.
19     This is extremely upsetting and inappropriate.  This in
20     conjunction with your other behaviors and actions, including
21     your romantic text messages, letters and comments has caused me
22     to feel very uncomfortable and scared.  I will not be working
23     in any capacity in which you are my supervisor.
24              I have attached a memo with the information necessary
25     to transition my current PHPA project and I will reasonably
```

Page 185

Robert Riley                                                          McKenna v. Riley

```
 1    cooperate in transitioning these projects so as to protect the
 2    client's interest.  Under the circumstances, I feel it better
 3    to not report --
 4            MR. DAVIS:  Felt it better.
 5            MS. RUSSELL:  I felt it better to not report at the
 6    PHPA annual meeting video and I leave preparation of such a
 7    video to you.  I received the $10,000 personal check from you.
 8    In light of this situation, I do not feel comfortable cashing
 9    this check.  I want you to know that I feared speaking up for
10    fear of retaliation due to your status and prominence in the
11    legal field.  I trust that this fear will not be realized.
12            I've removed the rest of my personal items from the
13    office.  I left the laptop on my desk and the keys to the
14    building and the office suite are located in the drawer on the
15    right-hand side of my desk.  I trust that we will move on
16    without further complication.  Elyse Hyde.
17       Q.   (By Ms. Russell)  Do you recall this email?
18       A.   Yes.
19       Q.   Is this the email that you were referring to when you
20    said August 2021?
21       A.   I think there was one before that, the one where she
22    said for the first time, this was an email that was separate or
23    text message, if my memory is correct.
24       Q.   What did that message say?
25       A.   That I had taken photographs that --
```

                                                                      Page  186

Robert Riley                                                    McKenna v. Riley

```
 1    after she received an offer?
 2         A.   At some point in time, yes, I talked to
 3    Donna MacKenzie about her concern about her salary and I said I
 4    hope you can find a way to get this done with her.  She had,
 5    therefore, the opportunity to consider a higher rate.  That was
 6    my suggestion.
 7         Q.   So it was your suggestion for her to get a higher
 8    salary at OMP; is that correct?
 9         A.   Yes.
10         MS. HARDY:  Objection, form.
11         Q.   (By Ms. Russell)  So what else did you talk to
12    Donna MacKenzie about in regards to Ms. McKenna from August
13    2021 to today?
14         MS. HARDY:  Same objection, form.
15         THE WITNESS:  Till today?  In the end of 2022, if I
16    have this right, Donna contacted me to ask what bonus did Elyse
17    get from Riley & Hurley.  I answered that question.
18         Q.   (By Ms. Russell)  Do you recall sending a text
19    message to Donna MacKenzie that references Silent Movie re
20    Elyse in June of 2023?
21         A.   What are you saying and I'll try to remember?
22         Q.   Sure.  I can pull that up and send it as an exhibit,
23    although it's in the Riley production.
24         MS. GORDON:  Are you going to send it to me as well,
25    Kimberly?
```

Page  202

Robert Riley                                                     McKenna v. Riley

```
 1   Ms. McKenna?  Were you aware of that?
 2        A.   I had no idea.
 3        Q.   When did you become aware that OMP terminated
 4   Ms. McKenna?
 5             MS. HARDY:  Objection, form.  Lack of foundation.
 6        Q.   (By Ms. Russell)  Are you aware that OMP terminated
 7   Ms. McKenna?
 8             MS. HARDY:  Objection, form, foundation.
 9             THE WITNESS:  I think I learned on either February 5
10   or 6, 2024, that she was leaving the firm.
11        Q.   (By Ms. Russell)  How did you learn that?
12        A.   I don't remember.
13        Q.   Did Ms. McKenna tell you?
14        A.   Oh, no.
15        Q.   Did someone from OMP tell you?
16        A.   I don't know whether it was Sarah --
17             MS. GORDON:  Sarah Prescott?
18             MS. HARDY:  Don't get into discussions as part of
19   the settlement.
20             THE WITNESS:  I don't know who told me.  That's the
21   best answer.
22        Q.   (By Ms. Russell)  Okay.  But you don't dispute
23   finding out around the same timeframe that she was terminated
24   about it, correct?
25             MS. HARDY:  He didn't testify she was terminated.  He
```

Page  205

Robert Riley                                                        McKenna v. Riley

```
 1    said she was leaving the firm.
 2              THE WITNESS:  That is correct.  I was not --
 3              MS. HARDY:  Nice try.
 4              MS. RUSSELL:  Okay.
 5              THE WITNESS:  I was not told she was terminated by
 6    anybody.  What I heard was that she was leaving the firm.
 7         Q.    (By Ms. Russell)  Okay.  What did you hear in regard
 8    to that?
 9              MS. HARDY:  He told you.
10              THE WITNESS:  I had no idea what was going on at that
11    time.  No idea.
12         Q.    (By Ms. Russell)  Yeah, but what was your
13    understanding of what happened?
14         A.    I don't know --
15              MS. HARDY:  Objection, asked and answered.
16              THE WITNESS: -- what happened.
17         Q.    (By Ms. Russell)  All right.
18         A.    On the 31st, we had a meeting.
19         Q.    Who is we?
20         A.    The people we can't talk about.  After that, the next
21    thing I heard was that she was leaving on February 5, which I
22    think was a Monday or the 6th, which was a Tuesday.  I had no
23    idea.  Didn't know what her status was, I didn't know where she
24    ranked in the firm.  I had no idea.  It was not of my business
25    anyway, zero.
```

Page 206

Robert Riley                                                    McKenna v. Riley

```
 1                MS. Hardy:  -- that has been asked and answered
 2       previously.
 3                THE WITNESS:  Friendships take many different
 4       directions, but Bill Hurley at the moment comes to mind.  He's
 5       been a godsend over all these decades.
 6                Q.   (By Ms. Russell)  Do you consider your wife your
 7       friend?
 8                A.   Well, of course.
 9                MS. HARDY:  Oh, my goodness.
10                MR. DAVIS:  That's just harassment.
11                THE WITNESS:  Why she tolerates me for 50 years, God
12       bless.
13                MS. HARDY:  Come on.  Let's move on to something
14       productive here.  It's getting late in the day.  I know I've
15       got questions.  Ms. Gordon's said she has questions.
16                MS. GORDON:  Yes.
17                MR. ALTMAN:  Well, we have seven hours and we are
18       going to take --
19                MS. HARDY:  I know, but let's move on and stop with
20       the -- it's late.
21                MR. ALTMAN:  It's objection, form and objection,
22       foundation.  Okay?  It's not this commentary that you think
23       it's not a relevant question.  That is not a relevant issue.
24                Q.   (By Ms. Russell)  All right.  So you stated earlier
25       that you found out about Ms. McKenna's departure from OMP
```

Page  228

Robert Riley                                                    McKenna v. Riley

1        Q.   I have tortious interference with business

2    relationships and expectancies for count one.  I have

3    defamation, common law and MCL 600.2911 for count two.  I have

4    trespass to chattels for count three and I have intrusion upon

5    seclusion for count four.  Is that correct?

6        A.   I think that's accurate, yes.

7        Q.   Talk to me about everything that Ms. McKenna has done

8    to defame you.

9        A.   Ms. McKenna has created a record that involves this:

10   The Detroit News article that she was an active participant in

11   was seen by people in both the U.S. and Canada and comments

12   came my way because of this, alerting me to what she had done.

13            In addition, with her complaint she makes a statement

14   that she talked about me throughout Michigan.  She made it an

15   apparent belief that attorneys throughout the state were

16   advised of my wrongdoing and they would not, nonetheless, take

17   a case against me.  The point I'm making, however, is that she

18   acknowledges going throughout the state and talking to

19   countless people about how horrible I am.

20            She was instrumental in going to the PHPA and making

21   statements about my wrongdoing.  It's my understanding that she

22   went directly to the executive director who was newly hired.

23   She, I think, was a key figure in him having meetings within

24   the organization and that he and his attorney had a meeting

25   with me in which they asked me to step down.  It is apparent to

Page  237

American Reporting, Inc.
248-559-6750

Robert Riley                                                          McKenna v. Riley

1   me that what she has done over extended periods of time is to

2   say as many negative things as she can to as many people as

3   possible --

4        Q.   What statements?

5        A.   -- and the irrelevant nature of this was her

6   pleadings, which she circulated all over which went to my

7   clients.  It went to entities that I did work for in the hockey

8   community other than the PHPA.  It went to various

9   universities.  It went to who knows else.  The point is, she

10  made it a point to make it clear that I in her opinion was a

11  horrible human being.

12       Q.   Are you testifying that she circulated an unfiled

13  copy of the complaint to everybody that you just listed?

14       A.   I don't know what, quote, unquote, copy she

15  circulated to people.  What I do know, however, is this became

16  a source for people to act and their actions were linked to her

17  providing them information about me and that, in turn,

18  supplemented by the newspaper article, put this all over the

19  place and I've had to live with that and will probably have to

20  live with this forever.

21       Q.   What specific untruthful statements has Ms. McKenna

22  made about you?

23       A.   I am not guilty of the claims that she has advanced

24  in this case and they are based on inappropriate and

25  unsubstantial claims.

Page  238

Robert Riley                                                    McKenna v. Riley

1        Q.    Outside of the filed pleadings, are you aware of any
2   specific statements that Ms. McKenna has stated besides the
3   Detroit article?
4        A.    She told us in her pleadings that she talked to
5   countless lawyers in Michigan before there was a lawsuit, that
6   she wanted them to address my wrongdoing that she perceived
7   existed and wanted them to act against me.
8        Q.    So --
9        A.    She emphasized that repeatedly in the subsequent
10  claims that she advanced in newer pleadings.
11       Q.    So --
12       A.    This has circulated in countless ways.
13       Q.    So you are asserting that her seeking legal counsel
14  was defaming you; is that correct?
15             MS. HARDY:  Objection, form, misrepresentation.
16             THE WITNESS:  That is not what I said at all.
17       Q.    (By Ms. Russell)  Then what did you mean?
18       A.    She did it.
19       Q.    She did what?
20       A.    Everything I just said.
21       Q.    Right, but help me understand because you're saying
22  that her -- from what I'm understanding is, is that you're
23  saying because she sought legal help based off of her claims
24  against you that that was defaming you.  She was seeking legal
25  help and because she sought legal help, that's defaming to you;

Robert Riley                                                          McKenna v. Riley

1    is that right?

2         A.    Telling all the lawyers in Michigan about how

3    terrible I am, that's not just about getting a lawyer.  It's

4    about telling them how horrible I am.

5         Q.    So who all did she tell that you were so horrible to?

6         A.    I don't know.  It's in her pleading where she said

7    she went all over Michigan seeking -- she also talks about

8    asking MAJ and AAJ for assistance and help.  So it seems to me

9    that her statements are the beginning of the evidence that

10   shows this.

11        Q.    Do you know of any specific remarks she's made?

12        A.    Read The Detroit News to start.

13        Q.    Besides The Detroit News article and besides the

14   pleadings, do you know of any specific remarks that she's made

15   to disparage you?

16        A.    Apart from everything I've said so far, I have no

17   other examples.

18        Q.    Okay.  So you don't.  All right.

19        So let's go on to tortious interference with business

20   relationships and expectancies.  Tell me everything that you

21   are relying on for this claim.

22        A.    Essentially, everything I just told you applies

23   equally here.

24        Q.    So the disparaging remarks that you can't identify

25   outside of this pleadings or the remark that she made about a

Page  240

Robert Riley                                                    McKenna v. Riley

```
 1         A.    -- ability in answering this question.  Because it
 2    hurts to have my reputation subject to these claims.
 3         Q.    Okay.
 4               MS. RUSSELL:  I think we have about 30 minutes left,
 5    so we will save that for recross.  If you are ready to ask your
 6    questions.
 7               MS. GORDON:  Appreciate it.
 8               MS. HARDY:  All right.  I am.
 9               For the record, I am going to be referring to a
10    document or actually an audiotape produced by plaintiff.  It is
11    PL 000258.  It's an audio recording.  Ms. McKenna testified at
12    her deposition that she tape-recorded the conversation on
13    October 25, 2023, with Mr. Riley and I am going to play a
14    portion of the dialogue between the two of them.  Okay.  And it
15    is 4507 to 4054.
16               MR. DAVIS:  No, it's 4054 of the recording.  It
17    starts at 4054 of the recording.
18               MR. ALTMAN:  Let me just ask a quick question.  Are
19    you putting this in as an exhibit?
20               MS. HARDY:  It's going to be on the record.
21               MR. ALTMAN:  I understand, but are you putting it in
22    the whole recording as exhibit --
23               MS. HARDY:  No, I'm not.
24               MR. ALTMAN:  -- or just an extract?
25               MS. HARDY:  It's just an extract that will be taken
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                      McKenna v. Riley

```
 1    former friend.  I thought it best to simply apologize at that
 2    point in time and to make it clear that I was apologizing
 3    rather than fight the issue or challenge it or the like wasn't
 4    appropriate at that specific moment and as I'm saying, the key
 5    issue was photos.
 6         Q.   And why did you apologize for the photos?
 7         A.   Because this is what she viewed, as best I could
 8    tell, as the most serious issue, was that these photographs
 9    were a horrible event in her life and she's emphasized this
10    repeatedly in the context of this case.  So my gut feelings
11    were accurate that it was best for me at this point to
12    apologize.
13         Q.   Did Ms. McKenna ever make a request of you with
14    respect to the photos after August -- after that initial
15    conversation and email in August 2021?
16         A.   My memory is that there was a comment to the effect
17    that she wished I had never done this.
18         Q.   Okay.  And what about a request to destroy them?
19         A.   Well, that came with this, that destroying these
20    would be a very good thing for me to do under those
21    circumstances.
22         Q.   Did you ultimately destroy the photos at her request?
23         A.   Yes.
24         Q.   And did you confirm with Elyse McKenna at some point
25    in time that per her request you had destroyed the photos?
```

                                                                   Page  276

Robert Riley                                              McKenna v. Riley

1          A.    If my memory is correct, I did just that in that
2    audiotape that she made of me.
3               MS. HARDY:  All right.  We are going to play, again,
4    from the audio recording produced by Elyse McKenna at 54 an
5    exchange between Mr. Riley and Ms. McKenna concerning the
6    destruction of the photos.
7               (Whereupon the audio recording was played back and
8    transcribed as follows.)
9                  "MS. MCKENNA:  Oh, this is how this would play
10               out and it's playing out exactly how I am trying to
11               trust that it wouldn't play out.
12                  MR. RILEY:  Okay.  By the way, all photographs of
13               been destroyed and gone.
14                  MS. KCKENNA:  Well, I appreciate that."
15          Q.    (By Ms. Hardy)  Do you recall advising her that they
16    were all destroyed and gone on October 25, 2023?
17          A.    Yes, I did.
18          Q.    At the point in time when you so advised Ms. McKenna
19    that the photos had been destroyed consistent with her wishes,
20    had you ever been contacted by any attorney who suggested that
21    there was potential litigation forthcoming?
22          A.    None.
23          Q.    Had Ms. McKenna ever suggested to you that she was
24    considering suing you?
25          A.    Never once.

American Reporting, Inc.
248-559-6750

Robert Riley                                             McKenna v. Riley

1          Q.    Was there any administrative charge filed or any

2    demand letter sent to you as of that point in time suggesting

3    that there was a thought of pursuing legal remedies?

4          A.    None.

5          Q.    And all the photos had been destroyed prior to any

6    knowledge of any potential legal claim; is that correct?

7          A.    Yes.

8          Q.    And let's talk for a moment about emails and texts.

9    After you received notice from Ms. Prescott and Mr. Mogill that

10   they were representing Ms. McKenna, did you destroy any email

11   or any text that related to her or anything concerning the

12   issues that have led to this lawsuit?

13            MS. RUSSELL:  I'm sorry, Counsel.  Are you asking him

14   to discuss conversations about a confidential settlement

15   agreement that you directed him not to answer when I was

16   questioning him on?

17            MS. HARDY:  No, I am just referencing it for any

18   point in time after.

19            MS. RUSSELL:  You are asking him questions about --

20            MS. HARDY:  No, I'm not.

21            MS. RUSSELL: -- the same thing that I was asking

22   about with these two attorneys.

23            MS. HARDY:  No, no --

24            MS. RUSSELL:  And you directed him not to answer my

25   questions; is that correct?

American Reporting, Inc.
248-559-6750

Robert Riley                                                      McKenna v. Riley

```
 1        Q.    Okay.  And she made that very clear; is that
 2   accurate?
 3        A.    Yes.
 4        Q.    And as far as you know, the Olsman firm had no
 5   expertise whatsoever in working with this hockey client or any
 6   other similar client; is that correct?
 7        A.    They had no experience of anything close.
 8        Q.    And as far as you know, they did not take cases that
 9   were billed hourly, rather they did contingency fee work, at
10   least as far as you knew; is that accurate?
11        A.    That's my understanding, yes.
12        Q.    And is it correct that as far as you are aware, the
13   Olsman firm did not have any interest in Ms. McKenna working
14   for the hockey client when they originally offered her a job,
15   they thought she was doing medmal practice cases; is that your
16   understanding?
17        A.    Please ask me one more time so I can process it.
18        Q.    Sure.  Ms. McKenna contacted the Olsman firm, at some
19   point connected up to discuss a possible job.  Was it your
20   understanding -- and I know you got pulled into this because of
21   the hockey client, was it your understanding that the Olsman
22   firm had never made working for the hockey client any part of
23   her requirement to work at the Olsman firm?
24        A.    I think that is correct.  It was not any kind of
25   requirement.
```

Page  284

Robert Riley                                              McKenna v. Riley

 1          Q.    And there was no agreement between the Olsman firm
 2    and PHPA as far as you are aware; is that correct?
 3          A.    As best as I know, there was zero relationship
 4    between them other than what McKenna had in getting paid.
 5          Q.    So do you know what that was?  As I understand it,
 6    she just sent a bill or an invoice for her hours worked.  Was
 7    that your understanding?
 8          A.    I'm not sure how it occurred, but an invoice would go
 9    reflecting her work to the PHPA and they would then pay it.
10          Q.    Okay.  And as far as you were aware, the Olsman firm
11    had no legal relationship whatsoever with PHPA; is that
12    correct?
13          A.    That is correct.
14          Q.    And as far as you know, the Olsman firm had nothing
15    to do with assigning Ms. McKenna work to be handled on the PHPA
16    client; is that correct?  That would not have come from Olsman?
17          A.    That's true.
18          Q.    Who would that have come from on the PHPA side, who
19    would have told Ms. McKenna, you know, what type of work needed
20    to be accomplished and when the due date was and so on?
21          A.    There may have been a number of staff members that
22    would have a discussion, but the most basic source of
23    information was Larry Landon.
24          Q.    Okay.  And as far as you knew, is Ms. McKenna free to
25    work as many hours or as few hours as she wanted to for PHPA?

American Reporting, Inc.
248-559-6750

Robert Riley                                                    McKenna v. Riley

```
 1    sorry.  Can we go back and read it?
 2              (Whereupon the testimony was read back by the
 3    reporter.)
 4              MS. GORDON:  That's the question.
 5              THE WITNESS:  Divorce is a sad thing.
 6         Q.   (By Ms. Russell)  Why?
 7              MS. HARDY:  Oh, come on.
 8              MS. GORDON:  He's not an expert in divorce.
 9              MS. RUSSELL:  He said he's sad.  I'm asking him why.
10              MS. GORDON:  He said why divorce is a sad thing.  I
11    think everybody at this table could probably agree to that.
12              MS. RUSSELL:  He might be the only --
13              MR. ALTMAN:  Not my last divorce.  Sorry.
14              MS. GORDON:  Your last divorce.  How about your first
15    one?
16              MR. ALTMAN:  My first one we just didn't want to be
17    married, but the last one was a nightmare.
18              MS. GORDON:  Oh, my God.
19              MR. DAVIS:  You are making the point, Mr. Altman,
20    that that is a ridiculous question because it's --
21              MR. ALTMAN:  No, I'm not making a point about it.
22              MS. GORDON:  I think the question does not need to be
23    answered.  It's a ridiculous question.
24              MR. ALTMAN:  It's not.  You don't get to say that.
25              MS. GORDON:  Why is it sad?
```

American Reporting, Inc.
248-559-6750

Robert Riley                                                              McKenna v. Riley

## CERTIFICATE OF NOTARY - COURT RECORDER

STATE OF MICHIGAN)
                 )
COUNTY OF OAKLAND)

        I, James A. Hengstebeck, a Notary Public in and for the above county and state, do hereby certify that witness ROBERT F. RILEY appeared before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth; that thereupon the foregoing questions were asked and foregoing answers made by the witness which were duly recorded by me; that it was later reduced to written form under my direction and supervision, and that this is, to the best of my knowledge and belief, a true and correct transcript.

        I further certify that I am neither of counsel to either party nor interested in the of this case.

_____

James A. Hengstebeck, CER 4623,
Notary Public, Oakland County,
Michigan
My Commission Expires:  10-30-2028

American Reporting, Inc.
248-559-6750