# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PLAINTIFF,

       Plaintiff,

v.

ROBERT F. RILEY, DONNA
MACKENZIE, RILEY &
HURLEY, PC, and
OLSMAN MACKENZIE
PEACOCK, PC,

       Defendants.

Case No. 24-cv-12347

Hon. Brandy R. McMillion
Magistrate Elizabeth A. Stafford

## PLAINTIFF'S THIRD AMENDED COMPLAINT AND JURY DEMAND

Plaintiff, Elyse McKenna ("Plaintiff"), by and through her undersigned

counsel, hereby file this Third Amended Complaint and Jury Demand.

### INTRODUCTION AND PROCEDURAL POSTURE

1.     This case exposes a years-long pattern of grooming, sexual harassment,

stalking, and exploitation by Defendant Robert Riley ("Riley")—one of Michigan's

most influential mediators—and the coordinated retaliation that followed after

Plaintiff refused to tolerate his inappropriate conduct. See **Ex. 1**, Riley Christmas

Note 2019; **Ex. 2**, Photograph of 6-Months of Riley Notes Dated from Oct. 21, 2019;

**Ex. 3**, Feb. 4, 2024 Olsman Law Termination Letter. Riley has used his reach and

stature within the legal community, and his role as Plaintiff's supervisor and co-counsel, to lure her away from other employment under false pretenses; to groom, romantically pursue, and harass her; and to exert control over her work assignments, travel, professional opportunities, and reputation. The behavior began while Plaintiff worked directly under Riley and persisted during her employment at Defendant Olsman MacKenzie Peacock P.C. ("Olsman Law").

2.      Plaintiff repeatedly alerted all Defendants, including Defendant Donna MacKenzie ("MacKenzie"), about Riley's escalating and inappropriate fixation. Instead of intervening or providing basic workplace protection, Defendants allowed and leveraged Riley's conduct for their own strategic and financial benefit. They forced Plaintiff into continued proximity with Riley, required joint travel and hotel arrangements, and disregarded her reported discomfort and requests for safety.

3.      When Plaintiff ultimately sought legal counsel and attempted to protect her career, Defendants closed ranks to shield Riley. They terminated her, disparaged her, and attempted to silence her for exercising her rights and seeking protection. Upon information and belief, that retaliation has not ended.

4.      Prior counsel filed the original complaint in this matter. While the pleadings remained open, they advised the Court that an amended complaint would be necessary to address additional evidence and ongoing misconduct. (*See* ECF No. 54.) Before completing that amendment, prior counsel withdrew.

2

5.     After undersigned counsel was retained, a thorough review of existing evidence, new disclosures, and recently surfaced information revealed a broader and more alarming reality: Defendants have continued to defame Plaintiff, undermine her career, weaponize their influence within the Michigan legal community, and retaliate against her for asserting her rights under Michigan and federal law. These acts are not historical—they are active, ongoing, and intentionally destructive.

6.     This Amended Complaint is therefore filed to expose the full scope of Defendants' conduct; to present newly discovered evidence of coordinated retaliation and reputational harm; and to ensure that the Court—and the public— understand the power dynamics, professional complicity, and continuing abuses that have harmed Plaintiff and threaten her livelihood.

## PARTIES

7.     Elyse McKenna ("Plaintiff") is a 32-year-old attorney and is now a resident and citizen of the state of Kentucky.

8.     Defendant Robert Riley ("Riley") is a 71-year-old attorney, the named and managing partner of Riley & Hurley and a resident and citizen of the State of Michigan.

9.     Defendant Riley & Hurley, PC, ("Riley & Hurley") is a general civil practice law firm and is incorporated in and has its principal place of business in Michigan.

3

10.     William Hurley ("Hurley") is an attorney and a named partner of Riley & Hurley and is a resident and citizen of the State of Michigan.

11.     Defendant Olsman MacKenzie Peacock, PC ("Olsman Law") is a metro-Detroit personal injury law firm which is incorporated in and has its principal place of business in Michigan.

12.     Defendant Donna MacKenzie ("MacKenzie") is an attorney and named partner at Olsman and is a resident and citizen of the State of Michigan.

13.     Jules Olsman ("Jules Olsman") is an attorney and named partner at Olsman Law and is a resident and citizen of the State of Michigan.

14.     Emily Peacock ("Peacock") is an attorney and named partner Olsman Law and is a resident and citizen of the State of Michigan.

15.

## JURISDICTION AND VENUE

16.     This Court has personal jurisdiction over the parties to this Complaint.

17.     Pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343, this Court has subject matter jurisdiction over this matter, because Plaintiff's claims arise under federal law.

18.     Pursuant to 28 U.S.C. §1332(a)(1), this Court also has subject matter jurisdiction over this action, based on diversity of citizenship and an amount in controversy in excess of $75,000.00.

19.     Pursuant to 28 U.S.C. §1367, this Court should exercise supplemental jurisdiction over Plaintiff's state law claims because those claims arise out of the same set of operative facts as Plaintiff's federal claims, such that all claims form part of the same case and controversy.

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action occurred in the Eastern District of Michigan.

## PROCEDURAL BACKGROUND

21.     Plaintiff exhausted her administrative remedies at the U.S. Equal Employment Opportunity Commission ("EEOC").

22.     The EEOC issued Plaintiff a Notice of Right to Sue, which Plaintiff received on or about October 15, 2024. A true and correct copy of that notification is attached as **Ex. 4**, October 15, 2025 EEOC Notice of Right to Sue. As such, Plaintiff has exhausted her administrative remedies.

## STATEMENT OF FACTS

## I.     Plaintiff's Background

23.    Plaintiff was born on February 16, 1993, and raised in Algonac, Michigan, by her parents, Judy and James McKenna. Her father's diagnosis with multiple sclerosis, and his progressive decline until his death when Plaintiff was sixteen, profoundly shaped her understanding of vulnerability, disability, and systemic mistreatment of those who are powerless.

24.    Plaintiff graduated from high school as honorary valedictorian while dual-enrolled in college courses and went on to graduate from Case Western Reserve University School of Law at age 22, the youngest member of her class.

25.    Plaintiff is a first-generation attorney who, upon switching from defending medical providers to becoming a plaintiffs' attorney, quickly became active in the plaintiffs' bar, including the American Association for Justice ("AAJ") and the Michigan Association for Justice ("MAJ"), and developed a practice focused on representing injured and vulnerable clients in complex civil cases.

## II.    Defendant Bob Riley and His Role in the Detroit Legal Community

26.    Defendant Bob Riley is a prominent Michigan attorney and mediator who has cultivated a reputation as the "go-to" facilitator for high-profile, sensitive cases involving medical malpractice, sexual harassment, sexual assault, discrimination, and institutional misconduct.

27.    Riley has served as mediator or facilitator in high-stakes matters, including, upon information and belief, the University of Michigan/Anderson sexual

abuse litigation, the Northwestern University hazing cases, and the Eastern Michigan University rape lawsuits. He has also facilitated sensitive disputes involving prominent Michigan attorneys and law firms, and refers to himself as "Casper" – meaning he agrees to be involved in sensitive matters but others won't be aware of his involvement. These sensitive matters have involved brokering the sale of co-defendant Olsman Law from Jules Olsman to Defendant Donna MacKenzie; handling Fieger Law firm management and monetary disputes when Geoffrey Fieger had a stroke; assisting attorneys with negotiating job offers with metro-Detroit area law firms such as McKeen & Associates, PC and Sommers Schwartz, PC; and helping hospital systems and insurance companies navigate transition, including assisting hospital claims representatives/adjusters with obtaining promotions and raises, and providing advice regarding retirement plans.

28.     Through decades of mediating medical malpractice, sexual misconduct, abuse-of-power, and institutional cases, Riley learned in detail how vulnerable individuals disclose, react, and respond under pressure, and how institutions protect themselves. Upon information and belief, Riley is uniquely situated to understand where the line is between mentorship and abuse—and how to cross that line without detection.

**III.     Riley Identifies Plaintiff and Lures Her to Riley & Hurley**

29.     Plaintiff first met Riley in or around 2014, when she was a 21-year-old law student working as a law clerk at a medical malpractice firm. Over the next several years, Riley encountered her at mediations and monitored her career.

30.     In late summer 2019, while Plaintiff was working at Foley Baron Metzger & Juip, PLLC ("FBMJ"), two individuals reached out to her: (1) an attorney at a Southfield firm, and (2) a hospital claims representative. Both communicated that Riley wanted to talk to Plaintiff about her career.

31.     Initially, Plaintiff was not looking to leave FBMJ. Riley independently used intermediaries to offer "mentorship" and to position himself as a trusted advisor who could guide her career decisions while avoiding the perception that he was "poaching" her.

32.     Plaintiff interviewed widely and received offers from four prominent Metro-Detroit law firms. When she consulted Riley, he advised her to leave FBMJ, asserted that its partners were undermining her, and discouraged every offer she received—stating she would not get the opportunities she deserved at those firms.

33.     Instead, Riley offered Plaintiff a position at Riley & Hurley, P.C. with a promised path to partnership. Plaintiff initially declined and accepted an offer with another firm.

34.     Riley reacted with visible distress, including tearfulness, and insisted Plaintiff was making a grave mistake but refused to give specifics. He then invited

8

Plaintiff and her then-husband to dinner and told them that the competing firm had a history of rape and sexual assault of female associates and subjected women to dangerous, unequal conditions.

35.     Riley's statements frightened Plaintiff and her husband and placed intense pressure on her decision. Upon information and belief, these representations were false and fabricated to manipulate Plaintiff and foreclose any career path that did not run through Riley.

36.     On or about September 27, 2019, Riley sent Plaintiff an unsolicited term sheet outlining a partnership track at Riley & Hurley. **Ex. 5**, Sept. 27, 2019, Riley & Hurley Term Sheet with Plaintiff's Offer of Employment, Partnership, and Ownership Track. With her resignation already tendered and terrified by what Riley had told her about the other firm, Plaintiff accepted his offer and joined Riley & Hurley on or about October 21, 2019.

37.     Riley specifically instructed Plaintiff not to tell her former employer what new job opportunity she was taking.

**IV.    Riley's Early Harassment and Escalating Boundary Violations at Riley & Hurley**

38.     Plaintiff's employment with Riley began a saga of grooming and gaslighting that completely disrupted Plaintiff's life and career.

39.      Beginning in the first days of Plaintiff's employment at Riley & Hurley,

Riley's conduct went far beyond mentorship. Riley left a page-long handwritten note

on her desk on October 21, 2019, another the next day, and then continued to deliver

a steady stream of handwritten letters, cards, and gifts, many of which contained

romantic language, emotional declarations, and references to "love" and "us." **Ex.**

**2**, Photograph of 6-Months of Riley Notes Dated from Oct. 21, 2019 to Feb. 28,

2020; **Ex. 6**, Scan of Riley Notes from October 21, 2019 to 2023.

40.      Between October 2019 and March 2020, Riley gave Plaintiff more than

fifteen handwritten notes or cards and multiple gifts, including expensive wine,

earrings, and round-trip plane tickets anywhere in the world. *See* **Ex. 2** and **Ex. 6**.

41.      Throughout this time, Riley was a majority shareholder of Riley &

Hurley and was Plaintiff's direct supervisor.

42.      Riley insisted on one-on-one "mandatory" dinners with Plaintiff at

upscale restaurants, often tying attendance to her future at the firm, including

references to partnership and advancement. Plaintiff attended multiple dinners per

month between November 2019 and early 2020. Riley made clear these dinners were

not optional.

43.      On Christmas Day 2019, Riley handwrote a four-page letter expressing

that Plaintiff brought him "joy," that he "would trust [her] with anything," that their

relationship was a "new beginning. The letter culminated with the statement that "love" was the best word to describe his feelings for her. *See* **Ex. 1**.

44.    Riley also directed his efforts at Plaintiff's family, including writing a handwritten letter to Plaintiff's mother and insisting on taking the family to dinner. Riley embedded himself into Plaintiff's personal life and made it harder for her to object or distance herself. He repeatedly pried into intimate aspects of her life and asked her questions regarding her close relationships, including her marriage.

45.    There was no functioning human resources department at Riley & Hurley. Riley's position as majority shareholder meant that Plaintiff had no safe internal channel to report or stop his conduct without jeopardizing her job and career.

## V.    COVID-19, Intensified Control, and Ongoing Harassment

46.    When the COVID-19 pandemic began in March 2020, in-person contact briefly decreased, but Riley replaced it with late-night Zoom meetings, mandatory virtual dinners, and even meetings at his home under the guise of work.

47.    Riley routinely scheduled after-hours Zoom sessions that stretched late into the night, used them to discuss personal matters, and criticized and questioned Plaintiff's commitment if she tried to end them at a reasonable time. He also questioned her close relationships, including her marriage, and probed into intimate aspects of her life.

48.     Despite public health guidance and concerns for Plaintiff's immunocompromised family members, Riley insisted she return to the office and manipulated the office schedule so that he was often alone with Plaintiff.

49.     Around June 2020, Riley began explicitly tying Plaintiff's career prospects and partnership at Riley & Hurley to her willingness to comply with his demands, including asking her to personally guarantee a seven-figure office lease. When Plaintiff declined, he became hostile and questioned her loyalty.

50.     Riley's romantic and controlling behavior continued into 2020 and 2021, including additional "anniversary" cards, holiday gifts, and further mandatory dinners. In May 2021, he summoned Plaintiff to his office to help with a purported technical issue, where she found him openly watching pornography. Riley made no attempt to hide or minimize the explicit material.

## VI.    Discovery of Riley's Secret Collection of Photographs

51.     In mid-2021, Plaintiff began noticing images of herself reflected in a window behind Riley's iPad during meetings. She became concerned that he was secretly photographing or recording her without her consent.

52.     On August 18, 2021, with assistance from staff, Plaintiff accessed Riley's iPad and discovered hundreds of photographs of herself: screenshots from Zoom, candid photos taken at the office and in hallways, images pulled from her

personal social media going back years, and pictures apparently taken of her without her knowledge or consent.

53.     The discovery of these photographs made clear to Plaintiff that Riley's conduct had escalated to obsessive surveillance. She no longer felt physically or psychologically safe at Riley & Hurley and intensified her search for other employment.

**VII.   Transition to Olsman Law and Riley's Continuing Influence**

54.     Plaintiff quickly found that leaving Riley & Hurley would be a difficult endeavor due to Riley's prominence and network in the metro-Detroit legal market.

55.     Prospective employers in the area repeatedly told Plaintiff that leaving Riley & Hurley would be challenging because of Riley's prominence as a mediator and their own reliance on him to resolve cases. Indeed, several firms hesitated to hire her out of concern that such a hire would jeopardize their relationship with Riley.

56.     Eventually, Plaintiff informed Riley of her intent to leave his firm.

57.     In an effort to remain in Plaintiff's life, Riley positioned himself in Plaintiff's search and even promised Plaintiff to continuing paying her full salary if she stayed at Riley & Hurley — even just to work for a singular Shared Client. He supported her move to Olsman Law because the firm continued to jointly represent this Shared Client.

58.    Plaintiff was desperate to escape Riley's daily control and believed Olsman Law would be a safer environment, particularly given the firm's representation of sexual abuse survivors. Despite a significant pay cut, Plaintiff accepted an offer from Olsman Law and gave notice at Riley & Hurley in August 2021. Following the acceptance but before her start date, Plaintiff informed partners at Olsman Law, specifically co-defendant MacKenzie, of Riley's history of inappropriate conduct.

59.    In August 2021, Plaintiff resigned from Riley & Hurley.

60.    On her last day, Riley left Plaintiff yet another handwritten note stating, in part, "I am sorry. For everything… Although we share a client, this is still goodbye. Farewell, Plaintiff." *See* **Ex. 6** at PL23237.

**VIII.   Olsman Law and MacKenzie Are Put on Notice and Choose to Minimize**

61.    Before starting at Olsman Law, Plaintiff informed Defendant Donna MacKenzie, a partner and subsequent owner of the firm, about Riley's harassment, including his collection of photographs and his ongoing role with the Shared Client

62.    MacKenzie acknowledged that Plaintiff had "balls of steel" for confronting Riley but told her she "wished [Plaintiff] had never told [her]," and instructed Plaintiff not to tell majority owner Jules Olsman. MacKenzie said she had endured "far worse" conduct in her own career and declined Plaintiff's offer to provide documentary proof (notes, emails, photographs).

14

63.    Over the next two years, Plaintiff raised concerns about Riley's conduct on multiple occasions with MacKenzie and co-defendant Peacock, including at professional events and during trial work. Each time, they downplayed her concerns, encouraged her to "forgive and forget," or urged her simply to "get through" work-related interactions with Riley.

64.    Meanwhile, Olsman Law continued to facilitate cases with Riley as a mediator. This maintained Riley's access to Plaintiff and allowed him to remain in a position of influence over Plaintiff's career and reputation.

## IX.    Orlando 2023: Suicidal Threats, Surveillance, and Further Notice to Olsman Law

65.    In June 2023, Plaintiff and Riley attended the Shared Client's Annual Meeting in Orlando, Florida. Riley arranged for Plaintiff's room to be connected to his via a "conference room suite," over Plaintiff's objections.

66.    Plaintiff informed Peacock over breakfast that she was deeply uncomfortable with this arrangement. Peacock told her not to "make a big stink" and then scheduled a facilitation with Riley on one of Plaintiff's cases, reinforcing his central role.

67.    During the Orlando trip, Riley repeatedly told Plaintiff that her confronting him about the photographs had "ruined his life," stated he no longer had the will to live, and, during a conference presentation about suicide, passed a note

15

implying that he related more than she could imagine, while telling Plaintiff that she might never see him again.

68.     On the final night, after Plaintiff left a banquet to return to her room, Riley called and texted her repeatedly, appeared outside her hotel room door, and refused to leave despite her instructions via text to stop. **Ex.7**, June 19, 2023 Text Messages Between Plaintiff and Riley. He remained outside for hours, frightening Plaintiff, who ultimately called a mental health hotline for advice on how to handle the situation.

69.     The next morning, Plaintiff altered her travel plans to avoid sharing a ride with Riley and passed by his room only by walking past his propped-open door, where he sat facing the hallway in a chair positioned to monitor her exit.

70.     Plaintiff reported her discomfort about the Orlando incidents to MacKenzie and Peacock, who again minimized her concerns, told her to "forgive and forget" or "get through the trip." Olsman Law and MacKenzie took no meaningful action to protect Plaintiff.

X.     **Niagara 2023 and Escalating Retaliation at Olsman Law**

71.     In the months that followed, Plaintiff's protected activity of reporting Riley's misconduct in Orlando to her employer would serve as the basis for retaliation and termination.

72.     In September 2023, the Shared Client required Plaintiff to attend another conference with Riley to attend a workers' compensation conference in Niagara-on-the-Lake. Throughout Plaintiff's time at Olsman Law, the firm received all revenue generated from the Shared Client, with the exception of $10,000 when Plaintiff first joined Olsman Law. Riley changed his flight to travel with Plaintiff, and they drove several hours together from Buffalo to the conference.

73.     During that drive and the conference, Riley again became tearful, accused Plaintiff of hurting him, made excuses for not stepping down from the Shared Client, and promised—again—that he would withdraw. He did not.

74.     Riley also used his influence with the Shared Client to undermine Plaintiff's role, questioning why she was handling certain responsibilities, suggesting others take over her tasks at higher hourly rates, and telling the Shared Client that Plaintiff was emotionally unstable due to her divorce.

75.     Following Niagara, the Shared Client questioned Plaintiff's workload, emotional state, and even her dating life based on information provided by Riley. Plaintiff was effectively placed on informal probation and became increasingly concerned that Riley was trying to have her removed from her role.

## XI.     Olsman Law's Bonus Structure, Retaliation, and Termination

76.     Olsman Law's compensation system purported to award annual bonuses based on a formula that included settlements, case originations, referral

relationships, and—historically—billing for the Shared Client. Plaintiff received bonuses in 2021 and 2022, including a $30,000 bonus in 2022.

77.    From January to December 2023, Plaintiff more than doubled her settlements and continued to bill extensively for the Shared Client. Yet, in December 2023, she was informed for the first time that she would receive no bonus and that Shared Client work no longer counted toward bonuses, contrary to prior practice and without prior disclosure.

78.    Throughout 2023, Plaintiff repeatedly expressed to MacKenzie and Peacock her concerns about Riley's conduct, his continuing failure to step down from the Shared Client as promised, and the effect on her standing at Olsman Law. They assured her that her treatment had nothing to do with Riley and encouraged her to address him "however she saw fit."

79.    On January 31, 2024, Plaintiff's attorneys confronted Riley regarding his harassment. Plaintiff promptly notified Olsman Law in writing that this confrontation had occurred, explaining that it could affect the firm's relationship with Riley and the Shared Client and offering to discuss a transition that might require her departure. **Ex. 8**, February 3, 2024 Email from Plaintiff to Olsman Law.

80.    Instead of engaging in any good-faith process, Olsman Law (via co-defendant MacKenzie) terminated Plaintiff on February 4, 2024, questioning her

"honesty, integrity, and judgment," while acknowledging her complaints about Riley. *See* **Ex. 3**, Feb. 4, 2024 Olsman Law Termination Letter.

81.     Deborah Gordon ("Gordon"), a prominent employment rights attorney in the metro-Detroit area, consulted Olsman Law in this process. Plaintiff had consulted Gordon on one separate occasion prior to Gordon consulting Olsman: regarding representation with respect to Riley's behavior. **Ex. 9**, ECF No. 40-1, Deborah Gordon Affidavit. After Gordon had already provided legal advice to Olsman Lan and unbeknownst to Plaintiff, Gordon's firm handled a consultation with Plaintiff regarding representation against Olsman Law. **Ex. 10**, ECF No. 40-7, Deborah Gordon Law Intake Affidavit. **Ex. 11**, Plaintiff's Verizon Phone Records. At that time, Gordon's office assured Plaintiff that her firm did not represent either of those parties – and that her firm specifically did not represent any law firms.

82.     Gordon currently represents Olsman Law, despite her prior knowledge of Plaintiff's claims.

83.     After termination and upon information and belief, Olsman Law (via co-defendant MacKenzie) communicated with clients and others in the Michigan legal community that Plaintiff was "incompetent," had suffered a "mental breakdown," and was fired for those reasons. Upon information and belief, Olsman Law partners and employees repeated these statements to other attorneys and potential referral sources, damaging Plaintiff's reputation.

19

84.     Olsman Law also contacted clients who had elected to follow Plaintiff to her new firm, telling them she had been terminated because she was incompetent and that she did not have a real firm or resources to represent them, causing some clients to reverse course and remain with Olsman Law.

## XII.   Settlement Negotiations, Additional Coercive Terms, and Defamation

85.     In early February 2024, Riley, acting through counsel, offered Plaintiff a $400,000 settlement with mutual non-disparagement and strict confidentiality regarding his conduct. Plaintiff and Riley reached an agreement in principle.

86.     Riley's counsel then attempted to add new, material terms to the agreement, including:

a.     Indemnification of Olsman Law for any claims related to Riley's harassment, including retaliation;

b.     Requirements that Plaintiff identify everyone with whom she had discussed his conduct;

c.     A liquidated damages clause requiring repayment of 20% of settlement proceeds for each alleged breach plus his fees and costs; and

d.     A restriction prohibiting Plaintiff from using two additional mediators in the Michigan medical malpractice community.

87.     Plaintiff could not accept these new terms. She had shared the harassment with trusted friends and family for support and was unwilling to hand over their identities to Riley or to waive her rights against Olsman Law and others who retaliated against her.

88.     Riley continued to make false, disparaging statements about Plaintiff to the Shared Client, including that she was incompetent, emotionally unstable due to her divorce, and unable to handle her workload. These statements were untrue and caused the Shared Client to threaten termination of her role and to "lighten" her workload based on perceived instability.

## XIII.  Ongoing Harm and Forced Relocation

89.     As a result of Defendants' conduct, Plaintiff was unable to find Michigan counsel willing to litigate this case due to Riley's prominence and his entanglement with major plaintiff firms. She has been warned that suing him will "ruin her career" and that she may have to leave Michigan to continue practicing.

90.     In April 2024, seeing no path to a safe or viable career in the Michigan plaintiffs' bar, Plaintiff moved out of Michigan, placing her belongings in storage and relocating to the Washington, D.C./Maryland area to rebuild her personal and professional life.

91.     In early 2024 after Plaintiff's termination, Plaintiff and a partner formed Fox Plaintiff, PLLC, a firm based in the District of Columbia with an office serving Michigan clients. However, Plaintiff's practice continued to be impaired because many opposing parties insisted on selecting Riley as mediator, and Plaintiff could not safely explain to clients and counsel why that was unacceptable prior to the filing of this lawsuit.

92.     Even after relocation and after she retained counsel, Riley continued to contact Plaintiff, asking where she lives and where she intends to live, repeatedly imploring her to "trust" him, and offering to mediate her fee disputes with Olsman Law, all while continuing to disparage her to others behind the scenes.

93.     Defendants' actions—including Riley's years-long harassment, Olsman Law's knowing minimization and retaliation, and Defendants' false statements to clients, colleagues, and the Shared Client—have destroyed Plaintiff's professional reputation in Michigan, interfered with her client and business relationships, forced her to leave her home state, and caused severe economic, reputational, and emotional harm.

94.     Upon information and belief of newly obtained evidence, this Defendants' retaliation, defamation, and tortious interference of business relations are ongoing. Indeed, since filing this lawsuit, Defendants have taken multiple opportunities to defame Plaintiff and attack her business relationships including but not limited to: disparaging Plaintiff's reputation, submitting untrue filings and arguments in court over client fee disputes, and untruthful communications with members of the metro-Detroit area legal community.

## DAMAGES

95.     Plaintiff has suffered harm and will continue to suffer harm in the future. Defendants' conduct is the direct and proximate cause of Plaintiff's actual

damages including loss of earnings and earning capacity. Plaintiff further suffered harm in her personal and professional relationships, including embarrassment, humiliation, mortification, loss of professional and personal reputation, physical distress, and loss of the ordinary pleasures of everyday life.

96.     Plaintiff's damages exceed $75,000.

## COUNT I
## Elliott-Larsen Civil Rights Act
## Sexual Harassment/Hostile Work Environment
### *Riley Defendants*

97.     Plaintiff incorporates by reference all preceding paragraphs.

98.     At all times relevant, Plaintiff, a female, was a member of a protected class under the Elliott–Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 *et seq*.

99.     From September 2019 to September 2021, Plaintiff was an employee, and Defendants Riley and Riley & Hurley were employers within the meaning of the ELCRA.

100.    Defendant Riley was an agent, partner, and majority shareholder of Defendant Riley & Hurley, acting within the scope of his authority. Defendants Riley and Riley & Hurley are therefore directly and vicariously liable for his conduct.

101.    From September 2021 to February 2024, although Plaintiff was employed by Olsman Law, Defendants Riley and Riley & Hurley exercised substantial control over the terms, conditions, and privileges of her employment,

including assignments, compensation, evaluations, case strategy, travel, and professional opportunities.

102.    Throughout Plaintiff's employment at both Riley & Hurley and Olsman Law, Defendant Riley subjected her to unwelcome sexual conduct, including unwanted romantic attention, comments, personal remarks, grooming behaviors, inappropriate physical contact, and other verbal and physical conduct of a sexual nature.

103.    Defendant Riley's conduct was based on Plaintiff's sex, consisting of sexualized, romantic, and gender-based behavior directed at her as a woman in the workplace.

104.    Defendant Riley's unwelcome conduct was severe and/or pervasive, unreasonably interfered with Plaintiff's work performance, and created an intimidating, hostile, abusive, and offensive work environment.

105.    Defendant Riley's conduct was intentional, willful, and in reckless disregard of Plaintiff's rights under the ELCRA.

106.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered harm.

## COUNT II
### Elliott-Larsen Civil Rights Act
### Sexual Harassment/Hostile Work Environment
*Defendants Olsman Law and MacKenzie*

107.    Plaintiff incorporates by reference all preceding paragraphs.

24

108.   At all times relevant, Plaintiff, a female, was a member of a protected class under the Elliott–Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 *et seq*.

109.   From September 2021 to February 2024, Plaintiff was an employee, and Defendants MacKenzie and Olsman Law were employers within the meaning of the ELCRA.

110.   Defendant MacKenzie was an agent, partner, and majority shareholder of Defendant Olsman Law, acting within the scope of her authority. Defendants MacKenzie and Olsman Law are therefore directly and vicariously liable for his conduct.

111.   Throughout her employment, Plaintiff reported to Defendants MacKenzie and Olsman Law that Defendant Riley was subjecting her to unwanted, unwelcome, and sexually harassing conduct, including grooming behaviors, sexualized attention, inappropriate personal comments, and obsessive communication.

112.   Despite actual knowledge of the harassment, Defendants Olsman Law and MacKenzie failed to take prompt and appropriate remedial action. Instead, Defendants Olsman Law and MacKenzie required Plaintiff to continue working closely with Defendant Riley, including joint case work, out-of-town travel, and overnight trips that Defendants knew—or reasonably should have known—posed a risk of continued harassment.

113.   Defendants Olsman Law and MacKenzie were aware of Defendant Riley's sexualized fixation on Plaintiff and, rather than protect Plaintiff, chose to leverage that dynamic for perceived strategic or professional advantage in joint matters and mediations.

114.   By requiring Plaintiff to continue interacting with her harasser under these circumstances, Defendants Olsman Law and MacKenzie subjected Plaintiff to conditions that were severe and/or pervasive, interfered with her ability to perform her job, and created an intimidating, hostile, abusive, and offensive work environment in violation of MCL 37.2103(i).

115.   Defendants' conduct was because of Plaintiff's sex, and consisted of gender-based decisions and actions that would not have occurred but for Plaintiff being a woman subjected to sexual harassment.

116.   Defendants' failures and actions were intentional, willful, and in reckless disregard of Plaintiff's rights under the ELCRA.

117.   As a direct and proximate result of Defendants' conduct, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

118.   As a further direct and proximate result, Plaintiff has suffered and will continue to suffer economic damages, emotional distress, reputational harm, physical manifestations of stress, loss of enjoyment of life, and all other damages available under the ELCRA, including attorney's fees and costs.

## COUNT III
### Elliott-Larsen Civil Rights Act
### Retaliation and Retaliatory Harassment
*All Defendants*

119.   Plaintiff incorporates by reference all preceding paragraphs.

120.   At all times relevant, Plaintiff, a female, was a member of a protected class under the Elliott–Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 et seq.

121.   Defendants Riley and Riley & Hurley were employers from September 2019 to September 2021. Defendants Olsman Law and MacKenzie were employers from September 2021 to February 2024. All Defendants are prohibited from retaliating under MCL 37.2701.

122.   At all times relevant, Defendants Riley and MacKenzie acted as agents, partners, principals, or supervisors within the meaning of the ELCRA. Defendants Riley & Hurley and Olsman Law are therefore directly and vicariously liable.

123.   Plaintiff engaged in protected activity under MCL 37.2701 by:

    a. reporting Defendant Riley's unwelcome sexual conduct, grooming behavior, and sexually harassing actions;

    b. opposing and objecting to such conduct;

    c. requesting protection from further harassment; and

    d. asserting her rights under the ELCRA.

124.   Defendants were aware of Plaintiff's protected activity, as she repeatedly informed Defendants Riley, MacKenzie, Olsman Law, and others of the harassment, its impact, and her need for intervention.

125.   Instead of taking steps to protect Plaintiff or stop the harassment, Defendants Riley, Riley & Hurley, Olsman Law, and MacKenzie retaliated against her for engaging in protected activity.

126.   Defendants' retaliatory actions included, but were not limited to:

   a.   Failing to take remedial action after actual notice;

   b.   requiring Plaintiff to continue working with her harasser despite known risks;

   c.   allowing or encouraging ongoing communication, case assignments, travel, and professional interactions with Defendant Riley;

   d.   creating or permitting a hostile environment directed at Plaintiff because she opposed the harassment;

   e.   undermining her professional opportunities; and

   f.   engaging in continuing retaliatory conduct after her employment ended, including disparagement, professional interference, and retaliatory harassment.

127. These retaliatory actions materially affected the terms, conditions, and privileges of Plaintiff's employment and her ability to earn a living.

128. Plaintiff's protected activity was a significant factor motivating Defendants' retaliatory actions and retaliatory harassment.

129. Defendants' failures and retaliatory actions were intentional, willful, and in reckless disregard of Plaintiff's rights.

130. As a direct and proximate result of Defendants' retaliation and retaliatory harassment, Plaintiff has suffered economic, emotional, and reputational harm, including loss of earnings and earning capacity; emotional distress; humiliation; damage to her professional and personal reputation; and other compensable injuries, including attorney's fees and litigation costs available under the ELCRA.

## COUNT IV
### Elliott-Larsen Civil Rights Act
### Discrimination
*All Defendants*

131. Plaintiff incorporates by reference all preceding paragraphs.

132. At all times relevant, Plaintiff, a female, was a member of a protected class under the Elliott–Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 et seq.

133. From September 2019 to September 2021, Plaintiff was an employee, and Defendants Riley and Riley & Hurley were employers within the meaning of

the ELCRA. Defendant Riley acted as an agent, partner, and majority shareholder of Riley & Hurley, and, as such, they are directly and vicariously liable for this conduct.

134.   From September 2021 to February 2024, Plaintiff was an employee, and Defendants MacKenzie and Olsman Law were employers within the meaning of the ELCRA. Defendant MacKenzie acted as a partner, principal, and agent of Olsman Law, and as such, they are directly and vicariously liable for this conduct.

135.   During the same period, Defendants Riley and Riley & Hurley also exercised control over significant terms, conditions, and privileges of Plaintiff's employment at Olsman Law, including compensation, client assignments, evaluations, travel requirements, and professional opportunities.

136.   Plaintiff was qualified for all positions she held with Defendants.

137.   Defendants subjected Plaintiff to adverse actions because of her sex, including but not limited to:

> a. forcing her to maintain professional contact with a man who sexually harassed and groomed her;
>
> b. requiring travel, overnight stays, and case work with her harasser despite actual notice of the risks;
>
> c. disregarding or trivializing her reports of sex-based misconduct;
>
> d. treating her concerns differently than those of male employees; and

e. undermining her professional opportunities and work environment because she is a woman subjected to sexual harassment.

138.   Defendants' decisions were motivated, in whole or in part, by Plaintiff's sex and their gender-based hostility or indifference to complaints of harassment.

139.   The conduct of Defendant Riley—including sexualized attention, grooming, and harassment—constitutes sex-based disparate treatment, and Defendants' endorsement, disregard, or use of that conduct for strategic advantage constitutes discrimination under the ELCRA.

140.   Defendants' failure to protect Plaintiff, their requirement that she continue working with her harasser, and their efforts to obtain negative information about her after she complained were adverse actions under circumstances giving rise to an inference of unlawful discrimination.

141.   Defendants' acts and omissions were intentional, willful, and in reckless disregard of Plaintiff's civil rights.

142.   As a direct and proximate result of Defendants' discriminatory conduct, the terms, conditions, and privileges of Plaintiff's employment were adversely affected.

143.    As a further direct and proximate result, Plaintiff has suffered economic losses, emotional distress, mental anguish, humiliation, reputational damage, physical symptoms of stress, loss of enjoyment of life, and all other damages and equitable relief available under the ELCRA, including reasonable attorney's fees and costs.

**COUNT V**
**Title VII – 42 U.S.C. § 2000e *et seq*.**
**Discrimination and Retaliation on the Basis of Sex, Retaliatory Harassment**
*Defendant Olsman Law*

144.    Plaintiff incorporates by reference all preceding paragraphs.

145.    At all times relevant, Plaintiff was an employee of Defendant Olsman Law, and Defendant Olsman Law was an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

146.    Plaintiff, a woman, is a member of a protected class under Title VII.

147.    Plaintiff performed her job at or above Defendant Olsman Law's legitimate expectations at all times relevant.

148.    During the course of her employment, Defendant Olsman Law discriminated against Plaintiff because of her sex by subjecting her to disparate treatment and by maintaining a hostile work environment, including requiring her to continue working closely with Defendant Riley despite actual knowledge of his sexualized and harassing conduct toward her.

149.   Defendant Olsman Law's actions and inactions unreasonably interfered with Plaintiff's work performance and created a hostile, intimidating, and abusive environment based on her sex, in violation of Title VII.

150.   Plaintiff engaged in protected activity under Title VII by reporting, opposing, and objecting to sexual harassment by Defendant Riley, and by requesting protection from further harassment.

151.   Defendant Olsman Law had actual knowledge of Plaintiff's protected activity.

152.   After Plaintiff engaged in protected activity, Defendant Olsman Law retaliated against her by taking materially adverse actions and by engaging in retaliatory harassment that would dissuade a reasonable employee from reporting or opposing discrimination.

153.   Defendants' retaliatory actions included, but were not limited to:

   a.  denying Plaintiff bonuses and other compensation;

   b.  subjecting her to increased scrutiny and disparate treatment;

   c.  undermining her work performance and evaluations;

   d.  manipulating performance metrics and financial requirements;

   e.  requiring continued interaction and travel with her known harasser;

33

f.  intimidating Plaintiff through supervisory actions by MacKenzie and Jules Olsman;

g.  interfering with professional relationships;

h.  issuing false or pretextual criticisms;

i.  carrying out post-termination retaliation, including disparagement, blacklisting, and interference with her ability to earn a living; and

j.  filing retaliatory counterclaims and engaging in conduct intended to chill Plaintiff's pursuit of her Title VII rights.

154.   These actions materially affected the terms, conditions, and privileges of Plaintiff's employment and constituted unlawful retaliation in violation of 42 U.S.C. § 2000e *et seq.*

155.   Defendant Olsman Law's actions were intentional, willful, and taken in reckless disregard of Plaintiff's federally protected rights.

156.   As a direct and proximate result of Defendant Olsman Law's discriminatory and retaliatory conduct, Plaintiff suffered adverse employment consequences, including the loss of compensation, career opportunities, and professional standing.

157.   Plaintiff has further suffered emotional distress, mental anguish, humiliation, reputational harm, physical symptoms of stress, loss of enjoyment of life, and other non-economic harms.

158.   Plaintiff is entitled to all damages and equitable relief available under Title VII, including compensatory damages, punitive damages, attorney's fees, and costs.

## COUNT VI
## Breach of Contract (Express)
### *Defendants Riley and RH*

159.   Plaintiff incorporates by reference all preceding paragraphs.

160.   At all times relevant, Plaintiff was employed by Defendant Riley & Hurley pursuant to a written, express employment contract executed in or around September 2019.

161.   Defendant Riley acted as an agent, partner, and majority shareholder of Riley & Hurley and exercised authority over the terms and performance of Plaintiff's employment contract. Riley & Hurley is therefore directly and vicariously liable for his conduct.

162.   The express employment contract between Plaintiff and Riley & Hurley set forth terms governing Plaintiff's employment, including duties, expectations, professional standards, compensation, and workplace conditions.

163.   Further, Riley laid out express terms for partner track and ownership of Riley & Hurley which Plaintiff relied upon in joining the firm.

164.   Defendants breached the employment contract by failing to provide Plaintiff with a safe, lawful, and professionally appropriate working environment consistent with the contract's terms and the implied obligation of good faith and fair dealing inherent in Michigan employment contracts.

165.   Defendant Riley further breached the contract through conduct that made Plaintiff's performance of her duties unreasonably difficult or impossible, including persistent unwelcome sexual attention, harassment, and conduct that interfered with her ability to perform the work contemplated by the parties.

166.   Riley & Hurley breached the contract by failing to take reasonable steps to prevent or correct the misconduct, by permitting a work environment inconsistent with contractual expectations, and by failing to uphold its obligations to Plaintiff under the express agreement.

167.   As a direct and proximate result of Defendants' breaches, Plaintiff suffered financial and professional harm, including loss of earnings, loss of earning capacity, and loss of the promised partnership opportunity contemplated by the contract.

168.   Plaintiff also sustained non-economic harm flowing directly from the contractual breach, including emotional distress, reputational damage, and other consequential damages recoverable under Michigan contract law.

**COUNT VII**
**MCL § 600.2954 Stalking**
*Defendants Riley and RH*

169.   Plaintiff incorporates by reference all preceding paragraphs.

170.   Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at Defendant RH.

171.   Defendant Riley's actions described in the factual statements set forth in the above paragraphs amount to conduct prohibited under section 411h and/or 411i of the Michigan Penal Code, Act No. 328 of the Public Acts of 1931, being sections 750.411h and 750.411i of the Michigan Compiled Laws.

172.   More specifically, Defendant Riley's conduct constitutes harassment under section 750.411h of the Michigan Compiled Laws, in that his conduct included repeated or continuing unconsented conduct that would cause a reasonable individual to suffer emotional distress and that Defendant Riley's conduct actually caused Plaintiff to suffer emotional distress.

173.   Defendant Riley's conduct, including, but not limited to photographing and collecting photos of Plaintiff and obsessively stalking her, also constitutes stalking under section 750.411h of the Michigan Compiled Laws, in that Defendant Riley engaged in a willful course of conduct involving repeated or continuing harassment of Plaintiff that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, or harassed, and that Defendant Riley's conduct actually caused Plaintiff to feel terrorized, frightened, intimidated, threatened, or harassed.

174.   Damages incurred by a victim as a result of conduct prohibited in sections 750.411h or 750.411i may be recovered, together with exemplary damages, costs of the action, and reasonable attorney fees. MCL § 600.2954.

175.   As a direct and proximate result of Defendant Riley's prohibited conduct, Plaintiff has suffered lost earnings and earning capacity, humiliation, mortification, embarrassment, sleeplessness, and anxiety, among other damages that may arise during the course of discovery, and any other compensatory and equitable damages that the Court deems appropriate.

## COUNT VIII
### Intentional Inflection of Emotional Distress
*All Defendants*

176.   Plaintiff incorporates by reference all preceding paragraphs.

177.   Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at Defendant RH.

178.   Defendant Riley's actions described in the factual statements set forth in the above paragraphs amount to conduct prohibited under section 411h and/or 411i of the Michigan Penal Code, Act No. 328 of the Public Acts of 1931, being sections 750.411h and 750.411i of the Michigan Compiled Laws.

179.   More specifically, Defendant Riley's conduct constitutes harassment under section 750.411h of the Michigan Compiled Laws, in that his conduct included repeated or continuing unconsented conduct that would cause a reasonable individual to suffer emotional distress and that Defendant Riley's conduct actually caused Plaintiff to suffer emotional distress.

180.   Defendant Riley's conduct, including, but not limited to photographing and collecting photos of Plaintiff and obsessively stalking her, also constitutes stalking under section 750.411h of the Michigan Compiled Laws, in that Defendant Riley engaged in a willful course of conduct involving repeated or continuing harassment of Plaintiff that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, or harassed, and that Defendant Riley's conduct

actually caused Plaintiff to feel terrorized, frightened, intimidated, threatened, or harassed.

181.   Damages incurred by a victim as a result of conduct prohibited in sections 750.411h or 750.411i may be recovered, together with exemplary damages, costs of the action, and reasonable attorney fees. MCL ¬ß 600.2954.

182.   As a direct and proximate result of Defendant Riley's prohibited conduct, Plaintiff has suffered lost earnings and earning capacity, humiliation, mortification, and embarrassment, among other damages, and any other compensatory and equitable damages that the Court deems appropriate.

## COUNT IX
## Intrusion Into Seclusion
### *Riley Defendants*

183.   Plaintiff incorporates by reference all preceding paragraphs.

184.   Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at RH.

185.   Plaintiff maintained privacy concerning details of her personal professional life.

186.   Plaintiff had a right to keep those intimate details and matters private.

187.   Defendant Riley invaded Plaintiff privacy, including but not limited to surreptitiously photographing her, secretly maintaining a cache of photographs of her; stalking her outside of her hotel room in Orlando; refusing to listen to her many requests to be left alone; and listening to her phone calls, some of which were about Defendant Riley's behavior, while she was in her hotel room.

188.   Defendant Riley's conduct was objectionable and would be objectionable to a reasonable person.

189.   Defendant Riley's conduct as outlined above was objectionable, extreme, outrageous, and beyond all possible bounds of decency, and of such character as to be intolerable in a civilized society.

190.   Defendant Riley's conduct was not for any proper purpose, nor was it within the scope of Defendant's authority or otherwise immune or privileged.

191.   As a direct and proximate result of Defendant Riley's conduct, Plaintiff has suffered lost earnings and earning capacity, humiliation, mortification, embarrassment, sleeplessness, and anxiety, among other damages that may arise during the course of discovery, and any other compensatory and equitable damages that the Court deems appropriate.

192.   Defendant Riley's conduct deliberately and intentionally injured Plaintiff; his acts were willful and malicious and are not dischargeable in bankruptcy.

**COUNT X**
**Conspiracy to Permit Stalking and to Violate the ELCRA**
*All Defendants*

193.   Plaintiff incorporates by reference all preceding paragraphs.

194.   Defendant Riley is liable for his negligent or intentional acts, and, as Defendant Riley's employer, Defendant Riley & Hurley is directly or vicariously liable for the negligent or intentional acts of Defendant Riley, as Defendant Riley at all times material hereto was an agent, partner and majority shareholder at RH.

195.   Defendant Olsman is vicariously liable for the negligent or intentional acts of all of its partners, including but not limited to MacKenzie, Jules Olsman, and Peacock.

196.   Defendant Riley and Co-Conspirator Defendant Olsman agreed and conspired together to allow Defendant Riley to continue to sexually harass and stalk Plaintiff, to subject Plaintiff to a hostile work environment at Defendant Olsman, and to retaliate against Plaintiff for exercising her right to oppose the harassment and hostile work environment that she was subjected to at Defendant Olsman, in violation of the ELCRA.

197.   Despite Plaintiff's repeated requests that she not be forced to use Defendant Riley as a mediator or have professional contact with the man because of his inappropriate sexual conduct, stalking, and obsession with her, Defendant Olsman had conversations with and conspired with Defendant Riley to continue to

42

allow Defendant Riley to have contact with, harass and stalk Plaintiff, including but not limited to conspiring to warn Plaintiff that Defendant Olsman had been "talking to Bob [Riley] about" her and that Plaintiff was to "keep Bob [Riley] happy" and conspiring to reject and disregard Plaintiff's reasonable fear of Defendant Riley with knowledge that her fear was reasonable and well-founded. This conspiracy permitted Defendant Riley's stalking and sexual harassment and Defendant Olsman's hostile work environment to continue.

198.   Because Plaintiff resisted, reported and confronted the unlawful misconduct of Defendant Riley, Defendants Riley and Olsman agreed to conspire to fire Plaintiff from her position at Defendant Olsman in further violation of the ELCRA, including but not limited to conspiring to threaten Plaintiff based on false information that she was "spending all of her time crying about her divorce" rather than doing her work; conspiring to rescind Plaintiff's 2023 year-end bonus; conspiring to concoct pretextual reasons to fire Plaintiff; and conspiring to retaliate against Plaintiff.

199.   As a direct and proximate result of the Defendants' conspiracy, Plaintiff suffered damages including but not limited to loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, loss of professional and personal reputation,

physical distress, loss of the ordinary pleasures of everyday life, and any other compensatory and equitable damages that the Court deems appropriate.

**COUNT XI**
**Defamation**
*Defendants Riley and MacKenzie*

200.   Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

201.   At all relevant times, Plaintiff was a licensed attorney in good standing and built a reputation in the Michigan legal community as a careful, competent, and ethical Plaintiffs' lawyer.

202.   Defendants Riley and MacKenzie have made, published, and caused to be published false and defamatory statements about Plaintiff's competence, mental stability, integrity, and fitness to practice law.

203.   Without limitation, Defendants made and/or republished the following categories of statements to clients, the Shared Client, other attorneys, and members of the Michigan legal community, including but not limited to:

    a.   That Plaintiff was "incompetent" and had to be terminated from Olsman Law because of her incompetence;

    b.   That Plaintiff had suffered a "mental breakdown," was mentally unstable, or was otherwise emotionally unfit to represent clients;

44

   c.  That Plaintiff was not honest, lacked integrity, and exercised poor judgment;

   d.  That Plaintiff did not have a real firm, did not have the resources or support to represent clients who wished to follow her from Olsman Law, and therefore could not handle their cases;

   e.  That Plaintiff was so emotionally compromised by her divorce that she was unable to work, was spending her time "crying about her divorce," and was therefore not performing her duties to clients or the Shared Client;

   f.  That Plaintiff had failed to complete assignments for the Shared Client or had negligently handled her work for the Shared Client.

204.   These statements were communicated to, among others:

   a.  The Shared Client, including the Executive Director and members of its leadership;

   b.  Existing and prospective clients who had elected or were considering electing to transition their cases to Plaintiff after her departure from Olsman Law;

   c.  Michigan attorneys, including referral counsel and others in the Plaintiffs' bar, with whom Plaintiff had existing or prospective professional relationships; and

d. Other third parties within the Michigan legal community whose opinions directly affect Plaintiff's ability to obtain work, referrals, and clients.

205.   The above statements are false. Plaintiff is not incompetent, did not have a mental breakdown, was not fired due to incompetence or mental instability, and has a proven record of successful client representation, trial work, and professional recognition.

206.   The statements were made and republished by Defendants with at least negligent disregard for their truth or falsity. Upon information and belief, many were made with actual malice—that is, with knowledge of their falsity or with reckless disregard for the truth—motivated by Defendants' desire to protect themselves from Plaintiff's complaints about harassment, retaliation, and unethical conduct, and to punish Plaintiff for standing up to Riley and OMPW.

207.   The statements are defamatory per se because, among other things, they:

a. Impute to Plaintiff a lack of ability, capacity, and fitness in her profession as a lawyer; and

b. Charge her with serious mental and emotional instability that allegedly prevent her from competently serving clients.

208.   The statements were not subject to any absolute privilege. To the extent any conditional or qualified privilege might arguably apply, Defendants abused and forfeited that privilege by acting with actual malice, ill will, and reckless disregard for the truth, and by publishing unnecessary, gratuitous, and false allegations to persons with no need to know.

209.   As a direct and proximate result of Defendants' defamatory statements, Plaintiff has suffered and continues to suffer:

   a.  Damage to her reputation in the Michigan legal community and beyond;

   b.  Loss of existing clients and cases, including clients who elected to remain with OMPW after being told false and disparaging information about Plaintiff;

   c.  Loss of referrals and future client matters;

   d.  Diminished earning capacity and business opportunities; and

   e.  Emotional distress, anxiety, humiliation, and loss of professional standing.

210.   Plaintiff is entitled to recover general, special, and consequential damages in an amount to be proven at trial, including damages for reputational harm, lost income, and emotional distress.

211.   Because Defendants' conduct was willful, malicious, and in reckless disregard of Plaintiff's rights, Plaintiff is also entitled to an award of punitive or exemplary damages to deter such conduct in the future.

**COUNT XII**
**Tortious Interference With**
**Business Relationships and Expectancies**
*All Defendants*

212.   Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

213.   At all relevant times, Plaintiff maintained or reasonably expected to maintain valid business relationships and expectancies, including but not limited to:

　　a.   Ongoing attorney–client relationships with medical malpractice and other civil clients who were represented by Plaintiff at Olsman Law and who elected, or were considering electing, to transition their cases to Plaintiff after her departure;

　　b.   A continuing professional relationship and fee-generating work with the Shared Client;

　　c.   Prospective employment, referral, and co-counsel relationships with law firms and attorneys in Michigan and elsewhere; and

　　d.   Future client relationships and business opportunities for her new firm, Fox Plaintiff, PLLC, including referrals and cases in the Michigan Plaintiffs' bar.

214.  Defendants were aware of these relationships and expectancies. Defendants knew:

    a.  Which clients had expressed a desire to move their cases with Plaintiff upon her departure;

    b.  That Plaintiff had an ongoing role and future opportunities with the Shared Client;

    c.  That Plaintiff's reputation in the Plaintiffs' bar and among referring counsel was critical to her livelihood; and

    d.  That Plaintiff was building a new practice dependent on her professional standing and ability to retain and attract clients.

215.  Defendants intentionally and improperly interfered with Plaintiff's business relationships and expectancies by, among other things:

    a.  Making and publishing false, disparaging statements that Plaintiff was incompetent, mentally unstable, had a "mental breakdown," and was terminated for those reasons;

    b.  Informing clients who had chosen to follow Plaintiff that she was incompetent, that she did not have a real firm or resources to handle their cases, and that they should remain with Olsman Law instead;

c. Communicating to the Shared Client that Plaintiff was emotionally unstable, not completing her work, or unable to perform her duties, causing the Shared Client to question her role, threaten her continued engagement, and reduce or alter her work assignments;

d. Using Riley's prominent role as mediator and his access to the Shared Client and other attorneys to undermine Plaintiff's reputation and cast doubt on her competence and emotional fitness;

e. Conditioning proposed settlement of Plaintiff's claims on onerous and improper terms, including blanket indemnification of OMPW and demands for the identities of anyone to whom Plaintiff had disclosed his harassment, in an attempt to silence Plaintiff and prevent her from vindicating her rights and protecting her professional reputation;

f. Repeating and amplifying false narratives about Plaintiff's alleged instability and incompetence within the Michigan legal community, including to attorneys who might otherwise employ her, refer cases, or co-counsel with her; and

g. Retaliating against Plaintiff for confronting Riley and reporting his misconduct by immediately terminating her employment, cutting off her access to OMPW's platform and resources, and then disparaging her to clients and colleagues.

216. Defendants' interference was intentional and undertaken with the purpose of:

a. Protecting themselves from liability for harassment, retaliation, and other unlawful conduct;

b. Punishing Plaintiff for standing up to Defendants and for asserting her rights;

c. Discouraging other attorneys and clients from supporting or associating with Plaintiff; and

d. Forcing Plaintiff out of the Michigan Plaintiffs' bar and undermining her ability to compete as an independent practitioner.

217. Defendants' actions were improper under Michigan law, in that they relied on false statements, misrepresentations, intimidation, coercive use of power and influence, and retaliation for Plaintiff's protected conduct, rather than legitimate competition or good-faith business practices.

218. As a direct and proximate result of Defendants' tortious interference:

a. Certain clients who had elected to transition their cases to Plaintiff reversed that decision and remained with Olsman law;

b. Plaintiff's role and opportunities with the Shared Client were diminished, threatened, or placed in jeopardy;

c. Plaintiff lost existing and prospective clients, referrals, and co-counsel relationships;

d. Plaintiff was effectively forced to leave Michigan and relocate to attempt to rebuild her life and career; and

e. Plaintiff suffered substantial lost income, lost earning capacity, reputational damage, and emotional distress.

219.    Plaintiff is entitled to recover compensatory damages for all losses proximately caused by Defendants' interference, including lost profits, lost client and referral value, and the costs associated with relocation and rebuilding her practice.

220.    Because Defendants' interference was willful, malicious, and in reckless disregard of Plaintiff's rights, Plaintiff is also entitled to exemplary and punitive damage

## DEMAND FOR JURY TRIAL

221.    Plaintiff demands trial by jury on all issues so triable in this action.

## RELIEF REQUESTED

222.     Plaintiff demands judgment against the Defendants for:

    a.  Compensatory damages;

    b.  Punitive damages;

    c.  Exemplary damages;

    d.  Pre-judgment and post-judgment interest;

    e.  Attorneys' fees and litigation expenses; and

    f.  Any other relief the Court deems appropriate.

Dated: January 8, 2026.                          Respectfully submitted,

**THE RUSSELL LAW FIRM, PLLC**

*/s/ Kimberly Russell*
KIMBERLY RUSSELL
Admitted EDMI
1140 3rd St. NE,
Washington, DC 20002
Tel: (202) 430-5085
kimberly@russellatlaw.com

**THE LAW OFFICE OF KEITH ALTMAN**

Keith Altman (P81702)
keithaltman@kaltmanlaw.com

**BROWN LEGAL GROUP, PLLC**

Sammy Brown, Jr.
Admitted EDMI
slb@brownlegalgrouppllc.com

*Attorneys for Plaintiff*

53

## <u>CERTIFCATE OF SERVICE</u>

The undersigned attorney for Plaintiff hereby certifies that true and correct copies of the foregoing documents have been electronically filed and are available for viewing and downloading from the ECF system in accordance with the local Federal Rules of Civil Procedure.

Dated: January 8, 2026

*/s/ Kimberly Russell*
Kimberly Russell

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

ELYSE MCKENNA,

        Plaintiff,

v.

ROBERT F. RILEY, DONNA
MACKENZIE, RILEY &
HURLEY, PC, and
OLSMAN MACKENZIE
PEACOCK, PC,

        Defendants.

Case No. 24-cv-12347

Hon. Brandy R. McMillion
Magistrate Elizabeth A. Stafford

## PLAINTIFF'S EXHIBIT LIST FOR HER
## THIRD AMENDED COMPLAINT AND JURY DEMAND

### Index of Exhibits

| EXHIBIT NUMBER | EXHIBIT TITLE |
| --- | --- |
| Ex. 1 | Dec. 25, 2019 Riley Christmas Letter |
| Ex. 2 | Photograph of 6-Months of Riley Notes Dated from Oct. 21, 2019 to Feb. 28, 2020 |
| Ex. 3 | Feb. 4, 2024 Olsman Law Termination Letter |
| Ex. 4 | Oct. 15, 2025 EEOC Notice of Right to Sue |
| Ex. 5 | Sept. 27, 2019 Riley & Hurley Term Sheet with Plaintiff's Offer of Employment, Partnership, and Ownership Track |
| Ex. 6 | Scan of Riley Notes from October 21, 2019 to 2023 |

| Ex. 7 | June 19, 2023 Text Messages Between Plaintiff and Riley |
|-------|--------------------------------------------------------|
| Ex. 8 | February 3, 2023 Email from Plaintiff to Olsman Law |
| Ex. 9 | ECF No.40-1, Deborah Gordon Affidavit |
| Ex. 10 | ECF No. 40-7, Deborah Gordon Law Intake Affidavit |
| Ex. 11 | Plaintiff's Verizon Phone Records. |

# EXHIBIT 1

Dec 25, 2014
Christmas Day

Good morning Elyse.

If ever there was a day when I wished I could spend time with you, it would be today. Were it otherwise, I think I would share, in person, the following thoughts.

A meaningful reflection about Christmas involves more than gifts, things and material objects. I believe instead that it is best with thoughts of joy, peace, new beginnings, acceptance and love. This apply to all of mankind. They also apply,

PL000502

-2-

from my perspective, to us.

You have became a tremendous joy in my life. Whether as a colleague RIT or a dear friend, you regularly bring a smile to my face. You laugh easily and often. "Joy" is a perfect word for you.

Peace involves quiet, serenity and the absence of disturbance.. It also involves trust. There are very few people in my life who evidence these qualities as you do. Indeed, I would trust you with anything and be a peace for doing so.

New beginnings? That is exactly us. Moreover, the opportunity to be part of

PL000503

Your evolution as a lawyer means the world. I find this opportunity to be incredibly satisfying and gives me a sense of real purpose.

Acceptance is also a virtue to celebrate at Christmas. No matter our differences, there is a genuine and very real mutual acknowledgment of all we share... a true acceptance of who and what we are.

Love is a powerful word but what is Christmas really all about? No matter its implications, I cannot think of a better word to describe the complete

-4-

package of feelings I have for you. My
affection is real, respectful and sincere
and I see no reason to be tentative.

I will miss you today my friend but
will think of you often. Enjoy a
fabulous day with family, friends and
loved ones!

Merry Christmas Elyse!

Bob

EXHIBIT 2



# EXHIBIT 3



Jules B. Olsman
Donna M. MacKenzie
Emily M. Peacock
Randy J. Wallace
Ronda M. Little
Lauren R. Walson

Of Counsel
Wolfgang Mueller

Deb Fisher, RN
Nancy Studer, RN
Jacqueline Liu, RN
Nicole Poney, RN

ATTORNEYS AND COUNSELORS AT LAW

Phone: 248-591-2300 ● Fax: 248-591-2304
olsmanlaw.com ● nursing-homelawyers.com ● www.birth-justice.com

February 4, 2024

*Via email: elyselmckenna@gmail.com*
Ms. Elyse McKenna

  *Re:*  Separation from Olsman MacKenzie Peacock & Wallace

Dear Ms. McKenna:

  I am in receipt of your email from yesterday at 3:56 p.m. You stated that you "will separate" from the firm. Your letter raised grave concerns about your honesty, integrity and judgment, and the firm decided that you must be separated immediately. We have no desire to wait for your "terms." Your email of today at 11:19 a.m., which purports to threaten us, is further evidence of your lack of integrity and honesty.

  Your assertion that you feel "retaliated against" based on issues you allegedly had with a former employer in 2021 have no factual or legal basis. Your email is replete with assertions that are flatly false. To be clear, you have never discussed any allegations involving Bob Riley with Jules Olsman. In fact, on the limited occasions when you voluntarily raised such allegations to either myself or Emily Peacock, you have requested confidentiality, which was honored.

  Bob Riley is not an employee of Olsman MacKenzie Peacock & Wallace. Instead, he is an attorney with whom you previously worked, and with whom you have chosen to continue to maintain a working relationship. You could have taken any action you chose against him while you were his employee or thereafter. Not only did you not take action against Bob Riley, in addition to choosing to continue to work with him as to the ███████████████████ ████████████████, you have utilized both Bob Riley and his partner, Bill Hurley, as facilitators and/or arbitrators in cases you have handled, and you have also requested that Bob Riley contribute to fundraising efforts in which you have been involved. All these things have been done on your own volition and not at the direction of Olsman MacKenzie Peacock & Wallace.

  Next, your statement that you have recently moved forward with your allegations against Bob Riley because of my supposed assurance that I would not "stand in the way" is both manipulative and false. I have never said or done anything that would prevent you from moving forward with your allegations.

  Rather, it is clear that your inaccurate and manufactured claim of "retaliation" has arisen in direct response to concerns that have been raised by us because of your sub-par performance at

*Re: Separation from Olsman MacKenzie Peacock & Wallace*
Page 2 of 3

the firm, including not meeting your performance goals, excessive out of state travel, and failure to conduct yourself in a manner consistent with the values of the firm. Based on your performance, you did not receive a bonus for 2023.

Due to your inability to meet your goals for 2023, we met with you to discuss how to make 2024 a more productive and successful year.[1] In addition to falling short of your financial goals in 2023,[2] your work has not been performed in a timely manner,[3] and you lack a system of organization that allows you to effectively and efficiently manage your cases.[4] We established a plan to address your performance issues by more closely monitoring your work and identifying ways in which other lawyers in the office could assist with your cases.

Additionally, on numerous occasions, both Emily Peacock and I have advised you that the amount of work that you are doing for the ████████████████████ is appreciably greater that what you anticipated when you joined our firm, and appears to be significantly impairing your ability to complete other work for Olsman MacKenzie Peacock & Wallace. Despite our concerns and recommendations, you have chosen to continue to do work for the PHPA.

Despite multiple warnings that your out of state travel in 2023 was excessive,[5] you proposed a travel schedule for 2024 that included five multi-day, out of town trips within six months.[6] When you proposed this travel schedule, we reiterated to you our concerns regarding your excessive travel and the impact that it is having on your productivity. We also established clear criteria for out of state travel, including limiting travel that is relevant to the firm's practice area, and that has demonstrated benefits to the firm. During our meeting, it was clear that a number of your proposed trips did not meet those requirements.

Finally, your conduct and behavior during the 2023 AAJ Annual Convention was inconsistent with the values of our firm and had a negative impact on our firm's reputation. You misled us about the details of a contested election in which you were participating, of which we had no advance notice. You claimed that your opponent had not timely announced her candidacy, which we later discovered was untrue. You also made a pact with your opponent to not throw an election party, which you purposefully and intentionally violated. Your opponent's refusal to allow you to drop out of the race, in exchange for her support of you in the following year's election,

---

[1] It should be noted that during this meeting, as well as a previous meeting that we had in 2023, you did not accept constructive criticism in a professional manner, and instead responded with defensive posturing, placed blame on others for your failures, and had an emotional breakdown. Additionally, it was brought to our attention that following the 2023 meeting, you made false and disparaging comments in an attempt to negatively influence external perceptions of the firm and its partners. This type of conduct is not acceptable. When we learned after the 2023 meeting that you were seeking employment elsewhere, we hoped you would be successful in that endeavor and that we could part ways amicably.

[2] As you know, your 2023 compensation was calculated on the basis of a column system. In 2023, you did not generate a sufficient amount of attorney fees to cover your base salary, and as a result, received no bonus compensation.

[3] For example, on one occasion you were asked to draft a demand letter, but did not do so for over one year. In another case, you failed to timely schedule an arbitration hearing, resulting in significant delay.

[4] There have been numerous occasions where you have attempted to negotiate a resolution to a case without knowing that you did not have the lien information that is necessary for you to engage in meaningful negotiations. Additionally, a legal assistant has reported concerns that your time management is inefficient due to time spent discussing personal issues and your lack of attention to important deadlines.

[5] On one occasion in 2023, you advised that because of your recent divorce, the out of state travel was important to you because it became your main source of socialization outside of the office. It should also be noted that your travel to these events centered around a romantic relationship you were having with a member of AAJ.

[6] This travel plan included places such as Austin, TX, Savannah, GA, Chicago, IL, Orlando, FL and Nashville, TN.

*Re: Separation from Olsman MacKenzie Peacock & Wallace*
Page 3 of 3

speaks volumes about your character in the election. Your unprofessional and deceptive practices
negatively impacted our firm.

      Your attempt to manipulate the narrative about your failure to meet your performance goals
in 2023 and the implementation of a performance plan in 2024 is alarming. The firm has never,
and would never, retaliate against you for allegations or claims made against anyone, much less a
third party who is not an employee of the firm.

      In light of your separation from the firm, we expect the immediate return of all firm
property as well as any physical firm client files that are in your possession. We will notify any
clients with whom you were working that you are no longer with the firm. Any personal items that
you have in the office, as well as any documents related to ████, will be available for you to pick
up in the firm lobby when you return the firm property.

Sincerely,

Donna M. MacKenzie

DMM/klh

EXHIBIT 4

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**Detroit Field Office**
477 Michigan Avenue, Room 865
Detroit, MI 48226
(313) 774-0020
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 10/15/2024

**To:** Miss Elyse McKenna
5400 Greystone Rd
CHEVY CHASE, MD 20815
Charge No: 471-2024-07180

EEOC Representative and email:   JOSEPH MAGLIOCCO
Investigator
joseph.magliocco@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC is closing this charge because: Ongoing lawsuit in Federal Court Eastern. Docket # 2-24CB-12347ERMEA.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 471-2024-07180.

On behalf of the Commission,

Digitally Signed By:Ramiro Gutierrez
10/15/2024
Ramiro Gutierrez
Director

# EXHIBIT 5

## ELYSE L. HYDE EMPLOYMENT TERM SHEET

Riley & Hurley, P.C. (RH) and Elyse L. Heid (ELH) have agreed to enter into a terminable at will employment relationship based on the following expectations and the following terms.

It is expected that ELH will exhibit exemplary performance in all respects as an associate attorney at RH.  It is expected that RH will provide exemplary opportunities for ELH to maximize her professional skills, to establish and secure client relationships and the opportunity to develop the professional skills and business acumen to eventually have an ownership interest in RH.

The parties agree to the following terms:

1. Subject to appropriate withholdings, base compensation shall be $100,000 annually and paid on a pro rata basis in accordance with RH practices for its employees.  This base compensation shall remain in effect through December 2020 at which time it will be further reviewed.

2. ELH shall be eligible for bonus compensation based on performance and at the discretion of RH.  Typically bonus compensation is considered twice a year at the sole discretion of RH.

3. ELH has advised that she has health insurance through her spouse and waives this benefit from RH as a result.

4. RH will provide both short term disability and long-term disability benefits consistent with its pre-existing practices for other employees.  RH will ascertain whether maternity benefits are included within the existing policies although it is presumed to be included.

5. RH will provide term life insurance to ELH with such coverage amounts to be determined.

6. ELH will be eligible for participation in the RH 401K plan in accordance with its terms and provisions.  It has also been the RH practice to contribute sums to its eligible employees.  This is discretionary and occurs in accordance with the plan's provisions.

7. RH will provide ELH legal malpractice insurance coverage.

8. ELH will receive work assignments from both William Hurley and Robert Riley. Such assignments are intended to:

    a. Meet and exceed client expectations relative to the professional needs each assignment presents;

      b.      Develop the skills of ELH to a level where she is ultimately recognized as possessing superior professional skills and abilities to fully serve all client needs; and

      c.      Obtain full access and exposure to RH clients.

9.      In exchange for exemplary service as an associate attorney, RH will provide ELH with the opportunity to develop sufficient client relationships so as to potentially earn client business within and for RH.  If, at a point in time to be determined, the current partners of RH retire, ELH, depending on client acceptance, will have the opportunity to acquire the assets of RH at no cost to her other than recognition of outstanding accounts receivables to RH and existing stock reimbursement.  It is recognized and understood that the concepts expressed herein are subject to further discussion, negotiation and documentation.

10.     In furtherance of the goals and objectives set forth in paragraph 9 above, RH commits to ELH that reviews will take place relative to potential partnership status. Such promotion, advancement and/or status associated with partnership will be at the sole discretion of RH.  It is subject to further discussion, negotiation and documentation.

11.     RH will be financially responsible for all ELH Bar and other professional association fees, dues and obligations.

In consideration of the foregoing, these terms are acknowledged and accepted.


_____          _____
ELYSE L. HEID (DATED)                  ROBERT F. RILEY (DATED)

# EXHIBIT 6

Law Offices of
## RILEY & HURLEY, P.C.

19853 Outer Drive, Suite 100 • Dearborn, Michigan 48124-2066 • (313) 565-1330 • Fax (313) 565-1318

Robert F. Riley
William C. Hurley
Allison M. Ensch*
Elyse L. Heid
    *Also admitted in Illinois

Of Counsel
Hainer & Berman, P.C.

10/21/19

Elyse,

Today marks a new chapter in your legal career and we welcome you with open arms. Your future is filled with promise, potential and opportunity. You are an important addition to our "family" and we look forward to a long association together.

We have much to share. Our staff has seen it all and will help with any aspect of our practice and your work. Indeed, they will generously assist you with whatever you might want or need to be the best lawyer you can be.

Bill and I are committed to you as well. Your goals are our objectives. We are absolutely delighted by your decision to join us and embrace the unlimited possibilities we can together share!

Bob

Lyse,

Today is our first real work day together. This significant moment is now at hand and I cannot adequately express how happy I am.

Our work is important, the obligations are many and we have a business to grow. It will not always be easy and formidable challenges are inevitable. We will together navigate them with persistence, dignity and integrity. Our rewards will likely be many.

Apart from such issues, there is something far more important to me: a special, unique and valued friendship. Seemingly out of nowhere, long and personal conversations have ensued. They have reflected a wide variety of revealing perspectives and insights far beyond "the law"... on life, personal challenges, adversity, interests, goals, hopes and dreams to name but a few. These were deep and thoughtful and often without filters or barriers. You became my friend with all the meaning such a label implies. I am grateful and trust you feel the same.

The years ahead will pass quickly. I intend to make the most of them.

Bob



THANK YOU

Elyse,

You made it! The first month is done and behind you and none the worst for it. From my perspective, pretty darn good despite some bumps along the way!

Even with difficult moments, you have amazed me. You are a wonderful addition and all of us will be the better for it. I know I am! Without any doubts!

"Thanks" seems insufficient but please know how grateful I am that you are an extraordinary part of everything!

Bob

# GRAPHITUDES

Content:



cards that want
you to be happy

cards with
ulterior motives

cards ending
with "day"

cards that make
you pee yourself

Printed on recycled paper in USA.

©Bridget Hobson 2005



8  11212  01041  7

GR-08

Quiplip

www.quiplip.com

Merry Christmas !!

2019

Elyse -

Thank you for being a part of
R&H.  I'm sure you will understand
the card within the card!

Santa

To pop up, squeeze card base.

*Hallmark*



*Thanks For Being You*

Christmas seems
like the perfect time
to say "thank you"...
not for any specific thing
you've done lately,
but for the many ways
you touch my life
with your caring
and kindness.
So often you lend a hand,
lift my spirits,
or just listen
with your heart
until my problems
seem to float away.



Elyse,
You once shared a "road of life" card with me. It resonated as I often reflect on the roads I have travelled.

You also shared the story of that particular card. Your words also resonated as I select this card.

*You're a wonderful presence in my world, one I'm so grateful for... and I'm hoping Christmas brings all the good things you so deserve.*

I never imagined a
card such as this would
be shared under these
circumstances. The roads
which brought you to
RiH was not foreseeable.
Similarly, I had no
expectation of finding
such a wonderful
Friend. Hence the
intersection of many
different roads and

Two special cards now
combine to give meaning
to where we are today.
I hope this makes
sense. If not, I will
gladly explain.
For now, thank you for
for your presence at RiH and
in my life.
Merry Christmas!
Bob

Xmas 2019

YOU'RE DEFINITELY
NICE LIST MATERIAL.



12/23/19



NO NEED TO CHECK TWICE.

Elyse,

Our amazing friendship is something to treasure. My gratitude is boundless and knows no limits. I am blessed!

Bob



X MAS RENEWAL

XMAS RENEWAL (FROM 2019)

Two Round Trip Plane Tickets

(Hint: Go to Mexico!)

Elyse —
Merry Christmas!! Enjoy a wonderful 2021 and include a long overdue vacation wherever you want.

Bob

Two Round Trip
Plane Tickets : Anywhere

Dec 25, 2024
Christmas Day

Good morning Glyfe.

If ever there was a day when I wished I could spend time with you, it would be today. Were it otherwise, I think I would share, in person, the following thoughts.

A meaningful reflection about Christmas involves more than gifts, things and material objects. I believe instead that it is best with thoughts of joy, peace, new beginnings, acceptance and love. This apply to all of mankind. They also apply,

-2-

from my perspective, to us.

You have became a tremendous joy in my life. Whether as a colleague RH or a dear friend, you regularly bring a smile to my face. You laugh easily and often. "Joy" is a perfect word for you.

Peace involves quiet, serenity and the absence of disturbance.. It also involves trust. There are very few people in my life who evidence these qualities as you do. Indeed, I would trust you with anything and be a peace for doing so.

New beginnings? That is exactly us. Moreover, the opportunity to be part of

Your evolution as a lawyer means the world. I find this opportunity to be incredibly satisfying and gives me a sense of real purpose.

Acceptance is also a virtue to celebrate at Christmas. No matter our differences, there is a genuine and very real mutual acknowledgment of all we share... a true acceptance of who and what we are.

Love is a powerful word but what is Christmas really all about? No matter its implications, I cannot think of a better word to describe the complete

package of feelings I have for you. My
affection is real, respectful and sincere
and I see no reason to be tentative.

I will miss you today my friend but
will think of you often. Enjoy a
fabulous day with family, friends and
loved ones!

Merry Christmas Elyse!

Bob

1/21/20

Elyte –

I'm guessing most lawyers won't celebrate 3 months. I'm not most.

I'll never be able to explain how happy I am! Thank you for EVERYTHING!   Bob

Destined
*for*
greatness.

RILEY & HURLEY, P.C.

ELYSE L. HEID
ATTORNEY AT LAW

19853 Outer Drive
Suite 100
Dearborn, MI 48124-2066

(313) 565-1330
Fax (313) 565-1318
eheid@rileyhurley.com

2/3/20

✓ Trial #1

More to come...

I'm very proud of you.

Bobe

E -                    2/10/20
If this is really a
2 week celebration,
this is a "happy birthday"
#1.
one! Have a good
              B

#2
Happy Birthday

Day #3
Birthday weeks
Continued !

ELMH BIRTHDAY WEEKS
DAY # 4
Happy Day #4 !

#5
A blend of birthday
and Valentines Day
wishes ! Both in
the Birthday weeks
celebration !!!



2/14/20

# FOREVER FRIENDS !

Happy Valentine's Day Elyse.

Bobo

E -

2/17/20

It is post birthday day #1

BUT it is Birthday week= day #8.

Please open the right door to the credenza behind my desk. The white bag is for you!

B

Birthday Weeks
Monday #8
2/17/20

Elyse ...

2/19/20

Today is a quiet day for reflection
and meaningful thoughts.

Many, many happy returns!

Bob

Here's the inside.

Although here we are celebrating
for 2 weeks, today is not
your birthday. - Nontheless,

HAPPY BIRTHDAY!.

## Here's your birthday card.



# shoebox

HALLMARK APPROVED. SORTA.

Hallmark Cares
Visit hallmark.com/ourplanet

THIS CARD IS MADE WITH PAPER FROM
WELL-MANAGED FORESTS.



7 204737 2678 7

3.49
ZZB 640-3

© HALLMARK LICENSING, LLC
HALLMARK MARKETING COMPANY, LLC
KANSAS CITY, MO 64141
MADE IN U.S.A.

Visit hallmark.com/shoebox



Elyse

Please open the middle drawer on the left side of the credenza behind my desk. An envelope awaits.

Happy Birthday!

Bob

MAY

THIS YEAR

INSTILL IN YOU

A GENUINE SATISFACTION

IN EVERYTHING YOU

ALREADY ARE.

HAPPY BIRTHDAY

GOOD JUJU INK

SPREADING GOOD JUJU ONE ILLUSTRATION AT A TIME

WWW.GOODJUJUINK.COM

2/21/20

"I can not ask for a finer Friendship."

Bob

"Rare as is true love, true Friendship is rarer."

Jean de La Fontaine

Christmas 2020

Elyse

Some 50 years ago, as I set out to become a lawyer, my father "quiped" that I should study hard and become a judge. When I entered law school, he gave me this gavel. Even though I never became a member of the judiciary, I doubt he would be disappointed in my career.

Your career is well underway and opportunities abound for great achievements. Keep this gavel as a symbol of all that is required in the years to come: conscience, honor, courage, integrity and accuracy. Stand by your principles. Always be trustworthy.

My hopes for you know no limits.

Merry Christmas.

Bob

Elyse                                    Christmas 2020

A challenging year nears its end.
A better year awaits. I trust
a great Christmas will find its way

to you and Brandon. A happy new year
will follow. Cheers!!

Bob



7/23/2021

Elyse

These are very difficult times. We have shared a lot. I understand what you are going through. If you could have but a few thoughts, consider these: You are strong, you are determined, you are fair, you are conscientious and you are a bright and beautiful person

Never be afraid of the changes and challenges ahead. You may lose something good but you may also gain something even better.

You are a special person Elyse. I care. Probably too much. My feelings are genuine. I will never regret them, even as we now face different paths. I am very happy having you as my friend and sharing an incredible bond including mutual affection and extraordinary trust.

I will miss you.

Bob

8/20/2021   5:40 PM

Elyse

It is late. I've waited in hopes we could talk. It is your last day. After weeks of waiting, I am giving up hope.

I am sorry Elyse. For everything.

We now part. Separate paths await. You are remarkable. Extraordinarily bright and talented. An amazing career lies ahead. Great things are possible.

Although we have a common client, this is still goodbye. I pray you find what you seek, including joy, comfort and peace. I also hope happiness abounds throughout the years ahead.

Farewell Elyse.
Bob

For Children
by Zeppa Studios
printed in the U. S. A.



S E A S O N ' S   G R E E T I N G S !

11/1/2023

Elyse -

This is a sad but important note. I write to acknowledge the apparent demise of a friendship. Although I do not understand what has occurred, I accept your distance and respect your silence

I am sorry for everything and anything that has caused or contributed to this. I am crushed and hope for your understanding and forgiveness. To do so, I pray we can one day meaningfully address our respective issues and concerns.

Our work continues. It will be as it should be. We have always demonstrated the highest standards of professionalism. This will not change.

My commitment to you will also not change: if asked, I will help and assist you in any possible way. My support and endorsement is assured.

Crane Bob

# EXHIBIT 7

Jun 19, 2023 at 11:52 PM

I'm so very sorry. I obviously screwed up once again.

I will now move on and leave you forever alone as well as everything between us in the past.

Please find an eventual path to forgive me.

Jun 20, 2023 at 7:27 AM

Bob, I am still processing everything.

What time are you headed downstairs?

I tried to finally apologize in person. It was important to me. I failed.

I am in 2 in the meeting room.

What floor?

Yes, 2

Subject

iMessage

RR

Robert ›

Jun 22, 2023 at 6:19 PM

Forgive me, but is your day ending any better than it started?

Jun 22, 2023 at 11:59 PM

It hurts to be ignored.

Please do not answer. There is no reason to respond.

Bob. I was not ignoring you. My phone was dead.

Jun 23, 2023 at 5:52 AM

This has been a lonely and sad week. I should have kept these feelings to myself and I will not now argue about it.

I hoped this time together would strengthen a friendship that is very important to me. Time has not allowed that. I suppose that is my fault.

I will keep trying.

Subject

iMessage

Jun 23, 2023 at 8:50 PM

Are you in the banquet room or upstairs?

Banquet room

I am staying here until you leave.

Did you leave?

I left to take a personal call.

Larry told me. I can't see you.

Ah understood.

Where are you?

Oh no, Elyse. You have scared the shit out of me.

When you are packed, will you talk to me? I will help. I am next-door.

Please.

Please don't be alone, Elyse.

Subject

iMessage

Oh no, Elyse. You have scared the shit out of me.

When you are packed, will you talk to me? I will help. I am next-door.

Please.

Please don't be alone, Elyse. There are so many positive things from this past week. You should consider that rather than your wounds. You are really

tonight, and I want to do whatever I can for you. This is not about me; it is only about you. Let me, please.

Don't shut me out when I can't help

Can help

The conference room door is propped open

I cannot do nothing. I am about to call. Please answer.

I cannot do nothing. I am about to call. Please answer.

Bob, I need space.

Will you change your mind?

My last request: please talk to me. I will be available no matter the time.

Jun 24, 2023 at 6:47 AM

Good morning, Elyse.

I am not sure what is going on. Although I have a good idea, I would like to know one thing: am I the problem or the source of your pain yesterday and today?

I know you may choose not to respond. That is ok and I will not text further.

I trust you have made it to your gate and that you are all set. Safe travels.

Subject

iMessage

Jun 28, 2023 at 6:55 AM

Good morning, Elyse. A friend would like to say hello. Perhaps a 2–3 minute call might work today?

Jun 28, 2023 at 7:29 PM

I do not know what has occurred, how I may have hurt you or what mistakes I have made. However, some thing is wrong. Your continued silence confirms this.

I do not know what to do. It is probably best that I do nothing further and simply let you be.

No matter what it is, I am very sorry, Elyse.

Jul 4, 2023 at 8:30 AM

Good morning and Happy 4th.

I hope you are doing ok. I may be a clueless, idiot knucklehead POS but I care.

Jul 14, 2023 at 8:50 AM

Subject

iMessage 🎤

# EXHIBIT 8

| | |
|---|---|
| **From:** | Elyse McKenna <emckenna@olsmanlaw.com> |
| **Sent:** | Saturday, February 3, 2024 3:57 PM |
| **To:** | Donna MacKenzie; Emily Peacock |
| **Cc:** | Jules B. Olsman |
| **Subject:** | Confidential Employment Matter |

All,

As discussed over the last few weeks, I have been holding off on a claim involving Bob Riley and the sexual harassment I have experienced working with him, out of concern for my employment here.

Donna, you said on the 22nd, and on the 25th, that I could proceed against Bob, you would not stand in the way, and so I have done so. Specifically, I've now addressed claims to him through counsel under Elliott-Larsen in confidence. I'm sure you understand that *his* reputation as well as *mine* call for this to be kept a confidential matter between us at least until we know if a suit will be filed. That said, this all affects my employment here, so I wanted to let you know.

We should also discuss how this affects our relationship going forward. While I have every intention of serving clients well, the strain within the firm of all of this has not been healthy. I do feel retaliated against for expressing facts about Bob's behavior towards me back in August of 2021 and re-raising it throughout last year, including over the summer when I was at the ███ conference, and most recently on January 22nd and 25th of this year. I do not see that improving with claims or a suit pending against Bob, especially given the close business relationship and ties that Bob has with the firm and with each of you.

But this is a professional setting, and we are attorneys, and I think we should work this out in a reasonable, positive way. If terms can be worked out satisfactorily, I will separate and we can agree to disagree and move forward. I will send you what I suggest within 48 hours.

I hope one day the culture of law firms everywhere and without exception is one in which women can speak their truth and receive support rather than retaliation.

**Elyse L. McKenna** | Attorney
Olsman MacKenzie Peacock & Wallace
2684 West Eleven Mile Road
Berkley, MI 48072
Direct: (248) 983-5604
General: (248) 591-2300
emckenna@olsmanlaw.com
(Please note my updated email address.)



**PL00252**

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**ELYSE MCKENNA**,

        Plaintiff,

v.

**ROBERT F. RILEY,** *an individual,*
**RILEY & HURLEY, P.C.** *a domestic*
    *professional corporation,*
**OLSMAN, MACKENZIE,**
**PEACOCK, P.C.** *a domestic professional*
    *corporation,*
Defendants.

Case No: 24-cv-12347
Hon. Judge Brandy R. McMillion

**DEFENDANT OMP'S RESPONSE TO PLAINTIFF'S MOTION TO DISQUALIFY DEFENDANT OLSMAN MACKENZIE PEACOCK, P.C.'S COUNSEL**

---

Kathleen J. Kalahar (P60301)
1394 East Jefferson Avenue
Detroit, MI 48207
(313) 567-6165 (office)
(248) 310-0133 (mobile)
(313) 567-4827 (facsimile)
kkalahar@goodmankalahar.com
**Attorney for Plaintiff**

**DEBORAH GORDON LAW**
Deborah L. Gordon (P27058)
Elizabeth Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com
**Attorneys for defendant Olsman, MacKenzie, Peacock & Wallace, P.C.**

**Kienbaum Hardy Viviano Pelton & Forrest, P.L.C.**
Elizabeth Hardy (P37426)
Thomas J. Davis (P78626)
280 North Old Woodward Avenue, Suite 400
Birmingham, MI 48009
(248) 645-0000
ehardy@khvpf.com
tdavis@khvpf.com
**Attorneys for Defendants Robert F. Riley and Riley & Hurley, P.C.**

## <u>INDEX OF EXHIBITS</u>

Ex. 1        Deborah L. Gordon Affidavit

Ex. 2        Teresa D'Costa Intake Notes

Ex. 3        Instagram Post

Ex. 4        Website Blog Post

Ex. 5        Website Statement as to McKenna's Location, Page 2

Ex. 6        Teresa D'Costa Affidavit

Ex 7         Unpublished Cases

# EXHIBIT 10

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**ELYSE MCKENNA**,

        Plaintiff,

v.

Case No: 24-cv-12347
Hon. Judge Brandy R. McMillion

**ROBERT F. RILEY,** *an individual,*
**RILEY & HURLEY, P.C.** *a domestic*
  *professional corporation,*
**OLSMAN, MACKENZIE,**
**PEACOCK, P.C.** *a domestic professional*
  *corporation,*
Defendants.

| | |
|---|---|
| Kathleen J. Kalahar (P60301)<br>1394 East Jefferson Avenue<br>Detroit, MI 48207<br>(313) 567-6165 (office)<br>(248) 310-0133 (mobile)<br>(313) 567-4827 (facsimile)<br>kkalahar@goodmankalahar.com<br>**Attorney for Plaintiff** | **DEBORAH GORDON LAW**<br>Deborah L. Gordon (P27058)<br>Elizabeth Marzotto Taylor (P82061)<br>Sarah Gordon Thomas (P83935)<br>33 Bloomfield Hills Parkway, Suite 220<br>Bloomfield Hills, Michigan 48304<br>(248) 258-2500<br>dgordon@deborahgordonlaw.com<br>emarzottotaylor@deborahgordonlaw.com<br>sthomas@deborahgordonlaw.com<br>**Attorneys for defendant Olsman, MacKenzie,**<br>**Peacock, P.C.**<br><br>**Kienbaum Hardy Viviano**<br>**Pelton & Forrest, P.L.C.**<br>Elizabeth Hardy (P37426)<br>Thomas J. Davis (P78626)<br>280 North Old Woodward Avenue, Suite 400<br>Birmingham, MI 48009<br>(248) 645-0000<br>ehardy@khvpf.com<br>tdavis@khvpf.com<br>**Attorneys for Defendants Robert F. Riley and**<br>**Riley & Hurley, P.C.** |

## <u>AFFIDAVIT OF TERESA D' COSTA</u>

STATE OF MICHIGAN      )

                               ) ss:

COUNTY OF OAKLAND     )

I, Teresa D' Costa, first being duly sworn on oath, state as follows:

1.      I am an administrative legal assistant at Deborah Gordon Law.

2.      I have no knowledge of a call from Elyse McKenna on February 5, 2024.

3.      On February 6, 2024 a call came in to the office from Elyse McKenna, which I answered.

4.      When I answered Ms. McKenna's call on February 6, 2024, I performed our intake process, in which I ask the caller the following questions: Caller's full name, phone number, email address, employer name, title held at the company, how long have they been at the company, if they are currently employed, salary, and a brief description of their situation, for example, whether an employment action has been taken against the caller, and what they believe the reason is.

5.      Our intake process is designed to be brief, provide basic information, and avoid discussion of irrelevant information, including a caller's thoughts, feelings, and other irrelevant details.

6.      The notes that I took summarizing the information I obtained from McKenna during the February 6, 2024 call are attached as Ex. 2.

2

7.      I do not recall learning any facts or information during the February 6, 2024 call that are not contained in my notes. Ex. 2.

8.      In particular, McKenna did not tell me she had already retained legal counsel to represent her. This would have been important information as part of intake.

9.      I did not give Ms. McKenna legal advice of any kind, as I am not an attorney and have no prior legal background.

FURTHER DECLARANT SAYETH NOT.

_____    3/26/25_____

Teresa D' Costa

DORA R KOSKI
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF OAKLAND
My Commission Expires May 29, 2031
Acting in the County of _Oakland_

Dora R. Koski 3/26/25

3

EXHIBIT 11

**verizon**

Account: ▮▮▮▮▮▮▮▮
Invoice: ▮▮▮▮▮▮
Billing period: Jan 29 - Feb 28, 2024

## Talk activity (cont.)

### Judith McKenna
▮▮▮▮▮▮▮

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|---|---|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Feb 5 | 9:05 AM | 248-258-2500 | Hazel Park, MI | Birmingham, MI | 2 | -- | -- | -- |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Feb 5 | 10:18 AM | 248-258-2500 | Hazel Park, MI | Incoming, CL | 5 | -- | -- | -- |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

**verizon**

**Account:** ███████████
**Invoice:** ████████
**Billing period:** Jan 29 - Feb 28, 2024

## Talk activity (cont.)

### Judith McKenna
███████████

| Date | Time | Number | Origination | Destination | Min. | Airtime Charges | LD/Other Charges | Total |
|------|------|--------|-------------|-------------|------|-----------------|------------------|-------|
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| Feb 6 | 3:10 PM | 248-258-2500 | Birmingham, MI | Birmingham, MI | 30 | -- | -- | -- |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |
| ████ | ████ | ████████ | ████████ | ████████ | █ | █ | █ | █ |