## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ELYSE MCKENNA,

       Plaintiff,

v.

ROBERT F. RILEY, DONNA
MACKENZIE, RILEY &
HURLEY, PC, and
OLSMAN MACKENZIE
PEACOCK, PC,

       Defendants.

Case No. 24-cv-12347

Hon. Brandy R. McMillion
Magistrate Elizabeth A. Stafford

## PLAINTIFF'S *OMNIBUS* OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS UNDER RULE 37 SANCTIONS

Plaintiff opposes Defendants' motions to dismiss under Fed. R. Civ. P. 37 and alternative sanctions. Despite proceeding under a Joint Defense Agreement ("JDA"), Defendants Robert F. Riley, Olsman MacKenzie Peacock P.C. ("Olsman"), and Riley & Hurley P.C. (collectively "Defendants") filed two separate motions seeking the same relief: dismissal under Rule 37 and sanctions. The arguments and relief are largely identical and seek to paint legitimate and meritorious ongoing discovery disputes as Plaintiff and her counsel's "willful," "bad-faith" non-cooperation.

Defendants' motions advance a narrative that misrepresents facts and orders and mischaracterizes Plaintiff's continued compliance with this Court's directions.

Defendants' assertion that Plaintiff has produced no evidence to prosecute her case is baseless. Plaintiff produced 600 pages of discovery responses to Defendants in May 2025,  including but not limited to: love notes, explicit written admissions of guilt from Riley, evidence of continued contact from Riley despite his promise to leave Plaintiff alone, a recording of a conversation with Robert Riley relating to the shared client work, a recording of a conversation with the OMP partners during which Donna MacKenzie stated she would not stand in the way of Plaintiff confront Robert Riley, Plaintiff's correspondence to OMP relating to her protected activity, the termination letter she received in response, thousands of text messages, financial documents, contingent fee agreements between Elyse McKenna, personally, and clients prior to the formation of Fox McKenna, PLLC, records relating to the creation of Fox McKenna, PLLC, records showing Plaintiff resided in Maryland – and more.

**1**, Riley's Christmas 2019 Love Note to Plaintiff; **Ex. 2**, Plaintiff's Production of Riley's Handwritten Notes; **Ex. 3**, Riley's Admissions of Guilt; **Ex. 4**, Plaintiff's Written Notice of Retaliation Concerns to Olsman Partners; **Ex. 5**, Olsman's Termination Letter to Plaintiff.

Plaintiff established a *prime facia* case against Defendants before a stay was ever issued in this matter. At this point, Defendants seek to have this case dismissed, before the conclusion of discovery, in order to avoid having to litigate it on its merits. Defendants' tactics include abusive, harassing depositions of Plaintiff, threats and

insults aimed at her and her new counsel, and relentless manufactured discovery disputes in lieu of good faith conferral amongst counsel. Defendants' sanctions requests follow a familiar pattern: repetitive filings unsupported by facts or law. The mere volume of sanctions motions does not confer merit where none exists. Serial, unsupported requests for sanctions are improper and undermine the orderly administration of discovery.

As such, Plaintiff respectfully requests 1) the Court deny Defendants' motions to dismiss under Rule 37 as well as all alternative relief, 2) extend fact discovery to May 31, 2026, and 3) appoint a discovery master at Defendants' expense.

# TABLE OF CONTENTS

I.    STATEMENT OF FACTS ................................................................3

    A.    Defendants Harassed, Discriminated, and Retaliated Against Plaintif for Engaging in Protected Activity...........................................3

    B.    Joint Defense Agreement and the Initial Settlement Issues. ................6

    C.    Plaintiff filed her pro se lawsuit; Discovery mismanagement. .............9

    D.    Court Entered Stay for Plaintiff to Find New Counsel. ......................11

    E.    Plaintiff Retained Undersigned Counsel; Undersigned Counsel Entered Appearance. ..........................................................13

    F.    Plaintiff's Good-Faith Cooperation in Discovery and Substantial Compliance with Court Orders. ...........................................15

II.    ARGUMENT ................................................................20

    A.    Dismissal Under Rule 37 is Not Appropriate At This Time..............21

        1.    Factor One: Plaintiff has cooperated in good-faith throughout the discovery process and substantially complied with every Court order. ...............................22

        2.    Factor Two: Defendants have not been prejudiced. ...............25

        3.    Factor Three: No prior warnings have been issued regarding dismissal. ................................................28

        4.    Factor Four: Less drastic sanctions have not been imposed. ................................................30

    B.    Motions for Alternative Relief Are Also Unwarranted. .....................32

    C.    The Court Should Extend Discovery Deadline and Appoint a Discovery Master at Defendants' Expense. ........................................34

III.    CONCLUSION................................................................36

# TABLE OF AUTHORITIES

**Cases**

*Bass v. Jostens, Inc.*
  71 F.3d 237 (6th Cir. 1995) ...................................................................22

*Beil v. Lakewood Eng'g &Mfg. Co.*
  15 F.3d 546 (6th Cir. 1994) ...................................................................20

*Buck v. U.S. Dep't of Agric., Farmers Home Admin.*
  960 F.2d 603 (6th Cir. 1992) .................................................................20

*Carpenter v. City of Flint*
  723 F.3d 700 (6th Cir. 2013) .................................................................21

*Harmon v. CSX Transp.*
  110 F.3d 364 (6th Cir. 1997) ................................................... 20, 26, 29

*Kelmendi v. Hogan*
  2025 WL 2901498 (6th Cir. Oct. 7, 2025) ............................. 22, 24, 29

*O'Dell v. Kelly Servs., Inc.*
  334 F.R.D. 486 (E.D. Mich. 2020) ........................................................22

*Prime Finish, LLC v. ITW Deltar IPAC*
  608 Fed.Appx. 310 (6th Cir. 2015) ............................................. 24, 28

*Schafer v. City of Defiance Police Dep't*
  529 F.3d 731 (6th Cir. 2008) .................................................................24

*Thompkins v. GPS Sols., LLC*
  2025 WL 3243867 (E.D. Mich. Nov. 20, 2025) .................................24

**Rules**

Fed. R. Civ. P. 37 ............................................................... *passim*

## I.     STATEMENT OF FACTS

## A.     Defendants Harassed, Discriminated, and Retaliated Against Plaintif for Engaging in Protected Activity.

This action arises from Riley's longstanding and escalating sexual harassment toward Plaintiff and the subsequent termination and ongoing retaliation toward her for engaging in protected activity under the law. ECF No. 23, ECF No. 131-1. While employed at Riley's firm, Plaintiff was subjected to persistent and unwelcome conduct by Riley that escalated over time. As a result of this conduct, Plaintiff ultimately sought new employment so that she could leave Riley's firm. When Riley learned that Plaintiff intended to leave Riley & Hurley, PC, Riley proposed to Plaintiff that she should continue to work with him to represent one of his organizational clients ("shared client"). Plaintiff joined the Olsman law firm ("OMP"). Prior to beginning employment, Plaintiff informed Donna MacKenziethat Riley had been harassing her for several years. Plaintiff subsequently confronted Riley and informed him that she would no longer work with him on the shared client despite his request, and demanded that his inappropriate conduct cease. Riley acknowledged his conduct and admitted wrongdoing on multiple occasions, assuring Plaintiff that he would leave her alone. Riley informed McKenna he was stepping down from the shared client, to allow her to continue the work without his involvement.

3

Plaintiff then informed MacKenzie that she had confronted Riley directly, informed him that she would no longer work with him on the shared client despite his request, and demanded that the inappropriate conduct cease. In response, Riley informed her that he would step down from working for the shared client instead. Ultimately, there was an agreement that Plaintiff alone would represent the shared client.

Despite these assurances, Riley did not stop harassing McKenna; nor did he discontinue his representation of the shared client. Unbeknownst to Plaintiff, Riley extended deadlines with the shared client and engaged in behind-the-scenes communications designed to maintain access to Plaintiff and to preserve influence over her professional relationships and career trajectory. These actions fostered division and tension between Plaintiff and her colleagues at OMP and undermined her professional standing. Plaintiff continued to discuss Riley's inappropriate conduct with MacKenzie. Plaintiff and her then-husband Brandon Heid discussed the matter in detail with MacKenzie and her husband. Plaintiff informed Emily Peacock of Riley's inappropriate behavior as well.

After Plaintiff's divorce, Riley's conduct escalated further. Riley renewed his pursuit of her and engaged in increasingly troubling behavior, including stalking and coercive conduct at professional conferences. Among other things, Riley sought to

4

be in close proximity to Plaintiff, requiring her to share adjoining hotel rooms[1], ordering her to appear for "meetings" with the shared client, who never showed up, as an opportunity to "wait" for hours with her alone in  in a conference room;  and repeatedly attempting to reestablish a personal relationship despite Plaintiff's express statements that she wanted him to leave her alone. Riley emotionally manipulated her during these encounters, including by crying and stating that his life was "over." Plaintiff communicated these incidents and concerns to OMP through its partners who took no corrective action.

As the situation continued to deteriorate and Plaintiff's fears for her safety became more urgent, Plaintiff began looking for counsel in late summer of 2023 to confront Riley. Recognizing that engaging in this protected activity could create a perceived conflict for her employer, she proactively informed OMP of her intentions. On February 3, 2024, Plaintiff emailed the OMP partners and stated that she feared retaliation for engaging in protected activity against Riley and wished to resolve the situation professionally. To that end, Plaintiff offered to enter into a mutual separation that would allow all parties to avoid escalation and preserve professional relationships. The next day, Olsman declined Plaintiff's proposal and terminated Plaintiff's employment effective immediately.

---

[1] In Orlando, Plaintiff and Riley shared executive suite hotel rooms with a shared conference room.

Plaintiff's claims are supported by contemporaneous communications, admissions by Riley, internal firm communications, and documentary evidence Plaintiff has produced to date, along with hundreds of documents that are within Defendants' possession, custody, or control that they have not produced. The documents produced by Plaintiff collectively corroborate Plaintiff's account of harassment, retaliation, and wrongful termination. Plaintiff looks forward to Defendants' full and complete production of their own responsive documents, and will seek a spoliation instruction if such are not produced.

**B.      Joint Defense Agreement and the Initial Settlement Issues.**

Following Plaintiff's termination, Defendants began coordinating their legal strategy in a manner that was not disclosed to Plaintiff, materially affecting Plaintiff's ability to resolve her claims. On or about February 26, 2024, Defendants entered into a JDA, but this wasn't disclosed to Plaintiff until twenty months later despite being requested in May of 2025. **Ex. 6**, Oct. 31, 2025 Olsman's Response to Plaintiff's Requests to Produce, p. 12 at No. 24. That agreement has clearly governed Defendants' coordinated legal strategy and aligned their interests in responding to Plaintiff's claims throughout pre-litigation leading into discovery management at this present moment. Tellingly, Defendants did not disclose the existence of the JDA to Plaintiff until October 31, 2025, at which point Defendants Olsman's discovery

6

responses were overdue by **months** and ultimately were only produced after Plaintiff's current counsel demanded their production.

Prior to this disclosure, Plaintiff was of the understanding that Defendants were proceeding independently. This concealment materially prejudiced Plaintiff in her pre-litigation settlement decisions. Riley conditioned any pre-litigation resolution on strict confidentiality terms that would have prohibited Plaintiff from discussing the underlying facts of her claims. It was clear that these confidentiality terms would prevent Plaintiff from separately mediating or resolving her claims with Olsman – therefore Plaintiff could not pursue mediation without violating such terms.

Plaintiff and Riley ultimately reached a proposed settlement agreement on or around February 11, 2024. However, after the material terms had been negotiated, Riley unilaterally altered the agreement to include provisions that fundamentally changed its character and value. These changes included but are not limited to: requiring Plaintiff to indemnify Olsman (understandable in light of their JDA) but refusing to provide any additional consideration for such; mandating that Plaintiff provide a list of all individuals that she had told about Riley's conduct;  requiring liquidated damages in the amount of 20% of the Settlement for each individual to whom Plaintiff had previously disclosed the underlying events; and insisting on installments instead of a lump-sum payment.

7

These unilateral and surprising modifications illustrate Riley's continued need to control Plaintiff and influence her career and her future, and hindered her ability to be free of him once and for all (all she had wanted since leaving employment at Riley & Hurley).  Nonetheless, Plaintiff spent the following seven months trying to negotiate a settlement with Robert Riley in order to avoid filing this lawsuit.

Defendants' concealment of their JDA continues to prejudice Plaintiff. Despite their joint posture, Defendants sought two separate seven-hour depositions from the Court and represented that the depositions were necessary as the parties were independent from one another, and they would be seeking bifurcation of the case on that basis at a later date. As Defendants acting under a JDA, the Riley Defendants and OMP should have 1) coordinated to take one seven-hour deposition of Plaintiff and 2) returned to the Court with a showing of good cause for additional time. Instead, Defendants concealed their JDA from the outset and secured fourteen hours to depose Plaintiff. Now, Defendants seek a total of eight additional hours to depose Plaintiff on the record once again.

Defendants have never been, and continue to not be, separate from one another – as they are actively coordinating their defense with one another and there are overlapping facts relating to all Defendants.  Unfortunately, Defendants' concealed

and coordinated strategy has resulted in vexatious litigation, and duplicative motion practice, as evidenced by Defendants' motions for dismissal under Rule 37.

### C. Plaintiff filed her pro se lawsuit; Discovery mismanagement.

On September 9, 2024, Plaintiff initiated this lawsuit pro se, prior to retaining counsel. ECF No. 1. Shortly thereafter, Plaintiff was approached by attorney Kathleen Kalahar, who expressed interest in representing Plaintiff. Plaintiff retained Ms. Kalahar as lead counsel. However, following Ms. Kalahar's appearance, the parties failed to establish foundational discovery frameworks, including a workable protocol for electronically stored information ("ESI"). ECF No. 38. In particular, no agreed-upon protocol was reached governing search terms, custodians, scope, or production format for electronically stored information. This fact has prejudiced all parties from producing ESI discovery in a proportional, cooperative way.

In the absence of such a framework, Defendants declined to narrow discovery parameters and refused to meaningfully limit search terms with prior or current Plaintiff's counsel. **Ex. 7**, Correspondence from Prior Counsel Regarding ESI. Simultaneously, they unilaterally limited their own custodians and search terms. This is a departure from the Sedona Principles that Defendants cite in their own Discovery Responses. **Ex. 8**, Riley Discovery Responses; **Ex. 9**, Olsman Discovery Responses. Defendants maintained broad and expansive discovery positions and declined proposals to tailor discovery in a proportional manner.

During this period, however, Plaintiff's mobile device was imaged by a third-party vendor and Plaintiff has paid a monthly fee to preserve all ESI on their servers in through an adequate chain of custody. Acting on advice of prior counsel, Plaintiff produced message threads for ten identified contacts. Communication from those custodians has been produced (Judy McKenna, Claire McKenna, Caitlin Barrett, Parker Stinar, Steven Hurbis, Robert Riley, Donna MacKenzie, Emily Peacock, Jules Olsman, and Sonia Mullins). Prior counsel made the decision not to conduct a broader extraction and search, which would have required a substantially larger data pull and incurred significant additional cost—estimated at tens of thousands of dollars.

Defendants were not satisfied with the scope of this production, but refused to identify what text messages they sought from Plaintiff. Instead of identifying specific custodians and search terms, Defendants sought all "outstanding" ESI without putting forth a supplemental discovery request and continued to contend that Plaintiff's production is incomplete, again pounding the table with their requests for sanctions. The scope discrepancy reflects decisions made by Ms. Kalahar regarding the breadth of the extraction and production, which Defendants' counsel were well-aware of. Undersigned counsel cannot speak to the basis for those decisions and did not participate in them.

As discovery disputes escalated, Defendants continued to threaten prior counsel with sanctions. **Ex. 10**, Confidential Attorney-Client Communications. Shortly thereafter, Ms. Kalahar withdrew from representation. The Riley Defendants subsequently proposed that the parties mutually dismiss their respective claims. OMP proposed that they would not seek attorneys' fees if Plaintiff dismissed her case.

Despite Defendants' representation in their motions, to date, no party has articulated or identified the reason for Ms. Kalahar's withdrawal. Plaintiff has not been provided an explanation for prior counsel's resignation, and Defendants possess no personal knowledge regarding the basis for that decision.

### D. Court Entered Stay for Plaintiff to Find New Counsel.

Following prior counsel's withdrawal, the Court granted a 60-day stay of discovery to allow Plaintiff time to retain new counsel. In doing so, the Court also ordered prior counsel to cooperate in the transition to successor counsel. The Court extended the stay to all parties to prevent prejudice and to preserve the orderly administration of the case.

When the Court granted prior counsel's withdrawal, the Court also instructed Plaintiff to re-execute releases that she had previously executed, and rescinded upon her attorneys' withdrawal, for her mental health records dating back to 2019. Pursuant to the Court's Order, Plaintiff re-executed identical releases and promptly

11

provided them to Defendants. Defendants then accused Plaintiff of doctoring the releases. In support of this accusation, Defendants' counsel produced releases to Plaintiff dating back to 2015 that were different from the releases Plaintiff had signed. Plaintiff reached out to her prior counsel to ask for clarification as to why Defendants were in possession of signed releases that she never signed dating back to 2015, rather than 2019. **Ex. 10**, Confidential Attorney-Client Communications. The Court ultimately ordered Plaintiff to sign Defendants' version of releases, dating back to 2015. Defendants now use this to argue that Plaintiff has routinely violated court orders.

Please see attached correspondence, being submitted under seal, in which Plaintiff  sent her then-counsel executed releases in May of 2025 dating back to January 2019 rather than 2015, and Plaintiff's subsequent correspondence to her prior counsel asking why Defendants' counsel was in possession of releases she never signed. Plaintiff did not violate this Court's order when she re-executed releases she had previously signed and provided to her counsel.

During the stay, Plaintiff actively worked to retain new counsel. Recognizing the continued difficulty of securing replacement counsel within the initial stay period, Plaintiff requested a 30-day extension of the discovery stay. The Court granted that request.

In its order, the Court advised Plaintiff that if she did not either (1) obtain new counsel or (2) enter an appearance pro se by September 25, 2025, the case would be dismissed for failure to prosecute.

Plaintiff complied with the Court's directive.

Prior to September 25, 2025, Plaintiff retained Kimberly Russell as new lead counsel. Because Ms. Russell was not yet admitted to practice before this Court and required both admission to the Eastern District of Michigan and the retention of local counsel, Plaintiff entered a pro se appearance on September 25, 2025 to ensure compliance with the Court's order and avoid dismissal. There have been no further warnings or contemplation of dismissal since the Court's September 5, 2025 Order which Plaintiff complied with.

### E.    Plaintiff Retained Undersigned Counsel; Undersigned Counsel Entered Appearance.

On or about that same date, Ms. Russell notified the Court and defense counsel that she had been retained, that she was in the process of securing admission to this Court, and that local counsel would be entering an appearance. The Court directed Ms. Russell to complete the admission process and enter an appearance by a specified date and instructed the parties to confer.

Ms. Russell immediately undertook the required steps. She obtained admission to the Eastern District of Michigan and filed a notice of substitution of

13

counsel on October 8, 2025. Plaintiff thereafter retained local counsel, Keith Altman, who entered an appearance on November 11, 2025. A third co-counsel, Sammy Brown, entered an appearance on December 8, 2025.

At all times relevant to the discovery stay and substitution of counsel, Plaintiff complied with the Court's orders, acted diligently to retain representation, and took affirmative steps to ensure the case proceeded without dismissal or undue delay. On October 10, 2025, Undersigned Counsel met with Defense Counsel. Undersigned Counsel made clear that her style is to collaborate. At this time,  she also asked Defendants to agree to a short time to allow Undersigned Counsel to familiarize herself with the case.

In this meeting, Undersigned Counsel also identified the deficiency in ESI protocol and asked for the parties to come to terms on this. Undersigned Counsel also made clear to Defense Counsel that Plaintiff had her phone imaged and that ESI was stored somewhere in a safe chain of custody. Defendants have not done anything similar. This is concerning because there are issues of spoliation concerning evidence – particularly in Riley's control. Riley has never produced the photographs from his iPad of Plaintiff; nor has he produced text messages with his former law partner William Hurley.

14

**F.     Plaintiff's Good-Faith Cooperation in Discovery and Substantial Compliance with Court Orders.**

Since Plaintiff retained new counsel and the Court resumed discovery, Plaintiff and her counsel—Kimberly Russell, Keith Altman, and Sammy Brown—have substantially complied with each and every discovery order issued by this Court, acting diligently and in good faith at every stage.[2]

Following the October 23, 2025 status conference, the Court issued a detailed discovery order on October 24, 2025, setting forth specific obligations and deadlines for the parties. ECF No. 99. Plaintiff complied with that Order. Most notably by: timely producing substantial amounts of ESI by the Court's November 24, 2025 deadline; appearing for two depositions as ordered; sitting for approximately fourteen (14) hours on the record; identifying her medical and mental health providers; and executing 14 HIPAA authorizations by the deadlines imposed. Each time the Court later ordered additional authorizations, Plaintiff executed and produced them without delay.

---

[2] Notably, although Plaintiff is represented by three counsel of record. Yet, Defendants seek sanctions only against lead counsel, Ms. Russell. Defendants do not contend that co-counsel engaged in sanctionable conduct, nor do they explain why sanctions would be appropriate against one attorney but not the others participating in the same discovery process. This selective targeting is consistent with Defendants' broader pattern of repeated discovery abuse and threats of sanction rather than good--faith conferral. Ex. 14, Threats of Sanctions Correspondence. Rule 37 is not a vehicle for discouraging representation or manufacturing leverage through personal attacks on counsel. Defendants' approach underscores the punitive—rather than remedial—nature of their sanctions request.

Particularly concerning ESI, Plaintiff has produced over ***30,000 text messages*** culled from 140,000 messages with no search terms to Riley, including no less than 15,000 text messages between herself and Riley. Plaintiff herself spent no less than two hundred hours on reviewing and culling text messages.

Plaintiff has additionally produced discovery material from ***nearly thirty custodians***. In contrast, Riley has produced a mere ***fourteen custodians*** and ***less than five hundred text messages*** (outside of his production of messages with Plaintiff). Riley has failed to produce any text messages whatsoever with his former law partner, William Hurley.

Many of the thirdparty custodian messages lack evidentiary value as it relates to the instant case. Of the thirty-two custodians listed in Riley's Rule 26(a)(1) initial disclosure, material from only six custodians (one of which is Plaintiff herself) has been provided to Plaintiff. In response to this, Plaintiff served Riley with supplemental discovery demands asking for specific ESI from each of the custodians identified in Riley's Initial Disclosures. **Ex. 11**, Jan. 8, 2026 Plaintiff's Supplemental Discovery Demands to Riley. It cannot be understated for the Court: no comparable, specific demands have ever been served from the Riley Defendants on Plaintiff beyond sweeping "production is deficient." Instead, Defendants issued 20 subpoenas on the eve of the ESI deadline to third parties listed on Plaintiff's Initial Disclosures. Defense Counsel has strategically used these last-minute subpoenas issued to third

parties to paint Plaintiff as obstructionist but at no point has Defense Counsel ever specific demanded ESI from these parties.

Defendants further assert that Plaintiff is obstructionist due to her repeated objections in the area of privilege. Throughout this matter, Defendants have manipulated the line of privilege when it comes to attorney-client matters, medical and therapy records, and marital communications. These are the only issues of concern Plaintiff has raised with respect to privilege, including disputes relating to non-treater Gemma Haynes, which remain pending before the Court and are the subject of separate legal briefing. Even then, Plaintiff raised privilege concerns narrowly and in accordance with the Court's directives.

Plaintiff's compliance efforts and production history were summarized for the Court in advance of the December 8, 2025 status conference in Plaintiff's Summary of Discovery Disputes, which detailed Plaintiff's compliance on a point-by-point basis and rebutted Defendants' accusations of noncompliance. **Ex. 12**, Dec. 6, 2025 Plaintiff's Letter Brief to the Court.

And while Plaintiff complied with her deposition obligations, Defendants did not reciprocate. During the same period in which Plaintiff sat for two lengthy depositions, Plaintiff sought to depose Defendants and to move forward with party discovery. Defendant Riley sat for his deposition, but refused to answer any questions regarding his family. Riley's counsel instructed him not to answer

17

questions about his wife on the basis of marital privilege, his son who is an attorney on the basis of attorney client privilege, and his other son on the basis of relevance. Moreover, Defendant Riley's counsel interrupted the deposition when Plaintiff's counsel had questions posed, presumably to coach their client.

Furthermore, Defendants obstructed the notice of party depositions by refusing for weeks to provide dates for depositions despite repeated requests; moved to quash a Rule 30(b)(6) deposition that the Court had indicated should proceed; failed to provide a Rule 30(b)(6) date or designation by the deadline ordered by the Court in December. To date, Olsman still has not provided a Rule 30(b)(6) witness or designation.

Instead, Defendants insisted that all Olsman party depositions be moved outside of fact discovery, a request that severely prejudices Plaintiff by foreclosing supplemental written discovery and follow-up discovery that would ordinarily flow from party testimony. Throughout this period, Defendants have refused to engage in meaningful meet-and-confer efforts. Since October, Plaintiff's counsel has exchanged hundreds of discovery-related emails with defense counsel, yet the parties have only spoken by phone three times, mostly in Court-ordered settings. Plaintiff's counsel has repeatedly attempted to schedule calls to resolve disputes, including as recently January 12, 2026. **Ex. 13**, Jan. 12, 2026, Email Correspondence Concerning Deposition Scheduling. Defendants have refused to meet and confer,

18

declined to reschedule calls, and have now refused to produce a party witness—William Hurley—based solely on the need to reschedule a deposition.

Despite Defendants' refusal to confer, failure to produce witnesses, and repeated escalation of disputes, Plaintiff has continued to comply with Court orders, respond to discovery, and participate in the process in good faith. At every stage, Plaintiff has acted to move discovery forward, while Defendants have multiplied disputes, delayed their own discovery obligations, and created the very inefficiencies they now cite in support of sanctions.

Plaintiff and her counsel have acted diligently, cooperatively, and in substantial compliance with every order of this Court, while Defendants have repeatedly escalated disputes, resisted reciprocal discovery, and sought punitive relief untethered from any actual prejudice. This case has not broken down because of obstruction by Plaintiff; it has broken down because discovery has proceeded without a workable framework, meaningful conferral, or structural oversight. Accordingly, Defendants' motions for sanctions should be denied. To restore order and ensure discovery proceeds efficiently and fairly, the Court should extend fact discovery through May 31, 2026, appoint a discovery master to oversee and resolve ongoing disputes, and require Defendants—who seek extraordinary sanctions and have multiplied discovery conflicts—to bear the costs of that appointment. This

proportional, corrective relief will return the case to a sustainable path toward resolution on the merits.

## II.    ARGUMENT

Defendants' motions for sanctions function as an improper motion to dismiss—or, alternatively, a premature motion for summary judgment—disguised as a discovery dispute. Rather than identify sanctionable conduct that warrants dispositive relief under Rule 37, Defendants repeatedly argue that Plaintiff's claims lack merit, that her evidence is insufficient, and that her allegations should not survive adjudication. That is not the purpose of Rule 37. Discovery sanctions exist to address noncompliance with court orders, not to resolve contested factual questions or terminate claims that turn on credibility and disputed evidence.

Plaintiff has established a *prima facie* case under the Elliott-Larsen Civil Rights Act for sexual harassment and retaliation. As set forth in the statement of facts, the record already contains substantial evidence supporting Plaintiff's claims, including contemporaneous communications evidencing Riley's conduct and the circumstances surrounding Plaintiff's termination by Olsman shortly after she engaged in protected activity. These materials—together with Plaintiff's testimony and the termination documentation—demonstrate the existence of material factual disputes that cannot be resolved through sanctions motion practice. At a minimum,

they confirm that this case is "very much alive" and proceeding toward adjudication on the merits.

Defendants are not litigating in the dark. They know the claims asserted, the theory of liability, and the core evidence supporting Plaintiff's case. Discovery has been ongoing, Plaintiff has produced substantial materials, and Defendants have examined Plaintiff extensively under oath. If Defendants believe the record ultimately does not support Plaintiff's claims, the Federal Rules provide a clear mechanism for that challenge: a properly supported motion for summary judgment after discovery closes. Rule 37 is not a substitute for Rule 56, and it cannot be used to avoid litigating disputed civil rights claims on their merits.

Because Defendants' motions seek dispositive relief without satisfying the standards governing dismissal or summary judgment, the motions should be denied. Discovery should proceed to its conclusion, and the case should be resolved through the ordinary application of the Federal Rules, not through premature termination under the guise of sanctions.

### A.    Dismissal Under Rule 37 is Not Appropriate At This Time.

"Dismissal is the sanction of last resort. It should only be imposed if the court concludes that the party's failure to cooperate in discovery was willful, in bad faith, or due to its own fault." *Beil v. Lakewood Eng'g &Mfg. Co.*, 15 F.3d 546, 552 (6th Cir. 1994). The Sixth Circuit is "extremely reluctant to uphold the dismissal of a

case… merely to discipline an errant attorney because such a sanction deprives the client of [her] day in court." *Harmon v. CSX Transp.*, 110 F.3d 364, 367 (6th Cir. 1997) (quoting *Buck v. U.S. Dep't of Agric., Farmers Home Admin.*, 960 F.2d 603, 608 (6th Cir. 1992)).

In determining whether dismissal is warranted under Fed. R. Civ. P. 37, courts in this district must consider four factors: 1) whether the failure to cooperate in discovery was due to willfulness, bad faith, or fault; 2) whether the adversary was prejudiced by the failure to cooperate; 3) whether the party was warned that failure to cooperate could lead to dismissal; and 4) whether less drastic sanctions were imposed or considered before dismissal was ordered. *Harmon* at 366-367.

No single factor is dispositive. However, dismissal is improper where the record does not demonstrate contumacious conduct, meaningful prejudice, or a clear explanation as to why lesser sanctions would be ineffective. Courts must explicitly consider proportional alternatives before imposing the ultimate sanction of dismissal including: additional time for discovery and evidentiary limitations. Here, dismissal is inappropriate because Plaintiff has cooperated in discovery, complied with every order issued by this Court, and has not demonstrated contumacious conduct.

1.   **Factor One: Plaintiff has cooperated in good-faith throughout the discovery process and substantially complied with every Court order.**

22

The most critical consideration in determining whether dismissal is appropriate under Rule 37 is whether the party's alleged failure to copper in discovery was the result of willfulness, bad faith, or fault. There must be a clear record of delay or stubbornly disobedient conduct. *Carpenter v. City of Flint*, 723 F.3d 700 (6th Cir. 2013) (finding dismissal for failure to prosecute was an abuse of discretion because counsel's conduct did not demonstrated a clear record of contumacious conduct warranting dismissal). Delays attributable to logistical challenges, evolving discovery positions, good-faith disagreements, or counsel error do not satisfy this standard. *Id*. Because willfulness and bad faith are central to the Rule 37 inquiry, the absence of such findings is fatal to a request for dismissal.

Olsman's willfulness argument fails because it rests on a false equivalence between this case and Sixth Circuit decisions involving repeated, unexcused defiance of discovery orders. Unlike the plaintiffs in *Kilmendi*, *Bass*, or *O'Dell*, Plaintiff has not refused to comply with Court-ordered discovery. *Kelmendi v. Hogan*, 2025 WL 2901498 (6th Cir. Oct. 7, 2025) (plaintiff never produced medical authorizations); *Bass v. Jostens, Inc.*, 71 F.3d 237 (6th Cir. 1995) (plaintiff failed to be deposed); *O'Dell v. Kelly Servs., Inc.*, 334 F.R.D. 486 (E.D. Mich. 2020) (motion seeking dismissal denied).[3] To the contrary, Plaintiff has executed every HIPAA

---

[3] In its motion, Olsman states that *O'Dell* was a dismissed due to the plaintiff's disregard for an order compelling production of document. Dismissal in this matter was actually denied.

authorization ordered by the Court, on every deadline, including authorizations for fourteen providers at the first deadline alone, and has continued to sign additional authorizations whenever ordered.

The only disputes that remain concern narrow and unresolved questions of privilege—most notably relating to Gemma Haynes—which are currently before the Court and cannot be recast as contemptuous conduct. Olsman's attempt to attribute alleged deficiencies to Plaintiff conflates prior counsel's actions with Plaintiff's conduct and ignores Plaintiff's substantial compliance since substitution of counsel. This record bears no resemblance to the "clear pattern of delay" or stubborn disobedience required to establish willfulness or bad faith under Rule 37.

The Riley Defendants present a willfulness narrative that similarly collapses under further scrutiny. Plaintiff has produced extensive text message communications, including threads for numerous witnesses identified in her disclosures, and Defendants have never defined what specific ESI they contend remains "outstanding." Despite repeated efforts by both prior and current counsel, Defendants have refused to agree on custodians, search terms, date ranges, or production format, instead relying on vague accusations untethered to any agreed framework. Additionally, Defendants' ESI production is severely deficient compared to the broad production from Plaintiff.

Further, the Riley Defendants' claim that Plaintiff waived attorney-client privilege misstates the Court's ruling, which was narrowly limited to consultations Plaintiff referenced in her Complaint. Plaintiff testified about those consultations and is unaware of any written communications responsive to that waiver.

Additionally, allegations of "manipulated" ESI and subpoena interference are unsupported. Plaintiff preserved her data, used a court-approved forensic vendor, produced ESI in a permitted format, and continues to offer address any formatting concerns. Defendants refuse to ask Plaintiff to correct the production and instead moved for sanctions.

Finally, the Riley Defendants' characterization of Court authorized motion practice as "retaliatory" and their effort to attribute prior counsel's conduct to Plaintiff do not establish willfulness. At most, Defendants identify unresolved discovery scope disputes and privilege disagreements, which fall far short of the intentional, contumacious conduct required to satisfy first—and most important—factor of dismissal under Rule 37.

### 2. Factor Two: Defendants have not been prejudiced.

A second, required consideration in determining whether dismissal is appropriate under Rule 37 is whether the opposing party suffered actual prejudice as a result of the alleged discovery misconduct. Prejudice in the Rule 37 context generally refers to the inability to secure information to which the party was entitled.

*Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 737 (6th Cir. 2008). Defendants would be prejudiced if there is a finding of "waste[d] time, money, and effort in pursuit of cooperation which [the plaintiff] was legally obligated to provide." *Id.* at 737. The key to finding prejudice is whether the defendants wasted time, money, and effort in pursuit of cooperation which the plaintiff was legally obligated to provide. *Kelmendi*, No. 24-1884, 2025 WL 2901498. A party is not prejudiced while merely waiting for a determination on how to proceed from the Court. *Prime Finish, LLC v. ITW Deltar IPAC*, 608 Fed.Appx. 310, 315 (6th Cir. 2015). Dismissal is inappropriate where sufficient prejudice to the opposing party has not been shown. *Thompkins v. GPS Sols., LLC*, 2025 WL 3243867 (E.D. Mich. Nov. 20, 2025).

Here, Defendants cannot establish prejudice because the record shows neither an inability to obtain relevant information nor wasted effort attributable to Plaintiff's conduct. Olsman deposed Plaintiff extensively and questioned her directly about her medical history and treatment, as did the Riley Defendants. The only records Olsman claims it has not accessed relate to Gemma Haynes—a discrete and unresolved privilege issue that remains pending before the Court and cannot be recast as discovery obstruction. Moreover, Olsman has not been "litigating in the dark." Plaintiff produced her initial written discovery responses in May 2025, months before the discovery stay, giving Olsman and Riley a substantial head start. By

26

contrast, Plaintiff did not receive discovery responses from Riley until September 25, 2025, and from Olsman until October 31, 2025, meaning Plaintiff—not Olsman—was the party disadvantaged by the stay. Any time or expense incurred while awaiting Court rulings or during a Court-ordered stay does not constitute prejudice as a matter of law, and Olsman's reliance on cases involving outright refusal to provide discovery is misplaced. At most, Olsman identifies ordinary litigation costs and unresolved privilege disputes, neither of which satisfies Rule 37's prejudice requirement.

The Riley Defendants' claim of "concrete and severe" prejudice similarly fails. Riley was not forced to depose Plaintiff without discovery. Rather, the Riley Defendants set their deposition of Plaintiff for December 10, 2025 instead of closer to the close of discovery. Likewise, Olsman's November 17, 2025 deposition of Plaintiff occurred before the Court-ordered ESI production deadline. The Riley Defendants elected—strategically—to proceed at that time rather than after discovery disputes were resolved.

Plaintiff has produced extensive contemporaneous communications, including text messages for numerous witnesses identified in her disclosures, and Riley has never defined what specific ESI it claims remains missing. Assertions that Plaintiff "refuses" to produce texts are belied by the record and ignore Riley's refusal to agree to custodians, search terms, or format. Claims of financial prejudice are

27

likewise overstated: Riley's references to "dozens of trips" to Court mischaracterize routine telephonic conferences as extraordinary burden, and ordinary litigation expenses do not amount to Rule 37 prejudice.

Finally, Riley's claim of reputational harm is not cognizable prejudice under Rule 37. Riley has possessed substantial discovery from the outset—including hundreds of pages of documents, contemporaneous communications, and the termination materials. Defendants have had ample information to understand and defend against Plaintiff's claims. Taken together, Defendants identify no actual impairment to their ability to litigate. Defendants may be dissatisfied with the pace and scope of discovery but that is insufficient to support a sanction of dismissal or to prove prejudice.

### 3. Factor Three: No prior warnings have been issued regarding dismissal.

Prior notice or lack thereof is a key consideration when determining whether a district court has abused its discretion in dismissing a case. This factor is critical because a prior warning is necessary before an involuntary dismissal if there is no evidence of bad faith or contumacious conduct. *Harmon*, 110 F.3d at 368.

It is important to point out that Defendants seek dismissal based on a warning of prior sanctions for a Court order that ***Plaintiff immediately complied with*** while at the same time, Defendants paint Plaintiff as a party who defies each and every

28

order from this Court. Their argument for Factor Three undercuts any allegations of willful, bad-faith non-compliance.

Further, The September 5, 2025 order did not warn Plaintiff that discovery noncompliance would result in dismissal; it warned only that the case would be dismissed for failure to prosecute if Plaintiff failed to secure counsel or proceed pro se by September 25, 2025—a condition Plaintiff undisputedly satisfied. Olsman's attempt to convert Plaintiff's compliance with that order into evidence supporting dismissal turns the Court's directive on its head. Nor does *Harmon* support Olsman's position. In *Harmon*, the plaintiff ignored discovery requests and disobeyed a direct court order compelling production for eleven months. Here, by contrast, Plaintiff has substantially complied with every discovery order, executed every HIPAA authorization required, and raised only narrow privilege disputes that remain pending before the Court. Absent contemptuous conduct or a clear record of defiance—which Olsman has not established—the warning factor weighs against dismissal.

The Riley Defendants likewise fail to establish the warning factor. Like Olsman, Riley relies on the September 2025 stay order as a supposed discovery warning, despite the fact that the order addressed only Plaintiff's obligation to secure counsel or proceed pro se—an obligation she met. Riley's assertion that Plaintiff's "technical compliance" followed by supposed obstruction warrants dismissal

improperly assumes the very bad faith and contemptuous conduct that Defendants have failed to prove. Riley's further claim that Plaintiff, as a lawyer, required no warning because her conduct was self-evidently sanctionable is unsupported and inflammatory. Disputes over ESI format, unresolved privilege issues, and good-faith efforts to address third-party subpoenas do not constitute fabricated evidence, disregard of court orders, or witness tampering—particularly where Defendants offer no evidentiary support for those accusations. Because Plaintiff was never warned that alleged discovery deficiencies could result in dismissal—and because the record reflects ongoing compliance rather than defiance—the third Rule 37 factor weighs decisively against the extreme sanction Defendants seek.

### 4. Factor Four: Less drastic sanctions have not been imposed.

The final factor in determining whether dismissal is appropriate is whether the Court imposed or meaningfully considered less drastic sanctions. Where the district court has not manifested consideration of less drastic sanctions, it becomes more difficult to conclude the district court properly exercised its discretion with appropriate forethought. *Prime Finish, LLC* at 315. This requirement reflects Rule 37's remedial purpose and the principle that dismissal should be employed only where no lesser sanction could adequately address the alleged misconduct. Where no prior sanctions have been imposed and lesser measures remain available, dismissal is disfavored. *Id.*

Olsman's argument on lesser sanctions collapses because it presupposes the existence of contemptuous conduct that the record does not support. While Olsman correctly notes that dismissal may, in rare circumstances, be imposed as a first and only sanction, Sixth Circuit precedent permits that outcome only where a party has blatantly disobeyed court orders or engaged in egregious, bad-faith misconduct. That is not this case. Plaintiff has substantially complied with every discovery order issued by this Court, including executing HIPAA authorizations whenever ordered. The only disputes Olsman identifies concern unresolved privilege questions—most notably relating to Gemma Haynes—which are discovery disputes currently before the Court, not defiance of court orders. Unlike *Harmon* or *Kelmendi*, Plaintiff did not ignore orders for months, refuse to comply outright, or disregard monetary sanctions. Olsman's characterization of Plaintiff's conduct as "even more egregious" than those cases relies on orders Plaintiff actually complied with and attempts to transform good-faith discovery disagreements into contempt. Because Plaintiff has engaged in discovery, produced documents, appeared for depositions, and sought reciprocal discovery from Defendants, lesser sanctions—such as structured discovery oversight—are not futile, and dismissal would not "protect the integrity of the judicial process," but instead short-circuit adjudication on the merits.

The Riley Defendants' argument that lesser sanctions are insufficient likewise fails because it rests on false premises. Riley claims that orders to compel have been

ignored, monetary sanctions have failed, and adverse inferences would be inadequate, yet none of those predicates exists. Plaintiff has not ignored discovery orders; she has substantially complied with them. No monetary sanctions have ever been imposed. And Riley's adverse-inference argument improperly assumes spoliation, despite the undisputed fact that Plaintiff's data has been preserved by a third-party forensic vendor and remains available for production in any agreed-upon format. Riley's assertion that dismissal is necessary to cure prejudice is further undermined by its own admission that the ESI it has obtained contains "damning evidence"—a concession that there is no evidentiary void to cure. Lesser sanctions have not "failed" because they have not been tried—and more importantly, because Plaintiff has not engaged in the kind of flagrant, contemptuous conduct that would render corrective measures futile. Under these circumstances, dismissal would be punitive, not proportional.

### B.   Motions for Alternative Relief Are Also Unwarranted.

Olsman's request for alternative sanctions fares no better than its request for dismissal because it rests on the same unsupported premise—that Plaintiff engaged in bad-faith, contemptuous conduct. The record shows otherwise. Plaintiff has participated fully in discovery, sat for fourteen hours of deposition testimony, produced voluminous ESI after culling more than 140,000 messages, and complied promptly with every Court order. Dissatisfaction with the pace or scope of discovery,

particularly where Defendants have refused to narrow requests or define parameters, does not constitute conduct that hampers enforcement of a court order or supports the exercise of the Court's inherent authority. Nor does Olsman identify with any specificity what facts should be deemed established, what claims should be stricken, or what evidence should be excluded—underscoring the speculative and punitive nature of the relief sought. To the extent Olsman seeks evidentiary limitations or issue preclusion, those matters are properly addressed through motions in limine or summary judgment, not discovery sanctions. Because Olsman has failed to demonstrate bad faith, contempt, or prejudice attributable to Plaintiff, neither inherent-authority sanctions nor monetary sanctions are warranted.

The Riley Defendants' proposed "alternative" sanctions confirm that their motion is punitive rather than corrective. Riley does not identify specific discovery Plaintiff has failed to produce; instead, it demands sweeping relief—including conditional dismissal, additional deposition time, contempt findings, evidentiary exclusions, adverse inferences, and joint-and-several fee awards—based on generalized accusations of "noncompliance." These requests are untethered from the record. Plaintiff's ESI has been preserved by a third-party forensic vendor and remains available for production in any agreed-upon format; there is no spoliation and no evidentiary gap to cure. Riley's demand for additional deposition time seeks to undo its own strategic choice to depose Plaintiff early, while simultaneously

33

refusing to produce Rule 30(b)(6) witnesses or provide dates—conduct that undermines any claim of equitable relief. Riley's attempt to bar Plaintiff from introducing evidence on core liability and damages issues, deem contested facts established, and impose adverse inferences is particularly improper where Riley concedes it already possesses "damning" evidence and has examined Plaintiff extensively on the very topics it claims are withheld. Finally, Riley's request to impose monetary sanctions solely on Plaintiff and Ms. Russell—while ignoring co-counsel and limiting fees to a selective timeframe—highlights the arbitrary and retaliatory nature of the relief sought. Rule 37 does not authorize sanctions untethered from actual noncompliance, and none of Riley's proposed alternatives would advance discovery or serve the interests of justice.

### C.   The Court Should Extend Discovery Deadline and Appoint a Discovery Master at Defendants' Expense.

The breakdown of discovery management in this case is not the result of Plaintiff's bad faith, willfulness, or contemptuous conduct or her counsel, but rather persistent and unresolved discovery disputes that have been exacerbated by Defendants' refusal to engage in meaningful conferral. Plaintiff and her counsel heard the Court clearly during the October 2025 status conference when the Court emphasized that discovery would proceed and that "the train is rolling." Since that time, Plaintiff has engaged in discovery in good faith, complied with Court orders, produced substantial evidence, and appeared for extensive deposition testimony. The

34

disputes now before the Court concern scope, format, privilege, and sequencing—classic discovery disagreements—not defiance of the Court's authority.

Despite repeated efforts by Plaintiff's counsel to resolve issues cooperatively, Defendants have refused to meaningfully meet and confer. Since October 2025, counsel have exchanged over 200 discovery-related emails, yet the parties have spoken by phone only three times, two of which occurred solely because the Court ordered them to do so. Plaintiff's counsel has repeatedly expressed willingness to confer by phone to resolve disputes efficiently, but Defendants have instead chosen serial motion practice and escalation. This approach has multiplied disputes, delayed reciprocal discovery, and made progress impossible without Court intervention.

Under these circumstances, the appropriate remedy is not punishment, but structure. Extending fact discovery through May 31, 2026 is proportional and necessary to allow for orderly completion of discovery, including written discovery and depositions that cannot meaningfully occur until Defendants produce witnesses and documents. An extension is further warranted given Plaintiff's pregnancy and the fact that Defendants' party depositions—particularly Olsman's—have not yet occurred and, by Defendants' own requests, may not occur until after a ruling on this motion practice. Without an extension, Plaintiff would be severely prejudiced by the inability to conduct follow-up discovery based on party testimony.

35

Additionally, appointment of a discovery master is warranted to restore order to the process. The volume of disputes, Defendants' refusal to confer, and the technical nature of the ESI and privilege issues demonstrate that judicial oversight through motion practice alone has been inefficient and ineffective. A discovery master would provide immediate, practical resolution of disputes, enforce conferral obligations, and prevent further escalation. Appointment at Defendants' expense is appropriate where Defendants have consistently declined to engage in good-faith conferral and have instead driven unnecessary motion practice.

This relief is corrective, not punitive. It addresses the actual problem before the Court—an unworkable discovery process—while preserving the merits of the case for resolution through the orderly application of the Federal Rules. Extending discovery and appointing a discovery master will put this case back on track and serve the interests of fairness, efficiency, and judicial economy.

## III.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' motions to dismiss under Rule 37 and the alternative relief they see. Plaintiff further requests: 1) fact discovery extend to May 31, 2021 and 2) the Court appoint a Discovery Master at the Defendants' expense.

36

Dated: January 26, 2026.                    Respectfully submitted,

**LAW OFFICE OF KEITH ALTMAN**

*/s/ Keith Altman*_____
Keith Altman (P81702)
30474 Fox Club Drive
Farmington Hills, MI 48331
O: (248) 987-8929
keithaltman@kaltmanlaw.com


**THE RUSSELL LAW FIRM, PLLC**

Kimberly Russell
Admitted to EDMI
1140 3rd Street NE
Washington, DC 20002
O: (202) 430-5085
kimberly@russellatlaw.com


**BROWN LEGAL GROUP, PLLC**

Sammy Brown, Jr.
Admitted EDMI
175 N. Union Street
Canton, MS 39046
O: (601) 691-5017
slb@brownlegalgrouppllc.com


*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. Civ. P. 5, I hereby certify that on January 26, 2026, I caused a true and correct copy of the foregoing document to be served on the following by electronic mail:

### KIENBAUM HARDY VIVIANO PELTON FORREST

Elizabeth Hardy and Thomas Davis
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI 49009
ehardy@khvpf.com
tdavis@khvpf.com

### DEBORAH GORDON LAW

Deborah Gordon, Sarah Thomas Gordon, and Elizabeth Marzotto Taylor
33 Bloomfield Hills, Parkway, Suite 220
Bloomfield Hills, MI 48304
dgordon@deborahgordonlaw.com
sthomas@deborahgordonlaw.com
emt@deborahgordonlaw.com

*Counsel for Defendants*

Dated: January 26, 2026.                    */s/ Keith Altman*
                                            Keith Altman