# EXHIBIT 6



## STATE OF MICHIGAN

### IN THE CIRCUIT COURT FOR THE COUNTY OF MUSKEGON

ROBERT HARRIS, Personal Representative of the
Estate of DAVID HARRIS, Deceased,
Plaintiff,

No. 2022-003810-NH

v

Hon. Kenneth S. Hoopes

DEBOER, INC. d/b/a Lake Woods Nursing
Rehabilitation Center d/b/a Lake Woods Nursing &
Rehabilitation Center d/b/a the Cove at Lake
Woods; THE PEPLINSKI GROUP, INC.;
Defendant.

| | |
|---|---|
| ELYSE L. McKENNA (P80192) | RYNE TAKACS (P81787) |
| FOX MCKENNA, PLLC | SMITH HAUGHEY RICE & ROEGGE |
| Attorney for Plaintiff | Attorneys for Defendants |
| 625 Purdy Street | 100 Monroe Center, N.W. |
| Birmingham, MI 48009 | Grand Rapids, MI 49503 |
| (810) 278-4130 | 616-774-8000 |
| emckenna@foxmckenna.com | rtakacs@shrr.com |

*FILED MAR 11 2024 CIRCUIT COURT RECORDS*

## PLAINTIFF'S OBJECTION AND RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY DISPOSITION PURSUANT TO MCR 2.116(C)(7), (C)(8), AND (C)(10)

NOW COMES the Plaintiff, ROBERT HARRIS, Personal Representative of the Estate of DAVID HARRIS, Deceased, by and through his attorneys, FOX MCKENNA, PLLC, and for his objection and response to Defendant's Motion for Summary Disposition pursuant to MCR 2.116(C)(7), MCR 2.116(C)(8), and MCR 2.116(C)(10), states as follows:

Plaintiff objects to Defendants' Motion for Summary Disposition as it is premature. Plaintiff has been working diligently to ascertain the events surrounding Mr. Harris's death. Although requested on multiple occasions, Defendants have yet to provide depositions of Defendants' facility staff members.[1] (**Exhibit 1 – Correspondence from Defendants' Counsel**). From the outset of this matter, Plaintiff planned to depose Defendants' staff to determine the facts surrounding Defendants' negligent care of Mr. Harris and his death. It is Plaintiff's good faith

---

[1] This is the subject of a motion to compel which has been contemporaneously filed with this Honorable Court.

Mich 411, 419 (2004). "In reviewing a (C)(7) motion, a court must accept all well-pleaded allegations as true and construe them in favor of the nonmoving party." *Telling v Forsyth Twp*, 291 Mich App 692, 698 (2011). "The court must consider all affidavits, pleadings, depositions, admissions, and documentary evidence filed or submitted by the parties, and the motion should be granted only if no factual development could provide a basis for recovery." *Xu v Gay*, 257 Mich App 263, 266-67 (2003).

A motion brought pursuant to MCR 2.116(C)(8) tests whether a claim is sufficient as a matter of law. When presented with a (C)(8) motion, this Court must decide whether the Plaintiff's pleadings allege a prima facie case. *Garvelink v Detroit News*, 206 Mich App 604, 608 (1994). In making this determination, this Court may only consider the Plaintiff's pleadings, "accepting all well pleaded facts as true." *Id.* A motion brought pursuant to MCR 2.116(C)(10) tests the factual sufficiency of the Plaintiff's Complaint.

When presented with a (C)(10) motion, this Court may consider documentary evidence submitted by the parties, including affidavits, pleadings, depositions, and admissions in a light most favorable to the nonmoving party. *Id.* Summary disposition is proper only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *West v General Motors Corp*, 469 Mich 177, 183, 665 NW2d 468 (2003). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id.*

### LAW AND ARGUMENT

A. **The PHCIA Does Not Apply Because** Mr. Harris **Was Not Injured by Reason of Health Care Services in Support of the State's Response to the COVID-19 Pandemic.**

12

Defendants are attempting to avoid responsibility for the death of Mr. Harris by asserting immunity pursuant to the PHCIA.[5] This Act purportedly provides immunity to health care providers and/or facilities for injuries caused by the reason of health care services rendered in support of the state's response to the COVID-19 pandemic from March 29, 2020 to July 14, 2020. Although the legislature could have attempted to grant blanket immunity to health care providers and facilities for those entire three and a half months, the legislature did not do so. In passing the Act, the legislature used very certain language that limited the applicability of immunity to certain circumstances. Notably, the circumstances of this case do not fall within the scope of the Act, as discussed throughout the accompanying Motion and the instant Brief.

According to the plain language of MCL 691.1475, in order for immunity to apply, the patient must have been injured "by reason of" health care services rendered "in support of this state's response to the COVID-19 pandemic." In fact, the Act reads:

> A health care provider or health care facility that provides health care services in support of this state's response to the COVID-19 pandemic is not liable for an injury, including death, sustained by an individual by reason of those services, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services constituted willful misconduct, gross negligence, intentional infliction of harm by the health care provider or health care facility. MCL 691.1475.

There is no question that the COVID-19 pandemic created a public health emergency that rapidly altered the provision of health care services across the country. COVID-19 was a novel condition, and many treatments were not approved specifically for COVID-19, were approved only for emergency use, or were experimental. The purpose of the PHCIA, which is clear from the plain language of the statute itself, and the Michigan House Judiciary Committee hearing on the

---

[5] As will be argued below, Plaintiff asserts that the Pandemic Health Care Immunity Act is unconstitutional. However, for the purposes of the argument in this section, Plaintiff will assume that the act is valid.

matter, is to protect providers from liability for injuries that resulted from this type of evolving novel treatment, and to protect health care providers from liability when they did not have the requisite PPE to care for patients with COVID-19. None of Defendants' treatment of Mr. Harris qualifies for protections under the PHCIA.

Here, Mr. Harris was not receiving any novel treatment and he never tested positive for COVID-19. The Act requires that the injury to the resident must occur 1) "by reason of" health care services provided 2) "in support of" this state's response to the COVID-19 pandemic. Based on the plain language of the statute alone, the statute does not apply to the circumstances of this case as discussed *infra*.

i. **Defendants' negligence in this case constitutes a failure to act, and the PHCIA does not extend immunity to *negligent* omissions.**

The Michigan Supreme Court previously analyzed a statute's absence of language pertaining to acts and/or omissions. In *Johnson v Pastoriza*, 491 Mich 417 (2012), a mother brought suit pursuant to MCL 600.2922a on behalf of herself and her deceased fetus. Plaintiff claimed that she specifically requested a cerclage, and defendants chose to deny the request. The trial court refused to grant the defendants' motion for summary disposition, and the Court of Appeals affirmed, finding that refusal to perform the cerclage was a "wrongful or negligent act under MCL 600.2922 a." The Michigan Supreme Court reversed, stating:

> The Legislature clearly intended to impose liability for affirmative or positive acts under MCL 600.2922a(1). In comparison, it is very clear that the Legislature did not intend to impose liability for omissions, something it can and has done in other statutes. The Legislature did not even include the more expansive terms "neglect" and "fault of another" that it included in MCL 600.2922(1), which permit liability on the basis of omissions. The Legislature's decision to exclude omissions from MCL 600.2922a indicates that it did not intend to attach liability to omissions that cause prenatal death or injury. *Pastoriza*, 491 Mich at 437 (Emphasis added).

14

As the Supreme Court emphasized in *Pastoriza*, the Legislature can, and has many times before, included statutory language that encompasses omissions as well as affirmative acts. Here, the legislature chose not to include any language encompassing omissions in the PHCIA. To the contrary, the PHCIA provides immunity for health care providers and/or facilities that "provide health care services in support of this state's response to the COVID-19 pandemic." However, Plaintiff's claim is that Defendants' staff was negligent in failing to render services to Mr. Harris. Defendants failed to assess Mr. Harris's skin breakdown and implement appropriate interventions to prevent its degradation. Plaintiff's allegations constitute omissions, not affirmative acts. A "service," by definition, cannot be an omission.

Plaintiff alleges that Defendants committed omissions by failing to provide services to Mr. Harris. Omissions do not fall within the purview of the PHCIA. As such, any PHCIA protections are not available to Defendants in this case.

### ii. Mr. Harris's injury and death were caused by Defendants' negligent omission of care and treatment of Mr. Harris and as such, Defendants are not eligible for any PHCIA protections.

Mr. Harris's injuries and subsequent death stem from negligent omission of care and treatment, as discussed *supra*. The negligent omission of proper care and treatment of Mr. Harris that led to his developing a stage IV sacral decubitus ulcer and subsequent sepsis and death is not the kind of conduct that the Legislature enacted the PHCIA to immunize.

Based on the language of the statute, the injury sustained by Mr. Harris must have been *by reason of* the health care services rendered in support of this state's response to the COVID-19 pandemic. To argue that Mr. Harris's stage IV sacral decubitus ulcer was a result of health care services rendered to combat the COVID-19 pandemic is nonsensical in light of the fact that Mr. Harris never had COVID-19.

15

Here, Mr. Harris did not suffer injury to his trachea as a result of hasty or prolonged intubation; he did not suffer pulmonary deconditioning or post-viral inflammatory disease due to viral complications; nor did he suffer any other medical conditions as a result of the novel and experimental treatments being offered for COVID-19. Instead, Mr. Harris suffered a horrific pressure ulcer which was allowed to degrade and cause sepsis, ultimately leading to his death, because Defendants failed to assess his skin for breakdown and failed again to implement interventions to prevent its worsening.

Of note, Defendants make no attempt in their Motion to explain how Mr. Harris's injuries were the result of services rendered in support of the COVID-19 pandemic, nor do Defendants attach an affidavit to their Motion attesting to the same. Defendants have failed to demonstrate the injuries sustained by Mr. Harris, and his resultant death, was even remotely "by reason of" services provided in support of the state's response to the COVID-19 pandemic. Such is required to make them eligible for the immunity under the Act. While further discovery may serve to assist Defendants in clarifying their position, to date, they have not met their own burden of proof. For all reasons aforementioned, Defendants are not eligible for protections under the PHCIA.

   iii. **Even if Defendants' lack of care and treatment of Mr. Harris was not deemed to constitute an omission, the alleged care that was rendered cannot be said to be *in support of* this state's response to the COVID-19 pandemic.**

Mr. Harris tested negative for COVID-19 on April 10, 2020. As of that negative test, Mr. Harris was certainly not receiving any health care services that were "in support of" this state's response to the COVID-19 pandemic. The health care services that were rendered to Mr. Harris during his admission were in support of his various other diagnoses which had caused him to be

16

admitted to Defendants' facility in the first place.[6] These ailments and the services rendered to address them were not related to COVID-19 in any way, and certainly cannot be said to have been rendered "in support of" the state's response to the COVID-19 pandemic. Again, it was an omission of proper care and treatment that led to Mr. Harris's death. Regardless, even assuming that "services rendered in support of" the pandemic impacted Defendants' ability to turn Mr. Harris and clean his wound, the facility has not provided any explanation whatsoever as to how any such services prevented the facility from doing so. The medical records show that Mr. Harris was being seen by fstaff and his heel pressure injury was supposedly being assessed and treated. There is no identifiable reason as to why he could not have been turned by those staff members as well. Certainly, if his providers could assess the wound on his heel, they could assess the wound on his buttocks. Further discovery into the circumstances surrounding this disconnect is required to determine the extent of Defendants' negligence.

**B. Retroactive Application of the PHCIA Would Be Unconstitutional.**

Even if Defendants were eligible for PHCIA protections, retroactive application of the Act would be unconstitutional as it would violate the Due Process Clause of the Michigan Constitution. See Const 1963 art 1 section 17 (**"No person shall be ... deprived of life, liberty, or property, without due process of law."**). Furthermore, "[i]t is axiomatic that the constitutional provision of due process extends to protect that 'property' is construed to be a vested right and that generally an accrued right of action is a vested property right which may not be arbitrarily impinged." *Grubaugh v St Johns*, 384 Mich 165, 170 (1970) (quoting 16 Am Jur 2d, Constitutional Law, Section 421 *et seq*).

---

[6] These diagnoses include Parkinson's disease, dementia, paranoid schizophrenia, bipolar disorder, major depressive disorder, anxiety disorder, insomnia, osteoarthritis, muscle wasting and atrophy, benign prostatic hyperplasia, dysphagia, difficulty walking, and abnormal posture.

17

Michigan Courts have repeatedly protected prospective plaintiffs' vested rights in a cause of action.[7] Michigan is not unique from jurisdictions around the country in this respect. Most recently, litigants have argued whether the legislative amendments to the no-fault act, MCL 500.3101 *et seq.*, limiting reimbursement for expenses covered by personal protection insurance apply retroactively to limit benefits to individuals injured before the effective date of amendment. On August 25, 2022, in keeping with precedent, the Michigan Court of Appeals held that these amendments do not apply retroactively. *Andary v USAA Cas Ins Co*, 343 Mich App 1 (2002). With respect to the *LaFontaine* considerations, and unlike the language of the Act at issue, the Court determined that the language of the no-fault amendments did not clearly demonstrate a legislative intent for the amendments to apply retroactively.

The Court stated:

> Even if we were to conclude that the Legislature intended for 2019 PA 21 to apply retroactively to those injured before the amendments' effective date, we would nonetheless hold that retroactive application violates the Contracts Clause of the Michigan Constitution.

*Id.* As exemplified above, Michigan courts have routinely declined to grant retroactive application of statutes, even when the language of the statute evidences clear legislative intent to do so.

Additionally, under Michigan law, statutes and amendments are presumed to operate prospectively. *Davis v State Employees' Retirement Bd*, 272 Mich App 151, 155 (2006). However, this Act provides for retroactive application "on or after March 29, 2020 and before July 14, 2020."

---

[7] See e.g., *Doe v Dep't of Corrections (On Remand)*, 249 Mich App 49, 61-62 (2001) ("A cause of action becomes a vested right when it accrues and all the facts become operative and known"); *Bd of Trs of the City v City of Pontiac*, 317 Mich App 570 (2016) (holding that retroactive application of EO 225 and the purported extinguishment of the city's accrued but unpaid 2011-2012 fiscal year contribution was impermissible and would impair or abolish the fund's accrued claim for a breach of contract, a vested right); *Ohio Farmers Ins Co v Shamie*, 243 Mich App 232, 237 (2000) ("Because plaintiff's cause of action accrued before the accountant liability act became effective in 1996, we find that its cause of action was a vested right and conclude that the retroactive application of the act is improper. . . because it would destroy that vested right.").

18

MCL 691.1477. While Michigan courts have yet to address this Act's constitutionality, they have long refused to extend retroactive application of legislation because it "presents problems of unfairness... can deprive citizens of legitimate expectations and upset transactions." *Downriver Plaza Group v Southgate*, 444 Mich 656, 666 (1994). In determining whether a law has a retroactive effect, Michigan courts keep four principles in mind:

> First, we consider whether there is specific language providing for retroactive application. Second, in some situations, a statute is not regarded as operating retroactively merely because it relates to an antecedent event. Third, in determining retroactivity, **we must keep in mind that retroactive laws impair vested rights acquired under existing laws** or create new obligations or duties with respect to transactions or considerations already past. Finally, a remedial or procedural act not affecting vested rights may be given retroactive effect where the injury or claim is antecedent to the enactment of the statute.

*LaFontaine Saline, Inc v Chrysler Group, LLC*, 496 Mich 26, 38-39 (2014) (emphasis added). Here, the first and second principles are not in dispute. The Act contains a statement of intended retroactive application. The third principle is significant and dictates that retroactive application of the Act is unconstitutional. "A statute may not be applied retroactively if it abrogates or impairs vested rights, creates new obligations, or attaches new disabilities concerning transactions or considerations occurring in the past." *Davis*, 272 Mich App at 158 (2006).

Here, Mr. Harris's rights vested before his death. Mr. Harris died on July 23, 2020, and Defendants' negligence preceded his death. As of at least the moment of his death, Plaintiff's cause of action accrued, and Plaintiff's cause of action became a vested right. Additionally, the PHCIA, upon which Defendants' motion is premised, became effective three months later, on October 22, 2020. To apply the PHCIA retroactively to Mr. Harris's vested property right would be patently unconstitutional as violative of the Contracts Clause of the Michigan Constitution.

**C. Plaintiff Has the Right to Conduct Liberal Discovery to Uncover the Extent of Defendants' Negligence and Amend His Complaint to Include a Count of Gross Negligence if the Facts and Justice so Require.**

Due to Defendants preventing him from conducting proper discovery by failing to produce facility staff for deposition, Plaintiff does not yet know the extent of Defendants' negligence. Plaintiff believes that upon the completion of discovery, he will be in a position to amend his Complaint to add a claim of gross negligence, rendering Defendants' instant motion for summary disposition moot. Not having had the opportunity to conduct appropriate discovery, Plaintiff is not yet in position to request this Honorable Court allow him to amend but believes he will be in such a position following the conclusion of discovery.

## CONCLUSION

Plaintiff, ROBERT HARRIS, respectfully requests that this honorable Court enter an Order DENYING Defendants' Motion for Summary Disposition. Alternatively, Plaintiff requests this Court stay Defendants' motion until Plaintiff has had the opportunity to complete discovery, including the requested depositions, [8] and amend his Complaint if the facts and justice so require. This discovery has the potential to render Defendants' entire motion moot. These depositions are necessary for Plaintiff to clearly identify the extent of Defendants' negligence. Plaintiff further requests any such relief that this Court shall deem necessary and just.

FOX MCKENNA, PLLC

By  *Elyse L McKenna*
     Elyse L. McKenna (P80192)
     Attorney for Plaintiff
     625 Purdy Street
     Birmingham, MI 48009
     (810) 278-4130

Dated: March 6, 2024

---

[8] Plaintiff's counsel contemporaneously filed this motion to compel which is currently pending with this Honorable Court.

# EXHIBIT 2

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

QUINTON LEE, LIP by his LEGAL GUARDIAN
MARTA DAVIS,

              Plaintiff,                          Case No. 22-192529-NH
                                                  HON. DAVID M. COHEN

-vs-

MARVIN AND BETTY DANTO HEALTH CARE
CENTER; HEALTH CARE AND RETIREMENT
CORP OF AMERICA, LLC D/B/A MARVIN AND
BETTY DANTO HEALTH CARE CENTER;
HENRY FORD HOSPITAL WEST BLOOMFIELD;
HENRY FORD HEALTH SYSTEM d/b/a HENRY
FORD HOSPITAL WEST BLOOMFIELD; THE
VILLA AT GREEN LAKE ESTATES; GREEN
LAKE OPCO, LLC d/b/a THE VILLA AT GREEN
LAKES ESTATES; ~~DMC HURON VALLEY SINAI~~
~~HOSPITAL and DMC HURON VALLEY SINAI~~
~~HOSPITAL PREMIER CLINICAL MANAGEMENT~~
~~SERVICES, LLC d/b/a DMC HURON VALLEY~~
~~SINAI HOSPITAL,~~ and VHS HURON VALLEY-
SINAI HOSPITAL, INC.,

              Defendants.
_____/

KEVIN S. OLIVER (P42578)
Attorney for Plaintiff
18927 Farmington Road
Livonia, MI 48152
(248) 477-1900 (fax-9505)

DAVID C. WIEGEL (P57277
Attorney for Marvin and Betty Danto
Health Care Center and Health Care
and Retirement Corp. of America, LLC
One Woodward Ave., Suite 2400
Detroit, MI 48226
(313) 965-7415

LAURA H. SELZER (P53836)
Attorney for Henry Ford Hospital
West Bloomfield and Henry Ford
Health System
150 W. Jefferson, Suite 2500
Detroit, MI 48226
(313) 496-7637

MARISA A. CICOTTE (P73474)
Attorney for VHS Huron Valley-Sinai
Hospital, Inc.
38777 Six Mile Road, Suite 101
Livonia, MI 48152
(313) 964-4500; fax (734) 469-4298

GABE SYBESMA (P66632)
JUSTIN ROSTKER (P82026)
Attorneys for Green Lake OPCO, LLC
d/b/a The Villa at Green Lakes Estates
One Woodward Ave., Suite 2400
Detroit, MI 48226
(313) 965-7987

_____/

Tanoury, Nauts, McKinney & Dwaihy, PLLC
38777 Six Mile Road, Suite 101
Livonia, Michigan 48152

Document received by the MI Macomb 16th Circuit Court.

**ORDER DENYING DEFENDANT VHS HURON VALLEY-SINAI HOSPITAL, INC.'S MOTION FOR PARTIAL SUMMARY DISPOSITION**

At a session of said Court, held in the City of Pontiac, County of Oakland, State of Michigan, on 3/1/2023

PRESENT: HON. _____ DAVID M. COHEN
CIRCUIT COURT JUDGE

This matter having come before the Court upon Defendant VHS Huron Valley-

Sinai Hospital, Inc.'s Motion for Partial Summary Deposition, oral argument having been

held on March 1, 2023, and the Court being fully advised in the premises;

**IT IS HEREBY ORDERED** that Defendant's Motion is denied for the reasons

stated on the record.

**IT IS SO ORDERED.**

/s/ David M. Cohen
March 1, 2023
CIRCUIT COURT JUDGE       LE

Tanoury, Nauts, McKinney & Dwaihy, PLLC
38777 Six Mile Road, Suite 101
Livonia, Michigan 48152

Document received by the MI Macomb 16th Circuit Court.

2

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

CYNTHIA ANDERSON,

      Plaintiff,

-v-

Case Number: **2022-197395-NH**
Honorable Nanci J. Grant

ASCENSION PROVIDENCE HOSPITAL
d/b/a ASCENSION PROVIDENCE
HOSPITAL, SOUTHFIELD CAMPUS,

      Defendant,

_____/

**ORDER AND OPINION**

At a session of said Court, held in the
Courthouse in the City of Pontiac, County of
Oakland, State of Michigan on the 14th day of
March, 2023,

PRESENT:   <u>HONORABLE NANCI J. GRANT, CIRCUIT JUDGE</u>

      This matter is before the Court on Defendant's Motion for Summary Disposition pursuant to MCR 2.116(C)(7), (C)(8), and (C)(10). Defendant argues that it is immune from suit pursuant to the Pandemic Healthcare Immunity Act (herein the "Act") as well as the Public Readiness and Emergency Preparedness Act (herein "PREP"). Plaintiff opposes the Motion. The Court waives oral argument pursuant to MCR 2.119(E)(3) [1] and denies the Motion.

---

[1] MCR 2.119(E)(3) provides courts with discretion to dispense with or limit oral argument and to require briefing. MCR 2.116(G)(1) specifically recognizes application of MCR 2.119(E)(3) to summary disposition motions. Subrule (G)(1) additionally authorizes courts to issue orders establishing times for raising and asserting arguments. The Michigan Court Rules clearly and unambiguously set the time for asserting and raising arguments, and legal authorities to be in the briefing—not to be raised and argued for the first time at oral argument. Therefore, both parties have been afforded due process as they each had notice of the arguments and an opportunity to be heard by responding in writing, and this Court has considered the submissions to be fully apprised of the parties' positions before ruling. Because due process simply requires parties to have a

FILED   Received for Filing   Oakland County Clerk   3/14/2023 1:12 PM

Document received by the MI Macomb 16th Circuit Court.

## Facts

On May 18, 2020, Plaintiff presented to the Ascension Emergency Department due to a concern for a possible suicide attempt. Defendant's employees performed a Hendrich II fall risk evaluation on Plaintiff upon arrival in the emergency department, with a score of 7. A score of 7 is considered a "high risk" for falls. Plaintiff was transferred from the emergency department to the Behavioral Medicine unit, where she suffered a fall on May 21, 2020 while showering without any assistance or aids despite her high risk of falls. Plaintiff claims Defendant was negligent in allowing her to shower unassisted, despite knowing she scored a 7 on the Hendrich II fall risk evaluation.

On October 22, 2020, the Michigan Legislature enacted the Pandemic Health Care Immunity Act, Public Act 240 of 2020. The purpose of the Act is "to provide immunity for health care providers and health care facilities in the event of a pandemic." MCL 691.1475 states as follows:

> A health care provider or health care facility that provides health care services in support of this state's response to the COVID-19 pandemic is not liable for an injury, including death, sustained by an individual by reason of those services, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services constituted willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm by the health care provider or health care facility.

MCL 691.1477 provides, "[t]he liability protection provided by this act applies retroactively, and applies on or after March 29, 2020, and before July 14, 2020." The statute does not protect medical providers from willful conduct, gross negligence, criminal misconduct, or the intentional infliction of harm. MCL 691.1475. On March 10, 2020, the United States Department of Health and Human Services issued a declaration pursuant to the PREP Act, which provided immunity from liability for activities related to medical counter measures against COVID-19, effective February 4, 2020.

In Response, Plaintiff argues that the Act has nothing to do with the care she received because Plaintiff was not being treated for COVID-19, had no symptoms of COVID-19, and tested negative for COVID-19. Plaintiff argues that Defendant's reading of the statute "would provide

meaningful opportunity to know and respond to the arguments and submissions which has occurred here, the parties have received due process.

Document received by the MI Macomb 16th Circuit Court.

total and complete immunity for all health care providers during the relevant time period, regardless of whether or not such health care providers were providing COVID-19 treatment."

The Court agrees with Plaintiff. Defendant's interpretation of the Act would result in immunity from liability for any negligence which occurred between March 18, 2020 and July 14, 2020, even involving treatment of patients for reasons completely unrelated to COVID-19 such as the birth of a child.

Defendant provides no support for its interpretation of the Act except to cite other circuit court cases wherein a motion made pursuant to the Act and pursuant to PREP were granted. However, in these cases, the patients were admitted to the defendant hospitals with COVID-19 and COVID-19 related ailments. Here, there is absolutely no evidence that Plaintiff had COVID-19 or that her treatment related in any way to COVID-19.

The primary goal of statutory construction is to discern and give effect to the intent of the Legislation. *Neal v Wilkes*, 470 Mich 661, 665 (2004). The words of a statute provide the most reliable evidence of the Legislature's intent. *Id.* The statute reads as follows, in relevant part, "health care facility that provides health care services **in support of this state's response to the COVID-19 pandemic** is not liable for an injury, including death, sustained by an individual by reason of **those services**, regardless of how, under what circumstances, or by what cause those injuries are sustained." (emphasis added).

The Legislature specified that "those services" covered by the Act included health care services "in support of this state's response to the COVID-19 pandemic..." The Legislature did not use the phrase "all medical services" to refer to the services covered by the Act. Instead, the Act is limited to services rendered to patients related to COVID-19.

Plaintiff presented to the emergency department without symptoms of COVID-19 and tested negative for COVID-19. She was moved to the Behavioral Unit where she fell in the shower because she was permitted to shower unassisted and/or without assistive aids despite Defendant's alleged knowledge that she was a high fall risk. Her treatment had nothing to do with COVID-19. The Court fails to see why it should extend the Act's reach to include all healthcare services provided within the relevant timeframe.

Defendant's Motion is denied.

IT IS SO ORDERED.

NANCI J. GRANT, Circuit Court Judge

3

Document received by the MI Macomb 16th Circuit Court.

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

ELIZABETH HARRIS, Deceased, by her
Personal Representative, TONIA HARRIS,

          Plaintiff,

-vs-

ADVANTAGE LIVING CENTER-HARPER
WOODS; RHEMA-BELMONT OPERATING, LLC,
d/b/a ADVANTAGE LIVING CENTER-HARPER
WOODS; and ASCENSION ST. JOHN HOSPITAL,

          Defendants.

Case No. 22-014888-NH
Hon. Annette J. Berry

_____/

KEVIN S. OLIVER (P42578)
AZAL R. ARABO (P86220)
OLIVER LAW FIRM
Attorneys for Plaintiff
18927 Farmington Road, Suite 110
Livonia, Michigan 48152
(248) 477-1900
kevin@oliverinjurylaw.com
azal@oliverinjurylaw.com

STEVEN J. BONASSO (P55529)
CORBET, SHAW, ESSAD
& BONASSO, P.L.L.C.
Attorney for Defendant Ascension St. John
Hospital
30500 Van Dyke Avenue, Suite 500
Warren, Michigan 48075
(313) 964-6300
steven.bonasso@cseb-law.com

AARON GABE SYBESMA (P66632)
JUSTIN L. ROSTKER (P82026)
KITCH DRUTCHAS WAGNER
Attorneys for Defs. Advantage Living
Center-Harper Woods & Rhema-Belmont
Operating, LLC
One Woodward Avenue, Suite 2400
Detroit, Michigan 48226
(313) 965-7987
gabe.sybesma@kitch.com
justin.rostker@kitch.com

_____/

**ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY DISPOSITION**

At a session of said Court, held in the
City of Detroit, County of Wayne,
State of Michigan on:

4/19/2023

PRESENT: Honorable JUDGE ANNETTE J.
BERRY Circuit Court Judge

THIS MATTER having come before the Court pursuant to Defendants' Motions for

Summary Disposition, oral argument heard on March 24, 2023 and the Court being fully advised

on the premises:

**IT IS HEREBY ORDERED** that Defendants' Motions for Summary Disposition are

denied for the reasons stated on the record.

*This is not a final order and does not close the case.*

/s/ Annette J. Berry 4/19/2023

Hon. Annette J. Berry
Circuit Court Judge

Approved as to form:

*/s/* Azal R. Arabo w/ permission
KEVIN S. OLIVER (P42578)
AZAL R. ARABO (P86220)
Attorneys for Plaintiff

/s/ Daniel R. Corbet
DANIEL R. CORBET (P37306)
STEVEN J. BONASSO (P55529)
Attorneys for Def. Ascension St. John

/s/ Aaron Gabe Sybesma w/ permission
AARON GABE SYBESMA (P66632)
JUSTIN L. ROSTKER (P82026)
Attorneys for Defs. Advantage Living
Center-Harper Woods & Rhema-Belmont
Operating, LLC

Document received by the MI-Macomb-16th Circuit Court.

2

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

DENISE CHANDLER, as Personal Representative
of the Estate of RICHARD CHANDLER, Deceased,

      Plaintiff,                         Case No. 21-006189-NH
                                       Hon. Kathleen M. McCarthy

      v.

VHS SINAI-GRACE HOSPITAL, INC., a foreign corporation
doing business as SINAI-GRACE HOSPITAL,
MEDICAL CENTER EMERGENCY SERVICES,
a Michigan Corporation,
ACADEMIC INTERNAL MEDICINE SPECIALISTS, P.L.L.C.,
a Michigan Professional Limited Liability Company,
RIZWAN KHAN, PLLC,
a Michigan Professional Limited Liability Company,
LAUREN GANDOLFO, D.O.,
STEFANIE WISE, M.D.
and RIZWAN KHAN, M.D.
Jointly and Severally,

      Defendants.

_____/

RANDALL M. BLAU (P53420)
MICHAEL J. BONVOLANTA (P80038)
Buckfire & Buckfire, P.C.
Attorneys for Plaintiff
29000 Inkster Rd, Suite 150
Southfield, MI 48034
(248) 569-4646
(248) 569-6737 (fax)
randy@buckfirelaw.com
michael@buckfirelaw.com

CULLEN B. McKINNEY (P49757)
JESSE M. DEPAUW (P81358)
Attorney for Defendants VHS Sinai-Grace Hospital,
Medical Center Emergency Services,
Drs. Gandolfo, Wise & Khan, M.D.
38777 Six Mile Rd., Ste. 101
Livonia, MI 48152
(313) 964-4500
(313) 469-4298 (fax)
cullen.mckinney@tnmglaw.com
jesse.depauw@tnmglaw.com

_____/

**ORDER DENYING**
**DEFENDANTS' MOTION FOR SUMMARY DISPOSITION**
**IN LIEU OF ANSWER**

21-006189-NH FILED IN MY OFFICE Cathy M. Garrett WAYNE COUNTY CLERK 10/11/2021 4:28 PM Moira Hartwell

Document received by the MI Macomb 16th Circuit Court.

At a session of said Court held in the
City of Detroit, County of Wayne,
State of Michigan,

On      10/11/2021

PRESENT HON. JUDGE KATHLEEN M. MCCARTHY
CIRCUIT COURT JUDGE

The parties having come before the Court on "Defendants' Motion for Summary

Disposition in Lieu of Answer", oral arguments having been heard on October 6, 2021, and the

Court being fully advised in the premises:

IT IS HEREBY ORDERED that Defendants' Motion for Summary Disposition in Lieu of

Answer is denied for the reasons stated on the record.

IT IS SO ORDERED.

*This is not a final order and does not close this case.*

/s/ Kathleen M. McCarthy

CIRCUIT COURT JUDGE

**Approved as to form and content by:**

Michael J. Bonvolanta (P80038)
Attorney for Plaintiff

Jesse M. Depauw (P81358)
Attorney for Defendants

Document received by the MI Macomb 16th Circuit Court.

00755268                                     2

## Court of Appeals, State of Michigan

## ORDER

Estate of Richard Chandler v VHS Sinai Grace Hospital Inc

Docket No. 359114

LC No. 21-006189-NH

Thomas C. Cameron
Presiding Judge

Christopher M. Murray

Anica Letica
Judges

The application for leave to appeal is DENIED for failure to persuade the Court of the need for immediate appellate review.

_Presiding Judge_

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

February 17, 2022
Date

Chief Clerk

Document received by the MI Macomb 16th Circuit Court.

# Order

**Michigan Supreme Court**
Lansing, Michigan

June 28, 2022

Bridget M. McCormack,
Chief Justice

164230

Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch,
Justices

DENISE CHANDLER, Personal Representative
of the ESTATE OF RICHARD CHANDLER,
      Plaintiff-Appellee,

v

SC: 164230
COA: 359114
Wayne CC: 21-006189-NH

VHS SINAI GRACE HOSPITAL, INC., d/b/a
SINAI-GRACE HOSPITAL MEDICAL
CENTER EMERGENCY SERVICES,
ACADEMIC INTERNAL MEDICINE
SPECIALISTS, PLLC, RIZWAN KHAN, PLLC,
LAUREN GANDOLFO, D.O., STEFANIE WISE,
M.D., and RIZWAN KHAN, M.D.,
      Defendants-Appellants.

_____/

      On order of the Court, the application for leave to appeal the February 17, 2022 order of the Court of Appeals is considered, and it is DENIED, because we are not persuaded that the questions presented should now be reviewed by this Court.





I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

June 28, 2022

Clerk

p0620

Document received by the MI Macomb 16th Circuit Court.

FILED · · · Received for Filing · · Oakland County Clerk 7/18/2023 2:33 PM

Document received by the MI Macomb 16th Circuit Court.

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**

ARLIEA JOHNSON, by her
Personal Representative ELDESSA
JOHNSON,

       Plaintiff,

Case No: 2022-197920-NH
HON. JEFFERY S. MATIS

v.

WEST BLOOMFIELD HEALTH AND
REHABILITATION CENTER, LLC,

       Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY DISPOSITION

This matter is before the Court on Defendant West Bloomfield Health and Rehabilitation

Center, LLC's ("West Bloomfield") Motion for Summary Disposition Pursuant to MCR

2.116(C)(7). The Court dispenses with oral argument. MCR 2.119(E)(3).

### I.    Background

This is a medical malpractice action in which Plaintiff alleges that because of West

Bloomfield's negligence, decedent, Arliea Johnson ("Johnson") developed pressure injuries

which led to sepsis and ultimately her death. Plaintiff commenced this action on December 22,

2022. Defendant asserts that it is statutorily immune for the treatment rendered.

### II.    Facts

The Complaint asserts that on February 22, 2019, Johnson was admitted to West

Bloomfield for long term care due to advanced dementia and a need for extensive assistance with

activities of daily living. No pressure injuries were noted during this time frame. On April 11,

2020, Johnson was feverish and lethargic and was sent to Henry Ford West Bloomfield. Johnson

tested positive for COVID upon admission. She was discharged back to West Bloomfield that

1

same day and stage II pressure injuries were noted. Plaintiff asserts that no Braden Assessment beyond the initial evaluation was performed and Johnson's treatment plan lacked necessary interventions to prevent further skin breakdown. Johnson's health continued to decline, and the pressure injuries continued to worsen. Johnson was sent to the emergency room of Henry Ford West Bloomfield Hospital for treatment on May 11, 2020. On May 19, 2020, Johnson passed away. Plaintiff asserts that Defendant failed to provide appropriate care which resulted in the pressure injuries progressing to severe unstageable/stage IV decubitus ulcers, resulting in sepsis which caused and/or contributed to Johnson's death.

## II. Standard of Review

West Bloomfield's motion is brought pursuant to MCR 2.116(C)(7). Under MCR 2.116(C)(7), a party is entitled to summary disposition if the Plaintiff's claims are "barred because of immunity granted by law . . . ." Under MCR 2.116(C)(7), "[t]he contents of the complaint are accepted as true unless contradicted by documentation submitted by the movant." *Maiden v Rozwood,* 461 Mich 109, 119; 597 NW2d 817 (1999). The moving party may support its motion with "affidavits, depositions, admissions, or other documentary evidence." *Id.*

## III.   Analysis

West Bloomfield claims that it is immune from liability under both state and federal law. West Bloomfield first argues that it is afforded immunity pursuant to the Pandemic Healthcare Immunity Act (the "Act"), MCL 691.1475 which provides in pertinent part as follows:

> A health care provider or health care facility that provides health care services in support of this state's response to the COVID-19 pandemic is not liable for an injury, including death, sustained by an individual by reason of those services, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services constituted willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm by the health care provider or health care facility.

2

Document received by the MI Maconb 16th Circuit Court.

Here, the Court finds that it is undisputed that West Bloomfield is a licensed nursing home and considered a health care facility under the act. MCL 691.1473(b). Further, it is also undisputed that Johnson was treated by West Bloomfield during the statutorily granted immunity period. MCL 691.1477 ("The liability protection provided by this act applies retroactively, and applies on or after March 29, 2020 and before July 14, 2020."). It is further undisputed that West Bloomfield provides "health care services" as they are defined under the Act ("Health care services" means services provided to an individual by a health care facility or health care provider regardless of the location where those services are provided, including the provision of health care services via telehealth or other remote method").

However, the Court notes that to qualify for immunity, the "health care services" must be provided "in support of this state's response to the COVID-19 pandemic" and there must be a nexus between those services and the plaintiff's injuries. MCL 691.1475 ("A health care provider or health care facility that *provides health care services in support of this state's response to the COVID-19 pandemic* is not liable for an injury, including death, sustained by an individual *by reason of those services....*").

The Complaint in this matter, which the Court must accept as true, alleges only that West Bloomfield failed to provide and implement appropriate pressure wound preventative care. However, West Bloomfield asserts, in its brief in support at pg. 7, that the Complaint alleges that Johnson's injuries were sustained by reason of health care services defendant provided in support of the state's response to the Covid-19 pandemic. Notably, West Bloomfield fails to direct the Court to any paragraph in the Complaint to support this assertion. Having reviewed the Complaint, the Court is unaware of any such allegations. Further, West Bloomfield did not submit any supporting documentation indicating that it was providing health care services "*in*

3

Document received by the MI Macomb 16th Circuit Court.

*support of this state's response to the COVID-19 pandemic*" or that Johnson was injured "*by reason of those services.*" At best, based on what is before the Court, the Court can only conclude that West Bloomfield was providing health care services *during* the pandemic. This is simply insufficient to support a finding that West Bloomfield is entitled to immunity pursuant to MCL 691.1475.

Next, West Bloomfield asserts that it is immune from suit pursuant to the Public Readiness And Emergency Preparedness Act ("PREP Act), 42 USC 247d-6d. The PREP Act provides as follows:

> Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure.

Thus, pursuant to the PREP Act, to be immune, a Plaintiff's injuries must have a causal relationship to West Bloomfield's use or administration of a "covered countermeasure." West Bloomfield makes the unsupported argument that Johnson was subject to the countermeasures of protective gear, devices, medications, and care plan interventions. There are simply no allegations in the Complaint to support this assertion and West Bloomfield failed to direct the Court to any evidentiary support for these assertions. The unsupported assertions of counsel are not enough to grant summary disposition. Moreover, the motion does not even assert that Johnson was injured because of any of these alleged countermeasures.

Accordingly, summary disposition is not warranted pursuant to the PREP Act.

## CONCLUSION

THEREFORE, IT IS HEREBY ORDERED that, for the reasons stated above, West Bloomfield's Motion for Summary Disposition is DENIED.

4

IT IS FURTHER ORDERED that the parties shall facilitate this matter within 90 days with a mutually agreed upon facilitator.

IT IS FURTHER ORDERED that the parties shall submit a stipulated order within 14 days, naming their mutually agreed upon facilitator. If the parties fail to agree, a facilitator will be selected utilizing the Court's random blind draw system.

*This is not a final order and does not close the case.*

IT IS SO ORDERED.

DATE: ___7\18\23___

Hon. Jeffery S. Matis
Circuit Court Judge

Document received by the MI Macomb 16th Circuit Court.

5

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

BRENDA BROWN, Personal Representative of the
Estate of ESSIE PRICE, Deceased,

    Plaintiff,

v

GRAND BLANC OPCO, LLC d/b/a Medilodge of
Grand Blanc, a foreign limited liability company;
B&Y HEALTHCARE S CORP, a foreign
corporation; CODY HEALTHCARE S CORP, a
foreign corporation; and GENERATIONS
HEALTHCARE MANAGEMENT, LLC, a foreign
limited liability company,

    Defendants, Jointly and Severally.

No. 22-118301-NH

Hon. Brian S. Pickell



| DONNA M. MACKENZIE (P62979) | GABE SYBESMA (P66632) |
|---|---|
| OLSMAN MACKENZIE PEACOCK | JUSTIN ROSTKER (P82026) |
| & WALLACE, P.C. | THE KITCH FIRM |
| Attorneys for Plaintiff | Attorney for Defendant Grand Blanc OPCO, |
| 2684 West Eleven Mile Road | LLC d/b/a MediLodge of Grand Blanc Only |
| Berkley, MI 48072 | One Woodward Avenue, Suite 2400 |
| 248-591-2300 / 248-591-2304 [fax] | Detroit, MI 48226-5485 |
| dmackenzie@olsmanlaw.com | (313) 965-7987 |
| | gabe.sybesma@kitch.com |

**ORDER DENYING DEFENDANT MEDILODGE OF GRAND BLANC'S MOTION FOR
SUMMARY DISPOSITION PURSUANT TO MCR 2.116(C)(7)**

At a session of this Honorable Court
this _____ day of __l_a__l_ _l_p_____, 2023
In the County of Genesee, State of Michigan
The Honorable Brian S. Pickell, presiding:

This matter having come before the Court on Defendant Medilodge of Grand Blanc's

Motion for Summary Disposition Pursuant to MCR 2.116(C)(7), the court having heard oral

arguments on the record, and the Court otherwise being fully advised;

Document received by the MI Macomb 16th Circuit Court.

IT IS HEREBY ORDERED that the Defendant Medilodge of Grand Blanc's Motion for

Summary Disposition Pursuant to MCR 2.116(C)(7) seeking immunity from Plaintiff's allegations

of negligence pursuant to the Pandemic Health Care Immunity Act and/or the Public Readiness

and Emergency Preparedness Act is DENIED without prejudice for the reasons stated on the

record.

THIS IS NOT A FINAL ORDER AND DOES NOT CLOSE THE CASE.

JUN 0 6 2023    **BRIAN S. PICKELL**
**P-57411**

Hon. Brian S. Pickell
Circuit Court Judge

Approved as to form by:

DONNA M. MACKENZIE (P62979)
Attorneys for Plaintiff

JUSTIN ROSTKER (P82026)
Attorneys for Defendant

Document received by the MI Macomb 16th Circuit Court.

2

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

ANN PAKENAS, Personal Representative of the
Estate of JOHN EDWARD ROGERS, Deceased,

      Plaintiff,                              No.   2022-004355-NH

v                                        Hon. Edward Servitto, Jr.

MCLAREN MACOMB d/b/a McLaren Medical
Center – Macomb,

      Defendant.

| DONNA M. MACKENZIE (P62979) | VICTORIA S. LEHMAN (P71935) |
|---|---|
| LAUREN R. WALSON (P85433) | DAVID A. OCCHIUTO (P84508) |
| OLSMAN MᴀᴄKENZIE PEACOCK & WALLACE, P.C. | GIARMARCO, MULLINS & HORTON, P.C. |
| Attorneys for Plaintiff | Attorneys for Defendant |
| 2684 West Eleven Mile Road | 101 W. Big Beaver Road, 10thFloor |
| Berkley, MI 48072 | Troy, MI 48084 |
| 248-591-2300 / 248-591-2304 [fax] | (248) 457-7185 / (248) 457-7001 |
| dmackenzie@olsmanlaw.com | vlehman@gmhlaw.com |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY
DISPOSITION PURSUANT TO MCR 2.116(C)(7) AND THE PANDEMIC HEALTH
CARE IMMUNITY ACT CONCURRENT TO ITS ANSWER**

      NOW COMES the Plaintiff, ANN PAKENAS, Personal Representative of the Estate of

JOHN EDWARD ROGERS, Deceased, by and though her attorneys, OLSMAN MᴀᴄKENZIE

PEACOCK & WALLACE, P.C., by and through DONNA M. MᴀᴄKENZIE, and for her

response to Defendant's Motion for Summary Disposition Pursuant to MCR 2.116(C)(7) And

The Pandemic Health Care Immunity Act Concurrent To Its Answer, states as follows:

      The Pandemic Health Care Immunity Act is not applicable in this case because Mr.

Rogers was not injured *by reason of* health care services in support of the state's response to the

COVID-19 pandemic. Instead, Mr. Rogers blunt force head trauma was caused by the

Defendant's failure to provide him with the assistance and assistive devices that he needed and/or failure to instruct Mr. Rogers to wait to shower until the assistance and devices that he needed for his safety were available.

Moreover, at the time of the incident alleged in this case, the hospital was not providing "services in support of the state's response to the COVID-19 pandemic." Assessing a patient's risk for falling and ensuring that interventions are in place to protect a patient from falling are not health care services related to COVID-19. Moreover, Defendant has "had the playbook to rely on" in providing these services for decades. Finally, at the time of the incident, the hospital was not providing any services to Mr. Rogers at all, as plaintiff's allegations relate to omissions, as opposed to affirmative acts. A "service" – by definition – cannot be an omission. Therefore, the plain language of the statute does not apply to the circumstances of this case.

Defendant's Motion should also be denied because retroactive application of the Pandemic Health Care Immunity Act would be unconstitutional.

Finally, in the event that this Court determines that the Pandemic Health Care Immunity Act should be applied retroactively and that it applies to Plaintiff's claims, Plaintiff should be permitted an opportunity to amend her complaint to include allegations of gross negligence, as there can be no doubt that allowing Mr. Rogers, who was both at high risk for falling and high risk for injury in the event of a fall, and who was known to require both assistance and assistive devices, to shower in a wet, slippery environment, without the assistance and assistive devices that he needed to keep him safe, was conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

WHEREFORE, Plaintiff, ANN PAKENAS, Personal Representative of the Estate of John EDWARD Rogers, Deceased, respectfully requests this Honorable Court enter an Order

DENYING Defendant's Motion for Summary Disposition Pursuant to MCR 2.116(C)(7) and the Pandemic Health Care Immunity Act Concurrent to its Answer. Alternatively, should the Court find that the Act applies retroactively to Plaintiff's claim despite the absence of COVID-19 related healthcare services and despite significant constitutional implications, Plaintiff would respectfully request leave of this Court to amend her Complaint to include a count of gross negligence, as the facts support doing so. Plaintiff further requests any such relief and this Court shall deem necessary and just.

OLSMAN MACKENZIE PEACOCK<br>
& WALLACE, P.C.<br>
<br>
_____<br>
Donna M. MacKenzie (P62979)<br>
Lauren R. Walson (P85433)<br>
Attorneys for Plaintiff

Dated:  January 10, 2023

## BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY DISPOSITION PURSUANT TO MCR 2.116(C)(7) AND THE PANDEMIC HEALTH CARE IMMUNITY ACT CONCURRENT TO ITS ANSWER

**I.     FACTUAL BACKGROUND**

*A.     Mr. Rogers' Hospitalization*

This matter arises out of the preventable, traumatic, and fatal injuries sustained by Mr. Rogers when staff at Defendant's hospital failed to implement and follow the basic safety interventions necessary to keep him safe. Mr. Rogers was admitted to Defendant's hospital on April 11, 2020. **(Exhibit 1, Records, at p. 1)**. Mr. Rogers was tested for COVID-19 on admission, and his results returned as negative the same day. **(Exhibit 1, p. 3).** From that point on, Defendant's staff provided health care services in response to Mr. Rogers' non-Covid related shortness of breath, cough, fever, and rigors. **(Exhibit 1, p. 1).** Additionally, the hospital's

nursing staff utilized the Morse Fall Scale tool to assess Mr. Rogers' risk of falling. Mr. Rogers, who was on blood thinners, was determined to be at high risk for falls. **(Exhibit 1, pp. 4-5).**

Because Mr. Rogers was at high risk for falling, and because his blood thinners placed him at high risk for injury in the event of a fall, he should have had the highest level of fall preventions in place to protect him and keep him safe. According to the tool utilized by the defendant, those interventions included, but are not limited to:

> Call light within reach; light cord within reach; encouraged to call for assistance; bed in low position; brakes locked on bed, stretcher, or wheelchair; side rails as appropriate; wearing non-slip footwear; sensory aids in place/remind as needed; night light, bathroom light on/door ajar after dark; path to bathroom obstacle free; assist when toileting every 2 hours while awake; reorient as needed to surroundings, use bed and call light; evaluate need for safety/adaptive devices; personal care items within reach; fall information given to patient &/or family; check personal equipment; patient safety education given; instruct patient/family of risk for falls and preventative interventions; visual observation every 2 hours; bedside commode; bedpan/urinal within easy reach (if appropriate); bed alarm/monitor on; move patient closer to nurse station; assist &/or standby patient during ambulation; when transported, notify receiving department of fall risk; fall risk level & intervention in report/ SBAR; safety related plan of care in place; do not leave patient unsupervised when off unit; personal alarm on; and visual observation every 1 hour. **(Exhibit 1, pp. 4-5).**

As a result of the inconsistent and inaccurate use of the Morse Fall Scale tool being used by the defendant, however, the interventions necessary to protect him and keep Mr. Rogers safe were not consistently implemented and followed. However, on April 17, 2020, the morning of his fall, nursing staff ***did*** recognize that Mr. Rogers was a high fall risk, required an ambulatory aid, was on IV Therapy / Heparin Lock, was on 2 or more medications, and required assistance for activities of daily living, including toileting and ambulating. Despite recognizing his high fall risk and need for assistance and assistive devices, just hours later, the staff permitted Mr. Rogers to take a shower *without any assistance or assistive devices*. Notably, the nursing staff did <u>not</u>

4

instruct Mr. Rogers to wait to shower until someone could assist him and ensure that he had the assistive devices that he needed – they simply allowed him to take a shower without any help whatsoever. Not surprisingly, while in the shower without any assistance or assistive devices, Mr. Rogers fell and struck his head with such force that he sustained a massive subdural hematoma with intracranial hemorrhage. **(Exhibit 1, at pp. 6-7).** An emergent craniotomy evacuation could not save his life; Mr. Rogers sadly passed away approximately 36 hours after his fall, on April 19, 2020. **(Exhibit 1, at p. 2).**

> ### B.    *Governor Whitmer's Executive Orders; Pandemic Health Care Immunity Act*

In the spring of 2020, Governor Whitmer issued a series of executive orders in response to the COVID-19 pandemic. On March 10, 2020, Governor Whitmer issued EO 2020-4, declaring a state of emergency under the Emergency Powers of the Governor Act of 1945 (EPGA), MCL § 10.31, *et seq*, and a state of emergency under the Emergency Management Act (EMA), MCL § 30.401, *et seq*. On April 1, 2020, Governor Whitmer issued EO 2020-33, declaring a state of emergency under the EPGA, and a state of emergency and state of disaster under the EMA. On March 29, 2020, Governor Whitmer issued EO 2020-30, which provided that any:

> [L]icensed health care professional or designated health care facility that provides medical services ***in support of this state's response to the COVID-19 pandemic*** is not liable for an injury sustained by a person by reason of those services . . . unless it is established that such injury or death was caused by the gross negligence, as defined in MCL 30.411(9), of such health care professional or designated health care facility.

Governor Whitmer then requested that the Legislature extend the state-of-emergency and state-of-disaster declarations by 70 days. However, the Legislature extended the declaration only through April 30, 2020. *See* Senate Concurrent Resolution 2020-24. Thus, on April 30, 2020, Governor Whitmer issued EO 2020-66, which terminated the state-of-emergency and state-of-

disaster declarations under the EMA. Immediately afterward, she issued EO 2020-67, which indicated that a state of emergency remained declared under the EPGA, and EO 2020-68, which redeclared a state of emergency and state of disaster under the EMA.

On October 2, 2020, however, the Michigan Supreme Court held, in relevant part, that Governor Whitmer did not have the authority to redeclare a state of emergency or state of disaster based on the COVID-19 pandemic after April 30, 2020, and that the EPGA was unconstitutional. *In re Certified Questions*, 506 Mich 332 (2020).

Following the Supreme Court's invalidation of the Governor's executive orders, on October 22, 2020, the Legislature enacted the Pandemic Health Care Immunity Act, MCL 691.1471 *et seq.*, in an attempt to retroactively restore the immunity previously provided under the Governor's executive orders. The Act provides:

> A health care provider or health care facility that ***provides*** health care ***services in support of this state's response to the COVID-19 pandemic*** is not liable for an injury, including death, sustained by an individual ***by reason of those services***, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services constituted willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm by the health care provider or health care facility. MCL § 691.1475.

The Act also states that the "liability protection provided by this act applies retroactively, and applies on or after March 29, 2020 and before July 14, 2020." MCL § 691.1477.

To date, Plaintiff is unaware of any no published Michigan caselaw interpreting the Act's applicability or constitutionality.

## II.     STANDARD OF REVIEW

Defendant's dispositive motion is brought pursuant to MCR 2.116(C)(7). In deciding a motion under this rule, the court may consider all documentary evidence submitted by the parties. *Bryant v Oakpointe Villa Nursing Centre, Inc*, 471 Mich 411, 419 (2004). "In reviewing

a (C)(7) motion, a court must accept all well-pleaded allegations as true and construe them in favor of the nonmoving party." *Tellin v Forsyth Twp*, 291 Mich App 692, 698 (2011). "The court must consider all affidavits, pleadings, depositions, admissions, and documentary evidence filed or submitted by the parties, and the motion should be granted only if no factual development could provide a basis for recovery." *Xu v Gay*, 257 Mich App 263, 266-67 (2003).

## III.   LAW AND ARGUMENT

### A.   *The Pandemic Health Care Immunity Act Does Not Apply Because Mr. Rogers Was Not Injured by Reason of Health Care Services in Support of The State's Response to the COVID-19 Pandemic.*

The defendant is attempting to avoid responsibility for the death of Mr. Rogers by asserting immunity pursuant to the Pandemic Health Care Immunity Act.[1] MCL § 691.1475. This Act purportedly provides immunity to health care providers or facilities for injuries caused by the provision of health care services in support of the state's response to the COVID-19 pandemic from March 29, 2020 to July 14, 2020. Although the legislature could have attempted to grant blanket immunity to all health care providers and facilities for those entire three and a half months, the legislature did not do so. Indeed, much of the committee hearing testimony relied upon by defendant in support of its argument for broad application of the statute's immunity contains language that could have been – but was <u>not</u> – incorporated into the statute itself. Instead, in passing the Act, the legislature used very specific language that limited the applicability of immunity to very particular circumstances. Notably, the circumstances of this case do not fall within the scope of the Act.

---

[1] As will be argued in section III(B) below, Plaintiff asserts that the Pandemic Health Care Immunity Act is unconstitutional. For purposes of the argument in the instant section, however, Plaintiff will assume for sake of argument that the act is valid.

According to the plain language MCL § 691.1475, in order for immunity to apply, the patient must have been injured "***by reason of***" health care services rendered "***in support of this state's response to the COVID-19 pandemic***." In fact, the Act reads:

> A health care provider or health care facility that provides health care ***services in support of this state's response to the COVID-19 pandemic*** is not liable for an injury, including death, sustained by an individual ***by reason of those services***, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services constituted willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm by the health care provider or health care facility. MCL § 691.1475 (Emphasis added).

"Health care services" is defined by the act as:

> ***[S]ervices provided*** to an individual by a health care facility or health care provider regardless of the location where those ***services are provided***, including the ***provision*** of health care ***services*** via telehealth or other remote method. MCL § 691.1473(d) (Emphasis added).

The COVID-19 pandemic created a public health emergency that rapidly altered the provision of health care services across the country. COVID was a novel condition, and many treatments were not approved specifically for COVID, were approved only for emergency use, or were experimental. The purpose of the Pandemic Health Care Immunity Act, which is clear from the plain language of the statute itself, is to protect providers and entities from liability for injuries that resulted from this type of evolving treatment that was novel and – as defendant has pointed out – treatment for which there was "no playbook to rely on." (Defendant's Motion, p. 9)

Mr. Rogers was not receiving any treatment for which there was no playbook to rely on. Hospitals have utilized tools to assess and evaluate patient risks for falls and have implemented interventions to keep such patients safe for decades. Moreover, there is no dispute that Mr. Rogers did not have COVID. The Act requires that the injury to the patient must occur "by reason of" health care services provided in support of this state's response to the COVID-19

8

pandemic. In this case, when the hospital staff negligently failed to provide Mr. Rogers with the assistance and/or assistive devices that he required to keep him safe, or simply instructed Mr. Rogers to wait to shower until he could be provided with the assistance or assistive devices that he needed, the hospital was not providing services in support of the state's COVID-19 pandemic. In fact, the hospital was not providing any services to him at all, as plaintiff's allegations relate to omissions, as opposed to affirmative acts. A "service" – by definition – cannot be an omission. Even more importantly, the blunt force head trauma that Mr. Rogers suffered was not caused by any health care services that were being provided in support of the state's COVID-19 pandemic. Therefore, the plain language of the statute does not apply to the circumstances of this case.

### i.   **Mr. Rogers' injury and death were not sustained *by reason of* health care services rendered in support of this state's response to the COVID-19 pandemic.**

Mr. Rogers' injury, i.e., blunt force head trauma, is not the kind of injury that the Legislature anticipated when immunizing injuries sustained "by reason of health care services rendered" to combat the COVID-19 pandemic. Based on the plain language of the statute, there is clearly a causal element that must be present in order for the Act to apply. The injury sustained by the plaintiff must have been ***by reason of*** the health care services rendered in support of this state's response to the COVID-19 pandemic. To argue that Mr. Rogers' blunt force head trauma was ***a result of*** health services rendered to combat the COVID-19 pandemic is simply absurd.

For example, Mr. Rogers did not suffer laryngotracheal injury as a result of hasty and/or prolonged intubation; he did not suffer subglottic or tracheal stenosis; he did not suffer pulmonary deconditioning or post-viral inflammatory disease; nor did he suffer any swallowing issues, intubation-related scarring, or other laryngeal injury or dysfunction. Instead, Mr. Rogers suffered a massive, fatal subdural hematoma when he suffered a fall because the hospital failed

to provide him with any assistance or assistive devices during his shower and/or failed to instruct Mr. Rogers to wait to shower until the hospital staff could ensure that he could do so safely.

Moreover, Defendant does not even attempt explain how Mr. Rogers' injury was a result of services rendered in support of the COVID-19 pandemic. For example, the hospital does not claim that its facility was plighted by staff or equipment shortages that prevented them from providing assistance or assistive devices to Mr. Rogers. Defendant does not claim that any hospital protocol in effect at the time that prevented the hospital from providing Mr. Rogers with assistance or an assistive device in the shower. Defendant makes no attempt to provide this court with a factual basis for how Mr. Rogers' injury was by reason of "services rendered in support of the COVID-19 pandemic," nor does Defendant attach an affidavit attesting to such facts to its motion.

Per the statutory language, Defendant has failed to demonstrate that the injury and death sustained by Mr. Rogers was even remotely "by reason of" services provided in support of the state's response to the COVID-19 pandemic.

### ii. The health care services rendered to Mr. Rogers were not *in support of* this state's response to the COVID-19 pandemic.

After testing negative for COVID-19 on the day of his admission, April 11, 2020, Mr. Rogers no longer received any health care services that were "in support of" this state's response to the COVID-19 pandemic. In fact, Mr. Rogers did not receive any health care services that related to COVID-19 aside from simply being tested for same. The reasons behind Mr. Rogers' continued admission to the hospital related to his shortness of breath; coughing; pneumonia; leukocytosis; and thrombocytosis. In fact, Elizabeth Uyematsu, DO, detailed Mr. Rogers' hospital course prior to his fall as follows:

COVID-19 testing was negative. He was seen by Pulmonary as well as Infectious Disease. The patient had a pneumonia on x-ray. He was started on antibiotics. Due to his coughing, he was seen by speech therapy and modified swallow eval was done which did not show aspiration of food or liquids. The patient had a persistent leukocytosis. Peripheral smear was sent during this hospital stay, but was not available upon disposition. The patient's cough waxed and waned. Through this hospital stay, he was seen by ENT who recommended further outpatient followup. The patient was seen by Pulmonary. Oxygen was titrated. He was on room air. He has been up ambulating in the hallways. However, due to his leukocytosis and thrombocytosis, he was kept for additional observation. He presented with alpha hemolytic strep. Case was discussed with ID. At this time, antibiotics will be continued. He had an echocardiogram done, which was nondiagnostic for endocarditis. On 04/17/2020, the patient asked to take a shower. **(Exhibit 1, p. 1).**

In other words, the health care services that were rendered to Mr. Rogers during his admission were in support of treating his pneumonia and cough; in support of treating and monitoring his leukocytosis; in support of treating and monitoring his thrombocytosis; in support of monitoring and adjusting his oxygen levels; in support of treating his alpha hemolytic strep; and in support of keeping him safe from the risk of falling. These services were not related to COVID-19 in any way and were not rendered "in support of" the state's response to the COVID-19 pandemic.

Regardless, even assuming that "services rendered in support of the COVID-19 pandemic" impacted Defendant's ability to assist Mr. Rogers in the shower, **the hospital has not provided any explanation whatsoever as to how any such "services rendered in support of the COVID-19 pandemic" prevented the hospital from simply instructing Mr. Rogers to wait to shower until the hospital staff could ensure that he could do so safely.**

### iii. The negligence in this case constituted a failure to act, and the Act does not extend immunity to negligent *omissions*.

Defendant broadly cites testimony from the House Judiciary Committee explaining that the bill was put into place to protect healthcare professionals and facilities from liability "for

actions they took **or were unable to take as part of the State's response to COVID-19**." (*See* Def's MSD, at p. 9) (Emphasis added). Defendant follows up with another excerpt which reads, "[b]est practices continually changed and difficult decisions were constantly made **with no playbook to rely on.**" *Id.* (Emphasis added).

First and foremost, these testimony excerpts were <u>not</u> incorporated into the language of the statute's final publication. The Legislature certainly could have provided for actions that healthcare professionals "*were unable to take,*" but deliberately chose not to; there is no language that accounts for *omissions*, or actions that they were "unable to take."

The Michigan Supreme Court has previously analyzed the absence within a statute of language pertaining to acts and/or omissions. In *Johnson v Pastoriza*, 491 Mich 417 (2012), a mother brought suit pursuant to MCL §600.2922a on behalf of herself and her deceased fetus, whom she lost at 20 weeks' gestation. Plaintiff claimed that she specifically requested the performance of a cerclage and defendants consciously chose to deny the request. The trial court refused to grant the defendants' motion for summary disposition, and the Court of Appeals affirmed, finding that the refusal to perform the cerclage was a "wrongful or negligent act under MCL § 600.2922a." The Michigan Supreme Court reversed:

> The Legislature clearly intended to impose liability *for affirmative or positive acts* under MCL 600.2922a(1). In comparison, it is very clear that the Legislature *did not intend to impose liability for omissions, something it can and has done in other statutes*. The Legislature did not even include the more expansive terms "neglect" and "fault of another" that it included in MCL 600.2922(1), which permit liability on the basis of omissions. The Legislature's decision to exclude omissions from MCL 600.2922a indicates that it did not intend to attach liability to omissions that cause prenatal death or injury. *Pastoriza*, 491 Mich at 437 (Emphasis added).

As the Supreme Court emphasized in *Pastoriza*, the Legislature ***can*** – and ***has*** many times before – included statutory language that encompasses omissions as well as affirmative

acts.[2] The reality is that the legislature chose not to include any language that encompasses omissions in the Pandemic Health Care Immunity Act.

The Pandemic Act provides immunity for health care providers and/or facilities that "***provide***[] health care ***services*** in support of this state's response to the COVID-10 pandemic[.]" However, Plaintiff's claim is that Defendant's staff rendered ***a lack of services*** when they ***failed to provide*** Mr. Rogers with the level of assistance he required to keep him safe, and failed to request that Mr. Rogers delay his shower until he could be provided with assistance. In addition to the fact that Defendant's staff were not providing Mr. Rogers with any health care services rendered in support of this state's response to the COVID-19 pandemic, they were not providing him with any services at all. In fact, Plaintiff's claim is that the defendant committed an **omission** by ***failing to provide services*** to Mr. Rogers, namely assistance, while he showered. In other words, plaintiff does not claim an injury due to the provision of services, but instead, the failure to provide services.

Second, it is abundantly clear that the testimony excerpts cited by Defendant, *supra*, are referring to health care services that were rendered in response to COVID-19, only. Take the first excerpt, for example. Almost every American is acutely aware of the fact that the pandemic caused disruptions in the sort of actions that healthcare professionals and facilities were taking or, more importantly, "unable to take": Many treatments were not approved specifically for COVID, were approved only for emergency use, or were experimental. The way doctors treated people with COVID-19 evolved over the course of the pandemic as scientists came to better

---

[2] *Johnson v Pastoriza*, 491 Mich 417, 437 n 51 (2010) ("See, e.g., MCL 3.751, art 7, § a(9) (concerning liability for acts or omissions for those involved in the transport of radioactive waste); MCL 41.711a (eliminating liability for good-faith acts or omissions of emergency personal when rendering care at the scene of an emergency); MCL 52.205(7) (concerning liability for acts or omissions of medical examiners); MCL 333.18826 (concerning liability for acts or omissions of veterinarians and veterinary technicians); MCL 600.2962 (concerning liability for acts or omissions of certified public accountants).

13

understand the virus and more studies were published. For example, early on, the antimalarial medication called hydroxychloroquine was touted to treat COVID-19. However, research eventually showed that it was not beneficial and posed some risk. Physicians then removed it from the treatment paradigm. Steroids, which are now widely used, also were not originally recommended. During the beginning of the pandemic, convalescent plasma was a commonly used treatment for COVID-19 patients, but today, physicians aren't using it as frequently because it's not clear if it significantly reduces disease progression and mortality among hospitalized patients. There were also debates about starting certain on blood thinners to prevent clots, how long certain medications can be prescribed to a patient, and what position patients should be in to improve outcomes.

These choices regarding which actions to take or refrain from taking in response to a **novel** virus were unclear precisely because, as Defendant quotes, "*[b]est practices continually changed . . . with no playbook to rely on.*"

This case, however, is about a different playbook, called the Morse Fall Scale and it has been used in hospitals since 1989. Once a patient is determined to be at high risk for falls – as Mr. Rogers was – the hospital staff has a duty to implement interventions to keep the patient safe and minimize the risk of injury. Defendant cannot with a straight face feign ignorance of a fall risk prevention "playbook," when its own staff determined that Mr. Rogers required assistance with toileting and ambulation on the date of the incident, and had entered **thirty-one** fall risk interventions to implement in his care. *Supra*, at pp. 4-5.

They had the playbook; they just chose not to rely on it.

Finally, it should be pointed out *again* that, aside from Defendant's general recitation of the above testimony excerpts from the House Judiciary Committee, Defendant does not make

any independent claim that its own facility was plighted by staff or equipment shortages. Defendant does not argue that they desired to provide Mr. Rogers assistance in the shower to maintain his safety but could not because the hospital was overwhelmed. Defendant has also failed to introduce any evidence that a staffing shortage or anything else related to a "response to the COVID-19 pandemic" impacted the services rendered to Mr. Rogers. Mr. Rogers had several members from the Defendant's nursing staff attending to him throughout his stay; there is no reason why Mr. Rogers could not have been provided with assistance from staff during his shower, or instructd to delay his shower until staff was available to provide him with assistance, to ensure his safety.

In the following section, B, Plaintiff will discuss the constitutionality of the Act's retroactive application. However, as Plaintiff has just demonstrated, even if the Act's retroactive application were deemed constitutional, the fact remains that the statute is substantively inapplicable to the facts of this case.

**B.** ***Retroactive Application of The Pandemic Health Care Immunity Act is Unconstitutional***

Mr. Rogers was injured on April 17, 2020. The Act that Defendant's motion is premised upon became effective on October 22, 2020. In general, statutes and amendments of same are presumed to operate prospectively. *Davis v State Employees' Retirement Bd*, 272 Mich App 151, 155 (2006). However, the Act provides for retroactive application "on or after March 29, 2020 and before July 14, 2020." MCL § 691.1477. The constitutionality of the Act has yet to be discussed in caselaw, but Michigan courts have long held that retroactive application of legislation "presents problems of unfairness . . . because it can deprive citizens of legitimate expectations and upset transactions." *Downriver Plaza Group v Southgate*, 444 Mich 656, 666

(1994). In determining whether a law has retroactive effect, Michigan courts keep four principles in mind:

> First, we consider whether there is specific language providing for retroactive application. Second, in some situations, a statute is not regarded as operating retroactively merely because it relates to an antecedent event. ***Third, in determining retroactivity, we must keep in mind that retroactive laws* impair vested rights *acquired under existing laws or create new obligations or duties with respect to transactions or considerations already past***. Finally, a remedial or procedural act not affecting vested rights may be given retroactive effect where the injury or claim is antecedent to the enactment of the statute.

*LaFontaine Saline, Inc v Chrysler Group, LLC*, 496 Mich 26, 38-39 (2014) (emphasis added). The first and second principles are not in dispute; the Act clearly contains a statement of intended retroactive application. The third principle, however, is significant and dictates that retroactive application of the Act herein is unconstitutional. "A statute ***may not be applied retroactively if it abrogates or impairs vested rights***, creates new obligations, or attaches new disabilities concerning transactions or considerations occurring in the past." *Davis,* 272 Mich App at 158 (2006) (emphasis added). When all the facts become operative and are known, a cause of action accrues and it becomes a vested right. *In re Certified Questions*, 416 Mich 558, 573 (1982). To reiterate, Mr. Rogers was injured on April 17, 2020. At that moment, all the facts became operative and known; plaintiff's cause of action accrued; and plaintiff's cause of action became a vested right. Therefore, applying the Act retroactively would be patently unconstitutional. Applying the Act prospectively, i.e., after October 22, 2020, is moot because the Act itself only intended to remain operative between March 29, 2020 and July 14, 2020.

16

Michigan Courts have repeatedly protected prospective plaintiffs' vested rights in a cause of action.[3] Michigan is not unique from jurisdictions around the country in this respect.[4] Most recently, litigants have argued whether the legislative amendments to the no-fault act, MCL § 500.3101 *et seq.*, limiting reimbursement for expenses covered by personal protection insurance apply retroactively so as to limit benefits to individuals injured before the effective date of amendment. On August 25, 2022, the Michigan Court of Appeals held in a soon-to-be published opinion that they ***do not apply retroactively.*** *Andary v USAA Cas Ins Co*, __ Mich App __; __ NW2d __ (2022) (Docket No. 356487) **(Exhibit 3)**. With respect to the first of the *LaFontaine* considerations – and unlike the language of the Act currently at issue – the Court determined that the language of the no-fault amendments did not clearly demonstrate a legislative intent for the amendments to apply retroactively. However, the Court went even further, holding:

> ***Even if we were to conclude that the Legislature intended for 2019 PA 21 to apply retroactively*** to those injured before the amendments' effective date, ***we would nonetheless hold that retroactive*** application ***violates*** the Contracts Clause of ***the Michigan Constitution***.

---

[3] See e.g., *Doe v Dep't of Corrections (On Remand)*, 249 Mich App 49, 61-62 (2001) ("A cause of action becomes a vested right when it accrues and all the facts become operative and known"); *Bd of Trs of the City v City of Pontiac*, 317 Mich App 570 (2016) (holding that retroactive application of EO 225 and the purported extinguishment of the city's accrued but unpaid 2011-2012 fiscal year contribution was impermissible and would impair or abolish the fund's accrued claim for a breach of contract, a vested right); *Ohio Farmers Ins Co v Shamie*, 243 Mich App 232, 237 (2000) ("Because plaintiff's cause of action accrued before the accountant liability act became effective in 1996, we find that its cause of action was a vested right and conclude that the retroactive application of the act is improper . . . because it would destroy that vested right.").

[4] See e.g., *Massey v Sullivan Cty*, 464 SW 2d 548, 549 (Tenn 1971) ("[A]n alteration of the common law, resulting in the deprivation of a valuable common law right . . . cannot be given retroactive application.") **(Exhibit 4)**; *Gibson v Commonwealth*, 415 A2d 80, 83 (Pa 1980) ("It is well-settled that the Legislature may not extinguish a right of action which has already accrued to a claimant. 'There is a vested right in an accrued cause of action . . .'") **(Exhibit 5)**; *Lawrence v Anheuser-Bush, Inc*, 523 A2d 864, 871 (R.I. 1987) (holding that a new law imposing liability on vendors who sold alcohol to intoxicated individuals did not apply retroactively to a defendant who had relied on a vested right of no liability) **(Exhibit 6)**; *Johno v Doe*, 218 So3d 1004, 1007 (La 2016) (holding that a law retroactively granting tort immunity to the government and its contractors engaged in cleanup efforts in the aftermath of Hurricane Katrina violated due process protections) **(Exhibit 7).**

*Andary*, __ Mich App at __; slip op at 11 (emphases added). In other words, there are clearly circumstances in which courts have declined to grant statutes retroactive application, <u>even when the language of the statute evidences clear legislative intent</u>. The same is true here. Retroactive application of the Pandemic Health Care Immunity Act would violate the Due Process clause of the Michigan Constitution. *See* Const 1963, art 1 § 17 ("***No person shall be*** . . . ***deprived of*** life, liberty, or ***property, without due process of law***.") Furthermore, "[i]t is axiomatic that the constitutional provision of due process extends to protect that 'property' construed to be a vested right and that generally an accrued right of action is a vested property right which may not be arbitrarily impinged." *Grubaugh v St Johns*, 384 Mich 165, 170 (1970) (quoting 16 Am Jur 2d, Constitutional Law, § 421 *et seq*).

Plaintiff's claim accrued when the nursing staff at Defendant's hospital chose to forego implementing the fall safety interventions that were necessary to keep Mr. Rogers safe, resulting in his fall and fatal subdural hematoma. Plaintiff has a vested property right in her claim of action that she cannot be deprived of without due process of law under the Michigan Constitution. Retroactive application of the Pandemic Health Care Immunity Act to Plaintiff's case – which was devoid of any COVID-19 related healthcare services in any event – would be patently unconstitutional.

### C. *The Facts of This Case Favor Allowing Plaintiff to Amend Her Complaint to Add a Count of Gross Negligence*

In the event this Court should determine that the statute should apply retroactively, and that Plaintiff's Complaint lacks allegations of gross negligence sufficient to overcome immunity, Plaintiff should be permitted an opportunity to amend her complaint to include same as the facts support doing so. Leave to amend "shall be freely given when justice so requires." MCR 2.118(A)(2).

The Act defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results," and "willful misconduct" as "conduct or a failure to act that was intended to cause harm." MCL § 691.1473(a), (e). The Act, which was promulgated in response to the COVID-19 pandemic, likely envisioned such actions as using oral thermometers without sterilizing them between patients to be grossly negligent, or purposely coughing in patients' faces to be willful misconduct.

However, even if this Court is to accept Defendant's argument that the ***COVID-19*** Act encompasses actions related to ***minimizing a <u>non-Covid</u> patient's fall risk***, Plaintiff asserts that actions of gross negligence are readily apparent. Defendant's staff had determined that Mr. Rogers was a high fall risk; they determined that he needed an ambulatory device to keep him safe; they determined that he needed assistance with ADLs, including toileting and ambulation; and they were aware he was on two different blood thinners.

Allowing a high fall risk patient to ambulate unassisted demonstrates a lack of concern for whether an injury will occur. However, allowing a <u>high fall risk</u> patient <u>who is on blood thinners</u> to take a <u>shower in a slippery environment</u> unassisted by staff or any assistive device, is "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."

## IV.    CONCLUSION

Defendant's motion presents a scenario where hospitals are immune under the Act because they were providing services in response to the state's pandemic, somewhere in the hospital, even if those responsive services did not cause the plaintiff's injury. In application, this scenario eliminates every possible claim against a hospital, COVID-19 related or not. As

Defendant would have it, thousands of people across the United States would be prevented from obtaining justice for medical malpractice and negligence no matter the underlying reasons.

Mr. Rogers did not die of COVID-19, nor did he die due to care rendered in response to the COVID-19 pandemic. Mr. Rogers died as a result of the Defendant's medical malpractice and grossly negligent care. The Defendant cannot be permitted to avoid liability for same on the basis of a topically inapplicable Act that, if allowed to apply retroactively, would operate to deprive the Plaintiff of her property rights under the Due Process clause of the Michigan Constitution. Alternatively, should the Court determine that Plaintiff's Complaint requires allegations of gross negligence to overcome immunity, the Court should permit Plaintiff an opportunity to amend her Complaint to include same, as the facts undoubtedly support doing so.

WHEREFORE, Plaintiff, ANN PAKENAS, Personal Representative of the Estate of John EDWARD Rogers, Deceased, respectfully requests this Honorable Court enter an Order DENYING Defendant's Motion for Summary Disposition Pursuant to MCR 2.116(C)(7) and the Pandemic Health Care Immunity Act. Alternatively, should the Court find that the unconstitutional Act applies retroactively to Plaintiff's claim despite the absence of COVID-19 related healthcare services, Plaintiff would respectfully request leave of this Court to amend her Complaint to include a count of gross negligence, as the facts support doing so. Plaintiff further requests any such relief and this Court shall deem necessary and just.

OLSMAN MACKENZIE PEACOCK
& WALLACE, P.C.

Donna M. MacKenzie (P62979)
Lauren R. Walson (P85433)

Dated:  January 10, 2023

20

**CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2023, I electronically filed PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY DISPOSITION PURSUANT TO MCR 2.116(C)(7) AND THE PANDEMIC HEALTH CARE IMMUNITY ACT CONCURRENT TO ITS ANSWER and Brief in Support, along with this Certificate of Service, with the Clerk of the Court using the MiFile TrueFiling E-File system which will send notification of such filing to the following:

VICTORIA S. LEHMAN (P71935)
DAVID A. OCCHIUTO (P84508)

I further hereby certify that I have mailed by United States Postal Service this filing to the following non-E-File participants: **NONE**

/s/ Kate Hinote
Kate Hinote

21

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

ANN PAKENAS, Personal Representative of the
Estate of JOHN EDWARD ROGERS, Deceased,

      Plaintiff,                              No.  2022-004355-NH

v                                      Hon. Edward Servitto, Jr.

MCLAREN MACOMB d/b/a McLaren Medical
Center – Macomb,

      Defendant.

| DONNA M. MACKENZIE (P62979) | VICTORIA S. LEHMAN (P71935) |
|---|---|
| LAUREN R. WALSON (P85433) | DAVID A. OCCHIUTO (P84508) |
| OLSMAN MacKENZIE PEACOCK & WALLACE, P.C. | GIARMARCO, MULLINS & HORTON, P.C. |
| Attorneys for Plaintiff | Attorneys for Defendant |
| 2684 West Eleven Mile Road | 101 W. Big Beaver Road, 10thFloor |
| Berkley, MI 48072 | Troy, MI 48084 |
| 248-591-2300 / 248-591-2304 [fax] | (248) 457-7185 / (248) 457-7001 |
| dmackenzie@olsmanlaw.com | vlehman@gmhlaw.com |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR SUMMARY DISPOSITION PURSUANT TO MCR 2.116(C)(7), MCR 2.116(C)(10), AND THE PANDEMIC HEALTH CARE IMMUNITY ACT**

      NOW COMES the Plaintiff, ANN PAKENAS, Personal Representative of the Estate of JOHN EDWARD ROGERS, Deceased, by and though her attorneys, OLSMAN MacKENZIE PEACOCK & WALLACE, P.C., by and through DONNA M. MacKENZIE, and for her response to Defendant's Renewed Motion for Summary Disposition Pursuant to MCR 2.116(C)(7), MCR 2.116(C)(10), And The Pandemic Health Care Immunity Act, states as follows:

      The Pandemic Health Care Immunity Act is still not applicable in this case because the testimony of Defendant's nursing staff does not change the fact that Mr. Rogers was not injured

*by reason of* health care services in support of the state's response to the COVID-19 pandemic. Instead, Mr. Rogers blunt force head trauma was caused by the Defendant's failure to provide him with the assistance and assistive devices that he needed and/or failure to instruct Mr. Rogers to wait to shower until the assistance and devices that he needed for his safety were available. Neither of these failures were precipitated by anything COVID-19 related whatsoever. Moreover, Defendant's own nursing staff contradict each others' testimonies in terms of what orders and instructions were given with respect to showering Mr. Rogers.

Additionally, at the time of the incident alleged in this case, the hospital was not providing "services in support of the state's response to the COVID-19 pandemic." Assessing a patient's risk for falling and ensuring that interventions are in place to protect a patient from falling are not health care services related to COVID-19. Moreover, Defendant has "had the playbook to rely on" in providing these services for decades. Finally, at the time of the incident, the hospital was not providing any services to Mr. Rogers at all, as plaintiff's allegations relate to omissions, as opposed to affirmative acts. A "service" – by definition – cannot be an omission. Therefore, the plain language of the statute does not apply to the circumstances of this case.

Judges sitting in circuit courts across the state have denied similar motions under the Immunity Act for the same reasons stated in this brief, including Judge David M. Cohen of Oakland County; Judge Nanci J. Grant of Oakland County; Judge Annette J. Berry of Wayne County; Judge Kathleen M. McCarthy of Wayne County; Judge Jeffery S. Matis of Oakland County; and Judge Brian S. Pickell of Genesee County. **(Exhibit 7, Covid-19 MSD Orders).**

Defendant's Motion should also be denied because retroactive application of the Pandemic Health Care Immunity Act would be unconstitutional.

Finally, in the event that this Court determines that the Pandemic Health Care Immunity Act should be applied retroactively and that it applies to Plaintiff's claims, Plaintiff should be permitted an opportunity to amend her complaint to include allegations of gross negligence, as there can be no doubt that allowing Mr. Rogers, who was both at high risk for falling and high risk for injury in the event of a fall, and who was known to require both assistance and assistive devices, to shower in a wet, slippery environment, without the assistance and assistive devices that he needed to keep him safe, was conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

WHEREFORE, Plaintiff, ANN PAKENAS, Personal Representative of the Estate of John EDWARD Rogers, Deceased, respectfully requests this Honorable Court enter an Order DENYING Defendant's Renewed Motion for Summary Disposition Pursuant to MCR 2.116(C)(7), MCR 2.116(C)(10), and the Pandemic Health Care Immunity Act. Alternatively, should the Court find that the Act applies retroactively to Plaintiff's claim despite the absence of COVID-19 related healthcare services and despite significant constitutional implications, Plaintiff would respectfully request leave of this Court to amend her Complaint to include a count of gross negligence, as the facts support doing so. Plaintiff further requests any such relief and this Court shall deem necessary and just.

OLSMAN MACKENZIE PEACOCK & WALLACE, P.C.

Donna M. MacKenzie (P62979)
Lauren R. Walson (P85433)
Attorneys for Plaintiff

Dated:  October 23, 2023

**BRIEF IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR SUMMARY DISPOSITION PURSUANT TO MCR 2.116(C)(7), MCR 2.116(C)(10), AND THE PANDEMIC HEALTH CARE IMMUNITY ACT.**

3

## I.     FACTUAL BACKGROUND

### A.     *Mr. Rogers' Hospitalization*

This matter arises out of the preventable, traumatic, and fatal injuries sustained by Mr. Rogers when staff at Defendant's hospital failed to implement and follow the basic safety interventions necessary to keep him safe. Mr. Rogers was admitted to Defendant's hospital on April 11, 2020 and subsequently tested negative for COVID-19 the same day. **(Exhibit 1, Records).** From that point on, Defendant's staff provided health care services in response to Mr. Rogers' <u>**non**</u>-Covid related symptoms. Mr. Rogers, who was on blood thinners, was also determined to be at high risk for falls. **(Exhibit 1, pp. 4-5).**

Because Mr. Rogers was at high risk for falling, and because his blood thinners placed him at high risk for injury in the event of a fall, he should have had the highest level of fall preventions in place to protect him and keep him safe. According to the tool utilized by the defendant, those interventions included all those listed in **Exhibit 1, pp. 4-5.**

On April 17, 2020, the morning of his fall, nursing staff ***again*** recognized that Mr. Rogers was a high fall risk and required assistance for activities of daily living, including toileting and ambulating. Despite this, just hours later, the staff permitted Mr. Rogers to take a shower *without any assistance or assistive devices*. Notably, the nursing staff did <u>not</u> instruct Mr. Rogers to wait to shower until someone could assist him and ensure that he had the assistive devices that he needed – they simply allowed him to take a shower without any help whatsoever. Not surprisingly, while in the shower without any assistance or assistive devices, Mr. Rogers fell and struck his head with such force that he sustained a massive subdural hematoma with intracranial hemorrhage. **(Exhibit 1, at pp. 6-7).** An emergent craniotomy evacuation could not

save Mr. Rogers; he sadly passed away approximately 36 hours after his fall, on April 19, 2020. **(Exhibit 1, at p. 2).**

Defendant has apparently renewed this motion for summary disposition on the basis of deposition testimony it believes supports its arguments for pandemic immunity. The excerpts quoted by Defendant, however, do not change the fact that Mr. Rogers' traumatic fall, brain bleed, and death, were not caused by any health care services in support of the state's response to the COVID-19 pandemic, but were instead the result of failure to follow instructions and unpreparedness. Plaintiff does not dispute that the hospital had a "COVID-19 floor" and was treating COVID-19(+) patients. However, the primary negligence in this matter occurred while Mr. Rogers *was already in the shower*, and he was injured not *by reason of* health care services in support of the state's response to the COVID-19 pandemic, but instead by reason of the unpreparedness of a nursing aide who failed to gather an adequate number of towels before getting Mr. Rogers into the shower, and who left him in the shower, alone, so she could go grab those towels.

After deposing three members of Defendant's nursing staff, the plaintiff has uncovered three different versions of why Mr. Rogers was in the shower alone on April 17, 2020. Brandy Marais, RN, states that she instructed the nursing aide, Joyce Selva, to set him up with a chair in front of the sink in his room, and that NA Selva acknowledged her instruction. **(Exhibit 2 - Deposition of Brandy Marais, RN, at pp. 81:17-82:13).** Contrastingly, NA Selva remembers the events leading up to Mr. Rogers' grievous injury much differently. It was NA Selva's testimony that Nurse Marais told her that the doctor said that Mr. Rogers was allowed to shower. In fact, NA Selva said:

        Q:     And what did Brandy say about it?

A:      She said he could shower. The doctor said – I don't know what you call it. The doctor said he can shower. If he wants to get in the shower, he can shower.

Q:      So your testimony is that Brandy [Marais] – right?

A:      Yes.

Q:      -- told you that you were allowed to give Mr. Rogers a shower?

A:      Yep. He said he was allowed to shower. That's what the doctor said, he's allowed to shower.

Q:      Did she say it was okay for you to let him shower?

A:      Yes.

Q:      Anything else you can recall about that conversation with Brandy and Mr. Rogers about the shower?

A:      I remember **previously, we wanted – we preferred him to sit at the sink, and we were going to do that until we let – he was cleared by the doctor, go ahead and let him shower, he can take an actual shower, and that's why the plans changed and he went to the shower.**

**(Exhibit 3 - Deposition of Joyce Selva, NA, at pp. 27:12-28:18).** Timothy Vigliarolo, RN, another nurse on Mr. Rogers' care team, similarly has no recollection of Mr. Rogers having any restrictions with respect to his ability to shower. **(Exhibit 4 - Deposition of Timothy Vigliarolo, RN, at pp. 51:3-20).** Although Defendant's brief claims that Nurse Marais' unwillingness to shower Mr. Rogers was "due to the risks associated with COVID-19," Nurse Vigliarolo was unable to corroborate such concerns.

Q:      Okay. Did you ever have that belief that patients shouldn't be showered because it -- patients who needed assistance in the shower shouldn't be showered because of the risk of COVID? Did you ever have that concern?

A:      Personally, I wasn't concerned about it. No.

Q:      **Did you ever hear anyone else in the hospital talking about whether or not patients who needed the assistance of a nurse or a PCA in the shower shouldn't be showered because of the risk of COVID?**

6

MS. LEHMAN: Form and foundation. Go ahead.

A:    **No.**

Q:    That's not something you ever heard of when you were working at McLaren, correct?

A:    No.

Q:    Did anyone ever express a concern to you that patients shouldn't -- patients who needed assistance shouldn't be showered with assistance **because of the risk of COVID?**

A:    **No.**

Q:    And Brandy never expressed anything about Mr. Rogers not being able to shower because he needed assistance and he couldn't get that assistance **because of COVID,** correct?

A:    **Correct.**

(*Id.*, at pp. 52:12-53:11). Nor did NA Selva express any such COVID-19 related concerns during her deposition. Indeed, NA Selva _**got into the shower with Mr. Rogers,**_ rendering Defendant's assertions on the matter irrelevant. Significantly, Nurse Marais made it clear during her deposition that her reason for _**not**_ wanting Mr. Rogers to take a shower was because she was unable to assist him in the shower at that moment, and she would have never wished for him to shower unassisted:

Q:    And what is the purpose of you being in there?

A:    Just to make sure he's staying in his chair and showering. If he needs anything, he's not going to grab outside of the curtain. **When you go to give a shower to begin with usually, you know, you put the mat on the floor, you have the towels, the gown, the soaps, you have everything in there before they even get in there.** And then it's kind of a – you place them in the shower, they take off their clothes and it's okay, I'm right at the door if you need me. And that way they can holler, hey, I'm feeling a little short-winded, can you grab the wheelchair or, you know, you're just there for them. I mean, it happens. People are oh, I'll be fine and then they're not.

Q:    Okay. So fair to say that you're in there in order to provide them with any assistance that they might need and to keep them safe?

A:      Yes.

**(Exhibit 2, at pp. 82:16-84:4).** Unfortunately, NA Selva's failure to follow the instructions of Nurse Marais to give Mr. Rogers a bath at the sink led to Mr. Rogers being in the shower in the first place. NA Selva acknowledges that her then leaving Mr. Rogers alone in the shower ultimately resulted in his traumatic fall:

Q:      What was your understanding of what type of assistance he needed in the shower?

A:      Help getting in and out. Help him sit-up, ***staying in there in case he needs something***. You know, be there with him, there to help somebody, and if he needed help, he needs help.

Q:      Did you go into the shower with him?

A:      Yes, I did.

                                    * * *

Q:      Okay. And ***did you stay in the shower the entire time*** he was showering?

A:      Most of it. I noticed the floor was getting more wet than we anticipated, so I went – I had – I said, Listen. Stay here – 'cause he was still washing his body. I said, Stay right here. I'm walking out to the door, going a few feet and getting one more towel . . . And I was gone maybe 10 to 15 seconds. I wouldn't even say it was 30 seconds. **I walked out the door, there's a little hallway here, towel's right there, grabbed it, came right back in. And I got as far as the door, I heard him falling.**

**(Exhibit 3, at pp. 30:21-31:3; 31:22-32:13).** The fact that Mr. Rogers was permitted to shower without the assistance he needed had nothing to do with the provision of health care services in support of the state's response to the COVID-19 pandemic; it was a result of a failure to follow instructions and unpreparedness, period.

Moreover, in terms of Mr. Rogers' reasoning for *why* he wanted to take a shower and get cleaned up, his wife and sister-in-law recall very different circumstances than what has been presented by defendant. Mr. Rogers' wife, Patti Rogers, testified that a few days prior to his fall,

he had been waiting upwards of six hours for someone to assist him to the bathroom to use the toilet. Unfortunately, Mr. Rogers was no longer able to wait, and ultimately soiled himself of feces and urine. **(Exhibit 5, Deposition of Patti Rogers, at pp. 26:17-27:14).** After Mr. Rogers had soiled himself, he was never adequately cleaned up. Thus, he desired to take a shower.[1]

**(*Id.*, at p. 41:20-21).** Ms. Rogers also testified that Defendant's nursing staff, who failed to respond to Mr. Rogers for upwards of six hours, proceeded to berate Mr. Rogers extensively for having soiled himself. **(*Id.*, at pp. 41:22-42:19).** Mr. Rogers' sister-in-law, Elizabeth Pakenas, testified in kind:

> A:   … So there was an incident where he wanted to go to the bathroom and he waited for quite a while, I can't tell you how long, to go and when they finally came in he stood up, he pooped all over himself, and they started yelling at him.

* * *

> Q:   Okay. Do you have an understanding of why he was showering that day?
>
> A:   Trying to clean up from when he pooped on himself.
>
> Q:   From a couple days prior?
>
> A:   Yes.

**(Exhibit 6 - Deposition of Elizabeth Pakenas, at pp. 36:1-12; 40:9-13).** In other words, Mr. Rogers was not trying to "wash the COVID" off of himself, or placate his wife's concerns that he would "bring COVID home." He wanted to shower because he was never helped to the bathroom in a timely manner, ultimately soiled himself, and then was left unclean for days.

### B.   *Governor Whitmer's Executive Orders; Pandemic Health Care Immunity Act*

---

[1] Ms. Rogers also testified that she was never concerned about Mr. Rogers "bringing COVID home." (***Id.***, at p. 34:4-12).

Plaintiff incorporates herein by reference, as though set forth in full, all legislative history, background information, case law excerpts, statutory citations, and statements previously made in Section I (B), section heading of the same name, in her January 10, 2023 dated Brief in Support of Plaintiff's Response to Defendant's Motion for Summary Disposition Pursuant to MCR 2.116(C)(7) and the Pandemic Health Care Immunity Act Concurrent to Its Answer.

## II.   STANDARD OF REVIEW

Defendant's dispositive motion is brought pursuant to MCR 2.116(C)(7). In deciding a motion under this rule, the court may consider all documentary evidence submitted by the parties. *Bryant v Oakpointe Villa Nursing Centre, Inc*, 471 Mich 411, 419 (2004). "In reviewing a (C)(7) motion, a court must accept all well-pleaded allegations as true and construe them in favor of the nonmoving party." *Tellin v Forsyth Twp*, 291 Mich App 692, 698 (2011). "The court must consider all affidavits, pleadings, depositions, admissions, and documentary evidence filed or submitted by the parties, and the motion should be granted only if no factual development could provide a basis for recovery." *Xu v Gay*, 257 Mich App 263, 266-67 (2003).

A motion brought pursuant to MCR 2.116(C)(10) tests the factual sufficiency of the Plaintiff's complaint. When presented with a (C)(10) motion, this Court may consider documentary evidence submitted by the parties including affidavits, pleadings, depositions, and admissions in a light most favorable to the nonmoving party. *Id.* Summary disposition is proper only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *West v General Motors Corp*, 469 Mich 177, 183, 665 NW2d 468 (2003). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id.*

## III.   LAW AND ARGUMENT

10

**A.**    ***The Pandemic Health Care Immunity Act Does Not Apply Because Mr. Rogers Was Not Injured by Reason of Health Care Services in Support of The State's Response to the COVID-19 Pandemic.***

The defendant is attempting to avoid responsibility for the death of Mr. Rogers by asserting immunity pursuant to the Pandemic Health Care Immunity Act. MCL § 691.1475. This Act purportedly provides immunity to health care providers or facilities for injuries caused by the provision of health care services in support of the state's response to the COVID-19 pandemic from March 29, 2020 to July 14, 2020. Although the legislature could have attempted to grant blanket immunity to all health care providers and facilities for those entire three and a half months, the legislature did not do so. Indeed, much of the committee hearing testimony relied upon by defendant in support of its argument for broad application of the statute's immunity contains language that could have been – but was <u>not</u> – incorporated into the statute itself. Instead, in passing the Act, the legislature used very specific language that limited the applicability of immunity to very particular circumstances. Notably, the circumstances of this case do not fall within the scope of the Act.

According to the plain language MCL § 691.1475, in order for immunity to apply, the patient must have been injured "***by reason of***" health care services rendered "***in support of this state's response to the COVID-19 pandemic.***" In fact, the Act reads:

> A health care provider or health care facility that provides health care ***services in support of this state's response to the COVID-19 pandemic*** is not liable for an injury, including death, sustained by an individual ***by reason of those services***, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services constituted willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm by the health care provider or health care facility. MCL § 691.1475 (Emphasis added).

"Health care services" is defined by the act as:

*[S]ervices provided* to an individual by a health care facility or health care provider regardless of the location where those *services are provided*, including the *provision* of health care *services* via telehealth or other remote method. MCL § 691.1473(d) (Emphasis added).

The COVID-19 pandemic created a public health emergency that rapidly altered the provision of health care services across the country. COVID was a novel condition, and many treatments were not approved specifically for COVID, were approved only for emergency use, or were experimental. The purpose of the Pandemic Health Care Immunity Act, which is clear from the plain language of the statute itself, is to protect providers and entities from liability for injuries that resulted from this type of evolving treatment that was novel and – as defendant has pointed out – treatment for which there was "no playbook to rely on." (Defendant's Motion, p. 9)

Mr. Rogers was not receiving any treatment for which there was no playbook to rely on. Hospitals have utilized tools to assess and evaluate patient risks for falls and have implemented interventions to keep such patients safe for decades. Moreover, there is no dispute that Mr. Rogers did not have COVID. The Act requires that the injury to the patient must occur "by reason of" health care services provided in support of this state's response to the COVID-19 pandemic. In this case, when the hospital staff, specifically NA Selva, negligently failed to follow instructions from Nurse Marais to give Mr. Rogers a bath at the sink and instead allowed him to shower. Even worse, despite acknowledging that he was a fall risk and required her presence while in the shower, she left him in the shower, alone and without the supervision and assistance that he required, because she failed to gather the supplies that she needed before putting him in the shower. At no time was NA Selva providing services in support of the state's COVID-19 pandemic. In fact, when NA Selva stepped out of the shower room to grab towels, NA Selva was not providing any services to Mr. Rogers at all, as plaintiff's allegations relate to omissions, as opposed to affirmative acts. A "service" – by definition – cannot be an omission.

Even more importantly, the blunt force head trauma that Mr. Rogers suffered was not caused by any health care services that were being provided in support of the state's COVID-19 pandemic. Therefore, the plain language of the statute does not apply to the circumstances of this case.

      **i.**    **Mr. Rogers' injury and death were not sustained _by reason of_ health care services rendered in support of this state's response to the COVID-19 pandemic.**

Mr. Rogers' injury, i.e., blunt force head trauma, is not the kind of injury that the Legislature anticipated when immunizing injuries sustained "by reason of health care services rendered" to combat the COVID-19 pandemic. Based on the plain language of the statute, there is clearly a causal element that must be present in order for the Act to apply. The injury sustained by the plaintiff must have been **_by reason of_** the health care services rendered in support of this state's response to the COVID-19 pandemic. To argue that Mr. Rogers' blunt force head trauma was **_a result of_** health services rendered to combat the COVID-19 pandemic is simply absurd.

For example, Mr. Rogers did not suffer laryngotracheal injury as a result of hasty and/or prolonged intubation; he did not suffer subglottic or tracheal stenosis; he did not suffer pulmonary deconditioning or post-viral inflammatory disease; nor did he suffer any swallowing issues, intubation-related scarring, or other laryngeal injury or dysfunction. Instead, Mr. Rogers suffered a massive, fatal subdural hematoma when he suffered a fall because the hospital failed to provide him with any assistance or assistive devices during his shower and/or failed to instruct Mr. Rogers to wait to shower until the hospital staff could ensure that he could do so safely.

Per the statutory language, Defendant has failed to demonstrate that the injury and death sustained by Mr. Rogers was even remotely "by reason of" services provided in support of the state's response to the COVID-19 pandemic.

      **ii.**    **The health care services rendered to Mr. Rogers were not _in support of_ this state's response to the COVID-19 pandemic.**

After testing negative for COVID-19 on the day of his admission, April 11, 2020, Mr. Rogers no longer received any health care services that were "in support of" this state's response to the COVID-19 pandemic. In fact, Mr. Rogers did not receive any health care services that related to COVID-19 aside from simply being tested for same. The reasons behind Mr. Rogers' continued admission to the hospital related to his shortness of breath; coughing; pneumonia; leukocytosis; and thrombocytosis. In fact, Elizabeth Uyematsu, DO, detailed Mr. Rogers' hospital course prior to his fall as follows:

> COVID-19 testing was negative. He was seen by Pulmonary as well as Infectious Disease. The patient had a pneumonia on x-ray. He was started on antibiotics. Due to his coughing, he was seen by speech therapy and modified swallow eval was done which did not show aspiration of food or liquids. The patient had a persistent leukocytosis. Peripheral smear was sent during this hospital stay, but was not available upon disposition. The patient's cough waxed and waned. Through this hospital stay, he was seen by ENT who recommended further outpatient followup. The patient was seen by Pulmonary. Oxygen was titrated. He was on room air. He has been up ambulating in the hallways. However, due to his leukocytosis and thrombocytosis, he was kept for additional observation. He presented with alpha hemolytic strep. Case was discussed with ID. At this time, antibiotics will be continued. He had an echocardiogram done, which was nondiagnostic for endocarditis. On 04/17/2020, the patient asked to take a shower.

**(Exhibit 1, p. 1).**

In other words, the health care services that were rendered to Mr. Rogers during his admission were in support of treating his pneumonia and cough; in support of treating and monitoring his leukocytosis; in support of treating and monitoring his thrombocytosis; in support of monitoring and adjusting his oxygen levels; in support of treating his alpha hemolytic strep; and in support of keeping him safe from the risk of falling. These services were not related to COVID-19 in any way and were not rendered "in support of" the state's response to the COVID-19 pandemic.

Regardless, even assuming that "services rendered in support of the COVID-19 pandemic" impacted Defendant's ability to assist Mr. Rogers in the shower, **the hospital has not provided any explanation whatsoever as to how any such "services rendered in support of the COVID-19 pandemic" prevented NA Selva from following the instructions from Nurse Marais to bathe Mr. Rogers at the sink. Likewise, the hospital has not provided any explanation as to how any such services forced NA Selva to be inadequately prepared for Mr. Rogers' shower by failing to gather a sufficient number of towels before putting Mr. Rogers in the shower, and then leaving Mr. Rogers alone so she could go get these items.**

### iii.   The negligence in this case constituted a failure to act, and the Act does not extend immunity to negligent *omissions*.

Defendant broadly cites testimony from the House Judiciary Committee explaining that the bill was put into place to protect healthcare professionals and facilities from liability "for actions they took **or were unable to take as part of the State's response to COVID-19**." (*See* Def's Renewed MSD, at p. 13) (Emphasis added). Defendant follows up with another excerpt which reads, "[b]est practices continually changed and difficult decisions were constantly made **with no playbook to rely on**." *Id.* (Emphasis added).

First and foremost, these testimony excerpts were <u>not</u> incorporated into the language of the statute's final publication. The Legislature certainly could have provided for actions that healthcare professionals "*were unable to take*," but deliberately chose not to; there is no language that accounts for *omissions*, or actions that they were "unable to take."

The Michigan Supreme Court has previously analyzed the absence within a statute of language pertaining to acts and/or omissions. In *Johnson v Pastoriza*, 491 Mich 417 (2012), a mother brought suit pursuant to MCL §600.2922a on behalf of herself and her deceased fetus, whom she lost at 20 weeks' gestation. Plaintiff claimed that she specifically requested the

15

performance of a cerclage and defendants consciously chose to deny the request. The trial court refused to grant the defendants' motion for summary disposition, and the Court of Appeals affirmed, finding that the refusal to perform the cerclage was a "wrongful or negligent act under MCL § 600.2922a." The Michigan Supreme Court reversed:

> The Legislature clearly intended to impose liability *for affirmative or positive acts* under MCL 600.2922a(1). In comparison, it is very clear that the Legislature *did not intend to impose liability for omissions, something it can and has done in other statutes*. The Legislature did not even include the more expansive terms "neglect" and "fault of another" that it included in MCL 600.2922(1), which permit liability on the basis of omissions. The Legislature's decision to exclude omissions from MCL 600.2922a indicates that it did not intend to attach liability to omissions that cause prenatal death or injury. *Pastoriza*, 491 Mich at 437 (Emphasis added).

As the Supreme Court emphasized in *Pastoriza*, the Legislature *can* – and *has* many times before – included statutory language that encompasses omissions as well as affirmative acts.[2] The reality is that the legislature chose not to include any language that encompasses omissions in the Pandemic Health Care Immunity Act.

The Pandemic Act provides immunity for health care providers and/or facilities that "*provide*[] health care *services* in support of this state's response to the COVID-10 pandemic[.]" However, Plaintiff's claim is that Defendant's staff rendered *a lack of services* when they *failed to provide* Mr. Rogers with the level of assistance he required to keep him safe, and failed to request that Mr. Rogers delay his shower until he could be provided with assistance. In addition to the fact that Defendant's staff were not providing Mr. Rogers with any health care services rendered in support of this state's response to the COVID-19 pandemic, they were not providing

---

[2] *Johnson v Pastoriza*, 491 Mich 417, 437 n 51 (2010) ("See, e.g., MCL 3.751, art 7, § a(9) (concerning liability for acts or omissions for those involved in the transport of radioactive waste); MCL 41.711a (eliminating liability for good-faith acts or omissions of emergency personal when rendering care at the scene of an emergency); MCL 52.205(7) (concerning liability for acts or omissions of medical examiners); MCL 333.18826 (concerning liability for acts or omissions of veterinarians and veterinary technicians); MCL 600.2962 (concerning liability for acts or omissions of certified public accountants).

him with any services at all. In fact, Plaintiff's claim is that the defendant committed an **omission** by _**failing to provide services**_ to Mr. Rogers, namely assistance, while he showered. In other words, plaintiff does not claim an injury due to the provision of services, but instead, the failure to provide services.

Second, it is abundantly clear that the testimony excerpts cited by Defendant, *supra*, are referring to health care services that were rendered in response to COVID-19, only. Take the first excerpt, for example. Almost every American is acutely aware of the fact that the pandemic caused disruptions in the sort of actions that healthcare professionals and facilities were taking or, more importantly, "unable to take": Many treatments were not approved specifically for COVID, were approved only for emergency use, or were experimental.  The way doctors treated people with COVID-19 evolved over the course of the pandemic as scientists came to better understand the virus and more studies were published. For example, early on, the antimalarial medication called hydroxychloroquine was touted to treat COVID-19. However, research eventually showed that it was not beneficial and posed some risk. Physicians then removed it from the treatment paradigm. Steroids, which are now widely used, also were not originally recommended. During the beginning of the pandemic, convalescent plasma was a commonly used treatment for COVID-19 patients, but today, physicians aren't using it as frequently because it's not clear if it significantly reduces disease progression and mortality among hospitalized patients. There were also debates about starting certain on blood thinners to prevent clots, how long certain medications can be prescribed to a patient, and what position patients should be in to improve outcomes.

These choices regarding which actions to take or refrain from taking in response to a **novel** virus were unclear precisely because, as Defendant quotes, "*[b]est practices continually changed . . . with no playbook to rely on*."

This case, however, is about a different playbook, called the Morse Fall Scale and it has been used in hospitals since 1989. Once a patient is determined to be at high risk for falls – as Mr. Rogers was – the hospital staff has a duty to implement interventions to keep the patient safe and minimize the risk of injury. Defendant cannot with a straight face feign ignorance of a fall risk prevention "playbook," when its own staff determined that Mr. Rogers required assistance with toileting and ambulation on the date of the incident, and had entered *thirty-one* fall risk interventions to implement in his care. *Supra*, at pp. 4-5.

They had the playbook; they just chose not to rely on it.

### B.    Retroactive Application of The Pandemic Health Care Immunity Act is Unconstitutional

Plaintiff incorporates herein by reference, as though set forth in full, all arguments, case law citations, statutory citations, Michigan Constitution citations, and secondary sources previously made in Section III (B), section heading of the same name, in her January 10, 2023 dated Brief in Support of Plaintiff's Response to Defendant's Motion for Summary Disposition Pursuant to MCR 2.116(C)(7) and the Pandemic Health Care Immunity Act Concurrent to Its Answer.

### C.    The Facts of This Case Favor Allowing Plaintiff to Amend Her Complaint to Add a Count of Gross Negligence

Plaintiff incorporates herein by reference, as though set forth in full, all arguments, statutory citations, and reference to the Michigan Court Rules previously made in Section III (C), section heading of the same name, in her January 10, 2023 dated Brief in Support of Plaintiff's

Response to Defendant's Motion for Summary Disposition Pursuant to MCR 2.116(C)(7) and the Pandemic Health Care Immunity Act Concurrent to Its Answer.

## IV.    CONCLUSION

Defendant's renewed motion must be denied because it does not present any new issues that this Court did not already rule upon as a result of their initial Motion for Summary Disposition. Mr. Rogers was not being treated for COVID-19, never tested positive for COVID-19, and was injured – not by reason of services rendered in support of the state's response to COVID-19, but because Defendant's nursing staff failed to follow instructions to bathe Mr. Rogers at the sink, and because of the unpreparedness of Defendant's nursing staff in gathering adequate shower supplies ahead of time. Negligence of this kind does not qualify for immunity, and Defendant's renewed Motion for Summary Disposition must be denied.

WHEREFORE, Plaintiff, ANN PAKENAS, Personal Representative of the Estate of JOHN EDWARD ROGERS, Deceased, respectfully requests this Honorable Court enter an Order DENYING Defendant's Renewed Motion for Summary Disposition Pursuant to MCR 2.116(C)(7), MCR 2.116(C)(10), and the Pandemic Health Care Immunity Act. Alternatively, should the Court find that the unconstitutional Act applies retroactively to Plaintiff's claim despite the absence of COVID-19 related healthcare services, Plaintiff would respectfully request leave of this Court to amend her Complaint to include a count of gross negligence, as the facts support doing so. Plaintiff further requests any such relief and this Court shall deem necessary and just.

OLSMAN MACKENZIE PEACOCK
& WALLACE, P.C.

Donna M. MacKenzie (P62979)
Dated:  October 23, 2023                    Lauren R. Walson (P85433)

**CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2023, I electronically filed PLAINTIFF'S RESPONSE TO DEFENDANT'S RENEWED MOTION FOR SUMMARY DISPOSITION PURSUANT TO MCR 2.116(C)(7), MCR 2.116(C)(10), AND THE PANDEMIC HEALTH CARE IMMUNITY ACT and Brief in Support, along with this Certificate of Service, with the Clerk of the Court using the MiFile TrueFiling E-File system which will send notification of such filing to the following:

VICTORIA S. LEHMAN (P71935)
DAVID A. OCCHIUTO (P84508)

I further hereby certify that I have mailed by United States Postal Service this filing to the following non-E-File participants: **NONE**

/s/ Katie Little
Katie Little

20