# EXHIBIT H

Message
_____

| | |
|---|---|
| **From:** | Rudy Harper [rudy.harper@realsolutionsrs.com] |
| **on behalf of** | Rudy Harper <rudy.harper@realsolutionsrs.com> [rudy.harper@realsolutionsrs.com] |
| **Sent:** | 9/9/2024 6:26:46 PM |
| **To:** | ghunter@detroitnews.com |
| **CC:** | Scott Schindlbeck [scott.schindlbeck@realsolutionsrs.com] |
| **Subject:** | Attorney Elyse McKenna Files Civil Rights Lawsuit - Press Release & Official Complaint |
| **Attachments:** | Press Release - Attorney Elyse McKenna Files Civil Rights Lawsuit - Sept 9 2024 - FOR IMMEDIATE RELEASE.pdf; Atty Elyse McKenna - Complaint & Jury Demand - Sept 9 2024.pdf; Elyse in Black Headshot.jpg; Elyse in Blue Blouse Headshot (BW).jpg; Elyse in Blue Blouse Headshot 4.jpg |

Good afternoon, George.

Great talking to you last week regarding Elyse McKenna's Civil Rights Lawsuit.

The official Complaint is being filed today in the US District Court for the Eastern District of Michigan.

I have included the official Press Release and a copy of the Filing Document (Complaint) for you with this email.

Please let me know the timeline you would like to follow for this story. If you would like to do an in-person interview, Ms. McKenna (Elyse) is in Detroit today, but will be flying back to Washington DC tomorrow morning.

If you have questions or would like to speak with me directly regarding this information, please don't hesitate to reach out to me on email or my mobile phone.

Thank you!
Rudy

Ps. I have included three separate head shots for your use if we aren't able to schedule a photographer within the timeframe she is in Detroit. Let me know if these will work for what you need.

_____

**Rudy Harper**
Real Solutions RS, CEO
+1 (636) 219-8996
http://www.RealSolutionsRS.com

MCK_ESI_00021009



# MEDIA PRESS RELEASE

**FOR IMMEDIATE RELEASE**

**Attorney Elyse McKenna Files Civil Rights Lawsuit Against Prominent Michigan Law Firms and Attorney Robert F. Riley**

**September 9th, 2024** — Attorney Elyse McKenna has filed a civil lawsuit in the U.S. District Court for the Eastern District of Michigan against prominent Michigan attorney Robert F. Riley, Riley & Hurley, PC, and Olsman, MacKenzie, Peacock & Wallace, PC. The lawsuit, filed under the Elliott-Larsen Civil Rights Act, alleges sexual harassment, stalking, wrongful termination, and emotional distress.

The complaint outlines a troubling pattern of predatory behavior by Robert Riley, who has previously served as a mediator on high-profile cases involving sexual misconduct claims. Notably, he was the court-appointed mediator in the University of Michigan lawsuit, in which the university paid $490 million to settle more than 1,000 claims of sexual abuse by the late UM physician Dr. Robert Anderson.

Now 70, Riley allegedly made inappropriate advances toward McKenna, including secretly photographing her in the office, stalking her on business trips, exposing her to pornography, and bombarding her with hundreds of handwritten notes, emails, and text messages. After discovering he had been photographing her without her consent, McKenna confronted Riley, who admitted to his actions in an email. Despite leaving Riley's firm, he used his considerable influence within the legal community to manipulate McKenna's career, causing significant professional and emotional harm.

McKenna, who worked at Riley & Hurley, PC from October 2019 to September 2021, and later at Olsman, MacKenzie, Peacock & Wallace, PC from September 2021 until February 2024, is seeking to hold Riley, his firm, and Olsman, MacKenzie, Peacock & Wallace, PC accountable for their actions. The lawsuit highlights Olsman, MacKenzie, Peacock & Wallace, PC's failure to protect McKenna after becoming aware of the harassment. Instead of taking corrective action, the firm prioritized its relationship with Riley, retaining him as a mediator in many of their cases, including those handled by McKenna, despite her repeated complaints. This arrangement, orchestrated by Riley, allowed him to maintain contact with McKenna and exploit his position in the legal community. When McKenna confronted Riley about his behavior, Olsman, MacKenzie, Peacock & Wallace, PC swiftly terminated her employment.

After being turned down by Riley's associates, colleagues, and others in the legal community, who refused to represent her due to Riley's influence, McKenna was forced to file the lawsuit on her own behalf.

MCK_ESI_00021010

"This lawsuit is not just about seeking justice for myself, but about shedding light on unacceptable behavior that too often goes unchecked in the legal industry," McKenna said. "The emotional toll and the fear of coming forward have been immense. However, I recognize the importance of sharing the truth to help hold those in positions of power accountable. I hope that this small step results in even one person coming forward when they observe or experience inappropriate behavior in the workplace."

The lawsuit underscores the importance of addressing and rectifying workplace misconduct, particularly in professions where power dynamics can be easily exploited. McKenna's case highlights the urgent need for a broader conversation about workplace conduct and the safeguards in place to protect legal professionals.

**For more information, please contact:**

Real Solutions RS
Rudy Harper
Rudy.Harper@RealSolutionsRS.com

MCK_ESI_00021011

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MICHIGAN

ELYSE MCKENNA,                                      )
                                                    )
                                                    )
        Plaintiff,                                  )
                                                    )
            v.                                      )
                                                    )
ROBERT F. RILEY,                                    )
                                                    )   CASE NO.
        and                                         )
                                                    )
RILEY & HURLEY, PC,                                 )
                                                    )
        and                                         )
                                                    )
OLSMAN, MACKENZIE, PEACOCK &                        )
WALLACE, PC,                                         )
                                                    )
        Defendants.                                 )
                                                    )

## COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiff, Elyse McKenna, *pro se*, and for her Complaint and Jury

Demand against the Defendants, Robert Riley, Riley & Hurley, PC, and Olsman, MacKenzie,

Peacock & Wallace, PC, alleges as follows:

## INTRODUCTION

Robert F. Riley ("Riley") is a prominent Michigan attorney who has harassed attorney

Elyse McKenna ("McKenna") for the past five years. Although McKenna resigned from Riley's

firm, began work at a different metro-Detroit law firm, repeatedly asked Riley to stop his

inappropriate behaviors, and Riley admitted his guilt and agreed to cease these behaviors, his

harassment of McKenna continued and has not stopped.

MCK_ESI_00021012

McKenna contacted numerous prominent employment attorneys in Michigan, all of whom stated that although Riley's conduct constituted sexual harassment, they would not file a lawsuit on her behalf given Riley's revered status in the legal field and the potential ramifications for their own careers. As such, McKenna has lived largely in fear of addressing Riley's behavior. When Riley was confronted regarding his continued harassment of McKenna and asked to stop, McKenna was immediately terminated and disparaged by her then employer Olsman, MacKenzie, Peacock & Wallace, PC ("OMPW"). McKenna has decided to file this complaint *pro se*.

## PARTIES

1.      Plaintiff Elyse McKenna, formerly known as Elyse Heid, is an individual residing at 5400 Greystone Street in Chevy Chase, Maryland 20815.

2.      Defendant Riley & Hurley, PC, ("RH") is a law firm located at 26400 Lahser Road, Suite 250 in Southfield, Michigan 48033.

3.      Robert F. Riley and William Hurley are named partners at RH.

4.      Defendant Robert Riley is an individual residing at 129 Linden Road in Birmingham, Michigan 48009.

5.      William Hurley is an individual residing at 370 Moross Road, Grosse Pointe Farms, Michigan 48326.

6.      Defendant Olsman, MacKenzie, Peacock & Wallace, PC is a law firm located at 2684 West Eleven Mile Road in Berkley, Michigan 48072.

7.      Jules Olsman, Donna MacKenzie, Emily Peacock, and Randall Wallace are all named partners at OMPW.

2

MCK_ESI_00021013

8.     Jules Olsman ("Olsman") is an individual residing at 26341 Hendrie Boulevard in Huntington Woods, Michigan 48070.

9.     Donna MacKenzie ("MacKenzie") is an individual residing at 47120 Land Street in Chesterfield, Michigan 48047.

10.    Emily Peacock ("Peacock") is an individual residing at 1313 Yorktown Street in Grosse Pointe Woods, Michigan 48236.

11.    Randy Wallace ("Wallace") is an individual residing at 1506 North Altadena Avenue in Royal Oak, Michigan 48067.

## JURISDICTION AND VENUE

12.    This action is brought pursuant to the Elliott-Larsen Civil Rights Act, MCL § 37.2101, et seq., as well as state statutory and common law.

13.    This Court has personal jurisdiction over the parties to this Complaint.

14.    This Court has subject matter jurisdiction over the matters alleged based on the diversity of the parties under 28 U.S.C. § 1332(a)(1) and an amount in controversy in excess of $75,000.00.

15.    McKenna was employed by RH from October 2019 until September 2021.

16.    During McKenna's employment, RH was located at 19853 Outer Drive, Suite 100, Dearborn, Michigan 48124 until on or around March 28, 2021, when it moved locations to 26400 Lahser Road, Suite 250, Southfield, Michigan 48033.

17.    McKenna was employed by OMPW located at 2684 West Eleven Mile Road, Berkeley, Michigan 48072, from September 2021 until February 4, 2024.

18.    Pursuant to 28 U.S.C. § 1391, venue is proper in this Court as all matters alleged herein arose in Oakland County, Michigan.

3

19. As a direct and proximate result of Riley's sexual harassment of her, McKenna has suffered and will continue to suffer lost wages, benefits, severe emotional distress, and damage to her reputation.

20. As a direct and proximate result of OMPW's hostile treatment of McKenna while she was employed there, and OMPW's termination of McKenna after she informed them that she had, through counsel, confronted Riley regarding his continued harassment of her, McKenna has suffered and will continue to suffer lost wages and benefits, severe emotional distress, and damage to her reputation.

## OVERVIEW

21. McKenna met Riley, who is and was at the time widely regarded as the foremost mediator in Michigan, in 2014 through her work as a law clerk at a nearby medical malpractice firm. Riley served as the facilitator on several of her cases.

22. She was 26 years old and had been a practicing medical malpractice attorney for almost four years when she was approached by Riley regarding the trajectory of her career and his hope for her continued success in her field.

23. McKenna ultimately began working at RH in October of 2019.

24. Upon beginning work at RH, Riley immediately, and with increasing frequency and intensity, expressed his fondness for McKenna to her through handwritten notes, text messages, and time spent in her office throughout the work day. Riley expected McKenna to reciprocate the handwritten notes and engage with him via text message, phone calls, and office visits.

4

25.     Riley mandated monthly dinners with McKenna, under the guise of ensuring she "enjoyed success in her career," and made it clear that a future partnership at RH was conditioned on her attendance at and engagement in such dinners.

26.     In the summer of 2021, McKenna suspected that Riley had been surreptitiously taking photographs of McKenna when she was in his office.

27.     Her suspicion was subsequently confirmed, as discussed *infra*.

28.     McKenna felt unsafe and knew she could no longer tolerate working at RH, therefore she decided to search for employment elsewhere.

29.     McKenna ultimately accepted a position as an attorney at OMPW, and began working there in September of 2021.

30.     McKenna continued to represent an organizational client ("Shared Client") that she had represented when she worked at RH, as Riley had assured her he would resign from working for the Shared Client. Riley never stepped down from representing the Shared Client.

31.     McKenna thought she was escaping from being under the control of Riley when she transitioned to OMPW.

32.     McKenna informed OMPW partner MacKenzie of the harassment she had endured by Riley, and requested she not be made to mediate cases with him.

33.     MacKenzie laughed off McKenna's complaints of harassment and insisted that she (MacKenzie) had endured far worse in her career, that she wished McKenna had never told her of Riley's behaviors, and that she wished McKenna had never confronted him.

34.     McKenna quickly discovered that Riley was OMPW's preferred mediator, and it became clear to McKenna that she was expected to keep a close relationship with Riley despite informing OMPW of his harassment of her.

5

MCK_ESI_00021016

35. From September 2021 to February 2024, McKenna attempted to appease her employer OMPW while simultaneously increasing her distance from Riley.

36. In spring of 2023, a member of OMPW informed Riley of McKenna's divorce and Riley attempted again, and more aggressively, to insert himself into McKenna's life, inviting McKenna to Easter at his home.

37. McKenna continued to rebut his advances, but treaded carefully given her employers urging her to forget what Riley had done, forgive him, and move on.

38. Riley again apologized to McKenna, reiterating his desire to say sorry to her in person and that he wanted to be her friend.

39. Shortly thereafter, Riley sent McKenna a racy photograph of a scantily clad brunette woman from ultrafilms.com.

40. Appalled by his actions, McKenna again attempted to enforce boundaries with Riley and tried to mediate her personal injury cases with other facilitators.

41. McKenna's employment conditions at OMPW grew increasingly hostile.

42. In June of 2023, McKenna and Riley attended an in-person multi-day meeting for their shared client, at which time Riley's behavior became increasingly inappropriate, as detailed *infra*.

43. In the fall of 2023, McKenna began searching for employment elsewhere.

44. It became clear to McKenna during her search for employment that she would have to change her area of practice or move outside of the state of Michigan to get away from Riley, as discussed in more detail *infra*.

45. McKenna resolved to stick it out at OMPW as she saw no other options.

6

MCK_ESI_00021017

46.     Conditions at OMPW did not improve. It became clear to McKenna that Riley and OMPW were routinely discussing her. This made her uncomfortable, given Riley's history of behaviors towards McKenna.

47.     McKenna became increasingly anxious to find employment that would not require her to work with or appease Riley.

48.     Feeling trapped, McKenna considered starting her own law firm as a means to escape.

49.     During a meeting with MacKenzie and Peacock in early 2024, McKenna expressed concern regarding Riley's behaviors and how that had negatively affected how she was being treated by members of OMPW. MacKenzie insisted that McKenna's treatment had nothing to do with Riley, and that she had never stood in the way of McKenna confronting him, and MacKenzie encouraged McKenna to do what she felt she had to do.

50.     Shortly thereafter, Riley was confronted by attorneys that agreed to attempt to resolve this dispute between McKenna and Riley in the absence of litigation.

51.     Upon notifying OMPW that Riley had been confronted about his harassment of McKenna, McKenna's employment was immediately terminated.

52.     MacKenzie and OMPW have and continue to enjoy a mutually beneficial relationship with Riley and routinely facilitate cases with him.

53.     Riley has contacted McKenna directly on numerous occasions despite knowing that McKenna is represented by counsel.

### FACTUAL ALLEGATIONS

**Defendants' Background**

54.     Riley, now age 70, has been practicing law since 1979.

MCK_ESI_00021018

55. He started his own law firm in 1994.

56. Riley has had a successful career as a mediator of medical malpractice lawsuits and major multi-plaintiff sex abuse/harassment lawsuits.

57. Of note, Riley has mediated:

    a. The UM/Anderson cases: A lawsuit involving 1,050 University of Michigan athletes and patients who alleged they were sexually abused by Dr. Robert Anderson, a physician at the school;

    b. The Northwestern University hazing cases: Numerous former football players have filed lawsuits against the university alleging sexualized hazing, racial discrimination, and abuse within the football program; and

    c. The Eastern Michigan University rape cases: 24 current and former Eastern Michigan students sued the university and several officials in 2021, alleging they covered up students' reports of rape near campus.

58. Riley has also enjoyed a successful career as a labor and employment attorney, representing the National Hockey League Players Association ("NHLPA") from 1993 to 2007 where he consulted in collective bargaining, salary arbitration hearings, and prepared and argued grievances.

59. Riley currently serves as General Counsel for the Professional Hockey Players' Association ("PHPA"), a role he has held since 2001.

60. Upon information and belief, Riley continues to serve as General Counsel for the North American Hockey League where he was named NAHL Executive of the Year in 2004.

61. Riley is a National Board Representative of the American Board of Trial Advocates of Michigan.

8

MCK_ESI_00021019

62.     The American Board of Trial Advocates ("ABOTA") of Michigan Civility Award is named the Robert F. Riley Civility Award and is described as follows:

> The Robert F. Riley Civility Award recognizes those who exemplify civility and professionalism. Who consistently conducts him/herself with the highest levels of professionalism, competence, civility and the highest degree of ethics, always exhibiting integrity, honor, courtesy, and a sense of fair play. One who seeks to efficiently advance causes through means that are consistent with truth and honor and contribute their skill, knowledge, and efforts to enhance and educate the profession.

63.     Riley was inducted into the National Academy of Distinguished Neutrals in 2016.

64.     Riley is well-respected throughout the legal community of Michigan and looked up to by attorneys around the state.

65.     OMPW represented second-wave victims of Larry Nassar in their pursuit for justice against Michigan State University.

66.     MacKenzie, a partner at OMPW, was openly critical of MSU's handling of the case brought by the second-wave victims of Nassar, stating:

> "The filings by MSU show a complete disregard for the mental and emotional well-being of the Nassar survivors."

David Jesse, *MSU: Nassar deserved criminal penalties, but we can't be held liable for sexual assaults*, DETROIT FREE PRESS (Aug. 27, 2019), https://www.freep.com/story/news/education/2019/08/27/msu-we-arent-liable-nassars-crimes/2124944001/.

**McKenna's Background**

67.     McKenna, now age 31, has been practicing law since 2015.

68.     McKenna was the valedictorian of Cardinal Mooney Catholic High School, graduating in 2010, having earned approximately 65 college credits.

69.     McKenna graduated from Michigan State University at the age of 19. She went on to attend Case Western Reserve University School of Law, where she participated in mock trial,

9

MCK_ESI_00021020

winning the Paul J. Hergenroeder Award and the Best Litigator Award, and moot court, in which she was a finalist in Case Western's moot court competition. McKenna also earned the highest grade in Trial Tactics.

70. She was inducted into the Order of the Barristers, a national honorary organization whose purpose is the encouragement of oral advocacy and brief writing skills through effective law school oral advocacy programs. She received her law degree in 2015, shortly after turning 22 years old.

71. McKenna was accepted into the ABOTA National Trial College in 2021. McKenna graduated from the Michigan Association for Justice Leadership Academy in 2023. McKenna was named a Super Lawyers Rising Star in 2022, 2023, and 2024. She is also a contributor to the medical malpractice chapter of the ICLE Michigan Basic Practice Handbook.

**Riley and McKenna Meet at a Facilitation**

72. In 2014, McKenna worked as a law clerk at a law firm in Troy, Michigan. Shortly after beginning at that law firm, she attended facilitation of a medical malpractice case and met Riley for the first time.

73. McKenna attended various facilitations that were mediated by Riley between 2014 and the summer of 2019.

74. Around July or August of 2019, McKenna received an email from an attorney at a Southfield, Michigan law firm. This attorney indicated that she had been given McKenna's name by a well-known attorney in the area, and she asked if McKenna was interested in a position with that Southfield firm.

10

75. A day or two following this exchange with the attorney at the Southfield law firm, McKenna was contacted by an adjuster that she frequently worked with in her representation of a nearby hospital system.

76. That adjuster encouraged McKenna to consider leaving her current firm, and told McKenna that Riley had asked her to reach out to her and share his contact information.

77. Per the adjuster, Riley didn't want the firm McKenna was employed by at the time to think Riley was trying to "poach" her, but Riley had indicated that he would be happy to be a sounding board for McKenna as she made career decisions, and Riley had further informed the adjuster that he had specific career advice for McKenna.

78. Ultimately, McKenna received offers of employment for medical malpractice associate positions from five prominent metro-Detroit law firms, including RH.

79. Subsequently, Riley reached out to McKenna to invite her to his annual end of summer barbeque, which is typically regarded as a party for the "who's who" of medical malpractice attorneys in Michigan.

80. Understanding Riley's prominence in the legal field in Michigan and respecting his opinion, McKenna reached out to him to take him up on his offer of mentorship.

81. Riley encouraged McKenna to leave her employer, informing her that the partners at that firm were subverting cases from being directly assigned to her by hospital systems that she was then in the practice of defending.

82. McKenna would come to learn that Riley had recommended her as a promising young attorney to metro-Detroit law firms in the area that were looking for an associate and that he wanted to serve as her mentor, as discussed in more detail *infra*.

83. On September 7, 2019, McKenna attended Riley's party.

11

84. Following the party, McKenna and Riley engaged in numerous conversations regarding the job offers that had been offered to McKenna.

85. Riley discouraged McKenna from taking any of these offers, stating that she would not be afforded the opportunities that she deserved at these other firms.

86. Riley implored McKenna to tell him about her upbringing, telling her that he could only determine where she would be a good fit, whether she would make a good attorney, and how much promise she had if she was willing to share intimate details about her childhood and family.

87. Riley ultimately offered McKenna a job with his firm and coordinated an interview of McKenna by his law partner.

88. After much consideration, McKenna decided to decline this position and accept a position with another law firm.

89. McKenna tendered her notice of resignation with the law firm for which she was employed.

90. Riley requested that McKenna meet with him in person at Townhouse Birmingham, a local restaurant. At this meeting, McKenna indicated her willingness to take a job with the Southfield law firm that had first contacted her.

91. Upon hearing this, Riley became very upset with McKenna and cried throughout the meeting. Riley expressed concern for McKenna's legal career and told McKenna that she was making the wrong decision, but refused to articulate why.

92. Later that week, Riley requested dinner with McKenna and McKenna's then-husband Brandon Heid.

93. Riley, McKenna, and Heid ate dinner at Bobcat Bonnie's in Ferndale, Michigan.

12

MCK_ESI_00021023

94.     During this dinner, Riley expressed to McKenna and Heid that female attorneys who had worked for the law firm that McKenna had accepted a position with had been raped, sexually assaulted, harassed, and further discriminated against on the basis of their sex. Riley warned her that going to work for that firm would ruin her career.

95.     Riley also discussed the all-male board of directors and indicated that this move would be terrible for McKenna's career, as he had a female attorney friend around his age who was a partner at the firm and she was consistently mistreated and disparately compensated. Riley also referenced that female attorney's female associate, who he stated was not fairly treated by the firm.

96.     Riley explained that he had been hesitant to tell McKenna all this upfront, but that he felt he had to tell her once he knew she was making a mistake with her career.

97.     On September 27, 2019, Riley sent McKenna an unsolicited term sheet detailing her potential to become partner at his firm, which stated as follows:

> It is expected that ELH will exhibit exemplary performance in all respects as an associate attorney at RH.
>
> It is expected that RH will provide exemplary opportunities for ELH to maximize her professional skills, to establish and secure client relationships and the opportunity to develop the professional skills and business acumen to <u>eventually have an ownership interest in RH</u>.
>
> ELH will receive work assignments from both William Hurley and Robert Riley. Such assignments are intended to:
>
> a.     Meet and exceed client expectations relative to the professional needs each assignment presents;
>
> b.     Develop the skills of ELH to a level where she is ultimately recognized as possessing superior professional skills and abilities to fully serve all client needs; and
>
> c.     <u>Obtain full access and exposure to RH clients.</u>

13

In exchange for exemplary service as an associate attorney, RH will provide ELH with the opportunity to develop sufficient client relationships so as to potentially earn client business within and for RH. If, at a point in time to be determined, the current partners of RH retire, ELH, depending on client acceptance, will have the opportunity to acquire the assets of RH at no cost to her other than recognition of outstanding accounts receivables to RH and existing stock reimbursement. It is recognized and understood that the concepts expressed herein are subject to further discussion, negotiation and documentation.

In furtherance of the goals and objectives set forth in paragraph 9 above, RH commits to ELH that reviews will take place relative to potential partnership status. Such promotion, advancement and/or status associated with partnership will be at the sole discretion of RH. It is subject to further discussion, negotiation and documentation. (emphasis added)

98.     Alarmed at what Riley had shared regarding the firm McKenna had accepted employment with, having already put in her notice at her current firm, recognizing the prominence of RH and Riley's reputation in the legal field in Michigan, and excited at the opportunity to become a partner at a well-respected law firm in the metro-Detroit area, McKenna decided to accept the offer with RH.

99.     What should have been the start of a long and promising career at RH turned into a decision that McKenna will look back on and regret for the foreseeable future.

**McKenna Begins Work at Riley & Hurley, PC**

100.     On October 21, 2019, McKenna began working at RH.

101.     McKenna felt lucky and grateful for the opportunity to work with Riley, and was excited about her path forward at RH.

102.     From the outset, Riley was incredibly encouraging and vocal about his enthusiasm for McKenna working at RH.

14

103. Upon beginning work at RH, Riley immediately, and with increasing frequency and intensity, expressed his fondness for McKenna to her through handwritten notes, text messages, and time spent in her office throughout the work day.

104. Riley mandated monthly dinners with McKenna, under the guise of ensuring she "enjoyed success in her career," and made it clear that a future partnership at RH was conditioned on her attendance at and engagement in such dinners.

105. Riley's contact with McKenna became increasingly frequent, and he would become upset when she did not respond immediately to his requests for contact. Riley inundated McKenna with text messages and monopolized her time, isolating her from her friends and family.

106. Within the first two days of McKenna working there, McKenna received two handwritten notes from Riley expressing his admiration of her and his excitement for her working with him.

107. On November 6, 2019, Riley invited McKenna to the first of many mandatory one-on-one dinners at fine dining establishments around Detroit, which Riley told her were required to ensure that she would learn and grow as a trial attorney and fit into the firm.

108. On November 18, 2019, Riley and McKenna went to a second mandatory dinner.

109. McKenna received another handwritten card on November 21, 2019 in recognition of her first month at RH.

110. McKenna and Riley went to dinner a third time in celebration of McKenna's first month at RH.

15

MCK_ESI_00021026

111. In December of 2019, McKenna received two Christmas cards and two handwritten notes. One handwritten note written on Christmas day started out with the following:

> **If ever there was a day when I wished I could spend time with you, it would be today.**

And continued with:

> **Love is a powerful word but what is Christmas really about? No matter its implications, I cannot think of a better word to describe the complete package of feeling I have for you. My affection is real, respectful and sincere, and I see no reason to be tentative.**

112. Along with the Christmas cards, Riley gave McKenna numerous gifts, including a pair of roundtrip plane tickets to anywhere in the world, expensive bottles of wine, and earrings.

113. McKenna did not know how to respond to Riley's gifts besides emphasizing to him that they were unnecessary. McKenna never utilized the plane tickets.

114. Sometime in November or December of 2019, Riley insisted on taking McKenna and her mother out to dinner. Following the dinner, McKenna's mother expressed concern regarding Riley's infatuation with McKenna.

115. Following the aforementioned dinner, Riley sent McKenna's mother a card detailing how impressed he was with McKenna and how much he admired her. McKenna's mother again expressed concern that Riley was infatuated with McKenna.

116. McKenna told her mother that she did not know how to make Riley stop given that RH had no human resources department and Riley was the majority shareholder of RH.

117. On January 4, 2020 and January 19, 2020, McKenna attended two additional mandatory dinners with Riley.

MCK_ESI_00021027

118. On January 21, 2020, McKenna received another handwritten card from Riley in recognition of three months at Riley & Hurley, PC.

119. On February 3, 2020, McKenna received a handwritten card from Riley regarding her first trial.

120. Beginning February 10, 2020, Riley initiated what would ultimately be a two-week long scavenger hunt to celebrate McKenna's birthday. Each day, McKenna found a new birthday card on her desk with clues for where to find that day's gift. They were typically hidden in Riley's office.

121. On February 11, 2020, McKenna attended another mandatory dinner with Riley.

122. In March of 2020, McKenna had two more mandatory dinners with Riley.

123. The COVID-19 pandemic enabled McKenna to work from home, providing a reprieve from Riley and his increasingly discomforting behaviors and demands for attention.

124. However, a few months into the COVID-19 pandemic and subsequent lockdown, Riley began complaining that he was not seeing enough of McKenna and he insisted that she return to the office.

125. This caused anxiety for McKenna, as Riley had implemented limited in-person work schedules for the staff and attorneys at RH, which would conveniently mean that Riley and McKenna would be in the office alone together.

126. Additionally, during the COVID-19 lockdown, McKenna and Riley had dinners together via Zoom and one at his house to ensure that McKenna was still progressing according to Riley's expectations and to "ensure McKenna's success."

127. As the pandemic drew on, Riley became increasingly possessive of McKenna's time, often requiring after-hours Zoom meetings lasting until midnight "to discuss work."

17

128.     When McKenna attempted to end these Zoom meetings at reasonable hours, Riley would threaten McKenna that she wasn't taking the work seriously.

129.     The work that Riley was requiring be worked on until the early hours of the morning was not pressing or urgent, and Riley would often veer off-topic, sharing personal details with McKenna about his life and his discussions with his therapist, and inquiring about the personal details of McKenna's life and her relationship with her husband at the time.

130.     On June 16, 2020, Riley sent McKenna the following message:

> Good morning ELMH! It is the 16th day of the 6th month of 2020 AD. **I have already thought of you 662,112 times today.** I think I miss you.
>
> Actually, I know I do.
>
> Now that you know too, it can be a great day for both of us. (emphasis added).

131.     Sometime during the summer of 2020, Riley reached out to McKenna about securing a new lease for the office for the continuation of the firm.

132.     Riley had previously discussed with McKenna the possibility of making her a partner in the firm and at this time, requested that McKenna personally guarantee the lease for the building that the firm would occupy.

133.     McKenna informed Riley that she was uncomfortable personally guaranteeing the lease for a building for a firm of which she was not an equity partner.

134.     Riley became frustrated at McKenna, questioning her loyalty to him, and the work environment grew increasingly hostile as McKenna tried to explain to Riley that she could not personally guarantee such an expensive lease.

18

135.    Riley and McKenna resolved their differences regarding the lease going into the holidays.

136.    In December of 2020, Riley again gave McKenna numerous cards, expensive gifts, and roundtrip plane tickets to anywhere for Christmas. Again, McKenna never used the tickets. Riley also gave McKenna a board game called "Collaboration" and informed McKenna that collaboration was required of her.

137.    McKenna hoped that the issue with the lease had been avoided and sought to continue her work at RH.

138.    On January 17, 2021 and January 24, 2021, Riley again required mandatory dinners with McKenna.

139.    On February 16, 2021, Riley gave McKenna numerous expensive gifts for her birthday yet again.

140.    On March 29, 2021, RH moved from its Dearborn office location to its Southfield office location.

141.    On March 30, 2021, McKenna attended another mandatory dinner with Riley.

142.    On April 22, 2021, McKenna attended another mandatory dinner with Riley during which he spoke with her about becoming a partner in the firm.

143.    Sometime in May of 2021, Riley invited McKenna into his office while he was watching pornography under the guise of needing McKenna's help with technology issues he was experiencing. This made McKenna extremely uncomfortable.

144.    In May of 2021, McKenna learned that William Hurley would be substantially slowing down his work and McKenna became concerned that she would be working solely with Riley.

MCK_ESI_00021030

145.    On June 7, 2021, McKenna attended another mandatory dinner with Riley.

**McKenna Becomes Suspicious of Riley Taking Photographs of Her**

146.    In June of 2021, McKenna became increasingly suspicious that Riley was taking photographs of her with his iPad while she was sitting in his office because McKenna could see a reflection of herself on the iPad screen in the window behind his desk.

147.    McKenna would deliberately sit in different parts of Riley's office out of view of his iPad.

148.    Riley always instructed McKenna to sit in the chair that the iPad was facing.

149.    Upon it becoming clear to McKenna that Riley was regularly taking photographs of her, McKenna felt unsafe and knew she could no longer tolerate working for RH, therefore she decided to search for employment elsewhere.

150.    McKenna was confronted repeatedly with the question of why she wanted to stop working for such a respected mediator and lawyer in the Michigan legal community. The attorneys that McKenna sought employment from were hesitant to hire her away from Riley and they expressed concern about how this might affect their ability to resolve cases via mediation and facilitation with Riley. These attorneys wanted to ensure that Riley would consent to them hiring McKenna.

151.    McKenna was left with no choice but to inform Riley of her intention to leave his firm. She premised her departure on the seemingly impending retirement of Riley's partner, William Hurley, and her desire to work for the plaintiff's bar.

152.    Upon telling Riley that she wanted to leave his firm and informing him of her employment prospects, Riley discouraged McKenna from seeking employment at these other law firms.

20

153. Riley encouraged McKenna to remain working at RH instead. He insisted that RH could continue to pay McKenna's salary even if she only worked for the Shared Client, and that she could start her career as a plaintiff's attorney at RH. Riley told McKenna that he would return to working as a trial attorney so that the two of them could be a team and try cases together.

154. McKenna was extremely uncomfortable at the thought of continuing to work with Riley, and stressed to him that she wanted to work for a plaintiff's medical malpractice firm where she could learn and grow.

155. Reluctantly, Riley instead encouraged McKenna to explore an opportunity to work for OMPW.

156. Riley also indicated that he and McKenna would continue to represent the Shared Client together.

157. Recognizing that Riley's approval was ultimately going to be required for another firm to hire her and so that she could leave her employment at RH, she agreed to explore the opportunity at OMPW.

158. Riley facilitated a meeting between MacKenzie and McKenna, and OMPW ultimately offered McKenna employment as an attorney with their firm.

159. McKenna was hopeful that because OMPW represented victims of Larry Nassar and had female partners, they would be in a position to understand the harassment and grooming that McKenna had endured and be in a position to shield her from more of the same.

160. McKenna put in her two weeks' notice at Riley's firm in the beginning of August of 2021.

21

MCK_ESI_00021032

161.    On August 18, 2021, McKenna went on Riley's iPad and found hundreds of photographs of herself - including photographs downloaded off of the internet, taken of her during Zoom calls, taken of her while she was sitting in his office, taken of her walking down the hallway, downloaded from other people's social media accounts, downloaded from McKenna's social media accounts from at least seven years prior when McKenna was younger, and in countless other situations when McKenna did not know Riley was photographing her.

162.    Following her finding the photographs, McKenna immediately blocked Riley from all of her social media accounts and changed the privacy settings on her social media accounts with the hope of precluding others from being able to tag McKenna in photographs that Riley could then obtain.

163.    McKenna also immediately went on Amazon and purchased a device that purported to be able to detect hidden cameras, audio bugs and GPS tracking devices.

164.    Upon receiving the device, McKenna went back to RH after-hours, but she could not bear to use the device to check for hidden cameras, including in the bathroom, because she did not think she could live with knowing that photographs of her like that exist.

**McKenna Stops Working at Riley & Hurley, PC**

165.    McKenna's last day at Riley & Hurley, PC was on August 20, 2021, two days after finding the photos on Riley's iPad, at which time Riley gave McKenna a handwritten card.

166.    McKenna had planned on continuing to work for the Shared Client at her new firm, OMPW.

167.    However, McKenna learned that Riley intended for McKenna to work as Riley's independent contractor and upon confirming the photographs that had been taken, along with

22

Riley's other advances which had made McKenna uncomfortable, McKenna resolved to step down from her position with the Shared Client instead.

**McKenna Contacts Attorneys to Request Help**

168. McKenna contacted numerous attorneys in Michigan seeking help regarding Riley's behavior and to get him to stop.

169. The attorneys that McKenna contacted informed her that although she had a viable legal claim, they were not comfortable with pursuing a case against him given his prominent status in the legal community.

170. One of the attorneys that McKenna consulted with assured her the communications and information disclosed by McKenna would be kept confidential, but ultimately informed McKenna that she could not represent her as she "would not touch Bob Riley with a ten foot pole." This attorney further advised McKenna not to file a lawsuit and warned her that if she did file a lawsuit, she would ruin her career. She informed McKenna that, at the very least, McKenna would have to leave the state of Michigan.

**McKenna Confronts Riley Regarding the Photographs and His Behavior**

171. McKenna's email to Robert Riley on August 22, 2021 stated as follows:

> Bob,
> I received the draft agreement regarding my proposed independent contractor status with Riley & Hurley, PC. I cannot agree to this arrangement.
> I am aware that you took photographs of me surreptitiously while I was in your office. This is extremely upsetting and inappropriate. This, in conjunction with your other behaviors and actions, including your romantic text messages, letters, and comments, has caused me to feel very uncomfortable and scared. I will not be working in any capacity in which you are my supervisor.
> I have attached a memo with the information necessary to transition my current [Shared Client] projects and I will reasonably cooperate in transitioning these projects so as to protect the client's interests. Under the circumstances, I felt it better to not record a

23

[Shared Client] annual meeting video and I leave preparation of such a video to you.

I received the $10,000 personal check from you. In light of this situation, I do not feel comfortable cashing this check.

I want you to know that I feared speaking up for fear of retaliation due to your status and prominence in the legal field.

I trust that this fear will not be realized.

I have removed the rest of my personal items from the office. I left the laptop on my desk and the keys to the building and the office suite are located in the drawer on the right-hand side of my desk. I trust that we will move on without further complication.

Elyse Heid

172. Robert Riley's three reply emails to Plaintiff's email on August 22, 2021 stated as follows:

Absent your help and assistance, I will be unable to maintain the [Shared Client] work. I propose an alternative.

To best serve the client, I will step aside as an attorney for the [Shared Client]. I will advise [Shared Client Executive Director] to begin work independently with you. Although a transition is necessary, I will have no supervisory role of any kind. The independent contractor agreement is withdrawn. I will have no financial interest in your billings. You will be free to establish your own legal services agreements with the [Shared Client].

Apart from transition activities, our contact will be minimal. I will end any and all personal contacts. I will make certain we have no in person dealings. You will have nothing to fear.

I will however fully support your efforts to establish your status as the [Shared Client]'s attorney. If asked I will also endorse you as an attorney elsewhere in the profession.

Please advise if this is acceptable.

Finally, my promises to you remain intact. The bonus payment is yours. So too is the trial college. The choice is obviously yours. I expect nothing in return.

I am devastated. You deserve better.

* * *

Elyse,

A final personal note is needed.

Shame, humiliation and regret is insufficient. Sorry is not enough. Although I may have misinterpreted some things, that is totally irrelevant.

24

MCK_ESI_00021035

I believe you should receive an unequivocal acknowledgment of my mistakes and a complete acceptance of responsibility. I was wrong. My many mistakes are clear, unambiguous and cannot be explained away. **I am guilty.** You became one of my very best friends. Elyse, I let you down. My disappointing actions have understandably shaken you. Indeed, I have frightened you. In addition, you fear retaliation. Even though I can absolutely assure you that there will be no retaliation in any manner or form, I recognize why it is a concern. It is with overwhelming regret and deep sorrow that I write this note of wrongdoing. Although my conduct has cost me a valued friendship, I do not seek nor merit forgiveness. You simply deserve these admissions. I accept whatever consequences may follow. Per your note, I will do my best and anticipate moving forward without complications.

Bob

\* \* \*

I never intended to hurt or harm you in any way. This wasn't even imaginable. I failed. I always wanted only the very best for you, both personally and professionally. This was my goal. I failed. I hoped to work with you for as long as I could. E&B was my dream. I failed. I sought to continue a terrific friendship that might last through our remaining years. No matter what else, l was counting on it. I failed. I failed you Elyse. I failed myself as well. However, there can be no failure to convey again my heartfelt regrets. I remain very sorry Elyse.

173. After McKenna indicated she would step down from representing the Shared Client, Riley stated that he would step down instead. McKenna continued her representation of the Shared Client.

174. McKenna informed her new employer, Donna MacKenzie, of this exchange with Riley and her plan to continue to represent the Shared Client since Riley had represented that he would be stepping down from the Shared Client.

25

MCK_ESI_00021036

175. During this conversation, McKenna informed MacKenzie that Riley was confronted via email and that Riley had also acknowledged his inappropriate behavior and apologized via email. MacKenzie told McKenna that she had "balls of steel." Furthermore, she stated that she wished McKenna had not told her about this, that McKenna was not to tell Jules Olsman about it, and that she, MacKenzie, had endured far worse during her legal career. McKenna offered to send MacKenzie the emails and the evidence of the photographs, but MacKenzie did not want to see any of it.

176. In the months following McKenna beginning work at OMPW, Riley contacted her minimally. Although Riley had previously advised McKenna that he would step aside as an attorney for the Shared Client, Riley never stepped down.

177. In May of 2022, McKenna attended the State Bar of Michigan Negligence Section meeting in Nashville with her then-husband Brandon Heid. Donna MacKenzie and her husband, Brandon MacKenzie, were also in attendance.

178. One night, they got together in Defendant MacKenzie's hotel room to socialize. McKenna and Heid discussed Riley's inappropriate behavior with the MacKenzies including his refusal to step down from working for the Shared Client and his continued interest in McKenna despite her many attempts at redirecting Riley.

179. In June of 2022, while trying a case together in Clare County, McKenna informed Emily Peacock about the harassment that she had endured from Riley. McKenna explained to Peacock that Riley had said he would step down from representing the Shared Client, but had yet to do so.

MCK_ESI_00021037

180. In December of 2022, Defendant MacKenzie and her husband invited McKenna and Heid to MacKenzie's home. At this dinner, MacKenzie congratulated McKenna for her successful year, and informed McKenna of the bonus she would receive.

181. In January of 2023, Plaintiff and her then-husband decided to get divorced.

182. In February of 2023, Defendant MacKenzie presented to the 2022-2023 Michigan Association of Justice (MAJ) Leadership Academy Class, showcasing a 5-star review that McKenna had received from a client and praising McKenna for her work for the firm.

183. McKenna informed Defendants MacKenzie and Olsman of her decision to get divorced in March 2023, at Defendant Peacock's urgence.

184. Sometime around March of 2023, McKenna became aware that someone at OMPW had told Riley of her divorce.

185. Upon learning this, Riley invited McKenna to spend Easter at his home. Riley informed McKenna that he was aware that in previous years she had spent the holiday with her former husband's family and explained that he wanted to apologize for everything he had done. McKenna promptly declined Riley's invitation.

186. Riley seemed to become very upset following McKenna's declination of his proposal.

187. McKenna reached out to Peacock about Riley's Easter invitation and explained discomfort with the fact that Riley was contacting her. Peacock advised McKenna to "forgive and forget."

188. Shortly following McKenna declining Riley's invitation, McKenna became aware that Riley was speaking negatively about her, her divorce, and the alleged effects it had on her to the senior partner at her firm, Jules Olsman.

27

MCK_ESI_00021038

189. As a result, Jules Olsman informed McKenna that she was no longer permitted to work from home as Riley had told him that McKenna was spending all of her time crying about her divorce.

190. McKenna and Riley were both invited to the Shared Client's Annual Conference in June of 2023 in Orlando, Florida.

191. Around this time, Riley began contacting McKenna to inform her that MacKenzie and Olsman had been talking negatively about her, and that he was preserving her reputation with them.

192. When McKenna pressed Riley on what negative comments were being made and what McKenna had allegedly done wrong, Riley would not say.

193. Riley encouraged McKenna to reach out to Peacock to seek resolution of negative statements Peacock had made about McKenna to Riley.

194. Riley informed McKenna that they would share a conference room suite, but that they would have separate rooms.

195. McKenna and Peacock attended breakfast together, and McKenna informed Peacock of the adjoining hotel rooms and the shared conference room suite.

196. McKenna expressed her discomfort, and asked for Peacock's advice, and Peacock again dismissed McKenna's concerns.

197. Immediately following that breakfast, Peacock set up a facilitation on one of McKenna's cases with Riley to be conducted on April 19, 2023, despite knowing that McKenna was uncomfortable with this arrangement, and then attended the facilitation with McKenna in an attempt to achieve early resolution.

28

MCK_ESI_00021039

198. In the months after Easter, Jules Olsman routinely came into McKenna's office and made comments regarding Riley such as, "I was talking to Riley about you" and "we keep Bob Riley happy in this office."

**McKenna and Riley Attend Annual Conference in Orlando**

199. In June of 2023, McKenna flew to Orlando to attend the Shared Client's Annual Conference.

200. Upon discovering that she and Riley were scheduled to be on the same flight, McKenna changed her reservation to avoid contact with Riley.

201. On June 14, 2023, in advance of the trip, McKenna and Peacock went to breakfast. McKenna expressed concern that she would be sharing a conference room suite with Riley. Defendant Peacock told McKenna not to make a big stink about it.

202. Upon arriving in Orlando on June 18, 2023, McKenna checked into her hotel room (part of the adjoining conference room suite previously referenced by Riley), and confirmed with the hotel receptionist that each room could still be locked and not accessed by the other party.

**McKenna and Riley Meet Together at Annual Conference in Orlando**

203. On June 19, 2023, Riley set up a meeting with McKenna and the Executive Director ("Executive Director") of the Shared Client that was to take place at 8 pm in the conference room connecting Riley and McKenna's hotel rooms.

204. Riley informed McKenna of the meeting and asked her to meet him in the adjoining conference room.

205. McKenna attended the meeting with Riley. While waiting for the Executive Director to arrive, Riley spoke tearfully about the photographs and McKenna confronting him,

29

accused McKenna of ruining his life, told her that he no longer has the will to live, and requested her forgiveness.

206. McKenna repeatedly told Riley that his behaviors made her uncomfortable and that it was not fair to blame her because all she wanted was for him to stop.

207. After an hour of waiting for the Executive Director and listening to Riley, McKenna informed Riley that the Executive Director clearly was not showing up and returned to her room.

208. The next day, the annual conference held a session regarding suicide rates, the incidence of suicide, and managing close relationships with suicidal individuals.

209. During this presentation, Riley wrote a note to McKenna insinuating he was threatening suicide; he indicated that he related to the presentation more than she could ever guess, and then told her that she would likely never see him again.

210. Riley then left the room, and McKenna became concerned that Riley was taking action on his various statements about not having the will to live and relating to the suicide presentation.

211. Following the presentation, Riley and McKenna were to conduct a meeting with the executive committee.

212. McKenna attended the meeting with the executive committee, and Riley ultimately showed up to the meeting late.

213. Riley asked McKenna to dinner numerous times during the Annual Meeting. Each time, McKenna declined his dinner invitations, and made sure she had dinner plans with other people to ensure her safety.

30

214. McKenna became aware that Riley was listening to her phone calls through the adjoining conference room door, based on Riley's statements to McKenna after the fact regarding the content of those calls.

215. Some of the conversations that Riley was eavesdropping on were about Defendant Riley's behavior.

**McKenna Informs Her Employer of Riley's Behavior During the Annual Meeting in Orlando**

216. McKenna called MacKenzie during the conference to provide her with an update on a case McKenna was handling. During this conversation, McKenna informed MacKenzie that she was uncomfortable with Riley's behavior. MacKenzie laughed it off and encouraged McKenna to get through the trip.

217. Defendant MacKenzie further indicated that she did not want to hear any more about Riley.

218. On their final night at the Annual Meeting, McKenna and Riley attended the closing dinner.

219. McKenna left the banquet hall following dinner.

220. Riley called McKenna's cell phone repeatedly, accusing her of scaring him because she had left.

221. McKenna informed Riley that she was fine and asked him to leave her alone.

222. Over the next several hours, Riley continued to call and text McKenna, insisting that he needed to talk to her.

223. McKenna returned to her hotel room and locked the door.

**Riley Refuses to Leave McKenna Alone**

31

224.    Riley then showed up outside of McKenna's hotel room, knocking on the door and calling her cell phone repeatedly.

225.    He insisted that he wanted to speak to her before she left.

226.    McKenna told him, via text message from the other side of her door, that she wanted him to leave her alone.

227.    Riley continued to text and call McKenna repeatedly while standing outside of McKenna's hotel room door, where he remained for hours.

228.    When McKenna looked out of the peephole on the hotel room door, she saw Riley remaining outside of her door.

229.    She became fearful and desperate that he would not leave her alone.

230.    McKenna called a mental health hotline to ask for help with handling Riley and to determine how to proceed.

231.    McKenna was scheduled to share a car with Riley to the airport the following morning.

232.    Instead, she changed her schedule to depart earlier, avoiding further interaction with Riley.

233.    The new flight required her to depart the hotel at 5 am.

234.    In order to access the elevators or staircase to get to the lobby entrance, where her Uber was picking her up to bring her to the airport, McKenna had to walk past Riley's hotel room.

235.    Riley's hotel room door was propped open with a shoe and she could clearly see Riley asleep in an armchair that he had positioned to face the hallway.

32

MCK_ESI_00021043

236. McKenna walked quickly and quietly by Riley's room, trying not to wake him, and took the elevator to the lobby where she met her Uber.

## McKenna Again Informs MacKenzie that Riley's Behavior Makes Her Uncomfortable

237. Following the Annual Meeting in Orlando, McKenna had a conversation with MacKenzie in which McKenna again expressed that she did not feel comfortable mediating cases with Riley due to his behavior.

238. Approximately a month after the Annual Meeting, McKenna had a facilitation scheduled with Riley, which McKenna attended via phone because she was uncomfortable attending via Zoom.

239. McKenna spoke with MacKenzie about the facilitation prior to it happening and expressed her discomfort, and MacKenzie dismissed her concerns.

240. McKenna again communicated to Riley that she needed him to leave her alone.

241. McKenna still wanted to navigate away from the Shared Client and working with Riley, but had concerns given the comments being made by Olsman and the threats that Riley posed to her career.

242. Around this time, McKenna set up a lunch with Olsman and suggested that McKenna stop working for the Shared Client so that she could devote her entire time to medical malpractice and nursing home abuse cases. Defendant Olsman told her that it was a terrible idea to give up a client that lauded her and that OMPW was enjoying McKenna's success with Riley.

243. McKenna came to the realization and conclusion that she would need someone to confront Riley and/or explain the situation to MacKenzie and Olsman to get anything to change and again consulted numerous attorneys.

33

244. The attorneys McKenna consulted would not take her case due to Riley's prominent status in the legal field.

**McKenna and Riley Attend a Shared Client Conference in Niagara on the Lake - McKenna Again Asks Riley to Leave Her Alone**

245. McKenna and Riley were required by the Shared Client to attend a workers' compensation conference in Niagara on the Lake in early September of 2023.

246. Riley changed his flight itinerary to be on the same flight as McKenna leaving Detroit.

247. Riley and McKenna rented a car in Buffalo and drove two-and-a-half hours from Buffalo to Niagara on the Lake together. During this drive, Riley again became tearful and insisted that McKenna's behavior hurt his feelings. McKenna told Riley she needed to be left alone and again reiterated that their relationship is a professional one. McKenna also told Riley that he made her uncomfortable with his behavior during the Orlando conference and the photographs, and that he had told her that he was stepping down from representing the Shared Client back in 2021, yet he still had not done so.

248. McKenna also discussed with Riley the fact that he kept coming up with new reasons as to why he could not step down from the Shared Client and that this made her uncomfortable because she had only continued working for the Shared Client because he had promised to step down. Riley specifically asked McKenna what she wanted from him and McKenna stated that she would either stop working for the Shared Client or that he needed to stop working for the Shared Client because he would not leave her alone.

249. During the conference, McKenna and Riley gave a presentation. Despite an agreement as to how the portions of the presentation would be handled, Riley presented McKenna's portions and disparaged her to the Executive Director following the presentation.

34

250. At the end of the Niagara-on-the-Lake conference, Riley again agreed to step down from working for the Shared Client and told McKenna he would step away and that she would never hear from him again.

251. Instead of stepping down from representing the Shared Client, Riley began meddling with McKenna's relationship with the Shared Client. She was identified as the point of contact to meet with workers' compensation lawyers from each state to discuss issues to cover in the negotiation of collective bargaining agreements. On a call shortly after the conference, McKenna was questioned by the Shared Client Executive Director about the meetings she had conducted related to this task. He asked why she was doing this work. She indicated that she had set up the meetings at Riley's direction. Riley, who was also on the call, indicated that he hadn't. Riley then suggested that another attorney take on the task, despite the fact that the other attorney billed a higher hourly rate than McKenna.

252. Later, the Executive Director of the Shared Client called McKenna to discuss lightening her workload after being told by Riley that she was having an emotional breakdown because of her divorce. The Executive Director also questioned McKenna about her dating life in light of information provided to him by Riley.

253. McKenna became increasingly concerned that instead of stepping down, Riley was working to have her fired from the Shared Client.

254. McKenna also reached out to numerous additional attorneys to ask if they would be willing to help her in her case against Riley, but upon learning the case was against Riley, those attorneys refused to help given his status and prominence in the legal field.

**McKenna Again Asks Riley to Leave Her Alone**

35

255. McKenna had another meeting with Riley on October 25, 2023 in an attempt to confront Riley regarding his behavior and with the hope of getting him to stop,

256. During this October 25, 2023 meeting, McKenna again explained to Riley that working with him made her uncomfortable and that she could not continue to do so.

257. McKenna reminded Riley that he had agreed to step down from representing the Shard Client on numerous occasions and that he still refused to do so, and therefore she could no longer trust his word.

258. Riley stated that he was the reason she received a 2022 bonus from Defendant OMPW, and that he had orchestrated her bonus.

259. He also claimed he was the reason that McKenna had received a raise in her hourly billing rate from the Shared Client.

260. When pressed about his prior statements that he would step back from the Shared Client, he stated that he could not step away from the Shared Client. He also assured her that all of the photographs had been destroyed.

261. Riley claimed that he had tried to have positive conversations with Defendants Olsman and MacKenzie about her.

262. During this meeting, Riley again assured McKenna that he would not interfere with her career or use his position of power over her.

263. It became clear to McKenna based on Riley's representations to her during this meeting that he was not going to step down and that she would have to continue to work with Riley if she continued to represent the Shared Client.

36

264. McKenna still wanted to navigate away from representing the Shared Client and working with Riley, but had concerns given the comments being made by Olsman and the threats that Riley posed to her career.

265. During this time, she felt increasingly alienated from the partners at her firm.

266. McKenna came to the realization and conclusion that she would need someone to confront Riley and/or explain the situation to MacKenzie and Olsman to get anything to change, therefore she again consulted attorneys.

267. During this time, McKenna was also exploring potential career opportunities with other law firms and businesses, so as to get herself away from Riley.

268. All of the in-state opportunities McKenna found had ties to Riley.

269. Some of these in-state opportunities made it clear to McKenna that mediating cases with Defendant Riley would be a condition of her employment.

270. McKenna also sought out-of-state opportunities, including at firms in Georgia and Florida. McKenna also applied for in-house counsel roles across the United States.

271. McKenna strongly considered accepting a position with a successful law firm in Atlanta, Georgia.

272. However, McKenna decided not to accept that position as she had no family or friends in Atlanta, Georgia. Moreover, she would need to be admitted to the Georgia bar, a lengthy process.

273. McKenna also applied for many positions in areas of law in which she had no experience, as she was desperate to get away from Riley and his harassing conduct, and she was fearful for her future at OMPW given her continued and repeated decision to stand up for herself to Riley.

37

274.   McKenna considered working at a restaurant in the metropolitan Detroit area as a consultant.

275.   Ultimately, McKenna did not want to walk away from nine years of practicing and learning medical malpractice law in Michigan.

276.   McKenna's passion is representing clients in medical malpractice cases and standing up for those who need representation.

277.   McKenna began seriously contemplating how she was going to continue to represent medical malpractice clients in Michigan.

278.   McKenna also understood that practicing medical malpractice law or any type of law in another state would not only require getting licensed in that state, but also learning the legal technicalities of that particular state.

**McKenna Learns She Will Not Receive a Year's End Bonus From OMPW for 2023**

279.   Conditions at OMPW did not improve. It became clear to McKenna that Riley and OMPW were routinely discussing her. This made her uncomfortable, given Riley's history of behaviors towards McKenna.

280.   In December of 2023, McKenna learned from the accountant at OMPW that she would not receive an annual bonus.

281.   OMPW's accountant sent notifications to the attorneys on a quarterly basis which broke down settlements and noted how much each attorney had accrued toward his or her bonus. Attorney bonuses were allocated according to a formula that factored in whether the attorney was a partner, whether the client had been originated by the attorney or assigned to the attorney, and whether there was an associated referral fee.  Bonuses were earned when an attorney had accrued enough fees to cover their base salary.

38

282. Prior to December 2023, McKenna received an accounting that indicated she was on track to earn a bonus based on case settlements. In December 2023, McKenna received an updated accounting that looked completely different from prior accountings and which reflected that she would not receive a bonus.

283. This came as a shock to McKenna in light of annual bonuses paid to her in 2021 and 2022. In December 2021 she received a $5000 bonus despite having only two cases in litigation and no settlements. In 2022 she received a $30,000 bonus based on her share of settlements in cases she personally managed, settlements in which she provided support to Olsman, and Client billing.

284. In 2023, McKenna more than doubled her settlements as well as her Shared Client billing, yet did not receive a bonus.

285. McKenna also did not receive a raise at any time during her employment at OMPW.

286. With the lack of a bonus from OMPW and the increasingly hostile work environment, McKenna became increasingly anxious to find employment that would not require her to work with, or appease, Riley.

287. Concerned about her future with OMPW, and scared about how she would navigate stepping down from the Shared Client without further upsetting OMPW, coupled with how she would get Riley to leave her alone, McKenna sought help from attorneys to confront Riley.

288. McKenna contemplated that the worst case scenario would be having to start her own firm to ensure that she could work without Bob's interference in her career.

39

289.   In the end of December of 2023, McKenna and Amanda Fox Perry began discussing their respective interests in having their own firms one day. Each of them had their own reasons for wanting to leave their current employers but hoped that they would be able to navigate their situations amicably.

**McKenna Attempts to Gain Understanding Regarding Her Lack of Bonus and Her Future at Olsman, MacKenzie, Peacock & Wallace, PC**

290.   On January 22, 2024, McKenna attended a scheduled meeting with partners MacKenzie and Peacock. At that meeting, McKenna presented MacKenzie and Peacock with her caseloads and annual bonuses over the prior two years. MacKenzie and Peacock explained that her work for the Shared Client did not contribute to her bonus calculation, despite it having counted toward her bonus for the prior year.

291.   At that meeting, McKenna discussed her travel plans for the year and caseload management. McKenna expressed frustration about the lack of support she received in light of the fact that she had numerous medical malpractice cases in litigation and was assisting Olsman on many other cases and matters. MacKenzie and Peacock expressed confusion as to why McKenna would not feel comfortable coming to them with her concerns and encouraged her to do so going forward, stating that they wanted her to feel supported. They agreed that McKenna would draft a travel proposal and that MacKenzie and Peacock would try to come up with a solution to ensure that McKenna received more paralegal support going forward.

292.   During this meeting, McKenna expressed concern regarding Riley's behaviors and how that had negatively affected how she was being treated. McKenna also expressed her fear of confronting Riley because of the ramifications it may have on her with OMPW.

40

293. MacKenzie insisted that McKenna's treatment had nothing to do with Riley, and that she had never stood in the way of McKenna confronting him. MacKenzie further encouraged McKenna to do what she felt she had to do.

294. On January 25, 2024, McKenna met again with MacKenzie and Peacock to discuss the travel proposal. After going over the merits of each proposed trip, MacKenzie and Peacock stated that they would review it and get back to her.

295. On January 29, 2024, McKenna and MacKenzie met to discuss McKenna's caseload. At that point in time, MacKenzie assigned new cases to McKenna. She also instructed McKenna to start learning about nursing home audit trails and begin drafting templates that could be used to request records in future cases.

296. On January 31, 2024, McKenna's attorneys confronted Riley.

297. On or around February 3, 2024, although McKenna feared termination, she informed OMPW in writing that Riley had been confronted, as she knew this would affect the working relationship OMPW had with Riley, which could impact client outcomes and settlements.

298. To that end, McKenna offered to discuss a transition strategy which she understood might require her departure.

299. In anticipation of the worst case scenario, and having realized that 1) if she was terminated and sought work for an already established Michigan firm, she would never be able to continue in her field of practice without Riley exerting control over her career because those firms, just like OMPW, use Riley as a mediator, 2) while seeking employment at a firm outside of the state of Michigan would be possible, McKenna is licensed as a Michigan lawyer, and would have to seek reciprocity and undergo the application process for another state prior to

41

practicing there which for many states takes at least a year, and/or sit for the Bar Exam in another state, McKenna's back up plan was to start a firm with Amanda Fox Perry ("Fox Perry").

## Olsman, MacKenzie, Peacock & Wallace, PC Fires McKenna After Learning She Confronted Riley

300. Despite having stated on January 22, 2024 that she would not stand in the way of McKenna addressing Riley how she saw fit and having assigned McKenna additional cases following that meeting, McKenna's fears were realized when MacKenzie, on behalf of OMPW, immediately terminated McKenna's employment on February 4, 2024, stating that she questioned McKenna's honesty, integrity, and judgment.

301. In correspondence related to McKenna's termination, OMPW defended Riley and made statements, apparently intended to justify her termination, regarding McKenna's personal life and her divorce. MacKenzie acknowledged McKenna's reporting of the sexual harassment that she had endured at the hands of Riley.

302. In an attempt to protect her reputation and career, as well as mitigate her damages, McKenna finalized her decision to start a firm with Fox Perry. Fox McKenna, PLLC is based in the District of Columbia, with an office in Michigan. This allows McKenna to represent Michigan clients, as McKenna is not licensed in any other states.

303. McKenna's cases routinely undergo mediation and McKenna does not feel comfortable using Riley as a mediator.

304. Opposing parties in McKenna's cases often select Riley as their first choice for a mediator, further complicating this dynamic for McKenna because McKenna cannot explain why she cannot use Riley to opposing counsel or any of her clients.

305. McKenna subsequently contacted her clients to inform them of her departure from OMPW and her plan to start a firm in the near future.

42

306. Numerous clients elected to transition with McKenna.

307. OMPW then contacted a number of the clients that had chosen to move with McKenna and informed those clients that McKenna had been terminated from OMPW because she was "incompetent" and that McKenna did not have a firm or the resources with which to continue their representation.

308. A few of these clients then decided to remain clients of OMPW.

309. On February 5, 2024, McKenna reached out to one of the prominent employment attorneys in Michigan who had previously advised her she would need to leave the state if she pursued litigation against Riley, as this attorney was well-aware of the underlying facts and circumstances in the case. McKenna engaged in a thirty minute intake telephone conference, in which she was assured confidentiality and that the law firm she was speaking with did not represent any law firms. McKenna was told she would be called back by an attorney from the firm, but was never called back. This attorney subsequently stepped in to represent OMPW, as discussed *infra*, despite having direct knowledge of McKenna's claims during a confidential intake call.

310. On February 9, 2024, Riley offered a settlement of $400,000.00 to McKenna, through her attorneys, which contained a confidentiality clause and a mutual non-disparagement clause. Riley represented himself in the negotiation of this agreement.

311. On or around February 11, 2024, McKenna accepted said agreement, and awaited the release and settlement agreement that would need to be signed to effectuate this agreement.

312. On or around February 13, 2024, OMPW was contacted by McKenna's attorneys to address McKenna's termination.

43

313.    OMPW's attorney contacted McKenna's attorneys, despite McKenna having consulted her and her firm regarding the claims in this matter, and informed them that she was representing OMPW.

314.    When Riley became aware of McKenna's potential dispute with OMPW, he retained counsel who stepped in and added additional material terms and conditions to the agreement including:

1)      a provision indemnifying OMPW against any claims related to Riley's harassment, including retaliation;

2)      confirmation that McKenna had only told MacKenzie, Olsman, and her attorneys about Riley's behavior;

3)      a request for a list of all individuals that McKenna had told about Riley's behavior;

4)      a liquidated damages clause requiring that McKenna re-pay 20% of the settlement proceeds for each breach of the contract, as well as Riley's costs and attorneys' fees; and

5)      precluding McKenna from utilizing two other mediators in the Michigan medical malpractice legal community, further complicating the dynamic set forth in ¶302.

315.    McKenna could not agree to the additional material terms and conditions added by Riley. Though she has kept the harassment a closely guarded secret, she has disclosed it to friends and family whom she relies on for support and guidance. In light of her distrust of Riley, she was not willing to provide their identities to him.

MCK_ESI_00021055

316. On or around February 16, 2024, McKenna was contacted by the Shared Client that she represented with Riley.

317. The Shared Client threatened to terminate her, citing comments Riley had made to the Shared Client regarding her competence, emotional well-being, and failure to complete recent assignments.

318. Riley's comments about McKenna were false and clearly served to disparage her to the Shared Client.

319. McKenna defended herself to the Shared Client and was essentially placed on probation.

320. Over the next four months, the Shared Client made intermittent comments to McKenna threatening her continued position based on additional comments made by Riley.

321. Although McKenna attempted to resolve her disputes with Riley, Riley made any resolution of these disputes conditioned on insuring indemnity for OMPW.

322. Such indemnity precluded McKenna from addressing her termination from OMPW and her fee disputes with OMPW on the cases that transitioned with her following her termination.

323. Numerous attorneys in Michigan have notified McKenna that OMPW partners and employees were speaking disparagingly about her in the legal field, claiming that she had a mental breakdown, was mentally unstable, and that she was incompetent and therefore had to be fired.

**McKenna Moves to Maryland**

324. In late April of 2024, having realized that for all intents and purposes her career had been ruined and reputation tarnished in her home state of Michigan, McKenna packed her

45

MCK_ESI_00021056

belongings into her car, put the rest of her items in a storage unit, and moved to Maryland away from her family, friends, professional ties, and connections.

325. McKenna's intention is to remain in Maryland.

326. Riley has reached out to McKenna on numerous occasions, inquiring as to where she is living and asking where she intends to live.

327. Riley's questioning regarding McKenna's whereabouts, in light of her many requests to Riley that he leave her alone, makes McKenna uncomfortable.

**McKenna and Riley Attend Annual Meeting in Orlando**

328. In June of 2024, the Client required Riley and McKenna's attendance at the Annual Meeting in Orlando, Florida.

329. McKenna's law partner attended the conference with her as McKenna did not feel safe attending the conference alone, given Riley's past behavior, including his behavior at the conference in June of 2023.

330. During the conference, there were numerous occasions in which Riley requested to speak with McKenna in private.

331. Riley expressed remorse regarding his prior conduct and promised McKenna that he would act differently going forward, including that he would not make negative representations and comments regarding McKenna to Shared Client.

332. Riley failed to fulfill this promise, and continued to disparage McKenna and engage in underhanded activities to diminish McKenna's status with Shared Client.

333. Riley also continued to condition any resolution of McKenna's dispute on indemnification of OMPW and offered to mediate McKenna's fee dispute claims against OMPW, imploring McKenna to trust him.

46

334.    McKenna rejected Riley's offer, and informed Riley again that he makes her uncomfortable and that she needed him to leave her alone.

335.    Riley implored McKenna on numerous occasions during this time period to trust him, and promised that his behavior would change.

336.    McKenna maintained repeatedly that she needed Riley to leave her alone.

337.    No matter, Riley continued to contact McKenna and shower her with compliments regarding her work performance and her legal knowledge, while simultaneously disparaging her to her colleagues and client behind her back.

338.    MacKenzie and OMPW have and continue to routinely facilitate cases with Riley.

339.    Riley has contacted McKenna on numerous occasions since McKenna involved attorneys.

**McKenna Files the Present Action *Pro Se***

340.    Though McKenna was able to find attorneys to engage the defendants in confidential settlement negotiations, she has been unable to find an attorney in the state of Michigan who is willing to litigate this matter on her behalf in court.

341.    McKenna has been warned that her reputation in the legal field will continue to be tarnished by filing suit.

342.    McKenna has decided to file suit *pro se*.

**COUNT I**
**Elliott-Larsen Civil Rights Act - Sexual Harassment, Hostile Work Environment - Riley**

343.    McKenna incorporates by reference all preceding averments.

344.    From September of 2019 to September of 2021, McKenna was an employee, and Riley and RH were her employers, covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act.

47

MCK_ESI_00021058

345. McKenna's submission to Defendants' sexually harassing conduct was explicitly or implicitly made a condition of McKenna's employment.

346. Defendant Riley's conduct was on the basis of and because of McKenna's sex.

347. Riley is liable for his acts and RH is vicariously liable for the negligent acts of Riley.

348. The actions of the Defendant Riley were intentional, willful, in deliberate disregard of, and with reckless indifference to, the rights and sensibilities of McKenna.

349. As a direct and proximate result of those actions, the terms, conditions, and privileges of McKenna's employment were adversely affected.

350. As a further direct and proximate result of Defendants' unlawful actions against McKenna as described, she has sustained and will continue to sustain in the future, injuries and damages, including, but not limited to, loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, physical distress, loss of the ordinary pleasures of everyday life, reasonable attorney's fees and costs incurred in this litigation, and any other compensatory and equitable damages that the Court deems appropriate.

## COUNT II
### Elliott-Larsen Civil Rights Act - Hostile Work Environment - OMPW

351. McKenna incorporates by reference all preceding paragraphs.

352. From September of 2021 to February of 2024, McKenna was an employee and Defendant Olsman MacKenzie Peacock & Wallace, PC were her employers, covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act.

353. McKenna's submission to Defendant Riley's sexually harassing conduct was explicitly or implicitly made a condition of McKenna's employment with Defendant OMPW.

MCK_ESI_00021059

354. Defendants' conduct was on the basis of and because of McKenna's sex.

355. Defendants' actions and inactions were intentional, willful, in deliberate disregard of, and with reckless indifference to, the rights and sensibilities of McKenna.

356. As a direct and proximate result of those actions, the terms, conditions, and privileges of McKenna's employment were adversely affected.

357. As a further direct and proximate result of Defendants' unlawful actions against McKenna as described, she has sustained and will continue to sustain in the future, injuries and damages, including, but not limited to, loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, physical distress, loss of the ordinary pleasures of everyday life, reasonable attorney's fees and costs incurred in this litigation, and any other compensatory and equitable damages that the Court deems appropriate.

## COUNT III
### Elliott-Larsen Civil Rights Act - Discrimination - All Defendants

358. McKenna incorporates by reference all preceding paragraphs.

359. From September of 2019 to September of 2021, McKenna was an employee of Defendants Riley and Riley & Hurley, PC were her employers, covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act.

360. From September of 2021 to February of 2024, McKenna was an employee and Defendant OMPW were her employers, covered by and within the meaning of Michigan's Elliott-Larsen Civil Rights Act.

361. Defendants' above-described conduct was on the basis of and because of McKenna's sex.

49

362.     The conduct of Defendant Riley in sexually harassing McKenna constitutes sex discrimination in violation of the Act.

363.     The intentional and reckless dismissal of McKenna's complaints related to Defendant Riley's conduct reflects gender hostility toward McKenna.

364.     Defendant OMPW's attempt to secure negative information about McKenna following her repeated complaints regarding Defendant Riley's conduct reflects gender hostility toward McKenna.

365.     The actions of Defendants were intentional, willful, in deliberate disregard of, and with reckless indifference to, the rights and sensibilities of McKenna.

366.     As a direct and proximate result of those actions and failures to act, the terms, conditions, and privileges of McKenna's employment were adversely affected.

367.     As a further direct and proximate result of Defendants' unlawful actions against McKenna as described, McKenna has sustained injuries and damages including, but not limited to, the loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, physical distress, loss of the ordinary pleasures of everyday life, reasonable attorney's fees and costs incurred in this litigation, and any other compensatory and equitable damages that the Court deems appropriate.

## COUNT IV
### Elliott-Larsen Civil Rights Act - Retaliation - OMPW

368.     McKenna incorporates by reference all preceding paragraphs.

369.     The Elliott-Larsen Civil Rights Act, M.C.L.A. sec. 37.2101 et seq., prohibits retaliation against an employee for engaging in activity protected under the Elliott-Larsen Civil Rights Act.

50

MCK_ESI_00021061

370. McKenna engaged in activity protected under the Elliott-Larsen Civil Rights Act, such as opposing unlawful sexual harassment committed by Defendant Riley.

371. McKenna was terminated by OMPW as a result of her activity protected by the Elliott-Larsen Civil Rights Act, M.C.L.A. sec. 37.2101 et seq.

372. Defendant OMPW is liable under the Elliott-Larsen Civil Rights Act for retaliating against McKenna.

373. As a further direct and proximate result of Defendants' unlawful actions against McKenna as described, she has sustained and will continue to sustain in the future, injuries and damages, including, but not limited to, loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, physical distress, loss of the ordinary pleasures of everyday life, reasonable attorney's fees and costs incurred in this litigation, and any other compensatory and equitable damages that the Court deems appropriate.

### COUNT V
### Breach of Contract (Express) - Riley

374. McKenna incorporates by reference all preceding paragraphs.

375. McKenna was employed by RH pursuant to an express employment contract, executed in writing in September of 2019.

376. Defendant Riley violated the terms of the employment contract between McKenna and Defendant Riley & Hurley.

377. Defendant Riley engaged in conduct that violated the employment contract.

378. Defendant's harassment was severe, offensive, and abusive; the harassment was ongoing and pervasive; the harassment prohibited Plaintiff from doing her job, and in doing so breached the employment contract by creating a workplace that was hostile to McKenna.

MCK_ESI_00021062

379. Defendant's repeated and pervasive harassment of McKenna constituted a breach of the contract.

380. A reasonable person in McKenna's circumstances would have considered the work environment to be hostile and/or abusive, and McKenna indeed considered the work environment to be hostile and abusive.

381. As a direct and proximate result of Defendant's breach, McKenna suffered damages including but not limited to loss of earnings and earning capacity, mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, physical distress, loss of the ordinary pleasures of everyday life, and any other compensatory and equitable damages that the Court deems appropriate.

## COUNT VI
### Breach of Contract (Express) - Riley

382. McKenna incorporates by reference all proceedings paragraphs.

383. In February 2024, McKenna and Riley entered into an agreement to resolve McKenna's claims against Riley.

384. The agreement required that Riley pay McKenna and that McKenna maintain confidentiality regarding Riley's identity and the underlying facts and circumstances relating to her claims against Riley.

385. McKenna maintained confidentiality with the understanding that this matter had resolved.

386. Upon learning that McKenna had a dispute with OMPW, Riley breached the agreement that had been reached by adding material terms to the agreement.

52

387. Specifically, Riley added a material term requiring indemnification of Donna MacKenzie, Jules Olsman, and OMPW, from any claims McKenna may have brought against them, which either directly or indirectly related to McKenna's claims against Riley.

388. As a direct and proximate result of Defendant's breach, McKenna suffered damages including but not limited to mental and emotional distress, including severe anxiety and mental anguish, humiliation and embarrassment, physical distress, loss of the ordinary pleasures of everyday life, and any other compensatory and equitable damages that the Court deems appropriate.

## COUNT VII
### MCL 600.2954 Stalking - Riley

389. McKenna incorporates by reference all preceding paragraphs.

390. Defendant Riley's actions described in the factual averments set forth in the above paragraphs amount to conduct prohibited under section 411h and/or 411i of the Michigan Penal Code, Act No. 328 of the Public Acts of 1931, being sections 750.411h and 750.411i of the Michigan Compiled Laws.

391. More specifically, Defendant Riley's conduct constitutes harassment under section 750.411h of the Michigan Compiled Laws, in that Riley's conduct included repeated or continuing unconsented conduct that would cause a reasonable individual to suffer emotional distress and that Riley's conduct actually caused McKenna to suffer emotional distress.

392. Defendant Riley's conduct also constitutes stalking under section 750.411h of the Michigan Compiled Laws, in that Riley engaged in a willful course of conduct involving repeated or continuing harassment of McKenna that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that Riley's conduct

53

MCK_ESI_00021064

actually caused Plaintiff to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

393. Damages incurred by a victim as a result of conduct prohibited in sections 750.411h or 750.411i may be recovered, together with exemplary damages, costs of the action, and reasonable attorney fees. MCL 600.2954.

394. As a direct and proximate result of Defendant's prohibited conduct, McKenna has suffered humiliation, mortification, embarrassment, sleeplessness and anxiety, among other damages that may arise during the course of discovery, and any other compensatory and equitable damages that the Court deems appropriate.

## COUNT VIII
## Defamation - All Defendants

395. McKenna incorporates by reference all preceding paragraphs.

396. The statements made by Defendants regarding McKenna's competence in the legal profession and Defendant OMPW's broadcasting to the legal field that McKenna was terminated for her incompetence are false.

397. Moreover, the statements, individually and jointly, tend to so harm the reputation of McKenna as to lower her reputation in the community or deter third persons from associating or dealing with her.

398. Furthermore, Defendants' statements involve materially false implications.

399. Defendants verbally published such statements, as described in detail above, negligently, with knowledge of the falsity of the statements, and/or with reckless disregard of their truth or falsity.

400. The statements set forth above do not involve matters of public concern.

MCK_ESI_00021065

401. When Defendants made these statements, Defendants were not acting within the scope of any public authority, nor could they have reasonably believed they were acting within the scope of any such authority.

402. The above publications were not privileged.

403. Defendants' statements constituted defamation *per se*.

404. Defendants' conduct in this matter, which proximately caused McKenna's injuries and damages, was grossly negligent because it was so reckless that it demonstrated a substantial lack of concern for McKenna's physical and emotional wellbeing.

405. The publication of these remarks has resulted in actionable damage to McKenna's reputation in the community, severe emotional distress, humiliation, mortification, embarrassment, sleeplessness and anxiety, among other damages that may arise during the course of discovery, and any other compensatory and equitable damages that the Court deems appropriate.

406. Defendants' conduct deliberately and intentionally injured McKenna; his acts were willful and malicious and are not dischargeable in bankruptcy.

## COUNT IX
## IIED - All Defendants

407. McKenna incorporates by reference all preceding paragraphs.

408. The above-described conduct of Defendants was extreme, outrageous, and beyond all possible bounds of decency, and of such character as to be intolerable in a civilized society.

409. The above-described conduct of Defendants was reckless and/or intentional.

410. Defendants' conduct was not for any proper purpose, nor was it within the scope of Defendants' authority.

55

411. The above-described conduct of Defendants caused McKenna severe emotional distress.

412. Defendants are liable to McKenna for intentional infliction of emotional distress.

413. Defendants' conduct in this matter, which proximately caused Plaintiff's injuries and damages, was grossly negligent because it was so reckless that it demonstrated a substantial lack of concern for Plaintiff's physical and emotional wellbeing.

414. As a direct and proximate result of Defendants' prohibited conduct, McKenna has suffered humiliation, mortification, embarrassment, sleeplessness and anxiety, among other damages that may arise during the course of discovery, and any other compensatory and equitable damages that the Court deems appropriate.

415. Defendants' conduct deliberately and intentionally injured McKenna; his acts were willful and malicious and are not dischargeable in bankruptcy.

## COUNT X
### Intrusion Into Seclusion - Riley

416. McKenna incorporates by reference all preceding paragraphs.

417. McKenna maintained privacy concerning details of her professional life.

418. McKenna had a right to keep those intimate details and matters private.

419. Defendant Riley invaded McKenna's privacy by stalking her outside of her hotel room in Orlando, refusing to listen to her many requests to be left alone, and listening to her phone calls, some of which were about Defendant Riley's behavior, while she was in her hotel room.

420. Defendant Riley's conduct was objectionable and would be objectionable to a reasonable person.

56

421. Defendant Riley's conduct as outlined above was objectionable, extreme, outrageous, and beyond all possible bounds of decency, and of such character as to be intolerable in a civilized society.

422. Defendant Riley's conduct was not for any proper purpose, nor was it within the scope of Defendant's authority or otherwise immune or privileged.

423. As a direct and proximate result of Defendant Riley's conduct, McKenna has suffered humiliation, mortification, embarrassment, sleeplessness, and anxiety, among other damages that may arise during the course of discovery, and any other compensatory and equitable damages that the Court deems appropriate.

424. Defendant Riley's conduct deliberately and intentionally injured McKenna; his acts were willful and malicious and are not dischargeable in bankruptcy.

## RELIEF REQUESTED

For all the foregoing reasons, Plaintiff McKenna demands judgment against Defendants as follows:

**Legal Relief:**

1. Compensatory damages from Defendants in whatever amount McKenna is found to be entitled;

2. Exemplary and/or punitive damages from Defendants in whatever amount McKenna is found to be entitled;

3. Consequential damages from Defendants in whatever amount McKenna is found to be entitled;

4. Trial by jury on all issues so triable; and

5. An award of interest, costs and reasonable attorney fees.

57

**Prospective Injunctive (Equitable) Relief**

1. An injunction out of this Court requiring Defendant Riley immediately stop contacting McKenna and to maintain a safe distance from her;

2. An injunction out of this Court requiring all Defendants to stop disparaging McKenna, including but not limited to, throughout the Michigan legal community;

3. An award of interest, costs and reasonable attorney fees; and

4. Whatever other equitable relief appears appropriate at the time of final judgment.


Respectfully submitted,

*Elyse L McKenna*

Elyse L. McKenna (P80192)
Attorney, *Pro se*
5400 Greystone Street
Chevy Chase, MD 20815
(202) 852-2000 / (202) 915-0244 (fax)

Dated: September 9, 2024

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| ELYSE MCKENNA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT F. RILEY, | ) | |
| | ) | CASE NO. |
| and | ) | |
| | ) | |
| RILEY & HURLEY, PC, | ) | |
| | ) | |
| and | ) | |

58

MCK_ESI_00021069

OLSMAN, MACKENZIE, PEACOCK &
WALLACE, PC,

    Defendants.

)
)
)
)
)
)
)

## JURY DEMAND

Plaintiff requests a trial by jury on all issues triable by a jury.

Respectfully submitted,

*Elyse L McKenna*

Elyse L. McKenna (P80192)
Attorney, *Pro se*
5400 Greystone Street
Chevy Chase, MD 20815
(202) 852-2000 / (202) 915-0244 (fax)

Dated: September 9, 2024

59

MCK_ESI_00021070



MCK_ESI_00021071



MCK_ESI_00021072



MCK_ESI_00021073